# EXHIBIT 8

**Table of Contents**

**Filed pursuant to Rule 424(b)(4)**
**Registration No. 333-236626**

**Prospectus**

**$200,000,000**



# GigCapital3, Inc.

## 20,000,000 Units

GigCapital3, Inc., a Delaware corporation (the "Company"), is a newly organized Private-to-Public Equity (PPE)™ company, also known as a blank check company or special purpose acquisition company, formed for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our "initial business combination." We have not identified any potential business combination target and we have not, nor has anyone on our behalf, initiated any substantive business discussions, directly or indirectly, with any potential business combination target. Our efforts to identify a prospective target business will not be limited to a particular industry or geographic region, although we intend to focus on companies in the technology, media, and telecommunications industry.

This is an initial public offering of our securities. We are offering 20,000,000 units at an offering price of $10.00 each. Each unit consists of one share of our common stock, par value $0.0001 per share ("Common Stock"), and three-fourths (3/4) of one redeemable warrant. We refer herein to the units sold in this offering as our "public units," and the components thereof as our "public shares" and "public warrants," respectively. Each whole warrant entitles the holder to purchase one share of Common Stock at a price of $11.50 per share. Each warrant will become exercisable on the later of 30 days after the completion of our initial business combination, or 12 months from the closing of this offering and will expire on the fifth anniversary of the completion of our initial business combination, or earlier upon redemption or liquidation as described in this prospectus. Warrants will only be exercisable for whole shares. As a result, you must purchase at least four units in order to validly exercise your warrants. We have also granted the underwriters, Nomura Securities International, Inc. ("Nomura"), Oppenheimer & Co. Inc. ("Oppenheimer") and Odeon Capital Group LLC ("Odeon"), a 45-day option to purchase up to an additional 3,000,000 units solely to cover over-allotments, if any.

We will provide the purchasers of our public units, or our "public stockholders," with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account described below as of 2 business days prior to consummation of the initial business combination, including interest (which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares, subject to the limitations described herein. If we are unable to complete our initial business combination within 18 months from the closing of this offering, we will redeem 100% of the public shares at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including the interest (which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares, subject to applicable law and as further described herein.

Our sponsor, GigAcquisitions3, LLC, a Delaware limited liability company ("Sponsor"), and the underwriters have committed, pursuant to written agreements, to purchase an aggregate of 893,479 units, at $10.00 per unit in a private placement that will close simultaneously with this offering. Each such unit consists of one share of our Common Stock and three-fourths (3/4) of one redeemable warrant. We refer to these units throughout this prospectus as the "private units" and the shares of Common Stock included therein as the "private shares," and

Table of Contents

the warrants therein as the "private warrants." Among the private units, 650,000 units will be purchased by our Sponsor and 243,479 units will be purchased by the underwriters. A portion of the proceeds from the sale of the private units will be placed in the trust account described below. The private units purchased by the underwriters are deemed underwriter's compensation by Financial Industry Regulatory Authority ("FINRA") pursuant to Rule 5110 of the FINRA Manual.

In February 2020, our Sponsor purchased 5,735,000 shares of Common Stock, or "founder shares," from us for an aggregate purchase price of $25,000, or $0.0044 per share. Up to 750,000 founder shares are subject to forfeiture depending on the extent to which the underwriters' over-allotment option is exercised during this offering. The proceeds from the sale of the founder shares will not be placed in the trust account described below. Our Sponsor is sometimes referred to in this prospectus as our "Founder". Prior to the consummation of this offering, we will issue 5,000 insider shares, solely in consideration of future services, to each of Mr. Weightman, our Vice President and Chief Financial Officer, Mr. Wang, our Software Chief Technical Officer, and Mr. Betti-Berutto, our Hardware Chief Technical Officer (together with the Founder, the "initial stockholders").

Certain funds and entities managed by a registered investment adviser subsidiary of Cohen & Company Inc. (NYSE Amex: COHN) (the "Anchor Investors") have indicated an interest in purchasing up to 1,739,130 (or 2,000,000 if the over-allotment option is exercised in full) public units at $10.00 per unit in this offering. Cohen & Company Inc., through its asset management division, manages approximately $2.8 billion and has significant experience in special purpose acquisition company transactions. Cohen & Company Inc.'s senior management and principals have variously served in management and sponsor roles in four special purpose acquisition companies across several industries since 2015. For a discussion of arrangements with the Anchor Investors, please see "Summary—The Offering—Indication of interest" beginning on page 13.

There is presently no public market for our units, Common Stock or warrants. We intend to apply to list our units on the New York Stock Exchange (the "NYSE"), under the symbol "GIK.U" on or promptly after the date of this prospectus. We cannot guarantee that our securities will be approved for listing on the NYSE. The shares of Common Stock and the warrants constituting the public units will begin separate trading on the 52nd day following the date of this prospectus, unless the underwriters determine that an earlier date is acceptable, and subject to our filing a Current Report on Form 8-K with the U.S. Securities and Exchange Commission (the "SEC") containing an audited balance sheet of the Company reflecting our receipt of the gross proceeds of this offering and issuing a press release announcing when such separate trading will begin. Once the securities comprising the units begin separate trading, we expect that our Common Stock and public warrants will be listed on the NYSE under the symbols "GIK" and "GIK.WS," respectively.

**We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 and will therefore be subject to reduced public company reporting requirements.**

**Investing in our securities involves a high degree of risk. See "Risk Factors" beginning on page 30 for a discussion of information that should be considered in connection with an investment in our securities. Investors will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings.**

Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

| | Price to Public | Underwriting Discount(1) | Proceeds, Before Expenses, to us |
|---|---|---|---|
| **Per Unit** | $ 10.00 | $ 0.60 | $ 9.40 |
| **Total** | $ 200,000,000 | $ 12,000,000 | $ 188,000,000 |

**Table of Contents**

(1)     Includes $0.40 per unit, or $8,000,000 (or up to $9,200,000 if the underwriters' over-allotment option is exercised in full) in the aggregate payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described in this prospectus. As described elsewhere in this prospectus, the deferred underwriting commissions will be payable to the underwriters upon completion of the initial business combination as consideration for certain services to be performed by them. The underwriters will receive compensation in addition to the underwriting discount. See "Underwriting."

Upon consummation of the offering, $10.10 per public unit sold in this offering (whether or not the over-allotment option has been exercised in full or part) will be deposited into a segregated trust account located in the United States with Continental Stock Transfer & Trust Company acting as trustee. Except as described in this prospectus, these funds will not be released to us until the earlier of (1) the completion of our initial business combination within the required time period or (2) our redemption of 100% of the outstanding public shares if we have not completed an initial business combination in the required time period.

The underwriters are offering the public units on a firm commitment basis. The underwriters expect to deliver the public units to purchasers on or about May 18, 2020, subject to customary closing conditions.

*Joint Book-Running Managers*

# Nomura                                                                 Oppenheimer & Co.

*Co-Manager*

## Odeon Capital Group LLC

**The date of this prospectus is May 13, 2020**

**Table of Contents**

**TABLE OF CONTENTS**

|  | **Page** |
|---|---|
| Summary | 1 |
| Summary Financial Data | 29 |
| Risk Factors | 30 |
| Cautionary Note Regarding Forward-Looking Statements | 60 |
| Use of Proceeds | 61 |
| Dividend Policy | 65 |
| Dilution | 66 |
| Capitalization | 68 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 70 |
| Proposed Business | 76 |
| Management | 97 |
| Principal Stockholders | 109 |
| Certain Relationships and Related Party Transactions | 112 |
| Description of Securities | 116 |
| Securities Eligible For Future Sale | 124 |
| Certain United States Federal Income Tax Considerations | 126 |
| Underwriting | 134 |
| Legal Matters | 140 |
| Experts | 140 |
| Where You Can Find Additional Information | 141 |
| Index to Financial Statements | F-1 |

We are responsible for the information contained in this prospectus. We have not authorized anyone to provide you with different information, and we take no responsibility for any other information others may give to you. We are not, and the underwriters are not, making an offer to sell securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than the date on the front of this prospectus.

i

**Table of Contents**

**SUMMARY**

*This summary only highlights the more detailed information appearing elsewhere in this prospectus. As this is a summary, it does not contain all of the information that you should consider in making an investment decision. You should read this entire prospectus carefully, including the information under "Risk Factors" and our financial statements and the related notes included elsewhere in this prospectus before investing. References in this prospectus to "we," "us" or "our company" refer to GigCapital3, Inc. References in this prospectus to our "public shares" are to shares of our Common Stock sold as part of the public units in this offering (whether they are purchased in this offering or thereafter in the open market) and references to "public stockholders" refer to the holders of our public shares, including our Sponsor (as defined below), executive officers and directors to the extent they purchase public shares, provided that their status as "public stockholders" shall only exist with respect to such public shares. References in this prospectus to our "management" or our "management team" refer to our executive officers and directors, references to our "Sponsor" refer to GigAcquisitions3, LLC, a company affiliated with our executive officers, directors and our other advisors and references to our "combined team" refer to our management team and our other advisors, collectively. Unless we tell you otherwise, the information in this prospectus assumes that the underwriters will not exercise their over-allotment option. You should rely only on the information contained in this prospectus. We have not, and the underwriters have not, authorized anyone to provide you with different information. We are not, and the underwriters are not, making an offer of these securities in any jurisdiction where the offer is not permitted. "Private-to-Public Equity (PPE) TM" and "Mentor-Investor TM" are trademarks of GigFounders, LLC, an affiliate of our Sponsor, and all are used pursuant to an agreement.*

**General**

We are a newly organized Private-to-Public Equity (PPE) company, also known as a blank check company or special purpose acquisition company, incorporated in Delaware and formed for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We have not identified any potential initial business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any potential initial business combination target.

We will seek to capitalize on the significant experience and contacts of our management team to complete our initial business combination. We believe our management team's distinctive background and record of acquisition and operational success could have a significant impact on target businesses. Although we may pursue our initial business combination in any business, industry or geographic location, we currently intend to focus on opportunities to capitalize on the ability of our management team, particularly our executive officers, to identify, acquire and operate a business in the technology, media and telecommunications ("TMT") industry. In particular, we intend to target TMT and other companies anywhere in the world that embrace today's digital transformation and experience as a competitive advantage. Digital transformation is driving value extraction across all industries. Statista forecasts that there will be 3.5 billion smartphone users worldwide in 2020, and IDC estimates that third platform technology, such as cloud services, mobile computing and big data analytics, will account for over 40% of information and communication technology spending for businesses across all industries.[1] Data center traffic is projected to reach 17 Zettabytes in 2020,

[1]  Statista, Number of smartphone users worldwide from 2016 to 2021; IDC White Paper, The 3rd Platform: Enabling Digital Transformation, (Nov. 2013).

1

**Table of Contents**

with ninety-four percent (94%) of the data center traffic coming from the cloud, and the global datasphere is projected to grow to 175 Zettabytes by 2025.[2] We believe that data has become a valuable asset and managing, and deriving insights from, data can transform customer experience, operational processes and business models. We believe that embracing today's digital transformation and experience enables both organic and inorganic fast pace growth, creating new strategic, operational and business opportunities fueled by emerging cloud, analytics, big data, and cognitive technologies. Being conscientious corporate citizens, we will focus on sustainable technology companies that can shape a better society and healthier environment. We intend to evaluate both private and public companies as potential initial business combination targets, focusing on opportunities that we believe would provide appropriate risk adjusted returns to stockholders. Following our initial business combination, our objective will be to implement or support the acquired company's operating strategies in order to generate additional value for stockholders. General goals may include additional acquisitions and operational improvements.

Our management team has significant hands-on experience helping TMT companies optimize their existing and new growth initiatives by exploiting insights from rich data assets that already exist within most TMT companies. We intend to apply a unique "Mentor-Investor" philosophy to partner with our targets where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company. Further, we intend to share best practices and key learnings, gathered from our management team's operating and investing experience, as well as strong relationships in the TMT industry, to help shape corporate strategies. Additionally, our management team has operated and invested in leading global TMT companies across their corporate life cycles and has developed deep relationships with key large multi-national organizations and investors. We believe that these relationships and our management team's know-how present a significant opportunity to help drive strategic dialogue, access new customer relationships and achieve global ambitions following the completion of our initial business combination.

Over the last several years, there has been an increase in private equity and venture backed capital invested in TMT companies. PricewaterhouseCoopers LLP ("PwC") estimates that global venture capital investment in 2019 resulted in a total of approximately $213 billion invested in 15,564 deals worldwide, with companies in the technology sectors receiving most of the investment.[3] This was an increase over the approximately $207 billion that PwC estimated was invested in 14,247 deals worldwide in 2018.[4] The total number of U.S. initial public offerings ("IPOs") in 2019 was approximately 165, which was a decrease of 20% from 2018.[5] Median deal size of IPOs was approximately $100 million for the third year in a row, and slightly up from 2018.[6] However, 9 IPOs raised over $1 billion, and the 10 largest IPOs raised $22 billion, or nearly half of total proceeds, as 2019 saw a number of mega unicorns (companies valued at $1 billion or more) conduct their IPOs.[7] Furthermore, 2019 was

[2] Statista, Global data center IP traffic 2012-2021, by data center type, (March 2020); IDC White Paper, The Digitization of the World - From Edge to Core, (Nov. 2018).
[3] PwC / CBInsights MoneyTree™ Report Q4 2019.
[4] PwC / CBInsights MoneyTree™ Report Q4 2018.
[5] EY, Global IPO Trends: Q4 2019. Compare to Renaissance Capital which estimates that there were 159 U.S. IPOs in 2019. Renaissance Capital, US IPO Market 2019 Annual Review.
[6] Renaissance Capital, US IPO Market 2019 Annual Review.
[7] Renaissance Capital, US IPO Market 2019 Annual Review.

Table of Contents

the largest year ever for both the numbers of blank check companies conducting IPOs and the amount of proceeds raised by such companies, with 59 IPOs of blank check companies that raised $13.6 billion.[8] As a result of the increased number of blank check company IPOs, blank check company IPOs represented a larger percentage of the IPOs in 2019 than in the prior ten years.[9] In addition, the number of blank check IPOs (59) exceeded the number of technology IPOs (52) in the U.S. in 2019.[10] Of the 59 IPOs that were conducted by blank check companies in 2019, approximately 20.2% were focused on TMT, and those companies raised approximately $2.7 billion in their IPOs.[11] In light of these market conditions, we intend to primarily focus our target sourcing efforts on private companies that we believe would benefit from a public listing and that are not otherwise gaining access to public capital in this current market environment. Furthermore, we believe that we are providing an interesting alternative investment opportunity that capitalizes on key trends impacting the capital markets for TMT companies.

We believe that our management team is well positioned to identify attractive businesses within the TMT industry that would benefit from access to the public markets and the skills of our management team. Our objective is to consummate our initial business combination with such a business and enhance stockholder value by improving its operational performance. We believe we can achieve this objective by utilizing our management team's extensive experience in both TMT industry transactions and operating TMT companies in combination with our management team's network of contacts in the TMT industry. We believe many companies in the TMT industry could benefit from access to the public markets but have been unable to do so due to a number of factors, including the time it takes to conduct a traditional IPO, market volatility and pricing uncertainty. We intend to focus on evaluating more established companies with leading competitive positions, strong management teams and strong long-term potential for revenue growth and margin expansion.

Our Sponsor, GigAcquisitions3, LLC, was founded and is managed by and affiliated with Dr. Avi S. Katz, who is also the Executive Chairman of our board of directors ("Board of Directors"), and our Chief Executive Officer, President and Secretary. Dr. Katz has spent approximately 33 years in international executive positions within the TMT industry, working for privately held start-ups, middle-cap companies and large enterprises. In these roles, Dr. Katz has been instrumental in launching and accelerating entities, building teams, large scale fund-raising, developing key alliances and technology partnerships, M&A activities, business development, financial management, global operations and sales and marketing. In October 2017, Dr. Katz founded GigCapital, Inc. ("GIG1"), a Private-to-Public Equity (PPE) company formed for the purpose of acquiring a company in the technology industry. GIG1 completed its initial public offering in December 2017, in which it sold 14,375,000 units at price of $10.00 per unit, with each unit consisting of one share of GIG1 common stock, three-fourths (3/4) of one warrant to purchase one share of GIG1 common stock and one right to receive one-tenth (1/10) of one share of GIG1 common stock, generating aggregate proceeds of $143,750,000, and, at that time, was listed on the NYSE under the symbol "GIG." On February 22, 2019, after intensive screening of more than 400 companies worldwide, GIG1 entered into a stock purchase agreement to acquire Kaleyra S.p.A., a company with shares formed under the laws of Italy ("Kaleyra"), at a transaction enterprise value of $187 million with combined cash and/or promissory note consideration of $15 million. Kaleyra is a global company specialized in providing mobile messaging services for financial institutions and companies of all sizes. The transaction closed on November 25, 2019, and GIG1 was renamed Kaleyra, Inc. and listed on the NYSE American stock exchange under the symbol "KLR" at that time. Dr. Katz has served as the Executive Chairman of Kaleyra, Inc. since the consummation of the transaction in November 2019. In March 2019, Dr. Katz founded GigCapital2, Inc. ("GIG2"), a Private-to-Public Equity (PPE) company formed for the purpose of acquiring a company in the TMT industry. GIG2 completed its initial public offering in June 2019, in which it sold 17,250,000 units at a per unit

[8]   Barrons, *2019 Was a Record Year for 'Blank-Check' Companies. Here Are the Biggest Trends.*, (Feb. 6, 2020).
[9]   Renaissance Capital, US IPO Market 2019 Annual Review.
[10] EY, Global IPO Trends: Q4 2018. CBInsights, The 2019 Tech IPO Pipeline.
[11] SPAC Research, SPACs: By The Numbers, (Feb. 2020).

Table of Contents

price of $10.00, with each unit consisting of one share of GIG2 common stock, one warrant to purchase one share of GIG2 common stock, and one right to receive one-twentieth (1/20) of one share of GIG2 common stock, generating aggregate proceeds of $172,500,000. GIG2 is listed on the NYSE under the symbol "GIX." GIG2 is engaged in intensive efforts of searching and screening companies worldwide, and has not yet completed its initial business combination. Dr. Katz serves as the Executive Chairman and Secretary of GIG2. He is also the co-founder of Cognizer, Inc., ("Cognizer") a software company specializing in deep-learning powered natural language artificial intelligence, and has been the Executive Chairman of Cognizer's board of directors since March 2019. Prior to GIG1 and GIG2, Dr. Katz dedicated 10 years to bootstrap, develop and manage GigPeak, Inc. ("GigPeak," NYSE American: formerly GIG), originally known as GigOptix, Inc. He served as Chairman of the Board, Chief Executive Officer and President of GigPeak. From its inception in 2007, which occurred through the acquisition of assets valued at less than $1 million, until its sale in April 2017 to Integrated Device Technology, Inc. (Nasdaq: IDTI) ("IDT") for $250 million in cash, GigPeak provided semiconductor integrated circuits (ICs) and software solutions for high-speed connectivity and video compression. While Dr. Katz was at GigPeak's helm, the company completed 10 M&A deals. From 2003 to 2005, Dr. Katz was the chief executive officer, president, and member of the board of directors of Intransa, Inc., which at the time provided full-featured, enterprise-class IP-based Storage Area Networks (SAN). From 2000 to 2003, Dr. Katz was the Chief Executive Officer and a member of the board of directors of Equator Technologies, Inc. ("Equator Technologies"), which at the time sought to commercialize leading edge programmable media processing platform technology for the rapid design and deployment of digital media and imaging products. Equator Technologies was sold to Pixelworks, Inc. for $110 million in 2005. Dr. Katz has held several leadership positions over the span of his career within the technology industry since serving as Member of Technical Staff at AT&T Bell Laboratories in the 1980s, and has made numerous angel investments in high-tech companies around the world. Dr. Katz is a graduate of the Israeli Naval Academy and holds a B.Sc. and Ph.D. in Semiconductors Materials from the Technion (Israel Institute of Technology). He is a serial entrepreneur, holds many U.S. and international patents, has published many technical papers and is the editor of a number of technical books.

With respect to the foregoing examples, the past performance of the members of our management team or their affiliates, including with respect to GIG1 and GIG2, and their engagement in the TMT markets, is not a guarantee that we will be able to identify a suitable candidate for our initial business combination or of success with respect to any business combination we may consummate. You should not rely on the historical record of the performance of our management or any of its affiliates' performance, including GIG1 and GIG2, as indicative of our future performance. In addition, members of our management team and their affiliates are likely to form other Private-to-Public Equity (PPE) companies prior to the completion of our initial business combination. Any future Private-to-Public (PPE) companies, while also focusing on TMT, will likely address other verticals to avoid competition with GigCapital3.

**Business Strategy**

Our business strategy is to identify and complete our initial business combination with a company that complements the experience of our management team and can benefit from our management team's operational expertise. Our selection process is expected to leverage our management team's broad and deep relationship network and unique TMT industry expertise, including proven deal-sourcing and structuring capabilities, to provide us with a multitude of business combination opportunities. Our management team has experience:

- operating companies, setting and changing strategies, and identifying, mentoring and recruiting world-class talent;
- developing and growing companies, both organically and inorganically, and expanding the product ranges and geographic footprints of a number of businesses;

4

Table of Contents

- sourcing, structuring, acquiring and selling businesses and achieving synergies to create stockholder value;
- establishing a wide deal flow and efficient methodology of screening superior M&A targets worldwide;
- partnering with industry-leading companies to increase sales and improve the competitive position of those companies;
- addressing business and technological changes in an evolving global TMT landscape;
- evaluating the viability of emerging TMT business models;
- fostering relationships with sellers, capital providers and target management teams; and
- accessing the capital markets across various business cycles, including financing businesses and assisting companies with the transition to public ownership.

Following the completion of this offering, we intend to begin the process of communicating with our management team and its affiliates' network of relationships worldwide to articulate the parameters for our search for a potential target initial business combination and begin the process of pursuing and reviewing potential opportunities.

**Business Combination Criteria**

Consistent with our strategy, we have identified general criteria and guidelines that we believe are important in evaluating prospective target businesses and, when evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews and inspection of facilities, as applicable, as well as a review of financial and other information that will be made available to us. We are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion. We intend to use the following and other criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet any or all of these criteria or guidelines:

- *Companies that embrace today's digital transformation and experience.* We will seek TMT and other companies anywhere in the world that are embracing today's digital transformation and experience as a competitive advantage. We believe that an embrace of today's digital transformation and experience enables both organic and inorganic growth, creating new strategic, operational and business opportunities fueled by the emerging cloud, analytics, big data and cognitive technologies. Being conscientious corporate citizens, we will focus on sustainable technology companies that can shape a better society and healthier environment.
- *Companies that will benefit from a public listing.* We will primarily seek companies that we believe will benefit from being publicly traded, and that will be able to effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.
- *Companies that will benefit from our industry expertise and relationships.* We will seek companies that will be best positioned to leverage our industry expertise, insights and relationships to create opportunities for value creation, whether acquisitions, capital investments in organic growth opportunities, generating greater operating efficiencies or significantly improving financial performance. We believe our strategy leverages our management team's distinctive background and vast network of industry leaders in the TMT industry. We will seek to identify such opportunities for value creation in evaluating potential business combinations.
- *Companies that are market-leading participants.* We will seek a target that has an established business and market position. While we will focus on TMT businesses, we will not seek a target that is pre-revenue or in early stages of development with unproven technologies.

5

Table of Contents

- *Companies that are small and mid-sized businesses ("SMB").* We believe targeting companies in the SMB market will provide the greatest number of opportunities for investment and will maximize the benefits of the collective network of our management team and its affiliates.
- *Companies with strong management.* We will prioritize entities with well-established, proven and talented management teams that wish to continue to drive their companies to growth and are eager to succeed with support from an interactive and hands-on board of directors. To the extent we believe it will enhance stockholder value, we would seek to selectively supplement the existing leadership of the business with proven leaders from our network, whether at the senior management level or at the board level.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management team may deem relevant.

### Initial Business Combination

We will either (1) seek stockholder approval of our initial business combination at a meeting called for such purpose at which stockholders may seek to convert their shares, regardless of whether they vote for or against the proposed business combination, into their pro rata share of the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable), or (2) provide our stockholders with the opportunity to sell their shares to us by means of a tender offer (and thereby avoid the need for a stockholder vote) for an amount equal to their pro rata share of the aggregate amount then on deposit in the trust account (net of taxes payable), in each case subject to the limitations described herein. The decision as to whether we will seek stockholder approval of our proposed business combination or allow stockholders to sell their shares to us in a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would otherwise require us to seek stockholder approval. Unlike other blank check companies which require stockholder votes and conduct proxy solicitations in conjunction with their initial business combinations and related conversions of public shares for cash upon consummation of such initial business combinations even when a vote is not required by law, we will have the flexibility to avoid such stockholder vote and allow our stockholders to sell their shares pursuant to the tender offer rules of the SEC. In that case, we will file tender offer documents with the SEC, which will contain substantially the same financial and other information about the initial business combination as is required under the SEC's proxy rules. We will consummate our initial business combination only if we have net tangible assets of at least $5,000,001 upon such consummation and, if we seek stockholder approval, the affirmative vote of the holders of a majority of the shares of the Common Stock that are voted at a stockholder meeting held to consider the initial business combination.

We will have until 18 months from the closing of this offering to consummate an initial business combination. If we are unable to consummate an initial business combination within such time period, we will, as promptly as reasonably possible but not more than 10 business days thereafter, redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including any interest earned on the funds held in the trust account and net of interest that may be used by us to pay our franchise and income taxes payable, and less up to $100,000 of interest to pay dissolution expenses, divided by the number of then outstanding public shares, which redemption will completely extinguish the public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law and as further described herein, and then seek to dissolve and liquidate. We expect the pro rata redemption price to be approximately $10.10 per share of Common Stock (regardless of whether or not the underwriters exercise their over-allotment option), without taking into account any interest earned on such funds. However, we cannot assure you that we will in fact be able to distribute such amounts as a result of claims of creditors, which may take priority over the claims of our public stockholders.

6

Table of Contents

Our initial business combination must occur with one or more target businesses that together have a fair market value of at least 80% of the assets held in the trust account (excluding the deferred underwriting commissions and any taxes payable on interest earned) at the time of the agreement to enter into the initial business combination. The fair market value of the target or targets will be determined by our Board of Directors based upon one or more standards generally accepted by the financial community (such as actual and potential sales, earnings, cash flow and/or book value). Even though our Board of Directors will rely on generally accepted standards, our Board of Directors will have discretion to select the standards employed. In addition, the application of the standards generally involves a substantial degree of judgment. Accordingly, investors will be relying on the business judgment of the Board of Directors in evaluating the fair market value of the target or targets. The proxy solicitation materials or tender offer documents used by us in connection with any proposed transaction will provide public stockholders with our analysis of the fair market value of the target business, as well as the basis for our determinations. If our Board of Directors is not able independently to determine the fair market value of the target business or businesses, we may obtain an opinion from an independent investment banking firm, or another independent entity that commonly renders valuation opinions on the type of target business we are seeking to acquire, with respect to the satisfaction of such criteria. However, unless we consummate our initial business combination with an affiliated entity, our Board of Directors is not required to obtain an opinion from an independent investment banking firm or another independent entity that the price we are paying is fair to our stockholders from a financial point of view.

We currently anticipate structuring a business combination to acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination where we merge directly with the target business or where we acquire less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. In this case, we could acquire a 100% controlling interest in the target; however, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% fair market value test.

As more fully discussed in "*Management—Conflicts of Interest,*" if any of our officers or directors becomes aware of a business combination opportunity that falls within the line of business of any entity to which he or she has fiduciary or contractual obligations, he or she may be required to present such business combination opportunity to such entity prior to presenting such business combination opportunity to us. Certain of our directors currently have, and any of our officers or directors may in the future have, certain relevant fiduciary duties or contractual obligations.

In addition, our Sponsor, officers and directors may participate in the formation of, or become an officer or director of, any other blank check company prior to completion of our initial business combination. As a result, our Sponsor, officers or directors could have conflicts of interest in determining whether to present business combination opportunities to us or to any other blank check company with which they may become involved. In particular, an affiliate of our Sponsor is currently sponsoring GIG2, which may seek to complete a business

7

Table of Contents

combination in the TMT industry. Further, there is significant overlap among the directors and officers of GIG2 and our company. Dr. Katz, our Chief Executive Officer and Chairman, serves as Executive Chairman of GIG2. Certain of our directors, Dr. Raluca Dinu and Neil Miotto and John Mikulsky, are members of the board of directors of GIG2. Dr. Dinu also serves as the Chief Executive Officer of GIG2. Our directors Peter Wang and Andrea Betti-Berutto serve as the Software Chief Technical Officer and Hardware Chief Technical Officer, respectively, of GIG2, and have similar roles with us. Messrs. Wang and Betti-Berutto are not officers or employees of our company; their respective titles of Software Chief Technical Officer and Hardware Chief Technical Officer reflect their core competencies and expertise and are primarily for marketing purposes as they assist our company to identify suitable business combination candidates. Finally, Brad Weightman, our Chief Financial Officer, serves as the Chief Financial Officer of GIG2. In addition, there is overlap among our directors and the directors of Kaleyra, Inc. as Dr. Katz and Messrs. Miotto and Mikulsky are also directors of that company, which may also seek to acquire companies in the TMT industry. Furthermore, Dr. Dinu chairs, and Mr. Wang is a member of, the Strategic Advisory Board of Kaleyra, Inc. Any such companies, including GIG2 and Kaleyra, Inc., may present additional conflicts of interest in pursuing an acquisition target. However, we do not believe that any potential conflicts would materially affect our ability to complete our initial business combination, particularly as we are planning to focus the target search of our company in different TMT verticals.

### Emerging Growth Company Status and Other Information

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.07 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Common Stock that is held by non-affiliates exceeds $700 million as of the prior June 30, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to emerging growth company shall have the meaning assigned to it in the JOBS Act.

### Corporate Information

Our executive offices are located at 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303, and our telephone number is (650) 276-7040.

Table of Contents

---

### THE OFFERING

In making your decision on whether to invest in our securities, you should take into account not only the backgrounds of the members of our management team, but also the special risks we face as a blank check company and the fact that this offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. You will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. You should carefully consider these and the other risks set forth in the section below entitled "Risk Factors."

| | |
|---|---|
| **Securities offered** | 20,000,000 units (or 23,000,000 units if the underwriters' over-allotment option is exercised in full), at $10.00 per unit, each unit consisting of: <ul><li>one share of Common Stock; and</li><li>three-fourths (3/4) of one warrant to purchase one share of Common Stock at a price of $11.50 per share, subject to adjustment as described in this prospectus.</li></ul> |
| **Listing of our securities and proposed symbols** | We anticipate that the units, as well as the shares of Common Stock and warrants underlying the units (once they begin separate trading), will be listed on the New York Stock Exchange (the "NYSE") under the symbols "GIK.U," "GIK," and "GIK.WS," respectively. Each of the units, shares of Common Stock and warrants may trade separately on the 52nd day after the date of this prospectus unless the underwriters determine that an earlier date is acceptable. In no event will the underwriters allow separate trading of our Common Stock and warrants until we file a Current Report on Form 8-K with the SEC with an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. Once our Common Stock and warrants commence separate trading, the holders thereof will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Common Stock and warrants. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least four units, you will not be able to receive or trade whole warrants. We will file a Current Report on Form 8-K with the SEC, including an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering, promptly upon the closing of this offering, which is anticipated to take place two business days from the date the units commence trading. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the over-allotment option. We will also include in the initial Current Report, or any amendment thereto or subsequent filing, as applicable, information indicating if the underwriters have allowed separate trading of the shares of Common Stock and warrants prior to the 52nd day after the date of this prospectus. |

9

**Table of Contents**

**Units:**

| | |
|---|---|
| **Issued and outstanding before this offering** | 0 units |
| **Issued and outstanding after this offering and the concurrent private placement** | 20,893,479 units [1] |

**Shares of Common Stock:**

| | |
|---|---|
| **Issued and outstanding before this offering** | 5,750,000 shares [2] |
| **Issued and outstanding after this offering and the concurrent private placement** | 25,893,479 shares [3] |

**Warrants to purchase Common Stock:**

| | |
|---|---|
| **Outstanding before this offering** | 0 warrants |
| **Outstanding after this offering and the concurrent private placement** | 15,670,108 warrants [4] |
| **Exercisability** | Each whole warrant is exercisable for one share of Common Stock. The warrants may only be exercisable for whole shares of Common Stock. |
| **Exercise price** | $11.50 per share of Common Stock, subject to adjustment as described in this prospectus. In addition, if (x) we issue additional shares of Common Stock or equity-linked securities for capital raising purposes in connection with the closing of our initial business combination at an issue price or effective issue price of less than $9.20 per share of Common Stock (with such issue price or effective issue price to be determined in good faith by our Board of Directors, and in the case of any such issuance to our Founder or its affiliates, without taking into account any founder shares held by them prior to |

[1] Assumes no exercise of the underwriters' over-allotment option and includes, accordingly, an aggregate of 893,479 private units sold concurrently with the closing of this offering.

[2] Consists of the 5,735,000 founder shares issued prior to the consummation of this offering and 15,000 insider shares issued prior to the consummation of this offering, and includes 750,000 founder shares subject to forfeiture by our Founder depending on the extent to which the underwriters' over-allotment option is exercised.

[3] Assumes no exercise of the underwriters' over-allotment option, and includes, accordingly, (i) an aggregate of 650,000 private units with 650,000 private shares purchased by our Sponsor, (ii) 243,479 private units with 243,479 private shares purchased by the underwriters, and (iii) assumes, accordingly, that an aggregate of 750,000 founder shares have been forfeited.

[4] Assumes no exercise of the underwriters' over-allotment option and includes, accordingly, private warrants to purchase 670,108 shares of Common Stock sold concurrently with the closing of this offering.

10

Table of Contents

| | |
|---|---|
| | such issuance), (y) the aggregate gross proceeds from such issuances represent more than 65% of the total equity proceeds, and interest thereon, available for the funding of our initial business combination on the date of the consummation of our initial business combination (net of redemptions), and (z) the volume weighted average trading price of our Common Stock during the 20 trading-day period starting on the trading day prior to the day on which we consummate our initial business combination (such price, the "Market Value") is below $9.20 per share, the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the greater of (i) the Market Value or (ii) the price at which we issue the additional shares of Common Stock or equity-linked securities. On the exercise of any warrant, the exercise price will be paid directly to us and not placed in the trust account. We are not registering the shares of Common Stock issuable upon exercise of the warrants (the "warrant shares") at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement for the registration under the Securities Act of the warrant shares and thereafter use our best efforts to cause the registration statement to become effective and to maintain the effectiveness of such registration statement until the expiration of the warrants. No warrants will be exercisable for cash unless we have an effective and current registration statement covering the issuance of the warrant shares and a current prospectus relating thereto. If a registration statement covering the issuance of the warrant shares is not effective within 90 days following the consummation of our initial business combination, warrant holders may nevertheless, until such time as there is such an effective registration statement and during any period when we shall have failed to maintain such an effective registration statement, exercise warrants on a cashless basis in accordance with Section 3(a)(9) of the Securities Act. In this circumstance, each holder would pay the exercise price by surrendering warrants exercisable for the number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying such warrants and the difference between the exercise price of such warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" means the average reported last sale price of the shares of Common Stock for the five trading days ending on the trading day prior to the date of exercise. |
| **Exercise period** | The warrants will become exercisable on the later of:<br>• 30 days after the completion of our initial business combination; and<br>• 12 months from the closing of this offering. |

11

Table of Contents

| | |
|---|---|
| **Redemption of Warrants** | The warrants will expire at 5:00 p.m., New York City time, on the fifth anniversary of our completion of an initial business combination, or earlier upon redemption. No fractional shares will be issued upon exercise of the warrants, and only whole warrants will trade. If, upon exercise of the warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round down to the nearest whole number of shares of Common Stock to be issued to the warrant holder.<br><br>Once the warrants become exercisable, we may redeem the outstanding warrants (excluding the private warrants):<br><br>• in whole and not in part;<br>• at a price of $0.01 per warrant;<br>• upon a minimum of 30 days' prior written notice of redemption, which we refer to as the 30-day redemption period; and<br>• if, and only if, the last reported sale price of our Common Stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which we send the notice of redemption to the warrant holders.<br><br>We will not redeem the warrants unless a registration statement under the Securities Act covering the issuance of the warrant shares underlying the warrants to be so redeemed is then effective and a current prospectus relating to those warrant shares is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.<br><br>If the foregoing conditions are satisfied and we issue a notice of redemption, each warrant holder may exercise his, her or its warrants prior to the scheduled redemption date. However, the price of the shares of Common Stock may fall below the $18.00 trigger price (as adjusted) as well as the $11.50 exercise price (as adjusted) after the redemption notice is issued.<br><br>The redemption criteria for our warrants have been established at a price which is intended to provide warrant holders a reasonable premium to the initial exercise price and provide a sufficient differential between the then-prevailing share price and the exercise price so that if the share price declines as a result of our redemption call, the redemption will not cause the share price to drop below the exercise price of the warrants. |

12

Table of Contents

|  |  |
|---|---|
|  | If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In making such determination, our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of warrant shares issuable upon exercise of outstanding warrants. In such event, the holder would pay the exercise price by surrendering the warrants for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of warrant shares underlying the warrants to be so exercised, and the difference between the exercise price of the warrants and the fair market value by (y) the fair market value. |
|  | No fractional shares of Common Stock will be issued upon redemption. If, upon redemption, a holder would be entitled to receive a fractional interest in a share, we will round down to the nearest whole number of the number of shares of Common Stock to be issued to the holder. |
| **Indication of interest** | The Anchor Investors have indicated to us an interest to purchase up to 1,739,130 (or 2,000,000 if the over-allotment option is exercised in full) public units at $10.00 per unit in this offering and we have agreed to direct the underwriters to sell to the Anchor Investors such number of public units. There can be no assurance that the Anchor Investors will acquire any public units in this offering. |
|  | The Anchor Investors will not have any rights to the funds held in the trust account beyond the rights afforded to our public stockholders, as described herein. |
| **Founder Shares and Insider Shares** | In February 2020, our Sponsor purchased 5,735,000 founder shares for an aggregate purchase price of $25,000, or $0.0044 per share. Up to 750,000 founder shares are subject to forfeiture depending on the extent to which the underwriters' over-allotment option is exercised during this offering. |
|  | The number of founder shares, and the forfeiture mechanism underlying the founder shares, has been determined in order to ensure that the founder shares and insider shares will collectively represent 20% of the outstanding shares of Common Stock (excluding the private shares) upon completion of this offering and the exercise of the underwriters' over-allotment option, if any. If we increase or decrease the size of this offering pursuant to Rule 462(b) under the Securities Act, we will effect a share dividend or a share contribution back to capital, as applicable, immediately prior to the consummation of the offering, in such amount as to maintain the collective ownership of the initial stockholders, prior to this offering at approximately 20% of our issued and outstanding shares of Common Stock (excluding the private shares) upon the consummation of this |

13

Table of Contents

| | |
|---|---|
| | offering. Prior to the investment in the Company of an aggregate of $25,000 by our Founder, we had no assets, tangible or intangible.<br><br>Prior to the consummation of this offering, we will issue 5,000 insider shares, solely in consideration of future services, to each Mr. Weightman, our Vice President and Chief Financial Officer, Mr. Wang, our Software Chief Technical Officer, and Mr. Betti-Berutto, our Hardware Chief Technical Officer. |
| **Private units** | Our Sponsor and the underwriters have committed, pursuant to written agreements, to purchase an aggregate of 893,479 private units (or 969,000 private units if the underwriters' over-allotment is exercised in full) at $10.00 per unit in a private placement that will close simultaneously with this offering.<br><br>A portion of the purchase price of the private units will be added to the proceeds of this offering to be held in the trust account described below. If we do not complete our initial business combination within 18 months from the closing of this offering, the proceeds from the sale of the private units held in the trust account will be used to fund the redemption of our public shares (subject to the requirements of applicable law) and the warrants included in the private units will expire worthless. The private units are identical to the public units, except that the underlying warrants: (i) will not be redeemable by us and (ii) may be exercised for cash or on a cashless basis, as described in this prospectus, so long as they are held by our Sponsor, the underwriters or any of their respective permitted transferees. If the warrants included in the private units are held by holders other than our Sponsor, the underwriters or any of their respective permitted transferees, then the warrants included in the private units will be redeemable by us and exercisable by the holders on the same basis as the public warrants. In the event of a liquidation prior to our initial business combination, the warrants included in the private units will expire worthless.<br><br>The private units purchased by the underwriters are deemed underwriter's compensation by FINRA pursuant to Rule 5110 of the FINRA Manual. |
| **Transfer restrictions applicable to founder shares, insider shares and private units** | Except with respect to Permitted Transferees as described herein under "*Principal Stockholders*," our initial stockholders and the underwriters have agreed not to transfer, assign or sell any of their respective founder shares, insider shares, private units or any securities underlying the private units that they may hold until the date that is (i) in the case of the founder shares and insider shares, the earlier of (A) 12 months after the date of the consummation of our initial business combination or (B) subsequent to our initial business combination, (x) the date on which the last sale price of our Common |

14

**Table of Contents**

|  |  |
|---|---|
|  | Stock equals or exceeds $12.50 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 90 days after our initial business combination, or (y) the date on which we consummate a liquidation, merger, stock exchange or other similar transaction after our initial business combination which results in all of our stockholders having the right to exchange their shares of Common Stock for cash, securities or other property, and (ii) in the case of the private units or any securities underlying the private units, until 30 days after the completion of our initial business combination. Any Permitted Transferees would be subject to the same restrictions and other agreements of our initial shareholders with respect to any founder shares. We refer to such transfer restrictions throughout this prospectus as the "lock-up." |
| **Voting arrangements with our Founder, underwriters and related parties** | Our initial stockholders and the underwriters have each entered into letter agreements with us, pursuant to which they have agreed: (1) to waive their redemption rights with respect to any shares of Common Stock held by them, insofar as such rights would enable them to receive funds from the trust account, in connection with the completion of our initial business combination; and (2) to waive their rights to liquidating distributions from the trust account with respect to any founder shares or insider shares they hold and any shares of Common Stock included in the private units they purchase if we fail to complete our initial business combination within 18 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our initial business combination within the prescribed time frame. If we submit an initial business combination to our stockholders for a vote, our initial stockholders and the underwriters have agreed, pursuant to such agreements, to vote any shares of Common Stock held by them in favor of such initial business combination. As a result, in addition to the founder shares, insider shares, shares of Common Stock included in the private units that our Sponsor and the underwriters have committed to purchase (as described above), we would need approximately 7,053,261 public shares, or approximately 35.27% of the 20,000,000 public shares sold in this offering, to be voted in favor of a transaction (assuming all issued and outstanding shares are voted, the over-allotment option is not exercised and 750,000 founder shares have been forfeited) in order to have such initial business combination approved. |
| **Offering proceeds to be held in the trust account** | The rules of the NYSE provide that at least 90% of the gross proceeds from this offering and the sale of the units be deposited in a trust account. Of the $208,934,790 gross proceeds we will receive from this offering and the sale of the private units (or $239,690,000 if the |

15

**Table of Contents**

over-allotment option is exercised in full), an aggregate of $202,000,000 (or $10.10 per unit), or $232,300,000 (or $10.10 per unit) if the over-allotment option is exercised in full, will be placed in a segregated trust account located in the United States maintained by Continental Stock Transfer & Trust Company acting as trustee pursuant to an agreement to be signed on the date of this prospectus. The funds in the trust account will be invested only in specified U.S. government treasury bills or in specified money market funds.

Except as set forth below, the proceeds held in the trust account will not be released until the earlier of: (1) the completion of our initial business combination within the required time period; (2) our redemption of 100% of the outstanding public shares if we have not completed an initial business combination in the required time period; or (3) our redemption of our public shares in connection with the approval of any amendment to the provisions of our amended and restated certificate of incorporation governing our pre-initial business combination activity and related stockholders' rights. Therefore, unless and until our initial business combination is consummated, the proceeds held in the trust account will not be available for our use for any expenses related to this offering or expenses which we may incur related to the investigation and selection of a target business and the negotiation of an agreement to acquire a target business. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders.

Unless and until we complete our initial business combination, no proceeds held in the trust account will be available for our use, except the withdrawal of interest to pay taxes. Based upon current interest rates, we expect the trust account to generate approximately $3,131,000 of interest annually (assuming an interest rate of 1.55% per year). Unless and until we complete our initial business combination, we may pay our expenses only from:

- that portion of the net proceeds of this offering and the sale of the private units not held in the trust account, which will be approximately $1,934,790 in working capital after the payment of approximately $1,000,000 (excluding the underwriters' discounts and commissions) in offering expenses relating to this offering; and
- any loans or additional investments from our Sponsor, members of our management team or any of their affiliates or other third parties, although they are under no obligation to loan funds or invest in us and provided that any such loans will not have any claim on the proceeds held in the trust account unless such proceeds are released to us upon completion of our initial business combination.

| | |
|---|---|
| **Limited payments to insiders** | There will be no fees, reimbursements or other cash payments paid to our Founder, officers and directors, or their affiliates prior to, or for |

16

Table of Contents

any services they render in order to effectuate, the consummation of our initial business combination (regardless of the type of transaction that it is) other than the following payments, none of which will be made from that portion of the proceeds of this offering and the sale of the private units held in the trust account prior to the consummation of our initial business combination:

- payment to an affiliate of our Sponsor, GigFounders, LLC, of a total of $20,000 per month for office space and administrative and support services;
- payment to Sponsor of $100,000, which Sponsor has made available to us as a general working capital loan evidenced by a promissory note and which has an outstanding principal amount of $100,000 as of February 24, 2020;
- payment to Mr. Weightman, our Chief Financial Officer, for his services in such capacity in an amount initially set at $5,000 per month, subject to variability based on the scope of work but not to exceed $15,000 per month;
- reimbursement of out-of-pocket expenses incurred by our executive officers and directors and advisory fees to directors in connection with certain activities on our behalf, such as identifying and investigating possible business targets and business combinations as well as advisory fees to directors pertaining to board committee service and extraordinary administrative and analytical services;
- payment for analyst and consultant services as approved by our Board of Directors; and
- repayment upon consummation of our initial business combination of any loans which may be made by our Sponsor, executive officers and directors, or their affiliates, to finance transaction costs in connection with an intended initial business combination. The terms of any such loans have not been determined nor have any written agreements been executed with respect thereto. Up to $1,500,000 of such loans may be convertible into additional units of the post-business combination entity at a price of $10.00 per unit at the option of the lender. The units would be identical to the private units.

These payments may be funded using that portion of the net proceeds of this offering and the sale of the private units not held in the trust account or, upon completion of the initial business combination, from any amounts remaining from the proceeds of the trust account released to us in connection therewith.

Our audit committee will review on a quarterly basis all payments that were made to our Sponsor, executive officers or directors, or our or any of their affiliates.

17

**Table of Contents**

| | |
|---|---|
| **Audit Committee** | Prior to the effectiveness of this registration statement, we will have established and will maintain an audit committee (which will be composed entirely of independent directors) to, among other things, monitor compliance with the terms described above and the other terms relating to this offering. If any noncompliance is identified, then the audit committee will be charged with the responsibility to immediately take all action necessary to rectify such noncompliance or otherwise to cause compliance with the terms of this offering. For more information, see "*Management—Committees of the Board of Directors—Audit Committee.*" |
| **Conditions to completing our initial business combination** | There is no limitation on our ability to raise funds privately or through loans in connection with our initial business combination. The rules of the NYSE require that our initial business combination must be with one or more operating businesses or assets with a fair market value equal to at least 80% of the net assets held in trust (less the deferred underwriting commissions and any taxes payable on interest earned) at the time of our signing a definitive agreement in connection with our initial business combination. We do not currently intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination. |
| | If our Board of Directors is not able to independently determine the fair market value of the target business or businesses, we may obtain an opinion from an independent investment banking firm that is a member of FINRA, or from another independent entity. However, unless we consummate our initial business combination with an affiliated entity, our Board of Directors is not required to obtain an opinion from an independent investment banking firm or another independent entity that the price we are paying is fair to our stockholders from a financial point of view. We will complete our initial business combination only if the post-transaction company in which our public stockholders own shares will own or acquire 50% or more of the issued and outstanding voting securities of the target or otherwise acquire a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to our initial business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in our initial business combination transaction. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% of net assets test; provided that in the event that our initial business combination involves more than one target business, the 80% of net assets test will be based on the aggregate value of all of the target businesses. |

18

Table of Contents

| Permitted purchases of public shares by our affiliates | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our Founder, directors, executive officers, advisors or any of their affiliates may purchase shares of our Common Stock in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. Please see "*Proposed Business—Initial Business Combination*" for a description of how such persons will determine from which stockholders to seek to acquire shares. There is no limit on the number of shares such persons may purchase, or any restriction on the price that they may pay. Any such price per share may be different than the amount per share a public stockholder would receive if it elected to redeem its shares in connection with our initial business combination. However, such persons have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. In the event our Founder, directors, executive officers, advisors or any of their affiliates determine to make any such purchases at the time of a stockholder vote relating to our initial business combination, such purchases could have the effect of influencing the vote necessary to approve such transaction. None of the funds in the trust account will be used to purchase shares of our Common Stock in such transactions. If any of our Founder, directors, executive officers, advisors or any of their affiliates engages in such transactions, they will not make any such purchases when they are in possession of any material non-public information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Subsequent to the consummation of this offering, we will adopt an insider trading policy which will require insiders to (1) refrain from purchasing securities during certain blackout periods and when they are in possession of any material non-public information and (2) clear all trades with our legal counsel prior to execution. We cannot currently determine whether any of our insiders will make such purchases pursuant to a Rule 10b5-1 plan, as that would be dependent upon several factors, including but not limited to, the timing and size of any such purchase. Depending on the circumstances, any of our insiders may decide to make purchases of our Common Stock pursuant to a Rule 10b5-1 plan or may determine that acting pursuant to such a plan is not required under the Exchange Act.<br><br>We do not currently anticipate that purchases of our Common Stock by any of our Founder, directors, executive officers, advisors or any of their affiliates, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules. None of our Founder, directors, officers, |

19

Table of Contents

|  |  |
|---|---|
|  | advisors or any of their affiliates will purchase shares of our Common Stock if such purchases would violate Section 9(a)(2) or Rule 10b-5 of the Exchange Act. |
| **Redemption rights for public stockholders upon completion of our initial business combination** | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest (which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares, subject to the limitations described herein; provided, that we shall not redeem public shares to the extent that the redemption would result in our failure to have net tangible assets of at least $5,000,001 (so that we do not then become subject to the SEC's "penny stock" rules), or any greater net tangible asset or cash requirement that may be contained in the agreement relating to our initial business combination. |
|  | The amount in the trust account is initially anticipated to be $10.10 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions. There will be no redemption rights upon the completion of our initial business combination with respect to our warrants. Our initial stockholders and the underwriters have entered into letter agreements with us, pursuant to which they have agreed to waive their redemption rights with respect to any Common Stock held by them in connection with the completion of our initial business combination. |
| **Manner of conducting redemptions** | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination either (1) in connection with a stockholder meeting called to approve the business combination or (2) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under applicable law or stock exchange listing requirement. Asset acquisitions and share purchases would not typically require stockholder approval while direct mergers with our company where we do not survive and any transactions where we issue more than 20% of our issued and outstanding shares of Common Stock or seek to amend our amended and restated certificate of incorporation would require stockholder approval. We intend to conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required |

20

**Table of Contents**

by applicable law or stock exchange listing requirement or we choose to seek stockholder approval for business or other reasons.

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers; and
- file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Upon the public announcement of our initial business combination, if we elect to conduct redemptions pursuant to the tender offer rules, we and our Founder, directors and executive officers will terminate any plan established in accordance with Rule 10b5-1 under the Exchange Act to purchase shares of our Common Stock in the open market, in order to comply with Rule 14e-5 under the Exchange Act.

In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. In addition, the tender offer will be conditioned on public stockholders not tendering more than a specified number of public shares, which number will be based on the requirement that we may not redeem public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we do not then become subject to the SEC's "penny stock" rules), or any greater net tangible asset or cash requirement that may be contained in the agreement relating to our initial business combination. If public stockholders tender more shares than we have offered to purchase, we will withdraw the tender offer and not complete such initial business combination.

If, however, stockholder approval of the transaction is required by applicable law or stock exchange listing requirement, or we decide to obtain stockholder approval for business or other reasons, we will:

- conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules; and
- file proxy materials with the SEC.

21

Table of Contents

We expect that a final proxy statement would be mailed to public stockholders at least 10 days prior to the stockholder vote. However, we expect that a draft proxy statement would be made available to such stockholders well in advance of such time, providing additional notice of redemption if we conduct redemptions in conjunction with a proxy solicitation. Although we are not required to do so, we currently intend to comply with the substantive and procedural requirements of Regulation 14A in connection with any stockholder vote even if we are not able to maintain our NYSE listings or Exchange Act registration.

If we seek stockholder approval, we will complete our initial business combination only if we receive the affirmative vote of a majority of shares of our Common Stock that are voted at a stockholder meeting relating to the initial business combination. In such case, pursuant to the terms of a letter agreement entered into with us, our initial stockholders have agreed (and any of their permitted transferees will agree) to vote their founder shares, insider shares, private shares and any public shares held by them in favor of our initial business combination. We expect that at the time of any stockholder vote relating to our initial business combination, our initial stockholders (and any of their permitted transferees) will beneficially own approximately 21.8% of our issued and outstanding shares of Common Stock entitled to vote thereon. These voting thresholds, and the voting agreements of our initial stockholders may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem their public shares without voting, and if they do vote, irrespective of whether they vote for or against the proposed transaction.

Our amended and restated certificate of incorporation will provide that in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we do not then become subject to the SEC's "penny stock" rules). Redemptions of our public shares may also be subject to a higher net tangible asset test or cash requirement pursuant to an agreement relating to our initial business combination. For example, the proposed business combination may require: (1) cash consideration to be paid to the target or its owners; (2) cash to be transferred to the target for working capital or other general corporate purposes; or (3) the retention of cash to satisfy other conditions in accordance with the terms of the proposed business combination. In the event the aggregate cash consideration we would be required to pay for all shares of Common Stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed business combination exceed the aggregate amount of cash available to us, we would not complete the business combination or redeem any shares of Common Stock, and all shares of Common Stock submitted for redemption would be returned to the holders thereof.

22

Table of Contents

| | |
|---|---|
| **Tendering share certificates in connection with a tender offer or redemption rights** | We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents or proxy materials mailed to such holders, or up to two business days prior to the vote on the proposal to approve our initial business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically using The Depository Trust Company's DWAC (Deposit/Withdrawal At Custodian) System, at the holder's option, rather than simply voting against the initial business combination. The tender offer or proxy materials, as applicable, that we will furnish to holders of our public shares in connection with our initial business combination will indicate whether we are requiring public stockholders to satisfy such delivery requirements. |
| **Limitation on redemption rights of stockholders holding more than 15% of the shares sold in this offering if we hold a stockholder vote** | Notwithstanding the foregoing redemption rights, if we seek stockholder approval of our initial business combination in conjunction with a stockholder vote pursuant to a proxy solicitation (meaning that we would not conduct redemptions pursuant to the tender offer rules), our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming its shares of Common Stock with respect to an aggregate of more than 15% of the shares of Common Stock sold in this offering without our prior consent. We believe this restriction will discourage stockholders from accumulating large blocks of shares of Common Stock, and subsequent attempts by such holders to use their ability to redeem their shares of Common Stock as a means to force us or our Founder, directors, executive officers or any of their affiliates to purchase their shares of Common Stock at a significant premium to the then-current market price or on other undesirable terms. Absent this provision, a public stockholder (together with its "group") holding an aggregate of more than 15% of the shares of Common Stock sold in this offering could threaten to exercise its redemption rights against a business combination if such holder's shares of Common Stock were not purchased by us or our Founder, directors, executive officers or any of their affiliates at a premium to the then-current market price or on other undesirable terms. By limiting our public stockholders' redemption rights as herein described, we believe we will limit the potential for a small group of stockholders to unreasonably attempt to block the completion of our initial business combination, particularly |

Table of Contents

| | |
|---|---|
| | in connection with a business combination with a target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. However, we would not restrict our stockholders' ability to vote all of their shares of Common Stock (including all shares held by those stockholders that hold more than 15% of the shares sold in this offering) for or against our initial business combination. |
| **Redemption rights in connection with proposed amendments to our charter documents** | Some other blank check companies have a provision in their charter documents which prohibits the amendment of certain charter provisions. Our amended and restated certificate of incorporation will provide that amendments to any of its provisions relating to our pre-initial business combination activity and related stockholders' rights may be amended if approved by holders of 65% of our Common Stock. If any such amendments to our amended and restated certificate of incorporation are approved by the requisite stockholder vote, we may amend the corresponding provisions of the trust agreement governing the release of funds from our trust account. In all other instances, our amended and restated certificate of incorporation may be amended by the holders of a majority of our outstanding Common Stock, subject to applicable provisions of the DGCL or applicable stock exchange rules. |
| | After the completion of this offering, and prior to the consummation of our initial business combination, we may not issue any additional shares of capital stock that would entitle the holders thereof to receive funds from the trust account or vote on an initial business combination, on any pre-business combination activity or on any amendment to the provisions of our amended and restated certificate of incorporation relating to our pre-initial business combination activity and related stockholders' rights. |
| | Our initial stockholders (and any of their permitted transferees), who will beneficially own approximately 21.8% of our shares of Common Stock upon the closing of this offering (assuming they do not purchase public units in this offering), may participate in any vote to amend our amended and restated certificate of incorporation and will have the discretion to vote in any manner they choose; *provided, that*, each of them has agreed (and their permitted transferees will agree), pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would affect the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering unless we provide our public stockholders with the opportunity to redeem their shares of Common Stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable), divided by the |

24

**Table of Contents**

|  |  |
|---|---|
|  | number of then issued and outstanding public shares. We may not redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we do not then become subject to the SEC's "penny stock" rules). |
|  | Our initial stockholders and the underwriters have entered into letter agreements with us pursuant to which they have agreed to waive their redemption rights with respect to their founder shares, insider shares, private shares and any public shares held by them in connection with any amendment to the provisions of our amended and restated certificate of incorporation relating to our pre-initial business combination activity and related stockholders' rights. |
| **Release of funds in trust account on closing of our initial business combination** | On the completion of our initial business combination, all amounts held in the trust account will be released to us. We will use these funds to pay the underwriters their deferred underwriting commissions as consideration for providing the services described in the paragraph below, to pay amounts due to any public stockholders who exercise their redemption rights as described above under "*Redemption rights for public stockholders upon completion of our initial business combination*," to pay all or a portion of the consideration payable to the target or owners of the target of our initial business combination and to pay other expenses associated with our initial business combination. If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our initial business combination, we may apply the balance of the cash released to us from the trust account for general corporate purposes, including for maintenance or expansion of operations of post-transaction businesses, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital. |
|  | The underwriters will use their commercially reasonable efforts to provide us with the following services: 1) originating and introducing us to potential targets for our initial business combination; 2) arranging institutional investor meetings on our behalf in connection with obtaining financing for the initial business combination; 3) assisting us in meeting our securities exchange listing requirements following the closing of this offering; and 4) providing capital markets advice and liquidity to us following the closing of this offering. If we use our best efforts (and the underwriters use commercially reasonable efforts) to obtain financing in private placements or privately negotiated transactions, but notwithstanding such efforts, we do not have sufficient cash necessary to consummate our initial business combination and pay the deferred underwriting commission, we and the underwriters will cooperate in good faith to come to a mutually-satisfactory solution with respect to the payment |

25

Table of Contents

| | |
|---|---|
| | of the deferred underwriting commission so as to ensure that our obligation to pay the deferred underwriting commission shall not impede the closing of the initial business combination. |
| **Redemption of public shares and distribution and liquidation if no initial business combination** | We will have only 18 months from the closing of this offering to complete our initial business combination. If we are unable to complete our initial business combination within such period, we will: (1) cease all operations except for the purpose of winding up; (2) as promptly as reasonably possible but not more than ten business days thereafter, redeem the outstanding public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (less up to $100,000 of interest to pay dissolution expenses and which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law; and (3) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board of Directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our initial business combination within the 18-month time period. |
| | Our initial stockholders and the underwriters have entered into letter agreements with us, pursuant to which they have waived their rights to liquidating distributions from the trust account with respect to their founder shares, insider shares and private shares if we fail to complete our initial business combination within 18 months from the closing of this offering. However, if our Founder, executive officers or directors acquire public shares after this offering they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the 18-month time frame. The underwriters have agreed to waive their rights to their deferred underwriting commissions held in the trust account in the event we do not complete our initial business combination within 18 months from the closing of this offering and, in such event, such amounts will be included with the funds held in the trust account that will be available to fund the redemption of our public shares. |
| **Conflicts of Interest** | If any of our officers or directors becomes aware of a business combination opportunity that falls within the line of business of any entity to which he or she has fiduciary or contractual obligations, he or she may be required to present such business combination opportunity to such entity prior to presenting such business |

26

Table of Contents

| | |
|---|---|
| | combination opportunity to us. Certain of our directors currently have, and any of our officers or directors may in the future have, certain relevant fiduciary duties or contractual obligations. |
| | In addition, our Sponsor, officers and directors may participate in the formation of, or become an officer or director of, any other blank check company prior to completion of our initial business combination. As a result, our Sponsor, officers or directors could have conflicts of interest in determining whether to present business combination opportunities to us or to any other blank check company with which they may become involved. In particular, an affiliate of our Sponsor is currently sponsoring GIG2, which may seek to complete a business combination in the TMT industry. Further, there is significant overlap among the directors and officers of GIG2 and our company. Dr. Katz, our Chief Executive Officer and Chairman, serves as Executive Chairman of GIG2. Certain of our directors, Dr. Dinu and Messrs. Miotto and Mikulsky, are members of the board of directors of GIG2. Dr. Dinu also serves as the Chief Executive Officer of GIG2. Our directors Messrs. Wang and Betti-Berutto serve as the Software Chief Technical Officer and Chief Technical Officer, respectively, of GIG2 and have similar roles with us. Messrs. Wang and Betti-Berutto are not officers or employees of our company; their respective titles of Software Chief Technical Officer and Hardware Chief Technical Officer reflect their core competencies and expertise and are primarily for marketing purposes as they assist our company to identify suitable business combination candidates. Mr. Weightman, our Chief Financial Officer, serves as the Chief Financial Officer of GIG2. In addition, there is overlap among our directors and the directors of Kaleyra, Inc. as Dr. Katz and Messrs. Miotto and Mikulsky are also directors of that company, which may also seek to acquire companies in the TMT industry Furthermore, Dr. Dinu chairs, and Mr. Wang is a member of, the Strategic Advisory Board of Kaleyra, Inc. Any such companies, including GIG2 and Kaleyra, Inc., may present additional conflicts of interest in pursuing an acquisition target. However, we do not believe that any potential conflicts would materially affect our ability to complete our initial business combination, particularly as we are planning to focus the target search of our company in different TMT verticals. |
| **Indemnity** | Our Sponsor has agreed that it will be liable to us, if and to the extent any claims by any third party for services rendered or products sold to us, or a prospective target business with which we have entered into an acquisition agreement, reduce the amounts in the trust account to below $10.10 per share (whether or not the underwriters' over-allotment option is exercised in full), except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. In the event that an executed waiver is deemed to be unenforceable against a third party, |

Table of Contents

our Sponsor will not be responsible to the extent of any liability for such third-party claims. We have not independently verified whether our Sponsor has sufficient funds to satisfy their indemnity obligations. We believe, however, the likelihood of our Sponsor having to indemnify the trust account is limited because we will endeavor to have all third-party vendors and prospective target businesses as well as other entities execute agreements with us waiving any right, title, interest or claim of any kind in or to monies held in the trust account.

**Risks**

In making your decision on whether to invest in our securities, you should take into account the special risks we face as a blank check company, as well as the fact that this offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act, and, therefore, you will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. For additional information concerning how Rule 419 blank check offerings differ from this offering, please see "*Proposed Business—Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419.*" You should carefully consider these and the other risks set forth in the section of this prospectus entitled "*Risk Factors.*"

28

Table of Contents

### SUMMARY FINANCIAL DATA

The following table summarizes the relevant financial data for our business and should be read with our financial statements, which are included in this prospectus. We have not had any significant operations to date, so only balance sheet data is presented.

| | February 14, 2020 | |
| | Actual | As Adjusted |
| --- | --- | --- |
| Balance Sheet Data: | | |
| Working capital (deficit) | $(116,427) | $203,954,165(1) |
| Total assets | $ 261,002 | $203,959,790(2) |
| Total liabilities | $ 241,627 | $ 8,005,625(3) |
| Value of shares of Common Stock which may be redeemed for cash | $ — | $190,954,155(4) |
| Stockholders' equity | $ 19,375 | $ 5,000,010(5) |

(1)   The "as adjusted" calculation equals the actual working capital deficit of $116,427, plus $202,000,000 cash held in trust from the proceeds of this offering and the sale of the private units, plus $1,934,790 held outside the trust account, plus the payment of offering costs of $135,802 as of February 14, 2020.

(2)   The "as adjusted" calculation equals the $202,000,000 cash held in trust from the proceeds of this offering and the sale of the private units, plus the $1,934,790 held outside the trust account, plus $19,375 of actual stockholders' equity, plus accrued expenses of $141,427 as of February 14, 2020 less payment of offering costs of $135,802.

(3)   The "as adjusted" calculation includes $8,000,000 of deferred underwriting commissions, the $135,802 payment of the deferred offering costs, the $100,000 repayment of the promissory note to the Sponsor and the $200 repayment of the amount borrowed from an affiliate of the Sponsor as of February 14, 2020.

(4)   The "as adjusted" value of shares of Common Stock which may be redeemed for cash is derived by taking 18,906,352 shares which may be redeemed, representing the maximum number of shares that may be redeemed while maintaining at least $5,000,001 in net tangible assets after the offering, multiplied by a redemption price of $10.10.

(5)   The "as adjusted" calculation equals the "as adjusted" total assets, less the "as adjusted" total liabilities, less the "as adjusted" value of shares of Common Stock which may be redeemed in connection with our initial business combination ($10.10 per share).

The "as adjusted" information gives effect to the sale of the public units and the private units, including the application of the related gross proceeds and the payment of the estimated remaining costs from such sale and the repayment of the accrued and other liabilities required to be repaid such that we have at least $5,000,001 of net tangible assets upon consummation of this offering and upon consummation of our initial business combination.

The "as adjusted" total assets amount includes the $202,000,000 held in the trust account (or $232,300,000 if the underwriters' over-allotment option is exercised in full) for the benefit of our public stockholders, which amount will be available to us only upon the completion of our initial business combination within 18 months from the closing of this offering.

We will consummate our initial business combination only if we have net tangible assets of at least $5,000,001 upon such consummation and a majority of the outstanding shares of Common Stock voted are voted in favor of the business combination (if a vote is required or being obtained).

29

**Table of Contents**

**RISK FACTORS**

*An investment in our securities involves a high degree of risk. You should consider carefully all of the risks described below, together with the other information contained in this prospectus, before making a decision to invest in our units. If any of the following events occur, our business, financial condition and operating results may be materially adversely affected. In that event, the trading price of our securities could decline, and you could lose all or part of your investment.*

**We are a blank check company with no operating history and no revenues, and you have no basis on which to evaluate our ability to achieve our business objective.**

We are a blank check company with no operating results, and we will not commence operations until obtaining funding through this offering. Because we lack an operating history, you have no basis upon which to evaluate our ability to achieve our business objective of completing our initial business combination with one or more target businesses. We have no plans, arrangements or understandings with any prospective target business concerning our initial business combination and may be unable to complete our initial business combination. If we fail to complete our initial business combination, we will never generate any operating revenues.

**Our independent registered public accounting firm's report contains an explanatory paragraph that expresses substantial doubt about our ability to continue as a "going concern."**

As of February 14, 2020, we had $125,200 in cash and a working capital deficiency of $116,427. Further, we expect to incur significant costs in pursuit of our acquisition plans. Management's plans to address this need for capital through this offering are discussed in the section of this prospectus titled "*Management's Discussion and Analysis of Financial Condition and Results of Operations*." Our plans to raise capital and to consummate our initial business combination may not be successful. These factors, among others, raise substantial doubt about our ability to continue as a going concern. The financial statements contained elsewhere in this prospectus do not include any adjustments that might result from our inability to consummate this offering or our inability to continue as a going concern.

**The requirement that the target business or businesses that we acquire must collectively have a fair market value equal to at least 80% of the balance of the funds in the trust account (less the deferred underwriting commissions and any taxes payable on interest earned) at the time of the execution of a definitive agreement for our initial business combination may limit the type and number of companies with which we may complete such a business combination.**

Pursuant to the NYSE listing rules, the target business or businesses that we acquire must collectively have a fair market value equal to at least 80% of the balance of the funds in the trust account (less the deferred underwriting commissions and any taxes payable on interest earned) at the time of the execution of a definitive agreement for our initial business combination. This restriction may limit the type and number of companies with which we may complete an initial business combination. If we are unable to locate a target business or businesses that satisfy this fair market value test, we may be forced to liquidate and you will only be entitled to receive your pro rata portion of the funds in the trust account.

**Our public stockholders may not be afforded an opportunity to vote on our proposed business combination, which means we may consummate our initial business combination even though a majority of our public stockholders do not support such a combination.**

We may not hold a stockholder vote to approve our initial business combination unless the business combination would require stockholder approval under applicable law or stock exchange rules or if we decide to hold a stockholder vote for business or other reasons. For instance, the rules of the NYSE currently allow us to engage in a tender offer in lieu of a stockholder meeting, but would still require us to obtain stockholder approval if we

30

Table of Contents

were seeking to issue more than 20% of our issued and outstanding shares to a target business as consideration in any business combination. Therefore, if we were structuring a business combination that required us to issue more than 20% of our issued and outstanding shares, we would seek stockholder approval of such business combination. However, except as required by applicable law or stock exchange rules, the decision as to whether we will seek stockholder approval of a proposed business combination or will allow stockholders to sell their shares to us in a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors, such as the timing of the transaction and whether the terms of the transaction would otherwise require us to seek stockholder approval. Accordingly, we may consummate our initial business combination even if holders of a majority of the issued and outstanding shares of Common Stock do not approve of the business combination we consummate. Please see the section entitled "*Proposed Business—Initial Business Combination—Stockholders may not have the ability to approve our initial business combination*" for additional information. Our Sponsor controls a substantial interest in us and thus may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.

**If we seek stockholder approval of our initial business combination, our initial stockholders have agreed to vote in favor of such initial business combination, regardless of how our public stockholders vote.**

Unlike many other blank check companies in which the Founder, executive officers and directors agree to vote their founder shares and insider shares in accordance with the majority of the votes cast by the public stockholders in connection with an initial business combination, our initial stockholders and the underwriters (and their permitted transferees will agree), pursuant to the terms of the letter agreements entered into with us, to vote any Common Stock held by them in favor of our initial business combination. As a result, in addition to the founder shares, the insider shares and private shares, we would need approximately 7,053,261 public shares, or approximately 35.27% of the 20,000,000 public shares sold in this offering to be voted in favor of a transaction (assuming all issued and outstanding shares are voted, the over-allotment option is not exercised and 750,000 founder shares are forfeited) in order to have such initial business combination approved. We expect that our initial stockholders, and their permitted transferees, will beneficially own approximately 21.8% of the issued and outstanding shares of our Common Stock at the time of any such stockholder vote. Accordingly, if we seek stockholder approval of our initial business combination, it is more likely that the necessary stockholder approval will be received than would be the case if such persons agreed to vote their founder shares in accordance with the majority of the votes cast by our public stockholders.

**Your only opportunity to affect the investment decision regarding a potential business combination may be limited to the exercise of your right to redeem your shares from us for cash.**

At the time of your investment in us, you will not be provided with an opportunity to evaluate the specific merits or risks of one or more target businesses. Because our Board of Directors may consummate our initial business combination without seeking stockholder approval, public stockholders may not have the right or opportunity to vote on the business combination. Accordingly, your only opportunity to affect the investment decision regarding a potential business combination may be limited to exercising your redemption rights within the period of time (which will be at least 20 business days) set forth in our tender offer documents mailed to our public stockholders in which we describe our initial business combination.

**The ability of our public stockholders to redeem their shares for cash may make our financial condition unattractive to potential business combination targets, which may make it difficult for us to enter into our initial business combination with a target.**

We may enter into a transaction agreement with a prospective target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. If too many public stockholders exercise their redemption rights, we may not be able to meet such closing condition, and as a result, would not be able to proceed with such business combination. Furthermore, in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 upon the consummation of our initial

31

Table of Contents

business combination or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. Our amended and restated certificate of incorporation will require us to provide all of our public stockholders with an opportunity to redeem all of their shares in connection with the consummation of any initial business combination. Consequently, if accepting all properly submitted redemption requests would cause our net tangible assets to be less than $5,000,001 upon the consummation of our initial business combination, or such greater amount necessary to satisfy a closing condition as described above, we would not proceed with such redemption and the related business combination and may instead search for an alternate business combination. Prospective targets would be aware of these risks and, thus, may be reluctant to enter into our initial business combination transaction with us.

**The ability of our public stockholders to exercise redemption rights with respect to a large number of our shares may not allow us to consummate the most desirable business combination or optimize our capital structure.**

In connection with the successful consummation of our initial business combination, we may redeem up to that number of shares of Common Stock that would permit us to maintain net tangible assets of $5,000,001 upon the consummation of our initial business combination. If our initial business combination requires us to use substantially all of our cash to pay the purchase price, the redemption threshold may be further limited. Alternatively, we may need to arrange third-party financing to help fund our business combination in case a larger percentage of stockholders exercise their redemption rights than we expect. If the acquisition involves the issuance of our shares as consideration, we may be required to issue a higher percentage of our shares to the target or its stockholders to make up for the failure to satisfy a minimum cash requirement. Raising additional funds to cover any shortfall may involve dilutive equity financing or incurring indebtedness at higher than desirable levels. This may limit our ability to effectuate the most attractive business combination available to us. The amount of the deferred underwriting commissions payable to the underwriters will not be adjusted for any shares that are redeemed in connection with an initial business combination. The per share amount we will distribute to stockholders who properly exercise their redemption rights will not be reduced by the deferred underwriting commission and after such redemptions, the per-share value of shares held by non-redeeming stockholders will reflect our obligation to pay the deferred underwriting commissions.

**The requirement that we maintain a minimum net worth or retain a certain amount of cash could increase the probability that our business combination would be unsuccessful and that you would have to wait for liquidation in order to redeem your shares.**

If, pursuant to the terms of our proposed business combination, we are required to maintain a minimum net worth or retain a certain amount of cash in trust in order to consummate the business combination and regardless of whether we proceed with redemptions under the tender or proxy rules, the probability that our business combination would be unsuccessful is increased. If our business combination is unsuccessful, you would not receive your pro rata portion of the trust account until we liquidate. If you are in need of immediate liquidity, you could attempt to sell your shares in the open market; however, at such time our shares may trade at a discount to the pro rata amount per share in our trust account. In either situation, you may suffer a material loss on your investment or lose the benefit of funds expected in connection with our redemption until we liquidate or you are able to sell your shares in the open market.

**The requirement that we complete our initial business combination within 18 months from the closing of this offering may give potential target businesses leverage over us in negotiating our initial business combination and may limit the amount of time we have to conduct due diligence on potential business combination targets as we approach our dissolution deadline, which could undermine our ability to consummate our initial business combination on terms that would produce value for our stockholders.**

Any potential target business with which we enter into negotiations concerning our initial business combination will be aware that we must consummate our initial business combination within 18 months from the closing of

32

Table of Contents

this offering. Consequently, such target businesses may obtain leverage over us in negotiating our initial business combination, knowing that if we do not complete our initial business combination with that particular target business, we may be unable to complete our initial business combination with any target business. This risk will increase as we get closer to the timeframe described above. In addition, we may have limited time to conduct due diligence and may enter into our initial business combination on terms that we would have rejected upon a more comprehensive investigation.

**We may not be able to consummate our initial business combination within the required time period, in which case we would cease all operations except for the purpose of winding up and we would redeem our public shares and liquidate.**

Our Founder, executive officers and directors have agreed that we must complete our initial business combination within 18 months from the closing of this offering. We may not be able to find a suitable target business and consummate our initial business combination within such time period. Our ability to complete our initial business combination may be negatively impacted by general market conditions, volatility in the capital and debt markets and the other risks described herein. Additionally, the outbreak of the COVID-19 coronavirus pandemic may negatively impact businesses we may seek to acquire. Similarly, the outbreak of this pandemic, the measures being taken to counter it, and volatility in valuations in the financial markets that are resulting from the imposition of such measures and the pending health crisis, may make it harder for us to find a suitable target business and consummate our initial business combination.

If we are unable to consummate our initial business combination within the require time period, we will, as promptly as reasonably possible but not more than 10 business days thereafter, distribute the aggregate amount then on deposit in the trust account (net of taxes payable and less up to $100,000 of interest to pay dissolution expenses), pro rata to our public stockholders by way of redemption and cease all operations except for the purposes of winding up of our affairs, as further described herein. This redemption of public stockholders from the trust account shall be effected as required by function of our amended and restated certificate of incorporation and prior to any voluntary winding up.

**Our search for a business combination, and any target business with which we ultimately consummate a business combination, may be materially adversely affected by the recent COVID-19 coronavirus pandemic and the status of debt and equity markets.**

In December 2019, a novel strain of coronavirus was reported to have surfaced in Wuhan, China, which has and is continuing to spread throughout China and other parts of the world, including the United States. On January 30, 2020, the World Health Organization declared the outbreak of the COVID-19 coronavirus disease a "Public Health Emergency of International Concern." On January 31, 2020, U.S. Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the United States to aid the U.S. healthcare community in responding to COVID-19, and on March 11, 2020 the World Health Organization characterized the outbreak as a "pandemic." COVID-19 could materially and adversely affect the business of any potential target business with which we consummate a business combination. Furthermore, we may be unable to complete a business combination if continued concerns relating to COVID-19 restrict travel, limit the ability to have meetings with potential investors, if the target company's personnel, vendors and service providers are unavailable to negotiate and consummate a transaction in a timely manner, or if COVID-19 causes a prolonged economic downturn. The extent to which COVID-19 impacts our search for a business combination will depend on future developments, which are highly uncertain and cannot be predicted, including new information which may emerge concerning the severity of COVID-19 and the actions to contain COVID-19 or treat its impact, among others. If the disruptions posed by COVID-19 or other matters of global concern continue for an extensive period of time, our ability to consummate a business combination, or the operations of a target business with which we ultimately consummate a business combination, may be materially adversely affected.

In addition, our ability to consummate a business combination may be dependent on the ability to raise equity and debt financing which may be impacted by COVID-19 and other events.

33

Table of Contents

**If we seek stockholder approval of our initial business combination pursuant to a proxy solicitation, our Founder, directors, executive officers, advisors and their affiliates may elect to purchase shares from stockholders, in which case they may influence a vote in favor of a proposed business combination that you do not support.**

If we seek stockholder approval of our initial business combination pursuant to a proxy solicitation (meaning we would not conduct redemptions pursuant to the tender offer rules), our Founder, directors, executive officers, advisors or any of their affiliates are permitted to purchase shares of our Common Stock in privately negotiated transactions or in the open market either prior to or following the consummation of our initial business combination. Any such purchase would be required to include a contractual acknowledgement that the selling stockholder, although he may still be the record holder of the shares being sold, would, upon consummation of such sale, no longer be the beneficial owner of such shares and would agree not to exercise the redemption rights applicable to such shares. In the event that our Founder, directors, executive officers, advisors or any of their affiliates purchase shares of Common Stock in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, any such selling stockholders would be required to revoke their prior elections to redeem their shares of Common Stock prior to the consummation of the transaction.

The purpose of such purchases could be to (1) increase the likelihood of obtaining stockholder approval of the initial business combination or (2) satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of the business combination, where it appears that such requirement would otherwise not be met. This may result in the consummation of an initial business combination that may not otherwise have been possible.

**Purchases of shares of our Common Stock in the open market or in privately negotiated transactions by our Founder, directors, executive officers, advisors or their affiliates may make it difficult for us to maintain the listing of our Common Stock on the NYSE following the consummation of an initial business combination.**

If our Founder, directors, executive officers, advisors or their affiliates purchase shares of our Common Stock in the open market or in privately negotiated transactions, the public "float" of our Common Stock and the number
of beneficial holders of our securities would both be reduced, possibly making it difficult to maintain the listing or trading of our securities on the NYSE following consummation of the initial business combination.

**You will not have any rights or interests in funds from the trust account, except under certain limited circumstances. To liquidate your investment, therefore, you may be forced to sell your public shares, potentially at a loss.**

Our public stockholders shall be entitled to receive funds from the trust account only (i) in the event of a redemption to public stockholders prior to any winding up in the event we do not consummate our initial business combination or our liquidation, (ii) if they redeem their shares in connection with an initial business combination that we consummate or, (iii) if they redeem their shares in connection with a stockholder vote to amend our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering, or (B) with respect to any other provision relating to our pre-business combination activity and related stockholders' rights. In no other circumstances will a stockholder have any right or interest of any kind to the funds in the trust account. Accordingly, to liquidate your investment, you may be forced to sell your securities, potentially at a loss.

**You will not be entitled to protections normally afforded to investors of many other blank check companies.**

Since the net proceeds of this offering are intended to be used to complete our initial business combination with a target business that has not been identified, we may be deemed to be a "blank check" company under the

34

Table of Contents

United States securities laws. However, since we will have net tangible assets of at least $5,000,001 upon the successful consummation of this offering and will file a Current Report on Form 8-K, including an audited balance sheet demonstrating this fact, we are exempt from rules promulgated by the SEC to protect investors in blank check companies, such as Rule 419. Accordingly, investors will not be afforded the benefits or protections of those rules. Among other things, this means our units will be immediately tradable and we may have a longer period of time to complete our initial business combination than do companies subject to Rule 419. Moreover, offerings subject to Rule 419 would prohibit the release of any interest earned on funds held in the trust account to us unless and until the funds in the trust account were released to us in connection with our consummation of an initial business combination. For a more detailed comparison of our offering to offerings that comply with Rule 419, please see "*Proposed Business —Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419.*"

**If we seek stockholder approval of our business combination pursuant to a proxy solicitation (meaning we would not conduct redemptions pursuant to the tender offer rules), and if you or a "group" of stockholders are deemed to hold in excess of 15% of the issued and outstanding shares of our Common Stock, you will lose the ability to redeem all such shares in excess of 15% of the issued and outstanding shares of our Common Stock.**

If we seek stockholder approval of our initial business combination pursuant to a proxy solicitation (meaning we would not conduct redemptions pursuant to the tender offer rules), our amended and restated certificate of incorporation will provide that a public stockholder, individually or together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), would be restricted from seeking redemption rights with respect to an aggregate of more than 15% of the shares of Common Stock sold in this offering. Your inability to redeem an aggregate of more than 15% of the shares of Common Stock sold in this offering will reduce your influence over our ability to consummate our initial business combination and you could suffer a material loss on your investment in us if you sell such excess shares in open market transactions. As a result, you will continue to hold that number of shares exceeding 15% and, in order to dispose of such shares, you would be required to sell your shares in open market transaction, potentially at a loss.

**If the net proceeds of this offering not being held in the trust account are insufficient to allow us to operate for at least the next 18 months from the closing of this offering, we may be unable to complete our initial business combination.**

The funds available to us outside of the trust account may not be sufficient to allow us to operate for at least the next 18 months from the closing of this offering, assuming that our initial business combination is not consummated during that time. Of the funds available to us, we could use a portion of the funds available to us to pay fees to consultants to assist us with our search for a target business. We could also use a portion of the funds as a down payment or to fund a "no-shop" provision (a provision in letters of intent designed to keep target businesses from "shopping" around for transactions with other companies on terms more favorable to such target businesses) with respect to a particular proposed business combination, although we do not have any current intention to do so. If we are unable to fund such down payments or "no shop" provisions, our ability to close a contemplated transaction could be impaired. Furthermore, if we entered into a letter of intent where we paid for the right to receive exclusivity from a target business and were subsequently required to forfeit such funds (whether as a result of our breach or otherwise), we might not have sufficient funds to continue searching for, or conduct due diligence with respect to, a target business. If we are unable to complete our initial business combination, our public stockholders may only receive $10.10 per share (whether or not the underwriters' over-allotment option is exercised in full) or potentially less than $10.10 per share on our redemption, and our warrants will expire worthless.

35

Table of Contents

**Subsequent to our consummation of our initial business combination, we may be required to take write-downs or write-offs, or we may be subject to restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and the price of our Common Stock, which could cause you to lose some or all of your investment.**

Even if we conduct thorough due diligence on a target business with which we combine, this diligence may not surface all material issues that may be present inside a particular target business.

Factors outside of the target business and outside of our control may, at any time, arise. As a result of these factors, we may be forced to later write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in our reporting losses. Even if our due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about us or our securities. In addition, charges of this nature may cause us to violate net worth or other covenants to which we may be subject as a result of assuming pre-existing debt held by a target business or by virtue of our obtaining post-combination debt financing.

**Our directors may decide not to enforce indemnification obligations against our Sponsor, resulting in a reduction in the amount of funds in the trust account available for distribution to our public stockholders.**

In the event that the proceeds in the trust account are reduced below $10.10 per share (whether or not the underwriters' over-allotment option is exercised in full) and our Sponsor asserts that it is unable to satisfy obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine on our behalf whether to take legal action against our Sponsor to enforce its indemnification obligations. While we currently expect that our independent directors would take legal action on our behalf against our Sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment may choose not to do so. Furthermore, each of our independent directors has a financial and voting interest in our Sponsor which creates the potential for a conflict of interest that may influence their decision as to whether to take legal action against our Sponsor to enforce its indemnification obligations. If our independent directors choose not to enforce these indemnification obligations on our behalf, the amount of funds in the trust account available for distribution to our public stockholders may be reduced below $10.10 per share.

**If we are deemed to be an investment company under the Investment Company Act, we may be required to institute burdensome compliance requirements and our activities may be restricted, which may make it difficult for us to complete our initial business combination.**

If we are deemed to be an investment company under the Investment Company Act, our activities may be restricted, including restrictions on the nature of our investments and restrictions on the issuance of securities, each of which may make it difficult for us to complete our initial business combination. In addition, we may have imposed upon us burdensome requirements, including registration as an investment company, adoption of a specific form of corporate structure and reporting, record keeping, voting, proxy and disclosure requirements and other rules and regulations.

If we were deemed to be subject to the Investment Company Act, compliance with these additional regulatory burdens would require additional expenses for which we have not allotted funds and may hinder our ability to consummate our initial business combination.

**Changes in laws or regulations, or a failure to comply with any laws and regulations, may adversely affect our business, investments and results of operations.**

We are subject to laws and regulations enacted by national, regional and local governments. In particular, we will be required to comply with certain SEC and other legal requirements. Compliance with, and monitoring of,

36

Table of Contents

applicable laws and regulations may be difficult, time consuming and costly. Those laws and regulations and their interpretation and application also may change from time to time and those changes could have a material adverse effect on our business, investments and results of operations. In addition, a failure to comply with applicable laws or regulations, as interpreted and applied, could have a material adverse effect on our business and results of operations.

**We may not be able to complete our initial business combination within the prescribed time frame, in which case we would cease all operations except for the purpose of winding up and we would redeem our public shares and liquidate.**

We must complete our initial business combination within 18 months from the closing of this offering. We may not be able to find a suitable target business and complete our initial business combination within such time period or we may be unable to consummate a business combination due to a downturn in industry or economic conditions or due to other factors that may occur, including due to the outbreak of the COVID-19 coronavirus pandemic, the measures being taken to counter it, and volatility in valuations in the financial markets that are resulting from the imposition of such measures and the pending health crisis. If we have not completed our initial business combination within 18 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than 10 business days thereafter, redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including any interest earned on the funds held in the trust account net of interest that may be used by us to pay our franchise and income taxes payable divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board of Directors, dissolve and liquidate, subject (in the case of (ii) and (iii) above) to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law.

**Our stockholders may be held liable for claims by third parties against us to the extent of distributions received by them.**

Our amended and restated certificate of incorporation provides that we will continue in existence only until 18 months from the closing of this offering. As promptly as reasonably possible following the redemptions we are required to make to our public stockholders in such event, subject to the approval of our remaining stockholders and our Board of Directors, we would dissolve and liquidate, subject to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. We cannot assure you that we will properly assess all claims that may be potentially brought against us. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend well beyond the third anniversary of the date of distribution. Accordingly, we cannot assure you that third parties will not seek to recover from our stockholders amounts owed to them by us.

If we are forced to file a bankruptcy case or an involuntary bankruptcy case is filed against us which is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. Furthermore, because we intend to distribute the proceeds held in the trust account to our public stockholders promptly after expiration of the time we have to complete an initial business combination, this may be viewed or interpreted as giving preference to our public stockholders over any potential creditors with respect to access to or distributions from our assets. Furthermore, our Board of Directors may be viewed as having breached their fiduciary duties to our creditors and/or may have acted in bad faith, and thereby exposing itself and our company to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against us for these reasons.

Table of Contents

**If we are unable to consummate our initial business combination within 18 months from the closing of this offering, our public stockholders may be forced to wait beyond such period before redemption from our trust account.**

If we are unable to consummate our initial business combination within 18 months from the closing of this offering, we will, as promptly as reasonably possible but not more than 10 business days thereafter, distribute the aggregate amount then on deposit in the trust account (net of taxes payable and less up to $100,000 of interest to pay dissolution expenses), pro rata to our public stockholders by way of redemption and cease all operations except for the purposes of winding up of our affairs by way of a voluntary liquidation, as further described herein. Any redemption of public stockholders from the trust account shall be effected as required by our amended and restated certificate of incorporation prior to our commencing any voluntary liquidation.

If we are required to liquidate prior to distributing the aggregate amount then on deposit in the trust account (net of taxes payable and less up to $100,000 of interest to pay dissolution expenses) pro rata to our public stockholders, then such winding up, liquidation and distribution must comply with the applicable provisions of the DGCL. In that case, investors may be forced to wait beyond 18 months from the closing of this offering before the redemption proceeds of our trust account become available to them, and they receive the return of their pro rata portion of the proceeds from our trust account. Except as otherwise described herein, we have no obligation to return funds to investors prior to the date of any redemption required as a result of our failure to consummate our initial business combination within the period described above or our liquidation, unless we consummate our initial business combination prior thereto and only then in cases where investors have sought to redeem their shares of Common Stock. Only upon any such redemption of public shares as we are required to effect or any liquidation will public stockholders be entitled to distributions if we are unable to complete our initial business combination.

**The grant of registration rights to our initial stockholders and the underwriters may make it more difficult to complete our initial business combination, and the future exercise of such rights may adversely affect the market price of our Common Stock.**

Pursuant to agreements to be entered into on the date of this prospectus, our initial stockholders and the underwriters, and their respective Permitted Transferees, can demand that we register for resale an aggregate of 5,735,000 founder shares (assuming exercise in full of the over-allotment option by the underwriters), 15,000 insider shares, 969,000 private units (assuming exercise in full of the over-allotment by the underwriters) and underlying securities and securities issued upon conversion of working capital loans, if any. We will bear the cost of registering these securities. The registration and availability of such a significant number of securities for trading in the public market may have an adverse effect on the market price of our Common Stock. In addition, the existence of the registration rights may make our initial business combination more costly or difficult to conclude. This is because the stockholders of the target business may increase the equity stake they seek in the combined entity or ask for more cash consideration to offset the negative impact on the market price of our Common Stock that is expected when the securities owned by our initial stockholders and the underwriters, or their respective Permitted Transferees, are registered.

**Our officers and directors will allocate their time to other businesses thereby causing conflicts of interest in their determination as to how much time to devote to our affairs. This conflict of interest could have a negative impact on our ability to complete our initial business combination.**

Our officers and directors are not required to, and will not, commit their full time to our affairs, which may result in a conflict of interest in allocating their time between our operations and our search for a business combination and their other businesses. We do not intend to have any full-time employees prior to the completion of our initial business combination. Each of our officers is engaged in several other business endeavors, including but not limited to new and existing Private-to-Public Equity (PPE) companies, for which they may be entitled to substantial compensation and our officers are not obligated to contribute any specific number of hours per week

Table of Contents

to our affairs. In particular, certain of our officers and directors provide services to affiliates of our Sponsor. In particular, certain of our officers and directors serve as an officer or director of GIG2, a blank check company sponsored by an affiliate of our Sponsor, and also of Kaleyra, Inc. Our independent directors also serve as officers or board members for other entities. If our officers' and directors' other business affairs require them to devote substantial amounts of time to such affairs in excess of their current commitment levels, it could limit their ability to devote time to our affairs which may have a negative impact on our ability to complete our initial business combination. For a complete discussion of our officers' and directors' other business affairs, please see the section of this prospectus entitled "Management—Directors and Officers."

**Because we are not limited to any particular business or specific geographic location or any specific target businesses with which to pursue our initial business combination, you will be unable to ascertain the merits or risks of any particular target business' operations.**

Although we intend to focus on the technology, media, and technology businesses, we may pursue acquisition opportunities in any geographic region and in any business industry or sector. Except for the limitations that a target business have a fair market value of at least 80% of the value of the trust account (less the deferred underwriting commissions and any taxes payable on interest earned) and that we are not permitted to effectuate our initial business combination with another blank check company or similar company with nominal operations, we will have virtually unrestricted flexibility in identifying and selecting a prospective acquisition candidate. Because we have not yet identified or approached any specific target business with respect to our initial business combination, there is no basis to evaluate the possible merits or risks of any particular target business's operations, results of operations, cash flows, liquidity, financial condition or prospects. To the extent we consummate our initial business combination, we may be affected by numerous risks inherent in the business operations with which we combine. For example, if we combine with a financially unstable business or an entity lacking an established record of sales or earnings, we may be affected by the risks inherent in the business and operations of a financially unstable or a development stage entity. Although our officers and directors will endeavor to evaluate the risks inherent in a particular target business, we may not properly ascertain or assess all of the significant risk factors or we may not have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a target business. An investment in our units may not ultimately prove to be more favorable to investors than a direct investment, if such opportunity were available, in an acquisition target.

**Past performance by our management team may not be indicative of future performance of an investment in the Company.**

Information regarding performance by, or businesses associated with, our management team and their affiliates, including GIG1 and GIG2, is presented for informational purposes only. Past performance by our management team, including with respect to GIG1 and GIG2, is not a guarantee either (i) that we will be able to identify a suitable candidate for our initial business combination or (ii) of success with respect to any business combination we may consummate. You should not rely on the historical record of our management team's performance as indicative of our future performance of an investment in the company or the returns the company will, or is likely to, generate going forward.

**We may seek acquisition opportunities outside the TMT industry, which may be outside of our management's areas of expertise.**

We will consider a business combination outside the technology industries, which may be outside of our management's areas of expertise, if a business combination candidate is presented to us and we determine that such candidate offers an attractive acquisition opportunity for our company. In the event we elect to pursue an acquisition outside of the areas of our management's expertise, our management's expertise may not be directly applicable to its evaluation or operation, and the information contained in this prospectus regarding the areas of our management's expertise would not be relevant to an understanding of the business that we elect to acquire.

39

Table of Contents

As a result, our management may not be able to adequately ascertain or assess all of the significant risk factors relevant to such acquisition. Accordingly, any stockholder who chooses to remain a stockholder following our initial business combination could suffer a reduction in the value of their securities. Such stockholders are unlikely to have a remedy for such reduction in value.

**Although we identified general criteria and guidelines that we believe are important in evaluating prospective target businesses, we may enter into our initial business combination with a target that does not meet such criteria and guidelines, and as a result, the target business with which we enter into our initial business combination may not have attributes entirely consistent with our general criteria and guidelines.**

Although we have identified specific criteria and guidelines for evaluating prospective target businesses, it is possible that a target business with which we enter into our initial business combination will not have all of these positive attributes. If we consummate our initial business combination with a target that does not meet some or all of these guidelines, such combination may not be as successful as a combination with a business that does meet all of our general criteria and guidelines. In addition, if we announce our initial business combination with a target that does not meet our general criteria and guidelines, a greater number of stockholders may exercise their redemption rights, which may make it difficult for us to meet any closing condition with a target business that requires us to have a minimum net worth or a certain amount of cash. In addition, if stockholder approval of the transaction is required by law or the rules of NYSE, or we decide to obtain stockholder approval for business or other legal reasons, it may be more difficult for us to attain stockholder approval of our initial business combination if the target business does not meet our general criteria and guidelines. If we are unable to complete our initial business combination, our public stockholders may only receive $10.10 per share (whether or not the underwriters' over-allotment option is exercised in full) or potentially less than $10.10 per share on our redemption, and our warrants will expire worthless.

**Management's flexibility in identifying and selecting a prospective acquisition candidate, along with our management's financial interest in consummating our initial business combination, may lead management to enter into an acquisition agreement that is not in the best interest of our stockholders.**

Subject to the requirement that our initial business combination must be with one or more target businesses or assets having an aggregate fair market value of at least 80% of the value of the trust account (less the deferred underwriting commissions and any taxes payable on interest earned) at the time of the agreement to enter into such initial business combination, we will have virtually unrestricted flexibility in identifying and selecting a prospective acquisition candidate. Investors will be relying on management's ability to identify business combinations, evaluate their merits, conduct or monitor diligence and conduct negotiations. Management's flexibility in identifying and selecting a prospective acquisition candidate, along with management's financial interest in consummating our initial business combination, may lead management to enter into an acquisition agreement that is not in the best interest of our stockholders.

**We may seek acquisition opportunities with an early stage company, a financially unstable business or an entity lacking an established record of revenue or earnings.**

To the extent we complete our initial business combination with an early stage company, a financially unstable business or an entity lacking an established record of sales or earnings, we may be affected by numerous risks inherent in the operations of the business with which we combine. These risks include investing in a business without a proven business model and with limited historical financial data, volatile revenues or earnings, intense competition and difficulties in obtaining and retaining executive officers and directors. Although our officers and directors will endeavor to evaluate the risks inherent in a particular target business, we may not be able to properly ascertain or assess all of the significant risk factors and we may not have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a target business.

40

Table of Contents

**We are not required to obtain an opinion from an independent investment banking firm or another independent entity, and consequently, an independent source may not confirm that the price we are paying for the business is fair to our stockholders from a financial point of view.**

Unless we consummate our initial business combination with an affiliated entity, we are not required to obtain an opinion from an independent investment banking firm or another independent entity that the price we are paying is fair to our stockholders from a financial point of view. If no opinion is obtained, our stockholders will be relying on the judgment of our Board of Directors, who will determine fair market value based on standards generally accepted by the financial community. Our Board of Directors will have significant discretion in choosing the standard used to establish the fair market value of the target acquisition. Such standards used will be disclosed in our tender offer documents or proxy solicitation materials, as applicable, related to our initial business combination.

**We may issue additional shares of Common Stock or preferred shares to complete our initial business combination or under an employee incentive plan upon or after consummation of our initial business combination, which would dilute the interest of our stockholders and likely present other risks.**

Our amended and restated certificate of incorporation authorizes the issuance of 100,000,000 shares of Common Stock, and 1,000,000 shares of preferred stock, par value $0.0001 per share. We may issue a substantial number of additional shares of Common Stock or shares of preferred stock, par value $0.0001 per share, to complete our initial business combination or under an employee incentive plan upon or after consummation of our initial business combination. Although no such issuance will affect the per share amount available for redemption from the trust account, the issuance of additional Common Stock or preferred shares:

- may significantly dilute the equity interest of investors in this offering, who will not have pre-emption rights in respect of such an issuance;
- may subordinate the rights of holders of shares of Common Stock if one or more classes of preferred stock are created, and such preferred shares are issued, with rights senior to those afforded to our Common Stock;
- could cause a change in control if a substantial number of shares of Common Stock are issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors; and
- may adversely affect prevailing market prices for our units, Common Stock and/or warrants.

**Resources could be wasted in researching acquisitions that are not consummated, which could materially adversely affect subsequent attempts to locate and acquire or merge with another business.**

We anticipate that the investigation of each specific target business and the negotiation, drafting, and execution of relevant agreements, disclosure documents, and other instruments will require substantial management time and attention and substantial costs for accountants, attorneys and others. If we decide not to complete a specific initial business combination, the costs incurred up to that point for the proposed transaction likely would not be recoverable. Furthermore, if we reach an agreement relating to a specific target business, we may fail to consummate our initial business combination for any number of reasons including those beyond our control. Any such event will result in a loss to us of the related costs incurred, which could materially adversely affect subsequent attempts to locate and acquire or merge with another business. If we are unable to complete our initial business combination, our public stockholders may only receive $10.10 per share (whether or not the underwriters' over-allotment option is exercised in full) or potentially less than $10.10 per share on our redemption, and our warrants will expire worthless.

41

Table of Contents

**Provisions in our amended and restated certificate of incorporation and Delaware law may inhibit a takeover of us, which could limit the price investors might be willing to pay in the future for our Common Stock and could entrench management.**

Our amended and restated certificate of incorporation will contain provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. These provisions include the ability of our Board of Directors to designate the terms of, and issue new series of, preferred stock. We are also subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together these provisions may make more difficult the removal of management and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities.

**Our amended and restated certificate of incorporation will provide, subject to limited exceptions, that the Court of Chancery of the State of Delaware will be the sole and exclusive forum for certain stockholder litigation matters, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees or stockholders.**

Our amended and restated certificate of incorporation will require, to the fullest extent permitted by law, that derivative actions brought in our name, actions against our directors, officers, and employees for breach of fiduciary duty and other similar actions may be brought only in the Court of Chancery in the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel except any action (A) as to which the Court of Chancery in the State of Delaware determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), (B) which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, (C) for which the Court of Chancery does not have subject matter jurisdiction, or (D) arising under the Securities Act, as to which the Court of Chancery and the federal district court for the District of Delaware shall have concurrent jurisdiction. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock shall be deemed to have notice of and consented to the forum provisions in our amended and restated certificate of incorporation. This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, or employees which may discourage lawsuits with respect to such claims, although our stockholders will not be deemed to have waived our compliance with federal securities laws and the rules and regulations thereunder. However, there is no assurance that a court would enforce the choice of forum provision contained in our amended and restated certificate of incorporation. If a court were to find such provision to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, operating results and financial condition.

Our amended and restated certificate of incorporation will provide that the exclusive forum provision will be applicable to the fullest extent permitted by applicable law. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. As a result, the exclusive forum provision will not apply to suits brought to enforce any duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction.

**We do not currently intend to hold an annual meeting of stockholders until after our consummation of a business combination and you will not be entitled to any of the corporate protections provided by such a meeting.**

We do not currently intend to hold an annual meeting of stockholders until after we consummate a business combination (unless required by the NYSE), and thus may not be in compliance with Section 211(b) of the DGCL, which requires an annual meeting of stockholders be held for the purposes of electing directors, in accordance with a company's bylaws, unless such election is made by written consent in lieu of such a meeting.

42

**Table of Contents**

If our stockholders want us to hold an annual meeting prior to our consummation of a business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

**We may reincorporate in another jurisdiction in connection with our initial business combination and such reincorporation may result in taxes imposed on stockholders.**

We may, in connection with our initial business combination, reincorporate in the jurisdiction in which the target company or business is located or in another jurisdiction. The transaction may require a stockholder to recognize taxable income in the jurisdiction in which the stockholder is a tax resident or in which its members are resident if it is a tax transparent entity. We do not intend to make any cash distributions to stockholders to pay such taxes. Stockholders may be subject to withholding taxes or other taxes with respect to their ownership of us after the reincorporation.

**Our ability to successfully effect our initial business combination and to be successful thereafter will be largely dependent upon the efforts of our executive officers and directors, some of whom may join the post-transaction company following our initial business combination. The loss of our executive officers or directors could negatively impact the operations and profitability of our business.**

Our operations are dependent upon a relatively small group of individuals and, in particular, our executive officers and directors. We believe that our success depends on the continued service of our executive officers and directors, at least until we have consummated our initial business combination. In addition, our executive officers and directors are not required to commit any specified amount of time to our affairs and, accordingly, will have conflicts of interest in allocating management time among various business activities, including identifying potential business combinations and monitoring the related due diligence. We do not have an employment agreement with, or key-man insurance on the life of, any of our directors or executive officers. The unexpected loss of the services of one or more of our directors or executive officers could have a detrimental effect on us. Additionally, we do not intend to have any full-time employees prior to the consummation of our initial business combination.

The role of such persons in the target business following the initial business combination, however, cannot presently be ascertained. Although some of such persons may remain with the post-transaction company in senior management or advisory positions following our initial business combination, it is likely that some or all of the management of the target business will remain in place. While we intend to closely scrutinize any individuals we engage after our initial business combination, our assessment of these individuals may not prove to be correct. These individuals may be unfamiliar with the requirements of operating a company regulated by the SEC, which could cause us to have to expend time and resources helping them become familiar with such requirements.

Our officers and directors also hold roles in other companies. For example, there is significant overlap among the directors and officers of GIG2 and our company. Dr. Katz, our Chief Executive Officer and Executive Chairman, serves as Executive Chairman of GIG2. Certain of our directors, Dr. Dinu and Messrs. Miotto and Mikulsky, are members of the board of directors of GIG2. Dr. Dinu also serves as the Chief Executive Officer of GIG2. Our directors Messrs. Wang and Betti-Berutto serve as the Software Chief Technical Officer and Hardware Chief Technical Officer, respectively, of GIG2 and have similar roles with us. Messrs. Wang and Betti-Berutto are not officers or employees of our company; their respective titles of Software Chief Technical Officer and Hardware Chief Technical Officer reflect their core competencies and expertise and are primarily for marketing purposes as they assist our company to identify suitable business combination candidates. Mr. Weightman, our Chief Financial Officer, serves as the Chief Financial Officer of GIG2. In addition, there is overlap among our directors and the directors of Kaleyra, Inc. as Dr. Katz and Messrs. Miotto and Mikulsky are also directors of Kaleyra, Inc. Furthermore, Dr. Dinu chairs, and Mr. Wang is a member of, the Strategic Advisory Board of Kaleyra, Inc.

43

Table of Contents

**Our executive officers and directors may negotiate employment or consulting agreements with a target business in connection with a particular business combination. These agreements may provide for them to receive compensation following our initial business combination and as a result, may cause them to have conflicts of interest in determining whether a particular business combination is the most advantageous.**

Our executive officers and directors may be able to remain with the post-transaction company after the consummation of our initial business combination only if they are able to negotiate employment or consulting agreements in connection with the business combination. Such negotiations would take place simultaneously with the negotiation of the business combination and could provide for such individuals to receive compensation in the form of cash payments and/or our securities for services they would render to us after the consummation of the business combination. The personal and financial interests of such individuals may influence their motivation in identifying and selecting a target business. Moreover, there is no certainty that any of our executive officers or directors will remain with the post-transaction company after the consummation of our initial business combination. Our executive officers and directors may not remain in senior management or advisory positions with the post-transaction company. The determination as to whether any of our executive officers and directors will remain with the post-transaction company will be made at the time of our initial business combination.

**We may have a limited ability to assess the management of a prospective target business and, as a result, may effect our initial business combination with a target business whose management may not have the skills, qualifications or abilities to manage a public company.**

When evaluating the desirability of effecting our initial business combination with a prospective target business, our ability to assess the target business' management may be limited due to a lack of time, resources or information. Our assessment of the capabilities of the target's management, therefore, may prove to be incorrect and such management may lack the skills, qualifications or abilities we suspected. Should the target's management not possess the skills, qualifications or abilities necessary to manage a public company, the operations and profitability of the post-combination business may be negatively impacted.

**The officers and directors of an acquisition candidate may resign upon consummation of our initial business combination. The loss of an acquisition target's key personnel could negatively impact the operations and profitability of our post-combination business.**

The role of an acquisition target's key personnel upon the consummation of our initial business combination cannot be ascertained at this time. Although we contemplate that certain members of an acquisition candidate's management team will remain associated with the post-transaction company following our initial business combination, it is possible that some members of the management team of an acquisition candidate will not wish to remain in place.

**None of the underwriters or any of their respective affiliates have an obligation to provide us with potential investment opportunities or to devote any specified amount of time or support to our company's business.**

None of the underwriters or any of their respective affiliates have any legal or contractual obligation to seek on our behalf or to present to us investment opportunities that might be suitable for our business, and may allocate any such opportunities at their discretion to us or other parties. We have no investment management, advisory, consulting or other agreement in place with the underwriters or any of their affiliates that obligates them to undertake efforts on our behalf or that govern the manner in which they will allocate investment opportunities. Even if the underwriters or one of their affiliates refers an opportunity to us, no assurance can be given that such opportunity will result in an acquisition agreement or our initial business combination.

44

**Table of Contents**

**Certain of our officers and directors are now, and all of them may in the future become, affiliated with entities engaged in business activities similar to those intended to be conducted by us, including other blank check companies, and, accordingly, may have conflicts of interest in allocating their time and determining to which entity a particular business opportunity should be presented.**

Following the completion of this offering and until we consummate our initial business combination, we intend to engage in the business of identifying and combining with one or more businesses. Our Sponsor and officers and directors are, and may in the future become, affiliated with entities that are engaged in a similar business. In addition, our Sponsor, officers and directors may participate in the formation of, or become an officer or director of, any other blank check company prior to completion of our initial business combination. As a result, our Sponsor, officers or directors could have conflicts of interest in determining whether to present business combination opportunities to us or to any other blank check company, or operating company, with which they may become involved. In particular, an affiliate of our Sponsor is currently sponsoring another blank check company, GIG2, which may seek to complete a business combination in the TMT industry. Further, there is significant overlap among the directors and officers of GIG2 and our company. Dr. Katz, our Chief Executive Officer and Executive Chairman, serves as Executive Chairman of GIG2. Certain of our directors, Dr. Dinu and Messrs. Miotto and Mikulsky, are members of the board of directors of GIG2. Dr. Dinu also serves as the Chief Executive Officer of GIG2. Our directors Messrs. Wang and Betti-Berutto serve as the Software Chief Technical Officer and Hardware Chief Technical Officer, respectively, of GIG2 and have similar roles with us. Messrs. Wang and Betti-Berutto are not officers or employees of our company; their respective titles of Software Chief Technical Officer and Hardware Chief Technical Officer reflect their core competencies and expertise and are primarily for marketing purposes as they assist our company to identify suitable business combination candidates. Mr. Weightman, our Chief Financial Officer, serves as the Chief Financial Officer of GIG2. In addition, there is overlap among our directors and the directors of Kaleyra, Inc. as Dr. Katz and Messrs. Miotto and Mikulsky are also directors of that company, which may also seek to acquire companies in the TMT industry. Furthermore, Dr. Dinu chairs, and Mr. Wang is a member of, the Strategic Advisory Board of Kaleyra, Inc. Any such companies, including GIG2 and Kaleyra, Inc., may present additional conflicts of interest in pursuing an acquisition target.

Our officers and directors also may become aware of business opportunities which may be appropriate for presentation to us and the other entities to which they owe certain fiduciary or contractual duties.

Accordingly, they may have conflicts of interest in determining to which entity a particular business opportunity should be presented. These conflicts may not be resolved in our favor and a potential target business may be presented to another entity prior to its presentation to us. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

For a complete discussion of our officers' and directors' business affiliations and the potential conflicts of interest that you should be aware of, please see the sections of this prospectus entitled "Management—Directors and Officers," "Management—Conflicts of Interest" and "Certain Relationships and Related Party Transactions."

**We may engage in our initial business combination with one or more target businesses that have relationships with entities that may be affiliated with our Founder, executive officers or directors, which may raise potential conflicts of interest.**

We have not adopted a policy that expressly prohibits our directors, executive officers, security holders or affiliates from having a direct or indirect pecuniary or financial interest in any investment to be acquired or disposed of by us or in any transaction to which we are a party or have an interest. In light of the involvement of our Founder, executive officers, directors, and each of their affiliates, with other entities, we may decide to acquire one or more businesses affiliated with our Founder, executive officers or directors, or any of their

45

Table of Contents

affiliates. Our directors also serve as executive officers and board members for other entities. Our Founder, executive officers and directors are not currently aware of any specific opportunities for us to consummate our initial business combination with any entities with which they are affiliated, and there have been no discussions concerning a business combination with any such entity or entities. Although we will not be specifically focusing on, or targeting, any transaction with any affiliated entities, we would pursue such a transaction if we determined that such affiliated entity met our criteria for our initial business combination as set forth in "*Proposed Business—Initial Business Combination—Selection of a Target Business and Structuring of a Business Combination*" and such transaction was approved by a majority of our disinterested directors. Despite our agreement to obtain an opinion from an independent investment banking firm or another independent entity regarding the fairness to our stockholders from a financial point of view of a business combination with one or more domestic or international businesses affiliated with our executive officers, directors or existing holders, potential conflicts of interest still may exist and, as a result, the terms of the business combination may not be as advantageous to our public stockholders as they would be absent any conflicts of interest. Our directors have a fiduciary duty to act in the best interests of our stockholders, whether or not a conflict of interest may exist.

**Since our Sponsor will lose its entire investment in us if our initial business combination is not consummated, and our executive officers and directors have significant financial interests in our Sponsor, a conflict of interest may arise in determining whether a particular acquisition target is appropriate for our initial business combination.**

In February 2020, our Sponsor purchased 5,735,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share. Drs. Katz and Dinu, who are husband and wife, and Mr. Miotto, have a financial interest in an affiliate of our Sponsor, GigFounders, LLC. Dr. Katz is also the manager of our Sponsor. Certain of our other directors, Messrs. Mikulsky, Wang and Betti-Berutto, and Mr. Weightman, our Chief Financial Officer, also have a financial interest in our Sponsor. See "—*Certain Relationships and Related Party Transactions*." In addition, prior to consummation of this offering, we will issue 5,000 insider shares to each of Messrs. Weightman, Wang and Betti-Berutto solely in consideration of future services. All of the founder shares and insider shares will be worthless if we do not consummate our initial business combination. In addition, our Sponsor has committed to purchase 689,000 (assuming exercise of the over-allotment option by the underwriters) private units, for an aggregate purchase price of $6,890,000 which will be worthless if we do not consummate our initial business combination. The personal and financial interests of our Sponsor, as well as our executive officers and directors with a significant financial interest in our Sponsor, may influence their motivation in identifying and selecting a target business combination, completing an initial business combination and influencing the operation of the business following the initial business combination.

**We may issue notes or other debt securities, or otherwise incur substantial debt, to complete our initial business combination, which may adversely affect our financial condition and thus negatively impact the value of our stockholders' investment in us.**

On February 13, 2020, we issued a promissory note to our Sponsor with a principal amount of $100,000, all of which remained outstanding as of February 24, 2020.

46

Table of Contents

Although we have no other commitments as of the date of this prospectus to issue any notes or other debt securities, or to otherwise incur outstanding debt, we may choose to incur substantial debt to complete initial business combination. Furthermore, we may issue a substantial number of additional common or preferred shares to complete our initial business combination or under an employee incentive plan upon or after consummation of our initial business combination. We and our officers and directors have agreed that we will not incur any indebtedness unless we have obtained from the lender a waiver of any right, title, interest or claim of any kind in or to any monies held in the trust account. As such, no issuance of debt will affect the per share amount available for redemption from the trust account. Nevertheless, the incurrence of debt could have a variety of negative effects, including:

- default and foreclosure on our assets if our operating revenues after our initial business combination are insufficient to repay our debt obligations;
- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;
- our immediate payment of all principal and accrued interest, if any, if the debt security is payable on demand;
- our inability to obtain necessary additional financing if the debt security contains covenants restricting our ability to obtain such financing while the debt security is outstanding;
- our inability to pay dividends on our Common Stock;
- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our Common Stock if declared, expenses, capital expenditures, acquisitions and other general corporate purposes;
- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;
- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation; and
- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, execution of our strategy and other purposes and other disadvantages compared to our competitors who have less debt.

**We may only be able to complete one business combination with the proceeds of this offering, and the sale of the private units, which will cause us to be solely dependent on a single business, which may have a limited number of products or services. This lack of diversification may negatively impact our operations and profitability.**

The net proceeds after this offering and the sale of the private units that we may use to complete our initial business combination will provide us with $202,000,000 (or $232,300,000 if the underwriters' over-allotment option is exercised in full). This includes $8,000,000, or up to $9,200,000 if the over-allotment option is exercised in full, for the payment of deferred underwriting commissions to be paid upon the completion of the initial business combination as consideration of the underwriters using their commercially reasonable efforts to provide us with the following services: 1) originating and introducing us to potential targets for our initial business combination; 2) arranging institutional investor meetings on our behalf in connection with obtaining financing for the initial business combination; 3) assisting us in meeting our securities exchange listing requirements following the closing of this offering; and 4) providing capital markets advice and liquidity to us following the closing of this offering.

We may effectuate our initial business combination with a single target business or multiple target businesses simultaneously. However, we may not be able to effectuate our initial business combination with more than one

Table of Contents

target business because of various factors, including the existence of complex accounting issues and the requirement that we prepare and file pro forma financial statements with the SEC that present operating results and the financial condition of several target businesses as if they had been operated on a combined basis. By consummating our initial business combination with only a single entity, our lack of diversification may subject us to numerous economic, competitive and regulatory risks. Further, we would not be able to diversify our operations or benefit from the possible spreading of risks or offsetting of losses, unlike other entities, which may have the resources to complete several business combinations in different industries or different areas of a single industry. Accordingly, the prospects for our success may be:

- solely dependent upon the performance of a single business, property or asset, or
- dependent upon the development or market acceptance of a single or limited number of products, processes or services.

This lack of diversification may subject us to numerous economic, competitive and regulatory risks, any or all of which may have a substantial adverse impact upon the particular industry in which we may operate subsequent to our initial business combination.

**We may attempt to simultaneously consummate business combinations with multiple prospective targets, which may hinder our ability to consummate our initial business combination and give rise to increased costs and risks that could negatively impact our operations and profitability.**

If we determine to simultaneously acquire several businesses that are owned by different sellers, we will need for each of such sellers to agree that our purchase of its business is contingent on the simultaneous closings of the other business combinations, which may make it more difficult for us, and delay our ability, to complete the initial business combination. With multiple business combinations, we could also face additional risks, including additional burdens and costs with respect to possible multiple negotiations and due diligence investigations (if there are multiple sellers) and the additional risks associated with the subsequent assimilation of the operations and services or products of the acquired companies in a single operating business. If we are unable to adequately address these risks, it could negatively impact our profitability and results of operations.

**We may attempt to consummate our initial business combination with a private company about which little information is available, which may result in our initial business combination with a company that is not as profitable as we suspected, or at all.**

In pursuing our acquisition strategy, we may seek to effectuate our initial business combination with a privately held company. By definition, very little public information exists about private companies, and we could be required to make our decision on whether to pursue a potential initial business combination on the basis of limited information, which may result in our initial business combination with a company that is not as profitable as we suspected, or at all.

**Our management team and our stockholders may not be able to maintain control of a target business after our initial business combination.**

We may structure our initial business combination to acquire less than 100% of the equity interests or assets of a target business, but we will only consummate such business combination if we will become the majority stockholder of the target (or control the target through contractual arrangements in limited circumstances for regulatory compliance purposes) or are otherwise not required to register as an investment company under the Investment Company Act. Even though we may own a majority interest in the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. In this case, we acquire a 100% controlling interest in the target. However, as a result of the

48

**Table of Contents**

issuance of a substantial number of new shares, our stockholders immediately prior to such transaction could own less than a majority of our outstanding shares subsequent to such transaction. In addition, other minority stockholders may subsequently combine their holdings resulting in a single person or group obtaining a larger share of the company's stock than we initially acquired. Accordingly, this may make it more likely that we will not be able to maintain our control of the post-transaction company.

**Unlike many blank check companies, we do not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it easier for us to consummate our initial business combination with which a substantial majority of our stockholders do not agree.**

Since we have no specified percentage threshold for redemption contained in our amended and restated certificate of incorporation, our structure is different in this respect from the structure that has been used by many blank check companies. Historically, blank check companies would not be able to consummate an initial business combination if the holders of such company's public shares voted against a proposed business combination and elected to redeem more than a specified maximum percentage of the shares sold in such company's IPO, which percentage threshold was typically between 19.99% and 39.99%. As a result, many blank check companies were unable to complete a business combination because the amount of shares voted by their public stockholders electing redemption exceeded the maximum redemption threshold pursuant to which such company could proceed with its initial business combination. As a result, we may be able to consummate our initial business combination even though a substantial majority of our public stockholders do not agree with the transaction and have redeemed their shares or, if we seek stockholder approval of our initial business combination and do not conduct redemptions in connection with our business combination pursuant to the tender offer, have entered into privately negotiated agreements to sell their shares to us or our Founder, executive officers, directors, advisors or their affiliates. However, in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 upon the consummation of our initial business combination. Furthermore, the redemption threshold may be further limited by the terms and conditions of our initial business combination. If too many public stockholders exercise their redemption rights so that we cannot satisfy the net tangible asset requirement or any net worth or cash requirements, we would not proceed with the redemption of our public shares and the related business combination, and instead may search for an alternate business combination.

**Holders of warrants will not participate in liquidating distributions if we are unable to complete an initial business combination within the required time period.**

If we are unable to complete an initial business combination within the required time period and we liquidate the funds held in the trust account, the warrants will expire and holders will not receive any of such proceeds with respect to the warrants. In this case, holders of warrants are treated in the same manner as holders of warrants of blank check companies whose units are comprised of shares and warrants, as the warrants in those companies do not participate in liquidating distribution. Nevertheless, holders of public units may have a financial incentive to vote in favor of any proposed initial business combination as each whole warrant would entitle the holder to purchase one share of Common Stock, resulting in an increase in their overall economic stake in our company. If a business combination is not approved, the warrants will expire and will be worthless.

**If we do not maintain a current and effective prospectus relating to the warrant shares issuable upon exercise of the warrants, public holders will only be able to exercise such warrants on a "cashless basis" which would result in a fewer number of shares being issued to the holder had such holder exercised the warrants for cash.**

If we do not maintain a current and effective prospectus relating to the warrant shares issuable upon exercise of the public warrants at the time that holders wish to exercise such warrants, they will only be able to exercise them on a "cashless basis" provided that an exemption from registration is available. As a result, the number of warrant shares that a holder will receive upon exercise of its public warrants will be fewer than it would have

Table of Contents

been had such holder exercised its warrant for cash. Further, if an exemption from registration is not available, holders would not be able to exercise their warrants on a cashless basis and would only be able to exercise their warrants for cash if a current and effective prospectus relating to the warrant issuable upon exercise of the warrants is available. Under the terms of the warrant agreement, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement for the registration under the Securities Act of the warrant shares and thereafter use its best efforts to cause the registration statement to become effective and to maintain the effectiveness of such registration statement until the expiration of the warrants. However, we cannot assure you that we will be able to do so. If we are unable to do so, the potential "upside" of the holder's investment in our company may be reduced or the warrants may expire worthless. In no event will we be required to net cash settle any warrant, or issue securities or other compensation in exchange for the warrants in the event that we are unable to register or qualify the shares underlying the warrants under the Securities Act or applicable state securities laws. If the issuance of the warrant shares upon exercise of the warrants is not so registered or qualified or exempt from registration or qualification, the holder of such warrants shall not be entitled to exercise such warrants and such warrants may have no value and expire worthless. In such event, holders who acquired their warrants as part of a purchase of units will have paid the full unit purchase price solely for the shares of Common Stock included in the units. Notwithstanding the foregoing, the private warrants may be exercisable for unregistered warrant shares for cash even if the prospectus relating to the warrant shares issuable upon exercise of the warrants is not current and effective.

**Our management's ability to require holders of our warrants to exercise such warrants on a cashless basis will cause holders to receive fewer shares of Common Stock upon their exercise of the warrants than they would have received had they been able to exercise their warrants for cash.**

If we call our public warrants for redemption after the redemption criteria described elsewhere in this prospectus have been satisfied, our management will have the option to require any holder that wishes to exercise his warrants (including any warrants held by our Founder, executive officers and directors, or any of their permitted transferees) to do so on a "cashless basis." If our management chooses to require holders to exercise their warrants on a cashless basis, the number of warrant shares received by a holder upon exercise will be fewer than it would have been had such holder exercised his warrants for cash. This will have the effect of reducing the potential "upside" of the holder's investment in our company.

**We may amend the terms of the warrants in a manner that may be adverse to holders with the approval by the holders of at least 50% of the then outstanding public warrants.**

Our warrants will be issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The warrant agreement will provide that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders. Accordingly, we may amend the terms of the warrants in a manner adverse to a holder if holders of at least 50% of the then outstanding public warrants approve of such amendment. Although our ability to amend the terms of the warrants with the consent of at least 50% of the then outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, shorten the exercise period or decrease the number of warrant shares issuable upon exercise of a warrant.

**A provision of our warrant agreement may make it more difficult for us to consummate an initial business combination.**

Unlike most blank check companies, if

- we issue additional shares of Common Stock or equity-linked securities for capital raising purposes in connection with the closing of our initial business combination at an issue price or effective issue price of less than $9.20 per share of Common Stock,

50

Table of Contents

- the aggregate gross proceeds from such issuances represent more than 65% of the total equity proceeds, and interest thereon, available for the funding of our initial business combination on the date of the consummation of our initial business combination (net of redemptions), and
- the Market Value is below $9.20 per share,

then the exercise price of the warrants will be adjusted to be equal to 115% of the higher of the Market Value and the price at which we issue the additional shares of Common Stock or equity-linked securities. This may make it more difficult for us to consummate an initial business combination with a target business.

**Our warrants may have an adverse effect on the market price of our Common Stock and make it more difficult to effectuate our initial business combination.**

We will be issuing warrants to purchase 15,000,000 shares of our Common Stock (or up to 17,250,000 shares if the underwriters' over-allotment option is exercised in full) as part of the units offered by this prospectus, and warrants to purchase 562,500 shares of our Common Stock (or up to 603,000 shares of Common Stock if the underwriters' over-allotment is exercised in full), as part of a private placement. In each case, the warrants are exercisable at a price of $11.50. To the extent we issue shares of Common Stock to effectuate a business transaction, the potential for the issuance of a substantial number of additional shares of Common Stock upon exercise of these warrants could make us a less attractive acquisition vehicle to a target business. Any such issuance will increase the number of issued and outstanding shares of Common Stock and reduce the value of the shares of Common Stock issued to complete the business transaction. Therefore, our warrants may make it more difficult to effectuate a business combination or increase the cost of acquiring the target business.

**The ability of our public stockholders to exercise their redemption rights may not allow us to effectuate the most desirable business combination or optimize our capital structure.**

If our initial business combination requires us to use substantially all of our cash to pay the purchase price, because we will not know how many public stockholders may exercise redemption rights, we may either need to reserve part of the trust account for possible payment upon such redemption, or we may need to arrange third party financing to help fund our initial business combination. In the event that the acquisition involves the issuance of our stock as consideration, we may be required to issue a higher percentage of our stock to make up for a shortfall in funds. Raising additional funds to cover any shortfall may involve dilutive equity financing or incurring indebtedness at higher than desirable levels. This may limit our ability to effectuate the most attractive business combination available to us.

**We may be unable to consummate an initial business combination if a target business requires that we have a certain amount of cash at closing, in which case public stockholders may have to remain stockholders of our company and wait until our redemption of the public shares to receive a pro rata share of the trust account or attempt to sell their shares in the open market.**

A potential target may make it a closing condition to our initial business combination that we have a certain amount of cash in excess of the $5,000,001 of net tangible assets we are required to have pursuant to our organizational documents available at the time of closing. If the number of our public stockholders electing to exercise their redemption rights has the effect of reducing the amount of money available to us to consummate an initial business combination below such minimum amount required by the target business and we are not able to locate an alternative source of funding, we will not be able to consummate such initial business combination and we may not be able to locate another suitable target within the applicable time period, if at all. In that case, public stockholders may have to remain stockholders of our company and wait the full 18 months from the closing of this offering, in order to be able to receive a portion of the trust account, or attempt to sell their shares in the open market prior to such time, in which case they may receive less than they would have in a liquidation of the trust account.

51

Table of Contents

**We intend to offer each public stockholder the option to vote in favor of the proposed business combination and still seek redemption of such stockholders' shares.**

In connection with any meeting held to approve an initial business combination, we will offer each public stockholder (but not our initial stockholders or the underwriters) the right to have his, her or its shares of Common Stock redeemed for cash (subject to the limitations described elsewhere in this prospectus) regardless of whether such stockholder votes for or against such proposed business combination or votes at all. We will consummate our initial business combination only if we have net tangible assets of at least $5,000,001 upon such consummation and a majority of the outstanding shares of Common Stock voted are voted in favor of the business combination. This is different than other similarly structured blank check companies where stockholders are offered the right to redeem their shares only when they vote against a proposed business combination. This threshold and the ability to seek redemption while voting in favor of a proposed business combination may make it more likely that we will consummate our initial business combination.

**We will require public stockholders who wish to redeem their shares of Common Stock in connection with a proposed business combination to comply with specific requirements for redemption that may make it more difficult for them to exercise their redemption rights prior to the deadline for exercising their rights.**

We will require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the expiration date set forth in the tender offer documents mailed to such holders, or in the event we distribute proxy materials, up to two business days prior to the vote on the proposal to approve the business combination, or to deliver their shares to the transfer agent electronically using The Depository Trust Company's DWAC (Deposit/Withdrawal At Custodian) System, at the holder's option. In order to obtain a physical stock certificate, a stockholder's broker and/or clearing broker, The Depository Trust Company ("DTC") and our transfer agent will need to act to facilitate this request. It is our understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the transfer agent. However, because we do not have any control over this process or over the brokers or DTC, it may take significantly longer than two weeks to obtain a physical stock certificate. While we have been advised that it takes a short time to deliver shares through the DWAC System, this may not be the case. Under our bylaws, we are required to provide at least 10 days advance notice of any stockholder meeting, which would be the minimum amount of time a stockholder would have to determine whether to exercise redemption rights. Accordingly, if it takes longer than we anticipate for stockholders to deliver their shares, stockholders who wish to redeem may be unable to meet the deadline for exercising their redemption rights and thus may be unable to redeem their shares. In the event that a stockholder fails to comply with the various procedures that must be complied with in order to validly tender or redeem public shares, its shares may not be redeemed.

Additionally, despite our compliance with the proxy rules or tender offer rules, as applicable, stockholders may not become aware of the opportunity to redeem their shares.

**Redeeming stockholders may be unable to sell their securities when they wish to in the event that the proposed business combination is not approved.**

We will require public stockholders who wish to redeem their shares of Common Stock in connection with any proposed business combination to comply with the delivery requirements discussed above for redemption. If such proposed business combination is not consummated, we will promptly return such certificates to the tendering public stockholders. Accordingly, investors who attempted to redeem their shares in such a circumstance will be unable to sell their securities after the failed acquisition until we have returned their securities to them. The market price for our Common Stock may decline during this time and you may not be able to sell your securities when you wish to, even while other stockholders that did not seek redemption may be able to sell their securities.

Table of Contents

**Because of our structure, other companies may have a competitive advantage and we may not be able to consummate an attractive business combination.**

We expect to encounter intense competition from entities other than blank check companies having a business objective similar to ours, including private equity groups, venture capital funds, leveraged buyout funds and operating businesses competing for acquisitions. Many of these entities are well established and have extensive experience in identifying and effecting business combinations directly or through affiliates. Many of these competitors possess greater technical, human and other resources than we do and our financial resources will be relatively limited when contrasted with those of many of these competitors. Therefore, our ability to compete in acquiring certain sizable target businesses may be limited by our available financial resources. This inherent competitive limitation gives others an advantage in pursuing the acquisition of certain target businesses. Furthermore, seeking stockholder approval of our initial business combination may delay the consummation of a transaction. Any of the foregoing may place us at a competitive disadvantage in successfully negotiating our initial business combination.

**Provisions of our amended and restated certificate of incorporation that relate to our pre-business combination activity (and corresponding provisions of the agreement governing the release of funds from our trust account) may be amended with the approval of holders of at least 65% of our issued and outstanding Common Stock, which is a lower amendment threshold than that of some other blank check companies. It may be easier for us, therefore, to amend our amended and restated certificate of incorporation and the trust agreement to facilitate the completion of an initial business combination that some of our stockholders may not support.**

Some other blank check companies have a provision in their charter which prohibits the amendment of certain of its provisions, including those which relate to a company's pre-business combination activity, without approval by holders of a certain percentage of the company's shares. In those companies, amendment of these provisions typically requires approval by holders holding between 90% and 100% of the company's public shares. Our amended and restated certificate of incorporation will provide that amendments to any its provisions relating to our pre-initial business combination activity and related stockholder rights may be amended if approved by holders of 65% of our outstanding Common Stock. If an amendment to any such provision is approved by the requisite stockholder vote, then the corresponding provisions of the trust agreement governing the release of funds from our trust account may be amended. In all other instances, our amended and restated certificate of incorporation may be amended by holders of a majority of our Common Stock, subject to applicable provisions of the DGCL or applicable stock exchange rules. Subsequent to this offering and prior to the consummation of our initial business combination, we may not issue additional securities that can vote on amendments to our amended and restated certificate of incorporation. Our initial stockholders (and their permitted transferees) will collectively beneficially own approximately 21.8% of our outstanding Common Stock upon the closing of this offering (assuming they do not purchase any public units in this offering), and they may participate in any vote to amend our amended and restated certificate of incorporation and/or trust agreement and will have the discretion to vote in any manner they choose; *provided, that*, each of them has agreed (and any of their permitted transferees will agree), pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation that would affect the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering unless we provide our public stockholders with the opportunity to redeem their shares of Common Stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares. As a result, we may be able to amend the provisions of our amended and restated certificate of incorporation which govern our pre-business combination behavior more easily than some other blank check companies, and this may increase our ability to complete our initial business combination with which you do not agree. In certain circumstances, our stockholders may pursue remedies against us for any breach of our amended and restated certificate of incorporation.

Table of Contents

**We may be unable to obtain additional financing to complete our initial business combination or to fund the operations and growth of a target business, which could compel us to restructure or abandon a particular business combination. If we are unable to complete our initial business combination, our public stockholders may only receive $10.10 per share (whether or not the underwriters' over-allotment option is exercised in full) or potentially less than $10.10 per share on our redemption, and the warrants will expire worthless.**

Although we believe that the net proceeds of this offering and the sale of the private units and founder shares, including the interest earned on the proceeds held in the trust account that may be available to us for our initial business combination, will be sufficient to allow us to consummate our initial business combination, because we have not yet identified any prospective target business we cannot ascertain the capital requirements for any particular transaction. If the net proceeds of this offering and the sale of the private units and founder shares prove to be insufficient, either because of the size of our initial business combination, the depletion of the available net proceeds in search of a target business, the obligation to repurchase for cash a significant number of shares from stockholders who elect redemption in connection with our initial business combination or the terms of negotiated transactions to purchase shares in connection with our initial business combination, we may be required to seek additional financing or to abandon the proposed business combination. Financing may not be available on acceptable terms, if at all. To the extent that additional financing proves to be unavailable when needed to consummate our initial business combination, we would be compelled to either restructure the transaction or abandon that particular initial business combination and seek an alternative target business candidate. If we are unable to complete our initial business combination, our public stockholders may only receive $10.10 per share (whether or not the underwriters' over-allotment option is exercised in full) or potentially less than $10.10 per share on our redemption, and the warrants will expire worthless. In addition, even if we do not need additional financing to consummate our initial business combination, we may require such financing to fund the operations or growth of the target business. The failure to secure additional financing could have a material adverse effect on the continued development or growth of the target business. None of our officers, directors or stockholders is required to provide any financing to us in connection with or after our initial business combination.

**Our initial stockholders will control a substantial interest in us and thus may influence certain actions requiring a stockholder vote.**

Upon consummation of our offering, our initial stockholders (and their permitted transferees) will own approximately 21.8% of the issued and outstanding shares of our Common Stock (assuming they do not purchase any public units in this offering). None of our Founder, executive officers, directors, or any of their affiliates has indicated any intention to purchase public units in this offering or any public units or shares of Common Stock from persons in the open market or in private transactions. However, our initial stockholders or any of their affiliates could determine in the future to make such purchases in the open market or in private transactions, to the extent permitted by law, in order to influence the vote or magnitude of the number of stockholders seeking to tender their shares to us. In connection with any vote for a proposed business combination our initial stockholders have agreed to vote the shares of Common Stock held by them immediately before this offering, the shares of Common Stock underlying the private units, as well as any shares of Common Stock acquired in this offering or in the aftermarket in favor of such proposed business combination.

In addition, we do not intend to hold an annual meeting of stockholders to elect new directors prior to the completion of our business combination. Unless we hold an annual meeting, all of the current directors will continue in office until at least the completion of the business combination. If there is an annual meeting, the entire Board of Directors will be considered for election, however our initial stockholders, because of their ownership position, will have considerable influence regarding the outcome. Accordingly, our initial stockholders will continue to exert control at least until the completion of our business combination.

Table of Contents

**Because our Founder paid an aggregate of $25,000, or $0.0044 per founder share (assuming the full exercise of the over-allotment option) and, prior to the consummation of this offering, our Chief Financial Officer, Software Chief Technical Officer and Hardware Chief Technical Officer will receive the insider shares for no cash consideration, you will experience immediate and substantial dilution from the purchase of our public shares.**

The difference between the public offering price per share (allocating the entire unit purchase price to the public shares and none to the warrants included in the public units) and the pro forma net tangible book value per share of Common Stock after this offering constitutes the dilution to you and the other investors in this offering. Our Founder acquired the founder shares at a nominal price and our Chief Financial Officer, Software Chief Technical Officer and Hardware Chief Technical Officer will each acquire the insider shares in consideration for future services only, and not for cash consideration, contributing to this dilution. Upon closing of this offering, you and the other public stockholders will incur an immediate and substantial dilution of approximately 92.8% or $9.28 per share of Common Stock (the difference between the pro forma net tangible book value of $0.72 per share and the initial offering price of $10.00 per share of Common Stock).

**Because each unit contains three-fourths (3/4) of one warrant and only a whole warrant may be exercised, the units may be worth less than units of other blank check companies.**

Each unit contains three-fourths (3/4) of one warrant. Because, pursuant to the warrant agreement, the warrants may only be exercised for a whole number of shares, only a whole warrant may be exercised at any given time. This is different from other offerings similar to ours whose units include one share of common stock and one warrant to purchase one whole share. We have established the components of the units in this way in order to reduce the dilutive effect of the warrants upon completion of a business combination since the warrants will be exercisable in the aggregate for three-fourths (3/4) of the number of shares compared to units that each contain a warrant to purchase one whole share, thus making us, we believe, a more attractive merger partner for target businesses. Nevertheless, this unit structure may cause our units to be worth less than if they included a warrant to purchase one whole share.

**The determination of the offering price of our units and the size of this offering is more arbitrary than the pricing of securities and size of an offering of an operating company in a particular industry.**

Prior to this offering there has been no public market for any of our securities. The public offering price of the units and the terms of the warrants were negotiated between us and the underwriters. In determining the size of this offering, management held customary organizational meetings with representatives of the underwriters, both prior to our inception and thereafter, with respect to the state of capital markets, generally, and the amount the underwriters believed they reasonably could raise on our behalf. Factors considered in determining the size of this offering, prices and terms of the units, including the shares of Common Stock and warrants underlying the units, include:

- the history and prospects of companies whose principal business is the acquisition of other companies;
- prior offerings of those companies;
- our prospects for acquiring an operating business at attractive values;
- a review of debt-to-equity ratios in leveraged transactions;
- our capital structure;
- an assessment of our management and their experience in identifying operating companies;
- general conditions of the securities markets at the time of this offering; and
- other factors as were deemed relevant.

**Table of Contents**

Although these factors were considered, the determination of our offering price is more arbitrary than the pricing of securities of an operating company in a particular industry since we have no historical operations or financial results.

**There is currently no market for our securities and a market for our securities may not develop, which would adversely affect the liquidity and price of our securities.**

Although we have applied to list our securities on the NYSE, as of the date of this prospectus there is currently no market for our securities. Prospective stockholders therefore have no access to information about prior market history on which to base their investment decision. Following this offering, the price of our securities may vary significantly due to one or more potential business combinations and general market or economic conditions. Once listed on the NYSE, an active trading market for our securities may never develop or, if developed, it may not be sustained. Additionally, if our securities become delisted from NYSE for any reason, and are quoted on the OTC Pink Sheets, an inter-dealer automated quotation system for equity securities not listed on a national exchange, the liquidity and price of our securities may be more limited than if we were listed on NYSE or another national exchange. You may be unable to sell your securities unless a market can be established and sustained.

**The NYSE may delist our securities from trading on its exchange, which could limit investors' ability to make transactions in our securities and subject us to additional trading restrictions.**

We intend to apply to have our units listed on the NYSE on or promptly after the date of this prospectus and our Common Stock and warrants listed on or promptly after their date of separation. Although after giving effect to this offering we expect to meet, on a pro forma basis, the minimum initial listing requirements set forth in the rules of the NYSE, we cannot assure you that our securities will be, or will continue to be, listed on the NYSE in the future or prior to our initial business combination. In order to continue listing our securities on the NYSE prior to our initial business combination, we must maintain certain financial, distribution and share price levels. Generally, we must maintain a minimum number of holders of our securities. Additionally, in connection with our initial business combination, we will be required to demonstrate compliance with the NYSE's initial listing requirements, which are more rigorous than the NYSE's continued listing requirements, in order to continue to maintain the listing of our securities on the NYSE. For instance, our share price would generally be required to be at least $4 per share. We cannot assure you that we will be able to meet those initial listing requirements at that time.

If the NYSE delists any of our securities from trading on its exchange and we are not able to list our securities on another national securities exchange, we expect such securities could be quoted on an over-the-counter market. If this were to occur, we could face significant material adverse consequences, including:

- a limited availability of market quotations for our securities;
- reduced liquidity for our securities;
- a determination that our Common Stock is a "penny stock," which will require brokers trading in our Common Stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;
- a limited amount of news and analyst coverage; and
- a decreased ability to issue additional securities or obtain additional financing in the future.

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." Because we expect that our units and eventually our Common Stock and warrants will be listed on the NYSE, our units, Common Stock and warrants will qualify as covered securities under such statute. Although the states are

Table of Contents

preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case. While we are not aware of a state having used these powers to prohibit or restrict the sale of securities issued by blank check companies, other than the state of Idaho, certain state securities regulators view blank check companies unfavorably and might use these powers, or threaten to use these powers, to hinder the sale of securities of blank check companies in their states. Further, if we were no longer listed on the NYSE, our securities would not qualify as covered securities under such statute and we would be subject to regulation in each state in which we offer our securities.

**Because we must furnish our stockholders with target business financial statements, we may lose the ability to complete an otherwise advantageous initial business combination with some prospective target businesses.**

The United States federal proxy rules require that a proxy statement with respect to a vote on a business combination meeting certain financial significance tests include historical and/or pro forma financial statement disclosure in periodic reports. We will include the same financial statement disclosure in connection with our tender offer documents, whether or not they are required under the tender offer rules. These financial statements must be prepared in accordance with, or be reconciled to, United States generally accepted accounting principles ("GAAP"), or International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board, and the historical financial statements must be audited in accordance with the standards of the Public Company Accounting Oversight Board (United States), or PCAOB. These financial statement requirements may limit the pool of potential target businesses we may acquire because some targets may be unable to provide such statements in time for us to disclose such statements in accordance with federal proxy rules and consummate our initial business combination within our 18-month time frame.

**Compliance obligations under the Sarbanes-Oxley Act may make it more difficult for us to effectuate our initial business combination, require substantial financial and management resources, and increase the time and costs of completing a business combination.**

Section 404 of the Sarbanes-Oxley Act requires that we evaluate and report on our system of internal controls beginning with our Annual Report on Form 10-K for the year ending December 31, 2022. Only in the event we are deemed to be a large accelerated filer or an accelerated filer will we be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting. Further, for as long as we remain an emerging growth company, we will not be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting. The fact that we are a blank check company makes compliance with the requirements of the Sarbanes-Oxley Act particularly burdensome on us as compared to other public companies because a target company with which we seek to complete our business combination may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding adequacy of its internal controls. The development of the internal control of any such entity to achieve compliance with the Sarbanes-Oxley Act may increase the time and costs necessary to complete any such business combination.

**We are an "emerging growth company" and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our securities less attractive to investors.**

We are an "emerging growth company" within the meaning of the Securities Act, as modified by the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, our stockholders may not have access to

**Table of Contents**

certain information they may deem important. We could be an emerging growth company for up to five years, although circumstances could cause us to lose that status earlier, including if the market value of our Common Stock held by non-affiliates exceeds $700 million as of any June 30 before that time, in which case we would no longer be an emerging growth company as of the following January 1. We cannot predict whether investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make a comparison of our financial statements with another public company, unless it is an emerging growth company that has not opted out of using the extended transition period, difficult or impossible because of the potential differences in accounting standards used.

**We may face risks related to companies in the technology industries.**

Business combinations with companies in the technology industries entail special considerations and risks. If we are successful in completing a business combination with such a target business, we may be subject to, and possibly adversely affected by, the following risks:

- an inability to compete effectively in a highly competitive environment with many incumbents having substantially greater resources;
- an inability to manage rapid change, increasing consumer expectations and growth;
- an inability to build strong brand identity and improve subscriber or customer satisfaction and loyalty;
- a reliance on proprietary technology to provide services and to manage our operations, and the failure of this technology to operate effectively, or our failure to use such technology effectively;
- an inability to deal with our subscribers' or customers' privacy concerns;
- an inability to attract and retain subscribers or customers;
- an inability to license or enforce intellectual property rights on which our business may depend;
- any significant disruption in our computer systems or those of third parties that we would utilize in our operations;
- an inability by us, or a refusal by third parties, to license intellectual property to us upon acceptable terms;
- potential liability for negligence, copyright, or trademark infringement or other claims based on the nature and content of materials that we may distribute;
- competition for the leisure and entertainment time and discretionary spending of subscribers or customers, which may intensify in part due to advances in technology and changes in consumer expectations and behavior;

58

Table of Contents

- disruption or failure of our networks, systems or technology as a result of computer viruses, "cyber-attacks," misappropriation of data or other malfeasance, as well as outages, natural disasters, terrorist attacks, accidental releases of information or similar events;
- an inability to obtain necessary hardware, software and operational support; and
- reliance on third-party vendors or service providers.

Any of the foregoing could have an adverse impact on our operations following a business combination. However, our efforts in identifying prospective target businesses will not be limited to the technology industries. Accordingly, if we acquire a target business in another industry, we will be subject to risks attendant with the specific industry in which the target business we acquire operates, which may or may not be different than those risks listed above.

**Table of Contents**

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements contained in this prospectus, which reflect our current views with respect to future events and financial performance, and any other statements of a future or forward-looking nature, constitute "forward-looking statements" for the purpose of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our or our management's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this prospectus may include, for example, statements about:

- our ability to complete our initial business combination;
- our success in retaining or recruiting, or changes required in, our officers, key employees or directors following our initial business combination;
- our executive officers and directors allocating their time to other businesses and potentially having conflicts of interest with our business or in approving our initial business combination, as a result of which they would then receive expense reimbursements;
- our potential ability to obtain additional financing to complete our initial business combination;
- our pool of prospective target businesses, including their industry and geographic location;
- the ability of our executive officers and directors to generate a number of potential investment opportunities;
- failure to list or delisting of our securities from the NYSE or an inability to have our securities listed on the NYSE following a business combination;
- our public securities' potential liquidity and trading;
- the lack of a market for our securities; or
- our financial performance following this offering.

The forward-looking statements contained in this prospectus are based on our current expectations and beliefs concerning future developments and their potential effects on us. Future developments affecting us may not be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described under the heading "*Risk Factors.*" Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

**Table of Contents**

**USE OF PROCEEDS**

We are offering 20,000,000 units at an offering price of $10.00 per unit. We estimate that the net proceeds of this offering together with the funds we will receive from the sale of the private units will be used as set forth in the following table.

| | Without Over-Allotment Option | Over-Allotment Option Exercised |
|---|---|---|
| *Gross proceeds* | | |
| Offering(1) | $ 200,000,000 | $ 230,000,000 |
| Private Placement(2) | 8,934,790 | 9,690,000 |
| Total gross proceeds | 208,934,790 | 239,690,000 |
| *Offering expenses* | | |
| Underwriting discount (2.0% of gross proceeds from offering, excluding deferred portion)(2) | 4,000,000 | 4,600,000 |
| Legal fees and expenses | 350,000 | 350,000 |
| NYSE listing fee | 100,000 | 100,000 |
| Printing and engraving expenses | 120,000 | 120,000 |
| Accounting fees and expenses | 120,000 | 120,000 |
| FINRA filing fee | 35,000 | 35,000 |
| D&O insurance | 200,000 | 200,000 |
| SEC registration fee | 29,854 | 29,854 |
| Miscellaneous expenses | 45,146 | 45,146 |
| Total offering expenses | 5,000,000 | 5,600,000 |
| *Net proceeds* | | |
| Held in the trust account(3) | 202,000,000 | 232,300,000 |
| Not held in the trust account | 1,934,790 | 1,790,000 |
| Total net proceeds | $ 203,934,790 | $ 234,090,000 |
| *Use of net proceeds not held in the trust account(4)(5)* | | |
| Legal, accounting and other third party expenses attendant to the search for target businesses and to the structuring of our initial business combination | $ 325,000 | $ 325,000 |
| Due diligence of target business by Sponsor, officers, directors | 295,000 | 220,000 |
| Legal and accounting fees relating to SEC reporting obligations | 200,000 | 200,000 |
| Administrative fee ($20,000 per month for up to 18 months) | 360,000 | 360,000 |
| Payments to CFO (up to $15,000 per month) | 270,000 | 270,000 |
| NYSE listing expenses | 100,000 | 100,000 |
| Miscellaneous | 69,790 | — |
| Analyst services ($7,500 per month for up to 18 months) | 135,000 | 135,000 |
| Support services—accounting specialist, financial analyst ($10,000 per month for up to 18) months) | 180,000 | 180,000 |
| Total | $ 1,934,790 | $ 1,790,000 |

**Table of Contents**

(1)    Includes amounts payable to public stockholders who properly redeem their shares in connection with our successful completion of our initial business combination.

(2)    Includes $6,500,000 from the sale of private units to our Sponsor ($6,890,000 if the underwriters' over-allotment option is exercised in full) and $2,434,790 from the sale of private units to the underwriters ($2,800,000 if the underwriters' over-allotment option is exercised in full). The underwriters have agreed to defer underwriting commissions equal to 4.0% of the gross proceeds of this offering. Upon completion of our initial business combination, $8,000,000, which constitutes the underwriters' deferred commissions (or up to $9,200,000 if the underwriters' over-allotment option is exercised in full) will be paid to the underwriters from the funds held in the trust account, and the remaining funds, less amounts released to the trustee to pay redeeming stockholders, will be released to us and can be used to pay all or a portion of the purchase price of the business or businesses with which our initial business combination occurs or for general corporate purposes, including payment of principal or interest on indebtedness incurred in connection with our initial business combination, to fund the purchases of other companies or for working capital. The underwriters will not be entitled to any interest accrued on the deferred underwriting discounts and commissions.

(3)    If the underwriters' over-allotment option is exercised, the underwriting discount applicable to each unit sold pursuant to the over-allotment option will be approximately $0.20. No discounts or commissions will be paid with respect to the purchase of the private units.

(4)    These expenses are estimates only. Our actual expenditures for some or all of these items may differ from the estimates set forth in this prospectus. For example, we may incur greater legal and accounting expenses than our current estimates in connection with negotiating and structuring a business combination based upon the level of complexity of such business combination. In the event we identify an acquisition target in a specific industry subject to specific regulations, we may incur additional expenses associated with legal due diligence and the engagement of special legal counsel. In addition, our staffing needs may vary and as a result, we may engage a number of consultants to assist with legal and financial due diligence. We do not anticipate any change in our intended use of proceeds, other than fluctuations among the current categories of allocated expenses, which fluctuations, to the extent they exceed current estimates for any specific category of expenses, would not be available for our expenses. The amount in the table above does not include interest available to us from the trust account.

(5)    The funds from the promissory note issued to our Sponsor for $100,000 as of February 13, 2020, will be used to prepay certain expenses related to the offering. Upon receipt of the funds from the offering, we will use funds allocated for these offering expenses to repay the promissory note in full.

The rules of the NYSE provide that at least 90% of the gross proceeds from this offering and the sale of the private units be deposited in a trust account. Of the gross proceeds of this offering and the sale of the private units, a total of $202,000,000 (or $232,300,000 if the underwriters' over-allotment option is exercised in full), including $8,000,000 (or $9,200,000 if the underwriters' over-allotment option is exercised in full) of deferred underwriting commissions, will be placed in a segregated trust account located in the United States maintained by Continental Stock Transfer & Trust Company acting as trustee, and will be invested only in U.S. government treasury bills, notes and bonds with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act and which invest solely in U.S. Treasuries. Except for (A) all interest income that may be released to us to pay taxes, and (B) up to $100,000 to pay dissolution expenses, as discussed below, none of the funds held in the trust account will be released from the trust account until the earlier of: (1) the completion of our initial business combination within the required time period; (2) our redemption of 100% of the outstanding public shares if we have not completed an initial business combination in the required time period; and (3) the redemption of any public shares properly tendered in connection with a stockholder vote to amend our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within the required time period or (B) with respect to any other provision relating to our pre-business combination activity and related stockholders' rights.

Table of Contents

The net proceeds held in the trust account may be used as consideration to pay the sellers of a target business with which we ultimately complete our initial business combination. If our initial business combination is paid for using shares or debt securities, or not all of the funds released from the trust account are used for payment of the purchase price in connection with our business combination, we may apply the cash released from the trust account that is not applied to the purchase price for general corporate purposes, including for maintenance or expansion of operations of acquired businesses, the payment of principal or interest due on indebtedness incurred in consummating the initial business combination, to fund the purchase of other companies or for working capital.

We believe that amounts not held in trust will be sufficient to pay the costs and expenses to which such proceeds are allocated. This belief is based on the fact that while we may begin preliminary due diligence of a target business in connection with an indication of interest, we intend to undertake in-depth due diligence, depending on the circumstances of the relevant prospective acquisition, only after we have negotiated and signed a letter of intent or other preliminary agreement that addresses the terms of our initial business combination. However, if our estimate of the costs of undertaking in-depth due diligence and negotiating our initial business combination is less than the actual amount necessary to do so, we may be required to raise additional capital, the amount, availability and cost of which is currently unascertainable. In this event, we could seek such additional capital through loans or additional investments from members of our Sponsor or an affiliate of our Sponsor or our executive officers and directors, but such members of our management team are not under any obligation to advance funds to, or invest in, us.

Commencing on the date that our securities are first listed on the NYSE, we have agreed to pay an affiliate of our Sponsor a total of $20,000 per month for office space, utilities and secretarial and administrative services. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our Sponsor, executive officers, directors, or their affiliates may, but are not obligated to, loan us funds as may be required. If we consummate our initial business combination, we would repay such loaned amounts. In the event that the initial business combination does not close, we may use a portion of the offering proceeds held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used to repay such loaned amounts. Up to $1,500,000 of such loans may be convertible into additional units of the post-business combination entity at a price of $10.00 per unit at the option of the lender. The units would be identical to the private units. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans.

The Anchor Investors have indicated to us an interest to purchase up to 1,739,130 (or 2,000,000 if the over-allotment option is exercised in full) public units at $10.00 per unit in this offering and we have agreed to direct the underwriters to sell to the Anchor Investors such number of public units. There can be no assurance that the Anchor Investors will acquire any public units in this offering.

In no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 upon the consummation of our initial business combination. Furthermore, the redemption threshold may be further limited by the terms and conditions of our initial business combination. If too many public stockholders exercise their redemption rights so that we cannot satisfy the net tangible asset requirement or any net worth or cash requirements, we would not proceed with the redemption of our public shares or the business combination, and instead may search for an alternate business combination.

A public stockholder will be entitled to receive funds from the trust account only upon the earlier to occur of: (i) our consummation of our initial business combination, and then only in connection with those shares of Common Stock that such stockholder properly elected to redeem, subject to the limitations described herein, (ii) the redemption of our public shares if we are unable to consummate our initial business combination within 18 months from the closing of this offering or, if our charter documents are amended to so provide, (iii) the

63

Table of Contents

redemption of our public shares in connection with a stockholder vote to amend our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering, or (B) with respect to any other provision relating to stockholders' rights or pre-business combination activity, subject to applicable law. In no other circumstances will a public stockholder have any right or interest of any kind to or in the trust account.

Our initial stockholders and the underwriters have agreed to waive their redemption rights with respect to their founder shares, insider shares, private shares and shares underlying any warrants included in the private units in connection with the consummation of our initial business combination. Our Founder has also agreed to waive its redemption rights with respect to any public shares purchased during or after this offering in connection with the consummation of our initial business combination. In addition, our initial stockholders and the underwriters have agreed to waive their rights to liquidating distributions with respect to their founder shares, insider shares and private shares if we fail to consummate our initial business combination within 18 months from the closing of this offering. However, if our initial stockholders and the underwriters acquire public shares in or after this offering, they will be entitled to receive liquidating distributions with respect to such public shares if we fail to consummate our initial business combination within the required time period.

64

**Table of Contents**

## DIVIDEND POLICY

We have not paid any cash dividends on our Common Stock to date and do not intend to pay cash dividends prior to the completion of our initial business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of our initial business combination. The payment of any cash dividends subsequent to our initial business combination will be within the discretion of our Board of Directors at such time. Our Board of Directors is not currently contemplating and does not anticipate declaring any share dividends in the foreseeable future, except if we increase the size of this offering pursuant to Rule 462(b) under the Securities Act, in which case we will effect a share dividend immediately prior to the consummation of the offering in such amount as to maintain the collective ownership of our Founder's ownership through its ownership of founder shares, together with Messrs. Weightman's, Wang's and Betti-Berutto's ownership of insider shares, at least at 20% of the issued and outstanding shares of Common Stock upon the consummation of this offering (assuming no purchase in this offering and not taking into account ownership of the private shares). Further, if we incur any indebtedness in connection with our initial business combination, our ability to declare dividends may be limited by restrictive covenants we may agree to in connection therewith.

65

**Table of Contents**

Table of Contents

**DILUTION**

The difference between the public offering price per share, assuming no value is attributed to the public warrants or the private warrants, and the pro forma net tangible book value per share after this offering constitutes the dilution to investors in this offering. Such calculation does not reflect any dilution associated with sale and exercise of warrants, including the private warrants. Net tangible book value per share is determined by dividing our net tangible book value, which is our total tangible assets less total liabilities (including the value of shares of Common Stock which may be redeemed for cash), by the number of issued and outstanding shares of Common Stock.

As of February 14, 2020, our net tangible book value was $19,375, or approximately $0.00 per share. For purposes of the dilution calculation, in order to present the maximum estimated dilution as a result of this offering, we have assumed the number of shares included in the units offered hereby will be deemed to be 20,000,000, and the price per unit in this offering will be deemed to be $10.00. After giving effect to the sale of 20,000,000 shares of Common Stock included in the units we are offering by this prospectus (assuming the over-allotment option has not been exercised), the deduction of underwriting discounts and estimated expenses of this offering, the sale of the private units and the issuance of 15,000 insider shares, our pro forma net tangible book value as of February 14, 2020 would have been $5,000,010, or $0.72 per share, representing an immediate increase in net tangible book value of $0.72 per share to the Founder and an immediate dilution of $9.28 per share, or 92.8%, to new investors not exercising their redemption rights. For purposes of presentation, our pro forma net tangible book value after this offering is $190,954,155 less than it otherwise would have been because if we effect our initial business combination, the redemption rights of the public stockholders (but not our Founder) may result in the redemption of up to 18,906,352 shares sold in this offering (assuming the over-allotment option has not been exercised).

The following table illustrates the dilution to our public stockholders on a per-share basis, assuming no value is attributed to the warrants included in the public units and the private units.

| | | |
|---|---:|---:|
| Public offering price | | $10.00 |
| Net tangible book value before this offering | $0.00 | |
| Increase attributable to new investors and private sales | 0.72 | |
| Pro forma net tangible book value after this offering and the sale of the private units | | 0.72 |
| Dilution to public stockholders | | $ 9.28 |
| Percentage of dilution to new investors | 92.8% | |

For purposes of presentation, we have reduced our pro forma net tangible book value after this offering (assuming no exercise of the underwriters' over-allotment option) by $190,954,155 because holders of up to approximately 94.5% of our public shares may redeem their shares for a pro rata share of the aggregate amount then on deposit in the trust account at a per share redemption price equal to the amount in the trust account as set forth in our proxy materials or tender offer documents, divided by the number of shares of Common Stock sold in this offering.

**Table of Contents**

The following table sets forth information with respect to our initial stockholders, the underwriters and the new investors:

| | Shares Purchased | | Total Consideration | | Average Price per Share |
|---|---|---|---|---|---|
| | Number | Percentage | Amount | Percentage | |
| Founder (with respect to founder shares) | 4,985,000(1) | 19.25% | $ 25,000 | 0.01% | $ 0.01 |
| Founder (with respect to private shares) | 650,000 | 2.51% | $ 6,500,000 | 3.11% | $ 10.00 |
| Underwriters (with respect to private shares) | 243,479 | 0.94% | $ 2,434,790 | 1.17% | $ 10.00 |
| Chief Financial Officer, Software Chief Technical Officer and Hardware Chief Technical Officer shares | 15,000 | 0.06% | $ — | —% | $ — |
| Public stockholders | 20,000,000 | 77.24% | $200,000,000 | 95.71% | $ 10.00 |
| Total | 25,893,479 | 100.00% | $208,959,790 | 100.00% | |

(1) Assumes the over-allotment option has not been exercised and an aggregate of 750,000 founder shares have been forfeited by our Founder as a result thereof.

The pro forma net tangible book value per share after the offering is calculated as follows:

| | | |
|---|---|---|
| Numerator: | | |
| Net tangible book value before the offering | $ | 19,375 |
| Proceeds from this offering and private placement of private units, net of expenses | | $ 203,934,790 |
| Less: Deferred underwriters' commissions payable | | (8,000,000) |
| Less: Shares subject to redemption to maintain net tangible assets of $5,000,001 | | $(190,954,155) |
| | $ | 5,000,010 |
| Denominator: | | |
| Shares of Common Stock outstanding prior to this offering | | 5,750,000 |
| Less: Shares forfeited if over-allotment is not exercised | | (750,000)(1) |
| Shares of Common Stock to be sold as part of the public units | | 20,000,000 |
| Shares of Common Stock to be sold as part of the private units | | 893,479 |
| Less: Shares subject to redemption to maintain net tangible assets of $5,000,001 | | (18,906,352) |
| | | 6,987,127 |

(1) Assumes the non-exercise of the underwriters' over-allotment option.

67

**Table of Contents**

## CAPITALIZATION

The following table sets forth our capitalization as of February 14, 2020 and as adjusted to give effect to the sale of our units offered by this prospectus and the private units, the application of the estimated net proceeds derived from the sale of such securities, and the issuance of the insider shares:

| | As of February 14, 2020 | |
| --- | --- | --- |
| | Actual | As Adjusted(1) |
| Sponsor loan | $ 100,000 | $ — |
| Deferred underwriting commissions(2) | — | 8,000,000 |
| Shares of Common Stock, par value $0.0001 per share, subject to redemption(3) | — | 190,954,155 |
| | | |
| Stockholders' equity: | | |
| Preferred shares, par value $0.0001 per share, 1,000,000 authorized; none issued or outstanding | — | — |
| Shares of Common Stock, par value $0.0001 per share, 100,000,000 shares authorized (actual and as adjusted); 5,735,000 shares issued and outstanding, actual; 6,987,127 shares issued and outstanding (excludes 18,906,352 shares subject to possible redemption), as adjusted(4) | 574 | 699 |
| Additional paid-in capital(5) | 24,426 | 5,004,936 |
| Accumulated deficit | (5.625) | (5,625) |
| Total stockholders' equity | $ 19,375 | $ 5,000,010 |
| Total capitalization | $ 119,375 | $ 203,954,165 |

(1)    Includes $6,500,000 we will receive from the sale of the 650,000 private units to our Sponsor at $10.00 per unit and $2,434,790 we will receive from the sale of the 243,479 private units to the underwriters at $10.00 per unit. Assumes the over-allotment option has not been exercised and 750,000 founder shares have been forfeited.

(2)    $0.40 per unit, or $8,000,000 in the aggregate, will be payable to the underwriters for deferred underwriting commissions. The deferred underwriting commissions will become payable to the underwriters from the amounts held in the trust account solely in the event that we complete an initial business combination, subject to the terms of the underwriting agreement. We record deferred underwriting commissions upon the closing of the initial public offering as a reduction of additional paid-in capital. Since the actual additional paid-in capital was reduced by the recording of the accrued deferred underwriting commission, total capitalization, as adjusted, includes the amount of the deferred underwriting commission to reflect total capitalization.

(3)    Upon the completion of our initial business combination, we will provide our public stockholders with the opportunity to redeem their public shares for cash equal to their pro rata portion of the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination, including interest (which interest shall be net of taxes payable, subject to the limitations described herein whereby our net tangible assets will be maintained at a minimum of $5,000,001 and any limitations (including, but not limited to, cash requirements) created by the terms of the proposed business combination. The "as adjusted" shares of Common Stock, subject to redemption equals the "as adjusted" total assets of $203,959,790, less "as adjusted" total liabilities of $8,005,625 (including deferred underwriting commissions of $8,000,000) and "as adjusted" total stockholders' equity of $5,000,010. The

68

**Table of Contents**

value of the shares of Common Stock that may be redeemed is equal to $10.10 per share (which is the assumed redemption price), multiplied by 18,906,352 shares of Common Stock, which is the maximum number of shares of Common Stock that may be redeemed for a $10.10 purchase price per share and still maintain at least $5,000,001 of net tangible assets.

(4)    Actual share amount is prior to any forfeiture of founder shares by our Founder and as adjusted assumes no exercise of the underwriters' over-allotment option. "As adjusted" includes the 5,000 insider shares issued to each of Mr. Weightman, our Vice President and Chief Financial Officer, Mr. Wang, our Software Chief Technical Officer, and Mr. Betti-Berutto, our Hardware Chief Technical Officer.

(5)    The "as adjusted" additional paid-in capital calculation is equal to the "as adjusted" total stockholders' equity of $5,000,010, minus shares of Common Stock (par value) of $699, plus the accumulated deficit of $5,625.

69

**Table of Contents**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS**

**Overview**

We are a newly organized Private-to-Public Equity (PPE) company, also known as a blank check company or special purpose acquisition vehicle, incorporated in the State of Delaware and formed for the purpose of acquiring, engaging in a share exchange, share reconstruction and amalgamation with, purchasing all or substantially all of the assets of, or engaging in any other similar business combination with one or more businesses or entities. We have not identified an acquisition target and we have not, nor has anyone on our behalf, initiated any discussions, directly or indirectly, to identify any acquisition target. We intend to effectuate our initial business combination using cash from the proceeds of this offering and the sale of the private units, our common equity or any preferred equity that we may create in accordance with the terms of our charter documents, debt, or a combination of cash, common or preferred equity and debt.

The issuance of additional shares of Common Stock or the creation of one or more classes of preferred stock during our initial business combination:

- may significantly dilute the equity interest of investors in this offering who would not have pre-emption rights in respect of any such issue;
- may subordinate the rights of holders of Common Stock if the rights, preferences, designations and limitations attaching to the preferred shares are senior to those afforded our shares of Common Stock;
- could cause a change in control if a substantial number of shares of Common Stock are issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors;
- may have the effect of delaying or preventing a change of control of us by diluting the share ownership or voting rights of a person seeking to obtain control of us; and
- may adversely affect prevailing market prices for our shares of Common Stock.

Similarly, if we issue debt securities or otherwise incur significant indebtedness, it could result in:

- default and foreclosure on our assets if our operating revenues after our initial business combination are insufficient to repay our debt obligations;
- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;
- our immediate payment of all principal and accrued interest, if any, if the debt is payable on demand;
- our inability to obtain necessary additional financing if any document governing such debt contains covenants restricting our ability to obtain such financing while the debt security is outstanding;
- our inability to pay dividends on our shares of Common Stock;
- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our Common Stock if declared, expenses, capital expenditures, acquisitions and other general corporate purposes;
- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;
- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation; and

70

Table of Contents

- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, execution of our strategy and other purposes and other disadvantages compared to our competitors who have less debt.

As indicated in the accompanying financial statements as of February 14, 2020, we had $125,200 in cash, deferred offering costs of $135,802, a note payable to our Sponsor of $100,000 and a working capital deficit of $116,427. Further, we expect to incur significant costs in the pursuit of our acquisition plans. We cannot assure you that our plans to raise capital or to complete our initial business combination will be successful. These factors, among others, raise substantial doubt about our ability to continue as a going concern.

**Results of Operations and Known Trends or Future Events**

We have neither engaged in any operations nor generated any revenues to date. Our only activities since inception have been organizational activities and those necessary to prepare for this offering. Following this offering, we will not generate any operating revenues until after completion of our initial business combination. We will generate non-operating income in the form of interest income on cash and cash equivalents after this offering. There has been no significant change in our financial or trading position and no material adverse change has occurred since the date of our audited financial statements. After this offering, we expect to incur increased expenses as a result of being a public company (for legal, financial reporting, accounting and auditing compliance), as well as for due diligence expenses. We expect our expenses to increase substantially after the closing of this offering.

**Liquidity and Capital Resources**

Our liquidity needs have been satisfied to date through receipt of $25,000 from the sale of the founder shares, receipt of proceeds from our Sponsor of $100,000 for which we issued a promissory note and receipt of $200 from an affiliate of the Sponsor, which amount has since been repaid. We estimate that the net proceeds from (1) the sale of the units in this offering, after deducting offering expenses of approximately $1,000,000, and underwriting discounts and commissions of $4,000,000 (or $4,600,000 if the over-allotment option is exercised in full), excluding deferred underwriting commissions of $8,000,000 (or $9,200,000 if the underwriters' over-allotment option is exercised in full) payable upon completion of the initial business combination as consideration for services to be performed by the underwriters as described elsewhere in this prospectus, (2) the sale of the private units to our Sponsor for a purchase price of $6,500,000 (or $6,890,000 if the over-allotment option is exercised in full), and (3) the sale of the private units to the underwriters for a purchase price of $2,434,790 (or $2,800,000 if the over-allotment option is exercised in full), will be $203,934,790 (or $234,090,000 if the over-allotment option is exercised in full), of which amount $202,000,000 (or $232,300,000 if the over-allotment option is exercised in full) which includes deferred underwriting commissions of $8,000,000 (or $9,200,000 if the underwriters' over-allotment option is exercised in full), will be held in the trust account. The remaining estimated $1,934,790 (or $1,790,000 if the over-allotment option is exercised in full) will not be held in the trust account.

We intend to use substantially all of the funds held in the trust account (less deferred underwriting commissions), including any amounts representing interest earned on the trust account (which interest shall be net of taxes payable by us), to acquire a target business or businesses and to pay our expenses relating thereto. We may withdraw interest to pay taxes. We estimate our annual franchise tax obligations, based on the number of shares of our Common Stock authorized and outstanding after the completion of this offering, to be $200,000. Our annual income tax obligations will depend on the amount of interest and other income earned on the amounts held in the trust account. To the extent that our capital stock is used in whole or in part as consideration to effect our initial business combination, the remaining proceeds held in the trust account as well as any other net proceeds not expended will be used as working capital to finance the operations of the target business or businesses. Such working capital funds could be used in a variety of ways including continuing or expanding the target business' operations, for strategic acquisitions and for marketing, research and development of existing or

71

Table of Contents

new products. Such funds could also be used to repay any operating expenses or finders' fees which we had incurred prior to the completion of our initial business combination if the funds available to us outside of the trust account were insufficient to cover such expenses.

We believe that, upon consummation of this offering, the estimated $1,934,790 of net proceeds not held in the trust account will be sufficient to allow us to operate for at least the next 18 months from the closing of this offering, assuming that a business combination is not consummated during that time. Over this time period, we will be using these funds for identifying and evaluating prospective acquisition candidates, performing business due diligence on prospective target businesses, traveling to and from the offices, plants or similar locations of prospective target businesses, reviewing corporate documents and material agreements of prospective target businesses, selecting the target business to acquire and structuring, negotiating and consummating the business combination. We anticipate that we will incur the following approximate expenses to be paid from the $1,934,790 not held in the trust account:

- $325,000 of expenses for the search for target businesses and for the legal, accounting and other third-party expenses attendant to the structuring and negotiating of our initial business combination;
- $295,000 of expenses for the due diligence investigation of the target by our Founder, officers and directors;
- $200,000 of expenses for legal and accounting fees related to SEC reporting obligations;
- $360,000 of expenses (equal to $20,000 per month for up to 18 months) for administrative fees;
- $270,000 of expenses (equal to $15,000 per month for up to 18 months) for payments to our CFO;
- $135,000 of expenses (equal to $7,500 per month for up to 18 months) for analyst services;
- $180,000 of expenses (equal to $10,000 per month for up to 18 months) for support services, including accounting specialists and financial analysts;
- $100,000 of NYSE listing expenses; and
- $69,790 ($0 if the over-allotment option is exercised in full) for general working capital that will be used for miscellaneous expenses, liquidation obligations and reserves.

If our estimates of the costs of undertaking in-depth due diligence and negotiating our initial business combination is less than the actual amount necessary to do so, we may have insufficient funds available to operate our business prior to our initial business combination. Moreover, we may need to obtain additional financing either to consummate our initial business combination or because we become obligated to redeem a significant number of our public shares upon consummation of our initial business combination, in which case we may issue additional securities or incur debt in connection with such business combination. Subject to compliance with applicable securities laws, we would only consummate such financing simultaneously with the consummation of our initial business combination. Following our initial business combination, if cash on hand is insufficient, we may need to obtain additional financing in order to meet our obligations.

As of February 14, 2020, we had $125,200 in cash and a working capital deficit of $116,427. We have incurred and expect to continue to incur significant costs in pursuit of our acquisition plans. Our plans to raise capital and to consummate our initial business combination may not be successful. These factors among others raise substantial doubt about our ability to continue as a going concern.

***Controls and Procedures***

We are not currently required to maintain an effective system of internal controls as defined by Section 404 of the Sarbanes-Oxley Act. We will be required to comply with the internal control requirements of the Sarbanes-Oxley Act for the fiscal year ending December 31, 2022. As of the date of this prospectus, we have not

Table of Contents

completed an assessment of internal controls. We expect to assess the internal controls of our target business or businesses prior to the completion of our initial business combination and, if necessary, to implement and test additional controls as we may determine are necessary in order to state that we maintain an effective system of internal controls. A target business may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding the adequacy of internal controls. Many small and mid-sized target businesses we may consider for our initial business combination may have internal controls that need improvement in areas such as:

- staffing for financial, accounting and external reporting areas, including segregation of duties;
- reconciliation of accounts;
- proper recording of expenses and liabilities in the period to which they relate;
- evidence of internal review and approval of accounting transactions;
- documentation of processes, assumptions and conclusions underlying significant estimates; and
- documentation of accounting policies and procedures.

Because it will take time, management involvement and perhaps outside resources to determine what internal control improvements are necessary for us to meet regulatory requirements and market expectations for our operation of a target business, we may incur significant expense in meeting our public reporting responsibilities, particularly in the areas of designing, enhancing, or remediating internal and disclosure controls. Doing so effectively also may take longer than we expect, thus increasing our exposure to financial fraud or erroneous financing reporting.

### Related Party Transactions

In February 2020, our Sponsor purchased 5,735,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share. The purchase price per founder share was determined by dividing the amount of cash contributed to the Company by the number of founder shares issued. Prior to the initial investment of $25,000 by our Founder, the Company had no assets, tangible or intangible.

The number of founder shares initially issued was determined with the intention that the founder shares, together with the insider shares owned by Messrs. Weightman, Wang and Betti-Berutto, would represent 20% of the outstanding shares of Common Stock upon completion of this offering (excluding the private units). Up to 750,000 of the founder shares are subject to forfeiture depending on whether and to what extent the underwriters' over-allotment option is exercised.

Dr. Katz, the manager of our Sponsor, and Mr. Miotto, one of our independent directors, have formed an LLC named GigFounders, LLC, of which 90% is owned by Drs. Katz and Dinu, who are husband and wife, and 10% is owned by Mr. Miotto; that partnership, which is also managed by Dr. Katz, has a financial and voting interest in our Sponsor that entitles it to participate in any economic return that the Sponsor receives for its investment in the Company in accordance with terms negotiated with the other holders of financial and voting interests in our Sponsor. Mr. Miotto's minority interest in GigFounders, LLC is passive as he does not participate in the governance of GigFounders, LLC. In addition, certain of our directors, Messrs. Mikulsky, Wang and Betti-Berutto, and Mr. Weightman, our Chief Financial Officer, each have a financial and voting interest in our Sponsor that entitles each of them to participate in any economic return that the Sponsor receives for its investment in the Company in accordance with terms negotiated with the other holders of financial and voting interests in our Sponsor.

We are obligated, commencing on the date of this prospectus, to pay GigFounders, LLC a monthly fee of an aggregate of $20,000 for office space and general and administrative services. In conjunction with our services agreement with GigFounders, LLC and in connection with GigFounders, LLC's affiliation with our Sponsor, we have a licensing arrangement with GigFounders, LLC whereby we are permitted to use its "Private-to-Public

Table of Contents

Equity (PPE)" and "Mentor-Investor" trademarks. Additionally, we have issued a promissory note to our Sponsor, dated as of February 13, 2020, in the aggregate principal amount of $100,000. The note is non-interest bearing and will mature on such date as is the earlier of the date on which we close this offering and December 31, 2020.

On February 14, 2020, we entered into a Strategic Services Agreement with Mr. Weightman, our Chief Financial Officer. Mr. Weightman is initially receiving $5,000 per month for his services and such amount could increase to up to $15,000 per month dependent upon the scope of services provided. Commencing with the first month after the consummation of this offering, the Company will pay Mr. Weightman for services rendered since February 14, 2020 and on a monthly basis thereafter for all services rendered after the consummation of this offering. In addition, prior to the consummation of this offering, we intend to issue 5,000 insider shares, in consideration of future services to us, to Mr. Weightman.

Prior to the consummation of this offering, we intend to also issue 5,000 insider shares to each of Messrs. Betti-Berutto and Wang in consideration of future services to us as the Hardware Chief Technical Officer and Software Chief Technical Officer, respectively. As a result, Messrs. Betti-Berutto and Wang shall each receive 5,000 shares of Common Stock.

Our Founder, officers and directors, or any of their respective affiliates, will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our Board of Directors may also approve the payment of advisory fees to directors in connection with such activities, including board committee service and extraordinary administrative and analytical services. Our audit committee will review on a quarterly basis all payments that were made to our Founder, officers, directors or our or any of their affiliates and will determine which expenses and the amount of expenses that will be reimbursed. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred by such persons in connection with activities on our behalf.

We do not believe we will need to raise additional funds following this offering in order to meet the expenditures required for operating our business. However, in order to finance transaction costs in connection with an intended initial business combination, our Sponsor, executive officers, directors, or their affiliates may, but are not obligated to, loan us funds as may be required. In the event that the initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts, but no proceeds from our trust account would be used for such repayment. Such loans would be evidenced by promissory notes. Up to $1,500,000 of such loans may be convertible into additional units of the post-business combination entity at a price of $10.00 per unit at the option of the lender. The units would be identical to the private units. The terms of such loans by our Sponsor, executive officers, directors, or their affiliates, if any, have not been determined and no written agreements exist with respect to such loans.

Our Sponsor has committed that it will purchase 650,000 private units (or 689,000 private units if the underwriters' over-allotment is exercised in full) at $10.00 per unit. The underwriters have committed that they will purchase an aggregate of 243,479 private units at $10.00 per unit (or 280,000 private units if the over-allotment is exercised in full). These purchases will take place on a private placement basis simultaneously with the consummation of this offering and the over-allotment option, as applicable. The foregoing purchases will only be made by our Founder if it is able to do so in accordance with Regulation M and Sections 9(a)(2) and 10(b) and Rule 10b-5 of the Exchange Act. All of the proceeds we receive from the purchase of the private units will be placed in the trust account described below.

Pursuant to a registration rights agreement we will enter into with each of our initial stockholders and the underwriters on or prior to the closing of this offering, we may be required to register certain securities for sale under the Securities Act. These holders, and the holders of warrants issued upon conversion of working capital loans, if any, are entitled under the registration rights agreement to make up to three demands that we register certain of our securities held by them under the Securities Act and to have the securities covered thereby

74

**Table of Contents**

registered for resale pursuant to Rule 415 under the Securities Act. In addition, these holders have the right to include their securities in any other registration statement filed by us. However, the registration rights agreement provides that we will not permit any registration statement filed under the Securities Act to become effective until the securities covered thereby are released from their respective lock-up restrictions, as described herein. Notwithstanding the foregoing, The underwriters and their affiliates may not exercise their respective demand rights on more than one occasion. We will bear the costs and expenses of filing any such registration statements. See "*Certain Relationships and Related Party Transactions*."

### *Quantitative and Qualitative Disclosures about Market Risk*

The amounts in the trust account, will be invested in United States government treasury bills, bonds or notes having a maturity of 185 days or less, or in money market funds meeting the applicable conditions under Rule 2a-7 promulgated under the Investment Company Act and that invest solely in U.S. treasuries. Due to the short-term nature of these investments, we believe there will be no associated material exposure to interest rate risk.

### *Off-Balance Sheet Arrangements; Commitments and Contractual Obligations; Quarterly Results*

As of the date of this prospectus, we did not have any off-balance sheet arrangements as defined in Item 303(a)(4)(ii) of Regulation S-K and did not have any commitments or contractual obligations. No unaudited quarterly operating data is included in this prospectus, as we have conducted no operations to date.

### *JOBS Act*

On April 5, 2012, the JOBS Act was signed into law. The JOBS Act contains provisions that, among other things, relax certain reporting requirements for qualifying public companies. We will qualify as an "emerging growth company" and under the JOBS Act will be allowed to comply with new or revised accounting pronouncements based on the effective date for private (not publicly traded) companies. We are electing to delay the adoption of new or revised accounting standards, and as a result, we may not comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

Additionally, we are in the process of evaluating the benefits of relying on the other reduced reporting requirements provided by the JOBS Act. Subject to certain conditions set forth in the JOBS Act, if, as an "emerging growth company," we choose to rely on such exemptions we may not be required to, among other things, (i) provide an independent registered public accounting firm's attestation report on our system of internal controls over financial reporting pursuant to Section 404, (ii) provide all of the compensation disclosure that may be required of non-emerging growth public companies under the Dodd-Frank Wall Street Reform and Consumer Protection Act, including but not limited to reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved, (iii) comply with any requirement that may be adopted by the PCAOB regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (auditor discussion and analysis), and (iv) disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the CEO's compensation to median employee compensation. These exemptions will apply for a period of five years following the completion of this offering or until we are no longer an "emerging growth company," whichever is earlier.

75

**Table of Contents**

## PROPOSED BUSINESS

**General**

We are a newly organized Private-to-Public Equity (PPE) company, also known as a blank check company or special purpose acquisition vehicle, incorporated in Delaware and formed for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, reorganization, recapitalization or other similar business combination with one or more businesses, which we refer to throughout this prospectus as our initial business combination. We have not identified any potential initial business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any potential initial business combination target.

We will seek to capitalize on the significant experience and contacts of our management team to complete our initial business combination. We believe our management team's distinctive background and record of acquisition and operational success could have a significant impact on verified target businesses. Although we may pursue our initial business combination in any business, industry or geographic location, we currently intend to focus on opportunities to capitalize on the ability of our management team, particularly our executive officers, to identify, acquire and operate a business in the TMT industry. In particular, we intend to target TMT and other companies anywhere in the world that are embracing today's digital transformation and experience as a competitive advantage. Digital transformation is driving value extraction across all industries. Statista forecasts that there will be 3.5 billion smartphone users worldwide in 2020, and IDC estimates that third platform technology, such as cloud services, mobile computing and big data analytics, will account for over 40% of information and communication technology spending for businesses across all industries.[12] Data center traffic is projected to reach 17 Zettabytes in 2020, with ninety-four percent (94%) of the data center traffic coming from the cloud, and the global datasphere is projected to grow to 175 Zettabytes by 2025.[13] We believe that data has become a valuable asset and managing, and deriving insights from, data can transform customer experience, operational processes and business models. We believe that embracing today's digital transformation and experience enables both organic and inorganic fast pace growth, creating new strategic, operational and business opportunities fueled by emerging cloud, analytics, big data, and cognitive technologies. Being conscientious corporate citizens, we will focus on sustainable technology companies that can shape a better society and healthier environment. We intend to evaluate both private and public companies as potential initial business combination targets, focusing on opportunities that we believe would provide appropriate risk adjusted returns to stockholders. Following our initial business combination, our objective will be to implement or support the acquired company's operating strategies in order to generate additional value for stockholders. General goals may include additional acquisitions and operational improvements.

Our management team has significant hands-on experience helping TMT companies optimize their existing and new growth initiatives by exploiting insights from rich data assets that already exist within most TMT companies. We intend to apply a unique "Mentor-Investor" philosophy to partner with our targets, where we will offer financial, operational and executive mentoring in order to accelerate the target's growth and development from a privately held entity to a publicly traded company. Further, we intend to share best practices and key learnings, gathered from our management team's operating and investing experience, as well as strong relationships in the TMT industry, to help shape corporate strategies. Additionally, our management team has operated and invested in leading global TMT companies across their corporate life cycles, and has developed deep relationships with key large multi-national organizations and investors. We believe that these relationships and our management team's know-how present a significant opportunity to help drive strategic dialogue, access new customer relationships and achieve global ambitions following the completion of our initial business combination.

[12] Statista, Number of smartphone users worldwide from 2016 to 2021; IDC White Paper, The 3rd Platform: Enabling Digital Transformation, (Nov. 2013).

[13] Statista, Global data center IP traffic 2012-2021, by data center type, (March 2020); IDC White Paper, The Digitization of the World - From Edge to Core, (Nov. 2018).

**Table of Contents**

Over the last several years, there has been an increase in private equity and venture backed capital invested in TMT companies. PwC estimates that global venture capital investment in 2019 resulted in a total of approximately $213 billion invested in 15,564 deals worldwide, with companies in the technology sectors receiving most of the investment.[14] This was an increase over the approximately $207 billion that PwC estimated was invested in 14,247 deals worldwide in 2018.[15] The total number of IPOs in 2019 was approximately 165, which was a decrease of 20% from 2018.[16] Median deal size of IPOs was approximately $100 million for the third year in a row, and slightly up from 2018.[17] However, 9 IPOs raised over $1 billion, and the 10 largest IPOs raised $22 billion, or nearly half of total proceeds, as 2019 saw a number of mega unicorns (companies valued at $1 billion or more) conduct their IPOs.[18] Furthermore, 2019 was the largest year ever for both numbers of blank check companies conducting IPOs and the amount of proceeds raised by such companies, with 59 IPOs of blank check companies that raised $13.6 billion.[19] As a result of the increased number of blank check company IPOs, blank check company IPOs represented a larger percentage of the IPOs in 2019 than in the prior ten years.[20] In addition, the number of blank check IPOs (59) exceeded the number of technology IPOs (52) in the U.S. in 2019.[21] Of the 59 IPOs that were conducted by blank check companies in 2019, approximately 20.2% were focused on TMT, and those companies raised approximately $2.7 billion in their IPOs.[22] In light of these market conditions, we intend to primarily focus our target sourcing efforts on private companies that we believe would benefit from a public listing and that are not otherwise gaining access to public capital in this current market environment. Furthermore, we believe that we are providing an interesting alternative investment opportunity that capitalizes on key trends impacting the capital markets for TMT companies.

We believe that our management team is well positioned to identify attractive businesses within the TMT industry that would benefit from access to the public markets and the skills of our management team. Our objective is to consummate our initial business combination with such a business and enhance stockholder value by improving its operational performance. We believe we can achieve this objective by utilizing our management team's extensive experience in both TMT industry transactions and operating TMT companies in combination with our management team's network of contacts in the TMT industry. We believe many companies in the TMT industry could benefit from access to the public markets but have been unable to do so due to a number of factors, including the time it takes to conduct a traditional IPO, market volatility and pricing uncertainty. We intend to focus on evaluating more established companies with leading competitive positions, strong management teams and strong long-term potential for revenue growth and margin expansion.

Our Sponsor, GigAcquisitions3, LLC, was founded and is managed by and affiliated with Dr. Avi S. Katz, who is also the Executive Chairman of our Board of Directors and our Chief Executive Officer, President and Secretary. Dr. Katz has spent approximately 33 years in international executive positions within the TMT industry working for privately held start-ups, middle-cap companies and large enterprises. In these roles, Dr. Katz has been instrumental in launching and accelerating entities, building teams, large scale fund-raising, developing key alliances and technology partnerships, M&A activities, business development, financial management, global operations and sales and marketing. In October 2017, Dr. Katz founded GIG1, a Private-to-Public Equity (PPE) company formed for the purpose of acquiring a company in the technology industry. GIG1 completed its initial public offering in December 2017, in which it sold 14,375,000 units at price of $10.00 per unit, with each unit consisting of one share of GIG1

[14] PwC / CBInsights MoneyTree™ Report Q4 2019.

[15] PwC / CBInsights MoneyTree™ Report Q4 2018.

[16] EY, Global IPO Trends: Q4 2019. Compare to Renaissance Capital which estimates that there were 159 U.S. IPOs in 2019. Renaissance Capital, US IPO Market 2019 Annual Review.

[17] Renaissance Capital, US IPO Market 2019 Annual Review.

[18] Renaissance Capital, US IPO Market 2019 Annual Review.

[19] Barrons, 2019 Was a Record Year for 'Blank-Check' Companies. Here Are the Biggest Trends., (Feb. 6, 2020).

[20] Renaissance Capital, US IPO Market 2019 Annual Review.

[21] EY, Global IPO Trends: Q4 2018. CBInsights, The 2019 Tech IPO Pipeline.

[22] SPAC Research, SPACs: By The Numbers, (Feb. 2020).

Table of Contents

common stock, three-fourths (3/4) of one warrant to purchase one share of GIG1 common stock and one right to receive one-tenth (1/10) of one share of GIG1 common stock, generating aggregate proceeds of $143,750,000, and, at that time, was listed on the NYSE under the symbol "GIG." On February 22, 2019, after intensive screening of more than 400 companies worldwide, GIG1 entered into a stock purchase agreement to acquire Kaleyra at a transaction enterprise value of $187 million with combined cash and/or promissory note consideration of $15 million. Kaleyra is a global company specialized in providing mobile messaging services for financial institutions and companies of all sizes. The transaction closed on November 25, 2019, and GIG1 was renamed Kaleyra, Inc. and listed on the NYSE American stock exchange under the symbol "KLR" at that time. Dr. Katz has served as the Executive Chairman of Kaleyra, Inc. since the consummation of the transaction in November 2019. In March 2019, Dr. Katz founded GIG2. GIG2 completed its initial public offering in June 2019, in which it sold 17,250,000 units at a per unit price of $10.00, with each unit consisting of one share of GIG2 common stock, one warrant to purchase one share of GIG2 common stock, and one right to receive one-twentieth (1/20) of one share of GIG2 common stock, generating aggregate proceeds of $172,500,000. GIG2 is listed on the NYSE under the symbol "GIX." GIG2 is engaged in intensive efforts of searching and screening companies worldwide, and has not yet completed its initial business combination. Dr. Katz serves as the Executive Chairman and Secretary of GIG2. He is also the co-founder of Cognizer, a software company specializing in deep-learning powered natural language artificial intelligence, and has been the Executive Chairman of Cognizer's board of directors since March 2019. Prior to GIG1 and GIG2, Dr. Katz dedicated 10 years to bootstrap, develop and manage GigPeak (NYSE American: formerly GIG), originally known as GigOptix, Inc. He served as Chairman of the Board, Chief Executive Officer and President of GigPeak. From its inception in 2007, which occurred through the acquisition of assets valued at less than $1 million, until its sale in April 2017 to IDT for $250 million in cash, GigPeak provided semiconductor integrated circuits (ICs) and software solutions for high-speed connectivity and video compression. While Dr. Katz was at GigPeak's helm, the company completed 10 M&A deals. From 2003 to 2005, Dr. Katz was the chief executive officer, president, and member of the board of directors of Intransa, Inc., which at the time provided full-featured, enterprise-class IP-based Storage Area Networks (SAN). From 2000 to 2003, Dr. Katz was the Chief Executive Officer and a member of the board of directors of Equator Technologies, which at the time sought to commercialize leading edge programmable media processing platform technology for the rapid design and deployment of digital media and imaging products. Equator Technologies was sold to Pixelworks, Inc. for $110 million in 2005. Dr. Katz has held several leadership positions over the span of his career within the technology industry since serving as Member of Technical Staff at AT&T Bell Laboratories in the 1980s, and has made numerous angel investments in high-tech companies around the world. Dr. Katz is a graduate of the Israeli Naval Academy and holds a B.Sc. and Ph.D. in Semiconductors Materials from the Technion (Israel Institute of Technology). He is a serial entrepreneur, holds many U.S. and international patents, has published many technical papers and is the editor of a number of technical books.

With respect to the foregoing examples, the past performance of the members of our management team or their affiliates, including with respect to GIG1 and GIG2, is not a guarantee that we will be able to identify a suitable candidate for our initial business combination or of success with respect to any business combination we may consummate. You should not rely on the historical record of the performance of our management or any of its affiliates' performance, including GIG1 and GIG2, as indicative of our future performance. In addition, members of our management team and their affiliates are likely to form other Private-to-Public Equity (PPE) companies prior to the completion of our initial business combination. Any future Private-to-Public (PPE) companies, while also focusing on TMT, will likely address other verticals to avoid competition with GigCapital3.

**Business Strategy**

Our business strategy is to identify and complete our initial business combination with a company that complements the experience of our management team and can benefit from our management team's operational expertise. Our selection process is expected to leverage our management team's broad and deep relationship network and unique TMT industry expertise, including proven deal-sourcing and structuring capabilities, to provide us with a multitude of business combination opportunities. Our management team has experience:

- operating companies, setting and changing strategies, and identifying, mentoring and recruiting world-class talent;

78

**Table of Contents**

- developing and growing companies, both organically and inorganically, and expanding the product ranges and geographic footprints of a number of businesses;
- sourcing, structuring, acquiring and selling businesses and achieving synergies to create stockholder value;
- establishing a wide deal flow and efficient methodology of screening superior M&A targets worldwide;
- partnering with industry-leading companies to increase sales and improve the competitive position of those companies;
- addressing business and technological changes in an evolving global TMT landscape;
- evaluating the viability of emerging TMT business models;
- fostering relationships with sellers, capital providers and target management teams; and
- accessing the capital markets across various business cycles, including financing businesses and assisting companies with the transition to public ownership.

Following the completion of this offering, we intend to begin the process of communicating with our management team and its affiliates' network of relationships worldwide to articulate the parameters for our search for a potential target initial business combination and begin the process of pursuing and reviewing potential opportunities.

**Business Combination Criteria**

Consistent with our strategy, we have identified general criteria and guidelines that we believe are important in evaluating prospective target businesses and, when evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews and inspection of facilities, as applicable, as well as a review of financial and other information that will be made available to us. We are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion. We intend to use the following and other criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet any or all of these criteria or guidelines.

- *Companies that embrace today's digital transformation and experience.* We will seek TMT companies and other companies anywhere in the world that are embracing today's digital transformation and experience as a competitive advantage. We believe that an embrace of today's digital transformation and experience enables both organic and inorganic growth, creating new strategic, operational and business opportunities fueled by the emerging cloud, analytics, big data and cognitive technologies. Being conscientious corporate citizens, we will focus on sustainable technology companies that can shape a better society and healthier environment.
- *Companies that will benefit from a public listing.* We will primarily seek companies that we believe will benefit from being publicly traded, and that will be able to effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.
- *Companies that will benefit from our industry expertise and relationships.* We will seek companies that will be best positioned to leverage our industry expertise, insights and relationships to create opportunities for value creation, whether acquisitions, capital investments in organic growth opportunities, generating greater operating efficiencies or significantly improving financial performance. We believe our strategy leverages our management team's distinctive background and vast network of industry leaders in the TMT industry. We will seek to identify such opportunities for value creation in evaluating potential business combinations.
- *Companies that are market-leading participants.* We will seek a target that has an established business and market position. While we will focus on TMT businesses, we will not seek a target that is pre-revenue or in early stages of development with unproven technologies.

79

Table of Contents

- *Companies that are SMB.* We believe targeting companies in the SMB market will provide the greatest number of opportunities for investment and will maximize the benefits of the collective network of our management team and its affiliates.
- *Companies with strong management.* We will prioritize entities with well-established, proven and talented management teams that wish to continue to drive their companies to growth and are eager to succeed with support from an interactive and hands-on board of directors. To the extent we believe it will enhance stockholder value, we would seek to selectively supplement the existing leadership of the business with proven leaders from our network, whether at the senior management level or at the board level.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management team may deem relevant.

### Competitive Strengths

We believe we have the following competitive strengths:

### Status as a Public Company

We believe our structure will make us an attractive business combination partner to target businesses. As an existing public company, we offer a target business an alternative to the traditional IPO through a merger or other business combination. In this situation, the owners of the target business would exchange their shares of stock in the target business for shares of stock or other securities or for a combination of shares of stock, other securities and cash, allowing us to tailor the consideration to the specific needs of the sellers. We believe target businesses might find this method a more certain and cost effective method to becoming a public company than the typical IPO. In a typical IPO, there are additional expenses incurred in marketing, roadshow and public reporting efforts that will likely not be present to the same extent in connection with a business combination with us. Furthermore, once the business combination is consummated, the target business will have effectively become public, whereas an IPO is always subject to the underwriters' ability to complete the offering, as well as general market conditions, which could prevent the offering from occurring. Once public, we believe the target business would then have greater access to capital and an additional means of providing management incentives consistent with stockholders' interests than it would have as a privately held company. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented employees. However there is currently no market for our securities and a market for our securities may not develop. As a result, this purported benefit may not be realized.

Although we believe that our status as a public company will make us an attractive business partner, some potential target businesses may view the inherent limitations in our status as a blank check company as a deterrent and may prefer to effect a business combination with a more established entity or with a private company. These inherent limitations include limitations on our available financial resources, which may be inferior to those of other entities pursuing the acquisition of similar target businesses; the requirement that we seek stockholder approval of a business combination or conduct a tender offer in relation thereto, which may delay the consummation of a transaction; and the existence of our outstanding warrants, which may represent a source of future dilution.

### Financial Position

With funds available for a business combination initially in the amount of $202,000,000 (or $232,300,000 if the over-allotment option is exercised), excluding deferred underwriting commissions of $8,000,000 (or $9,200,000 if the underwriters' over-allotment option is exercised in full) assuming no redemptions, we can offer a target

80

Table of Contents

business a variety of options to facilitate a business combination and fund future expansion and growth of its business. Because we are able to consummate a business combination using the cash proceeds in our trust account, debt or a combination of the foregoing, we have the flexibility to use an efficient structure allowing us to tailor the consideration to be paid to the target business to address the needs of the parties. However, if a business combination requires us to use substantially all of our cash to pay for the purchase price, we may need to arrange third party financing to help fund our business combination. Since we have no specific business combination under consideration, we have not taken any steps to secure third-party financing. Accordingly, our flexibility in structuring a business combination may be subject to constraints resulting from a need to finance such business combination.

**Initial Business Combination**

*General*

We are not presently engaged in, and we will not engage in, any operations for an indefinite period of time following this offering. We intend to effectuate our initial business combination using cash from the proceeds of this offering and the private placement of the private units, our common and preferred equity (if any), new debt, or a combination of these, as the consideration to be paid in effecting a business combination which has not yet been identified. Accordingly, investors in this offering are investing without first having an opportunity to evaluate the specific merits or risks of any one or more business combinations. A business combination may involve the acquisition of, or merger with, a company which does not need substantial additional capital but which desires to establish a public trading market for its shares, while avoiding what it may deem to be adverse consequences of undertaking a public offering itself. These include time delays, significant expense, loss of voting control and compliance with various federal and state securities laws. In the alternative, we may seek to consummate our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, which would subject us to the numerous risks inherent in such companies and businesses, although we will not be permitted to effectuate our initial business combination with another blank check company or a similar company with nominal operations.

We will have until 18 months from the closing of this offering to consummate an initial business combination. If we are unable to consummate our initial business combination within the applicable time period, we will, as promptly as reasonably possible but not more than 10 business days thereafter, redeem the public shares for a pro rata portion of the funds held in the trust account and as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board of Directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law.

*We Have Not Identified a Target Business*

To date, we have not selected any target business on which to concentrate our search for a business combination. We do not have any specific business combination under consideration and we have not (nor has anyone on our behalf), directly or indirectly, contacted any prospective target business with respect to such a transaction. Additionally, we have not engaged or retained any agent or other representative to identify or locate such companies. As a result, we cannot assure you that we will be able to locate a target business or that we will be able to engage in a business combination with a target business on favorable terms or at all.

Subject to our officers' and directors' pre-existing fiduciary duties and the limitation that a target business have a fair market value of at least 80% of the balance in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned) at the time of the execution of a definitive agreement for our initial business combination, as described below in more detail, we will have virtually unrestricted flexibility in identifying and selecting a prospective acquisition candidate. Except for the general criteria and guidelines set forth above under the caption "*Business Strategy*," we have not established any other specific attributes or

81

Table of Contents

criteria (financial or otherwise) for prospective target businesses. Accordingly, there is no basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete a business combination. To the extent we effect a business combination with a financially unstable company or an entity in its early stage of development or growth, including entities without established records of sales or earnings, we may be affected by numerous risks inherent in the business and operations of financially unstable and early stage or potential emerging growth companies. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors.

*Sources of Target Businesses*

We expect to evaluate opportunities that are sourced through the relationship networks of Dr. Katz and our combined management and advisory team, which includes numerous entrepreneurs, management teams, intermediaries and venture capital funds. Dr. Katz and our combined management and advisory team has considerable expertise in the evaluation of technology investments.

While we have not yet identified any acquisition candidates, we believe based on our combined team's business knowledge and past experience that there are numerous acquisition candidates. We expect that our principal means of identifying potential target businesses will be through the extensive contacts and relationships of our combined management and advisory team. Although our Founder, executive officers and directors are not required to commit any specific amount of time in identifying or performing due diligence on potential target businesses, our Founder, executive officers and directors, as augmented by our advisors, believe that the relationships they have developed collectively over their careers and their access to their contacts and resources will generate a number of potential business combination opportunities that will warrant further investigation. We also anticipate that target business candidates may also be brought to our attention from various unaffiliated sources, including investment bankers, including the underwriters, venture capital funds, private equity funds, leveraged buyout funds, management buyout funds and other members of the financial community. Target businesses may be brought to our attention by such unaffiliated sources as a result of being solicited by us through calls or mailings. These sources may also introduce us to target businesses they think we may be interested in on an unsolicited basis, since many of these sources will have read this prospectus and know what types of businesses we are targeting. Our Founder, executive officers and directors, as well as their affiliates, may also bring to our attention target business candidates that they become aware of through their business contacts as a result of formal or informal inquiries or discussions they may have, as well as attending trade shows or conventions. Our Sponsor, executive officers and directors must present to us all target business opportunities in the sectors of the TMT industry that we are focusing on and that have a fair market value of at least 80% of the assets held in the trust account (excluding the deferred underwriting commissions and any taxes payable on the interest earned) at the time of the agreement to enter into the initial business combination, subject to any pre-existing fiduciary or contractual obligations. While we do not presently anticipate engaging the services of professional firms or other individuals that specialize in business acquisitions on any formal basis, we may engage these firms or other individuals in the future, in which event we may pay a finder's fee, consulting fee or other compensation to be determined in an arm's length negotiation based on the terms of the transaction. In no event, however, will our Founder, executive officers, directors or their respective affiliates be paid any finder's fee, consulting fee or other compensation prior to, or for any services they render in order to effectuate, the consummation of an initial business combination (regardless of the type of transaction that it is) other than the $20,000 per month administrative services fee, the repayment of any loans, including but not limited to the Sponsor note, from our Sponsor, officers and directors for working capital purposes and reimbursement of any out-of-pocket expenses.

Our audit committee will review and approve all reimbursements and payments made to our Founder, executive officers, directors or their respective affiliates, with any interested director abstaining from such review and approval. We have no present intention to enter into a business combination with a target business that is affiliated with any of our Founder, executive officers, directors or their respective affiliates. However, we are not

82

**Table of Contents**

restricted from entering into any such transactions and may do so if (i) such transaction is approved by a majority of our disinterested independent directors and (ii) we obtain an opinion from an independent investment banking firm, or another independent entity that commonly renders valuation opinions on the type of target business we are seeking to acquire, that the business combination is fair to our unaffiliated stockholders from a financial point of view.

*Selection of a Target Business and Structuring of a Business Combination*

Subject to our executive officers' and directors' pre-existing fiduciary duties and the limitations that a target business have a fair market value of at least 80% of the balance in the trust account (excluding the deferred underwriting commissions and any taxes payable on the interest earned) at the time of the execution of a definitive agreement for our initial business combination, as described below in more detail, and that we must acquire a controlling interest in the target business, our management will have virtually unrestricted flexibility in identifying and selecting a prospective target business. Except for the general criteria and guidelines set forth above under the caption "*Business Strategy*," we have not established any specific attributes or criteria (financial or otherwise) for prospective target businesses. In evaluating a prospective target business, our management may consider a variety of factors, including one or more of the following:

- financial condition and results of operation;
- growth potential;
- brand recognition and potential;
- experience and skill of management and availability of additional personnel;
- capital requirements;
- competitive position;
- barriers to entry;
- stage of development of the products, processes or services;
- existing distribution and potential for expansion;
- degree of current or potential market acceptance of the products, processes or services;
- proprietary aspects of products and the extent of intellectual property or other protection for products or formulas;
- impact of regulation on the business;
- regulatory environment of the industry;
- costs associated with effecting the business combination;
- industry leadership, sustainability of market share and attractiveness of market industries in which a target business participates;
- macro competitive dynamics in the industry within which the company competes; and
- fit, cooperation and coachability of management team.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular business combination will be based, to the extent relevant, on the above factors as well as other considerations deemed relevant by our management in effecting a business combination consistent with our business objective. In evaluating a prospective target business, we will conduct an extensive due diligence review which will encompass, among other things, meetings with incumbent management and inspection of facilities, as well as review of financial and other information which is made available to us. This due diligence review will be conducted either by our management or by unaffiliated third parties we may engage, although we have no current intention to engage any such third parties.

Table of Contents

The time and costs required to select and evaluate a target business and to structure and complete the business combination cannot presently be ascertained with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which a business combination is not ultimately completed will result in a loss to us and reduce the amount of capital available to otherwise complete a business combination.

### Fair Market Value of Target Business

The target business or businesses that we acquire must collectively have a fair market value equal to at least 80% of the balance of the funds in the trust account (excluding the deferred underwriting commissions and any taxes payable on the interest earned) at the time of the execution of a definitive agreement for our initial business combination, although we may acquire a target business whose fair market value significantly exceeds 80% of the trust account balance.

We currently anticipate structuring a business combination involving 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination where we merge directly with the target business or involving less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders or for other reasons, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act. Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. In this case, we could acquire a 100% controlling interest in the target; however, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% fair market value test. In order to consummate such an acquisition, we may issue a significant amount of our debt or equity securities to the sellers of such businesses and/or seek to raise additional funds through a private offering of debt or equity securities. Since we have no specific business combination under consideration, we have not entered into any such fund raising arrangement and have no current intention of doing so. The fair market value of the target will be determined by our Board of Directors based upon one or more standards generally accepted by the financial community (such as actual and potential sales, earnings, cash flow and/or book value). The proxy solicitation materials or tender offer documents used by us in connection with any proposed transaction will provide public stockholders with our analysis of the fair market value of the target business, as well as the basis for our determinations. If our Board of Directors is not able to independently determine that the target business has a sufficient fair market value, we will obtain an opinion from an unaffiliated, independent investment banking firm, or another independent entity that commonly renders valuation opinions on the type of target business we are seeking to acquire, with respect to the satisfaction of such criteria. We will not be required to obtain an opinion from an investment banking firm as to the fair market value if our Board of Directors independently determines that the target business complies with the 80% threshold.

### Lack of business diversification

For an indefinite period of time after consummation of our initial business combination, the prospects for our success may depend entirely on the future performance of a single business. Unlike other entities that have the resources to complete business combinations with multiple entities in one or several industries, it is probable that we will not have the resources to diversify our operations and mitigate the risks of being in a single line of

84

Table of Contents

business. By consummating our initial business combination with only a single entity, our lack of diversification may:

- subject us to negative economic, competitive and regulatory developments, any or all of which may have a substantial adverse impact on the particular industry in which we operate after our initial business combination, and
- cause us to depend on the marketing and sale of a single product or limited number of products or services.

*Limited ability to evaluate the target's management team*

Although we intend to closely scrutinize the management of a prospective target business when evaluating the desirability of effecting our initial business combination with that business, our assessment of a target business' management may not prove to be correct. Moreover, members of our management team may not have significant experience or knowledge relating to the operations of the particular target business. The future role of members of our management team, if any, in a post-transaction company cannot presently be stated with any certainty. Consequently, members of our management team may not become a part of the post-transaction company's management team or serve it in advisory positions, and the future management may not have the necessary skills, qualifications or abilities to manage a public company. Further, it is also not certain whether one or more of our directors will remain associated with the post-transaction company in some capacity following our initial business combination. The determination as to whether any of our key personnel will remain with the post-transaction company will be made at the time of our initial business combination.

Following our initial business combination, we may seek to recruit additional managers to supplement the incumbent management of the target business. However, we may not have the ability to recruit additional managers, or to locate additional managers who will have the requisite skills, knowledge or experience necessary to enhance the incumbent management.

*Stockholders May Not Have the Ability to Approve an Initial Business Combination*

In connection with any proposed business combination, we will either (1) seek stockholder approval of our initial business combination at a meeting called for such purpose at which stockholders may seek to convert their shares, regardless of whether they vote for or against the proposed business combination, into their pro rata share of the aggregate amount then on deposit in the trust account (net of taxes payable), or (2) provide our stockholders with the opportunity to sell their shares to us by means of a tender offer (and thereby avoid the need for a stockholder vote) for an amount equal to their pro rata share of the aggregate amount then on deposit in the trust account (net of taxes payable), in each case subject to the limitations described herein. We will seek stockholder approval if it is required by applicable law or stock exchange listing requirement, provided, that we may also decide to seek stockholder approval for business or other reasons.

Under the rules of the NYSE, stockholder approval would be required for our initial business combination if, for example:

- we issue (other than in a public offering for cash) a number of shares of Common Stock that would either (a) be equal to or in excess of 20% of the number of shares of Common Stock then outstanding or (b) have voting power equal to or in excess of 20% of the voting power then outstanding;
- any of our directors, officers or substantial security holders (as defined by the rules of the NYSE) has a 5% or greater interest, directly or indirectly, in the target business or assets to be acquired and if the number of shares of Common Stock to be issued, or if the number of shares of Common Stock into which the securities may be convertible or exercisable, exceeds either (a) 1% of the number of shares of Common Stock or 1% of the voting power outstanding before the issuance in the case of any of our directors and officers or (b) 5% of the number of shares of Common Stock or 5% of the voting power outstanding before the issuance in the case of any substantial security holders; or

85

Table of Contents

- the issuance or potential issuance of shares of our Common Stock will result in our undergoing a change of control.

If we determine to engage in a tender offer, such tender offer will be structured so that each stockholder may tender any or all of his, her or its shares rather than some pro rata portion of his, her or its shares. The decision as to whether we will seek stockholder approval of a proposed business combination or will allow stockholders to sell their shares to us in a tender offer will be made by us, solely in our discretion, and will be based on business and legal reasons, which include a variety of factors, including, but not limited to:

- the timing of the proposed transaction, including in the event we determine stockholder approval would require additional time and there is either not enough time to seek stockholder approval or doing so would place us at a disadvantage in the transaction or result in other additional burdens on us;
- the expected cost of holding a stockholder vote;
- the risk that our stockholders would fail to approve the initial business combination;
- other time and budget constraints; and
- potential additional legal complexities of an initial business combination that would be time-consuming and burdensome to present to stockholders.

Unlike other blank check companies which require stockholder votes and conduct proxy solicitations in conjunction with their initial business combinations and related conversions of public shares for cash upon consummation of such initial business combination even when a vote is not required by law, we will have the flexibility to avoid such stockholder vote and allow our stockholders to sell their shares pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers. In that case, we will file tender offer documents with the SEC, which will contain substantially the same financial and other information about the initial business combination as is required under the SEC's proxy rules. We will consummate our initial business combination only if we have net tangible assets of at least $5,000,001 upon such consummation and, if we seek stockholder approval, a majority of the shares of Common Stock voted at a stockholder meeting are voted in favor of the business combination.

We chose our net tangible asset threshold of $5,000,001 to ensure that we would avoid being subject to Rule 419 promulgated under the Securities Act. However, if we seek to consummate an initial business combination with a target business that imposes any type of working capital closing condition or requires us to have a minimum amount of funds available from the trust account upon consummation of such initial business combination, we may need to have more than $5,000,001 in net tangible assets upon consummation and this may force us to seek third party financing which may not be available on terms acceptable to us or at all. As a result, we may not be able to consummate such initial business combination and we may not be able to locate another suitable target within the applicable time period, if at all. Public stockholders may therefore have to wait up to 18 months from the closing of this offering in order to be able to receive a pro rata share of the trust account.

Our initial stockholders and the underwriters have agreed (1) to vote any shares of Common Stock owned by them in favor of any proposed business combination, including the founder shares, the insider shares, the shares of Common Stock underlying the private units, (2) not to convert any shares of Common Stock in connection with a stockholder vote to approve a proposed initial business combination and (3) not sell any shares of Common Stock in any tender in connection with a proposed initial business combination. As a result, we would need only approximately 7,053,261 public shares, or approximately 35.27% of the 20,000,000 public shares sold in this offering to be voted in favor of a transaction in order to have our initial business combination approved (assuming (i) the over-allotment option is not exercised and all shares were present and entitled to vote at the meeting, (ii) 750,000 founder shares have been forfeited and (iii) there are 893,479 private shares outstanding).

None of our Founder, executive officers, directors, or their affiliates has indicated any intention to purchase units or shares of Common Stock in this offering or from persons in the open market or in private transactions.

Table of Contents

However, if we hold a meeting to approve a proposed business combination and a significant number of stockholders vote, or indicate an intention to vote, against such proposed business combination, our Founder, executive officers, directors, or their affiliates could make such purchases in the open market or in private transactions in order to influence the vote. Notwithstanding the foregoing, our Founder, executive officers, directors, and their affiliates will not make purchases of shares of Common Stock if the purchases would violate Section 9(a)(2) or Rule 10b-5 of the Exchange Act, which are rules designed to stop potential manipulation of a company's stock.

*Redemption Rights*

At any meeting called to approve an initial business combination, public stockholders (but not our initial stockholders or the underwriters) may seek to redeem their shares of Common Stock, regardless of whether they vote for or against the proposed business combination, by converting such shares into their pro rata share of the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination, less any taxes then due but not yet paid (which taxes may be paid only from the interest earned on the funds in the trust account, net of taxes). Alternatively, we may provide our public stockholders (but not our initial stockholders or the underwriters) with the opportunity to sell their shares of Common Stock to us through a tender offer (and thereby avoid the need for a stockholder vote) for an amount equal to their pro rata share of the aggregate amount then on deposit in the trust account, less any taxes then due but not yet paid.

We may also require public stockholders seeking redemption, whether they are a record holder or hold their shares in "street name," to either (i) tender their certificates to our transfer agent or (ii) deliver their shares to the transfer agent electronically using Depository Trust Company's DWAC (Deposit/Withdrawal At Custodian) System, at the holder's option, in each case prior to a date set forth in the proxy materials sent in connection with the proposal to approve the business combination.

There is a nominal cost associated with the above-referenced delivery process and the act of certificating the shares or delivering them through the DWAC System. The transfer agent will typically charge the tendering broker $45.00 and it would be up to the broker whether or not to pass this cost on to the holder. This fee would be incurred regardless of whether or not we require holders seeking to exercise redemption rights to do so prior to the time that we know that the proposed business combination will be consummated. The need to deliver shares is a requirement of exercising redemption rights regardless of the timing of when such delivery must be effectuated. Thus, in the event we require stockholders seeking to exercise redemption rights to deliver their shares prior to the consummation of the proposed business combination and the proposed business combination is not consummated, this may result in an increased cost to stockholders.

Any proxy solicitation materials we furnish to stockholders in connection with a vote for any proposed business combination will indicate whether we are requiring stockholders to satisfy such certification and delivery requirements. Accordingly, a stockholder would have from the time the stockholder received our proxy statement up until the time designated in the proxy statement to deliver his, her or its shares if he, she or it wishes to seek to exercise his, her or its redemption rights. This time period varies depending on the specific facts of each transaction. However, as the delivery process can be accomplished by the stockholder, whether or not he, she or it is a record holder or his, her or its shares are held in "street name," in a matter of hours by simply contacting the transfer agent or his, her or its broker and requesting delivery of his her or its shares through the DWAC System, we believe this time period is sufficient for an average investor. However, we cannot assure you of this fact. Please see the risk factor titled "*We will require public stockholders who wish to redeem their shares of Common Stock in connection with a proposed business combination to comply with specific requirements for redemption that may make it more difficult for them to exercise their redemption rights prior to the deadline for exercising their rights*" for further information on the risks of failing to comply with these requirements.

The foregoing is different from the procedures historically used by some blank check companies. Traditionally, in order to perfect redemption rights in connection with a blank check company's business combination, the

87

**Table of Contents**

company would distribute proxy materials for the stockholders' vote on an initial business combination, and a holder could simply vote against a proposed business combination and check a box on the proxy card indicating such holder was seeking to exercise his, her or its redemption rights. After the business combination was approved, the company would contact such stockholder to arrange for him, her or it to deliver his, her or its certificate to verify ownership. As a result, the stockholder then had an "option window" after the consummation of the business combination during which he, she or it could monitor the price of the company's stock in the market. If the price rose above the conversion price, he could sell his, her or its shares in the open market before actually delivering his, her or its shares to the company for cancellation. As a result, the redemption rights, to which stockholders were aware they needed to commit before the stockholder meeting, would become a "continuing" right surviving past the consummation of the business combination until the holder delivered his, her or its certificate or shares. The requirement for physical or electronic delivery prior to the meeting ensures that a holder's election to convert his, her or its shares is irrevocable once the business combination is approved.

Any request to redeem such shares once made, may be withdrawn at any time up to the vote on the proposed business combination. Furthermore, if a holder of a public share delivered his, her or its certificate in connection with an election of such shares' redemption and subsequently decides prior to the vote on the proposed business combination not to elect to exercise such rights, he, she or it may simply request that the transfer agent return the certificate or shares (physically or electronically).

If the initial business combination is not approved or completed for any reason, then our public stockholders who elected to exercise their redemption rights would not be entitled to redeem their shares for the applicable pro rata share of the trust account (net of taxes payable) as of two business days prior to the consummation of the initial business combination. In such case, we will promptly return any certificates or shares delivered by public holders. Furthermore, if the initial business combination is not approved or completed for any reason, then our public stockholders who elected to exercise their redemption rights will not be entitled to convert their shares into a full pro rata portion of the trust account (net of taxes payable and less $100,000 for dissolution expenses), as applicable. We will thereafter promptly return any shares delivered by public stockholders. In such case, public stockholders may only share in the assets of the trust account upon our liquidation. This may result in public stockholders receiving less than they would have received if the business combination was completed and they had exercised redemption rights in connection therewith due to potential claims of creditors. If we would be left with less than $5,000,001 of net tangible assets as a result of the holders of public shares properly demanding redemption of their shares, we will likely be unable to consummate a business combination.

### *Liquidation if No Business Combination*

Our amended and restated certificate of incorporation provides that we will have only 18 months from the closing of this offering to complete an initial business combination. If we have not completed an initial business combination by such date, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, (less up to $100,000 of such net interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board of Directors, dissolve and liquidate, subject (in the case of (ii) and (iii) above) to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law.

Our initial stockholders and the underwriters have agreed (pursuant to written letter agreements with us filed as exhibits to the registration statement of which this prospectus forms a part) that they will not propose any amendment to our amended and restated certificate of incorporation that would stop our public stockholders from converting or selling their shares of Common Stock to us in connection with a business combination or affect the substance or timing of our obligation to redeem 100% of our public shares if we do not complete a business

88

**Table of Contents**

combination within 18 months from the closing of this offering unless we provide our public stockholders with the opportunity to redeem their shares of Common Stock upon such approval at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, net of franchise and income taxes payable, divided by the number of then outstanding public shares. This redemption right shall apply in the event of the approval of any such amendment, whether proposed by our Founder, any executive officer, director or director nominee, or any other person.

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our trust account distributed to our public stockholders upon the redemption of 100% of our outstanding public shares in the event we do not complete our initial business combination within the required time period may be considered a liquidation distribution under Delaware law. If the corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution.

Furthermore, if the pro rata portion of our trust account (net of taxes payable, and less $100,000 for dissolution expenses) distributed to our public stockholders upon the redemption of 100% of our public shares in the event we do not complete our initial business combination within the required time period is not considered a liquidation distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidation distribution. However, if we are unable to complete a business combination within the prescribed time frame, we will proceed as provided for in our amended and restated certificate as described above. Accordingly, it is our intention to redeem our public shares as soon as reasonably possible following the 18-month anniversary of the closing of this offering, and, therefore, we do not intend to comply with the procedures required by Section 280 of the DGCL, which would limit the amount and duration of our stockholders' liability with respect to liquidating distributions as described above. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend well beyond the third anniversary of such date.

Because we will not be complying with Section 280 of the DGCL, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the subsequent ten years. However, because we are a blank check company, rather than an operating company, and our operations will be limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses.

We are required to use our reasonable best efforts to have all third parties (including any vendors or other entities we engage after this offering) and any prospective target businesses enter into agreements with us waiving any right, title, interest or claim of any kind they may have in or to any monies held in the trust account. As a result, the claims that could be made against us will be limited, thereby lessening the likelihood that any claim would result in any liability extending to the trust. We therefore believe that any necessary provision for creditors will be reduced and should not have a significant impact on our ability to distribute the funds in the trust account (net of taxes and less $100,000 for dissolution expenses) to our public stockholders. Nevertheless, we cannot assure you of this fact as there is no guarantee that vendors, service providers and prospective target businesses will execute such agreements. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third

89

**Table of Contents**

party's engagement would be significantly more beneficial to us than any alternative. Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third-party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. Our underwriters and auditor are the only third parties we are currently aware of that may not execute a waiver. Nor is there any guarantee that, even if they execute such agreements with us, they will not seek recourse against the trust account.

We anticipate notifying the trustee of the trust account to begin liquidating such assets promptly after such date and anticipate it will take no more than ten business days to effectuate such distribution. Our initial stockholders and the underwriters have waived their rights to participate in any liquidation distribution with respect to the founder shares and the private units. There will be no distribution from the trust account with respect to our warrants, which will expire worthless. We will pay the costs of any subsequent liquidation from our remaining assets outside of the trust account and the interest earned on the funds held in the trust account that we are permitted to withdraw to pay such expenses.

If we are unable to complete an initial business combination and expend all of the net proceeds of this offering, other than the proceeds deposited in the trust account, and without taking into account interest, if any, earned on the trust account, the initial per-share redemption price would be $10.10. The proceeds deposited in the trust account could, however, become subject to claims of our creditors that are in preference to the claims of public stockholders.

Our public stockholders shall be entitled to receive funds from the trust account only in the event of our failure to complete a business combination within the required time period or if the stockholders seek to have us redeem or purchase their respective shares upon a business combination which is actually completed by us or upon certain amendments to our charter documents as described elsewhere herein. In no other circumstances shall a stockholder have any right or interest of any kind to or in the trust account.

Our initial stockholders and the underwriters will not participate in any redemption distribution from our trust account with respect to their founder shares, insider shares and private units. Additionally, any loans made by our officers, directors, sponsors or their affiliates for working capital needs will be forgiven and not repaid if we are unable to complete an initial business combination.

If we are forced to file a bankruptcy case or an involuntary bankruptcy case is filed against us which is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the trust account, we cannot make any assurance of the amount we will be able to return to our public stockholders.

If we are forced to file a bankruptcy case or an involuntary bankruptcy case is filed against us which is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. Furthermore, because we intend to distribute the proceeds held in the trust account to our public stockholders promptly after 18 months from the closing of this offering, this may be viewed or interpreted as giving preference to our public stockholders over any potential creditors with respect to access to or distributions from our assets. Furthermore, our Board of Directors may be viewed as having breached their fiduciary duties to our creditors and/or may have acted in bad faith, and thereby exposing itself and our company to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against us for these reasons.

90

Table of Contents

*Amended and Restated Certificate of Incorporation*

Our amended and restated certificate of incorporation will contain certain requirements and restrictions relating to this offering that will apply to us until the consummation of our initial business combination. These provisions cannot be amended without the approval of a majority of our stockholders. If we seek to amend any provisions of our amended and restated certificate of incorporation that would stop our public stockholders from converting or selling their shares to us in connection with a business combination or affect the substance or timing of our obligation to redeem 100% of our public shares if we do not complete a business combination within 18 months from the closing of this offering, we will provide dissenting public stockholders with the opportunity to convert their public shares in connection with any such vote. This redemption right shall apply in the event of the approval of any such amendment, whether proposed by our Founder, any executive officer, director or director nominee, or any other person. Our initial stockholders and the underwriters have agreed to waive any redemption rights with respect to any Common Stock held by them, including any public shares they may hold in connection with any vote to amend our amended and restated certificate of incorporation. Specifically, our amended and restated certificate of incorporation provides, among other things, that:

- we shall either (1) seek stockholder approval of our initial business combination at a meeting called for such purpose at which stockholders may seek to redeem their shares, regardless of whether they vote for or against the proposed business combination, into their pro rata share of the aggregate amount then on deposit in the trust account (net of taxes payable), or (2) provide our stockholders with the opportunity to sell their shares to us by means of a tender offer (and thereby avoid the need for a stockholder vote) for an amount equal to their pro rata share of the aggregate amount then on deposit in the trust account (net of taxes payable), in each case subject to the limitations described herein;
- we will consummate our initial business combination only if we have net tangible assets of at least $5,000,001 upon such consummation and, if we seek stockholder approval, a majority of the shares of Common Stock voted at a stockholder meeting are voted in favor of the business combination;
- if our initial business combination is not consummated within 18 months from the closing of this offering then we will redeem all of the outstanding public shares and thereafter liquidate and dissolve the Company;
- upon the consummation of this offering, $202,000,000, or approximately $232,300,000 if the over-allotment option is exercised in full, shall be placed into the trust account; and
- prior to our initial business combination, we may not issue additional stock that participates in any manner in the proceeds of the trust account, or that votes as a class with the Common Stock sold in this offering on any matter.

*Competition*

In identifying, evaluating and selecting a target business, we may encounter intense competition from other entities having a business objective similar to ours. Many of these entities are well established and have extensive experience identifying and effecting business combinations directly or through affiliates. Many of these competitors possess greater technical, human and other resources than us and our financial resources will be relatively limited when contrasted with those of many of these competitors. Although we believe there may be numerous potential target businesses that we could acquire with the net proceeds of this offering, our ability to compete in acquiring certain sizable target businesses may be limited by our available financial resources.

The following also may not be viewed favorably by certain target businesses:

- our obligation to seek stockholder approval of a business combination or engage in a tender offer may delay the completion of a transaction;
- our obligation to convert or repurchase shares of Common Stock held by our public stockholders may reduce the resources available to us for a business combination; and
- our outstanding warrants and unit purchase options, and the potential future dilution they represent.

91

Table of Contents

Any of these factors may place us at a competitive disadvantage in successfully negotiating a business combination. Our management believes, however, that our status as a public entity and potential access to the United States public equity markets may give us a competitive advantage over privately held entities having a similar business objective as ours in acquiring a target business with significant growth potential on favorable terms.

If we succeed in effecting a business combination, there will be, in all likelihood, intense competition from competitors of the target business. We cannot assure you that, subsequent to a business combination, we will have the resources or ability to compete effectively.

### *Facilities*

We currently maintain our principal executive offices at 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303. The cost for this space is included in the $20,000 per-month aggregate fee our Sponsor will charge us for general and administrative services commencing on the date of this prospectus pursuant to a letter agreement between us and GigFounders, LLC. We believe, based on rents and fees for similar services in the San Francisco Bay Area, that the fee charged by our Sponsor is at least as favorable as we could have obtained from an unaffiliated person. We consider our current office space, combined with the other office space otherwise available to our executive officers, adequate for our current operations.

### *Employees*

We have two executive officers. The amount of time they will devote in any time period will vary based on whether a target business has been selected for the business combination and the stage of the business combination process the Company is in. Accordingly, once a suitable target business to acquire has been located, management will spend more time investigating such target business and negotiating and processing the business combination (and consequently spend more time on our affairs) than had been spent prior to locating a suitable target business. We presently expect our executive officers to devote such amount of time as they reasonably believe is necessary to our business. We do not intend to have any full time employees prior to the consummation of a business combination.

### *Periodic Reporting and Audited Financial Statements*

We have registered our units, Common Stock and warrants under the Exchange Act and have reporting obligations, including the requirement that we file annual, quarterly and current reports with the SEC. In accordance with the requirements of the Exchange Act, our annual report will contain financial statements audited and reported on by our independent registered public accountants.

We will provide stockholders with audited financial statements of the prospective target business as part of any proxy solicitation materials or tender offer documents sent to stockholders to assist them in assessing the target business. These financial statements will need to be prepared in accordance with or reconciled to GAAP or IFRS. We cannot assure you that any particular target business identified by us as a potential acquisition candidate will have the necessary financial statements. To the extent that this requirement cannot be met, we may not be able to acquire the proposed target business.

We may be required to have our internal control procedures audited for the fiscal year ending December 31, 2022 as required by the Sarbanes-Oxley Act. A target company may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding adequacy of their internal controls. The development of the internal controls of any such entity to achieve compliance with the Sarbanes-Oxley Act may increase the time and costs necessary to complete any such acquisition.

Table of Contents

*Legal Proceedings*

There is no material litigation, arbitration or governmental proceeding currently pending against us or any members of our management team.

**Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419**

The following table compares the terms of this offering to the terms of an offering by a blank check company subject to the provisions of Rule 419. This comparison assumes that the gross proceeds, underwriting commissions and underwriting expenses of our offering would be identical to those of an offering undertaken by a company subject to Rule 419, and that the underwriters will not exercise their over-allotment option. None of the provisions of Rule 419 apply to our offering.

| | **Terms of Our Offering** | **Terms Under a Rule 419 Offering** |
|---|---|---|
| **Escrow of offering proceeds** | $202,000,000 of the net offering proceeds (or $232,300,000 if the over-allotment option is exercised), which includes $6,500,000 of the net proceeds from the sale of the private units to our Sponsor (or $6,890,000 if the over-allotment option is exercised) and $2,434,790 of the net proceeds from the sale of the private units to the underwriters (or $2,800,000 if the over-allotment option is exercised), will be deposited into a segregated trust account located in the United States maintained by Continental Stock Transfer & Trust Company acting as trustee. | $175,500,000 of the net offering proceeds (or $201,960,000 if the over-allotment option is exercised) would be required to be deposited into either an escrow account with an insured depositary institution or in a separate bank account established by a broker-dealer in which the broker-dealer acts as trustee for persons having the beneficial interests in the account. |
| **Investment of net proceeds** | $202,000,000 of the net offering proceeds (or $232,300,000 if the over-allotment option is exercised), which includes $6,500,000 of the net proceeds from the sale of the private units to our Sponsor (or $6,890,000 if the over-allotment option is exercised) and $2,434,790 of the net proceeds from the sale of the private units to the underwriters (or $2,800,000 if the over-allotment option is exercised), held in trust will be invested in United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act which invest only in direct U.S. government treasury obligations. | Proceeds could be invested only in specified securities such as a money market fund meeting conditions of the Investment Company Act or in securities that are direct obligations of, or obligations guaranteed as to principal or interest by, the United States. |
| **Receipt of interest on escrowed funds** | Interest on proceeds from the trust account to be paid to stockholders is reduced by any taxes paid or payable and up to $100,000 payable for dissolution expenses. | Interest on funds in escrow account would be held for the sole benefit of investors, unless and only after the funds held in escrow were released to us in connection |

93

Table of Contents

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| | | with our consummation of a business combination. |
| **Limitation on fair value or net assets of target business** | Our initial business combination must be with one or more target businesses or assets having an aggregate fair market value of at least 80% of the value of the trust account (less the deferred underwriting commissions and any taxes payable on interest earned) at the time of the agreement to enter into such initial business combination. | The fair value or net assets of a target business must represent at least 80% of the maximum offering proceeds. |
| **Trading of securities issued** | The units may commence trading on or promptly after the date of this prospectus. The public shares and public warrants may begin trading separately on the 52nd day after the date of this prospectus unless Nomura informs us of its decision to allow earlier separate trading, provided we have filed with the SEC a Current Report on Form 8-K, which includes an audited balance sheet reflecting our receipt of the proceeds of this offering, such Form 8-K to be amended or supplemented with updated financial information in the event the over- allotment option is exercised or if Nomura permits separate trading prior to the 52nd day after the date of this prospectus. | No trading of the units or the underlying public shares or warrants would be permitted until the completion of a business combination. During this period, the securities would be held in the escrow or trust account. |
| **Exercise of the warrants** | The warrants cannot be exercised until the later of 30 days after the completion of our initial business combination and 12 months from the closing of this offering and, accordingly, will be exercised only after the trust account has been terminated and distributed. | The warrants could be exercised prior to the completion of a business combination, but securities received and cash paid in connection with the exercise would be deposited in the escrow or trust account. |
| **Election to remain an investor** | We will either (1) give our stockholders the opportunity to vote on the business combination or (2) provide our public stockholders with the opportunity to sell their shares of Common Stock to us in a tender offer for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account, less any taxes payable on interest earned. If we hold a meeting to approve a proposed business combination, we will send each stockholder a proxy statement containing information required by the SEC. Under Delaware law and our amended and restated certificate of incorporation, we must provide notice of any meeting of stockholders at least 10 days | A prospectus containing information pertaining to the business combination required by the SEC would be sent to each investor. Each investor would be given the opportunity to notify the company in writing, within a period of no less than 20 business days and no more than 45 business days from the effective date of a post-effective amendment to the company's registration statement, to decide if he, she or it elects to remain a stockholder of the company or require the return of his, her or its investment. If the company has not received the notification by the end of the 45th business day, funds and interest or dividends, if any, held in the trust or escrow |

94

**Table of Contents**

| | **Terms of Our Offering** | **Terms Under a Rule 419 Offering** |
|---|---|---|
| | in advance. Accordingly, this is the minimum amount of time we would need to provide holders to determine whether to exercise their rights to convert their shares into cash or to remain an investor in our company. Alternatively, if we do not hold a meeting and instead conduct a tender offer, we will conduct such tender offer in accordance with the tender offer rules of the SEC and file tender offer documents with the SEC which will contain substantially the same financial and other information about the initial business combination as we would have included in a proxy statement. Under the tender offer rules, a tender offer must remain open for 20 business days. Accordingly, this is the minimum amount of time we would need to provide holders to determine whether to sell their shares to us in such a tender offer or to remain an investor in our company. | account are automatically returned to the stockholder. Unless a sufficient number of investors elect to remain investors, all funds on deposit in the escrow account must be returned to all of the investors and none of the securities are issued. |
| **Business combination deadline** | Pursuant to our amended and restated certificate of incorporation, if we are unable to complete our initial business combination within 18 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than 10 business days thereafter, redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including any interest earned on the funds held in the trust account net of interest that may be used by us to pay our franchise and income taxes payable, less $100,000 for dissolution expenses, divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board of Directors, dissolve and liquidate, subject (in the case of (ii) and (iii) above) to our obligations under Delaware law to provide | If an acquisition has not been consummated within 18 months after the effective date of the company's registration statement, funds held in the trust or escrow account are returned to investors. |

95

**Table of Contents**

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| | for claims of creditors and the requirements of other applicable law. | |
| **Release of funds** | Except for interest earned on the funds in the trust account that may be released to us to pay our tax obligations, the proceeds held in the trust account will not be released until the earlier; (1) of the completion of our initial business combination within the required time period; (2) our redemption of 100% of the outstanding public shares if we have not completed an initial business combination in the required time period; and, if our charter documents are amended to require it and (3) the redemption of any public shares properly tendered in connection with a stockholder vote to amend our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within the required time period or (B) with respect to any other provision relating to stockholders' rights or pre-business combination activity. | The proceeds held in the escrow account are not released until the earlier of the completion of a business combination or the failure to effect our initial business combination within the allotted time. |
| **Limitation on redemption rights of stockholders holding more than 15% of the shares sold in this offering if we hold a stockholder vote** | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder (including our affiliates), together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to Excess Shares (more than an aggregate of 15% of the shares sold in this offering). Our public stockholders' inability to redeem Excess Shares will reduce their influence over our ability to complete our initial business combination and they could suffer a material loss on their investment in us if they sell any Excess Shares in open market transactions. | Many blank check companies provide no restrictions on the ability of stockholders to redeem shares based on the number of shares held by such stockholders in connection with an initial business combination. |

96

**Table of Contents**

## MANAGEMENT

Our current directors and executive officers are listed below.

| Name | Age | Position |
|---|---|---|
| Dr. Avi S. Katz | 62 | Executive Chairman of the Board of Directors, Secretary, President and Chief Executive Officer |
| Brad Weightman | 65 | Chief Financial Officer |
| Neil Miotto | 74 | Director |
| John Mikulsky | 74 | Director |
| Dr. Raluca Dinu | 46 | Director |
| Andrea Betti-Berutto | 56 | Director |
| Peter Wang | 64 | Director |

**Dr. Avi S. Katz** has served as our Executive Chairman of our Board of Directors, Chief Executive Officer, President and Secretary since February 2020. Dr. Katz has spent approximately 33 years in international executive positions within the TMT industry working for privately held start-ups, middle-cap companies and large enterprises. In these roles, Dr. Katz has been instrumental in launching and accelerating entities, building teams, large scale fund-raising, developing key alliances and technology partnerships, M&A activities, business development, financial management, global operations and sales and marketing. In October 2017, Dr. Katz founded GIG1, a Private-to-Public Equity (PPE) company formed for the purpose of acquiring a company in the technology industry. GIG1 completed its initial public offering in December 2017, in which it sold 14,375,000 units at price of $10.00 per unit, with each unit consisting of one share of GIG1 common stock, three-fourths (3/4) of one warrant to purchase one share of GIG1 common stock and one right to receive one-tenth (1/10) of one share of GIG1 common stock, generating aggregate proceeds of $143,750,000, and, at that time, was listed on the NYSE under the symbol "GIG." On February 22, 2019, after intensive screening of more than 400 companies worldwide, GIG1 entered into a stock purchase agreement to acquire Kaleyra at a transaction enterprise value of $187 million with combined cash and/or promissory note consideration of $15 million. Kaleyra is a global company specialized in providing mobile messaging services for financial institutions and companies of all sizes. The transaction closed on November 25, 2019, and GIG1 was renamed Kaleyra, Inc. and listed on the NYSE American stock exchange under the symbol "KLR" at that time. Dr. Katz has served as the Executive Chairman of Kaleyra, Inc. since the consummation of the transaction in November 2019. In March 2019, Dr. Katz founded GIG2. GIG2 completed its initial public offering in Junes 2019, in which it sold 17,250,000 units at a per unit price of $10.00, with each unit consisting of one share of GIG2 common stock, one warrant to purchase one share of GIG2 common stock, and one right to receive one-twentieth (1/20) of one share of GIG2 common stock, generating aggregate proceeds of $172,500,000. GIG2 is listed on the NYSE under the symbol "GIX." GIG2 is engaged in intensive efforts of searching and screening companies worldwide, and has not yet completed its initial business combination. Dr. Katz serves as the Executive Chairman and Secretary of GIG2. He is also the co-founder of Cognizer, a software company specializing in deep-learning powered natural language artificial intelligence, and has been the Executive Chairman of Cognizer's board of directors since March 2019. Prior to GIG1 and GIG2, Dr. Katz dedicated 10 years to bootstrap, develop and manage GigPeak (NYSE American: formerly GIG), originally known as GigOptix, Inc. He served as Chairman of the Board, Chief Executive Officer and President of GigPeak. From its inception in 2007, which occurred through the acquisition of assets valued at less than $1 million, until its sale in April 2017 to IDT for $250 million in cash, GigPeak provided semiconductor integrated circuits (ICs) and software solutions for high-speed connectivity and video compression. While Dr. Katz was at GigPeak's helm, the company completed 10 M&A deals. From 2003 to 2005, Dr. Katz was the chief executive officer, president, and member of the board of directors of Intransa, Inc., which at the time provided full-featured, enterprise-class IP-based Storage Area Networks (SAN). From 2000 to 2003, Dr. Katz was the Chief Executive Officer and a member of the board of directors of Equator Technologies, which at the time sought to commercialize leading edge programmable media processing platform technology for the rapid design and deployment of digital media and imaging products. Equator Technologies was sold to Pixelworks, Inc. for $110 million in 2005. Dr. Katz has held several leadership positions over the span of his career within the technology industry since serving as Member of Technical Staff at AT&T Bell Laboratories in the 1980s, and has made numerous angel investments in high-tech companies around the world. Dr. Katz is a graduate of

97

Table of Contents

the Israeli Naval Academy and holds a B.Sc. and Ph.D. in Semiconductors Materials from the Technion (Israel Institute of Technology). He is a serial entrepreneur, holds many U.S. and international patents, has published many technical papers and is the editor of a number of technical books. Dr. Katz is married to Dr. Dinu, one of our directors.

**Brad Weightman** has served as our Chief Financial Officer since February 2020. Mr. Weightman has more than 30 years of global finance and accounting experience with a combination of large, mid-sized, and small public and private companies in the semiconductor, internet of things, hardware and software industries. Mr. Weightman has been the Chief Financial Officer of GIG2 since August 2019, and was also the Chief Financial Officer of GIG1 from that time until the closing of its business combination with Kaleyra, Inc. on November 25, 2019. Before then, beginning in April 2017, Mr. Weightman was Senior Business Controller at IDT, providing strategic and financial support for the General Manager and the division, prior to IDTI being acquired by Renesas Electronics Corp (TSE 6723:JP) in April 2019. Prior to GigPeak being acquired by IDT in April 2017, Mr. Weightman was Corporate Controller at GigPeak from September 2015 to April 2017. Before joining GigPeak, Mr. Weightman was self-employed as a financial consultant in 2015. Additionally, Mr. Weightman has held various finance and accounting positions at Echelon Corporation, an early developer of the internet of things market, supporting company growth from early stages to a mid-sized public company, as well as large corporations such as Advanced Micro Devices, Inc. and Xerox Holdings Corporation. Mr. Weightman received a Bachelor of Science degree in Accounting from San Jose State University, and is a Certified Public Accountant in California (inactive).

**Neil Miotto** joined the Board of Directors in February 2020. Mr. Miotto is a financial consultant and a retired assurance partner of KPMG LLP ("KPMG"), where he was a partner for 27 years until his retirement in September 2006. Since his retirement from KPMG, Mr. Miotto has provided high-level financial consulting services to companies in need of timely accounting assistance and has served on public company boards. He is deemed to be a "audit committee financial expert" under SEC rules. While at KPMG, Mr. Miotto focused on serving large public companies. Mr. Miotto also served as an SEC reviewing partner while at KPMG. Mr. Miotto became a member of the board of directors of GIG1 in October 2017 and has continued in that role after that company became Kaleyra, Inc. Mr. Miotto has also served on the board of directors of GIG2 since March 2019. In addition, Mr. Miotto served on the board of directors of Micrel, Inc. prior to its sale to Microchip Technology Inc. in May 2015, and on the board of directors of GigPeak from 2008 until its sale to IDT in April 2017. He currently serves on the board of directors of Cognizer, a position he has held since March 2019. He is a member of the American Institute of Certified Public Accountants and holds a Bachelor of Business Administration degree from Baruch College of The City University of New York.

**John J. Mikulsky** joined our Board of Directors in February 2020. Mr. Mikulsky became a member of the board of directors of GIG1 since December 2017 and has continued in that role after the company became Kaleyra, Inc. He joined the board of directors of GIG2 and the board of directors of Cognizer, in March 2019. Mr. Mikulsky served as the Chief Executive Officer of Traycer Diagnostic Systems, Inc. from August 2016 to December 2017, and as a director, from October 2014 to December 2017. He previously served as President and Chief Executive Officer of Endwave Corporation (Nasdaq: ENWV) from December 2009 until June 2011, when Endwave Corporation was acquired by GigPeak; subsequent to such acquisition, he served on the board of directors of GigPeak from June 2011 until its sale IDT in April 2017. From May 1996 until November 2009, Mr. Mikulsky served Endwave Corporation in a multitude of capacities including Vice President of Product Development, Vice President of Marketing and Business Development and Chief Operating Officer. Prior to Endwave Corporation, Mr. Mikulsky worked as a Technology Manager for Balazs Analytical Laboratory, a provider of analytical services to the semiconductor and disk drive industries, from 1993 until 1996. Prior to 1993, Mr. Mikulsky worked at Raychem Corporation, most recently as a Division Manager for its Electronic Systems Division. Mr. Mikulsky holds a B.S. in electrical engineering from Marquette University, an M.S. in electrical engineering from Stanford University and an S.M. in Management from the Sloan School at the Massachusetts Institute of Technology.

**Dr. Raluca Dinu** joined our Board of Directors in February 2020. She has served as the Chief Executive Officer of GIG2 since August 2019 and as a member of its board of directors since March 2019. From April 2017 to

98

**Table of Contents**

May 2019, Dr. Dinu was the Vice President and General Manager of IDT's Optical Interconnects Division. Prior to that, she held several executive-level positions at GigPeak, including Executive Vice President and Chief Operation Officer from April 2016 until it was acquired by IDT in April 2017, and before that, as its Executive Vice President of Global Sales and Marketing from August 2015 to April 2016, and as its Senior Vice President of Global Sales and Marketing from December 2014 to August 2015. From February 2014 to September 2017, Dr. Dinu was a member of the board of directors of Brazil-Photonics, in Campinas, Brazil, a joint venture that GigPeak established with the Centro de Pesquisa e Desenvolvimento em Telecomunicações (CPqD). From 2001 to 2008, Dr. Dinu was VP of Engineering at Lumera Corporation ("Lumera") (Nasdaq: LMRA). Lumera was acquired by GigPeak in 2008, and Dr. Dinu joined GigPeak at that time. Dr. Dinu holds a B.Sc. in Physics and Ph.D. in Solid State Condensed Matter Physics from the University of Bucharest, and an Executive-M.B.A. from Stanford University. Dr. Dinu is married to Dr. Katz, our Executive Chairman of our Board of Directors, Chief Executive Officer, President and Secretary.

**Andrea Betti-Berutto** joined the Board of Directors as a director in February 2020. Mr. Betti-Berutto is a senior technologist and entrepreneur with more than 25 years of experience in Radio-Frequency and Optical Interconnect Systems and Components and Radio-Frequency Integrated Circuit Semiconductor technologies. He has served as the Hardware Chief Technical Officer of GIG2 since August 2019 and as the Hardware Chief Technical Officer of the Company since February 2020. Mr. Betti-Berutto is not an officer or employee of GIG2 or the Company, and in each instance the title of Hardware Chief Technical Officer reflects Mr. Betti-Berutto's core competency and expertise and is primarily for marketing purposes as he assists GIG2 and the Company, respectively, to identify suitable business combination candidates. From April 2017 through June 2019, Mr. Betti-Berutto was the Fellow of Optical Interconnect Business Units at IDT, which was acquired by Renesas Electronics Corp (TSE 6723:JP) in 2019. Mr. Betti-Berutto joined IDT through the acquisition of GigPeak in April 2017, and he led the integration of the of GigPeak technical team into IDT. At GigPeak, he served as the Chief Technology Officer since April 2007 through the April 2017 acquisition by IDT. Previously, Mr. Betti-Berutto was Co-Founder of iTerra Communication, a pioneer in semiconductors for new generation 40G optical networks, where he served as VP of Engineering for RF and Optical Communication Product Development and as a member of the board of directors. After a reorganization of iTerra, he co-founded GigOptix (which was renamed GigPeak in April 2016) and, as Chief Technology Officer (CTO), led the growth of the company's technologies and product lines into the 100/200G optical market, mmWave transceivers for future 5G network deployment and transceivers for sensing application. Together with Dr. Katz and the rest of the GigPeak executive leadership team, Mr. Betti-Berutto drove the acquisition and integration of 10 companies and technologies. Before starting iTerra Communication, he worked for various companies in microwave system and devices for Basestation and Space Communication such as Fujitsu (USA), European Space Agency (Netherlands) and Space Engineering SpA (Italy). Mr. Betti-Berutto is a very hands-on executive with large experience in product/technology and business roadmap definition, strategic initiatives, company re-organization, product development and NPI processes. He has published multiple papers in IEEE journals and conferences and owns U.S. patents in the area of high-speed RF and Optical Integrated circuits. Mr. Betti-Berutto holds the degree of Electronic Engineer (MS) from University of Rome "La Sapienza" (Italy) with specialization in Electromagnetism.

**Peter Wang** joined the Board of Directors as a director in February 2020. Mr. Wang served as a member of the board of directors of GIG1 from December 2017 until its business combination with Kaleyra, Inc. in November 2019. He has served as the Software Chief Technical Officer of GIG2 since August 2019 and as the Software Chief Technical Officer of the Company since February 2020. Mr. Wang is not an officer or employee of GIG2 or the Company, and in each instance the title of Software Chief Technical Officer reflects Mr. Wang's core competency and expertise and is primarily for marketing purposes as he assists GIG2 and the Company, respectively, to identify suitable business combination candidates. He is a managing partner of Tekhill Catalyst LLC, a cross-border business strategy and technology transfer advisory service, since January 2018. He was a Managing Partner of Optino Network LLC from September 2016 through December 2017. He also serves on the Technology Advisory Council for Benhamou Global Ventures since April 2014. Mr. Wang previously served as the founding President of CoolCloudz, an Infrastructure-as-a-Service company, and the Sr. Vice President and

99

Table of Contents

General Manager of the Cloud Storage Products Business Unit of UIT, in China between 2010 and 2012. Mr. Wang co-founded Retrevo Inc., a venture funded Web 2.0 vertical search company employing machine learning technology, and served as the Vice President of Engineering and Operations and Board director between late 2005 and 2009. Mr. Wang led the founding of Intransa Inc. and served as the founding President and Chairman of the Board in late 2000. Intransa Inc. was a pioneer IP SAN company in the storage industry, backed by prominent Silicon Valley venture capital firms. Through his tenure at Intransa Inc. through mid-2005, Mr. Wang not only served as the CTO and a Board director, but also as Vice President of Engineering and Marketing, driving global strategic partnerships, at different stages. Prior to Intransa Inc., Mr. Wang led the corporate Technology Development Center at 3Com Corp. and served in various leadership positions from 1995-2000. While at 3Com, Mr. Wang spear-headed wide ranging technology investigations, prototyping, cross-division technology strategies, and strategic and university research partnership efforts, on VoIP, high-speed networks, broadband and wireless access, intelligent infrastructure, and network appliances. Prior to 1995, Mr. Wang led advanced development of distributed computing technologies at TRW Space & Defense and received TRW Chairman's Award for Innovation. Mr. Wang was instrumental in a number of IEEE 802, IETF and ANSI standards. He has been awarded over 20 U.S. patents and has published a number of IEEE conferences and other journal papers. He holds MS in Management Sciences from Stanford University, M.S. in EECS from U.C. Berkeley, and B.S. in Electrical Engineering from the University of Michigan.

### Number, Terms of Office and Election of Executive Officers and Directors

Our Board of Directors will be elected each year at our annual meeting of stockholders. We may not hold an annual meeting of stockholders until after we consummate our initial business combination (unless required by the NYSE).

Our executive officers are elected by the Board of Directors and serve at the discretion of the Board of Directors, rather than for specific terms of office. Our Board of Directors is authorized to appoint persons to the offices set forth in our bylaws as it deems appropriate. Our bylaws provide that our executive officers may consist of a Chief Executive Officer, a President, a Chief Financial Officer, Vice Presidents, a Secretary, Assistant Secretaries, a Treasurer and such other offices as may be determined by the Board of Directors.

### Director Independence

NYSE requires that a majority of our board must be composed of "independent directors," which is defined generally as a person other than an executive officer or employee of the Company or its subsidiaries or any other individual having a relationship, which, in the opinion of the Company's Board of Directors would interfere with the director's exercise of independent judgment in carrying out the responsibilities of a director.

Upon the effective date of the registration statement of which this prospectus forms a part, Messrs. Miotto, Mikulsky, Wang and Betti-Berutto will be our independent directors. In determining Messrs. Betti-Berutto's and Wang's independence, the Company's Board of Directors relied on the following: (i) Messrs. Betti-Berutto and Wang are not officers or employees of the Company; (ii) their respective titles of Hardware Chief Technical Officer and Software Chief Technical Officer reflect their core competencies and expertise and are primarily for marketing purposes as they assist the Company to identify suitable candidates for the Company's business combination; and (iii) other than a one-time grant of 5,000 insider shares, Messrs. Betti-Berutto and Wang do not, and will not, receive any continued compensation for their efforts in identifying potential business combination candidates. Our independent directors may have regularly scheduled meetings at which only independent directors are present in certain circumstances. Any affiliated transactions will be on terms no less favorable to us than could be obtained from independent parties. Any affiliated transactions must be approved by a majority of our independent and disinterested directors.

### Executive Officer and Director Compensation

Commencing on the date that our securities are first listed on NYSE through the earlier of consummation of our initial business combination and our liquidation, we will pay GigFounders, LLC, an affiliate of our Sponsor, a

100

Table of Contents

monthly fee of an aggregate of $20,000 for office space and general and administrative services. This arrangement is being agreed to by an affiliate of our Executive Chairman of our Board of Directors and Chief Executive Officer for our benefit and is not intended to provide such affiliate of our Executive Chairman of our Board of Directors and Chief Executive Officer compensation in lieu of a salary. We believe that such fees are at least as favorable as we could have obtained from an unaffiliated third party for such services.

On February 14, 2020, we entered into a Strategic Services Agreement with Mr. Weightman, our Chief Financial Officer. Mr. Weightman is initially receiving $5,000 per month for his services and such amount could increase to up to $15,000 per month dependent upon the scope of services provided. Commencing with the first month after the consummation of this offering, the Company will pay Mr. Weightman for services rendered since February 14, 2020 and on a monthly basis thereafter for all services rendered after the consummation of this offering. In addition, prior to the consummation of this offering, we intend to issue 5,000 insider shares, in consideration of future services to us, to Mr. Weightman.

Prior to the consummation of this offering, we intend to also issue 5,000 insider shares to each of Messrs. Betti-Berutto and Wang in consideration of future services to us as the Hardware Chief Technical Officer and Software Chief Technical Officer, respectively. As a result, Messrs. Betti-Berutto and Wang will each receive 5,000 shares of Common Stock.

Except as set forth above and in this paragraph, no compensation will be paid to our Sponsor, executive officers and directors, or any of their respective affiliates, prior to or in connection with the consummation of our initial business combination. Additionally, these individuals will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our Board of Directors may also approve the payment of advisory fees to directors in connection with such activities, including board committee service, and extraordinary administrative and analytical services. Our independent directors will review on a quarterly basis all payments that were made to our Sponsor, executive officers, directors or our or their affiliates.

After the completion of our initial business combination, members of our management team who remain with us, may be paid consulting, management or other fees from the combined company with any and all amounts being fully disclosed to stockholders, to the extent then known, in the tender offer materials or proxy solicitation materials furnished to our stockholders in connection with a proposed business combination. It is unlikely the amount of such compensation will be known at the time, as it will be up to the directors of the post-combination business to determine executive and director compensation. Any compensation to be paid to our officers will be determined, or recommended, to the Board of Directors for determination, either by a committee constituted solely of independent directors or by a majority of the independent directors on our Board of Directors.

We do not intend to take any action to ensure that members of our management team maintain their positions with us after the consummation of our initial business combination, although it is possible that some or all of our officers and directors may negotiate employment or consulting arrangements to remain with us after the initial business combination. The existence or terms of any such employment or consulting arrangements to retain their positions with us may influence our management's motivation in identifying or selecting a target business but we do not believe that the ability of our management to remain with us after the consummation of our initial business combination will be a determining factor in our decision to proceed with any potential business combination. We are not party to any agreements with our officers and directors that provide for benefits upon termination of employment.

**Committees of the Board of Directors**

Upon the effective date of the Registration Statement of which this prospectus forms a part, our Board of Directors will have three standing committees: an audit committee; a compensation committee; and a nominating and corporate governance committee. Each of our audit committee, our compensation committee and our

**Table of Contents**

nominating and corporate governance committee will be composed solely of independent directors. Each committee will operate under a charter that will be approved by our Board of Directors and will have the composition and responsibilities described below. The charter of each committee will be available on our website following the closing of this offering.

*Audit Committee*

Upon the effectiveness of the registration statement of which this prospectus forms a part, we will establish an audit committee of the Board of Directors. Messrs. Miotto, Mikulsky and Wang will serve as members of our audit committee. Mr. Miotto will serve as chairman of the audit committee. Under the NYSE listing standards and applicable SEC rules, we are required to have three members of the audit committee, all of whom must be independent. Messrs. Miotto, Mikulsky and Wang are independent.

Each member of the audit committee is financially literate and our Board of Directors has determined that Mr. Miotto qualifies as an "audit committee financial expert" as defined in applicable SEC rules.

We will adopt an audit committee charter, which will detail the purpose and principal functions of the audit committee, including:

- assisting the Board of Directors in the oversight of (1) the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, (2) the preparation and integrity of the financial statements of the Company, (3) the compliance by the Company with financial statement and regulatory requirements, (4) the performance of the Company's internal finance and accounting personnel and its independent registered public accounting firms, and (5) the qualifications and independence of the Company's independent registered public accounting firms;
- reviewing with each of the internal and independent registered public accounting firms the overall scope and plans for audits, including authority and organizational reporting lines and adequacy of staffing and compensation;
- reviewing and discussing with management and internal auditors the Company's system of internal control and discussing with the independent registered public accounting firm any significant matters regarding internal controls over financial reporting that have come to its attention during the conduct of its audit;
- reviewing and discussing with management, internal auditors and the independent registered public accounting firm the Company's financial and critical accounting practices, and policies relating to risk assessment and management;
- receiving and reviewing reports of the independent registered public accounting firm and discussing 1) all critical accounting policies and practices to be used in the firm's audit of the Company's financial statements, 2) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm, and 3) other material written communications between the independent registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;
- reviewing and discussing with management and the independent registered public accounting firm the annual and quarterly financial statements and section entitled "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" of the Company prior to the filing of the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q;
- reviewing, or establishing, standards for the type of information and the type of presentation of such information to be included in, earnings press releases and earnings guidance provided to analysts and rating agencies;

102

Table of Contents

- discussing with management and the independent registered public accounting firm any changes in the Company's critical accounting principles and the effects of alternative GAAP methods, off-balance sheet structures and regulatory and accounting initiatives;
- reviewing material pending legal proceedings involving the Company and other contingent liabilities;
- meeting periodically with the Chief Executive Officer, Chief Financial Officer, the senior internal auditing executive and the independent registered public accounting firm in separate executive sessions to discuss results of examinations;
- reviewing and approving all transactions between the Company and related parties or affiliates of the officers of the Company requiring disclosure under Item 404 of Regulation S-K prior to the Company entering into such transactions;
- establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submissions by employees or contractors of concerns regarding questionable accounting or accounting matters;
- reviewing periodically with the Company's management, independent registered public accounting firm and outside legal counsel (i) legal and regulatory matters which may have a material effect on the financial statements, and (ii) corporate compliance policies or codes of conduct, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities; and
- establishing policies for the hiring of employees and former employees of the independent registered public accounting firm.

### Compensation Committee

Upon the effectiveness of the registration statement of which this prospectus forms a part, we will establish a compensation committee of the Board of Directors. The members of our compensation committee will be Messrs. Mikulsky, Miotto and Betti-Berutto. Mr. Mikulsky will serve as chairman of the compensation committee. We will adopt a compensation committee charter, which will detail the purpose and responsibility of the compensation committee, including:

- reviewing the performance of the Chief Executive Officer and executive management;
- assisting the Board in developing and evaluating potential candidates for executive positions (including Chief Executive Officer);
- reviewing and approving goals and objectives relevant to the Chief Executive Officer and other executive officer compensation, evaluating the Chief Executive Officer's and other executive officers' performance in light of these corporate goals and objectives, and setting the Chief Executive Officer and other executive officer compensation levels consistent with its evaluation and the company philosophy;
- approving the salaries, bonus and other compensation for all executive officers;
- reviewing and approving compensation packages for new corporate officers and termination packages for corporate officers as requested by management;
- reviewing and discussing with the Board of Directors and senior officers plans for officer development and corporate succession plans for the Chief Executive Officer and other senior officers;
- reviewing and making recommendations concerning executive compensation policies and plans;

**Table of Contents**

- reviewing and recommending to the Board of Directors the adoption of or changes to the compensation of the Company's directors;
- reviewing and approving the awards made under any executive officer bonus plan, and providing an appropriate report to the Board of Directors;
- reviewing and making recommendations concerning long-term incentive compensation plans, including the use of stock options and other equity-based plans, and, except as otherwise delegated by the Board of Directors, acting as the "Plan Administrator" for equity-based and employee benefit plans;
- approving all special perquisites, special cash payments and other special compensation and benefit arrangements for the Company's executive officers and employees;
- reviewing periodic reports from management on matters relating to the Company's personnel appointments and practices;
- assisting management in complying with the Company's proxy statement and annual report disclosure requirements;
- issuing an annual Report of the Compensation Committee on Executive Compensation for the Company's annual proxy statement in compliance with applicable SEC rules and regulations;
- annually evaluating the committee's performance and the committee's charter and recommending to the Board of Directors any proposed changes to the charter or the committee; and
- undertaking all further actions and discharge all further responsibilities imposed upon the Committee from time to time by the Board of Directors, the federal securities laws or the rules and regulations of the SEC.

The charter will also provide that the compensation committee may, in its sole discretion, retain or obtain the advice of a compensation consultant, independent legal counsel or other adviser and will be directly responsible for the appointment, compensation and oversight of the work of any such adviser. However, before engaging or receiving advice from a compensation consultant, external legal counsel or any other adviser, the compensation committee will consider the independence of each such adviser, including the factors required by the NYSE and the SEC.

*Nominating and Corporate Governance Committee*

Upon the effectiveness of the registration statement of which this prospectus forms a part, we will establish a nominating and corporate governance committee of the Board of Directors. The members of our nominating and corporate governance will be Messrs. Mikulsky, Miotto and Wang. Mr. Mikulsky will serve as chair of the nominating and corporate governance committee. We will adopt a nominating and corporate governance committee charter, which will detail the purpose and responsibilities of the nominating and corporate governance committee, including:

- developing and recommending to the Board of Directors the criteria for appointment as a director;
- identifying, considering, recruiting and recommending candidates to fill new positions on the Board of Directors;
- reviewing candidates recommended by stockholders;
- conducting the appropriate and necessary inquiries into the backgrounds and qualifications of possible candidates; and
- recommending director nominees for approval by the Board of Directors and election by the stockholders at the next annual meeting.

Table of Contents

The charter will also provide that the nominating and corporate governance committee may, in its sole discretion, retain or obtain the advice of, and terminate, any search firm to be used to identify director candidates and will be directly responsible for approving the search firm's fees and other retention terms.

We have not formally established any specific, minimum qualifications that must be met or skills that are necessary for directors to possess. In general, in identifying and evaluating nominees for director, the Board of Directors considers educational background, diversity of professional experience, knowledge of our business, integrity, professional reputation, independence, wisdom, and the ability to represent the best interests of our shareholders. Prior to our initial business combination, holders of our public shares will not have the right to recommend director candidates for nomination to our Board of Directors.

**Code of Conduct and Ethics**

Upon the effectiveness of the registration statement of which this prospectus forms a part, we will adopt a code of conduct and ethics applicable to our directors, officers and employees in accordance with applicable federal securities laws. We will file a copy of our form of Code of Ethics and our board committee charters as exhibits to the registration statement. You will be able to review these documents by accessing our public filings at the SEC's web site at *www.sec.gov*. In addition, a copy of the Code of Ethics will be provided without charge upon request from us. We intend to disclose any amendments to or waivers of certain provisions of our Code of Ethics in a Current Report on Form 8-K. See "*Where You Can Find Additional Information*."

**Conflicts of Interest**

Our management team is responsible for the management of our affairs. As described above and below, each of our officers and directors presently has, and any of them in the future may have additional, fiduciary, contractual or other obligations or duties to one or more other entities pursuant to which such officer or director is or will be required to present a business combination opportunity to such entities. Accordingly, if any of our officers or directors becomes aware of a business combination opportunity which is suitable for one or more entities to which he or she has fiduciary, contractual or other obligations or duties, he or she will honor these obligations and duties to present such business combination opportunity to such entities first, and only present it to us if such entities reject the opportunity and he or she determines to present the opportunity to us (including as described in "*Proposed Business - Initial Business Combination*"). These conflicts may not be resolved in our favor and a potential target business may be presented to another entity prior to its presentation to us.

We do not believe, however, that the fiduciary, contractual or other obligations or duties of our officers or directors will materially affect our ability to complete our initial business combination. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless (i) such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company, (ii) such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue and (iii) the director or officer is permitted to refer the opportunity to us without violating another legal obligation.

Our Sponsor, officers and directors may participate in the formation of, or become an officer or director of, any other blank check company prior to completion of our initial business combination. In particular, an affiliate of our Sponsor is currently sponsoring GIG2, which may seek to complete a business combination in the TMT industry. Further, there is significant overlap among the directors and officers of GIG2 and our company. Dr. Katz, our Chief Executive Officer and Executive Chairman, serves as Executive Chairman of GIG2. Certain of our directors, Dr. Raluca Dinu, Neil Miotto and John Mikulsky, are members of the board of directors of GIG2. Dr. Dinu also serves as the Chief Executive Officer of GIG2. Our directors Peter Wang and Andrea Betti-Berutto serve as the Software Chief Technical Officer and Hardware Chief Technical Officer, respectively, of GIG2, and have similar roles with us. Messrs. Wang and Betti-Berutto are not officers or employees of our company; their respective titles of Software Chief Technical Officer and Hardware Chief Technical Officer

105

Table of Contents

reflect their core competencies and expertise and are primarily for marketing purposes as the assist our company to identify suitable business combination candidates. Finally, Brad Weightman, our Chief Financial Officer, serves as the Chief Financial Officer of GIG2. In addition, there is overlap among our directors and the directors of Kaleyra, Inc. as Dr. Katz and Messrs. Miotto and Mikulsky are also directors of that company, which may also seek to acquire companies in the TMT industry. Furthermore, Dr. Dinu chairs, and Mr. Wang is a member of, the Strategic Advisory Board of Kaleyra, Inc. Any such companies, including GIG2 and Kaleyra, Inc., may present additional conflicts of interest in pursuing an acquisition target.

Investors should be aware of the following potential conflicts of interest:

- None of our officers and directors is required to commit their full time to our affairs and, accordingly, they may have conflicts of interest in allocating their time among various business activities.
- In the course of their other business activities, our Sponsor, officers and directors may become aware of investment and business opportunities which may be appropriate for presentation to our company as well as the other entities with which they are affiliated. However, our officers and directors have agreed to present to us all suitable target business opportunities, subject to any fiduciary or contractual obligations.
- Unless we consummate our initial business combination, our executive officers, directors and Sponsor will not receive reimbursement for any out-of-pocket expenses incurred by them to the extent that such expenses exceed the amount of available proceeds not deposited in the trust account.
- The founder shares, insider shares and private units (and underlying securities) will be released from their respective lock-up restrictions only if a business combination is successfully completed, and the private warrants will expire worthless if a business combination is not consummated. Additionally, Messrs. Weightman, Wang and Betti-Berutto will not receive liquidation distributions with respect to any of their insider shares.
- Drs. Katz and Dinu, Messrs. Mikulsky, Wang and Betti-Berutto, and Mr. Weightman, our Chief Financial Officer, each have a financial and voting interest in our Sponsor that entitles each of them to participate in any economic return that the Sponsor receives for its investment in the Company in accordance with terms negotiated with the other holders of financial and voting interests in our Sponsor.

For the foregoing reasons, our Board of Directors may have a conflict of interest in determining whether a particular target business is appropriate to effect a business combination with the Company.

In general, executive officers and directors of a corporation incorporated under the laws of the State of Delaware are required to present business opportunities to a corporation if:

- the corporation could financially undertake the opportunity;
- the opportunity is within the corporation's line of business; and
- it would not be fair to the corporation and its stockholders for the opportunity not to be brought to the attention of the corporation.

Accordingly, as a result of multiple business affiliations, our officers and directors may have similar legal obligations relating to presenting business opportunities meeting the above-listed criteria to multiple entities. In addition, conflicts of interest may arise when our Board of Directors evaluates a particular business opportunity with respect to the above-listed criteria. We cannot assure you that any of the above mentioned conflicts will be resolved in our favor.

In order to minimize potential conflicts of interest which may arise from multiple corporate affiliations, each of our officers and directors has contractually agreed, pursuant to a written agreement with us, until the earliest of

106

**Table of Contents**

our execution of a definitive agreement for a business combination, our liquidation or such time as he or she ceases to be an officer or director, to present to our company for our consideration, prior to presentation to any other entity, any suitable business opportunity which may reasonably be required to be presented to us, subject to any fiduciary or contractual obligations he or she might have. Accordingly, our amended and restated certificate of incorporation will provide that the doctrine of corporate opportunity will not apply with respect to any of our executive officers or directors in circumstances where the application of the doctrine would conflict with any fiduciary duties or contractual obligations they may have.

Below is a table summarizing the entities to which our executive officers and directors currently have fiduciary duties or contractual obligations.

| Individual | Entity | Entity's Business | Affiliation |
|---|---|---|---|
| Dr. Avi S. Katz | Kaleyra, Inc. | Mobile Messaging Services | Executive Chairman |
| | GigNext, LLC | Consulting and Investment | Founder and managing member |
| | GigFounders, LLC | Consulting and Investment | Founder and managing member |
| | GigAcquisitions, LLC | PPE (SPAC) sponsorship | Founder and manager |
| | GigAcquisitions2, LLC | PPE (SPAC) sponsorship | Founder and manager |
| | GigCapital2, Inc. | PPE (SPAC) | Founder and Executive Chairman |
| | GigAcquisitions3, LLC | PPE (SPAC) sponsorship | Founder and manager |
| | Cognizer, Inc. | AI Technology | Co-Founder and Executive Chairman |
| Brad Weightman | GigCapital2, Inc. | PPE (SPAC) | Chief Financial Officer |
| Neil Miotto | Kaleyra, Inc. | Mobile Messaging Services | Director |
| | GigFounders, LLC | Consulting and Investment | Minority member |
| | GigCapital2, Inc. | PPE (SPAC) | Director |
| | Cognizer, Inc. | AI Technology | Director |
| John Mikulsky | Kaleyra, Inc. | Mobile Messaging Services | Director |
| | GigCapital2, Inc. | PPE (SPAC) | Director |
| | Cognizer, Inc. | AI Technology | Director |
| Dr. Raluca Dinu | GigCapital2, Inc. | PPE (SPAC) | Chief Executive Officer and Director |
| | Kaleyra, Inc. | Mobile Messaging Services | Strategic Advisory Board, Chair |
| Peter Wang | GigCapital2, Inc. | PPE (SPAC) | Software Chief Technical Officer (title held for marketing purposes only) |
| | Kaleyra, Inc. | Mobile Messaging Services | Strategic Advisory Board, Member |
| Andrea Betti-Berutto | GigCapital2, Inc. | PPE (SPAC) | Hardware Chief Technical Officer (title held for marketing purposes only) |

If we submit our initial business combination to our public stockholders for a vote, our initial stockholders have agreed to vote any shares held by them in favor of our initial business combination. In addition, they have agreed to waive their respective rights to participate in any liquidation distribution with respect to their founder shares, insider shares or the shares of Common Stock underlying the private units. If they purchase shares of Common Stock as part of this offering or in the open market, however, they would be entitled to participate in any liquidation distribution in respect of such shares but have agreed not to convert or sell such shares to us in connection with the consummation of an initial business combination.

107

**Table of Contents**

All ongoing and future transactions between us and any of our Sponsor, executive officers and directors or their respective affiliates will be on terms believed by us to be no less favorable to us than are available from unaffiliated third parties. Such transactions will require prior approval by a majority of our uninterested "independent" directors or the members of our Board of Directors who do not have an interest in the transaction, in either case who had access, at our expense, to our attorneys or independent legal counsel. We will not enter into any such transaction unless our disinterested "independent" directors determine that the terms of such transaction are no less favorable to us than those that would be available to us with respect to such a transaction from unaffiliated third parties.

108

**Table of Contents**

**PRINCIPAL STOCKHOLDERS**

The following table sets forth information regarding the beneficial ownership of our shares of Common Stock as of the date of this prospectus, and as adjusted to reflect the sale of our shares of Common Stock included in the units offered by this prospectus and private units, and assuming no purchase of units in this offering, by:

- each person known by us to be the beneficial owner of more than 5% of the outstanding shares of Common Stock;
- each of our executive officers and directors that beneficially owns shares of Common Stock; and
- all our executive officers and directors as a group.

Unless otherwise indicated, we believe that all persons named in the table have sole voting and investment power with respect to all shares of Common Stock beneficially owned by them. The following table does not reflect record or beneficial ownership of any shares of Common Stock issuable upon exercise of warrants as these warrants are not exercisable within 60 days of the date of this prospectus. The post-offering numbers and percentages presented assume that the underwriters do not exercise their over-allotment option, that our Sponsor forfeits 750,000 founder shares, that the Anchor Investors do not buy any units in this offering and that there are 25,893,479 shares of our Common Stock issued and outstanding after this offering.

| Name and Address of Beneficial Owner(1) | Prior to Offering Amount and Nature of Beneficial Ownership | Approximate Percentage of Outstanding Common Stock(3) | After Offering(2) Amount and Nature of Beneficial Ownership | Approximate Percentage of Outstanding Common Stock(4) |
|---|---|---|---|---|
| GigAcquisitions3, LLC(5) | 5,735,000 | 99.74% | 5,635,000(6) | 21.76% |
| Dr. Avi S. Katz(5) | 5,735,000 | 99.74% | 5,635,000(6) | 21.76% |
| Brad Weightman | 5,000 | * | 5,000 | * |
| Neil Miotto | — | — | — | — |
| John Mikulsky | — | — | — | — |
| Dr. Raluca Dinu | — | — | — | — |
| Andrea Betti-Berutto | 5,000 | * | 5,000 | * |
| Peter Wang | 5,000 | * | 5,000 | * |
| All directors and officers as a group (7 individuals) | 5,750,000 | 100.00% | 5,650,000 | 21.82% |

\* Less than one percent
(1) Unless otherwise indicated, the business address of each of the individuals is 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303.
(2) Assumes (i) no exercise of the over-allotment option, (ii) an aggregate of 750,000 shares of Common Stock have been forfeited by our Founder, (iii) 650,000 private units have been purchased by our Sponsor simultaneously with the consummation of this offering, and (iv) 243,479 private units have been purchased by the underwriters simultaneously with the consummation of this offering.
(3) Based on 5,750,000 shares of Common Stock outstanding immediately prior to this offering.
(4) Based on 25,893,479 shares of Common Stock outstanding immediately after this offering.
(5) Represents shares held by our Sponsor. The shares held by our Sponsor are beneficially owned by Dr. Katz, our Executive Chairman of the Board of Directors, Chief Executive Officer, President and Secretary, and the manager of our Sponsor, who has sole voting and dispositive power over the shares held by our Sponsor. The Sponsor's business address is 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303.
(6) Includes 4,985,000 founder shares and 650,000 private units.

Immediately after this offering (without the exercise of the underwriters' over-allotment option), our initial stockholders and any of their permitted transferees will beneficially own approximately 21.8% of our issued and

109

Table of Contents

outstanding Common Stock (assuming none of our initial stockholders purchase any public units), with our Founder beneficially owning approximately 21.8% of such issued and outstanding Common Stock. Because of this ownership block, our Founder, acting alone, may be able to effectively influence the outcome of all matters requiring approval by our stockholders, including the election of directors, amendments to our amended and restated certificate of incorporation and approval of significant corporate transactions.

To the extent the underwriters do not exercise the over-allotment option, up to an aggregate of 750,000 founder shares will be subject to forfeiture. Our Founder will be required to forfeit only that number of founder shares necessary to maintain the representation by the founder shares, together with the insider shares owned by Messrs. Weightman, Wang and Betti-Berutto, of a 20% ownership interest in our outstanding shares of Common Stock (without giving effect to the sale of the private units) after consummation of this offering.

The Anchor Investors have indicated to us an interest to purchase up to 1,739,130 (or 2,000,000 if the over-allotment option is exercised in full) public units at $10.00 per unit in this offering and we have agreed to direct the underwriters to sell to the Anchor Investors such number of public units. There can be no assurance that the Anchor Investors will acquire any public units in this offering. The Anchor Investors are managed by a registered investment adviser subsidiary of Cohen & Company Inc. (NYSE Amex: COHN). Cohen & Company Inc., through its asset management division, manages approximately $2.8 billion and has significant experience in special purpose acquisition company transactions. Cohen & Company Inc.'s senior management and principals have variously served in management and sponsor roles in four special purpose acquisition companies across several industries since 2015.

Assuming no exercise of the over-allotment option, our Sponsor has committed that it will purchase an aggregate of 650,000 private units at $10.00 per unit. The underwriters have agreed to purchase in the aggregate 243,479 private units (or 280,000 private units if the underwriters' over-allotment option is exercised in full) for $10.00 per unit. These purchases will take place on a private placement basis simultaneously with the consummation of this offering, provided, that, the additional private units whose purchase is triggered by the exercise of the over-allotment option will be purchased in a private placement that will occur simultaneously with the purchase of public units resulting from the exercise of the over-allotment option. The private units are identical to the public units, except that the underlying warrants: (i) will not be redeemable by us and (ii) may be exercised for cash or on a cashless basis, as described in this prospectus, so long as they are held by the initial purchasers or their respective permitted transferees. In addition, for as long as the private warrants are held by the underwriters or their respective designees or affiliates, they may not be exercised after five years from the effective date of the registration statement of which this prospectus forms a part.

Our initial stockholders and the underwriters have agreed (A) to vote their private shares in favor of any proposed business combination, (B) not to propose an amendment to our charter documents with respect to our pre-business combination activities prior to the consummation of such a business combination unless we provide our public stockholders with the opportunity to redeem their shares of Common Stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable, divided by the number of then issued and outstanding public shares, (C) not to redeem any private shares or private units (and underlying securities) in connection with a stockholder vote to approve our proposed initial business combination and (D) that such private shares and private units (and underlying securities) shall not participate in any liquidating distribution upon winding up if a business combination is not consummated, until all of the claims of any redeeming stockholders and creditors are fully satisfied (and then only from funds held outside the trust account).

Our initial stockholders and the underwriters have agreed not to transfer, assign or sell any of their respective founder shares, insider shares, private units or any securities underlying the private units that they hold until the date that is (i) in the case of the founder shares and insider shares, the earlier of (A) 12 months after the date of the consummation of our initial business combination or (B) subsequent to our initial business combination, (x) the date on which the last sale price of our Common Stock equals or exceeds $12.50 per share (as adjusted for

110

**Table of Contents**

stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 90 days after our initial business combination, or (y) the date on which we consummate a liquidation, merger, stock exchange or other similar transaction after our initial business combination which results in all of our stockholders having the right to exchange their shares of Common Stock for cash, securities or other property, and (ii) in the case of the private units or any securities underlying the private units, until 30 days after the completion of our initial business combination. Notwithstanding the foregoing, during the their respective lock-up periods, the initial stockholders and the underwriters may transfer, assign or sell any of the aforenamed securities (1) amongst the Founder and its affiliates, to our executive officers or directors, or to any affiliate or family member of any of our executive officers or directors, (2) in the case of an entity, as a distribution to its partners, stockholders or members upon its liquidation, (3) in the case of an individual, (i) by bona fide gift to such person's immediate family or to a trust, the beneficiary of which is a member of such person's immediate family, an affiliate of such person or to a charitable organization, (ii) by virtue of the laws of descent and distribution upon death of such person, (iii) pursuant to a qualified domestic relations order, (4) by certain pledges to secure obligations incurred in connection with purchases of the Company's securities, (5) through private sales or transfers made in connection with the consummation of our initial business combination at prices no greater than the price at which such securities were originally purchased, (6) in the case of an underwriter, to such underwriter's affiliates or any entity controlled by such underwriter. or (7) to us for no value for cancellation in connection with the consummation of our initial business combination; *provided*, that, in each such case (except clause (7)), these transferees (the "Permitted Transferees") shall enter into a written agreement with us agreeing to be bound by the transfer restrictions agreed to by the original holder in connection with the purchase of the securities being transferred.

**Registration Rights**

Our initial stockholders, the underwriters and their Permitted Transferees can demand that we register the founder shares, the insider shares, the private units and underlying securities and any securities issued upon conversion of working capital loans, pursuant to an agreement to be signed prior to or on the date of this prospectus. The holders of these securities are entitled to make up to three demands that we register such securities. The holders of these securities or units issued in payment of working capital loans made to us (or underlying securities) can elect to exercise these registration rights at any time after we consummate a business combination. In addition, the holders have certain "piggy-back" registration rights on registration statements filed after the Company's consummation of a business combination. Notwithstanding the foregoing, the underwriters and their affiliates may not exercise their demand and "piggyback" registration rights after five and seven years, respectively, after the effective date of the registration statement of which this prospectus forms a part and may not exercise their demand rights on more than one occasion.

111

**Table of Contents**

**CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

In February 2020, our Founder purchased an aggregate of 5,735,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share. The purchase price per founder share was determined by dividing the amount of cash contributed to the Company by the number of founder shares issued. Prior to the investment of $25,000 by our Founder, the Company had no assets, tangible or intangible.

The number of founder shares, and the forfeiture mechanism underlying the founder shares, has been determined in order to ensure that the founder shares, together with the insider shares owned by Messrs. Weightman, Wang and Betti-Berutto, will collectively represent 20% of the outstanding shares of Common Stock (excluding the private shares) upon completion of this offering and the exercise of the underwriters' over-allotment option, if any. Accordingly, as of the date of this prospectus there are 5,735,000 founder shares outstanding. Up to 750,000 founder shares are subject to forfeiture depending on the extent to which the underwriters' over-allotment option is exercised during this offering.

Our Sponsor has committed that it will purchase an aggregate of 650,000 private units (or 689,000 private units if the underwriters' over-allotment option is exercised in full) at $10.00 per unit. The underwriters have agreed to purchase an aggregate of 243,479 private units (or 280,000 private units if the underwriters' over-allotment option is exercised in full) for $10.00 per unit. These purchases of private units shall take place as a private placement simultaneously with the sale of the public units in this offering.

Except with respect to Permitted Transferees as described herein under "*Principal Stockholders*," our initial stockholders and the underwriters have agreed not to transfer, assign or sell any of their respective founder shares, insider shares, private units or any securities underlying the private units that they may hold until the date that is (i) in the case of the founder shares and insider shares, the earlier of (A) 12 months after the date of the consummation of our initial business combination or (B) subsequent to our initial business combination, (x) the date on which the last sale price of our Common Stock equals or exceeds $12.50 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 90 days after our initial business combination, or (y) the date on which we consummate a liquidation, merger, stock exchange or other similar transaction after our initial business combination which results in all of our stockholders having the right to exchange their shares of Common Stock for cash, securities or other property, and (ii) in the case of the private units or any securities underlying the private units, until 30 days after the completion of our initial business combination. Permitted Transferees would be subject to the same restrictions and other agreements of our initial shareholders with respect to any such securities.

On February 13, 2020, we issued a promissory note to our Sponsor with a principal amount of $100,000, all of which remained outstanding as of February 24, 2020. The note will mature on the earlier of April 30, 2020 or the consummation of this offering. It is a non-interest bearing note.

In order to meet our working capital needs following the consummation of this offering, our Sponsor, executive officers, directors or their affiliates may, but are not obligated to, loan us funds, from time to time or at any time, in whatever amount they deem reasonable in their sole discretion. Each loan would be evidenced by a promissory note. Up to $1,500,000 of such loans may be convertible into additional units of the post-business combination entity at a price of $10.00 per unit at the option of the lender. The units would be identical to the private units. The terms of such loans by our Sponsor, executive officers, directors, or their affiliates, if any, have not been determined and no written agreements exist with respect to such loans.

The holders of our founder shares and insider shares issued and outstanding on the date of this prospectus, as well as the holders of the private units and any units our Sponsor, officers, directors or their affiliates may be issued in payment of working capital loans made to us (and all underlying securities), will be entitled to registration rights pursuant to an agreement to be signed prior to or on the effective date of this offering. The

112

Table of Contents

holders of these securities are entitled to make up to three demands that we register such securities. The holders of these securities or units issued in payment of working capital loans made to us (or underlying securities) can elect to exercise these registration rights at any time after we consummate a business combination. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to our consummation of a business combination. Notwithstanding the foregoing, the underwriters and their affiliates may not exercise their demand and "piggyback" registration rights after five and seven years, respectively, after the effective date of the registration statement of which this prospectus forms a part and may not exercise their demand rights on more than one occasion. We will bear the expenses incurred in connection with the filing of any such registration statements.

An affiliate of our Sponsor, GigFounders, LLC, has agreed that, commencing on the effective date of this prospectus through the earlier of our consummation of our initial business combination or our liquidation, it will make available to us certain general and administrative services, including office space, utilities and administrative support, as we may require from time to time. We have agreed to pay it an aggregate of $20,000 per month for these services. Dr. Katz, our Executive Chairman of our Board of Directors and our Chief Executive Officer, President and Secretary, is the sole manager of our Sponsor, and is also the sole managing member of GigFounders, LLC. In addition, he and Mr. Miotto, one of our independent directors, are the members of GigFounders, LLC, of which 90% is owned by Drs. Katz and Dinu, who are husband and wife, and the remaining 10% is owned by Mr. Miotto, and that partnership has a financial and voting interest in our Sponsor that entitles this partnership to participate in any economic return that the Sponsor receives for its investment in the Company in accordance with terms negotiated with the other holders of financial and voting interests in our Sponsor. Mr. Miotto's minority interest in GigFounders, LLC is passive as he does not participate in the governance of GigFounders, LLC. In addition, certain of our independent directors, Messrs. Mikulsky, Betti-Berutto and Wang, and Mr. Weightman, our Chief Financial Officer, each have a financial and voting interest in our Sponsor that entitles each of them to participate in any economic return that the Sponsor receives for its investment in the Company in accordance with terms negotiated with the other holders of financial and voting interests in our Sponsor. Accordingly, they will all benefit from the transaction to the extent of their interest in our Sponsor. The arrangement that we have with GigFounders, LLC is solely for our benefit and is not intended to provide our officers or directors compensation in lieu of a salary. We believe, based on rents and fees for similar services in the San Francisco Bay Area, that the fee charged by our Sponsor is at least as favorable as we could have obtained from an unaffiliated person.

In conjunction with our services agreement with GigFounders, LLC and in connection with GigFounders, LLC's affiliation with our Sponsor, we have a licensing arrangement with GigFounders, LLC whereby we are permitted to use its "Private-to-Public Equity (PPE)" and "Mentor-Investor" trademarks.

On February 14, 2020, we entered into a Strategic Services Agreement with Mr. Weightman, our Chief Financial Officer. Mr. Weightman is initially receiving $5,000 per month for his services and such amount could increase to up to $15,000 per month dependent upon the scope of services provided. Commencing with the first month after the consummation of this offering, the Company will pay Mr. Weightman for services rendered since February 14, 2020 and on a monthly basis thereafter for all services rendered after the consummation of this offering. In addition, prior to the consummation of this offering, we intend to issue 5,000 insider shares, in consideration of future services to us, to Mr. Weightman.

Prior to the consummation of this offering, we intend to also issue 5,000 insider shares to each of Messrs. Betti-Berutto and Wang in consideration of future services to us as the Hardware Chief Technical Officer and Software Chief Technical Officer, respectively. As a result, Messrs. Betti-Berutto and Wang shall each receive 5,000 shares of Common Stock.

Other than the foregoing and as described in this paragraph, no compensation or fees of any kind, including finder's, consulting fees and other similar fees, will be paid to our Sponsor, members of our management team or their respective affiliates, for services rendered prior to or in connection with the consummation of our initial

113

Table of Contents

business combination (regardless of the type of transaction that it is). However, such individuals will receive the repayment of any loans from our Sponsor, officers and directors for working capital purposes and reimbursement for any out-of-pocket expenses incurred by them in connection with activities on our behalf, such as identifying potential target businesses, performing business due diligence on suitable target businesses and business combinations as well as traveling to and from the offices, plants or similar locations of prospective target businesses to examine their operations. Our Board of Directors may also approve the payment of advisory fees for such activities, including board committee service, and extraordinary administrative and analytical services. There is no limit on the amount of out-of-pocket expenses reimbursable by us. Our independent directors will review on a quarterly basis all payments that were made to our Sponsor, executive officers or our or their affiliates.

After our initial business combination, members of our management team who remain with us may be paid consulting, management or other fees from the combined company with any and all amounts being fully disclosed to stockholders, to the extent then known, in the proxy solicitation materials furnished to our stockholders. It is unlikely the amount of such compensation will be known at the time of a stockholder meeting held to consider an initial business combination, as it will be up to the directors of the post-combination business to determine executive and director compensation. In this event, such compensation will be publicly disclosed at the time of its determination in a Current Report on Form 8-K, as required by the SEC.

All ongoing and future transactions between us and any of our officers and directors or their respective affiliates will be on terms believed by us to be no less favorable to us than are available from unaffiliated third parties. Such transactions will require prior approval by a majority of our uninterested "independent" directors or the members of our Board of Directors who do not have an interest in the transaction, in either case who had access, at our expense, to our attorneys or independent legal counsel. We will not enter into any such transaction unless our disinterested "independent" directors determine that the terms of such transaction are no less favorable to us than those that would be available to us with respect to such a transaction from unaffiliated third parties.

Dr. Katz, our Executive Chairman of our Board of Directors and our Chief Executive Officer, President and Secretary, and Dr. Dinu, one of our directors, are husband and wife.

Dr. Katz, our Executive Chairman and Chief Executive Officer, also serves as the Executive Chairman of GIG2. Certain of our directors, Dr. Dinu and Messrs. Miotto and Mikulsky, are members of the board of directors of GIG2. Dr. Dinu also serves as the Chief Executive Officer of GIG2. Our directors Messrs. Wang and Betti-Berutto serve as the Software Chief Technical Officer and Hardware Chief Technical Officer, respectively, of GIG2 and have similar roles with us. Messrs. Wang and Betti-Berutto are not officers or employees of our company; their respective titles of Software Chief Technical Officer and Hardware Chief Technical Officer reflect their core competencies and expertise and are primarily for marketing purposes as they assist our company to identify suitable business combination candidates. Mr. Weightman, our Chief Financial Officer, serves as the Chief Financial Officer of GIG2.

**Related Party Policy**

Our Code of Ethics will require us to avoid, wherever possible, all related party transactions that could result in actual or potential conflicts of interests, except under guidelines approved by the Board of Directors (or the audit committee). Related party transactions are defined as transactions in which (1) the aggregate amount involved will or may be expected to exceed $120,000 in any calendar year, (2) we or any of our subsidiaries is a participant, and (3) any (a) executive officer, director or nominee for election as a director, (b) greater than 5% beneficial owner of our shares of Common Stock, or (c) immediate family member, of the persons referred to in clauses (a) and (b), has or will have a direct or indirect material interest (other than solely as a result of being a director or a less than 10% beneficial owner of another entity). A conflict of interest situation can arise when a person takes actions or has interests that may make it difficult to perform his or her work objectively and effectively. Conflicts of interest may also arise if a person, or a member of his or her family, receives improper personal benefits as a result of his or her position.

114

**Table of Contents**

Our audit committee, pursuant to its written charter, will be responsible for reviewing and approving related party transactions to the extent we enter into such transactions. The audit committee will consider all relevant factors when determining whether to approve a related party transaction, including whether the related party transaction is on terms no less favorable to us than terms generally available from an unaffiliated third party under the same or similar circumstances and the extent of the related party's interest in the transaction. No director may participate in the approval of any transaction in which he is a related party, and that director is required to provide the audit committee with all material information concerning the transaction. We also require each of our directors and executive officers to complete a directors' and officers' questionnaire that elicits information about related party transactions.

These procedures are intended to determine whether any such related party transaction impairs the independence of a director or presents a conflict of interest on the part of a director, employee or officer.

To further minimize conflicts of interest, we have agreed not to consummate an initial business combination with an entity that is affiliated with any of our Sponsor, officers or directors, including (i) an entity that is either a portfolio company of, or has otherwise received a material financial investment from, any private equity fund or investment company (or an affiliate thereof) that is affiliated with any of the foregoing, (ii) an entity in which any of the foregoing or their affiliates are currently passive investors, (iii) an entity in which any of the foregoing or their affiliates are currently officers or directors, or (iv) an entity in which any of the foregoing or their affiliates are currently invested through an investment vehicle controlled by them, unless we have obtained an opinion from an independent investment banking firm, or another independent entity that commonly renders valuation opinions on the type of target business we are seeking to acquire, and the approval of a majority of our disinterested independent directors that the business combination is fair to our unaffiliated stockholders from a financial point of view.

115

**Table of Contents**

**DESCRIPTION OF SECURITIES**

**General**

As of the date of this prospectus, we are authorized to issue 100,000,000 shares of Common Stock, par value $0.0001 per share, and 1,000,000 shares of preferred stock, par value $0.0001 per share. As of the date of this prospectus, 5,735,000 shares of Common Stock are outstanding, and we expect to issue the 15,000 insider shares prior to the public offering. No shares of preferred stock are currently outstanding. The following description summarizes the material terms of our securities. Because it is only a summary, it may not contain all the information that is important to you. For a complete description, you should refer to our amended and restated certificate of incorporation and the form of warrant agreement, which are filed as exhibits to the registration statement of which this prospectus is a part, and to the applicable provisions of Delaware law.

**Units**

Each unit consists of one share of our Common Stock and three-fourths (3/4) of one warrant to purchase one share of our Common Stock for an exercise price of $11.50 per share, subject to adjustment as described in this prospectus. Only whole warrants are exercisable. Accordingly, unless you purchase at least four units, you will not be able to receive or trade whole warrants. The warrants will become exercisable on the later of (a) 30 days after the completion of our initial business combination; and (b) 12 months from the closing of this offering. The warrants will expire at 5:00 p.m., New York City time, on the fifth anniversary of our completion of an initial business combination, or earlier upon redemption.

The shares of Common Stock and warrants will begin to trade separately on the 52nd day after the date of this prospectus unless the underwriters inform us of its decision to allow earlier separate trading, provided that in no event may the shares of Common Stock and warrants be traded separately until we have filed with the SEC a Current Report on Form 8-K which includes an audited balance sheet reflecting our receipt of the gross proceeds of this offering. Once the shares of Common Stock and warrants commence separate trading, holders will have the option to continue to hold units or separate their units into the component pieces.

We will file a Current Report on Form 8-K which includes an audited balance sheet promptly upon the consummation of this offering. The audited balance sheet will reflect proceeds we receive from the exercise of the over-allotment option, if the over-allotment option is exercised on the date of this prospectus. If the over-allotment option is exercised after the date of this prospectus, we will file an amendment to the Form 8-K to provide updated financial information to reflect the exercise of the over-allotment option. We will also include in this Form 8-K, an amendment thereto, or in a subsequent Form 8-K information indicating if the underwriters have allowed separate trading of the shares of Common Stock and warrants prior to the 52nd day after the date of this prospectus.

**Common Stock**

Prior to the date of this prospectus, there were 5,735,000 shares of our Common Stock outstanding. Our Founder, together with Messrs. Weightman, Wang and Betti-Berutto, will own 20% of our issued and outstanding shares after this offering (excluding the private units and assuming they do not purchase any units in this offering). Upon the closing of this offering, 25,893,479 shares of our Common Stock will be outstanding (assuming no exercise of the underwriters' over-allotment option and the corresponding forfeiture of an aggregate of 750,000 founder shares). If we increase or decrease the size of the offering pursuant to Rule 462(b) under the Securities Act, we will effect a stock dividend or share contribution back to capital, as applicable, immediately prior to the consummation of the offering in such amount as to maintain the ownership of our Founder, together with Messrs. Weightman, Wang and Betti-Berutto, prior to this offering at 20% of our issued and outstanding shares of our Common Stock upon the consummation of this offering, as described above.

Common stockholders of record are entitled to one vote for each share held on all matters to be voted on by stockholders. Unless specified in our amended and restated certificate of incorporation, or as required by

116

**Table of Contents**

applicable provisions of the DGCL or applicable stock exchange rules, the affirmative vote of a majority of our shares of Common Stock that are voted is required to approve any such matter voted on by our stockholders. Our stockholders are entitled to receive ratable dividends when, as and if declared by the Board of Directors out of funds legally available therefor. We will consummate our initial business combination only if we have net tangible assets of at least $5,000,001 upon such consummation and, solely if a vote is held to approve a business combination, a majority of the outstanding shares of Common Stock voted are voted in favor of the business combination.

Our Board of Directors is elected each year at our annual meeting of stockholders; however, we do not currently intend to hold an annual meeting of stockholders until after we consummate a business combination (unless required by the NYSE). There is no cumulative voting with respect to the election of directors, with the result that the holders of more than 50% of the shares eligible to vote for the election of directors can elect all of the directors.

In accordance with NYSE corporate governance requirements, we are not required to hold an annual meeting until one year after our first fiscal year end following our listing on NYSE. Our fiscal year end will be on December 31. Under Section 211(b) of the DGCL, we are, however, required to hold an annual meeting of stockholders for the purposes of electing directors in accordance with our bylaws unless such election is made by written consent in lieu of such a meeting. We may not hold an annual meeting of stockholders to elect new directors prior to the consummation of our initial business combination, and thus we may not be in compliance with Section 211(b) of the DGCL, which requires an annual meeting. Therefore, if our stockholders want us to hold an annual meeting prior to the consummation of our initial business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price which is payable in cash and equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest (which interest shall be net of taxes payable by us) divided by the number of then outstanding public shares, subject to the limitations described in this prospectus. The amount in the trust account is initially anticipated to be approximately $10.10 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions. Our initial stockholders and the underwriters have entered into letter agreements with us, pursuant to which they have agreed to waive their redemption rights with respect to their founder shares, insider shares, private shares, private underwriters shares and public shares in connection with the completion of our business combination.

Unlike many blank check companies that hold stockholder votes and conduct proxy solicitations in conjunction with their initial business combinations and provide for related redemptions of public shares for cash upon completion of such initial business combinations even when a vote is not required by law, if a stockholder vote is not required by law and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation, conduct the redemptions pursuant to the tender offer rules of the SEC and file tender offer documents with the SEC prior to completing our initial business combination. Our amended and restated certificate of incorporation requires these tender offer documents to contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under the SEC's proxy rules. If, however, a stockholder approval of the transaction is required by law, or we decide to obtain stockholder approval for business or other legal reasons, we will, like many blank check companies, offer to redeem shares in conjunction with a proxy solicitation pursuant to the proxy rules and not pursuant to the tender offer rules.

If we seek stockholder approval, we will complete our initial business combination only if a majority of the shares of Common Stock voting at a stockholder meeting are voted in favor of the business combination.

Table of Contents

However, the participation of our Founder, officers, directors, advisors or their affiliates in privately negotiated transactions (as described in this prospectus), if any, could result in the approval of our business combination even if a majority of our public stockholders vote, or indicate their intention to vote, against such business combination. For purposes of seeking approval of the majority of our outstanding shares of Common Stock, non-votes will have no effect on the approval of our business combination once a quorum is obtained. We intend to give prior written notice approximately 30 days (but not less than 10 days nor more than 60 days) in advance of any such meeting, if required, at which a vote shall be taken to approve our business combination.

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 15% of the shares sold in this offering. However, we would not be restricting our stockholders' ability to vote all of their shares for or against our business combination.

If we seek stockholder approval in connection with our business combination, our initial stockholders and the underwriters have agreed to vote their founder shares, insider shares, private shares and any public shares purchased during or after this offering in favor of our initial business combination. As a result, we would need only approximately 7,053,261 public shares, or approximately 35.27% of the 20,000,000 public shares sold in this offering to be voted in favor of our initial business combination in order to have such transaction approved (assuming the over-allotment option is not exercised). Additionally, each public stockholder may elect to redeem their public shares irrespective of whether they vote for or against the proposed transaction.

Pursuant to our amended and restated certificate of incorporation, if we are unable to complete our business combination within 18 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but no more than 10 business days thereafter, subject to lawfully available funds therefor, redeem the public shares, at a per-share price which is payable in cash and equal to the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable by us and up to $100,000 of interest to pay dissolution expenses) divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board of Directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. Our initial stockholders and the underwriters have entered into letter agreements with us, pursuant to which they have agreed to waive their rights to liquidating distributions from the trust account with respect to their founder shares, private shares and insider shares if we fail to complete our business combination within 18 months from the closing of this offering. However, if our Founder, underwriters, executive officers or directors acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our business combination within the prescribed time period.

In the event of a liquidation, dissolution or winding up of the Company after a business combination, our stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the Common Stock. Our stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the Common Stock, except that we will provide our public stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable by us) upon the completion of our initial business combination, subject to the limitations described in this prospectus.

118

**Table of Contents**

**Warrants**

No warrants are currently outstanding. Each whole warrant entitles the registered holder to purchase one share of our Common Stock at a price of $11.50 per share, subject to adjustment as discussed below, at any time commencing on the later of 12 months from the closing of this offering or 30 days after the completion of our initial business combination. Pursuant to the warrant agreement, a warrant holder may exercise its warrants only for a whole number of shares of Common Stock. This means that only a whole warrant may be exercised at any given time by a warrant holder. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least four units, you will not be able to receive or trade whole warrants. The warrants will expire at 5:00 p.m., New York City time, on the fifth anniversary of our completion of an initial business combination, or earlier upon redemption.

No public warrants will be exercisable for cash unless we have an effective and current registration statement covering the warrant shares issuable upon exercise of the warrants and a current prospectus relating to such warrant shares. Notwithstanding the foregoing, if a registration statement covering the issuance of the warrant shares issuable upon exercise of the public warrants is not effective within 90 days from the closing of our initial business combination, warrant holders may, until such time as there is an effective registration statement and during any period when we shall have failed to maintain an effective registration statement, exercise warrants on a cashless basis pursuant to an available exemption from registration under the Securities Act. If an exemption from registration is not available, holders will not be able to exercise their warrants on a cashless basis. In the event of a cashless exercise, each holder would pay the exercise price by surrendering the warrants for that number of warrant shares equal to the quotient obtained by dividing (x) the product of the number of warrant shares underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" by (y) the fair market value. The "fair market value" for this purpose will mean the average reported last sale price of the shares of Common Stock for the five trading days ending on the trading day prior to the date of exercise.

The private warrants will be identical to the public warrants underlying the units being offered by this prospectus, except that such private warrants will be exercisable for cash (even if a registration statement covering the issuance of the warrant shares issuable upon exercise of such warrants is not effective) or on a cashless basis, at the holder's option, and will not be redeemable by us, in each case so long as they are still held by the Founder or its affiliates.

Once the warrants become exercisable, we may redeem the outstanding warrants (excluding the private warrants):

- at a price of $0.01 per warrant;
- upon a minimum of 30 days' prior written notice of redemption, which we refer to as the 30-day redemption period; and
- if, and only if, the last reported sale price of our Common Stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which we send the notice of redemption to the warrant holders.

We will not redeem the warrants unless a registration statement under the Securities Act covering the issuance of the warrant shares underlying the warrants to be so redeemed is then effective and a current prospectus relating to those warrant shares is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.

If the foregoing conditions are satisfied and we issue a notice of redemption, each warrant holder may exercise his, her or its warrants prior to the scheduled redemption date. However, the price of the shares of Common

119

Table of Contents

Stock may fall below the $18.00 trigger price (as adjusted) as well as the $11.50 exercise price (as adjusted) after the redemption notice is issued.

The redemption criteria for our warrants have been conditioned on a share price which is intended to provide warrant holders a reasonable premium to the initial exercise price and provide a sufficient differential between the then-prevailing share price and the exercise price so that if the share price declines as a result of our redemption call, the redemption will not cause the share price to drop below the exercise price of the warrants.

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In making such determination, our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of warrant shares issuable upon exercise of outstanding warrants. In such event, the holder would pay the exercise price by surrendering the warrants for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of warrant shares underlying the warrants to be so exercised, and the difference between the exercise price of the warrants and the fair market value by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the shares of Common Stock for the five trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. No fractional Common Stock will be issued upon redemption. If, upon redemption, a holder would be entitled to receive a fractional interest in a share, we will round down to the nearest whole number of the number of Common Stock to be issued to the holder.

A holder of a warrant may notify us in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such warrant, to the extent that after giving effect to such exercise, such person (together with such person's affiliates), to the warrant agent's actual knowledge, would beneficially own in excess of 9.8% (or such other amount as a holder may specify) of the shares of Common Stock outstanding immediately after giving effect to such exercise.

The warrants will be issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. You should review a copy of the warrant agreement, which will be filed as an exhibit to the registration statement of which this prospectus is a part, for a complete description of the terms and conditions applicable to the warrants. The warrant agreement will provide that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants.

The exercise price and number of warrant shares issuable on exercise of the warrants may be adjusted in certain circumstances including in the event of a stock dividend, extraordinary dividend or our recapitalization, reorganization, merger or consolidation. However, except as described below, the warrants will not be adjusted for issuances of shares of Common Stock at a price below their respective exercise prices.

If (x) we issue additional shares of Common Stock or equity-linked securities for capital raising purposes in connection with the closing of our initial business combination at an issue price or effective issue price of less than $9.20 per share of Common Stock (with such issue price or effective issue price to be determined in good faith by our Board of Directors, and in the case of any such issuance to our Founder or its affiliates, without taking into account any founder shares held by them prior to such issuance), (y) the aggregate gross proceeds from such issuances represent more than 65% of the total equity proceeds, and interest thereon, available for the funding of our initial business combination on the date of the consummation of our initial business combination (net of redemptions), and (z) the Market Value is below $9.20 per share, the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the greater of (i) the Market Value or (ii) the price at which we issue the additional shares of Common Stock or equity-linked securities.

120

**Table of Contents**

The warrants may be exercised upon surrender of the warrant certificate on or prior to the expiration date at the offices of the warrant agent, with the exercise form on the reverse side of the warrant certificate completed and executed as indicated, accompanied by full payment of the exercise price (or on a cashless basis, if applicable), by certified or official bank check payable to us, for the number of warrants being exercised. The warrant holders do not have the rights or privileges of holders of Common Stock and any voting rights until they exercise their warrants and receive shares of Common Stock. After the issuance of shares of Common Stock upon exercise of the warrants, each holder will be entitled to one vote for each share held of record on all matters to be voted on by stockholders.

Under the terms of the warrant agreement, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement for the registration under the Securities Act of the warrant shares and thereafter use its best efforts to cause the registration statement to become effective and to maintain the effectiveness of such registration statement until the expiration of the warrants. However, we cannot assure you that we will be able to do so and, if we do not maintain a current prospectus relating to the warrant shares issuable upon exercise of the warrants, holders will be unable to exercise their warrants for cash and we will not be required to net cash settle or cash settle the warrant exercise.

No fractional shares will be issued upon exercise of the warrants. If, upon exercise of the warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round down to the nearest whole number of shares of Common Stock to be issued to the warrant holder. As a result, warrant holders not purchasing an even number of warrants must sell any odd number of warrants in order to obtain full value from the fractional interest that will not be issued.

### Preferred Stock

There are no shares of preferred stock outstanding. Our amended and restated certificate of incorporation will authorize the issuance of 1,000,000 shares of preferred stock with such designation, rights and preferences as may be determined from time to time by our Board of Directors. No shares of preferred stock are being issued or registered in this offering. Accordingly, our Board of Directors is empowered, without stockholder approval, to issue preferred stock with dividend, liquidation, conversion, voting or other rights which could adversely affect the voting power or other rights of the holders of Common Stock. However, the underwriting agreement prohibits us, prior to a business combination, from issuing preferred stock which participates in any manner in the proceeds of the trust account, or which votes as a class with the Common Stock on a business combination. We may issue some or all of the preferred stock to effect a business combination. In addition, the preferred stock could be utilized as a method of discouraging, delaying or preventing a change in control of us. Although we do not currently intend to issue any shares of preferred stock, we cannot assure you that we will not do so in the future.

### Dividends

We have not paid any cash dividends on our shares of Common Stock to date and do not intend to pay cash dividends prior to the completion of a business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of a business combination. The payment of any dividends subsequent to a business combination will be within the discretion of our then Board of Directors. It is the present intention of our Board of Directors to retain all earnings, if any, for use in our business operations and, accordingly, our Board of Directors does not anticipate declaring any dividends in the foreseeable future.

### Our Transfer Agent and Warrant Agent

The transfer agent for our Common Stock and warrant agent for our warrants will be Continental Stock Transfer & Trust Company.

121

**Table of Contents**

**Listing of Securities**

We anticipate that the units, as well as the shares of Common Stock and warrants underlying the units (once they begin separate trading), will be listed on New York Stock Exchange under the symbols "GIK.U," "GIK" and "GIK.WS," respectively.

**Certain Anti-Takeover Provisions of Delaware Law and our Amended and Restated Certificate of Incorporation**

*Special meeting of stockholders*

Our amended and restated certificate of incorporation will provide that special meetings of our stockholders may be called only by a majority vote of our Board of Directors, by our Chief Executive Officer or by our Executive Chairman.

*Advance notice requirements for stockholder proposals and director nominations*

Our amended and restated certificate of incorporation will provide that stockholders seeking to bring business before our annual meeting of stockholders, or to nominate candidates for election as directors at our annual meeting of stockholders, must provide timely notice of their intent in writing. To be timely, a stockholder's notice will need to be received by the company secretary at our principal executive offices not later than the close of business on the 90th day nor earlier than the open of business on the 120th day prior to the anniversary date of the immediately preceding annual meeting of stockholders. Pursuant to Rule 14a-8 of the Exchange Act, proposals seeking inclusion in our annual proxy statement must comply with the notice periods contained therein. Our amended and restated certificate of incorporation will also specify certain requirements as to the form and content of a stockholders' meeting. These provisions may preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders.

*Authorized but unissued shares*

Our authorized but unissued Common Stock and preferred stock are available for future issuances without stockholder approval and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved Common Stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

*Exclusive Forum Selection*

Our amended and restated certificate of incorporation requires, to the fullest extent permitted by law, that derivative actions brought in our name, actions against directors, officers and employees for breach of fiduciary duty and other actions under the DGCL or the Company's amended and restated certificate of incorporation or bylaws may be brought only in the Court of Chancery in the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel; provided that the exclusive forum provision will not apply to any action (i) as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), (ii) which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, (iii) for which the Court of Chancery does not have subject matter jurisdiction, or (iv) arising under the Securities Act as to which the Court of Chancery and the federal district court for the District of Delaware shall have concurrent jurisdiction. The exclusive forum provision will not apply to suits brought to enforce any duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Although we believe the exclusive forum provision benefits our

122

Table of Contents

company by providing increased consistency in the application of Delaware law in the types of lawsuits to which it applies, a court may determine that this provision is unenforceable, and to the extent it is enforceable, the provision may have the effect of discouraging lawsuits against our directors and officers, although our stockholders will not be deemed to have waived our compliance with federal securities laws and the rules and regulations thereunder.

### Section 203 of the Delaware General Corporation Law

We will be subject to the provisions of Section 203 of the DGCL regulating corporate takeovers. This statute prevents certain Delaware corporations, under certain circumstances, from engaging in a "business combination" with:

- a stockholder who owns 15% or more of our outstanding voting stock (otherwise known as an "interested stockholder");
- an affiliate of an interested stockholder; or
- an associate of an interested stockholder, for three years following the date that the stockholder became an interested stockholder.

A "business combination" includes a merger or sale of more than 10% of our assets. However, the above provisions of Section 203 do not apply if:

- our Board of Directors approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction;
- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of Common Stock; or
- on or subsequent to the date of the transaction, the business combination is approved by our Board of Directors and authorized at a meeting of our stockholders, and not by written consent, by an affirmative vote of at least two-thirds of the outstanding voting stock not owned by the interested stockholder.

### Limitation on Liability and Indemnification of Directors and Officers

Our amended and restated certificate of incorporation will provide that our directors and officers will be indemnified by us to the fullest extent authorized by Delaware law as it now exists or may in the future be amended. In addition, our amended and restated certificate of incorporation will provide that our directors will not be personally liable for monetary damages to us for breaches of their fiduciary duty as directors, unless they violated their duty of loyalty to us or our stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived an improper personal benefit from their actions as directors.

Our amended and restated certificate of incorporation also will permit us to secure insurance on behalf of any officer, director or employee for any liability arising out of his or her actions, regardless of whether Delaware law would permit indemnification. We will purchase a policy of directors' and officers' liability insurance that insures our directors and officers against the cost of defense, settlement or payment of a judgment in some circumstances and insures us against our obligations to indemnify the directors and officers.

These provisions may discourage stockholders from bringing a lawsuit against our directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions. We believe that these provisions, the insurance and the indemnity agreements are necessary to attract and retain talented and experienced directors and officers.

Table of Contents

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers and controlling persons pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable.

**SECURITIES ELIGIBLE FOR FUTURE SALE**

Immediately after this offering we will have 25,893,479 (or 29,719,000 if the over-allotment option is exercised in full) shares of Common Stock outstanding. Of these shares, the 20,000,000 (or 23,000,000 if the over-allotment option is exercised in full) shares sold in this offering will be freely tradable without restriction or further registration under the Securities Act, except for any shares purchased by one of our affiliates within the meaning of Rule 144 under the Securities Act. All of the 4,985,000 founder shares (or 5,735,000 if the over-allotment is exercised in full), 15,000 insider shares, 650,000 private shares purchased by our Sponsor (or 689,000 if the over-allotment is exercised in full) and 243,479 private units purchased by the underwriters (or 280,000 if the over-allotment option is exercised in full) are restricted securities under Rule 144, in that they were issued in private transactions not involving a public offering.

**Rule 144**

Pursuant to Rule 144, a person who has beneficially owned restricted securities for at least six months would be entitled to sell their securities provided that (i) such person is not deemed to have been one of our affiliates at the time of, or at any time during the three months preceding, a sale and (ii) we are subject to the Exchange Act periodic reporting requirements for at least three months before the sale and have filed all required reports under Section 13 or 15(d) of the Exchange Act during the 12 months (or such shorter period as we were required to file reports) preceding the sale.

Persons who have beneficially owned restricted shares of Common Stock and warrants for at least six months but who are our affiliates at the time of, or at any time during the three months preceding, a sale, would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period only a number of securities that does not exceed the greater of:

- 1% of the total number of shares of our Common Stock then outstanding, which will equal 257,500 shares immediately after this offering (or 295,540 if the underwriters exercise their over-allotment option in full); or
- the average weekly reported trading volume of shares of our Common Stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

Sales by our affiliates under Rule 144 are also limited by manner of sale provisions and notice requirements and to the availability of current public information about us.

*Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies*

Rule 144 is not available for the resale of securities initially issued by shell companies (other than business combination-related shell companies) or issuers that have been at any time previously a shell company. However, Rule 144 also includes an important exception to this prohibition if the following conditions are met:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;
- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;
- the issuer of the securities has filed all Exchange Act reports and material required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Current Reports on Form 8-K; and

Table of Contents

- at least one year has elapsed from the time that the issuer filed current Form 10-type information with the SEC reflecting its status as an entity that is not a shell company.

As a result, our Sponsor will be able to sell its founder shares and private units, as applicable, pursuant to Rule 144 without registration one year after we have completed our initial business combination.

**Registration Rights**

Pursuant to an agreement to be entered into on the date of this prospectus, our initial stockholders, the underwriters and their Permitted Transferees, may demand that we register for resale the founder shares, insider shares, the private units and underlying securities and any securities issued upon conversion of working capital loans. The holders of these securities are entitled to make up to three demands, excluding short form demands, that we register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to our consummation of our initial business combination. Notwithstanding the foregoing, the underwriters and their affiliates may not exercise their demand and "piggyback" registration rights after five and seven years, respectively, after the effective date of the registration statement of which this prospectus forms a part and may not exercise their demand rights on more than one occasion. We will bear the expenses incurred in connection with the filing of any such registration statements.

125

**Table of Contents**

**CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS**

The following is a discussion of the material U.S. federal income tax consequences of the acquisition, ownership and disposition of our units, the shares of Common Stock and warrants received as part of such units, and the shares of Common Stock received upon exercise of warrants received as part of such units or pursuant to right received as part of such units, which we refer to collectively as our securities. Because the components of a unit are separable at the option of the holder, the holder of a unit generally should be treated, for U.S. federal income tax purposes, as the owner of the underlying Common Stock and warrant components of the unit, as the case may be. As a result, the discussion below with respect to actual holders of Common Stock and warrants should also apply to holders of units (as the deemed owners of the underlying Common Stock and warrants that comprise the units). This discussion applies only to securities that are held as capital assets for U.S. federal income tax purposes and is applicable only to holders who purchased for cash units in this offering.

This discussion does not describe all of the tax consequences that may be relevant to you in light of your particular circumstances, including the alternative minimum tax, the Medicare tax on certain investment income and the different consequences that may apply if you are subject to special rules that apply to certain types of investors, such as:

- banks and other financial institutions;
- insurance companies;
- dealers in securities or currencies;
- traders in securities subject to a mark-to-market method of accounting with respect to their securities holdings;
- persons holding the securities as part of a "straddle," hedge, integrated transaction or similar transaction;
- U.S. Holders (as defined below) whose functional currency is not the U.S. dollar;
- partnerships or other pass-through entities for U.S. federal income tax purposes and investors therein;
- controlled foreign corporations;
- passive foreign investment companies;
- certain former citizens or long-term residents of the United States;
- tax-exempt entities; and
- persons deemed to sell our securities pursuant to the constructive sale provisions of the Internal Revenue Code of 1986, as amended (the "Code").

If you are a partnership for U.S. federal income tax purposes, the U.S. federal income tax treatment of your partners will generally depend on the status of the partners and your activities.

This discussion is based on the Code and administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations as of the date hereof, changes to any of which subsequent to the date of this prospectus may affect the tax consequences described herein. Any proposals or changes to U.S. federal income tax laws, regulations and interpretations thereof may or may not be applied retroactively. No ruling from the Internal Revenue Service (the "IRS") has been or will be sought regarding any tax matter discussed herein. This discussion does not address any aspect of state, local or non-U.S. taxation, or any U.S. federal taxes other than income taxes (such as gift and estate taxes).

You should consult your tax advisor with respect to the application of U.S. federal tax laws to your particular situation, as well as any tax consequences arising under the laws of any state, local or non-U.S. jurisdiction.

126

Table of Contents

**Personal Holding Company Status**

We could be subject to a second level of U.S. federal income tax on a portion of our income if we are determined to be a personal holding company (a "PHC") for U.S. federal income tax purposes. A U.S. corporation generally will be classified as a PHC for U.S. federal income tax purposes in a given taxable year if (i) at any time during the last half of such taxable year, five or fewer individuals (without regard to their citizenship or residency and including as individuals for this purpose certain entities such as certain tax-exempt organizations, pension funds and charitable trusts) own or are deemed to own (pursuant to certain constructive ownership rules) more than 50% of the stock of the corporation by value and (ii) at least 60% of the corporation's adjusted ordinary gross income, as determined for U.S. federal income tax purposes, for such taxable year consists of PHC income (which includes, among other things, dividends, interest, certain royalties, annuities and, under certain circumstances, rents).

Depending on the date and size of our initial business combination, it is possible that at least 60% of our adjusted ordinary gross income may consist of PHC income. In addition, depending on the concentration of our stock in the hands of individuals, including the members of our sponsor and certain tax-exempt organizations, pension funds and charitable trusts, it is possible that more than 50% of our stock may be owned or deemed owned (pursuant to the constructive ownership rules) by such persons during the last half of a taxable year. Thus, no assurance can be given that we will not be a PHC following this offering or in the future. If we are or were to become a PHC in a given taxable year, we would be subject to an additional PHC tax, currently 20%, on our undistributed PHC income, which generally includes our taxable income, subject to certain adjustments.

**Allocation of Purchase Price and Characterization of a Unit**

No statutory, administrative or judicial authority directly addresses the treatment of a unit or instruments similar to a unit for U.S. federal income tax purposes and, therefore, that treatment is not entirely clear. The acquisition of a unit should be treated for U.S. federal income tax purposes as the acquisition of one share of our Common Stock and three-fourths (3/4) of one warrant, with each whole warrant exercisable for one share of our Common Stock. We intend to treat the acquisition of a unit in this manner and, by purchasing a unit, you will agree to adopt such treatment for tax purposes. For U.S. federal income tax purposes, each holder of a unit must allocate the purchase price paid by such holder for such unit between the one share of Common Stock and the three-fourths (3/4) of one warrant based on the relative fair market value of each at the time of issuance. The price allocated to each share of Common Stock and each three-fourths (3/4) of one warrant should be the stockholder's tax basis in such share or three-fourths (3/4) of one warrant, as the case may be. Any disposition of a unit should be treated for U.S. federal income tax purposes as a disposition of the share of Common Stock and the three-fourths (3/4) of one warrant comprising the unit, and the amount realized on the disposition should be allocated between the Common Stock and the three-fourths (3/4) of one warrant based on their respective relative fair market values at the time of disposition. The separation of the share of Common Stock and the three-fourths (3/4) of one warrant comprising a unit should not be a taxable event for U.S. federal income tax purposes.

The foregoing treatment of the shares of Common Stock and warrants and a holder's purchase price allocation are not binding on the IRS or the courts. Because there are no authorities that directly address instruments that are similar to the units, no assurance can be given that the IRS or the courts will agree with the characterization described above or the discussion below. Accordingly, each prospective investor is urged to consult its own tax advisors regarding the tax consequences of an investment in a unit (including alternative characterizations of a unit). The balance of this discussion assumes that the characterization of the units described above is respected for U.S. federal income tax purposes.

**U.S. Holders**

This section applies to you if you are a "U.S. Holder." A U.S. Holder is a beneficial owner of our units, shares of Common Stock or warrants who is, for U.S. federal income tax purposes:
- an individual who is a citizen or resident of the United States;

127

**Table of Contents**

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) organized in or under the laws of the United States, any state thereof or the District of Columbia;
- an estate whose income is subject to U.S. federal income tax regardless of its source; or
- a trust (x) whose administration is subject to the primary supervision of a U.S. court and which has one or more "United States persons" (within the meaning of the Code) who have the authority to control all substantial decisions of the trust or (y) which has made a valid election under applicable Treasury Regulations to be treated as a United States person.

*Taxation of Distributions.* If we pay cash distributions to U.S. Holders of shares of our Common Stock, such distributions generally will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. Holder's adjusted tax basis in our Common Stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the Common Stock and will be treated as described under "U.S. Holders—Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Common Stock or Warrants" below.

Dividends we pay to a U.S. Holder that is a taxable corporation generally will qualify for the dividends received deduction (at varying percentages based upon such U.S. Holder's ownership percentage in us) if the requisite holding period is satisfied. With certain exceptions (including, but not limited to, dividends treated as investment income for purposes of investment interest deduction limitations) and provided certain holding period requirements are met, dividends we pay to a non-corporate U.S. Holder generally will constitute "qualified dividends" that will be subject to tax at preferential long-term capital gains rates. It is unclear whether the redemption rights with respect to the Common Stock described in this prospectus may prevent a U.S. Holder from satisfying the applicable holding period requirements with respect to the dividends received deduction or the preferential tax rate on qualified dividend income, as the case may be.

*Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Common Stock or Warrants.* Upon a sale or other taxable disposition of our Common Stock or warrants which, in general, would include a redemption of Common Stock or warrants that is treated as a sale as described below, and including as a result of a dissolution and liquidation in the event we do not complete our initial business combination within the required time period, a U.S. Holder generally will recognize capital gain or loss in an amount equal to the difference between the amount realized and the U.S. Holder's adjusted tax basis in the Common Stock or warrants. Any such capital gain or loss generally will be long-term capital gain or loss if the U.S. Holder's holding period for the Common Stock or warrants so disposed of exceeds one year. It is unclear, however, whether the redemption rights with respect to the Common Stock described in this prospectus may suspend the running of the applicable holding period for this purpose. Long-term capital gains recognized by non-corporate U.S. Holders will be eligible to be taxed at reduced rates. The deductibility of capital losses is subject to limitations.

Generally, the amount of gain or loss recognized by a U.S. Holder is an amount equal to the difference between (i) the sum of the amount of cash and the fair market value of any property received in such disposition (or, if the Common Stock or warrants are held as part of units at the time of the disposition, the portion of the amount realized on such disposition that is allocated to the Common Stock or warrants based upon the then fair market values of the Common Stock and warrants included in the units) and (ii) the U.S. Holder's adjusted tax basis in its Common Stock or warrants so disposed of. A U.S. Holder's adjusted tax basis in its Common Stock or warrants generally will equal the U.S. Holder's acquisition cost (that is, as discussed above, the portion of the purchase price of a unit allocated to a share of Common Stock or a warrant or, as discussed below, the U.S. Holder's initial basis for Common Stock received upon exercise of warrants) less, in the case of a share of Common Stock, any prior distributions treated as a return of capital.

*Redemption of Common Stock.* In the event that a U.S. Holder's Common Stock is redeemed pursuant to the redemption provisions described in this prospectus under "*Description of Securities—Common Stock*" or if we

128

**Table of Contents**

purchase a U.S. Holder's Common Stock in an open market transaction, the treatment of the transaction for U.S. federal income tax purposes will depend on whether the redemption qualifies as a sale of the Common Stock under Section 302 of the Code. If the redemption qualifies as a sale of Common Stock, the U.S. Holder will be treated as described under "*U.S. Holders—Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Common Stock or Warrants*" above. If the redemption does not qualify as a sale of Common Stock, the U.S. Holder will be treated as receiving a corporate distribution with the tax consequences described above under "U.S. Holders—Taxation of Distributions." Whether a redemption qualifies for sale treatment will depend largely on the total number of shares of our stock treated as held by the U.S. Holder (including any stock constructively owned by the U.S. Holder as a result of owning warrants) relative to all of our shares outstanding both before and after the redemption. The redemption of Common Stock generally will be treated as a sale of the Common Stock (rather than as a corporate distribution) if the redemption (i) is "substantially disproportionate" with respect to the U.S. Holder, (ii) results in a "complete termination" of the U.S. Holder's interest in us or (iii) is "not essentially equivalent to a dividend" with respect to the U.S. Holder. These tests are explained more fully below.

In determining whether any of the foregoing tests are satisfied, a U.S. Holder takes into account not only stock actually owned by the U.S. Holder, but also shares of our stock that are constructively owned by it. A U.S. Holder may constructively own, in addition to stock owned directly, stock owned by certain related individuals and entities in which the U.S. Holder has an interest or that have an interest in such U.S. Holder, as well as any stock the U.S. Holder has a right to acquire by exercise of an option, which would generally include Common Stock which could be acquired pursuant to the exercise of the warrants. In order to meet the substantially disproportionate test, the percentage of our outstanding voting stock actually and constructively owned by the U.S. Holder immediately following the redemption of Common Stock must, among other requirements, be less than 80% of the percentage of our outstanding voting stock actually and constructively owned by the U.S. Holder immediately before the redemption. There will be a complete termination of a U.S. Holder's interest if either (i) all of the shares of our stock actually and constructively owned by the U.S. Holder are redeemed or (ii) all of the shares of our stock actually owned by the U.S. Holder are redeemed and the U.S. Holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of stock owned by certain family members and the U.S. Holder does not constructively own any other shares of our stock. The redemption of the Common Stock will not be essentially equivalent to a dividend if the redemption results in a "meaningful reduction" of the U.S. Holder's proportionate interest in us. Whether the redemption will result in a meaningful reduction in a U.S. Holder's proportionate interest in us will depend on the particular facts and circumstances. However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over corporate affairs may constitute such a "meaningful reduction." A U.S. Holder should consult with its own tax advisors as to the tax consequences of a redemption.

If none of the foregoing tests is satisfied, then the redemption will be treated as a corporate distribution and the tax effects will be as described under "U.*S. Holders—Taxation of Distributions*," above. After the application of those rules, any remaining tax basis of the U.S. Holder in the redeemed Common Stock will be added to the U.S. Holder's adjusted tax basis in its remaining stock, or, if it has none, to the U.S. Holder's adjusted tax basis in its warrants or possibly in other stock constructively owned by it.

*Exercise or Lapse of a Warrant*. Except as discussed below with respect to the cashless exercise of a warrant, a U.S. Holder generally will not recognize taxable gain or loss with respect to the acquisition of Common Stock upon exercise of a warrant for cash. The U.S. Holder's tax basis in the share of our Common Stock received upon exercise of the warrant generally will be an amount equal to the sum of the U.S. Holder's initial investment in the warrant (i.e., the portion of the U.S. Holder's purchase price for a unit that is allocated to the warrant, as described above under "—*Allocation of Purchase Price and Characterization of a Unit*") and the exercise price. The U.S. Holder's holding period for the Common Stock received upon exercise of the warrants will begin on the date following the date of exercise (or possibly the date of exercise) of the warrants and will not include the

Table of Contents

period during which the U.S. Holder held the warrants. If a warrant is allowed to lapse unexercised, a U.S. Holder generally will recognize a capital loss equal to such holder's tax basis in the warrant.

The tax consequences of a cashless exercise of a warrant are not clear under current tax law. A cashless exercise may be tax-free, either because the exercise is not a gain realization event or because the exercise is treated as a recapitalization for U.S. federal income tax purposes. In either tax-free situation, a U.S. Holder's basis in the Common Stock received would equal the holder's basis in the warrant. If the cashless exercise were treated as not being a gain realization event, a U.S. Holder's holding period in the Common Stock would be treated as commencing on the date following the date of exercise (or possibly the date of exercise) of the warrant. If the cashless exercise were treated as a recapitalization, the holding period of the Common Stock would include the holding period of the warrant.

It is also possible that a cashless exercise could be treated in whole or in part as a taxable exchange in which gain or loss would be recognized. In such event, the exercise price for the total number of warrants to be exercised could be deemed satisfied by a U.S. Holder through the deemed surrender (but not exercise) of a number of warrants having an aggregate fair market value equal to such exercise price. The U.S. Holder would recognize capital gain or loss in an amount equal to the difference between the fair market value of the Common Stock received in respect of the warrants deemed surrendered and the U.S. Holder's tax basis in the warrants deemed surrendered. In this case, a U.S. Holder's tax basis in the Common Stock received would equal the sum of the exercise price of the warrants exercised and the U.S. Holder's tax basis in the warrants exercised. A U.S. Holder's holding period for the Common Stock would commence on the date following the date of exercise (or possibly the date of exercise) of the warrant and would not include the period during which the U.S. Holder held the warrants.

Due to the absence of authority on the U.S. federal income tax treatment of a cashless exercise, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, U.S. Holders should consult their tax advisors regarding the tax consequences of a cashless exercise.

*Possible Constructive Distributions*. The terms of each warrant provide for an adjustment to the number of shares of Common Stock for which the warrant may be exercised or to the exercise price of the warrant in certain events, as discussed in the section of this prospectus captioned "*Description of Securities—Warrants*." An adjustment which has the effect of preventing dilution generally is not taxable. The U.S. Holders of the warrants would, however, be treated as receiving a constructive distribution from us if, for example, the adjustment increases the warrant holders' proportionate interest in our assets or earnings and profits (e.g., through an increase in the number of shares of Common Stock that would be obtained upon exercise or through a decrease in the exercise price of the warrant) as a result of a distribution of cash to the holders of shares of our Common Stock which is taxable to the U.S. Holders of such shares as described under "*U.S. Holders—Taxation of Distributions*" above. Such constructive distribution would be subject to tax as described under that section in the same manner as if the U.S. Holders of the warrants received a cash distribution from us equal to the fair market value of such increased interest.

*Information Reporting and Backup Withholding*. In general, information reporting requirements may apply to dividends (including constructive dividends) paid to a U.S. Holder and to the proceeds of the sale or other disposition of our units, shares of Common Stock and warrants, unless the U.S. Holder is an exempt recipient. Backup withholding may apply to such payments if the U.S. Holder fails to provide a taxpayer identification number (generally, on a properly completed IRS Form W-9) or a certification of exempt status, or has been notified by the IRS that it is subject to backup withholding (and such notification has not been withdrawn).

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a U.S. Holder's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

130

Table of Contents

**Non-U.S. Holders**

This section applies to you if you are a "*Non-U.S. Holder.*" A Non-U.S. Holder is a beneficial owner of our units, shares of Common Stock or warrants who is, for U.S. federal income tax purposes, neither a U.S. Holder nor a partnership.

*Taxation of Distributions*. In general, any distributions we make to a Non-U.S. Holder of shares of our Common Stock, to the extent paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles), will constitute dividends for U.S. federal income tax purposes and, provided such dividends are not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States, we will be required to withhold tax from the gross amount of the dividend at a rate of 30%, unless such Non-U.S. Holder is eligible for a reduced rate of withholding tax under an applicable income tax treaty and provides proper certification of its eligibility for such reduced rate (usually on an IRS Form W-8BEN or W-8BEN-E). Any distribution not constituting a dividend will be treated first as reducing (but not below zero) the Non-U.S. Holder's adjusted tax basis in its shares of our Common Stock and, to the extent such distribution exceeds the Non-U.S. Holder's adjusted tax basis, as gain realized from the sale or other disposition of the Common Stock, which will be treated as described under "*Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Common Stock or Warrants*" below.

This withholding tax does not apply to dividends paid to a Non-U.S. Holder who provides a Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States. Instead, the effectively connected dividends will be subject to regular U.S. income tax as if the Non-U.S. Holder were a U.S. resident, subject to an applicable income tax treaty providing otherwise. A Non-U.S. corporation receiving effectively connected dividends may also be subject to an additional "branch profits tax" imposed at a rate of 30% (or a lower treaty rate).

In addition, if we determine that we are likely to be classified as a "United States real property holding corporation" (see "*Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Common Stock or Warrants*" below), we may withhold up to 15% of any distribution to a Non-U.S. Holder to which Section 301 of the Code applies and which is not made out of our earnings and profits.

*Exercise of a Warrant*. The U.S. federal income tax treatment of a Non-U.S. Holder's exercise of a warrant, or the lapse of a warrant held by a Non-U.S. Holder, generally will correspond to the U.S. federal income tax treatment of the exercise or lapse of a warrant by a U.S. Holder, as described under "*U.S. Holders—Exercise or Lapse of a Warrant*" above, although to the extent a cashless exercise results in a taxable exchange, the consequences would be similar to those described below in "*Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Common Stock or Warrants.*"

*Gain on Sale, Taxable Exchange or Other Taxable Disposition of Common Stock or Warrants*. Subject to the discussions below under "*Non-U.S. Holders—Information Reporting and Backup Withholding*" and "*Non-U.S. Holders—Foreign Account Tax Compliance Act,*" a Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax in respect of gain recognized on a sale, taxable exchange or other taxable disposition of our Common Stock, which would include a dissolution and liquidation in the event we do not complete our initial business combination within 18 months from the closing of this offering or warrants (including an expiration or redemption of our warrants), in each case without regard to whether those securities were held as part of a unit, unless:

- the gain is effectively connected with the conduct of a trade or business by the Non-U.S. Holder within the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment or fixed base maintained by the Non-U.S. Holder);
- the gain is realized by an individual Non-U.S. Holder who is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met; or

131

Table of Contents

- we are or have been a "U.S. real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five-year period ending on the date of disposition or the period that the Non-U.S. Holder held our Common Stock, and, in the case where shares of our Common Stock are regularly traded on an established securities market, the Non-U.S. Holder has owned, directly or constructively, more than 5% of our Common Stock at any time within the shorter of the five-year period preceding the disposition or such Non-U.S. Holder's holding period for the shares of our Common Stock. There can be no assurance that our Common Stock will be treated as regularly traded on an established securities market for this purpose.

Unless an applicable treaty provides otherwise, the gain described in the first bullet point above will be subject to tax at generally applicable U.S. federal income tax rates as if the Non-U.S. Holder were a U.S. resident. Any gains described in the first bullet point above of a Non-U.S. Holder that is a non-U.S. corporation may also be subject to an additional "branch profits tax" at a 30% rate (or lower treaty rate).

An individual Non-U.S. Holder described in the second bullet above will be required to pay a flat 30% tax on the gain derived from the sale, exchange or other disposition, which tax may be offset by U.S.-source capital losses for the year, provided such Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses. Please note a foreign individual who is present in the United States for 183 days or more in the taxable year ordinarily would be treated as a U.S. resident for U.S. federal income tax purposes under the "substantial presence" test, subject to exceptions.

If the third bullet point above applies to a Non-U.S. Holder, gain recognized by such holder on the sale, exchange or other disposition of our Common Stock or warrants will be subject to tax at generally applicable U.S. federal income tax rates. In addition, a buyer of our Common Stock or warrants from such holder may be required to withhold U.S. federal income tax at a rate of 15% of the amount realized upon such disposition. We cannot determine whether we will be a U.S. real property holding corporation in the future until we complete our initial business combination. We will be classified as a United States real property holding corporation if the fair market value of our "United States real property interests" equals or exceeds 50 percent of the sum of the fair market value of our worldwide real property interests plus our other assets used or held for use in a trade or business, as determined for U.S. federal income tax purposes.

*Redemption of Common Stock*. The characterization for U.S. federal income tax purposes of the redemption of a Non-U.S. Holder's Common Stock pursuant to the redemption provisions described in this prospectus under "*Description of Securities—Common Stock*" generally will correspond to the U.S. federal income tax characterization of such a redemption of a U.S. Holder's Common Stock, as described under "*U.S. Holders—Redemption of Common Stock*" above, and the consequences of the redemption to the Non-U.S. Holder will be as described above under "*Non-U.S. Holders—Taxation of Distributions*" and "*Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Common Stock or Warrants*," as applicable.

*Possible Constructive Distributions*. The terms of each warrant provide for an adjustment to the number of shares of Common Stock for which the warrant may be exercised or to the exercise price of the warrant in certain events, as discussed in the section of this prospectus captioned "*Description of Securities—Warrants*." An adjustment which has the effect of preventing dilution generally is not taxable. The Non-U.S. Holders of the warrants would, however, be treated as receiving a constructive distribution from us if, for example, the adjustment increases the warrant holders' proportionate interest in our assets or earnings and profits (e.g., through an increase in the number of shares of Common Stock that would be obtained upon exercise or through a decrease in the exercise price of the warrant) as a result of a distribution of cash to the holders of shares of our Common Stock which is taxable to the Non-U.S. Holders of such shares as described under "*Non-U.S. Holders—Taxation of Distributions*" above. Such constructive distribution would be subject to tax as described under that section in the same manner as if the Non-U.S. Holders of the warrants received a cash distribution from us equal to the fair market value of such increased interest.

132

**Table of Contents**

*Information Reporting and Backup Withholding*. Information returns will be filed with the IRS in connection with payments of dividends (including constructive dividends) and the proceeds from a sale or other disposition of our units, shares of Common Stock and warrants. A Non-U.S. Holder may have to comply with certification procedures to establish that it is not a United States person in order to avoid information reporting and backup withholding requirements (for example, by properly certifying its non-U.S. status on an IRS Form W-8BEN, IRS Form W-8BEN-E or other applicable IRS Form W-8, as applicable). The certification procedures required to claim a reduced rate of withholding under a treaty will satisfy the certification requirements necessary to avoid the backup withholding as well. The amount of any backup withholding from a payment to a Non-U.S. Holder will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund, provided that the required information is timely furnished to the IRS.

*Foreign Account Tax Compliance Act*. The Foreign Account Tax Compliance Act ("FATCA") generally imposes a U.S. federal withholding tax of 30% on dividends on and the gross proceeds of a disposition of our Common Stock or warrants paid to a "foreign financial institution" (as specially defined under these rules), unless such institution enters into an agreement with the U.S. government to withhold on certain payments and to collect and provide to the U.S. tax authorities substantial information regarding the U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are foreign entities with U.S. owners) or otherwise establishes an exemption. FATCA also generally imposes a U.S. federal withholding tax of 30% on dividends on and the gross proceeds of a disposition of our Common Stock or warrants paid to a "non-financial foreign entity" (as specially defined under these rules) unless such entity provides the withholding agent with a certification identifying certain substantial direct and indirect U.S. owners of the entity, certifies that there are none or otherwise establishes an exemption. The withholding obligations under FATCA generally apply to payments of dividends (including constructive dividends) on our Common Stock or warrants. Pursuant to proposed Treasury Regulations, the U.S. Treasury Department has indicated its intent to eliminate the requirements under FATCA of withholding on gross proceeds from the sale, exchange, maturity or other disposition of relevant financial instruments. The U.S. Treasury Department has indicated that taxpayers may rely on these proposed Treasury Regulations pending their finalization. Under certain circumstances, a Non-U.S. Holder might be eligible for refunds or credits of such taxes. An intergovernmental agreement between the United States and an applicable foreign country may modify the requirements described in this paragraph.

We will not pay any additional amounts to holders in respect of any amounts withheld, including pursuant to FATCA. Under certain circumstances, you may be eligible for refunds or credits of such taxes. Prospective investors are encouraged to consult with their own tax advisors regarding the possible implications of this legislation on their investment in our securities.

133

**Table of Contents**

## UNDERWRITING

We are offering the units described in this prospectus through the underwriters, named below. Nomura Securities International, Inc. and Oppenheimer & Co. Inc. are acting as joint representatives of the underwriters. We have entered into an underwriting agreement with the representatives. Subject to the terms and conditions of the underwriting agreement, the underwriters have agreed to purchase, and we have agreed to sell to the underwriters, the number of units listed next to each of its name in the following table.

| Underwriter | Number of Units |
|---|---|
| Nomura Securities International, Inc. | 10,200,000 |
| Oppenheimer & Co. Inc. | 6,800,000 |
| Odeon Capital Group LLC. | 3,000,000 |
| Total | 20,000,000 |

The underwriting agreement provides that the underwriters must buy all of the units if they buy any of them. However, the underwriters are not required to purchase the units covered by the underwriters' option to purchase additional units as described below. The underwriters may sell units to the public through one or more of their affiliates or selling agents.

Our public units are offered hereby subject to a number of conditions, including:
- receipt and acceptance of such units by the underwriters; and
- the underwriters' right to reject orders in whole or in part.

In connection with this offering, the underwriters or securities dealers may distribute prospectuses electronically.

### Option to Purchase Additional Units

We have granted the underwriters an option to buy up to an aggregate of 3,000,000 additional units. The underwriters have 45 days from the date of this prospectus to exercise this option. If the underwriters exercise this option, they will purchase additional units approximately in proportion to the amounts specified in the table above.

### Underwriting Discount

Units sold by the underwriters to the public will initially be offered at the initial offering price set forth on the cover of this prospectus. Any units sold by the underwriters to securities dealers may be sold at a discount of up to $0.12 per unit from the IPO price. Sales of units made outside of the United States may be made by affiliates of the underwriters. After the initial public offering, if all the units are not sold at the IPO price, the representatives may change the offering price and the other selling terms. Upon execution of the underwriting agreement, the underwriters will be obligated to purchase the units at the prices and upon the terms stated therein.

The following table shows the per unit and total underwriting discount we will pay to the underwriters assuming both no exercise and full exercise of the underwriters' option to purchase up to 3,000,000 additional units.

| | No Exercise | Full Exercise |
|---|---|---|
| Per Unit(1) | $ 0.60 | $ 0.60 |
| Total | $ 12,000,000 | $ 13,800,000 |

(1) $0.20 per unit, or $4,000,000 in the aggregate (or $4,600,000 in the aggregate if the underwriters' option to purchase additional units is exercised in full), is payable upon the closing of this offering. $0.40 per unit, or

Table of Contents

$8,000,000 in the aggregate (or $9,200,000 in the aggregate if the underwriters' option to purchase additional units is exercised in full) payable to the underwriters for deferred underwriting commissions will be placed in a trust account located in the United States as described herein. The deferred commissions will be payable to the underwriters as consideration for the services described in the paragraph below and will be released to the underwriters only on and concurrently with completion of our initial business combination.

We estimate that the total expenses of the offering payable by us, not including the underwriting discount, will be approximately $1,000,000. Further, we have agreed to pay for the FINRA-related fees and expenses of the underwriters' legal counsel, not to exceed $25,000, and the expenses of investigations and background checks of our officers and directors (which fees and disbursements shall not exceed $35,000).

If we do not complete our initial business combination within 18 months from the closing of this offering, we and the underwriters have agreed that: (i) they will forfeit any rights or claims to their deferred underwriting discounts and commissions, including any accrued interest thereon, then in the trust account; and (ii) the deferred underwriters' discounts and commissions will be distributed on a pro rata basis, together with any accrued interest thereon (which interest shall be net of taxes payable) to the public stockholders.

The underwriters will use their commercially reasonable efforts to provide us with the following services: 1) originating and introducing us to potential targets for our initial business combination; 2) arranging institutional investor meetings on our behalf in connection with obtaining financing for the initial business combination; 3) assisting us in meeting our securities exchange listing requirements following the closing of this offering; and 4) providing capital markets advice and liquidity to us following the closing of this offering. If we use our best efforts (and the underwriters use commercially reasonable efforts) to obtain financing in private placements or privately negotiated transactions, but notwithstanding such efforts, we do not have sufficient cash necessary to consummate our initial business combination and pay the deferred underwriting commission, we and the underwriters will cooperate in good faith to come to a mutually-satisfactory solution with respect to the payment of the deferred underwriting commission so as to ensure that our obligation to pay the deferred underwriting commission shall not impede the closing of the initial business combination.

**Right of First Refusal**

We have granted to the underwriters a "right of first refusal" to serve as a placement agent on terms to be negotiated and consistent with the most favorable terms in the market for similar offerings for any private placement of our securities in support of a business combination that is consummated by us no later than three years from the date of this prospectus. This "right of first refusal" is considered to be an item of value in connection with this offering pursuant to FINRA Rule 5110 and has a deemed compensation value of one percent of the proceeds of this offering.

**Private Units**

The underwriters have committed to purchase from us 243,479 private units (or 280,000 if the over-allotment option is exercised in full) at $10.00 per unit. The private units purchased by the underwriters have terms and provisions that are identical to the units and the private shares contained in the units sold in this offering except as described under "*Description of Securities—Units,*" including that, subject to certain exceptions, the private units purchased by the underwriters will not be transferable, assignable or salable until 30 days after the completion of our initial business combination. The purchases of the private units by the underwriters will take place on a private placement basis simultaneously with the consummation of this offering. Such private units will be considered underwriting compensation in connection with this offering. Such private units will be subject to lock-up restrictions, as required by FINRA Rule 5110(g)(1), and may not be sold during the offering, or sold, transferred, assigned, pledged, or hypothecated, or be the subject of any hedging, short sale, derivative, put, or call transaction that would result in the effective economic disposition of such securities by any person for a period of 180 days immediately following the date of effectiveness of the registration statement of which this

135

**Table of Contents**

prospectus forms a part or commencement of sales of the offering, except as provided in FINRA Rule 5110(g)(2).

**No Sales of Similar Securities**

We, our executive officers and directors, and our Founder will enter into lock-up agreements with the underwriters. Under the lock-up agreements, subject to certain exceptions, we and each of these persons may not, without the prior written approval of the underwriters offer, sell, contract to sell, pledge, or otherwise dispose of, directly or indirectly, or hedge our units, warrants, shares of Common Stock or any other securities convertible into or exchangeable or exercisable for shares of our Common Stock. These restrictions will be in effect for a period of 180 days after the date of this prospectus.

The underwriters may, at any time and in their sole discretion, release some or all the securities from these lock-up agreements. The underwriters will consider, among other factors, the holder's reasons for requesting the release, the number of securities for which the release is being requested and market conditions at the time. If the restrictions under the lock-up agreements are waived, our units, warrants and shares of Common Stock may become available for resale into the market, subject to applicable law, which could reduce the market price of our securities.

Except with respect to Permitted Transferees as described herein under "*Principal Stockholders*," our initial stockholders and the underwriters have agreed not to transfer, assign or sell any of their respective founder shares, insider shares, private units or any securities underlying the private units that they may hold until the date that is (i) in the case of the founder shares and insider shares, the earlier of (A) 12 months after the date of the consummation of our initial business combination or (B) subsequent to our initial business combination, (x) the date on which the last sale price of our Common Stock equals or exceeds $12.50 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 90 days after our initial business combination, or (y) the date on which we consummate a liquidation, merger, stock exchange or other similar transaction after our initial business combination which results in all of our stockholders having the right to exchange their shares of Common Stock for cash, securities or other property, and (ii) in the case of the private units or any securities underlying the private units, until 30 days after the completion of our initial business combination. Any Permitted Transferees would be subject to the same restrictions and other agreements of our initial shareholders with respect to any shares.

**Indemnification**

We have agreed to indemnify the underwriters against certain liabilities, including certain liabilities under the Securities Act. If we are unable to provide this indemnification, we have agreed to contribute to payments the underwriters may be required to make in respect of those liabilities.

**NYSE Listing**

We intend to apply for listing of our units on NYSE under the symbol "GIK.U" and, once the units begin separate trading, we expect our Common Stock and warrants to be listed on the NYSE under the symbols "GIK" "and "GIK.WS," respectively.

**Price Stabilization, Short Positions**

In connection with this offering, the underwriters may engage in activities that stabilize, maintain or otherwise affect the price of units during and after this offering, including:
- stabilizing transactions;

136

**Table of Contents**

- short sales;
- purchases to cover positions created by short sales;
- imposition of penalty bids; and
- syndicate covering transactions.

Stabilizing transactions consist of bids or purchases made for the purpose of preventing or retarding a decline in the market price of our units while this offering is in progress. Stabilization transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum. These transactions may also include making short sales of our units, which involve the sale by the underwriters of a greater number of units than they are required to purchase in this offering and purchasing units on the open market to cover short positions created by short sales. Short sales may be "covered short sales," which are short positions in an amount not greater than the underwriters' option to purchase additional units referred to above, or may be "naked short sales," which are short positions in excess of that amount.

The underwriters may close out any covered short position by either exercising their over-allotment option, in whole or in part, or by purchasing units in the open market. In making this determination, the underwriters will consider, among other things, the price of units available for purchase in the open market as compared to the price at which they may purchase units through the over-allotment option.

Naked short sales are short sales made in excess of the over-allotment option. The underwriters must close out any naked short position by purchasing units in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the units in the open market that could adversely affect investors who purchased in this offering.

These stabilizing transactions, short sales, purchases to cover positions created by short sales, the imposition of penalty bids and syndicate covering transactions may have the effect of raising or maintaining the market price of our units or preventing or retarding a decline in the market price of our units. As a result of these activities, the price of our units may be higher than the price that otherwise might exist in the open market. The underwriters may carry out these transactions on NYSE, in the over-the-counter market or otherwise. Neither we nor the underwriters make any representation or prediction as to the effect that the transactions described above may have on the price of the units. Neither we, nor the underwriters make any representation that the underwriters will engage in these stabilization transactions or that any transaction, once commenced, will not be discontinued without notice.

**Determination of Offering Price**

Prior to this offering, there was no public market for our units. The initial public offering price will be determined by negotiation between us and the representatives of the underwriters. The principal factors to be considered in determining the initial public offering price include:

- the information set forth in this prospectus and otherwise available to the representatives;
- our history and prospects and the history and prospects for the industry in which we compete;
- our past and present financial performance;
- our prospects for future earnings and the present state of our development;
- the general condition of the securities market at the time of this offering;
- the recent market prices of, and demand for, publicly traded units of generally comparable companies; and
- other factors deemed relevant by the underwriters and us.

137

**Table of Contents**

The estimated public offering price range set forth on the cover page of this preliminary prospectus is subject to change as a result of market conditions and other factors. Neither we nor the underwriters can assure investors that an active trading market will develop for our units, warrants or Common Stock or that the units will trade in the public market at or above the initial public offering price.

**Affiliations**

The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing and brokerage activities. The underwriters and their respective affiliates may from time to time in the future engage with us and perform services for us or in the ordinary course of their business for which they will receive customary fees and expenses. In the ordinary course of their various business activities, the underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers, and such investment and securities activities may involve securities and/or instruments of us. The underwriters and their respective affiliates may also make investment recommendations and/or publish or express independent research views in respect of these securities or instruments and may at any time hold, or recommend to clients that they acquire, long and/or short positions in these securities and instruments.

We are not under any contractual obligation to engage the underwriters to provide any services for us after this offering, and have no present intent to do so. However, the underwriters may introduce us to potential target businesses or assist us in raising additional capital in the future. If the underwriters provide services to us after this offering, we may pay such underwriter fair and reasonable fees that would be determined at that time in an arm's length negotiation; provided, that no agreement will be entered into with the underwriters and no fees for such services will be paid to the underwriter prior to the date that is 90 days from the date of this prospectus, unless FINRA determines that such payment would not be deemed underwriters' compensation in connection with this offering and we may pay the underwriters of this offering or any entity with which it is affiliated a finder's fee or other compensation for services rendered to us in connection with the completion of a business combination.

**Notice to Residents of Canada**

The securities may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 *Prospectus Exemptions* or subsection 73.3(1) of the *Securities Act* (Ontario), and are permitted clients, as defined in National Instrument 31-103 *Registration Requirements, Exemptions and Ongoing Registrant Obligations*. Any resale of the securities must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 *Underwriting Conflicts* ("NI 33-105"), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

Table of Contents

**Notice to Prospective Investors in the European Economic Area and United Kingdom**

This prospectus is not a prospectus for the purposes of the Prospectus Regulation (as defined below). This prospectus and any offer if made subsequently is directed only at persons in Member States of the European Economic Area (the "EEA") or in the United Kingdom (the "UK") (each, a "Relevant State") who are "qualified investors" within the meaning of Article 2(e) of the Prospectus Regulation. This prospectus has been prepared on the basis that any offer of our securities in any Relevant State will be made pursuant to an exemption under the Prospectus Regulation from the requirement to publish a prospectus for offers of our securities. Accordingly any person making or intending to make an offer in that Relevant State of our securities which are the subject of the offering contemplated in this prospectus may only do so in circumstances in which no obligation arises for the Company or any of the underwriters to publish a prospectus pursuant to Article 3 of the Prospectus Regulation in relation to such offer. Neither we nor the underwriters have authorized, nor do we or they authorize, the making of any offer of our securities in circumstances in which an obligation arises for us or the underwriters to publish a prospectus for such offer. The expression "Prospectus Regulation" means Regulation (EU) 2017/1129.

In relation to each Relevant State, no offer of our securities which are the subject of the offering contemplated by this prospectus to the public may be made in that Relevant State other than:

(a) to any legal entity which is a qualified investor as defined in the Prospectus Regulation;

(b) to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Regulation), subject to obtaining the prior consent of the relevant underwriter or underwriters nominated by us for any such offer; or

(c) in any other circumstances falling within Article 1(4) of the Prospectus Regulation, provided that no such offer of our securities shall require us or any underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Regulation.

For the purposes of this provision, the expression an "offer of our securities to the public" in relation to our securities in any Relevant State means the communication in any form and by any means of sufficient information on the terms of the offer and our securities to be offered so as to enable an investor to decide to purchase or subscribe for our securities.

This EEA and UK selling restriction is in addition to any other selling restrictions set out below.

**Notice to Prospective Investors in Switzerland**

This prospectus is not intended to constitute an offer or solicitation to purchase or invest in the units in Switzerland. The units offered hereby may not be publicly offered, directly or indirectly, in Switzerland within the meaning of the Swiss Financial Services Act ("FinSA") and no application has or will be made to admit the units to trading on any trading venue (exchange or multilateral trading facility) in Switzerland. Neither this prospectus nor any other offering or marketing material relating to the units constitutes a prospectus pursuant to the FinSA, and neither this prospectus nor any other offering or marketing material relating to the units may be publicly distributed or otherwise made publicly available in Switzerland.

**Selling Restrictions with Respect to the United Kingdom**

This prospectus may not be distributed or circulated to any person in the UK other than to (i) persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "Order"); and (ii) high net worth entities falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons"). In the UK, this prospectus is directed only at relevant persons. Other persons in the UK should not act on this prospectus or any of its contents. In the UK, this prospectus is being supplied on a confidential basis only to relevant persons for their information and may not be reproduced, redistributed or passed on to any other person or published, in whole or in part, for any other purpose.

139

Table of Contents

Any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the United Kingdom's Financial Services and Markets Act 2000, as amended (the "FSMA")) in connection with the issue or sale of our securities may only be communicated or caused to be communicated in circumstances in which Section 21(1) of the FSMA does not apply to us.

All applicable provisions of the FSMA must be complied with in respect to anything done by any person in relation to our securities in, from or otherwise involving the UK.

**Notice to Prospective Investors in France**

Neither this prospectus nor any other offering material relating to the units described in this prospectus has been submitted to the clearance procedures of the Autorité des Marchés Financiers or by the competent authority of another member state of the European Economic Area and notified to the Autorité des Marchés Financiers. The units have not been offered or sold and will not be offered or sold, directly or indirectly, to the public in France. Neither this prospectus nor any other offering material relating to the units has been or will be:

- released, issued, distributed or caused to be released, issued or distributed to the public in France; or
- used in connection with any offer for subscription or sale of the units to the public in France.

Such offers, sales and distributions will be made in France only:

- to qualified investors (investisseurs qualifiés) and/or to a restricted circle of investors (cercle restreint d'investisseurs), in each case investing for their own account, all as defined in, and in accordance with, Article L.411-2, D.411-1, D.411-2, D.734-1, D.744-1, D.754-1 and D.764-1 of the French Code monétaire et financier;
- to investment services providers authorized to engage in portfolio management on behalf of third parties; or
- in a transaction that, in accordance with article L.411-2-II-1°-or-2°-or 3° of the French Code monétaire et financier and article 211-2 of the General Regulations (Règlement Général) of the Autorité des Marchés Financiers, does not constitute a public offer (appel public à l'épargne).

The units may be resold directly or indirectly, only in compliance with Articles L.411-1, L.411-2, L.412-1 and L.621-8 through L.621-8-3 of the French Code monétaire et financier.

## LEGAL MATTERS

The validity of the securities offered in this prospectus is being passed upon for us by Crowell & Moring LLP, San Francisco, California. Sidley Austin LLP, New York, New York, is acting as counsel to the underwriters in connection with this offering.

## EXPERTS

The financial statements of GigCapital3, Inc. as of February 14, 2020 and for the period from February 3, 2020 (date of inception) to February 14, 2020 included in this prospectus have been so included in reliance on the report (which contains an explanatory paragraph relating to the Company's ability to continue as a going concern as described in Note 1 to the financial statements) of BPM LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting.

140

**Table of Contents**

**WHERE YOU CAN FIND ADDITIONAL INFORMATION**

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the securities we are offering by this prospectus. This prospectus does not contain all of the information included in the registration statement. For further information about us and our securities, you should refer to the registration statement and the exhibits and schedules filed with the registration statement. Whenever we make reference in this prospectus to any of our contracts, agreements or other documents, the references are materially complete but may not include a description of all aspects of such contracts, agreements or other documents, and you should refer to the exhibits attached to the registration statement for copies of the actual contract, agreement or other document.

Upon completion of this offering, we will be subject to the information requirements of the Exchange Act and will file (if we are a foreign private issuer, in certain cases voluntarily) annual, quarterly and current event reports, proxy statements (if we will not be a foreign private issuer at such time) and other information with the SEC. You can read our SEC filings, including the registration statement, over the Internet at the SEC's website at *www.sec.gov*. In addition, copies of our SEC filings may be accessed on our company website at *http://www.gigcapital3.com*.

141

**Table of Contents**

**GIGCAPITAL3, INC.**

**Index to Financial Statements**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Balance Sheet | F-3 |
| Statement of Operations | F-4 |
| Statement of Stockholder's Equity | F-5 |
| Statement of Cash Flows | F-6 |
| Notes to Financial Statements | F-7 |

F-1

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and
Stockholders of GigCapital3, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying balance sheet of GigCapital3, Inc. (a Delaware corporation) (the "Company") as of February 14, 2020, and the related statements of operations, stockholders' equity, and cash flows for the period from February 3, 2020 (date of inception) to February 14, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of February 14, 2020, and the results of its operations and its cash flows for the period from February 3, 2020 (date of inception) to February 14, 2020, in conformity with accounting principles generally accepted in the United States of America.

**Going Concern Uncertainty**

The accompanying financial statements have been prepared assuming that GigCapital3, Inc. will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has no present revenue, its business plan is dependent on the completion of a financing and the Company's cash and working capital as of February 14, 2020 are not sufficient to complete its planned activities for the upcoming year. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans regarding these matters are also described in Notes 1 and 3. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ BPM LLP

We have served as the Company's auditor since 2020.

San Jose, California
May 11, 2020

F-2

**Table of Contents**

**GIGCAPITAL3, INC.**
**BALANCE SHEET**

| | February 14, 2020 |
|---|---:|
| **ASSETS** | |
| Current assets—cash | $ 125,200 |
| Deferred offering costs | 135,802 |
| **TOTAL ASSETS** | $ 261,002 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | |
| Current liabilities | |
| Related party loans | $ 100,200 |
| Accrued expenses | 141,427 |
| **Total liabilities** | 241,627 |
| **Commitments (Note 4-Related Party Transactions)** | |
| **Stockholders' equity** | |
| Preferred stock, par value of $0.0001 per share; 1,000,000 shares authorized; none issued or outstanding | — |
| Common stock, par value of $0.0001 per share; 100,000,000 shares authorized; 5,735,000 shares issued and outstanding(1) | 574 |
| Additional paid-in capital | 24,426 |
| Accumulated deficit | (5,625) |
| **Total stockholders' equity** | 19,375 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 261,002 |

(1)  This number includes up to 750,000 founder shares subject to forfeiture if the over-allotment option is not exercised in full or in part by the underwriters

*The accompanying notes are an integral part of these financial statements.*

F-3

**Table of Contents**

**GIGCAPITAL3, INC.**
**STATEMENT OF OPERATIONS**

| | Period from February 3, 2020 (Inception) through February 14, 2020 |
|---|---:|
| Revenues | $ — |
| General and administrative expenses | 5,625 |
| Net loss and comprehensive loss | $ (5,625) |
| Weighted-average shares of common stock outstanding, basic and diluted(1) | 1,246,250 |
| Net loss per share of common stock, basic and diluted | $ (0.00) |

(1)    This number includes up to 750,000 founder shares subject to forfeiture if the over-allotment option is not exercised in full or in part by the underwriters

*The accompanying notes are an integral part of these financial statements.*

F-4

Table of Contents

**GIGCAPITAL3, INC.**
**STATEMENT OF STOCKHOLDERS' EQUITY**

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Stockholders' Equity |
| --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | |
| Balance as of February 3, 2020 (inception) | — | $    — | $    — | $    — | $    — |
| Sale of common stock to Founder at $0.01 per share(1) | 5,735,000 | 574 | 24,426 | — | 25,000 |
| Net loss | — | — | — | (5,625) | (5,625) |
| Balance as of February 14, 2020 | 5,735,000 | $   574 | $  24,426 | $  (5,625) | $  19,375 |

(1)  This number includes up to 750,000 founder shares subject to forfeiture if the over-allotment option is not exercised in full or in part by the underwriters

*The accompanying notes are an integral part of these financial statements.*

F-5

**Table of Contents**

**GIGCAPITAL3, INC.**
**STATEMENT OF CASH FLOWS**

| | Period from February 3, 2020 (Inception) through February 14, 2020 |
|---|---|
| **OPERATING ACTIVITIES** | |
| Net loss | $ (5,625) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Increase in accrued expenses | 5,625 |
| Net cash provided by operating activities | — |
| **FINANCING ACTIVITIES** | |
| Proceeds from sale of common stock to Founder | 25,000 |
| Related party loans | 100,200 |
| Net cash provided by financing activities | 125,200 |
| Net increase in cash during period | 125,200 |
| Cash, beginning of period | — |
| Cash, end of period | $ 125,200 |
| **SUPPLEMENTAL DISCLOSURE OF NON-CASH FINANCING ACTIVITIES** | |
| Deferred offering costs included in accrued expenses | $ 135,802 |

*The accompanying notes are an integral part of these financial statements.*

F-6

**Table of Contents**

## 1. DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS

### Organization and General

GigCapital3, Inc. (the "Company") was incorporated in Delaware on February 3, 2020. The Company was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (the "Business Combination"). The Company will be an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act") upon the closing of the initial public offering.

As of February 14, 2020 the Company had not commenced any operations. All activity for the period from February 3, 2020 (date of inception) through February 14, 2020 relates to the Company's formation and the proposed initial public offering ("Proposed Offering") described below. The Company will not generate any operating revenues until after completion of the Business Combination, at the earliest. The Company will generate non-operating income in the form of interest income on cash and cash equivalents from the proceeds derived from the Proposed Offering. The Company has selected December 31 as its fiscal year end.

### Sponsor, Founder and Proposed Financing

The Company's sponsor is GigAcquisitions3, LLC, a Delaware limited liability company (the "Sponsor" and is sometimes referred to as the "Founder"). The Company intends to finance a Business Combination with proceeds from a $200,000,000 public offering (Note 3), a $6,500,000 private placement with the Sponsor (or $6,890,000 private placement if the over-allotment option is exercised in full) and a $2,434,790 private placement (or $2,800,000 private placement if the over-allotment option is exercised in full) with Nomura Securities International, Inc. ("Nomura"), Oppenheimer & Co. Inc. ("Oppenheimer") and Odeon Capital Group LLC ("Odeon") (collectively, the "Underwriters") (Note 4). Upon the closing of the Proposed Offering and the private placement, $202,000,000 (or $232,300,000 if the underwriters' over-allotment option is exercised in full—Note 3) will be held in the Trust Account (discussed below).

### The Trust Account

The funds in the Trust Account will be invested only in U.S. government treasury bills with a maturity of one hundred and eighty-five (185) days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act of 1940 which invest only in direct U.S. government obligations. Funds will remain in the Trust Account until the earlier of (i) the consummation of the Business Combination or (ii) the distribution of the Trust Account as described below. The remaining proceeds from the Proposed Offering outside the Trust Account may be used to pay for business, legal and accounting due diligence expenses on acquisition targets and continuing general and administrative expenses.

The Company's amended and restated certificate of incorporation will provide that, other than the withdrawal of interest to pay taxes none of the funds held in the Trust Account will be released until the earlier of: (i) the completion of the Business Combination; (ii) the redemption of 100% of the shares of common stock included in the units being sold in the Proposed Offering if the Company is unable to complete a Business Combination within 18 months from the closing of the Proposed Offering; or (iii) the redemption of the public shares in connection with a stockholder vote to amend the Company's amended and restated certificate of incorporation to modify the substance or timing of the Company's obligation to redeem 100% of its public shares if it does not complete its initial Business Combination within 18 months from the closing of the Proposed Offering.

### Business Combination

The Company's management has broad discretion with respect to the specific application of the net proceeds of the Proposed Offering, although substantially all of the net proceeds of the Proposed Offering are intended to be

F-7

**Table of Contents**

generally applied toward consummating a Business Combination with (or acquisition of) a Target Business. As used herein, "Target Business" must be with one or more target businesses that together have a fair market value equal to at least 80% of the balance in the Trust Account (less the deferred underwriting commissions and the taxes payable on interest earned) at the time the Company signs a definitive agreement in connection with the Business Combination. There is no assurance that the Company will be able to successfully effect a Business Combination.

The Company, after signing a definitive agreement for a Business Combination, will either (i) seek stockholder approval of the Business Combination at a meeting called for such purpose in connection with which stockholders may seek to redeem their shares, regardless of whether they vote for or against the Business Combination, for cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the initial Business Combination, including interest but less taxes payable, or (ii) provide stockholders with the opportunity to have their shares redeemed by the Company by means of a tender offer (and thereby avoid the need for a stockholder vote) for an amount in cash equal to their pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to commencement of the tender offer, including interest but less taxes payable. The decision as to whether the Company will seek stockholder approval of the Business Combination or will allow stockholders to redeem their shares in a tender offer will be made by the Company, solely in its discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would otherwise require the Company to seek stockholder approval unless a vote is required by New York Stock Exchange rules. If the Company seeks stockholder approval, it will complete its Business Combination only if a majority of the outstanding shares of common stock voted are voted in favor of the Business Combination. However, in no event will the Company redeem its public shares in an amount that would cause its net tangible assets to be less than $5,000,001 upon consummation of a Business Combination. In such case, the Company would not proceed with the redemption of its public shares and the related Business Combination, and instead may search for an alternate Business Combination.

If the Company holds a stockholder vote or there is a tender offer for shares in connection with the Business Combination, a public stockholder will have the right to redeem its shares for an amount in cash equal to its pro rata share of the aggregate amount then on deposit in the Trust Account as of two business days prior to the consummation of the initial Business Combination, including interest but less taxes payable. As a result, such shares of common stock will be recorded at redemption amount and classified as temporary equity upon the completion of the Proposed Offering. The amount in the Trust Account is initially anticipated to be $10.10 per public share ($202,000,000 held in the Trust Account divided by 20,000,000 public shares).

The Company will have 18 months from the closing date of the Proposed Offering to complete its initial Business Combination. If the Company does not complete a Business Combination within this period of time, it shall (i) cease all operations except for the purposes of winding up possible, but not more than ten business days thereafter, redeem the public shares of common stock for a per share pro rata portion of the Trust Account, including interest, but less taxes payable (less up to $100,000 of such net interest to pay dissolution expenses) and (iii) as promptly as possible following such redemption, dissolve and liquidate the balance of the Company's net assets to its creditors and remaining stockholders, as part of its plan of dissolution and liquidation. The Founder, the Underwriters, and Messrs. Weightman, Wang and Betti-Berutto (the "Insiders") will enter into letter agreements with the Company, pursuant to which they will waive their rights to participate in any redemption with respect to their initial shares; however, if the Founder, the Underwriters or the Insiders or any of the Company's officers, directors or affiliates acquire shares of common stock in or after the Proposed Offering, they will be entitled to a pro rata share of the Trust Account upon the Company's redemption or liquidation in the event the Company does not complete a Business Combination within the required time period.

In the event of such distribution, it is possible that the per share value of the residual assets remaining available for distribution (including Trust Account assets) will be less than the initial public offering price per unit in the Proposed Offering.

Table of Contents

*Going Concern Consideration*

As of February 14, 2020, the Company had $125,200 in cash and a working capital deficit of $116,427. Further, the Company expects to continue to incur significant costs in pursuit of its financing and acquisition plans. These conditions raise substantial doubt about the Company's ability to continue as a going concern. The Company plans to address this uncertainty through a Proposed Offering as discussed in Note 3. There is no assurance that the Company's plans to raise capital or to consummate a Business Combination will be successful or successful within the target business acquisition period. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of Presentation*

The financial statements of the Company have been prepared in conformity with accounting principles generally accepted in the United States of America.

*Emerging Growth Company*

Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period which means that when an accounting standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised accounting standard at the time private companies adopt the new or revised standard.

*Net Loss Per Share of Common Stock*

Net loss per share of common stock is computed by dividing net loss by the weighted-average number of shares of common stock outstanding during the period (after deducting 750,000 shares subject to forfeiture in connection with the Proposed Offering), plus to the extent dilutive the incremental number of shares of common stock to settle warrants, as calculated using the treasury stock method. As of February 14, 2020, the Company did not have any dilutive securities and other contracts that could, potentially, be exercised or converted into common stock and then share in the earnings of the Company. As a result, diluted net loss per common share is the same as basic net loss per common share for the period.

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist of a cash account in a financial institution, which at times, may exceed federally insured limits. The Company has not experienced losses on these accounts and management believes the Company is not exposed to significant risks on such accounts.

*Financial Instruments*

The fair value of the Company's assets and liabilities approximates the carrying amounts represented in the balance sheet.

Table of Contents

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires the Company's management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Deferred Offering Costs*

Costs incurred in connection with preparation for the Proposed Offering, together with the underwriter discount, will be reclassified to additional paid-in capital as a reduction to the gross proceeds received upon completion of the Proposed Offering or charged to operations if the Proposed Offering is not completed.

*Income Taxes*

The Company follows the asset and liability method of accounting for income taxes. Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that included the enactment date. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized.

The Company prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. There were no unrecognized tax benefits as of February 14, 2020. The Company recognizes accrued interest and penalties related to unrecognized tax benefits as income tax expense. No amounts were accrued for the payment of interest and penalties as of February 14, 2020. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position. The Company is subject to income tax examinations by major taxing authorities since inception.

*Recent Accounting Pronouncements*

The Company does not believe that any recently issued, but not yet effective, accounting pronouncements, if currently adopted, would have a material effect on the Company's financial statements.

**3. PROPOSED OFFERING**

Pursuant to the Proposed Offering, the Company intends to offer for sale up to 20,000,000 units at a price of $10.00 per unit (the "Units"). Each Unit consists of one share of the Company's common stock, $0.0001 par value and three-fourths (3/4) of one warrant to purchase one share of common stock (the "Warrants"). Warrants will only be exercisable for whole shares at $11.50 per share. As a result, at least four Warrants must be exercised. Under the terms of a proposed Warrant agreement, the Company has agreed to use its best efforts to file a new registration statement under the Securities Act, following the completion of the Company's initial Business Combination.

No fractional shares will be issued upon exercise of the Warrants. If, upon exercise of the Warrants, a holder would be entitled to receive a fractional interest in a share, the Company will, upon exercise, round down to the nearest whole number the number of shares of common stock to be issued to the Warrant holder. Each Warrant will become exercisable on the later of 30 days after the completion of the Company's initial Business

F-10

Table of Contents

Combination or 12 months from the closing of the Proposed Offering and will expire five years after the completion of the Company's initial Business Combination or earlier upon redemption or liquidation. However, if the Company does not complete its initial Business Combination on or prior to the 18-month period allotted to complete the Business Combination, the Warrants will expire at the end of such period. If the Company is unable to deliver registered shares of common stock to the holder upon exercise of the Warrants during the exercise period, there will be no net cash settlement of these Warrants and the Warrants will expire worthless, unless they may be exercised on a cashless basis in the circumstances described in the Warrant agreement. Once the Warrants become exercisable, the Company may redeem the outstanding Warrants in whole and not in part at a price of $0.01 per Warrant upon a minimum of 30 days' prior written notice of redemption, only in the event that the last sale price of the Company's shares of common stock equals or exceeds $18.00 per share for any 20 trading days within the 30-trading day period ending on the third trading day before the Company sends the notice of redemption to the Warrant holders.

The Company expects to grant the Underwriters a 45-day option to purchase up to 3,000,000 additional Units to cover any over-allotments, at the initial public offering price less the underwriting discounts and commissions.

The Company expects to pay an underwriting discount of $0.20 of per Unit offering price to the Underwriters at the closing of the Proposed Offering. The underwriting discount is payable in cash. In addition, the Company has agreed to pay deferred underwriting commissions of $0.40 per Unit, or $8,000,000 (or up to $9,200,000 if the underwriters' over-allotment option is exercised in full) in the aggregate. The deferred underwriting commission will become payable to the underwriters from the amount held in the trust account solely in the event that the Company completes a Business Combination, subject to the terms of the underwriting agreement, including the performance of services specified therein. As further described in Note 4, the Underwriters have agreed to purchase 243,479 shares of common stock, $0.0001 par value, for an aggregate purchase price of $2,434,790 (or 280,000 shares of common stock for an aggregate purchase price of $2,800,000 if the underwriters' over-allotment option is exercised in full).

## 4. RELATED PARTY TRANSACTIONS

### Founder Shares

During the period from February 3, 2020 (date of inception) to February 14, 2020, the Founder purchased 5,735,000 shares of common stock (the "Founder Shares") for an aggregate purchase price of $25,000, or $0.0044 per share. Prior to the consummation of the Proposed Offering, the Company will also issue 5,000 shares of Common Stock, solely in consideration of future services, to each of the Insiders. The Founder Shares are identical to the common stock included in the Units being sold in the Proposed Offering except that the Founder Shares are subject to certain transfer restrictions, as described in more detail below. The Founder has agreed to forfeit up to 750,000 Founder Shares to the extent that the over-allotment option is not exercised in full by the Underwriters. The forfeiture will be adjusted to the extent that the over-allotment option is not exercised in full by the Underwriters so that the Founder and Insiders will own 20% of the Company's issued and outstanding shares after the Proposed Offering. If the Company increases or decreases the size of the Proposed Offering pursuant to Rule 462(b) under the Securities Act, the Company will effect a stock dividend or share contribution back to capital, as applicable, immediately prior to the consummation of the Proposed Offering in such amount as to maintain the ownership of the Founder, together with the Insiders, prior to the Proposed Offering at 20% of the Company's issued and outstanding shares of the Company's common stock upon the consummation of the Proposed Offering.

### Private Placement

The Founder and the Underwriters have agreed to purchase from the Company an aggregate of 650,000 units and 243,479 units (or 689,000 units and 280,000 units, respectively, if the underwriters' over-allotment is exercised in full), respectively, at a price of $10.00 per unit in a private placement that will occur simultaneously with the

F-11

Table of Contents

completion of the Proposed Offering (the "Private Placement Units"). Each Private Placement Unit consists of one share of the Company's common stock, $0.0001 par value, and three-fourths (3/4) of a Warrant. Warrants will only be exercisable for whole shares at $11.50 per share. As a result, at least four Warrants must be exercised. Under the terms of a proposed Warrant agreement, the Company has agreed to use its best efforts to file a new registration statement under the Securities Act, following the completion of the Company's initial Business Combination.

No fractional shares will be issued upon exercise of the Warrants. If, upon exercise of the Warrants, a holder would be entitled to receive a fractional interest in a share, the Company will, upon exercise, round down to the nearest whole number the number of shares of common stock to be issued to the Warrant holder. Each Warrant will become exercisable on the later of 30 days after the completion of the Company's initial Business Combination or 12 months from the closing of the Proposed Offering and will expire five years after the completion of the Company's initial Business Combination or earlier upon redemption or liquidation. However, if the Company does not complete its initial Business Combination on or prior to the 18-month period allotted to complete the initial Business Combination, the Warrants will expire at the end of such period. If the Company is unable to deliver registered shares of common stock to the holder upon exercise of the Warrants during the exercise period, there will be no net cash settlement of these Warrants and the Warrants will expire worthless, unless they may be exercised on a cashless basis in the circumstances described in the Warrant agreement. Once the Warrants become exercisable, the Company may redeem the outstanding Warrants in whole and not in part at a price of $0.01 per Warrant upon a minimum of 30 days' prior written notice of redemption, only in the event that the last sale price of the Company's shares of common stock equals or exceeds $18.00 per share for any 20 trading days within the 30-trading day period ending on the third trading day before the Company sends the notice of redemption to the Warrant holders.

The Company's Founder, the Insiders and the Underwriters have agreed not to transfer, assign or sell any of their respective Founder Shares, shares held by the Insiders, Private Placement Units, shares or other securities underlying such Private Placement Units that they may hold until the date that is (i) in the case of the Founder Shares or shares held by the Insiders, the earlier of (A) 12 months after the date of the consummation of the Company's initial Business Combination or (B) subsequent to the Company's initial Business Combination, (x) the date on which the last sale price of the Company's common stock equals or exceeds $12.50 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 90 days after the Company's initial Business Combination, or (y) the date on which the Company consummates a liquidation, merger, stock exchange or other similar transaction after the Company's initial Business Combination which results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property, and (ii) in the case of the Private Placement Units and shares or other securities underlying such Private Placement Units, until 30 days after the completion of the Company's initial Business Combination.

If the Company does not complete a Business Combination, then a portion of the proceeds from the sale of the Private Placement Units and all of the proceeds from the sale of the Private Underwriter Shares will be part of the liquidating distribution to the public stockholders.

*Registration Rights*

The Company's Founder, the Underwriters and the Insiders will be entitled to registration rights pursuant to a registration rights agreement to be signed on or before the date of the prospectus for the Proposed Offering. These holders will be entitled to make up to three demands, excluding short form registration demands, that the Company register such securities for sale under the Securities Act. In addition, these holders will have "piggy-back" registration rights to include their securities in other registration statements filed by the Company. The Company will bear the expenses incurred in connection with the filing of any such registration statements. There will be no penalties associated with delays in registering the securities under the proposed registration rights agreement.

F-12

Table of Contents

***Administrative Services Agreement and Other Agreements***

The Company has agreed to pay $20,000 a month for office space, administrative services and secretarial support to an affiliate of the Sponsor, GigFounders, LLC. Services will commence on the date the securities are first listed on the New York Stock Exchange and will terminate upon the earlier of the consummation by the Company of an initial Business Combination or the liquidation of the Company.

***Related Party Loans***

The Company has entered into a promissory note with the Sponsor with a principal amount of $100,000, all of which remained outstanding as of February 14, 2020, (the "Promissory Note") to be used for the payment of expenses related to the Proposed Offering. The Promissory Note is non-interest bearing, unsecured and is due on the earlier of (i) April 30, 2020 or (ii) the date on which the Company consummates an initial public offering of its securities. The Company borrowed $200 from an affiliate of the Sponsor for initial set up expenses, all of which has been paid back as of the filing of this report.

**5. STOCKHOLDERS' EQUITY**

***Common Stock***

The authorized common stock of the Company includes up to 100,000,000 shares. Holders of the Company's common stock are entitled to one vote for each share of common stock. As of February 14, 2020, there were 5,735,000 shares of common stock issued and outstanding, 750,000 of which are forfeitable as described in Note 4.

***Preferred Stock***

The Company is authorized to issue 1,000,000 shares of preferred stock with such designations, voting and other rights and preferences as may be determined from time to time by the Board of Directors. As of February 14, 2020, there were no shares of preferred stock issued and outstanding.

F-13

**Table of Contents**

**20,000,000 Units**



# GigCapital3, Inc.

**Prospectus**

**May 13, 2020**

*Joint Book Running Managers*

**Nomura**

**Oppenheimer & Co.**

*Co-Manager*

**Odeon Capital Group, LLC**