# EXHIBIT 8

424B3 1 d70436d424b3.htm 424B3

**Table of Contents**

**Filed Pursuant to Rule 424(b)(3)**
**Registration No. 333-251862**

**PROSPECTUS**

**PROXY STATEMENT FOR**
**SPECIAL MEETING OF**
**GIGCAPITAL3, INC.**

**PROSPECTUS FOR 70,385,096 SHARES OF COMMON STOCK**
**OF**
**GIGCAPITAL3, INC.**
**WHICH WILL BE RENAMED "LIGHTNING EMOTORS, INC." IN CONNECTION WITH THE BUSINESS COMBINATION DESCRIBED HEREIN**

The board of directors of GigCapital3, Inc., a Delaware corporation ("*GigCapital3*"), has unanimously approved (i) the merger of Project Power Merger Sub, Inc. ("*Merger Sub*"), a Delaware corporation, and Lightning Systems, Inc. ("*Lightning Systems*"), a Delaware corporation (the "*Business Combination*"), with Lightning Systems surviving the Business Combination as a wholly-owned subsidiary of GigCapital3, pursuant to the terms of the Business Combination Agreement, dated as of December 10, 2020, by and among GigCapital3, Merger Sub and Lightning Systems, attached to this proxy statement/prospectus as Annex A (the "*Business Combination Agreement*"), as more fully described elsewhere in this proxy statement/prospectus; and (ii) the other transactions contemplated by the Business Agreement and documents related thereto. In connection with the Business Combination, GigCapital3 will change its name to "Lightning eMotors, Inc."

At the effective time of the Business Combination, among other things, each share of Lightning Systems capital stock, par value $0.00001 per share (collectively, "*Lightning Systems Capital Stock*") issued and outstanding immediately prior to the effective time of the Business Combination (including shares of Lightning Systems Capital Stock resulting from the conversion or exercise of warrants, stock options and convertible notes prior to the effective time of the Business Combination) will be cancelled and converted into (i) the right to receive shares of common stock, par value $0.0001 per share, of the Company ("*Common Stock*") equal to the Exchange Ratio (as defined below) (such amount, the "*Per Share Merger Consideration*") and (ii) the contingent right to receive a portion of the Stockholder Earnout Shares (as defined in the accompanying proxy statement/prospectus, calculated on a Pro Rata Basis as defined in the accompanying proxy statement/prospectus) together with all other shares of Lightning Systems Capital Stock held by the holder of such shares as of immediately prior to the effective time of the Business Combination, if, as and when payable in accordance with the provisions of the Business Combination Agreement. The "*Exchange Ratio*" means the quotient of (a) the Aggregate Closing Merger Consideration (as defined below) divided by (b) the Company Fully Diluted Capital Stock (as defined below). The "*Aggregate Closing Merger Consideration*" means a number of shares of Common Stock equal to the quotient of (a) the Aggregate Closing Merger Consideration Value (as defined below) divided by (b) $10.00. The "*Aggregate Closing Merger Consideration Value*" means (a) $539,220,000, plus (b) the sum of the exercise prices of all Lightning Systems Options (as defined below) outstanding immediately prior to the effective time of the Business Combination, minus (c) the amount by which the net debt of Lightning Systems at the Closing (as defined below) exceeds $15,000,000, minus (d) the amount by which the cash and cash equivalents of Lightning Systems at the Closing is less than $500,000. The "*Company Fully Diluted Capital Stock*" means the sum of (a) the aggregate number of shares of Lightning Systems Capital Stock that are issued and outstanding as of immediately prior to the effective time of the Business Combination (including shares issued upon the exercise or conversion of Lightning Systems Options (as defined below), and warrants and convertible notes of Lightning Systems, in each case prior to the effective time of the Business Combination, but excluding any shares to be cancelled pursuant to the terms of the Business Combination Agreement, and (b) the maximum number of shares of Lightning Systems Common Stock (as defined below) issuable upon full exercise, exchange or conversion of all Lightning Systems stock options outstanding as of the effective time of the Business Combination. In addition, at the effective time of the Business Combination, each outstanding option to purchase shares of Lightning Systems common stock, par value $0.00001 per share ("*Lightning Systems Common Stock*," and each such option, a "*Lightning Systems Option*"), whether vested or unvested, will be assumed by GigCapital3 and converted into an option to purchase a number of shares of Common Stock (such option, an "*Exchanged Option*") equal to the product (rounded down to the nearest whole number) of (x) the number of shares of Lightning Systems Common Stock subject to such Lightning Systems Option immediately prior to the effective time of the Business Combination and (y) the Exchange Ratio, at an exercise price per share (rounded up to the nearest whole cent) equal to the quotient of (A) the exercise price per share of such Lightning Systems Option immediately prior to the effective time of the Business Combination divided by (B) the Exchange Ratio. Except as specifically provided above or as agreed to in writing with any holder of a Lightning Systems Option, following the effective time of the Business Combination, each Exchanged Option will continue to be governed by the same vesting and exercisability terms and otherwise substantially similar terms and conditions as were applicable to the corresponding former Lightning Systems Option immediately prior to the effective time of the Business Combination. The "*Closing*" means the closing of the transactions contemplated by the Business Combination Agreement.

The GigCapital3 Common Stock, units and warrants are currently listed on the New York Stock Exchange ("*NYSE")* under the symbols "GIK", "GIK.U" and "GIK.WS," respectively. Upon Closing, we intend to apply to list the shares as consideration in the Business Combination on the NYSE under the symbol "ZEV". Thereafter, our units (each comprised of one share of Common Stock, one right to receive one-tenth of one share of Common Stock and three-fourths of one warrant to purchase one share of Common Stock), will cease to trade as an individual security and, instead, will be separated into their constituent securities, and the Common Stock and warrants will trade under the symbols "ZEV" and "ZEV.WS," respectively. It is a condition of the consummation of the Business Combination described above that GigCapital3 receives confirmation from the NYSE that the securities have been conditionally approved for listing on the NYSE, but there can be no assurance such listing conditions will be met or that GigCapital3 will obtain such confirmation from the NYSE. If such listing conditions are not met or if such confirmation is not obtained, the Business Combination described above will not be consummated unless the NYSE condition set forth in the Business Combination Agreement is waived by the applicable parties.

**This proxy statement/prospectus provides shareholders of GigCapital3 with detailed information about the proposed business combination and other matters to be considered at the special meeting of GigCapital3. We encourage you to read this entire document, including the Annexes and other documents referred to herein, carefully and in their entirety. You should also carefully consider the risk factors described in the section entitled "*Risk Factors*" beginning on page 53 of this proxy statement/prospectus.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN THIS PROXY STATEMENT/PROSPECTUS, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR RELATED TRANSACTIONS OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THIS PROXY STATEMENT/PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.**

**This proxy statement/prospectus is dated March 26, 2021, and is first being mailed to GigCapital3's shareholders on or about March 26, 2021.**

**Table of Contents**

Sponsor has agreed, among other things, to vote (or execute and return an action by written consent), or cause to be voted at the Special Meeting (or validly execute and return and cause such consent to be granted with respect to), all of its shares of Company Common Stock (A) in favor of the approval and adoption of the Business Combination Agreement and approval of the Business Combination, including the Merger, (B) against any action, agreement or transaction or proposal that would result in a breach of any covenant, representation or warranty or any other obligation or agreement of the Company under the Business Combination Agreement or that would reasonably be expected to result in the failure of the Merger from being consummated and (C) in favor of each of the proposals and any other matters necessary or reasonably requested by the Company for consummation of the Business Combination, including the Merger.

### Registration Rights and Lock-Up Agreement

In connection with the Closing, the Company and the Holders will enter into a Registration Rights and Lock-Up Agreement, pursuant to which the Holders, subject to certain conditions, will be entitled to registration rights. Pursuant to the Registration Rights and Lock-Up Agreement, we will agree that we will file with the SEC (at our sole cost and expense) a registration statement registering the resale of the Registrable Securities, and we will use our reasonable best efforts to have such registration statement declared effective by the SEC as soon as reasonably practicable after the filing thereof. Certain of the Holders will be granted demand underwritten offering registration rights and all of the Holders will be granted piggyback registration rights. The Registration Rights and Lock-Up Agreement further provides that, subject to certain exceptions, each of the Holders will not Transfer any shares of New Lightning eMotors Common Stock beneficially owned or owned of record by such of the Holders until the earlier of (i) 180 days after the date of the Closing or (ii) the date on which, subsequent to the Business Combination, the last sale price of the New Lightning eMotors Common Stock (x) equals or exceeds $12.50 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30 trading day period commencing at least 90 days after the Business Combination, or (y) the date following the completion of the Business Combination on which New Lightning eMotors completes a liquidation, merger, stock exchange or other similar transaction that results in all of the New Lightning eMotors' stockholders having the right to exchange their shares of New Lightning eMotors Common Stock for cash, securities or other property; provided that in the sole discretion of the majority of the independent members of the New Lightning eMotors Board, the such lock-up period may end earlier than as provided therein upon written notice to the Holders.

