# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02774-RMR-KLM (consolidated with 1:21-cv-03215-KLM)

JOHNNY R. SHAFER,
JUSTIN COHEN, Individually and On Behalf of All Others Similarly Situated,

      Plaintiff,

v.

LIGHTNING EMOTORS, INC.,
TIMOTHY RICHARD REESER,
TERESA P. COVINGTON,
GIGACQUISITIONS3, LLC,
GIGCAPITAL GLOBAL,
AVI S. KATZ,
RALUCA DINU
NEIL MIOTTO,
GIGFOUNDERS, LLC
BRAD WEIGHTMAN,
ANDREA BETTI-BERUTTO,
PETER WANG,
JOHN J. MIKULSKY, and
ROBERT FENWICK SMITH,

      Defendants.

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE
CONSOLIDATED COMPLAINT**

---

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   PLAINTIFFS' ALLEGATIONS ......................................................................... 4

    A. The Creation of GigCapital3 and Its IPO .............................................. 4

    B. Lightning and the Gig Defendants Issue a Misleading Proxy in Order to Obtain Shareholder Approval of the Business Combination........................................................... 6

    C. Lightning's Undisclosed Operational Challenges ............................................. 7

    D. Lightning's Significant Operational Problems Continue Following the Business Combination's Close ................................................................................ 8

    E. The Truth Is Revealed................................................................................... 9

III.  LEGAL STANDARD.......................................................................................... 9

    A. PLAINTIFFS ADEQUATELY PLEAD EXCHANGE ACT CLAIMS ......................... 10

    1. Plaintiffs Allege Materially False and Misleading Statements........................................ 11

        a.    Defendants' Statements About the Company's Strong Revenue Visibility, Robust Supply Chain, and Amazon Being a Key Lightning Customer Were False and/or Materially Misleading When Made ........................................................... 11

        b.    Defendants' Statements Concerning Lightning's Projections Were False and/or Materially Misleading When Made ........................................................... 18

        c.    Defendants' Statements About GigCapital's Mentor-Investor Approach Were Materially Misleading When Made ........................................................... 22

    2. Plaintiffs Allege Deceptive Acts Under Rules 10b-5(a) and (c)...................................... 25

    3. Plaintiffs Allege a Strong Inference of Defendants' Scienter.......................................... 28

        a.    Plaintiffs Sufficiently Plead the Section 10(b) Defendants' Scienter....................... 29

        (i) The Lightning Defendants Knew or Recklessly Disregarded That the Company's Undisclosed Supply Chain and Related Production Issues Would Continue to Prevent It from Scaling ........................................................... 29

(ii) The Gig Defendants Were Aware of or Reckless in Not Knowing of Lightning's Undisclosed Supply and Production Constraints ...................................................... 36

(iii) Defendants Fail to Present a *More* Compelling Inference ............................................................................................................ 40

b.    The Complaint Sufficiently Pleads the Gig Defendants' Negligence With Respect to the Proxy ........................................................................................................ 41

4.  The Complaint Sufficiently Pleads Liability Under Section 20(a) ................................... 44

B. PLAINTIFFS PLEAD VIOLATIONS OF THE SECURITIES ACT .............................. 45

IV.  CONCLUSION .............................................................................................................. 49

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) .......................................................................... 11, 25, 28, 29

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ..................................................................................... 29, 31

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal 2009)..................................................................................... 30

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)................................................................................................................. 47

*Beck v. Dobrowski*,
559 F.3d 680 (7th Cir. 2009) .................................................................................................. 41

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 555 (2007).................................................................................................. 10, 46

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................................. 19

*Bond v. Clover Health Invs., Corp.*,
No. 3:21-cv-00096,
2022 WL 602432 (M.D. Tenn. Feb. 28, 2022)........................................................................ 36

*Britton v. Parker*,
Nos. 06–cv–01797–MSK–KLM, 06–cv–1922–MSK–KLM, 06–cv–02017–MSK–KLM,
2009 WL 3158133 (D. Colo. Sept. 23, 2009).......................................................................... 43

*Brown v. Brewer*,
No. CV 06–3731–GHK (SHx),
2010 WL 2472182 (C.D. Cal. June 17, 2010) ........................................................................ 41

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
No. 4:19-CV-957,
2021 WL 1416025 (S.D. Tex. Apr. 14, 2021)......................................................................... 45

*Chen v. X Financial*,
No. 19-CV-6908-KAM-SJB,
2021 WL 7449851 (E.D.N.Y. Dec. 9, 2021) ............................................................................ 23

*City of Philadelphia v. Fleming Cos., Inc.*,
264 F.3d 1245 (10th Cir. 2001) ........................................................................................ 28, 38

*Correa v. Liberty Oilfield Servs. Inc.*,
548 F. Supp. 3d 1069 (D. Colo. 2021) ............................................................................... 46, 48

*Croker v. Carrier Access Corp.*,
No. 05-cv-01011-LTB-OES,
2006 WL 2035366 (D. Colo. July 18, 2006) ............................................................................ 30

*Ellis v. Spectranetics Corp.*,
No. 15-cv-01857-KLM,
2018 WL 1583837 (D. Colo. Apr. 2, 2018) .............................................................................. 31

*Exkae Ltd. v. Domo, Inc.*,
No. 2:19-CV-781-DAK-DAO,
2020 WL 7352735 (D. Utah Dec. 15, 2020) ....................................................................... 18, 19

*Friedman v. Endo Int'l PLC*,
No. 16-CV-3912 (JMF),
2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) ............................................................................. 47

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
No. 2:20-cv-00368-JNP-DBP,
2022 WL 716653 (D. Utah Mar. 9, 2022) .......................................................................... 11, 13

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016) ..................................................................................... 47

*Gregory v. Pronai Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018) ..................................................................................... 18

*Grossman v. Novell*, Inc.,
120 F.3d 1112 (10th Cir. 1997) ........................................................................................ 10, 25

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ............................................................................................................. 46

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
958 F. Supp. 2d 1065 (D. Minn. 2013) .................................................................................... 20

*In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*,
No. 20 Civ. 5615 (KPF),
2021 WL 4481215 (S.D.N.Y. Sept. 30, 2021) ........................................................................ 14

*In re Apple Inc. Sec. Litig.*,
No. 19-cv-02033-YGR,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ......................................................................... 34

*In re Cardinal Health, Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) .................................................................................. 29

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005) ............................................................................................... 35

*In re Eros Int'l PLC Sec. Litig.*,
No. 19-14125,
2021 WL 1560728 (D.N.J. Apr. 20, 2021) ............................................................................ 21

*In re Gold Res. Corp. Sec. Litig.*,
957 F. Supp. 2d 1284 (D. Colo. 2013) .............................................................................. 20, 21

*In re Jumei International Holding Limited Sec. Litig.*,
No. 14cv9826,
2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ............................................................................ 25

*In re Lehman Bros. Sec. & Erisa Litig.*,
Nos. 10 Civ. 6637(LAK), 09 MD 2017(LAK),
2013 WL 3989066 (S.D.N.Y. July 31, 2013) ........................................................................ 18

*In re Level 3 Comm'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ........................................................................................ 12, 35

*In re Lulelemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014) ...................................................................................... 18

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................................................... 32

*In re Molson Coors Bev. Co. Sec. Litig.*,
No. 19-cv-00455-DME-MEH,
2020 WL 13499995 (D. Colo. Dec. 2, 2020) ............................................................... 32, 34, 38

*In re Molycorp, Inc. Sec. Litig.*,
157 F. Supp. 3d 987 (D. Colo. 2016) .................................................................................. 11, 31

*In re Molycorp, Inc. Sec. Litig.*,
  No. 12–cv–00292–RM–KMT,
  2015 WL 1540523 (D. Colo. Mar. 31, 2015) ........................................................................... 35

*In re Nektar Therapeutics*,
  No. 18-cv-06607-HSG,
  2020 WL 3962004 (N.D. Cal. July 13, 2020) .......................................................................... 26

*In re Overstock Sec. Litig.*,
  No. 2:19-CV-709-DAK-DAO,
  2020 WL 5775845 (D. Utah Sept. 28, 2020) ........................................................................... 19

*In re PolarityTE, Inc., Sec. Litig.*,
  No. 2:18-cv-00510,
  2020 WL 6873798 (D. Utah Nov. 22, 2020) ............................................................................ 18

*In re Qudian Inc. Secs. Litig.*,
  No. 17-CV-9741 (JMF),
  2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) .................................................................... 24, 25

*In re Rhythms Sec. Litig.*,
  300 F. Supp. 2d 1081 (D. Colo. 2004) ..................................................................................... 17

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ....................................................................................................... 16

*In re SemGroup Energy Partners, LP*,
  729 F. Supp. 2d 1276 (N.D. Okla. 2010) ................................................................................. 46

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) ...................................................................................... 25

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
  504 F. Supp. 3d 224 (S.D.N.Y. 2020) ...................................................................................... 18

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003) ............................................................................ 19, 22

*In re XL Fleet Corp. Sec. Litig.*,
  No. 21 Civ. 2002 (LGS),
  2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) ...................................................................... 27, 36

*Jedrzejczyk v. Skillz, Inc.*,
  No. 21-cv-03450-RS,
  2022 WL 2441563 (N.D. Cal. July 5, 2022) ............................................................................ 23

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ...................................................................................... 14

*Knurr v. Orbital ATK Inc.*,
   276 F. Supp. 3d 527 (E.D. Va. 2017) ............................................................................ 42

*Lane v. Page*,
   581 F. Supp. 2d 1094 (D.N.M. 2008) ..................................................................... passim

*Lorenzo v. S.E.C.,*
   139 S. Ct. 1094 (2019) ................................................................................................. 27

*Lorusso v. Boulder Brands, Inc.*,
   No. 15-cv-00679-MSK-KMT,
   2017 WL 4365180 (D. Colo. Mar. 1, 2017) ................................................................ 20

*Maher v. Durango Metals, Inc.*,
   144 F.3d 1302 (10th Cir. 1998) ............................................................................. 44, 45

*Malouf v. S.E.C.*,
   933 F.3d 1248 (10th Cir. 2019) .................................................................................... 26

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)................................................................................................... 13, 32

*Mbaku v. Carrington Mortgage Services, LLC*,
   735 Fed.Appx. 533 (10th Cir. 2018)............................................................................. 14

*McDermott v. Inovio Pharms., Inc.*,
   520 F. Supp. 3d 652 (E.D. Pa. 2021) ...................................................................... 20, 21

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
   900 F.2d 576 (2d Cir. 1990)......................................................................................... 11

*Medina v. Clovis Oncology, Inc.*,
   215 F. Supp. 3d 1094 (D. Colo. 2017)................................................................ 15, 35, 38

*Mishkin v. Zynex Inc.*,
   No. 09-cv-00780-REB-KLM,
   2011 WL 1158715 (D. Colo. Mar. 30, 2011) ............................................................... 17

*Miss. Pub. Emps' Ret. Sys. v. Boston Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2008)........................................................................................... 33

*Pirraglia v. Novell, Inc.*,
   339 F.3d 1182 (10th Cir. 2003) .................................................................................... 10

*S.E.C. v. Falstaff Brewing Corp.*,
629 F.2d 62 (D.C.C. 1980) ..................................................................................... 43

*S.E.C. v. Galaxy Foods, Inc.*,
417 F. Supp. 1225 (E.D.N.Y. 1976) ........................................................................ 1

*S.E.C. v. GenAudio Inc.*,
32 F.4th 902 (10th Cir. 2022) ........................................................................... 47, 48

*S.E.C. v. Parklane Hosiery Co., Inc.*,
558 F.2d 1083 (2d Cir.1977).................................................................................. 44

*Smallen v. The Western Union Co.*,
No. 17-cv-00474-KLM,
2019 WL 1382823 (D. Colo. Mar. 27, 2019) ......................................................... 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*,
551 U.S. 308 (2007)......................................................................................... passim

*Terenzini v. Goodrx Holdings*,
No. LA CV 20-11444-DOC-MAR,
2022 WL 122944 (C.D. Cal. Jan. 6, 2022) ............................................................. 24

*Turner Ins. Agency Inc. v Farmland Partners Inc.*,
No. 18-cv-02104-DME-NYW,
2019 WL 2521834 (D. Colo. June 6, 2019)...................................................... 30, 34

*United Food & Commer. Workers Int'l Union Local 464A v. Pilgrim's Pride Corp.*,
No. 20-cv-01966-RM-MEH,
2022 WL 684169 (D. Colo. Mar. 8, 2022) .............................................................. 12

*Voulgaris v. Array Biopharma Inc.*,
No. 17-cv-02789-KLM,
2020 WL 8367829 (D. Colo. Nov. 24, 2020) ...................................... 10, 24, 28, 44

*West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
No. 05-cv-01265-WDM-MEH,
2008 WL 879023 (D. Colo. Mar. 28, 2008) ............................................................ 19

*Wolfe v. AspenBio Pharma, Inc.*,
587 Fed.Appx. 493 (10th Cir. 2014)....................................................................... 32

*Yannes v. SCWorx Corp.*,
No. 20-cv-03349 (JGK),
2021 WL 2555437 (S.D.N.Y. June 21, 2021) ......................................................... 14

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
   426 F. Supp. 3d 864 (D. Kan. 2019) .......................................................................................... 44

**STATUTES, RULES AND OTHER AUTHORITIES**

15 U.S.C. § 78u-4(b)(2) ................................................................................................................ 28

Section 10(b) of the Securities Exchange Act of 1934 ........................................................... passim

Section 11 of the Securities Act of 1933 ............................................................................... passim

Section 14(a) of the Securities Exchange Act of 1934 ........................................................... passim

Section 20(a) of the Securities Exchange Act of 1934 ........................................................... passim

Lead Plaintiffs David P. Sarro, Kevin L. Tye, and Jess Q. Williams (together, "Plaintiffs"), by and through their undersigned counsel, hereby oppose Lightning eMotors, Inc., Timothy R. Reeser ("Reeser"), Teresa P. Covington ("Covington"), and Robert Fenwick-Smith's ("Fenwick-Smith") (together, "Lightning Defendants") Motion to Dismiss Plaintiffs' Consolidated Complaint (ECF No. 69) (hereafter, "LD Br.") and GigAcquisitions3, LLC, GigFounders, LLC, GigCapital Global, Avi S. Katz ("Katz"), Raluca Dinu ("Dinu"), Neil Miotto ("Miotto"), Brad Weightman ("Weightman"), John Mikulsky, Andrea Betti-Berutto ("Betti-Berutto"), and Peter Wang's ("Wang") (together, "Gig Defendants", and together with the Lightning Defendants, "Defendants") Motion to Dismiss Consolidated Complaint (ECF No. 72) (hereafter, "Gig Br.").

