**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-02774-RMR-KLM (consolidated with 1:21-cv-03215-KLM)

JOHNNY R. SHAFER,
JUSTIN COHEN, Individually and On Behalf of All Others Similarly Situated,

       Plaintiffs,

       v.

LIGHTNING EMOTORS, INC.,
TIMOTHY R. REESER,
TERESA P. COVINGTON,
GIGACQUISITIONS3 LLC,
GIGCAPITAL GLOBAL,
AVI S. KATZ,
RALUCA DINU,
NEIL MIOTTO,
GIGFOUNDERS LLC,
BRAD WEIGHTMAN,
ANDREA BETTI-BERUTTO,
PETER WANG,
JOHN J. MIKULSKY, and
ROBERT FENWICK-SMITH,

       Defendants.

---

**LIGHTNING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
CONSOLIDATED COMPLAINT**

---

**TABLE OF CONTENTS**

INTRODUCTION ……………………………………………………………… 1

FACTUAL BACKGROUND ………………………………………………………... 2

    A.  Lightning as a Successful Private Company Producing Electric Fleet Vehicles … 2

    B.  Gig3 Goes Public and Searches for a Partner in the Technology Industry …..…... 2

    C.  Lightning and Gig3 Negotiate a Deal to Grow Lightning's Business ………..….. 3

    D.  Lightning Lowers and Withdraws Guidance After Chassis Manufacturers Halt Production ………………………………………………………………..…· 4

ARGUMENT ……………………………………………………………………… 6

I.    THE FEDERAL SECURITIES LAWS IMPOSE A HEIGHTENED PLEADINGS STANDARD …………………………………………………………………… 6

II.    PLAINTIFFS FAIL TO ALLEGE A SECTION 10(b) CLAIM …………………….. 6

    A.  Plaintiffs Do Not Plead a Material False or Misleading Statement ……………… 7

        1.  No False Statement about "Mentor-Investors" ………………………….. 8

        2.  No False Statement about Lightning's Projections …………………….. 10

        3.  No False Statement about Lightning's Supply Chain ………………….... 13

    B.  Plaintiffs Do Not Allege Particularized Facts Necessary to Plead Fraud ……..… 18

        1.  Former Employees Do Not Provide an Inference of Scienter ………….. 19

        2.  No Scienter Based on Director and Executive Departures ……………... 21

        3.  Generic "Motive" Allegations Do Not Establish Scienter ……………... 22

III.    PLAINTIFFS FAIL TO ALLEGE A SECTION 14(a) CLAIM …………………... 23

IV.    PLAINTIFFS FAIL TO ALLEGE A SECTION 11 CLAIM ……………………..… 24

CONCLUSION …………………………………………………………………….. 25

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) .................................................................................. 6

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
105 F. Supp. 3d 1246 (D. Kan. 2015) …........................................................................ 22

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ....................................................................... 18, 19, 23

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662 (D. Colo. 2007) ........................................................................ 23

*Britton v. Parker*,
2007 WL 2871003 (D. Colo. Sept. 26, 2007) ............................................................. 23

*Chipman v. AspenBio Pharma, Inc.*,
2012 WL 4069353 (D. Colo. Sept. 17, 2012) .............................................................. 2

*City of Roseville Emples. Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................................................... 20

*City of Roseville Emples. Ret. Sys. v. Sterling Fin. Corp.*,
691 Fed. App'x 393 (9th Cir. 2017) …....................................................................... 20

*In re Crocs, Inc. Sec. Litig.*,
774 F. Supp. 2d 1122 (D. Colo. 2011) …..................................................................... 14

*Emplrs. Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) ..................................................................................... 9

*EXKAE Ltd. v. Domo, Inc.*,
2020 WL 7352735 (D. Utah Dec. 15, 2020) .......................................................... *passim*

*Fan v. StoneMor Partners LP*,
927 F.3d 710 (3d Cir. 2019) ....................................................................................... 23

*Friedman v. Endo Int'l PLC*,
2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) .................................................................. 9

*Furlong Fund LLC v. VBI Vaccines, Inc.*,
2016 WL 1181710 (S.D.N.Y. Mar. 25, 2016) ............................................................... 24

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016) ........................................................................ 9

**Page**

*In re Gold Res. Corp. Sec. Litig.*,
957 F. Supp. 2d 1284 (D. Colo. 2013) …………………………………………….. 13

*In re Gold Res. Corp. Sec. Litig.*,
776 F.3d 1103 (10th Cir. 2015) ………........................................................... 13

*Gregory v. Pronai Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018) ………...................................................... 16

*Gregory v. Pronai Therapeutics Inc.*,
757 Fed. App'x 35 (2d Cir. 2018) ................................................................... 17

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) …............................................................. 2, 7, 8

*Hampton v. root9B Techs., Inc.*,
897 F.3d 1291 (10th Cir. 2018) .............................................................. 18, 24

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
2021 WL 1222290 (D. Utah Mar. 31, 2021) .................................................. 15

*Jedrzejczyk v. Skillz Inc.*,
2022 WL 2441563 (N.D. Cal. July 5, 2022) ................................................. 17

*In re Lehman Bros. Sec. & Erisa Litig.*,
2013 WL 3989066 (S.D.N.Y. July 31, 2013) ............................................... 15

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) …...................................................... 7, 17, 22

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014) ...................................................... 15, 16

*In re Lululemon Sec. Litig.*,
604 Fed. App'x 62 (2d Cir. 2015) ............................................................... 15

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit Aerosystems Holdings, Inc.*,
2022 WL 377415 (N.D. Okla. Jan. 7, 2022) …………................................... 6

*Mendoza v. HF Foods Grp., Inc.*,
2021 WL 3772850 (C.D. Cal. Aug. 25, 2021) ............................................. 24

*In re Molycorp, Inc. Sec. Litig.*,
2015 WL 1540523 (D. Colo. Mar. 31, 2015) …................................... *passim*

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) ............................................. 25

**Page**

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.*,
     2005 WL 4161977 (D. Colo. Oct. 20, 2005) ..................................................... 8

*Okla. Police Pension & Ret. Sys. v. Boulder Brands, Inc.*,
     2017 WL 1148689 (D. Colo. Mar. 28, 2017) ................................................ 15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
     575 U.S. 175 (2015) ........................................................................................ 9

*In re Overstock Sec. Litig.*,
     2020 WL 5775845 (D. Utah Sep. 28, 2020) ...................................... 10, 12, 21

*In re PolarityTE, Inc., Sec. Litig.*,
     2020 WL 6873798 (D. Utah Nov. 22, 2020) .................................................. 8

*Rumbaugh v. USANA Health Scis., Inc.*,
     2018 WL 5044240 (D. Utah Oct. 17, 2018) ...................................... 14, 20, 21

*Sakkal v. Anaplan Inc.*,
     557 F. Supp. 3d 988 (N.D. Cal. 2021) .................................................... 20, 21

*Sanchez v. Crocs, Inc.*,
     667 Fed. App'x 710 (10th Cir. 2016) …………..……………………….……………… 14

*Slater v. A.G. Edwards & Sons, Inc.*,
     719 F.3d 1190 (10th Cir. 2013) .................................................................... 24

*Smallen v. W. Union Co.*,
     2019 WL 1382823 (D. Colo. Mar. 27, 2019) ............................................... 18

*Smallen v. W. Union Co.*,
     950 F.3d 1297 (10th Cir. 2020) ...................................................... 18, 21, 23

*Steamfitters' Industry Pension Fund v. Endo Int'l PLC*,
     771 Fed. App'x 494 (2nd Cir. 2019) .............................................................. 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
     551 U.S. 308 (2007) ...................................................................................... 18

*Terenzini v. Goodrx Holdings*,
     2022 WL 122944 (C.D. Cal. Jan. 6, 2022) ...................................................... 9