"Registrable Securities" under the Registration Rights and Lock-up Agreement means (i) any equity securities (including the shares of Common Stock issued or issuable upon the exercise or conversion of any such equity security) of the Company held by a Holder immediately following consummation of the Merger and (ii) all of the Earnout Shares. Registrable Securities include any warrants, shares of capital stock or other securities of the Company issued as a dividend or other distribution with respect to or in exchange for or in replacement of any of the securities described in the foregoing clauses (i)—(ii). As to any particular Registrable Security, such security shall cease to be a Registrable Security when: (a) a registration statement with respect to the sale of such security shall have become effective under the Securities Act and such security shall have been sold, transferred, disposed of or exchanged in accordance with such registration statement; (b) such security shall have been otherwise transferred, a new certificate for such security not bearing a legend restricting further transfer shall have been delivered by the Company and subsequent public distribution of such security shall not require registration under the Securities Act; (c) such security shall have ceased to be outstanding; or (d) such security is freely saleable under Rule 144 promulgated pursuant to the Securities Act ("Rule 144") without volume limitations.

### PIPE Subscription Agreement

In connection with the execution of the Business Combination Agreement, the Company entered into the PIPE Subscription Agreement, dated as of December 10, 2020, with the PIPE Investor, pursuant to which, among other things, the Company agreed to issue and sell, in a private placement to close immediately prior to the Closing, an aggregate of 2,500,000 shares of Company Common Stock at $10.00 per share, for an aggregate

**Table of Contents**

purchase price of $25,000,000, to the PIPE Investor. The purpose of the PIPE Investment is to raise additional capital for use by the post-combination company following the Closing. The obligations to consummate the subscription are conditioned upon, among other things, all conditions precedent to the closing of the transactions contemplated by the Convertible Note Subscription Agreements having been satisfied or waived, and the closing of the transaction contemplated by the PIPE Subscription Agreement occurring concurrently with the closing of the transactions contemplated by the Convertible Note Subscription Agreements.

Under the terms of the PIPE Subscription Agreement, the Company agreed to file a registration statement (the "*PIPE Resale Registration Statement*") registering for resale under the Securities Act all of the PIPE Shares acquired by the Subscribers within 45 days after the consummation of the Business Combination (the "*PIPE Resale Registration Filing Deadline*"), and the Company shall use its commercially reasonable efforts to have the PIPE Resale Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the 60th calendar day (or 120th calendar day if the SEC notifies the Company that it will "review" the PIPE Resale Registration Statement) following the PIPE Resale Registration Filing Deadline. The Company will use its commercially reasonable efforts to maintain the continuous effectiveness of the PIPE Resale Registration Statement, and to be supplemented and amended to the extent necessary to ensure that such PIPE Resale Registration Statement is available or, if not available, that another registration statement is available for the resale of the Subscribed Shares, until the earliest of (i) the date on which the PIPE Shares may be resold without volume or manner of sale limitations pursuant to Rule 144, (ii) the date on which such PIPE Shares have actually been sold and (iii) the date which is two years after the Closing.

Notwithstanding anything to the contrary in the PIPE Subscription Agreement, the Company shall be entitled to delay or postpone the effectiveness of the PIPE Resale Registration Statement, and from time to time to require the PIPE Investor not to sell under the PIPE Resale Registration Statement or to suspend the effectiveness thereof, if the negotiation or consummation of a transaction by the Company or its subsidiaries is pending or an event has occurred, which negotiation, consummation or event, the New Lightning eMotors Board reasonably believes, upon the advice of legal counsel, would require additional disclosure by the Company in the PIPE Resale Registration Statement of material information that the Company has a bona fide business purpose for keeping confidential and the non-disclosure of which in the PIPE Resale Registration Statement would be expected, in the reasonable determination of the New Lightning eMotors Board, upon the advice of legal counsel, to cause the PIPE Resale Registration Statement to fail to comply with applicable disclosure requirements; provided, however, that the Company may not delay or suspend the PIPE Resale Registration Statement on more than two occasions or for more than sixty consecutive calendar days, or more than ninety total calendar days, in each case during any twelve-month period.

**Convertible Note Subscription Agreements, Indenture, Amended and Restated Warrant Agreement**

In connection with the execution of the Business Combination Agreement, the Company has also entered into the Convertible Note Subscription Agreements, each dated December 10, 2020, with the Convertible Note Investors, pursuant to which the Convertible Note Investors, upon the terms and subject to the conditions set forth in their respective Convertible Note Subscription Agreements, shall purchase from the Company, and the Company shall issue to the Convertible Note Investors, (i) subject to the terms and conditions of the Indenture, $100,000,000 of unsecured Convertible Notes which shall bear interest at a rate of 7.5% per annum, payable semi-annually, and be convertible into shares of Common Stock at a conversion price of $11.50 in accordance with the terms thereof, and shall mature three (3) years after their issuance, and (b) subject to the terms and conditions of the Amended and Restated Warrant Agreement, the Convertible Note Warrants to purchase up to 8,695,652 shares of Common Stock for a per share exercise price of $11.50, in each case such issuances to be consummated immediately prior to the consummation of the Merger and other transactions contemplated by the Business Combination Agreement.

The Company may force conversion of the Convertible Notes after the first anniversary of the issuance of the Convertible Notes, subject to a holder's prior right to convert, if the trading price of the Common Stock

144

**Table of Contents**

affiliates actively searched for and brought business combination targets to our attention. During this search process, the Company reviewed more than 10 acquisition opportunities and entered into discussions with more than 10 potential target businesses or their representatives pursuant to signed nondisclosure agreements. In addition to Lightning Systems, we delivered draft term sheets or preliminary proposals, some at a high level early in discussions, to 3 other prospective targets, but executed term sheets with none of them.

The decision not to pursue the alternative acquisition targets was generally the result of one or more of (i) our determination that these businesses did not represent an attractive target due to a combination of business prospects, strategy, management teams, structure, valuation or ability to execute or (ii) our decision to pursue a Business Combination with Lightning Systems.

On August 17, 2020, two Managing Directors of BofA Securities, Inc. ("*BofA Securities*"), which has acted as a financial advisor to Lightning Systems, contacted Dr. Avi Katz, the Company's Chief Executive Officer and Executive Chairman, and Dr. Raluca Dinu, a member of the Company's Board, to discuss the possibility of BofA Securities sharing with the Company information regarding a potential acquisition target for the Company.

On August 22, Dr. Katz delivered a signed non-disclosure agreement to representatives of BofA Securities for the purpose of facilitating the proposed discussions between representatives of the Company and BofA Securities in connection with this potential acquisition target for the Company.

On August 23, 2020, Drs. Katz and Dinu, and representatives of BofA Securities conducted further preliminary discussions regarding this potential business combination involving the Company and an acquisition target that the representatives from BofA Securities identified was in the automotive technology sector.

On August 25, 2020, representatives of BofA Securities e-mailed to Drs. Katz and Dinu (i) an investment presentation which identified the potential acquisition target as Lightning Systems, then doing business as "Lightning eMotors," and (ii) a form of mutual non-disclosure agreement to be entered into directly between the Company and Lightning Systems in connection with a potential business combination.

On August 31, 2020, the Company and Lightning Systems entered into such mutual non-disclosure agreement. Thereafter, on August 31, 2020, the respective management teams for the Company and Lightning Systems attended a virtual meeting to discuss a potential business combination involving the Company and Lightning Systems, during which the parties made investment and marketing presentations to each other concerning their respective businesses.