## I.    INTRODUCTION

"[F]ake it 'til you make it" is not a legitimate business plan under the securities laws.  *See S.E.C. v. Galaxy Foods, Inc*., 417 F. Supp. 1225, 1244 (E.D.N.Y. 1976).  "However strongly the promoters of an enterprise may believe in its potential, prospective investors must still be dealt with fairly and the unadulterated decision to invest or not must be theirs alone."  *Id.* at 1245.

*                         *                         *

This case concerns a special purpose acquisition vehicle ("SPAC") named GigCapital3, Inc. ("GigCapital3"), which was formed by a group of private equity investors to raise money through a traditional initial public offering ("IPO") and then identify and acquire a private company that would be taken public through a reverse-merger business combination.

Having first sold prospective investors on the SPAC's unique "Mentor-Investor™" business strategy, Defendants next sold investors on the SPAC's actual target, Lightning Systems, which later became Lightning eMotors, Inc. ("Lightning" or the "Company"), an electric vehicle

- 1 -

and powertrain ("EV") manufacturing company with enormous potential.  Lightning stood to produce and sell 500 EVs and earn up to $63 million in revenues in 2021 (as compared to 2020 revenues of only $9 million), Defendants said.  They claimed there were several reasons for investors to trust these numbers.  *First*, the Company had "strong" revenue "visibility."  At the start of 2021, Lightning already had an order backlog of 1,500 medium- to heavy-duty vehicles with an annual production capacity of 1,000 EVs.  *Second*, despite well-recognized worldwide supply chain issues, the Company remained on track to hit its projections because it had an "established network" of suppliers and manufacturing partners, which was "diversif[ied]" and had "a high degree of resilience" due to there being "multiple suppliers for each core component of [its] vehicles."  "Even with [its] battery supply," Defendants claimed Lightning had "a safety net against any single supplier constraint."  This "robust" supply chain for core components would purportedly be "a key driver in [Lightning's] ability to scale without unduly sacrificing quality or delivery times and serve as a foundation for [its] growth."  *Third*, if all of this wasn't good enough, delivery behemoth Amazon(!) was a "key customer[]" for Lightning's EVs.  *Fourth*, as a final selling point, the Company was backed by a SPAC made up of experts who would, for three to five years, lend their experience and leverage their relationships to support the Company's growth and serve as "[m]entor[s] to senior management as they grow and develop the business" with "a goal of reaching an enterprise value of over $1 billion."

Unfortunately for investors, Lightning's capabilities and prospects were greatly overstated. In truth, the Company's backlog of orders did not equate to strong revenue visibility since it was unable to fill the orders due to, among other things, its inability to source a sufficient supply of batteries.  As a result, Lightning was unable to scale production during the Class Period (May 18,

2020 through August 16, 2021, inclusive) and its manufacturing capacity remained flat throughout

2021, at about two or three EVs per week. Nor was Amazon a "key customer," or even a customer

at all, after it had suspended its 15-van pilot project with Lightning in 2020 due to significant

quality and performance issues. And, the SPAC's purported experts never intended to stick around

to help Lightning scale its production or expand its operations. Within months of the de-SPAC

transaction, they had cashed out and walked away from the Company. Consequently, Defendants

violated the federal securities laws by failing to provide prospective investors with a complete,

accurate and candid assessment of the then-current state of Lightning's business and prospects.

Defendants move to dismiss, claiming that Plaintiffs' allegations are nothing more than

hindsight speculation and are not particular enough to support securities claims. But Plaintiffs'

allegations of then-existing, undisclosed facts are detailed, numerous, coherent and plausible, and

many are supported by contemporaneous accounts of Lightning's former employees or even later

acknowledged by Defendants. Nor should the Court credit Defendants' attempts to rewrite

Plaintiffs' complaint by claiming that Plaintiffs are seeking to hold them liable for not anticipating

Ford's decision to shut down chassis production due to a surge in COVID-19. Plaintiffs'

allegations show that Lightning's battery supply constraints and related problems existed

throughout the Class Period and that these longstanding issues, not a sudden shortage of chassis,

were a major reason for the Company's inability to scale production and meet its financial

projections. Defendants may not, on a motion to dismiss, rely on materials outside of the

Complaint to contradict Plaintiffs' well-pleaded allegations.

Defendants also complain that Plaintiffs fail to allege direct evidence of their scienter. But

scienter, like all mental states, is typically established through circumstantial evidence. Plaintiffs

here do just that, raising an inference of scienter (and negligence) that is as compelling as, if not more compelling than, any competing innocent inference.  To wit, it is simply implausible that the Company's most senior executives, who provided the 500-vehicle projection for 2021, who ran a company that does one thing: produce EVs, and who had just raised hundreds of millions of dollars in capital, would not know exactly why it could not produce and sell more than two or three vehicles per week.

Defendants raise a litany of lesser challenges to the Complaint which are equally misguided and, as addressed below, may not serve as a basis to dismiss Plaintiffs' claims.  Because Plaintiffs meet or exceed the pleading requirements for securities claims imposed by the Rule 8, Rule 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), Defendants' motions to dismiss should be denied and this action allowed to proceed to the next stage of litigation.

## II.    PLAINTIFFS' ALLEGATIONS

### A.    The Creation of GigCapital3 and Its IPO

Lightning began as GigCapital3, a SPAC formed at the direction of defendants Katz and Dinu (with defendant Miotto serving as a minority partner).  ¶¶3, 34–36.[1]  Like other SPACs, GigCapital3 did not have any operations of its own; its sole purpose was to pool funds through an IPO in order to later combine with a late-stage private company.  ¶¶3, 50.  Because SPACs may not identify acquisition targets prior to going public, investors' investment decisions are typically based upon the SPACs' management team, their business experience, their stated investment thesis

---

[1] All "¶" or "¶¶" references herein are to Plaintiffs' Consolidated Complaint for Violation of the Federal Securities Laws (ECF No. 52) (the "Complaint").  Unless otherwise noted, all emphasis is added and internal citations are omitted.

and strategies, and management's track record.  ¶¶3, 44.  GigCapital3's May 12, 2020 registration statement for its IPO, which incorporated its prospectus (collectively, the "Registration Statement"), stated that the Gig Defendants' strategy involved a "unique" "Mentor-Investors™" approach to private equity.  ¶¶4, 32–33, 52-53.  GigCapital3 would place members of its management on the board of the target company and use their considerable experience to mentor and partner with the target's management for several years.  ¶¶4, 52–53.

The Gig Defendants' sales pitch succeeded.  In its May 18, 2020 IPO, GigCapital3 sold 20 million publicly-traded units (each consisting of one share of common stock and three-fourths of one warrant) for gross proceeds of $200 million.  ¶52.[2]  With the IPO complete, GigCapital3 had eighteen months, until November 18, 2021, to close a business combination.  ¶54.  If it was unable to timely close a deal, it would be obligated to redeem 100% of its outstanding public shares equal to the aggregate proceeds from the IPO, plus interest.  *Id.*

On December 10, 2020, GigCapital3 announced that it would acquire Lightning Systems, an EV designer and manufacturer with a focus on medium and heavy duty commercial fleets, for a pro forma equity value of $823 million, to be funded by its IPO proceeds, $539 million in new common stock, and $125 million from a private placement (the "Business Combination").  ¶¶55–58.  The Business Combination would be structured such that the surviving entity would become "Lightning eMotors," with GigCapital3's and Lightning System's shareholders becoming shareholders of Lightning eMotors (NYSE: ZEV, ZEV.WS).  ¶¶59, 60.  The Business

---

[2] Prior to the IPO, GigAcquisitions3 purchased 5,735,000 shares of GigCapital3 stock for just $25,000, or $0.0044 per share.  ¶50.  This was followed by additional private awards of 5,000 shares to each of defendants Weightman, Betti-Berutto and Wang, and a private placement of 650,000 units to GigAcquisitions3.  ¶50.

Combination, however, would only close if approved by GigCapital3's shareholders, who would vote on the merger at an April 21, 2021 shareholders meeting. ¶61. The deal also required that a sufficient number of GigCapital3 shareholders forego their right to redeem their GigCapital3 shares in connection with Business Combination. ¶54. If too many shareholders elected to redeem their shares, the Business Combination would no longer be economically feasible. *Id*.

> **B.    Lightning and the Gig Defendants Issue a Misleading Proxy in Order to Obtain Shareholder Approval of the Business Combination**

On March 26, 2021, GigCapital3's proxy statement seeking shareholder approval for the Business Combination was declared effective by the SEC (the "Proxy"). ¶66. In the Proxy, GigCapital3's board unanimously recommended that shareholders vote in favor of the merger because "[it] was fair from a financial perspective to its stockholders." ¶67. The Proxy also repeatedly emphasized that members of the GigCapital team would remain involved in the new Lightning eMotors following the Business Combination, and it proposed a slate of directors which included defendants Katz (as Co-Chairman of the new Lightning's board of directors ("Board")), Dinu, and Miotto (as co-chairman of the Board's audit committee). ¶68.

The Proxy focused heavily on Lightning's anticipated explosive growth, stating that it was on track to achieve $63 million in revenue in 2021 with a 14% gross profit margin, and $354 million in 2022 with a 19% gross profit margin. ¶69. The Proxy assured investors that Lightning's financial projections were "backed by existing customer contracts" that "completely cover[ed]" estimated 2021 revenue" and "over 25% of 2022 revenue." ¶70. The Proxy also represented, among other things, that Lightning had "built an extensive ecosystem of supply-chain partners," resulting in a supply chain "optimized for quality, reliability, and cost" and that because Lightning

had "relationships with multiple suppliers for each core component of our vehicles, we are able to build and maintain a high degree of resilience in our supply chain[.]" ¶72.

### C.    Lightning's Undisclosed Operational Challenges

While Defendants portrayed Lightning as primed for quick expansion, it was in fact facing a series of known operational challenges which would necessarily prevent a rapid ramp up of production and which rendered its 2021 financial projections unachievable. ¶¶77–84. Contrary to what investors were told, Lightning did not have a robust, optimized or resilient supplier network in place at the time the Business Combination was announced or the Proxy was issued. ¶¶79–82. Instead, the Company was experiencing worsening shortages of core components, which created a choke point preventing the Company from scaling up production beyond two to three completed EVs per week at any point during 2021. ¶¶89, 108. For example, as a small EV producer with limited business, Lightning was forced to work with small battery suppliers like Octillion and eMatrix Energy Systems that simply could not supply Lightning with enough batteries to materially increase the Company's EV production. ¶¶80, 110, 117. Partially built vehicles often remained sitting on the factory floor for weeks or months until batteries or other core components became available. ¶¶82, 111, 125. This crippling shortage of batteries and other core components continued throughout the Class Period. *See* ¶¶111, 124, 126, 131.

Making matters worse, Lightning's EV technology was not yet fully developed and tested. ¶¶80, 83, 120–121, 123, 129. As a result, Lightning's vehicles suffered an astounding failure rate of *40% to 50%* and sometimes required repairs just days after delivery. ¶¶83, 110, 130. Lightning's cyclical hiring and firing practices left the Company without adequately trained staff, which compounded these issues. ¶¶84, 118–19, 123. Nevertheless, the Company pushed vehicles

- 7 -

out to customers before they were entirely debugged in order to meet quotas and promised delivery times.  ¶¶116, 121, 123, 128.  In 2020 and early 2021, this practice cost the Company several important contracts because customers such as Amazon were dissatisfied with the poor performance of Lightning's vehicles.  ¶¶115–116, 119–122, 128, 130.