*United Food & Commer. Workers Int'l Union Local 464A v. Pilgrim's Pride Corp.*,
     2022 WL 684169 (D. Colo. Mar. 8, 2022) ................................................... 17

**Page**

*In re Velti PLC Sec., Litig.*,
2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) .................................................................. 12

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
504 F. Supp. 3d 224 (S.D.N.Y. 2020) ........................................................................... 16

*Wolfe v. AspenBio Pharma, Inc.*,
2012 WL 4040344 (D. Colo. Sept. 13, 2012) ........................................................... 7, 14

*Wolfe v. AspenBio Pharma, Inc.*,
587 Fed. App'x 493 (10th Cir. 2014) .............................................................................. 8

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ........................................................................................ 21

**Statutes**

15 U.S.C. § 78u-4(b)(1) .................................................................................................. 7

15 U.S.C. § 78u-5(c)(1) ................................................................................................. 12

**Other Authorities**

Michael Wayland, *Chip shortage causes Ford to slash vehicle production at several plants in July*, CNBC (June 30, 2021 @ 2:23 PM EDT), https://www.cnbc.com/2021/06/30/chip-shortage-causes-ford-to-cut-vehicle-production-at-Several-plants.html ……........................ 11

*Ford to shut some N. American plants for few weeks on chip shortage*, Reuters (June 30, 2021 @ 2:03 PM PDT), https://www.reuters.com/business/autos-transportation/ford-shut-some-n-american-plants-few-weeks-chip-shortage-2021-06-30/ ………….......................................... 11

Defendants Lightning eMotors, Inc. ("Lightning"), Timothy R. Reeser, Teresa P. Covington, and Robert Fenwick-Smith (collectively, the "Lightning Defendants") hereby move to dismiss Plaintiffs' Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint" or "¶"). In compliance with Local Civil Rule 7.1(a), counsel for Defendants conferred with Plaintiffs' counsel who advised that they were opposed to the filing of the underlying motion.

## INTRODUCTION

Plaintiffs' lawsuit is based on a flawed premise: They fault Defendants for failing to predict the future. That cannot be the basis for alleging securities fraud.

Lightning supplies novel electric fleet vehicles for major companies like DHL and Forest River (a Berkshire Hathaway subsidiary). In May 2021, it became publicly traded after merging with an existing public company. At the time of the merger, Lightning disclosed more than 25 pages of operational risks in public filings. After the merger, Lightning has continued to grow its business while navigating extreme volatility in the global supply chain that has affected even manufacturing giants like Ford and GM.

A few months after the merger closed, in August 2021, Lightning was obligated to withdraw its guidance for 2021 in light of industry-wide chassis shortages and the delta variant of the Covid-19 pandemic. Its stock price temporarily dipped, before rebounding. Even that temporary decline was enough to cause this lawsuit.

Plaintiffs' allegations are a textbook example of "fraud by hindsight." They fault Lightning for not anticipating the disruptions that occurred months after the merger, which Plaintiffs contend Lightning should have somehow divined ahead of time and disclosed to investors as *fact*. The Complaint provides no explanation—because it cannot—of how Lightning could have predicted headwinds that affected global manufacturing, when much larger companies and even governments were unable to. Tellingly, when it comes to pleading

1

*scienter*, the state of mind required for securities fraud, Plaintiffs are unable to plead any facts.  Instead they rely on a handful of irrelevant anecdotes from anonymous former employees, many of whom were not even employed by the Company at the time of the merger.  None of these "confidential witnesses" connected any defendant to any foreknowledge of the supply chain challenges Lightning experienced after the merger.  The Tenth Circuit has soundly rejected attempts to manufacture securities claims by pleading "fraud by hindsight."  *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).

Knowing that their allegations cannot support a securities fraud claim, Plaintiffs add a handful of lesser claims, hoping that at least some will survive dismissal.  They do not, being all rooted in the same flawed theories.  The Court should dismiss the Complaint.

## FACTUAL BACKGROUND

### A.    Lightning as a Successful Private Company Producing Electric Vehicles

In 2008, Tim Reeser founded Lightning in Loveland to bring more clean energy jobs to Colorado.  Ex. 1 at 244.[1]  To better address growing air pollution problems, in 2017, Lightning shifted its focus exclusively to zero emission vehicles, including both battery-powered and fuel cell electric vehicles.  *Id.*  As part of its commitment to a clean energy future, Lightning also provides charging infrastructure for electric vehicles.  *Id.*

Unlike other electric vehicle companies that develop vehicles for individual consumers, Lightning supplies electric vehicles for commercial fleets.  Ex. 1 at 244. Lightning focuses on Class 3 vehicles (cargo and passenger vans), Class 6 vehicles (work trucks), and Class 7 vehicles (buses).  *Id.*  Lightning supplies electric fleet vehicles to major companies like DHL and Forest River (a Berkshire Hathaway subsidiary).  Ex. 2 at Ex. 99.1.

---

[1] All references to "Ex." refer to Exhibits to the accompanying Declaration of Doru Gavril. These documents are incorporated by reference into the Complaint and/or are publicly-available SEC filings or conference call transcripts, of which the Court can take judicial notice.  *See Chipman v. AspenBio Pharma, Inc.*, 2012 WL 4069353, at *2 (D. Colo. Sept. 17, 2012) (taking judicial notice of SEC filings and conference call transcripts).

B.    **Gig3 Goes Public and Searches for a Partner in the Technology Industry**

In February 2020, GigCapital3, Inc. ("Gig3") was formed as a Special Purpose Acquisition Company ("SPAC"). ¶¶ 2, 50. Unlike traditional companies, which operate a business, a SPAC is an investment vehicle that is formed and goes public with the express purpose of entering into a merger with an existing private company. ¶ 43. After a SPAC goes public, it searches for a "target" and negotiates a potential merger. If the SPAC and target reach an agreement, the SPAC's shareholders vote on whether they want to proceed with the merger or whether they wish to have their initial investment returned. If the merger is approved and closes, the SPAC's shareholders become shareholders of the resulting operating company, which inherits the proceeds that the SPAC raised. SPACs can be advantageous for private companies seeking to go public because they can be completed more quickly than a traditional IPO with greater certainty in pricing. SPACs became an attractive alternative to IPOs in 2020 due to COVID-19 and the resulting volatility in the financial markets.

In May 2020, Gig3 went public via an IPO and began searching for a target company to merge with. ¶ 52.

C.    **Lightning and Gig3 Negotiate a Deal to Grow Lightning's Business**

In mid-2020, Lightning began exploring potential avenues to raise capital to scale its business. In August 2020, Lightning's external financial advisors contacted Gig3 to discuss whether Gig3 might be interested in exploring a potential merger with Lightning. Ex. 1 at 148. The two companies negotiated for months until reaching an agreement in December 2020. *Id.* at 156-57. The boards of both Lightning and Gig3 separately approved a merger between the two companies (the "Business Combination"). On December 10, 2020, Gig3 and Lightning publicly announced the proposed Business Combination. *Id.* at 157.

On December 31, 2020, Gig3 publicly filed a draft proxy statement disclosing information about the Business Combination with the SEC, so that its shareholders could

3

hold an informed vote on whether to proceed with the merger.  Ex. 3.  The draft proxy statement disclosed information about Lightning's business, including projections for potential financial performance between 2020-2025.  *Id.* at 159.  The projections were dated November 29, 2020, and expressly warned investors that they would "not take into account any circumstances or events occurring after the date they were prepared."  *Id.* at 158-59.  At the time, Lightning was projecting significant growth in its business.  It had over $120 million of contracted orders in its backlog, which consisted of orders that Lightning had not yet fulfilled.  *Id.* at 154.  Lightning planned to use the proceeds of the Business Combination to scale up its production capacities so it could meet demand for its products.  *Id.* at 57, 153.