On August 31, 2020, following the management meeting described above, a representative of BofA Securities e-mailed to Drs. Katz and Dinu a process overview and question and answer document to facilitate the Company making a proposal to enter into a business combination with Lightning Systems. On the same date, in response Dr. Katz requested via e-mail that representatives of BofA Securities provide a copy of the Lightning Systems confidential investment slide presentation that was presented at the management meeting of that same date. Representatives of BofA Securities thereafter provided such slides to Drs. Katz and Dinu, and they then provided the slides to the Company's Board for review.

On September 1, 2020, Dr. Dinu, in anticipation of the Company engaging Oppenheimer and Nomura to act as the Company's joint financial advisors in connection with a proposed business combination involving Lightning Systems, as well as joint placement agents in connection with a possible related PIPE financing, shared copies of the investment and marketing materials provided by representatives of Lightning Systems with representatives of both Oppenheimer and Nomura.

On September 3, 2020, representatives of the Company, Lightning Systems, Oppenheimer, Nomura and BofA Securities participated in a joint working group session concerning the high-level terms of both a potential business combination between the Company and Lightning Systems and a related PIPE financing, including (i) a

148

Table of Contents

possible pre-money valuation of Lightning Systems, (ii) that Lightning Systems stockholders would solely receive in a business combination shares of Common Stock at the Closing, as well as the potential for additional shares of Common Stock to be issued as a contingent earnout over a period of five years, and (iii) that the proposed business combination would be supported by a related PIPE financing.

On September 8, 2020, Dr. Dinu requested that representatives of BofA Securities arrange access for the Company's management, Board and team of analysts affiliated with its Sponsor to a virtual data room established by BofA Securities in connection with a potential business combination involving Lightning Systems. On September 8 a representative of BofA Securities confirmed that he had arranged such access.

On September 8, 2020, representatives of Oppenheimer provided our Board with financial valuations for a set of public companies comparable to Lightning Systems, including electric vehicle developers, component part suppliers and other recent high-growth auto technology companies that had entered into business combinations with special purpose acquisition companies to be considered by the Board in assessing a valuation for Lightning Systems. Members of our Board reviewed this information and referenced back to it in later discussions in September and October regarding valuation.

On September 8, 2020, Dr. Dinu e-mailed representatives of BofA Securities a comprehensive due diligence request list relating to Lightning Systems. Later that day, a representative of BofA Securities confirmed that he had arranged access for the designated representatives of the Company to a more detailed virtual data room than the one to which those individuals had previously been granted access. Later that day, Jeffrey Selman of DLA, legal counsel to the Company, requested that BofA Securities arrange access to the more detailed virtual data room for a list of designated DLA team members. On September 8, 2020, confirmation was provided by a representative of BofA Securities to Mr. Selman that such access for the DLA team had been provided.

On September 13, 2020, Dr. Dinu e-mailed the Company's process letter response and transaction framework for the proposed business combination to a representative of BofA Securities, setting forth, among other things, (i) an approximate $1 billion pre-money valuation for Lightning Systems based on the methodology detailed therein, (ii) a transaction structure in which the Company would acquire all of the outstanding shares of Lightning Systems, (iii) a nine member board of directors for the post-combination company, and (iv) a proposed marketing and target investor list for a related PIPE financing of the business combination.

On September 15, 2020, a representative of BofA Securities e-mailed representatives of Oppenheimer with comments to the Company's process letter response for the proposed business combination, which Oppenheimer and Nomura then e-mailed to the Company's management.

On September 17, 2020, the Company delivered a response letter to representatives of BofA Securities based on the comments provided by BofA Securities on September 17, providing for, among other things, (i) a potential forfeiture of shares of Common Stock held by the Sponsor in the event PIPE investors seek to renegotiate the proposed pre-money valuation of Lightning Systems that could then be earned back if the stock price of shares of the post-combination company's Common Stock increased, (ii) a minimum cash condition, (iii) a minimum PIPE financing amount condition, (iv) a proposed earnout structure for the Lightning Systems stockholders, (v) certain conditions regarding the composition of the post-combination company's board and (vi) the structure of the post-Closing lock-up applicable to certain stockholders following the Closing of the proposed business combination.

On September 18, 2020, a representative of BofA Securities informed Dr. Dinu via e-mail that after review of the September 17, 2020 process response letter, Lightning Systems would like to move forward with the Company as its business combination partner and move to finalize the terms set forth in that process response letter into a letter of intent between the parties by September 20, 2020, and then begin to solicit potential fundamental investors in a PIPE as early as September 21, 2020. The Company then worked with its counsel at DLA to prepare a draft letter of intent that it could provide to Lightning Systems.

Table of Contents

On September 20, 2020, Dr. Dinu e-mailed to representatives of BofA Securities a draft letter of intent setting forth the Company's proposed terms for the proposed business combination and the related PIPE financing based on the Company's previously submitted process response letter and transaction framework. This draft letter of intent proposed a target post-combination enterprise value of approximately $1 billion, which equates to approximately $1.3 billion of equity value pro forma for the transaction including proceeds in the Trust Account and the proposed PIPE financing, which for these purposes was estimated at $135 million. This implied a pre-money equity value to existing Lightning Systems equity holders of approximately $900 million. This draft letter of intent also proposed the potential for additional shares of Common Stock to be issued as a contingent earnout over a period of five years based upon appreciation of the stock price of shares of the post-combination company's Common Stock, with such amount that could be earned set at up to 6%, as well as a potential forfeiture of shares of Common Stock held by the Sponsor in the event PIPE investors seek to renegotiate the proposed pre-money valuation of Lightning Systems that could also then be earned back if the stock price of shares of the post-combination company's Common Stock increased.

On September 21, 2020, a representative of BofA Securities e-mailed to Dr. Dinu a revised letter of intent, providing clarifications to various of the terms based on comments from the Company, BofA Securities and King & Spalding (counsel to Lightning Systems), and adding that the contingent earnout for the Lightning Systems equity holders could be increased in the event PIPE investors seek to renegotiate the proposed pre-money valuation of Lightning Systems. Later that day Dr. Dinu returned a slightly revised letter of intent that made a non-substantive revision and was signed by Dr. Katz on behalf of the Company.

On September 23, 2020, Mr. Fenwick-Smith e-mailed the letter of intent fully executed by Lightning Systems and the Company to Drs. Katz and Dinu.

On September 24, 2020, representatives of the Company, Oppenheimer, Nomura and the BofA Securities participated in a conference call to discuss the process for pursuing the PIPE financing and the Company's due diligence investigation of Lightning Systems, as well as concrete next steps to advance both processes. The parties agreed to review the virtual data room that weekend to identify the need, if any, for additional documents, and to schedule a meeting with Lightning Systems management to discuss next steps after reviewing the data room material. While the Company's diligence team had already begun conducting preliminary due diligence on Lightning Systems a few weeks earlier as discussed above, they, together with and counsel at DLA, accelerated their review of diligence material provided in the virtual data room and sustained a committed diligence process (including meetings with Lightning Systems management) for several weeks thereafter.

On September 25, 2020, a representative of Nomura e-mailed to the DLA team a draft of a wall cross script for Nomura to contact prospective investors in connection with the proposed PIPE financing. H. Thomas Felix, III of DLA responded with comments later that day.

On September 28, 2020, Dr. Dinu e-mailed to representatives of BofA Securities an updated comprehensive due diligence request list, and asked them to send the request list to Lightning Systems management. Dr. Dinu also stated that the Company would like to schedule business diligence meetings to discuss products & technology, and sales & marketing, toward the end of the next week.

On September 29, 2020, a representative of BofA Securities provided Mr. Felix with a draft of a wall cross script for BofA Securities to reach out to prospective investors in connection with the proposed PIPE financing. Mr. Felix and the representative of BofA Securities traded drafts that and the next day, with the result that the wall cross script was revised to also contemplate that Oppenheimer would use such script in connection with crossing accounts for the proposed PIPE financing.

On October 1, 2020, the Company entered into a letter agreement with Oppenheimer and Nomura, pursuant to which, among other things, (1) the Company engaged Oppenheimer and Nomura to act as (1) joint placement agents (which they would do together with BofA Securities) in connection with the proposed PIPE financing, and (2) exclusive joint financial advisors to the Company in connection with the proposed Business Combination.