**D.      Lightning's Significant Operational Problems Continue Following the Business Combination's Close**

GigCapital3 shareholders voted in favor of the Business Combination on April 21, 2021 and elected the slate of directors proposed in the Proxy, including Katz, Dinu, and Miotto.  ¶85. The deal closed on May 6, 2021 and, on May 7, 2021, Lightning's common stock and warrants began trading on the NYSE.  ¶¶86–87.  Following the closing, GigAcquisitions3 (and thereby Katz and the Gig Defendants) owned 8.3% of Lightning's outstanding shares, defendant Fenwick-Smith owned 6.8%, and defendant Reeser owned 1.9%, while Aravaipa Venture Fund, in which Fenwick-Smith and Reeser both had financial interests, owned 6.3%.  ¶87.

Just three business days after the merger closed, on May 11, 2021, the new Lightning Board held its first meeting where it reclassified the directors that had just been elected.  ¶88.  Now, Katz and Dinu would be Class I directors along with Miotto, requiring re-election at the annual shareholder meeting to be held in October 2021, rather than serving initial terms of three and two years, respectively.  *Id.*  No reason was given for the sudden change.  *Id*.

Not even a week later, on May 17, 2021, Lightning disclosed disappointing first quarter results.  Lightning had completed and sold just thirty-one vehicles and one powertrain kit – barely two EVs per week.  ¶89.  The Company lost $27.4 million for the quarter on revenues of just $4.6 million.  *Id.*  Lightning also lowered its financial guidance to $50 million to $60 million in revenue for 2021, rather than the $63 million provided in the Proxy, an approximate 5% to 20% reduction.

*Id.* Although the Company blamed the shortfalls on supply chain delays and resultant "production inefficiencies," it reaffirmed its 500 EV production/sales projection for 2021. ¶90. Defendant Reeser assured investors that supply chain issues would not inhibit a rapid scaling of production, stating "[e]ven with our battery supply, we have . . . a safety net against any single supplier constraint." *Id.*

### E.    The Truth Is Revealed

On August 16, 2021, Lightning investors were stunned to learn that, despite Defendants' recent assurances, the Company had not made any tangible progress in scaling its production during Q2 2021 and that, as a result, it was nowhere close to being on track to produce 500 EVs for 2021. ¶101. Lightning disclosed that it had produced and sold only thirty-seven vehicles and powertrain systems during the quarter (less than three EVs per week), for revenue of just $5.9 million. ¶101. The Company also announced that it was withdrawing its prior financial guidance for 2021 and, without any explanation, stated that Katz, Dinu, and Miotto would not be running for re-election to the Lightning Board at the October 7, 2021 shareholders' meeting. ¶¶102–103.

Following these disclosures, Lightning's stock price dropped 17% from a closing price of $9.63 per share on August 16, 2021, to close at $8 per share on August 17, 2021. ¶104. Its warrant price suffered an even more severe 21% single-day decrease, dropping to a closing price of $1.44 on August 17, 2021 from a prior-day closing price of $1.82. ¶104. As of May 16, 2022, Lightning's closing stock price was $3.94 per share – just *39%* of the pre-Business Combination redemption price of $10.10 per share. ¶108.

## III.    LEGAL STANDARD

To withstand a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to

state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Courts must accept all well-pleaded allegations as true, draw all reasonable inferences in the favor of the non-moving party and construe the pleading in the light most favorable to plaintiffs. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 322–23 (2007). Accordingly, "the Court must decline a defendant's invitation to conclude that facts alleged by the plaintiffs are simply false, regardless of whether the plaintiffs' claims 'seem far-fetched.'" *Smallen v. The Western Union Co.*, No. 17-cv-00474-KLM, 2019 WL 1382823, at *5 (D. Colo. Mar. 27, 2019) (quoting *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1193–94 (10th Cir. 2003)). "Moreover, the Court must accept the truth of the confidential witnesses' accounts as pled in the [complaint] and decline to assess those witnesses' credibility." *Smallen*, 2019 WL 1382823, at *5.

### A.    PLAINTIFFS ADEQUATELY PLEAD EXCHANGE ACT CLAIMS

"Securities fraud claims are [] subject to the heightened pleading requirements of both Rule 9(b) and the PSLRA." *Voulgaris v. Array Biopharma Inc.*, No. 17-cv-02789-KLM, 2020 WL 8367829, at *6 (D. Colo. Nov. 24, 2020). To adequately allege a claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, a plaintiff must plead: (1) a misrepresentation or omission of material fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; and (5) loss causation and economic loss. *Grossman v. Novell*, Inc., 120 F.3d 1112, 1118 (10th Cir. 1997). To plead a Section 14(a) claim, a plaintiff must allege that: "(i) the proxy statement contained a material misrepresentation or omission; (ii) defendants were at least negligent; and (iii) that the proxy statement was an essential link in the completion of the transaction at issue." *Lane v. Page*, 581 F. Supp. 2d 1094, 1110–11 (D.N.M. 2008).

- 10 -

### 1.    Plaintiffs Allege Materially False and Misleading Statements

To allege an actionable false or misleading statement, a plaintiff must plead: "(1) each statement alleged to have been misleading; [and] (2) why the statement is misleading." *In re Molycorp, Inc. Sec. Litig.* ("*Molycorp II*"), 157 F. Supp. 3d 987, 1002 (D. Colo. 2016).  If "a reasonable person would find the defendant's statements to be false or misleading, 'the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements.'"  *Id.* at 1003.  In making this determination, a court may consider the detail provided, the number of facts alleged, the coherence and plausibility of the allegations as a whole, the reliability of the source of information (if provided), and any other helpful indicia. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099 (10th Cir. 2003).[3]

### a.    Defendants' Statements About the Company's Strong Revenue Visibility, Robust Supply Chain, and Amazon Being a Key Lightning Customer Were False and/or Materially Misleading When Made

On December 10, 2020, Defendants began publicly touting Lightning's strong "visibility" into its future revenues due to an impressive backlog of purchase orders and an "annual production capacity of 1,000 vehicles today," "expanding to 3,000 in 2021," and then to "10,000 vehicles per year in 2022."  ¶¶63, 134, 136.  Its impressive ability to "quickly scale revenues" was purportedly not only due to this "backlog of contracted purchase orders," but also the competitive advantage of Lightning's "optimized" supply chain which was already in place.  ¶¶64, 136, 138, 163.  The

---

[3] Additionally, "[s]tatements of literal truth 'can become, through their context and manner of presentation, devices which mislead investors.'"  *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, No. 2:20-cv-00368-JNP-DBP, 2022 WL 716653, at \*5 (D. Utah Mar. 9, 2022) (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)).

robust supply chain, which involved multiple partners "for each core component," that is, "supply chain diversification," was particularly important to investors since Defendants claimed that Lightning's redundancies "prevented major disruptions in production" despite the global supply chain troubles. *See* ¶¶72, 141, 148, 156, 161, 163. Because of this, securities analysts observed that Lightning was "relatively insulated" from worldwide supply chain disruptions as compared to its peers. ¶¶75–76. Thus, its already-in-place, "optimized" supply chain would not only ensure that the Company would meet its production goals but would allow Lightning to "reduce [its] cost-of-goods-sold by up to 50% over the next 18 months."[4] ¶¶72, 148, 163. On June 17, 2021, defendant Reeser specifically assured analysts and investors that because Lightning's supply chain continued to be sound, it expected to meet production projections. He said, "So, we can have – we have inventory on the side of chassis, we have inventory of batteries" and "based on what we have on site today and what we have today, and what our suppliers have told us they will continue delivering, we do feel confident in [Lightning eMotors' projections]." ¶¶96, 161. He continued,

---

[4] Defendants argue that a claim of an optimized supply chain is a subjective statement that "no reasonable investor could find . . . important." LD Br. at 17 (quoting *In re Level 3 Comm'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012)). Yet, Defendants repeatedly stated that Lightning's supply chain diversification allowed it to scale notwithstanding worldwide supply disruptions. ¶¶95, 141, 148, 156, 161, 163. Securities analysts believed them. ¶97 ("[Lightning was] managing the [supply chain] risks by building redundancy in suppliers"). This is not a meaninglessly vague statement. *Compare United Food & Commer. Workers Int'l Union Local 464A v. Pilgrim's Pride Corp.*, No. 20-cv-01966-RM-MEH, 2022 WL 684169, at *5 (D. Colo. Mar. 8, 2022) (rejecting vague statements "lacking in specificity" such as "strong" customer relationships). Also, Defendants' statement "that [Lightning] leveraged an established network of US commercial manufacturing partners – making it easier to scale!" is alleged to be materially *misleading*, as are Defendants' statements about the competitive advantage of Lightning's "very important" third generation supply chain. ¶¶138, 139(b)-(c), 159, 162(b); *see* LD Br. at 15 (wrongly claiming statements are inactionable because they were not alleged to be *literally false*).

"[e]ven with our battery supply, we have . . . a safety net against any single supplier constraint."

¶¶90, 156.[5]

This was untrue.  Lightning's undisclosed operational problems ensured that the Company could not quickly scale its EV production or capture the associated revenues.  ¶¶77–84.  For example, Lightning's supply chain as it related to batteries—a core component in the Company's vehicles—was anything but "optimized," "diversified," or "resilient."  Rather, as multiple former Lightning employees confirm, throughout the entirety of the Class Period the Company suffered from a crippling shortage of batteries which prevented it from scaling production above an average of about two vehicles per week.  ¶¶89, 101, 108, 111–12, 117, 124, 126.  Accordingly, Reeser's assurance that Lightning had secured a sufficient inventory of batteries was false or materially misleading when made.  So were the statements touting Lightning's resilient supply chain and its ability to quickly scale in 2021, 2022 and beyond, absent disclosure of these then-existing, known choke points.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (disclosure required to make "statements made, in the light of the circumstances under which they were made, not misleading").  Thus, the backlog figures did not provide "visibility"; they were a misleading mirage because Lightning lacked the parts needed to convert the orders to completed EVs at a rate anywhere near what was necessary to meet its targets.[6]  *See Yannes v. SCWorx Corp.*, No. 20-cv-

---

[5] Defendants' purported disclosures regarding existing supply constraints (LD Br. at 14 n.6) cannot insulate them from liability given their repeated assurances that such constraints would not prevent Lightning from meeting its projections.  *See* ¶¶159–161.

[6] Even if the backlog figures were literally accurate as Defendants claim (LD Br. at 11–12), the inability to fulfill the backlog due to known supply constraints made the figures, and especially the revenue projections, actionably misleading. *Gelt Trading*, 2022 WL 716653, at *5 (even where

03349 (JGK), 2021 WL 2555437, at *4, *7 (S.D.N.Y. June 21, 2021) (defendants' statements

touting $840 million committed purchase order of COVID test kits was actionable given problems

with the supplier that defendants recklessly disregarded).

The Lightning Defendants counter that the Company's inability to scale had nothing to do

with batteries, supply chain diversification, or any undisclosed operational issue. Instead, they

claim that because of a resurgence in COVID-19 in the summer of 2021, Lightning just could not

get enough chassis from Ford, thereby preventing the Company from meeting its numbers. *See*

LD Br. at 1, 4–5, 11; Gig Br. at 8. But this is not at all what Plaintiffs allege, and their well-

pleaded allegations, which are supported by particularized witness accounts and later validated by

Reeser himself (¶107), must be taken as true on a motion to dismiss. *See In re Allianz Glob. Invs.*

*U.S. LLC Alpha Series Litig.*, No. 20 Civ. 5615 (KPF), 2021 WL 4481215, at *31 (S.D.N.Y. Sept.

30, 2021) ("Defendant's failure to predict the COVID-19 pandemic is unrelated to [plaintiff]'s

actual allegations, which are that [d]efendant improperly concealed a change in investment

strategy that left the [f]unds severely exposed to an increase in volatility").[7]

---

a statement may be considered literally true, it may become, through its context and presentation,
actionably misleading).

[7] Plaintiffs object to Defendants' introduction of materials outside of the Complaint to establish
the truth of the matters asserted therein. *See Mbaku v. Carrington Mortgage Services, LLC*, 735
Fed.Appx. 533, 536 & n.1 (10th Cir. 2018) (citing *Tellabs*, 551 U.S. at 322) (courts may consider
certain documents outside of the complaint to show their contents, but not to establish the truth of
their contents). Courts have noted "a concerning pattern in securities cases like this one: exploiting
[the judicial notice and incorporation doctrines] improperly to defeat what would otherwise
constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988, 998 (9th Cir. 2018). Defendants here attempt just that by claiming 'incorporation
by reference' to try to disprove a key contested allegation in this case—that Lightning's continuing
supply constraints largely related to an ongoing, undisclosed shortage of batteries and *not* COVID-
19 or the publicly announced Ford shutdown. This is a critical factual dispute that may not be
settled by the Court accepting the truth of matters asserted in documents outside of the Complaint

Defendants next urge the Court to reject Plaintiffs' confidential witness ("CW") accounts as "general anecdotes" of "occasional[] . . . component delays" and "workplace gripes" by "low-level former employees." LD Br. at 15–16. Defendants' characterizations aside, these witnesses confirm that, during the Class Period, Lightning was suffering from crippling supply chain issues, in particular an ongoing shortage of batteries, which necessarily prevented it from scaling production. ¶¶79–80. According to CW1, a Company service technician through mid-2021 who also served in a production role, Lightning's biggest supply problem was a shortage of batteries, as the Company's existing battery suppliers could not keep up with demand. ¶¶110–111. CW1 stated that in mid-2021 it was common practice to set aside partially completed EVs to wait for necessary parts and, on at least one occasion, employees were instructed to remove batteries from completed vehicles and reinstall them in other vehicles in order to double count completed vehicles. ¶¶111–112. Making matters worse, one of Lightning's key battery suppliers, eMatrix, supplied unreliable batteries such that technicians were constantly swapping batteries in customers' vehicles. ¶112. CW1 added that Lightning's vehicle failure rate was an astounding 40% to 50% "across the board," making scaling production virtually impossible. ¶¶110–111.