On March 26, 2021, Gig3 filed its final proxy statement for the meeting at which its shareholders would vote on the Business Combination.  Ex. 1.  Gig3's shareholders approved the Business Combination on April 21, 2021, and it closed on May 6, 2021.  ¶ 85.

Following the close of the Business Combination, Lightning became a public company and Gig3's shareholders became shareholders of Lightning.  Mr. Reeser remained (and is still today) the CEO of Lightning.

Dr. Katz and two other Gig3 directors—Raluca Dinu and Neil Miotto—joined Lightning's Board as directors.  At that time, Mr. Miotto's term was set to expire later in 2021, Dr. Dinu's in 2022, and Dr. Katz's in 2023.  Ex. 1 at 170.  On May 11, 2021, Lightning's Board decided to reclassify Dr. Katz and Dr. Dinu, so their terms as directors would also expire in October 2021.  Ex. 4 at 18.  On August 16, 2021, Lightning announced that its Board had decided not to renominate Dr. Katz, Dr. Dinu, or Mr. Miotto to new terms.  Ex. 5 at 82.  Their terms expired in October 2021, at which time they departed the Company.

**D.    Lightning Lowers and Withdraws Guidance After Chassis Manufacturers Halt Production**

Prior to the Business Combination, Lightning had developed a network of suppliers for the complex components needed to manufacture electric vehicles, including "Ford,

BorgWarner, Romeo Power, Hino and Delta Electronics, among others." Ex. 1 at 250. In order to mitigate supply chain disruptions, Lightning had "multiple suppliers for each core component of [its] vehicles[.]" *Id.* at 245. Despite these measures, Lightning was not immune to the global supply chain issues resulting from COVID-19. As it disclosed to investors, "as a result of the COVID-19 pandemic, [Lightning] has experienced significant delivery delays from suppliers since April 2020." *Id.* at 261.

In early 2021, Lightning continued to execute against its business plan. It reported 2020 revenue "consistent with its financial projections." Ex. 1 at 261. And "[b]ased on performance through January 2021," Lightning "reaffirmed its revenue projections for 2021[.]" *Id.* Still, Lightning warned that its "management anticipates that [it] will continue to be negatively impacted by the COVID-19 pandemic through the first half of 2021, including supply-chain disruptions, which may negatively impact revenue for 2021[.]" *Id.*

Lightning's warning proved correct as the global supply chain continued to weaken. On May 17, 2021, Lightning announced that the automotive industry was facing "[e]xtreme supply chain shortages[.]" Ex. 4 at Ex. 99.3 at 3. As a result, it lowered its 2021 revenue guidance from $63 million to a range of $50-$60 million. *Id.*

The situation worsened again in July 2021 as the COVID-19 delta variant began spreading more widely. In July, Lightning's major chassis supplier, Ford, unexpectedly halted manufacturing due to a lack of semiconductors and said that it "believe[d] the automotive semiconductor shortage may not be fully resolved until 2022." Ex. 6 at 33.

Several weeks later, on August 16, 2021, Lightning withdrew its 2021 revenue guidance due to the "unexpected chassis production disruptions and COVID-related delays[.]" Ex. 7 at 7. As Mr. Reeser publicly explained, Ford's recent shutdown and pessimistic outlook for the future drastically impacted Lightning's ability to meet its production targets. *Id.* at 5 ("[m]ajor chassis OEMs have surprised the industry by shutting

5

down in July for a week or more" and "further supply chain disruptions remain").  Despite withdrawing its guidance, Lightning specifically noted that demand for its products remained strong because, despite the delays, "no orders have been canceled, and we expect to fulfill those orders in future quarters." *Id.* at 7.  It also planned to continue to innovate, including by "addressing the industry chassis shortage with [its] own Lightning-branded strip chassis and cab chassis products." *Id.* at 5.

The following day, on August 17, 2021, Lightning's stock dropped from $9.63 per share to $8 per share.  By the end of August, Lightning's stock price had rebounded to over $9 per share.  Despite the bounceback in Lightning's stock price, this putative securities class action followed shortly thereafter, in October 2021.

## ARGUMENT

### I.   THE FEDERAL SECURITIES LAWS IMPOSE A HEIGHTENED PLEADINGS STANDARD

Plaintiffs' central claim is for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act").  The Private Securities Litigation Reform Act of 1995 ("PSLRA"), imposes a heightened standard for such claims:  The PSLRA "is seen as imposing a standard of pleading which is more strict than that of Rule 9(b)." *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1540523, at *12 (D. Colo. Mar. 31, 2015) (citation omitted).  Under the PSLRA, "[g]eneralized or conclusory allegations of fraud will not be sufficient." *Meitav Dash Provident Funds & Pension Ltd. v. Spirit Aerosystems Holdings, Inc.*, 2022 WL 377415, at *8 (N.D. Okla. Jan. 7, 2022) (quoting *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1098 (10th Cir. 2003)).  Plaintiffs fail to meet the high bar for securities fraud claims.

Plaintiffs are aware of the flaws in their securities fraud claim.  As a workaround, they add two other claims based on the same theories, in the hopes that these may survive the Court's scrutiny.  The Court should also reject Plaintiffs' claims brought under Section 14(a) of the Exchange Act and Section 11 of the Securities Act of 1933 ("Securities Act").

## II.    PLAINTIFFS FAIL TO ALLEGE A SECTION 10(b) CLAIM

Plaintiffs' Section 10(b) claim, which encompasses all of the purported false statements in the Complaint, fails for two independent reasons.  First, Plaintiffs do not plead particularized facts that the Lightning Defendants actually made a material false or misleading statement.  Second, Plaintiffs do not plead any particularized facts that any of the Lightning Defendants acted with scienter—i.e., fraudulent indent.

### A.    Plaintiffs Do Not Plead a Material False or Misleading Statement

The Complaint challenges various public statements Defendants made between May 2020 and July 2021.  These statements can be sorted into three categories: (1) statements about Gig3's intent to form a "mentor-investor" relationship with Lightning; (2) Lightning's financial projections; and (3) statements about Lightning's supply chain.

As the Tenth Circuit has instructed, "[i]n order to overcome a motion to dismiss, a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"  *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012) (quoting 15 U.S.C. § 78u-4(b)(1)).  Plaintiffs do not meet this high bar for any of the three categories of challenged statements.

As explained below, Plaintiffs' theories all suffer from the *same* fatal flaw:  They fail to plead facts showing that "the statements were actually false *when made*."  *Novell*, 120 F.3d at 1119 (emphasis added) (affirming dismissal).  In *Novell*, the Tenth Circuit explained that plaintiffs must provide factual allegations showing contemporaneous falsity, because "securities claims will not be based on 'fraud by hindsight.'"  *Id.* at 1124 ("often there is no reason to assume that . . . simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false") (citation omitted).  This

7

rule is widely followed in this Circuit. *See, e.g.*, *Wolfe v. AspenBio Pharma, Inc.*, 2012 WL 4040344, at *5 (D. Colo. Sept. 13, 2012) (dismissing complaint; "to eschew the danger of inferring fraud based on hindsight[,]" Plaintiffs must plead facts "as to why the disputed statement was untrue or misleading *when made*") (citation omitted), *aff'd,* 587 Fed. App'x 493 (10th Cir. 2014); *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, 2005 WL 4161977, at *11 (D. Colo. Oct. 20, 2005) (dismissing complaint; "plaintiff's characterization of the defendants' statements as misleading falls into the category of 'fraud by hindsight'").

### 1.    No False Statement about "Mentor-Investors"

Plaintiffs challenge statements regarding Gig3's hope to form a "mentor-investor" relationship and long-term partnership with Lightning.  ¶¶ 132, 135, 144, 150, 152, 154. Their attack on these statements fails for the following two reasons.