150

Table of Contents

On October 2, 2020, the Company also entered into two separate letter agreements with BofA Securities pursuant to which, among other things, (1) the Company engaged BofA Securities to act as co-placement agent with Oppenheimer and Nomura on behalf of the Company in connection with the proposed PIPE financing and (2) acknowledged that BofA Securities would be permitted to provide such services as co-placement agent to the Company and concurrently provide transaction advisory services to Lightning Systems in connection with the proposed Business Combination.

On October 2, 2020, Oppenheimer, Nomura and BofA Securities began reaching out to prospective investors to schedule preliminary discussions regarding the proposed PIPE financing.

On October 4, 2020, Dr. Dinu introduced Mr. Selman to both Mr. Fenwick-Smith and Timothy Reeser, the Chief Executive Officer of Lightning Systems, over e-mail, and asked that Messrs. Fenwick-Smith and T. Reeser introduce Mr. Selman to Lightning Systems' legal counsel to begin discussions regarding the definitive Business Combination Agreement and a proxy statement. Dr. Dinu also requested that DLA review a draft of a confidential information memorandum that the Company and Lightning Systems intended to begin using the following day in meetings with prospective investors in the PIPE financing.

On October 4, 2020, Mr. Fenwick-Smith introduced Mr. Selman by e-mail to Keith Townsend of King & Spalding, outside legal counsel to Lightning Systems, and Jeff Reeser, who is acting as general counsel to Lightning Systems. Mr. Selman replied introducing his partner John Maselli of DLA, who Mr. Selman indicated would assist with preparing the definitive transaction documentation, and indicating that the lawyers should arrange a kick-off call to discuss documentation. Mr. Selman that same day e-mailed the same group with a proposed form of PIPE Subscription Agreement to be entered into by the Company and prospective investors in the PIPE financing, and requested that Messrs. J. Reeser and Townsend provide comments. Mr. J. Reeser replied indicating that he and Mr. Townsend would review the form of PIPE Subscription Agreement and let Mr. Selman know if they have any comments.

On October 5, 2020, and continuing for several weeks thereafter, the respective teams for Oppenheimer, Nomura, BofA Securities, the Company and Lightning Systems arranged and hosted virtual meetings with prospective investors in the PIPE financing, during which those teams made presentations to and answered questions from prospective PIPE financing investors regarding Lightning Systems' business, with the goal of raising at least $100 and up to $150 million in the PIPE financing based on a proposed pre-money valuation of Lightning Systems equity of $899 million. Between October 5, 2020 and November 16, 2020 the parties met approximately 46 potential investors in the PIPE financing in 58 meetings.

On October 5, 2020, Mr. Selman spoke by telephone with representatives of King & Spalding to provide an update on the investor meetings for the proposed PIPE financing that had occurred that day. During that call, the counsel discussed the preparation of the form of PIPE Subscription Agreement for the proposed PIPE financing, the definitive Business Combination Agreement for the proposed Business Combination, this proxy statement/prospectus and Lightning Systems' financial statements to be filed with the SEC in connection with the proposed Business Combination. They also discussed legal due diligence, which commenced after this conversation and continued until the Business Combination Agreement was finalized and signed on December 10, 2020.

On October 5, 2020, Dr. Dinu, Mr. Miotto, and Dr. Katz spoke with Mr. T. Reeser for 90 minutes about the current status of Lightning Systems sales, orders, and the sales pipeline, with specific questions around timing, risks, and cancellation clauses.

On October 7, 2020, Mr. Selman e-mailed the proposed form of PIPE Subscription Agreement for the proposed PIPE financing to a representative of Mayer Brown LLP ("*Mayer Brown*"), outside legal counsel to the joint placement agents, and asked that Mayer Brown provide comments to the form of PIPE Subscription Agreement. Later that day, Mr. Selman spoke by telephone with this same representative of Mayer Brown regarding the form of PIPE Subscription Agreement.

**Table of Contents**

On October 9, 2020, representatives of King & Spalding and Mayer Brown separately e-mailed proposed edits to the form of PIPE Subscription Agreement to Mr. Selman.

On October 12, 2020, Mr. Maselli e-mailed an initial draft of the definitive Business Combination Agreement to representatives of King & Spalding for their review.

On October 13, 2020, Mr. Selman replied to the representatives of Mayer Brown via e-mail with a revised form of PIPE Subscription Agreement incorporating certain of their proposed edits as well as King & Spalding's proposed edits to this agreement.

On October 16, 2020, Mr. Maselli e-mailed an updated draft of the definitive Business Combination Agreement to representatives of King & Spalding incorporating incremental legal subject matter specialist comments based upon legal diligence that DLA had conducted upon Lightning Systems.

On October 18, 2020, a representative of King & Spalding e-mailed to representatives of DLA a revised draft of the Business Combination Agreement reflecting edits that Lightning Systems sought to make to this agreement. These proposed revisions primarily clarified issues around the payment of merger consideration, as well as reflected proposed changes to the representations and warranties by the parties and their interim operating covenants.

Between October 18 and November 3, Mr. T. Reeser provided potential PIPE investors with Lightning Systems customer reference contacts to facilitate individual due diligence calls by the PIPE investors. In addition, on October 19 and 20, 2020 the Company facilitated a group due diligence call with two of Lightning System's customers.

On October 21, 2020, Tulin Gurer of DLA e-mailed a revised draft of the definitive Business Combination Agreement to representatives of King & Spalding. The proposed revisions contained in this draft further revised the representations and warranties by the parties and the interim operating covenants of Lightning Systems, as well as director and officer indemnification following the Closing of the Business Combination for pre-Closing acts of the Company's Board and management.

On October 24, 2020, a representative of King & Spalding e-mailed to representatives of DLA a revised draft of the Business Combination Agreement that made additional proposed revisions to the representations and warranties of Lightning Systems, and requested a telephone call the following day with representatives of DLA to discuss any outstanding legal diligence matters. Mr. Selman replied to confirm a telephone call for the next day, which did take place to discuss the small number of open items on the Business Combination Agreement and legal diligence.

On October 26, 2020, a representative of King & Spalding e-mailed to representatives of DLA a further revised draft of the definitive Business Combination Agreement making minor revisions to the representations and warranties of Lightning Systems, and an initial draft of the Lightning Systems Schedules.

On October 27 and October 28, 2020, Mr. Maselli and Ms. Gurer e-mailed to representatives of King & Spalding drafts of the Registration Rights and Lock-up Agreement, the Second Amended and Restated Certificate of Incorporation and the Stockholder Support Agreement.

On October 29, 2020, representatives of the Company, Lightning Systems, Oppenheimer, Nomura, BofA Securities and DLA held a virtual meeting to discuss the prospects of the proposed PIPE financing based on feedback received as of that time from prospective investors. In light of prospective investor feedback that the proposed pre-money valuation of the Lightning Systems equity be lowered to $539 million to support a PIPE financing of at least $75 million, the parties discussed this possibility and agreed to continue to explore it in an effort to proceed with the proposed Business Combination.

152

**Table of Contents**

On October 30, 2020, representatives of the Company, Lightning Systems, Oppenheimer, Nomura, BofA Securities and DLA held another virtual meeting to consider again whether to propose to prospective PIPE investors modifications to the terms of the proposed PIPE financing and the pre-money valuation of the Lightning Systems equity. During that meeting, Messrs. Fenwick-Smith and T. Reeser and Drs. Dinu and Katz indicated their desire to modify the proposed terms of the PIPE financing to lower the pre-money valuation of Lightning Systems equity to $539 million to support a PIPE financing of at least $75 million.

On November 2, 2020, a representative of King & Spalding e-mailed to Ms. Gurer a revised draft of the Lightning Systems Schedules.

On November 2, 2020, Mr. Maselli e-mailed to representatives of King & Spalding an initial draft of the Sponsor Earnout Agreement that was contemplated to be used in accordance with the terms of the letter of intent as a result of the reduction in the pre-money valuation of Lightning Systems equity.

On November 4, 2020, Oppenheimer, Nomura and BofA Securities began communicating with prospective investors in the PIPE financing regarding the lower valuation for the Lightning Systems pre-money valuation and reduced size of the Proposed PIPE financing. These communications continued through November 13, 2020, although none occurred on the U.S. national election day on November 3, 2020. During the course of that period, the market experienced volatility related both to the election and events involving other special purpose acquisition companies.

On November 5, 2020, Ms. Gurer e-mailed a representative of King & Spalding a revised draft of the Lightning Systems Schedules.