CW1's allegations are corroborated by numerous other sources. CW2, who worked as an engineer in 2019 and 2020, confirmed that Lightning had been forced to work with "lower tier" battery suppliers (such as eMatrix and Octillion) since large battery suppliers did not want to work

over Plaintiffs' well-pled allegations. *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1102 (D. Colo. 2017) (refusing to consider documents outside of the complaint "to either establish the truth of a matter or make 'sweeping' claims about what the financial market as a whole believed."). *See also, e.g.,* LD Br. at 2–6, 8, 11, 14 (relying on exhibits outside of the Complaint for the truth of their contents); Gig Br. at 3–4, 8, 12-13, 19, 22 (same). This gambit is particularly unfair given that Plaintiffs have not yet had access to a single document in discovery.

with the Company.  ¶117; *see also* ¶81 (June 2021 Company presentation listing eMatrix and Octillion as battery suppliers); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-class period allegations relevant "to establish that at the start of the class period, defendants had a basis for knowing increased [product] sales were unlikely in the third quarter").  CW3, a manufacturing supervisor who left the Company during the Class Period, in spring 2021, agreed that there were significant supply issues at Lightning, particularly with batteries, and added that these issues were getting progressively worse.  ¶124.  CW3 reported that due to the constant shortage of batteries, Lightning would prioritize vehicles which only required one battery so it could complete more vehicles. ¶125.  Like CW1, CW4 (a manufacturing supervisor through spring 2021) reported that his/her team could not meet their build quotas due to insufficient battery supplies.  ¶126.  CW6, a senior technician during the Class Period, agreed that Lightning always had supply issues and that they had gotten progressively worse toward the end of 2020 and beginning of 2021.  ¶131.

The witness accounts are further substantiated by defendant Reeser's post-Class Period admission that instead of being redundant, diversified, and robust (or as Defendants now claim, made up of large suppliers (LD Br. at 14 n.7)), Lightning's "supply chain has been largely made up of early-stage, small volume manufacturers" and "we couldn't get [parts] from other people in the scale we need them."  ¶107; *see Scholastic*, 252 F.3d at 72 ("our cases have relied on post-class period data to confirm what a defendant should have known during the class period.").[8]

---

[8] The CW accounts are fully consistent with other facts alleged in the Complaint.  For example, while struggling to build and sell just thirty-two EVs during Q1 2021, Lightning announced on March 16, 2021 that it had hired a veteran of Tesla and Rivian as Chief Procurement Officer ("CPO") to "lead all purchasing activities."  ¶179.  The new CPO's resignation just months later, two months into his first full financial quarter, three weeks after the merger, and two weeks after

Plaintiffs' witnesses also explain that Amazon was no longer a Lightning customer and certainly could not reasonably be considered a "key customer" by the time Defendants made that claim on January 4, 2021. ¶142; *see* ¶119 (CW2: Amazon fifteen van pilot plan, which could have led to a 100 van order, put on hold in spring 2020 due to performance issues); ¶120 (CW3, who worked primarily on the Amazon project: vans provided were unverified, untested, and potentially unsafe, and required a significant number of repairs, leading to Amazon threatening to "pull the contract"); ¶128 (CW5: vans provided to Amazon performed well-below customer expectations). Defendants' footnote suggestion that despite the 2020 pilot program's abject failure, Amazon could have become a "key" customer shortly thereafter, is speculative, implausible and contrary to the allegations in the Complaint. *See* LD Br. 17 n.8.

Plaintiffs' CW allegations, which significantly strengthen the totality of Plaintiffs' allegations of falsity, "are entitled to significant weight because the complaint describes the bases of the CWs' knowledge, the positions they held, their exposure to the relevant conduct, and the relevant time frame." *See Mishkin v. Zynex Inc.*, No. 09-cv-00780-REB-KLM, 2011 WL 1158715, at *7 (D. Colo. Mar. 30, 2011); *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1089 (D. Colo. 2004) (CW allegations credited where the complaint supported the probability that employees

---

Lightning reduced its guidance, was highly unusual but entirely consistent with the witness accounts of the fiasco surrounding Lightning's supply chain and related production issues. ¶180. The contemporaneous witness accounts are also consistent with Lightning's acknowledged failure to boost production above an average of two or three EVs per week at any time during 2021. *See* ¶¶89, 108. That Defendants were rejected by some forty-five potential PIPE investors, who had access to inside information from due diligence, is also consistent with the witness accounts of ongoing and known supply chain issues which would prevent Lightning from quickly scaling production. ¶¶176–77. As is the fact that, ultimately, Lightning's only PIPE investor already held 31% of Lightning's private equity and shared Defendants' motive to close the Business Combination at any cost. ¶177.

possessed the information alleged by disclosing their positions within the company).[9]

### b.    Defendants' Statements Concerning Lightning's Projections Were False and/or Materially Misleading When Made

Entwined with Defendants' materially misleading claims about Lightning's robust supply chain, its revenue visibility, and its ability to quickly scale production, were statements about the Company's $63 million (and then $50 million to $60 million) 2021 revenue targets and statements indicating that it was on track to meet its projections. Defendants say these claims are "fraud by hindsight" because Plaintiffs supposedly rely on the fact that Lightning withdrew its guidance to show falsity. LD Br. at 10–11. Not so. Because of Lightning's *then-existing* (and worsening) supply chain constraints, its inability to scale, and its related vehicle failure rates, it was not on track or well-positioned to meet its guidance at the time the statements were made. Thus, the projections themselves were materially misleading without disclosure of the true extent of then-existing supply and production shortcomings which would inevitably prevent Lightning from achieving its stated goals. That is not fraud by hindsight. [10] *See Berson v. Applied Signal Tech.,*

---

[9] Plaintiffs' allegations are unlike those in *Lululemon* where the CWs only described general quality issues and where there were no CW facts suggesting "the alleged statements were false when they were made*." In re Lulelemon Sec. Litig.*, 14 F. Supp. 3d 553, 579–80 (S.D.N.Y. 2014). Nor are Defendants' other authorities helpful to the Court's analysis. *See* LD Br. at 15–17; *In re Lehman Bros. Sec. & Erisa Litig*., Nos. 10 Civ. 6637(LAK), 09 MD 2017(LAK), 2013 WL 3989066, at *3–*4 (S.D.N.Y. July 31, 2013) (refusing to credit CW accounts taken from another complaint in another case with different counsel); *Exkae Ltd. v. Domo, Inc*., No. 2:19-CV-781-DAK-DAO, 2020 WL 7352735, at *6 (D. Utah Dec. 15, 2020) (refusing to credit witness accounts where the CWs "do not agree about the reasons for a decline in billings"); *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 252 (S.D.N.Y. 2020) (discounting CW's subjective views as not compelling); *Gregory v. Pronai Therapeutics Inc*., 297 F. Supp. 3d 372, 408–09 (S.D.N.Y. 2018) (rejecting CW allegations "unmoored in time").

[10] *In re PolarityTE, Inc., Sec. Liti*g., on which Defendants rely (LD Br. at 8), is thus distinguishable. *See* No. 2:18-cv-00510*,* 2020 WL 6873798, at *7–*8 (D. Utah Nov. 22, 2020) (dismissing statements of opinion that product was appropriately registered under a specific FDA code section when plaintiff merely relied on later statements by the FDA that it should have been registered

*Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008) (company's statement of anticipated revenues from backlog of work misleading because it failed to disclose that a significant portion of the "backlogged" work was "substantially delayed and at serious risk of being cancelled altogether.").

Further, Defendants' statements are not protected by the PSLRA's "safe harbor," which immunizes from liability a forward-looking statement that is identified as such and accompanied by meaningful cautionary statements, or is immaterial; or where the plaintiff fails to show the statement was made with actual knowledge of its falsehood. LD Br. at 12–13; *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1220 (N.D. Okla. 2003). To begin, the PSLRA's safe harbor does not apply to omissions of present fact. *See In re Williams Sec. Litig.,* 339 F. Supp. 2d at 1231. Therefore, for example, Defendants' misleading failure to disclose Lightning's long-running and worsening inability to source sufficient batteries and other core components from its suppliers, which would inevitably prevent it from achieving its targets, is not forward-looking. *See West Palm Beach Firefighters' Pension Fund v. Startek, Inc*., No. 05-cv-01265-WDM-MEH, 2008 WL 879023, at *17 (D. Colo. Mar. 28, 2008) ("The alleged non-disclosure of the loss of the Microsoft contract, which allegedly represented 34.4% of the company's revenues, is not a forward looking event").

---

under a different code section to prove falsity). Similarly, unlike here, Defendants' other cases did not include well-pled facts demonstrating that their guidance was not made in good faith. *See* LD Br. at 10 (citing *In re Overstock Sec. Litig.*, No. 2:19-CV-709-DAK-DAO, 2020 WL 5775845, at *6 (D. Utah Sept. 28, 2020) ("There is no well-pled fact suggesting that the guidance did not reflect the company's good faith projection . . . at the time it was given.") and *Domo*, 2020 WL 7352735, at *6 ("Plaintiffs have not demonstrated that any of the challenged opinions were unjustified.")).

Where a defendant makes a "mixed present/future statement," the safe harbor provision

does not apply "to the part of the statement that refers to the present." *In re Gold Res. Corp. Sec.*

*Litig.*, 957 F. Supp. 2d 1284, 1295 (D. Colo. 2013).[11]  Courts recognize that statements indicating

that a company is on track to meet its projections contain both a present fact component (that is,

the company is *currently* on track) and a forward-looking element.  *See, e.g., Lorusso v. Boulder*

*Brands, Inc.*, No. 15-cv-00679-MSK-KMT, 2017 WL 4365180, at *10 (D. Colo. Mar. 1, 2017)

(listing numerous mixed present/future statements each premised upon "representations that

customer service and operations had reached satisfactory levels," including statement that "looking

at the April volumes we are seeing, we are confident that we're on track to deliver results in line

with our plan and guidance").  The present fact elements of such statements are not protected by

the PSLRA's safe harbor.  *See Gold Resource*, 957 F. Supp. 2d at 1296.

In *McDermott v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652 (E.D. Pa. 2021), Inovio's

assertion that it remained on track to produce one million doses of its vaccine by year end was not

protected as forward-looking because, at the time of the statement, the company lacked the

manufacturing capacity to do so.  *Id.* at 666.  The court found that such a projection was

"inextricably linked to Inovio's current manufacturing capabilities."  *Id.*; *see also IBEW Local 98*

*Pension Fund v. Best Buy Co., Inc.*, 958 F. Supp. 2d 1065, 1076 (D. Minn. 2013) ("Best Buy's

statements claiming that it was 'on track to meet or exceed our annual guidance' and that 'earnings

---

[11] Defendants suggest that Lightning's financial projections were not false or misleading as of the date they were purportedly completed, November 29, 2020.  LD Br. at 10 n.3.  But the projections were included in the March 26, 2021 Proxy, which was issued during the final week of the Company's Q1 2021.  As alleged, absent a statement that the Company was no longer on track, "[i]nvestors could . . . reasonably expect that the projections aligned with recent performance." ¶70.  Nevertheless, Defendants reiterated or reaffirmed the same or similar projections throughout the Class Period without any such disclaimer or temporal limitation.  *See, e.g.,* ¶¶134, 156, 159.

are essentially in line with our original expectations for the year' are not forward-looking and are, therefore, actionable as a statement of present condition.").

Here too, Defendants' statements about Lightning's targets and projections have a present fact component which is "inextricably linked to [Lightning's] current manufacturing capabilities." *Inovio Pharms.*, 520 F. Supp. 3d 652 at 666. To wit, on December 10, 2020, Defendants touted 2021 projected revenues of $63 million, based upon sales supported by fully "contracted orders ... in place *today*" and an "annual production capacity of 1,000 vehicles *today*." ¶¶134, 136–138. On March 26, 2021, Reeser stated that "Lightning eMotors has *maintained* remarkable momentum since [it] announced the proposed business combination in December." ¶152; *In re Eros Int'l PLC Sec. Litig.*, No. 19-14125, 2021 WL 1560728, at *7 (D.N.J. Apr. 20, 2021) ("We have *maintained* a strong balance sheet *and built-in* working capital efficiencies" not forward-looking) (emphasis in original). On May 17, 2021, Lightning revised its guidance downward, claiming it *currently* was "well-positioned to achieve its 2021 forecast of over 500 purpose-built zero-emission commercial vehicles" and that "Q1 2021 *continued* the fast sales and delivery growth that started in 2020." ¶156; *see Gold Resource*, 957 F. Supp. 2d at 1296 ("as we *continue* on our trajectory for aggressive production growth" not forward-looking) (emphasis in original). On June 17, 2021, the Company expressly reaffirmed its 2021 revenue projections and updated its gross margin targets, with Reeser stating that Lightning's confidence in the projections was based in part upon components "on site *today*," and that the Company's *mature supply chain* would help drive positive gross margin in Q4 2021. ¶¶159, 161.