***No Fraud by Hindsight.***  Plaintiffs do not allege a single contemporaneous fact that Gig3's representatives did *not* intend to have a lasting partnership with Lightning.  Plaintiffs' sole basis for claiming that these statements must have been false is that none of Gig3's representatives on Lightning's Board—Dr. Katz, Dr. Dinu, and Mr. Miotto—remained directors beyond October 2021.  *E.g.*, ¶ 133.  But this merely reflects changed circumstances. The absence of contemporaneous facts in the Complaint is stark.  Despite claiming that, as early as May 2020—a *year* before the Business Combination—Gig3's representatives had no intention of remaining on Lightning's Board, Plaintiffs do not provide any factual support. By relying solely on subsequent events, Plaintiffs assert the same "fraud by hindsight" theory squarely rejected by the Tenth Circuit in *Novell* and subsequent cases.  120 F.3d at 1124; *see also In re PolarityTE, Inc., Sec. Litig.*, 2020 WL 6873798, at *7 (D. Utah Nov. 22, 2020) (dismissing complaint; no factual allegations statements were not "true when made").

Because of their inability to allege particularized facts, Plaintiffs rely on speculation. Plaintiffs assume that Dr. Katz, Dr. Dinu, and Mr. Miotto must have always intended not to

remain on Lightning's Board.  But Plaintiffs do not even allege facts that it was their decision to leave Lightning's Board.  As Lightning disclosed, the decision was made by Lightning's full Board, *not* Gig3's representatives.  In May 2021, Lightning's Board voted to reclassify Dr. Katz and Dr. Dinu, so their terms as directors expired in October 2021, when Mr. Miotto's term also expired.  Ex. 4 at 18.  Then, in August 2021, Lightning's Board decided not to renominate Dr. Katz, Dr. Dinu, or Mr. Miotto.  Ex. 5 at 82.  Plaintiffs cannot assume that Gig3 made false statements about its intentions to form a long-term partnership with Lightning when they "allege no facts indicating that Defendants were aware of [Lightning's] plans" otherwise.  *Terenzini v. Goodrx Holdings*, 2022 WL 122944, at \*5 (C.D. Cal. Jan. 6, 2022) (dismissing complaint based on subsequent business decision by third party).

  ***Inactionable Future Intentions***.  Plaintiffs' theory also fails because the challenged statements are inactionable statements of future intentions.  For example, Plaintiffs challenge statements like "[w]e intend to apply a unique 'Mentor-Investor' philosophy" (¶ 132) and "[w]e believe that through our Mentor-Investment approach, we will be able to work with Lightning Systems to look for and successfully exploit opportunities for value creation."  ¶ 150.  "An alleged misstatement or omission 'must be one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention.'"  *Friedman v. Endo Int'l PLC*, 2018 WL 446189, at \*4 (S.D.N.Y. Jan. 16, 2018) (citation omitted) (dismissing complaint), *aff'd*, *Steamfitters' Industry Pension Fund v. Endo Int'l PLC*, 771 Fed. App'x 494 (2nd Cir. 2019); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015) (challenging a statement of opinion "is no small task for an investor").  For example, in *Gillis v. QRX Pharma Ltd.*, the court held that a statement about the company's "*intention* to pursue an aggressive commercialisation strategy" was "not actionable."  197 F. Supp. 3d 557, 593-94 (S.D.N.Y. 2016) (dismissing complaint).  As a

result, Gig3's intentions to maintain a lasting partnership with Lightning are inactionable.[2]

### 2.    No False Statement about Lightning's Projections

Plaintiffs claim that statements about Lightning's 2020-2025 financial projections and 2021 revenue guidance were false because they were supposedly "unrealistic and unachievable." *E.g.*, ¶¶ 77, 139(b), 151(e). Their attack fails for the following three reasons.

***No Fraud by Hindsight.*** Plaintiffs assume that Lightning's 2020-2025 financial projections and 2021 revenue guidance must have been false because Lightning lowered its full-year 2021 guidance in May 2021 and then withdrew it entirely in August 2021. ¶¶ 173-74. But Plaintiffs' "heavy reliance on the fact that [the company] ultimately missed its guidance is a classic attempt to plead fraud by hindsight." *In re Overstock Sec. Litig.*, 2020 WL 5775845, at *6 (D. Utah Sep. 28, 2020) (dismissing complaint). As the court noted in *Overstock*, "[p]redictions of future growth . . . will almost always prove to be wrong in hindsight[.]" *Id.* (citation omitted). Plaintiffs must "demonstrate that the projections were false *when they were given*." *Id.* (emphasis added); *see also EXKAE Ltd. v. Domo, Inc.*, 2020 WL 7352735, at *6 (D. Utah Dec. 15, 2020) (dismissing complaint; "[w]hile Domo's billings did not meet forecasted levels a year after the IPO, this does not make statements regarding the strength of Domo's ability to grow inaccurate or misleading"). Plaintiffs fail to do so.

The changes to Lightning's projections reflected evolving commercial realities. Lightning's 2020-2025 financial projections were dated as of November 29, 2020—before

---

[2] These statements are also protected by the "bespeaks caution" doctrine, which tracks the PSLRA Safe Harbor. *See Emplrs. Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) ("The PSLRA created a statutory version of [the bespeaks caution] doctrine"); *see also infra* at 12-13. Gig3's statements of future intention are protected by the "bespeaks caution" doctrine because it repeatedly warned investors that its directors may not remain affiliated with the merger target. *E.g.*, Ex. 8 at 85 ("members of our management team may not become a part of the post-transaction company's management team or serve it in advisory positions"; "it is also not certain whether one or more of our directors will remain associated with the post-transaction company").

the global 2021 supply-chain crisis.  Ex. 1 at 164.[3]  In May 2021, as the automotive industry

was facing "[e]xtreme supply chain shortages," Lightning lowered its 2021 guidance.  Ex. 4

at Ex. 99.3 at 3.  Then, in July 2021, Lightning's major chassis supplier, Ford, unexpectedly

halted manufacturing chassis due to a lack of components.[4]  Later that month, Ford also said

it believed the "shortage may not be fully resolved until 2022."  Ex. 6 at 33.  Ford's shutdown

and pessimistic forecast—which occurred *after* all of the challenged statements in the

Complaint—drastically impacted Lightning's production capabilities.  In August 2021, after

assessing the impact of Ford's shutdown and the long-lasting chassis shortage that would

result, Lightning withdrew its 2021 guidance.  Ex. 7 at 7 ("Primarily because of unexpected

chassis production disruptions and COVID-related delays, we are withdrawing our prior

guidance for 2021.").  Plaintiffs do not allege any particularized facts that Lightning's

projections were false when made, rather than based on rapidly evolving market conditions.

 *No Particularized Facts Challenging Backlog.*  A key input for Lightning's

projections was its order backlog, which reflects customer orders that have been placed but

not yet fulfilled.  Ex. 1 at 262.  In 2021 (and today), Lightning had significant customer

demand for its electric vehicles and powertrains.  *Id.* at 159 (backlog of 1,569 vehicles).

Plaintiffs attack Defendants' statements that Lightning's large backlog provided "visibility"

---

[3] The Complaint erroneously suggests that the projections were misleading because they were
issued "just days before the end of Lightning Systems' first financial quarter" in 2021.  ¶
151(e).  But the Complaint omits that the projections were dated November 29, 2020, and
were publicly disclosed in December 2020.  Ex. 3 at 159. The projections clearly stated that
they "do not take into account any circumstances or events occurring after the date they were
prepared."  Ex. 1 at 163-64.