On November 6, 2020, a representative of King & Spalding e-mailed to Mr. Maselli a revised draft of the Registration Rights and Lock-up Agreement that made some proposed revisions regarding the timing and manner for registering securities for resale.

On November 6, 2020, representatives of DLA and King & Spalding held a conference call to discuss finalizing the drafts of the definitive Business Combination Agreement and related ancillary agreements.

On November 7, 2020, a representative of King & Spalding e-mailed representatives of DLA a revised draft of the Sponsor Support Agreement, which K&S had modified to include sponsor support provisions and was renamed as the "Sponsor Earnout and Support Agreement." On that same date, Mr. Maselli e-mailed a further revised draft of the Sponsor Earnout and Support Agreement to a representative of King & Spalding.

On November 7, 2020, Mr. Maselli e-mailed a representative of King & Spalding a revised draft of the Registration Rights and Lock-up Agreement to make clarifying changes to the timing and manner for registering securities for resale.

On November 7, 2020, Ms. Gurer e-mailed to representatives of King & Spalding a revised draft of the definitive Business Combination Agreement to reflect certain of the changes needed in light of the revised pre-money valuation of the Lightning Systems equity to $539 million.

On November 8, 2020, Dr. Dinu and Messrs. Fenwick-Smith and T. Reeser exchanged e-mails regarding a possible new earnout structure that Oppenheimer and Nomura could present to prospective PIPE Investors involving both shares for the Lightning Systems equity holders and the Company's Sponsor, with vesting for such an earnout to occur based on increases in the share price of the post-combination company's Common Stock.

On November 8, 2020, a representative of King & Spalding e-mailed to representatives of DLA a revised draft of the Stockholder Support Agreement reflecting further comments from a principal stockholder of Lightning Systems.

Table of Contents

Company that it was in the process of revising some of the financial projections previously provided to the Company for fiscal year 2020. On November 18, 2020, Ms. Dinu informed Mr. T. Reeser via e-mail that, as a result of these intended revisions to previous projections, and to further enhance internal controls for the post-combination company, the Company would require that Neil Miotto join the New Lightning eMotors Board as the co-chairman of the audit committee and that both companies should evaluate additional corporate governance measures that should be taken following the Closing of the Business Combination.

On November 24, 2020, representatives of Oppenheimer informed the Company of a proposal from a potential anchor Convertible Note Investor that the Company offer a senior secured note for the proposed convertible note financing of the Company. Representatives of the Company, Oppenheimer, Nomura and DLA discussed this proposal, and the Company informed Oppenheimer and Nomura that it was rejecting this proposal, but that Oppenheimer should continue to discuss other alternatives with this potential anchor Convertible Note Investor. Oppenheimer on November 25, 2020 told the Company that it would pick up such further discussions with this potential anchor Convertible Note Investor following the Thanksgiving holiday weekend.

On November 29, 2020, and following discussions between Drs. Dinu and Katz and representatives of Lightning Systems between November 18, 2020 and November 28, 2020 regarding Lightning Systems' financial projections, a representative of BofA Securities delivered to representatives of the Company the updated financial projections of Lightning Systems that had been discussed were being undertaken a couple of weeks earlier and which Lightning Systems finalized following the discussions with Drs. Dinu and Katz. These updated financial projections lowered the amount of projected revenues, gross profit and EBITDA for the periods of 2020 through 2025 from what had been initially provided to the Company.

On November 30, 2020, representatives of the Company, Oppenheimer, Nomura and DLA discussed possible terms for a convertible note financing. Further discussions occurred between representatives of the Company, Oppenheimer, Nomura and DLA on December 1, 2020 regarding possible terms for a convertible note financing. On December 1, 2020, it was agreed that Oppenheimer would look to move forward with the potential anchor Convertible Note Investor on a $75-100 million convertible note financing for which the anchor investor would purchase $10-15 million of the Convertible Notes, that the Convertible Notes would have a three year term, a conversion price of $11.50 and a 7.5% interest rate, and that New Lightning eMotors could force conversion of the Convertible Notes if the price of New Lightning eMotors Common Stock was at least $13.80 and provided that average daily market value of such Common Stock traded for the preceding 30 trading day period exceeded $3.0 million. In an effort to provide an alternative to the prior proposal for a senior secured note, while providing some protection to Convertible Note Investors from debt more senior to the Convertible Notes, the Company also proposed that the terms include covenants restricting the amount of additional debt that New Lightning eMotors could maintain would be limited to a $5.0 million accounts receivable facility and that if New Lightning eMotors sought to incur additional debt, that it would need to both redeem the Convertible Notes and issue warrants to the holders of the Convertible Notes with an exercise price of $11.50 and in an amount equal to the number of shares into which the Convertible Notes could convert and for a term equal to the remainder of the term of the Convertible Notes.

On December 2, 2020, the potential anchor Convertible Note Investor tentatively indicated to a representative of Oppenheimer that it would anchor the proposed convertible note financing on the terms discussed the prior day and presented to it by Oppenheimer, and indicated that it would likely purchase $10 million of the Convertible Notes, to which Oppenheimer began to push to increase that amount to $15 million. During the course of that day, representatives of Oppenheimer and Nomura engaged with various potential Convertible Note Investors on these terms, and received feedback.

On December 3, 2020, Dr. Katz spoke with a potential Convertible Note Investor to discuss the terms for the convertible note financing, and that potential investor stated that he believed that a strategic investor needed to participate in the previously contemplated PIPE financing in order to facilitate the convertible note financing. Dr. Katz informed Oppenheimer and Nomura, as well as representatives of Lightning Systems of this

155

Table of Contents

- *No Third-Party Valuation Risk*. The risk that the Company did not obtain a third-party valuation or fairness opinion in connection with the Business Combination.

- *The Company Stockholders Receiving a Minority Positions Risk*. The Company's stockholders will hold a minority position in the combined company.

- *Fees, Expenses and Time Risk.* The risk of incurring significant fees and expenses associated with completing the Business Combination and the substantial time and effort of management required to complete the Business Combination.

- *Other Risks Factors*. Various other risk factors associated with Lightning Systems' business, as described in the section entitled "Risk Factors."

In addition to considering the factors described above, the Company's Board also considered that some officers and directors of the Company may have interests in the Business Combination as individuals that are in addition to, and that may be different from, the interests of the Company's stockholders. The Company's independent directors reviewed and considered these interests during the negotiation of the Business Combination and in evaluating and unanimously approving, as members of the Company's Board, the Business Combination Agreement and the Business Combination. For more information, see the section entitled "—*Interests of Certain Persons in the Business Combination*."

The Company's Board concluded that the potential benefits that it expects the Company and its stockholders to achieve as a result of the Business Combination outweigh the potentially negative factors associated with the Business Combination. Accordingly, the Company's Board, based on its consideration of the specific factors listed above, unanimously (a) determined that the Business Combination, Merger, the other transactions contemplated by the Business Combination Agreement, the PIPE Subscription Agreement and PIPE Investment, and the Convertible Note Subscription Agreements, Convertible Note Investment and the other agreements contemplated by the Convertible Note Subscription Agreements are just and equitable and fair as to the Company and its stockholders, and that it is advisable and in the best interests of the Company and its stockholders of the Company to adopt and approve these agreements and transactions, (b) approved, adopted and declared advisable the Business Combination Agreement, the PIPE Subscription Agreement, the Convertible Note Subscription Agreements and the agreements and transactions contemplated thereby and (c) recommended that the stockholders of the Company approve each of the Proposals.

The above discussion of the material factors considered by the Company's Board is not intended to be exhaustive but does set forth the principal factors considered by the Company's Board.

**Unaudited Prospective Financial Information**

Lightning Systems provided the Company with its internally prepared forecasts for each of the years in the six-year period ending December 31, 2025. The Company's management reviewed and, as a result of its due diligence investigation, worked with Lightning Systems to have Lightning Systems revise the forecasts for presentation to the Company's Board as part of the Company's Board's review and subsequent approval of the Business Combination. Lightning Systems and the Company do not, as a matter of general practice, publicly disclose long-term forecasts or internal projections of future performance, revenue, financial condition or other results. However, in connection with the proposed Business Combination, management of the Company used the financial projections set forth below to present key elements of the forecasts provided to the Company. The forecasts were prepared solely for internal use and not with a view toward public disclosure, the published guidelines of the SEC regarding projections or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information.