Even if some statements can be considered forward-looking, Lightning's generic, boilerplate warnings do nothing to alert investors to current, ongoing critical risks known to

- 21 -

Defendants.  Defendants identify five warnings which they claim to be "highly specific," which cautioned that Lightning's projections may not be indicative of future results or were subject to a variety of unspecified risks and uncertainties.  LD Br. at 13.  But each of these five warnings is the definition of boilerplate, being inherently applicable to virtually any estimate or projection.  *Id.* Accordingly, Defendants' statements are not protected by the PSLRA's safe harbor.  *See In re Williams Secs. Litig.*, 339 F. Supp. 2d at 1232 (warnings "were simply not enough in light of what Defendants knew at the time they made their false statements").

**c.    Defendants' Statements About GigCapital's Mentor-Investor Approach Were Materially Misleading When Made**

Defendants' statements about GigCapital's plan to partner with Lightning by applying its "unique" mentor-investor approach over the long term were materially false and misleading when made.  For instance, on March 26, 2021, defendant Dinu reaffirmed statements made in the Proxy (and before), that "[t]he GigCapital team stays true to our Mentor Investor mission partnering with the exceptional management team of Lightning eMotors through the IPO and beyond, as we continue to build together a solid company to last."  ¶¶150, 152.  On March 31, 2021, just three weeks before the shareholder vote, the Gig Defendants confirmed, "[w]e intend to apply a unique 'Mentor-Investor' philosophy to partner with Lightning where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company."  ¶154.  Having received no further updates on GigCapital's mentor-investor partnership with Lightning, shareholders voted to approve the Business Combination and elect the slate of directors proposed in the Proxy on April 21, 2021, and the deal closed on Thursday, May 6, 2021.  ¶85.

Then, just three business days later, on Tuesday, May 11, 2021, the Lightning Board held its first meeting and—without any explanation—reclassified Katz's and Dinu's respective two- and three-year terms such that they would face reelection with Miotto in only five months, in October 2021. ¶88; *see also* ¶103 (August 16, 2021 announcement that Katz, Dinu, and Miotto would not run for reelection). This is not just a situation where a director resigns under questionable circumstances. Rather, the hasty departures of Katz, Dinu, and Miotto represented a fundamental change in the business plan for Lightning going forward as a public company. The entire premise of investors' investment in GigCapital3 was its management and their unique "Mentor-Investors™" program. ¶¶32, 53, 132, 144, 150, 154. This much-hyped strategy was then abruptly thrown to the curb after the successful close of the Business Combination, without explanation. ¶¶10, 12, 171. From the timing and nature of this fundamental change in business strategy alone, a reasonable person would infer that the Gig Defendants had not been forthcoming about their plans. *See Chen v. X Financial*, No. 19-CV-6908-KAM-SJB, 2021 WL 7449851, at *9 n.65 (E.D.N.Y. Dec. 9, 2021) ("The Registration Statement plainly touts the preferred loan business as a core part of [X Financial]'s business, and a few short weeks after its issuance, the company announced that it had already begun phasing out the program. The timing alone creates an inference of falsity.").[12]

---

[12] The Gig Defendants also claim that Dinu's December 10, 2020 representation that Lightning was "the only company that met our target objectives," including being a company that the Gig team could "partner with [] for the long-term," is forward-looking and inactionable. ¶135; Gig Br. at 21. However, when viewed in context, the statement expresses a present fact: that GigCapital had specifically looked for a company that would partner with it long-term and Lightning met that objective. *Jedrzejczyk v. Skillz, Inc.*, No. 21-cv-03450-RS, 2022 WL 2441563, at *5 (N.D. Cal. July 5, 2022) (Gig Br. at 21), where the court found that a company's stated goal to launch a plan in India in 2021 was forward-looking, is therefore distinguishable.

- 23 -

It is implausible that the Board would have undertaken such a significant about-face on a whim, without time-consuming discussion and debate, legal consultation, and a detailed, concrete plan for moving forward.[13]  Accordingly, Plaintiffs are entitled to the reasonable inference that the decision was made much earlier.  *See Voulgaris*, 2020 WL 8367829, at *16 ("the Court agrees with Plaintiffs that they do not have to 'identify the precise moment when Squarer … first decided to seek approval for binemetinib on the basis of a modified indication[,]' . . . What matters is that Plaintiffs plead facts from which it can be inferred that the change in indication occurred during the putative Class Period").

The court's reasoning in *In re Qudian Inc. Secs. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) is instructive.  Relying on Qudian's fundamental change in its business shortly after its IPO (launching a new business with IPO funds), the plaintiffs alleged that the timing of the change, which began a month after the IPO and was announced two months after that, supported an inference that the decision to launch the new business had occurred pre-IPO.  *Id.* at *3, *9.  Despite the company's pre-IPO warning that it retained discretion on how to employ IPO funds and that it could expand into auto loans in the future, the court agreed that Plaintiffs had plausibly pleaded falsity.  *Id.* at *2, *9.  It explained:

> Defendants argue that Plaintiffs' allegations are "deficient as a matter of law" because they rely "solely on post-IPO developments." . . . But the cases cited by

---

[13] That the Lightning and GigCapital3 boards negotiated the deal together, including the slate of directors to be proposed in the Proxy and the terms each would serve, further supports an inference that the Gig Defendants were aware of the plan to reclassify their directorships after the Business Combination closed and distinguishes the allegations here from those in *Terenzini*.  *See* LD Br. at 9; *Terenzini v. Goodrx Holdings*, No. LA CV 20-11444-DOC-MAR, 2022 WL 122944 (C.D. Cal. Jan. 6, 2022).  In *Terenzini*, the court dismissed claims where plaintiffs did not allege any specific facts about how defendants could know about a *competitor* company's not-yet-public plans.  *See Terenzini*, 2022 WL 122944, at *7.

- 24 -

> Defendants, such as *In re Jumei International Holding Limited Securities Litigation*, [No. 14cv9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017)] do not support such a categorical rule.  Surely if Qudian had announced the opening of Dabai Auto (and its investment) the day after the IPO, a factfinder could conclude that the company misled investors by not disclosing those plans in its offering materials. . . . [K]nowledge on "day-2" arguably would support an inference of knowledge on "day-1."   The allegations here fall somewhere in the middle of the spectrum. But drawing all reasonable inferences in [p]laintiffs' favor, the Court concludes, from the timing and scale of the opening of Dabai Auto, that [p]laintiffs' allegations of knowledge on "day-1" here are plausible enough to survive [d]efendants' motion to dismiss.

*Id.* at \*9 n.6.[14]

Here too, based upon the unusual and suspicious timing of the directors' reclassification and departures, along with the glaring lack of explanation for immediately jettisoning GigCapital3's central business philosophy upon the closing of the combination, a reasonable person would conclude that the Gig Defendants had abandoned their "Mentor-Investors™" approach prior to the March 26, 2021 Proxy and press release, and likely before the May 13, 2020 Registration Statement.  *See Adams*, 340 F.3d at 1099.

### 2.      Plaintiffs Allege Deceptive Acts Under Rules 10b-5(a) and (c)

Plaintiffs allege that Defendants' misstatements and omissions were part of an overarching scheme to profit from a business combination/public offering regardless of whether that business combination was fair, or even fairly represented, to shareholders, in violation of Rules 10b-5(a)

---

[14] Defendants argue in a footnote that the "bespeaks caution" doctrine renders any misleading statement about their "Mentor-Investor" approach inactionable.  LD Br. at 9 n.2.  Under the doctrine, "[f]orward-looking representations are also considered immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect."  *Grossman,* 120 F.3d at 1120.  But not only would a reasonable investor still consider the omission of the fundamental change material, the doctrine itself is inapplicable where, as is the case here, Defendants knew that the risk was already occurring.  *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005).

and (c). ¶¶14, 49–104, 243. Defendants dispute that Plaintiffs adequately assert scheme liability "because Plaintiffs do not attempt to allege fraud independent of a misrepresentation or omission." LD Br. at 25 n.13. However, in the Tenth Circuit, scheme liability may rest upon Defendants' failure to disclose or otherwise correct the misrepresentations of others. *Malouf v. S.E.C.*, 933 F.3d 1248, 1259 (10th Cir. 2019).[15] The Complaint also details numerous deceptive acts in furtherance of Defendants' alleged scheme that are independent of their misstatements and omissions. These actions include, for example:

- the formation of GigCapital3 by Katz, Dinu, Miotto, GigAcquisitions3, GigFounders LLC and GigCapital, and their awards of insider shares at negligible or no cost to themselves and the rest of the GigCapital3 management team (ensuring huge profit as long as any deal closed) (¶¶5, 27, 167);

- the marketing of the SPAC by the Gig Defendants as a unique investment vehicle with experienced management that would remain involved in the target company for three-to-five years, giving investors in the SPAC false comfort that the SPAC was not just a "get rich quick" scheme for the Gig Defendants (¶¶4, 32–33);

- the negotiation of the purportedly "fair" deal with Lightning Systems by Katz, Dinu, Fenwick-Smith and Reeser, based upon the Gig team's due diligence, which would lead to rich rewards for all four individuals (¶¶67, 167);

- the creation of an alternate funding method (debt securities) in order to complete the deal even though there was a demonstrated lack of interest among dozens of sophisticated investors with access to inside information about Lightning Systems in a PIPE investment, and only Lightning's existing investor was willing to provide additional investment funds to make up the purchase price (¶¶176–178);

- the solicitation of investor proxies by the Gig Defendants through the creation and/or dissemination of materially misleading information about Lightning Systems, created or disseminated by the Lightning Defendants, in press releases, presentations, and eventually, the Proxy (¶¶67, 138, 146);

---

[15] *In re Nektar Therapeutics*, No. 18-cv-06607-HSG, 2020 WL 3962004 (N.D. Cal. July 13, 2020), upon which the Lightning Defendants rely (LD Br. at 25 n.13), is inapposite since, in addition to not being from this Circuit, the plaintiffs failed to specify the protocols that allegedly were not followed. *See id*. at *13–*14.

- the reclassification of Katz's and Dinu's directorships just days after the deal closed, materially changing the slate of directors that investors had elected in reliance on the Proxy (¶¶10, 88, 133, 171);

- the failure of Katz, Miotto or Dinu to stand for reelection following Katz's and Dinu's reclassification, such that the Gig management team would have no involvement in Lightning just months after the deal closed (a fact that the Lightning Defendants, Katz, Dinu and Miotto then concealed for the next several months) (¶¶12, 103, 171); and

- continued concealment by the Lightning Defendants, Katz, Dinu and Miotto as to the true state of Lightning's operations and ability to meet its stated 2021 projections, including at an analyst day held at Lightning headquarters and in a registration statement to sell insider shares (¶¶156-157, 159–161, 163–164).

Through their scheme, Defendants profited from a business combination that was not nearly as promising as represented to investors, circumvented investors' right to elect a board for the new company by restructuring the elected board as soon as the deal was closed (¶¶10, 88, 133, 171), and in the process, awarded themselves large increases in compensation, new stock grants, and bonuses for completing the unfair transaction (¶¶14, 93, 170).

These allegations demonstrate that the Defendants committed deceptive acts and/or employed deceptive devices in furtherance of a scheme under Rule 10b-5(a) and (c). *See Lorenzo v. S.E.C.,* 139 S. Ct. 1094, 1096 (2019) ("Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b-5(a) and (c), [and] §10(b)…even if they are secondarily liable under 10b-5(b)."); *In re XL Fleet Corp. Sec. Litig.*, No. 21 Civ. 2002 (LGS), 2022 WL 493629, at *7 (S.D.N.Y. Feb. 17, 2022) (preparation of false sales projections that defendant knew would likely be disseminated to investors sufficient for scheme liability).

*          *          *

The facts alleged in the Complaint are sufficiently detailed, numerous, coherent, plausible, and "specific enough to be verified or refuted" such that a reasonable person would find that

Defendants' statements were false and/or materially misleading at the time they were made, and that they committed acts in furtherance of a fraudulent scheme. *Adams*, 340 F.3d at 1103–04.  The Complaint "adequately puts the defendants on notice of the substance of the plaintiffs' claims, and the range, sources, and level of detail of the facts alleged demonstrate that this complaint is not frivolous or conclusory and deserves to proceed to the next stage of litigation." *Id.* at 1105.