[4] Michael Wayland, *Chip shortage causes Ford to slash vehicle production at several plants
in July*, CNBC (June 30, 2021 @ 2:23 PM EDT), https://www.cnbc.com/2021/06/30/chip-
shortage-causes-ford-to-cut-vehicle-production-at-Several-plants.html ("Ford is significantly
cutting its North American vehicle production in July due to an ongoing shortage of
semiconductor chips impacting the global automotive industry."); *Ford to shut some N.
American plants for few weeks on chip shortage*, Reuters (June 30, 2021 @ 2:03 PM PDT),
https://www.reuters.com/business/autos-transportation/ford-shut-some-n-american-plants
-few-weeks-chip-shortage-2021-06-30/ ("several of [Ford's] North American factories will be
shut for a few weeks in July and August due to a global shortage of semiconductors").

11

into future revenues.  ¶¶ 139(c), 143(a).  But Plaintiffs do not allege facts contradicting Lighting's statements that, as of December 2020, it had received purchase orders for "100% of projected 2021 revenue . . . and 25% of 2022 projected revenue."  ¶ 134.[5]

Plaintiffs' sole quibble with Lightning's backlog is that its "purchase order contracts were cancellable, largely without any penalty."  ¶¶ 139(c), 143(a).  But Plaintiffs' "theory" is drawn directly from Lightning's *own contemporaneous disclosures*.  *E.g.*, Ex. 1 at 66, 268 ("these non-binding orders may be cancelled or delayed by customers without penalty"; "our backlog could be reduced due to cancellation of orders by customers").  Plaintiffs cannot attempt to hold Defendants liable for supposed omissions when those exact facts "were actually disclosed."  *Domo*, 2020 WL 7352735, at *7; *see also In re Velti PLC Sec., Litig.*, 2015 WL 5736589, at *22 (N.D. Cal. Oct. 1, 2015) (dismissing complaint where "[e]ach of these circumstances—and the risks they entailed—was disclosed").  And Plaintiffs do not allege particularized facts showing that any customers canceled orders, much less any cancellations so significant that they should have altered Lightning's projections.

***PSLRA Safe Harbor for Forward-Looking Statements.***  Defendants' statements about Lightning's projections are also inactionable because they are protected by the PSLRA's Safe Harbor.  15 U.S.C. § 78u-5(c)(1); *see also Molycorp*, 2015 WL 1540523, at *25 (PSLRA Safe Harbor "shields securities fraud defendants from liability").  The PSLRA Safe Harbor has two parts: (i) the statements are forward looking; and (ii) the statements are accompanied by meaningful cautionary language.  Both prongs are satisfied here.

First, statements about Lightning's financial projections are inherently forward looking.  "As defined by the statute, 'forward-looking statements' include, among other

---

[5] Plaintiffs also confuse the distinct concepts of demand and supply.  They claim that Lightning "could not have had high visibility into its projected revenues because it did not know whether it would be able to get the parts necessary to complete and sell" the vehicles.  ¶ 139(c).  But the challenged statements about Lightning's backlog and orders are about customer demand, not supply.  ¶ 137 (backlog provides "visibility . . . to where that revenue comes from and what it is").

things, projections of revenues, expenditures, and income [and] *statements of management's plans and objectives for future operations*[.]" *Molycorp*, 2015 WL 1540523, at *25; *see also Overstock*, 2020 WL 5775845, at *6 ("guidance . . . is the quintessential example of a forward-looking statement protected by the PSLRA's safe harbor").

Second, the statements also meet the PSLRA Safe Harbor's second prong because Lightning repeatedly provided investors with detailed warnings that it might be unable to meet its projections. As Judge Jackson observed, "[e]ven 'mere boilerplate' cautionary statements . . . have been upheld as sufficient." *In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1297 (D. Colo. 2013) (dismissing complaint), *aff'd*, 776 F.3d 1103 (10th Cir. 2015). The Company provided highly specific warnings that far exceed "mere boilerplate." For example, when it announced the Business Combination, the Company explicitly warned investors that Lightning's projections "should not be relied upon as necessarily being indicative of future results." Ex. 9 at Ex. 99.2 at 3. It also explained that the "assumptions and estimates underlying such financial forecast information are inherently uncertain and subject to a wide variety of . . . risks and uncertainties." *Id.* The Company continued to provide similar warnings, including on *every* occasion on which Plaintiffs challenge Lightning's projections. Ex. 1 at 163 ("[t]he financial projections are forward-looking statements that are inherently subject to significant uncertainties and contingencies"); Ex. 4 at Ex. 99.3 at 4 ("actual results may vary in material respects from those projected"); Ex. 10 at Ex. 99.1 at 2 ("assumptions and estimates underlying such financial forecast information are inherently uncertain and are subject to a wide variety of . . . risks and uncertainties").

"When an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Gold Res. Corp.*, 957 F. Supp. 2d at 1297-98 (citation omitted). The Company provided detailed warnings to

investors.  "Thus, the cautionary statements here suffice to bring the forward-looking portions of the challenged statements under the safe harbor" and these statements are "insulated from liability under federal law."  *Id.*

### 3.    No False Statement about Lightning's Supply Chain

The Complaint emphasizes in bold and italic type various statements about Lightning's supply chain and procurement partners.  ¶¶ 138, 141, 146, 148, 156, 159, 161, 163, 164.  These quotes are then followed by a repeated boilerplate allegation that Lightning "did not have a robust supply chain" and that its "supply chain was not optimized for quality or reliability[.]"  *E.g.*, ¶¶ 143(b), 151(b)-(c).  Plaintiffs fail to allege that Defendants' statements about Lightning's supply chain were false for at least three reasons.

*No Particularized Facts.*  Plaintiffs do not plead any particularized facts that Defendants' statements about Lightning's supply chain were false.  Plaintiffs instead rely on conclusions that are "not supported by the required particularized factual allegations." *Rumbaugh v. USANA Health Scis., Inc.*, 2018 WL 5044240, at *6 (D. Utah Oct. 17, 2018) (dismissing complaint); *see also In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1140 (D. Colo. 2011) (dismissing complaint; "[g]eneralized or conclusory allegations of fraud will not be sufficient") (citation omitted), *aff'd*, *Sanchez v. Crocs, Inc.*, 667 Fed. App'x 710 (10th Cir. 2016).  For example, Plaintiffs repeatedly claim that Lightning had only "a small pool of suppliers" and that it had "little leverage to bring down costs."  ¶¶ 151(b), 162(b), 165(a). But they fail to provide particularized facts to support their speculation about Lightning's supplier network or procurement costs.  And any attempt to base their allegations on the worsening supply-chain crisis in 2021 is impermissible 'fraud by hindsight.'  *Supra* at 7-8.[6]

---

[6] Contrary to Plaintiffs' theory, Lightning provided investors with updates about supply-chain pressures as the 2021 crisis unfolded.  In May 2021, it warned investors that the industry faced "[e]xtreme supply chain shortages."  Ex. 4 at Ex. 99.3 at 3.  Then, in June 2021, Lightning told investors that "[c]hassis and battery supply constraints [were] impacting revenue timing."  Ex. 10 at Ex. 99.1 at 41.

"In the absence of such detail, it is not possible to conclude that statements . . . were false or materially misleading at the time they were made." *AspenBio*, 2012 WL 4040344, at *8.[7]

In addition, despite its liberal use of bold and italics, the Complaint does not actually challenge many of Defendants' statements about Lightning's supply chain. For example, statements that Lightning had "built relationships with the suppliers" (¶ 138) and had an "established network of US commercial manufacturing partners" (¶ 159) are bolded and italicized. But Plaintiffs do not even attempt to allege facts that Lightning did not have relationships with suppliers or have manufacturing partners. In *Okla. Police Pension & Ret. Sys. v. Boulder Brands, Inc.*, Judge Krieger dismissed a similarly half-hearted challenge where the plaintiff did "not argue that the quoted statements are themselves false[.]" 2017 WL 1148689, at *6 (D. Colo. Mar. 28, 2017); *see also Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 2021 WL 1222290, at *16 (D. Utah Mar. 31, 2021) (rejecting challenge to statements about sales force growth because "[p]laintiffs do not dispute that Pluralsight's sales force had grown overall—only that it had not grown sufficiently"). The same is true here: Plaintiffs do not dispute the accuracy of many of Defendants' statements.