The inclusion of financial projections in this proxy statement/prospectus should not be regarded as an indication that the Company, Lightning Systems, their respective directors, officers, advisors or other

162

Table of Contents

representatives considered, or now considers, such financial projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the Business Combination Proposal. The financial projections are not fact and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement/prospectus, including investors or stockholders, are cautioned not to place undue reliance on this information. You are cautioned not to rely on the projections in making a decision regarding the Business Combination, as the projections may be materially different than actual results. We will not refer back to the financial projections in our future periodic reports filed under the Exchange Act.

The financial projections reflect numerous estimates and assumptions with respect to general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to Lightning Systems' business, all of which are difficult to predict and many of which are beyond Lightning Systems' and the Company's control. The financial projections are forward-looking statements that are inherently subject to significant uncertainties and contingencies, many of which are beyond Lightning Systems' and the Company's control. The various risks and uncertainties include those set forth in the sections entitled "*Risk Factors*," "*Management's Discussion and Analysis of Financial Condition and Results of Operations of Lightning Systems*" and "*Cautionary Note Regarding Forward-Looking Statements*." As a result, there can be no assurance that the projected results will be realized or that actual results will not be significantly higher or lower than projected. Since the financial projections cover multiple years, such information by its nature becomes less reliable with each successive year. These financial projections are subjective in many respects and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments.

Furthermore, the financial projections do not take into account any circumstances or events occurring after the date they were prepared. None of Lightning Systems' independent registered accounting firm, the Company's independent registered accounting firm or any other independent accountants, have compiled, examined or performed any procedures with respect to the financial projections included below, nor have they expressed any opinion or any other form of assurance on such information or their accuracy or achievability, and they assume no responsibility for, and disclaim any association with, the financial projections. Nonetheless, a summary of the financial projections is provided in this proxy statement/prospectus because they were made available to the Company and the Company's Board in connection with their review of the proposed Business Combination.

EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAWS, BY INCLUDING IN THIS PROXY STATEMENT A SUMMARY OF THE FINANCIAL PROJECTIONS FOR LIGHTNING SYSTEMS, GIGCAPITAL3 UNDERTAKES NO OBLIGATIONS AND EXPRESSLY DISCLAIMS ANY RESPONSIBILITY TO UPDATE OR REVISE, OR PUBLICLY DISCLOSE ANY UPDATE OR REVISION TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE FINANCIAL PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS CHANGE OR ARE SHOWN TO BE IN ERROR.

The projections were prepared by, and are the responsibility of, Lightning Systems and the Company management. Grant Thornton LLP, Lightning Systems' independent registered public accounting firm, and BPM LLP, the Company's independent registered public accounting firm, have not examined, compiled or otherwise applied procedures to the accompanying prospective financial information presented herein and, accordingly, express no opinion or any other form of assurance with respect to the prospective financial information. The audit reports for Lightning Systems included in this proxy statement/prospectus relate to historical financial information of Lightning Systems. It does not extend to the projections and should not be read as if it does.

Table of Contents

The key elements of the projections for Lightning Systems provided to the Company on November 29, 2020 in connection with the evaluation of the Business Combination by the Company's Board are summarized below:

**Lightning Systems Key Financials**

| ($ in million, unless otherwise noted) | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Revenue | $ 9 | $ 63 | $354 | $640 | $1,165 | $2,012 |
| *Gross Growth* | *NM* | *NM* | *462%* | *81%* | *82%* | *73%* |
| Gross Profit | $ 0 | $ 9 | $ 68 | $140 | $ 296 | $ 528 |
| *Gross Margin* | *3%* | *14%* | *19%* | *22%* | *25%* | *26%* |
| Adjusted EBITDA | ($ 11) | ($ 17) | $ 15 | $ 50 | $ 155 | $ 315 |
| *Adjusted EBITDA Margin* | *(122%)* | *(27%)* | *4%* | *8%* | *13%* | *16%* |

Souce: Lightning Systems' Management Projections

**Comparable Company Analysis**

The Company's management primarily relied upon a public company comparables analysis to assess the value that the public markets would likely ascribe to New Lightning eMotors following the Business Combination with the Company and this analysis was presented to the Board. The relative valuation analysis was based on publicly-traded companies in the electric vehicle and auto technology sectors, and included companies in these sectors which had recently agreed to combine with other special purpose acquisition companies, as these were determined to be most comparable. The comparable public companies the Board reviewed within these sectors are set forth in the table below. These companies were selected by the Company based upon discussions with Oppenheimer and also input from BofA Securities using the information provided by Oppenheimer in September 2020 and updated on December 6, 2020 to add recent high-growth auto technology companies that subsequent to September had entered into business combinations with special purpose acquisition companies as the publicly-traded companies having businesses most similar to New Lightning eMotors' business. However, the Company's Board realized that no company was identical in nature to Lightning Systems.

Our Board reviewed, among other things, information for benchmarking of similar companies and information for comparable companies regarding estimated enterprise value multiples, projected revenue growth for 2021 over 2020 or 2024 over 2023, gross margins and EBITDA margins for 2021 or 2024 and revenue and EBITDA margins for the five-year period 2020 through 2024.

164

**Table of Contents**

compared to the $10.00 per share price being used to determine the number of shares of Common Stock being issued to the Lightning Systems equity holders in the Business Combination or at which the PIPE Investors have agreed to purchase Common Stock). However, 750,000 shares of Common Stock issued to the Sponsor were forfeited due to the over-allotment option not being exercised by the Underwriters. Additionally, the Sponsor purchased 650,000 private placement units simultaneously with the consummation of GigCapital3's initial public offering for an aggregate purchase price of $6.5 million. Certain of GigCapital3's directors and executive officers, including Dr. Avi Katz, Dr. Raluca Dinu, Neil Miotto, John Mikulsky, Peter Wang, Andrea Betti-Berutto and Brad Weightman, also have a direct or indirect economic interest in such private placement units and in the 5,635,000 Initial Stockholder Shares owned by the Sponsor. The 5,635,000 Initial Stockholder Shares owned by the Sponsor would have had an aggregate market value of $63.1 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The 650,000 private placement units held by the Sponsor would have had an aggregate market value of $8.8 million based upon the closing price of $13.59 per public unit on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The Sponsor does not hold any warrants independent of what is included in the private placement units. While the private placement units have a trading price and value as set forth above, the private placement units will be, upon completion of the Business Combination, broken into their constituent components of stock and warrants, and each of those separately trade and the value of each of those is $11.19 per public share and $3.05 per public warrant. Additionally, the Sponsor, officers and directors do not currently have any unreimbursed out-of-pocket expenses in connection with the business combination. Upon completion of the Business Combination, the former Lightning Systems equity holders will own 53,922,000 shares of our Common Stock. The shares owned by the former Lightning Systems equity holders would have had an aggregate market value of $603.4 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus.

**Potential Purchases of Public Shares**

In connection with the stockholder vote to approve the Business Combination, our Sponsor, directors, officers, advisors or any of their respective affiliates may privately negotiate transactions to purchase public shares from stockholders who would have otherwise elected to have their shares redeemed in conjunction with the Business Combination for a per share pro rata portion of the Trust Account. There is no limit on the number of public shares our Sponsor, directors, officers, advisors or any of their respective affiliates may purchase in such transactions, subject to compliance with applicable law and the rules of the NYSE. Any such privately negotiated purchases may be effected at purchase prices that are in excess of the per share pro rata portion of the Trust Account. However, our Sponsor, directors, officers, advisors and their respective affiliates have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the Trust Account will be used to purchase public shares or public warrants in such transactions. None of our Sponsor, directors, officers, advisors or any of their respective affiliates will make any such purchases when they are in possession of any material non-public information not disclosed to the seller of such public shares or during a restricted period under Regulation M under the Exchange Act. Such a purchase could include a contractual acknowledgement that such stockholder, although still the record holder of such public shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights, and could include a contractual provision that directs such stockholder to vote such shares in a manner directed by the purchaser.

In the event that our Sponsor, directors, officers, advisors or any of their respective affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares.

The purpose of any such purchases of public shares could be to (a) vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining stockholder approval of the Business Combination

168

**Table of Contents**

or (b) to satisfy a closing condition in the Business Combination Agreement, where it appears that such requirement would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding. Any such purchases of our public shares or public warrants may result in the completion of the Business Combination that may not otherwise have been possible. Any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent the purchasers are subject to such reporting requirements.