### 3.    Plaintiffs Allege a Strong Inference of Defendants' Scienter

When alleging that a defendant acted with scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Courts must consider the complaint *in its entirety* in order to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23 (emphasis in original).  While courts are to consider plausible nonculpable explanations, they still must assume the truth of the plaintiff's well-pled allegations in undertaking their comparative analysis. *Id.* at 323.  A plaintiff adequately pleads scienter if "a reasonable person would deem the inference of scienter cogent and *at least* as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.[16]

---

[16] "To establish scienter in a securities fraud case alleging non-disclosure of material facts, the Tenth Circuit holds that 'the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors.'" *Voulgaris*, 2020 WL 8367829, at *21 (quoting *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001)).  For such non-disclosures, the undisclosed fact must have been "so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Id.* at *22 (quoting *Fleming*, 264 F.3d at 1261).  Here, Defendants do not challenge materiality, or Defendants' knowledge thereof, since there was no issue more important to Lightning than its ability to scale its production of EVs.

- 28 -

As Judge Marbley aptly noted in *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 741 (S.D. Ohio 2006), "the scienter analysis in these types of securities fraud cases is akin to looking at a painting.  Though one or two brush strokes may be more powerful up close, to fully appreciate the painting, the viewer must step back to take in the 'big picture.'"  Here, Plaintiffs' allegations paint a picture, through multiple brush strokes, illustrating an inference of Defendants' scienter at least as compelling as any competing innocent inference.

> **a.    Plaintiffs Sufficiently Plead the Section 10(b) Defendants' Scienter**

The required state of mind for a Section 10(b) claim is "[1] intent to deceive, manipulate, or defraud,' or [2] recklessness."  *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236–37 (10th Cir. 2016) (quoting *Adams*, 340 F.3d at 1105).

> **(i)    The Lightning Defendants Knew or Recklessly Disregarded That the Company's Undisclosed Supply Chain and Related Production Issues Would Continue to Prevent It from Scaling**

Reeser (Lightning's co-founder, President and Chief Executive Officer ("CEO")), Fenwick-Smith (its Chairman of the Board since 2010 and previous Interim Chief Financial Officer ("CFO"), as well as a 6.3% shareholder), and Covington (its Senior Vice President and CFO since January 4, 2021), were Lightning's most senior executives.  ¶¶38–40.  While this alone typically would not establish the required strong inference of scienter, it is an important starting point for this Court's holistic analysis.  *See Adams*, 340 F.3d at 1106 (it was reasonable to infer that a company's most senior executives knew of an improper revenue recognition practice that had a substantial effect on reported net income).

Plaintiffs allege that these executives ran a company that promised to manufacture and sell 500 EVs for 2021 but, in reality, had only been able to produce thirty-two EVs during Q1 2021, thirty-seven EVs during Q2 2021, and seventy-seven EVs combined during Q3 and Q4 2021 (an average of about thirty-eight EVs in each quarter). ¶¶75, 89, 101, 108. Put differently, during each and every week of 2021, Lightning's vehicle production capacity remained about the same, averaging about two to three completed EVs per week. Things were not improving. It is implausible that the Company's most senior executives, who provided the 500-vehicle projection, who ran a small company that does one thing: produce EVs, and who had just taken the Company public and raised $268 million in capital, would not know exactly why it could not produce and sell more than two or three vehicles per week. It is equally implausible that these defendants would not know that Amazon's fifteen-van pilot project was a complete failure, the reasons for that failure, and that Amazon was not a "key customer." *See Croker v. Carrier Access Corp.*, No. 05-cv-01011-LTB-OES, 2006 WL 2035366, at *7 (D. Colo. July 18, 2006) ("the only fair and reasonable inference is that [the CEO] knew the status of the development of the one product on which [Carrier Access Corp.]'s future profitability depended.").

The relatively small size of Lightning, fewer than 100 employees, makes it even more implausible that Defendants would not know of these issues. ¶¶68, 150. *See Turner Ins. Agency Inc. v Farmland Partners Inc.*, No. 18-cv-02104-DME-NYW, 2019 WL 2521834, at *6 (D. Colo. June 6, 2019) (Ebel, J.) (company's small size supports inference of executives' scienter); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1173, 1186 (S.D. Cal 2009) (company's small size of 300 employees supports inference of scienter). Certainly, for a small company that was completing about two EVs per week, it would take nothing short of willful blindness (and so,

deliberate recklessness) to ignore the thirty partially completed vehicles on the factory floor during mid-2021 that were awaiting parts. ¶¶9, 108, 111. That Reeser was reportedly a "hands-on" manager who frequently discussed the "supply shortages and their impacts on production quotas" with the Director of Supply Chain & Operations and production floor supervisors at weekly and twice-weekly meetings further supports his scienter. ¶¶82, 114–15. There was no issue of greater importance to the Lightning Defendants than the number of EVs being pushed out the door.

This case is much like *Molycorp II*, where the Court found a strong inference of defendants' scienter where the company's only business was mining rare earth elements (HREEs) such that "it would be absurd to suggest that [d]efendants . . . were without knowledge that Mountain Pass did not contain any HREEs (if that is factually accurate)." *Molycorp II*, 157 F. Supp. 3d at 1011. In this same respect, Plaintiffs' case is unlike *Spirit Aerosystems* (LD Br. at 19), where Spirit's senior executives were accuse of failing to disclose cost overruns experienced in producing aircraft parts via three different projects. 827 F.3d at 1235–36. Various CW accounts of the defendants' knowledge of the cost overruns were discounted because the witnesses could not show that the information in their reports made it (apparently four to eight layers) up the management chain to the defendants, since the reports were revised at various levels. *Id.* at 1241–43; *see also* Gig Br. at 24 (citing *Ellis v. Spectranetics Corp.*, No. 15-cv-01857-KLM, 2018 WL 1583837, at *9 (D. Colo. Apr. 2, 2018) (refusing to assume reports of channel stuffing by sales personnel made their way to CEO and CFO)). There is no such complexity or disconnect here. Lightning was producing only one product – EVs – and it was doing so at a rate of only two to three per week, making it implausible that the Lightning Defendants did not know the reasons for the Company's production shortfalls.

- 31 -

More, having spoken extensively about Lightning's production, guidance, robust supply chain, and its ability to secure a sufficient supply of batteries, the Lightning Defendants had a duty to know—and may be presumed to have known or recklessly disregarded—the true and complete reason for Lightning's troubles.  ¶¶90, 96, 156, 161; *Matrixx*, 563 U.S. at 49 & n.15 (defendant's statement that drug did not cause specific medical condition, when defendant did not know whether this was true, supported inference of scienter).  Under similar circumstances in *Clovis Oncology*, Judge Moore rejected the defendants' claim that plaintiffs were relying on executive positions alone in pleading scienter.  In distinguishing *Wolfe v. AspenBio Pharma, Inc*., 587 Fed.Appx. 493, 497–98 (10th Cir. 2014), he found that the complaint "does not merely allege . . . [d]efendants' knowledge due to their positions, it also alleges that [the individual executive defendants] 'gave detailed, data-laden responses to analyst questions on multiple occasions.'" *Medina*, 215 F. Supp. 3d at 1127; *see also In re Molson Coors Bev. Co. Sec. Litig*., No. 19-cv-00455-DME-MEH, 2020 WL 13499995, at *8 (D. Colo. Dec. 2, 2020) (Ebel, J.) (that defendants spoke extensively on an issue supported an inference of scienter).

Defendants' attempt on August 16, 2021 to falsely blame Lightning's production failures on new "supply chain challenges" or, more specifically, Ford's June 2021 shutdown—just one month after Reeser and Covington assured investors Lightning had secured a sufficient supply of batteries and other critical components—is additional evidence of their scienter.  ¶¶12, 161; LD Br. at 11.  Had they truthfully explained that a protracted history of supply chain issues, particularly as they related to batteries, were the real cause of Lightning's nonperformance, their previous misrepresentations would have been laid bare.  *See In re MicroStrategy, Inc. Sec. Litig*., 115 F. Supp. 2d 620, 641 (E.D. Va. 2000) ("A fair inference to be drawn from the fact that MicroStrategy

originally cited a different—if not an outright false and misleading—reason for its need to restate its financials is that, faced with the public revelation of its irregular accounting practices, the Company was seeking to conceal a conscious or reckless practice of violating GAAP and falsely reporting financial figures.").

The timing of Lightning's announcements lowering and then pulling its guidance likewise supports an inference that Defendants knew, or recklessly disregarded, earlier in the Class Period that the Company could not meet its targets. Over the course of eight months, beginning in August 2020, Defendants worked to bring the Business Combination to fruition. ¶¶55, 58–76, 85–86. This required, among other things, a GigCapital3 shareholder vote in favor of the combination. ¶61. Slashing guidance, of course, would threaten the deal. That Defendants revised Lightning's guidance down by up to 20% just *11 days* after the deal closed, particularly in light of the totality of Plaintiffs' other allegations, supports an inference that they acted with scienter in not doing so much earlier and by failing to disclose the material facts alleged in the Complaint. ¶173; *see Miss. Pub. Emps' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (concluding that passage of one week between public remarks and later disclosure was "strong evidence" of scienter).

Much the same, Lightning's August 16, 2021 announcement that it would not meet guidance (and that it had only produced and sold thirty-seven EVs during Q2 2021 for revenue of just $5.9 million), after reaffirming this same guidance just two weeks before the end of Q2 2021, supports an inference that Defendants acted with scienter. ¶¶97, 101. After having completed and sold an average of two to three EVs per week in Q1 2021 (thirty-two total), Lightning increased this by merely two vehicles *per month* (0.5 per week) for Q2 2021. ¶101. With the second quarter all but complete, Defendants knew of Lightning's complete failure to ramp up two weeks before

- 33 -

the June 30, 2021 quarter-end when, on June 17, 2021, they reaffirmed guidance. ¶¶159, 174. The only plausible inference is that Defendants knew throughout Q2 2021 (and the Class Period) that Lightning was not scaling as represented and was nowhere near being on track to produce and sell 500 EVs in 2021. *See In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020) ("close temporal proximity between an allegedly fraudulent statement or omission and a later disclosure may bolster an inference of scienter").

Defendants' decision in or around March 2021 to bring in a veteran of Tesla and Rivian as CPO to "lead all purchasing activities" supports an inference that Lightning's top executives knew of and were desperately trying to address the Company's undisclosed supply chain constraints. ¶179. That the new CPO quit after just ten weeks on the job, thereby forfeiting significant compensation, was highly unusual. His resignation occurred just ten days after Lightning provided 2021 guidance of 500 vehicles and $50 million to $60 million in associated revenue, and at a time when (unbeknownst to investors) the Company was still averaging less than three completed vehicles per week. ¶¶101, 156, 180. Considered with the totality of Plaintiffs' allegations, the curious timing of the CPO's resignation supports an inference that he left because he knew that Lightning's supply chain problems were far more severe than had been disclosed, and that the production projections issued by Lightning were unrealistic. ¶¶156, 180. *See Molson Coors*, 2020 WL 13499995, at *11 (executive departures that are "uncharacteristic or accompanied by suspicious circumstances" support an inference of scienter); *Farmland Partners*, 2019 WL 2521834, at *6 (Ebel, J.) (considering director resignations as part of holistic scienter analysis).[17]

---

[17] To the extent Defendants suggest that CW accounts are necessary to establish scienter, they are mistaken. *See* LD Br. at 19–20; Gig Br. at 20. *See Farmland Partners*, 2019 WL 2521834, at *6 (Ebel, J.) (facts such as defendants' executive positions, company's small size, and various

- 34 -

Although Plaintiffs are not required to plead Defendants' motive in misleading investors, such allegations may be part of the Court's cumulative scienter analysis. *Tellabs*, 551 U.S. at 325. Here, the Lightning Defendants were motivated to quickly close the Business Combination to raise $268 million in capital in order to attempt to "scale operations" and "continue product development and become profitable." ¶¶86, 136, 168. Defendants counter that this motive must be discounted as a general desire to further corporate interests that is shared by all companies. LD Br. at 22 (citing *Level 3*, 667 F.3d at 1346 and *In re Molycorp, Inc. Sec. Litig.* ("*Molycorp I*"), No. 12–cv–00292–RM–KMT, 2015 WL 1540523, at *24 (D. Colo. Mar. 31, 2015)). But in *Level 3*, the court rejected the "general desire" to "refinance Level 3's debt" and complete an acquisition on "more favorable terms." *Level 3*, 667 F.3d at 1345–46. In *Molycorp I*, the alleged motive to "use overpriced shares to acquire another company" on more favorable terms was also a motive shared by all companies. *Molycorp I*, 2015 WL 1540523, at *24.

This action is more akin to *Medina v. Clovis Oncology, Inc.,* where Judge Moore credited Clovis Oncology's alleged motive to conceal negative study data in order "to finance pipeline products" since, far from being generalized, the allegations were "tied to specific needs and circumstances of Clovis' business." 215 F. Supp. 3d at 1128. Plaintiffs here present allegations specific to Lightning demonstrating that its business would be in peril had the Business Combination not closed. Plaintiffs allege that "[m]oney was so tight that employees were

---

resignations sufficient to establish scienter). Nevertheless, the CWs' particularized allegations regarding the state of Lightning's production, supply chain issues, inability to scale, and management's knowledge thereof, as discussed in detail above, support a strong inference of the Lightning Defendants' recklessness or fraudulent intent. *See In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (falsity and scienter "are generally strongly inferred from the same set of facts"); *see also* ¶¶111–13, 124–27, 130–31 (confirming that during the Class Period Lightning's supply chain and production issues were readily apparent and known to management).

frequently laid off when orders were cancelled, including a mass layoff in spring 2020." ¶168.