***CW Allegations Are Insufficient.*** Because they lack particularized facts about Lightning's supply chain, Plaintiffs are forced to base their theory on low-level former employees' generic anecdotes about component shortages. *E.g.*, ¶¶ 111, 124, 131. Such allegations are similar to those rejected in *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580-81 (S.D.N.Y. 2014), *aff'd*, 604 Fed. App'x 62 (2d Cir. 2015). In *Lululemon*, plaintiffs claimed that statements about the high quality of Lululemon's products or its quality controls must have been false because former employees questioned the thoroughness of the quality

---

[7] For example, Plaintiffs provide no factual support for their conclusory allegation that Lightning's suppliers were small companies "who had never to deliver more than a few dozen parts at a time." *E.g.*, ¶ 139 (b). Plaintiffs ignore that Lightning's suppliers included automotive behemoths like Ford, BorgWarner, and Hino. Ex. 1 at 250 ("Our key suppliers include Ford, BorgWarner, Romeo Power, Hino and Delta Electronics").

assurance processes. *Lululemon*, 14 F. Supp. 3d at 580-81. The court found that the allegations suggested only that "the company received complaints about quality issues" and "could have done more in terms of quality control[.]" *Id.* at 580. It held that "[n]either the law nor the allegations attributed to the CWs support such a theory of liability." *Id.* at 579; *see also In re Lehman Bros. Sec. & Erisa Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (dismissing complaint; not crediting allegations from low-level CWs who were "not managers or corporate officers who could have spoken to the company's practices broadly").

The same is true here. The former employees suggest only that Lightning occasionally experienced component delays, which could slow production. ¶¶ 111, 124, 131. And many of their complaints are everyday workplace gripes that have nothing to do with this lawsuit, such as that, before it went public, Lightning lacked a written service manual (¶ 110) or a "formal tracking tool" (¶ 129). Although the former employees may have disagreed with some of the Company's processes, "[e]very business will have employees that disagree on the correct strategy for growth, especially in businesses involved in emerging technologies with uncertain markets." *Domo*, 2020 WL 7352735, at *6 (rejecting CW allegations); *see also In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 252 (S.D.N.Y. 2020) (dismissing complaint based on CW allegations because "subjective views of how the Company should have managed such challenges[] are not sufficient to demonstrate that any of the statements were inaccurate"). Like the software company in *Domo*, Lightning is developing new, innovative technology. It is unsurprising that some former employees have differing views on how best to operate the Company to meet those unprecedented challenges.

Plaintiffs' reliance on the former employees also fails for the independent reason that they do not allege that the CWs were referring to any severe supply chain issues *at the same time* any challenged statements were made. The first challenged statement about Lightning's supply chain is in January 2021 (¶ 141), but many of the CWs departed from the Company in

spring 2020—*almost a year earlier.* ¶¶ 114, 120, 128.  These CWs thus lack any

contemporaneous knowledge about Lightning's supply chain at the time of the challenged

statements.  Like in *Lululemon*, the former employees' general claims about periodic

component shortages "do not substitute for well-pleaded allegations of contemporaneous

falsity[.]"  14 F. Supp. 3d at 580; *see also Gregory v. Pronai Therapeutics Inc.*, 297 F. Supp.

3d 372, 408-09 (S.D.N.Y. 2018) (dismissing complaint; rejecting CW allegations that are

"unmoored in time" to challenged statements), *aff'd*, 757 Fed. App'x 35 (2d Cir. 2018).[8]

    ***Inactionable Subjective Statements.***  Plaintiffs' challenge to Defendants' supply

chain statements also fails because they are inactionable subjective statements that are "not

capable of objective verification."  *Level 3 Commc'ns*, 667 F.3d at 1339 (citation omitted).

For example, Plaintiffs challenge the Company's subjective statements that it had an

"extensive ecosystem of supply-chain partners" (¶ 148) and "optimize[d] [its] supply chain

for quality, reliability, and cost."  ¶ 163.  As the Tenth Circuit held, such statements are the

"kind of rosy affirmations commonly heard from corporate managers and numbingly familiar

to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity .

. . that no reasonable investor could find them important."  *Level 3 Commc'ns*, 667 F.3d at

1336, 1340 (statements that "integration of all the acquired companies is progressing well"

and "the overall customer experience is still positive" were inactionable) (citation omitted).

    Judge Moore recently held that generic statements similar to those here were

inactionable.  *See United Food & Commer. Workers Int'l Union Local 464A v. Pilgrim's*

*Pride Corp.*, 2022 WL 684169, at *5 (D. Colo. Mar. 8, 2022).  He found that statements

---

[8] Plaintiffs theorize that, in January 2021, the Company falsely claimed that Amazon was one
of Lightning's "key customers."  ¶¶ 142, 143(c).  But they do not allege any facts that
Amazon was *not* one of Lightning's customers at that time.  The sole basis for their
speculation is that, according to an unidentified former employee, Amazon was dissatisfied
with the first 15 vehicles the Lightning sold it and placed the remainder of its order on hold.
¶ 119.  But this former employee departed in spring 2020, so he would not have any
knowledge about Lightning's customers almost a year later.  And even he admits that
Amazon's order was merely placed on hold, *not* canceled.  *Id.* l

about "a corporation's 'efficient operations,' 'strong relationships with its key customers,'

'results-oriented corporate culture,' or collective 'vision'" were too generic to be actionable.

*Id.*; *see also Jedrzejczyk v. Skillz Inc.*, 2022 WL 2441563, at *5 (N.D. Cal. July 5, 2022)

(statement about "vibrant and growing ecosystem" was inactionable). Defendants' generic,

subjective statements about Lightning's supply chain are similarly inactionable.[9]

*           *            *

In sum, the Court can dismiss the Section 10(b) claim for failing to plead falsity.

**B.  Plaintiffs Do Not Allege Particularized Facts Necessary to Plead Fraud**

In addition to failing to plead falsity, Plaintiffs' Section 10(b) claim should be

dismissed for an independent reason. Plaintiffs fail to, "with respect to each act or omission

alleged . . . , state with particularity facts giving rise to a *strong* inference that the defendants

acted with the required state of mind in violating the securities laws." *Smallen v. W. Union

Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020) (citation omitted). The Tenth Circuit instructs that

"[t]o assess the strength of an inference of scienter, [courts] compare the 'inferences urged by

the plaintiff[s]' with 'competing inferences rationally drawn from the facts alleged.'"

*Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1237 (10th Cir. 2016) (quoting

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). Plaintiffs' Complaint

"suffices 'only if a reasonable person would deem the inference of scienter cogent and at least

as compelling as any opposing inference one could draw from the facts alleged.'" *Spirit

Aerosystems*, 827 F.3d at 1237 (quoting *Tellabs*, 551 U.S. at 324). Given these requirements,

---

[9] Plaintiffs' supposition that Lightning's production capacity "[i]nexplicably" dropped from 1,000 vehicles in December 2020 to 500 vehicles in March 2021 compares apples to oranges. ¶ 149. The December 2020 statement concerns total "annual production capacity" (¶ 134), while the March 2021 statement provides the annual production capacity for only "a single labor shift[.]" ¶ 149. Lightning retained the ability to run either one or two labor shifts. *See* Ex. 11 at 34 ("facility can currently produce 1,500 ZEVs per year on one eight-hour shift"; "[t]he same facility and equipment can produce 3,000 ZEVs annually by increasing labor to two eight-hour shifts"). Rather than contradicting the December 2020 statement, the March 2021 statement "is more reasonably read as providing greater details[.]" *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1300-01 (10th Cir. 2018) (affirming dismissal).