In addition, if such purchases are made, the public "float" of our Common Stock may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

Our Sponsor, officers, directors, advisors or any of their respective affiliates anticipate that they may identify the stockholders with whom our Sponsor, officers, directors, advisors or any of their respective affiliates may pursue privately negotiated purchases by either the stockholders contacting us directly or by our receipt of redemption requests submitted by stockholders (in the case of shares of Common Stock) following our mailing of proxy materials in connection with the Business Combination. To the extent that our Sponsor, officers, directors, advisors or any of their respective affiliates enter into a privately negotiated purchase, they would identify and contact only potential selling stockholders who have expressed their election to redeem their shares for a pro rata share of the Trust Account or vote against the Business Combination, whether or not such stockholder has already submitted a proxy with respect to the Business Combination but only if such shares have not already been voted at the stockholder meeting related to the Business Combination. Our Sponsor, officers, directors, advisors or any of their respective affiliates will select which stockholders to purchase shares from based on the negotiated price and number of shares and any other factors that they may deem relevant, and will only purchase public shares if such purchases comply with Regulation M under the Exchange Act and the other federal securities laws.

Any purchases by our Sponsor, officers, directors, advisors or any of their respective affiliates who are affiliated purchasers under Rule 10b-18 under the Exchange Act will only be made to the extent such purchases are able to be made in compliance with Rule 10b-18, which is a safe harbor from liability for manipulation under Section 9(a)(2) of and Rule 10b-5 under the Exchange Act. Rule 10b-18 has certain technical requirements that must be complied with in order for the safe harbor to be available to the purchaser. Our Sponsor, officers, directors, advisors and any of their respective affiliates will not make purchases of Common Stock if the purchases would violate Section 9(a)(2) of or Rule 10b-5 under the Exchange Act.

**Total Company Shares to Be Issued in the Business Combination**

We anticipate that, upon completion of the Business Combination, the ownership of New Lightning eMotors will be as follows:

- the former Lightning Systems equity holders will own 53,922,000 shares of our Common Stock, representing a 65.5% interest;

- the public stockholders (not including any Initial Stockholders that own public shares) will own 20,000,000 shares of our Common Stock, representing a 24.3% interest;

- the PIPE Investors will own 2,500,000 shares of our Common Stock, representing a 3.0% interest; and

- the Initial Stockholders will own 5,893,479 shares of our Common Stock, representing a 7.2% interest.

The ownership percentage with respect to New Lightning eMotors following the Business Combination assume that (a) no public stockholders elect to have their public shares redeem, and (b) all pre-merger Lightning Systems Options have vested and been exercised prior to the merger (however, for a discussion of the actual adjustment provisions applicable to the Lightning Systems Options, see "*Proposal No. 1—Approval of the Business Combination—The Business Combination Agreement—Conversion of Securities*"); and does not take

169

**Table of Contents**

**INFORMATION ABOUT LIGHTNING SYSTEMS**

*References in this section to "Lightning Systems" refers to Lightning Systems, Inc.*

**Company Overview**

Lightning Systems, doing business as "*Lightning eMotors*", is an electric vehicle designer and manufacturer, providing complete electrification solutions for commercial fleets – from Class 3 cargo and passenger vans to Class 6 work trucks, Class 7 city buses, which we believe represents a significant total addressable market of approximately $67 billion and Class A motor coaches. Lightning eMotors is committed to eradicating commercial fleet emissions, a primary cause of urban air pollution, by providing zero emission Class 3 to 7 Battery Electric Vehicles, Fuel Cell Electric Vehicles and charging infrastructure solutions to commercial fleet customers. As of the date of this proxy statement/prospectus, Lightning eMotors is the market leader in the Class 3 to Class 6 EV segment, with 72 units sold in 2020 representing approximately 36% of the total market in 2020. Lightning Systems delivered 41 Class 3 vehicles in 2020, constituting approximately 75% market share among Class 3 EVs. We believe that Lightning Systems is the only company in the United States that has delivered fully functional Class 3 to 7 EVs to end customers that are in use today, with 97 units delivered by us in 2019 and 2020 (in addition to 12 demonstration and test vehicles).

We started in 2008 as a manufacturer of hybrid systems for commercial vehicles, but have since realized that hybrid solutions did not adequately address the growing issue of urban air pollution from commercial vehicle fleets. We understood the importance of zero emission and the attractive market opportunity to offer full-range ZEVs, and in 2017 we redirected our efforts to focus exclusively on ZEVs, leveraging nearly 10 years of unparalleled knowledge developing and selling hybrid commercial vehicles to successfully adapt to zero emission vehicles. As of the date of this proxy statement/prospectus, all of Lightning eMotors' platforms have been fully certified by the California Air Resource Board ("*CARB*"), the clean air agency that defines vehicle emissions standards. We currently maintain 6 Executive Orders, which is a requirement to sell ZEV vehicles in California as well as various other states.

We are the only full-range manufacturer of Class 3 to 7 BEV and FCEV in the United States and provide end-to-end electrification solutions including advanced analytics software, charging solutions (which we refer to as "*Energy-as-a-Service*") and financing (which we refer to as "*EV-as-a-Service*"). We combine optimized modular software with a customized hardware design that allows us to address the diversified opportunities in the markets in which we operate in a cost-effective manner with a significant time-to-market advantage. We have also built an extensive ecosystem of supply-chain partners and specialty vehicle partners which are instrumental to our growth.

We believe the commercial ZEV space is at an inflection point with strong secular trends of regulation, corporate mandates and grants to accelerate the transition to zero emission vehicles globally. In addition, ZEVs already provide a lower TCO than ICE vehicles with state and federal grants made available to offset the higher upfront cost of commercial ZEVs. We believe that the TCO of ZEVs will continue to decrease as we drive down costs through our R&D efforts, supply chain maturity and scale. We believe that the TCO of Lightning eMotors' solutions will be lower than that of ICE vehicles, even without state and federal grants starting in the first half of 2022.

**Our Customers**

We sell primarily to large-scale enterprises, making our sales process Business-to-Big-Business focused and our products bespoke to our customers' needs. Because we sell directly to customers, we are able to assess and meet their needs in a cost-effective manner. Our customers choose to partner with us because we are the only one-stop shop for ZEVs, across classes 3 to 7 in the United States. We aim to take the complexity out of the EV purchasing process by helping customers to specify the vehicles that suit their individual needs based on our in-depth telematics\analytics while also providing them with complete charging solutions for their fleets and access to custom financing solutions.

244

**Table of Contents**

Our two-year, industry-leading head start in the commercial ZEV space led to significant progress in customer validation with 121 vehicles on the road as of February 22, 2021 (including 12 demonstration and test vehicles) and 1,569 electric commercial vehicles and electric powertrains on order as of December 31, 2020. Our vehicles currently on the road benefit from extensive validation with customers and end-users, ranging between 3 and 24 months, and are deployed in real working conditions, gathering real-world data.

Our customers represent some of the largest global fleet operators and logistics providers in the world, as well as a variety of other large enterprises and governments across a variety of commercial vehicle categories. We expect to generate significant repeat orders from these customers. In the third quarter of 2020, we secured $120 million of purchase orders from both new and existing customers, demonstrating a significant inflection point in ZEV adoption. As of December 31, 2020, we had $169 million of backlog, as compared to a backlog of $27 million as of December 31, 2019, and a pipeline of $800 million of sales. We have already received purchase orders to completely cover our estimated 2021 revenue and over 25% of 2022 revenue. As we continue to scale our manufacturing capabilities to meet increased demand – from both new and existing customers – we anticipate that our pipeline will continue to scale.

**Our Partners**

We optimize our supply chain for quality, reliability, and cost. We believe our long-term relationships with supply chain partners will be a key driver in our ability to scale without unduly sacrificing quality or delivery times and serve as a foundation for our growth. Because we have relationships with multiple suppliers for each core component of our vehicles, we are able to build and maintain a high degree of resilience in our supply chain, which will assist us with mitigating delays. We also partner with battery pack manufacturers allowing us to keep the latest battery technology in our vehicles at the time of manufacturing. To this end, we have recently entered into a three-year contract with our primary battery supplier, Romeo Power Technology, that will secure battery inventory without significant fluctuations in cost. We believe, that through careful supply chain management and the cultivation of long-term relationships with our suppliers, we can reduce our cost-of-goods-sold by up to 50% over the next 18 months. Continuous communication and partnerships with all of our suppliers has enabled us to maintain cutting-edge technology in our vehicles at the lowest possible cost.