Management's desperation was such that "while in the early stages of discussion with GigCapital3,

Lightning Systems borrowed $9.7 million at an interest rate of 8% . . . [and] used these funds to

purchase equipment . . . to make it a more attractive target." *Id.* Accordingly, that the Lightning

Defendants needed the Business Combination to close strongly supports an inference of scienter.[18]

**(ii)    The Gig Defendants Were Aware of or Reckless in Not Knowing of Lightning's Undisclosed Supply and Production Constraints**

Plaintiffs also plead a strong inference of the Gig Defendants' scienter. SPACs and their

executives routinely perform due diligence into key issues affecting their merger targets. *See Bond*

*v. Clover Health Invs., Corp.*, No. 3:21-cv-00096, 2022 WL 602432, at \*25 (M.D. Tenn. Feb. 28,

2022) ("Any suggestion that SPAC investors going into a deal like this would not make substantial

inquiries into [Anti-Kickback Statue] compliance would be implausible, to say the least."). Based

upon such due diligence, courts frequently find a strong inference of scienter. *See XL Fleet*, 2022

WL 493629, at \*6) ("allegations that [SPAC] directors . . . were substantially involved in

conducting due diligence into [target company] . . . supports a finding of conscious misbehavior

or recklessness"). This is the most plausible inference since identifying a suitable merger target

and performing due diligence on it is a SPAC's one and only activity.

It was no different with the Gig Defendants. Initially, the Gig Defendants' sole job was to

find a merger target, undertake thorough due diligence, and provide sufficient information to

---

[18] Reeser, Fenwick-Smith, and Covington's cash bonuses, which were specifically tied to the closing of the Business Combination, are also relevant to and further support an inference of their scienter. ¶170. As are Reeser and Fenwick-Smith's substantial equity holdings, which would only convert to valuable publicly-traded shares upon a successful closing of the SPAC transaction. ¶169.

investors so that they could decide whether to vote in favor of the combination.  ¶¶2, 43, 52, 71.

GigCapital3's Registration Statement described the due diligence as follows:

> when evaluating a prospective target business, we expect to conduct a *thorough due diligence review* that will encompass, among other things, meetings with incumbent management and employees, document reviews and inspection of facilities, as applicable, as well as a review of financial and other information that will be made available to us.

¶132.  Later, the Gig Defendants confirmed that GigCapital3's "Board of Directors conducted *significant due diligence* on Lightning Systems."  ¶67.  In addition to their own due diligence, the Gig Defendants surely received feedback from some of the forty-six potential PIPE investors (during some fifty-eight meetings) who had the opportunity to undertake their own due diligence.[19]

¶¶177–78.  The Gig Defendants' claim that they were "outsiders" post-merger, without knowledge of Lightning's operations, directly contradicts their own assertions that they employed a "mentor-investor" approach and were supposedly "hands-on" with Lightning and "mentor[ed]" management while providing "support and guidance."  *Compare* Gig Br. at 2 & 20 (claiming they were outsiders) *to* ¶¶132, 144, 154 (describing a hands-on partnership).  Their supposed hands-on partnership with Lightning supports an inference that Katz, Dinu, and Miotto would have continued to track the ongoing issues which stalled the Company's production at two or three EVs a week throughout 2021; Defendants' implications that the three did *not* have knowledge of major operational issues at Lightning post-merger only strengthens the inference that they never intended to remain hands-on at the Company at all.  *See* Gig Br. at 24.

---

[19] That Defendants were unable to attract PIPE investors even after slashing Lightning's pre-money valuation by 40% also supports their scienter.  ¶¶177–78.  In light of this enormous red flag, a fair inference is that the Gig Defendants either knew or were reckless in not knowing of Lightning's core component and battery supply constraints, the related production constraints, and that Amazon was not a "Key Customer[]."

The timing of Katz's and Dinu's reclassification as Class I directors (without explanation), just *five days* after the Business Combination closed, such that they would be facing reelection in October 2021, instead of 2022 and 2023, is also indicative of scienter. ¶¶10, 171; *cf. Molson Coors*, 2020 WL 13499995, at *11. This is particularly true since the Gig Defendants had reaffirmed their "Mentor Investor Mission" just weeks earlier. ¶¶152, 154. Lightning's August 16, 2021 disclosure – again without explanation – that Katz, Dinu, and Miotto would not be seeking re-election at the expiration of their terms in only two months strengthens this inference.[20] ¶¶12, 171.

The Gig Defendants argue that their significant financial motives to complete the business combination at any cost must be left out of the scienter analysis because they are "generalized motives shared by all companies." Gig Br. at 22 (quoting *City of Philadelphia*, 264 F.3d at 1269). But not every company is a SPAC, which is, by its very nature, rife with conflicts of interest. ¶¶48–49. These SPAC-related allegations provide critical context and must be considered in the Court's scienter analysis. *See Medina,* 215 F. Supp. 3d at 1128.[21]

---

[20] The Gig Defendants' argument that Lightning actually stated that Katz, Dinu and Miotto would "not be re-nominated to the Board" as opposed to stating they would "not be running for re-election" is a red herring. *See* Gig Br. at 18. That statement says nothing about whether that decision was made voluntarily. Moreover, the Court's comparative scienter analysis must be made with respect to the *totality of the allegations*, not such individual allegations. *Tellabs*, 551 U.S. at 322–23. *See also* Gig Br. at 19 (relying on the Gig Defendants' purported continued involvement in other companies alone (which is not even alleged in the Complaint) without considering the collective scienter allegations, to infer an innocent explanation); LD Br. at 21–22 (seeking inference that CPO quit because "he was not a good fit" without assessing cumulative allegations).
[21] Defendants claim there was no pressure to close the Lightning deal since they "still had 11 months to complete a business combination." Gig Br. at 22. However, because they had to "*complete* that transaction within 18 months of the May 2020 IPO," they really would only have had seven months to close a new acquisition if shareholders voted down the Lightning acquisition. ¶54. Since the Lightning deal took eight months to close *after* Lightning was identified as a target, it unlikely that the Gig Defendants would have had time to find another target, perform due

Plaintiffs further allege that the Gig Defendants were motivated by the significant financial rewards they would receive from the successful de-SPAC transaction. ¶¶166–67. Had the transaction not closed, "GigAcquisitions3, Katz, Dinu, and the rest of the GigCapital3 officers and directors would 'lose their entire investment [] and w[ould] not be reimbursed for any out-of-pocket expenses.'" ¶167. More, "GigAcquisitions3's shares, which accounted for approximately 21.8% of GigCapital3's outstanding shares (and in which each Gig Defendant had financial interest) – and per the Proxy, were valued at approximately $63.1 million as of March 19, 2021 – would be worthless, as the Initial Stockholder Shares were not redeemable for cash." *Id.*[22] The miserable performance of other recent post-SPAC companies brought to market by GigCapital Global (Katz, Dinu, and Miotto's investment group in which the other Gig Defendants participated) is consistent with and further supports an inference of a pattern of recklessness on the part of the Gig Defendants to the true state of their target companies' operations and potential. ¶¶24–30, 181–82. Consequently, the Gig Defendants' financial motives, especially when considered in light of the structural conflicts inherent in SPAC transactions, further support a strong inference of intent or recklessness.[23]

---

diligence, and close a different deal if the Lightning acquisition fell apart. ¶¶55, 85.

[22] *See also* ¶5 ("GigAcquisitions3 . . . purchased more than 5.7 million 'founders' shares' of GigCapital3 . . . for just $25,000"); ¶¶6, 86 (GigCapital3 shares converted to publicly-traded Lightning shares on May 7, 2021); ¶87 ("Immediately following the closing, GigAcquisitions3 (and thereby Katz and the Gig Defendants) owned 8.3% of Lightning eMotors' outstanding 73.2 million shares, Fenwick-Smith owned 6.8%, and Reeser owned 1.9%, while Aravaipa Venture Fund, in which Fenwick-Smith and Reeser both have financial interests, owned 6.3% (approximately 4.6 million shares)."); ¶¶24–30, 50, 55 (describing additional financial incentives and compensation received by the Gig Defendants).

[23] The Gig Defendants further claim they were incentivized to ensure Lightning's long-term success due to the lock-up agreement on their stock. Gig Br. at 23. While the lock-up agreement for the private placement shares could last up to twelve months, it would end in three months if

### (iii)    Defendants Fail to Present a *More* Compelling Inference

The Lightning Defendants spin the Court a tale of an executive team that honestly believed that, because of Lightning's diversification of suppliers of batteries and other core components, the Company would quickly scale EV production from two vehicles per week to a point where it would successfully manufacture and sell 500 vehicles by 2021 year-end. They purportedly believed that they were providing accurate and complete information to investors about the Company's current situation, and they were unaware of the battery supply constraints and related issues which prevented a successful ramp up. The Gig Defendants' narrative is that they performed thorough due diligence on Lightning but were unable to learn of Lightning's undisclosed production constraints or that Amazon was not a key customer. Katz, Dinu, and Miotto, they say, wanted to remain on the Board and mentor the Company but were unceremoniously dumped with little or no warning once the purportedly heavily-negotiated Business Combination closed.

Plaintiffs' allegations give rise to equally compelling (really, more compelling) inference that Defendants intentionally or recklessly misled investors about Lightning's current business and ability to meet production and revenue targets. Plaintiffs' detailed allegations tell the story of a company desperately in need of cash and management which knowingly oversold the Company to secure $268 million in needed capital. Perhaps even envisioning Lightning as the next Tesla, management was, at best, operating in a "fake it 'til you make it" mode. But the Lightning Defendants knew that the Company was never positioned to meet its targets due to undisclosed, ongoing battery constraints and related production issues. After Lightning predictably failed to

---

Lightning's stock hit $12.50 per share for a specified time, thereby providing additional incentive to inflate its stock price by misleading the market. ¶50.

- 40 -

materially increase its production at all, and certainly nowhere near what was necessary to produce 500 EVs in 2021, the Lightning Defendants falsely blamed COVID-19 and an unexpected Ford plant shutdown—matters for which they bore no responsibility. As to the Gig Defendants, despite having had full access to Lightning and its operations before and after the de-SPAC transaction, at best they were reckless in not knowing of the Company's operational challenges and that Amazon was not in fact a key customer. And, as was always the plan, they quickly cashed out what they could as soon as they could and walked away.

Because the inference of knowledge or recklessness is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," Plaintiffs have pleaded a strong inference of Defendants' scienter. *Tellabs*, 551 U.S. at 324.

### b. The Complaint Sufficiently Pleads the Gig Defendants' Negligence With Respect to the Proxy

That the Gig Defendants prepared and signed the Proxy containing materially misleading statements, despite having access to the omitted facts suggesting that the statements were materially misleading, adequately demonstrates their negligence which in turn suffices to plead Section 14(a) liability.[24] *Lane*, 581 F. Supp. 2d at 1119; *see also Brown v. Brewer*, No. CV 06–3731–GHK (SHx), 2010 WL 2472182, at *24 (C.D. Cal. June 17, 2010) ("As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the . . . negligence standard."). The GigCapital3 board stated that it had conducted "significant due diligence" before issuing a Proxy

---

[24] No heightened pleading standard applies to a negligence allegation because "negligence is not a state of mind." *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009); *accord Lane*, 581 F. Supp. 2d at 1109–1110. Regardless, Plaintiffs' allegations satisfy even the heightened standard.

that contained materially misleading statements regarding Lightning's ability to scale, the robustness of its supply chain, its visibility into future revenues, the suitability of Lightning Systems to GigCapital's "Mentor-Investors™" approach, and the continued involvement of members of the Gig team. ¶¶31, 67–68. The Gig Defendants had access to non-public due diligence materials provided by Lightning and feedback from the potential PIPE investors they pitched (who balked at the chance to invest).[25] ¶¶67, 176–178. Certainly, individuals with the extensive executive and public market experience such as the Gig Defendants professed to have could not have conducted such diligence and missed the fact that Amazon – a purported "key customer" of Lightning and a massive market opportunity for Lightning's delivery vehicles – had not actually ordered any vehicles from Lightning following its unsuccessful pilot program in early 2020. ¶¶83, 119–122, 128. They would not have failed to notice that Lightning's key battery suppliers were small and not able to scale at the levels Lightning's projections required, or to understand that, in a supply-constrained environment such as existed globally in spring 2021, the resilience of a manufacturer's supply chain was critical to revenue. ¶¶80–81, 107, 110, 117. If they did miss such observable and material facts, then the members of the Gig Board were at a minimum negligent, and Plaintiffs have adequately pleaded their Section 14(a) claims. *See Knurr v. Orbital ATK Inc.*, 276 F. Supp. 3d 527, 541 (E.D. Va. 2017) (finding a strong inference of

---

[25] The Gig Defendants argue that because Lightning's original revenue projections were lowered, they were not negligent. Gig Br. at 15. Yet, while the projections apparently were reduced, those projections were *still* unattainable based on Lightning's then-existent production capabilities and supply chain constraints. And that Lightning needed to revise its revenue projections downward mid-negotiation was another red flag ignored by the Gig Defendants. Defendants had already reduced Lightning's valuation after poor feedback from PIPE investors and the lower valuation was still insufficient to attract an adequate PIPE investment. ¶178. As a result, the Gig Defendants had to create and sell substantial interest paying notes to fund the purchase price. *Id.*

negligence where the defendants "could have discovered" the information alleged in the complaint because they engaged in due diligence prior to the merger).  Of course, if they did not, then the GigCapital3 board had actual knowledge of the true facts contradicting the misleading statements in the Proxy.