18

Plaintiffs must "meet the high bar of pleading scienter[.]" *Smallen v. W. Union Co.*, 2019 WL 1382823, at *35 (D. Colo. Mar. 27, 2019), *aff'd*, 950 F.3d 1297 (10th Cir. 2020).

Plaintiffs do not plead any contemporaneous, direct facts about Mr. Reeser, Ms. Covington, or Mr. Fenwick-Smith's state of mind.  Instead, they base their scienter theories on indirect supposition: (1) allegations made by low-level former employees; (2) executive departures; and (3) generic motives.  Plaintiffs fail to establish a strong inference of scienter.

### 1.    Former Employees Do Not Provide an Inference of Scienter

Because they have no direct, particularized facts regarding any Individual Defendant's state of mind, Plaintiffs are forced to attempt to plead scienter by relying on statements by anonymous former employees.  In order to contribute to an inference of scienter, the former employees must provide "reliable personal knowledge of the defendants' mental state." *Spirit Aerosystems*, 827 F.3d at 1244 (citation omitted).  The Complaint's CWs lack the required "reliable personal knowledge" because (i) they were low-level employees; and (ii) many were not even Company employees during the relevant time period.

***Low-Level Employees.***  Plaintiffs' CWs were low-level employees "too far removed" from the Company's executives to "provide sufficiently particularized accounts of what the [company] executives must have known." *Spirit Aerosystems*, 827 F.3d at 1244.  CW-1, CW-3, and CW-6 were technicians, CW-2 and CW-5 were engineers, and CW-4 was a manufacturing supervisor.  ¶¶ 110, 114, 120, 123, 128, 130.  "As relatively low-level employees, these witnesses could not provide evidence bearing on the executives' mental states." *Spirit Aerosystems*, 827 F.3d at 1244.

The Complaint does not allege that the CWs had regular contact with the Individual Defendants.  Plaintiffs do not allege that CW-3, CW-5, and CW-6 had *any* contact with *any* Individual Defendant.  And the extent of CW-1 and CW-4's alleged contacts are extremely limited.  Plaintiffs claim only that CW-1 and CW-4 attended an unspecified meeting or two

19

led by Mr. Reeser, which could be said of almost any employee.  ¶¶ 113, 126.

The only former employee who is alleged to have had any semi-regular contact with an Individual Defendant is CW-2, who "occasionally" reported to Mr. Reeser.  ¶ 114.  He also purportedly "attended a weekly sales team meeting" at which Mr. Reeser was also present.  ¶ 116.  But these limited connections are irrelevant:  The Complaint does not allege that CW-2 had any communications with Mr. Reeser about the issues in this case.  According to CW-2, he only interacted with Mr. Reeser when necessary to provide unspecified "technical assistance or feedback from customers."  ¶ 114.  He does not provide any allegations—particularized or otherwise—about Mr. Reeser's state of mind.

Collectively, the CWs are not a reliable source because "none of the CWs had any significant contact" with any Individual Defendant "that could show what" they "actually knew[.]"  *Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021) (dismissing complaint); *see also USANA Health*, 2018 WL 5044240, at *9 (no scienter from CW allegations because CWs "failed to provide a sufficiently particularized account of what the defendants must have known").

***Not Employed at Relevant Time.***  Many of the CWs lack personal knowledge because they were not even employed by Lightning at the relevant time.  For example, Plaintiffs state that CW-2, CW-3, and CW-5 were Lightning employees until "spring 2020."  ¶¶ 114, 120, 128.  But the earliest challenged statements about Lightning were not made until *December 2020*—almost a year later.  ¶¶ 134-38.  Similarly, the Complaint states that CW-4 departed in "spring 2021," which means he lacks personal knowledge regarding the entire Class Period.  Courts in this Circuit routinely decline to credit allegations made by CWs who were not employed by the company at the relevant time.  *See, e.g.*, *Domo*, 2020 WL 7352735, at *8 (not crediting CWs who were not "even employed by Domo throughout the entire Class Period"); *USANA Health*, 2018 WL 5044240, at *8 (not crediting CW who "is specifically

20

alleged to have ceased working at USANA prior to" relevant period).  The Court should reject any attempt to have it assume that "pre-Class Period practices continued during the Class Period" as "unsubstantiated speculation."  *City of Roseville Emples. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1135 (E.D. Wash. 2013) (rejecting CW allegations), *aff'd*, 691 Fed. App'x 393 (9th Cir. 2017).

In sum, "[t]he accounts of the CWs cited in the [C]omplaint add little, if any weight, to Plaintiff[s'] side of the scienter scale."  *W. Union*, 950 F.3d at 1308 n.6.

### 2.    No Scienter Based on Director and Executive Departures

Plaintiffs attempt to use the departures of Dr. Katz, Dr. Dinu, and Mr. Miotto (¶ 171) from the Company's Board in October 2021 and the resignation of Lightning's Chief Procurement Officer Stephen Ivsan (¶ 180) to support an inference of scienter.  The Court should not credit these departures because Plaintiffs do not allege particularized facts that they were "'numerous,' 'uncharacteristic' in relation to the company's 'typical hiring and termination patterns' or were accompanied by 'suspicious circumstances[.]'"  *USANA Health*, 2018 WL 5044240, at *9 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009)) ("the court finds no inference of scienter arises from the resignation").  As the court explained in *USANA*, "[a]n inference of scienter "will 'never' be as compelling as the inference that the resignation was due to 'unrelated personal or business reasons.'"  *Id.*; *see also Anaplan*, 557 F. Supp. 3d at 999 (dismissing complaint; "simple fact of the departures of many important sales leaders raises only speculation").

As explained previously, Plaintiffs do not allege any facts suggesting that Dr. Katz, Dr. Dinu, and Mr. Miotto decided to leave the Company themselves, rather than because of a business decision made by Lightning's Board to reclassify and not renominate them.  *Supra* at 8-9.  Their departures cannot provide any inference of scienter.

Plaintiffs theorize that Mr. Ivsan's departure somehow meant that Lightning's "supply chain and operations were not nearly as mature or robust as investors had been told." ¶ 180. But this is pure speculation: They fail to allege any facts about the reasons for Mr. Ivsan's departure. *Id.* In *Overstock*, the court similarly held that speculation about an executive's departure was "not sufficient to plead scienter" because plaintiff's claim that the departure "was suspicious [was] not based on any supporting facts." 2020 WL 5775845, at *9. The more reasonable inference is that Mr. Ivsan departed because he and Lightning determined that he was not a good fit. Plaintiffs provide no facts to assume otherwise.

### 3.    Generic "Motive" Allegations Do Not Establish Scienter

Finally, Plaintiffs allege that the Lightning Defendants had "financial motives" to close the Business Combination because Lightning "needed more capital" (¶ 168) and Mr. Reeser and Mr. Fenwick-Smith "stood to profit financially[.]" ¶¶ 169-70. Neither supposed "motive" creates a strong inference of scienter.

***First,*** the Lightning Defendants' desire to close the Business Combination to procure capital for the Company "reflect[s] nothing more than a general desire to further the corporation's interests." *Level 3 Commc'ns*, 667 F.3d at 1346. Motives to "to further the interests of the corporation fail to raise an inference of scienter." *Id.* As Judge Moore explained, "[a]llegations that corporate defendants were motivated to present the company as successful, to facilitate corporate transactions, and to raise capital—are all generalized motives shared by all companies and as such, are not helpful in establishing scienter." *Molycorp*, 2015 WL 1540523, at *24 (citation omitted) (rejecting theory to "use overpriced shares to acquire another company and complete a convertible note offering"). The Lightning Defendants' success capitalizing the Company does not contribute to scienter.