**Industry Background**

According to Bloomberg New Energy Finance ("*Bloomberg NEF*"), global commercial EV sales are expected to increase from 96,000 vehicles in 2020 to 473,000 vehicles in 2040, representing a nearly 500% increase over the next 20 years. Even with this strong expected growth through 2040, such sales would represent only an estimated 7.7% of the commercial EV market providing Lightning eMotors a large, compelling market and opportunities for growth.

The TCO for commercial ZEVs has become highly competitive to ICE commercial vehicles. Today, grants and credits are driving TCO parity for ZEV versus their ICE counterparts. We expect that by the first half of 2022, the TCO of our vehicles will be lower than ICE without relying on grants and credits, as Lightning eMotors continues to reduce vehicle costs through economies of scale and contract-based cost reductions across the supply chain.

In addition to the TCO progress, strong global secular trends are accelerating the pace of commercial ZEV adoption. These trends can be broadly categorized as follows:

- *Regulatory Tailwinds*

    ○ Zero-Emission Zones: Led by London, England and Santa Monica, California, over 30 cities worldwide have enacted legislation creating zero-emission zones. These zones are intended to improve air quality and reduce noise. The cities are driving the conversion to ZEV's through tax revenues

**Table of Contents**

**LIGHTNING SYSTEMS' MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis provide information that Lightning Systems' management believes is relevant to an assessment and understanding of Lightning Systems' results of operations and financial condition. The discussion and analysis should be read together with "Selected Historical Financial Information of Lightning Systems" and the financial statements and related notes that are included elsewhere in this proxy statement/prospectus. The discussion and analysis should also be read together with our pro forma financial information as of December 31, 2020 and for the year ended December 31, 2020. See "Unaudited Pro Forma Condensed Combined Financial Information." This discussion may contain forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" or in other parts of this proxy statement/prospectus. Unless the context otherwise requires, references in this "Lightning Systems Management's Discussion and Analysis of Financial Condition and Results of Operations" to "we", "us", "our", and "the Company" are intended to mean the business and operations of Lightning Systems.*

**Overview**

Lightning Systems, which also does business as Lightning eMotors, is a leading electric vehicle designer and manufacturer, providing complete electrification solutions for commercial fleets – from Class 3 cargo and passenger vans to Class 6 work trucks, Class 7 city buses, and Class A motor coaches which we believe represents a significant total addressable market of approximately $67 billion. Lightning Systems is committed to eradicating commercial fleet emissions, the main cause of urban air pollution, by providing zero emission Class 3 to 7 Battery Electric Vehicles, Fuel Cell Electric Vehicles and charging infrastructure solutions to commercial fleet customers. Our ongoing focus has been on reducing emissions and improving energy efficiency. As of the date of this proxy statement/prospectus, Lightning Systems is the market leader in the Class 3 to Class 6 EV segment, with 72 units sold in 2020 representing approximately 36% of the total market in 2020. Lightning Systems delivered 41 Class 3 vehicles in 2020, constituting approximately 75% market share among Class 3 EVs. We believe that Lightning Systems is the only company in the United States that has delivered fully functional Class 3 to 7 EVs to end customers that are in use today, with 97 units delivered by us in 2019 and 2020 (in addition to 12 demonstration and test vehicles).

We started in 2008 as a manufacturer of hybrid systems for commercial vehicles. In 2017 realizing that hybrid solutions did not adequately address the growing issue of urban air pollution from commercial vehicle fleets, we directed our efforts to focus exclusively on the attractive market opportunity in ZEVs. We leveraged nearly 10 years of unparalleled knowledge developing and implementing hybrid commercial vehicles to successfully adapt to zero emission vehicles. As of the date of this proxy statement/prospectus, all of Lightning Systems' platforms have been fully certified as zero emission vehicles by the California Air Resource Board, the clean air agency that defines vehicle emissions standards. We currently maintain 6 Executive Orders, which is a requirement to sell ZEV vehicles in California as well as various other states.

We are the only full-range manufacturer of Class 3 to 7 BEV and FCEV in the United States and provide end-to-end electrification solutions including advanced analytics software, mobile charging solutions, or Energy-as-a-Service, and financing which we refer to as EV-as-a-Service. We combine an internally developed optimized modular software with Lightning Systems hardware designs that allow us to address the diverse opportunities in the markets in which we operate in a cost-effective manner with a significant time-to-market advantage. We have also built an extensive ecosystem of supply-chain partners and specialty vehicle partners which are instrumental to our growth.

***Business Combination and Public Company Costs***

Lightning Systems entered into the Business Combination Agreement with GigCapital3 on December 10, 2020. Pursuant to the Business Combination Agreement, and assuming a favorable vote of GigCapital3's stockholders,

259

**Table of Contents**

of operations, cash flows, and financial condition could be impacted, and the extent of such impact cannot be reasonably estimated.

*Partial Shutdowns and Slow-Downs*. Lightning Systems is adhering to CDC guidelines that oblige us to shut down any department in which an employee tests positive for COVID-19 for 14 days. In November 2020, Lightning Systems closed our material handling department for two weeks after an employee tested positive. We have also regularly had employees absent from work or working from home on suspected COVID-19 infections. As COVID-19 spikes in Northern Colorado, there is a significant risk of department shutdowns impacting our first and second quarter 2021 revenue.

*Supply-Chain Delays*. Also, as a result of the COVID-19 pandemic, we have been experiencing significant delivery delays from our suppliers since April 2020. Within our capital constraints, we increased our raw material inventories to attempt to manage and mitigate this risk. However, several key suppliers have informed us of delivery delays ranging from four to sixteen weeks, that are expected to adversely impact production in the first and second quarter of 2021. Although we are working with our suppliers to minimize the impact, we expect supply chain delays will have a significant impact on our 2021 revenue and possibly thereafter.

The year ended December 31, 2020 revenue was consistent with its financial projections provided to GigCapital3 on November 29, 2020, but operating costs were higher than projected at that time. Lightning Systems incurred higher expenses for 2020 and expects higher expenses for 2021 related to its preparation to be a public company, supply-chain disruptions from the COVID-19 pandemic, and higher investments in its manufacturing operations as it lays the foundation for future revenue growth. Based on performance through January 2021, Lightning Systems has reaffirmed its revenue projections for 2021, but has indicated that it anticipates operating expenses will be higher than previously forecast to GigCapital3 in light of higher public company expenses, increased research and development costs and higher sales and marketing costs. In addition, Lighting Systems' management anticipates that we will continue to be negatively impacted by the COVID-19 pandemic through the first half of 2021, including supply-chain disruptions, which may negatively impact revenue for 2021 as previously projected to GigCapital3. Please see the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information*" for additional information.

## Comparability of Financial Information

Lightning Systems' results of operations and statements of assets and liabilities may not be comparable between periods as a result of Lightning Systems' ongoing evolution, refinement, and growth of its business operations within the electric commercial vehicle industry. While historically, the Company developed hybrid systems for commercial vehicles, during 2017, Lightning Systems refocused its business to producing the zero-emission EV power train upgrades and phased-out the production of hydraulic hybrid upfit systems. During 2019, Lightning Systems increased the physical and production capabilities of its Loveland, Colorado facility, in preparation of the installation and integration of EV power train upgrades into vehicles beginning in 2020. This change significantly reduced Lightning Systems' use and reliance on certified installer or dealers. In conjunction with the transition to using the Loveland plant for comprehensive production, Lightning Systems has continually improved its production technology, processes, and productivity and has invested in the supporting personnel and other infrastructure.

## Key Factors Affecting Operating Results

We believe that our performance and future success depend on several factors that present significant opportunities for us but also pose risks and challenges, including those discussed below and in the section of this proxy statement/prospectus titled "*Risk Factors*."

*Commercial Launch of medium-duty trucks and other products*

In 2020, Lightning Systems attained revenue commercialization of its ZEVs, with 72 customer-ordered Class 3 to Class 7 Commercial vehicles delivered during the year ended December 31, 2020. Prior to commercialization,

261