Because the Complaint pleads that the entire Gig board had access to the due diligence results on Lightning, unanimously recommended the merger, and signed the Proxy statement, the Gig Defendants' insistence that Plaintiffs fail to allege negligence on a defendant-by-defendant basis is facile.  *Compare* Gig Br. at 14 *with Lane*, 581 F. Supp. 2d at 1119 (negligence alleged where director defendants "issued a Proxy containing numerous misrepresentations and omissions, . . . had knowledge of or access to facts about the false or misleading nature of these misrepresentations and omissions, . . . and that nonetheless they issued the Proxy.").[26]

To the extent the Gig Defendants argue that they were not negligent because they lacked "real-time access to Lightning Systems' financial results" (Gig Br. at 15), they are wrong. "[C]orporations and corporate officers . . . have an ongoing duty to ensure that later events do not render a disclosure misleading." *Lane,* 581 F. Supp. 2d at 1111.  The Gig Defendants could not

---

[26] Although defendant Weightman may not have signed the Proxy (Gig Br. at 16-17), the Proxy contained misleading *financial projections* which would have been the reviewed and approved for inclusion by Weightman as GigCapital3's CFO.  ¶¶27, 69, 147; *S.E.C. v. Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C.C. 1980) (Section 14(a) requires "a substantial connection between the use of the person's name and the solicitation effort.").  Thus, *Britton v. Parker*, Nos. 06–cv–01797–MSK–KLM, 06–cv–1922–MSK–KLM, 06–cv–02017–MSK–KLM, 2009 WL 3158133 (D. Colo. Sept. 23, 2009) (Gig Br. at 17) is distinguishable.  *See id.* at *6 n.9 (dismissing claims where defendant CFO (Nanke) was "not alleged to have been responsible for either of the challenged Proxy Statements").  (In addition, the Proxy confirms that the projections were "prepared by, and are the responsibility of, Lightning Systems and [GigCapital3] management" which certainly includes Weightman.  *See* ECF No. 71-1 (Proxy) at 163).

"lawfully sit by and allow shareholders to approve corporate action on the basis of a proxy statement" without disclosing recent material facts or trends that occurred to change the information in the Proxy in the four months since the data was provided to Gig on November 29, 2020. *See id.* (citing *S.E.C. v. Parklane Hosiery Co., Inc.*, 558 F.2d 1083, 1089 n.3 (2d Cir.1977)).

Finally, as detailed above, the timing of Katz's and Dinu's directorship reclassification (three business days the merger) to one-year terms, with none of Miotto, Katz or Dinu standing for reelection, strongly suggests that the Gig Defendants did not ever intend to utilize a "Mentor-Investor™" approach with Lightning Systems. At a minimum, they were negligent in representing to investors that doing so was a priority and that Lightning was an excellent acquisition candidate in part because it would embrace the mentor-investor approach.

### 4.    The Complaint Sufficiently Pleads Liability Under Section 20(a)

The Complaint also sufficiently pleads Section 20(a) violations against the Gig Defendants, Control Entity Defendants and Lightning Defendants. Plaintiffs have pleaded primary violations of their Sections 10(b) and 14(a) claims and that the various defendants were "control persons" for purposes of Exchange Act. This is all that is required. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998); *Voulgaris*, 2020 WL 8367829, at *25.

The only defendants to dispute their status as control persons are GigCapital Global and GigFounders. *See* Gig Br. at 12–13, 17. As an initial matter, disputes as to whether a person or entity is a "control person" are fact-specific and so ordinarily inappropriate for resolution on a Rule 12(b)(6) motion to dismiss. *Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 877 (D. Kan. 2019). Nonetheless, the Complaint pleads facts "indicating that the defendants had possession, direct or indirect, of the power to direct or cause the direction of the

management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Maher*, 144 F.3d at 1305.

GigCapital3 was sponsored (*i.e.*, created) by GigAcquisitions3, which in turn was controlled by GigFounders. ¶¶2, 35–36, 50. GigFounders thus indirectly controlled GigCapital3 prior to the Business Combination. Although the Gig Defendants claim that GigCapital Global is a "brand" (Gig Br. at 13), it is unclear at this point to what extent GigCapital Global is also a legal entity. For example, GigCapital Global operates a website, claims copyright privileges, and appears to act as an employer.[27] Certainly, all of GigCapital3's management team had titles at GigCapital Global, and GigCapital Global and GigFounders are controlled by the same persons as GigCapital3 was prior to the Business Combination (Katz, Dinu, and to a lesser extent, Miotto). ¶¶24–30, 181. Thus, under 17 C.F.R. § 230.405, GigFounders and GigCapital Global are both "controlled by, or is under common control with" GigCapital3, making both entities (like GigCapital3) a "control person" for purposes of Section 20(a) liability. *See also Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, No. 4:19-CV-957, 2021 WL 1416025, at *10 (S.D. Tex. Apr. 14, 2021) (upholding Section 20(a) claims against SPAC entities entwined with the main entity defendant through business relationships).

### B.    PLAINTIFFS PLEAD VIOLATIONS OF THE SECURITIES ACT

Plaintiffs allege that Lightning and the Gig Defendants violated Section 11 of the Securities Act of 1933 by making material misrepresentations regarding GigCapital3's business model in the Registration Statement stating, for example, that GigCapital3 and the Gig Defendants would apply

---

[27]    *See, e.g.,* www.gigcapitalglobal.com; https://www.gigcapitalglobal.com/wp-content/uploads/GigCapital-Overview-Broch2022_v10.pdf.

a "unique Mentor-Investor philosophy," "help drive strategic dialogue," "seek Mentor-Investor candidates to partner with over a 3 to 5 year horizon," and "prioritize entities with well-established, proven and talented management . . . that are eager to succeed with support from an interactive and hands-on board of directors." ¶¶202–212.

"Because Section 11 is a strict liability provision, a plaintiff's burden for a prima facie showing is low. 'If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.'" *Correa v. Liberty Oilfield Servs. Inc.*, 548 F. Supp. 3d 1069, 1078 (D. Colo. 2021) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). Claims under Section 11 are governed by Rule 8's notice pleading standard, which requires that a complaint plead "enough facts to state a claim to relief that is plausible on its face." *See Correa*, 548 F. Supp. 3d at 1078 (citing *Iqbal* and *Twombly* standards); *In re SemGroup Energy Partners, LP*, 729 F. Supp. 2d 1276, 1304 (N.D. Okla. 2010). As discussed above, the Complaint pleads that statements made concerning GigCapital's "Mentor-Investor approach" were materially false and misleading when made. *See also* ¶¶103, 132–133, 144–145, 150–155.

The Gig Defendants argue that these statements should be considered "puffery" or immaterial under the "bespeaks caution" doctrine, claiming that they were accompanied by "'sufficiently specific risk disclosures . . . to nullify any potentially misleading effect.'" Gig Br. at 10-11. Not so. First, because no target company has been identified at the time a SPAC issues its registration statement, the *only* information that potential SPAC investors have to go on concerns the structure of the SPAC itself, its management and management's business experience,

- 46 -

and what the SPAC's management says about its strategy and intentions for selecting a target

company. *See* ¶¶3, 44, 132–133, 144–145, 150–155. Consequently, in the SPAC context,

forward-looking statements about SPAC management's business plans are necessarily material.

*Basic, Inc. v. Levinson*, , 246 (1988) (in assessing materiality, "the relevant inquiry concerns the

total mix of information available to the market at the time of the allegedly fraudulent

statements").[28] This is particularly true given that the Gig Defendants' trademarked "Mentor-

Investor™" business strategy was used to set their SPAC apart among the hundreds of other SPAC

options available to investors. ¶¶4, 32.[29]

Second, in this context, the risk disclosures the Gig Defendants point to in the Registration

Statement would not negate the import that a reasonable investor would place on the Gig

Defendants' stated business model. Nor did they sufficiently warn investors about the specific

facts that ultimately were concealed by the false and misleading statements in the Registration

Statement. *S.E.C. v. GenAudio Inc*., 32 F.4th 902, 928–29 (10th Cir. 2022) ("In assessing whether

a statement is not actionable under [the 'bespeaks context'] doctrine, we look for evidence of

---

[28] This context provides yet another reason that statements about the Gig Defendants' long-term involvement in Lightning are actionable irrespective of whether they may be read as statements of intent. *Compare* LD Br. at 9 (citing *Gillis v. QRX Pharma Ltd*., 197 F. Supp. 3d 557, 593–94 (S.D.N.Y. 2016) (backward-looking statements concerning past intentions were "too broad and nebulous to be material") and *Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189, at *4 (S.D.N.Y. Jan. 16, 2018) (statements of opinion not false where premised on theory of "improper and illegal sales practices" and plaintiff did not "actually alleg[e] that the tactics at issue were fraudulent.")).

[29] The Gig Defendants' claim that these statements are "vague aspirations for the future," "too general to cause a reasonable investor to rely on them" is belied by their repetition throughout GigCapital3 marketing materials, the Registration Statement, GigCapital's trademarking activities, and later, the Proxy statement, including as a basis for recommending shareholders approve the Business Combination. *Compare* Gig Br. at 11 n.3 *with* ¶¶32, 53, 132, 144, 150, 154, 206, 225.

'general, forward looking projections dealing with subjects that were dealt with in much greater detail in the cautionary sections of the registration statement and amendments thereto.'"). The Registration Statement did not disclose a risk that the Gig Defendants would not, in fact, seek a target where they would be hands-on in guiding strategy and/or mentoring management. Nor does the Registration Statement disclose the risk that the Gig Defendants would not necessarily partner with the target company over several years if an opportunity presented itself to cash out sooner. Thus, there is simply no support for Defendants' contention that the Gig Defendants' planned business strategy was immaterial to a reasonable investor. *See id.* at 930 (risk disclosure that "no deal was guaranteed" insufficient, as it "hardly would negate—as a logical and commercially practical matter—the misleading import of" defendants' statement that a deal was imminent).

Lastly, the Gig Defendants argue that the Complaint does not set forth facts establishing that they never intended to remain hands-on and partner with a target company for several years. Gig Br. at 11. However, Plaintiffs have alleged a massive discrepancy between the intentions expressed by the Gig Defendants in the Registration Statement and what actually occurred, beginning just three business days after the Business Combination closed. ¶¶10, 12, 88, 103, 133, 171. At this stage of the proceedings, and with the relevant facts exclusively within the control of Defendants, these allegations suffice to permit Plaintiffs' claims to go forward. *See Lane*, 581 F. Supp. 2d at 1122–23 (allegations of extreme discrepancy between directors' stated intentions and actual conduct sufficed to allege falsity).[30]

---

[30] Because Plaintiffs have alleged a primary violation of Section 11, they have also alleged Section 15 violations against the Gig Defendants and Control Entity Defendants. *See Correa*, 548 F. Supp. 3d at 1084. To the extent that GigFounders and GigCapital Global argue that they are not "control persons" (*see* Gig Br. at 13), that argument fails as stated in section III(B), above.

## IV.    CONCLUSION

Because the Complaint alleges Defendants' violations of the federal securities laws with the requisite particularity required by the Federal Rules of Civil Procedure and the PSLRA, Defendants' motions to dismiss should be denied.  In the alternative, if the Court is inclined to grant Defendants' motions, Plaintiffs respectfully request that the Court provide them an opportunity to bring an appropriate motion to amend the Complaint to cure any identified deficiencies.

DATED:  August 17, 2022

JOHNSON FISTEL, LLP

*/s/ Jeffrey A. Berens*
Jeffrey A. Berens
2373 Central Park Boulevard
Suite 100
Denver, CO  80238
Telephone:  303/861-1764
303/861-1764 (fax)
jeffb@johnsonfistel.com

JOHNSON FISTEL, LLP
Michael I. Fistel, Jr.
Mary Ellen Conner
40 Powder Springs Street
Marietta, GA 30064
Telephone:  470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com
maryellenc@johnsofistel.com

- 49 -

**ROBBINS GELLER RUDMAN
& DOWD LLP**
Daniel S. Drosman
Hillary B. Stakem
Heather G. Geiger
655 West Broadway
Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
hstakem@rgrdlaw.com
hgeiger@rgrdlaw.com

*Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

*/s/ Jeffrey A. Berens*
Jeffrey A. Berens
JOHNSON FISTEL, LLP
2373 Central Park Boulevard
Suite 100
Denver, CO  80238
Telephone:  303/861-1764
303/861-1764 (fax)
jeffb@johnsonfistel.com

- 51 -