***Second,*** Plaintiffs' accusation that Mr. Reeser and Mr. Fenwick-Smith profited personally from the Business Combination also fails to support an inference of scienter. Even

if they received stock as a result of the Business Combination, the Tenth Circuit has held that incentive-based equity compensation is "common among executives at publicly traded companies and does not ordinarily indicate scienter." *Level 3 Commc'ns*, 667 F.3d at 1346. Similarly, according to the Tenth Circuit, any cash bonuses that Mr. Reeser and Mr. Fenwick-Smith received in connection with the close of the Business Combination do not support an inference of scienter. *See id.* (no motive based on receipt of "cash bonuses"); *see also Anderson v. Spirit Aerosystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1267 (D. Kan. 2015) ("bonuses have been found to be insufficient motives to support scienter because they are motives shared by all company executives"), *aff'd,* 827 F.3d 1229 (10th Cir. 2016).

Plaintiffs fail to plead a cognizable motive for the Lightning Defendants to have engaged in fraud. "Although the absence of an alleged motive is not fatal to Plaintiff[s'] claims, it does weigh against a finding of scienter." *W. Union*, 950 F.3d at 1311.

In sum, Plaintiffs fail to allege the required strong inference of scienter that any of the Lightning Defendants had a fraudulent intent.[10] The Court can dismiss Plaintiffs' Section 10(b) claim on this ground alone.

## III.    PLAINTIFFS FAIL TO ALLEGE A SECTION 14(a) CLAIM

Plaintiffs' Section 14(a) claim is limited to statements made in the March 2021 proxy statement for the Business Combination. ¶¶ 223-28; *see also Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 689 (D. Colo. 2007) ("to prevail under Section 14(a), a plaintiff must show, among other things, that a proxy statement contained a material misrepresentation or omission") (citation omitted). Plaintiffs fail to plead two elements of

---

[10] Plaintiffs attempt to infer scienter because there was only one PIPE investor and Lightning's pre-merger valuation decreased. ¶ 177. But Plaintiffs fail to provide any factual allegations that either was due to purported fraud rather than general economic conditions. The fact that an extremely sophisticated investor like BP Technology Ventures invested $25 million in the PIPE cuts against Plaintiffs' theory. In addition, the Company publicly disclosed information about PIPE investors and Lightning's valuation. Ex. 1 at 149-53; *see also Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019) (affirming dismissal; no "intent to defraud" because "investors were appraised of the relevant information").

their Section 14(a) claim: "(1) that the proxy contained a material misrepresentation or omission; [and] (2) that the defendant was at least negligent[.]" *Britton v. Parker*, 2007 WL 2871003, at *8 (D. Colo. Sept. 26, 2007) (citation omitted) (dismissing complaint).

*No Particularized Facts Alleging Misstatement*. The statements Plaintiffs challenge in the proxy statement (¶¶ 146-51) fall within the same three categories as their Section 10(b) claim. *Supra* Section II(A). Plaintiffs cannot recycle their theories, because "[t]he PSLRA's pleading requirements as to misleading statements and omissions apply to Section 14(a) claims[.]" *Furlong Fund LLC v. VBI Vaccines, Inc.*, 2016 WL 1181710, at *3 (S.D.N.Y. Mar. 25, 2016) (dismissing complaint). For the reasons discussed previously, Plaintiffs have failed to plead facts that any of these statements were false at the time they were made. *Supra* Section II(A); *see also Parker*, 2007 WL 2871003, at *8 ("For the same reasons that the allegations in the Amended Complaint are too conclusory and inspecific to support [10(b) claim], the allegations are too conclusory and inspecific to support" 14(a) claim).

*No Particularized Facts Alleging Negligence*. "[B]ecause the PSLRA's pleading requirements are applicable to Rule 14a-9 claims, the [Complaint] must thus be pleaded with particularity and state facts that give rise to a strong inference of negligence." *Mendoza v. HF Foods Grp., Inc.*, 2021 WL 3772850, at *11 (C.D. Cal. Aug. 25, 2021) (citation omitted) (dismissing complaint). Plaintiffs fail to plead particularized facts about any Defendants' state of mind or conduct. *Supra* Section II(B). For these same reasons, they fail to plead that any of the Individual Defendants acted negligently.[11]

## IV.    PLAINTIFFS FAIL TO ALLEGE A SECTION 11 CLAIM

Unable to plead fraud or negligence, Plaintiffs attempt a third tack under Section 11 of the Securities Act. Unlike Section 10(b) and Section 14(a), Section 11 does not have a state

---

[11] Plaintiffs' Section 20(a) claims (¶¶ 232-38, 249-57) should be dismissed because they are predicated on their Section 10(b) and 14(a) claims. *See root9B Techs.*, 897 F.3d at 1303 ("a § 20(a) claim must be premised on a primary violation of the securities laws but no such violation has been established here") (citation omitted).

of mind requirement.  *See Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013) ("Section 11 . . . imposes strict liability").  Plaintiffs' Section 11 claim is limited, however, to statements made in the May 2020 Registration Statement for Gig3's IPO.  ¶¶ 206-10; *see also Molycorp*, 2015 WL 1540523, at *31 ("A claim under Section 11 must be based on a registration statement filed with the SEC.").

Because Plaintiffs' Section 11 claim is constrained to the Registration Statement, the only statements it challenges are several generic, aspirational statements about Gig3's intention to be "mentor-investors" to the SPAC's eventual target.  ¶¶ 132-33.  But Gig3's Registration Statement went effective in May 2020—months before Gig3 had *any* contact with Lightning.  As explained previously, Plaintiffs fail to allege any facts showing that Dr. Katz, Dr. Dinu, or Mr. Miotto did *not* intend to be "mentor-investors" or form a lasting partnership with Lightning.  *Supra* at 8-9.  And Plaintiffs do not plead facts showing that Dr. Katz, Dr. Dinu, and Mr. Miotto voluntarily chose to depart Lightning's Board.  *Supra* at 8-9.  Plaintiffs' allegation is another example of impermissible "fraud by hindsight" pleading.

Because Plaintiffs have failed to plead facts that any statements in the Registration Statement were false, the Court should dismiss the Section 11 claim.  *See Domo*, 2020 WL 7352735, at *7 (dismissing Section 11 claim; "[p]laintiffs' allegations fail to plead a false or misleading statement or omission in Domo's Offering Documents").[12]

---

[12] Plaintiffs' Section 15 claim (¶¶ 213-18) fails because it is predicated on their Section 11 claim.  *Molycorp*, 2015 WL 1540523, at *36 ("because Plaintiffs have failed to establish a primary violation of the 1933 Act . . . Plaintiffs do not plead sufficiently a Section 15 claim").

**CONCLUSION**

The Lightning Defendants respectfully request that the Complaint be dismissed.[13]

Dated: June 14, 2023                    FRESHFIELDS BRUCKHAUS DERINGER US LLP


                                        /s/ Boris Feldman              .
                                         Boris Feldman
                                        Freshfields Bruckhaus Deringer US LLP
                                        855 Main Street
                                        Redwood City, CA 94063
                                        (650) 618-9250
                                        boris.feldman@freshfields.com

                                        *Attorneys for Defendants Lightning eMotors,
                                        Inc., Timothy R. Reeser, Teresa P.
                                        Covington, and Robert Fenwick-Smith*

---

[13] To the extent Plaintiffs purport to assert scheme liability under Rule 10b-5(a) or (c) (¶ 243), this fails because Plaintiffs do not attempt to allege fraud independent of a misrepresentation or omission. *See In re Nektar Therapeutics*, 2020 WL 3962004, at *13 (N.D. Cal. July 13, 2020) ("scheme liability claim cannot be based solely on false or misleading statements").

**CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2023, I caused to be electronically filed the foregoing LIGHTNING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all registered participants.


/s/ Boris Feldman
Boris Feldman

27