# EXHIBIT 1

Filed Pursuant to Rule 424(b)(3)
Registration No. 333-251862

**PROSPECTUS**

**PROXY STATEMENT FOR
SPECIAL MEETING OF
GIGCAPITAL3, INC.**

**PROSPECTUS FOR 70,385,096 SHARES OF COMMON STOCK
OF
GIGCAPITAL3, INC.**
**WHICH WILL BE RENAMED "LIGHTNING EMOTORS, INC." IN CONNECTION WITH THE BUSINESS COMBINATION DESCRIBED HEREIN**

The board of directors of GigCapital3, Inc., a Delaware corporation (" *GigCapital3*"), has unanimously approved (i) the merger of Project Power Merger Sub, Inc. (" *Merger Sub*"), a Delaware corporation, and Lightning Systems, Inc. ("*Lightning Systems*"), a Delaware corporation (the "*Business Combination*"), with Lightning Systems surviving the Business Combination as a wholly-owned subsidiary of GigCapital3, pursuant to the terms of the Business Combination Agreement, dated as of December 10, 2020, by and among GigCapital3, Merger Sub and Lightning Systems, attached to this proxy statement/prospectus as Annex A (the "*Business Combination Agreement*"), as more fully described elsewhere in this proxy statement/prospectus; and (ii) the other transactions contemplated by the Business Agreement and documents related thereto. In connection with the Business Combination, GigCapital3 will change its name to "Lightning eMotors, Inc."

At the effective time of the Business Combination, among other things, each share of Lightning Systems capital stock, par value $0.00001 per share (collectively, " *Lightning Systems Capital Stock*") issued and outstanding immediately prior to the effective time of the Business Combination (including shares of Lightning Systems Capital Stock resulting from the conversion or exercise of warrants, stock options and convertible notes prior to the effective time of the Business Combination) will be cancelled and converted into (i) the right to receive shares of common stock, par value $0.0001 per share, of the Company ("*Common Stock*") equal to the Exchange Ratio (as defined below) (such amount, the " *Per Share Merger Consideration*") and (ii) the contingent right to receive a portion of the Stockholder Earnout Shares (as defined in the accompanying proxy statement/prospectus), calculated on a Pro Rata Basis as defined in the accompanying proxy statement/prospectus) together with all other shares of Lightning Systems Capital Stock held by the holder of such shares as of immediately prior to the effective time of the Business Combination, if, as and when payable in accordance with the provisions of the Business Combination Agreement. The "*Exchange Ratio*" means the quotient of (a) the Aggregate Closing Merger Consideration (as defined below) divided by (b) the Company Fully Diluted Capital Stock (as defined below). The "*Aggregate Closing Merger Consideration*" means a number of shares of Common Stock equal to the quotient of (a) the Aggregate Closing Merger Consideration Value (as defined below) divided by (b) $10.00. The "*Aggregate Closing Merger Consideration Value*" means (a) $539,220,000, plus (b) the sum of the exercise prices of all Lightning Systems Options (as defined below) outstanding immediately prior to the effective time of the Business Combination, minus (c) the amount by which the net debt of Lightning Systems at the Closing (as defined below) exceeds $15,000,000, minus (d) the amount by which the cash and cash equivalents of Lightning Systems at the Closing is less than $500,000. The "*Company Fully Diluted Capital Stock*" means the sum of (a) the aggregate number of shares of Lightning Systems Capital Stock that are issued and outstanding as of immediately prior to the effective time of the Business Combination (including shares issued upon the exercise or conversion of Lightning Systems Options (as defined below), and warrants and convertible notes of Lightning Systems, in each case prior to the effective time of the Business Combination, but excluding any shares to be cancelled pursuant to the terms of the Business Combination Agreement, and (b) the maximum number of shares of Lightning Systems Common Stock (as defined below) issuable upon full exercise, exchange or conversion of all Lightning Systems stock options outstanding as of the effective time of the Business Combination. In addition, at the effective time of the Business Combination, each outstanding option to purchase shares of Lightning Systems common stock, par value $0.00001 per share ("*Lightning Systems Common Stock* ," and each such option, a "*Lightning Systems Option*"), whether vested or unvested, will be assumed by GigCapital3 and converted into an option to purchase a number of shares of Common Stock (such option, an "*Exchanged Option*") equal to the product (rounded down to the nearest whole number) of (x) the number of shares of Lightning Systems Common Stock subject to such Lightning Systems Option immediately prior to the effective time of the Business Combination and (y) the Exchange Ratio, at an exercise price per share (rounded up to the nearest whole cent) equal to the quotient of (A) the exercise price per share of such Lightning Systems Option immediately prior to the effective time of the Business Combination divided by (B) the Exchange Ratio. Except as specifically provided above or as agreed to in writing with any holder of a Lightning Systems Option, following the effective time of the Business Combination, each Exchanged Option will continue to be governed by the same vesting and exercisability terms and otherwise substantially similar terms and conditions as were applicable to the corresponding former Lightning Systems Option immediately prior to the effective time of the Business Combination. The "*Closing*" means the closing of the transactions contemplated by the Business Combination Agreement.

The GigCapital3 Common Stock, units and warrants are currently listed on the New York Stock Exchange (" *NYSE")* under the symbols "GIK", "GIK.U" and "GIK.WS," respectively. Upon Closing, we intend to apply to list the shares as consideration in the Business Combination on the NYSE under the symbol "ZEV". Thereafter, our units (each comprised of one share of Common Stock, one right to receive one-tenth of one share of Common Stock and three-fourths of one warrant to purchase one share of Common Stock), will cease to trade as an individual security and, instead, will be separated into their constituent securities, and the Common Stock and warrants will trade under the symbols "ZEV" and "ZEV.WS," respectively. It is a condition of the consummation of the Business Combination described above that GigCapital3 receives confirmation from the NYSE that the securities have been conditionally approved for listing on the NYSE, but there can be no assurance such listing conditions will be met or that GigCapital3 will obtain such confirmation from the NYSE. If such listing conditions are not met or if such confirmation is not obtained, the Business Combination described above will not be consummated unless the NYSE condition set forth in the Business Combination Agreement is waived by the applicable parties.

**This proxy statement/prospectus provides shareholders of GigCapital3 with detailed information about the proposed business combination and other matters to be considered at the special meeting of GigCapital3. We encourage you to read this entire document, including the Annexes and other documents referred to herein, carefully and in their entirety. You should also carefully consider the risk factors described in the section entitled "*Risk Factors*" beginning on page 53 of this proxy statement/prospectus.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN THIS PROXY STATEMENT/PROSPECTUS, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR RELATED TRANSACTIONS OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THIS PROXY STATEMENT/PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.**

**This proxy statement/prospectus is dated March 26, 2021, and is first being mailed to GigCapital3's shareholders on or about March 26, 2021.**

**Table of Contents**

# GigCapital3, Inc.

**1731 Embarcadero Rd., Suite 200**
**Palo Alto, CA 94303**

Dear GigCapital3, Inc. Stockholder:

We cordially invite you to attend a special meeting (the "*Special Meeting*") of the stockholders of GigCapital3, Inc., a Delaware corporation ("*we*," "*us*," "*our*" or the "*Company*"), which will be held on April 21, 2021 at 10:00 a.m., PDT, via live webcast at www.virtualshareholdermeeting.com/GIK2021SM. In light of ongoing developments related to coronavirus (COVID-19), after careful consideration, the Company has determined that the Special Meeting will be a virtual meeting conducted exclusively via live webcast in order to facilitate stockholder attendance and participation while safeguarding the health and safety of our stockholders, directors and management team. You or your proxyholder will be able to attend and vote at the Special Meeting online by visiting www.virtualshareholdermeeting.com/GIK2021SM and using a control number assigned by Broadridge Financial Solutions. To register and receive access to the virtual meeting, registered stockholders and beneficial stockholders (those holding shares through a stock brokerage account or by a bank or other holder of record) will need to follow the instructions applicable to them provided in the proxy statement. Please note that you will only be able to access the Special Meeting by means of remote communication.

On December 10, 2020, the Company, Project Power Merger Sub, Inc. ("*Merger Sub*"), and Lightning Systems, Inc., a Delaware corporation ("*Lightning Systems*"), entered into a business combination agreement (and as it may be further amended from time to time, the *Business Combination Agreement*"). If the Business Combination Agreement is adopted by Lightning Systems stockholders, and the Business Combination Agreement is approved by Company stockholders at the Special Meeting, Merger Sub will merge with and into Lightning Systems, with Lightning Systems surviving the merger. Upon the consummation of the transactions contemplated by the Business Combination Agreement (the "*Business Combination*"), the Company will change its name to Lightning eMotors, Inc. **As described in this proxy statement/prospectus, the Company's stockholders are being asked to consider and vote upon, among other things, the Business Combination and the other proposals set forth herein**.

Subject to the terms and conditions of the Business Combination Agreement, at the effective time of the Business Combination, each share of Lightning Systems capital stock, par value $0.00001 per share (collectively, "*Lightning Systems Capital Stock*") issued and outstanding immediately prior to the effective time of the Business Combination (including shares of Lightning Systems Capital Stock resulting from the conversion or exercise of warrants, stock options and convertible notes prior to the effective time of the Business Combination) will be cancelled and converted into (i) the right to receive shares of common stock, par value $0.0001 per share, of the Company ("*Common Stock*") equal to the Exchange Ratio (as defined below) (such amount, the "*Per Share Merger Consideration*") and (ii) the contingent right to receive a portion of the Stockholder Earnout Shares (as defined below), calculated on a Pro Rata Basis (as defined below) together with all other shares of Lightning Systems Capital Stock held by the holder of such shares as of immediately prior to the effective time of the Business Combination, if, as and when payable in accordance with the provisions of the Business Combination Agreement. The "*Exchange Ratio*" means the quotient of (a) the Aggregate Closing Merger Consideration (as defined below) divided by (b) the Company Fully Diluted Capital Stock (as defined below). The "*Aggregate Closing Merger Consideration*" means a number of shares of Common Stock equal to the quotient of (a) the Aggregate Closing Merger Consideration Value (as defined below) divided by (b) $10.00. The "*Aggregate Closing Merger Consideration Value*" means (a) $539,220,000, plus (b) the sum of the exercise prices of all Lightning Systems Options (as defined below) outstanding immediately prior to the effective time of the Business Combination, minus (c) the amount by which the net debt of Lightning Systems at the Closing (as defined below) exceeds $15,000,000, minus (d) the amount by which the cash and cash equivalents of Lightning Systems at the Closing is less than $500,000. The "*Company Fully Diluted Capital Stock*" means the sum of the aggregate number of shares of Lightning Systems Capital Stock that are issued and outstanding as of immediately prior to the effective time of the Business Combination (including shares issued upon the exercise or conversion of Lightning Systems Options (as defined below), and warrants and convertible notes of Lightning

Table of Contents

Systems, in each case prior to the effective time of the Business Combination, but excluding any shares to be cancelled pursuant to the terms of the Business Combination Agreement, and (b) the maximum number of shares of Lightning Systems Common Stock (as defined below) issuable upon full exercise, exchange or conversion of all Lightning Systems stock options outstanding as of the effective time of the Business Combination. In addition, at the effective time of the Business Combination, each outstanding option to purchase shares of Lightning Systems common stock, par value $0.00001 per share ("*Lightning Systems Common Stock*," and each such option, a "*Lightning Systems Option*"), whether vested or unvested, will be assumed by GigCapital3 and converted into an option to purchase a number of shares of Common Stock (such option, an "*Exchanged Option*") equal to the product (rounded down to the nearest whole number) of (x) the number of shares of Lightning Systems Common Stock subject to such Lightning Systems Option immediately prior to the effective time of the Business Combination and (y) the Exchange Ratio, at an exercise price per share (rounded up to the nearest whole cent) equal to the quotient of (A) the exercise price per share of such Lightning Systems Option immediately prior to the effective time of the Business Combination divided by (B) the Exchange Ratio. Except as specifically provided above or as agreed to in writing with any holder of a Lightning Systems Option, following the effective time of the Business Combination, each Exchanged Option will continue to be governed by the same vesting and exercisability terms and otherwise substantially similar terms and conditions as were applicable to the corresponding former Lightning Systems Option immediately prior to the effective time of the Business Combination. The "*Closing*" means the closing of the transactions contemplated by the Business Combination Agreement.

The "*Stockholder Earnout Shares*" are up to an additional 16,463,096 shares of Common Stock that shall be issued to equity holders of Lightning Systems who have received, or are entitled to receive, any Per Share Merger Consideration (such holders, the "*Stockholder Earnout Group*"), in three equal tranches if, during the period from the date of the Closing through and including the fifth anniversary of the date of the Closing, the dollar volume-weighted average price of Common Stock (as determined in accordance with the Business Combination Agreement) equals or exceeds $12.00, $14.00 and $16.00 per share for twenty (20) of any thirty (30) consecutive trading days commencing after the Closing on the NYSE, Nasdaq or any other national securities exchange, as applicable for each of such three tranches, respectively. "*Pro Rata Basis*" shall mean, with respect to any member of the Stockholder Earnout Group, in accordance with the ratio calculated by dividing (x) the sum of the aggregate Per Share Merger Consideration issued or issuable to such holder *by* (y) the sum of the aggregate Per Share Merger Consideration issued or issuable to the Stockholder Earnout Group, in each case, as of immediately following the Closing as determined in accordance with the Business Combination Agreement.

In connection with the execution of the Business Combination Agreement, the Company entered into a subscription agreement, dated as of December 10, 2020 (the "*PIPE Subscription Agreement*"), with BP Technology Ventures, Inc. (the "*PIPE Investor*"), pursuant to which, among other things, the Company agreed to issue and sell to the PIPE Investor, in a private placement to close immediately prior to the Closing, an aggregate of 2,500,000 shares of Common Stock at $10.00 per share, for an aggregate purchase price of $25,000,000.

Also in connection with execution of the Business Combination Agreement, the Company entered into subscription agreements, each dated as of December 10, 2020 (the "*Convertible Note Subscription Agreements*"), with certain investors (collectively, the "*Convertible Note Investors*"), pursuant to which, among other things, the Company agreed to issue and sell to the Convertible Note Investors, in private placements to close immediately prior to Closing, (a) convertible notes due in 2024 ("*Convertible Notes*") for an aggregate purchase price of $100,000,000 and (b) warrants to purchase up to 8,695,652 shares of Common Stock for a per share exercise price of $11.50 ("*Convertible Note Warrants*"). The Convertible Notes are convertible into 8,695,652 shares of Common Stock at a conversion price of $11.50.

The Company and Lightning Systems cannot complete the Business Combination unless the Company's stockholders approve the Business Combination, including the issuance of Common Stock to Lightning Systems equity holders as merger consideration and the issuance of shares of Common Stock to the PIPE Investors and the Convertible Notes and Convertible Note Warrants to the Convertible Note Investors, and certain of the other proposals contained herein. The Company is sending you this proxy statement/prospectus to ask you to vote in

Table of Contents

favor of the Business Combination Proposal, as described below, and the other matters described in this proxy statement/prospectus.

At the Special Meeting, Company stockholders will be asked to consider and vote upon a proposal (the "*Business Combination Proposal*" or "*Proposal No. 1*") to adopt the Business Combination Agreement, a copy of which is attached to the accompanying proxy statement as *Annex A*, and approve the transactions contemplated thereby, including the Business Combination. In addition, you are being asked to consider and vote upon a proposal to approve, for purposes of complying with applicable New York Stock Exchange (the "*NYSE*") listing rules, the issuance of more than 20% of the Company's outstanding Common Stock in connection with the Business Combination, the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, including up to 70,385,096 shares of Common Stock to the Lightning Systems equity holders, 2,500,000 shares of Common Stock to the PIPE Investor, 8,695,652 shares of our Common Stock upon conversion of the Convertible Notes and 8,695,652 shares of our Common Stock upon exercise of the Convertible Note Warrants (the "*NYSE Stock Issuance Proposal*" or "*Proposal No. 2*"); a proposal to adopt (i) two separate proposals to approve and adopt amendments to the Company's current amended and restated certificate of incorporation, as amended, to: (A) provide for the classification of our board of directors (our "*Board*") into three classes of directors with staggered terms of office and to make certain related changes ("*Proposal No. 3*"); and (B) (x) provide for certain additional changes, including but not limited to changing the post-combination company's corporate name from "GigCapital3, Inc." to "Lightning eMotors, Inc." and eliminating certain provisions specific to our status as a blank check company, which our Board believes are necessary to adequately address the needs of the post-combination company ("Proposal 4A") and (y) to authorize the adoption of Delaware as the exclusive forum for certain stockholder litigation ("*Proposal 4B*", which together with Proposal No. 3 and Proposal 4A are collectively referred to as the "*Charter Amendment Proposals*"); a proposal to approve the GigCapital3, Inc. 2021 Equity Incentive Plan (the "*Incentive Plan*") (the "*Incentive Plan Proposal*" or "*Proposal No. 5*"); a proposal to consider and vote upon a proposal to elect, effective at Closing Date, nine directors to serve staggered terms on our board of directors until the 2021, 2022 and 2023 annual meetings of stockholders, respectively, and until their respective successors are duly elected and qualified (the "*Election of Directors Proposal*" or "*Proposal No. 6*"); and a proposal to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal (the "*Adjournment Proposal*" or "*Proposal No. 7*").

Each of these proposals is more fully described in the accompanying proxy statement, which each stockholder is encouraged to read carefully.

Our Common Stock, units and warrants are currently listed on the New York Stock Exchange ("*NYSE*") under the symbols "GIK", "GIK.U" and "GIK.WS," respectively. Upon Closing, we intend to apply to list the shares as consideration in the Business Combination on the NYSE under the symbol "ZEV". Thereafter, our units (each comprised of one share of Common Stock, one right to receive one-tenth of one share of Common Stock and three-fourths of one warrant to purchase one share of Common Stock), will cease to trade as an individual security and, instead, will be separated into their constituent securities, and the Common Stock and warrants will trade under the symbols "ZEV" and "ZEV.WS," respectively.

Pursuant to our certificate of incorporation, we are providing our stockholders that hold shares of Common Stock that were included in the units issued in our initial public offering ("*IPO*") ("*public stockholders*" and such shares, "*public shares*"), with the opportunity to redeem, upon the Closing, public shares then held by them for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing) in our trust account (the "*Trust Account*") that holds the proceeds (including interest, which shall be net of taxes paid and taxes payable and amounts previously redeemed) of our IPO and such additional amounts as we may deposit into such trust account in connection with extensions of time for us to consummate the Business Combination. The per-share amount we will distribute to public stockholders that properly redeem their shares will not be reduced by transaction expenses incurred by the Company and Lightning Systems in connection with the Business Combination. For illustrative purposes, based on the fair value of marketable securities held in our

Table of Contents

Trust Account of approximately $202.0 million as of December 31, 2020, the estimated per share redemption price would have been approximately $10.10 on such date. **Public stockholders may elect to redeem their shares even if they vote for the Business Combination** A public stockholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13d-3 of the Securities Exchange Act of 1934, as amended), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 15% of the public shares. We have no specified maximum redemption threshold under our certificate of incorporation, other than the aforementioned 15% threshold. Each redemption of shares of Common Stock by our public stockholders will reduce the amount in our Trust Account, which held marketable securities with a fair value of approximately $202.0 million as of December 31, 2020.

The Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, being no less than an aggregate amount of $150.0 million. This condition to closing in the Business Combination Agreement is for the sole benefit of the parties thereto and may be waived by either of us or Lightning Systems. If, as a result of redemptions of Common Stock by our public stockholders, this condition is not met (or waived), then either we or Lightning Systems may elect not to consummate the Business Combination. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. In addition, in no event will we redeem shares of our Common Stock in an amount that would result in the Company's failure to have net tangible assets equaling or exceeding $5,000,001 (so that we are not subject to the SEC's "penny stock" rules). Holders of our outstanding public warrants do not have redemption rights in connection with the Business Combination. Unless otherwise specified, the information in the accompanying proxy statement assumes that none of our public stockholders exercise their redemption rights with respect to their shares of common stock.

Our initial stockholders prior to the IPO, GigAcquisitions3, LLC (sometimes referred to as the "*Founder*"), and those of our directors and officers who hold shares of Common Stock, together with Nomura Securities International, Inc. ("*Nomura*"), Oppenheimer & Co. Inc. ("*Oppenheimer*") and Odeon Capital Group LLC ("*Odeon*" and, together with Oppenheimer and Nomura, the "*Underwriters*")(such directors, officers, the Founder and the Underwriters, our "*Initial Stockholders*") have agreed to vote their shares of Common Stock in favor of the Business Combination.**Currently, our Initial Stockholders, officers and directors own approximately 22.8% of our issued and outstanding shares of Common Stock, including all of the Initial Stockholder Shares** (as defined below). The Initial Stockholder Shares are subject to transfer restrictions. The 5,893,479 shares of Common Stock (the "*Initial Stockholder Shares*") that are currently owned by our Initial Stockholders, of which 15,000 shares are held by our directors and officers, will be excluded from the pro rata calculation used to determine the per-share redemption price. Our Initial Stockholders have agreed to vote any shares of Common Stock owned by them in favor of the Business Combination.

We are providing you with the accompanying proxy statement and accompanying proxy card in connection with the solicitation of proxies to be voted at the Special Meeting and at any adjournments or postponements of the Special Meeting. Information about the Special Meeting, the Business Combination and other related business to be considered by the Company's stockholders at the Special Meeting is included in this proxy statement/prospectus. **Whether or not you plan to attend the Special Meeting, we urge you to read this proxy statement/prospectus, including the Annexes and the accompanying financials statements of the Company and of Lightning Systems, carefully and in their entirety. In particular, we urge you to read carefully the section entitled "*Risk Factors*" beginning on page 53 of the accompanying proxy statement.**

After careful consideration, our Board has approved the Business Combination Agreement and the transactions contemplated therein, and recommends that our stockholders vote "**FOR**" adoption of the Business Combination Agreement and approval of the transactions contemplated thereby, including the Business Combination, and "**FOR**" all other proposals presented to our stockholders in the accompanying proxy statement. When you consider the Board's recommendation of these proposals, you should keep in mind that our

Table of Contents

directors and officers have interests in the Business Combination that may conflict with your interests as a stockholder. Please see the section entitled "*Proposal No. 1 - Approval of the Business Combination - Interests of Certain Persons in the Business Combination*" for additional information.

Approval of each of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Incentive Plan Proposal, the Election of Directors Proposal and the Adjournment Proposal require the affirmative vote of a majority of the votes cast at the Special Meeting. Approval of the Charter Amendment Proposals require the affirmative vote of a majority of the outstanding shares of our Common Stock.

**Your vote is very important. Whether or not you plan to attend the Special Meeting, please vote as soon as possible by following the instructions in this proxy statement/prospectus to make sure that your shares are represented at the Special Meeting. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the Special Meeting. Even if you have voted by proxy, you may still vote during the Special Meeting by visiting www.virtualshareholdermeeting.com/GIK2021SM with your 16-digit control number assigned by Broadridge Financial Solutions included on your proxy card or obtained from them via email. The transactions contemplated by the Business Combination Agreement will be consummated only if the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal are approved at the Special Meeting. The proposals in this proxy statement/prospectus (other than the Adjournment Proposal) are conditioned on the approval of the Business Combination Proposal.**

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted "**FOR**" each of the proposals presented at the Special Meeting. If you fail to return your proxy card or fail to instruct your bank, broker or other nominee how to vote, and do not attend the Special Meeting in person, the effect will be that your shares will not be counted for purposes of determining whether a quorum is present at the Special Meeting. If you are a stockholder of record and you attend the Special Meeting and wish to vote in person, you may withdraw your proxy and vote in person.

TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST DEMAND THAT THE COMPANY REDEEM YOUR SHARES FOR A PRO RATA PORTION OF THE FUNDS HELD IN THE TRUST ACCOUNT AND TENDER YOUR SHARES TO THE COMPANY'S TRANSFER AGENT AT LEAST TWO BUSINESS DAYS PRIOR TO THE VOTE AT SUCH MEETING. YOU MAY TENDER YOUR SHARES BY EITHER DELIVERING YOUR SHARE CERTIFICATE TO THE TRANSFER AGENT OR BY DELIVERING YOUR SHARES ELECTRONICALLY USING DEPOSITORY TRUST COMPANY'S DWAC (DEPOSIT WITHDRAWAL AT CUSTODIAN) SYSTEM. IF THE BUSINESS COMBINATION IS NOT COMPLETED, THEN THESE SHARES WILL NOT BE REDEEMED FOR CASH. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS.

On behalf of our Board, I would like to thank you for your support of GigCapital3, Inc. and look forward to a successful completion of the Business Combination.

Sincerely,

Dr. Avi S. Katz
Executive Chairman, Secretary, President and Chief Executive Officer
March 26, 2021

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN

**Table of Contents**

THIS PROXY STATEMENT/PROSPECTUS, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR RELATED TRANSACTIONS OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THIS PROXY STATEMENT/PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.

This proxy/prospectus statement is dated March 26, 2021, and is expected to be first mailed to Company stockholders on or about March 26, 2021.

**Table of Contents**

**NOTICE OF SPECIAL MEETING OF**
**STOCKHOLDERS OF GIGCAPITAL3, INC.**
**TO BE HELD ON APRIL 21, 2021**

To the Stockholders of GigCapital3, Inc.:

NOTICE IS HEREBY GIVEN that a special meeting (the "*Special Meeting*") of the stockholders of GigCapital3, Inc., a Delaware corporation ("*we*," "*us*," "*our*" or the "*Company*"), which will be held on April 21, 2021 at 10:00 a.m., PDT, via live webcast at www.virtualshareholdermeeting.com/GIK2021SM. In light of ongoing developments related to coronavirus (COVID-19), after careful consideration, the Company has determined that the Special Meeting will be a virtual meeting conducted exclusively via live webcast in order to facilitate stockholder attendance and participation while safeguarding the health and safety of our stockholders, directors and management team. You or your proxyholder will be able to attend and vote at the Special Meeting online by visiting www.virtualshareholdermeeting.com/GIK2021SM and using a control number assigned by Broadridge Financial Solutions. To register and receive access to the virtual meeting, registered stockholders and beneficial stockholders (those holding shares through a stock brokerage account or by a bank or other holder of record) will need to follow the instructions applicable to them provided in the proxy statement. Please note that you will only be able to access the Special Meeting by means of remote communication. You are cordially invited to attend the Special Meeting to conduct the following items of business which you will be asked to consider and vote on:

1. **Proposal No. 1 - The Business Combination Proposal -** To approve and adopt the Business Combination Agreement, dated as of December 10, 2020 (as it may be amended and/or restated from time to time, the "*Business Combination Agreement*") by and among the Company, its wholly owned subsidiary, Project Power Merger Sub, Inc. ("*Merger Sub*"), and Lightning Systems, Inc. ("*Lightning Systems*"), a copy of which is attached to this proxy statement/prospectus as *Annex A*, and approve the transactions contemplated thereby (the "*Business Combination*"), including the merger of Merger Sub with and into Lightning Systems, with Lightning Systems surviving the merger, and the issuance of Common Stock (as defined below) to Lightning Systems equity holders as merger consideration;

2. **Proposal No. 2 - The NYSE Stock Issuance Proposal** - To approve, for purposes of complying with applicable listing rules of the New York Stock Exchange (the "*NYSE*"), the issuance of more than 20% of the Company's outstanding Common Stock in connection with the Business Combination, and the transactions contemplated by the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, including up to 70,385,096 shares of Common Stock to the Lightning Systems equity holders, 2,500,000 shares of Common Stock to the PIPE Investor, 8,695,652 shares of our Common Stock upon conversion of the Convertible Notes (as defined below) and 8,695,652 shares of our Common Stock upon exercise of the Convertible Note Warrants (as defined below);

3. **Proposal No. 3 - Classification of the Board of Directors Proposal** - To provide for the classification of our board of directors into three classes of directors with staggered terms of office and to make certain related changes;

4. **Proposal No. 4A - Approval of Additional Amendments to Current Amended and Restated Certificate of Incorporation in Connection with the Business Combination Proposal (Governance Proposal) -** To approve certain additional changes, including but not limited to changing the post-combination company's corporate name from "GigCapital3, Inc." to "Lightning eMotors, Inc." and eliminating certain provisions specific to our status as a blank check company, which our Board believes are necessary to adequately address the needs of the post-combination company;

   **Proposal No. 4B - Authorization of Exclusive Forum Provision (Forum Proposal)** - To authorize the adoption of Delaware as the exclusive forum for certain stockholder litigation;

5. **Proposal No. 5 - Incentive Plan Proposal** - To approve the GigCapital3, Inc. 2021 Equity Incentive Plan (the "*Incentive Plan*"), including the authorization of the initial share reserve under the Incentive Plan;

6. **Proposal No. 6 - The Election of Directors Proposal** - To elect, effective at Closing, nine directors to serve staggered terms on our board of directors until the 2021, 2022 and 2023 annual meetings of stockholders, respectively, and until their respective successors are duly elected and qualified; and

Table of Contents

8.   **Proposal No. 7 - Adjournment Proposal** - To approve, if necessary, the adjournment of the Special Meeting to a later date or dates to permit further solicitation and votes of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Classification of the Board of Directors Proposal, the Governance Proposal. the Forum Proposal (together with the Classification of the Board of Directors Proposal and the Governance Proposal, the "*Charter Amendment Proposals*"), the Incentive Plan Proposal or the Election of Directors Proposal. This proposal will only be presented at the Special Meeting if there are not sufficient votes to approve the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal.

The above matters are more fully described in the accompanying proxy statement, which also includes, as *Annex A* and *Annex B*, copies of the Business Combination Agreement and a copy of the Second Amended and Restated Certificate of Incorporation. **We urge you to read carefully the accompanying proxy statement in its entirety, including the Annexes and accompanying financial statements of the Company and Lightning Systems.**

The record date for the Special Meeting is March 15, 2021. Only stockholders of record at the close of business on that date may vote at the Special Meeting or any adjournment thereof. A complete list of our stockholders of record entitled to vote at the Special Meeting will be available for ten days before the Special Meeting at our principal executive offices for inspection by stockholders during ordinary business hours for any purpose germane to the Special Meeting and electronically during the Special Meeting at www.virtualshareholdermeeting.com/GIK2021SM.

Pursuant to our certificate of incorporation, we are providing our stockholders that hold shares of Common Stock that were included in the units issued in our initial public offering ("*IPO*") ("*public stockholders*" and such shares, "*public shares*"), with the opportunity to redeem, upon the Closing, public shares then held by them for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing) in our trust account (the "*Trust Account*") that holds the proceeds (including interest, which shall be net of taxes paid and taxes payable and amounts previously redeemed) of our IPO and such additional amounts as we may deposit into such trust account in connection with extensions of time for us to consummate the Business Combination. The per-share amount we will distribute to public stockholders that properly redeem their shares will not be reduced by transaction expenses incurred by the Company and Lightning Systems in connection with the Business Combination. For illustrative purposes, based on the fair value of marketable securities held in our Trust Account of approximately $202.0 million as of December 31, 2020, the estimated per share redemption price would have been approximately $10.10 on such date. **Public stockholders may elect to redeem their shares even if they vote for the Business Combination**. A public stockholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13d-3 of the Securities Exchange Act of 1934, as amended), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 15% of the public shares. We have no specified maximum redemption threshold under our certificate of incorporation, other than the aforementioned 15% threshold. Each redemption of shares of Common Stock by our public stockholders will reduce the amount in our Trust Account, which held marketable securities with a fair value of approximately $202.0 million as of December 10, 2020.

The Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, being no less than an aggregate amount of $150.0 million. This condition to closing in the Business Combination Agreement is for the sole benefit of the parties thereto and may be waived by either of us or Lightning Systems. If, as a result of redemptions of Common Stock by our public stockholders, this condition is not met (or waived), then either we or Lightning Systems may elect not to consummate the Business Combination. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. In addition, in no event will we redeem shares of our Common Stock in an amount that would result in the

Table of Contents

Company's failure to have net tangible assets equaling or exceeding $5,000,001 (so that we are not subject to the SEC's "penny stock" rules). Holders of our outstanding public warrants do not have redemption rights in connection with the Business Combination. Unless otherwise specified, the information in the accompanying proxy statement assumes that none of our public stockholders exercise their redemption rights with respect to their shares of Common Stock.

Our initial stockholders prior to the IPO, GigAcquisitions3, LLC (sometimes referred to as the "*Founder*"), and those of our directors and officers who hold shares of Common Stock, together with Nomura Securities International, Inc. ("*Nomura*"), Oppenheimer & Co. Inc. ("*Oppenheimer*") and Odeon Capital Group LLC ("*Odeon*" and, together with Oppenheimer and Nomura, the "*Underwriters*")(such directors, officers, the Founder and the Underwriters, our "*Initial Stockholders*") have agreed to vote their shares of common stock in favor of the Business Combination.**Currently, our Initial Stockholders, officers and directors own approximately 22.8% of our issued and outstanding shares of Common Stock, including all of the Initial Stockholder Shares** (as defined below). The Initial Stockholder Shares are subject to transfer restrictions. The 5,893,479 shares of Common Stock (the "*Initial Stockholder Shares*") that are currently owned by our Initial Stockholders, of which 15,000 shares are held by our directors and officers, will be excluded from the pro rata calculation used to determine the per-share redemption price. Our Initial Stockholders have agreed to vote any shares of Common Stock owned by them in favor of the Business Combination.

In connection with the execution of the Business Combination Agreement, the Company entered into a subscription agreement, dated as of December 10, 2020 (the "*PIPE Subscription Agreement*"), with BP Technology Ventures, Inc. (the "*PIPE Investor*"), pursuant to which, among other things, the Company agreed to issue and sell to the PIPE Investor, in a private placement to close immediately prior to the Closing, an aggregate of 2,500,000 shares of Common Stock at $10.00 per share, for an aggregate purchase price of $25,000,000.

Also in connection with execution of the Business Combination Agreement, the Company entered into subscription agreements, each dated as of December 10, 2020 (the "*Convertible Note Subscription Agreements*"), with certain investors (collectively, the "*Convertible Note Investors*"), pursuant to which, among other things, the Company agreed to issue and sell to the Convertible Note Investors, in private placements to close immediately prior to Closing, (a) convertible notes due in 2024 ("*Convertible Notes*") for an aggregate purchase price of $100,000,000 and (b) warrants to purchase up to 8,695,652 shares of Common Stock for a per share exercise price of $11.50 ("*Convertible Note Warrants*"). The Convertible Notes are convertible into 8,695,652 shares of Common Stock at a conversion price of $11.50.

The Company and Lightning Systems cannot complete the Business Combination unless the Company's stockholders approve the Business Combination, including the issuance of Common Stock to Lightning Systems equity holders as merger consideration and the issuance of shares of to the PIPE Investors and the Convertible Notes and Convertible Note Warrants to the Convertible Note Investors, and certain of the other proposals contained herein. The transactions contemplated by the Business Combination Agreement will be consummated only if the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal are approved at the Special Meeting. The proposals in this proxy statement/prospectus (other than the Adjournment Proposal) are conditioned on the approval of the Business Combination Proposal. The Company is sending you this proxy statement/prospectus to ask you to vote in favor of the Business Combination Proposal, as described below, and the other matters described in this proxy statement/prospectus.

A majority of the voting power of all outstanding shares of capital stock of the Company entitled to vote must be present in person via the virtual meeting platform or by proxy to constitute a quorum for the transaction of business at the Special Meeting. Approval of each of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Incentive Plan Proposal, the Election of Directors Proposal and the Adjournment Proposal require the affirmative vote of a majority of the votes cast at the Special Meeting. Approval of the Charter Amendment Proposals require the affirmative vote of a majority of the outstanding shares of our Common Stock. **The Board unanimously recommends that you vote "FOR" each of these proposals**

Table of Contents

By Order of the Board of Directors

Dr. Avi S. Katz
Executive Chairman, Secretary, President and Chief Executive Officer

Palo Alto, California
March 26, 2021

Table of Contents

Table of Contents

## TABLE OF CONTENTS

| | |
|---|---|
| SUMMARY TERM SHEET | 1 |
| FREQUENTLY USED TERMS | 6 |
| QUESTIONS AND ANSWERS ABOUT THE PROPOSALS FOR STOCKHOLDERS | 11 |
| SUMMARY OF THE PROXY STATEMENT/PROSPECTUS | 30 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF THE COMPANY | 45 |
| SELECTED HISTORICAL FINANCIAL AND OTHER INFORMATION OF LIGHTNING SYSTEMS | 46 |
| SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 47 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 50 |
| RISK FACTORS | 53 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 105 |
| COMPARATIVE SHARE INFORMATION | 113 |
| SPECIAL MEETING OF THE COMPANY'S STOCKHOLDERS | 117 |
| PROPOSAL NO. 1—APPROVAL OF THE BUSINESS COMBINATION | 126 |
| PROPOSAL NO. 2—THE NYSE STOCK ISSUANCE PROPOSAL | 179 |
| PROPOSAL NO. 3—CLASSIFICATION OF THE BOARD OF DIRECTORS PROPOSAL | 182 |
| PROPOSAL NO. 4A— APPROVAL OF ADDITIONAL AMENDMENTS TO CURRENT AMENDED AND RESTATED CERTIFICATE OF INCORPORATION IN CONNECTION WITH THE BUSINESS COMBINATION PROPOSAL | 185 |
| PROPOSAL NO. 4B – AUTHORIZATION OF EXCLUSIVE FORUM PROVISION PROPOSAL | 198 |
| PROPOSAL NO. 5—INCENTIVE PLAN PROPOSAL | 201 |
| PROPOSAL NO. 6—THE ELECTION OF DIRECTORS PROPOSAL | 210 |
| PROPOSAL NO. 7—THE ADJOURNMENT PROPOSAL | 211 |
| INFORMATION ABOUT THE COMPANY PRIOR TO THE BUSINESS COMBINATION | 212 |
| THE COMPANY'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 230 |
| EXECUTIVE COMPENSATION | 235 |
| INFORMATION ABOUT LIGHTNING SYSTEMS | 244 |
| LIGHTNING SYSTEMS' MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 259 |
| MANAGEMENT AFTER THE BUSINESS COMBINATION | 276 |
| DESCRIPTION OF SECURITIES | 288 |
| BENEFICIAL OWNERSHIP OF SECURITIES | 299 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 302 |
| PRICE RANGE OF SECURITIES AND DIVIDENDS | 305 |
| CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS | 306 |
| ACCOUNTING TREATMENT | 311 |
| LEGAL MATTERS | 311 |
| EXPERTS | 311 |
| APPRAISAL RIGHTS | 311 |
| HOUSEHOLDING INFORMATION | 312 |
| TRANSFER AGENT AND REGISTRAR | 312 |
| SUBMISSION OF STOCKHOLDER PROPOSALS | 312 |
| WHERE YOU CAN FIND MORE INFORMATION | 313 |
| | |
| INDEX TO FINANCIAL STATEMENTS | F-1 |
| ANNEX A—BUSINESS COMBINATION AGREEMENT | |
| ANNEX B—SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION | |
| ANNEX C—AMENDED AND RESTATED BYLAWS | |

i

**Table of Contents**

**ANNEX D**—FORM OF STOCKHOLDER SUPPORT AGREEMENT
**ANNEX E**—FORM OF REGISTRATION RIGHTS AND LOCK-UP AGREEMENT
**ANNEX F**—FORM OF PIPE SUBSCRIPTION AGREEMENT
**ANNEX G**—FORM OF CONVERTIBLE NOTE SUBSCRIPTION AGREEMENT
**ANNEX H**—GIGCAPITAL3, INC. 2021 EQUITY INCENTIVE PLAN

ii

**Table of Contents**

**SUMMARY TERM SHEET**

This summary term sheet, together with the sections entitled "*Questions and Answers About the Proposals for Stockholders*" and "*Summary of the Proxy Statement/Prospectus*," summarizes certain information contained in this proxy statement/prospectus, but does not contain all of the information that is important to you. You should read carefully this entire proxy statement, including the attached Annexes, for a more complete understanding of the matters to be considered at the Special Meeting. In addition, for definitions used commonly throughout this proxy statement/prospectus, including this summary term sheet, please see the section entitled "*Frequently Used Terms.*"

- The Company is a Private-to-Public Equity (PPE)™ company, also known as a blank check company or special purpose acquisition company, formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

- In connection with the Company's IPO, we issued 20,000,000 units at a price of $10.00 per unit resulting in total gross proceeds of $200,000,000. Each unit consisted of one share of Common Stock and three-fourths of one warrant to purchase one share of Common Stock.

- There are currently 25,893,479 shares of Common Stock, par value $0.0001 per share, issued and outstanding, including 20,000,000 shares of Common Stock originally sold as units as part of the IPO, 5,893,479 Initial Stockholder Shares of Common Stock that were either initially issued or purchased as part of units prior to our IPO by our Initial Stockholders (of which 893,479 shares are private placement shares (as defined below)), and 15,000 shares of Common Stock issued to two of our directors and one of our officers (the "*Insider Shares*"). There are currently no shares of preferred stock issued and outstanding.

- In addition, we have 14,999,996 public warrants to purchase common stock (originally sold as part of the units issued in our IPO) outstanding along with 670,108 private placement warrants issued to our Sponsor and Underwriters in private placements conducted concurrently with our IPO. Each whole warrant entitles its holder to purchase one share of our Common Stock at an exercise price of $11.50 per whole share, to be exercised only for a whole number of shares of our Common Stock. The warrants will become exercisable at the later to occur of May 18, 2021 or 30 days after the completion of the Business Combination, and they expire five years after the completion of the Business Combination, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation. Once the warrants become exercisable, the Company may redeem the outstanding public warrants at a price of $0.01 per warrant, if the last reported sales price of the Company's Common Stock equals or exceeds $18.00 per share for any 20 trading days within a 30 trading day period ending on the third trading day prior to the date on which we give notice of such redemption and provided certain other conditions are met.

- For more information regarding our Common Stock and warrants, please see the section entitled "*Description of Securities.*"

- Lightning Systems, which also does business as Lightning eMotors, is a leading electric vehicle designer and manufacturer, providing complete electrification solutions for commercial fleets – from Class 3 cargo and passenger vans to Class 6 work trucks, and Class 7 city buses. Lightning Systems is committed to eradicating commercial fleet emissions, the main cause of urban air pollution, by providing zero emission Class 3 to 7 Battery Electric Vehicles ("*BEV*") and Fuel Cell Electric Vehicles ("*FCEV*") and infrastructure solutions to commercial fleet customers. For more information about Lightning Systems, please see the sections entitled "*Lightning Systems' Business,*" "*Lightning Systems' Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Management after the Business Combination.*"

- Subject to the terms of the Business Combination Agreement and customary adjustments, at the Effective Time (as defined below) of the Business Combination, each share of Lightning Systems

1

Table of Contents

Capital Stock (as defined below) issued and outstanding immediately prior to the Effective Time of the Business Combination (other than shares owned by Lightning Systems as treasury stock or dissenting shares) will convert into a number of shares of Company Common Stock as set forth in the Business Combination Agreement (the "*Merger Consideration*").

- The Company has agreed to pay Lightning Systems equity holders aggregate consideration consisting of up to 53,922,000 shares of Common Stock, including any shares issuable in respect of vested equity awards of Lightning Systems that are exercised prior to the Closing or equity awards of Lightning Systems that the Company assumes and which are exercised following the Closing in accordance with the terms of such equity awards. In addition, the Company may issue pursuant to the Business Combination Agreement up to an additional 16,463,096 shares of Common Stock to equity holders of Lightning Systems who have received, or are entitled to receive, any Per Share Merger Consideration (such holders, the "*Stockholder Earnout Group*" and such shares, the "*Stockholder Earnout Shares*").

- The PIPE Investor (as defined below) has agreed to purchase 2,500,000 shares of Common Stock in the aggregate, for $25,000,000 of gross proceeds. In connection with the execution of the Business Combination Agreement, the Company entered into the PIPE Subscription Agreement (as defined below) with the PIPE Investor, pursuant to which, among other things, the Company agreed to issue and sell to the PIPE Investor, in a private placement to close immediately prior to the Closing, an aggregate of 2,500,000 shares of Common Stock at $10.00 per share, for an aggregate purchase price of $25,000,000.

- The Convertible Note Investors (as defined below) have agreed to purchase pursuant to the Convertible Note Subscription Agreements (as defined below) with the Convertible Note Investors, pursuant to which, among other things, the Company agreed to issue and sell to the Convertible Note Investors, in private placements to close immediately prior to the Closing, (a) the Convertible Notes (as defined below) for an aggregate purchase price of $100,000,000 and (b) the Convertible Note Warrants (as defined below) to purchase up to 8,695,652 shares of Common Stock for a per share exercise price of $11.50. The Convertible Notes are convertible into 8,695,652 shares of Common Stock at a conversion price of $11.50.

- It is anticipated that, upon completion of the Business Combination: (i) the Company's public stockholders (other than the PIPE Investor and the Convertible Note Investors) will retain an ownership interest of approximately 24.3% in the post-combination company; (ii) the PIPE Investor will own approximately 3% of the post-combination company (such that public stockholders, including the PIPE Investor, will own approximately 27.3% of the post-combination company); (iii) our Initial Stockholders (including our Sponsor) will own approximately 7.2% of the post-combination company; and (iv) the former Lightning Systems equity holders will own approximately 65.5% of the post-combination company, not including any Stockholder Earnout Shares or the shares of Common Stock that will be issuable upon conversion of the Convertible Notes or the exercise of any warrants, including the Convertible Note Warrants. At the Effective Time (as defined below), each outstanding Lightning Systems Option (as defined below), whether vested or unvested, will be assumed by the Company and converted into an option to purchase a number of shares of the Company's Common Stock in accordance with the terms of the Business Combination Agreement.

- The ownership percentage with respect to the post-combination company following the Business Combination does not take into account (i) warrants to purchase Company Common Stock that will remain outstanding immediately following the Business Combination, (ii) the issuance of Stockholder Earnout Shares to the Stockholder Earnout Group should the earnout conditions in the Business Combination Agreement be satisfied, (iii) conversion of any of the Convertible Notes or (iv) the issuance of any shares upon completion of the Business Combination under the Incentive Plan, a copy of which is attached to this proxy statement/prospectus as *Annex H*. If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in the post-combination company will be different. For more information, please see the sections entitled

2

Table of Contents

"*Summary of the Proxy Statement/Prospectus - Impact of the Business Combination on the Company's Public Float*" "*Unaudited Pro Forma Condensed Combined Financial Information*" "*Proposal No. 5 - Approval of the Incentive Plan*".

- Our management and Board considered various factors in determining whether to approve the Business Combination Agreement and the Business Combination. For more information about our decision-making process, see the section entitled "*Proposal No. 1 - Approval of the Business Combination - The Company's Board of Directors' Reasons for the Approval of the Business Combination*"

- Pursuant to our amended and restated certificate of incorporation, in connection with the Business Combination, holders of public shares may elect to have their public shares redeemed for cash at the applicable redemption price per share calculated in accordance with our certificate of incorporation. As of December 10, 2020, this would have amounted to approximately $10.10 per share. If a holder exercises its redemption rights, then such holder will be exchanging its shares of our Common Stock for cash and will no longer own shares of the post-combination company and will not participate in the future growth of the post-combination company, if any. Such a holder will be entitled to receive cash for its public shares only if it properly demands redemption and delivers its shares (either physically or electronically) to our transfer agent at least two business days prior to the Special Meeting. Please see the section entitled "*Special Meeting of Company Stockholders—Redemption Rights.*"

- In addition to voting on the proposal to adopt the Business Combination Agreement and approve the transactions contemplated thereunder, including the Business Combination, at the Special Meeting, the stockholders of the Company will be asked to vote on:

  - *Proposal No. 2 - The NYSE Stock Issuance Proposal* - To approve, for purposes of complying with applicable listing rules of the NYSE, the issuance of more than 20% of the Company's outstanding Common Stock in connection with the Business Combination, and the transactions contemplated by the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, including up to 70,385,096 shares of Common Stock to the Lightning Systems equity holders, 2,500,000 shares of Common Stock to the PIPE Investor, 8,695,652 shares of our Common Stock upon conversion of the Convertible Notes (as defined below) and 8,695,652 shares of our Common Stock upon exercise of the Convertible Note Warrants (as defined below);

  - *Proposal No. 3 - Classification of the Board of Directors Proposal* - To adopt the classification of our board of directors into three classes of directors with staggered terms of office and to make certain related changes;

  - *Proposal No. 4A - Approval of Additional Amendments to Current Amended and Restated Certificate of Incorporation in Connection with the Business Combination Proposal (Governance Proposal)* - To approve certain additional changes, including but not limited to changing the post-combination company's corporate name from "GigCapital3, Inc." to "Lightning eMotors, Inc." and eliminating certain provisions specific to our status as a blank check company, which our Board believes are necessary to adequately address the needs of the post-combination company;

  - *Proposal 4B - Authorization of Exclusive Forum Provision (Forum Proposal)* - To authorize the adoption of Delaware as the exclusive forum for certain stockholder litigation;

  - *Proposal No. 5 - Incentive Plan Proposal* - To approve the Incentive Plan, including the authorization of the initial share reserve under the Incentive Plan;

  - *Proposal No. 6 —Election of Directors Proposal* — to consider and vote upon a proposal to elect, effective at Closing, nine directors to serve staggered terms on our board of directors until the 2021, 2022 and 2023 annual meetings of stockholders, respectively, and until their respective successors are duly elected and qualified; and

  - *Proposal No. 7 - Adjournment Proposal* - To approve, if necessary, the adjournment of the Special Meeting to a later date or dates to permit further solicitation and votes of proxies in the event that

3

Table of Contents

there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal. This proposal will only be presented at the Special Meeting if there are not sufficient votes to approve the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal.

- Please see the sections entitled "*Proposal No. 1 — Approval of the Business Combination,*" "*Proposal No. 2 — The NYSE Stock Issuance Proposal,*" "*Proposal No. 3 - Classification of the Board of Directors Proposal,*" "*Proposal No. 4A — Approval of Additional Amendments to Current Amended and Restated Certificate of Incorporation in Connection with the Business Combination Proposal,*" "*Proposal 4B — Authorization of Exclusive Forum Provision,*" "*Proposal No. 5 — Approval of the Incentive Plan,*" "*Proposal No. 6 — The Election of Directors Proposal,*" and "*Proposal No. 7 — The Adjournment Proposal.*" Proposals in this proxy statement/prospectus (other than the Adjournment Proposal) are conditioned on the approval of the Business Combination Proposal.

- The Business Combination Agreement may be terminated at any time prior to the consummation of the Business Combination upon agreement of the parties thereto, or by the Company or Lightning Systems in specified circumstances. For more information about the termination rights under the Business Combination Agreement, please see the section entitled "Proposal No. 1 — Approval of the Business Combination — The Business Combination Agreement - Termination."

- The proposed Business Combination involves numerous risks. For more information about these risks, please see the section entitled "Risk Factors."

- In considering the recommendation of our Board to vote in favor of the Business Combination, stockholders should be aware that aside from their interests as stockholders, our Sponsor and certain members of our Board and officers have interests in the Business Combination that are different from, or in addition to, those of other stockholders generally. Our Board was aware of and considered these interests, among other matters, in evaluating and negotiating the Business Combination, and in recommending to stockholders that they approve the Business Combination. Stockholders should take these interests into account in deciding whether to approve the Business Combination. These interests include, among other things:

    - the fact that our Initial Stockholders have agreed not to redeem any of the Initial Stockholder Shares in connection with a stockholder vote to approve the Business Combination;

    - the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Initial Stockholder Shares if we fail to complete an initial business combination by the applicable deadline;

    - if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party (other than our independent public accountants) for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

    - the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

    - the fact that Neil Miotto and Drs. Avi Katz and Raluca Dinu will continue as board members of the post-combination company, and each shall be entitled to receive compensation for serving on the board of directors of the post-combination company; and

4

Table of Contents

- the fact that our Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the applicable deadline. Prior to GigCapital3's initial public offering, the Sponsor purchased 5,735,000 Initial Stockholder Shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share (as compared to the $10.00 per share price being used to determine the number of shares of Common Stock being issued to the Lightning Systems equity holders in the Business Combination or at which the PIPE Investors have agreed to purchase Common Stock). However, 750,000 shares of Common Stock issued to the Sponsor were forfeited due to the over-allotment option not being exercised by the Underwriters. Additionally, the Sponsor purchased 650,000 private placement units simultaneously with the consummation of GigCapital3's initial public offering for an aggregate purchase price of $6.5 million. Certain of GigCapital3's directors and executive officers, including Dr. Avi Katz, Dr. Raluca Dinu, Neil Miotto, John Mikulsky, Peter Wang, Andrea Betti-Berutto and Brad Weightman, also have a direct or indirect economic interest in such private placement units and in the 5,635,000 Initial Stockholder Shares owned by the Sponsor. The 5,635,000 Initial Stockholder Shares owned by the Sponsor would have had an aggregate market value of $63.1 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The 650,000 private placement units held by the Sponsor would have had an aggregate market value of $8.8 million based upon the closing price of $13.59 per public unit on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The Sponsor does not hold any warrants independent of what is included in the private placement units. While the private placement units have a trading price and value as set forth above, the private placement units will be, upon completion of the Business Combination, broken into their constituent components of stock and warrants, and each of those separately trade and the value of each of those is $11.19 per public share and $3.05 per public warrant. Additionally, the Sponsor, officers and directors do not currently have any unreimbursed out-of-pocket expenses in connection with the business combination. Upon completion of the Business Combination, the former Lightning Systems equity holders will own 53,922,000 shares of our Common Stock. The shares owned by the former Lightning Systems equity holders would have had an aggregate market value of $603.4 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus.

5

**Table of Contents**

**FREQUENTLY USED TERMS**

Unless otherwise stated or unless the context otherwise requires, the terms "*we*," "*us*," "*our*," the "*Company*" and "*GigCapital3*" refer to GigCapital3, Inc., a Delaware corporation, and the term "*post-combination company*" refers to the Company following the consummation of the Business Combination.

In this proxy statement/prospectus:

"*Amended and Restated Warrant Agreement*" means the amendment and restatement of the Company's existing Warrant Agreement (the "*Warrant Agreement*") between the Company and Continental Stock Transfer & Trust Company (the "*Warrant Agent*"), to be entered into in connection with the Closing between the Company and the Warrant Agent, in substantially the form attached as an exhibit to the Convertible Note Subscription Agreements, to enable the issuance of the Convertible Note Warrants.

"*applicable deadline*" means November 18, 2021.

"*Board*" or "*Board of Directors*" means the board of directors of the Company.

"*Business Combination*" means the transactions contemplated by the Business Combination Agreement, including the Merger of Merger Sub with and into Lightning Systems, with Lightning Systems continuing as the surviving company and the Company changing its name to Lightning eMotors, Inc.

"*Business Combination Agreement*" means that certain Business Combination Agreement, dated as of December 10, 2020, by and among Company, Merger Sub and Lightning Systems.

"*Bylaws*" means our Bylaws, dated as of February 25, 2020.

"*Closing*" means the closing of the transactions contemplated by the Business Combination Agreement.

"*Closing Date*" means the date on which the Closing occurs.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Common Stock*" means the shares of common stock, par value $0.0001 per share, of the Company.

"*Company*" means GigCapital3, Inc., a Delaware corporation.

"*Company Sale*" means the occurrence of any of the following events: (a) any person or any group of persons acting together which would constitute a "group" for purposes of Section 13(d) of the Exchange Act or any successor provisions thereto is or becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than 50% of the combined voting power of the Company's then outstanding voting securities, (b) there is consummated a merger or consolidation of the Company with any other corporation or other entity, and, immediately after the consummation of such merger or consolidation, either (x) the Board immediately prior to the merger or consolidation does not constitute at least a majority of the board of directors of the company surviving the merger or, if the surviving company is a subsidiary, the ultimate parent thereof, or (y) the voting securities of the Company immediately prior to such merger or consolidation do not continue to represent or are not converted into more than 50% of the combined voting power of the then outstanding voting securities of the person resulting from such merger or consolidation or, if the surviving company is a subsidiary, the ultimate parent thereof, or (c) the shareholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement or series of related agreements for the sale, lease or other disposition, directly or indirectly, by the Company of all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, other than such sale or other disposition by the Company of all

6

Table of Contents

or substantially all of the assets of the Company and its subsidiaries, taken as a whole, to an entity at least 50% of the combined voting power of the voting securities of which are owned by shareholders of the Company in substantially the same proportions as their ownership of the Company immediately prior to such sale.

"*Convertible Note Investment*" means the private placement pursuant to which the Convertible Note Investors have subscribed for the Convertible Notes for an aggregate purchase price of $100,000,000 and the Convertible Note Warrants.

"*Convertible Note Investors*" means certain institutional investors that will invest in the Convertible Note Investment.

"*Convertible Note Shares*" means the 8,695,652 shares of Common Stock to be issued upon conversion of the Convertible Notes, in accordance with the terms and subject to the conditions of the Convertible Note Subscription Agreements and the Indenture.

"*Convertible Note Subscription Agreements*" means, collectively, those certain subscription agreements entered into on December 10, 2020, between the Company and certain investors, pursuant to which such Convertible Note Investors have agreed to purchase an aggregate of $100,000,000 in the Convertible Note Investment, and substantially in the form attached hereto as *Annex G*.

"*Convertible Notes*" means the 7.50% Convertible Senior Notes due 2024 and that are convertible into Convertible Note Shares at a conversion price of $11.50 per share.

"*Convertible Note Warrants*" means the warrants to purchase up to 8,695,652 shares of Common Stock for a per share exercise price of $11.50 being issued pursuant to the terms of the Convertible Note Subscription Agreements.

"*DGCL*" means the General Corporation Law of the State of Delaware.

"*DLA*" means DLA Piper LLP (US), counsel to the Company.

"*Earnout Conditions*" means the condition in the Business Combination Agreement specifying that Lightning Systems equity holders will receive in the aggregate, up to an additional 16,463,096 shares of Common Stock as the Stockholder Earnout Shares in three equal tranches if, during the period from the Closing Date through and including the fifth anniversary of the date of the Closing, the dollar volume-weighted average price of Common Stock (as determined in accordance with the Business Combination Agreement) equals or exceeds $12.00, $14.00 and $16.00 per share for twenty (20) of any thirty (30) consecutive trading days commencing after the Closing on the NYSE, Nasdaq or any other national securities exchange, as applicable for each of such three tranches, respectively.

"*EBITDA*" means earnings before interest, tax, depreciation and amortization.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exchange Fund*" means the fund holding our Common Stock and maintained by that bank or trust company that shall be designated by the Company and is reasonably satisfactory to Lightning Systems (the "*Exchange Agent*"), for the benefit of the holders of Lightning Systems Capital Stock, for exchange of such Lightning Systems Capital Stock into the number of shares of our Common Stock sufficient to deliver the aggregate Per Share Merger Consideration payable pursuant to the Business Combination Agreement, and also the Stockholder Earnout Consideration to the Stockholder Earnout Group.

"*Founder*" means the Sponsor.

7

"*GAAP*" means generally accepted accounting principles.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"*Incentive Plan*" means the GigCapital3, Inc. 2021 Equity Incentive Plan.

"*Indenture*" means the indenture to be entered into in connection with the Closing between New Lightning eMotors and Wilmington Trust, National Association, a national banking association, (the "*Indenture Trustee*") in its capacity as trustee thereunder, in substantially the form attached as an exhibit to the Convertible Note Subscription Agreements.

"*Insider Shares*" means the shares of Common Stock issued to certain of two of our directors and our Chief Financial Officer.

"*Investment Company Act*" means the Investment Company Act of 1940, as amended.

"*IPO*" means the Company's initial public offering, consummated on May 18, 2020, through the sale of 20,000,000 units at $11.50 per unit.

"*JOBS Act*" means the Jumpstart Our Business Startups Act.

"*King & Spalding*" means King & Spalding LLP, counsel to Lightning Systems.

"*Lightning Systems*" means Lightning Systems, Inc., a Delaware corporate and its subsidiaries.

"*Lightning Systems Capital Stock*" means the shares of Lightning Systems capital stock, par value $0.00001 per share (including shares of Lightning Systems Capital Stock resulting from the conversion or exercise of warrants, stock options and convertible notes).

"*Lightning Systems Common Stock*" means the shares of Lightning Systems common stock, par value $0.00001 per share.

"*Lightning Systems equity holder*" means each holder of Lightning Systems Capital Stock or a vested equity award.

"*Lightning Systems Options*" means the outstanding options to purchase shares of Lightning Systems Common Stock.

"*MacKenzie*" means MacKenzie Partners, Inc., proxy solicitor to the Company.

"*Merger*" means that merger whereby Merger Sub will merge with and into Lightning Systems, with Lightning Systems surviving the merger as a wholly owned subsidiary of the Company.

"*Merger Sub*" means Project Power Merger Sub Inc.

"*New Lightning eMotors*" means the Company immediately following the consummation of the Business Combination and approval of the proposed Second Amended and Restated Certificate of Incorporation.

"*New Lightning eMotors Board*" means New Lightning eMotors' board of directors following the consummation of the Business Combination and the election of directors pursuant to Proposal No. 6 — The Election of Directors Proposal.

8

Table of Contents

"*New Lightning eMotors Common Stock*" means, following the consummation of the Business Combination and approval of the proposed Second Amended and Restated Certificate of Incorporation, New Lightning eMotors common stock, par value $0.0001 per share, as authorized under the proposed Second Amended and Restated Certificate of Incorporation.

"*NYSE*" means the New York Stock Exchange.

"*PIPE Investment*" means the private placement pursuant to which the PIPE Investor has subscribed for 2,500,000 shares of common stock at $10.00 per share, for an aggregate purchase price of $25,000,000.

"*PIPE Investor*" means BP Technology Ventures, Inc.

"*PIPE Shares*" means the 2,500,000 shares of Common Stock to be issued in the PIPE Investment.

"*PIPE Subscription Agreement*" means, that certain subscription agreement entered into on December 10, 2020, between the Company and BP Technology Ventures, Inc., pursuant to which the PIPE Investor has agreed to purchase an aggregate of 2,500,000 shares of Common Stock in the PIPE Investment, and substantially in the form attached hereto as *Annex F*.

"*private placement shares*" mean the shares of our Common Stock included in the private placement units issued to our Initial Stockholders in a private placement that closed prior to the IPO.

"*private placement units*" mean the units, consisting of one share of Company Common Stock and three-fourths of one warrant to purchase one share of Company Common Stock, issued to our Initial Stockholders in a private placement that closed in connection with the IPO.

"*private placement warrants*" means the warrants included in the private placement units issued to our Initial Stockholders in a private placement that closed in connection with the IPO, each of which is exercisable for one share of Common Stock, in accordance with its terms.

"*public shares*" means shares of Common Stock included in the public units issued in our IPO.

"*public stockholders*" means holders of public shares, including our Initial Stockholders to the extent our Initial Stockholders hold public shares, *provided*, that our Initial Stockholders will be considered "public stockholders" only with respect to any public shares held by them.

"*public units*" means one unit, consisting of one public share of Company Common Stock and three-fourths of one warrant to purchase one share of Company Common Stock, issued in our IPO.

"*public warrants*" means the warrants included in the public units issued in the IPO, each of which is exercisable for one share of Common Stock, in accordance with its terms.

"*Registration Rights and Lock-up Agreement*" means that certain Registration Rights and Lock-up Agreement to be entered into by and between the Company and certain stockholders of Lightning Systems at the Closing.

"*Requisite Approval*" means the affirmative vote of the holders of at least a (i) majority of the outstanding shares of the Lightning Systems Capital Stock, voting together as a single class on an as-converted to Lightning Systems Common Stock basis and (ii) seventy percent (70%) of the outstanding shares of Lightning Systems Series B Preferred Stock and Lightning Systems Series C Preferred Stock, voting together as a single class on an as-converted to Lightning Systems Common Stock basis.

"*SEC*" means the United States Securities and Exchange Commission.

9

Table of Contents

"*Second Amended and Restated Certificate of Incorporation*" means the proposed Second Amended and Restated Certificate of Incorporation of the Company, a form of which is attached hereto as *Annex B*, which will become the post-combination company's certificate of incorporation upon the approval of the Charter Amendment Proposals, assuming the consummation of the Business Combination.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Special Meeting*" means the special meeting of the stockholders of the Company that is the subject of this proxy statement/prospectus.

"*Sponsor*" means GigAcquisitions3, LLC, a Delaware limited liability company.

"*Transfer Agent*" means Continental Stock Transfer & Trust Company.

"*Trust Account*" means the trust account of the Company that holds the proceeds from the Company's IPO and a portion of the proceeds from the sale of the private placement warrants.

"*Trustee*" means Continental Stock Transfer & Trust Company.

"*U.S. GAAP*" means accounting principles generally accepted in the United States of America.

"*Underwriters*" means Nomura Securities International, Inc., Oppenheimer & Co. Inc. and Odeon Capital Group LLC.

"*VWAP*" means, for any security as of any date(s), the dollar volume-weighted average price for such security on the principal securities exchange or securities market on which such security is then traded during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg through its "HP" function (set to weighted average) or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York time, and ending at 4:00:00 p.m., New York time, as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing bid price and the lowest closing ask price of any of the market makers for such security as reported by OTC Markets Group Inc. If the VWAP cannot be calculated for such security on such date(s) on any of the foregoing bases, the VWAP of such security on such date(s) shall be the fair market value per share on such date(s) as reasonably determined in good faith by a majority of the disinterested independent directors of the board of directors (or equivalent governing body) of the Company at such time.

"*warrants*" means the private placement warrants, the public warrants and the Convertible Note Warrants.

10

Table of Contents

**QUESTIONS AND ANSWERS ABOUT THE PROPOSALS FOR STOCKHOLDERS**

*The questions and answers below highlight only selected information from this document and only briefly address some commonly asked questions about the proposals to be presented at the Special Meeting, including with respect to the proposed Business Combination. The following questions and answers do not include all the information that is important to our stockholders. We urge stockholders to read carefully this entire proxy statement, including the Annexes and the other documents referred to herein, to fully understand the proposed Business Combination and the voting procedures for the Special Meeting, which will be held on April 21, 2021 at 10:00 a.m., PDT, via live webcast at www.virtualshareholdermeeting.com/GIK2021SM. In light of ongoing developments related to coronavirus (COVID-19), after careful consideration, the Company has determined that the Special Meeting will be a virtual meeting conducted exclusively via live webcast in order to facilitate stockholder attendance and participation while safeguarding the health and safety of our stockholders, directors and management team. You or your proxyholder will be able to attend and vote at the Special Meeting online by visiting www.virtualshareholdermeeting.com/GIK2021SM and using a control number assigned by Broadridge Financial Solutions.*

**Q: Why am I receiving this proxy statement/prospectus?**

A: You are being asked to consider and vote upon a proposal to adopt the Business Combination Agreement and approve the Business Combination and transactions contemplated thereby, among other proposals. We have entered into the Business Combination Agreement, pursuant to which the Company's wholly owned subsidiary, Merger Sub, will merge with and into Lightning Systems, with Lightning Systems surviving the Merger. Subject to the terms of the Business Combination Agreement and customary adjustments, at the Effective Time of the Business Combination, each share of Lightning Systems Capital Stock issued and outstanding immediately prior to the Effective Time of the Business Combination (other than shares owned by Lightning Systems as treasury stock or dissenting shares) will convert into a number of shares of Company Common Stock as set forth in the Business Combination Agreement. A copy of the Business Combination Agreement is attached to this proxy statement/prospectus as *Annex A*.

In addition to the Business Combination, there are related matters that we are asking you to approve. This proxy statement/prospectus and its Annexes contain important information about the proposed Business Combination and the other matters to be acted upon at the Special Meeting. You should read this proxy statement/prospectus and its Annexes carefully and in their entirety.

**Your vote is important. You are encouraged to submit your proxy as soon as possible after carefully reviewing this proxy statement/prospectus and its Annexes.**

**Q: When and where is the Special Meeting?**

A: The Special Meeting will be held on April 21, 2021 at 10:00 a.m., PDT, via live webcast at www.virtualshareholdermeeting.com/GIK2021SM. In light of ongoing developments related to coronavirus (COVID-19), after careful consideration, the Company has determined that the Special Meeting will be a virtual meeting conducted exclusively via live webcast in order to facilitate stockholder attendance and participation while safeguarding the health and safety of our stockholders, directors and management team. You or your proxyholder will be able to attend the virtual Special Meeting online, vote, view the list of stockholders entitled to vote at the special meeting and submit questions during the Special Meeting by visiting www.virtualshareholdermeeting.com/GIK2021SM and using a control number assigned by Broadridge Financial Solutions. To register and receive access to the virtual meeting, registered stockholders and beneficial stockholders (those holding shares through a stock brokerage account or by a bank or other holder of record) will need to follow the instructions applicable to them provided in the proxy statement. Because the Special Meeting is completely virtual and being conducted via live webcast, stockholders will not be able to attend the meeting in person.

11

Table of Contents

**Q: How can I attend and vote at the Special Meeting?**

A: If you are a stockholder of record, you may vote by Internet before or during the Special Meeting, by telephone or by proxy. Whether or not you plan to attend the meeting, we urge you to vote by proxy to ensure your vote is counted.

- To vote using the proxy card, simply complete, sign, date and return the proxy card pursuant to the instructions on the card. If you return your signed proxy card before the Annual Meeting, we will vote your shares as directed.

- To vote over the telephone, dial toll-free 1-800-690-6903 using a touch-tone phone and follow the recorded instructions. You will be asked to provide the company number and control number from the Notice. Your telephone vote must be received by 11:59 p.m. Eastern Time on April 20, 2021 to be counted.

- To vote through the Internet before the meeting, go to www.proxyvote.com and follow the on-screen instructions. Your Internet vote must be received by 11:59 p.m., Eastern Time on April 20, 2021 to be counted.

- To vote through the Internet during the meeting, please visit www.virtualshareholdermeeting.com/GIK2021SM and have available the 16-digit control number included in your Notice, on your proxy card or on the instructions that accompanied your proxy materials.

**Q: What are the specific proposals on which I am being asked to vote at the Special Meeting?**

A: You are being asked to approve the following proposals:

1. **Proposal No. 1 - The Business Combination Proposal** - To approve and adopt the Business Combination Agreement, a copy of which is attached to this proxy statement/prospectus as *Annex A*, and approve the transactions contemplated thereby, including the Merger of Merger Sub with and into Lightning Systems, with Lightning Systems surviving the Merger, and the issuance of Common Stock to Lightning Systems equity holders as Merger Consideration and Stockholder Earnout Shares to the Stockholder Earnout Group;

2. **Proposal No. 2 - The NYSE Stock Issuance Proposal** - To approve, for purposes of complying with applicable listing rules of the NYSE, the issuance of more than 20% of the Company's outstanding Common Stock in connection with the Business Combination, and the transactions contemplated by the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, including up to 70,385,096 shares of Common Stock to the Lightning Systems equity holders, 2,500,000 shares of Common Stock to the PIPE Investor, 8,695,652 shares of our Common Stock upon conversion of the Convertible Notes and 8,695,652 shares of our Common Stock upon exercise of the Convertible Note Warrants;

3. **Proposal No. 3 - Classification of the Board of Directors Proposal** - To adopt the classification of the New Lightning eMotors Board into three classes of directors with staggered terms of office and to make certain related changes;

4. **Proposal No. 4A - Approval of Additional Amendments to Current Amended and Restated Certificate of Incorporation in Connection with the Business Combination Proposal (Governance Proposal)** - To approve certain additional changes, including but not limited to changing the post-combination company's corporate name from "GigCapital3, Inc." to "Lightning eMotors, Inc." and eliminating certain provisions specific to our status as a blank check company, which our Board believes are necessary to adequately address the needs of New Lightning eMotors;

**Proposal No. 4B - Authorization of Exclusive Forum Provision (Forum Proposal)** - To authorize the adoption of Delaware as the exclusive forum for certain stockholder litigation;

12

Table of Contents

5. **Proposal No. 5 - Incentive Plan Proposal** - To approve the Incentive Plan, including the authorization of the initial share reserve under the Incentive Plan;

6. **Proposal No. 6 - Election of Directors Proposal** - To elect the directors comprising the New Lightning eMotors Board; and

7. **Proposal No. 7 - Adjournment Proposal** - To approve, if necessary, the adjournment of the Special Meeting to a later date or dates to permit further solicitation and votes of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal. This proposal will only be presented at the Special Meeting if there are not sufficient votes to approve the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal.

**Q: Are the proposals conditioned on one another?**

A: Yes. The proposals in this proxy statement/prospectus (other than the Adjournment Proposal) are conditioned on the approval of the Business Combination Proposal. Therefore, approval of the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal are conditioned upon stockholders' approval of the Business Combination Proposal. Moreover, the transactions contemplated by the Business Combination Agreement will be consummated only if the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal are approved at the Special Meeting.

It is important for you to note that in the event that the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal do not receive the requisite vote for approval, we will not consummate the Business Combination. If we do not consummate the Business Combination and fail to complete an initial business combination by the applicable deadline, we will be required to dissolve and liquidate our Trust Account by returning the then remaining funds in such account to the public stockholders.

Our current deadline to consummate the Business Combination is November 18, 2021.

**Q: Why are we providing stockholders with the opportunity to vote on the Business Combination?**

A: Under our current amended and restated certificate of incorporation, we must provide all holders of public shares with the opportunity to have their public shares redeemed upon the consummation of our initial business combination either in conjunction with a tender offer or in conjunction with a stockholder vote. For business and other reasons, we have elected to provide our stockholders with the opportunity to have their public shares redeemed in connection with a stockholder vote, rather than a tender offer. Therefore, we are seeking to obtain the approval of our stockholders of the Business Combination Proposal in order to allow our public stockholders to effectuate redemptions of their public shares in connection with the Closing. The adoption of the Business Combination Agreement is required under Delaware law and the approval of the Business Combination is required under our current amended and restated certificate of incorporation. In addition, such approval is also a condition to the Closing under the Business Combination Agreement.

**Q: What revenues and profits/losses has Lightning Systems generated in the last two years?**

A: For the years ended December 31, 2019 and 2020, Lightning Systems had revenue of $3.2 million and $9.1 million, respectively, and net loss of $9.7 million and $37.7 million, respectively. For additional information, please see the sections entitled "*Selected Historical Financial and Other Information of Lightning Systems*" and "*Lightning Systems' Management's Discussion and Analysis of Financial Condition and Results of Operations.*"

13

Table of Contents

**Q: How will Lightning Systems be acquired in the Business Combination?**

A: Pursuant to the Business Combination Agreement, Lightning Systems will become a wholly owned subsidiary of the Company as a result of the Company's wholly owned subsidiary, Merger Sub, Merger with and into Lightning Systems, with Lightning Systems surviving the Merger.

**Q: Following the Business Combination, will our securities continue to trade on a stock exchange?**

A: Yes. We intend to apply to continue the listing of our Common Stock and warrants on the NYSE under the symbols "ZEV" and "ZEV.WS", respectively, upon the Closing. Our units will automatically separate into the component securities upon consummation of the Business Combination and, as a result, will no longer trade as a separate security.

**Q: What has been the trading price of our Common Stock following the announcement of the Business Combination?**

A: On December 9, 2020, the trading date immediately prior to the public announcement of the Business Combination, our Common Stock, public warrants and public units closed at $12.55, $2.68 and $14.60, respectively. On March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus, our Common Stock, public warrants and public units closed at $11.19, $3.05 and $13.59, respectively.

**Q: How will the Business Combination impact the shares of the Company outstanding after the Business Combination?**

A: After the Business Combination and the consummation of the transactions contemplated thereby, including the PIPE Investment and the Convertible Note Investment, the amount of Common Stock outstanding will increase by approximately 318% to approximately 82.3 million shares of Common Stock (assuming that no shares of Common Stock are redeemed and all Lightning Systems Options are exercised and converted into Common Stock). Additional shares of Common Stock may be issuable in the future as a result of the issuance of additional shares that are not currently outstanding, including the issuance of shares of Common Stock upon exercise or settlement of the public warrants, private placement warrants, Convertible Note Warrants, conversion of the Convertible Notes and issuance of the Stockholder Earnout Shares, as well as future exercise of options issued in the future. The issuance and sale of such shares in the public market could adversely impact the market price of our Common Stock, even if our business is doing well.

**Q: Is the Business Combination the first step in a "going private" transaction?**

A: No. We do not intend for the Business Combination to be the first step in a "going private" transaction. One of the primary purposes of the Business Combination is to provide a platform for Lightning Systems to access the U.S. public markets.

**Q: Did the Company's Board of Directors obtain a third-party valuation or fairness opinion in determining whether or not to proceed with the Business Combination?**

A: No. The Company's Board of Directors did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the Business Combination. Accordingly, investors will be relying solely on the judgment of the Company's Board of Directors in valuing Lightning Systems and assuming the risk that the Company's Board of Directors may not have properly valued the business. However, the Company's officers and directors have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and have substantial experience with mergers and acquisitions. Furthermore, in analyzing the Business Combination, the Company's Board of Directors conducted significant due diligence on Lightning Systems and also engaged in lengthy negotiations with PIPE Investor and the Convertible Note

14

Table of Contents

Investors regarding those investments and the valuation of Lightning Systems. Based on the foregoing, the Company's Board of Directors concluded that its members' collective experience and backgrounds, together with the experience and sector expertise of the Company's advisors, enabled it to make the necessary analyses and determinations regarding the Business Combination, including that the Business Combination was fair from a financial perspective to its stockholders and that Lightning Systems' fair market value was at least 80% of the assets held in the Trust Account (excluding the deferred underwriting commissions and taxes payable on interest earned on the Trust Account) at the time of the agreement to enter into the Business Combination. There can be no assurance, however, that the Company's Board of Directors was correct in its assessment of the Business Combination.

**Q: Will the management and board of directors of Lightning Systems change in the Business Combination?**

A: We anticipate that all of the executive officers of Lightning Systems will remain with New Lightning eMotors. Upon completion of the Business Combination, Robert Fenwick-Smith and Dr. Avi Katz will become the co-Chairman of the New Lightning eMotors Board; our current directors will resign from our Board (other than Neil Miotto and Drs. Avi Katz and Raluca Dinu) and Timothy Reeser, Thaddeus Senko, Meghan Sharp, Diana Tremblay and Bruce Coventry, who are qualified as independent directors under NYSE rules, will comprise the New Lightning eMotors Board.

**Q: What equity stake will current stockholders of the Company, PIPE Investor and the Lightning Systems equity holders hold in New Lightning eMotors after the Closing?**

A: It is anticipated that, upon completion of the Business Combination, assuming no redemptions: (i) the Company's public stockholders (other than the PIPE Investor and the Convertible Note Investors) will retain an ownership interest of approximately 24.3% in New Lightning eMotors; (ii) the PIPE Investor will own approximately 3% of New Lightning eMotors (such that public stockholders, including PIPE Investor, will own approximately 27.3% of New Lightning eMotors); (iii) our Initial Stockholders (including our Sponsor) will own approximately 7.2% of New Lightning eMotors; and (iv) the former Lightning Systems equity holders will own approximately 65.5% of New Lightning eMotors, not including any Stockholder Earnout Shares or the shares of Common Stock that will be issuable upon conversion of the Convertible Notes or the exercise of any warrants, including the Convertible Note Warrants.

The ownership percentage with respect to New Lightning eMotors following the Business Combination does not take into account (i) warrants to purchase Common Stock that will remain outstanding immediately following the Business Combination, (ii) the issuance of Stockholder Earnout Shares to the Stockholder Earnout Group should the earnout conditions in the Business Combination Agreement be satisfied, (iii) conversion of any of the Convertible Notes or (iv) the issuance of any shares upon completion of the Business Combination under the Incentive Plan, a copy of which is attached to this proxy statement/prospectus as *Annex H*. If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in New Lightning eMotors will be different. For more information, please see the sections entitled "*Summary of the Proxy Statement - Impact of the Business Combination on the Company's Public Float*," "*Unaudited Pro Forma Condensed Combined Financial Information,*" "*Proposal No. 5 - Approval of the Incentive Plan*".

**Q: Will we obtain new financing in connection with the Business Combination?**

A: Yes. The PIPE Investor has agreed to purchase 2,500,000 shares of Common Stock in the aggregate, for $25,000,000 of gross proceeds, pursuant to the PIPE Subscription Agreement. The PIPE Subscription Agreement is contingent upon, among other things, stockholder approval of the Business Combination Proposal and the Closing. See "*Proposal No. 1 - Approval of the Business Combination - Related Agreements - PIPE Subscription Agreement*."

15

Table of Contents

Additionally, the Convertible Note Investors have agreed to purchase an aggregate of $100,000,000 of gross proceeds, pursuant to the Convertible Note Subscription Agreements. The Convertible Note Subscription Agreements are contingent upon, among other things, stockholder approval of the Business Combination Proposal and the Closing. See "*Proposal No. 1 - Approval of the Business Combination - Related Agreements - Convertible Note Subscription Agreements.*"

**Q: What conditions must be satisfied to complete the Business Combination?**

A: There are a number of closing conditions in the Business Combination Agreement, including the approval by the stockholders of the Company of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal. For a summary of the conditions that must be satisfied or waived prior to completion of the Business Combination, please see the section entitled "*Proposal No. 1 - Approval of the Business Combination - The Business Combination Agreement.*"

**Q: Are there any arrangements to help ensure that the Company will have sufficient funds, together with the proceeds in its Trust Account and from the PIPE Investment and the Convertible Note Investment, to fund the aggregate purchase price?**

A: Unless waived by Lightning Systems, the Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement, will be no less than an aggregate amount of $150,000,000. The PIPE Investor has agreed to purchase approximately 2,500,000 shares of Common Stock at $10.00 per share for gross proceeds to the Company of approximately $25,000,000 pursuant to PIPE Subscription Agreement entered into at the signing of the Business Combination Agreement. Additionally, the Convertible Note Investors have agreed to purchase an aggregate amount of gross proceeds of $100,000,000 pursuant to the Convertible Note Subscription Agreements entered into at the signing of the Business Combination Agreement. Each of the PIPE Investment and the Convertible Note Investment is contingent upon, among other things, stockholder approval of the Business Combination Proposal and the Closing. In addition, the Convertible Note Investment is also contingent upon there being, in addition to the aggregate amount of $150,000,000 in total funding available from any source, at least $50,000,000 of such funding being from funds remaining in the Trust Account on the Closing after taking into account redemptions by the Company's public stockholders (if any).

The Company will use the proceeds of the PIPE Investment and the Convertible Note Investment, together with the funds in the Trust Account, to: (i) pay Company stockholders who properly exercise their redemption rights; and (ii) pay certain other fees, costs and expenses (including regulatory fees, legal fees, accounting fees, printer fees and other professional fees) that were incurred by the Company and other parties to the Business Combination Agreement in connection with the transactions contemplated by the Business Combination Agreement, including the Business Combination, and pursuant to the terms of the Business Combination Agreement.

**Q: Why is the Company proposing the NYSE Stock Issuance Proposal?**

A: We are proposing the NYSE Stock Issuance Proposal in order to comply with NYSE Listing Rule 312.03, which requires stockholder approval of certain transactions that result in the issuance of 20% or more of the outstanding voting power or shares of Common Stock outstanding before the issuance of stock or securities.

In connection with the Business Combination, we expect to issue (i) up to 70,385,096 shares of Common Stock to the Lightning Systems equity holders, including the Stockholder Earnout Shares, (ii) 2,500,000 shares of Common Stock to the PIPE Investor, (iii) 8,695,652 shares of our Common Stock upon conversion of the Convertible Notes and (iv) 8,695,652 shares of our Common Stock upon exercise of the Convertible Note

16

Table of Contents

Warrants. Because we may issue 20% or more of our outstanding Common Stock when considering together the Common Stock Consideration, the PIPE Investment and the Convertible Note Investment, we are required to obtain stockholder approval of such issuance pursuant to NYSE Listing Rule 312.03(c). For more information, please see the section entitled "*Proposal No. 2 - The NYSE Stock Issuance Proposal*"

**Q: Why is the Company proposing the Charter Amendment Proposals?**

A: The proposed Second Amended and Restated Certificate of Incorporation that we are asking our stockholders to approve in connection with the Business Combination provides for: (i) the classification of the New Lightning eMotors Board into three separate classes; and (ii) certain additional changes, including changing the post-combination company's corporate name from "GigCapital3, Inc." to "Lightning eMotors, Inc." and eliminating certain provisions specific to our status as a blank check company, which our Board believes are necessary to adequately address the needs of New Lightning eMotors. Pursuant to Delaware law and the Business Combination Agreement, we are required to submit the Charter Amendment Proposals to the Company's stockholders for approval. For additional information please see the sections entitled "*Proposal No. 3 - Classification of the Board of Directors Proposal*," "*Proposal No. 4A - Approval of Additional Amendments to Current Amended and Restated Certificate of Incorporation in Connection with the Business Combination Proposal*" and "*Proposal No. 4B* **-** *Authorization of Exclusive Forum Provision*."

**Q: Why is the Company proposing the Incentive Plan Proposal?**

A: The purpose of the Incentive Plan Proposal is to further align the interests of the eligible participants with those of stockholders by providing long-term incentive compensation opportunities tied to the performance of the Company. Please see the section entitled "*Proposal No. 5 - Approval of the Incentive Plan*" for additional information.

**Q: Why is the Company proposing the Election of Directors Proposal?**

A: The purpose of the Election of Directors proposal is to elect the directors comprising the board of directors of New Lightning eMotors after the Closing Date of the Business Combination. For more information, please see the section entitled "*Proposal No. 6 - The Election of Directors Proposal*".

**Q: Why is the Company proposing the Adjournment Proposal?**

A: We are proposing the Adjournment Proposal to allow our Board to adjourn the Special Meeting to a later date or dates to permit further solicitation of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal, but no other proposal if the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal are approved. Please see the section entitled "*Proposal No. 7 - The Adjournment Proposal*" for additional information.

**Q: What happens if you sell your shares of Common Stock before the Special Meeting?**

A: The record date for the Special Meeting is earlier than the date of the Special Meeting. If you transfer your shares of Common Stock after the record date, but before the Special Meeting, unless the transferee obtains from you a proxy to vote those shares, you will retain your right to vote at the Special Meeting. However, you will not be able to seek redemption of your shares of Common Stock because you will no longer be able to deliver them two business days prior to the Special Meeting. If you transfer your shares of Common Stock prior to the record date, you will have no right to vote those shares at the Special Meeting or redeem those shares for a pro rata portion of the proceeds held in our Trust Account.

17

**Q: What constitutes a quorum at the Special Meeting?**

A: A majority of the voting power of all outstanding shares of the capital stock of the Company entitled to vote must be present in person or by proxy (which would include presence at the virtual Special Meeting) to constitute a quorum for the transaction of business at the Special Meeting. Abstentions will be counted as present for the purpose of determining a quorum. Our Initial Stockholders, who currently own approximately 22.8% of our issued and outstanding shares of Common Stock, will count towards this quorum. In the absence of a quorum, the chairman of the Special Meeting has power to adjourn the Special Meeting. As of the record date for the Special Meeting, 12,946,741 shares of our Common Stock would be required to achieve a quorum.

**Q: What vote is required to approve the proposals presented at the Special Meeting?**

A:

***Proposal No. 1 - The Business Combination Proposal:*** The approval of the Business Combination Proposal requires the affirmative vote of a majority of the votes cast by the stockholders present in person or represented by proxy and entitled to vote at the Special Meeting. Accordingly, a Company stockholder's failure to vote, as well as an abstention from voting and a broker non-vote, will have no effect on the Business Combination Proposal. Abstentions will be counted in connection with the determination of whether a valid quorum is established but will have no effect on the Business Combination Proposal. Our Initial Stockholders have agreed to vote their shares of Common Stock "FOR" the Business Combination Proposal.

***Proposal No. 2 - The NYSE Stock Issuance Proposal:*** The approval of the NYSE Stock Issuance Proposal requires the affirmative vote of a majority of the votes cast by the stockholders present in person or represented by proxy and entitled to vote at the Special Meeting. Accordingly, under Delaware law, a Company stockholder's failure to vote, as well as an abstention and broker non-vote, will have no effect on the NYSE Stock Issuance Proposal. For purposes of NYSE rules, however, abstentions are treated as "votes cast" and will be counted as votes **"AGAINST"** this proposal. Abstentions will be counted in connection with the determination of whether a valid quorum is established.

***Proposal No. 3 - Classification of the Board of Directors Proposal:*** The approval of the classification of our Board into three classes of directors with staggered terms of office and to make certain related changes requires the affirmative vote of the holders of a majority of the outstanding shares of our Common Stock entitled to vote thereon at the Special Meeting. Accordingly, a Company stockholder's failure to vote, as well as an abstention from voting and a broker non-vote, will have the same effect as a vote **"AGAINST"** such Proposal No. 3. Abstentions will be counted in connection with the determination of whether a valid quorum is established.

***Proposal No. 4A - Approval of Additional Amendments to Current Amended and Restated Certificate of Incorporation in Connection with the Business Combination Proposal (Governance Proposal):*** The approval of the additional changes to the Charter requires the affirmative vote of the holders of a majority of the outstanding shares of our Common Stock entitled to vote thereon at the Special Meeting. Accordingly, a Company stockholder's failure to vote, as well as an abstention from voting and a broker non-vote, will have the same effect as a vote **"AGAINST"** such Proposal No. 4A.

***Proposal No. 4B - Authorization of Exclusive Forum Provision (Forum Proposal) -*** To authorize the adoption of Delaware as the exclusive forum for certain stockholder litigation. Accordingly, a Company stockholder's failure to vote, as well as an abstention from voting and a broker non-vote, will have the same effect as a vote **"AGAINST"** such Proposal No. 4B.

***Proposal No. 5 - The Incentive Plan Proposal:*** The approval of the Incentive Plan Proposal requires the affirmative vote of a majority of the votes cast by the stockholders present in person or represented by proxy and entitled to vote at the Special Meeting. Accordingly, under Delaware law, a Company stockholder's failure to

18

Table of Contents

vote by proxy, as well as an abstention and broker non-vote, will have no effect on the Incentive Plan Proposal. For purposes of NYSE rules, however, abstentions are treated as "votes cast" and will be counted as votes **"AGAINST"** this proposal. Abstentions will be counted in connection with the determination of whether a valid quorum is established.

*Proposal No. 6 – The Election of Directors Proposal:* The approval of the Election of Directors Proposal requires the affirmative vote of a majority of the votes cast by the stockholders present in person or represented by proxy and entitled to vote at the Special Meeting. Accordingly, under Delaware law, a Company stockholder's failure to vote by proxy, as well as an abstention and broker non-vote, will have no effect on the Election of Directors Proposal. For purposes of NYSE rules, however, abstentions are treated as "votes cast" and will be counted as votes **"AGAINST"** this proposal. Abstentions will be counted in connection with the determination of whether a valid quorum is established.

*Proposal No. 7 - The Adjournment Proposal:* The approval of the Adjournment Proposal requires the affirmative vote of a majority of the votes cast by the stockholders present in person or represented by proxy and entitled to vote at the Special Meeting. Accordingly, a Company stockholder's failure to vote, as well as an abstention from voting and a broker non-vote, will have no effect on the Adjournment Proposal. Abstentions will be counted in connection with the determination of whether a valid quorum is established but will have no effect on the Adjournment Proposal.

**Q: What happens if the Business Combination Proposal is not approved?**

A: If the Business Combination Proposal is not approved and we do not consummate a business combination by November 18, 2021, we will be required to dissolve and liquidate our Trust Account, unless we amend our current amended and restated certificate of incorporation to extend the time we have to consummate a business combination. Our current deadline to consummate the Business Combination is November 18, 2021.

**Q: May the Company, Initial Stockholders or the Company's directors or officers or their affiliates purchase shares in connection with the Business Combination?**

A: In connection with the stockholder vote to approve the proposed Business Combination, our Sponsor, directors or officers or their respective affiliates may privately negotiate transactions to purchase shares from stockholders who would have otherwise elected to have their shares redeemed in conjunction with a proxy solicitation pursuant to the proxy rules for a per-share pro rata portion of the Trust Account. None of our directors or officers or their respective affiliates will make any such purchases when they are in possession of any material non-public information not disclosed to the seller or during a restricted period under Regulation M under the Exchange Act. Such a purchase may include a contractual acknowledgement that such selling stockholder, although still the record holder of our shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights, and could include a contractual provision that directs such selling stockholder to vote such shares in a manner directed by the purchaser. In the event that our Sponsor, directors or officers or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. Any such privately negotiated purchases may be effected at purchase prices that are below or in excess of the per-share pro rata portion of the Trust Account.

**Q: How many votes do you have at the Special Meeting?**

A: Each stockholder is entitled to one vote on each proposal presented at the Special Meeting for each share of Common Stock held of record by such stockholder as of March 15, 2021, the record date for the Special Meeting. As of the close of business on the record date, there were 25,893,479 outstanding shares of our Common Stock.

19

Table of Contents

**Q: How will our Initial Stockholders, directors and officers vote?**

A: Prior to our IPO, we entered into agreements with our Initial Stockholders and each of our directors and officers, pursuant to which each agreed to vote any shares of Common Stock owned by them in favor of the Business Combination Proposal. None of our Initial Stockholders, directors or officers has purchased any shares of our Common Stock during or after our IPO and, as of the date of this proxy statement/prospectus, neither we nor our Initial Stockholders, directors or officers have entered into agreements, and are not currently in negotiations, to purchase shares prior to the consummation of the Business Combination. Currently, our Initial Stockholders own approximately 22.8% of our issued and outstanding shares of Common Stock, including all of the Initial Stockholder Shares, and will be able to vote all such shares at the Special Meeting.

**Q: How do I vote?**

A: If you were a stockholder of record on March 15, 2021, you may vote by granting a proxy. Specifically, you may vote:

- *By Mail* - You may vote by mail by completing, signing, dating and returning the enclosed proxy card in the postage-paid envelope provided **Votes submitted by mail must be received by 5:00 p.m. Eastern time on April 19, 2021.**

  - You should sign your name exactly as it appears on the proxy card. If you are signing in a representative capacity (for example, as guardian, executor, trustee, custodian, attorney or officer of a corporation), indicate your name and title or capacity.

  - We encourage you to sign and return the proxy card even if you plan to attend the Special Meeting so that your shares will be voted if you are unable to attend the Special Meeting.

  - If you receive more than one proxy card, it is an indication that your shares are held in multiple accounts. Please sign and return all proxy cards to ensure that all of your shares are voted.

- *Voting at the Special Meeting* - We will be hosting the Special Meeting via live webcast. If you attend the Special Meeting, you may submit your vote at the Special Meeting online at www.virtualshareholdermeeting.com/GIK2021SM, in which case any votes that you previously submitted will be superseded by the vote that you cast at the Special Meeting.

If you hold your shares in street name, you must submit voting instructions to your broker, bank or other nominee. In most instances, you will be able to do this over the Internet, by telephone or by mail. Please refer to information from your bank, broker, or other nominee on how to submit voting instructions.

**Q: What will happen if I abstain from voting or fail to vote at the Special Meeting?**

A: At the Special Meeting, we will count a properly executed proxy marked "**ABSTAIN**" with respect to a particular proposal as present for purposes of determining whether a quorum is present. For purposes of approval, a failure to vote or an abstention will have no effect on the Business Combination Proposal and the Adjournment Proposal. However, an abstention or failure to vote will have the same effect as a vote "**AGAINST**" the Charter Amendment Proposals. In addition, for purposes of the NYSE Stock Issuance Proposal, the Incentive Plan Proposal and the Election of Directors Proposal, the NYSE considers an abstention vote as a "vote cast", and therefore, an abstention will have the same effect as a vote **"AGAINST"** such proposals, while a failure to vote will have no effect on these two proposals.

**Q: What will happen if I sign and return my proxy card without indicating how I wish to vote?**

A: Signed and dated proxies received by us without an indication of how the stockholder intends to vote on a proposal will be voted "**FOR**" each proposal presented to the stockholders. The proxyholders may use their discretion to vote on any other matters which properly come before the Special Meeting.

20

Table of Contents

**Q: If I am not going to attend the Special Meeting, should I return my proxy card instead?**

A: Yes. Whether you plan to attend the Special Meeting or not, please read the enclosed proxy statement carefully. If you are a stockholder of record of our Common Stock as of the close of business on the record date, you can vote by proxy by mail by following the instructions provided in the enclosed proxy card. Please note that if you are a beneficial owner of our Common Stock, you may vote by submitting voting instructions to your broker, bank or nominee, or otherwise by following instructions provided by your broker, bank or nominee. Telephone and internet voting may be available to beneficial owners. Please refer to the vote instruction form provided by your broker, bank or nominee.

**Q: What is the difference between a stockholder of record and a "street name" holder?**

A: If your shares are registered directly in your name with the Company's Transfer Agent, you are considered the stockholder of record with respect to those shares, and access to proxy materials is being provided directly to you. If your shares are held in a stock brokerage account or by a bank or other nominee, then you are considered the beneficial owner of those shares, which are considered to be held in "street name." Access to proxy materials is being provided to you by your broker, bank or other nominee who is considered the stockholder of record with respect to those shares.

**Q: If my shares are held in "street name," will my broker, bank or nominee automatically vote my shares for me?**

A: No. Under the rules of various national and regional securities exchanges, your broker, bank, or nominee cannot vote your shares with respect to non-routine matters unless you provide instructions on how to vote in accordance with the information and procedures provided to you by your broker, bank, or nominee. We believe the proposals presented to the stockholders at this Special Meeting will be considered non-routine and, therefore, your broker, bank, or nominee **cannot vote your shares without your instruction** on any of the proposals presented at the Special Meeting. If you do not submit voting instructions, your broker, bank, or other nominee may deliver a proxy card expressly indicating that it is NOT voting your shares; this indication that a broker, bank, or nominee is not voting your shares is referred to as a "broker non-vote." Broker non-votes will not be counted for the purposes of determining the existence of a quorum or for purposes of determining the number of votes cast at the Special Meeting. Your bank, broker, or other nominee can vote your shares only if you provide instructions on how to vote. You should instruct your broker to vote your shares in accordance with directions you provide.

**Q: How will a broker non-vote impact the results of each proposal?**

A: Broker non-votes will count as a vote "**AGAINST**" the Charter Amendment Proposals but will not have any effect on the outcome of any other proposals.

**Q: May I change my vote after I have returned my signed proxy card or voting instruction form?**

A: Yes. If you are a holder of record of our Common Stock as of the close of business on the record date, whether you vote by mail, you can change or revoke your proxy before it is voted at the Special Meeting by:

• delivering a signed written notice of revocation to our Secretary at GigCapital3, Inc., 1731 Embarcadero Rd., Suite 200, Palo Alto, California 94303, bearing a date later than the date of the proxy, stating that the proxy is revoked;

• signing and delivering a new proxy, relating to the same shares and bearing a later date; or

• attending and voting at the Special Meeting and voting, although attendance at the special meeting will not, by itself, revoke a proxy.

If you are a beneficial owner of our Common Stock as of the close of business on the record date, you must follow the instructions of your broker, bank or other nominee to revoke or change your voting instructions.

21

Table of Contents

**Q: What should I do if I receive more than one set of voting materials?**

A: You may receive more than one set of voting materials, including multiple copies of this proxy statement/prospectus and multiple proxy cards or voting instruction cards. For example, if you hold your shares in more than one brokerage account, you will receive a separate voting instruction card for each brokerage account in which you hold shares. If you are a holder of record and your shares are registered in more than one name, you will receive more than one proxy card. Please complete, sign, date and return each proxy card and voting instruction card that you receive in order to cast your vote with respect to all of your shares.

**Q: What interests do our Initial Stockholders and our current officers and directors have in the Business Combination?**

A: Our Initial Stockholders and certain members of our Board and officers have interests in the Business Combination that are different from or in addition to (and which may conflict with) your interests. You should take these interests into account in deciding whether to approve the Business Combination. These interests include but are not limited to:

- the fact that our Initial Stockholders cannot redeem any of the shares of Common Stock that they hold in connection with a stockholder vote to approve a proposed initial business combination and such Initial Stockholders will lose their entire investment in us if an initial business combination is not consummated by November 18, 2021;

- the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their shares of Common Stock that they hold (other than any public shares, in the case of Cowen Investments) if we fail to complete an initial business combination by November 18, 2021;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party (other than our independent public accountants) for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that Neil Miotto and Drs. Avi Katz and Raluca Dinu will join as members of the New Lightning eMotors Board and each shall be entitled to receive compensation for serving on such board of directors; and

- the fact that our Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the applicable deadline. Prior to GigCapital3's initial public offering, the Sponsor purchased 5,735,000 Initial Stockholder Shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share (as compared to the $10.00 per share price being used to determine the number of shares of Common Stock being issued to the Lightning Systems equity holders in the Business Combination or at which the PIPE Investors have agreed to purchase Common Stock). However, 750,000 shares of Common Stock issued to the Sponsor were forfeited due to the over-allotment option not being exercised by the Underwriters. Additionally, the Sponsor purchased 650,000 private placement units simultaneously with the consummation of GigCapital3's initial public offering for an aggregate purchase price of $6.5 million. Certain of GigCapital3's directors and executive officers, including Dr. Avi Katz, Dr. Raluca Dinu, Neil Miotto, John Mikulsky, Peter Wang, Andrea Betti-Berutto and Brad Weightman, also have a direct or indirect economic interest in such private placement units and in the

22

Table of Contents

5,635,000 Initial Stockholder Shares owned by the Sponsor. The 5,635,000 Initial Stockholder Shares owned by the Sponsor would have had an aggregate market value of $63.1 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The 650,000 private placement units held by the Sponsor would have had an aggregate market value of $8.8 million based upon the closing price of $13.59 per public unit on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The Sponsor does not hold any warrants independent of what is included in the private placement units. While the private placement units have a trading price and value as set forth above, the private placement units will be, upon completion of the Business Combination, broken into their constituent components of stock and warrants, and each of those separately trade and the value of each of those is $11.19 per public share and $3.05 per public warrant. Additionally, the Sponsor, officers and directors do not currently have any unreimbursed out-of-pocket expenses in connection with the business combination. Upon completion of the Business Combination, the former Lightning Systems equity holders will own 53,922,000 shares of our Common Stock. The shares owned by the former Lightning Systems equity holders would have had an aggregate market value of $603.4 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus.

These interests may influence our directors in making their recommendation that you vote in favor of the approval of the Business Combination. See the sections entitled "*Proposal No. 1—Approval of the Business Combination—Interests of Certain Persons in the Business Combination*" and "*Information about the Company Prior to the Business Combination—Conflicts of Interest*" for a complete description of such interests.

**Q: What happens if you vote against the Business Combination Proposal?**

A: If you vote against the Business Combination Proposal but the Business Combination Proposal still obtains the affirmative vote of a majority of the votes cast by holders of our Common Stock represented in person or by proxy and entitled to vote at the Special Meeting, then the Business Combination Proposal will be approved and, assuming the approval of the NYSE Stock Issuance Proposal and the Charter Amendment Proposals and the satisfaction or waiver of the other conditions to closing, the Business Combination will be consummated in accordance with the terms of the Business Combination Agreement.

If you vote against the Business Combination Proposal and the Business Combination Proposal does not obtain the affirmative vote of a majority of the votes cast by holders of our of Common Stock represented in person or by proxy and entitled to vote at the Special Meeting, then the Business Combination Proposal will fail and we will not consummate the Business Combination. If we do not consummate the Business Combination, we may continue to try to complete a business combination with a different target business until the applicable deadline. If we fail to complete an initial business combination by the applicable deadline, then we will be required to dissolve and liquidate the Trust Account by returning the then-remaining funds in such account to our public stockholders.

**Q: Do you have Redemption Rights?**

A: Pursuant to our current amended and restated certificate of incorporation, we are providing our public stockholders with the opportunity to redeem, upon the Closing, shares of Common Stock for cash equal to the pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing) in the Trust Account that holds the proceeds of our IPO (including interest not previously released to the Company to pay franchise and income taxes), subject to certain limitations. For illustrative purposes, based on the balance of the Trust Account of $202.0 million as of December 10, 2020, the estimated per share redemption price would have been approximately $10.10. **Public stockholders may elect to redeem their shares even if they vote for the Business Combination**. Any request to redeem public shares, once made, may be withdrawn at any time until the deadline for exercising redemption requests and thereafter, with our consent, until the Closing. If we receive valid redemption requests from holders of public shares prior to the redemption deadline, we may, at our sole discretion, following the redemption deadline and until the date of Closing, seek and permit withdrawals by one

23

Table of Contents

or more of such holders of their redemption requests. We may select which holders to seek such withdrawals of redemption requests from based on any factors we may deem relevant, and the purpose of seeking such withdrawals may be to increase the funds held in the Trust Account, including where we otherwise would not satisfy the closing condition that the amount in the Trust Account and the proceeds from the PIPE Investment and Convertible Note Investment equal or exceed $150.0 million.

Our Initial Stockholders have agreed to waive their redemption rights with respect to such shares, which will be excluded from the pro rata calculation used to determine the per-share redemption price. Each redemption of shares of Common Stock by our public stockholders will reduce the amount in the Trust Account. The Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, being no less than an aggregate amount of $150.0 million. This condition to closing in the Business Combination Agreement is for the sole benefit of the parties thereto and may be waived by either of us or Lightning Systems. If, as a result of redemptions of Common Stock by our public stockholders, this condition is not met (or waived), then either we or Lightning Systems may elect not to consummate the Business Combination. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. In addition, in no event will we redeem shares of our Common Stock in an amount that would result in the Company's failure to have net tangible assets equaling or exceeding $5,000,001 (so that we are not subject to the SEC's "penny stock" rules). Holders of our outstanding public warrants do not have redemption rights in connection with the Business Combination. Unless otherwise specified, the information in the accompanying proxy statement assumes that none of our public stockholders exercise their redemption rights with respect to their shares of Common Stock.

**Q: If you are a Company public warrant holder, can you exercise Redemption Rights with respect to your public warrants?**

A: No. The holders of our public warrants have no Redemption Rights with respect to such public warrants.

**Q: Can the Initial Stockholders redeem their Initial Stockholder Shares or Insider Shares in connection with consummation of the Business Combination?**

A: No. Our Initial Stockholders, officers and directors have agreed to waive their redemption rights with respect to their shares of Common Stock in connection with the consummation of our Business Combination. Our Initial Stockholders have also agreed to waive their right to a conversion price adjustment with respect to any shares of our Common Stock they may hold in connection with the consummation of the Business Combination.

**Q: Is there a limit on the number of shares you may redeem?**

A: We have no specified maximum redemption threshold under our current amended and restated certificate of incorporation. Each redemption of shares of Common Stock by our public stockholders will reduce the amount in the Trust Account. The Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, being no less than an aggregate amount of $150.0 million. This condition to closing in the Business Combination Agreement is for the sole benefit of the parties thereto and may be waived by either of us or Lightning Systems. If, as a result of redemptions of Common Stock by our public stockholders, this condition is not met (or waived), then either we or Lightning Systems may elect not to consummate the Business Combination. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. In addition, in no event will we redeem shares of our Common Stock in an amount that would result in the Company's failure to have net tangible assets equaling or exceeding $5,000,001 (so that we are not subject to the SEC's "penny stock" rules).

Table of Contents

**Q: Is there a limit on the total number of shares that may be redeemed?**

A: Yes. Our current amended and restated certificate of incorporation provides that we may not redeem our public shares in an amount that would result in the Company's failure to have net tangible assets in excess of $5,000,000 (such that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the Business Combination Agreement. Other than this limitation, our current amended and restated certificate of incorporation does not provide a specified maximum redemption threshold. In addition, the Business Combination Agreement provides that the obligation of Lightning Systems to consummate the Business Combination is conditioned on the amount in the Trust Account and the proceeds from the PIPE Investment and Convertible Note Investment equaling or exceeding $150.0 million. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. In the event the aggregate cash consideration we would be required to pay for all shares of Common Stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the Business Combination Agreement and the Convertible Note Subscription Agreements exceeds the aggregate amount of cash available to us, we may not complete the Business Combination or redeem any shares, all shares of Common Stock submitted for redemption will be returned to the holders thereof, and we instead may search for an alternate business combination.

Based on the amount of approximately $202.0 million in our Trust Account as of December 10, 2020, and taking into account the anticipated gross proceeds of approximately $25.0 million from the PIPE Investment and approximately $100.0 million from the Convertible Note Investment, approximately 15.0 million shares of Common Stock may be redeemed and still enable us to have sufficient cash to satisfy the cash closing conditions in the Business Combination Agreement and the Convertible Note Subscription Agreements. We refer to this as the maximum redemption scenario.

**Q: Will how you vote affect your ability to exercise Redemption Rights?**

A: No. You may exercise your redemption rights whether you vote your shares of Common Stock for or against, or whether you abstain from voting on the Business Combination Proposal or any other proposal described by this proxy statement/prospectus. As a result, the Business Combination Agreement can be approved by stockholders who will redeem their shares and no longer remain stockholders, leaving stockholders who choose not to redeem their shares holding shares in a company with a potentially less-liquid trading market, fewer stockholders, potentially less cash and the potential inability to meet the listing standards of NYSE.

**Q: How do you exercise your Redemption Rights?**

A: In order to exercise your redemption rights, you must (i)(a) hold public shares or (b) hold public shares through units and elect to separate your unites into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares; and (ii) prior to 5:00 p.m. Eastern time on April 19, 2021 (two business days before the Special Meeting) (a) submit a written request to the Transfer Agent that the Company redeem your public shares for cash and (b) deliver your public shares to the Transfer Agent, physically or electronically through DTC. Any demand for redemption, once made, may be withdrawn at any time until the deadline for exercising redemption requests and thereafter, with our consent, until the Closing. The Transfer Agent's address is as follows:

Continental Stock Transfer & Trust Company
1 State Street - 30th Floor
New York, New York 10004
Attention: Mark Zimkind
E-mail: mzimkind@continentalstock.com

25

Table of Contents

You must also affirmatively certify in your request to Continental Stock Transfer & Trust Company for redemption if you "ARE" or "ARE NOT" acting in concert or as a "group" (as defined in Section 13d-3 of the Exchange Act) with any other stockholder with respect to shares of Common Stock. Notwithstanding the foregoing, a holder of public shares, together with any affiliate of his or any other person with whom he is acting in concert or as a "group" (as defined in Section 13d-3 of the Exchange Act) will be restricted from seeking Redemption Rights with respect to more than 15% of the public shares, which we refer to as the "15% threshold." Accordingly, all public shares in excess of the 15% threshold beneficially owned by a public stockholder or "group" (as defined in Section 13d-3 of the Exchange Act) will not be redeemed for cash.

Stockholders seeking to exercise their Redemption Rights and opting to deliver physical certificates should allot sufficient time to obtain physical certificates from the Transfer Agent and time to effect delivery. It is our understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the Transfer Agent. However, we do not have any control over this process and it may take longer than two weeks. Stockholders who hold their shares in street name will have to coordinate with their bank, broker or other nominee to have the shares certificated or delivered electronically.

Stockholders seeking to exercise their Redemption Rights, whether they are record holders or hold their shares in "street name", are required to either tender their certificates to our Transfer Agent prior to the date that is two business days prior to the Special Meeting, or to deliver their shares to the Transfer Agent electronically using Depository Trust Company's ("DTC") Deposit/Withdrawal At Custodian ("DWAC") system, at such stockholder's option. *The requirement for physical or electronic delivery prior to the Special Meeting ensures that a redeeming stockholder's election to redeem is irrevocable once the Business Combination is approved*.

There is a nominal cost associated with the above-referenced tendering process and the act of certificating the shares or delivering them through the DWAC system. The Transfer Agent will typically charge a tendering broker a fee and it is in the broker's discretion whether or not to pass this cost on to the redeeming stockholder. However, this fee would be incurred regardless of whether or not we require stockholders seeking to exercise Redemption Rights to tender their shares, as the need to deliver shares is a requirement to exercising Redemption Rights, regardless of the timing of when such delivery must be effectuated.

Any demand for redemption, once made, may be withdrawn at any time until the deadline for exercising redemption requests (and submitting shares to the Transfer Agent) and thereafter, with our consent, until the vote is taken with respect to the Business Combination. If you delivered your shares for redemption to our Transfer Agent and decide within the required timeframe not to exercise your Redemption Rights, you may request that our Transfer Agent return the shares (physically or electronically). You may make such request by contacting our Transfer Agent at the address listed under the question "Who can help answer my questions?" below.

**Q: What are the U.S. federal income tax consequences of exercising your Redemption Rights?**

A: The U.S. federal income tax consequences of the redemption depend on particular facts and circumstances. Please see the section entitled "*Proposal No. 1 - Approval of the Business Combination - Certain U.S. Federal Income Tax Considerations*" We urge you to consult your tax advisors regarding the tax consequences of exercising your redemption rights.

**Q: Do you have appraisal rights if you object to the Business Combination?**

A: No. Appraisal rights are not available to holders of our Common Stock in connection with the Business Combination.

**Q: What happens to the funds held in the Trust Account upon consummation of the Business Combination?**

A: The funds held in the Trust Account (together with the proceeds from the PIPE Investment and the Convertible Note Investment) will be used to: (i) pay Company stockholders who properly exercise their

26

Table of Contents

redemption rights; and (ii) pay certain other fees, costs and expenses (including regulatory fees, legal fees, accounting fees, printer fees and other professional fees) that were incurred by the Company and other parties to the Business Combination Agreement in connection with the transactions contemplated by the Business Combination Agreement, including the Business Combination, and pursuant to the terms of the Business Combination Agreement.

**Q: What happens if the Business Combination is not consummated?**

A: There are certain circumstances under which the Business Combination Agreement may be terminated. Please see the section entitled "*Proposal No. 1 - Approval of the Business Combination - The Business Combination Agreement*" for information regarding the parties' specific termination rights.

If we do not consummate the Business Combination, we may continue to try to complete a business combination with a different target business until the applicable deadline. If we fail to complete an initial business combination by the applicable deadline, then we will: (i) cease all operations except for the purpose of winding up; (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem our public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest not previously released to the Company to pay its franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish our public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law; and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. In the event of such distribution, it is possible that the per share value of the residual assets remaining available for distribution (including Trust Account assets) will be less than the initial public offering price per unit in the IPO. Please see the section entitled "*Risk Factors - Risks Related to the Company and the Business Combination*."

Holders of our Initial Stockholder Shares have waived any right to any liquidation distribution with respect to such shares and the underwriters of our IPO agreed to waive their rights to the business combination marketing fee held in the Trust Account in the event we do not complete our initial business combination within the required period. In addition, if we fail to complete a business combination by the applicable deadline, there will be no redemption rights or liquidating distributions with respect to our outstanding warrants, which will expire worthless.

**Q: When is the Business Combination expected to be completed?**

A: The closing of the Business Combination is expected to take place on or prior to the third business day following the satisfaction or waiver of the conditions described below in the subsection entitled "*Proposal No. 1 - Approval of the Business Combination - The Business Combination Agreement - Conditions to Closing of the Business Combination*" The closing is expected to occur in the first half of 2021. The Business Combination Agreement may be terminated by the Company or Lightning Systems if the Closing has not occurred by November 18, 2021.

For a description of the conditions to the completion of the Business Combination, see the section entitled "*Proposal No. 1 - Approval of the Business Combination - The Business Combination Agreement - Conditions to Closing of the Business Combination*"

**Q: What do you need to do now?**

A: You are urged to read carefully and consider the information contained in this proxy statement/prospectus, including the Annexes, and to consider how the Business Combination will affect you as a stockholder. You should then vote as soon as possible in accordance with the instructions provided in this proxy statement/prospectus and on the enclosed proxy card or, if you hold your shares through a brokerage firm, bank or other nominee, on the voting instruction form provided by the broker, bank or nominee.

27

Table of Contents

**Q: Who can vote at the special meeting?**

A: Only holders of record of the Company's Common Stock, including those shares held as a constituent part of our units, at the close of business on March 15, 2021 are entitled to have their vote counted at the special meeting and any adjournments or postponements thereof. On this record date, 25,893,479 shares of Common Stock were outstanding and entitled to vote.

*Stockholder of Record: Shares Registered in Your Name* If on the record date your shares or units were registered directly in your name with the Company's Transfer Agent, then you are a stockholder of record. As a stockholder of record, you may vote in person at the special meeting or vote by proxy. Whether or not you plan to attend the special meeting in person, the Company urges you to fill out and return the enclosed proxy card to ensure your vote is counted.

*Beneficial Owner: Shares Registered in the Name of a Broker or Bank.* If on the record date your shares or units were held, not in your name, but rather in an account at a brokerage firm, bank, dealer, or other similar organization, then you are the beneficial owner of shares held in "street name" and this proxy statement/ prospectus are being forwarded to you by that organization. As a beneficial owner, you have the right to direct your broker or other agent on how to vote the shares in your account. You are also invited to attend the Special Meeting. However, since you are not the stockholder of record, you may not vote your shares in person at the Special Meeting unless you request and obtain a valid proxy from your broker or other agent.

**Q: Who will solicit and pay the cost of soliciting proxies for the Special Meeting?**

A: We will pay the cost of soliciting proxies for the Special Meeting. We have engaged MacKenzie to assist in the solicitation of proxies for the Special Meeting. We have agreed to pay MacKenzie a fee of $9,000, plus disbursements, and will reimburse MacKenzie for its reasonable out-of-pocket expenses and indemnify MacKenzie and its affiliates against certain claims, liabilities, losses, damages and expenses. We will also reimburse banks, brokers and other custodians, nominees and fiduciaries representing beneficial owners of our Common Stock for their expenses in forwarding soliciting materials to beneficial owners of our Common Stock and in obtaining voting instructions from those owners. Our directors, officers and employees may also solicit proxies by telephone, by facsimile, by mail, on the Internet or in person. They will not be paid any additional amounts for soliciting proxies.

**Q: Who can help answer my questions?**

A: If you have questions about the proposals or if you need additional copies of this proxy statement/prospectus or the enclosed proxy card you should contact:

c/o GigCapital3, Inc.
1731 Embarcadero Rd., Suite 200
Palo Alto, CA 94303
Attention: Secretary
Telephone: (650) 276-7040

You may also contact our proxy solicitor at:

MacKenzie Partners, Inc.
1407 Broadway, 27th Floor
New York, NY 10018
Telephone: (212) 929-5500 (Call Collect)

or
Call Toll-Free: (800) 322-2885
E-mail: proxy@mackenziepartners.com

28

Table of Contents

To obtain timely delivery, our stockholders must request the materials no later than five business days prior to the Special Meeting.

You may also obtain additional information about us from documents filed with the SEC by following the instructions in the section entitled "*Where You Can Find More Information*."

If you intend to seek redemption of your public shares, you will need to send a letter demanding redemption and deliver your stock (either physically or electronically) to our Transfer Agent prior to the Special Meeting in accordance with the procedures detailed under the question "How do I exercise my Redemption Rights?" If you have questions regarding the certification of your position or delivery of your stock, please contact our Transfer Agent:

Continental Stock Transfer & Trust Company
1 State Street-30th Floor
New York, New York 10004
Attention: Mark Zimkind
E-mail: mzimkind@continentalstock.com

29

Table of Contents

## SUMMARY OF THE PROXY STATEMENT/PROSPECTUS

*This summary highlights selected information contained in this proxy statement/prospectus and does not contain all of the information that may be important to you. You should carefully read this entire proxy statement/prospectus, including the Annexes and accompanying financial statements of the Company and Lightning Systems, to fully understand the proposed Business Combination (as described below) before voting on the proposals to be considered at the Special Meeting (as described below). Please see the section entitled "Where You Can Find More Information" beginning on page 312 of this proxy statement/prospectus.*

*Unless otherwise specified, all share calculations assume: (i) no exercise of redemption rights by the Company's public stockholders; (ii) no inclusion of any shares of Common Stock issuable upon the exercise of the Company's warrants or any shares to be issued pursuant to the Incentive Plan at or following the Closing; (iii) an equity raise of approximately $25,000,000 of gross proceeds from the PIPE Investment of 2,500,000 shares of Common Stock at $10.00 per share; (iv) no conversion of the Convertible Notes issued pursuant to the convertible debt raise of approximately $100,000,000 of gross proceeds from the Convertible Investment and (v) no issuance of the Stockholder Earnout Shares to Lightning Systems equity holders upon satisfaction of the Earnout Conditions.*

### Parties to the Business Combination

*The Company*

The Company is a Private-to-Public Equity (PPE) company, also known as a blank check company or a special purpose acquisition company, incorporated on February 3, 2020, as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

The public units began trading on the NYSE under the symbol "GIK.U" on May 14, 2020. On June 29, 2020, the Company announced that the holders of the Company's units may elect to separately trade the securities underlying such units as of July 2, 2020. On July 2, 2020, the Company's shares of Common Stock and warrants began trading on the NYSE under the symbols "GIK" and "GIK.WS," respectively. We intend to apply to continue the listing of our publicly traded Common Stock and warrants on NYSE under the symbols "ZEV" and "ZEV.WS" respectively, upon the Closing.

The mailing address of the Company's principal executive office is c/o GigCapital3, Inc., 1731 Embarcadero Rd., Suite 200, Palo Alto, California 94303.

*Merger Sub*

Merger Sub, a Delaware corporation, is a wholly owned subsidiary of the Company, formed by the Company in December 2020 to consummate the Business Combination. In the Business Combination, Merger Sub will merge with and into Lightning Systems, with Lightning Systems continuing as the surviving corporation (the "*Surviving Corporation*").

The mailing address of Merger Sub's principal executive office is 1731 Embarcadero Rd., Suite 200, Palo Alto, California 94303.

*Lightning Systems*

Lightning Systems, which also does business as Lightning eMotors, is a leading electric vehicle designer and manufacturer, providing complete electrification solutions for commercial fleets – from Class 3 cargo and passenger vans to Class 6 work trucks, and Class 7 city buses, which we believe represents a significant total addressable market of approximately $67 billion. Lightning Systems is committed to eradicating commercial fleet emissions, the main cause of urban air pollution, by providing zero emission Class 3 to 7 BEVs and FCEVs

30

Table of Contents

and infrastructure solutions to commercial fleet customers. As of the date of this proxy statement/prospectus, Lightning Systems is the market leader in the Class 3 to Class 6 EV segment, with 72 units sold in 2020 representing approximately 36% of the total market in 2020. Lightning Systems delivered 41 Class 3 vehicles in 2020, constituting approximately 75% market share among Class 3 EVs. We believe that Lightning Systems is the only company in the United States that has delivered fully functional Class 3 to 7 EVs to the end customer that are in use today, with 97 units delivered by us in 2019 and 2020 (in addition to 12 demonstration and test vehicles).

For more information about Lightning Systems, please see the sections entitled "*Information About Lightning Systems*," "*Lightning Systems' Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Management After the Business Combination.*"

**Emerging Growth Company**

The Company is an "emerging growth company," as defined under the JOBS Act. As an emerging growth company, the Company is eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies. These include, but are not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, reduced disclosure obligations regarding executive compensation in its periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and the requirement to obtain stockholder approval of any golden parachute payments not previously approved.

In addition, Section 107 of the JOBS Act provides that an emerging growth company can take advantage of an extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. GigCapital3 has elected to take advantage of such extended transition period.

The Company will remain an emerging growth company until the earlier of (1) December 31, 2025 (the last day of the fiscal year following the fifth anniversary of the consummation of the Company's initial public offering), (2) the last day of the fiscal year in which the Company has total annual gross revenue of at least $1.07 billion, (3) the last day of the fiscal year in which the Company is deemed to be a "large accelerated filer," as defined in the Exchange Act, and (4) the date on which the Company has issued more than $1.0 billion in nonconvertible debt during the prior three-year period.

**The Business Combination Proposal**

On December 10, 2020, the Company and Merger Sub entered into the Business Combination Agreement with Lightning Systems. If the Business Combination Agreement is adopted by Lightning Systems stockholders and the Business Combination Agreement is approved by Company stockholders at the Special Meeting, Merger Sub will merge with and into Lightning Systems, with Lightning Systems surviving the Merger. For more information about the transactions contemplated by the Business Combination Agreement, please see the section entitled "*Proposal No. 1 - Approval of the Business Combination.*" A copy of the Business Combination Agreement is attached to this proxy statement/prospectus as *Annex A*.

**Business Combination Consideration to the Lightning Systems Stockholders**

Subject to and in accordance with the terms of the Business Combination Agreement and customary adjustments, at the Effective Time of the Business Combination, each share of Lightning Systems Capital Stock issued and outstanding immediately prior to the Effective Time of the Business Combination (other than shares owned by Lightning Systems as treasury stock and Dissenting Shares (as defined in the Business Combination Agreement)) will (i) convert into that number of shares of Company Common Stock that constitutes the Merger Consideration, which aggregate amount, including any shares issuable in respect of vested equity awards of

31

Table of Contents

Lightning Systems that are exercised prior to the Closing or equity awards of Lightning Systems that the Company assumes and which are exercised following the Closing in accordance with the terms of such equity awards, plus (2) up to an additional 16,463,096 shares of Company Common Stock as Stockholder Earnout Shares to equity holders of Lightning Systems who have received, or are entitled to receive, any Per Share Merger Consideration shares of Company Common Stock earned due to the satisfaction of the Earnout Conditions pursuant to the terms of the Business Combination Agreement. At the Effective Time, each outstanding Lightning Systems Option (as defined below), whether vested or unvested, will be assumed by the Company and converted into an option to purchase a number of shares of the Company's Common Stock in accordance with the terms of the Business Combination Agreement.

### Related Agreements

This section describes the material provisions of the Related Agreements, but does not purport to describe all of the terms thereof. The following summary is qualified in its entirety by reference to the complete text of each of the Related Agreements. The PIPE Subscription Agreement is attached hereto as *Annex F*. The Convertible Note Subscription Agreement is attached hereto as *Annex G*. Stockholders and other interested parties are urged to read such Related Agreements in their entirety prior to voting on the proposals presented at the Special Meeting.

#### Stockholder Support Agreement

Contemporaneously with the execution of the Business Combination Agreement on December 10, 2020, the Company and certain stockholders of Lightning Systems entered into a stockholder support agreement (the "*Stockholder Support Agreement*") pursuant to which such Lightning Systems stockholders agreed to vote all of their shares of Lightning Systems Common Stock and Lightning Systems preferred stock in favor of the approval and adoption of the Business Combination and the Business Combination Agreement. Additionally, such Lightning Systems stockholders agreed not to (a) sell, assign, transfer (including by operation of law), pledge, dispose of, permit to exist any material lien with respect to or otherwise encumber any of their shares of Lightning Systems Common Stock and Lightning Systems preferred stock (or enter into any arrangement with respect thereto), subject to certain exceptions, or (b) deposit any of their shares of Lightning Systems Common Stock and Lightning Systems preferred stock into a voting trust or enter into any voting arrangement that is inconsistent with the Stockholder Support Agreement.

#### Sponsor Support Agreement

Contemporaneously with the execution of the Business Combination Agreement on December 10, 2020, the Company, Lightning Systems and the Sponsor entered into the Sponsor Support Agreement (the "*Sponsor Support Agreement*"), pursuant to which the Sponsor has agreed, among other things, to vote (or execute and return an action by written consent), or cause to be voted at the Special Meeting (or validly execute and return and cause such consent to be granted with respect to), all of its shares of Company Common Stock (A) in favor of the approval and adoption of the Business Combination Agreement and approval of the Business Combination, including the Merger, (B) against any action, agreement or transaction or proposal that would result in a breach of any covenant, representation or warranty or any other obligation or agreement of the Company under the Business Combination Agreement or that would reasonably be expected to result in the failure of the Merger from being consummated and (C) in favor of each of the proposals and any other matters necessary or reasonably requested by the Company for consummation of the Business Combination, including the Merger.

Table of Contents

*Stockholders Agreement*

On October 23, 2020, Lightning Systems and certain of its stockholders entered into a Stockholders Agreement (the "*Stockholders Agreement*") providing that immediately prior to the Closing (i) the Lightning Systems preferred stock shall automatically convert into the number of shares of Lightning Systems Common Stock issuable thereunder in accordance with the terms of the Stockholders Agreement and (ii) such stockholders shall exercise all outstanding Lightning Systems warrants prior to the Closing or such Lightning Systems warrants shall be deemed expired as of the Effective Time.

*Registration Rights and Lock-up Agreement*

In connection with the Business Combination, the Company and certain stockholders of Lightning Systems (the "*Holders*") will enter into the Registration Rights and Lock-up Agreement at the Closing. Pursuant to the terms of the Registration Rights and Lock-up Agreement, the Company will be obligated to file a registration statement to register the resale of certain shares of Common Stock held by the Holders. In addition, pursuant to the terms of the Registration Rights and Lock-up Agreement and subject to certain requirements and customary conditions, including with the Company regarding the number of demand rights that may be exercised, the Holders may demand at any time or from time to time, that the Company file a registration statement on Form S-1 or Form S-3 to register certain shares of Common Stock held by such Holders. The Registration Rights and Lock-up Agreement will also provide the Holders with "piggy-back" registration rights, subject to certain requirements and customary conditions. The Registration Rights and Lock-up Agreement further provides that, subject to certain exceptions, each of the Holders will not Transfer any shares of Common Stock beneficially owned or owned of record by such the Holders until the earlier of (i) 180 days after the date of the Closing or (ii) the date on which, subsequent to the Business Combination, the last sale price of the Common Stock (x) equals or exceeds $12.50 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30 trading day period commencing at least 90 days after the Business Combination, or (y) the date following the completion of the Business Combination on which the Company completes a liquidation, merger, stock exchange or other similar transaction that results in all of the Company stockholders having the right to exchange their shares of Common Stock for cash, securities or other property; provided that in the sole discretion of the majority of the independent members of the Board, such lock-up period may end earlier than as provided therein upon written notice to the Holders.

For more information about the Registration Rights and Lock-Up Agreement, see the section entitled "*Proposal No. 1 - Approval of the Business Combination - Related Agreements - Registration Rights and Lock-Up Agreement.*"

*PIPE Subscription Agreement*

In connection with the execution of the Business Combination Agreement, the Company entered into the PIPE Subscription Agreement with the PIPE Investor, pursuant to which, among other things, the Company agreed to issue and sell to the PIPE Investor, in a private placement to close immediately prior to the Closing, an aggregate of 2,500,000 shares of Company Common Stock at $10.00 per share, for an aggregate purchase price of $25,000,000. The obligations of the parties to consummate the PIPE Investment are conditioned upon, among other things, all conditions precedent to the closing of the transactions contemplated by the Convertible Note Subscription Agreements having been satisfied or waived, and the closing of the transaction contemplated by the PIPE Subscription Agreement occurring concurrently with the closing of the transactions contemplated by the Convertible Note Subscription Agreements. The PIPE Investment will be consummated concurrently with the Closing.

For more information about the PIPE Subscription Agreement, see the section entitled "*Proposal No. 1 - Approval of the Business Combination - Related Agreements – PIPE Subscription Agreement.*"

33

Table of Contents

*Convertible Note Subscription Agreements*

In connection with the execution of the Business Combination Agreement, the Company entered into the Convertible Note Subscription Agreements with the Convertible Note Investors, pursuant to which, among other things, the Company agreed to issue and sell to the Convertible Note Investors, in private placements to close immediately prior to Closing, (a) the Convertible Notes for an aggregate purchase price of $100,000,000 and (b) warrants to purchase up to 8,695,652 shares of Common Stock for a per share exercise price of $11.50 ("*Convertible Note Warrants*"). The Convertible Notes are convertible into 8,695,652 shares of Common Stock at a conversion price of $11.50. The obligations to consummate the Convertible Note Investment are conditioned upon, among other things, customary closing conditions and the consummation of the transactions contemplated by the Business Combination Agreement. The Convertible Note Investment will be consummated substantially concurrently with the Closing.

For more information about the Convertible Note Subscription Agreements, see the section entitled "*Proposal No. 1 - Approval of the Business Combination - Related Agreements – Convertible Note Subscription Agreements, Indenture, Amended and Restated Warrant Agreement.*"

**GigCapital3, Inc. 2021 Equity Incentive Plan**

Our Board approved the Incentive Plan on December 30, 2020, subject to stockholder approval of the Incentive Plan at the Special Meeting. The purpose of the Incentive Plan is to promote the long-term success of the Company and the creation of stockholder value by encouraging service providers to focus on critical long-range corporate objectives, encouraging the attraction and retention of service providers with exceptional qualifications and linking service providers directly to stockholder interests through increased stock ownership. These incentives are provided through the grant of incentive stock options, nonqualified stock options, stock appreciation rights, restricted stock and restricted stock units. For more information about the Incentive Plan, please see the section entitled "*Proposal No. 5 - Approval of the Incentive Plan - Summary of the Incentive Plan.*"

**Board of New Lightning eMotors following the Business Combination**

Upon the Closing Date, we anticipate that the New Lightning eMotors Board will consist of nine members, reclassified into three separate classes, with each class serving a three-year term; except with respect to the election of directors at the special meeting pursuant to Proposal No. 6 - The Election of Directors Proposal, the Class I directors will be elected to an initial one-year term (and three-year terms subsequently), the Class II directors will be elected to an initial two-year term (and three-year terms subsequently) and the Class III directors will be elected to an initial three-year term (and three-year terms subsequently). All of our existing directors of the Company have informed us that they will resign from our board of directors upon the Closing Date, unless they are elected to the New Lightning eMotors Board.

Our Board has nominated the following individuals for election at the Special Meeting pursuant to Proposal No. 6 - The Election of Directors Proposal:

- *Class I Directors*: Thaddeus Senko, Neil Miotto and Bruce Coventry;

- *Class II Directors*: Timothy Reeser, Dr. Raluca Dinu and Meghan Sharp; and

- *Class III Directors*: Robert Fenwick-Smith, Dr. Avi Katz and Diana Tremblay.

For additional details, see the sections of this proxy statement/prospectus entitled "*Proposal No. 6 - The Election of Directors Proposal*" and "*Management After the Business Combination.*"

34

Table of Contents

**Redemption Rights**

Pursuant to our current amended and restated certificate of incorporation, holders of public shares may elect to have their shares redeemed for cash at the applicable redemption price per share equal to the quotient obtained by dividing (i) the aggregate amount on deposit in the Trust Account as of two (2) business days prior to the consummation of the Business Combination, including interest not previously released to the Company to pay its franchise and income taxes, by (ii) the total number of then-outstanding public shares; provided that the Company will not redeem any shares of Common Stock issued in the IPO to the extent that such redemption would result in the Company's failure to have net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) in excess of $5,000,001. As of December 31, 2020, the estimated per share redemption price would have been approximately $10.10.

If a holder exercises its redemption rights, then such holder will be exchanging its shares of our Common Stock for cash and will no longer own shares of New Lightning eMotors. Such a holder will be entitled to receive cash for its public shares only if it properly demands redemption and delivers its shares (either physically or electronically) to our Transfer Agent in accordance with the procedures described herein. Please see the section entitled "*Special Meeting of Company Stockholders - Redemption Rights*" for the procedures to be followed if you wish to redeem your shares for cash. Any request for redemption may be withdrawn until the deadline for submitting redemption requests and thereafter, with our consent, until the Closing.

**Impact of the Business Combination on the Company's Public Float**

It is anticipated that, upon completion of the Business Combination: (i) the Company's public stockholders (other than the PIPE Investor and the Convertible Note Investors) will retain an ownership interest of approximately 24.3% in New Lightning eMotors; (ii) the PIPE Investor will own approximately 3% of New Lightning eMotors (such that public stockholders, including PIPE Investor, will own approximately 27.3% of New Lightning eMotors); (iii) our Initial Stockholders (including our Sponsor) will own approximately 7.2% of New Lightning eMotors; and (iv) the former Lightning Systems equity holders will own approximately 65.5% of New Lightning eMotors, not including any Stockholder Earnout Shares or the shares of Common Stock that will be issuable upon conversion of the Convertible Notes or the exercise of any warrants, including the Convertible Note Warrants. The PIPE Investor has agreed to purchase 2,500,000 shares of Common Stock in the aggregate, for $25,000,000 of gross proceeds. The Convertible Note Investors have agreed to purchase an aggregate principal amount of $100,000,000 of Convertible Notes. The ownership percentage with respect to New Lightning eMotors following the Business Combination does not take into account (i) warrants to purchase Common Stock that will remain outstanding immediately following the Business Combination, (ii) the issuance of Stockholder Earnout Shares to the Stockholder Earnout Group should the earnout conditions in the Business Combination Agreement be satisfied, (iii) conversion of any of the Convertible Notes or (iv) the issuance of any shares upon completion of the Business Combination under the Incentive Plan, a copy of which is attached to this proxy statement/prospectus as *Annex H*. If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in New Lightning eMotors will be different. For more information, please see the sections entitled "*Summary of the Proxy Statement/Prospectus - Impact of the Business Combination on the Company's Public Float*" "*Unaudited Pro Forma Condensed Combined Financial Information,*" and "*Proposal No. 5 - Approval of the Incentive Plan*".

35

Table of Contents

The following table illustrates varying ownership levels in the Company, assuming no redemptions by the Company's public stockholders and the maximum redemptions by the Company's stockholders:

| | No Redemptions | 15,050,267 shares of Common Stock redeemed |
|---|---|---|
| The Company's public stockholders | 24.3% | 7.36% |
| PIPE Investor | 3.0% | 3.72% |
| Initial Stockholders | 7.2% | 8.76% |
| The former Lightning Systems equity holders | 65.5% | 80.16% |
| | 100.0% | 100.00% |

Please see "*Unaudited Pro Forma Condensed Combined Financial Information - Description of the Business Combination*" on page 105.

**The Charter Amendment Proposals**

Upon the Closing, our amended and restated certificate of incorporation will be amended promptly to reflect the Charter Amendment Proposals to:

• provide for the classification of our Board into three classes of directors with staggered terms of office and to make certain related changes (Proposal No. 3);

• provide for certain additional changes, including but not limited to changing the post-combination company's corporate name from "GigCapital3, Inc." to "Lightning eMotors, Inc." and eliminating certain provisions specific to our status as a blank check company, which our Board believes are necessary to adequately address the needs of the post-combination company (Proposal No. 4A); and

• provide for the adoption of Delaware as the exclusive forum for certain stockholder litigation.

Please see the sections entitled *"Proposal No. 3 - Classification of the Board of Directors Proposal," "Proposal No. 4A - Approval of Additional Amendments to Current Amended and Restated Certificate of Incorporation in Connection with the Business Combination Proposal"* and *"Proposal 4B - Authorization of Exclusive Form Provision"* for more information.

**Other Proposals**

In addition, the stockholders of the Company will be asked to vote on:

• a proposal to approve, for purposes of complying with applicable NYSE Listing Rules, the issuance of more than 20% of the Company's issued and outstanding Common Stock pursuant to the Business Combination, the PIPE Investment and the Convertible Note Investment (Proposal No. 2);

• a proposal to approve and adopt the Incentive Plan, a copy of which is attached to this proxy statement/prospectus as *Annex H*, including the authorization of the initial share reserve under the Incentive Plan (Proposal No. 5);

• a proposal to elect the directors comprising the board of directors of New Lightning eMotors following the closing of the Business Combination (Proposal No. 6); and

• a proposal to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals or the Incentive Plan Proposal (Proposal No.7).

**Table of Contents**

Please see the sections entitled "*Proposal No. 2 - The NYSE Stock Issuance Proposal*," "*Proposal No. 5 - Approval of the Incentive Plan*," "*Proposal No. 6 – The Election of Directors Proposal*" and "*Proposal No. 7 - The Adjournment Proposal*" for more information.

**Date, Time and Place of Special Meeting**

The Special Meeting will be held on April 21, 2021 at 10:00 a.m., PDT, via live webcast at www.virtualshareholdermeeting.com/GIK2021SM. In light of ongoing developments related to coronavirus (COVID-19), after careful consideration, the Company has determined that the Special Meeting will be a virtual meeting conducted exclusively via live webcast in order to facilitate stockholder attendance and participation while safeguarding the health and safety of our stockholders, directors and management team. The Special Meeting will be conducted exclusively via live webcast and so stockholders will not be able to attend the meeting in person. Stockholders may attend the special meeting online and vote at the Special Meeting by visiting www.virtualshareholdermeeting.com/GIK2021SM and entering your 12-digit control number, which is either included on the proxy card you received or obtained through Broadridge Financial Solutions.

**Registering for the Special Meeting**

Any stockholder wishing to attend the virtual meeting should register in advance at www.virtualshareholdermeeting.com/GIK2021SM. To vote at the Special Meeting, please follow these instructions as applicable to the nature of your ownership of our Common Stock:

- To vote using the proxy card, simply complete, sign, date and return the proxy card pursuant to the instructions on the card. If you return your signed proxy card before the Annual Meeting, we will vote your shares as directed.

- To vote over the telephone, dial toll-free 1-800-690-6903 using a touch-tone phone and follow the recorded instructions. You will be asked to provide the company number and control number from the Notice. Your telephone vote must be received by 11:59 p.m. Eastern Time on April 20, 2021 to be counted.

- To vote through the Internet before the meeting, go to www.proxyvote.com and follow the onscreen instructions. Your Internet vote must be received by 11:59 p.m., Eastern Time on April 20, 2021 to be counted.

- To vote through the Internet during the meeting, please visit www.virtualshareholdermeeting.com/GIK2021SM and have available the 16-digit control number included in your Notice, on your proxy card or on the instructions that accompanied your proxy materials.

**Voting Power and Record Date**

Only Company stockholders of record at the close of business on March 15, 2021, the record date for the Special Meeting, will be entitled to vote at the Special Meeting. You are entitled to one vote for each share of Common Stock that you owned as of the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker, bank or other nominee to ensure that votes related to the shares you beneficially own are properly counted. On the record date, there were 25,893,479 shares of Common Stock outstanding and entitled to vote, of which 20,000,000 are public shares and 5,893,479 are Initial Stockholder Shares and Insider Shares held by our Initial Stockholders.

**Tax Consequences of the Business Combination**

For a description of the material U.S. federal income tax consequences of the Business Combination, please see the information set forth in the section entitled "*Proposal No. 1 – Approval of the Business Combination—Certain U.S. Federal Income Tax Considerations*".

Table of Contents

**Accounting Treatment**

The Business Combination will be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, the Company will be treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the Business Combination will be treated as the equivalent of Lightning Systems issuing stock for the net assets of the Company, accompanied by a recapitalization whereby no goodwill or other intangible assets are recorded.

**Appraisal Rights**

Appraisal rights are not available to holders of shares of our Common Stock or Lightning Systems Common Stock in connection with the Business Combination.

Pursuant to Section 262 of the DGCL, Lightning Systems stockholders who comply with the applicable requirements of Section 262 of the DGCL and do not otherwise fail to perfect, waive withdraw or lose the right to appraisal under Delaware law have the right to seek appraisal of the fair value of their shares of Lightning Systems Capital Stock, as determined by the Court of Chancery, if the Merger is completed. The "fair value" of such shares of Lightning Systems Capital Stock as determine by the Court of Chancery may be more or less than, or the same as, the value of the consideration that such stockholder would otherwise be entitled to receive under the Business Combination Agreement. Lightning Systems stockholders who do not vote in favor of the Merger nor consent in writing to it and who wish to preserve their appraisal rights must so advise Lightning Systems by submitting a demand for appraisal within the period prescribed by Section 262 of the DGCL after receiving a notice from Lightning Systems or the Company that appraisal rights are available to them, and must otherwise precisely follow the procedures prescribed by Section 262 of the DGCL. Failure to follow any of the statutory procedures set forth in Section 262 of the DGCL will result in the loss or waiver of appraisal rights under Delaware law. In view of the complexity of Section 262 of the DGCL, Lightning Systems stockholders who may wish to pursue appraisal rights should consult their legal and financial advisors. Any shares of Lightning Capital Stock that are outstanding immediately prior to the Effective Time and that are held by stockholders of the Company who shall have neither voted in favor of the Merger nor consented thereto in writing and who shall have demanded properly in writing appraisal for such Lightning Systems Capital Stock in accordance with Section 262 of the DGCL and otherwise complied with all of the provisions of the DGCL relevant to the exercise and perfection of dissenters' rights are referred to as "*Dissenting Shares*".

Please see the sections entitled "*Special Meeting of Company Stockholders - Appraisal Rights*," "*Proposal No. 1 – Approval of the Business Combination—Appraisal Rights*" and "*Appraisal Rights*".

**Proxy Solicitation**

Proxies may be solicited by mail. The Company has engaged MacKenzie to assist in the solicitation of proxies.

If a stockholder grants a proxy, it may still vote its shares in person if it revokes its proxy before the Special Meeting. A stockholder may also change its vote by submitting a later-dated proxy, as described in the section entitled "*Special Meeting of Company Stockholders—Revoking Your Proxy*."

**Interests of Certain Persons in the Business Combination**

In considering the recommendation of our Board to vote in favor of the Business Combination, stockholders should be aware that aside from their interests as stockholders, our Sponsor and certain members of our Board and officers have interests in the Business Combination that are different from, or in addition to, those of other stockholders generally. Our Board was aware of and considered these interests, among other matters, in

38

Table of Contents

evaluating and negotiating the Business Combination, and in recommending to stockholders that they approve the Business Combination. Stockholders should take these interests into account in deciding whether to approve the Business Combination.

These interests include, among other things:

- the fact that our Initial Stockholders have agreed not to redeem any of the Initial Stockholder Shares in connection with a stockholder vote to approve the Business Combination;

- the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Initial Stockholder Shares if we fail to complete an initial business combination by the applicable deadline;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party (other than our independent public accountants) for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that Neil Miotto and Drs. Avi Katz and Raluca Dinu will continue as members of the New Lightning eMotors Board, and each shall be entitled to receive compensation for serving on such board; and

- the fact that our Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the applicable deadline. Prior to GigCapital3's initial public offering, the Sponsor purchased 5,735,000 Initial Stockholder Shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share (as compared to the $10.00 per share price being used to determine the number of shares of Common Stock being issued to the Lightning Systems equity holders in the Business Combination or at which the PIPE Investors have agreed to purchase Common Stock). However, 750,000 shares of Common Stock issued to the Sponsor were forfeited due to the over-allotment option not being exercised by the Underwriters. Additionally, the Sponsor purchased 650,000 private placement units simultaneously with the consummation of GigCapital3's initial public offering for an aggregate purchase price of $6.5 million. Certain of GigCapital3's directors and executive officers, including Dr. Avi Katz, Dr. Raluca Dinu, Neil Miotto, John Mikulsky, Peter Wang, Andrea Betti-Berutto and Brad Weightman, also have a direct or indirect economic interest in such private placement units and in the 5,635,000 Initial Stockholder Shares owned by the Sponsor. The 5,635,000 Initial Stockholder Shares owned by the Sponsor would have had an aggregate market value of $63.1 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The 650,000 private placement units held by the Sponsor would have had an aggregate market value of $8.8 million based upon the closing price of $13.59 per public unit on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The Sponsor does not hold any warrants independent of what is included in the private placement units. While the private placement units have a trading price and value as set forth above, the private placement units will be, upon completion of the Business Combination, broken into their constituent components of stock and warrants, and each of those separately trade and the value of each of those is $11.19 per public share and $3.05 per public

39

Table of Contents

warrant. Additionally, the Sponsor, officers and directors do not currently have any unreimbursed out-of-pocket expenses in connection with the business combination. Upon completion of the Business Combination, the former Lightning Systems equity holders will own 53,922,000 shares of our Common Stock. The shares owned by the former Lightning Systems equity holders would have had an aggregate market value of $603.4 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus.

**Reasons for the Approval of the Business Combination**

In approving the Business Combination Agreement and the Business Combination and recommending that the Company's stockholders approve the Business Combination Agreement and the Business Combination, the Board considered the following positive factors which are based upon our due diligence, although not weighted or in any order of significance:

•   Consideration of the following general criteria and guidelines that we stated in the prospectus for our IPO that we believe would believe would be important in evaluating prospective target businesses, although we indicated that we may enter into a business combination with a target business that does not meet these criteria and guidelines:

  •   *Companies that embrace today's digital transformation and experience.*
  •   *Companies that will benefit from a public listing.*
  •   *Companies that will benefit from our industry expertise and relationships.*
  •   *Companies that are market-leading participants.*
  •   *Companies that are small and mid-size businesses.*
  •   *Companies with strong management.*

•   The following additional factors:

  •   *Lightning Systems' Capital Light and Cost Effective Business Model.*
  •   *Lightning Systems' Competitive Advantages In Cost of Ownership and Fueling Infrastructure.*
  •   *Lightning Systems' Competitive Advantages in Vehicle Performance.*
  •   *Strong Customer Demand.*
  •   *Available Infrastructure.*
  •   *Terms of the Business Combination Agreement.*

The criteria and situations described above were not intended to be exhaustive and we indicated our evaluation of any particular initial business combination might reflect other considerations, factors and criteria deemed relevant by our management in effecting the relevant transaction, consistent with our business objective and strategy.

For more information about our decision-making process, please see the section entitled "*Proposal No. 1 - Approval of the Business Combination - The Company's Board of Directors' Reasons for the Approval of the Business Combination*"

**Conditions to Closing of the Business Combination**

*Conditions to Each Party's Obligations*

The respective obligations of the Company and Lightning Systems to complete the Business Combination are subject to the satisfaction of the following conditions:

•   the applicable waiting period(s) under the HSR Act and, if required, any other applicable antitrust law in respect of the transactions contemplated by the Business Combination Agreement must have expired or been terminated;

40

Table of Contents

- there must not be in effect any governmental order, statute, rule or regulation enjoining or prohibiting the consummation of the transactions contemplated by the Business Combination Agreement;

- the redemption offer in relation to the public shares must have been completed in accordance with the terms of the Business Combination Agreement and this proxy statement/prospectus;

- the approval by the Company stockholders of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal shall have been obtained;

- the Company Common Stock to be issued in connection with the Business Combination (including the Common Stock to be issued pursuant to payment of the Stockholder Earnout Shares) must have been approved for listing on the NYSE, subject only to official notice of issuance thereof; and

- the approval of the Business Combination Agreement and the transactions contemplated by the Business Combination Agreement by the requisite vote of the Lightning Systems stockholders, as more fully described in "*Proposal No. 1 - Approval of the Business Combination - The Business Combination Agreement - Conditions to Closing of the Business Combination Agreement*" on page 126.

*Conditions to the Company's Obligations*

The obligation of the Company to complete the Business Combination is also subject to the satisfaction, or waiver by the Company, of the following conditions:

- the accuracy of the representations and warranties of Lightning Systems as of the date of the Business Combination Agreement and as of the Closing, subject to certain materiality and material adverse effect thresholds, as more fully described in "*Proposal No. 1 - Approval of the Business Combination - The Business Combination Agreement - Conditions to Closing of the Business Combination Agreement*" on page 126;

- each of the covenants of Lightning Systems to be performed or complied with as of or prior to the Closing must have been performed or complied with in all material respects;

- no material adverse effect must have occurred since the date of the Business Combination Agreement that is continuing;

- Lightning Systems must have delivered a certificate signed by an officer of Lightning Systems certifying that the three preceding conditions have been satisfied;

- the transactions contemplated by the PIPE Subscription Agreement must be consummated concurrently with the Closing;

- the transactions contemplated by the Convertible Note Subscription Agreements must be consummated concurrently with the Closing;

- certain specified individuals must have entered into employment agreements with the Company or Lightning Systems on terms and conditions reasonably satisfactory to the Company (but no less favorable to such employees than their current employment arrangements);

- certain specified contracts must have been terminated;

- Lightning Systems must have provided evidence reasonably satisfactory to the Company that a valid exemption from the registration requirement under the Securities Act is available for the delivery of the shares of Company Common Stock to the Lightning Systems equity holders pursuant to the Business Combination Agreement; and

- Lightning Systems must have provided evidence reasonably satisfactory to the Company that each holder of Lightning Systems Capital Stock that is a party to the IRA (as defined in the Business

41

Table of Contents

Combination Agreement) is bound by a customary "lockup" restricting the transfer, sale and conveyance of the shares of Company Common Stock to be issued in connection with the Business Combination Agreement for a period of six months following the Closing, all in a form reasonably acceptable to the Company.

*Conditions to Lightning Systems' Obligations*

The obligation of Lightning Systems to complete the merger is also subject to the satisfaction, or waiver by Lightning Systems, of the following conditions:

- the accuracy of the representations and warranties of the Company as of the date of the Business Combination Agreement and as of the Closing, subject to certain materiality and material adverse effect thresholds, as more fully described in "*Proposal No. 1 - Approval of the Business Combination - The Business Combination Agreement - Conditions to Closing of the Business Combination Agreement*" on page 126;

- each of the covenants of the Company to be performed or complied with as of or prior to the Closing must have been performed or complied with in all material respects;

- the Company must have delivered a certificate signed by an officer of the Company, dated as of the Closing, certifying that, to the knowledge and belief of such officer, the two preceding conditions have been fulfilled;

- the existing certificate of incorporation of the Company must be amended and restated to reflect the form attached to this proxy as *Annex B*; and

- The Company must have delivered to Lightning Systems evidence that, immediately after the Closing (and for the avoidance of doubt, without deducting or taking into account any liabilities, expenses or other deductions, including the Company Redemption Amount (as defined in the Business Combination Agreement), any transaction expenses of Lightning Systems or the Company or any other payable or deductions that is expected to occur at or after the Closing), the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, will be no less than an aggregate amount of $150.0 million.

**Regulatory Matters**

Under the HSR Act and the rules that have been promulgated thereunder by the U.S. Federal Trade Commission ("*FTC*"), certain transactions may not be consummated unless information has been furnished to the Antitrust Division of the Department of Justice ("*Antitrust Division*") and the FTC and certain waiting period requirements have been satisfied. The Business Combination is subject to these requirements and may not be completed until the expiration of a 30-day waiting period following the filing of the required Notification and Report Forms with the Antitrust Division and the FTC or until early termination is granted. If the FTC or the Antitrust Division makes a request for additional information or documentary material related to the Business Combination (a "*Second Request*"), the waiting period with respect to the Business Combination will be extended for an additional period of 30 calendar days, which will begin on the date on which the Company and Lightning Systems each certify compliance with the Second Request. Complying with a Second Request can take a significant period of time. On February 3, 2021, the Company and Lightning Systems filed the required forms under the HSR Act with the Antitrust Division and the FTC. The 30-day waiting period with respect to the Business Combination, which cannot expire on a Saturday, Sunday or a U.S. federal holiday, is expected to expire at 11:59 p.m. Eastern time on March 5, 2021 unless the FTC and the Antitrust Division earlier terminate the waiting period or issue a Second Request.

Table of Contents

At any time before or after consummation of the Business Combination, notwithstanding any termination of the waiting period under the HSR Act, the applicable competition authorities could take such action under applicable antitrust laws as each deems necessary or desirable in the public interest, including seeking to enjoin the consummation of the Business Combination. Private parties may also seek to take legal action under the antitrust laws under certain circumstances. We cannot assure you that the Antitrust Division, the FTC, any state attorney general, or any other government authority will not attempt to challenge the Business Combination on antitrust grounds, and, if such a challenge is made, we cannot assure you as to its result. Neither the Company nor Lightning Systems is aware of any material regulatory approvals or actions that are required for completion of the Business Combination other than the expiration or early termination of the waiting period under the HSR Act. It is presently contemplated that if any such additional regulatory approvals or actions are required, those approvals or actions will be sought. There can be no assurance, however, that any additional approvals or actions will be obtained.

**Quorum and Required Vote for Proposals for the Special Meeting**

A quorum of Company stockholders is necessary to hold a valid meeting. A quorum will be present at the Special Meeting if a majority of the Company's Common Stock outstanding and entitled to vote at the Special Meeting is represented in person or by proxy. Abstentions will count as present for the purposes of establishing a quorum.

The approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Incentive Plan Proposal, the Election of Directors Proposal and the Adjournment Proposal requires the affirmative vote of a majority of the votes cast by holders of our Common Stock represented in person or by proxy and entitled to vote at the Special Meeting. The approval of the Charter Amendment Proposals require the affirmative vote of holders of a majority of our outstanding shares of Common Stock entitled to vote thereon at the Special Meeting.

A failure to vote or an abstention will have no effect on the Business Combination Proposal and the Adjournment Proposal. However, an abstention or failure to vote will have the same effect as a vote "**AGAINST**" the Charter Amendment Proposals. In addition, for purposes of the NYSE Stock Issuance Proposal, the Incentive Plan Proposal and the Election of Directors Proposal, the NYSE considers an abstention vote as a "vote cast", and therefore, an abstention will have the same effect as a vote "**AGAINST**" such proposals, while a failure to vote will have no effect on these two proposals.

The proposals in this proxy statement/prospectus (other than the Adjournment Proposal) are conditioned on the approval of the Business Combination Proposal and the NYSE Stock Issuance Proposal.

It is important for you to note that in the event that the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal do not receive the requisite vote for approval, we will not consummate the Business Combination. If we do not consummate the Business Combination and fail to complete an initial business combination by the applicable deadline, we will be required to dissolve and liquidate our Trust Account by returning the then remaining funds in such account to our public stockholders.

**Recommendation to Company Stockholders**

Our Board believes that each of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Governance Proposal, the Forum Proposal, the Incentive Plan Proposal, the Election of Directors Proposal and the Adjournment Proposal to be presented at the Special Meeting is in the best interests of the Company and our stockholders and recommends that its stockholders vote "FOR" each of the proposals.

43

Table of Contents

When you consider the recommendation of our Board in favor of approval of the Business Combination Proposal, you should keep in mind that our Sponsor and certain members of our Board and officers have interests in the Business Combination that are different from or in addition to (or which may conflict with) your interests as a stockholder. Stockholders should take these interests into account in deciding whether to approve the proposals presented at the Special Meeting, including the Business Combination Proposal. Please see the section entitled "*Special Meeting of Company Stockholders - Recommendation to Company Stockholders.*"

**Risk Factors**

In evaluating the Business Combination and the proposals to be considered and voted on at the Special Meeting, you should carefully review and consider the risk factors set forth under the section entitled "*Risk Factors*" beginning on page 53 of this proxy statement/prospectus. The occurrence of one or more of the events or circumstances described in that section, alone or in combination with other events or circumstances, may have a material adverse effect on (i) the ability of the Company and Lightning Systems to complete the Business Combination, and (ii) the business, cash flows, financial condition and results of operations of Lightning Systems prior to the consummation of the Business Combination and New Lightning eMotors following consummation of the Business Combination.

44

Table of Contents

### SELECTED HISTORICAL FINANCIAL INFORMATION OF THE COMPANY

The following table contains summary historical financial data for the Company as of December 31, 2020 and for the period from February 3, 2020 (date of inception) through December 31, 2020. The information below is only a summary and should be read in conjunction with the sections entitled "*The Company's Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Information About the Company Prior to the Business Combination*" and in our financial statements, and the notes and schedules related thereto, which are included elsewhere in this proxy statement/prospectus.

|  | As of December 31, 2020 |
|---|---|
| *($ in thousand)* | |
| **Balance Sheet Data:** | |
| Working capital | $ (576) |
| Cash and cash equivalents | $ 1,170 |
| Cash and marketable securities held in Trust Account | $ 202,029 |
| Total assets | $ 203,394 |
| Total liabilities | $ 9,896 |
| Common stock subject to possible redemption | $ 188,498 |
| Stockholders' equity | $ 5,000 |

|  | Period from February 3, 2020 (Date of Inception) through December 31, 2020 |
|---|---|
| *($ in thousands, except share and per share amounts)* | |
| **Statement of Operations Data:** | |
| Revenue | $ — |
| Loss from operations | $ (2,760) |
| Interest income | $ 44 |
| Net loss | $ (2,729) |
| Basic and diluted net loss per share | $ (0.44) |
| Weighted average shares outstanding excluding shares subject to possible redemption—basic and diluted | 6,247,527 |

45

Table of Contents

**SELECTED HISTORICAL FINANCIAL AND OTHER INFORMATION OF LIGHTNING SYSTEMS**

The following tables show selected historical financial information of Lightning Systems for the periods and as of the dates indicated. This information was derived from the audited financial statements of Lightning Systems for the years ended December 31, 2020 and December 31, 2019. The information below is only a summary and should be read in conjunction with the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations of Lightning Systems" as well as Lightning Systems' historical financial statements and the notes and schedules related thereto, included elsewhere in this proxy statement.

|  | Year Ended December 31, | |
|---|---|---|
| (*$ in thousands, except share and per share amounts*) | 2020 | 2019 |
| **Statements of Operations Data:** | | |
| Revenue | $ 9,088 | $ 3,164 |
| Cost of revenue | 11,087 | 4,233 |
| Gross loss | (1,999) | (1,069) |
| Operating expenses | | |
| Research and development | 1,309 | 975 |
| Selling, general, and administrative | 10,451 | 7,121 |
| Total operating expenses | 11,760 | 8,096 |
| Loss from operations | (13,759) | (9,165) |
| Other expenses | | |
| Inducement expenses | — | 309 |
| Interest expenses | 2,983 | 575 |
| Loss (gain) from change in fair value of warrant liabilities | 20,835 | (119) |
| Other expense, net | 76 | (240) |
| Total other expenses | 15,712 | 525 |
| Net loss | $ (37,653) | $ (9,690) |
| Net loss per share | $ (11.18) | $ (3.78) |
| Weighted average shares outstanding —basic and diluted | 3,671,569 | 3,254,478 |

|  | As of December 31, 2020 | As of December 31, 2019 |
|---|---|---|
| (*$ in thousands*) | | |
| **Balance Sheet Data:** | | |
| Working capital | $ (28,322) | $ 2,696 |
| Cash and cash equivalents | $ 460 | $ 1,297 |
| Total assets | $ 24,865 | $ 9,778 |
| Total liabilities | $ 51,560 | $ 9,408 |
| Redeemable convertible preferred stock | $ 43,272 | $ 37,982 |
| Shareholders' deficit | $ (69,967) | $ (37,612) |

46

Table of Contents

**SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

*Defined terms included below have the same meaning as terms defined and included elsewhere in this proxy statement/prospectus.*

The following unaudited pro forma condensed combined financial statements give effect to the Business Combination as described in the section entitled "*Proposal No. 1—Approval of the Business Combination*" under the acquisition method of accounting in accordance with Financial Accounting Standards Board ("*FASB*") Accounting Standard Codification ("*ASC*") Topic 805, *Business Combinations* ("*ASC 805*"). Operations prior to the Business Combination will be presented in future financial reports as those of Lightning Systems. The Business Combination will be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, the Company will be treated as the "acquired" company for financial reporting purposes. For accounting purposes, Lightning Systems will be deemed to be the accounting acquirer in the transaction and, consequently, the transaction will be treated as a recapitalization of Lightning Systems (*i.e*., a capital transaction involving the issuance of stock by the Company for the stock of Lightning Systems). Accordingly, the assets, liabilities and results of operations of Lightning Systems will become the historical financial statements of New Lightning eMotors, and the Company's assets, liabilities and results of operations will be consolidated with Lightning Systems beginning on the acquisition date. The net assets of the Company will be recognized at historical cost (which is expected to be consistent with carrying value), with no goodwill or other intangible assets recorded.

Lightning Systems has been determined to be the accounting acquirer based on an evaluation of the following facts and circumstances:

- Lightning Systems' business will comprise the ongoing operations of the post-combination company immediately following the consummation of the Business Combination, which we refer to herein as "New Lightning eMotors";

- Lightning Systems' senior management will serve as senior management of New Lightning eMotors;

- Lightning Systems' existing stockholders will have the greatest voting interest in New Lightning eMotors and a majority interest under both the no redemption and maximum redemption scenarios (holding approximately 65.5% and 80.2% of the total shares outstanding of New Lightning eMotors under the no redemption and maximum redemption scenarios, respectively);

- Lightning Systems' existing directors and individuals designated by, or representing, Lightning Systems' existing stockholders will constitute at least three of the nine members of the initial New Lightning eMotors Board following the consummation of the Business Combination;

- Lightning Systems' existing stockholders will have the ability to control decisions regarding election and removal of directors from the New Lightning eMotors Board; and

- New Lightning eMotors will continue to operate under the Lightning Systems tradename and the headquarters of New Lightning eMotors will be Lightning Systems' existing headquarters.

Other factors were considered, including the purpose and intent of the Business Combination, noting that the preponderance of evidence as described above is indicative that Lightning Systems is the accounting acquirer in the Business Combination.

The historical financial information has been adjusted in these unaudited pro forma condensed combined financial statements to give effect to pro forma events that are (1) directly attributable to the Business Combination, (2) factually supportable and (3) with respect to the statements of operations, expected to have a continuing impact on New Lightning eMotors. The unaudited pro forma condensed combined balance sheet combines Lightning Systems' audited historical balance sheet as of December 31, 2020 and the audited balance sheet of the Company as of December 31, 2020 and has been prepared to reflect the Business Combination as if it occurred on December 31, 2020. The unaudited pro forma condensed combined statement of operations for the

47

Table of Contents

twelve months ended December 31, 2020 combines the audited historical results of operations of Lightning Systems for the twelve months ended December 31, 2020 and the audited historical results of operations of the Company for the period from February 3, 2020 (date of inception) through December 31, 2020. The unaudited pro forma condensed combined statement of operations for the twelve months ended December 31, 2020 gives pro forma effect to the Business Combination as if it occurred on January 1, 2020, the beginning of the fiscal year presented. Lightning Systems and the Company have not had any historical relationship prior to the Business Combination. Accordingly, no pro forma adjustments were required to eliminate activities between the companies.

The unaudited pro forma condensed combined statement of operations for the twelve months ended December 31, 2020 was derived from Lightning Systems' audited historical statement of operations for the twelve months ended December 31, 2020 and the Company's audited historical statement of operations for the period from February 3, 2020 (date of inception) through December 31, 2020, each of which is included elsewhere in this proxy statement/prospectus. Such unaudited financial information has been prepared on a basis consistent with the audited financial statements of Lightning Systems and the Company, respectively, and should be read in conjunction with the audited historical financial statements and related notes, which is included elsewhere in this proxy statement/prospectus. The unaudited pro forma condensed combined financial statements are for informational purposes only. They do not purport to indicate the results that would actually have been obtained had the Business Combination been completed on the assumed date or for the period presented, or which may be realized in the future. The pro forma adjustments are based on the information currently available and the assumptions and estimates underlying the pro forma adjustments are described in the accompanying notes. Actual results may differ materially from the assumptions within the accompanying unaudited pro forma condensed combined financial information. New Lightning eMotors will incur additional costs after the Business Combination in order to satisfy its obligations as an SEC-reporting public company. In addition, we anticipate the adoption of various stock compensation plans or programs (including the GigCapital3, Inc. 2021 Equity Incentive Plan) that are typical for employees, officers and directors of public companies. No adjustment to the unaudited pro forma statements of operations has been made for these items as the amounts are not yet known.

The unaudited pro forma condensed combined financial information should be read in conjunction with the accompanying notes and the sections entitled "*Lightning Systems' Management's Discussion and Analysis of Financial Condition and Results of Operations,*" "*The Company's Management's Discussion and Analysis of Financial Condition and Results of Operations*" and the historical financial statements and notes thereto of Lightning Systems and the Company, each of which is included elsewhere in this proxy statement/prospectus.

The unaudited pro forma condensed combined financial statements have been prepared using two different levels of assumed redemptions of Common Stock:

- **Assuming No Redemption**: This scenario assumes that no shares of Common Stock are redeemed; and

- **Assuming Maximum Redemption**: This scenario assumes that 15,050,267 shares of Common Stock are redeemed for an aggregate payment of approximately $152.0 million (based on the estimated per share redemption price of approximately $10.10 per share based on the fair value of marketable securities held in the Trust Account as of December 31, 2020 of approximately $202.0 million) from the Trust Account. The Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, being no less than an aggregate amount of $150.0 million. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. This scenario therefore gives effect to $50.0 million being retained in the Trust Account. This results in public share redemptions of 15,050,267 shares for aggregate redemption payments of $152.0 million.

48

Table of Contents

**SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**
**(in thousands except share and per share amounts)**

| | Historical | | Lightning Systems, Inc. Equivalent Pro Forma Per Share Data | | Combined Pro Forma | |
| --- | --- | --- | --- | --- | --- | --- |
| | GigCapital3, Inc | Lightning Systems, Inc. | Scenario 1 (Assuming No Additional Redemptions into Cash) | Scenario 2 (Assuming Maximum Redemptions into Cash) | Scenario 1 (Assuming No Additional Redemptions into Cash) | Scenario 2 (Assuming Maximum Redemptions into Cash) |
| **Selected Unaudited Pro Forma Condensed Combined Statement of Operations – Twelve Months ended December 31, 2020 and Period from February 3, 2020 (Date of Inception) through December 31, 2020** | | | | | | |
| Book value per Share (2) | $ 0.69 | $ (14.25) | $ 2.54 | $ 0.96 | $ 2.67 | $ 1.01 |
| Net loss available to common stockholders | $ (2,729) | $ (37,653) | | | $ (41,208) | $ (41,208) |
| Net loss per share available to common stockholders – basic and diluted (2) | $ (0.44) | $ (11.18) | $ (0.48) | $ (0.59) | $ (0.51) | $ (0.62) |
| Cash dividends per share (1) | $ — | $ — | $ — | $ — | NA | NA |
| Weighted average shares outstanding – basic and diluted | 6,247,527 | 3,671,569 | | | 81,347,698 | 66,297,431 |

(1)    No dividends have been paid by the Company or Lightning Systems.

(2)    The equivalent pro forma basic and diluted per share data for Lightning Systems is calculated by multiplying the combined pro forma per share data by the Exchange Ratio as set forth in the Business Combination Agreement calculated by dividing the shares issued to Lightning Systems in the Business Combination by the aggregate fully diluted number of shares of Lightning Systems immediately prior to the Business Combination.

49

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This proxy statement/prospectus contains forward-looking statements. Forward-looking statements provide the Company's current expectations or forecasts of future events. Forward-looking statements include statements about the Company's expectations, beliefs, plans, objectives, intentions, assumptions and other statements that are not historical facts. The words "anticipates," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predicts," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this proxy statement/prospectus include, but are not limited to, statements about the:

- benefits from the Business Combination;

- ability to complete an initial business combination, including the Business Combination;

- future financial performance following the Business Combination;

- success in retaining or recruiting, or changes required in, our officers, key employees or directors following an initial business combination;

- officers and directors allocating their time to other businesses and potentially having conflicts of interest with the Company's business or in approving our initial business combination, as a result of which they would then receive expense reimbursements;

- public securities' potential liquidity and trading;

- use of proceeds not held in the Trust Account or available to the Company from interest income on the Trust Account balance; and

- impact from the outcome of any known and unknown litigation.

Forward-looking statements in this proxy statement/prospectus include, but are not limited to, statements about Lightning Systems or New Lightning eMotors:

- the financial and business performance of New Lightning eMotors, including financial projections and business metrics and any underlying assumptions thereunder;

- changes in New Lightning eMotors' strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects and plans;

- New Lightning eMotors' product development timeline and expected start of production;

- the implementation, market acceptance and success of New Lightning eMotors' business model;

- New Lightning eMotors' ability to scale in a cost-effective manner;

- developments and projections relating to New Lightning eMotors' competitors and industry;

- the impact of health epidemics, including the COVID-19 pandemic, on Lightning Systems' business and the actions New Lightning eMotors may take in response thereto;

- New Lightning eMotors' expectations regarding its ability to obtain and maintain intellectual property protection and not infringe on the rights of others;

- expectations regarding the time during which we will be an emerging growth company under the JOBS Act;

- New Lightning eMotors' future capital requirements and sources and uses of cash;

- New Lightning eMotors' ability to obtain funding for its operations;

- New Lightning eMotors' business, expansion plans and opportunities; and

- the outcome of any known and unknown litigation and regulatory proceedings.

50

Table of Contents

These forward-looking statements are based on information available as of the date of this proxy statement/prospectus, and current expectations, forecasts and assumptions, and involve a number of risks and uncertainties. Accordingly, forward-looking statements should not be relied upon as representing our views as of any subsequent date, and we do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

In addition, statements that the Company or Lightning Systems "believes" and similar statements reflect such parties' beliefs and opinions on the relevant subject. These statements are based upon information available to such party as of the date of this proxy statement/prospectus, and while such party believes such information forms a reasonable basis for such statements, such information may be limited or incomplete, and these statements should not be read to indicate that either the Company or Lightning Systems has conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

You should not place undue reliance on these forward-looking statements in deciding how to grant your proxy or instruct how your vote should be cast or vote your shares on the proposals set forth in this proxy statement/prospectus. As a result of a number of known and unknown risks and uncertainties, our actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include:

- the occurrence of any event, change or other circumstances that could give rise to the termination of the Business Combination Agreement;

- the outcome of any legal proceedings that may be instituted against the Company, Lightning Systems or others following announcement of the Business Combination and the transactions contemplated in the Business Combination Agreement;

- the inability to complete the transactions contemplated by the Business Combination Agreement due to the failure to obtain approval of the stockholders of the Company or Lightning Systems or other conditions to closing in the Business Combination Agreement;

- the ability to obtain or maintain the listing of New Lightning eMotors Common Stock on the NYSE following the Business Combination;

- the risk that the proposed transaction disrupts current plans and operations as a result of the announcement and consummation of the Business Combination;

- the ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, the ability of the Company to grow and manage growth profitably, maintain relationships with customers, compete within its industry and retain its key employees;

- costs related to the proposed Business Combination;

- changes in applicable laws or regulations;

- the effect of the COVID-19 pandemic on New Lightning eMotors' business;

- the ability of New Lightning eMotors to execute its business model, including market acceptance of its planned products and services and achieving sufficient production volumes at acceptable quality levels and prices;

- New Lightning eMotors' ability to raise capital;

- the possibility that the Company or Lightning Systems may be adversely impacted by other economic, business, and/or competitive factors;

- future exchange and interest rates; and

51

**Table of Contents**

- other risks and uncertainties indicated in this proxy statement/prospectus, including those under "*Risk Factors*" in this proxy statement/prospectus, and other filings that have been made or will be made with the SEC by the Company.

52

Table of Contents

**RISK FACTORS**

*You should carefully review and consider the following risk factors and the other information contained in this proxy statement/prospectus, including the financial statements and notes to the financial statements included herein, in evaluating the Business Combination and the proposals to be voted on at the Special Meeting. The following risk factors that apply to the business and operations of New Lightning eMotors will also apply to the business and operations of New Lightning eMotors following the completion of the Business Combination. The occurrence of one or more of the events or circumstances described in these risk factors, alone or in combination with other events or circumstances, may adversely affect the ability to complete or realize the anticipated benefits of the Business Combination, and may harm the business, cash flows, financial condition and results of operations of New Lightning eMotors. These risk factors are not exhaustive and investors are encouraged to perform their own investigation with respect to the business, financial condition and prospects of New Lightning eMotors and New Lightning eMotors. You should carefully consider the following risk factors in addition to the other information included in this proxy statement/prospectus, including matters addressed in the section entitled "Cautionary Note Regarding Forward-Looking Statements." New Lightning eMotors may face additional risks and uncertainties that are not presently known to it, or that Lightning Systems currently deems immaterial, which may also impair New Lightning eMotors' business or financial condition. The following discussion should be read in conjunction with the financial statements and notes to the financial statements included herein. Additional risks, beyond those summarized below may apply to our activities or operations as currently conducted or as we may conduct them in the future or in the markets in which we operate or may in the future operate. Consistent with the foregoing, we are exposed to a variety of risks, including risks associated with:*

- *Our company as an early stage company with a history of losses, which expects to incur significant expenses and continuing losses for the foreseeable future;*

- *Our dependency upon commercial fleets' adoption of vehicles with electric powertrains;*

- *Increases in costs, disruption of supply or shortage of raw materials, which could harm our business;*

- *Substantial regulation and the potential for unfavorable changes to, or failure by us to comply with, these regulations, which could substantially harm our business and operating results;*

- *Developments and projections relating to our competitors and industry;*

- *The impact of health epidemics, including theCOVID-19 pandemic, on our business and the actions we may take in response thereto;*

- *The unavailability, reduction or elimination of government and economic incentives, which could have a material adverse effect on our business, prospects, financial condition and operating results;*

- *The possibility of our need to defend ourselves against patent or trademark infringement claims, which may be time-consuming and cause us to incur substantial costs;*

- *Concentration of ownership among our existing executive officers, directors and their respective affiliates, which may prevent new investors from influencing significant corporate decisions;*

- *The lack of assurance that the combined company's common stock will be approved for listing on NYSE or that the combined company will be able to comply with the continued listing standards of NYSE;*

- *If the Business Combination's benefits do not meet the expectations of investors or securities analysts, the potential for the market price of the Company's securities or, following the Closing, the combined company's securities, may decline;*

- *The risk that the proposed Business Combination disrupts current plans and operations of our business as a result of the announcement and consummation of the transactions described herein; and*

- *Following the consummation of the Business Combination, the combined company's significant increased expenses and administrative burdens as a public company, which could have an adverse effect on its business, financial condition and results of operations.*

53

Table of Contents

**Risks Related to Lightning Systems' Business and Industry**

*Unless the content otherwise requires, all references in this section to "we," "us," or "our" refer to Lightning Systems, Inc. ("Lightning Systems") and its subsidiaries prior to the consummation of the Business Combination.*

***We are an early stage company with a history of losses, and expect to incur significant expenses and continuing losses for the foreseeable future.***

We incurred a net loss of $37.7 million for the year ended December 31, 2020 and have incurred net losses of approximately $80.8 million since our inception through December 31, 2020. We believe that we will continue to incur operating and net losses each quarter until at least the time we begin significant deliveries of our zero emission vehicles, or ZEVs, and electric powertrains, which is expected to occur over the next five years, but which may occur later. Even if we are able to successfully develop and sell our ZEVs and electric powertrains, there can be no assurance that they will be commercially successful. Our potential profitability is dependent upon the successful development and successful commercial introduction and acceptance of fleets of electric medium-duty vehicles, which may not occur.

We expect the rate at which we will incur losses to be significantly high in future periods as we:

- design, develop and manufacture our ZEVs and electric powertrains;

- build up inventories of parts and components for our ZEVs and electric powertrains;

- manufacture an available inventory of our ZEVs and electric powertrains;

- expand our design, development, maintenance and repair capabilities;

- increase our sales and marketing activities and develop our distribution infrastructure; and

- increase our general and administrative functions to support our growing operations.

Because we will incur the costs and expenses from these efforts before we receive any incremental revenues with respect thereto, our losses in future periods will be significant. In addition, we may find that these efforts are more expensive than we currently anticipate or that these efforts may not result in revenues, which would further increase our losses.

***Our financial results may vary significantly from period to period due to fluctuations in our operating costs and other factors.***

Our quarterly and annual operating results may fluctuate significantly, which makes it difficult for us to predict our future operating results. These fluctuations may occur due to a variety of factors, many of which are outside of our control, including:

- the pace at which we continue to design, develop and produce new products and increase production capacity;

- the number of customer orders in a given period;

- changes in manufacturing costs;

- the timing and cost of, and level of investment in, research and development relating to our technologies and our current or future facilities;

- developments involving our competitors;

- changes in governmental regulations or applicable law;

- future accounting pronouncements or changes in our accounting policies; and

54

Table of Contents

- general market conditions and other factors, including factors unrelated to our operating performance or the operating performance of our competitors.

As a result of these factors, we believe that quarter-to-quarter comparisons of our financial results, especially in the short term, are not necessarily meaningful and that these comparisons cannot be relied upon as indicators of future performance. Moreover, our financial results may not meet expectations of equity research analysts, ratings agencies or investors, who may be focused only on quarterly financial results. If any of this occurs, the trading price of our Common Stock could fall substantially, either suddenly or over time.

***Our operating and financial results forecast relies in large part upon assumptions and analyses developed by our management. If these assumptions or analyses prove to be incorrect, our actual operating results may be materially different from our forecasted results.***

The projected financial and operating information appearing elsewhere in this proxy statement/prospectus reflect current estimates of future performance and incorporates certain financial and operational assumptions, including the level of demand for our ZEVs, the performance of our ZEVs, the utilization of the ZEV fleet, the useable vehicle life, vehicle downtime and related maintenance and repair costs. These assumptions are preliminary and there can be no assurance that the actual results upon which our assumptions are based will be in line with our expectations. In addition, whether actual operating and financial results and business developments will be consistent with our expectations and assumptions as reflected in our forecasts depends on a number of factors, many of which are outside of our control, including, but not limited to:

- whether we can obtain sufficient capital to sustain and grow our business;

- our ability to manage our growth;

- whether we can manage relationships with key suppliers and partners;

- the ability to obtain necessary regulatory approvals;

- the timing and costs of new and existing marketing and promotional efforts;

- competition, including from established and future competitors;

- our ability to retain existing key management, to integrate recent hires and to attract, retain and motivate qualified personnel;

- the overall strength and stability of domestic and international economies;

- regulatory, legislative and political changes; and

- consumer preferences and spending habits.

Unfavorable changes in any of these or other factors, most of which are beyond our control, could materially and adversely affect our business, results of operations and financial results.

***We may be unable to adequately control the costs associated with our operations.***

We will require significant capital to develop and grow our business, including developing and manufacturing our ZEVs and electric powertrains and building Lightning Systems' brand. We expect to incur significant expenses which will impact our profitability, including research and development expenses, raw material procurement costs, lease costs, sales and distribution expenses as we build Lightning Systems' brand and market our ZEVs and electric powertrains, and general and administrative expenses as we scale our operations. In addition, we may incur significant costs in connection with our services. Our ability to become profitable in the future will not only depend on our ability to successfully market our ZEVs and electric powertrains and other products and services, but also to control our costs. If we are unable to cost efficiently design, manufacture, market, sell, distribute and service our electric powertrains and services, our margins, profitability and prospects would be materially and adversely affected.

55

Table of Contents

***If any of our suppliers become economically distressed or go bankrupt, we may be required to provide substantial financial support or take other measures to ensure supplies of components or materials, which could increase our costs, affect our liquidity or cause production disruptions, remain available.***

We expect to purchase various types of equipment, raw materials and manufactured component parts from our suppliers. If these suppliers experience substantial financial difficulties, cease operations, or otherwise face business disruptions, we may be required to provide substantial financial support to ensure supply continuity or take other measures to ensure components and materials remain available. Any disruption could affects our ability to deliver vehicles and could increase our costs and negatively affect our liquidity and financial performance.

***We have been, and may in the future be, adversely affected by the global COVID-19 pandemic, the duration and economic, governmental and social impact of which is difficult to predict, which may significantly harm our business, prospects, financial condition and operating results.***

The World Health Organization has declared the COVID-19 outbreak a pandemic, and the virus continues to spread in areas where we operate and sell our products and services. The COVID-19 pandemic and similar issues in the future could have a material adverse effect on our ability to operate, results of operations, financial condition, liquidity, and capital investments. Numerous government regulations and public advisories, as well as shifting social behaviors, have temporarily limited or closed non-essential transportation, government functions, business activities and person-to-person interactions, and the duration of such trends is difficult to predict. Reduced operations and production line shutdowns at commercial vehicle OEMs due to the COVID-19 pandemic, limitations on travel by our personnel and personnel of our customers and increased demand for medium-duty commercial trucks within our customers' fleets caused some customers to delay the planned installation of our powertrain system on their trucks, and future delays or shutdowns of medium-duty commercial vehicle OEMs or our suppliers could impact our ability to meet customer orders. We also instituted certain temporary cost reduction measures such as reducing or deferring discretionary spending. Specifically, difficult macroeconomic conditions, such as decreases in per capita income and level of disposable income, increased and prolonged unemployment or a decline in consumer confidence as a result of the COVID-19 pandemic, as well as reduced spending by businesses, could have a material adverse effect on the demand for ZEVs. Under difficult economic conditions, potential customers may seek to reduce spending by foregoing ZEVs for other traditional options. Decreased demand for ZEVs, particularly in the United States, could negatively affect our business.

The specific timing and pace of our resumption of normal operations will depend on the status of various government regulations and the readiness of our suppliers, vendors and workforce. Although we are working to resume meetings with potential customers, it ultimately remains uncertain how we may be impacted should the COVID-19 pandemic concerns increase in the future.

Our operations and timelines may also be affected by global economic markets and levels of consumer comfort and spend, which could impact demand in the worldwide transportation industries. Because the impact of current conditions on an ongoing basis is yet largely unknown, is rapidly evolving and has been varied across geographic regions, this ongoing assessment will be particularly critical to allow us to accurately project demand and infrastructure requirements globally and deploy our workforce and other resources accordingly. If current global market conditions continue or worsen, or if we cannot or do not resume reduced operations at a rate commensurate with such conditions or resumes full operational capacity and we are later required to or choose to reduce such operations again, our business, prospects, financial condition and operating results could be materially harmed.

Additionally, there are no comparable recent events which may provide guidance as to the effect of the spread of the COVID-19 pandemic, and, as a result, the ultimate impact of the COVID-19 pandemic or a similar health epidemic is highly uncertain and subject to change. We do not yet know the full extent of COVID-19's impact on our business, operations, or the global economy as a whole. However, the effects could have a material impact on our results of operations, and we will continue to monitor the situation closely.

56

Table of Contents

***Our business model has yet to be tested and any failure to commercialize our strategic plans would have a material adverse effect on our operating results and business, harm our reputation and could result in substantial liabilities that exceed our resources.***

Investors should be aware of the difficulties normally encountered by a new enterprise, many of which are beyond our control, including substantial risks and expenses in the course of establishing or entering new markets, organizing operations and undertaking marketing activities. The likelihood of our success must be considered in light of these risks, expenses, complications, delays and the competitive environment in which we operate. Therefore, there is nothing at this time upon which to base an assumption that our business plan will prove successful, and we may not be able to generate significant revenue, raise additional capital or operate profitably. We will continue to encounter risks and difficulties frequently experienced by early commercial stage companies, including scaling up our infrastructure and headcount, and may encounter unforeseen expenses, difficulties or delays in connection with our growth. In addition, as a result of the capital-intensive nature of our business, we can be expected to continue to sustain substantial operating expenses without generating sufficient revenues to cover expenditures. Any investment in our company is therefore highly speculative and could result in the loss of your entire investment.

***Our limited operating history makes evaluating our business and future prospects difficult and may increase the risk of your investment.***

You must consider the risks and difficulties we face as an early stage company with a limited operating history. If we do not successfully address these risks, our business, prospects, operating results and financial condition will be materially and adversely harmed. We have a very limited operating history on which investors can base an evaluation of our business, operating results and prospects. We intend to derive substantially all of our revenues from the sale of ZEVs and electric powertrains, which are still in the early stages of development. There are no assurances that we will be able to secure future business with the major trucking companies or bus companies, including city transit companies.

It is difficult to predict our future revenues and appropriately budget for our expenses, and we have limited insight into trends that may emerge and affect our business. In the event that actual results differ from our estimates or we adjust our estimates in future periods, our operating results and financial position could be materially affected. The projected financial information appearing elsewhere in this proxy statement/prospectus/information statement has prepared by management and reflects current estimates of future performance. The projected results depend on the successful implementation of management's growth strategies and are based on assumptions and events over which we have only partial or no control. The assumptions underlying such projected information require the exercise of judgement and may not occur, and the projections are subject to uncertainty due to the effects of economic, business, competitive, regulatory, legislative, and political or other changes.

***Our business plans require a significant amount of capital. We expect to need to raise additional funds and these funds may not be available to us when we need them. If we cannot raise additional funds when we need them, our operations and prospects could be negatively affected.***

The design, manufacture, sale and servicing of our ZEVs and electric powertrains is capital-intensive. In the near term following the Closing, Lightning Systems' capital will be deployed for the projected operating expenses to execute on Lightning Systems' business plan, to provide necessary working capital for accounts receivable and inventory, to finance Lightning Systems' anticipated capital expenditures to expand the manufacturing capacity to meet revenue forecasts and to fund Lightning Systems' EV-as-a-Service and Energy-as-a-Service initiatives. Beyond 12 to 18 months, Lightning Systems will need to raise additional capital to scale its manufacturing. In addition, Lightning Systems may raise capital earlier on an opportunistic basis. These additional funds may be raised through the issuance of equity, equity related or debt securities, or through obtaining credit from government or financial institutions. Additional capital will be necessary in the future to

57

Table of Contents

fund ongoing operations, continue research, development and design efforts and improve infrastructure. We cannot be certain that additional funds will be available to us on favorable terms when required, or at all. If we cannot raise additional funds when we need them, our financial condition, results of operations, business and prospects could be materially adversely affected.

Our ability to obtain the necessary financing to carry out our business plan is subject to a number of factors, including general market conditions and investor acceptance of our business model. These factors may make the timing, amount, terms and conditions of such financing unattractive or unavailable to us. If we are unable to raise sufficient funds, we will have to significantly reduce our spending, delay or cancel our planned activities or substantially change our corporate structure. We might not be able to obtain any funding, and it might not have sufficient resources to conduct its business as projected, both of which could mean that we would be forced to curtail or discontinue our operations.

In addition, our future capital needs and other business reasons could require us to sell additional equity or debt securities or obtain a credit facility. The sale of additional equity or equity-linked securities could dilute our stockholders. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict our operations or our ability to pay dividends to our stockholders.

If we cannot raise additional funds when we need or want them, our operations and prospects could be negatively affected.

***Lightning Systems relies on its Hybrid and Zero-Emission Truck and Bus Voucher Incentive Project ("HVIP") for a large portion of its revenues, and the failure to effectively execute the HVIP could have a material adverse impact on its business, financial condition and results of operations.***

Many customers of EVs utilize state and Federal incentive programs to offset the higher initial costs of electric vehicles. Lightning Systems' customers have historically leveraged the California Hybrid and Zero-Emission Truck and Bus Voucher Incentive Project ("HVIP") as well as Volkswagen Emissions Mitigation Trust Fund ("VW EMTF") funding that is allocated to each state to purchase Lightning Systems' vehicles and charging systems. The HVIP program represents the most commonly utilized of the subsidy programs to Lightning customers due to its ease of access and amount of funding per vehicle (approximately 35% of the cost of a Lightning electric vehicle). For the fiscal years ended December 31, 2019 and 2020, Lightning Systems derived approximately 29% and 30%, respectively, of its revenue from HVIP funding. Of the order backlog as of December 31, 2020, approximately 70% of the orders have contingencies for 2021 HVIP funding that have not yet been secured, representing approximately 45% of the 2021 revenue. In December 2020, California announced that it planned to allocate approximately $150M to the 2021 HVIP program. As of November 30, 2020, there were seven other active companies that, like Lightning, have certified vehicles that can be funded under the program. Although Lightning has successfully participated in the program for the last five years, and expects to have HVIP funding secured for its 2021 orders in Q1 2021, any material problem with the HVIP program for 2021 could have a material adverse impact on Lightning's business, financial condition and results of operations.

***Increased interest and potential competition in our market from traditional OEMs may reduce our market share and could negatively impact our business and prospects.***

Historically, large legacy OEMs have not been attracted to our market because it is comprised of multiple, specialized sub-TAMs, each of which does not have sufficient volume to support their high-capital manufacturing models. The return on investment in the medium-duty EV markets has not been sufficient for large legacy OEMs to justify the research and development and capital expenditures necessary to innovate and compete in our market. Additionally, traditional vocational OEMs have not entered the powertrain market, and we believe they do not currently have the engineering or manufacturing resources to enter such markets. However, given the anticipated increase in market demand for clean energy solutions and general

58

Table of Contents

decrease in the cost of manufacturing such solutions over time, we anticipate both large legacy OEMs and traditional vocational OEMs may transition into our market and become our direct competitors. If and when this occurs, the resulting increase in competition is likely to reduce our market share and could negatively impact our business and prospects.

***Our EVs make use of lithium-ion battery cells, which, if not appropriately managed and controlled, have occasionally been observed to catch fire or vent smoke and flames. If such events occur in our EVs, we could face liability associated with our warranty, for damage or injury, adverse publicity and a potential safety recall, any of which would adversely affect our business, prospects, financial condition and operating results***.

The battery packs in our EVs uselithium-ion cells, which have been used for years in laptop computers and cell phones. On occasion, if not appropriately managed and controlled, lithium-ion cells can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials. Highly publicized incidents of laptop computers and cell phones bursting into flames have focused consumer attention on the safety of these cells. These events also have raised questions about the suitability of these lithium-ion cells for automotive applications. There can be no assurance that a field failure of our battery packs will not occur, which would damage the vehicle or lead to personal injury or death and may subject us to lawsuits. Furthermore, there is some risk of electrocution if individuals who attempt to repair battery packs on our vehicles do not follow applicable maintenance and repair protocols. Any such damage or injury would likely lead to adverse publicity and potentially a safety recall. Any such adverse publicity could adversely affect our business, prospects, financial condition and operating results.

***There can be no assurance that we will be able to comply with the terms of our credit facilities.***

Our credit facilities require us to maintain compliance with certain financial and other covenants. Our ability to comply with these covenants is uncertain and will be affected by our results of operations and financial condition, and events or circumstances beyond our control. Absent a waiver or amendment, a breach of any of these covenants contained in our credit facilities could result in an event of default under these facilities. In October 2019, Lightning Systems entered into a term note and working capital facility (the "Facility") with a company represented on our Board. Under the Facility, Lightning Systems may borrow up to $24 million. Borrowings under the Facility, which were $6 million as of December 31, 2020, are secured by substantially all of Lightning Systems' assets, are subject to borrowing base limitations, and require Lightning Systems to meet certain covenants. Due to a change in accounting policies in connection with our annual financial statements for the year ended December 31, 2019, there is uncertainty as to our ability to remain in compliance with certain of the financial covenants and ratios under the Facility. If we violate these financial covenants and ratios, or any other covenant in our credit facilities, our indebtedness may become immediately due and payable, the interest rates under our credit facilities may increase and the lenders' commitment, if any, to make further loans to us may terminate. In the event that some or all of the amounts outstanding under our credit facilities are accelerated and become immediately due and payable, we may not have the funds to repay, or the ability to refinance, such outstanding amounts and our lenders could foreclose upon critical assets. Any of these outcomes would have an adverse effect on our business and financial condition.

In addition, the Facility contains reporting covenants that require delivery of audited financial statements and related reports and certificates on or before certain deadlines provided for in our credit facilities. Failure to comply with these covenants would constitute a default under our credit facilities. On December 22, 2020, we entered into a waiver with each of our lenders to waive any potential default arising from the failure to deliver audited financial statements and related reports and certificates by the applicable deadlines, and with respect to compliance with financial ratios for the fiscal quarters beginning on or after October 1, 2019 and the years ended December 31, 2019 and December 31, 2020. These waivers were effective immediately, subject to the conditions set forth in the waivers. Although we have entered into these waivers, there is no guarantee that our lenders will agree to waive events of default or potential events of default in the future. Failure to obtain such waivers in the future would have an adverse effect on our business and financial condition.

59

Table of Contents

***Lightning Systems and its independent registered public accounting firm have identified material weaknesses in its internal control over financial reporting. If Lightning Systems is unable to remedy these material weaknesses, or if Lightning Systems fails to establish and maintain effective internal controls, Lightning Systems may be unable to produce timely and accurate financial statements, and Lightning Systems may conclude that its internal control over financial reporting is not effective, which could adversely impact its investors' confidence and New Lightning eMotors' stock price.***

In connection with the audit of its financial statements for the year ended December 31, 2020, Lightning Systems and its independent registered public accounting firm identified material weaknesses in its internal control over financial reporting. Specifically, Lightning Systems found that it did not have in place an effective control environment with formal processes and procedures to allow for a detailed review of accounting transactions that would identify errors in a timely manner. In addition, due to its small size, Lightning Systems did not have proper segregation of duties in certain areas of the financial reporting process, including but not limited to cash receipts and disbursements, journal entry processing and IT general controls, and did not maintain sufficient personnel with an appropriate level of technical accounting knowledge, experience, and training in the application of U.S. GAAP commensurate with Lightning Systems' complexity and financial accounting and reporting requirements.

Lightning Systems has begun implementing and is continuing to implement measures designed to improve its internal control over financial reporting to remediate these material weaknesses, including retaining an outside accounting contractor in 2020 and conducting an extensive search and hiring a new Chief Financial Officer in early 2021.

If Lightning Systems is unable to successfully remediate its existing or any future material weaknesses in its internal control over financial reporting, or if Lightning Systems identifies any additional material weaknesses, the accuracy and timing of its financial reporting may be adversely affected, Lightning Systems may be unable to maintain compliance with securities law requirements regarding timely filing of periodic reports in addition to applicable NYSE listing requirements, investors may lose confidence in its financial reporting, and New Lightning eMotors' stock price may decline as a result. Lightning Systems also could become subject to investigations by the NYSE, the SEC or other regulatory authorities.

***Lightning Systems has a history of operating losses and has received a going concern opinion from its auditors.***

Lightning Systems has incurred substantial net losses since its inception and may continue to incur losses for the foreseeable future, as it continues its product development activities. Through December 31, 2020, Lightning Systems has accumulated a total deficit of $80.8 million. Additionally, Lightning Systems has received a "going concern" opinion from its independent registered public accounting firm. The Company expects that it will continue to incur operating and net losses until at least the time we begin significant deliveries of ZEVs and electric powertrains, which is expected to offer over the next five years, but which may occur later. As a result of these and other factors, Lightning Systems management has determined there is substantial doubt about Lightning Systems' ability to continue as a going concern. Lightning Systems' ability to continue as a going concern is dependent upon its ability to implement its business plan and raise additional capital, including in connection with the Business Combination, the PIPE Investment and the Convertible Notes Investment. If Lightning Systems is unable to achieve or sustain profitability or to secure additional financing on acceptable terms, it may not be able to meet its obligations as they come due, raising substantial doubts as to its ability to continue as a going concern. Any such inability to continue as a going concern may result in New Lightning eMotors common stockholders losing their entire investment. There is no guarantee that New Lightning eMotors will become profitable or secure additional financing on acceptable terms. Lightning Systems financial statements contemplate that it will continue as a going concern and do not contain any adjustments that might result if it were unable to continue as a going concern. Changes in Lightning Systems' operating plans, its existing and anticipated working capital needs, the acceleration or modification of its expansion plans, increased

60

expenses, potential acquisitions or other events will all affect Lightning Systems' and New Lightning eMotors' ability to continue as a going concern.

***The performance characteristics of our electrified powertrain solutions, including fuel economy and emissions levels, may vary, including due to factors outside of our control.***

The performance characteristics of our electrified powertrain solutions, including fuel economy and emissions levels, may vary, including due to factors outside of our control. Our electrified powertrain solutions are still being designed and developed, and there are no assurances that they will be able to meet their projected performance characteristics, including fuel economy and emissions levels. External factors may also impact the performance characteristics of our electrified powertrain solutions. For instance, the estimated fuel savings and fuel economy of vehicles installed with our electrified powertrain solutions may vary depending on factors including, but not limited to, driver behavior, speed, terrain, hardware efficiency, payload, vehicle and weather conditions. Additionally, greenhouse gas, GHG, emissions of vehicles installed with our electrified powertrain solutions may vary due to external factors, including the type of fuel, driver behavior, the efficiency and certification of the engine, where the engine is being operated and the characteristics of the vehicle itself, including but not limited to the vehicle's software controls, drivetrain efficiency, aerodynamics and rolling resistance. These external factors as well as any operation of our electrified powertrain solutions other than as intended, may result in emissions levels that are greater than we expect. Additionally, the amount of GHG emissions of both the ZEVs and electric powertrains will vary due to, but not limited to, the factors mentioned above. Due to these factors, there can be no guarantee that the operators of vehicles using our electrified powertrain solutions will realize the expected fuel savings and fuel economy and GHG emission reductions.

***If we fail to manage our growth effectively, including failing to attract and integrate qualified personnel, we may not be able to develop, produce, market and sell our electrified powertrain solutions successfully.***

Any failure to manage our growth effectively could materially and adversely affect our business, prospects, operating results and financial condition. We intend to expand our operations significantly. We expect our future expansion to include:

- expanding the management team;

- hiring and training new personnel;

- leveraging consultants to assist with company growth and development;

- forecasting production and revenue;

- controlling expenses and investments in anticipation of expanded operations;

- establishing or expanding design, production, sales and service facilities;

- implementing and enhancing administrative infrastructure, systems and processes; and

- expanding into international markets.

We intend to continue to hire a significant number of additional personnel, including software engineers, design and production personnel and service technicians for our electrified powertrain solutions. Because our electrified powertrain solutions are based on a different technology platform than traditional internal combustion engines, individuals with sufficient training in alternative fuel and electric vehicles may not be available to hire, and as a result, we will need to expend significant time and expense training any newly hired employees. Competition for individuals with experience designing, producing and servicing electrified vehicles and their software is intense, and we may not be able to attract, integrate, train, motivate or retain additional highly qualified personnel, particularly with respect to software engineers in the Austin, Texas area. The failure to attract, integrate, train, motivate and retain these additional employees could seriously harm our business, prospects, financial condition and operating results.

61

Table of Contents

***We, our outsourcing partners and our suppliers may rely on complex machinery for our production, which involves a significant degree of risk and uncertainty in terms of operational performance and costs.***

We, our outsourcing partners and our suppliers may rely on complex machinery, for the production, assembly and installation of our electrified powertrain solutions, which will involve a significant degree of uncertainty and risk in terms of operational performance and costs. Our production facilities and the facilities of our outsourcing partners and suppliers consist of large-scale machinery combining many components. These components may suffer unexpected malfunctions from time to time and will depend on repairs and spare parts to resume operations, which may not be available when needed. Unexpected malfunctions of these components may significantly affect the intended operational efficiency. Operational performance and costs can be difficult to predict and are often influenced by factors outside of our control, such as, but not limited to, scarcity of natural resources, environmental hazards and remediation, costs associated with decommissioning of machines, labor disputes and strikes, difficulty or delays in obtaining governmental permits, damages or defects in electronic systems, industrial accidents, fire, seismic activity and natural disasters. Should operational risks materialize, it may result in personal injury to or death of workers, the loss of production equipment, damage to production facilities, monetary losses, delays and unanticipated fluctuations in production, environmental damage, administrative fines, increased insurance costs and potential legal liabilities, all which could have a material adverse effect on our business, prospects, financial condition or operating results.

***We are dependent on our suppliers, some of which are single or limited source suppliers, and the inability of these suppliers to deliver the necessary components of our vehicles at prices and volumes, and specifications acceptable to us could have a material adverse effect on our business, prospects, financial condition and operating results.***

We rely on third-party suppliers for the provision and development of many of the key components and materials used in our electrified powertrain solutions, such as natural gas generators. While we plan to obtain components from multiple sources whenever possible, some of the components used in our vehicles will be purchased by us from a single source. Our third-party suppliers may not be able to meet their product specifications and performance characteristics or our desired specifications, performance and pricing, which would impact our ability to achieve our product specifications and performance characteristics as well. Additionally, our third-party suppliers may be unable to obtain required certifications for their products for which we plan to use or provide warranties that are necessary for our solutions. If we are unable to obtain components and materials used in our electrified powertrain solutions from our suppliers or if our suppliers decide to create or supply a competing product, our business could be adversely affected.

***Our future growth and success is dependent upon consumers' willingness to adopt electric and zero-emission vehicles and specifically our vehicles. We operate in the automotive industry, which is generally susceptible to cyclicality and volatility.***

Our growth is highly dependent upon the worldwide adoption by consumers of alternative fuel vehicles in general and ZEVs and electric vehicles in particular. Although we have successfully grown demand for our vehicles thus far, there is no guarantee of such future demand, or that our vehicles will not compete with one another in the market. Moreover, the target demographics for our vehicles, in particular the mass market demographic for medium-duty trucks, are highly competitive. If the market for electric vehicles in general and Lightning Systems' ZEVs in particular, does not develop as we expect, develops more slowly than we expect, or if demand for our vehicles decreases in our markets, our business, prospects, financial condition and operating results could be harmed.

62

Table of Contents

We are still at an earlier stage and have limited resources relative to our competitors. Moreover, the market for alternative fuel vehicles is rapidly evolving. As a result, the market for our vehicles could be affected by numerous factors, such as:

- perceptions about alternative fuel, hybrid and electric vehicle quality, safety, design, performance, reliability and cost, especially if adverse events or accidents occur that are linked to the quality or safety of alternative fuel, hybrid or electric vehicles;

- perceptions about vehicle safety in general, including the use of advanced technology, such as vehicle electronics, alternative fuel and regenerative braking systems;

- the decline of vehicle efficiency resulting from deterioration over time in the ability of the battery to hold a charge;

- changes or improvements in the fuel economy of internal combustion engines, the vehicle and the vehicle controls or competitors' electrified systems;

- the availability of service and associated costs for alternative fuel, hybrid or electric vehicles;

- perceptions about the limited range over which ZEV and electric vehicles may be driven on a single battery charge;

- competition, including from other types of alternative fuel vehicles,plug-in ZEV and electric vehicles and high fuel-economy internal combustion engine vehicles;

- volatility in the cost of energy, oil, gasoline, natural gas, hydrogen and renewable fuels could affect buying decisions, which could affect the carbon profile of our solutions;

- the availability of refueling stations, particularly compressed natural gas, or CNG, stations;

- government regulations and economic incentives promoting fuel efficiency and alternate forms of energy or mandating reductions in tailpipe emissions, including new regulations mandating zero tailpipe emissions compared to overall carbon reduction;

- the availability of tax and other governmental incentives to purchase and operate alternative fuel, hybrid and electric vehicles or future regulation requiring increased use of nonpolluting trucks;

- the availability of rebates provided by natural gas fueling stations and natural gas providers to offset the costs of natural gas and natural gas vehicles;

- the ability of Lightning System, fleets, utilities and others to purchase and take credit for renewable fuel and energy, such as fast electric charging infrastructure, through low carbon fuel standards, or LCFS, programs or similar programs that establish carbon intensity benchmarks for transportation fuels in approved states;

- the availability of tax and other governmental incentives to sell natural gas or deploy electric vehicle charging infrastructure;

- perceptions about and the actual cost of alternative fuel itself, as well as hybrid and electric vehicles;

- macroeconomic factors; and

- concerns about our future viability.

For example, the market price of oil has dropped since March 2020, and it is unknown to what extent any corresponding decreases in the cost of diesel fuel may impact the market for electric vehicles. Moreover, travel restrictions and social distancing efforts in response to the COVID-19 pandemic may negatively impact the commercial trucking industry, such as reduced consumer demand for products carried by the commercial trucking industry, for an unknown, but potentially lengthy, period of time. Additionally, we may become subject to regulations that may require us to alter the design of our electrified powertrain solutions, which could negatively impact customer interest in our products.

63

Table of Contents

In addition, sales of vehicles in the automotive industry tend to be cyclical in many markets, which may expose us to increased volatility, especially as we expand and adjust our operations and retail strategies. Specifically, it is uncertain as to how such macroeconomic factors will impact us as a company that has been experiencing growth and increasing market share in an industry that has globally been experiencing a recent decline in sales.

***We may fail to attract new customers in sufficient numbers or at sufficient rates or at all or to retain existing customers.***

We must continually add new customers both to replace departing customers and to expand our current customer base. We may not be able to attract new customers in sufficient numbers to do so. Even if we are able to attract new customers to replace departing customers, these new customers may not maintain the same level of commitment. In addition, we may incur marketing or other expenses, including referral fees, to attract new customers, which may further offset revenues from customers. For these and other reasons, we could experience a decline in revenue growth, which could adversely affect our results of operations.

If consumers do not perceive our product offerings to be of value or our ZEV offerings are not favorably received by them, we may not be able to attract and retain customers. If our efforts to satisfy and retain our existing customers are not successful, we may not be able to attract customers, and as a result, our ability to maintain and/or grow our business will be adversely affected. Customer retention will also be largely dependent on the quality and effectiveness of our customer service and operations, which may be handled internally by our personnel and also by third-party service providers. If we are unable to successfully compete with current and new competitors in both retaining existing customers and attracting new customers, our business will be adversely affected.

In addition, our results of operations could be adversely affected by declines in demand for our product offerings. Demand for our product offerings may be negatively affected by a number of factors, including geopolitical uncertainty, competition, cybersecurity incidents, decline in our reputation and saturation in the markets where we operate.

***If we are unable to establish and maintain confidence in our long-term business prospects among customers and analysts within our industry or we become subject to negative publicity, then our financial condition, operating results, business prospects and access to capital may suffer materially.***

Customers may be less likely to purchase our commercial ZEVs if they are not convinced that our business will succeed or that our service and support and other operations will continue in the long term. Similarly, suppliers and other third parties will be less likely to invest time and resources in developing business relationships with us if they are not convinced that our business will succeed. Accordingly, in order to build and maintain our business, we must maintain confidence among customers, suppliers, analysts, ratings agencies and other parties in our ZEVs, long-term financial viability and business prospects. Maintaining such confidence may be particularly complicated by certain factors including those that are largely outside of our control, such as our limited operating history, customer unfamiliarity with our ZEVs, any delays in scaling production, delivery and service operations to meet demand, competition and uncertainty regarding the future of hybrid electric and ZEVs, including our ZEVs and our production and sales performance compared with market expectations.

***If we fail to manage our future growth effectively, we may not be able to market and sell our ZEVs and electric powertrains successfully.***

Any failure to manage our growth effectively could materially and adversely affect our business, prospects, operating results and financial condition. We intend to expand our operations significantly. Our future expansion will include:

- training new personnel;

64

Table of Contents

- forecasting production and revenue;

- controlling expenses and investments in anticipation of expanded operations;

- establishing or expanding design, manufacturing, and sales; and

- implementing and enhancing administrative infrastructure, systems and processes.

We intend to continue to hire a significant number of additional personnel, including design and manufacturing personnel. Because our electric powertrains are based on a different technology platform than traditional powertrains, individuals with sufficient training in alternative fuel and electric vehicles may not be available to hire, and as a result, we will need to expend significant time and expense training the employees we do hire. Competition for individuals with experience designing and manufacturing electric powertrains is intense, and we may not be able to attract, integrate, train, motivate or retain additional highly qualified personnel in the future. The failure to attract, integrate, train, motivate and retain these additional employees could seriously harm our business and prospects.

***Our business and prospects depend significantly on our ability to build our brand. We may not succeed in continuing to establish, maintain and strengthen the Lightning Systems brand, and our brand and reputation could be harmed by negative publicity regarding Lightning Systems or its ZEVs.***

Our business and prospects are heavily dependent on our ability to develop, maintain and strengthen the Lightning Systems brand. If we do not continue to establish, maintain and strengthen our brand, we may lose the opportunity to build a critical mass of customers. Promoting and positioning our brand will likely depend significantly on our ability to provide high quality ZEVs and engage with our customers as intended, and we have limited experience in these areas. In addition, our ability to develop, maintain and strengthen our brand will depend heavily on the success of our customer development and branding efforts. Such efforts may be non-traditional and may not achieve the desired results. To promote our brand, we may be required to change our customer development and branding practices, which could result in substantially increased expenses. If we do not develop and maintain a strong brand, our business, prospects, financial condition and operating results will be materially and adversely impacted.

In addition, if incidents occur or are perceived to have occurred, whether or not such incidents are our fault, we could be subject to adverse publicity. In particular, given the popularity of social media, any negative publicity, whether true or not, could quickly proliferate and harm consumer perceptions and confidence in our brand. Our ability to successfully position our brand could also be adversely affected by perceptions about the quality of our competitors' vehicles.

In addition, from time to time, our ZEVs may be evaluated and reviewed by third parties. Any negative reviews or reviews which compare us unfavorably to our competitors could adversely affect consumer perception about our ZEVs.

***We may experience significant delays in the design, manufacture, launch and financing of our ZEVs and electric powertrains, which could harm our business and prospects.***

Any delay in the financing, design, manufacture and launch of our ZEVs or electric powertrains, could materially damage our brand, business, prospects, financial condition and operating results. Vehicle manufacturers often experience delays in the design, manufacture and commercial release of new products. To the extent we delay or interrupt the launch of our ZEVs or electric powertrains, our growth prospects could be adversely affected as we may fail to grow our market share. Furthermore, we rely on third party suppliers for the provision and development of many of the key components and materials used in our products. To the extent our suppliers experience any delays in providing us with or developing necessary components, we could experience delays in delivering on our timelines, or be forced to seek alternative suppliers.

65

Table of Contents

***We will rely on complex machinery for our operations and our production involves a significant degree of risk and uncertainty in terms of operational performance and costs.***

We will rely heavily on complex machinery for our operations and our production will involve a significant degree of uncertainty and risk in terms of operational performance and costs. Our manufacturing plant consists of large-scale machinery combining many components. The manufacturing plant components are likely to suffer unexpected malfunctions from time to time and will depend on repairs and spare parts to resume operations, which may not be available when needed. Unexpected malfunctions of the manufacturing plant components may significantly affect the intended operational efficiency. Operational performance and costs can be difficult to predict and are often influenced by factors outside of our control, such as, but not limited to, scarcity of natural resources, environmental hazards and remediation, costs associated with decommissioning of machines, labor disputes and strikes, difficulty or delays in obtaining governmental permits, damages or defects in electronic systems, industrial accidents, fire, and seismic activity and natural disasters. Should operational risks materialize, it may result in the personal injury to or death of workers, the loss of production equipment, damage to manufacturing facilities, monetary losses, delays and unanticipated fluctuations in production, environmental damage, administrative fines, increased insurance costs and potential legal liabilities, all which could have a material adverse effect on our business, results of operations, cash flows, financial condition or prospects.

***Amounts included in backlog may not result in actual revenue and are an uncertain indicator of our future earnings.***

We define backlog as the accumulation of all orders for which revenue has not been recognized and we consider valid. The determination of backlog includes, among other factors, our subjective judgment about the likelihood of an order becoming revenue. Our judgments in this area have been, and in the future, may be, incorrect and we cannot assure you that we will recognize revenue with respect to each order included in backlog. In addition, orders can be delayed for a number of reasons, many of which are beyond our control, including supplier delays, which may cause delays in our manufacturing process, and delays associated with the ongoing coronavirus pandemic. We may not be aware of these delays affecting our suppliers and as a result may not consider them when evaluating the contemporaneous effect on backlog. Moreover, orders generally do not have firm dates by when a customer must take delivery or accept our products, and certain customers may not provide a deposit or letter of credit with the contract, either of which could allow a customer greater flexibility to delay the order without cancelling the contract. Further, our backlog could be reduced due to cancellation of orders by customers. Should a cancellation occur, our backlog and anticipated revenue would be reduced unless we were able to replace the cancelled order. Reductions in our backlog could negatively impact our future results of operations or the price of our Common Stock.

We evaluate our backlog at least quarterly to determine if the orders continue to meet our criteria for inclusion in backlog. We may adjust our reported backlog to account for any changes in: customer or distributor plans or financial conditions; the customer's or distributor's continued intent and ability to fulfill the order contract; regulatory requirements; or due to changes in our ability, or the methodology used, to determine whether an order contract is likely to be completed. Because revenue will not be recognized until we have fulfilled our obligations to a customer, there may be a significant amount of time from signing a contract with a customer or shipping a system and revenue recognition. We cannot assure you that our backlog will result in revenue on a timely basis or at all, or that any cancelled contracts will be replaced.

***If our ZEV medium-duty trucks fail to perform as expected, our ability to develop, market and sell or lease our alternative fuel and electric trucks could be harmed.***

Our ZEV trucks and our electric powertrains may contain defects in design and manufacture that may cause them not to perform as expected or may require repair. We currently have limited frame of reference by which to evaluate the performance of our electric powertrains upon which our business prospects depend. For example, our powertrains will use a substantial amount of software to operate which will require modification and updates over the life of the vehicle. Software products are inherently complex and often contain defects and errors when

66

Table of Contents

first introduced. There can be no assurance that we will be able to detect and fix any defects in the powertrains' hardware or software prior to commencing customer sales. We may experience recalls in the future, which could adversely affect Lightning Systems' brand in our target markets and could adversely affect our business, prospects and results of operations. Our electric powertrains may not perform consistent with customers' expectations or consistent with other powertrains which may become available. Any product defects or any other failure of our electric powertrains to perform as expected could harm our reputation and result in adverse publicity, lost revenue, delivery delays, product recalls, product liability claims and significant warranty and other expenses, and could have a material adverse impact on our business, financial condition, operating results and prospects. Additionally, problems and defects experienced by other alternative fuel truck companies or electric consumer vehicles could by association have a negative impact on perception and customer demand for our electrified powertrain solutions.

***Although we hope to be the first company to bring electric powertrains for medium- duty vehicles to market, competitors have already displayed prototypes similar to ours and may enter the market before our powertrains.***

We face intense competition in trying to be the first company to bring our electric powertrains for medium-duty vehicles platform to market, including from companies in our target markets with greater financial resources, more extensive development, manufacturing, marketing and service capabilities, greater brand recognition and a larger number of managerial and technical personnel. If competitor's electric powertrains are brought to market before our electric powertrains, we may experience a reduction in potential market share.

Additionally, our competitors also have greater name recognition, longer operating histories, larger sales forces, broader customer and industry relationships and other resources than we do. These competitors also compete with us in recruiting and retaining qualified research and development, sales, marketing and management personnel, as well as in acquiring technologies complementary to, or necessary for, our products. Additional mergers and acquisitions may result in even more resources being concentrated in our competitors. We cannot provide assurances that our electrified systems will be the first to market. Even if our electrified systems are first to market, there are no assurances that customers will choose vehicles with our electrified systems over those of our competitors, or over diesel powered trucks.

Tesla, Inc., or, and Nikola Corporation, or Nikola, have announced their plans to bring Class 8 long haul battery electric vehicles, or BEVs, and fuel cell electric vehicles, or FCEVs, to the market over the coming years. Tesla announced its BEV and Nikola announced its plug-in BEVs. Cummins Inc., or Cummins, Daimler AG, or Daimler, parent of Freightliner Trucks, Dana, Navistar International Corporation, or Navistar, PACCAR Inc., or PACCAR, parent of Kenworth Trucks, Inc. and Peterbilt Motors Company, Volvo Group, or Volvo, XOS Trucks, or XOS, and other commercial vehicle manufacturers have announced their plans to bring Class 8 BEVs or FCEVs to the market. Furthermore, we will also face competition from manufacturers of internal combustion engines powered by diesel fuel. We expect additional competitors to enter the industry as well.

We expect competition in our industry to intensify in the future in light of increased demand and regulatory push for alternative fuel and electric vehicles.

***Developments in alternative technology improvements in the internal combustion engine may adversely affect the demand for our products.***

Significant developments in alternative technologies, such as advanced diesel, ethanol, or compressed natural gas or improvements in the fuel economy of the internal combustion engine, may materially and adversely affect our business and prospects in ways we do not currently anticipate. Other fuels or sources of energy may emerge as customers' preferred alternative to our electric powertrains for medium-duty trucks platform. Any failure by us to develop new or enhanced technologies or processes, or to react to changes in existing technologies, could materially delay our development and introduction of new and enhanced electric powertrains, which could result in the loss of competitiveness of our powertrains, decreased revenue and a loss of

67

Table of Contents

market share to competitors. Our research and development efforts may not be sufficient to adapt to changes in electric powertrain technology. As technologies change, we plan to upgrade or adapt our electric powertrains and introduce new models in order to continue to provide vehicles with the latest technology. However, our electrified powertrain solutions may not compete effectively with alternative systems if we are not able to source and integrate the latest technology into our electrified powertrain solutions.

### *We have limited experience servicing our vehicles. If we are unable to address the service requirements of our customers, our business will be materially and adversely affected.*

Because we have only recently begun production of our ZEV medium-duty trucks, we have limited experience servicing or repairing our vehicles. Servicing alternative fuel and electric vehicles is different than servicing vehicles with internal combustion engines and requires specialized skills, including high voltage training and servicing techniques. We may decide to partner with a third party to perform some or all of the maintenance on our trucks, and there can be no assurance that we will be able to enter into an acceptable arrangement with any such third-party provider. Our customers will also depend on our customer support team to resolve technical and operational issues relating to the integrated software underlying our electrified powertrain solutions. Our ability to provide effective customer support is largely dependent on our ability to attract, train and retain qualified personnel with experience in supporting customers on platforms such as ours. As we continue to grow, additional pressure may be placed on our customer support team, and we may be unable to respond quickly enough to accommodate short-term increases in customer demand for technical support. We also may be unable to modify the future scope and delivery of our technical support to compete with changes in the technical support provided by our competitors. Increased customer demand for support, without corresponding revenue, could increase costs and negatively affect our operating results. If we are unable to successfully address the service requirements of our customers or establish a market perception that we do not maintain high-quality support, we may be subject to claims from our customers, including loss of revenue or damages, and our business, prospects, financial condition and operating results may be materially and adversely affected.

In addition, the motor vehicle industry laws in many states require that service facilities be available to service vehicles physically sold from locations in their state. While we anticipate developing a service program that would satisfy regulators in these circumstances, the specifics of our service program are still in development, and at some point may need to be restructured to comply with state law, which may impact our business, prospects, financial condition and operating results.

### *Future product recalls could materially adversely affect our business, prospects, operating results and financial condition.*

Any product recall in the future may result in adverse publicity, damage our brand and materially adversely affect our business, prospects, operating results and financial condition. In the future, we may voluntarily or involuntarily, initiate a recall if any of our electric powertrain components (including the fuel cell or batteries) prove to be defective or noncompliant with applicable federal motor vehicle safety standards. If a large number of vehicles are the subject of a recall or if needed replacement parts are not in adequate supply, we may not be able to re-deploy recalled vehicles for a significant period of time. Such recalls involve significant expense and diversion of management attention and other resources, which could adversely affect our brand image in our target markets, as well as our business, prospects, financial condition and results of operations.

### *Insufficient warranty reserves to cover future warranty claims could materially adversely affect our business, prospects, financial condition and operating results.*

Once our powertrains are in production, we will need to maintain warranty reserves to cover warranty-related claims. If our warranty reserves are inadequate to cover future warranty claims on our electric powertrains, our business, prospects, financial condition and operating results could be materially and adversely affected. We may become subject to significant and unexpected warranty expenses. There can be no assurances that then-existing warranty reserves will be sufficient to cover all claims.

68

Table of Contents

*We face significant barriers to manufacture our ZEVs, and if we cannot successfully overcome those barriers our business will be negatively impacted.*

The ZEV industry has traditionally been characterized by significant barriers to entry, including the ability to meet performance requirements or industry specifications, acceptance by end users, large capital requirements, investment costs of design and production, long lead times to bring ZEVs to market from the concept and design stage, the need for specialized design and development expertise, regulatory requirements, establishing a brand name and image and the need to establish sales capabilities. If we are not able to overcome these barriers, our business, prospects, financial condition and operating results will be negatively impacted and our ability to grow our business will be harmed.

*Our ZEVs are subject to motor vehicle standards and the failure to satisfy such mandated safety standards would have a material adverse effect on our business and operating results.*

All vehicles sold must comply with international, federal and state motor vehicle safety standards. In the United States, vehicles that meet or exceed all federally mandated safety standards are certified by the manufacturer under the federal regulations. Rigorous design, testing and the use of approved materials and equipment are among the requirements for achieving federal certification. Failure by us to have our ZEVs or other altered vehicles satisfy all applicable motor vehicle standards would have a material adverse effect on our business and operating results.

*If we are unable to attract and retain key employees and hire qualified management, technical and engineering personnel, our ability to compete could be harmed.*

Our success depends, in part, on our ability to retain our key personnel. The unexpected loss of or failure to retain one or more of our key employees could adversely affect our business. Our success also depends, in part, on our continuing ability to identify, hire, attract, train and develop other highly qualified personnel.

Competition for these employees can be intense, and our ability to hire, attract and retain them depends on our ability to provide competitive compensation. We may not be able to attract, assimilate, develop or retain qualified personnel in the future, and our failure to do so could adversely affect our business, including the execution of our global business strategy. Any failure by our management team to perform as expected may have a material adverse effect on our business, prospects, financial condition and results of operations.

In particular, we are highly dependent on the services of Tim Reeser, Chief Executive Officer, and largest stockholder. Mr. T. Reeser is the source of many, if not most, of the ideas and execution driving Lightning System. If Mr. T. Reeser were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

*Increases in costs, disruption of supply or shortage of raw materials could harm our business.*

Once we begin commercial production of electric powertrains, we may experience increases in the cost or a sustained interruption in the supply or shortage of raw materials. Any such increase or supply interruption could materially negatively impact our business, prospects, financial condition and operating results. We use various raw materials including aluminum, steel, carbon fiber, non-ferrous metals (such as copper), and cobalt. The prices for these raw materials fluctuate depending on market conditions and global demand and could adversely affect our business and operating results.

Any disruption in the supply of necessary components could temporarily disrupt production of our ZEV medium-duty trucks or our electric powertrains until a different supplier is fully qualified. Furthermore, fluctuations or shortages in petroleum and other economic conditions may cause us to experience significant increases in freight charges and raw material costs. Substantial increases in the prices for our raw materials would increase our operating costs and could reduce our margins if the increased costs cannot be recouped through increased ZEV truck prices. There can be no assurance that we will be able to recoup increasing costs of raw materials by increasing truck prices.

Table of Contents

***We are or may be subject to risks associated with strategic alliances or acquisitions, and may not be able to identify adequate strategic relationship opportunities, or form strategic relationships, in the future.***

We have entered into, and may in the future enter into additional, strategic alliances, including joint ventures or minority equity investments with various third parties to further our business purpose. These alliances could subject us to a number of risks, including risks associated with sharing proprietary information, non-performance by the third party and increased expenses in establishing new strategic alliances, any of which may materially and adversely affect our business. We may have limited ability to monitor or control the actions of these third parties and, to the extent any of these strategic third parties suffer negative publicity or harm to their reputation from events relating to their business, we may also suffer negative publicity or harm to our reputation by virtue of our association with any such third party.

Strategic business relationships will be an important factor in the growth and success of our business. However, there are no assurances that we will be able to continue to identify or secure suitable business relationship opportunities in the future or our competitors may capitalize on such opportunities before we do. Moreover, identifying such opportunities could require substantial management time and resources, and negotiating and financing relationships involves significant costs and uncertainties. If we are unable to successfully source and execute on strategic relationship opportunities in the future, our overall growth could be impaired, and our business, prospects, financial condition and operating results could be materially adversely affected.

When appropriate opportunities arise, we may acquire additional assets, products, technologies or businesses that are complementary to our existing business. In addition to possible stockholder approval, we may need approvals and licenses from relevant government authorities for the acquisitions and to comply with any applicable laws and regulations, which could result in increased delay and costs, and may disrupt our business strategy if we fail to do so. Furthermore, acquisitions and the subsequent integration of new assets and businesses into our own require significant attention from our management and could result in a diversion of resources from our existing business, which in turn could have an adverse effect on our operations. Acquired assets or businesses may not generate the financial results we expect. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the occurrence of significant goodwill impairment charges, amortization expenses for other intangible assets and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant.

***We are dependent on our suppliers, a significant number of which are single or limited source suppliers, and the inability of these suppliers to deliver necessary components of our ZEVs and electric powertrains at prices and volumes acceptable to us would have a material adverse effect on our business, prospects and operating results.***

While we plan to obtain components from multiple sources whenever possible, many of the components used in our ZEVs and electric powertrains will be purchased by us from a single source. We refer to these component suppliers as our single source suppliers. Our third-party suppliers may not be able to meet their product specifications and performance characteristics or our desired specifications, performance and pricing, which would impact our ability to achieve our product specifications and performance characteristics as well. Additionally, our third-party suppliers may be unable to obtain required certifications for their products for which we plan to use or provide warranties that are necessary for our solutions. If we are unable to obtain components and materials used in our electrified powertrain solutions from our suppliers or if our suppliers decide to create or supply a competing product, our business could be adversely affected. While we believe that we may be able to establish alternate supply relationships and can obtain or engineer replacement components for our single source components, we may be unable to do so in the short term (or at all) at prices or quality levels that are favorable to us.

70

Table of Contents

***Any unauthorized control or manipulation of our electric powertrains' systems could result in loss of confidence in us, ZEVs and our powertrains and harm our business.***

Our electric powertrains contain complex information technology systems andbuilt-in data connectivity to accept and install periodic remote updates to improve or update functionality. We have designed, implemented and tested security measures intended to prevent unauthorized access to our information technology networks, our electric powertrains and related systems. However, hackers may attempt to gain unauthorized access to modify, alter and use such networks, powertrains and systems to gain control of or to change our powertrains' functionality, user interface and performance characteristics, or to gain access to data stored in or generated by the powertrain. Future vulnerabilities could be identified and our efforts to remediate such vulnerabilities may not be successful. Any unauthorized access to or control of our powertrains or their systems, or any loss of customer data, could result in legal claims or proceedings. In addition, regardless of their veracity, reports of unauthorized access to our powertrains, systems or data, as well as other factors that may result in the perception that our powertrains, systems or data are capable of being "hacked," could negatively affect Lightning Systems' brand and harm our business, prospects, financial condition and operating results.

***We, our outsourcing partners and our suppliers are or may be subject to substantial regulation and unfavorable changes to, or failure by us, our outsourcing partners or our suppliers to comply with, these regulations could substantially harm our business and operating results.***

Our ZEVs, our electric powertrains, and the sale of electric motor vehicles in general, are subject to substantial regulation under international, federal, state, and local laws. We continue to evaluate requirements for licenses, approvals, certificates and governmental authorizations necessary to manufacture, sell or service our electrified powertrain solutions in the jurisdictions in which we plan to operate and intend to take such actions necessary to comply. We may experience difficulties in obtaining or complying with various licenses, approvals, certifications and other governmental authorizations necessary to manufacture, sell or service their electrified powertrain solutions in any of these jurisdictions. For instance, our electrified powertrain solutions are novel technology that may not be readily classified into categories by governmental agencies. If we, our outsourcing partners or our suppliers are unable to obtain or comply with any of the licenses, approvals, certifications or other governmental authorizations necessary to carry out our operations in the jurisdictions in which we currently operate, or those jurisdictions in which we plan to operate in the future, our business, prospects, financial condition and operating results could be materially adversely affected. We expect to incur significant costs in complying with these regulations. For example, if the battery packs installed in our electrified powertrain solutions are deemed to be transported, we will need to comply with the mandatory regulations governing the transport of "dangerous goods," and any deficiency in compliance may result in us being prohibited from selling our electrified powertrain solutions until compliant batteries are installed. We expect to incur significant costs in complying with these regulations. Regulations related to the electric vehicle industry and alternative energy are currently evolving and we face risks associated with changes to these regulations, including but not limited to:

- increased subsidies for corn and ethanol or soy and biodiesel production, which could reduce the operating cost of vehicles that use ethanol or biodiesel, or a combination of renewable and petroleum fuels;

- increased support for other alternative fuel systems, which could have an impact on the acceptance of our electric powertrain system; and

- increased sensitivity by regulators to the needs of established automobile manufacturers with large employment bases, high fixed costs and business models based on the internal combustion engine, which could lead them to pass regulations that could reduce the compliance costs of such established manufacturers or mitigate the effects of government efforts to promote alternative fuel vehicles.

To the extent that laws or regulations change, our electric powertrains may not comply with applicable international, federal, state or local laws, which would have an adverse effect on our business. Compliance with changing regulations could be burdensome, time consuming, and expensive. To the extent compliance with new regulations is cost prohibitive, our business, prospects, financial condition and operating results would be adversely affected. Further, delays, reduction, or elimination of applicable international, federal, or state laws or

71

Table of Contents

regulations requiring or incentivizing reductions in emissions of greenhouse gases or other pollutants from internal combustion engines or requiring or incentivizing manufacturers to offer for sale increasing numbers of ZEVs may result in the diminished competitiveness of the alternative fuel and electric vehicle industry generally. This could materially and adversely affect the growth of the alternative fuel automobile markets and our business, prospects, financial condition and operating results.

***We are subject to various environmental laws and regulations that could impose substantial costs upon us and cause delays in building our manufacturing facilities.***

Our operations are and will continue to be subject to international, federal, state, and/or local environmental laws and regulations, including laws relating to water use; air emissions; use of recycled materials; energy sources; the protection of human health and the environment, natural resources and endangered species; and the use, handling, storage, disposal and human exposure to hazardous materials. Environmental and health and safety laws and regulations can be complex, and we expect that we will be affected by future amendments to such laws or other new environmental and health and safety laws and regulations which may require us to change our operations, potentially resulting in a material adverse effect on our business, prospects, financial condition, and operating results. We have been required to obtain and comply with the terms and conditions of multiple environmental permits, certificates, or registrations, many of which are difficult and costly to obtain and could be subject to legal challenges. Violations of these laws, regulations, and permits, certificates and registrations can give rise to liability for administrative oversight and correction costs, cleanup costs, property damage, bodily injury and fines and penalties. In some cases, violations may result in suspension or revocation of permits, certificates or registrations. Capital and operating expenses needed to comply with environmental laws and regulations can be significant, and violations may result in substantial fines and penalties, third party damages, suspension of production or a cessation of our operations, and reputational harm.

Contamination at properties we currently own or operate, will own or operate, we formerly owned or operated or to which hazardous substances were sent by us, may result in liability for us under environmental laws and regulations, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, which can impose liability for the full amount of remediation-related costs without regard to fault, for the investigation and cleanup of contaminated soil and ground water, for vapor intrusion and other exposure pathways or impacts to human health or the environment and for damages to natural resources. The costs of complying with environmental laws and regulations and any claims concerning noncompliance, or liability with respect to contamination in the future, could have a material adverse effect on our financial condition or operating results. We may face unexpected delays in obtaining the required permits and approvals in connection with our planned production facilities that could require significant time and financial resources and delay our ability to operate these facilities, which would adversely impact our business, prospects, financial condition and operating results.

***We intend to retain certain personal information about our customers, employees or others and may be subject to various privacy laws.***

We plan to collect, store, transmit and otherwise process data from customers, employees and others as part of our business and operations, which may include personal data or confidential or proprietary information. We also work with partners and third-party service providers or vendors that collect, store and process such data on our behalf and in connection with our ZEVs. There can be no assurance that any security measures that we or our third-party service providers or vendors have implemented will be effective against current or future security threats. If a compromise of data were to occur, we may become liable under our contracts with other parties and under applicable law for damages and incur penalties and other costs to respond to, investigate and remedy such an incident. Our systems, networks and physical facilities could be breached or personal information could otherwise be compromised due to employee error or malfeasance, if, for example, third parties attempt to fraudulently induce our employees or our customers to disclose information or user names and/or passwords. Third parties may also exploit vulnerabilities in, or obtain unauthorized access to, platforms, systems, networks and/or physical facilities utilized by our service providers and vendors.

72

Table of Contents

We also intend to use our trucks' electronic systems to log information about each vehicle's use in order to aid us in vehicle diagnostics, repair and maintenance. Our customers may object to the use of this data, which may increase our vehicle maintenance costs and harm our business prospects. Possession and use of our customers' information in conducting our business may subject us to legislative and regulatory burdens in the United States and the European Union that could require notification of data breaches, restrict our use of such information and hinder our ability to acquire new customers or market to existing customers. The regulatory framework for data privacy and security is rapidly evolving, and we may not be able to monitor and react to all developments in a timely manner. As legislation continues to develop, we will likely be required to expend significant additional resources to continue to modify or enhance our protective measures and internal processes to comply with such legislation. Non-compliance or a major breach of our network security and systems could have serious negative consequences for our business and future prospects, including possible fines, penalties and damages, reduced customer demand for our vehicles, and harm to our reputation and brand.

We may not have adequate insurance coverage. The successful assertion of one or more large claims against us that exceeds our available insurance coverage, or results in changes to our insurance policies (including premium increases or the imposition of large deductible or co-insurance requirements), could have an adverse effect on our business. In addition, we cannot be sure that our existing insurance coverage will continue to be available on acceptable terms or that our insurers will not deny coverage as to any future claim.

***We are subject to evolving laws, regulations, standards, policies, and contractual obligations related to data privacy and security regulations, and our actual or perceived failure to comply with such obligations could harm our reputation, subject us to significant fines and liability, or otherwise adversely affect our business.***

We are subject to or affected by a number of federal, state and local laws and regulations, as well as contractual obligations and industry standards, that impose certain obligations and restrictions with respect to data privacy and security, and govern our collection, storage, retention, protection, use, processing, transmission, sharing and disclosure of personal information including that of our employees, customers and others. Most jurisdictions have enacted laws requiring companies to notify individuals, regulatory authorities and others of security breaches involving certain types of data. Such laws may be inconsistent or may change or additional laws may be adopted. In addition, our agreements with certain customers may require us to notify them in the event of a security breach. Such mandatory disclosures are costly, could lead to negative publicity, result in penalties or fines, result in litigation, may cause our customers to lose confidence in the effectiveness of our security measures and require us to expend significant capital and other resources to respond to and/or alleviate problems caused by the actual or perceived security breach.

The global data protection landscape is rapidly evolving, and implementation standards and enforcement practices are likely to remain uncertain for the foreseeable future. We may not be able to monitor and react to all developments in a timely manner. For example, California adopted the California Consumer Privacy Act, or CCPA, which became effective in January 2020. The CCPA establishes a privacy framework for covered businesses, including an expansive definition of personal information and data privacy rights for California residents. The CCPA includes a framework with potentially severe statutory damages and private rights of action. The CCPA requires covered businesses to provide new disclosures to California residents, provide them new ways to opt-out of certain disclosures of personal information, and allow for a new cause of action for data breaches. As we expand our operations, the CCPA may increase our compliance costs and potential liability. Some observers have noted that the CCPA could mark the beginning of a trend toward more stringent privacy legislation in the United States. Other states have begun to propose similar laws. Compliance with any applicable privacy and data security laws and regulations is a rigorous and time-intensive process, and we may be required to put in place additional mechanisms to comply with such laws and regulations.

73

Table of Contents

*The unavailability, reduction or elimination of government and economic incentives could have a material adverse effect on our business, prospects, financial condition and operating results.*

Any reduction, elimination or discriminatory application of government subsidies and economic incentives because of policy changes, the reduced need for such subsidies and incentives due to the perceived success of the electric vehicle or other reasons may result in the diminished competitiveness of the alternative fuel and electric vehicle industry generally. This could materially and adversely affect the growth of the alternative fuel automobile markets and our business, prospects, financial condition and operating results.

While certain tax credits and other incentives for alternative energy production, alternative fuel and electric vehicles have been available in the past, there is no guarantee these programs will be available in the future. If current tax incentives are not available in the future, our financial position could be harmed. As federal, state, or local legislation related to alternative fuel and electric vehicles or data protection continues to develop, we will likely be required to expend significant additional resources to continue to modify or enhance our products, protective measures and internal processes to comply with such legislation.

In particular, we are influenced by federal, state and local tax credits, rebates, grants and other government programs. These include various government programs such as LCFS programs, which encourage low carbon "compliant" transportation fuels (including CNG) in the California or Oregon marketplaces by allowing producers of these fuels to generate LCFS Credits that can be sold to noncompliant regulated parties. Additionally, we are influenced by laws, rules and regulations requiring or incentivizing reductions in emissions of greenhouse gases or other pollutants from internal combustion engines or requiring or incentivizing manufacturers to offer for sale increasing numbers of ZEVs. Lawmakers, regulators, policymakers, environmental or advocacy organizations, OEMs, trade groups, suppliers or other groups may invest significant time and money in efforts to delay, repeal or otherwise negatively influence regulations and programs that promote electric vehicles. Many of these parties have substantially greater resources and influence than we do. Further, changes in federal, state or local political, social or economic conditions, including a lack of legislative focus on these programs and regulations, could result in their modification, delayed adoption or repeal. Any failure to adopt, delay in implementation, expiration, repeal or modification of these programs and regulations, or the adoption of any programs or regulations that encourage the use of other alternative fuels or alternative vehicles over electric vehicles, would reduce the market for electrified powertrains or ZEVs and harm our operating results, liquidity and financial condition. For instance, California lawmakers and regulators have implemented various measures designed to increase the use of electric, hydrogen and other zero-emission vehicles, including establishing firm goals for the number of these vehicles offered for sale or operated within the state by specified dates and enacting various laws and other programs in support of these goals. Although the influence and applicability of these or similar measures on our business and electrified powertrain and ZEV adoption in general remains uncertain, a reduction in focus by these groups on, or loss of legal authority to incentivize or require the sale of, ZEVs or vehicles with an overall net carbon negative emissions profile, could adversely affect the market for our electrified powertrain solutions. The state of California's legal authority to develop and implement greenhouse gas emission standards is currently the subject of legal challenges, and the authority of California to implement and enforce GHG emission standards for vehicles and engines in the future is uncertain. If these economic incentives or regulatory programs are reduced or eliminated, there could be a reduction in demand for our electrified powertrain solutions, which could have a material adverse effect on our business, prospects, financial condition and operating results.

*We may not be able to obtain or agree on acceptable terms and conditions for all or a significant portion of the government grants, loans and other incentives for which we may apply. As a result, our business and prospects may be adversely affected.*

We anticipate applying for federal and state grants, loans and tax incentives under government programs designed to stimulate the economy and support the production of alternative fuel and electric vehicles and related technologies. We anticipate that in the future there will be new opportunities for us to apply for grants, loans and other incentives from the United States, state and foreign governments. Our ability to obtain funds or incentives

74

Table of Contents

from government sources is subject to the availability of funds under applicable government programs and approval of our applications to participate in such programs. The application process for these funds and other incentives will likely be highly competitive. We cannot assure you that we will be successful in obtaining any of these additional grants, loans and other incentives. If we are not successful in obtaining any of these additional incentives and we are unable to find alternative sources of funding to meet our planned capital needs, our business and prospects could be materially adversely affected.

***We may need to defend ourselves against patent or trademark infringement claims, which may be time-consuming and cause us to incur substantial costs.***

Companies, organizations or individuals, including our competitors, may own or obtain patents, trademarks or other proprietary rights that would prevent or limit our ability to make, use, develop or sell our electric powertrains, which could make it more difficult for us to operate our business. We may receive inquiries from patent or trademark owners inquiring whether we infringe their proprietary rights. Companies owning patents or other intellectual property rights relating to electric powertrains may allege infringement of such rights. In response to a determination that we have infringed upon a third party's intellectual property rights, we may be required to do one or more of the following:

• cease development, sales, or use of electric powertrains that incorporate the asserted intellectual property;

• pay substantial damages;

• obtain a license from the owner of the asserted intellectual property right, which license may not be available on reasonable terms or at all; or

• redesign one or more aspects or systems of our powertrains.

A successful claim of infringement against us could materially adversely affect our business, prospects, operating results and financial condition. Any litigation or claims, whether valid or invalid, could result in substantial costs and diversion of resources.

We also plan to license patents and other intellectual property from third parties, including suppliers and service providers, and we may face claims that our use of this in-licensed technology infringes the intellectual property rights of others. In such cases, we will seek indemnification from our licensors. However, our rights to indemnification may be unavailable or insufficient to cover our costs and losses.

***Our business may be adversely affected if we are unable to protect our intellectual property rights from unauthorized use by third parties.***

Failure to adequately protect our intellectual property rights could result in our competitors offering similar products, potentially resulting in the loss of some of our competitive advantage and a decrease in our revenue which would adversely affect our business, prospects, financial condition and operating results. Our success depends, at least in part, on our ability to protect our core technology and intellectual property. To accomplish this, we will rely on a combination of patents, trade secrets (including know-how), employee and third-party nondisclosure agreements, copyright, trademarks, intellectual property licenses and other contractual rights to establish and protect our rights in our technology.

The protection of our intellectual property rights will be important to our future business opportunities. However, the measures we take to protect our intellectual property from unauthorized use by others may not be effective for various reasons, including the following:

• any patent applications we submit may not result in the issuance of patents (and patents have not yet been issued to us based on our pending applications);

• the scope of our issued patents may not be broad enough to protect our proprietary rights;

• our issued patents may be challenged and/or invalidated by our competitors;

75

Table of Contents

- our employees or business partners may breach their confidentiality, non-disclosure and non-use obligations to us;

- the costs associated with enforcing patents, confidentiality and invention agreements or other intellectual property rights may make aggressive enforcement impracticable;

- our employees or business partners may breach their confidentiality, non-disclosure and non-use obligations to us;

- third-parties may independently develop technologies that are the same or similar to our;

- current and future competitors may circumvent our patents; and

- our in-licensed patents may be invalidated, or the owners of these patents may breach our license arrangements.

Patent, trademark, and trade secret laws vary significantly throughout the world. Some foreign countries do not protect intellectual property rights to the same extent as do the laws of the United States. Further, policing the unauthorized use of our intellectual property in foreign jurisdictions may be difficult. Therefore, our intellectual property rights may not be as strong or as easily enforced outside of the United States.

Also, while we have registered trademarks in an effort to protect our investment in our brand and goodwill with customers, competitors may challenge the validity of those trademarks and other brand names in which we have invested. Such challenges can be expensive and may adversely affect our ability to maintain the goodwill gained in connection with a particular trademark.

***Our patent applications may not issue as patents, which may have a material adverse effect on our ability to prevent others from commercially exploiting products similar to ours.***

We cannot be certain that we are the first inventor of the subject matter to which we have filed a particular patent application, or if we are the first party to file such a patent application. If another party has filed a patent application to the same subject matter as we have, we may not be entitled to the protection sought by the patent application. Further, the scope of protection of issued patent claims is often difficult to determine. As a result, we cannot be sure that patents will be granted with respect to any of our pending patent applications or with respect to any patent applications we may own or license in the future, nor can we be sure that any of our existing patents or any patents we may own or license in the future will be useful in protecting our technology. In addition, our competitors may design around our issued patents, which may adversely affect our business, prospects, financial condition or operating results.

***Our management has limited experience in operating a public company.***

Our executive officers have limited experience in the management of a publicly traded company. Our management team may not successfully or effectively manage our transition to a public company that will be subject to significant regulatory oversight and reporting obligations under federal securities laws. Their limited experience in dealing with the increasingly complex laws pertaining to public companies could be a significant disadvantage in that it is likely that an increasing amount of our management's time may be devoted to these activities which will result in less time being devoted to the management and growth of New Lightning eMotors. We may not have adequate personnel with the appropriate level of knowledge, experience and training in the accounting policies, practices or internal control over financial reporting required of public companies in the U.S. We are in the process of upgrading our finance and accounting systems to an enterprise system suitable for a public company, and a delay could impact our ability or prevent us from timely reporting our operating results, timely filing required reports with the SEC and complying with Section 404 of the Sarbanes-Oxley Act. The development and implementation of the standards and controls necessary for us to achieve the level of accounting standards required of a public company in the U.S. may require costs greater than expected. It is possible that we will be required to expand our employee base and hire additional employees to support our operations as a public company which will increase our operating costs in future periods.

Table of Contents

***We will incur increased costs as a result of operating as a public company, and our management will devote substantial time to new compliance initiatives.***

If we complete the Business Combination and become a public company, we will incur significant legal, accounting and other expenses that we did not incur as a private company, and these expenses may increase even more after we are no longer an emerging growth company, as defined in Section 2(a) of the Securities Act of 1933, as amended. As a public company, we will be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, as well as rules adopted, and to be adopted, by the SEC and NYSE. Our management and other personnel will need to devote a substantial amount of time to these compliance initiatives. Moreover, we expect these rules and regulations to substantially increase our legal and financial compliance costs and to make some activities more time-consuming and costly. The increased costs will increase our net loss. For example, we expect these rules and regulations to make it more difficult and more expensive for it to obtain director and officer liability insurance and it may be forced to accept reduced policy limits or incur substantially higher costs to maintain the same or similar coverage. We cannot predict or estimate the amount or timing of additional costs it may incur to respond to these requirements. The impact of these requirements could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, our board committees or as executive officers.

***The automotive market is highly competitive, and we may not be successful in competing in this industry.***

We face intense competition in bringing our ZEVs to market. Both the automobile industry generally, and the ZEV segment in particular, are highly competitive, and we will be competing for sales with both ZEV manufacturers and traditional automotive companies. Many of our current and potential competitors have significantly greater financial, technical, manufacturing, marketing and other resources than we do and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products, including their ZEVs. Additionally, our competitors also have greater name recognition, longer operating histories, larger sales forces, broader customer and industry relationships and other resources than we do. These competitors also compete with us in recruiting and retaining qualified research and development, sales, marketing and management personnel, as well as in acquiring technologies complementary to, or necessary for, our ZEVs. Additional mergers and acquisitions may result in even more resources being concentrated in our competitors. There are no assurances that customers will choose our ZEVs over those of our competitors, or over internal combustion engines vehicles. We expect additional competitors to enter the industry as well.

We expect competition in our industry to intensify from our existing and future competitors in the future in light of increased demand and regulatory push for alternative fuel and ZEVs.

***If the market for ZEVs does not develop as we expect or develops more slowly than we expect, our business, prospects, financial condition and operating results will be adversely affected.***

Our growth is highly dependent upon the adoption by consumers of ZEVs. The target demographics for our ZEVs are highly competitive. If the market for ZEVs does not develop at the rate or in the manner or to the extent that we expect, our business, prospects, financial condition and operating results will be harmed. The market for alternative fuels, hybrid and ZEVs is new and untested and is characterized by rapidly changing technologies, price competition, numerous competitors, evolving government regulation and incentives, industry standards and uncertain customer demands and behaviors.

The market for alternative fuel vehicles is rapidly evolving and as a result, the market for our ZEVs could be affected by numerous factors, such as:

• perceptions about ZEV features, quality, safety, performance and cost;

• perceptions about the limited range over which ZEVs may be driven on a single battery charge;

77

Table of Contents

- competition, including from other types of alternative fuel vehicles,plug-in hybrid ZEVs and high fuel-economy internal combustion engine vehicles;

- fuel prices, including volatility in the cost of fossil fuels;

- the timing of adoption and implementation of fully autonomous vehicles;

- government regulations and economic incentives;

- access to charging facilities and related infrastructure costs and standardization of ZEV charging systems;

- electric grid capacity and reliability; and

- macroeconomic factors.

***Our employees and independent contractors may engage in misconduct or other improper activities, which could have an adverse effect on our business, prospects, financial condition and operating results.***

We are exposed to the risk that our employees and independent contractors may engage in misconduct or other illegal activity. Misconduct by these parties could include intentional, reckless or negligent conduct or other activities that violate laws and regulations, including production standards, U.S. federal and state fraud, abuse, data privacy and security laws, other similar non-U.S. laws or laws that require the true, complete and accurate reporting of financial information or data. It is not always possible to identify and deter misconduct by employees and other third parties, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to be in compliance with such laws or regulations. In addition, we are subject to the risk that a person or government could allege such fraud or other misconduct, even if none occurred. If any such actions are instituted against us, and we are not successful in defending ourselves or asserting our rights, those actions could have a significant impact on our business, prospects, financial condition and operating results, including, without limitation, the imposition of significant civil, criminal and administrative penalties, damages, monetary fines, disgorgement, integrity oversight and reporting obligations to resolve allegations of non-compliance, imprisonment, other sanctions, contractual damages, reputational harm, diminished profits and future earnings and curtailment of our operations, any of which could adversely affect our business, prospects, financial condition and operating results.

***We may become subject to product liability claims, including possible class action and derivative lawsuits, which could harm our financial condition and liquidity if we are not able to successfully defend or insure against such claims.***

Product liability claims, even those without merit or those that do not involve our ZEVs, could harm our business, prospects, financial condition and operating results. The automobile industry in particular experiences significant product liability claims, and we face inherent risk of exposure to claims in the event our ZEVs do not perform or are claimed to not have performed as expected. As is true for other ZEV suppliers, we expect in the future that our ZEVs will be involved in crashes resulting in death or personal injury. Additionally, product liability claims that affect our competitors or suppliers may cause indirect adverse publicity for us and our ZEVs.

A successful product liability claim against us could require us to pay a substantial monetary award. Moreover, a product liability claim against us or our competitors could generate substantial negative publicity about our ZEVs and business and could have a material adverse effect on our brand, business, prospects, financial condition and operating results. We may self-insure against the risk of product liability claims for vehicle exposure, meaning that any product liability claims will likely have to be paid from company funds, not by insurance.

78

Table of Contents

***Our business may be adversely affected by labor and union activities.***

Although none of our employees are currently represented by a labor union, it is common throughout the automobile industry generally for many employees at automobile companies to belong to a union, which can result in higher employee costs and increased risk of work stoppages. We may also directly and indirectly depend upon other companies with unionized work forces, such as our manufacturing partners, parts suppliers and trucking and freight companies, and work stoppages or strikes organized by such unions could have a material adverse impact on our business, financial condition or operating results.

***We are subject to U.S. and foreign anti-corruption and anti-money laundering laws and regulations. We can face criminal liability and other serious consequences for violations, which can harm our business.***

We are subject to the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.S. domestic bribery statute contained in 18 U.S.C. § 201, the U.S. Travel Act, the USA PATRIOT Act and possibly other anti-bribery and anti-money laundering laws in countries in which we conduct activities. Anti-corruption laws are interpreted broadly and prohibit companies and their employees, agents, contractors and other collaborators from authorizing, promising, offering or providing, directly or indirectly, improper payments or anything else of value to recipients in the public or private sector. We can be held liable for the corrupt or other illegal activities of our employees, agents, contractors and other collaborators, even if we do not explicitly authorize or have actual knowledge of such activities. Any violations of the laws and regulations described above may result in substantial civil and criminal fines and penalties, imprisonment, the loss of export or import privileges, debarment, tax reassessments, breach of contract and fraud litigation, reputational harm and other consequences.

**Risks Related to Ownership of New Lightning eMotors Common Stock**

***Concentration of ownership among our existing executive officers, directors and their affiliates may prevent new investors from influencing significant corporate decisions.***

Upon completion of the Business Combination,          will beneficially own approximately          % of New Lightning eMotors Common Stock and our executive officers, directors and their affiliates as a group will beneficially own approximately          % of New Lightning eMotors Common Stock. As a result, these stockholders will be able to exercise a significant level of control over all matters requiring stockholder approval, including the election of directors, amendment of the Second Amended and Restated Certificate of Incorporation and approval of significant corporate transactions. This control could have the effect of delaying or preventing a change of control of our company or changes in management and will make the approval of certain transactions difficult or impossible without the support of these stockholders.

***We do not expect to declare any dividends in the foreseeable future.***

After the completion of the Business Combination, we do not anticipate declaring any cash dividends to holders of New Lightning eMotors Common Stock in the foreseeable future. Consequently, investors may need to rely on sales of their shares after price appreciation, which may never occur, as the only way to realize any future gains on their investment.

**Risks Related to the Company and the Business Combination**

***The Company has no operating history and is subject to a mandatory liquidation and subsequent dissolution requirement. If the Company is unable to consummate a business combination, including the Business Combination, its public stockholders may be forced to wait until after November 18, 2021 before receiving distributions from the Trust Account.***

The Company is a development stage blank check company, and as it has no operating history and is subject to a mandatory liquidation and subsequent dissolution requirement. The Company has until November 18, 2021

79

Table of Contents

to complete a business combination. The Company has no obligation to return funds to investors prior to such date unless (i) it consummates a business combination prior thereto or (ii) it seeks to amend its current amended and restated certificate of corporation prior to consummation of a business combination, and only then in cases where investors have sought to convert or sell their shares to the Company. Only after the expiration of this full time period will public security holders be entitled to distributions from the Trust Account if the Company is unable to complete a business combination. Accordingly, investors' funds may be unavailable to them until after such date and to liquidate their investment, public security holders may be forced to sell their public shares or warrants, potentially at a loss. In addition, if the Company fails to complete an initial business combination by November 18, 2021, there will be no Redemption Rights or liquidating distributions with respect to the warrants, which will expire worthless, unless the Company amends its certificate of incorporation to extend its life and certain other agreements it has entered into.

***We have no operating or financial history and our results of operations and those of New Lightning eMotors may differ significantly from the unaudited pro forma financial data included in this proxy statement/prospectus.***

We are a blank check company and we have no operating history and no revenues. This proxy statement/prospectus includes unaudited pro forma condensed combined financial statements for New Lightning eMotors. The unaudited pro forma condensed combined statement of operations of New Lightning eMotors combines the historical audited results of operations of the Company for the year ended December 31, 2020, with the historical audited results of operations of Lightning Systems for the year ended December 31, 2020, respectively, and gives pro forma effect to the Business Combination as if it had been consummated on January 1, 2020. The unaudited pro forma condensed combined balance sheet of New Lightning eMotors combines the historical balance sheets of the Company as of December 31, 2020 and of Lightning Systems as of December 31, 2020 and gives pro forma effect to the Business Combination as if it had been consummated on December 31, 2020.

The unaudited pro forma condensed combined financial statements are presented for illustrative purposes only, are based on certain assumptions, address a hypothetical situation and reflect limited historical financial data. Therefore, the unaudited pro forma condensed combined financial statements are not necessarily indicative of the results of operations and financial position that would have been achieved had the Business Combination and the acquisitions by Lightning Systems been consummated on the dates indicated above, or the future results of operations or financial position of New Lightning eMotors. Accordingly, New Lightning eMotors' business, assets, cash flows, results of operations and financial condition may differ significantly from those indicated by the unaudited pro forma condensed combined financial statements included in this document. For more information, please see the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information*"

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our financial condition and results of operations.***

We will be subject to income taxes in the United States and other jurisdictions, and our tax liabilities will be subject to the allocation of expenses in differing jurisdictions. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- tax effects of stock-based compensation;

- costs related to intercompany restructurings;

- changes in tax laws, regulations or interpretations thereof; or

- lower than anticipated future earnings in jurisdictions where we have lower statutory tax rates and higher than anticipated future earnings in jurisdictions where we have higher statutory tax rates.

80

**Table of Contents**

In addition, we may be subject to audits of our income, sales and other transaction taxes by taxing authorities. Outcomes from these audits could have an adverse effect on our financial condition and results of operations

***If we are unable to complete an initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of the Trust Account (or less than $10.00 per share in certain circumstances where a third party brings a claim against us that our Sponsor is unable to indemnify), and our warrants will expire worthless.***

If we are unable to complete an initial business combination by the applicable deadline, our public stockholders may receive only approximately $10.00 per share on the liquidation of the Trust Account (or less than $10.00 per share in certain circumstances where a third-party brings a claim against us that our Sponsor is unable to indemnify (as described herein)) and our warrants will expire worthless.

***Following the consummation of the Business Combination, our only significant asset will be our ownership interest in New Lightning eMotors and such ownership may not be sufficient to pay dividends or make distributions or loans to enable us to pay any dividends on our Common Stock or satisfy our other financial obligations.***

Following the consummation of the Business Combination, we will have no direct operations and no significant assets other than our ownership of New Lightning eMotors. We and certain investors, the Lightning Systems equity holders, and directors and officers of Lightning Systems and its affiliates will become stockholders of New Lightning eMotors at that time. We will depend on New Lightning eMotors for distributions, loans and other payments to generate the funds necessary to meet our financial obligations, including our expenses as a publicly traded company and to pay any dividends with respect to our Common Stock. The financial condition and operating requirements of New Lightning eMotors may limit our ability to obtain cash from New Lightning eMotors. The earnings from, or other available assets of, New Lightning eMotors may not be sufficient to pay dividends or make distributions or loans to enable us to pay any dividends on our Common Stock or satisfy our other financial obligations.

The ability of New Lightning eMotors to make distributions, loans and other payments to us for the purposes described above and for any other purpose may be limited by credit agreements to which New Lightning eMotors is party from time to time, including the existing loan and security agreement described in "Lightning Systems' Management's Discussion and Analysis of Financial Condition and Results of Operations", and will be subject to the negative covenants set forth therein. Any loans or other extensions of credit to us from New Lightning eMotors will be permitted only to the extent there is an applicable exception to the investment covenants under these credit agreements. Similarly, any dividends, distributions or similar payments to us from New Lightning eMotors will be permitted only to the extent there is an applicable exception to the dividends and distributions covenants under these credit agreements.

***Because we have no current plans to pay cash dividends on shares of common stock for the foreseeable future, you may not receive any return on investment unless you sell shares of Common Stock for a price greater than that which you paid for it.***

We may retain future earnings, if any, for future operations, expansion and debt repayment and have no current plans to pay any cash dividends for the foreseeable future. Any decision to declare and pay dividends as a public company in the future will be made at the discretion of the Company's Board and will depend on, among other things, our results of operations, financial condition, cash requirements, contractual restrictions and other factors that the Board may deem relevant. In addition, our ability to pay dividends may be limited by covenants of any existing and future outstanding indebtedness we or our subsidiaries incur. As a result, you may not receive any return on an investment in the Company's Common Stock unless you sell your Common Stock for a price greater than that which you paid for it.

Table of Contents

***There can be no assurance that New Lightning eMotors Common Stock will be approved for listing on the NYSE or that New Lightning eMotors will be able to comply with the continued listing standards of NYSE.***

In connection with the closing of the Business Combination, we intend to list New Lightning eMotors' common stock and warrants on the NYSE under the symbols "ZEV" and "ZEV.WS," respectively. New Lightning eMotors' continued eligibility for listing may depend on the number of the Company's shares that are redeemed. If, after the Business Combination, the NYSE delists New Lightning eMotors' shares from trading on its exchange for failure to meet the listing standards, New Lightning eMotors and its stockholders could face significant material adverse consequences including:

- a limited availability of market quotations for New Lightning eMotors' securities;

- a determination that New Lightning eMotors Common Stock is a "penny stock" which will require brokers trading in New Lightning eMotors Common Stock to adhere to more stringent rules, possibly resulting in a reduced level of trading activity in the secondary trading market for shares of New Lightning eMotors Common Stock;

- a limited amount of analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

***The Company's independent registered public accounting firm's report contains an explanatory paragraph that expresses substantial doubt about its ability to continue as a "going concern."***

As of December 31, 2020, the Company had a working capital deficit of $(0.6) million. Further, the Company has incurred and expects to continue to incur significant costs in pursuit of its financing and acquisition plans, including the Business Combination Agreement. The Company cannot assure you that its plans to raise capital or to consummate an initial business combination, including the Business Combination Agreement, will be successful. These factors, among others, raise substantial doubt about its ability to continue as a going concern. The financial statements contained elsewhere in this proxy statement/prospectus do not include any adjustments that might result from its inability to consummate the Business Combination or its inability to continue as a going concern.

***Subsequent to the consummation of the Business Combination, New Lightning eMotors may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on its financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.***

Although the Company has conducted due diligence on Lightning Systems, the Company cannot assure you that this diligence revealed all material issues that may be present in Lightning Systems' business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of the Company's and Lightning Systems' control will not later arise. As a result, New Lightning eMotors may be forced to later write-down or write-off assets, restructure its operations, or incur impairment or other charges that could result in losses. Even if the Company's due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with the Company's preliminary risk analysis. Even though these charges may be non-cash items and may not have an immediate impact on New Lightning eMotors' liquidity, the fact that New Lightning eMotors reports charges of this nature could contribute to negative market perceptions about it or its securities. In addition, charges of this nature may cause New Lightning eMotors to be unable to obtain future financing on favorable terms or at all.

***Following the consummation of the Business Combination, New Lightning eMotors will incur significant increased expenses and administrative burdens as a public company, which could have an adverse effect on its business, financial condition and results of operations.***

Following the consummation of the Business Combination, New Lightning eMotors will face increased legal, accounting, administrative and other costs and expenses as a public company that New Lightning eMotors

82

**Table of Contents**

does not incur as a private company. The Sarbanes-Oxley Act of 2002 (the "*Sarbanes-Oxley Act*"), including the requirements of Section 404, as well as rules and regulations subsequently implemented by the SEC, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and the rules and regulations promulgated and to be promulgated thereunder, Public Company Accounting Oversight Board (the "*PCAOB*") and the securities exchanges, impose additional reporting and other obligations on public companies. Compliance with public company requirements will increase costs and make certain activities more time-consuming. A number of those requirements will require New Lightning eMotors to carry out activities Lightning Systems has not done previously. For example, New Lightning eMotors will create new board committees and adopt new internal controls and disclosure controls and procedures. In addition, expenses associated with SEC reporting requirements will be incurred. Furthermore, if any issues in complying with those requirements are identified (for example, if the auditors identify a material weakness or significant deficiency in the internal control over financial reporting), New Lightning eMotors could incur additional costs rectifying those issues, and the existence of those issues could adversely affect New Lightning eMotors' reputation or investor perceptions of it. It may also be more expensive to obtain director and officer liability insurance. Risks associated with New Lightning eMotors' status as a public company may make it more difficult to attract and retain qualified persons to serve on the New Lightning eMotors Board or as executive officers. The additional reporting and other obligations imposed by these rules and regulations will increase legal and financial compliance costs and the costs of related legal, accounting and administrative activities. These increased costs will require New Lightning eMotors to divert a significant amount of money that could otherwise be used to expand the business and achieve strategic objectives. Advocacy efforts by stockholders and third parties may also prompt additional changes in governance and reporting requirements, which could further increase costs.

***The Initial Stockholders have agreed to vote in favor of such initial Business Combination, regardless of how the Company's public stockholders vote.***

Unlike some other blank check companies in which the initial stockholders agree to vote their initial stockholder shares in accordance with the majority of the votes cast by the public stockholders in connection with an initial business combination, the Initial Stockholders have agreed (i) to vote their shares in favor of any proposed business combination, including the Business Combination, (ii) not to convert their shares in connection with a stockholder vote to approve a proposed initial business combination, and (iii) not to sell any such shares to the Company in a tender offer in connection with any proposed business combination. Our Initial Stockholders have agreed to vote their shares in favor of the Business Combination Proposal. As a result, we would need only 7,053,262, or approximately 35.3%, of the 20,000,000 public shares, to be voted in favor of the Business Combination Agreement in order to have the Business Combination approved. Accordingly, it is more likely that the necessary stockholder approval will be received than would be the case if the Initial Stockholders agreed to vote their Initial Stockholder Shares, private placement shares and Insider Shares in accordance with the majority of the votes cast by the Company's public stockholders.

***The unaudited pro forma condensed combined financial information included in this proxy statement/prospectus may not be indicative of what the Company's actual financial position or results of operations would have been.***

The unaudited pro forma condensed combined financial information in this proxy statement/prospectus is presented solely for illustrative purposes only and is not necessarily indicative of what the Company's actual financial position or results of operations would have been had the Business Combination completed on the dates indicated. See the section titled "*Unaudited Pro Forma Condensed Combined Financial Information*" for more information.

***If third parties bring claims against the Company, the proceeds held in trust could be reduced and the per-share redemption price received by stockholders may be less than $10.00 per share.***

The Company's placing of funds in trust may not protect those funds from third party claims against the Company. Although the Company has sought to have all vendors and service providers the Company engages

83

**Table of Contents**

and prospective target businesses the Company negotiated with execute agreements with the Company waiving any right, title, interest or claim of any kind in or to any monies held in the Trust Account for the benefit of the Company's public stockholders, they may not execute such agreements. Furthermore, even if such entities execute such agreements with the Company, they may seek recourse against the Trust Account. A court may not uphold the validity of such agreements. Accordingly, the proceeds held in trust could be subject to claims which could take priority over those of the Company's public stockholders. If the Company is unable to complete a business combination and distribute the proceeds held in trust to the Company's public stockholders, the Sponsor has agreed (subject to certain exceptions described elsewhere in this proxy statement/prospectus) that it will be liable to ensure that the proceeds in the Trust Account are not reduced below $10.00 per share by the claims of target businesses or claims of vendors or other entities that are owed money by the Company for services rendered or contracted for or products sold to the Company. However, it may not be able to meet such obligation. Therefore, the per-share distribution from the Trust Account may be less than $10.00, plus interest, due to such claims.

Additionally, if the Company is forced to file a bankruptcy case or an involuntary bankruptcy case is filed against the Company's which is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in the Company's bankruptcy estate and subject to the claims of third parties with priority over the claims of the Company's stockholders. To the extent any bankruptcy claims deplete the Trust Account, the Company may not be able to return to the Company's public stockholders at least $10.00. The Sponsor may not have sufficient funds to satisfy its indemnity obligations, as its only assets are securities of the Company. The Company has not asked the Sponsor to reserve for such indemnification obligations. As a result, if any such claims were successfully made against the Trust Account, the funds available for the Company's initial business combination, including the Business Combination, and redemptions could be reduced to less than $10.00 per public share.

***Our directors may decide not to enforce the indemnification obligations of our Sponsor, resulting in a reduction in the amount of funds in the Trust Account available for distribution to our public stockholders.***

In the event that the proceeds in the Trust Account are reduced below the lesser of (i) $10.00 per public share and (ii) the actual amount per share held in the Trust Account as of the date of the liquidation of the Trust Account if less than $10.00 per share due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, and our Sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our Sponsor to enforce its indemnification obligations. While we currently expect that our independent directors would take legal action on our behalf against our Sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment and subject to their fiduciary duties may choose not to do so in any particular instance if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. If our independent directors choose not to enforce these indemnification obligations, the amount of funds in the Trust Account available for distribution to our public stockholders may be reduced below $10.00 per share.

***If, before distributing the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our stockholders and the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.***

If, before distributing the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the Trust Account, the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.

84

Table of Contents

***If, after we distribute the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and we and our Board may be exposed to claims of punitive damages.***

If, after we distribute the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. In addition, our Board may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith, thereby exposing itself and us to claims of punitive damages, by paying public stockholders from the Trust Account prior to addressing the claims of creditors.

***The Company's stockholders may be held liable for claims by third parties against the Company to the extent of distributions received by them.***

The Company's certificate of incorporation provides that it will continue in existence only until November 18, 2021. If the Company has not completed a business combination by such date, the Company will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including any interest earned on the funds held in the Trust Account net of interest that may be used by the Company to pay its franchise and income taxes payable and up to $100,000 for dissolution expenses, divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the Company's remaining stockholders and our Board, dissolve and liquidate, subject (in the case of (ii) and (iii) above) to the Company's obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law.

If the Company is forced to file a bankruptcy case or an involuntary bankruptcy case is filed against the Company which is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by the Company's stockholders. Furthermore, because GigCapital3 intends to distribute the proceeds held in the public shares to the Company's public stockholders promptly after expiration of the time the Company has to complete an initial business combination, this may be viewed or interpreted as giving preference to the Company's public stockholders over any potential creditors with respect to access to or distributions from the Company's assets. Furthermore, our Board may be viewed as having breached their fiduciary duties to the Company's creditors and/or may have acted in bad faith, and thereby exposing itself and the Company to claims of punitive damages, by paying public stockholders from the Trust Account prior to addressing the claims of creditors. The Company cannot assure you that claims will not be brought against it for these reasons.

***Neither the Company nor its stockholders will have the protection of any indemnification, escrow, price adjustment or other provisions that allow for a post-closing adjustment to be made to the total aggregate closing consideration in the event that any of the representations and warranties made by Lightning Systems in the Business Combination ultimately proves to be inaccurate or incorrect.***

The representations and warranties made by Lightning Systems and the Company to each other in the Business Combination Agreement will not survive the consummation of the Business Combination. As a result, the Company and its stockholders will not have the protection of any indemnification, escrow, price adjustment or other provisions that allow for a post-closing adjustment to be made to the total merger consideration if any representation or warranty made by Lightning Systems in the Business Combination Agreement proves to be inaccurate or incorrect. Accordingly, to the extent such representations or warranties are incorrect, the Company would have no indemnification claim with respect thereto and its financial condition or results of operations could be adversely affected.

85

Table of Contents

***GigCapital3 may not have sufficient funds to satisfy indemnification claims of its directors and executive officers.***

GigCapital3 has agreed to indemnify its officers and directors to the fullest extent permitted by law. However, GigCapital3's officers and directors have agreed to waive any right, title, interest or claim of any kind in or to any monies in the Trust Account and not to seek recourse against the Trust Account for any reason whatsoever. Accordingly, any indemnification provided will be able to be satisfied by GigCapital3 only if (i) GigCapital3 has sufficient funds outside of the Trust Account or (ii) GigCapital3 consummates an initial business combination. GigCapital3's obligation to indemnify its officers and directors may discourage stockholders from bringing a lawsuit against its officers or directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against GigCapital3's officers and directors, even though such an action, if successful, might otherwise benefit GigCapital3 and its stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent GigCapital3 pays the costs of settlement and damage awards against its officers and directors pursuant to these indemnification provisions.

***If the Company does not file and maintain a current and effective prospectus relating to the Common Stock issuable upon exercise of the warrants, holders will only be able to exercise such warrants on a "cashless basis."***

If the Company does not file and maintain a current and effective prospectus relating to the Common Stock issuable upon exercise of the warrants at the time that holders wish to exercise such warrants, they will only be able to exercise them on a "cashless basis" provided that an exemption from registration is available. As a result, the number of shares of Common Stock that holders will receive upon exercise of the warrants will be fewer than it would have been had such holder exercised its warrant for cash. Further, if an exemption from registration is not available, holders would not be able to exercise on a cashless basis and would only be able to exercise their warrants for cash if a current and effective prospectus relating to the Common Stock issuable upon exercise of the warrants is available. Under the terms of the Warrant Agreement, the Company has agreed to use its best efforts to meet these conditions and to file and maintain a current and effective prospectus relating to the Common Stock issuable upon exercise of the warrants until the expiration of the warrants. However, the Company cannot assure you that it will be able to do so. If the Company is unable to do so, the potential "upside" of the holder's investment in the Company may be reduced or the warrants may expire worthless.

***Even if the Company consummates the Business Combination, there is no guarantee that the warrants will ever be in the money, and they may expire worthless and the terms of warrants may be amended.***

The exercise price for the warrants is $11.50 per share of Common Stock. There is no guarantee that the public warrants will ever be in the money prior to their expiration, and as such, the warrants may expire worthless.

In addition, the Company's warrants were issued in registered form under the Warrant Agreement between Continental Stock Transfer & Trust Company, as warrant agent, and the Company. The Warrant Agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any other change. Accordingly, the Company may amend the terms of the warrants in a manner adverse to a holder if holders of at least 50% of the then outstanding public warrants approve of such amendment. Although the Company's ability to amend the terms of the warrants with the consent of at least 50% of the then outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, shorten the exercise period or decrease the number of shares and their respective affiliates and associates have of Common Stock purchasable upon exercise of a warrant.

Table of Contents

***The exercise price for our public warrants is higher than in many similar blank check company offerings in the past, and, accordingly, the public warrants are more likely to expire worthless.***

The exercise price of our public warrants is higher than is typical with many similar blank check companies in the past. Historically, with regard to units offered by blank check companies, the exercise price of a public warrant was generally a fraction of the purchase price of the units in the initial public offering. The exercise price for our public warrants is $11.50 per share, subject to adjustment as provided herein. As a result, the public warrants are less likely to ever be in the money and more likely to expire worthless.

***Warrants will become exercisable for our Common Stock, which would increase the number of shares eligible for future resale in the public market and result in dilution to our stockholders.***

Our public warrants issued as part of our IPO are exercisable for 15,000,000 shares of Common Stock at $11.50 per share. We are also issuing the Convertible Note Warrants to purchase up to 8,695,652 shares of Common Stock for a per share exercise price of $11.50. The additional shares of Common Stock issued upon exercise of our warrants will result in dilution to the then existing holders of Common Stock of the Company and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of our Common Stock.

***Stockholders may not know immediately after the special meeting whether we have satisfied the closing condition that the Trust Account and the proceeds from the PIPE Investment and Convertible Note Investment equal or exceed $150,000,000.***

If we receive valid redemption requests from holders of public shares prior to the redemption deadline, we may, at our sole discretion, following the redemption deadline and until the Closing Date, seek and permit withdrawals by one or more of such holders of their redemption requests. We may select which holders to seek such withdrawals of redemption requests from based on any factors we may deem relevant, and the purpose of seeking such withdrawals may be to increase the funds held in the trust account, including where we otherwise would not satisfy the closing condition that the amount in the Trust Account and the proceeds from the PIPE Investment and Convertible Note Investment equal or exceed $150,000,000, or that the amount remaining in the Trust Account is at least $50,000,000. This process could take a number of days, and there may be a period of time after the special meeting and before the Closing when stockholders do not know whether we have satisfied this closing condition.

***The Company has no obligation to net cash settle the warrants.***

In no event will the Company have any obligation to net cash settle the warrants. Furthermore, there are no contractual penalties for failure to deliver securities to the holders of the warrants upon consummation of an initial business combination, including the Business Combination, or exercise of the warrants. Accordingly, the warrants may expire worthless.

***The Company's ability to successfully effect the Business Combination and to be successful thereafter will be totally dependent upon the efforts of its key personnel, including Lightning Systems' key personnel, all of whom are expected to join the Company following the Business Combination. While the Company intends to closely scrutinize any individuals it engages after the Business Combination, it cannot assure you that its assessment of these individuals will prove to be correct.***

The Company's ability to successfully effect the Business Combination is dependent upon the efforts of key personnel of Lightning Systems and of the Company, including Dr. Avi Katz, the Company's Chief Executive Officer and Executive Chairman, and Timothy Reeser, Lightning Systems' Chief Executive Officer. Although the Company expects all of Lightning Systems' key personnel to remain with New Lightning eMotors following the Business Combination, it is possible that New Lightning eMotors will lose some key personnel, the loss of which could negatively impact the operations and profitability of New Lightning eMotors. While New Lightning eMotors intends to closely scrutinize any individuals it engages after the Business Combination, it cannot assure

87

**Table of Contents**

you that its assessment of these individuals will prove to be correct. These individuals may be unfamiliar with the requirements of operating a public company which could cause New Lightning eMotors to have to expend time and resources helping them become familiar with such requirements. This could be expensive and time-consuming and could lead to various regulatory issues which may adversely affect its operations.

***The Company and Lightning Systems will be subject to business uncertainties and contractual restrictions while the Business Combination is pending.***

Uncertainty about the effect of the Business Combination on employees and third parties may have an adverse effect on the Company and Lightning Systems. These uncertainties may impair our or Lightning Systems' ability to retain and motivate key personnel and could cause third parties that deal with any of us or them to defer entering into contracts or making other decisions or seek to change existing business relationships. If key employees depart because of uncertainty about their future roles and the potential complexities of the Business Combination, our or Lightning Systems' business could be harmed.

***We may waive one or more of the conditions to the Business Combination.***

We may agree to waive, in whole or in part, one or more of the conditions to our obligations to complete the Business Combination, to the extent permitted by our current amended and restated certificate of incorporation and bylaws and applicable laws. We may not waive the condition that our stockholders approve the Business Combination. Please see the section entitled "*Proposal No. 1 - Approval of the Business Combination - The Business Combination Agreement - Conditions to Closing of the Business Combination*" for additional information.

***The exercise of discretion by our directors and officers in agreeing to changes to the terms of or waivers of closing conditions in the Business Combination Agreement may result in a conflict of interest when determining whether such changes to the terms of the Business Combination Agreement or waivers of conditions are appropriate and in the best interests of our stockholders.***

In the period leading up to the Closing, other events may occur that, pursuant to the Business Combination Agreement, would require the Company to agree to amend the Business Combination Agreement, to consent to certain actions or to waive rights that we are entitled to under those agreements. Such events could arise because of changes in the course of Lightning Systems' business, a request by Lightning Systems to undertake actions that would otherwise be prohibited by the terms of the Business Agreement or the occurrence of other events that would have a material adverse effect on Lightning Systems' business and would entitle the Company to terminate the Business Combination Agreement. In any of such circumstances, it would be in the discretion of the Company, acting through the Board, to grant its consent or waive its rights. The existence of the financial and personal interests of the directors described elsewhere in this proxy statement/prospectus may result in a conflict of interest on the part of one or more of the directors between what he or she may believe is best for the Company and our stockholders and what he or she may believe is best for himself or herself or his or her affiliates in determining whether or not to take the requested action. As of the date of this proxy statement/prospectus, we do not believe there will be any changes or waivers that our directors and officers would be likely to make after stockholder approval of the Business Combination has been obtained. While certain changes could be made without further stockholder approval, if there is a change to the terms of the Business Combination that would have a material impact on the stockholders, we will be required to circulate a new or amended proxy statement or supplement thereto and resolicit the vote of our stockholders with respect to the Business Combination Proposal.

***We and Lightning Systems will incur significant transaction and transition costs in connection with the Business Combination.***

We and Lightning Systems have both incurred and expect to incur significant, non-recurring costs in connection with consummating the Business Combination and operating as a public company following the consummation of the Business Combination. We and Lightning Systems may also incur additional costs to retain

Table of Contents

key employees. All expenses incurred in connection with the Business Combination Agreement and the transactions contemplated thereby (including the Business Combination), including all legal, accounting, consulting, investment banking and other fees, expenses and costs, will be for the account of the party incurring such fees, expenses and costs or paid by the Company following the Closing.

The aggregate transaction expenses as a result of the Business Combination are expected to be approximately $40.0 million. The per-share amount we will distribute to stockholders who properly exercise their redemption rights will not be reduced by the transaction expenses and after such redemptions, the per-share value of shares held by non-redeeming stockholders will reflect our obligation to pay the transaction expenses.

***Our Sponsor, certain members of our Board and our officers have interests in the Business Combination that are different from or are in addition to other stockholders in recommending that stockholders vote in favor of approval of the Business Combination Proposal and approval of the other proposals described in this proxy statement/prospectus.***

When considering our Board's recommendation that our stockholders vote in favor of the approval of the Business Combination Proposal, our stockholders should be aware that the directors and officers of the Company have interests in the Business Combination that may be different from, or in addition to, the interests of our stockholders. These interests include:

- the fact that our Initial Stockholders have agreed not to redeem any of the Initial Stockholder Shares in connection with a stockholder vote to approve the Business Combination;

- the fact that our Sponsor will retain 5,635,000 Initial Stockholder Shares upon the Closing;

- the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Initial Stockholder Shares if we fail to complete an initial business combination by the applicable deadline;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party (other than our independent public accountants) for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that Neil Miotto and Drs. Avi Katz and Raluca Dinu will continue as board members of New Lightning eMotors, and each shall be entitled to receive compensation for serving on the New Lightning eMotors Board; and

- the fact that our Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the applicable deadline. Prior to GigCapital3's initial public offering, the Sponsor purchased 5,735,000 Initial Stockholder Shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share (as compared to the $10.00 per share price being used to determine the number of shares of Common Stock being issued to the Lightning Systems equity holders in the Business Combination or at which the PIPE Investors have agreed to purchase Common Stock). However, 750,000 shares of Common Stock issued to the Sponsor were forfeited due to the over-allotment option not being exercised by the Underwriters. Additionally, the Sponsor purchased 650,000 private placement units simultaneously with the consummation of GigCapital3's initial public offering for an aggregate purchase price of $6.5 million. Certain of GigCapital3's directors and executive officers, including Dr. Avi Katz, Dr. Raluca Dinu, Neil Miotto, John Mikulsky, Peter Wang, Andrea Betti-Berutto and Brad

89

Table of Contents

Weightman, also have a direct or indirect economic interest in such private placement units and in the 5,635,000 Initial Stockholder Shares owned by the Sponsor. The 5,635,000 Initial Stockholder Shares owned by the Sponsor would have had an aggregate market value of $63.1 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The 650,000 private placement units held by the Sponsor would have had an aggregate market value of $8.8 million based upon the closing price of $13.59 per public unit on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The Sponsor does not hold any warrants independent of what is included in the private placement units. While the private placement units have a trading price and value as set forth above, the private placement units will be, upon completion of the Business Combination, broken into their constituent components of stock and warrants, and each of those separately trade and the value of each of those is $11.19 per public share and $3.05 per public warrant. Additionally, the Sponsor, officers and directors do not currently have any unreimbursed out-of-pocket expenses in connection with the business combination. Upon completion of the Business Combination, the former Lightning Systems equity holders will own 53,922,000 shares of our Common Stock. The shares owned by the former Lightning Systems equity holders would have had an aggregate market value of $603.4 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus.

Our Initial Stockholders, including our Sponsor and our independent directors, hold a significant number of shares of our Common Stock. They will lose their entire investment in us if a business combination is not completed.

Our Initial Stockholders hold in the aggregate 5,893,749 Initial Stockholder Shares, representing 22.8% of the total shares outstanding as of the date of this proxy statement/prospectus. The Initial Stockholder Shares will be worthless if we do not complete a business combination by the applicable deadline.

The Initial Stockholder Shares are identical to the shares of Common Stock included in the public units, except that: (i) the Initial Stockholder Shares are subject to certain transfer restrictions; (ii) our Initial Stockholders, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed: (a) to waive their redemption rights with respect to their shares of Common Stock in connection with the completion of our Business Combination; (b) waive their redemption rights with respect to their shares of Common Stock in connection with a stockholder vote to approve an amendment to our current amended and restated certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of the IPO or to provide for redemption in connection with a business combination; and (c) to waive their rights to liquidating distributions from the Trust Account with respect to their Initial Stockholder Shares if we fail to complete our initial business combination by the applicable deadline (although they will be entitled to liquidating distributions from the Trust Account with respect to any public shares they hold if we fail to complete our initial business combination by the applicable deadline.

The personal and financial interests of our officers and directors may have influenced their motivation in identifying and selecting Lightning Systems, completing a business combination with Lightning Systems and may influence their operation of New Lightning eMotors following the Business Combination. This risk may become more acute as the deadline of the applicable deadline for completing an initial business combination nears.

***Our Sponsor, directors or officers or their affiliates may elect to purchase shares or warrants from public stockholders, which may influence a vote on a proposed Business Combination and the other proposals described in this proxy statement/prospectus and reduce the public "float" of our Common Stock.***

Our Sponsor, directors or officers or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our Business Combination, although they are

90

Table of Contents

under no obligation to do so. Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of our shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that our Sponsor, directors, officers or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. The purpose of such purchases could be to vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining stockholder approval of the Business Combination or to satisfy closing conditions in the Business Combination Agreement regarding required amounts in the Trust Account and the proceeds from the PIPE Investment and the Convertible Note Investment equaling or exceeding certain thresholds where it appears that such requirements would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with our initial business combination. This may result in the completion of our Business Combination that may not otherwise have been possible. Any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements.

In addition, if such purchases are made, the public "float" of our Common Stock and the number of beneficial holders of our securities may be reduced, possibly making it difficult to obtain or maintain the quotation, listing or trading of our securities on the NYSE or another national securities exchange or reducing the liquidity of the trading market for our Common Stock.

*A market for the Company's securities may not continue, which would adversely affect the liquidity and price of its securities.*

Following the Business Combination, the price of New Lightning eMotors' securities may fluctuate significantly due to the market's reaction to the Business Combination and general market and economic conditions. An active trading market for the Company's securities following the Business Combination may never develop or, if developed, it may not be sustained. In addition, the price of New Lightning eMotors' securities after the Business Combination can vary due to general economic conditions and forecasts, New Lightning eMotors' general business condition and the release of New Lightning eMotors' financial reports. Additionally, if New Lightning eMotors' securities are not listed on, or become delisted from, the NYSE for any reason, and are quoted on the OTC Bulletin Board (an inter-dealer automated quotation system for equity securities that is not a national securities exchange) or New Lightning eMotors' securities are not listed on the NYSE and are quoted on the OTC Bulletin Board, the liquidity and price of New Lightning eMotors' securities may be more limited than if New Lightning eMotors' securities were quoted or listed on the NYSE or another national securities exchange. You may be unable to sell your securities unless a market can be established or sustained.

*The ability to execute New Lightning eMotors' strategic plan could be negatively impacted to the extent a significant number of stockholders choose to redeem their shares in connection with the Business Combination.*

Depending upon the aggregate amount of cash consideration the Company would be required to pay for all shares of Common Stock that are validly submitted for redemption, New Lightning eMotors may be required to increase the financial leverage New Lightning eMotors' business would have to support. This may negatively impact its ability to execute on its own future strategic plan and its financial viability.

*If New Lightning eMotors fails to introduce or acquire new products or services that achieve broad market acceptance on a timely basis, or if its products or services are not adopted as expected, the combined company will not be able to compete effectively.*

New Lightning eMotors will operate in a highly competitive, quickly changing environment, and the combined company's future success depends on its ability to develop or acquire, and introduce new products and services that achieve broad market acceptance. New Lightning eMotors' ability to successfully introduce and

91

Table of Contents

market new products is unproven. Because New Lightning eMotors will have a limited operating history and the market for its products, including newly acquired or developed products, is rapidly evolving, it is difficult to predict the combined company's operating results, particularly with respect to any new products that it may introduce. New Lightning eMotors' future success will depend in large part upon its ability to identify demand trends in the market in which it will operate and quickly develop or acquire, and design, manufacture and sell, products and services that satisfy these demands in a cost-effective manner.

In order to differentiate New Lightning eMotors' products and services from competitors' products, New Lightning eMotors will need to increase focus and capital investment in research and development, including software development. If any products currently sold by, and services offered by, Lightning Systems do not continue, or if New Lightning eMotors' new products or services fail to achieve widespread market acceptance, or if we are unsuccessful in capitalizing on opportunities in the market in which New Lightning eMotors will operate, New Lightning eMotors' future growth may be slowed and its business, results of operations and financial condition could be materially adversely affected. Successfully predicting demand trends is difficult, and it is very difficult to predict the effect that introducing a new product or service will have on existing product or service sales. It is possible that New Lightning eMotors may not be successful with its new products and services, and as a result New Lightning eMotors' future growth may be slowed and its business, results of operations and financial condition could be materially adversely affected. Also, New Lightning eMotors' may not be able to respond effectively to new product or service announcements by competitors by quickly introducing competitive products and services.

In addition, New Lightning eMotors may acquire companies and technologies in the future. In these circumstances, the combined company may not be able to successfully manage integration of the new product and service lines with the combined company's existing suite of products and services. If New Lightning eMotors is unable to effectively and successfully further develop these new product and service lines, New Lightning eMotors may not be able to increase or maintain sales (as compared to sales of Lightning Systems on a standalone basis), and New Lightning eMotors' gross margin (as compared to sales of Lightning Systems on a standalone basis) may be adversely affected.

Furthermore, the success of New Lightning eMotors' new products will depend on several factors, including, but not limited to, market demand costs, timely completion and introduction of these products, prompt resolution of any defects or bugs in these products, New Lightning eMotors' ability to support these products, differentiation of new products from those of New Lightning eMotors' competitors, market acceptance of these products, delays and quality issues in releasing new products and services. The occurrence of one or more of the foregoing factors may result in lower quarterly revenue than expected, and New Lightning eMotors may in the future experience product or service introductions that fall short of its projected rates of market adoption.

***If New Lightning eMotors' products fail to achieve and sustain sufficient market acceptance, the combined company's revenue will be adversely affected.***

New Lightning eMotors' success will depend on its ability to develop and market products that are recognized and accepted as reliable, enabling and cost-effective. Some potential customers of the combined company may already use products similar to what Lightning Systems currently offers and similar to what New Lightning eMotors may offer in the future and may be reluctant to replace those products with what Lightning Systems currently offers or which the combined company may offer in the future. Market acceptance of New Lightning eMotors' products and technology will depend on many factors, including New Lightning eMotors' ability to convince potential customers that New Lightning eMotors' products and technology are an attractive alternative to existing products and technology. Prior to adopting New Lightning eMotors' products and technology, some potential customers may need to devote time and effort to testing and validating New Lightning eMotors' systems. Any failure of New Lightning eMotors' systems to meet these customer benchmarks could result in potential customers choosing to retain their existing systems or to purchase systems other than the combined company's.

92

Table of Contents

***If the Business Combination's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of the Company's securities may decline.***

If the benefits of the Business Combination do not meet the expectations of investors or securities analysts, the market price of the Company's securities prior to the Closing may decline. The market values of the Company's securities at the time of the Business Combination may vary significantly from their prices on the date the Business Combination was executed, the date of this proxy statement/prospectus, or the date on which the Company's stockholders vote on the Business Combination.

In addition, following the Business Combination, fluctuations in the price of the Company's securities could contribute to the loss of all or part of your investment. Prior to the Business Combination, there has not been a public market for Lightning Systems' stock and trading in the shares of Company Common Stock has not been active. Accordingly, the valuation ascribed to Lightning Systems and Company Common Stock in the Business Combination may not be indicative of the price that will prevail in the trading market following the Business Combination. If an active market for the Company's securities develops and continues, the trading price of the Company's securities following the Business Combination could be volatile and subject to wide fluctuations in response to various factors, some of which are beyond the Company's control. Any of the factors listed below could have a material adverse effect on your investment in the Company's securities and the Company's securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of the Company's securities may not recover and may experience a further decline.

Factors affecting the trading price of the Company's securities following the Business Combination may include:

- actual or anticipated fluctuations in New Lightning eMotors' quarterly financial results or the quarterly financial results of companies perceived to be similar to New Lightning eMotors;

- changes in the market's expectations about New Lightning eMotors' operating results;

- success of competitors;

- New Lightning eMotors' operating results failing to meet the expectation of securities analysts or investors in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning New Lightning eMotors or the market in general;

- operating and stock price performance of other companies that investors deem comparable to New Lightning eMotors';

- New Lightning eMotors' ability to market new and enhanced services and products on a timely basis;

- changes in laws and regulations affecting New Lightning eMotors' business;

- commencement of, or involvement in, litigation involving the Company;

- changes in New Lightning eMotors' capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares of New Lightning eMotors' securities available for public sale;

- any major change in the board or management;

- sales of substantial amounts of Common Stock by New Lightning eMotors' directors, executive officers or significant stockholders or the perception that such sales could occur; and

- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations and acts of war or terrorism.

Table of Contents

Broad market and industry factors may materially harm the market price of the Company's securities irrespective of its operating performance. The stock market in general and the NYSE have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of the Company's securities, may not be predictable. A loss of investor confidence in the market for retail stocks or the stocks of other companies which investors perceive to be similar to the Company could depress the Company's stock price regardless of the Company's business, prospects, financial condition or results of operations. A decline in the market price of the Company's securities also could adversely affect the Company's ability to issue additional securities and the Company's ability to obtain additional financing in the future.

***Following the Business Combination, if securities or industry analysts do not publish or cease publishing research or reports about the Company, its business, or its market, or if they change their recommendations regarding the Company's securities adversely, the price and trading volume of the Company's securities could decline.***

The trading market for New Lightning eMotors' securities will be influenced by the research and reports that industry or securities analysts may publish about New Lightning eMotors, its business, its market, or its competitors. Securities and industry analysts do not currently, and may never, publish research on New Lightning eMotors. If no securities or industry analysts commence coverage of New Lightning eMotors, New Lightning eMotors' stock price and trading volume would likely be negatively impacted. If any of the analysts who may cover New Lightning eMotors, change their recommendation regarding New Lightning eMotors' stock adversely, or provide more favorable relative recommendations about New Lightning eMotors' competitors, the price of New Lightning eMotors' securities would likely decline. If any analyst who may cover New Lightning eMotors were to cease coverage of New Lightning eMotors or fail to regularly publish reports on it, New Lightning eMotors could lose visibility in the financial markets, which could cause its stock price or trading volume to decline.

***The future sales of shares by existing stockholders may adversely affect the market price of the Company's Common Stock.***

Sales of a substantial number of shares of the Company's Common Stock in the public market could occur at any time. If the Company's stockholders sell, or the market perceives that the Company's stockholders intend to sell, substantial amounts of the Company's Common Stock in the public market, the market price of the Company's Common Stock could decline.

***Our public stockholders will experience dilution as a consequence of, among other transactions, the issuance of Common Stock as consideration in the Business Combination, the PIPE Investment and the Convertible Note Investment. Having a minority share position may reduce the influence that our current stockholders have on the management of New Lightning eMotors.***

The issuance of the Common Stock in the Business Combination and in the PIPE Investment, as well as the conversion of the Convertible Notes, will dilute the equity interest of our existing stockholders and may adversely affect prevailing market prices for our public shares and/or public warrants.

It is anticipated that, upon completion of the Business Combination: (i) the Company's public stockholders (other than the PIPE Investor and the Convertible Note Investors) will retain an ownership interest of approximately 24.3% in New Lightning eMotors; (ii) the PIPE Investor will own approximately 3% of New Lightning eMotors (such that public stockholders, including PIPE Investor, will own approximately 27.3% of New Lightning eMotors); (iii) our Initial Stockholders (including our Sponsor) will own approximately 7.2% of New Lightning eMotors; and (iv) the former Lightning Systems equity holders will own approximately 65.5% of New Lightning eMotors, not including any Stockholder Earnout Shares or the shares of Common Stock that will be issuable upon conversion of the Convertible Notes or the exercise of any warrants, including the Convertible

94

Table of Contents

Note Warrants. The PIPE Investor has agreed to purchase 2,500,000 shares of Common Stock in the aggregate, for $25,000,000 of gross proceeds. The Convertible Note Investors have agreed to purchase an aggregate principal amount of $100,000,000 of Convertible Notes. The ownership percentage with respect to New Lightning eMotors following the Business Combination does not take into account (i) warrants to purchase Common Stock that will remain outstanding immediately following the Business Combination, (ii) the issuance of Stockholder Earnout Shares to the Stockholder Earnout Group should the earnout conditions in the Business Combination Agreement be satisfied, (iii) conversion of any of the Convertible Notes or (iv) the issuance of any shares upon completion of the Business Combination under the Incentive Plan, a copy of which is attached to this proxy statement/prospectus as *Annex H.* If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in New Lightning eMotors will be different. For more information, please see the sections entitled "*Summary of the Proxy Statement/Prospectus - Impact of the Business Combination on the Company's Public Float,*" "*Unaudited Pro Forma Condensed Combined Financial Information*" and "*Proposal No. 5 - Approval of the Incentive Plan*."

***The NYSE may not list our securities on its exchange, which could limit investors' ability to make transactions in our securities and subject us to additional trading restrictions.***

In connection with the Business Combination, in order to obtain the listing of New Lightning eMotors' securities on the NYSE, we will be required to demonstrate compliance with the NYSE's initial listing requirements, which are more rigorous than the NYSE's continued listing requirements. We will seek to have New Lightning eMotors' securities listed on the NYSE upon consummation of the Business Combination. We cannot assure you that we will be able to meet all initial listing requirements. Even if New Lightning eMotors' securities are listed on the NYSE, we may be unable to maintain the listing of its securities in the future.

If we fail to meet the initial listing requirements and the NYSE does not list New Lightning eMotors' securities on its exchange, Lightning Systems would not be required to consummate the Business Combination. In the event that Lightning Systems elected to waive this condition, and the Business Combination was consummated without New Lightning eMotors' securities being listed on the NYSE or on another national securities exchange, we could face significant material adverse consequences, including:

- a limited availability of market quotations for our securities;

- reduced liquidity for our securities;

- a determination that our Common Stock is a "penny stock" which will require brokers trading in our Common Stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." If New Lightning eMotors' securities were not listed on the NYSE, such securities would not qualify as covered securities and we would be subject to regulation in each state in which we offer our securities because states are not preempted from regulating the sale of securities that are not covered securities. Although the states are preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case. While we are not aware of a state, other than the State of Idaho, having used these powers to prohibit or restrict the sale of securities issued by blank check companies, certain state securities regulators view blank check companies unfavorably and might use these powers, or threaten to use these powers, to hinder the sale of securities of blank check companies in their states.

95

Table of Contents

***Resales of the shares of Common Stock included in the Merger Consideration could depress the market price of our Common Stock.***

We will have approximately 82.3 million shares of Common Stock outstanding immediately following the Business Combination, and there may be a large number of shares of Common Stock sold in the market following the completion of the Business Combination or shortly thereafter. The shares held by the Company's public stockholders are freely tradable, and the shares of Common Stock held by the PIPE Investor will be freely tradable following effectiveness of the registration statement that we have agreed to file in connection with the Business Combination covering the resales of such shares. In addition, the Company will be obligated to register the resale of shares of some of the shares of Common Stock issued as Merger Consideration, which shares will become available for resale following the expiration of any applicable lockup period, as well as the shares of Common Stock into which the Convertible Notes will convert and are issuable upon exercise of the Convertible Note Warrants. We also expect that Rule 144 will become available for the resale of shares of our Common Stock that are not registered for resale once one year has elapsed from the date that we file the Current Report on Form 8-K following the Closing that includes the required Form 10 information that reflects we are no longer a shell company. Such sales of shares of Common Stock or the perception of such sales may depress the market price of our Common Stock.

***New Lightning eMotors may redeem the unexpired warrants prior to their exercise at a time that is disadvantageous to warrant holders, thereby making their warrants worthless.***

New Lightning eMotors has the ability to redeem outstanding warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of the Common Stock equals or exceeds $18.00 per share for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date New Lightning eMotors sends the notice of redemption to the warrant holders. If and when the warrants become redeemable by New Lightning eMotors, New Lightning eMotors may exercise its redemption right even if New Lightning eMotors is unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding warrants could force you (i) to exercise your warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so, (ii) to sell your warrants at the then-current market price when you might otherwise wish to hold your warrants or (iii) to accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of your warrants. None of the private placement warrants and warrants underlying the units issuable upon conversion of working capital loan will be redeemable by New Lightning eMotors so long as they are held by their initial purchasers or their permitted transferees.

***Anti-takeover provisions contained in the proposed Second Amended and Restated Certificate of Incorporation as well as provisions of Delaware law, could impair a takeover attempt.***

The proposed Second Amended and Restated Certificate of Incorporation will contain provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. New Lightning eMotors is also subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together these provisions may make more difficult the removal of management and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for New Lightning eMotors' securities. These provisions will include:

- no cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates;

- a classified board of directors with three-year staggered terms, which could delay the ability of stockholders to change the membership of a majority of the Board;

- the right of our Board to elect a director to fill a vacancy created by the expansion of our Board or the resignation, death or removal of a director in certain circumstances, which prevents stockholders from being able to fill vacancies on our Board;

Table of Contents

- a prohibition on stockholder action by written consent, which forces stockholder action to be taken at an annual or special meeting of our stockholders; and

- the requirement that a meeting of stockholders may only be called by members of our Board or the stockholders holding a majority of our shares, which may delay the ability of our stockholders to force consideration of a proposal or to take action, including the removal of directors.

These provisions, alone or together, could delay hostile takeovers and changes in control of New Lightning eMotors or changes in the New Lightning eMotors Board and New Lightning eMotors' management.

As a Delaware corporation, we are also subject to provisions of Delaware law, including Section 203 of the DGCL, which prevents some stockholders holding more than 15% of our outstanding Common Stock from engaging in certain business combinations without approval of the holders of substantially all of New Lightning eMotors Common Stock. Any provision of the Second Amended and Restated Certificate of Incorporation or bylaws or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our Common Stock and could also affect the price that some investors are willing to pay for our Common Stock.

***The JOBS Act permits "emerging growth companies" like us to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies.***

We currently qualify as an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the JOBS Act. As such, we take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies for as long as we continue to be an emerging growth company, including: (i) the exemption from the auditor attestation requirements with respect to internal control over financial reporting under Section 404 of SOX; (ii) the exemptions from say-on-pay, say-on-frequency and say-on-golden parachute voting requirements; and (iii) reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements. As a result, our stockholders may not have access to certain information they deem important. We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year: (a) following May 18, 2025, the fifth anniversary of our IPO; (b) in which we have total annual gross revenue of at least $1.07 billion; or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Common Stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (ii) the date on which we have issued more than $1.0 billion in non-convertible debt during the prior three-year period.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the exemption from complying with new or revised accounting standards provided in Section 7(a)(2)(B) of the Securities Act as long as we are an emerging growth company. An emerging growth company can therefore delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but any such election to opt out is irrevocable. We have elected to avail ourselves of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company that is neither an emerging growth company nor an emerging growth company that has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

We cannot predict if investors will find our Common Stock less attractive because we rely on these exemptions. If some investors find our Common Stock less attractive as a result, there may be a less active trading market for our Common Stock and our stock price may be more volatile.

Table of Contents

***Our internal controls over financial reporting may not be effective and our independent registered public accounting firm may not be able to certify as to their effectiveness, which could have a significant and adverse effect on our business and reputation.***

As a public company, we are required to comply with the SEC's rules implementing Sections 302 and 404 of SOX, which require management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of internal control over financial reporting. To comply with the requirements of being a public company, New Lightning eMotors will be required to provide management's assessment on internal controls commencing with the annual report for fiscal year ended December 31, 2021, and we may need to undertake various actions, such as implementing additional internal controls and procedures and hiring additional accounting or internal audit staff. The standards required for a public company under Section 404 of SOX are significantly more stringent than those required of Lightning Systems as a privately held company. Further, as an emerging growth company, our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal controls over financial reporting pursuant to Section 404 until the date we are no longer an emerging growth company. At such time, our independent registered public accounting firm may issue a report that is adverse in the event that it is not satisfied with the level at which the controls of New Lightning eMotors are documented, designed or operating.

Testing and maintaining these controls can divert our management's attention from other matters that are important to the operation of our business. If we identify material weaknesses in the internal control over financial reporting of New Lightning eMotors or are unable to comply with the requirements of Section 404 or assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal controls over financial reporting when we no longer qualify as an emerging growth company, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our Common Stock could be negatively affected, and we could become subject to investigations by the SEC or other regulatory authorities, which could require additional financial and management resources.

***Activities taken by the Company's affiliates to purchase, directly or indirectly, public shares will increase the likelihood of approval of the Business Combination Proposal and the other Proposals and may affect the market price of the Company's securities.***

The Company's Initial Stockholders, directors, officers, advisors or their affiliates may purchase shares in privately negotiated transactions either prior to or following the consummation of the Business Combination. None of the Company's Initial Stockholders, directors, officers, advisors or their affiliates will make any such purchases when such parties are in possession of any material non-public information not disclosed to the seller or during a restricted period under Regulation M under the Exchange Act. Although none of the Company's Initial Stockholders, directors, officers, advisors or their affiliates currently anticipate paying any premium purchase price for such public shares, in the event such parties do, the payment of a premium may not be in the best interest of those stockholders not receiving any such additional consideration. There is no limit on the number of shares that could be acquired by the Company's Initial Stockholders, directors, officers, advisors or their affiliates, or the price such parties may pay.

If such transactions are effected, the consequence could be to cause the Business Combination to be approved in circumstances where such approval could not otherwise be obtained. Purchases of shares by the persons described above would allow them to exert more influence over the approval of the Business Combination Proposal and other proposals and would likely increase the chances that such Proposals would be approved. If the market does not view the Business Combination positively, purchases of public shares may have the effect of counteracting the market's view, which would otherwise be reflected in a decline in the market price of the Company's securities. In addition, the termination of the support provided by these purchases may materially adversely affect the market price of the Company's securities.

98

Table of Contents

As of the date of this proxy statement/prospectus, no agreements with respect to the private purchase of public shares by the Company or the persons described above have been entered into with any such investor or holder. The Company will file a Current Report on Form 8-K with the SEC to disclose private arrangements entered into or significant private purchases made by any of the aforementioned persons that would affect the vote on the Business Combination Proposal or other proposals.

***Changes in laws or regulations, or a failure to comply with any laws and regulations, may adversely affect the Company's business, investments and results of operations.***

The Company is subject to laws, regulations and rules enacted by national, regional and local governments. In particular, the Company is required to comply with certain SEC, NYSE and other legal or regulatory requirements, including the NYSE upon the transfer of its listing. Compliance with, and monitoring of, applicable laws, regulations and rules may be difficult, time consuming and costly. Those laws, regulations and rules and their interpretation and application may also change from time to time and those changes could have a material adverse effect on the Company's business, investments and results of operations. In addition, a failure to comply with applicable laws, regulations and rules, as interpreted and applied, could have a material adverse effect on the Company's business and results of operations.

***We have not registered the shares of Common Stock issuable upon exercise of the public warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise public warrants, thus precluding such investor from being able to exercise its public warrants except on a cashless basis and potentially causing such public warrants to expire worthless.***

We have not registered the shares of Common Stock issuable upon exercise of the public warrants under the Securities Act or any state securities laws at this time. However, under the terms of the Warrant Agreement, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement for the registration under the Securities Act of the shares of Common Stock issuable upon exercise of the warrants and thereafter will use our best efforts to cause the same to become effective and to maintain a current prospectus relating to the Common Stock issuable upon exercise of the public warrants, until the expiration of the public warrants in accordance with the provisions of the Warrant Agreement. We cannot assure you that we will be able to do so if, for example, any facts or events arise which represent a fundamental change in the information set forth in the registration statement or prospectus, the financial statements contained or incorporated by reference therein are not current or correct or the SEC issues a stop order. If the shares issuable upon exercise of the public warrants are not registered under the Securities Act, we will be required to permit holders to exercise their public warrants on a cashless basis. However, no public warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their public warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder or an exemption from registration is available. Notwithstanding the above, if our Common Stock is at the time of any exercise of a public warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their public warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, and in the event we do not so elect, we will use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. In no event will we be required to net cash settle any public warrant, or issue securities or other compensation in exchange for the public warrants in the event that we are unable to register or qualify the shares underlying the public warrants under applicable state securities laws and there is no exemption available. If the issuance of the shares upon exercise of the public warrants is not so registered or qualified or exempt from registration or qualification, the holder of such public warrant shall not be entitled to exercise such public warrant and such public warrant may have no value and expire worthless. In such event, holders who acquired their public warrants as part of a purchase of public units will have paid the full unit purchase price solely for the shares of Common Stock

99

Table of Contents

included in the public units. If and when the public warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. We will use our best efforts to register or qualify such shares of Common Stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in the IPO. However, there may be instances in which holders of our public warrants may be unable to exercise such public warrants but holders of our private warrants may be able to exercise such private warrants.

***Our Board did not obtain a third-party valuation or fairness opinion in determining whether or not to proceed with the business combination.***

Our Board did not obtain a third-party valuation or fairness opinion in connection with their determination to approve the Business Combination. In analyzing the Business Combination, our Board and management conducted due diligence on Lightning Systems and researched the industry in which it operates and concluded that the Business Combination was in the best interest of our stockholders. Accordingly, investors will be relying solely on the judgment of our Board in valuing Lightning Systems' business, and our Board may not have properly valued such business. The lack of a third-party valuation or fairness opinion may also lead an increased number of stockholders to vote against the proposed business combination or demand redemption of their shares for cash, which could potentially impact the ability to consummate the Business Combination or the operations of New Lightning eMotors.

***The Company may be a*** "***controlled company" within the meaning of the applicable rules of the NYSE and, as a result, may qualify for exemptions from certain corporate governance requirements. If the Company relies on these exemptions, its stockholders will not have the same protections afforded to stockholders of companies that are subject to such requirements.***

Upon the Closing, depending on the number of shares of Common Stock redeemed by the Company's public stockholders, the Sellers may control a majority of the voting power of New Lightning eMotors' outstanding Common Stock, and the Company may then be a "controlled company" within the meaning of applicable rules of the NYSE upon the Closing of the Business Combination. Under these rules, a company of which more than 50% of the voting power for the election of directors is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance requirements, including the requirements:

- that a majority of the board consists of independent directors;

- for an annual performance evaluation of the nominating and corporate governance and compensation committees;

- that the controlled company has a nominating and corporate governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and

- that the controlled company has a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibility.

If available, New Lightning eMotors may use these exemptions now or in the future. As a result, New Lightning eMotors' stockholders may not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance requirements.

100

Table of Contents

***The Company's proposed Second Amended and Restated Certificate of Incorporation provides, subject to limited exceptions, that the Court of Chancery of the State of Delaware and the federal district courts of the United States of America will be the sole and exclusive forums for substantially all disputes between the Company and its stockholders, which could limit the Company's stockholders' ability to obtain a favorable judicial forum for disputes with the Company or its directors, officers, or employees.***

Our Second Amended and Restated Certificate of Incorporation will require, to the fullest extent permitted by law, that derivative actions brought in our name, actions against our directors, officers, and employees for breach of fiduciary duty and other similar actions may be brought only in the Court of Chancery in the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel except any action (A) as to which the Court of Chancery in the State of Delaware determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), (B) which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, (C) for which the Court of Chancery does not have subject matter jurisdiction, or (D) any action arising under the Securities Act, as to which the Court of Chancery and the federal district court for the District of Delaware shall have concurrent jurisdiction. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock shall be deemed to have notice of and consented to the forum provisions in our Second Amended and Restated Certificate of Incorporation. This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, or employees which may discourage lawsuits with respect to such claims, although our stockholders will not be deemed to have waived our compliance with federal securities laws and the rules and regulations thereunder. However, there is no assurance that a court would enforce the choice of forum provision contained in our Second Amended and Restated Certificate of Incorporation. If a court were to find such provision to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, operating results and financial condition.

Our Second Amended and Restated Certificate of Incorporation will provide that the exclusive forum provision will be applicable to the fullest extent permitted by applicable law. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. As a result, the exclusive forum provision will not apply to suits brought to enforce any duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction.

***The future exercise of registration rights may adversely affect the market price of our Common Stock.***

Certain of our stockholders will have registration rights for restricted securities. We are obligated to register certain securities, including all of the shares of Common Stock held by the Initial Stockholders, shares of Common Stock received by certain significant Lightning Systems stockholders as part of the Business Combination, the PIPE Shares and the Convertible Notes Shares, if applicable. We are obligated to (i) file a resale "shelf" registration statement to register such securities (and any shares of Lightning Systems Common Stock into which they may be exercised following the consummation of the Business Combination) within 15 business days after of the Closing Date and (ii) use reasonable best efforts to cause such registration statement to be declared effective by the SEC as soon as reasonably practicable after the filing. Sales of a substantial number of shares of Common Stock pursuant to the resale registration statement in the public market could occur at any time the registration statement remains effective. In addition, certain registration rights holders can request underwritten offerings to sell their securities. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our Common Stock.

101

Table of Contents

***There is uncertainty regarding the U.S. federal income tax consequences of the redemption to the holders of our Common Stock.***

There is some uncertainty regarding the U.S. federal income tax consequences to holders of our Common Stock who exercise their redemption rights. The uncertainty of tax consequences relates primarily to the individual circumstances of the taxpayer and include (i) whether the redemption results in a dividend or a sale taxable as capital gain, and (ii) whether such capital gain is "long-term" or "short-term." Whether the redemption qualifies for sale treatment will depend largely on whether the holder owns (or is deemed to own) any shares of our Common Stock following the redemption, and if so, the total number of shares of our Common Stock held by the holder both before and after the redemption relative to all shares of our Common Stock outstanding both before and after the redemption. The redemption generally will be treated as a sale, rather than a dividend, if the redemption (i) is "substantially disproportionate" with respect to the holder, (ii) results in a "complete termination" of the holder's interest in the Company or (iii) is "not essentially equivalent to a dividend" with respect to the holder. Due to the personal and subjective nature of certain of such tests and the absence of clear guidance from the IRS, there is uncertainty as to whether a holder who elects to exercise its redemption rights will be treated as receiving a dividend or recognizing capital gain. See the section entitled "*Proposal No. 1 – Approval of the Business Combination – Certain U.S. Federal Income Tax Considerations.*"

**Risks Related to the Redemption**

***We do not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for us to complete a Business Combination with which a substantial majority of our stockholders do not agree.***

Our current amended and restated certificate of incorporation does not provide a specified maximum redemption threshold, except that we will not redeem our public shares in an amount that would cause the Company's net tangible assets to be less than $5,000,001 upon consummation of our initial business combination (such that we are not subject to the SEC's "penny stock" rules). However, the Business Combination Agreement provides that our obligation to consummate the Business Combination is conditioned on the amount in the Trust Account and the proceeds from the PIPE Investment and the Convertible Note Investment equaling or exceeding $150.0 million, and the obligation of Lightning Systems to consummate the Business Combination is conditioned on the amount in the Trust Account and the proceeds from the PIPE Investment and the Convertible Note Investment equaling or exceeding $150.0 million. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. This scenario therefore gives effect to $50.0 million being retained in the Trust Account. As a result, we may be able to complete our Business Combination even though a substantial portion of our public stockholders do not agree with the transaction and have redeemed their shares or have entered into privately negotiated agreements to sell their shares to our Sponsor, directors or officers or their affiliates. Based on the amount of approximately $202.0 million in our Trust Account as of December 31, 2020, and taking into account the anticipated gross proceeds of $25,000,000 from the PIPE Investment and $100,000,000 from the Convertible Note Investment, approximately 15,050,267 shares of Common Stock may be redeemed and still enable us to have sufficient cash to satisfy the cash closing conditions in the Business Combination Agreement. As of the date of this proxy statement/prospectus, no agreements with respect to the private purchase of public shares by the Company or the persons described above have been entered into with any such investor or holder. We will file a Current Report on Form 8-K with the SEC to disclose private arrangements entered into or significant private purchases made by any of the aforementioned persons that would affect the vote on the Business Combination Proposal or other proposals (as described in this proxy statement/prospectus) at the Special Meeting.

In the event the aggregate cash consideration we would be required to pay for all shares of Common Stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the Business Combination Agreement exceeds the aggregate amount of cash available to us, we may not complete the Business Combination or redeem any shares, all shares of Common Stock submitted for redemption will be returned to the holders thereof, and we instead may search for an alternate business combination.

102

Table of Contents

***If you or a "group" of stockholders of which you are a part are deemed to hold an aggregate of 15% or more of Company Common Stock issued in the Company's IPO, you (or, if a member of such a group, all of the members of such group in the aggregate) will lose the ability to redeem all such shares issued in the Company's IPO.***

A public stockholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, of 15% or more of the shares of Common Stock included in the units sold in the Company's IPO. The Company refers to such shares in excess of an aggregation of 15% or more of the shares sold in the Company's IPO as "Unredeemable Shares." In order to determine whether a stockholder is acting in concert or as a group with another stockholder, the Company will require each public stockholder seeking to exercise Redemption Rights to certify to the Company whether such stockholder is acting in concert or as a group with any other stockholder. Such certifications, together with other public information relating to stock ownership available to the Company at that time, such as Section 13D, Section 13G and Section 16 filings under the Exchange Act, will be the sole basis on which the Company makes the above-referenced determination. Your inability to redeem any Unredeemable Shares will reduce your influence over the Company's ability to consummate the Business Combination and you could suffer a material loss on your investment in the Company if you sell Unredeemable Shares in open market transactions. Additionally, you will not receive redemption distributions with respect to the Unredeemable Shares if the Company consummates the Business Combination. As a result, in order to dispose of such shares, you would be required to sell your stock in open market transactions, potentially at a loss. Notwithstanding the foregoing, stockholders may challenge the Company's determination as to whether a stockholder is acting in concert or as a group with another stockholder in a court of competent jurisdiction.

***There is no guarantee that a stockholder's decision whether to redeem their shares for a pro rata portion of the Trust Account will put the stockholder in a better future economic position.***

The Company can give no assurance as to the price at which a stockholder may be able to sell its public shares in the future following the completion of the Business Combination or any alternative business combination. Certain events following the consummation of any initial business combination, including the Business Combination, may cause an increase in the Company's share price, and may result in a lower value realized now than a stockholder of the Company might realize in the future had the stockholder redeemed their shares. Similarly, if a stockholder does not redeem their shares, the stockholder will bear the risk of ownership of the public shares after the consummation of any initial business combination, and there can be no assurance that a stockholder can sell its shares in the future for a greater amount than the redemption price set forth in this proxy statement/prospectus. A stockholder should consult the stockholder's own tax and/or financial advisor for assistance on how this may affect his, her or its individual situation.

***If the Company's stockholders fail to comply with the redemption requirements specified in this proxy statement/prospectus, they will not be entitled to redeem their shares of Company Common Stock for a pro rata portion of the funds held in the Trust Account.***

Holders of public shares are not required to affirmatively vote either for or against the Business Combination Proposal or any other proposal in order to exercise their rights to redeem their shares for a pro rata portion of the Trust Account. In order to exercise their Redemption Rights, they are required to submit a request in writing and deliver their stock (either physically or electronically) to the Company's transfer agent at least two (2) business days prior to the Special Meeting. Stockholders electing to redeem their shares will receive their pro rata portion the aggregate amount then on deposit in the Trust Account, including interest earned on the funds held in the Trust Account and not previously released to it to pay the Company's franchise and income taxes, calculated as of two (2) business days prior to the anticipated consummation of the Business Combination. See the section titled "*Special Meeting of Company Stockholders—Redemption Rights*" for additional information on how to exercise your Redemption Rights.

Table of Contents

***The Company's stockholders who wish to redeem their shares for a pro rata portion of the Trust Account must comply with specific requirements for redemption that may make it more difficult for them to exercise their Redemption Rights prior to the deadline.***

The Company's public stockholders who wish to redeem their shares for a pro rata portion of the Trust Account must, among other things as fully described in the section titled "*Special Meeting of Company Stockholders—Redemption Rights*," tender their certificates to the Company's transfer agent or deliver their shares to the transfer agent electronically through the DTC at least two business days prior to the Special Meeting. In order to obtain a physical stock certificate, a stockholder's broker and/or clearing broker, DTC and the Company's transfer agent will need to act to facilitate this request. It is the Company's understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the transfer agent. However, because GigCapital3 does not have any control over this process or over the brokers, which the Company refers to as "DTC," it may take significantly longer than two weeks to obtain a physical stock certificate. If it takes longer than anticipated to obtain a physical certificate, stockholders who wish to redeem their shares may be unable to obtain physical certificates by the deadline for exercising their Redemption Rights and thus will be unable to redeem their shares.

***If a stockholder fails to receive notice of our offer to redeem our public shares in connection with our Business Combination, or fails to comply with the procedures for tendering its shares, such shares may not be redeemed.***

If, despite our compliance with the proxy rules, a stockholder fails to receive our proxy materials, such stockholder may not become aware of the opportunity to redeem its shares. In addition, the proxy materials that we are furnishing to holders of our public shares in connection with our Business Combination describes the various procedures that must be complied with in order to validly redeem public shares. In the event that a stockholder fails to complete with these procedures, its shares may not be redeemed.

104

**Table of Contents**

**UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

**Introduction**

The Company is providing the following unaudited pro forma condensed combined financial information to aid you in your analysis of the financial aspects of the Business Combination. The following unaudited pro forma condensed combined financial information has been prepared in accordance with Article 11 of Regulation S-X.

The Company is a blank check company whose purpose is to acquire, through a merger, share exchange, asset acquisition, stock purchase, reorganization or other similar Business Combination with one or more businesses. The Company was incorporated in Delaware on February 3, 2020, as GigCapital3, Inc. On May 18, 2020, the Company consummated its IPO. Upon the closing of the IPO, $202.0 million from the net proceeds thereof was placed in a Trust Account and invested in U.S. "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act having a maturity of 180 days or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act which invest only in direct U.S. government treasury obligations. The underwriters of the IPO were granted a 45-day option to purchase up to an additional 3,000,000 units to cover over-allotments. On June 27, 2020, the underwriters' over-allotment option expired. As of December 31, 2020, there was $202.0 million held in the Trust Account.

Lightning Systems, which also does business as Lightning eMotors, is a leading electric vehicle designer and manufacturer, providing complete electrification solutions for commercial fleets – from Class 3 cargo and passenger vans to Class 6 work trucks, and Class 7 city buses. Lightning Systems is committed to eradicating commercial fleet emissions, the main cause of urban air pollution, by providing zero emission Class 3 to 7 BEVs and FCEVs and infrastructure solutions to commercial fleet customers. As of the date of this proxy statement/prospectus, Lightning Systems is the dominant market leader in the urban commercial ZEV industry, with over 36% market share in Class 3 to 6 EVs in 2020 and the distinction of being the only company in the United States that has delivered fully functional Class 3 to 7 EVs to the end customer that are in use today.

The following unaudited pro forma condensed combined balance sheet as of December 31, 2020 assumes that the Business Combination occurred on December 31, 2020. The unaudited pro forma condensed combined statement of operations for the period ended December 31, 2020 presents pro forma effect to the Business Combination as if it had occurred on January 1, 2020.

The unaudited pro forma condensed combined financial statements have been presented for illustrative purposes only and do not necessarily reflect what New Lightning eMotors' financial condition or results of operations would have been had the acquisition occurred on the dates indicated. Further, the pro forma condensed combined financial information also may not be useful in predicting the future financial condition and results of operations of New Lightning eMotors. The actual financial position and results of operations may differ significantly from the pro forma amounts reflected herein due to a variety of factors.

The historical financial information of the Company was derived from the audited financial statements of the Company for the period from inception (February 3, 2020) through December 31, 2020, included elsewhere in this proxy statement/prospectus. The historical financial information of Lightning Systems was derived from the audited financial statements of Lightning Systems as of and for the twelve months ended December 31, 2020, included elsewhere in this proxy statement/prospectus. This information should be read together with the Company's and Lightning Systems' unaudited and audited financial statements and related notes, the sections titled "*The Company's Management's Discussion and Analysis of Financial Condition and Results of Operations*," and "*Lightning Systems' Management's Discussion and Analysis of Financial Condition and Results of Operations*" and other financial information included elsewhere in this proxy statement/prospectus.

105

Table of Contents

**Description of the Business Combination**

On December 10, 2020, the Company and its wholly owned subsidiary, Project Power Merger Sub, Inc., entered into a Business Combination Agreement with Lightning Systems. If the Business Combination Agreement is adopted by Lightning Systems stockholders, and the Business Combination Agreement is approved by Company stockholders at the Special Meeting, Project Power Merger Sub, Inc. will merge with and into Lightning Systems, with Lightning Systems surviving the merger. Upon the consummation of the Business Combination, the Company will change its name to Lightning Systems, Inc.

Subject to and in accordance with the terms of the Business Combination Agreement and customary adjustments, at the Effective Time of the Business Combination, each share of Lightning Systems Capital Stock issued and outstanding immediately prior to the Effective Time of the Business Combination (other than shares owned by Lightning Systems as treasury stock or Dissenting Shares) will (i) convert into that number of shares of Company Common Stock that constitutes the Merger Consideration, which aggregate amount, including any shares issuable in respect of vested equity awards of Lightning Systems that are exercised prior to the Closing or equity awards of Lightning Systems that the Company assumes and which are exercised following the Closing in accordance with the terms of such equity awards, plus (2) up to an additional 16,463,096 shares of Common Stock as Stockholder Earnout Shares to equity holders of Lightning Systems who have received, or are entitled to receive, any Per Share Merger Consideration shares of Company Common Stock earned due to the satisfaction of the Earnout Conditions pursuant to the terms of the Business Combination Agreement. The following summarizes the consideration.

The unaudited pro forma condensed combined financial statements have been prepared using two different levels of assumed redemptions of common stock:

- **Assuming No Redemption**: This scenario assumes that no shares of Common Stock are redeemed; and

- **Assuming Maximum Redemption**: This scenario assumes that 15,050,267 shares of Common Stock are redeemed for an aggregate payment of approximately $152.0 million (based on the estimated per share redemption price of approximately $10.10 per share based on the fair value of marketable securities held in the Trust Account as of December 31, 2020 of approximately $202.0 million) from the Trust Account. The Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, being no less than an aggregate amount of $150.0 million. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. This scenario therefore gives effect to $50.0 million being retained in the Trust Account. This results in public share redemptions of 15,050,267 shares for aggregate redemption payments of $152.0 million.

106

Table of Contents

**PRO FORMA CONDENSED COMBINED BALANCE SHEET AS OF DECEMBER 31, 2020**
**(in thousands except share and per share amounts)**
**(unaudited)**

|  | (A) GigCapital3, Inc. | (B) Lightning Systems, Inc. | (C) Scenario 1 (Assuming No Redemptions into Cash) Pro Forma Adjustments | | Pro Forma Balance Sheet | (C) Scenario 2 (Assuming Maximum Redemptions into Cash) Pro Forma Adjustments | | Pro Forma Balance Sheet |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| **Current assets** | | | | | | | | |
| Cash and cash equivalents | $ 1,170 | $ 460 | $ 202,029 | (1) | | $ 202,029 | (1) | |
|  | | | 2 | (1) | | 2 | (1) | |
|  | | | 25,000 | (2) | | 25,000 | (2) | |
|  | | | 100,000 | (3) | | 100,000 | (3) | |
|  | | | | | | (152,031) | (5) | |
|  | | | (39,993) | (7) | | (39,993) | (7) | |
|  | | | (4,500) | (8) | | (4,500) | (8) | |
|  | | | | | 284,168 | | | 132,137 |
| Accounts receivable, net | — | 4,122 | | | 4,122 | | | 4,122 |
| Inventories | — | 5,743 | | | 5,743 | | | 5,743 |
| Prepaid expenses and other current | 150 | 3,999 | (1,913) | (7) | 2,236 | (1,913) | (7) | 2,236 |
| **Total current assets** | **1,320** | **14,324** | **280,625** | | **296,269** | **128,594** | | **144,238** |
| Property and equipment, net | — | 2,615 | | | 2,615 | | | 2,615 |
| Operating lease right-of-use asset | — | 7,881 | | | 7,881 | | | 7,881 |
| Other non-current assets | $ 43 | 45 | | | 88 | | | 88 |
| Cash and marketable securities held in Trust Account | 202,029 | — | (202,029) | (1) | — | (202,029) | (1) | — |
| Interest receivable on cash held in trust account | 2 | — | (2) | (1) | — | (2) | (1) | — |
| **Total Assets** | **$ 203,394** | **$ 24,865** | **$ 78,594** | | **$ 306,853** | **$ (73,437)** | | **$ 154,822** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | | | | |
| **Current liabilities:** | | | | | | | | |
| Accounts payable | $ 84 | $ 2,599 | $ (432) | (7) | $ 2,251 | $ (432) | (7) | $ 2,251 |
| Accrued expenses and other current liabilities | 1,806 | 2,762 | (3,289) | (7) | 1,279 | (3,289) | (7) | 1,279 |
| Accrued expenses due to related parties | 6 | 128 | | | 134 | | | 134 |
| Warrant liabilities | — | 21,155 | (21,155) | (4) | — | (21,155) | (5) | — |
| Current portion of long-term debt | — | 7,954 | (6,454) | (4) | | (6,454) | (5) | |
|  | — | | (1,500) | (8) | — | (1,500) | (8) | — |
| Current portion of long-term debt-related party | — | 6,225 | (3,225) | (4) | | (3,225) | (5) | |
|  | — | | (3,000) | (8) | — | (3,000) | (8) | — |
| Current portion of operating lease obligation | — | 1,769 | | | 1,769 | | | 1,769 |
| Current portion of finance lease obligation | — | 54 | | | 54 | | | 54 |
| **Total current liabilities** | **1,896** | **42,646** | **(39,055)** | | **5,487** | **(39,055)** | | **5,487** |
| Long-term debt net of current portion and debt discount related party | — | 1,649 | 1,351 | (9) | 3,000 | 1,351 | (9) | 3,000 |
| Derivative liability | — | — | 42,547 | (3) | 42,547 | 42,547 | (3) | 42,547 |
| Long-term convertible debt | — | — | 100,000 | (3) | | 100,000 | (3) | |
|  | | | (42,547) | (3) | | (42,547) | (3) | |
|  | | | (28,974) | (3) | 28,479 | (28,974) | (3) | 28,479 |
| Operating lease liability, net of current portion | — | 7,265 | | | 7,265 | | | 7,265 |
| Deferred underwriting fee payable | 8,000 | — | (8,000) | (7) | — | (8,000) | (7) | — |
| **Total liabilities** | **9,896** | **51,560** | **25,322** | | **86,778** | **25,322** | | **86,778** |

107

Table of Contents

| | (A) GigCapital3, Inc. | (B) Lightning Systems, Inc. | (C) Scenario 1 (Assuming No Redemptions into Cash) Pro Forma Adjustments | | (C) Scenario 1 Pro Forma Balance Sheet | (C) Scenario 2 (Assuming Maximum Redemptions into Cash) Pro Forma Adjustments | | (C) Scenario 2 Pro Forma Balance Sheet |
|---|---|---|---|---|---|---|---|---|
| **Commitments and contingencies** | | | | | | | | |
| **GigCapital** | | | | | | | | |
| Common stock subject to possible redemption, 18,663,171 shares at a redemption value of $10.10 per share | **188,498** | — | (188,498) | (4) | — | (188,498) | (5) | — |
| **Redeemable, convertible preferred stock** | | | | | | | | |
| Series A redeemable, convertible preferred stock | — | 18,036 | (18,036) | (4) | — | (18,036) | (5) | — |
| Series B redeemable, convertible preferred stock | — | 4,101 | (4,101) | (4) | — | (4,101) | (5) | — |
| Series C redeemable, convertible preferred stock | — | 21,135 | (21,135) | (4) | — | (21,135) | (5) | — |
| **Total redeemable, convertible preferred stock** | — | **43,272** | (43,272) | | — | (43,272) | | — |
| **Stockholders' equity** | | | | | | | | |
| Common stock | 1 | — | 2 | (4) | | 1 | (5) | |
| | | | 5 | (4) | 8 | 5 | (5) | 7 |
| Preferred stock | — | — | — | | — | | | — |
| Additional paid-in capital | 7,728 | 10,828 | 25,000 | (2) | | 25,000 | (2) | |
| | | | 28,974 | (3) | | 28,974 | (3) | |
| | | | 188,496 | (4) | | 36,466 | (5) | |
| | | | (5) | (4) | | (5) | (5) | |
| | | | 43,272 | (4) | | 43,272 | (5) | |
| | | | 9,679 | (4) | | 9,679 | (5) | |
| | | | 21,155 | (4) | | 21,155 | (5) | |
| | | | (914) | (6) | | (914) | (6) | |
| | | | (32,000) | (7) | | (32,000) | (7) | |
| | | | (1,351) | (9) | | (1,351) | (9) | |
| | | | | | 300,862 | | | 148,832 |
| Accumulated deficit | (2,729) | (80,795) | 914 | (6) | | 914 | (6) | |
| | | | 1,815 | (7) | | 1,815 | (7) | |
| | | | | | (80,795) | | | (80,795) |
| **Total stockholders' equity** | **5,000** | **(69,967)** | **285,042** | | **220,075** | **133,011** | | **68,044** |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | **$ 203,394** | **$ 24,865** | **$ 78,594** | | **$ 306,853** | **$ (73,437)** | | **$ 154,822** |

**Pro Forma Adjustments to the Unaudited Condensed Combined Balance Sheet**

(A) Derived from the audited balance sheet of the Company as of December 31, 2020.

(B) Derived from the audited balance sheet of Lightning Systems as of December 31, 2020.

108

Table of Contents

(C) The total consideration under each of the two scenarios, no redemption of shares to cash and maximum number of shares (75%) redeemed for cash, as of December 31, 2020 is as follows:

| (In thousands except share amounts) | Scenario 1 (Assuming No Additional Redemptions into Cash) | Scenario 2 (Assuming Maximum Redemptions into Cash) |
|---|---|---|
| **Closing Share Consideration (in shares of the Company's Common Stock)(1)** | 53,922,000 | 53,922,000 |
| Share Consideration Dollars (2) | $ 710,692 | $ 710,692 |
| **Total Aggregate Closing Consideration** | 710,692 | 710,692 |
| Contingent Consideration (Value of Stockholder Earnout Shares)(3) | — | — |
| **Total Aggregate and Contingent Consideration** | $ 710,692 | $ 710,692 |

(1)    The final adjustment may differ as a result of the net debt or cash balance as of the close of the Business Combination.

(2)    Calculated at the closing price of the stock at December 31, 2020 of $13.18.

(3)    Stockholder Earnout Shares are earned based on the market price of the stock. The closing price of the stock at December 31, 2020 of $13.18 was below any earn out threshold.

The total consideration of $710,692,000, is greater than 80% of the original $202,029,000 held in the Trust Account ($161,623,200), therefore the total consideration would satisfy the 80% test in the NYSE rules. The entries related to each component of the consideration are described further in Note 4 and Note 5 below.

(1) To reflect the release of $202,037,000 of investments and $2,000 of interest receivable held in the Trust Account as all amounts held in the Trust Account are to be released upon the consummation of the Business Combination to either be used to satisfy the exercise of redemption rights or for use by New Lightning eMotors.

(2) To reflect the sale under a subscription agreement with the PIPE Investor of 2,500,000 shares at $10.00 per share for a total of $25.0 million.

(3) To reflect the issuance of Convertible Notes due in 2024 to the Convertible Note Investors totaling $100 million, the derivative liability for the conversion feature, mandatory redemption and the interest make-whole provision ($42.5 million) and to reflect the debt discount resulting from the issuance of 8,695,652 warrants with the associated debt discount ($28.9 million). The Convertible Notes are convertible into Common Stock at a rate of 86.9565 shares per $1,000 of principal amount.

(4) Scenario 1 assumes no stockholders of the Company exercise their redemption rights. To reflect the surrender of shares of Lightning Systems Capital Stock (including shares resulting from the conversion of notes, warrants and preferred stock), transfer of the remaining 18,663,171 shares of the Common Stock to permanent equity ($188,498,000), and the issuance of 53,922,000 shares of Common Stock ($0.0001 par value).

(5) Scenario 2 assumes the maximum number of shares are redeemed into cash by the stockholders of the Company. To reflect the surrender of shares of Lightning Systems Capital Stock (including shares resulting from the conversion of notes, warrants and preferred stock), redemption of 15,050,267 shares of the Common Stock subject to redemption and the issuance of 53,922,000 shares of Common Stock ($0.0001 par value).

(6) To reflect the elimination of the historical accumulated deficit of the Company, the accounting acquiree.

(7) To reflect the payment of estimated transaction and other costs of approximately $40.0 million, including deferred underwriters fees already accrued of $8.0 million, in conjunction with the Business Combination.

(8) To reflect the payoff of unsecured facility agreement and all but $3 million of the term notes as part of the closing of the Business Combination.

(9) To reflect the writeoff by Lightning Systems of the unamortized debt discount.

109

**Table of Contents**

**PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS**
**FOR THE TWELVE-MONTH PERIOD ENDED DECEMBER 31, 2020**
**(in thousands except share and per share amounts)**
**(unaudited)**

| | (A) GigCapital3, Inc. Period from February 3, 2020 (Date of Inception) through December 31, 2020 | (B) Lightning Systems, Inc. Twelve months ended December 31, 2020 | Pro Forma Adjustments | | Scenario 1 (Assuming No Additional Redemptions into Cash) Pro Forma Statement of Operations | Pro Forma Adjustments | | Scenario 2 (Assuming Maximum Redemptions into Cash) Pro Forma Statement of Operations |
|---|---|---|---|---|---|---|---|---|
| Revenue | $ — | $ 9,088 | $ — | | 9,088 | $ — | | 9,088 |
| Cost of revenue | — | 11,087 | — | | 11,087 | — | | 11,087 |
| **Gross profit** | — | (1,999) | — | | (1,999) | — | | (1,999) |
| **Operating expenses:** | | | | | | | | |
| Research and development | — | 1,309 | — | | 1,309 | — | | 1,309 |
| Sales, general, and administrative | 2,760 | 10,451 | — | | 13,211 | — | | 13,211 |
| **Total operating expenses** | 2,760 | 11,760 | — | | 14,520 | — | | 14,520 |
| **Loss from operations** | (2,760) | (13,759) | — | | (16,519) | — | | (16,519) |
| Interest Expense | — | 2,983 | (677) | (4) | | (677) | (4) | |
| | | | 22,307 | (3) | 24,613 | 22,307 | (3) | 24,613 |
| Loss (gain) from change in fair value of warrant liabilities | — | 20,835 | (20,835) | (2) | — | (20,835) | (2) | — |
| Other expense, net | — | 76 | — | | 76 | — | | 76 |
| Interest (income) on marketable securities held in Trust Account | (44) | — | 44 | (1) | — | 44 | (1) | — |
| **Loss before income taxes** | (2,716) | (37,653) | (839) | | (41,208) | (839) | | (41,208) |
| Income tax expense | 13 | — | (13) | (1) | — | (13) | (1) | — |
| **Net loss** | $ (2,729) | $ (37,653) | $ (826) | | $ (41,208) | $ (826) | | $ (41,208) |
| Net loss per share attributable to common stockholders, basic and diluted | $ (0.44) | $ (11.18) | | | $ (0.51) | | | $ (0.62) |
| Weighted-average shares used in computing net loss per share attributable to common stockholders basic and diluted | 6,247,527 | 3,671,569 | 75,100,171 | (5) | 81,347,698 | 60,049,904 | (5) | 66,297,431 |

**Pro Forma Adjustments to the Unaudited Condensed Combined Statement of Operations**

(A) Derived from the audited statement of operations of the Company for the period from inception (February 3, 2020) through December 31, 2020.

(B) Derived from the audited statement of operations of Lightning Systems for the twelve months ended December 31, 2020.

(1) Represents an adjustment to eliminate both the interest income on marketable securities held in the Trust Account as of the beginning of the period and the corresponding income tax expense.

110

Table of Contents

(2) To reflect the reversal of the loss from change in fair value of warrant liabilities incurred by Lightning Systems as the Business Combination is reflected as if it had occurred at the beginning of the twelve-month period.

(3) To reflect the amortization of the regular interest plus the debt discount of $71.4 million on the notes financing ($42.5 million from the derivative liability and $28.9 million resulting from the warrants issued) over three years (the term of the loan) at a constant interest rate as if the loan had occurred at the beginning of the twelve-month period.

(4) To reflect the reversal of the Business Combination related expenses included in the statements of operations incurred by Lightning Systems.

(5) To reflect the reversal of interest on the unsecured facility agreement and other notes that would be either converted to common stock or paid off at the start of the nine-month period as the Business Combination is reflected as if it had occurred at the beginning of the twelve-month period.

(6) As the Business Combination is being reflected as if it had occurred at the beginning of the twelve-month period ended December 31, 2020, the calculation of weighted average shares outstanding for basic and diluted net loss per share assumes that the shares issuable to the Lightning Systems equity holders in the Business Combination have been outstanding for the entire period presented. If the maximum number of shares are redeemed, this calculation is retroactively adjusted to eliminate such redeemed shares for the entire period.

(7) The Company applies the two-class method in calculating the net loss per common share. Shares of common stock subject to possible redemption as of December 31, 2020 have been excluded from the calculation of the basic net loss per share since such shares, if redeemed, only participate in their pro rata share of the Trust Account earnings. Prior to the business combination, basic and diluted weighted-average common shares outstanding exclude 18,663,171 common shares potentially redeemable shares. For Scenario 1, no additional shares are considered redeemed and all 18,663,171 shares were included in the calculation of the basic and diluted weighted-average shares for the period ended December 31, 2020. For Scenario 2, a total of 15,050,267 shares were considered redeemed and were excluded from the calculation of basic and diluted weighted-average common shares outstanding. The Company has not considered the effect of the incremental number of shares of common stock to settle 15,670,104 outstanding warrants sold in the Offering and Private Placement as the shares would be anti-dilutive for the period ended December 31, 2020.

111

Table of Contents

**PRO FORMA CHANGE IN EQUITY ACCOUNTS**
**FOR THE TWELVE-MONTH PERIOD ENDED DECEMBER 31, 2020**
**(in thousands except share and per share amounts)**
**(unaudited)**

| | GigCapital3, Inc. | | | Lightning Systems, Inc. | | Lightning Systems, Inc. | | | Scenario 1 (Assuming No Additional Redemptions into Cash) | | | Scenario 2 (Assuming Maximum Redemptions into Cash) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Common Stock | APIC | Shares | Convertible Preferred Stock | Shares | Common Stock | APIC | Shares | Common Stock | APIC | Shares | Common Stock | APIC |
| Beginning Balance | 7,230,308 | $ 1 | $7,728 | 30,120,057 | $ 43,272 | 4,910,555 | $ — | $ 10,828 | 12,140,863 | $ 1 | $ 18,556 | 12,140,863 | $ 1 | $ 18,556 |
| Sale of GigCapital3, Inc. shares under subscription agreement | — | — | — | — | — | — | — | — | 2,500,000 | — | 25,000 | 2,500,000 | — | 25,000 |
| Surrender of Lightning Systems, Inc. common stock | — | — | — | — | — | (4,910,555) | — | (10,828) | (4,910,555) | — | — | (4,910,555) | — | — |
| Surrender of Lightning Systems, Inc. preferred stock | — | — | — | (30,120,057) | (43,272) | — | — | — | — | — | 43,272 | — | — | 43,272 |
| Surrender of Lightning Systems, Inc. preferred stock converted from notes | — | — | — | — | — | — | — | — | — | — | 9,679 | — | — | 9,679 |
| Write off of debt discount on notes converted | — | — | — | — | — | — | — | — | — | — | (1,351) | — | — | (1,351) |
| Surrender of Lightning Systems, Inc. warrants | — | — | — | — | — | — | — | — | — | — | 21,155 | — | — | 21,155 |
| GigCapital3, Inc. shares in exchange | — | — | — | — | — | — | — | — | 53,922,000 | 5 | (5) | 53,922,000 | 5 | (5) |
| Shares subject to redemption transferred to equity | — | — | — | — | — | — | — | — | 18,663,171 | 2 | 188,496 | — | — | — |
| Redemption of shares assuming maximum redemption | — | — | — | — | — | — | — | — | — | — | — | 3,612,904 | 1 | 36,466 |
| Recording of debt discount for warrants associated with the issuance of convertible notes | — | — | — | — | — | — | — | — | — | — | 28,974 | — | — | 28,974 |
| Transaction costs classified as equity issuance costs | — | — | — | — | — | — | — | — | — | — | (32,000) | — | — | (32,000) |
| Eliminate historical accumulated deficit of GigCapital3, Inc. | — | — | — | — | — | — | — | — | — | — | (914) | — | — | (914) |
| Ending balance | — | $ — | $ — | — | $ — | — | $ — | $ — | 82,315,479 | $ 8 | $300,862 | 67,265,212 | $ 7 | $148,832 |

112

**Table of Contents**

**COMPARATIVE SHARE INFORMATION**

The following tables set forth:

- historical per share information of the Company for the period from February 3, 2020 (inception) through December 31, 2020; and

- unaudited pro forma per share information of the post-combination company for the twelve months ended December 31, 2020 after giving effect to the Business Combination, assuming two redemption scenarios as follows:

  - *Scenario 1—Assuming no additional redemptions of public shares for cash*: This scenario assumes that none of the Company's stockholders exercise redemption rights upon Closing of the Business Combination; and

  - *Scenario 2—Assuming maximum redemptions of public shares for cash*: This scenario assumes that 15,050,267 shares of Common Stock are redeemed for an aggregate payment of approximately $152.0 million (based on the estimated per share redemption price of approximately $10.10 per share based on the fair value of marketable securities held in the Trust Account as of December 31, 2020 of approximately $202.0 million) from the Trust Account. The Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, being no less than an aggregate amount of $150.0 million. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. This scenario therefore gives effect to $50.0 million being retained in the Trust Account. This results in public share redemptions of 15,050,267 shares for aggregate redemption payments of $152.0 million.

The pro forma net loss per share information reflects the Business Combination contemplated by the Business Combination Agreement as if it had occurred at the beginning of the respective periods. This information is based on, and should be read together with, the selected historical financial information, the unaudited pro forma condensed combined financial information and the historical financial information of the Company and Lightning Systems, and the accompanying notes to such financial statements, that are included in this proxy statement/prospectus. The unaudited pro forma condensed combined per share data are presented for illustrative purposes only and are not necessarily indicative of actual or future financial position or results of operations that would have been realized if the Business Combination had been completed as of the dates indicated or will be realized upon the completion of the Business Combination. Uncertainties that could impact New Lightning eMotors' financial condition include risks that affect its operations and outlook such as increases in costs, disruption of supply or shortage of raw materials, including as a result of the COVID-19 pandemic. For more information on the risks that could impact New Lightning eMotors' financial condition and results of operations, please see the section entitled "*Risk Factors.*"

113

Table of Contents

You are also urged to read the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information*."

| | Historical | | Lightning Systems, Inc. Equivalent Pro Forma Per Share Data | | Combined Pro Forma | |
| | GigCapital3, Inc | Lightning Systems, Inc. | Scenario 1 (Assuming No Additional Redemptions into Cash) | Scenario 2 (Assuming Maximum Redemptions into Cash) | Scenario 1 (Assuming No Additional Redemptions into Cash) | Scenario 2 (Assuming Maximum Redemptions into Cash) |
|---|---|---|---|---|---|---|
| **Selected Unaudited Pro Forma Condensed Combined Statement of Operations – Twelve Months ended December 31, 2020 and Period from February 3, 2020 (Date of Inception) through December 31, 2020** | | | | | | |
| Book value per Share (2) | $ 0.69 | $ (14.25) | $ 2.54 | $ 0.96 | $ 2.67 | $ 1.01 |
| Net loss available to common stockholders | $ (2,729) | $ (37,653) | | | $ (41,208) | $ (41,208) |
| Net loss per share available to common stockholders – basic and diluted (2) | $ (0.44) | $ (11.18) | $ (0.48) | $ (0.59) | $ (0.51) | $ (0.62) |
| Cash dividends per share (1) | $ — | $ — | $ — | $ — | NA | NA |
| Weighted average shares outstanding – basic and diluted | 6,247,527 | 3,671,569 | | | 81,347,698 | 66,297,431 |

(1)    No dividends have been paid by the Company or Lightning Systems.
(2)    The equivalent pro forma basic and diluted per share data for Lightning Systems is calculated by multiplying the combined pro forma per share data by the Exchange Ratio as set forth in the Business Combination Agreement calculated by dividing the shares issued to Lightning Systems in the Business Combination by the aggregate fully diluted number of shares of Lightning Systems immediately prior to the Business Combination.

114

Table of Contents

| | Scenario 1 Combined (Assuming No Additional Redemptions into Cash) Twelve Months Ended December 31, 2020 and Period from February 3, 2020 (Date of Inception) through December 31, 2020 | Scenario 2 Combined (Assuming Maximum Redemptions into Cash) Twelve Months Ended December 31, 2020 and Period from February 3, 2020 (Date of Inception) through December 31, 2020 |
|---|---|---|
| **Weighted-average common shares outstanding, basic and diluted:** | | |
| GigCapital3, Inc. weighted average shares outstanding | 6,247,527 | 6,247,527 |
| GigCapital3, Inc. shares of common stock no longer subject to forfeiture | 15,000 | 15,000 |
| Sale of additional GigCapital3, Inc. shares in conjunction with the Business Combination | 2,500,000 | 2,500,000 |
| GigCapital3, Inc. shares subject to redemption reclassified to equity | 18,663,171 | 3,612,904 |
| Stockholder Earnout Shares (1) | — | — |
| Shares issued to Lightning Systems, Inc. in business combination | 53,922,000 | 53,922,000 |
| **Weighted-average common shares outstanding, basic and diluted** | 81,347,698 | 66,297,431 |
| Percent of shares owned by GigCapital3, Inc. | 34% | 19% |
| Percent of shares owned by Lightning System, Inc. | 66% | 81% |

(1)    No contingently issuable Stockholder Earnout Shares associated with the Business Combination are included in the calculation of weighted-average Common Stock outstanding as they would be anti-dilutive.

115

**Table of Contents**

|  | Scenario 1 Combined (Assuming No Additional Redemptions into Cash) Twelve Months Ended December, 2019 and Period from February 3, 2020 (Date of Inception) through December 31, 2020 | Scenario 2 Combined (Assuming Maximum Redemptions into Cash) Twelve Months Ended December 31, 2019 and Period from February 3, 2020 (Date of Inception) through December 31, 2020 |
|---|---|---|
| **Weighted-average common shares outstanding, basic and diluted:** | | |
| GigCapital3, Inc. holders | 27,425,698 | 12,375,431 |
| Lightning Systems, Inc. | 53,922,000 | 53,922,000 |
| **Weighted-average common shares basic, basic and diluted** | 81,347,698 | 66,297,431 |

116

**Table of Contents**

**SPECIAL MEETING OF THE COMPANY'S STOCKHOLDERS**

This proxy statement/prospectus is being provided to Company stockholders as part of a solicitation of proxies by the Board for use at the Special Meeting of Stockholders to be held on April 21, 2021, and at any adjournment or postponement thereof. This proxy statement/prospectus contains important information regarding the Special Meeting, the proposals on which you are being asked to vote and information you may find useful in determining how to vote and voting procedures.

This proxy statement/prospectus is being first mailed on or about March 26, 2021 to all stockholders of record of the Company as of March 15, 2021, the record date for the Special Meeting. Stockholders of record who owned Common Stock at the close of business on the record date are entitled to receive notice of, attend and vote at the Special Meeting. On the record date, there were 25,893,479 shares of Common Stock outstanding.

**Date, Time and Place of Special Meeting**

The Special Meeting will be held on April 21, 2021 at 10:00 a.m., PDT, via live webcast at www.virtualshareholdermeeting.com/GIK2021SM. In light of ongoing developments related to coronavirus (COVID-19), after careful consideration, the Company has determined that the Special Meeting will be a virtual meeting conducted exclusively via live webcast in order to facilitate stockholder attendance and participation while safeguarding the health and safety of our stockholders, directors and management team. The Special Meeting will be conducted exclusively via live webcast and so stockholders will not be able to attend the meeting in person. Stockholders may attend the special meeting online and vote at the Special Meeting by visiting www.virtualshareholdermeeting.com/GIK2021SM and entering your 12-digit control number, which is either included on the proxy card you received or obtained through Broadridge Financial Solutions.

**Registering for the Special Meeting**

Any stockholder wishing to attend the virtual meeting should register in advance at www.virtualshareholdermeeting.com/GIK2021SM. To vote at the Special Meeting, please follow these instructions as applicable to the nature of your ownership of our Common Stock:

- To vote using the proxy card, simply complete, sign, date and return the proxy card pursuant to the instructions on the card. If you return your signed proxy card before the Annual Meeting, we will vote your shares as directed.

- To vote over the telephone, dial toll-free 1-800-690-6903 using a touch-tone phone and follow the recorded instructions. You will be asked to provide the company number and control number from the Notice. Your telephone vote must be received by 11:59 p.m. Eastern Time on April 20, 2021 to be counted.

- To vote through the Internet before the meeting, go to www.proxyvote.com and follow the on-screen instructions. Your Internet vote must be received by 11:59 p.m., Eastern Time on April 20, 2021 to be counted.

- To vote through the Internet during the meeting, please visit www.virtualshareholdermeeting.com/GIK2021SM and have available the 16-digit control number included in your Notice, on your proxy card or on the instructions that accompanied your proxy materials.

**Voting Power; Record Date**

As a stockholder of the Company, you have a right to vote on certain matters affecting the Company. The proposals that will be presented at the Special Meeting and upon which you are being asked to vote are summarized below and fully set forth in this proxy statement/prospectus. You will be entitled to vote or direct votes to be cast at the Special Meeting if you owned shares of our Common Stock at the close of business on

117

Table of Contents

March 15, 2021, which is the record date for the Special Meeting. You are entitled to one vote for each share of Common Stock that you owned as of the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker, bank or other nominee to ensure that votes related to the shares you beneficially own are properly counted. On the record date, there were 25,893,479 shares of Common Stock outstanding and entitled to vote, of which 20,000,000 are public shares and 5,893,479 are Initial Stockholder Shares and Insider Shares held by our Initial Stockholders.

**Proposals at the Special Meeting**

At the Special Meeting, Company stockholders will vote on the following proposals:

- **Proposal No. 1 - The Business Combination Proposal** - To approve and adopt the Business Combination Agreement, a copy of which is attached to this proxy statement/prospectus as *Annex A*, and approve the transactions contemplated thereby, including the merger of Merger Sub with and into Lightning Systems, with Lightning Systems surviving the merger, and the issuance of Common Stock to Lightning Systems equity holders as Merger Consideration and Stockholder Earnout Shares to the Stockholder Earnout Group;

- **Proposal No. 2 - The NYSE Stock Issuance Proposal** - To approve, for purposes of complying with applicable listing rules of the NYSE, the issuance of more than 20% of the Company's outstanding Common Stock in connection with the Business Combination, and the transactions contemplated by the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, including up to 70,385,096 shares of Common Stock to the Lightning Systems equity holders, 2,500,000 shares of common stock to the PIPE Investor, 8,695,652 shares of our Common Stock upon conversion of the Convertible Notes and 8,695,652 shares of our Common Stock upon exercise of the Convertible Note Warrants;

- **Proposal No. 3 - Classification of the Board of Directors Proposal** - To adopt the classification of our Board into three classes of directors with staggered terms of office and to make certain related changes;

- **Proposal No. 4A - Approval of Additional Amendments to Current Amended and Restated Certificate of Incorporation in Connection with the Business Combination Proposal (Governance Proposal)** - To approve certain additional changes, including but not limited to changing the post-combination company's corporate name from "GigCapital3, Inc." to "Lightning eMotors, Inc." and eliminating certain provisions specific to our status as a blank check company, which our Board believes are necessary to adequately address the needs of the post-combination company;

- **Proposal No. 4B - Authorization of Exclusive Forum Provision (Forum Proposal) -** To authorize the adoption of Delaware as the exclusive forum for certain stockholder litigation;

- **Proposal No. 5 - Incentive Plan Proposal** - To approve the Incentive Plan, including the authorization of the initial share reserve under the Incentive Plan;

- **Proposal No. 6 – The Election of Directors Proposal** - To elect the directors comprising the board of directors of New Lightning eMotors following the Closing Date; and

- **Proposal No. 7- Adjournment Proposal** - To approve, if necessary, the adjournment of the Special Meeting to a later date or dates to permit further solicitation and votes of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal. This proposal will only be presented at the Special Meeting if there are not sufficient votes to approve the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors.

118

Table of Contents

**THE BOARD UNANIMOUSLY RECOMMENDS THAT YOU VOTE "FOR" EACH OF THESE PROPOSALS.**

**Vote of the Initial Stockholders, Directors and Officers**

Prior to our IPO, we entered into agreements with our Initial Stockholders, other current directors and officers, pursuant to which each agreed to vote any shares of common stock owned by them in favor of an initial business combination. These agreements apply to our Initial Stockholders, including our Sponsor, as it relates to the Initial Stockholder Shares and the requirement to vote all of the Initial Stockholder Shares in favor of the Business Combination Proposal and for all other proposals to be presented to our stockholders at the Special Meeting and described in this proxy statement/prospectus.

Our Initial Stockholders, other current directors and officers have waived any redemption rights, including with respect to shares of common stock purchased in our IPO or in the aftermarket, in connection with Business Combination. The Initial Stockholder Shares held by our Initial Stockholders have no redemption rights upon our liquidation and will be worthless if no business combination is effected by us by the applicable deadline. However, our Initial Stockholders are entitled to redemption rights upon our liquidation with respect to any public shares they may own.

**Quorum and Required Vote for Proposals for the Special Meeting**

The approval of the Business Combination Proposal requires the affirmative vote of holders of a majority of the outstanding shares of our Common Stock represented in person or by proxy and entitled to vote thereon at the Special Meeting. In order to establish the quorum for purposes of the Business Combination Proposal, holders of at least a majority of the outstanding shares of Common Stock must be present at the Special Meeting in person or by proxy. Accordingly, a Company stockholder's failure to vote by proxy or to vote in person at the Special Meeting will not be counted towards the number of shares of Common Stock required to validly establish a quorum, and if a valid quorum is otherwise established, such failure to vote will have no effect on the outcome of any vote on the Business Combination Proposal. Abstentions will be counted in connection with the determination of whether a valid quorum is established and will have the same effect as a vote "**AGAINST**" the Business Combination Proposal.

The approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Incentive Plan Proposal, the Election of Directors Proposal and the Adjournment Proposal requires the affirmative vote of a majority of the votes cast by holders of our common stock represented in person or by proxy and entitled to vote at the Special Meeting. The approval of the Charter Amendment Proposals requires the affirmative vote of holders of a majority of our outstanding shares of common stock entitled to vote thereon at the Special Meeting.

Under these voting standards, a failure to vote or an abstention will have no effect on the Business Combination Proposal and the Adjournment Proposal. However, an abstention or failure to vote will have the same effect as a vote "**AGAINST**" the Charter Amendment Proposals. In addition, for purposes of the NYSE Stock Issuance Proposal, the Incentive Plan Proposal and the Election of Directors Proposal, the NYSE considers an abstention vote as a "vote cast", and therefore, an abstention will have the same effect as a vote "**AGAINST**" such proposals, while a failure to vote will have no effect on these two proposals.

The transactions contemplated by the Business Combination Agreement will be consummated only if the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal are approved at the Special Meeting. The proposals in this proxy statement/prospectus (other than the Adjournment Proposal) are conditioned on the approval of the Business Combination Proposal.

119

**Table of Contents**

*It is important for you to note that in the event that the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal do not receive the requisite vote for approval, we will not consummate the Business Combination. If we do not consummate the Business Combination and fail to complete an initial business combination by the applicable deadline, we will be required to dissolve and liquidate our Trust Account by returning the then remaining funds in such account to our public stockholder.*

**Recommendation to Company Stockholders**

*Our Board believes that each of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal, the Election of Directors Proposal and the Adjournment Proposal to be presented at the Special Meeting is in the best interests of the Company and our stockholders and recommends that its stockholders vote "FOR" each of the proposals.*

When you consider the recommendation of our Board in favor of approval of the Business Combination Proposal, you should keep in mind that our Sponsor and certain members of our Board and officers have interests in the Business Combination that are different from or in addition to (or which may conflict with) your interests as a stockholder. Stockholders should take these interests into account in deciding whether to approve the proposals presented at the Special Meeting, including the Business Combination Proposal. These interests include, among other things:

- the fact that our Initial Stockholders have agreed not to redeem any of the Initial Stockholder Shares in connection with a stockholder vote to approve the Business Combination;

- the fact that our Sponsor will retain 5,635,000 Initial Stockholder Shares upon the Closing;

- the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Initial Stockholder Shares if we fail to complete an initial business combination by the applicable deadline;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party (other than our independent public accountants) for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that Neil Miotto and Drs. Avi Katz and Raluca Dinu will continue as members of New Lightning eMotors Board, and each shall be entitled to receive compensation for serving on such board; and

- the fact that our Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the applicable deadline. Prior to GigCapital3's initial public offering, the Sponsor purchased 5,735,000 Initial Stockholder Shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share (as compared to the $10.00 per share price being used to determine the number of shares of Common Stock being issued to the Lightning Systems equity holders in the Business Combination or at which the PIPE Investors have agreed to purchase Common Stock). However, 750,000 shares of Common Stock issued to the Sponsor were forfeited due to the over-allotment option not being exercised by the Underwriters. Additionally, the Sponsor purchased 650,000 private placement units simultaneously with the consummation of GigCapital3's initial public offering for an aggregate purchase price of $6.5 million. Certain of GigCapital3's directors and executive officers, including Dr. Avi Katz, Dr. Raluca Dinu, Neil Miotto, John Mikulsky, Peter Wang, Andrea Betti-Berutto and Brad Weightman, also have a direct or

120

indirect economic interest in such private placement units and in the 5,635,000 Initial Stockholder Shares owned by the Sponsor. The 5,635,000 Initial Stockholder Shares owned by the Sponsor would have had an aggregate market value of $63.1 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The 650,000 private placement units held by the Sponsor would have had an aggregate market value of $8.8 million based upon the closing price of $13.59 per public unit on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The Sponsor does not hold any warrants independent of what is included in the private placement units. While the private placement units have a trading price and value as set forth above, the private placement units will be, upon completion of the Business Combination, broken into their constituent components of stock and warrants, and each of those separately trade and the value of each of those is $11.19 per public share and $3.05 per public warrant. Additionally, the Sponsor, officers and directors do not currently have any unreimbursed out-of-pocket expenses in connection with the business combination. Upon completion of the Business Combination, the former Lightning Systems equity holders will own 53,922,000 shares of our Common Stock. The shares owned by the former Lightning Systems equity holders would have had an aggregate market value of $603.4 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus.

### Broker Non-Votes and Abstentions

Abstentions are considered present for the purposes of establishing a quorum. Abstentions will have the same effect as a vote "**AGAINST**" the Charter Amendment Proposals, the NYSE Stock Issuance Proposal, the Incentive Plan Proposal and the Election of Directors Proposal.

In general, if your shares are held in "street" name and you do not instruct your broker, bank or other nominee on a timely basis on how to vote your shares, your broker, bank or other nominee, in its sole discretion, may either leave your shares unvoted or vote your shares on routine matters, but not on any non-routine matters. **None of the proposals at the Special Meeting are routine matters. As such, without your voting instructions, your brokerage firm cannot vote your shares on any proposal to be voted on at the Special Meeting.**

### Voting Your Shares—Stockholders of Record

If you are a Company stockholder of record, you may vote by mail or in person at the Special Meeting. Each share of our Common Stock that you own in your name entitles you to one vote on each of the proposals for the Special Meeting. Your one or more proxy cards show the number of shares of our Common Stock that you own.

**Voting by Mail.** You can vote your shares by completing, signing, dating and returning the enclosed proxy card in the postage-paid envelope provided. By signing the proxy card and returning it in the enclosed prepaid and addressed envelope, you are authorizing the individuals named on the proxy card to vote your shares at the Special Meeting in the manner you indicate. We encourage you to sign and return the proxy card even if you plan to attend the Special Meeting so that your shares will be voted if you are unable to attend the Special Meeting. If you receive more than one proxy card, it is an indication that your shares are held in multiple accounts. Please sign and return all proxy cards to ensure that all of your shares are voted. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the Special Meeting. If you sign and return the proxy card but do not give instructions on how to vote your shares, your shares of our Common Stock will be voted as recommended by our Board. Our Board recommends voting "**FOR**" the Business Combination Proposal, "**FOR**" the NYSE Stock Issuance Proposal, "**FOR**" the Charter Amendment Proposals, "**FOR**" the Governance Proposal, "**FOR**" the Forum Proposal, "**FOR**" the Incentive Plan Proposal, "**FOR**" the Election of Directors Proposal and "**FOR**" the Adjournment Proposal. Votes submitted by mail must be received by 5:00 p.m. Eastern time on April 19, 2021.

Table of Contents

**Voting at the Meeting -** We will be hosting the Special Meeting via live webcast. If you attend the Special Meeting, you may submit your vote at the Special Meeting online at www.virtualshareholdermeeting.com/GIK2021SM, in which case any votes that you previously submitted will be superseded by the vote that you cast at the Special Meeting. See "- *Registering for the Special Meeting*" above for further details on how to attend the Special Meeting.

### Voting Your Shares—Beneficial Owners

If your shares are held in an account at a brokerage firm, bank or other nominee, then you are the beneficial owner of shares held in "street name" and this proxy statement/prospectus is being sent to you by that broker, bank or other nominee. The broker, bank or other nominee holding your account is considered to be the stockholder of record for purposes of voting at the Special Meeting. As a beneficial owner, you have the right to direct your broker, bank or other nominee regarding how to vote the shares in your account by following the instructions that the broker, bank or other nominee provides you along with this proxy statement/prospectus. However, since you are not the stockholder of record, you may not vote your shares in person at the Special Meeting unless you request and obtain a valid proxy from your broker or other agent.

### Revoking Your Proxy

If you give a proxy, you may revoke it at any time before the Special Meeting or at the Special Meeting by doing any one of the following:

- you may send another proxy card with a later date;

- you may notify the Company's Secretary in writing to c/o 1731 Embarcadero Rd., Suite 200, Palo Alto, CA, Attn: Secretary, before the Special Meeting that you have revoked your proxy; or

- you may attend the Special Meeting, revoke your proxy, and vote in person, as indicated above.

### No Additional Matters

The Special Meeting has been called only to consider the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal, the Election of Directors Proposal and the Adjournment Proposal. Under our bylaws, other than procedural matters incident to the conduct of the Special Meeting, no other matters may be considered at the Special Meeting if they are not included in this proxy statement/prospectus, which serves as the notice of the Special Meeting.

### Who Can Answer Your Questions About Voting

If you have any questions about how to vote or direct a vote in respect of your shares of our Common Stock, you may contact MacKenzie, our proxy solicitor, at (212) 929-5500 (call collect), (800) 322-2885 (call toll-free), or by sending an e-mail to proxy@mackenziepartners.com.

### Redemption Rights

Pursuant to our certificate of incorporation, any holders of our public shares may demand that such shares be redeemed in exchange for a pro rata share of the aggregate amount on deposit in the Trust Account, including interest (which interest shall be net of taxes payable), calculated as of two business days prior to the consummation of the Business Combination. If demand is properly made and the Business Combination is consummated, these shares, immediately prior to the Business Combination, will cease to be outstanding and will represent only the right to receive a pro rata share of the aggregate amount on deposit in the Trust Account which holds the proceeds of our IPO (calculated as of two business days prior to the consummation of the Business Combination, including interest (which interest shall be net of taxes payable). For illustrative purposes, based on the fair value of marketable securities held in the Trust Account of approximately $202.0 million as of December 31, 2020, the estimated per share redemption price would have been approximately $10.10 on such

122

Table of Contents

date. **Public stockholders may elect to redeem their shares even if they vote for the Business Combination** Any request to redeem public shares, once made, may be withdrawn at any time until the deadline for exercising redemption requests and thereafter, with our consent, until the Closing. If we receive valid redemption requests from holders of public shares prior to the redemption deadline, we may, at our sole discretion, following the redemption deadline and until the date of Closing, seek and permit withdrawals by one or more of such holders of their redemption requests. We may select which holders to seek such withdrawals of redemption requests from based on any factors we may deem relevant, and the purpose of seeking such withdrawals may be to increase the funds held in the Trust Account, including where we otherwise would not satisfy the closing condition that the amount in the Trust Account and the proceeds from the PIPE Investment and the Convertible Note Investment equal or exceed $150.0 million, of which at least $50.0 million is from funds that are retained in the Trust Account.

In order to exercise your Redemption Rights, you must:

- if you hold public units, separate the underlying public shares and public warrants;

- prior to 5:00 p.m. Eastern time, on April 19, 2021 (two business days before the Special Meeting), tender your shares physically or electronically and submit a request in writing that we redeem your public shares for cash to Continental Stock Transfer & Trust Company, our Transfer Agent, at the following address:

Continental Stock Transfer & Trust Company
1 State Street – 30th Floor
New York, New York 10004
Attention: Mark Zimkind
E-mail: mzimkind@continentalstock.com

- In your request to Continental Stock Transfer & Trust Company for redemption, you must also affirmatively certify if you "ARE" or "ARE NOT" acting in concert or as a "group" (as defined in Section 13d-3 of the Exchange Act) with any other stockholder with respect to shares of Common Stock; and

- deliver your public shares either physically or electronically through DTC's DWAC system to our Transfer Agent at least two business days before the Special Meeting. Stockholders seeking to exercise their Redemption Rights and opting to deliver physical certificates should allot sufficient time to obtain physical certificates from the Transfer Agent and time to effect delivery. It is our understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the Transfer Agent. However, we do not have any control over this process and it may take longer than two weeks. Stockholders who hold their shares in street name will have to coordinate with their bank, broker or other nominee to have the shares certificated or delivered electronically. If you do not submit a written request and deliver your public shares as described above, your shares will not be redeemed.

Stockholders seeking to exercise their Redemption Rights, whether they are record holders or hold their shares in "street name" are required to either tender their certificates to our Transfer Agent prior to the date that is two business days prior to the Special Meeting, or to deliver their shares to the Transfer Agent electronically using DTC's DWAC system, at such stockholder's option. **The requirement for physical or electronic delivery prior to the Special Meeting ensures that a redeeming stockholder's election to redeem is irrevocable once the Business Combination is approved**.

Any demand for redemption, once made, may be withdrawn at any time until the deadline for exercising redemption requests (and submitting shares to the transfer agent) and thereafter, with our consent, until the vote is taken with respect to the Business Combination. If you delivered your shares for redemption to our transfer agent and decide within the required timeframe not to exercise your Redemption Rights, you may request that our transfer agent return the shares (physically or electronically). You may make such request by contacting our transfer agent at the address listed above.

123

Table of Contents

Holders of outstanding public units must separate the underlying public shares and public warrants prior to exercising Redemption Rights with respect to the public shares.

If you hold public units registered in your own name, you must deliver the certificate for such public units to our Transfer Agent, with written instructions to separate such public units into public shares and public warrants. This must be completed far enough in advance to permit the mailing of the public share certificates back to you so that you may then exercise your Redemption Rights upon the separation of the public shares from the public units.

If a broker, dealer, commercial bank, trust company or other nominee holds your public units, you must instruct such nominee to separate your public units. Your nominee must send written instructions by facsimile to our Transfer Agent. Such written instructions must include the number of public units to be split and the nominee holding such public units. Your nominee must also initiate electronically, using DTC's DWAC system, a withdrawal of the relevant units and a deposit of an equal number of public shares and completed far enough in advance to permit your nominee to exercise your Redemption Rights upon the separation of the public shares from the public units. While this is typically done electronically on the same business day, you should allow at least one full business day to accomplish the separation. If you fail to cause your public shares to be separated in a timely manner, you will likely not be able to exercise your Redemption Rights.

Each redemption of shares of common stock by our public stockholders will reduce the amount in the Trust Account. The Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, being no less than an aggregate amount of $150.0 million. This condition to closing in the Business Combination Agreement is for the sole benefit of the parties thereto and may be waived by either of us or Lightning Systems. If, as a result of redemptions of common stock by our public stockholders, this condition is not met (or waived), then either we or Lightning Systems may elect not to consummate the Business Combination. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. In addition, in no event will we redeem shares of our common stock in an amount that would result in the Company's failure to have net tangible assets equaling or exceeding $5,000,001 (so that we are not subject to the SEC's "penny stock" rules). Holders of our outstanding public warrants do not have redemption rights in connection with the Business Combination. Unless otherwise specified, the information in the accompanying proxy statement assumes that none of our public stockholders exercise their redemption rights with respect to their shares of common stock.

Prior to exercising Redemption Rights, stockholders should verify the market price of our Common Stock as they may receive higher proceeds from the sale of their Common Stock in the public market than from exercising their Redemption Rights if the market price per share is higher than the redemption price. We cannot assure you that you will be able to sell your shares of our Common Stock in the open market, even if the market price per share is higher than the redemption price stated above, as there may not be sufficient liquidity in our Common Stock when you wish to sell your shares.

**If you exercise your Redemption Rights, your shares of our Common Stock will cease to be outstanding immediately prior to the Business Combination and will only represent the right to receive a pro rata share of the aggregate amount on deposit in the Trust Account.** You will no longer own those shares and will have no right to participate in, or have any interest in, the future growth of the post-combination company, if any. You will be entitled to receive cash for these shares only if you properly and timely demand redemption.

If the Business Combination is not approved and we do not consummate an initial business combination by November 18, 2021, we will be required to dissolve and liquidate our Trust Account by returning the then remaining funds in such account to the public stockholders and our warrants will expire worthless.

Table of Contents

**Appraisal Rights**

Appraisal rights are not available to holders of shares of our Common Stock or Lightning Systems Common Stock in connection with the Business Combination.

**Proxy Solicitation Costs**

The Company is soliciting proxies on behalf of its Board. This proxy solicitation is being made by mail, but also may be made by telephone or in person. The Company has engaged MacKenzie to assist in the solicitation of proxies for the Special Meeting. The Company and its directors, officers and employees may also solicit proxies in person. The Company will ask banks, brokers and other institutions, nominees and fiduciaries to forward the proxy materials to their principals and to obtain their authority to execute proxies and voting instructions.

The Company will bear the entire cost of the proxy solicitation, including the preparation, assembly, printing, mailing and distribution of the proxy materials. The Company will pay MacKenzie a fee of $9,000, plus disbursements, reimburse MacKenzie for its reasonable out-of-pocket expenses and indemnify MacKenzie and its affiliates against certain claims, liabilities, losses, damages and expenses for their services as our proxy solicitor. We will reimburse brokerage firms and other custodians for their reasonable out-of-pocket expenses for forwarding the proxy materials to our stockholders. Directors, officers and employees of the Company who solicit proxies will not be paid any additional compensation for soliciting proxies.

125

**Table of Contents**

## PROPOSAL NO. 1—APPROVAL OF THE BUSINESS COMBINATION

We are asking our stockholders to approve and adopt the Business Combination Agreement and the Business Combination. Our stockholders should carefully read this proxy statement/prospectus in its entirety for more detailed information concerning the Business Combination Agreement, a copy of which is attached as *Annex A* to this proxy statement/prospectus. Please see the subsection below entitled "*The Business Combination Agreement*" for additional information and a summary of certain terms of the Business Combination Agreement. You are urged to read carefully the Business Combination Agreement in its entirety before voting on this proposal.

Because we are holding a special meeting of stockholders to vote on the Business Combination, we may consummate the Business Combination only if it is approved by the affirmative vote (online or by proxy) of the holders of a majority of the outstanding shares of our Common Stock entitled to vote and actually cast thereon online at the Special Meeting, voting as a single class.

### The Business Combination Agreement

*This subsection of the proxy statement/prospectus describes the material provisions of the Business Combination Agreement but does not purport to describe all of the terms of the Business Combination Agreement. The following summary is qualified in its entirety by reference to the complete text of the Business Combination Agreement, a copy of which is attached as Annex A hereto. You are urged to read the Business Combination Agreement in its entirety because it is the primary legal document that governs the Business Combination.*

*The Business Combination Agreement contains representations, warranties and covenants that the respective parties made to each other as of the date of the Business Combination Agreement or other specific dates. The assertions embodied in those representations, warranties and covenants were made and will be made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating the Business Combination Agreement. The representations, warranties and covenants in the Business Combination Agreement are also modified in important part by the underlying disclosure schedules, referred to as the "Schedules," which are not filed publicly and which are subject to a contractual standard of materiality different from that generally applicable to stockholders and were used for the purpose of allocating risk among the parties rather than establishing matters as facts.*

### General: Structure of the Business Combination

On December 10, 2020, the Company, Merger Sub and Lightning Systems entered into the Business Combination Agreement, pursuant to which the Company and Lightning Systems will enter into the Business Combination whereby Merger Sub will merge with and into Lightning Systems in the Merger, with Lightning Systems surviving the Merger as a wholly owned subsidiary of the Company. The Business Combination Agreement contains customary representations and warranties, covenants, closing conditions, termination provisions and other terms relating to the Merger and the other transactions contemplated by the Business Combination Agreement. The Business Combination Agreement is summarized below.

The Merger will be consummated by the filing of a certificate of merger (the "*Certificate of Merger*") with the Secretary of State of the State of Delaware and will be effective immediately upon such filing or upon such later time as may be agreed by the parties and specified in the Certificate of Merger (the date and time of the filing of such Certificate of Merger (or such later time as may be agreed by each of the parties to the Business Combination Agreement and specified in such Certificate of Merger) being the "*Effective Time*"). The Certificate of Merger will be filed as promptly as practicable, but in no event later than three (3) business days, after the

126

Table of Contents

satisfaction or, if permissible, waiver of the closing conditions set forth in the Business Combination Agreement (other than those conditions that by their nature are to be satisfied at the Closing, it being understood that the occurrence of the Closing shall remain subject to the satisfaction or, if permissible, waiver of such conditions at the Closing). The parties will hold the Closing immediately prior to the filing of the Certificate of Merger. The date on which the Closing shall occur is referred to as the Closing Date.

Subject to and in accordance with the terms of the Business Combination Agreement and customary adjustments, at the Effective Time of the Business Combination, each share of Lightning Systems Capital Stock issued and outstanding immediately prior to the Effective Time of the Business Combination (other than shares owned by Lightning Systems as treasury stock and Dissenting Shares (as defined in the Business Combination Agreement)) will (i) convert into that number of shares of Company Common Stock that constitutes the Merger Consideration, which aggregate amount, including any shares issuable in respect of vested equity awards of Lightning Systems that are exercised prior to the Closing or equity awards of Lightning Systems that the Company assumes and which are exercised following the Closing in accordance with the terms of such equity awards, plus (2) up to an additional 16,463,096 shares of Common Stock as Stockholder Earnout Shares to equity holders of Lightning Systems who have received, or are entitled to receive, any Per Share Merger Consideration shares of Company Common Stock earned due to the satisfaction of the Earnout Conditions pursuant to the terms of the Business Combination Agreement.

**Conversion of Securities**

Immediately prior to the Effective Time, Lightning Systems will cause the outstanding principal amount, together with all accrued and unpaid interest, of the Lightning Systems convertible notes to be automatically converted into a number of shares of Lightning Systems Series C preferred stock at the per share conversion price set forth in the applicable Lightning Systems convertible note. Upon conversion, all of the Lightning Systems convertible notes will no longer be outstanding and will cease to exist, any liens securing obligations under the Lightning Systems convertible notes will be released and each holder of Lightning Systems convertible notes will thereafter cease to have any rights with respect to such convertible notes.

Immediately prior to the Effective Time, Lightning Systems will cause each share of Lightning Systems preferred stock that is issued and outstanding to be converted into a number of shares of Lightning Systems Common Stock at the then-effective conversion rate, as calculated pursuant to Section 4.1.1 of Lightning Systems' certificate of incorporation, and upon conversion such shares of Lightning Systems preferred stock will no longer be outstanding and will cease to exist, and each holder of Lightning Systems preferred stock will thereafter cease to have any rights with respect to such preferred stock.

At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Merger Sub, Lightning Systems or the holders of any of Lightning Systems' securities:

- each share of Lightning Systems Capital Stock issued and outstanding immediately prior to the Effective Time will be canceled and converted into the right to receive (a) the number of shares of the Company Common Stock equal to the Exchange Ratio (the "*Per Share Merger Consideration*") and (b) the contingent right to receive a portion of the Stockholder Earnout Shares (as defined below), calculated on a Pro Rata Basis together with all other shares of Lightning Systems Capital Stock held by the holder of such share as of immediately prior to the Effective Time (as discussed further below);

- each share of Lightning Systems Common Stock and Lightning Systems preferred stock held in the treasury of Lightning Systems will be canceled without any conversion thereof and no payment or distribution will be made with respect thereto;

- each share of Merger Sub Common Stock issued and outstanding immediately prior to the Effective Time will be converted into and exchanged for one validly issued, fully paid and nonassessable share of common stock of the Surviving Corporation;

127

Table of Contents

- each Lightning Systems Option that is outstanding immediately prior to the Effective Time, whether vested or unvested, will be assumed by the Company and converted into an option to purchase a number of shares of the Company's Common Stock (such option, an "*Exchanged Option*") equal to the product (rounded down to the nearest whole number) of (a) the number of shares of Lightning Systems Common Stock subject to such Lightning Systems Option immediately prior to the Effective Time and (b) the Exchange Ratio, at an exercise price per share (rounded up to the nearest whole cent) equal to the quotient of (i) the exercise price per share of such Lightning Systems Option immediately prior to the Effective Time divided by (ii) the Exchange Ratio. Except as specifically provided in the Business Combination Agreement, following the Effective Time, each Exchanged Option will continue to be governed by the same vesting and exercisability terms and otherwise substantially similar terms and conditions as were applicable to the corresponding former Lightning Systems Option immediately prior to the Effective Time; and

- the portion of the Aggregate Closing Merger Consideration issuable to any holder shall be calculated on an aggregate basis with respect to all shares of Lightning Systems Capital Stock held of record by such holder immediately prior to the Effective Time and, after such aggregation, any fractional share of the Company's Common Stock to which holders of Lightning Systems Common Stock would otherwise be entitled, fractional shares shall be rounded up to the nearest whole share of the Company's Common Stock.

Following the consummation of the Business Combination, the proposed Second Amended and Restated Certificate of Incorporation of the Company will be filed with the Office of the Secretary of State of the State of Delaware. See the section entitled "- *Proposed Second Amended and Restated Certificate of Incorporation*".

**Stockholder Earnout**

After the Closing, subject to the terms and conditions set forth in the Business Combination Agreement, the Stockholder Earnout Group shall have the contingent right to receive additional shares of Common Stock as the Stockholder Earnout Shares based on the stock price performance of New Lightning eMotors if certain requirements are achieved. At the Closing and immediately prior to the Effective Time, the Company shall deliver to the Exchange Fund the Stockholder Earnout Shares, as such shares may be adjusted for any stock split, reverse stock split, recapitalization, reclassification, reorganization, exchange, subdivision or combination. The Stockholder Earnout Shares shall be allocated on a Pro Rata Basis among the members of the Stockholder Earnout Group. "*Pro Rata Basis*" shall mean, with respect to any member of the Stockholder Earnout Group, in accordance with the ratio calculated by dividing (x) the sum of the aggregate Per Share Merger Consideration issued or issuable to such holder *by* (y) the sum of the aggregate Per Share Merger Consideration issued or issuable to the Stockholder Earnout Group, in each case, as of immediately following the Closing as determined in accordance with the Business Combination Agreement.

The Stockholder Earnout Shares shall be released and delivered upon satisfaction of the Earnout Conditions as follows:

- one-third of the Stockholder Earnout Shares will be released from the Exchange Fund and distributed to each member of the Stockholder Earnout Group on a Pro Rata Basis if, on or prior to the fifth (5th) anniversary of the Closing Date, the VWAP of shares of Common Stock equals or exceeds $12.00 per share for twenty (20) of any thirty (30) consecutive trading days commencing after the Closing on the NYSE, Nasdaq or any other national securities exchange, as applicable (the "*First Share Price Trigger*");

- one-third of the Stockholder Earnout Shares will be released from the Exchange Fund and distributed to each member of the Stockholder Earnout Group on a Pro Rata Basis if, on or prior to the fifth (5th) anniversary of the Closing Date the VWAP of shares of Common Stock equals or exceeds $14.00 per share for twenty (20) of any thirty (30) consecutive trading days commencing after the Closing on the NYSE, Nasdaq or any other national securities exchange, as applicable (the "*Second Share Price Trigger*");

- one-third of the Stockholder Earnout Shares will be released from the Exchange Fund and distributed to each member of the Stockholder Earnout Group on a Pro Rata Basis if, on or prior to the fifth (5th)

128

Table of Contents

anniversary of the Closing Date the VWAP of shares of Common Stock equals or exceeds $16.00 per share for twenty (20) of any thirty (30) consecutive trading days commencing after the Closing on the NYSE, Nasdaq or any other national securities exchange, as applicable (the "*Third Share Price Trigger*" and, collectively with the First Share Price Trigger and the Second Share Price Trigger, the "*Share Price Triggers*");

- if the Earnout Conditions set forth above have not been satisfied following the fifth (5th) anniversary of the Closing Date, any Stockholder Earnout Shares remaining in the Exchange Fund shall be automatically released to New Lightning eMotors for cancellation and the members of the Stockholder Earnout Group shall not have any right to receive such Stockholder Earnout Shares or any benefit therefrom; and

- the portion of the Aggregate Closing Merger Consideration issuable to any holder shall be calculated on an aggregate basis with respect to all shares of Lightning Systems Capital Stock held of record by such holder immediately prior to the Effective Time and, after such aggregation, any fractional share of the Company's Common Stock to which holders of Lightning Systems Common Stock would otherwise be entitled, fractional shares shall be rounded up to the nearest whole share of the Company's Common Stock.

**Closing**

The Closing will occur as promptly as practicable, but in no event later than three (3) business days following the satisfaction or waiver of all of the closing conditions.

**Representations, Warranties and Covenants**

The Business Combination Agreement contains customary representations, warranties and covenants of the Company, Merger Sub and Lightning Systems relating to, among other things, their ability to enter into the Business Combination Agreement and their respective outstanding capitalization. These representations and warranties are subject to materiality, knowledge and other similar qualifications in many respects and terminate and expire upon the occurrence of the Closing (and there shall be no liability after the Closing in respect thereof), except for those covenants and agreements that by their terms expressly apply in whole or in part after the Closing and then only with respect to any breaches occurring after the Closing. These representations and warranties have been made solely for the benefit of the parties to the Business Combination Agreement.

The Business Combination Agreement contains representations and warranties made by Lightning Systems to the Company and Merger Sub relating to a number of matters, including the following:

- organization and qualification to do business;

- subsidiaries;

- certificate of incorporation and bylaws;

- capitalization;

- authority to enter into the Business Combination Agreement;

- absence of conflicts with organizational documents, applicable laws or certain other agreements;

- required filings and consents in connection with the Business Combination Agreement;

- permits and compliance;

- financial statements;

- absence of changes or events;

- absence of litigation;

129

**Table of Contents**

- employee benefit plans;

- labor and employment matters;

- real property and title to assets;

- intellectual property;

- taxes;

- environmental matters;

- material contracts;

- international trade laws;

- insurance;

- approval of the board and the stockholders;

- certain business practices;

- interested party transactions;

- Exchange Act;

- brokers; and

- exclusivity of the representations and warranties made by Lightning Systems.

The Business Combination Agreement contains representations and warranties made by the Company and Merger Sub to Lightning Systems relating to a number of matters, including the following:

- corporate organization;

- certificate of incorporation and bylaws;

- capitalization;

- authority to enter into the Business Combination Agreement;

- absence of conflicts with organizational documents, applicable laws or certain other agreements;

- required filings and consents in connection with the Business Combination Agreement;

- compliance;

- proper filing of documents with the SEC, financial statements and compliance with the Sarbanes-Oxley Act;

- absence of certain changes or events;

- absence of litigation;

- approval of the board and the stockholders;

- no prior operations of Merger Sub;

- brokers;

- the Trust Account;

- employees;

- taxes;

130

Table of Contents

- the listing of Common Stock, warrants and units; and

- investigation and reliance.

**Conduct of Business Pending the Merger**

Lightning Systems has agreed that, prior to the Effective Time or termination of the Business Combination Agreement, subject to certain exceptions, it will conduct its business in the ordinary course of business and in a manner consistent with past practice. Lightning Systems has also agreed to use commercially reasonable efforts to preserve substantially intact its business organization, to keep available the services of its current officers, key employees and consultants and to preserve the current relationships of Lightning Systems with customers, suppliers and other persons with which Lightning Systems has significant business relations.

In addition to the general covenants above, Lightning Systems has agreed that prior to the Effective Time or termination of the Business Combination Agreement, subject to certain exceptions, it will not, without the prior written consent of the Company (which may not be unreasonably conditioned, withheld or delayed):

- amend or otherwise change its certificate of incorporation, bylaws or equivalent organizational documents;

- issue, sell, pledge, dispose of, grant or encumber, or authorize the issuance, sale, pledge, disposition, grant or encumbrance of, (a) any shares of any class of Lightning Systems Capital Stock, or any options, warrants, convertible securities or other rights of any kind to acquire any shares of such Lightning Systems Capital Stock, or any other ownership interest (including, without limitation, any phantom interest), of Lightning Systems, provided that (i) the exercise or settlement of any Lightning Systems Options in effect on the date of the Business Combination Agreement or grants of Lightning Systems Options in the ordinary course of business consistent with past practice, (ii) the issuance of shares of Lightning Systems Common Stock under the Stockholders Agreement, (iii) the conversion of Lightning Systems convertible notes into Lightning Systems Series C preferred stock contemplated under the Lightning Systems convertible notes and (iv) the issuance of up to 400,000 warrants to certain of Lightning Systems' vendors, exercisable for shares of Lightning Systems Common Stock, as authorized by the Lightning Systems board of directors on September 30, 2020 (the "*Vendor Warrants*") shall not require the consent of the Company, provided that such Vendor Warrants will terminate or convert into shares of Company Common Stock prior to the Effective Time; or (b) any material assets of Lightning Systems except in the ordinary course of business and consistent with past practice;

- except as contemplated or permitted under the Stockholders Agreement, declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock;

- reclassify, combine, split, subdivide or redeem, or purchase or otherwise acquire, directly or indirectly, any of its capital stock, other than redemptions of equity securities from former employees upon the terms set forth in the underlying agreements governing such equity securities;

- (a) acquire (including, without limitation, by merger, consolidation, or acquisition of stock or assets or any other business combination) any corporation, partnership, other business organization or any division thereof in an amount in excess of $2,000,000; or (b) incur any indebtedness for borrowed money in excess of $10,000,000 or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for, the obligations of any person, or make any loans or advances, or intentionally grant any security interest in any of its assets, in each case, except in the ordinary course of business and consistent with past practice;

- (a) grant any material increase in the compensation, incentives or benefits payable or to become payable to any current or former director, officer, employee or consultant of Lightning Systems as of the date of the Business Combination Agreement, other than (i) increases in the ordinary course of business and increases required by the terms of a Lightning Systems plan or applicable law and (ii) increases that do not result in

131

Table of Contents

compensation, incentives or benefits for the current directors, officers, employees or consultants of Lightning Systems that are materially more favorable to such directors, officers, employees or consultants than those provided by peer group of companies agreed to by the parties (the "*Peer Group*") to their respective directors, officers, employees or consultants, as applicable, or (b) enter into any new, or materially amend any existing severance or termination agreement (or the severance or termination provisions of existing employment agreements) with any current or former director, officer or employee whose compensation would exceed, on an annualized basis, $300,000 other than any new severance or termination agreement or material amendment to existing severance or termination agreements (or to the severance or termination provisions of any existing employment agreements) with any current director, officer or employee of Lightning Systems that do not result in any such director, officer or employee receiving severance or termination benefits that are more favorable to such director, officer, or employee that those provided by the Peer Group to their respective directors, officers or employees, as applicable; provided, that any increase to the compensation, incentives or benefits of any current officer of the Company, or any decision to hire any new officer of Lightning Systems (and the terms of any sure hire), will be made by Lightning Systems only in consultation with the Company;

- materially amend, other than reasonable and usual amendments in the ordinary course of business, accounting policies or procedures, other than as required by U.S. GAAP;

- make, change or revoke any material tax election, amend a material tax return or settle or compromise any material U. S. federal, state, local or non-U. S. income tax liability;

- materially amend, modify or consent to the termination (excluding any expiration in accordance with its terms) of any material contract, in each case, in a manner that is materially adverse to Lightning Systems, taken as a whole, except in the ordinary course of business;

- intentionally permit any material item of intellectual property owned by Lightning Systems to lapse or to be abandoned, invalidated, dedicated to the public, or disclaimed, or otherwise become unenforceable; or

- enter into any formal or informal agreement or otherwise make a binding commitment to do any of the foregoing.

Lightning Systems shall not be required to obtain consent from the Company to do any of the foregoing if obtaining such consent might reasonably be expected to violate applicable law. Additionally, the foregoing does not give to the Company, directly or indirectly, the right to control or direct the operations of Lightning Systems prior to the Closing Date.

Except as expressly contemplated by the Business Combination Agreement or any Ancillary Agreement (including (x) entering into the PIPE Subscription Agreement and consummating the PIPE Investment and (y) entering into the Convertible Note Subscription Agreements, the Indenture and the Amended and Restated Warrant Agreement and consummating the Convertible Note Investment) and as required by applicable law, the Company has agreed that, prior to the Effective Time or termination of the Business Combination Agreement, it will conduct its business, and cause Merger Sub to conduct its business, in the ordinary course of business and in a manner consistent with past practice. In addition, the Company has agreed that prior to the Effective Time, subject to specified exceptions, it will not, and will cause Merger Sub not to, without the prior written consent of Lightning Systems (which may not be unreasonably withheld, delayed or conditioned):

- amend or otherwise change its organizational documents or the organizational documents of Merger Sub, or form any subsidiary of the Company other than Merger Sub;

- declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock, other than redemptions from the Trust Account that are required pursuant to the Company organizational documents;

132

Table of Contents

- reclassify, combine, split, subdivide, redeem, purchase or otherwise acquire, directly or indirectly, any the Company Common Stock or the Company warrants except for redemptions from the Trust Account that are required pursuant to the Company organizational documents;

- other than pursuant to the PIPE Subscription Agreement, the Convertible Note Subscription Agreement, the Indenture and the Amended and Restated Warrant Agreement, issue, sell, pledge, dispose of, grant or encumber, or authorize the issuance, sale, pledge, disposition, grant or encumbrance of, any shares of any class of capital stock or other securities of the Company or Merger Sub, or any options, warrants, convertible securities or other rights of any kind to acquire any shares of such capital stock, or any other ownership interest (including, without limitation, any phantom interest), of the Company or Merger Sub;

- acquire (including, without limitation, by merger, consolidation, or acquisition of stock or assets or any other business combination) any corporation, partnership, other business organization or enter into any strategic joint ventures, partnerships or alliances with any other person;

- engage in any conduct in a new line of business or engage in any commercial activities (other than to consummate the transactions contemplated by the Business Combination Agreement);

- incur any indebtedness for borrowed money or guarantee any such indebtedness of another person or persons, issue or sell any debt securities or options, warrants, calls or other rights to acquire any debt securities of the Company, as applicable, enter into any "keep well" or other agreement to maintain any financial statement condition or enter into any arrangement having the economic effect of any of the foregoing, in each case, except in the ordinary course of business consistent with past practice or except a loan from its Sponsor or an affiliate thereof or certain of the Company's officers and directors to finance the Company's transaction costs in connection with the Business Combination;

- make any change in any method of financial accounting or financial accounting principles, policies, procedures or practices, except as required by a concurrent amendment in GAAP or applicable law made subsequent to the date of the Business Combination Agreement, as agreed to by its independent accountants;

- make any material tax election or settle or compromise any material U.S. federal, state, local omon-U.S. income tax liability, except in the ordinary course consistent with past practice;

- liquidate, dissolve, reorganize or otherwise wind up the business and operations of the Company or Merger Sub;

- amend the trust agreement or any other agreement related to the Trust Account;

- (i) hire, or otherwise enter into any employment or consulting agreement or arrangement with, any person, (ii) grant any material increase in the compensation of any current or former officer or director, (iii) adopt any benefit plan for the benefit of any current or former officer or director, or (iv) materially amend any existing agreement with any current or former officer or director; or

- enter into any formal or informal agreement or otherwise make a binding commitment to do any of the foregoing.

The Company shall not be required to obtain consent from Lightning Systems to do any of the foregoing if obtaining such consent might reasonably be expected to violate applicable law.

**Additional Agreements**

***Proxy Statement/Prospectus***

The Company and Lightning Systems agreed to prepare and file with the SEC this proxy statement/prospectus to be sent to the stockholders of the Company relating to the special meeting to consider the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal (collectively, the "*Proposals*") as promptly as practicable

133

Table of Contents

after the execution of the Business Combination Agreement and the Company's receipt of Lightning Systems' audited financial statements for the years ended December 31, 2019 and 2020, each audited by a U.S. accounting firm registered with the Public Company Accounting Oversight Board (United States) (collectively, the "*PCAOB Financial Statements*") .

### The Company's Special Stockholders' Meetings; Lightning Systems Stockholders' Written Consent

The Company has agreed to call and hold the special meeting as promptly as practicable following the clearance of this proxy statement/prospectus by the SEC. The Company has agreed, through the Company's Board, to recommend to its stockholders that they approve the Proposals and to include the recommendation of the Company Board in this proxy statement/prospectus.

Lightning Systems has agreed to seek the irrevocable written consent of the holders of the Requisite Approval in favor of the approval and adoption of the Business Combination Agreement and the Business Combination and all other transactions contemplated by the Business Combination Agreement (the "*Written Consent*") as soon as reasonably practicable after this proxy statement/prospectus becomes effective (and in any event within forty-eight hours).

134

Table of Contents

*Exclusivity*

From the date of the Business Combination Agreement and ending on the earlier of (a) the Closing and (b) the termination of the Business Combination Agreement, Lightning Systems will not, and will cause its representatives not to, directly or indirectly, (i) enter into, solicit, initiate or continue any discussions or negotiations with, or encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any way with, any person or other entity or "group" within the meaning of Section 13(d) of the Exchange Act, concerning (A) any sale of assets of Lightning Systems equal to 5% or more of Lightning Systems' assets or to which 5% or more of Lightning Systems' revenues or earnings are attributable, (B) the issuance or acquisition of 5% or more of the outstanding capital stock (on an as converted to Lightning Systems Common Stock basis) or other voting securities representing 5% or more of the combined voting power of Lightning Systems or (C) any conversion, consolidation, merger, liquidation, dissolution or similar transaction which, if consummated, would result in any person or other entity or group beneficially owning 5% or more of the combined voting power of Lightning Systems, other than with the Company and its representatives (an "*Alternative Transaction*"), (ii) enter into any agreement regarding, continue or otherwise participate in any discussions regarding, or furnish to any person any information with respect to, or cooperate in any way that would otherwise reasonably be expected to lead to, any Alternative Transaction or (iii) commence, continue or renew any due diligence investigation regarding any Alternative Transaction; provided that the execution, delivery and performance of the Business Combination Agreement and related documents and the consummation of the transactions contemplated thereby shall not be deemed a violation of this provision. Lightning Systems will, and will cause its affiliates and representatives to, immediately cease any and all existing discussions or negotiations with any person conducted heretofore with respect to any Alternative Transaction. Lightning Systems also agrees that it will promptly request each person (other than the parties hereto and their respective representatives) that has prior to the date thereof executed a confidentiality agreement in connection with its consideration of acquiring Lightning Systems to return or destroy all confidential information furnished to such person by or on behalf of it prior to the date thereof. If Lightning Systems or any of its representatives receives any inquiry or proposal with respect to an Alternative Transaction at any time prior to the Closing, then Lightning Systems will promptly (and in no event later than twenty-four (24) hours after Lightning Systems becomes aware of such inquiry or proposal) notify such person in writing that Lightning Systems is subject to an exclusivity agreement with respect to the sale of Lightning Systems that prohibits it from considering such inquiry or proposal.

From and after the date hereof until the effective time of the Business Combination or, if earlier, the termination of the Business Combination Agreement, the Company will not take, nor will it permit any of its affiliates or representatives to take, whether directly or indirectly, any action to solicit, initiate, continue or engage in discussions or negotiations with, or enter into any agreement with, or encourage, respond, provide information to or commence due diligence with respect to, any person (other than Lightning Systems, its stockholders and/or any of their affiliates or representatives), concerning, relating to or which is intended or is reasonably likely to give rise to or result in, any offer, inquiry, proposal or indication of interest, written or oral relating to any business combination transaction (a "*Business Combination Proposal*") other than with Lightning Systems, its stockholders and their respective affiliates and representatives. The Company will, and will cause its affiliates and representatives to, immediately cease any and all existing discussions or negotiations with any person (other than with Lightning Systems, its stockholders and their respective affiliates and representatives) conducted prior to the date hereof with respect to, or which is reasonably likely to give rise to or result in, a Business Combination Proposal.

*Stock Exchange Listing*

The Company will use its reasonable best efforts to cause the shares of Common Stock to be issued in connection with the Business Combination to be approved for listing on the NYSE at the Closing. Until the Closing, the Company shall use its reasonable best efforts to keep the Company units, Common Stock and public warrants listed for trading on the NYSE.

135

Table of Contents

***Other Covenants and Agreements***

The Business Combination Agreement contains other covenants and agreements, including covenants related to:

- Lightning Systems and the Company providing access to books and records and furnishing relevant information to the other party, subject to certain limitations and confidentiality provisions;

- certain employee benefit matters including the establishment of the Incentive Plan to be effective after the Closing;

- director and officer indemnification;

- prompt notification of certain matters;

- Lightning Systems and the Company using reasonable best efforts to consummate the Business Combination and the transactions contemplated by the Business Combination Agreement;

- public announcement of the Business Combination;

- the intended tax treatment of the Business Combination;

- cooperation regarding any filings required under the HSR Act;

- the Trust Account;

- Lightning Systems using reasonable best efforts to deliver audited financial statements for the years ended December 31,

- 2018 and 2019 and audited or reviewed financial statements for the nine (9) month period ended September 30, 2020; and

- Section 16(a) of the Exchange Act.

See "*Proposal No. 5 - Approval of the Incentive Plan*" for a discussion of the Incentive Plan being established in accordance with the terms of the Business Combination Agreement.

***Conditions to Closing of the Business Combination Agreement***

*Mutual Conditions*

The obligations of the Company, Merger Sub and Lightning Systems to consummate the Business Combination are subject to the satisfaction or waiver (where legally permissible) at or prior to the Closing of the following conditions:

- the Written Consent shall have been delivered to the Company;

- the Proposals shall have been approved and adopted by the requisite affirmative vote of the Company stockholders in accordance with this proxy statement/prospectus, the DGCL, the Company organizational documents and the rules and regulations of the NYSE;

- no governmental authority shall have enacted, issued, promulgated, enforced or entered any law, rule, regulation, judgment, decree, executive order or award which is then in effect and has the effect of making the Business Combination, including the Merger, illegal or otherwise prohibiting consummation of the Business Combination, including the Merger;

- all required filings under the HSR Act shall have been completed and any applicable waiting period (and any extension thereof) applicable to the consummation of the Business Combination under the HSR Act shall have expired or been terminated, and any pre-Closing approvals or clearances reasonably required thereunder shall have been obtained;

136

Table of Contents

- certain specified consents, approvals and authorizations shall have been obtained from and made with certain governmental authorities;

- this proxy statement/prospectus shall have been declared effective under the Securities Act, no stop order suspending the effectiveness of this proxy statement/prospectus shall be in effect, and no proceedings for purposes of suspending the effectiveness of this proxy statement/prospectus shall have been initiated or be threatened by the SEC;

- upon the Closing, and after giving effect to the redemption rights, the Company shall have net tangible assets of at least $5,000,001 (excluding assets of the Surviving Corporation);

- the Company shall have cash and cash equivalents in the Trust Account and from the transactions contemplated by the PIPE Subscription Agreement and the Convertible Note Subscription Agreements of an aggregate amount not less than $150,000,000; and

- the shares of the New Lightning eMotors Common Stock shall be listed on the NYSE as of the Closing Date.

*The Company and Merger Sub Conditions*

The obligations of the Company and Merger Sub to consummate the Business Combination are subject to the satisfaction or waiver (where legally permissible) at or prior to the Closing of the following additional conditions:

- the representations and warranties of Lightning Systems contained in the sections of the Business Combination Agreement entitled (a) "Organization and Qualification; Subsidiaries," (b) "Capitalization," (c) "Authority Relative to the Business Combination Agreement" and (d) "Brokers" shall each be true and correct in all material respects as of the Closing Date as though made on the Closing Date (without giving effect to any limitation as to "materiality" or "Lightning Systems Material Adverse Effect" or any similar limitation set forth therein), except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date. All other representations and warranties of Lightning Systems contained in the Business Combination Agreement shall be true and correct (without giving any effect to any limitation as to "materiality" or "Lightning Systems Material Adverse Effect" or any similar limitation set forth therein) in all respects as of the Closing Date, as though made on and as of the Closing Date, except (i) to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date and (ii) where the failure of such representations and warranties to be true and correct (whether as of the Closing Date or such earlier date), taken as a whole, does not result in a Lightning Systems Material Adverse Effect;

- Lightning Systems shall have performed or complied in all material respects with all agreements and covenants required by the Business Combination Agreement to be performed or complied with by it at or prior to the Effective Time;

- Lightning Systems shall have delivered to the Company a customary officer's certificate, dated the date of the Closing, certifying as to the satisfaction of certain conditions;

- no Lightning Systems Material Adverse Effect shall have occurred between the date of the Business Combination Agreement and the Closing Date;

- other than those persons identified as continuing directors in the Business Combination Agreement, all members of the Lightning Systems Board of Directors, as required pursuant to the Business Combination Agreement, shall have executed written resignations effective as of the Effective Time;

- all parties to the Stockholder Support Agreement shall have delivered, or caused to be delivered, to the Company copies of the Stockholder Support Agreement duly executed by all such parties;

137

Table of Contents

- the PIPE Subscription Agreement shall be in full force and effect and nothing shall exist that would impair the private placement pursuant to such agreement occurring in connection with the Closing;

- the Convertible Note Subscription Agreements, the Indenture and the Amended and Restated Warrant Agreement shall be in full force and effect and nothing shall exist that would impair the Convertible Note Investment occurring in connection with the Closing;

- all parties to the Registration Rights and Lock-up Agreement (other than the Company) shall have delivered, or caused to be delivered, to the Company copies of the Registration Rights and Lock-up Agreement duly executed by all such parties;

- on or prior to the Closing, Lightning Systems shall deliver to the Company a properly executed certification that shares of Lightning Systems Capital Stock are not "U.S. real property interests" in accordance with the Treasury Regulations under Sections 897 and 1445 of the Code, together with a notice to the IRS (which shall be filed by the Company with the IRS following the Closing) in accordance with the provisions of Section 1.897-2(h)(2) of the Treasury Regulations;

- Lightning Systems shall have delivered to the Company the PCAOB Financial Statements;

- the Lightning Systems convertible notes shall have converted into shares of Lightning Systems Series C preferred stock in accordance with the terms thereof; and

- the Lightning Systems warrants shall have terminated or converted into shares of Lightning Systems Common Stock or Lightning Systems Series C preferred stock (including, for the avoidance of doubt, that the Vendor Warrants shall have terminated or converted into shares of Company Common Stock) in accordance with their terms.

Some of the conditions to the Company's obligations are qualified by the concept of a "Lightning Systems Material Adverse Effect." Under the terms of the Business Combination Agreement, a "Lightning Systems Material Adverse Effect" means event, circumstance, change, development, effect or occurrence (collectively "*Effect*") that, individually or in the aggregate with all other Effects, (a) is or would reasonably be expected to be materially adverse to the business, financial condition, assets, liabilities or operations of Lightning Systems or (b) prevents, materially delays or materially impedes the performance by Lightning Systems of its obligations under the Business Combination Agreement or the consummation of the Merger or any of the other transactions provided for in the Business Combination Agreement; provided, however, that none of the following shall be deemed to constitute, alone or in combination, or be taken into account in the determination of whether, there has been or will be a Lightning Systems Material Adverse Effect: (i) any change or proposed change in or change in the interpretation of any law (including any COVID-19 Measures) or GAAP after the date of the Business Combination Agreement; (ii) events or conditions generally affecting the industries or geographic areas in which Lightning Systems operates; (iii) any downturn in general economic conditions, including changes in the credit, debt, securities, financial or capital markets (including changes in interest or exchange rates, prices of any security or market index or commodity or any disruption of such markets); (iv) acts of war, sabotage, civil unrest, terrorism, epidemics, pandemics or disease outbreaks (including COVID-19), or any escalation or worsening of any such acts of war, sabotage, civil unrest, terrorism, epidemics, pandemics or disease outbreaks, or changes in global, national, regional, state or local political or social conditions; (v) any hurricane, tornado, flood, earthquake, natural disaster, or other acts of God, (vi) any actions taken or not taken by Lightning Systems as required by the Business Combination Agreement or any Related Agreement or agreement to be entered into pursuant to one of such agreements, (vii) any Effect attributable to the announcement or execution, pendency, negotiation or consummation of the Merger or any of the other transactions provided for in the Business Combination Agreement (including the impact thereof on relationships with customers, suppliers, employees or governmental authorities), (viii) any failure to meet any projections, forecasts, guidance, estimates, milestones, budgets or financial or operating predictions of revenue, earnings, cash flow or cash position, provided that this clause (viii) shall not prevent a determination that any change, event, or occurrence underlying such failure has resulted in a Lightning Systems Material Adverse Effect, (ix) any actions taken, or failures to take action, or such other changes or events, in each case, which the Company has requested or to which it has consented or which

138

Table of Contents

actions are contemplated by the Business Combination Agreement or (x) any statements or items set forth in the Schedules to the Business Combination Agreement of Lightning Systems, except in the cases of clauses (i) through (iii), to the extent that Lightning Systems and its subsidiaries, taken as a whole, are materially and disproportionately affected thereby as compared with other participants in the industries in which Lightning Systems operates.

*Lightning Systems Conditions*

The obligations of Lightning Systems to consummate the Business Combination are subject to the satisfaction or waiver (where legally permissible) at or prior to the Closing of the following additional conditions:

- the representations and warranties of the Company and Merger Sub contained in the sections of the Business Combination Agreement entitled (a) "Corporate Organization," (b) "Capitalization," (c) "Authority Relative to the Business Combination Agreement" and (d) "Brokers" shall each be true and correct in all material respects as of the Closing Date as though made on the Closing Date (without giving effect to any limitation as to "materiality" or "Company Material Adverse Effect" or any similar limitation set forth therein), except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date. All other representations and warranties of the Company and Merger Sub contained in the Business Combination Agreement shall be true and correct (without giving any effect to any limitation as to "materiality" or "Company Material Adverse Effect" or any similar limitation set forth therein) in all respects as of the Closing Date, as though made on and as of the Closing Date, except (i) to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date and (ii) where the failure of such representations and warranties to be true and correct (whether as of the Closing Date or such earlier date), taken as a whole, does not result in a Company Material Adverse Effect;

- the Company and Merger Sub shall have performed or complied in all material respects with all agreements and covenants required by the Business Combination Agreement to be performed or complied with by it at or prior to the Effective Time;

- the Company shall have delivered to Lightning Systems a customary officer's certificate (signed by the President of the Company), dated the date of the Closing, certifying as to the satisfaction of certain conditions;

- no Company Material Adverse Effect shall have occurred between the date of the Business Combination Agreement and the Closing Date;

- a supplemental listing shall have been filed with the New York Stock Exchange as of the Closing Date to list the shares constituting the Aggregate Closing Merger Consideration; and

- the Company shall have delivered a copy of the Registration Rights and Lock-up Agreement duly executed by the Company and the Company's stockholders party thereto.

Some of the conditions to Lightning Systems' obligations are qualified by the concept of a "Company Material Adverse Effect." Under the terms of the Business Combination Agreement, a "Company Material Adverse Effect" means any Effect that, individually or in the aggregate with all other Effects, (a) is or would reasonably be expected to be materially adverse to the business, financial condition or results of operations of the Company; or (b) would prevent, materially delay or materially impede the performance by the Company or Merger Sub of their respective obligations under the Business Combination Agreement or the consummation of the Merger or any of the other transactions provided for in the Business Combination Agreement; provided, however, that none of the following shall be deemed to constitute, alone or in combination, or be taken into account in the determination of whether, there has been or will be a Company Material Adverse Effect: (i) any

139

**Table of Contents**

change or proposed change in or change in the interpretation of any law (including any COVID-19 Measures) or GAAP after the date of the Business Combination Agreement; (ii) events or conditions generally affecting the industries or geographic areas in which the Company operates; (iii) any downturn in general economic conditions, including changes in the credit, debt, securities, financial or capital markets (including changes in interest or exchange rates, prices of any security or market index or commodity or any disruption of such markets); (iv) acts of war, sabotage, civil unrest, terrorism, epidemics, pandemics or disease outbreaks (including COVID-19) or any escalation or worsening of any such acts of war, sabotage, civil unrest, terrorism, epidemics, pandemics or disease outbreaks, or changes in global, national, regional, state or local political or social conditions; (v) any hurricane, tornado, flood, earthquake, natural disaster, or other acts of God, (vi) any actions taken or not taken by the Company as required by the Business Combination Agreement or any Related Agreement or agreement to be entered into pursuant to one of such agreements, (vii) any Effect attributable to the announcement or execution, pendency, negotiation or consummation of the Merger or any of the other transactions provided for in the Business Combination Agreement, or (viii) any actions taken, or failures to take action, or such other changes or events, in each case, which the Company has requested or to which it has consented or which actions are contemplated by the Business Combination Agreement, except in the cases of clauses (i) through (iii), to the extent that the Company is materially and disproportionately affected thereby as compared with other participants in the industry in which the Company operates.

*Termination*

The Business Combination Agreement may be terminated and the Business Combination, including the Merger, may be abandoned at any time prior to the Effective Time, notwithstanding any requisite approval and adoption of the Business Combination Agreement and the Business Combination by the stockholders of Lightning Systems or the Company, as follows:

•   by mutual written consent of the Company and Lightning Systems;

•   by either the Company or Lightning Systems, if (a) the Effective Time has not occurred prior to June 30, 2021 (the "*Outside Date*"); provided, however, that the Business Combination Agreement may not be terminated under this provision by or on behalf of any party that either directly or indirectly through its affiliates is in breach or violation of any representation, warranty, covenant, agreement or obligation contained in the Business Combination Agreement and such breach or violation is the principal cause of the failure of the conditions to the Merger on or prior to the Outside Date, (b) any governmental authority in the U.S. has enacted, issued, promulgated, enforced or entered any permanent injunction, order, decree or ruling which has become final and nonappealable and has the effect of making consummation of the Business Combination, including the Merger, illegal or otherwise preventing or prohibiting consummation of the Business Combination, (c) any of the Proposals fail to receive the requisite vote for approval at the special meeting or (d) if cash and cash equivalents in the Trust Account is less than $150,000,000;

•   by Lightning Systems if there is a breach of any representation, warranty, covenant or agreement on the part of the Company and Merger Sub set forth in the Business Combination Agreement, or if any representation or warranty of the Company and Merger Sub becomes untrue, in either case such that the first two conditions described above in "- *Conditions to Closing of the Business Combination Agreement—LightningSystems Conditions*" would not be satisfied (a "*Terminating Company Breach*"); provided that Lightning Systems has not waived such Terminating Company Breach and Lightning Systems is not then in material breach of its representations, warranties, covenants or agreements in the Business Combination Agreement; provided, however, that, if such Terminating Company Breach is curable by the Company and Merger Sub, Lightning Systems may not terminate the Business Combination Agreement under this provision for so long as the Company and Merger Sub continue to exercise their reasonable efforts to cure such breach, unless such breach is not cured within thirty (30) days after notice of such breach is provided by Lightning Systems to the Company; or

140

Table of Contents

- by the Company if (a) Lightning Systems has failed to deliver the Written Consent to the Company within forty-eight hours after this proxy statement/prospectus becomes effective; provided, however, that the Company's right to terminate the Business Combination Agreement pursuant to this provision shall expire at the end of the fifth business day following the date on which the Written Consent is delivered to the Company; (b) there is a breach of any representation, warranty, covenant or agreement on the part of Lightning Systems set forth in the Business Combination Agreement, or if any representation or warranty of Lightning Systems becomes untrue, in either case such that the first two conditions described above in "- *Conditions to Closing of the Business Combination Agreement—the Company and Merger Sub Conditions*" would not be satisfied (a "*Terminating Lightning Systems Breach*"); provided that the Company has not waived such Terminating Lightning Systems Breach and the Company and Merger Sub are not then in material breach of their representations, warranties, covenants or agreements in the Business Combination Agreement; provided further that, if such Terminating Lightning Systems Breach is curable by Lightning Systems, the Company may not terminate the Business Combination Agreement under this provision for so long as Lightning Systems continues to exercise its reasonable efforts to cure such breach, unless such breach is not cured within thirty (30) days after notice of such breach is provided by the Company to Lightning Systems; or (c) Lightning Systems has not delivered its PCAOB Financial Statements to the Company on or before December 31, 2020.

### *Effect of Termination*

If the Business Combination Agreement is terminated, the Business Combination Agreement will forthwith become void, and there will be no liability under the Business Combination Agreement on the part of any party to the Business Combination Agreement, except as set forth in the Business Combination Agreement or in the case of termination subsequent to a willful material breach of the Business Combination Agreement by a party thereto.

### Appraisal Rights

Pursuant to Section 262 of the DGCL, Lightning Systems stockholders who comply with the applicable requirements of Section 262 of the DGCL and do not otherwise fail to perfect, waive withdraw or lose the right to appraisal under Delaware law have the right to seek appraisal of the fair value of their shares of Lightning Systems Capital Stock, as determined by the Court of Chancery, if the Merger is completed. The "fair value" of such Dissenting Shares of Lightning Systems Capital Stock as determined by the Court of Chancery may be more or less than, or the same as, the value of the consideration that such stockholder would otherwise be entitled to receive under the Business Combination Agreement. Lightning Systems stockholders who do not vote in favor of the Merger nor consent in writing to it and who wish to preserve their appraisal rights must so advise Lightning Systems by submitting a demand for appraisal within the period prescribed by Section 262 of the DGCL after receiving a notice from Lightning Systems or the Company that appraisal rights are available to them, and must otherwise precisely follow the procedures prescribed by Section 262 of the DGCL. Failure to follow any of the statutory procedures set forth in Section 262 of the DGCL will result in the loss or waiver of appraisal rights under Delaware law. In view of the complexity of Section 262 of the DGCL, Lightning Systems stockholders who may wish to pursue appraisal rights should consult their legal and financial advisors.

### Proposed Second Amended and Restated Certificate of Incorporation

Pursuant to the terms of the Business Combination Agreement, upon the Closing, we will amend and restate our current amended and restated certificate of incorporation to, among other things, provide for certain provisions described below relating to the capital structure of New Lightning eMotors following the consummation of the Business Combination.

141

Table of Contents

*Authorized Share Amendment.* The proposed Second Amended and Restated Certificate of Incorporation will increase the number of authorized shares of our Common Stock from 100,000,000 shares to 250,000,000 shares.

*Director Classification Amendment.* The proposed Second Amended and Restated Certificate of Incorporation will reclassify the New Lightning eMotors Board.

*Additional Amendments.* The proposed Second Amended and Restated Certificate of Incorporation will also eliminate certain provisions relating to an initial business combination that will no longer be applicable to us following the Closing, change the post-combination company's name to "Lightning eMotors, Inc." and make certain other changes that the Board deems appropriate for a public operating company.

For more information about the amendments to our Charter, see the sections entitled *"Proposal No. 3 - Classification of the Board of Directors Proposal," "Proposal No. 4A - Approval of Additional Amendments to Current Amended and Restated Certificate of Incorporation in Connection with the Business Combination Proposal," "Proposal 4B - Authorization of Exclusive Forum Provision,"* and "*Proposal No. 6 - Election of Directors Proposal.*"

### Related Agreements

*This section describes the material provisions of certain additional agreements entered into or to be entered into pursuant to the Business Combination Agreement, which we refer to as the "Related Agreements," but does not purport to describe all of the terms thereof. The Related Agreements will be filed with the SEC at a future date. Stockholders and other interested parties are urged to read such Related Agreements in their entirety.*

#### Stockholder Support Agreement

Contemporaneously with the execution of the Business Combination Agreement, the Company and certain stockholders of Lightning Systems (the "*Key Company Stockholders*") entered into the Stockholder Support Agreement pursuant to which the Key Company Stockholders agreed to vote all of their shares of Lightning Systems Common Stock and Lightning Systems preferred stock in favor of the approval and adoption of the Business Combination and the Business Combination Agreement. Additionally, such Key Company Stockholders agreed not to (a) sell, assign, transfer (including by operation of law), pledge, dispose of, permit to exist any material lien with respect to or otherwise encumber any of their shares of Lightning Systems Common Stock and Lightning Systems preferred stock (or enter into any arrangement with respect thereto), subject to certain exceptions, or (b) deposit any of their shares of Lightning Systems Common Stock and Lightning Systems preferred stock into a voting trust or enter into any voting arrangement that is inconsistent with the Stockholder Support Agreement.

#### Stockholders Agreement

On October 23, 2020, Lightning Systems and the Key Company Stockholders entered into the Stockholders Agreement providing that immediately prior to the Closing (i) the Lightning Systems preferred stock shall automatically convert into the number of shares of Lightning Systems Common Stock issuable thereunder in accordance with the terms of the Stockholders Agreement and (ii) the Key Company Stockholders shall exercise all outstanding Lightning Systems warrants prior to the Closing or such Lightning Systems warrants shall be deemed expired as of the Effective Time.

#### Sponsor Support Agreement

The Company, Lightning Systems and the Sponsor, concurrently with the execution and delivery of the Business Combination Agreement, have entered into the Sponsor Support Agreement, pursuant to which the

142

Table of Contents

Sponsor has agreed, among other things, to vote (or execute and return an action by written consent), or cause to be voted at the Special Meeting (or validly execute and return and cause such consent to be granted with respect to), all of its shares of Company Common Stock (A) in favor of the approval and adoption of the Business Combination Agreement and approval of the Business Combination, including the Merger, (B) against any action, agreement or transaction or proposal that would result in a breach of any covenant, representation or warranty or any other obligation or agreement of the Company under the Business Combination Agreement or that would reasonably be expected to result in the failure of the Merger from being consummated and (C) in favor of each of the proposals and any other matters necessary or reasonably requested by the Company for consummation of the Business Combination, including the Merger.

### *Registration Rights and Lock-Up Agreement*

In connection with the Closing, the Company and the Holders will enter into a Registration Rights and Lock-Up Agreement, pursuant to which the Holders, subject to certain conditions, will be entitled to registration rights. Pursuant to the Registration Rights and Lock-Up Agreement, we will agree that we will file with the SEC (at our sole cost and expense) a registration statement registering the resale of the Registrable Securities, and we will use our reasonable best efforts to have such registration statement declared effective by the SEC as soon as reasonably practicable after the filing thereof. Certain of the Holders will be granted demand underwritten offering registration rights and all of the Holders will be granted piggyback registration rights. The Registration Rights and Lock-Up Agreement further provides that, subject to certain exceptions, each of the Holders will not Transfer any shares of New Lightning eMotors Common Stock beneficially owned or owned of record by such of the Holders until the earlier of (i) 180 days after the date of the Closing or (ii) the date on which, subsequent to the Business Combination, the last sale price of the New Lightning eMotors Common Stock (x) equals or exceeds $12.50 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30 trading day period commencing at least 90 days after the Business Combination, or (y) the date following the completion of the Business Combination on which New Lightning eMotors completes a liquidation, merger, stock exchange or other similar transaction that results in all of the New Lightning eMotors' stockholders having the right to exchange their shares of New Lightning eMotors Common Stock for cash, securities or other property; provided that in the sole discretion of the majority of the independent members of the New Lightning eMotors Board, the such lock-up period may end earlier than as provided therein upon written notice to the Holders.

"Registrable Securities" under the Registration Rights and Lock-up Agreement means (i) any equity securities (including the shares of Common Stock issued or issuable upon the exercise or conversion of any such equity security) of the Company held by a Holder immediately following consummation of the Merger and (ii) all of the Earnout Shares. Registrable Securities include any warrants, shares of capital stock or other securities of the Company issued as a dividend or other distribution with respect to or in exchange for or in replacement of any of the securities described in the foregoing clauses (i)—(ii). As to any particular Registrable Security, such security shall cease to be a Registrable Security when: (a) a registration statement with respect to the sale of such security shall have become effective under the Securities Act and such security shall have been sold, transferred, disposed of or exchanged in accordance with such registration statement; (b) such security shall have been otherwise transferred, a new certificate for such security not bearing a legend restricting further transfer shall have been delivered by the Company and subsequent public distribution of such security shall not require registration under the Securities Act; (c) such security shall have ceased to be outstanding; or (d) such security is freely saleable under Rule 144 promulgated pursuant to the Securities Act ("Rule 144") without volume limitations.

### *PIPE Subscription Agreement*

In connection with the execution of the Business Combination Agreement, the Company entered into the PIPE Subscription Agreement, dated as of December 10, 2020, with the PIPE Investor, pursuant to which, among other things, the Company agreed to issue and sell, in a private placement to close immediately prior to the Closing, an aggregate of 2,500,000 shares of Company Common Stock at $10.00 per share, for an aggregate

143

Table of Contents

purchase price of $25,000,000, to the PIPE Investor. The purpose of the PIPE Investment is to raise additional capital for use by the post-combination company following the Closing. The obligations to consummate the subscription are conditioned upon, among other things, all conditions precedent to the closing of the transactions contemplated by the Convertible Note Subscription Agreements having been satisfied or waived, and the closing of the transaction contemplated by the PIPE Subscription Agreement occurring concurrently with the closing of the transactions contemplated by the Convertible Note Subscription Agreements.

Under the terms of the PIPE Subscription Agreement, the Company agreed to file a registration statement (the "*PIPE Resale Registration Statement*") registering for resale under the Securities Act all of the PIPE Shares acquired by the Subscribers within 45 days after the consummation of the Business Combination (the "*PIPE Resale Registration Filing Deadline*"), and the Company shall use its commercially reasonable efforts to have the PIPE Resale Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the 60th calendar day (or 120th calendar day if the SEC notifies the Company that it will "review" the PIPE Resale Registration Statement) following the PIPE Resale Registration Filing Deadline. The Company will use its commercially reasonable efforts to maintain the continuous effectiveness of the PIPE Resale Registration Statement, and to be supplemented and amended to the extent necessary to ensure that such PIPE Resale Registration Statement is available or, if not available, that another registration statement is available for the resale of the Subscribed Shares, until the earliest of (i) the date on which the PIPE Shares may be resold without volume or manner of sale limitations pursuant to Rule 144, (ii) the date on which such PIPE Shares have actually been sold and (iii) the date which is two years after the Closing.

Notwithstanding anything to the contrary in the PIPE Subscription Agreement, the Company shall be entitled to delay or postpone the effectiveness of the PIPE Resale Registration Statement, and from time to time to require the PIPE Investor not to sell under the PIPE Resale Registration Statement or to suspend the effectiveness thereof, if the negotiation or consummation of a transaction by the Company or its subsidiaries is pending or an event has occurred, which negotiation, consummation or event, the New Lightning eMotors Board reasonably believes, upon the advice of legal counsel, would require additional disclosure by the Company in the PIPE Resale Registration Statement of material information that the Company has a bona fide business purpose for keeping confidential and the non-disclosure of which in the PIPE Resale Registration Statement would be expected, in the reasonable determination of the New Lightning eMotors Board, upon the advice of legal counsel, to cause the PIPE Resale Registration Statement to fail to comply with applicable disclosure requirements; provided, however, that the Company may not delay or suspend the PIPE Resale Registration Statement on more than two occasions or for more than sixty consecutive calendar days, or more than ninety total calendar days, in each case during any twelve-month period.

**Convertible Note Subscription Agreements, Indenture, Amended and Restated Warrant Agreement**

In connection with the execution of the Business Combination Agreement, the Company has also entered into the Convertible Note Subscription Agreements, each dated December 10, 2020, with the Convertible Note Investors, pursuant to which the Convertible Note Investors, upon the terms and subject to the conditions set forth in their respective Convertible Note Subscription Agreements, shall purchase from the Company, and the Company shall issue to the Convertible Note Investors, (i) subject to the terms and conditions of the Indenture, $100,000,000 of unsecured Convertible Notes which shall bear interest at a rate of 7.5% per annum, payable semi-annually, and be convertible into shares of Common Stock at a conversion price of $11.50 in accordance with the terms thereof, and shall mature three (3) years after their issuance, and (b) subject to the terms and conditions of the Amended and Restated Warrant Agreement, the Convertible Note Warrants to purchase up to 8,695,652 shares of Common Stock for a per share exercise price of $11.50, in each case such issuances to be consummated immediately prior to the consummation of the Merger and other transactions contemplated by the Business Combination Agreement.

The Company may force conversion of the Convertible Notes after the first anniversary of the issuance of the Convertible Notes, subject to a holder's prior right to convert, if the trading price of the Common Stock

144

Table of Contents

exceeds 120% of the conversion price 20 out of the preceding 30 trading days and 30-day average daily trading volume ending on, and including, the last trading day of the applicable exercise period is greater than or equal to $3,000,000. Upon such conversion, the Company will be obligated to pay all regularly scheduled interest payments, if any, due on the converted Convertible Notes on each interest payment date occurring after the conversion date for such conversion to, but excluding, the maturity date. In the event that a holder of the Convertible Notes elects to convert the Convertible Notes prior to the maturity date, the Company will be obligated to pay an amount equal to twelve months of interest if prior to the second anniversary of the issuance of the Convertible Notes, or if on or after such second anniversary, any remaining amounts that would be owed to, but excluding, the maturity date in respect of such Convertible Notes. In addition, pursuant to a debt incurrence covenant in the Indenture, if the Company or any of its subsidiaries following the issuance of the Convertible Notes incurs, assumes, permits to exist, or otherwise becomes or remains directly or indirectly liable with respect to, any indebtedness (subject to certain specified exceptions), it will (a) offer to redeem, in full, all outstanding principal of, and accrued and unpaid interest on, the Convertible Notes, (b) make a prepayment premium equal to twelve months of interest on the principal amount of the Convertible Notes being repaid, from the date of such debt incurrence, if prior to the second anniversary of the issuance of the Convertible Notes, or if on or after such second anniversary, make a prepayment premium equal to the amount of interest which would otherwise have accrued on the Convertible Notes so repaid to, but excluding, the maturity date, and (c) issue to each holder of the Convertible Notes a warrant to purchase a number of shares of Common Stock equal to the quotient of (i) the amount of outstanding principal of the Convertible Notes then held by such holder, divided by (ii) $11.50, which warrant shall be (A) exercisable only during the period from the date of repayment of such Convertible Notes through and including the maturity date for an exercise price of $11.50 per share. Excluded from the debt incurrence covenant is (i) indebtedness in respect of capital lease obligations incurred by New Lightning eMotors in an aggregate amount not to exceed $30,000,000, (ii) indebtedness under Lightning Systems' existing accounts receivable facility, and (iii) any other indebtedness, in an amount for such permitted indebtedness under clauses (ii) and (iii) above not to exceed $15,000,000 in the aggregate; provided that, such permitted indebtedness under clauses (ii) and (iii) above shall be reduced to an amount not to exceed $5,000,000 within thirty business days of the issue date of the Convertible Notes.

The Amended and Restated Warrant Agreement will amend the existing Warrant Agreement dated May 18, 2020, by and between the Company and the Warrant Agent to cover the Convertible Note Warrants being issued pursuant to the Convertible Note Subscription Agreements under the terms of such Amended and Restated Warrant Agreement. Such Convertible Note Warrants will be issued on substantially the same terms as the existing public warrants except that such Convertible Note Warrants will not be redeemable so long as they are held, either directly or indirectly through one or more participants, by the subscribers and/or their permitted transferees.

The Company shall be obligated to register the shares issuable upon conversion of the Convertible Notes and the exercise of the Convertible Note Warrants, as well as the resale of the Convertible Note Warrants. The Company agreed that, within 45 days after the consummation of the Business Combination (the "*Convertible Note Resale Registration Filing Deadline*"), the Company will file with the SEC a registration statement (the "*Convertible Note Resale Registration Statement*") registering the resale of the (I) shares of Common Stock issuable upon (x) conversion of the Convertible Notes and (y) exercise of the Convertible Note Warrants and (II) the Convertible Note Warrants (together, the "*Convertible Note Registrable Securities*"), and the Company shall use its commercially reasonable efforts to have the Convertible Note Resale Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the 60th calendar day (or 90th calendar day if the Commission notifies the Company that it will "review" the Convertible Note Resale Registration Statement) following the Convertible Note Resale Registration Filing Deadline. The Company will use its commercially reasonable efforts to maintain the continuous effectiveness of the Convertible Note Resale Registration Statement, and to be supplemented and amended to the extent necessary to ensure that such Convertible Note Resale Registration Statement is available or, if not available, that another registration statement is available for the resale of the Convertible Note Registrable Securities, until the earliest of (i) the date on which the Convertible Note Registrable Securities may be resold without volume or manner of sale limitations

Table of Contents

pursuant to Rule 144 promulgated under the Securities Act, (ii) the date on which such Convertible Note Registrable Securities have actually been sold and (iii) the date which is three years after the Closing.

Notwithstanding anything to the contrary in this Convertible Note Subscription Agreements, the Company shall be entitled to delay or postpone the effectiveness of the Convertible Note Resale Registration Statement, and from time to time to require any Note Investor not to sell under the Convertible Note Resale Registration Statement or to suspend the effectiveness thereof, if the negotiation or consummation of a transaction by the Company or its subsidiaries is pending or an event has occurred, which negotiation, consummation or event, the New Lightning eMotors Board reasonably believes, upon the advice of legal counsel, would require additional disclosure by the Company in the Convertible Note Resale Registration Statement of material information that the Company has a bona fide business purpose for keeping confidential and the non-disclosure of which in the Convertible Note Resale Registration Statement would be expected, in the reasonable determination of the New Lightning eMotors Board, upon the advice of legal counsel, to cause the Convertible Note Resale Registration Statement to fail to comply with applicable disclosure requirements.

In addition, pursuant to the terms of the Amended and Restated Warrant Agreement to be entered into by the Company, and consistent with what is provided for in the Warrant Agreement with regard to the public warrants, the Company will agree that as soon as practicable, but in no event later than fifteen business days after the Closing, it shall use its best efforts to file with the SEC a registration statement for the registration, under the Securities Act, of the shares of Common Stock issuable upon exercise of the warrants (the "*Warrant Shares Registration Statement*"). The Company shall use its best efforts to cause the same to become effective and to maintain the effectiveness of such Warrant Shares Registration Statement, and a current prospectus relating thereto, until the expiration of the warrants in accordance with the provisions of the Amended and Restated Warrant Agreement. If any such Warrant Shares Registration Statement has not been declared effective by the 90th day following the Closing of the Business Combination, holders of the warrants shall have the right, during the period beginning on the 91st day after the Closing of the Business Combination and ending upon such Warrant Shares Registration Statement being declared effective by the SEC, and during any other period when the Company shall fail to have maintained an effective registration statement covering the shares of Common Stock issuable upon exercise of the warrants, to exercise such warrants on a "cashless basis," by exchanging the warrants (in accordance with Section 3(a)(9) of the Securities Act (or any successor rule) or another exemption) for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the warrants, multiplied by the difference between the exercise price and the Fair Market Value (as defined below) by (y) the Fair Market Value. "*Fair Market Value*" shall mean the VWAP of the Common Stock as reported during the five trading day period ending on the trading day prior to the date that notice of exercise is received by the Warrant Agent from the holder of such warrants or its securities broker or intermediary. The date that notice of cashless exercise is received by the Warrant Agent shall be conclusively determined by the Warrant Agent. In connection with the "cashless exercise" of a public warrant or a Convertible Note Warrant, the Company shall, upon request, provide the Warrant Agent with an opinion of counsel for the Company (which shall be an outside law firm with securities law experience) stating that (i) the exercise of the warrants on a cashless basis is not required to be registered under the Securities Act and (ii) the shares of Common Stock issued upon such exercise shall be freely tradable under U.S. federal securities laws by anyone who is not an affiliate (as such term is defined in Rule 144 (or any successor rule)) of the Company and, accordingly, shall not be required to bear a restrictive legend.

The obligations of the Convertible Note Investors to consummate the subscriptions provided for in the Convertible Note Subscription Agreements are conditioned upon, among other things, the Company having cash and cash equivalents in the Trust Account and from the transactions contemplated in the Convertible Note Subscription Agreements and the PIPE Subscription Agreement of an aggregate amount not less than $150,000,000 pursuant to the terms and conditions of the Business Combination Agreement, of which at least $50,000,000 is from the Trust Account and no more than $75,000,000 is from the transactions contemplated in the Convertible Note Subscription Agreements, and all conditions precedent to the closing of the transactions

146

Table of Contents

contemplated by the PIPE Subscription Agreement having been satisfied or waived, and the closing under the Convertible Note Subscription Agreements occurring concurrently with the investment by the PIPE Investor.

**Background of the Business Combination**

The terms of the Business Combination are the result of negotiations among the representatives of the Company and Lightning Systems. The following is a brief description of the background of these negotiations and the resulting Business Combination.

The Company is a blank check company incorporated in Delaware on February 3, 2020 for the purpose of entering into a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses. We have sought to capitalize on the substantial deal sourcing, investing and operating expertise of our management team to identify and combine with a business with high growth potential in the United States or internationally.

On May 18, 2020, we completed our IPO of 20,000,000 units at a price of $10.00 per unit generating gross proceeds of $200,000,000 before underwriting discounts and expenses. Each unit consists of one share of our Common Stock and three-fourths of a public warrant. The public warrants will become exercisable at the later to occur of May 18, 2021 or 30 days after the Closing, and each whole public warrant entitles the holder thereof to purchase one share of Common Stock at a price of $11.50 per share, subject to adjustment to such price in certain circumstances.

On May 18, 2020, the Initial Stockholders purchased from us an aggregate of 893,479 private placement units at a price of $10.00 per unit in a private placement that occurred simultaneously with the completion of the initial closing of our IPO. The Sponsor purchased 650,000 private placement units and the Underwriters purchased 243,479 private placement units in the aggregate.

Upon the closing of the IPO and the private placement, a total of $202.0 million ($10.10 per Unit) of the net proceeds of the sale of the units in the IPO and the private placement was placed in the Trust Account maintained by the Trustee. The proceeds held in the Trust Account were invested in U.S. government securities, within the meaning set forth in Section 2(a)(16) of the Investment Company Act, with a maturity of 180 days or less or in any open ended investment company that holds itself out as a money market fund selected by us meeting the conditions of paragraphs (d)(2), (d)(3) and (d)(4) of Rule 2a-7 of the Investment Company Act, as determined by us, until the earlier of: (i) the Closing of the Business Combination, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our current certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete a Business Combination within 18 months from the closing of the IPO or to provide for redemption in connection with the Business Combination and (iii) the redemption of our public shares if we are unable to complete a Business Combination within the required time period, subject to applicable law.

Our amended and restated certificate of incorporation provides that we have 18 months from the closing of the Company's IPO, or until November 18, 2021, to complete an initial business combination. As of December 31, 2020, we had $202.0 million remaining in the Trust Account.

Prior to the consummation of our IPO, neither the Company, nor anyone on its behalf, contacted any prospective target business or had any substantive discussions, formal or otherwise, with respect to such a transaction with the Company.

After our IPO, our officers and directors commenced an active search for prospective businesses or assets to acquire in our initial business combination. Representatives of the Company were contacted by, and representatives of the Company contacted, numerous individuals, financial advisors, business owners and other entities who offered to present ideas for business combination opportunities. Our officers and directors and their

147

Table of Contents

affiliates actively searched for and brought business combination targets to our attention. During this search process, the Company reviewed more than 10 acquisition opportunities and entered into discussions with more than 10 potential target businesses or their representatives pursuant to signed nondisclosure agreements. In addition to Lightning Systems, we delivered draft term sheets or preliminary proposals, some at a high level early in discussions, to 3 other prospective targets, but executed term sheets with none of them.

The decision not to pursue the alternative acquisition targets was generally the result of one or more of (i) our determination that these businesses did not represent an attractive target due to a combination of business prospects, strategy, management teams, structure, valuation or ability to execute or (ii) our decision to pursue a Business Combination with Lightning Systems.

On August 17, 2020, two Managing Directors of BofA Securities, Inc. ("*BofA Securities*"), which has acted as a financial advisor to Lightning Systems, contacted Dr. Avi Katz, the Company's Chief Executive Officer and Executive Chairman, and Dr. Raluca Dinu, a member of the Company's Board, to discuss the possibility of BofA Securities sharing with the Company information regarding a potential acquisition target for the Company.

On August 22, Dr. Katz delivered a signed non-disclosure agreement to representatives of BofA Securities for the purpose of facilitating the proposed discussions between representatives of the Company and BofA Securities in connection with this potential acquisition target for the Company.

On August 23, 2020, Drs. Katz and Dinu, and representatives of BofA Securities conducted further preliminary discussions regarding this potential business combination involving the Company and an acquisition target that the representatives from BofA Securities identified was in the automotive technology sector.

On August 25, 2020, representatives of BofA Securities e-mailed to Drs. Katz and Dinu (i) an investment presentation which identified the potential acquisition target Lightning Systems, then doing business as "Lightning eMotors," and (ii) a form of mutual non-disclosure agreement to be entered into directly between the Company and Lightning Systems in connection with a potential business combination.

On August 31, 2020, the Company and Lightning Systems entered into such mutual non-disclosure agreement. Thereafter, on August 31, 2020, the respective management teams for the Company and Lightning Systems attended a virtual meeting to discuss a potential business combination involving the Company and Lightning Systems, during which the parties made investment and marketing presentations to each other concerning their respective businesses.

On August 31, 2020, following the management meeting described above, a representative of BofA Securities e-mailed to Drs. Katz and Dinu a process overview and question and answer document to facilitate the Company making a proposal to enter into a business combination with Lightning Systems. On the same date, in response Dr. Katz requested via e-mail that representatives of BofA Securities provide a copy of the Lightning Systems confidential investment slide presentation that was presented at the management meeting of that same date. Representatives of BofA Securities thereafter provided such slides to Drs. Katz and Dinu, and they then provided the slides to the Company's Board for review.

On September 1, 2020, Dr. Dinu, in anticipation of the Company engaging Oppenheimer and Nomura to act as the Company's joint financial advisors in connection with a proposed business combination involving Lightning Systems, as well as joint placement agents in connection with a possible related PIPE financing, shared copies of the investment and marketing materials provided by representatives of Lightning Systems with representatives of both Oppenheimer and Nomura.

On September 3, 2020, representatives of the Company, Lightning Systems, Oppenheimer, Nomura and BofA Securities participated in a joint working group session concerning the high-level terms of both a potential business combination between the Company and Lightning Systems and a related PIPE financing, including (i) a

148

Table of Contents

possible pre-money valuation of Lightning Systems, (ii) that Lightning Systems stockholders would solely receive in a business combination shares of Common Stock at the Closing, as well as the potential for additional shares of Common Stock to be issued as a contingent earnout over a period of five years, and (iii) that the proposed business combination would be supported by a related PIPE financing.

On September 8, 2020, Dr. Dinu requested that representatives of BofA Securities arrange access for the Company's management, Board and team of analysts affiliated with its Sponsor to a virtual data room established by BofA Securities in connection with a potential business combination involving Lightning Systems. On September 8 a representative of BofA Securities confirmed that he had arranged such access.

On September 8, 2020, representatives of Oppenheimer provided our Board with financial valuations for a set of public companies comparable to Lightning Systems, including electric vehicle developers, component part suppliers and other recent high-growth auto technology companies that had entered into business combinations with special purpose acquisition companies to be considered by the Board in assessing a valuation for Lightning Systems. Members of our Board reviewed this information and referenced back to it in later discussions in September and October regarding valuation.

On September 8, 2020, Dr. Dinu e-mailed representatives of BofA Securities a comprehensive due diligence request list relating to Lightning Systems. Later that day, a representative of BofA Securities confirmed that he had arranged access for the designated representatives of the Company to a more detailed virtual data room than the one to which those individuals had previously been granted access. Later that day, Jeffrey Selman of DLA, legal counsel to the Company, requested that BofA Securities arrange access to the more detailed virtual data room for a list of designated DLA team members. On September 8, 2020, confirmation was provided by a representative of BofA Securities to Mr. Selman that such access for the DLA team had been provided.

On September 13, 2020, Dr. Dinu e-mailed the Company's process letter response and transaction framework for the proposed business combination to a representative of BofA Securities, setting forth, among other things, (i) an approximate $1 billion pre-money valuation for Lightning Systems based on the methodology detailed therein, (ii) a transaction structure in which the Company would acquire all of the outstanding shares of Lightning Systems, (iii) a nine member board of directors for the post-combination company, and (iv) a proposed marketing and target investor list for a related PIPE financing of the business combination.

On September 15, 2020, a representative of BofA Securities e-mailed representatives of Oppenheimer with comments to the Company's process letter response for the proposed business combination, which Oppenheimer and Nomura then e-mailed to the Company's management.

On September 17, 2020, the Company delivered a response letter to representatives of BofA Securities based on the comments provided by BofA Securities on September 17, providing for, among other things, (i) a potential forfeiture of shares of Common Stock held by the Sponsor in the event PIPE investors seek to renegotiate the proposed pre-money valuation of Lightning Systems that could then be earned back if the stock price of shares of the post-combination company's Common Stock increased, (ii) a minimum cash condition, (iii) a minimum PIPE financing amount condition, (iv) a proposed earnout structure for the Lightning Systems stockholders, (v) certain conditions regarding the composition of the post-combination company's board and (vi) the structure of the post-Closing lock-up applicable to certain stockholders following the Closing of the proposed business combination.

On September 18, 2020, a representative of BofA Securities informed Dr. Dinu via e-mail that after review of the September 17, 2020 process response letter, Lightning Systems would like to move forward with the Company as its business combination partner and move to finalize the terms set forth in that process response letter into a letter of intent between the parties by September 20, 2020, and then begin to solicit potential fundamental investors in a PIPE as early as September 21, 2020. The Company then worked with its counsel at DLA to prepare a draft letter of intent that it could provide to Lightning Systems.

Table of Contents

On September 20, 2020, Dr. Dinu e-mailed to representatives of BofA Securities a draft letter of intent setting forth the Company's proposed terms for the proposed business combination and the related PIPE financing based on the Company's previously submitted process response letter and transaction framework. This draft letter of intent proposed a target post-combination enterprise value of approximately $1 billion, which equates to approximately $1.3 billion of equity value pro forma for the transaction including proceeds in the Trust Account and the proposed PIPE financing, which for these purposes was estimated at $135 million. This implied a pre-money equity value to existing Lightning Systems equity holders of approximately $900 million. This draft letter of intent also proposed the potential for additional shares of Common Stock to be issued as a contingent earnout over a period of five years based upon appreciation of the stock price of shares of the post-combination company's Common Stock, with such amount that could be earned set at up to 6%, as well as a potential forfeiture of shares of Common Stock held by the Sponsor in the event PIPE investors seek to renegotiate the proposed pre-money valuation of Lightning Systems that could also then be earned back if the stock price of shares of the post-combination company's Common Stock increased.

On September 21, 2020, a representative of BofA Securities e-mailed to Dr. Dinu a revised letter of intent, providing clarifications to various of the terms based on comments from the Company, BofA Securities and King & Spalding (counsel to Lightning Systems), and adding that the contingent earnout for the Lightning Systems equity holders could be increased in the event PIPE investors seek to renegotiate the proposed pre-money valuation of Lightning Systems. Later that day Dr. Dinu returned a slightly revised letter of intent that made a non-substantive revision and was signed by Dr. Katz on behalf of the Company.

On September 23, 2020, Mr. Fenwick-Smith e-mailed the letter of intent fully executed by Lightning Systems and the Company to Drs. Katz and Dinu.

On September 24, 2020, representatives of the Company, Oppenheimer, Nomura and the BofA Securities participated in a conference call to discuss the process for pursuing the PIPE financing and the Company's due diligence investigation of Lightning Systems, as well as concrete next steps to advance both processes. The parties agreed to review the virtual data room that weekend to identify the need, if any, for additional documents, and to schedule a meeting with Lightning Systems management to discuss next steps after reviewing the data room material. While the Company's diligence team had already begun conducting preliminary due diligence on Lightning Systems a few weeks earlier as discussed above, they, together with and counsel at DLA, accelerated their review of diligence material provided in the virtual data room and sustained a committed diligence process (including meetings with Lightning Systems management) for several weeks thereafter.

On September 25, 2020, a representative of Nomura e-mailed to the DLA team a draft of a wall cross script for Nomura to contact prospective investors in connection with the proposed PIPE financing. H. Thomas Felix, III of DLA responded with comments later that day.

On September 28, 2020, Dr. Dinu e-mailed to representatives of BofA Securities an updated comprehensive due diligence request list, and asked them to send the request list to Lightning Systems management. Dr. Dinu also stated that the Company would like to schedule business diligence meetings to discuss products & technology, and sales & marketing, toward the end of the next week.

On September 29, 2020, a representative of BofA Securities provided Mr. Felix with a draft of a wall cross script for BofA Securities to reach out to prospective investors in connection with the proposed PIPE financing. Mr. Felix and the representative of BofA Securities traded drafts that and the next day, with the result that the wall cross script was revised to also contemplate that Oppenheimer would use such script in connection with crossing accounts for the proposed PIPE financing.

On October 1, 2020, the Company entered into a letter agreement with Oppenheimer and Nomura, pursuant to which, among other things, (1) the Company engaged Oppenheimer and Nomura to act as (1) joint placement agents (which they would do together with BofA Securities) in connection with the proposed PIPE financing, and (2) exclusive joint financial advisors to the Company in connection with the proposed Business Combination.

150

Table of Contents

On October 2, 2020, the Company also entered into two separate letter agreements with BofA Securities pursuant to which, among other things, (1) the Company engaged BofA Securities to act as co-placement agent with Oppenheimer and Nomura on behalf of the Company in connection with the proposed PIPE financing and (2) acknowledged that BofA Securities would be permitted to provide such services as co-placement agent to the Company and concurrently provide transaction advisory services to Lightning Systems in connection with the proposed Business Combination.

On October 2, 2020, Oppenheimer, Nomura and BofA Securities began reaching out to prospective investors to schedule preliminary discussions regarding the proposed PIPE financing.

On October 4, 2020, Dr. Dinu introduced Mr. Selman to both Mr. Fenwick-Smith and Timothy Reeser, the Chief Executive Officer of Lightning Systems, over e-mail, and asked that Messrs. Fenwick-Smith and T. Reeser introduce Mr. Selman to Lightning Systems' legal counsel to begin discussions regarding the definitive Business Combination Agreement and a proxy statement. Dr. Dinu also requested that DLA review a draft of a confidential information memorandum that the Company and Lightning Systems intended to begin using the following day in meetings with prospective investors in the PIPE financing.

On October 4, 2020, Mr. Fenwick-Smith introduced Mr. Selman by e-mail to Keith Townsend of King & Spalding, outside legal counsel to Lightning Systems, and Jeff Reeser, who is acting as general counsel to Lightning Systems. Mr. Selman replied introducing his partner John Maselli of DLA, who Mr. Selman indicated would assist with preparing the definitive transaction documentation, and indicating that the lawyers should arrange a kick-off call to discuss documentation. Mr. Selman that same day e-mailed the same group with a proposed form of PIPE Subscription Agreement to be entered into by the Company and prospective investors in the PIPE financing, and requested that Messrs. J. Reeser and Townsend provide comments. Mr. J. Reeser replied indicating that he and Mr. Townsend would review the form of PIPE Subscription Agreement and let Mr. Selman know if they have any comments.

On October 5, 2020, and continuing for several weeks thereafter, the respective teams for Oppenheimer, Nomura, BofA Securities, the Company and Lightning Systems arranged and hosted virtual meetings with prospective investors in the PIPE financing, during which those teams made presentations to and answered questions from prospective PIPE financing investors regarding Lightning Systems' business, with the goal of raising at least $100 and up to $150 million in the PIPE financing based on a proposed pre-money valuation of Lightning Systems equity of $899 million. Between October 5, 2020 and November 16, 2020 the parties met approximately 46 potential investors in the PIPE financing in 58 meetings.

On October 5, 2020, Mr. Selman spoke by telephone with representatives of King & Spalding to provide an update on the investor meetings for the proposed PIPE financing that had occurred that day. During that call, the counsel discussed the preparation of the form of PIPE Subscription Agreement for the proposed PIPE financing, the definitive Business Combination Agreement for the proposed Business Combination, this proxy statement/prospectus and Lightning Systems' financial statements to be filed with the SEC in connection with the proposed Business Combination. They also discussed legal due diligence, which commenced after this conversation and continued until the Business Combination Agreement was finalized and signed on December 10, 2020.

On October 5, 2020, Dr. Dinu, Mr. Miotto, and Dr. Katz spoke with Mr. T. Reeser for 90 minutes about the current status of Lightning Systems sales, orders, and the sales pipeline, with specific questions around timing, risks, and cancellation clauses.

On October 7, 2020, Mr. Selman e-mailed the proposed form of PIPE Subscription Agreement for the proposed PIPE financing to a representative of Mayer Brown LLP ("*Mayer Brown*"), outside legal counsel to the joint placement agents, and asked that Mayer Brown provide comments to the form of PIPE Subscription Agreement. Later that day, Mr. Selman spoke by telephone with this same representative of Mayer Brown regarding the form of PIPE Subscription Agreement.

151

Table of Contents

On October 9, 2020, representatives of King & Spalding and Mayer Brown separately e-mailed proposed edits to the form of PIPE Subscription Agreement to Mr. Selman.

On October 12, 2020, Mr. Maselli e-mailed an initial draft of the definitive Business Combination Agreement to representatives of King & Spalding for their review.

On October 13, 2020, Mr. Selman replied to the representatives of Mayer Brown via e-mail with a revised form of PIPE Subscription Agreement incorporating certain of their proposed edits as well as King & Spalding's proposed edits to this agreement.

On October 16, 2020, Mr. Maselli e-mailed an updated draft of the definitive Business Combination Agreement to representatives of King & Spalding incorporating incremental legal subject matter specialist comments based upon legal diligence that DLA had conducted upon Lightning Systems.

On October 18, 2020, a representative of King & Spalding e-mailed to representatives of DLA a revised draft of the Business Combination Agreement reflecting edits that Lightning Systems sought to make to this agreement. These proposed revisions primarily clarified issues around the payment of merger consideration, as well as reflected proposed changes to the representations and warranties by the parties and their interim operating covenants.

Between October 18 and November 3, Mr. T. Reeser provided potential PIPE investors with Lightning Systems customer reference contacts to facilitate individual due diligence calls by the PIPE investors. In addition, on October 19 and 20, 2020 the Company facilitated a group due diligence call with two of Lightning System's customers.

On October 21, 2020, Tulin Gurer of DLA e-mailed a revised draft of the definitive Business Combination Agreement to representatives of King & Spalding. The proposed revisions contained in this draft further revised the representations and warranties by the parties and the interim operating covenants of Lightning Systems, as well as director and officer indemnification following the Closing of the Business Combination for pre-Closing acts of the Company's Board and management.

On October 24, 2020, a representative of King & Spalding e-mailed to representatives of DLA a revised draft of the Business Combination Agreement that made additional proposed revisions to the representations and warranties of Lightning Systems, and requested a telephone call the following day with representatives of DLA to discuss any outstanding legal diligence matters. Mr. Selman replied to confirm a telephone call for the next day, which did take place to discuss the small number of open items on the Business Combination Agreement and legal diligence.

On October 26, 2020, a representative of King & Spalding e-mailed to representatives of DLA a further revised draft of the definitive Business Combination Agreement making minor revisions to the representations and warranties of Lightning Systems, and an initial draft of the Lightning Systems Schedules.

On October 27 and October 28, 2020, Mr. Maselli and Ms. Gurer e-mailed to representatives of King & Spalding drafts of the Registration Rights and Lock-up Agreement, the Second Amended and Restated Certificate of Incorporation and the Stockholder Support Agreement.

On October 29, 2020, representatives of the Company, Lightning Systems, Oppenheimer, Nomura, BofA Securities and DLA held a virtual meeting to discuss the prospects of the proposed PIPE financing based on feedback received as of that time from prospective investors. In light of prospective investor feedback that the proposed pre-money valuation of the Lightning Systems equity be lowered to $539 million to support a PIPE financing of at least $75 million, the parties discussed this possibility and agreed to continue to explore it in an effort to proceed with the proposed Business Combination.

152

On October 30, 2020, representatives of the Company, Lightning Systems, Oppenheimer, Nomura, BofA Securities and DLA held another virtual meeting to consider again whether to propose to prospective PIPE investors modifications to the terms of the proposed PIPE financing and the pre-money valuation of the Lightning Systems equity. During that meeting, Messrs. Fenwick-Smith and T. Reeser and Drs. Dinu and Katz indicated their desire to modify the proposed terms of the PIPE financing to lower the pre-money valuation of Lightning Systems equity to $539 million to support a PIPE financing of at least $75 million.

On November 2, 2020, a representative of King & Spalding e-mailed to Ms. Gurer a revised draft of the Lightning Systems Schedules.

On November 2, 2020, Mr. Maselli e-mailed to representatives of King & Spalding an initial draft of the Sponsor Earnout Agreement that was contemplated to be used in accordance with the terms of the letter of intent as a result of the reduction in the pre-money valuation of Lightning Systems equity.

On November 4, 2020, Oppenheimer, Nomura and BofA Securities began communicating with prospective investors in the PIPE financing regarding the lower valuation for the Lightning Systems pre-money valuation and reduced size of the Proposed PIPE financing. These communications continued through November 13, 2020, although none occurred on the U.S. national election day on November 3, 2020. During the course of that period, the market experienced volatility related both to the election and events involving other special purpose acquisition companies.

On November 5, 2020, Ms. Gurer e-mailed a representative of King & Spalding a revised draft of the Lightning Systems Schedules.

On November 6, 2020, a representative of King & Spalding e-mailed to Mr. Maselli a revised draft of the Registration Rights and Lock-up Agreement that made some proposed revisions regarding the timing and manner for registering securities for resale.

On November 6, 2020, representatives of DLA and King & Spalding held a conference call to discuss finalizing the drafts of the definitive Business Combination Agreement and related ancillary agreements.

On November 7, 2020, a representative of King & Spalding e-mailed representatives of DLA a revised draft of the Sponsor Support Agreement, which K&S had modified to include sponsor support provisions and was renamed as the "Sponsor Earnout and Support Agreement." On that same date, Mr. Maselli e-mailed a further revised draft of the Sponsor Earnout and Support Agreement to a representative of King & Spalding.

On November 7, 2020, Mr. Maselli e-mailed a representative of King & Spalding a revised draft of the Registration Rights and Lock-up Agreement to make clarifying changes to the timing and manner for registering securities for resale.

On November 7, 2020, Ms. Gurer e-mailed to representatives of King & Spalding a revised draft of the definitive Business Combination Agreement to reflect certain of the changes needed in light of the revised pre-money valuation of the Lightning Systems equity to $539 million.

On November 8, 2020, Dr. Dinu and Messrs. Fenwick-Smith and T. Reeser exchanged e-mails regarding a possible new earnout structure that Oppenheimer and Nomura could present to prospective PIPE Investors involving both shares for the Lightning Systems equity holders and the Company's Sponsor, with vesting for such an earnout to occur based on increases in the share price of the post-combination company's Common Stock.

On November 8, 2020, a representative of King & Spalding e-mailed to representatives of DLA a revised draft of the Stockholder Support Agreement reflecting further comments from a principal stockholder of Lightning Systems.

153

Table of Contents

On November 8, 2020, a representative of King & Spalding e-mailed a revised draft of the Second Amended and Restated Certificate of Incorporation to representatives of DLA.

On November 8, 2020, Ms. Gurer e-mailed to a representative of King & Spalding a draft of the Lightning Systems amended and restated certificate of incorporation.

On November 8, 2020, a representative of King & Spalding e-mailed to Mr. Maselli a revised draft of the Registration Rights and Lock-up Agreement.

On November 10, 2020, a representative of King & Spalding e-mailed an updated draft of the Stockholder Support Agreement reflecting comments from a principal stockholder of Lightning Systems. That same date Mr. Selman responded to this representative of King & Spalding with additional comments to the Stockholder Support Agreement. On November 11, 2020, this representative of King & Spalding confirmed to Mr. Selman via e-mail that the Lightning Systems' principal stockholder had signed-off on DLA's most recent comments to the form of Stockholder Support Agreement.

On November 13, 2020, representatives of Oppenheimer, Nomura and BofA Securities informed the Company and Lightning Systems management that given market conditions they did not believe that the PIPE financing involving the sale and issuance of Common Stock was going to be a viable method for bringing in additional financing to support the proposed Business Combination, and as a result, the joint placement agents discussed with the Company and Lightning Systems considering alternatives for seeking additional financing.

Also on November 13, 2020, a representative of King & Spalding e-mailed a revised draft of the Lightning Systems Schedules to representatives of DLA. Later that same day, this representative of King & Spalding e-mailed a revised draft of the Business Combination Agreement to Ms. Gurer that made minor non-substantive revisions to this agreement.

On November 16, 2020, a representative of Oppenheimer provided to the Company a proposed draft Indicative Convertible Terms & Precedent Transaction Analysis for a proposed 3-year unsecured convertible note financing of the Company as a means for providing financing to support the proposed Business Combination. The Indicative Convertible Terms, among other things, provided for (1) a $75-100 million convertible note offering, (2) closing of this offering concurrently with the announcement of the proposed Business Combination (with the proceeds of the convertible note financing being escrowed until the closing of the proposed Business Combination, or returned in connection with the convertible notes being redeemed at 102% of principal if the proposed Business Combination failed to close), (3) an interest rate of 7.5%, (4) a conversion premium of 15%, (5) underlying shares of Common Stock of 6.52 to 8.7 million, and (6) mandatory conversion after one year if the Common Stock price exceeds 175% of the conversion price. The Company, Oppenheimer and Nomura held discussions that day to discuss the proposed terms of this convertible note financing.

On November 17, 2020, the Company, Oppenheimer and Nomura continued their discussions regarding a proposed convertible note financing of the Company. Later that day, Dr. Dinu e-mailed Oppenheimer and Nomura revised indicative terms for the convertible note financing that the Company was willing to consider, which mirrored the terms provided the prior day by the representative of Oppenheimer except for contemplating that (1) the total enterprise value of Lightning Systems for purposes of the convertible note financing would be $631 million with no earnout structure involving shares of the Company's Sponsor, and (2) the closing of the convertible note financing would occur concurrently with the Closing of the Business Combination. On November 17, 2020, representatives for Oppenheimer and Nomura began marketing the proposed convertible note financing to prospective Convertible Note Investors based on these terms communicated by Dr. Dinu.

During the period between November 13, 2020 and November 17, 2020 that the Company was working with Oppenheimer and Nomura on a potential convertible note financing, Lightning Systems informed the

154

Table of Contents

Company that it was in the process of revising some of the financial projections previously provided to the Company for fiscal year 2020. On November 18, 2020, Ms. Dinu informed Mr. T. Reeser via e-mail that, as a result of these intended revisions to previous projections, and to further enhance internal controls for the post-combination company, the Company would require that Neil Miotto join the New Lightning eMotors Board as the co-chairman of the audit committee and that both companies should evaluate additional corporate governance measures that should be taken following the Closing of the Business Combination.

On November 24, 2020, representatives of Oppenheimer informed the Company of a proposal from a potential anchor Convertible Note Investor that the Company offer a senior secured note for the proposed convertible note financing of the Company. Representatives of the Company, Oppenheimer, Nomura and DLA discussed this proposal, and the Company informed Oppenheimer and Nomura that it was rejecting this proposal, but that Oppenheimer should continue to discuss other alternatives with this potential anchor Convertible Note Investor. Oppenheimer on November 25, 2020 told the Company that it would pick up such further discussions with this potential anchor Convertible Note Investor following the Thanksgiving holiday weekend.

On November 29, 2020, and following discussions between Drs. Dinu and Katz and representatives of Lightning Systems between November 18, 2020 and November 28, 2020 regarding Lightning Systems' financial projections, a representative of BofA Securities delivered to representatives of the Company the updated financial projections of Lightning Systems that had been discussed were being undertaken a couple of weeks earlier and which Lightning Systems finalized following the discussions with Drs. Dinu and Katz. These updated financial projections lowered the amount of projected revenues, gross profit and EBITDA for the periods of 2020 through 2025 from what had been initially provided to the Company.

On November 30, 2020, representatives of the Company, Oppenheimer, Nomura and DLA discussed possible terms for a convertible note financing. Further discussions occurred between representatives of the Company, Oppenheimer, Nomura and DLA on December 1, 2020 regarding possible terms for a convertible note financing. On December 1, 2020, it was agreed that Oppenheimer would look to move forward with the potential anchor Convertible Note Investor on a $75-100 million convertible note financing for which the anchor investor would purchase$10-15 million of the Convertible Notes, that the Convertible Notes would have a three year term, a conversion price of $11.50 and a 7.5% interest rate, and that New Lightning eMotors could force conversion of the Convertible Notes if the price of New Lightning eMotors Common Stock was at least $13.80 and provided that average daily market value of such Common Stock traded for the preceding 30 trading day period exceeded $3.0 million. In an effort to provide an alternative to the prior proposal for a senior secured note, while providing some protection to Convertible Note Investors from debt more senior to the Convertible Notes, the Company also proposed that the terms include covenants restricting the amount of additional debt that New Lightning eMotors could maintain would be limited to a $5.0 million accounts receivable facility and that if New Lightning eMotors sought to incur additional debt, that it would need to both redeem the Convertible Notes and issue warrants to the holders of the Convertible Notes with an exercise price of $11.50 and in an amount equal to the number of shares into which the Convertible Notes could convert and for a term equal to the remainder of the term of the Convertible Notes.

On December 2, 2020, the potential anchor Convertible Note Investor tentatively indicated to a representative of Oppenheimer that it would anchor the proposed convertible note financing on the terms discussed the prior day and presented to it by Oppenheimer, and indicated that it would likely purchase $10 million of the Convertible Notes, to which Oppenheimer began to push to increase that amount to $15 million. During the course of that day, representatives of Oppenheimer and Nomura engaged with various potential Convertible Note Investors on these terms, and received feedback.

On December 3, 2020, Dr. Katz spoke with a potential Convertible Note Investor to discuss the terms for the convertible note financing, and that potential investor stated that he believed that a strategic investor needed to participate in the previously contemplated PIPE financing in order to facilitate the convertible note financing. Dr. Katz informed Oppenheimer and Nomura, as well as representatives of Lightning Systems of this

155

Table of Contents

information, and it was agreed to engage the PIPE Investor in such a possible PIPE Investment. In addition, during the course of that day, representatives of Oppenheimer and Nomura engaged with various potential Convertible Note Investors on these terms, and received feedback and initial indications of interest in the Convertible Note Investment.

During this week of November 30 through December 4, 2020, Dr. Katz and Mr. Fenwick Smith continued to discuss the governance structure of New Lightning eMotors as a follow-up to the issues raised by Dr. Dinu on November 18, 2020. In addition, the parties discussed the pre-money valuation of Lightning Systems equity in light of the proposed convertible note financing, as well as the earnout for Lightning Systems equity holders that the Company was willing to consider.

On December 4, 2020, the representatives of Oppenheimer and Nomura continued their discussions with various potential Convertible Note Investors, including with one potential investor that proposed a different set of terms that the Company decided not to consider as it was less favorable than the terms already under discussion. However, feedback from the potential anchor Convertible Note Investor as it had continued to assess the valuation of New Lightning eMotors following a Closing of the Business Combination was that this potential anchor Convertible Investor wanted inclusion of 100% warrant coverage on the Convertible Notes before it would proceed with the Convertible Note Investment. Representatives of the Company, Lightning Systems, Oppenheimer, Nomura, BofA Securities and DLA discussed this feedback, and it was agreed that 100% warrant coverage for a 5 year warrant with terms similar to the public warrants, including an exercise price of $11.50, would be added to the convertible note financing terms under discussion with the potential anchor Convertible Note Investor. This was communicated by Oppenheimer to this potential anchor Convertible Note Investor and accepted by it.

Over the weekend of December 5 and 6, 2020, DLA proceeded to draft the form of Convertible Note Subscription Agreement, the Indenture and the Amended and Restated Warrant Agreement. Representatives of the Company, Oppenheimer, Nomura, DLA, King & Spalding, the Indenture Trustee and the Warrant Agent reviewed these documents on December 7, 2020. During this same period of December 5 through 7, representatives of Oppenheimer and Nomura continued to engage potential Convertible Note Investors and solicit indications of interest (with a total outreach to 26 potential investors between November 16, 2020 and December 7, 2020, of which 20 of such investors had previously met with the Company to discuss the potential PIPE financing), while representatives of Nomura and Lightning Systems engaged with the PIPE Investor about it making the PIPE Investment.

On December 8, 2020, representatives of Oppenheimer and Nomura delivered drafts of the Convertible Note Subscription Agreement, the Indenture and the Amended and Restated Warrant Agreement to those potential Convertible Note Investors who had provided indications of interest in participating in the Convertible Note Investment, including the potential anchor Convertible Note Investor. Those potential Convertible Note Investors reviewed and requested revisions to the documents on December 8 and 9, 2020, including revisions to the exclusions to the debt incurrence covenant that representatives of DLA negotiated with the potential anchor Convertible Note Investor.

In addition, between December 5 and 9, 2020, representatives of DLA and King & Spalding worked to finalize the Business Combination Agreement, revising it to reflect the Convertible Note Investment and the PIPE Investment, as well as the other Related Agreements and the Lightning Systems Schedules.

On December 9, 2020, the Company's Board convened a remote special meeting by videoconference. Representatives of DLA attended the meeting to review the terms of the Business Combination, PIPE Investment and Convertible Note Investment. Drs. Katz and Dinu reported on matters relating to the proposed Business Combination, PIPE Investment and Convertible Note Investment, and discussion ensued regarding the proposed pre-money valuation of the Lightning Systems equity, including a consideration of updated information provided to the Board by BofA Securities and Oppenheimer on an updated set of public companies selected in discussions

156

with the Company on December 6, 2020 as comparable to Lightning Systems, including electric vehicle developers, component part suppliers and other recent high-growth auto technology companies that had entered into business combinations with special purpose acquisition companies that added some companies in the latter category that had been announced since September when Oppenheimer initially provided comparable company information, the terms of the Convertible Note Investment and the likely acceptance of and benefit to the Company's stockholders of the proposed transactions. Following this discussion, the Company's Board unanimously approved the Business Combination, the PIPE Investment and the Convertible Note Investment.

Also on December 9, 2020, the Lightning Systems board of directors approved the Business Combination Agreement.

On December 10, 2020, (1) the parties executed the Business Combination Agreement and the Related Agreements, (2) the Convertible Note Investors subscribing to purchase the Convertible Notes and the Convertible Note Warrants in connection with the Convertible Note Investment executed the Convertible Note Subscription Agreements, and (3) the PIPE Investor executed the PIPE Subscription Agreement. A total of 30 Convertible Note Investors, representing 13 institutional fund families signed the Convertible Note Subscription Agreements.

After the market closed on December 10, 2020, the Company announced the Business Combination with Lightning Systems together with the execution of the Business Combination Agreement, the PIPE Subscription Agreement and the Convertible Note Subscription Agreements.

**The Company Board's Reasons for the Approval of the Business Combination**

The Company's Board considered a wide variety of factors in connection with its evaluation of the Business Combination. In light of the complexity of those factors, the Company's Board, as a whole, did not consider it practicable to, nor did it attempt to, quantify or otherwise assign relative weights to the specific factors it took into account in reaching its decision. The Company's Board viewed its decision as being based on all of the information available and the factors presented to and considered by it. In addition, individual members of the Company's Board may have given different weight to different factors. This explanation of the reasons for the Company's Board's approval of the Business Combination, and all other information presented in this section, is forward-looking in nature and, therefore, should be read in light of the factors discussed in the section entitled "*Cautionary Note Regarding Forward-Looking Statements*."

Before reaching its decision, the Company's Board reviewed the results of the due diligence conducted by the Company's management and advisors. The Company's management, including its directors and advisors, has many years of experience in both operational management and investment and financial management and analysis and, in the opinion of the Company's Board, was suitably qualified to conduct the due diligence and other investigations and analyses required in connection with the search for a business combination partner. A detailed description of the experience of the Company's executive officers and directors is included in the section entitled "*Information About the Company Prior to the Business Combination - Management*". The due diligence which was conducted included:

- meetings and calls with the management teams, advisors and Lightning Systems regarding operations and forecasts;
- meetings and calls with Lightning Systems' customers, suppliers and industry partners;
- research on comparable public companies, including using information provided by BofA Securities and Oppenheimer, including electric vehicle developers, component part suppliers and other recent high-growth auto technology companies that had entered into business combinations with special purpose acquisition companies;
- review of material contracts;

Table of Contents

- review of intellectual property matters;

- review of financial, tax, legal, insurance and accounting due diligence;

- consultation with legal and financial advisors and industry experts;

- financial and valuation analysis of Lightning Systems and the Business Combination; and

- the financial statements of Lightning Systems.

The Company's Board also considered the extensive feedback obtained by the Company as part of the PIPE financing process as well as in engaging with potential Convertible Note Investors and in entering into the Convertible Note Subscription Agreements and the PIPE Subscription Agreement with the strategic PIPE Investor.

In the prospectus for our IPO, we identified the following general criteria and guidelines that we believed would be important in evaluating prospective target businesses, although we indicated we may enter into a business combination with a target business that does not meet these criteria and guidelines. Generally, we stated that we are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion. The Company's Board considered each of the factors identified in the IPO prospectus in its evaluation of Lightning Systems. Furthermore, in light of the due diligence conducted of Lightning Systems and the evaluation of the following factors with regard to Lightning Systems, the Company's Board's decision to pursue a Business Combination with Lightning Systems resulted in the Company's Board deciding not to forego this Business Combination and instead continue to look for an alternative acquisition target.

- *Companies that embrace today's digital transformation and experience.* We stated in the IPO prospectus that we will seek TMT and other companies anywhere in the world that are embracing today's digital transformation and experience as a competitive advantage. We believe that an embrace of today's digital transformation and experience enables both organic and inorganic growth, creating new strategic, operational and business opportunities fueled by the emerging cloud, analytics, big data and cognitive technologies. Being conscientious corporate citizens, we stated that we will focus on sustainable technology companies that can shape a better society and healthier environment.

  Based upon our due diligence, we believe that Lightning Systems delivers on our stated goal to focus on sustainable technology companies that are utilizing data analytics in furtherance of their business objectives. As an electric vehicle manufacturer, Lightning Systems has turned every vehicle that it produces into a data generator for it to provide real-time actionable intelligence to its customers. Its solution leverages big data and analytics to provide intelligence around driver behavior optimization, preventative diagnostics and fleet management. This drives greater efficiency compared to its competitors while also further strengthening its technology leadership in the market and providing additional sources of revenues and driving customer retention.

- *Companies that will benefit from a public listing.* We stated in the IPO prospectus that we will primarily seek companies that we believe will benefit from being publicly traded, and that will be able to effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.

  Lightning Systems has represented to us that the proceeds raised in the proposed transactions, as well as the ability to have access to capital as a publicly traded company, will fund Lightning Systems to positive cash flow and can fund its strategic growth initiatives, including executing on its customer relationships to fulfill orders, expand its vehicle portfolio and enable selective acquisitions. A business combination with a special purpose acquisition company is Lightning Systems' preferred course of action, as opposed to a traditional initial public offering, because Lightning Systems can provide forward-looking guidance and talk more directly about projections for future years that are backed by existing customer contracts. As a result, its ability to become a publicly traded company is accelerated through the Business Combination. Given the

158

Table of Contents

inflection point of the electric vehicle industry in general and Lightning Systems' market position, the Company and Lightning Systems believe being public with a fully-funded business plan will be a significant catalyst to Lightning Systems' business in terms of branding, visibility and financial strength.

- *Companies that will benefit from our industry expertise and relationships.* We stated in the IPO prospectus that we will seek companies that will be best positioned to leverage our industry expertise, insights and relationships to create opportunities for value creation, whether acquisitions, capital investments in organic growth opportunities, generating greater operating efficiencies or significantly improving financial performance. We believe our strategy leverages our management team's distinctive background and vast network of industry leaders in the TMT industry. We stated that we will seek to identify such opportunities for value creation in evaluating potential business combinations.

As evidenced by the number of electric vehicle manufacturers and other auto technology companies that have entered into business combinations with special purpose acquisition companies in 2020 (see "—*Comparable Company Analysis*"), this is a highly diversified and growing market. We believe that through our Mentor-Investment approach, we will be able to work with Lightning Systems to look for and successfully exploit opportunities for value creation. In particular, Lightning System's intent stated to us in diligence to pursue acquisitions as a means to accelerate its growth plans or augment its internal product and service development if such acquisitions represent a strategic fit, drive value and are consistent with its overall strategy is well suited to the assistance that we can provide, and makes Lightning Systems a very suitable target for our business combination.

- *Companies that are market-leading participants.* We stated in the IPO prospectus that we will seek a target that has an established business and market position. While we stated that we will focus on TMT businesses, we will not seek a target that is pre-revenue or in early stages of development with unproven technologies.

Based upon our due diligence, we believe that Lightning Systems is the dominant market leader in the urban commercial Zero Emission Vehicle ("*ZEV*") industry, with over 36% market share in Class 3 through 6 electric vehicles ("*EVs*") in 2020 and has the distinction of being the only company in the United States that has delivered fully functional Class 3 to 7 EVs to the end customer that are in use today. The know-how gathered by Lightning Systems over the course of its 12-year operating history, combined with data that it has aggregated from every vehicle it has had on the road for the last two years, has enabled it to customize its offering to maximize reliability and minimize total cost of ownership, driving repeat purchase behavior across our customer base. Lightning Systems' efforts in the commercial ZEV space have led to significant progress in customer validation with 121 vehicles on the road as of February 22, 2021 (including 12 demonstration and test vehicles) and 1,569 electric commercial vehicles and electric powertrains on order as of December 31, 2020. As of December 31, 2020, we had $169 million of backlog, as compared to a backlog of $27 million as of December 31, 2019, and a pipeline of $800 million of sales. We have already received purchase orders to completely cover our estimated 2021 and over 25% of 2022 revenue. As we continue to scale our manufacturing capabilities to meet increased demand – from both new and existing customers – we anticipate that our pipeline will continue to scale.

- *Companies that are small and mid-sized businesses ("SMB").* We believe targeting companies in the SMB market will provide the greatest number of opportunities for investment and will maximize the benefits of the collective network of our management team and its affiliates.

Notwithstanding the significant progress that Lightning Systems has made in developing itself as a market leader, with $169 million of backlog as of December 31, 2020, and a pipeline of $800 million of sales as of December 31, 2020, it is still a relatively small company, with 93 employees and 43 contractors as of December 31, 2020, with substantial growth opportunity in front of it that we believe can benefit from our Mentor-Investment approach.

159

Table of Contents

- *Companies with strong management.* We stated in the IPO prospectus that we will prioritize entities with well-established, proven and talented management teams that wish to continue to drive their companies to growth and are eager to succeed with support from an interactive and hands-on board of directors. To the extent we believe it will enhance stockholder value, we would seek to selectively supplement the existing leadership of the business with proven leaders from our network, whether at the senior management level or at the board level.

  Lightning Systems satisfies this criteria. Its existing senior management, which has informed us that it will continue following the Business Combination, has built Lightning Systems into a market leader in the urban commercial ZEV industry and is committed to staying with the company to drive it forward as it executes on its strategic growth plans.

In approving the Business Combination, the Company's Board determined not to obtain a fairness opinion. The officers and directors of the Company have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and background, together with experience and sector expertise of Nomura and Oppenheimer, enabled them to make the necessary analyses and determinations regarding the Business Combination.

The factors considered by the Company's Board include, but are not limited to, those set forth above as well as the following which are based upon our due diligence:

- *Lightning Systems' Capital Light and Cost Effective Business Model* Lightning Systems' relationships with its suppliers are instrumental to the performance and reliability of its vehicles and have enabled it to scale in a relatively asset light and cost-effective manner.

- *Lightning Systems' Competitive Advantages in Cost of Ownership and Fueling Infrastructure.* The commercial ZEV space is at an inflection point with strong secular trends of regulation, corporate mandates and grants to accelerate the transition to zero emission vehicles globally, and as a result provide a lower Total Cost of Ownership ("*TCO*") than Internal Combustion Engine ("*ICE*") vehicles. It is expected that by the first half of 2022, the TCO of New Lightning eMotors' vehicles will be lower than ICE without relying on grants and credits, as the company continues to reduce vehicle costs through economies of scale and contract-based cost reductions across the supply chain.

- *Lightning Systems' Competitive Advantages in Vehicle Performance.* Lightning Systems has manufactured and sold vehicles on the road for over two years, providing an important first-mover advantage in the commercial ZEV space across Class 3 to 7 vehicles. While other companies are still in the prototyping phase, it has a broad range of customers who have validated its vehicles. Lightning Systems has been actively gathering telematics data off each vehicle every day and utilizing its analytics capabilities to optimize vehicle performance, which enhances customer attachment, which is expected to result in low churn. As a result, the company has been able to quantifiably demonstrate reliability and TCO validation for its customers, while continuing to improve its manufacturing and design practices. This has led to continued growth in market share.

- *Strong Customer Demand.* The sales cycle can take up to two years, as many customers wish to test and purchase vehicles in small numbers before scaling. Because Lightning Systems has already completed this process with many customers, it is seeing strong repeat purchase behavior from many of its early purchasers. In the third quarter of 2020, it received $120 million in repeat purchase orders. As of December 31, 2020, Lightning Systems had $169 million of backlog, as compared to a backlog of $27 million as of December 31, 2019, and a pipeline of $800 million of sales. Lightning Systems has already received purchase orders to completely cover its estimated 2021 and over 25% of 2022 revenue. As Lightning Systems continues to scale its manufacturing capabilities to meet increased demand – from both new and existing customers – Lightning Systems anticipate that its pipeline will continue to scale.

160

Table of Contents

- *Available Infrastructure.* At Lightning Systems' 124,000 square foot headquarters, it is capable of designing, manufacturing, assembling and testing its ZEVs, powertrains and charging solutions. It manufactures its powertrains at its headquarters but also trains its original equipment manufacturer partners' technicians to install them at their own manufacturing facilities. Lightning Systems facility's current production capacity is 500 vehicles per shift per year. Lightning Systems is currently expanding its production facility by roughly 107,000 square feet to prepare for capacity expansion to 3,000 vehicles per shift per year needed to meet the unit forecast for 2022.

- *Terms of the Business Combination Agreement* The financial and other terms of the Business Combination Agreement and the fact that such terms and conditions are reasonable and were the product of arm's length negotiations between the Company and Lightning Systems.

In the course of its deliberations, the Company's Board also considered a variety of uncertainties, risks and other potentially negative factors relevant to the Business Combination, including the following which are based upon our diligence:

- *Early-Stage Company Risk.* Lightning Systems is an early-stage company with fast-growing revenues, and the risk that it may not be able to execute on its business plan.

- *Macroeconomic Risk.* The risk of macroeconomic uncertainty and the effects it could have on Lightning Systems' revenues.

- *Future Growth Risk.* Future growth of Lightning Systems is dependent upon the worldwide adoption by consumers of alternative fuel vehicles in general and ZEVs and electric vehicles in particular.

- *Cost Assumption Risk.* The risk that Lightning Systems may not be able to achieve current cost assumptions.

- *Supply Risk.* The risk that Lightning Systems' suppliers may not be able to deliver the necessary components for Lightning Systems' electrified solutions at prices or volumes acceptable to Lightning Systems.

- *Competitive Risk.* Lightning Systems operates in a highly competitive and rapidly evolving industry.

- *OEM Integration Risk.* The risk that OEMs may choose to develop their own solutions to compete with Lightning Systems' or may price the integration of Lightning Systems' solutions at levels lower than the price projected by Lightning Systems.

- *Public Company Risk.* The risks that are associated with being a publicly traded company that is in its early, developmental stage.

- *Benefits May Not Be Achieved Risk.* The risk that the potential benefits of the Business Combination may not be fully achieved or may not be achieved within the expected timeframe.

- *Redemption Risk.* The risk that a significant number of the Company's stockholders elect to redeem their shares prior to the consummation of the Business Combination and pursuant to the Company's existing amended and restated certificate of incorporation, which would potentially make the Business Combination more difficult to complete or reduce the amount of cash available to the combined company to accelerate its business plan following the Closing.

- *Stockholder Vote Risk.* The risk that the Company's stockholders may fail to provide the votes necessary to effect the Business Combination.

- *Litigation Risk.* The risk of the possibility of litigation challenging the Business Combination or that an adverse judgment granting permanent injunctive relief could indefinitely enjoin consummation of the Business Combination.

- *Closing Conditions Risk.* The risk that completion of the Business Combination is conditioned on the satisfaction of certain closing conditions that are not within the Company's control.

161

Table of Contents

- *No Third-Party Valuation Risk.* The risk that the Company did not obtain a third-party valuation or fairness opinion in connection with the Business Combination.

- *The Company Stockholders Receiving a Minority Positions Risk* The Company's stockholders will hold a minority position in the combined company.

- *Fees, Expenses and Time Risk.* The risk of incurring significant fees and expenses associated with completing the Business Combination and the substantial time and effort of management required to complete the Business Combination.

- *Other Risks Factors.* Various other risk factors associated with Lightning Systems' business, as described in the section entitled "Risk Factors."

In addition to considering the factors described above, the Company's Board also considered that some officers and directors of the Company may have interests in the Business Combination as individuals that are in addition to, and that may be different from, the interests of the Company's stockholders. The Company's independent directors reviewed and considered these interests during the negotiation of the Business Combination and in evaluating and unanimously approving, as members of the Company's Board, the Business Combination Agreement and the Business Combination. For more information, see the section entitled "—*Interests of Certain Persons in the Business Combination.*"

The Company's Board concluded that the potential benefits that it expects the Company and its stockholders to achieve as a result of the Business Combination outweigh the potentially negative factors associated with the Business Combination. Accordingly, the Company's Board, based on its consideration of the specific factors listed above, unanimously (a) determined that the Business Combination, Merger, the other transactions contemplated by the Business Combination Agreement, the PIPE Subscription Agreement and PIPE Investment, and the Convertible Note Subscription Agreements, Convertible Note Investment and the other agreements contemplated by the Convertible Note Subscription Agreements are just and equitable and fair as to the Company and its stockholders, and that it is advisable and in the best interests of the Company and its stockholders of the Company to adopt and approve these agreements and transactions, (b) approved, adopted and declared advisable the Business Combination Agreement, the PIPE Subscription Agreement, the Convertible Note Subscription Agreements and the agreements and transactions contemplated thereby and (c) recommended that the stockholders of the Company approve each of the Proposals.

The above discussion of the material factors considered by the Company's Board is not intended to be exhaustive but does set forth the principal factors considered by the Company's Board.

**Unaudited Prospective Financial Information**

Lightning Systems provided the Company with its internally prepared forecasts for each of the years in the six-year period ending December 31, 2025. The Company's management reviewed and, as a result of its due diligence investigation, worked with Lightning Systems to have Lightning Systems revise the forecasts for presentation to the Company's Board as part of the Company's Board's review and subsequent approval of the Business Combination. Lightning Systems and the Company do not, as a matter of general practice, publicly disclose long-term forecasts or internal projections of future performance, revenue, financial condition or other results. However, in connection with the proposed Business Combination, management of the Company used the financial projections set forth below to present key elements of the forecasts provided to the Company. The forecasts were prepared solely for internal use and not with a view toward public disclosure, the published guidelines of the SEC regarding projections or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information.

The inclusion of financial projections in this proxy statement/prospectus should not be regarded as an indication that the Company, Lightning Systems, their respective directors, officers, advisors or other

162

Table of Contents

representatives considered, or now considers, such financial projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the Business Combination Proposal. The financial projections are not fact and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement/prospectus, including investors or stockholders, are cautioned not to place undue reliance on this information. You are cautioned not to rely on the projections in making a decision regarding the Business Combination, as the projections may be materially different than actual results. We will not refer back to the financial projections in our future periodic reports filed under the Exchange Act.

The financial projections reflect numerous estimates and assumptions with respect to general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to Lightning Systems' business, all of which are difficult to predict and many of which are beyond Lightning Systems' and the Company's control. The financial projections are forward-looking statements that are inherently subject to significant uncertainties and contingencies, many of which are beyond Lightning Systems' and the Company's control. The various risks and uncertainties include those set forth in the sections entitled "*Risk Factors,*" "*Management's Discussion and Analysis of Financial Condition and Results of Operations of Lightning Systems*" and "*Cautionary Note Regarding Forward-Looking Statements*." As a result, there can be no assurance that the projected results will be realized or that actual results will not be significantly higher or lower than projected. Since the financial projections cover multiple years, such information by its nature becomes less reliable with each successive year. These financial projections are subjective in many respects and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments.

Furthermore, the financial projections do not take into account any circumstances or events occurring after the date they were prepared. None of Lightning Systems' independent registered accounting firm, the Company's independent registered accounting firm or any other independent accountants, have compiled, examined or performed any procedures with respect to the financial projections included below, nor have they expressed any opinion or any other form of assurance on such information or their accuracy or achievability, and they assume no responsibility for, and disclaim any association with, the financial projections. Nonetheless, a summary of the financial projections is provided in this proxy statement/prospectus because they were made available to the Company and the Company's Board in connection with their review of the proposed Business Combination.

EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAWS, BY INCLUDING IN THIS PROXY STATEMENT A SUMMARY OF THE FINANCIAL PROJECTIONS FOR LIGHTNING SYSTEMS, GIGCAPITAL3 UNDERTAKES NO OBLIGATIONS AND EXPRESSLY DISCLAIMS ANY RESPONSIBILITY TO UPDATE OR REVISE, OR PUBLICLY DISCLOSE ANY UPDATE OR REVISION TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE FINANCIAL PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS CHANGE OR ARE SHOWN TO BE IN ERROR.

The projections were prepared by, and are the responsibility of, Lightning Systems and the Company management. Grant Thornton LLP, Lightning Systems' independent registered public accounting firm, and BPM LLP, the Company's independent registered public accounting firm, have not examined, compiled or otherwise applied procedures to the accompanying prospective financial information presented herein and, accordingly, express no opinion or any other form of assurance with respect to the prospective financial information. The audit reports for Lightning Systems included in this proxy statement/prospectus relate to historical financial information of Lightning Systems. It does not extend to the projections and should not be read as if it does.

163

Table of Contents

The key elements of the projections for Lightning Systems provided to the Company on November 29, 2020 in connection with the evaluation of the Business Combination by the Company's Board are summarized below:

**Lightning Systems Key Financials**

| ($ in million, unless otherwise noted) | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Revenue | $ 9 | $ 63 | $354 | $640 | $1,165 | $2,012 |
| *Gross Growth* | *NM* | *NM* | *462%* | *81%* | *82%* | *73%* |
| Gross Profit | $ 0 | $ 9 | $ 68 | $140 | $ 296 | $ 528 |
| *Gross Margin* | *3%* | *14%* | *19%* | *22%* | *25%* | *26%* |
| Adjusted EBITDA | ($ 11) | ($ 17) | $ 15 | $ 50 | $ 155 | $ 315 |
| *Adjusted EBITDA Margin* | *(122%)* | *(27%)* | *4%* | *8%* | *13%* | *16%* |

Souce: Lightning Systems' Management Projections

**Comparable Company Analysis**

The Company's management primarily relied upon a public company comparables analysis to assess the value that the public markets would likely ascribe to New Lightning eMotors following the Business Combination with the Company and this analysis was presented to the Board. The relative valuation analysis was based on publicly-traded companies in the electric vehicle and auto technology sectors, and included companies in these sectors which had recently agreed to combine with other special purpose acquisition companies, as these were determined to be most comparable. The comparable public companies the Board reviewed within these sectors are set forth in the table below. These companies were selected by the Company based upon discussions with Oppenheimer and also input from BofA Securities using the information provided by Oppenheimer in September 2020 and updated on December 6, 2020 to add recent high-growth auto technology companies that subsequent to September had entered into business combinations with special purpose acquisition companies as the publicly-traded companies having businesses most similar to New Lightning eMotors' business. However, the Company's Board realized that no company was identical in nature to Lightning Systems.

Our Board reviewed, among other things, information for benchmarking of similar companies and information for comparable companies regarding estimated enterprise value multiples, projected revenue growth for 2021 over 2020 or 2024 over 2023, gross margins and EBITDA margins for 2021 or 2024 and revenue and EBITDA margins for the five-year period 2020 through 2024.

164

Table of Contents

The key elements for benchmarking of similar companies, based on an analysis as of December 9, 2020, are summarized in the table below:

| Revenue ($ in million) | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| Lightning eMotors | $ 9 | $ 63 | $ 354 | $ 640 | $ 1,165 |
| Arrival | NA | NA | $ 1,009 | $5,099 | $14,135 |
| Fisker | NA | NA | ~$ 600 | $3,314 | $10,604 |
| Lordstown | $ 0 | $ 118 | $ 1,690 | $3,476 | $ 5,776 |
| Lion Electric | $ 29 | $ 204 | $ 668 | $1,672 | $ 3,625 |
| Nikola | $ 0 | $ 60 | $ 247 | $1,077 | $ 2,380 |
| Hyliion | $ 1 | $ 8 | $ 344 | $1,019 | $ 2,091 |
| Canoo | NA | $ 120 | $ 329 | $ 840 | $ 1,430 |
| XL Fleet | $ 21 | $ 75 | $ 281 | $ 648 | $ 1,377 |

| Revenue Growth | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| Lightning eMotors | NM | NM | 462% | 81% | 82% |
| Arrival | NM | NM | NM | 405% | 177% |
| Fisker | NM | NM | NM | 452% | 220% |
| Lordstown | NM | NM | NM | 106% | 66% |
| Lion Electric | NM | NM | 227% | 150% | 117% |
| Nikola | NM | NM | 309% | 336% | 121% |
| Hyliion | NM | NM | NM | 196% | 105% |
| Canoo | NM | NM | 174% | 155% | 70% |
| XL Fleet | NM | 259% | 273% | 130% | 113% |

| EBITDA Margin | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| Lightning eMotors | (122%) | (27%) | 4% | 8% | 13% |
| Arrival | NA | NA | 6% | 22% | 23% |
| Fisker | NA | NA | 4% | 13% | 19% |
| Lordstown | NM | (131%) | 1% | 9% | 10% |
| Lion Electric | (14%) | 14% | 18% | 18% | 20% |
| Nikola | NM | (257%) | (134%) | (29%) | (8%) |
| Hyliion | NM | (193%) | 2% | 21% | 29% |
| Canoo | NA | (291%) | (74%) | (8%) | 13% |
| XL Fleet | (47%) | (20%) | 11% | 18% | 22% |

Souce: FactSet, CapIQ and SPAC Merger Announcement Decks

165

Table of Contents

The multiples for the selected comparable companies, based on analysis as of December 9, 2020, are summarized in the table below:

**Electric Vehicle and AutoTech Comparable Companies**

| Ticker | Company Name | Revenue Growth CY'21E | Gross Margin CY'21E | EBITDA Margin CY'21E | EV / Revenue CY'21E | EV / Rev / Growth CY'21E | EV / EBITDA CY'21E |
|---|---|---|---|---|---|---|---|
| WKHS | Workhorse | >500% | (0%) | (36%) | 19.29x | 0.00x | NM |
| XPEV | Xpeng | 163% | 12% | (15%) | 13.70x | 0.08x | NM |
| NIO | NIO | 103% | 18% | (5%) | 12.46x | 0.12x | NM |
| TSLA | Tesla | 47% | 23% | 20% | 15.32x | 0.33x | 78.0x |
| PLUG | Plug Power | 37% | 16% | 13% | 39.01x | 1.04x | NM |
| BLDP-CA | Ballard Power | 22% | 24% | (17%) | 30.03x | 1.34x | NM |
| NVDA | NVIDIA | 21% | 66% | 46% | 16.42x | 0.78x | 35.5x |
| XLNX | Xilinx | 8% | 69% | 33% | 10.08x | 1.32x | 30.3x |

**Selected Recent AutoTech SPAC Mergers**

| Ticker | Company Name | Revenue Growth CY'24E | Gross Margin CY'24E | EBITDA Margin CY'24E | EV / Revenue CY'24E | EV / Rev / Growth CY'24E | EV / EBITDA CY'24E |
|---|---|---|---|---|---|---|---|
| FSR | Fisker | 220% | NA | 19% | 0.35x | 0.00x | 1.9x |
| CIIC | Arrival | 177% | 26% | 23% | 1.32x | 0.01x | 5.8x |
| NKLA | Nikola | 121% | 11% | (8%) | 2.86x | 0.02x | NM |
| NGA | Lion Electric | 117% | NA | 20% | 0.70x | 0.01x | 3.6x |
| PIC | XL Fleet | 113% | 25% | 22% | 1.54x | 0.01x | 6.9x |
| HYLN | Hyliion | 105% | 35% | 29% | 1.12x | 0.01x | 3.9x |
| HCAC | Canoo | 70% | 30% | 13% | 3.00x | 0.04x | 22.8x |
| RIDE | Lordstown | 66% | 19% | 10% | 0.43x | 0.01x | 4.2x |
| SBE | ChargePoint | 63% | 41% | 9% | 12.67x | 0.20x | NM |
| RMG | Romeo Power | 51% | 29% | 17% | 1.89x | 0.04x | 11.1x |

| | Revenue Growth CY'24E | Revenue Growth CY'25E | Gross Margin CY'24E | Gross Margin CY'25E | EBITDA Margin CY'24E | EBITDA Margin CY'25E | EV / Revenue CY'24E | EV / Revenue CY'25E | EV / Rev / Growth CY'24E | EV / Rev / Growth CY'25E | EV / EBITDA CY'24E | EV / EBITDA CY'25E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Lightning Systems** | 82% | 73% | 25% | 26% | 13% | 16% | 0.56x | 0.32x | 0.01x | 0.00x | 4.2x | 2.1x |

Souce: FactSet, CapIQ and SPAC Merger Announcement Decks

The implied total enterprise value as a multiple of estimated 2024 revenues of the electric vehicle and automotive technology companies in the first table above based upon a median estimated calendar year 2021 multiple of 15.87x establishes a range for these companies of 6.00x-8.00x to estimated 2024 revenues. New Lightning eMotors' estimated 2024 revenue multiple of total enterprise value of 0.56x discounted 92% to this comparable set of publicly traded companies. Similarly, comparing Lightning Systems to the recent automotive technology companies that have combined with special purpose acquisition companies also results in the implied total enterprise valuation of Lightning Systems being discounted as compared to these peers, with those publicly traded companies having a range of 1.00x-2.00x to their estimated 2024 revenues.

Based on the review of these selected comparable publicly traded companies, our Board concluded that New Lightning eMotors' pro forma implied total enterprise value as a multiple of its estimated 2024 revenue was below the total enterprise value as a multiple of the estimated 2024 revenues of similar benchmarks of such companies. This analysis supported our Board's determination, based on a number of factors, that the terms of the Business Combination were fair to and in the best interests of the Company and its stockholders.

166

Table of Contents

**Satisfaction of 80% Test**

It is a requirement under our Charter and the NYSE listing requirements that the business or assets acquired in an initial business combination have a fair market value equal to at least 80% of the balance of the funds in the Trust Account (excluding the deferred underwriting discounts and commissions and taxes payable on the income earned on the Trust Account) at the time of the execution of a definitive agreement for an initial business combination. On December 10, 2020, there was approximately $202.0 million in the Trust Account, and 80% of that amount was therefore approximately $161.6 million. The fair market value of the target or targets had to be determined by our Board based upon one or more standards generally accepted by the financial community, such as discounted cash flow valuation or value of comparable businesses. Subject to this requirement, our management has had virtually unrestricted flexibility in identifying and selecting one or more prospective target businesses, although the Company was not permitted to effectuate an initial business combination with another blank check company or a similar company with nominal operations. In any case, the Company determined that it would only complete an initial business combination in which it acquired 50% or more of the outstanding voting securities of the target or were otherwise not required to register as an investment company under the Investment Company Act. Furthermore, and for the reasons discussed above, the Company has determined that the fair market value of Lightning Systems exceeds $161.6 million, and therefore, that the requirement that the business or assets in an initial business combination have a fair market value equal to at least 80% of the balance of the funds in the Trust Account has been satisfied.

**Interests of Certain Persons in the Business Combination**

In considering the recommendation of the Company's Board to vote in favor of the Business Combination, stockholders should be aware that, aside from their interests as stockholders, our Sponsor and certain of our directors and officers have interests in the Business Combination that are different from, or in addition to, those of other stockholders generally. Our directors were aware of and considered these interests, among other matters, in evaluating the Business Combination, and in recommending to stockholders that they approve the Business Combination. Stockholders should take these interests into account in deciding whether to approve the Business Combination. These interests include, among other things:

- the fact that the Initial Stockholders hold 670,108 private placement warrants that would expire worthless if a Business Combination is not consummated;

- the fact that our Sponsor, officers and directors have agreed not to redeem any of the shares of our Common Stock held by them in connection with a stockholder vote to approve the Business Combination;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser amount per public share as is in the Trust Account on the liquidation date, by the claims of (a) any third party (other than our independent public accountants) for services rendered or products sold to us or (b) a prospective target business with which we have entered into a letter of intent, confidentiality or other similar agreement or Business Combination agreement, but only if such a third party or target business has not executed a waiver of all rights to seek access to the Trust Account;

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that Neil Miotto and Drs. Avi Katz and Raluca Dinu will continue as members of the New Lightning eMotors Board, and each shall be entitled to receive compensation for serving on such board; and

- the fact that our Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the applicable deadline. Prior to GigCapital3's initial public offering, the Sponsor purchased 5,735,000 Initial Stockholder Shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share (as

167

Table of Contents

compared to the $10.00 per share price being used to determine the number of shares of Common Stock being issued to the Lightning Systems equity holders in the Business Combination or at which the PIPE Investors have agreed to purchase Common Stock). However, 750,000 shares of Common Stock issued to the Sponsor were forfeited due to the over-allotment option not being exercised by the Underwriters. Additionally, the Sponsor purchased 650,000 private placement units simultaneously with the consummation of GigCapital3's initial public offering for an aggregate purchase price of $6.5 million. Certain of GigCapital3's directors and executive officers, including Dr. Avi Katz, Dr. Raluca Dinu, Neil Miotto, John Mikulsky, Peter Wang, Andrea Betti-Berutto and Brad Weightman, also have a direct or indirect economic interest in such private placement units and in the 5,635,000 Initial Stockholder Shares owned by the Sponsor. The 5,635,000 Initial Stockholder Shares owned by the Sponsor would have had an aggregate market value of $63.1 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The 650,000 private placement units held by the Sponsor would have had an aggregate market value of $8.8 million based upon the closing price of $13.59 per public unit on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus. The Sponsor does not hold any warrants independent of what is included in the private placement units. While the private placement units have a trading price and value as set forth above, the private placement units will be, upon completion of the Business Combination, broken into their constituent components of stock and warrants, and each of those separately trade and the value of each of those is $11.19 per public share and $3.05 per public warrant. Additionally, the Sponsor, officers and directors do not currently have any unreimbursed out-of-pocket expenses in connection with the business combination. Upon completion of the Business Combination, the former Lightning Systems equity holders will own 53,922,000 shares of our Common Stock. The shares owned by the former Lightning Systems equity holders would have had an aggregate market value of $603.4 million based upon the closing price of $11.19 per public share on the NYSE on March 19, 2021, the most recent practicable date prior to the date of this proxy statement/prospectus.

**Potential Purchases of Public Shares**

In connection with the stockholder vote to approve the Business Combination, our Sponsor, directors, officers, advisors or any of their respective affiliates may privately negotiate transactions to purchase public shares from stockholders who would have otherwise elected to have their shares redeemed in conjunction with the Business Combination for a per share pro rata portion of the Trust Account. There is no limit on the number of public shares our Sponsor, directors, officers, advisors or any of their respective affiliates may purchase in such transactions, subject to compliance with applicable law and the rules of the NYSE. Any such privately negotiated purchases may be effected at purchase prices that are in excess of the per share pro rata portion of the Trust Account. However, our Sponsor, directors, officers, advisors and their respective affiliates have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the Trust Account will be used to purchase public shares or public warrants in such transactions. None of our Sponsor, directors, officers, advisors or any of their respective affiliates will make any such purchases when they are in possession of any material non-public information not disclosed to the seller of such public shares or during a restricted period under Regulation M under the Exchange Act. Such a purchase could include a contractual acknowledgement that such stockholder, although still the record holder of such public shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights, and could include a contractual provision that directs such stockholder to vote such shares in a manner directed by the purchaser.

In the event that our Sponsor, directors, officers, advisors or any of their respective affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares.

The purpose of any such purchases of public shares could be to (a) vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining stockholder approval of the Business Combination

168

Table of Contents

or (b) to satisfy a closing condition in the Business Combination Agreement, where it appears that such requirement would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding. Any such purchases of our public shares or public warrants may result in the completion of the Business Combination that may not otherwise have been possible. Any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent the purchasers are subject to such reporting requirements.

In addition, if such purchases are made, the public "float" of our Common Stock may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

Our Sponsor, officers, directors, advisors or any of their respective affiliates anticipate that they may identify the stockholders with whom our Sponsor, officers, directors, advisors or any of their respective affiliates may pursue privately negotiated purchases by either the stockholders contacting us directly or by our receipt of redemption requests submitted by stockholders (in the case of shares of Common Stock) following our mailing of proxy materials in connection with the Business Combination. To the extent that our Sponsor, officers, directors, advisors or any of their respective affiliates enter into a privately negotiated purchase, they would identify and contact only potential selling stockholders who have expressed their election to redeem their shares for a pro rata share of the Trust Account or vote against the Business Combination, whether or not such stockholder has already submitted a proxy with respect to the Business Combination but only if such shares have not already been voted at the stockholder meeting related to the Business Combination. Our Sponsor, officers, directors, advisors or any of their respective affiliates will select which stockholders to purchase shares from based on the negotiated price and number of shares and any other factors that they may deem relevant, and will only purchase public shares if such purchases comply with Regulation M under the Exchange Act and the other federal securities laws.

Any purchases by our Sponsor, officers, directors, advisors or any of their respective affiliates who are affiliated purchasers under Rule10b-18 under the Exchange Act will only be made to the extent such purchases are able to be made in compliance with Rule 10b-18, which is a safe harbor from liability for manipulation under Section 9(a)(2) of and Rule 10b-5 under the Exchange Act. Rule 10b-18 has certain technical requirements that must be complied with in order for the safe harbor to be available to the purchaser. Our Sponsor, officers, directors, advisors and any of their respective affiliates will not make purchases of Common Stock if the purchases would violate Section 9(a)(2) of or Rule 10b-5 under the Exchange Act.

**Total Company Shares to Be Issued in the Business Combination**

We anticipate that, upon completion of the Business Combination, the ownership of New Lightning eMotors will be as follows:

- the former Lightning Systems equity holders will own 53,922,000 shares of our Common Stock, representing a 65.5% interest;

- the public stockholders (not including any Initial Stockholders that own public shares) will own 20,000,000 shares of our Common Stock, representing a 24.3% interest;

- the PIPE Investors will own 2,500,000 shares of our Common Stock, representing a 3.0% interest; and

- the Initial Stockholders will own 5,893,479 shares of our Common Stock, representing a 7.2% interest.

The ownership percentage with respect to New Lightning eMotors following the Business Combination assume that (a) no public stockholders elect to have their public shares redeem, and (b) all pre-merger Lightning Systems Options have vested and been exercised prior to the merger (however, for a discussion of the actual adjustment provisions applicable to the Lightning Systems Options, see "*Proposal No. 1—Approval of the Business Combination —The Business Combination Agreement—Conversion of Securities*"); and does not take

169

Table of Contents

into account (i) warrants to purchase Common Stock that will remain outstanding immediately following the Business Combination, (ii) the issuance of Stockholder Earnout Shares to the Stockholder Earnout Group should the earnout conditions in the Business Combination Agreement be satisfied, (iii) conversion of any of the Convertible Notes or (iv) the issuance of any shares upon completion of the Business Combination under the Incentive Plan, a copy of which is attached to this proxy statement/prospectus as *Annex H*. If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in New Lightning eMotors will be different. As a result of the Business Combination, the economic and voting interests of our public stockholders will decrease.

The public warrants and private placement warrants will become exercisable thirty (30) days after the completion of an initial business combination and will expire five (5) years after the completion of an initial business combination or earlier upon their redemption or liquidation.

Please read "*Unaudited Pro Forma Condensed Combined Financial Information*" for further information.

**Board of Directors of New Lightning eMotors Following the Business Combination**

Assuming the Election of Directors Proposal is approved by our stockholders at the special meeting, we expect the New Lightning eMotors Board to be comprised of the individuals set forth below following the completion of the Business Combination.

| Name | Age | Position |
|---|---|---|
| Timothy Reeser | 49 | Chief Executive Officer and Class II Director |
| Dr. Avi Katz | 62 | Co-Chairman of the Board and Class III Director |
| Robert Fenwick-Smith | 58 | Co-Chairman of the Board and Class III Director |
| Dr. Raluca Dinu | 47 | Class II Director |
| Neil Miotto | 74 | Class I Director |
| Thaddeus Senko | 64 | Class I Director |
| Meghan Sharp | 49 | Class II Director |
| Diana Tremblay | 61 | Class III Director |
| Bruce Coventry | 68 | Class I Director |

Upon the Closing Date, we anticipate that the New Lightning eMotors Board will consist of nine members, reclassified into three separate classes, with each class serving a three-year term. Except with respect to the election of directors at the special meeting pursuant to *Proposal No. 6 — The Election of Directors Proposal*, the Class I directors will be elected to an initial one-year term (and three-year terms subsequently), the Class II directors will be elected to an initial two-year term (and three-year terms subsequently) and the Class III directors will be elected to an initial three-year term (and three-year terms subsequently).

Our board of directors has nominated the following individuals for election at our special meeting pursuant to Proposal No. 6 — The Election of Directors Proposal:

- *Class I Directors*: Neil Miotto, Thaddeus Senko and Bruce Coventry;

- *Class II Directors*: Dr. Raluca Dinu, Timothy Reeser and Meghan Sharp; and

- *Class III Directors*: Dr. Avi Katz, Robert Fenwick-Smith and Diana Tremblay.

For additional details, see the sections of this proxy statement/prospectus entitled "*Proposal No. 6 — The Election of Directors Proposal*" and "*Management After the Business Combination*."

170

Table of Contents

**Redemption Rights**

Pursuant to our current amended and restated certificate of incorporation, holders of public shares may elect to have their shares redeemed for cash at the applicable redemption price per share calculated in accordance with our current certificate of incorporation. As of December 10, 2020, the estimated per share redemption price would have been approximately $10.10. If a holder exercises its redemption rights, then such holder will be exchanging shares of the Company's Common Stock for cash and will no longer own shares of the post-combination company. Such a holder will be entitled to receive cash for its public shares only if it properly demands redemption and delivers its shares (either physically or electronically) to our Transfer Agent in accordance with the procedures described herein.

Each redemption of shares of Common Stock by our public stockholders will reduce the amount in the Trust Account. The Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, being no less than an aggregate amount of $150.0 million. This condition to closing in the Business Combination Agreement is for the sole benefit of the parties thereto and may be waived by either of us or Lightning Systems. If, as a result of redemptions of Common Stock by our public stockholders, this condition is not met (or waived), then either we or Lightning Systems may elect not to consummate the Business Combination. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. In addition, in no event will we redeem shares of our Common Stock in an amount that would result in the Company's failure to have net tangible assets equaling or exceeding $5,000,001 (so that we are not subject to the SEC's "penny stock" rules). Holders of our outstanding public warrants do not have redemption rights in connection with the Business Combination. Unless otherwise specified, the information in the accompanying proxy statement assumes that none of our public stockholders exercise their redemption rights with respect to their shares of Common Stock. Please see the section entitled "*Special Meeting of Company Stockholders - Redemption Rights*" for the procedures to be followed if you wish to redeem your shares for cash.

**Accounting Treatment**

The Business Combination will be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, the Company will be treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the Business Combination will be treated as the equivalent of New Lightning eMotors issuing stock for the net assets of the Company, accompanied by a recapitalization whereby no goodwill or other intangible assets are recorded.

**Name; Headquarters**

The name of the post-combination company after the Business Combination will be Lightning eMotors, Inc. and the headquarters will be located at 815 14th Street SW, Suite A100, Loveland, Colorado 80537.

**Certain U.S. Federal Income Tax Considerations**

The following is a discussion of certain U.S. federal income tax consequences to holders of our Common Stock that elect to have their Common Stock redeemed for cash if the Business Combination is completed. This discussion is limited to holders that hold our Common Stock as a "capital asset" for U.S. federal income tax purposes (generally, property held for investment). This summary is based on the provisions of the Code, U.S. Treasury regulations, administrative rules and judicial decisions, all as in effect on the date hereof. These authorities may change or be subject to differing interpretations. Any such change or differing interpretation may be applied retroactively in a manner that could adversely affect holders to which this section applies. We have not sought and will not seek any rulings from the IRS with respect to the statements made and the conclusions reached in the following discussion, and there can be no assurance that the IRS or a court will agree with such statements and conclusions.

171

Table of Contents

The following does not purport to be a complete analysis of all potential tax effects resulting from redemptions of our Common Stock, and this discussion does not address all aspects of U.S. federal income taxation that may be relevant to particular holders in light of their personal circumstances. In addition, this summary does not address the Medicare tax on certain investment income, U.S. federal estate or gift tax laws, any state, local or non-U.S. tax laws or any tax treaties. This summary also does not address tax considerations applicable to investors that may be subject to special treatment under the U.S. federal income tax laws, such as:

- banks, insurance companies or other financial institutions;

- tax-exempt or governmental organizations;

- qualified foreign pension funds (or any entities all of the interests of which are held by a qualified foreign pension fund);

- brokers or dealers in securities or foreign currencies;

- U.S. persons whose functional currency is not the U.S. dollar;

- "controlled foreign corporations," "passive foreign investment companies" and corporations that accumulate earnings to avoid U.S. federal income tax;

- traders in securities that use the mark-to-market method of accounting for U.S. federal income tax purposes;

- persons subject to the alternative minimum tax;

- partnerships or other pass-through entities for U.S. federal income tax purposes or holders of interests therein;

- persons deemed to sell our Common Stock under the constructive sale provisions of the Code;

- persons that acquired our Common Stock through the exercise of employee stock options or otherwise as compensation or through a tax-qualified retirement plan;

- real estate investment trusts;

- regulated investment companies;

- certain former citizens or long-term residents of the United States; and

- persons that hold our Common Stock as part of a straddle, appreciated financial position, synthetic security, hedge, conversion transaction or other integrated investment or risk reduction transaction.

If a partnership (including an entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds our Common Stock, the tax treatment of a partner in the partnership generally will depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner level. Accordingly, we urge partners in partnerships (including entities or arrangements treated as partnerships for U.S. federal income tax purposes) holding our Common Stock to consult their tax advisors regarding the U.S. federal income tax consequences to them relating to the matters discussed below.

THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. INVESTORS SHOULD CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATIONS, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER THE U.S. FEDERAL ESTATE OR GIFT TAX LAWS OR UNDER THE LAWS OF ANY STATE, LOCAL OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE INCOME TAX TREATY.

Table of Contents

**U.S. Holders**

This section is addressed to "U.S. holders" of our Common Stock. For purposes of this discussion, a "U.S. holder" is a beneficial owner of shares of our Common Stock, that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust (i) the administration of which is subject to the primary supervision of a U.S. court and which has one or more United States persons (within the meaning of the Code) who have the authority to control all substantial decisions of the trust or (ii) which has made a valid election under applicable U.S. Treasury regulations to be treated as a United States person.

*Redemption of Our Common Stock*

In the event that a U.S. holder's Common Stock is redeemed pursuant to the redemption provisions described in the section entitled "*Special Meeting of the Company's Stockholders—Redemption Rights*," the treatment of the transaction for U.S. federal income tax purposes will depend on whether the redemption qualifies as a sale of our Common Stock under Section 302 of the Code. If the redemption qualifies as a sale of our Common Stock, the U.S. holder will be treated as described under *U.S. Holders—Redemption of Our Common Stock—Redemption Treated as a Sale of Our Common Stock*" below. If the redemption does not qualify as a sale of our Common Stock, the U.S. holder will be treated as receiving a corporate distribution with the tax consequences described below under "- *U.S. Holders—Redemption of Our Common Stock—Redemption Treated as a Distribution*".

Whether a redemption qualifies for sale treatment will depend largely on the total number of shares of our stock treated as held by the U.S. holder (including any stock constructively owned by the U.S. holder as a result of owning warrants) relative to all of our shares of stock outstanding both before and after the redemption. The redemption of a U.S. holder's Common Stock generally will be treated as a sale of such Common Stock (rather than as a corporate distribution) if the redemption (i) is "substantially disproportionate" with respect to the U.S. holder, (ii) results in a "complete termination" of the U.S. holder's interest in us or (iii) is "not essentially equivalent to a dividend" with respect to the U.S. holder. These tests are explained more fully below.

In determining whether any of the foregoing tests are satisfied, a U.S. holder takes into account not only stock owned directly by the U.S. holder, but also shares of our stock that are treated as constructively owned by the U.S. holder. In addition to stock actually owned by a U.S. holder, such U.S. holder may also be treated as constructively owning stock owned by certain related individuals and entities in which the U.S. holder has an interest or that have an interest in such U.S. holder, as well as any stock that the U.S. holder has a right to acquire by exercise of an option, which would generally include Common Stock which could be acquired pursuant to the exercise of the warrants. In order to meet the substantially disproportionate test, the percentage of our outstanding voting stock actually and constructively owned by the U.S. holder immediately following the redemption of Common Stock must, among other requirements, be less than 80% of the percentage of our outstanding voting stock actually and constructively owned by the U.S. holder immediately before the redemption. There will be a complete termination of a U.S. holder's interest if either (i) all of the shares of our Common Stock actually and constructively owned by the U.S. holder are redeemed or (ii) all of the shares of our Common Stock actually owned by the U.S. holder are redeemed and the U.S. holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of stock owned by certain family members and the U.S. holder does not constructively own any other stock. Finally, the redemption of a U.S. holder's Common Stock will not be essentially equivalent to a dividend if such redemption results in a "meaningful reduction" of the U.S. holder's proportionate interest in us. Whether the redemption will result in a meaningful reduction in a U.S. holder's proportionate interest in us will depend on the particular facts and circumstances.

173

Table of Contents

However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over corporate affairs may constitute such a "meaningful reduction." A U.S. holder should consult with its own tax advisors as to the tax consequences of electing to have our Common Stock redeemed for cash.

If none of the foregoing tests are satisfied, then the redemption will be treated as a corporate distribution, and the tax effects will be as described under "- *Redemption Treated as a Distribution*" below. After the application of those rules, any remaining tax basis of the U.S. holder in the redeemed Common Stock will be added to the U.S. holder's adjusted tax basis in its remaining stock, or, if it has none, to the U.S. holder's adjusted tax basis in its warrants or possibly in other stock constructively owned by it.

*Redemption Treated as a Sale of Our Common Stock.* If the redemption qualifies as a sale of Common Stock, a U.S. holder generally will recognize capital gain or loss in an amount equal to the difference between (a) the amount of cash received in such redemption and (b) the U.S. holder's adjusted tax basis in its Common Stock redeemed. A U.S. holder's adjusted tax basis in its Common Stock generally will equal the U.S. holder's acquisition cost less any prior distributions paid to such U.S. holder that were treated as a return of capital for U.S. federal income tax purposes. Any capital gain or loss recognized with respect to a redemption generally will be long-term capital gain or loss if the U.S. holder held the Common Stock redeemed for more than one year. Long-term capital gains recognized by non-corporate U.S. holders will be eligible to be taxed at reduced rates. The deductibility of capital losses is subject to limitations.

*Redemption Treated as a Distribution.* If the redemption does not qualify as a sale of our Common Stock, the U.S. holder will generally be treated as receiving a distribution of cash from the Company. Such distribution generally will constitute a dividend for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of our current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. holder's adjusted tax basis in our Common Stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the Common Stock and will be treated as described under "- *Redemption Treated as a Sale of Our Common Stock*" above.

Dividends we pay to a U.S. holder that is a corporation for U.S. federal income tax purposes generally will qualify for the dividends received deduction if the requisite holding period is satisfied. With certain exceptions (including, but not limited to, dividends treated as investment income for purposes of investment interest deduction limitations), and provided certain holding period requirements are met, dividends we pay to a non-corporate U.S. holder generally will constitute "qualified dividends" that will be subject to tax at the maximum tax rate accorded to long-term capital gains. It is unclear whether the redemption rights with respect to the Common Stock described in this proxy statement/prospectus may prevent a U.S. holder from satisfying the applicable holding period requirements with respect to the dividends received deduction or the preferential tax rate on qualified dividend income, as the case may be.

**The rules governing the tax treatment of redemptions are complex and the determination of whether a redemption will be treated as a sale of our Common Stock or as a distribution with respect to such Common Stock is made on a holder-by-holder basis. U.S. holders of our Common Stock considering the exercise of their redemption rights are encouraged to consult their own tax advisors as to whether the redemption of their Common Stock will be treated as a sale or as a distribution under the Code.**

### *Information Reporting and Backup Withholding*

Payments received by a U.S. holder may be subject, under certain circumstances, to information reporting and backup withholding. Backup withholding will not apply, however, to a U.S. holder that (i) is a corporation or entity that is otherwise exempt from backup withholding (which, when required, certifies as to its exempt status) or (ii) furnishes a correct taxpayer identification number and makes any other required certification on IRS Form W-9.

174

**Table of Contents**

Backup withholding is not an additional tax. Rather, the U.S. income tax liability (if any) of persons subject to backup withholding will be reduced by the amount of tax withheld. If backup withholding results in an overpayment of taxes, a refund may be obtained, provided that the required information is timely furnished to the IRS.

**Non-U.S. Holders**

This section is addressed to "Non-U.S. holders" of our Common Stock. For purposes of this discussion, a "Non-U.S. holder" is any beneficial owner of our Common Stock that is neither a U.S. holder nor an entity treated as a partnership for U.S. federal income tax purposes.

*Redemption of Our Common Stock*

The characterization of the redemption of a Non-U.S. holder's Common Stock pursuant to the redemption provisions described in the section entitled "*Special Meeting of the Company's Stockholders – Redemption Rights*" as a sale or distribution for U.S. federal income tax purposes generally will correspond to the U.S. federal income tax characterization of such a redemption of a U.S. holder's Common Stock, as described under "*U.S. Holders – Redemption of Our Common Stock*" above.

*Redemption Treated as a Sale of Our Common Stock.* If the redemption qualifies as a sale of our Common Stock with respect to a Non-U.S. holder, subject to the discussions below under "*Non-U.S. Holders—Information Reporting and Backup Withholding*" and "*Non-U.S. Holders—Foreign Account Tax Compliance Act*," such Non-U.S. holder generally will not be subject to U.S. federal income tax on any gain realized upon the redemption of its Common Stock unless:

- the Non-U.S. holder is an individual who is present in the United States for a period or periods aggregating 183 days or more during the calendar year in which the sale or disposition occurs and certain other conditions are met;

- the gain is effectively connected with a trade or business conducted by the Non-U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment maintained by the Non-U.S. holder in the United States); or

- we are or have been a "U.S. real property holding corporation" (a "*USRPHC*") for U.S. federal income tax purposes at any time during the shorter of the five-year period ending on the date of disposition or the period that the Non-U.S. Holder held our Common Stock, and, in the case where shares of our Common Stock are regularly traded on an established securities market, the Non-U.S. holder has owned, directly or constructively, more than 5% of our Common Stock at any time within the shorter of the five-year period preceding the disposition or such Non-U.S. Holder's holding period for the shares of our Common Stock.

A Non-U.S. holder described in the first bullet point above will be subject to U.S. federal income tax at a rate of 30% (or such lower rate as specified by an applicable income tax treaty) on the amount of such gain, which generally may be offset by U.S. source capital losses.

A Non-U.S. holder whose gain is described in the second bullet point above generally will be taxed on a net income basis at the rates and in the manner generally applicable to United States persons (as defined in the Code) unless an applicable income tax treaty provides otherwise. If the Non-U.S. holder is a corporation for U.S. federal income tax purposes whose gain is described in the second bullet point above, then such gain would also be included in its effectively connected earnings and profits (as adjusted for certain items), which may be subject to a branch profits tax (at a rate of 30% or such lower rate as specified by an applicable income tax treaty).

Generally, a corporation is a USRPHC if the fair market value of its United States real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide property interests and its other assets used or held for use in a trade or business. We believe that we currently are not (and have not been during the applicable testing period) a USRPHC for U.S. federal income tax purposes.

175

*Redemption Treated as a Distribution.* If the redemption does not qualify as a sale of common stock, a Non-U.S. holder will generally be treated as receiving a distribution of cash from the Company. Such distribution generally will constitute a dividend for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of our current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the Non-U.S. holder's adjusted tax basis in our Common Stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the Common Stock and will be treated as described under *Non-U.S. Holders – Redemption of Common Stock – Redemption Treated as a Sale of Common Stock*" above.

Subject to the withholding requirements under FATCA (as defined below) and provided such dividend is not effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States, each of which is discussed below, any portion of such distribution treated as a dividend made to a Non-U.S. holder on our Common Stock generally will be subject to U.S. withholding tax at a rate of 30% of the gross amount of the dividend unless an applicable income tax treaty provides for a lower rate. To receive the benefit of a reduced treaty rate, a Non-U.S. holder must provide the applicable withholding agent with an applicable IRS Form W-8, together with all attachments (or a successor form) certifying qualification for the reduced rate. Because we generally cannot determine at the time we make a distribution whether or not the distribution will exceed our current and accumulated earnings and profits, we normally will withhold tax on the entire amount of any distribution at the 30% rate (subject to reduction by an applicable income tax treaty). However, some or all of any amounts thus withheld may be refundable to the Non-U.S. holder if it is subsequently determined that such distribution was, in fact, in excess of our current and accumulated earnings and profits.

Dividends paid to a Non-U.S. holder that are effectively connected with a trade or business conducted by the Non-U.S. holder within the United States (and, if required by an applicable income tax treaty, are treated as attributable to a permanent establishment maintained by the Non-U.S. holder in the United States) generally will be taxed on a net income basis at the rates and in the manner generally applicable to United States persons (as defined under the Code). Such effectively connected dividends will not be subject to U.S. withholding tax if the Non-U.S. holder satisfies certain certification requirements by providing the applicable withholding agent with a properly executed IRS Form W-8ECI certifying eligibility for exemption. If the Non-U.S. holder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax (at a 30% rate or such lower rate as specified by an applicable income tax treaty) on its effectively connected earnings and profits (as adjusted for certain items), which will include effectively connected dividends.

**The rules governing the tax treatment of redemptions are complex and the determination of whether a redemption will be treated as a sale of our Common Stock or as a distribution with respect to such stock is made on a holder-by-holder basis. As a result, a withholding agent may require a Non-U.S. holder to provide certain information regarding its ownership in order to determine whether the redemption proceeds should be treated as sale proceeds or as a distribution subject to withholding. Non-U.S. holders of our Common Stock considering the exercise of their redemption rights are encouraged to consult their own tax advisors as to whether the redemption of their Common Stock will be treated as a sale or as a distribution under the Code.**

### Information Reporting and Backup Withholding

Any dividends paid to a Non-U.S. holder (including constructive dividends received pursuant to a redemption of our Common Stock treated as such) must be reported annually to the IRS and to the Non-U.S. holder. Copies of these information returns may be made available to the tax authorities in the country in which the Non-U.S. holder resides or is established. Any dividends paid to a Non-U.S. holder (including constructive dividends received pursuant to a redemption of our Common Stock) generally will not be subject to backup withholding if the Non-U.S. holder establishes an exemption by properly certifying its non-U.S. status on an applicable IRS Form W-8 (or a successor form).

176

Table of Contents

Payments of the proceeds of the sale or other disposition by a Non-U.S. holder of our Common Stock effected by or through a U.S. office of a broker generally will be subject to information reporting and backup withholding (at the applicable rate) unless the Non-U.S. holder establishes an exemption by properly certifying its non-U.S. status on an applicable IRS Form W-8 (or a successor form) and certain other conditions are met. Information reporting and backup withholding generally will not apply to any payment of the proceeds from a sale or other disposition of our Common Stock effected outside the United States by a non-U.S. office of a broker. However, unless such broker has documentary evidence in its records that the Non-U.S. holder is not a United States person and certain other conditions are met, or the Non-U.S. holder otherwise establishes an exemption, information reporting will apply to a payment of the proceeds of the disposition of our Common Stock effected outside the United States by such a broker if it has certain relationships within the United States.

Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability (if any) of persons subject to backup withholding will be reduced by the amount of tax withheld. If backup withholding results in an overpayment of taxes, a refund may be obtained, provided that the required information is timely furnished to the IRS.

### *Additional Withholding Requirements under FATCA*

Sections 1471 through 1474 of the Code, and the U.S. Treasury regulations and administrative guidance issued thereunder ("*FATCA*"), impose a 30% withholding tax on any dividends paid on our Common Stock, and subject to the discussion of certain proposed Treasury regulations below, on the gross proceeds from a disposition of our Common Stock, in each case if paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code) (including, in some cases, when such foreign financial institution or non-financial foreign entity is acting as an intermediary), unless (i) in the case of a foreign financial institution, such institution enters into an agreement with the U.S. government to withhold on certain payments, and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are non-U.S. entities with U.S. owners), (ii) in the case of a non-financial foreign entity, such entity certifies that it does not have any "substantial United States owners" (as defined in the Code) or provides the applicable withholding agent with a certification identifying the direct and indirect substantial United States owners of the entity, or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules and provides appropriate documentation. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these rules may be subject to different rules. Under certain circumstances, a holder might be eligible for refunds or credits of such taxes.

The U.S. Treasury released proposed Treasury regulations which, if finalized in their present form, would eliminate the federal withholding tax of 30% applicable to the gross proceeds of a sale or other disposition of our Common Stock. In its preamble to such proposed Treasury regulations, the U.S. Treasury stated that taxpayers may generally rely on the proposed regulations until final regulations are issued.

Non-U.S. holders are encouraged to consult their own tax advisors regarding the possible implications of FATCA to them.

### Regulatory Matters

Neither the Company nor Lightning Systems is aware of any material regulatory approvals or actions that are required for completion of the Business Combination other than as required under the HSR Act. The parties have filed a premerger notification under the HSR Act. It is presently contemplated that if any additional regulatory approvals or actions are required, those approvals or actions will be sought. There can be no assurance, however, that any such additional approvals or actions will be obtained.

177

Table of Contents

**Vote Required for Approval**

The Business Combination is conditioned on the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Approval Proposals, the Incentive Plan Proposal and the Election of Directors Proposal at the Special Meeting. The proposals in this proxy statement/prospectus (other than the Adjournment Proposal) are conditioned on the approval of the Business Combination Proposal.

This Business Combination Proposal (and consequently, the Business Combination Agreement and the transactions contemplated thereby, including the Business Combination) will be adopted and approved only if at least a majority of the votes cast at the Special Meeting vote "**FOR**" the Business Combination Proposal. A stockholder's failure to vote, as well as an abstention and broker non-vote, will have no effect on the approval of the Business Combination Proposal. Abstentions will be counted in connection with the determination of whether a valid quorum is established.

Our Initial Stockholders have agreed to vote their shares of Common Stock **"FOR"** the Business Combination Proposal. As of the record date, our Initial Stockholders, directors and officers own approximately 22.8% of our issued and outstanding shares of Common Stock.

**Recommendation of the Company's Board**

**OUR BOARD OF DIRECTORS RECOMMENDS
THAT OUR STOCKHOLDERS VOTE "FOR"
THE BUSINESS COMBINATION PROPOSAL.**

The existence of financial and personal interests of one or more of the Company's directors or officers may result in a conflict of interest on the part of such director(s) or officer(s) between what he or they may believe is in the best interests of the Company and its stockholders and what he or they may believe is best for himself or themselves in determining to recommend that stockholders vote for the proposals. See the section above entitled "*Interests of Certain Persons in the Transactions*" for further information.

178

Table of Contents

**PROPOSAL NO. 2—THE NYSE STOCK ISSUANCE PROPOSAL**

**Overview**

Assuming the Business Combination Proposal is approved, we are asking our stockholders to approve, for purposes of complying with applicable listing rules of the NYSE, the issuance of more than 20% of the Company's outstanding Common Stock in connection with the Business Combination, including the issuances described below.

**Issuance of common stock to Lightning Systems equity holders under Business Combination Agreement**

Subject to the terms and conditions of the Business Combination Agreement, the Company has agreed to pay Lightning Systems equity holders aggregate consideration consisting of up to 53,922,000 shares of Common Stock, including any shares issuable in respect of vested equity awards of Lightning Systems that are exercised prior to the Closing or equity awards of Lightning Systems that the Company assumes and which are exercised following the Closing in accordance with the terms of such equity awards. In addition, the Company may issue pursuant to the Business Combination Agreement up to an additional 16,463,096 shares of Common Stock to stockholders of Lightning Systems who have received, or are entitled to receive, any Per Share Merger Consideration. Such additional Stockholder Earnout Shares shall be issued by the Company in three equal tranches if, during the period from the date of the Closing through and including the fifth anniversary of the date of the Closing, the dollar volume-weighted average price of Common Stock (as determined in accordance with the Business Combination Agreement) equals or exceeds $12.00, $14.00 and $16.00 per share for twenty (20) of any thirty (30) consecutive trading days commencing after the Closing on the NYSE, Nasdaq or any other national securities exchange, as applicable for each of such three tranches, respectively.

**Issuance of common stock to PIPE Investor**

In connection with the execution of the Business Combination Agreement, the Company entered into the PIPE Subscription Agreement with the PIPE Investor, pursuant to which, among other things, the Company agreed to issue and sell, in a private placement to close immediately prior to the Closing, an aggregate of 2,500,000 shares of common stock at $10.00 per share to the PIPE Investor for an aggregate purchase price of $25,000,000.

**Issuance of common stock to Convertible Note Investors**

Also in connection with the execution of the Business Combination Agreement, the Company entered into the Convertible Note Subscription Agreements with the Convertible Note Investors, pursuant to which, among other things, the Company agreed to issue and sell to the Convertible Note Investors, in private placements to close immediately prior to Closing, (a) the Convertible Notes for an aggregate purchase price of $100,000,000 and (b) the Convertible Note Warrants to purchase up to 8,695,652 shares of Common Stock for a per share exercise price of $11.50. The Convertible Notes are convertible into 8,695,652 shares of Common Stock at a conversion price of $11.50.

The issuance of more than 20% of the Company's outstanding Common Stock in connection with the Business Combination, the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, including up to 70,385,096 shares of Common Stock to the Lightning Systems equity holders, 2,500,000 shares of common stock to the PIPE Investor, 8,695,652 shares of our Common Stock upon conversion of the Convertible Notes and 8,695,652 shares of our Common Stock upon exercise of the Convertible Note Warrants .

**Why the Company Needs Stockholder Approval**

Pursuant to Section 312.03(c) of the NYSE's Listed Company Manual, stockholder approval is required prior to the issuance of common stock in any transaction or series of related transactions if: (1) the common stock

179

Table of Contents

has, or will have upon issuance, voting power equal to or in excess of 20 percent of the voting power outstanding before the issuance of such stock, or (2) the number of shares of common stock to be issued is, or will be upon issuance, equal to or in excess of 20 percent of the number of shares of common stock outstanding before the issuance of the common stock.

As described above, upon the consummation of the Business Combination and the transactions contemplated by the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, we expect to issue (1) up to 70,385,096 shares of our Common Stock to the Lightning Systems equity holders in accordance with the terms and subject to the conditions of the Business Combination Agreement, (2) 2,500,000 shares of our Common Stock to the PIPE Investor, in accordance with the terms and subject to the conditions of the PIPE Subscription Agreement and (3) 8,695,652 shares of our Common Stock upon conversion of the Convertible Notes and 8,695,652 shares of our Common Stock upon exercise of the Convertible Note Warrants, in accordance with the terms and subject to the conditions of the Convertible Note Subscription Agreements, the Indenture and the Amended and Restated Warrant Agreement. Accordingly, the aggregate number of shares of our common stock that we will issue in connection with the Business Combination and the transactions contemplated by the PIPE Subscription Agreement and the Convertible Note Subscription Agreements will exceed 20% of both the voting power and the number of shares of Common Stock outstanding before such issuance, and for this reason, we are seeking the approval of our stockholders for the issuance of shares of our Common Stock pursuant to the Business Combination Agreement, the PIPE Investment and the Convertible Note Investment.

Moreover, pursuant to Section 312.03(d) of the NYSE's Listed Company Manual, stockholder approval is required prior to an issuance that will result in a change of control of the Company. The issuances of shares of Common Stock described above could result in a change of control of the Company. Accordingly, the Company is seeking the approval of its stockholders for such issuances.

In the event that this proposal is not approved by Company stockholders, the Business Combination and the transactions contemplated by the PIPE Subscription Agreement and the Convertible Note Subscription Agreements cannot be consummated. In the event that this proposal is approved by Company stockholders, but the Business Combination Agreement is terminated (without the Business Combination being consummated) prior to the issuance of shares of our Common Stock pursuant to the Business Combination Agreement, the PIPE Investment or the Convertible Note Investment, such shares of Common Stock will not be issued.

**Vote Required for Approval**

The approval of the NYSE Stock Issuance Proposal requires the affirmative vote of a majority of the votes cast by the stockholders present in person or represented by proxy and entitled to vote at the Special Meeting. Accordingly, under Delaware law, a Company stockholder's failure to vote, as well as an abstention and broker non-vote, will have no effect on the NYSE Stock Issuance Proposal. For purposes of NYSE rules, however, abstentions are treated as "votes cast" and will be counted as votes **"AGAINST"** this proposal. Abstentions will be counted in connection with the determination of whether a valid quorum is established.

The Sponsor and each of our officer and directors have agreed to, among other things, vote in favor of this NYSE Stock Issuance Proposal. As of the date of this proxy statement/prospectus, the Initial Stockholders own approximately 22.8% of the outstanding shares of our Common Stock.

This Proposal No. 2 is conditioned upon the approval of the Business Combination Proposal. If the Business Combination Proposal is not approved, this Proposal No. 2 will have no effect, even if approved by our stockholders.

Table of Contents

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE NYSE STOCK ISSUANCE PROPOSAL.**

The existence of financial and personal interests of one or more of the Company's directors or officers may result in a conflict of interest on the part of such director(s) or officer(s) between what he or they may believe is in the best interests of the Company and its stockholders and what he or they may believe is best for himself or themselves in determining to recommend that stockholders vote for the proposals. See the section above entitled "*Proposal No. 1 - Approval of the Business Combination - Interests of Certain Persons in the Transactions*" for a further discussion.

181

Table of Contents

**PROPOSAL NO. 3—CLASSIFICATION OF THE BOARD OF DIRECTORS PROPOSAL**

**Overview**

Assuming the Business Combination Proposal is approved, our stockholders are also being asked to approve the classification of the Board. Our amended and restated current amended and restated certificate of incorporation does not currently contemplate classification of directors.

In connection with the Business Combination, our Board will be reconstituted and initially comprised of seven directors who will be voted upon by the stockholders at the special meeting, with vacancies for an eighth and ninth director which our Board will act with regard to filling following the Business Combination when candidates are identified. Our Board believes it is in the best interests of the Company for the Board to be classified into three classes, each comprising as nearly as possible one-third of the directors to serve three-year terms; *provided* that the term of the initial Class I Directors shall expire at the annual meeting of the stockholders of the Company held in 2021, the term of the initial Class II Directors shall expire at the annual meeting of the stockholders of the Company held in 2022 and the term of the initial Class III Directors shall expire at the annual meeting of the stockholders of the Company held in 2023.

Furthermore, any vacancies which occur during the year may be filled by the Board to serve for the unexpired term of his or her predecessor in office, and a director chosen to fill a position resulting from an increase in the number of directors shall hold office for the remainder of the full term of the class of directors in which the vacancy occurred and until his or her successor has been elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal.

**Reasons for the Amendments**

The classification of directors is intended to encourage experience and leadership stability on the Board of the post-combination company. The Board believes that providing for a classified board of directors will ensure desirable continuity in leadership and policy following the Business Combination.

**Comparison of Current Amended and Restated Certificate of Incorporation to Proposed Second Amended and Restated Certificate of Incorporation**

The following table sets forth a summary of the change proposed to be made between our current amended and restated certificate of incorporation and the proposed Second Amended and Restated Certificate of Incorporation. This summary is qualified by reference to the complete text of the proposed Second Amended and Restated Certificate of Incorporation, a copy of which is attached to this proxy statement as *Annex B*. All stockholders are encouraged to read the proposed Second Amended and Restated Certificate of Incorporation in its entirety for a more complete description of its terms. Capitalized terms used in the summary set forth in the table below have the meaning set forth in the current amended and restated certificate of incorporation and the proposed Second Amended and Restated Certificate of Incorporation, as applicable.

| | Current Amended and Restated Certificate of Incorporation | Proposed Second Amended and Restated Certificate of Incorporation |
| --- | --- | --- |
| **ARTICLE V** | There is no applicable language in the current amended and restated certificate of incorporation. | *Section 5.2(b)* shall be revised and restated in its entirety as follows: *Section 5.2(b)*. Subject to Section 5.5 hereof, the Board shall be divided into three classes, as nearly equal in number as possible and designated Class I, Class II, and Class III. The Board is authorized to assign members of the Board already in office to Class I, Class II, or |

182

Table of Contents

Class III. The term of the initial Class I Directors shall expire at the first annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate, the term of the initial Class II Directors shall expire at the second annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate, and the term of the initial Class III directors shall expire at the third annual meeting of the stockholders following the effectiveness of this Second Amended and Restated Certificate. At each succeeding annual meeting of the stockholders of the Corporation, beginning with the first annual meeting of the stockholders of the Corporation following the effectiveness of this Second Amended and Restated Certificate, each of the successors elected to replace the class of directors whose term expires at that annual meeting shall be elected for a three-year term or until the election and qualification of their respective successors in office, subject to their earlier death, resignation or removal. Subject to Section 5.5 hereof, if the number of directors that constitutes the Board is changed, any increase or decrease shall be apportioned by the Board among the classes so as to maintain the number of directors in each class as nearly equal as possible, but in no case shall a decrease in the number of directors constituting the Board shorten the term of any incumbent director. Subject to the rights of the holders of one or more series of Preferred Stock, voting separately by class or series, to elect directors pursuant to the terms of one or more series of Preferred Stock, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon. The Board is hereby expressly authorized, by resolution or resolutions thereof, to assign members of the Board already in office to the aforesaid classes at the time this Second Amended and Restated Certificate (and therefore such classification) becomes effective in accordance with the DGCL.

183

**Table of Contents**

The current amended and restated certificate of incorporation provides as follows:

*Section 5.2(c)*. Subject to Section 5.5 hereof, a director shall hold office until the next annual meeting and until his or her successor has been elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal.

*Section 5.4* currently states that any director may be removed from office at any time, with or without cause, by the affirmative vote of holders of a majority of the voting power of all then outstanding shares of capital stock of GigCapital3 entitled to vote generally in the election of directors, voting together as a single class.

*Section 5.2(c)* shall be revised and restated in its entirety as follows:

*Section 5.2(c)*. Subject to Section 5.5 hereof, a director shall hold office until the next annual meeting for the year in which his or her term expires and until his or her successor has been elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal.

*Section 5.4* shall be amended to allow for removal of a director only for cause.

**Vote Required for Approval**

The affirmative vote of holders of a majority of the outstanding shares of our Common Stock entitled to vote thereon at the Special Meeting is required to approve this Proposal No. 3. Abstentions or the failure to vote on Proposal No. 3 will have the same effect as a vote "**AGAINST**" Proposal No. 3.

This Proposal No. 3 is conditioned upon the approval and completion of the Business Combination Proposal. If the Business Combination Proposal is not approved, this Proposal No. 3 will have no effect, even if approved by our stockholders.

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT
OUR STOCKHOLDERS VOTE "FOR" PROPOSAL NO. 3.**

184

Table of Contents

**PROPOSAL NO. 4A— APPROVAL OF ADDITIONAL AMENDMENTS TO CURRENT AMENDED AND RESTATED CERTIFICATE OF INCORPORATION IN CONNECTION WITH THE BUSINESS COMBINATION PROPOSAL**

**Overview**

Assuming the Business Combination Proposal is approved, our stockholders are also being asked to approve certain amendments to our current amended and restated certificate of incorporation, which are, in the judgment of our Board, necessary to adequately address the needs of the post-combination company.

The additional amendments effect the following:

- change the post-combination company's name to Lightning eMotors, Inc.;

- delete the second sentence in Article II and delete the prior provisions under, and references to, Article IX (Business Combination Requirements; Existence) of the current amended and restated certificate of incorporation;

- Amend certain terms in Article X (Corporate Opportunities) with respect to certain non-employee directors of the combined company pursuing outside business activities and corporate opportunities; and

- Amend the exclusive forum provision in our current amended and restated certificate of incorporation to conform to recent SEC guidance regarding the exclusion of certain potential claims from exclusive forum charter provisions.

**Reasons for the Amendments**

These additional amendments to the Second Amended and Restated Certificate of Incorporation of New Lightning eMotors and the reasons for each of them are:

- Amending Article I to change the post-combination company's name to "Lightning eMotors, Inc." Currently, the Company's name is GigCapital3, Inc. The Board believes the name of the post-combination company should more closely align with the name of the existing operating business of Lightning Systems and therefore has proposed the name change.

- Amending Article II to delete the provision regarding the Company's powers to consummate a business combination.

- Amending Articles IV and XI to delete references to Article IX, which will be deleted in its entirety, as more fully described below.

- Deleting Article IX to eliminate provisions specific to our status as a blank check company. This deletion is desirable because these provisions will serve no purpose following the consummation of the Business Combination. For example, these proposed amendments remove the requirement to dissolve the Company and allow it to continue as a corporate entity with perpetual existence following consummation of the Business Combination. Perpetual existence is the usual period of existence for corporations, and the Board believes it is the most appropriate period for the post-combination company following the Business Combination. In addition, certain provisions in Article IX of our Charter require that proceeds from the Company's IPO be held in the Trust Account until a business combination or liquidation of the Company has occurred. These provisions would restrict our ability to pursue the Business Combination with Lightning Systems, among other things.

- Revising Article X regarding corporate opportunities to add certain terms with respect to certain non-employee directors of the combined company pursuing outside business activities and corporate opportunities, as certain of our non-employee directors may serve as directors of multiple companies in the same or similar lines of business as the combined company.

185

Table of Contents

- Amending Article XI regarding the exclusive forum provision for certain lawsuits to clarify that for any action arising under the Securities Act, the Court of Chancery and the federal district court for the District of Delaware will have concurrent jurisdiction, and that the exclusive forum provision will not apply to any suits brought to enforce any liability or duty created by the Exchange Act, or any other claim for which the federal courts have exclusive jurisdiction.

**Comparison of Current Amended and Restated Certificate of Incorporation to Proposed Second Amended and Restated Certificate of Incorporation**

The following table sets forth a summary of the changes proposed to be made between our current amended and restated certificate of incorporation and our proposed Second Amended and Restated Certificate of Incorporation. This summary is qualified by reference to the complete text of the proposed Second Amended and Restated Certificate of Incorporation, a copy of which is attached to this proxy statement as *Annex B*. Capitalized terms used in the summary set forth in the table below have the meaning set forth in the current amended and restated certificate of incorporation and the proposed Second Amended and Restated Certificate of Incorporation, as applicable.

| | Current Amended and Restated Certificate of Incorporation | Proposed Second Amended and Restated Certificate of Incorporation |
|---|---|---|
| **ARTICLE I** | The current amended and restated certificate of incorporation provides as follows:<br><br>**ARTICLE I**<br>**NAME**<br>The name of the corporation is GigCapital3, Inc. (the "*Corporation*"). | *Article I* shall be revised and restated in its entirety as follows:<br><br>**ARTICLE I**<br>**NAME**<br>The name of the corporation is Lightning eMotors, Inc. (the "*Corporation*") |
| **ARTICLE II** | The current amended and restated certificate of incorporation provides as follows:<br><br>The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL. In addition to the powers and privileges conferred upon the Corporation by law and those incidental thereto, the Corporation shall possess and may exercise all the powers and privileges that are necessary or convenient to the conduct, promotion or attainment of the business or purposes of the Corporation, including, but not limited to, effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination, involving the Corporation and one or more businesses (a "*Business Combination*"). | *Article II* shall be revised and restated in its entirety as follows:<br><br>The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL. |
| **ARTICLE IV** | The current amended and restated certificate of incorporation provides as follows:<br><br>*Section 4.2—Preferred Stock—*Subject to Article IX of this Amended and Restated Certificate, the Board of Directors of the | *Section 4.2* shall be revised and restated in its entirety as follows:<br><br>*Section 4.2—* The Board of Directors of the Corporation (the "*Board*") is hereby expressly authorized to provide out of the unissued |

186

**Table of Contents**

Corporation (the "*Board*") is hereby expressly authorized to provide out of the unissued shares of the Preferred Stock for one or more series of Preferred Stock and to establish from time to time the number of shares to be included in each such series and to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Board providing for the issuance of such series and included in a certificate of designation (a "*Preferred Stock Designation*") filed pursuant to the DGCL, and the Board is hereby expressly vested with the authority to the full extent provided by law, now or hereafter, to adopt any such resolution or resolutions

The current amended and restated certificate of incorporation provides as follows:

*Section 4.3—Common Stock*:
*(b) Dividends.* Subject to applicable law, the rights, if any, of the holders of any outstanding series of the Preferred Stock and the provisions of *Article IX* hereof, the holders of the shares of Common Stock shall be entitled to receive such dividends and other distributions (payable in cash, property or capital stock of the Corporation) when, as and if declared thereon by the Board from time to time out of any assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends and distributions.
*(c) Liquidation, Dissolution or Winding Up of the Corporation.* Subject to applicable law, the rights, if any, of the holders of any outstanding series of the Preferred Stock and the provisions of *Article IX* hereof, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of the shares of Common Stock shall be entitled to receive all the remaining assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Common Stock held by them.

shares of the Preferred Stock for one or more series of Preferred Stock and to establish from time to time the number of shares to be included in each such series and to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Board providing for the issuance of such series and included in a certificate of designation (a "*Preferred Stock Designation*") filed pursuant to the DGCL, and the Board is hereby expressly vested with the authority to the full extent provided by law, now or hereafter, to adopt any such resolution or resolutions

*Sections 4.3(b)* and *(c)* shall be revised and restated in its entirety as follows:

*Section 4.3—Common Stock*:
*(b) Dividends.* Subject to applicable law, the rights, if any, of the holders of any outstanding series of the Preferred Stock, the holders of the shares of Common Stock shall be entitled to receive such dividends and other distributions (payable in cash, property or capital stock of the Corporation) when, as and if declared thereon by the Board from time to time out of any assets or funds of the Corporation legally available therefor and shall share equally on a per share basis in such dividends and distributions.
*(c) Liquidation, Dissolution or Winding Up of the Corporation.* Subject to applicable law, the rights, if any, of the holders of any outstanding series of the Preferred Stock, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of the shares of Common Stock shall be entitled to receive all the remaining assets of the Corporation available for distribution to its stockholders, ratably in proportion to the number of shares of Common Stock held by them.

187

**Table of Contents**

| ARTICLE IX | The current amended and restated certificate of incorporation provides as follows: | The proposed Second Amended and Restated Certificate of Incorporation will not include provisions similar to *Article IX* (Business Combination Requirements; Existence) of the current amended and restated certificate of incorporation. |

**ARTICLE IX**
**BUSINESS COMBINATION REQUIREMENTS;**
**EXISTENCE**

*Section 9.1— General.*

*(a)* The provisions of this *Article IX* shall apply during the period commencing upon the effectiveness of this Amended and Restated Certificate and terminating upon the consummation of the Corporation's initial Business Combination and no amendment to this *Article IX* shall be effective prior to the consummation of the initial Business Combination unless approved by the affirmative vote of the holders of at least 65% of all then outstanding shares of the Common Stock.

*(b)* Immediately after the Offering, a certain amount of the net offering proceeds received by the Corporation in the Offering (including the proceeds of any exercise of the underwriters' over-allotment option) and certain other amounts specified in the Corporation's registration statement on Form S-1, as initially filed with the Securities and Exchange Commission on February 25, 2020, as amended (the "Registration Statement"), shall be deposited in a trust account (the "Trust Account"), established for the benefit of the Public Stockholders (as defined below) pursuant to a trust agreement described in the Registration Statement. Except for the payment of deferred underwriting commissions and the withdrawal of interest to pay taxes, none of the funds held in the Trust Account (including the interest earned on the funds held in the Trust Account) will be released from the Trust Account until the earliest to occur of (i) the completion of the initial Business Combination, (ii) the redemption of 100% of the Offering Shares (as defined below) if the Corporation is unable to complete its initial Business Combination within 18 months from the closing of the Offering, and (iii) the redemption of shares in connection with a vote seeking to amend any provisions of the Amended and

188

Table of Contents

Restated Certificate relating to the Corporation's pre-initial Business Combination activity and related stockholders' rights (as described in Section 9.7). Holders of shares of Common Stock included as part of the units sold in the Offering (the "*Offering Shares*") (whether such Offering Shares were purchased in the Offering or in the secondary market following the Offering and whether or not such holders are Founders (as such term is defined in the Registration Statement), officers or directors of the Corporation, or affiliates of any of the foregoing) are referred to herein as "*Public Stockholders*."

*Section 9.2— Redemption Rights.*
*(a)* Prior to the consummation of the initial Business Combination, the Corporation shall provide all holders of Offering Shares with the opportunity to have their Offering Shares redeemed upon the consummation of the initial Business Combination pursuant to, and subject to the limitations of, Sections 9.2(b) and 9.2(c) (such rights of such holders to have their Offering Shares redeemed pursuant to such Sections, the "*Redemption Rights*") hereof for cash equal to the applicable redemption price per share determined in accordance with Section 9.2(b) hereof (the "*Redemption Price*"); *provided, however*, that the Corporation shall not redeem Offering Shares to the extent that such redemption would result in the Corporation's failure to have net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*") (or any successor rule)) of at least $5,000,001 or any greater net tangible asset or cash requirement which may be contained in the agreement relating to the initial Business Combination upon consummation of the initial Business Combination (such limitation hereinafter called the "*Redemption Limitation*"). Notwithstanding anything to the contrary contained in this Amended and Restated Certificate, there shall be no Redemption Rights or liquidating distributions with respect to any warrants issued pursuant to the Offering.

(b) If the Corporation offers to redeem the Offering Shares other than in conjunction with

189

Table of Contents

a stockholder vote on an initial Business Combination with a proxy solicitation pursuant to Regulation 14A of the Exchange Act (or any successor rules or regulations) and filing proxy materials with the Securities and Exchange Commission (the "*SEC*"), the Corporation shall offer to redeem the Offering Shares upon the consummation of the initial Business Combination, subject to lawfully available funds therefor, in accordance with the provisions of Section 9.2(a) hereof pursuant to a tender offer in accordance with Rule 13e-4 and Regulation 14E of the Exchange Act (or any successor rule or regulation) (such rules and regulations hereinafter called the "*Tender Offer Rules*") which it shall commence prior to the consummation of the initial Business Combination and shall file tender offer documents with the SEC prior to the consummation of the initial Business Combination that contain substantially the same financial and other information about the initial Business Combination and the Redemption Rights as is required under Regulation 14A of the Exchange Act (or any successor rule or regulation) (such rules and regulations hereinafter called the "*Proxy Solicitation Rules*"), even if such information is not required under the Tender Offer Rules; *provided, however,* that if a stockholder vote is required by law to approve the proposed initial Business Combination, or the Corporation decides to submit the proposed initial Business Combination to the stockholders for their approval for business or other legal reasons, the Corporation shall offer to redeem the Offering Shares, subject to lawfully available funds therefor, in accordance with the provisions of Section 9.2(a) hereof in conjunction with a proxy solicitation pursuant to the Proxy Solicitation Rules (and not the Tender Offer Rules) at a price per share equal to the Redemption Price calculated in accordance with the following provisions of this Section 9.2(b). In the event that the Corporation offers to redeem the Offering Shares pursuant to a tender offer in accordance with the Tender Offer Rules, the Redemption Price per share of the Common Stock payable to holders of the Offering Shares tendering their Offering Shares pursuant to such tender

190

Table of Contents

offer shall be equal to the quotient obtained by dividing: (i) the aggregate amount on deposit in the Trust Account as of two business days prior to the consummation of the initial Business Combination, including interest not previously released to the Corporation to pay its taxes, by (ii) the total number of then outstanding Offering Shares. If the Corporation offers to redeem the Offering Shares in conjunction with a stockholder vote on the proposed initial Business Combination pursuant to a proxy solicitation, the Redemption Price per share of the Common Stock payable to holders of the Offering Shares exercising their Redemption Rights shall be equal to the quotient obtained by dividing (a) the aggregate amount on deposit in the Trust Account as of two business days prior to the consummation of the initial Business Combination, including interest not previously released to the Corporation to pay its taxes, by (b) the total number of then outstanding Offering Shares.

*(c)* If the Corporation offers to redeem the Offering Shares in conjunction with a stockholder vote on an initial Business Combination pursuant to a proxy solicitation, a Public Stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "*group*" (as defined under Section 13(d)(3) of the Exchange Act), shall be restricted from seeking Redemption Rights with respect to more than an aggregate of 15% of the Offering Shares without the prior consent of the Corporation.

*(d)* In the event that the Corporation has not consummated an initial Business Combination within 18 months from the closing of the Offering, the Corporation shall (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than 10 business days thereafter subject to lawfully available funds therefor, redeem 100% of the Offering Shares in consideration of a per-share price, payable in cash, equal to the quotient obtained by dividing (A) the aggregate amount then on deposit in the Trust Account, including interest not previously released to the Corporation to pay its taxes (less up to $100,000 of such net

191

Table of Contents

interest to pay dissolution expenses), by (B) the total number of then outstanding Offering Shares, which redemption will completely extinguish rights of the Public Stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the remaining stockholders and the Board in accordance with applicable law, dissolve and liquidate, subject in each case to the Corporation's obligations under the DGCL to provide for claims of creditors and other requirements of applicable law.

*(e)* If the Corporation offers to redeem the Offering Shares in conjunction with a stockholder vote on an initial Business Combination, the Corporation shall consummate the proposed initial Business Combination only if (i) such initial Business Combination is approved by the affirmative vote of the holders of a majority of the shares of the Common Stock that are voted at a stockholder meeting held to consider such initial Business Combination and (ii) the Redemption Limitation is not exceeded.

*(f)* If the Corporation conducts a tender offer pursuant to Section 9.2(b), the Corporation shall consummate the proposed initial Business Combination only if the Redemption Limitation is not exceeded.

*Section 9.3— Distributions from the Trust Account.*
*(a)* A Public Stockholder shall be entitled to receive funds from the Trust Account only as provided in Sections 9.2(a), 9.2(b), 9.2(d) or 9.7 hereof. In no other circumstances shall a Public Stockholder have any right or interest of any kind in or to distributions from the Trust Account, and no stockholder other than a Public Stockholder shall have any interest in or to the Trust Account.

*(b)* Each Public Stockholder that does not exercise its Redemption Rights shall retain its interest in the Corporation and shall be deemed to have given its consent to the release of the remaining funds in the Trust Account to the Corporation, and following payment to any Public Stockholders exercising their

192

Table of Contents

Redemption Rights, the remaining funds in the Trust Account shall be released to the Corporation.

*(c)* The exercise by a Public Stockholder of the Redemption Rights shall be conditioned on such Public Stockholder following the specific procedures for redemptions set forth by the Corporation in any applicable tender offer or proxy materials sent to the Public Stockholders relating to the proposed initial Business Combination. Payment of the amounts necessary to satisfy the Redemption Rights properly exercised shall be made as promptly as practical after the consummation of the initial Business Combination.

*Section 9.4—Share Issuances.* Prior to the consummation of the Corporation's initial Business Combination, the Corporation shall not issue any additional shares of capital stock of the Corporation that would entitle the holders thereof to receive funds from the Trust Account or vote on any initial Business Combination, on any pre-Business Combination activity or on any amendment to this *Article IX.*

*Section 9.5— Transactions with Affiliates.* In the event the Corporation enters into an initial Business Combination with a target business that is affiliated with any of the Founders, any director or officer of the Corporation or any of their respective affiliates, the Corporation, or a committee of the independent directors of the Corporation, shall obtain an opinion from an independent accounting firm or an independent investment banking firm that is a member of the Financial Industry Regulatory Authority that such Business Combination is fair to the Corporation from a financial point of view.

*Section 9.6— No Transactions with Other Blank Check Companies.* The Corporation shall not enter into an initial Business Combination with another blank check company or a similar company with nominal operations.

*Section 9.7— Additional Redemption Rights.* If, in accordance with Section 9.1(a), any amendment is made to this *Article IX*, the Public Stockholders shall be provided with the opportunity to redeem their Offering Shares upon the approval of any such amendment, at a

**Table of Contents**

per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest not previously released to the Corporation to pay its taxes, divided by the number of then outstanding Offering Shares; *provided, however*, that any such amendment will be voided, and this *Article IX* will remain unchanged, if any stockholders who wish to redeem are unable to redeem due to the Redemption Limitation.

**ARTICLE X**

The current amended and restated certificate of incorporation provides as follows:

*Article IX* shall be revised and restated in its entirety as follows:

| ARTICLE X<br>CORPORATE OPPORTUNITY | ARTICLE IX<br>CORPORATE OPPORTUNITY |
|---|---|
| **Current Amended and Restated Certificate of Incorporation** | **Proposed Second Amended and Restated Certificate of Incorporation** |
| To the extent allowed by law, the doctrine of corporate opportunity, or any other analogous doctrine, shall not apply with respect to the Corporation or any of its officers or directors, and the Corporation renounces any expectancy that any of the directors or officers of the Corporation will offer any such corporate opportunity of which he or she may become aware to the Corporation, except, the doctrine of corporate opportunity shall apply with respect to any of the directors or officers of the Corporation only with respect to a corporate opportunity that was offered to such person solely in his or her capacity as a director or officer of the Corporation and such opportunity is one the Corporation is legally and contractually permitted to undertake and would otherwise be reasonable for the Corporation to pursue, and to the extent the director or officer is permitted to refer that opportunity to the Corporation without violating any legal obligation. | *Section 9.1— Corporate Opportunities and Non-Employee Directors*<br>(a) In recognition and anticipation that members of the Board who are not employees of the Corporation (the "*Non-Employee Directors*") and their respective Affiliates may now engage and may continue to engage in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, the provisions of this *Article IX* are set forth to regulate and define the conduct of certain affairs of the Corporation with respect to certain classes or categories of business opportunities as they may involve any of the Non-Employee Directors or their respective Affiliates and the powers, rights, duties and liabilities of the Corporation and its directors, officers and stockholders in connection therewith. For purposes of this *Article IX*, (i) "*Affiliate*" shall mean, (a) in respect of each Non-Employee Director, any Person that, directly or indirectly, is controlled by such Non-Employee Director (other than the Corporation and any entity that is controlled by the Corporation) and (b) in respect of the Corporation, any Person that, directly or indirectly, is controlled by the Corporation; and (ii) "*Person*" shall mean any individual, corporation, general or limited partnership, |

194

**Table of Contents**

limited liability company, joint venture, trust, association or any other entity.

(b) No Non-Employee Director (including any Non-Employee Director who serves as an officer of the Corporation in both his or her director and officer capacities) or his or her Affiliates (such Persons being referred to, collectively, as "*Identified Persons*" and, individually, as an "*Identified Person*") shall, to the fullest extent permitted by law, have any duty to refrain from directly or indirectly

(1) engaging in the same or similar business activities or lines of business in which the Corporation or any of its Affiliates now engages or proposes to engage or (2) otherwise competing with the Corporation or any of its Affiliates, and, to the fullest extent permitted by law, no Identified Person shall be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities. To the fullest extent permitted by law, the Corporation hereby renounces any interest or expectancy in, or right to be offered an opportunity to participate in, any business opportunity which may be a corporate opportunity for an Identified Person and the Corporation or any of its Affiliates, except as provided in Section 9.1(c) of this *Article IX*. Subject to said Section 9.1(c) of this *Article IX*, in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for itself, herself or himself and the Corporation or any of its Affiliates, such Identified Person shall, to the fullest extent permitted by law, have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates and, to the fullest extent permitted by law, shall not be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty as a stockholder, director or officer of the Corporation solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself, herself or himself, or offers or directs such corporate opportunity to another Person.

(c) The Corporation does not renounce its interest in any corporate opportunity offered to

195

Table of Contents

any Non-Employee Director (including any Non-Employee Director who serves as an officer of this Corporation) if such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of the Corporation, and the provisions of Section 9.1(b) of this *Article IX* shall not apply to any such corporate opportunity.

(d) In addition to and notwithstanding the foregoing provisions of this *Article IX*, a corporate opportunity shall not be deemed to be a potential corporate opportunity for the Corporation if it is a business opportunity that (i) the Corporation is unable, financially or legally, or is not contractually permitted to undertake, (ii) from its nature, is not in the line of the Corporation's business or is of no practical advantage to the Corporation or (iii) is one in which the Corporation has no interest or reasonable expectancy.

(e) To the fullest extent permitted by law, any Person purchasing or otherwise acquiring any interest in any shares of capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this *Article IX.*

| | | |
|---|---|---|
| **ARTICLE XI** | The current amended and restated certificate of incorporation provides as follows: | *ARTICLE X* shall be revised and restated in its entirety as follows: |

<table>
<tr><td>

**ARTICLE XI**
**AMENDMENT OF AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

The Corporation reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate (including any Preferred Stock Designation), and other provisions authorized by the laws of the State of Delaware at the time in force that may be added or inserted, in the manner now or hereafter prescribed by this Amended and Restated Certificate and the DGCL; and, except as set forth in *Article VIII*, all rights, preferences and privileges of whatever nature herein conferred upon stockholders, directors or any other persons by and pursuant to this Amended and Restated Certificate in its present form or as hereafter amended are granted subject to the right reserved in this *Article XI*; *provided, however,* that *Article IX* of this Amended and

</td><td>

**ARTICLE X**
**AMENDMENT OF SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

The Corporation reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate (including any Preferred Stock Designation), and other provisions authorized by the laws of the State of Delaware at the time in force that may be added or inserted, in the manner now or hereafter prescribed by this Amended and Restated Certificate and the DGCL; and, except as set forth in *Article VIII*, all rights, preferences and privileges of whatever nature herein conferred upon stockholders, directors or any other persons by and pursuant to this Second Amended and Restated Certificate in its present form or as hereafter amended are granted subject to the right reserved in this *Article X* .

</td></tr>
</table>

196

Table of Contents

Restated Certificate may be amended only as provided therein

**Vote Required for Approval**

The affirmative vote of holders of a majority of the outstanding shares of our Common Stock entitled to vote thereon at the Special Meeting is required to approve this Proposal No. 4A. Abstentions or the failure to vote on Proposal No. 4A will have the same effect as a vote "**AGAINST**" Proposal No. 4A.

This Proposal No. 4A is conditioned upon the approval and completion of the Business Combination Proposal. If the Business Combination Proposal is not approved, Proposal No. 4A will have no effect, even if approved by our stockholders.

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT
OUR STOCKHOLDERS VOTE "FOR" PROPOSAL NO. 4A.**

197

**Table of Contents**

**PROPOSAL NO. 4B— AUTHORIZATION OF EXCLUSIVE FORUM PROVISION PROPOSAL**

**Overview**

Assuming the Business Combination Proposal is approved, our stockholders are also being asked to authorize the adoption of Delaware as the exclusive forum for certain stockholder litigation.

The proposed Second Amended and Restated Certificate of Incorporation provides that, unless the Company consents in writing to the selection of an alternative forum, (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, other employee, agent or stockholder of the Company to the Company or the Company's stockholders, or any claim for aiding and abetting such alleged breach, (iii) any action asserting a claim against the Company or any current or former director, officer, other employee, agent or stockholder of the Company (a) arising pursuant to any provision of the DGCL, the current amended and restated certificate of incorporation (as it may be amended or restated) or the Bylaws or (b) as to which the DGCL confers jurisdiction on the Delaware Court of Chancery or (iv) any action asserting a claim against the Company or any current or former director, officer, other employee, agent or stockholder of the Company governed by the internal affairs doctrine of the law of the State of Delaware shall, as to any action in the foregoing clauses (i) through (iv), to the fullest extent permitted by law, be solely and exclusively brought in the Delaware Court of Chancery; provided, however, that the foregoing shall not apply to any claim (a) as to which the Delaware Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Delaware Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), (b) which is vested in the exclusive jurisdiction of a court or forum other than the Delaware Court of Chancery, or (c) arising under federal securities laws, including the Securities Act as to which the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the sole and exclusive forum. Notwithstanding the foregoing, the provisions of Article XII of the current amended and restated certificate of incorporation will not apply to suits brought to enforce any liability or duty created by the Exchange Act, or any other claim for which the federal district courts of the United States of America shall be the sole and exclusive forum.

Any person or entity purchasing or otherwise acquiring any interest in any shares of the Company's capital stock shall be deemed to have notice of and to have consented to the forum provisions in the current amended and restated certificate of incorporation. If any action the subject matter of which is within the scope of the forum provisions is filed in a court other than a court located within the State of Delaware (a "foreign action") in the name of any stockholder, such stockholder shall be deemed to have consented to: (x) the personal jurisdiction of the state and federal courts located within the State of Delaware in connection with any action brought in any such court to enforce the forum provisions (an "enforcement action"); and (y) having service of process made upon such stockholder in any such enforcement action by service upon such stockholder's counsel in the foreign action as agent for such stockholder.

**Reasons for the Amendments**

These additional amendments to the Second Amended and Restated Certificate of Incorporation of New Lightning eMotors and the reasons for each of them are:

- Amending Article XI regarding the exclusive forum provision for certain lawsuits to clarify that for any action arising under the Securities Act, the Court of Chancery and the federal district court for the District of Delaware will have concurrent jurisdiction, and that the exclusive forum provision will not apply to any suits brought to enforce any liability or duty created by the Exchange Act, or any other claim for which the federal courts have exclusive jurisdiction.

198

**Table of Contents**

**Comparison of Current Amended and Restated Certificate of Incorporation to Proposed Second Amended and Restated Certificate of Incorporation**

The following table sets forth a summary of the changes proposed to be made between our current amended and restated certificate of incorporation and our proposed Second Amended and Restated Certificate of Incorporation. This summary is qualified by reference to the complete text of the proposed Second Amended and Restated Certificate of Incorporation, a copy of which is attached to this proxy statement as *Annex B*. Capitalized terms used in the summary set forth in the table below have the meaning set forth in the current amended and restated certificate of incorporation and the proposed Second Amended and Restated Certificate of Incorporation, as applicable.

| **ARTICLE XII** | The current amended and restated certificate of incorporation at *Article XII, Section 12.1* provides as follows: | The proposed certificate revises *Article XI, Section 11.1* as follows: |
|---|---|---|
| | *Section 12.1— Forum.* Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the DGCL or this Amended and Restated Certificate or the Bylaws, or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. | *Section 11.1— Forum.* Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the DGCL or this Amended and Restated Certificate or the Bylaws, or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel except any action (A) as to which the Court of Chancery in the State of Delaware determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), (B) which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, (C) for which the Court of Chancery does not have subject matter jurisdiction, or (D) any action arising under the Securities Act of 1933, as amended, as to which the Court of Chancery |

199

Table of Contents

and the federal district court for the District of Delaware shall have concurrent jurisdiction. Notwithstanding the foregoing, the provisions of this Section 11.1 will not apply to suits brought to enforce any liability or duty created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction.

**Vote Required for Approval**

The affirmative vote of holders of a majority of the outstanding shares of our Common Stock entitled to vote thereon at the Special Meeting is required to approve this Proposal No. 4B. Abstentions or the failure to vote on Proposal No. 4B will have the same effect as a vote "**AGAINST**" Proposal No. 4B.

This Proposal No. 4B is conditioned upon the approval and completion of the Business Combination Proposal. If the Business Combination Proposal is not approved, Proposal No. 4B will have no effect, even if approved by our stockholders.

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT
OUR STOCKHOLDERS VOTE "FOR" PROPOSAL NO. 4B.**

200

Table of Contents

PROPOSAL NO. 5—INCENTIVE PLAN PROPOSAL

**Overview**

In connection with the Business Combination, our Board recommends that the stockholders approve the Equity Incentive Plan. The following is a summary of certain terms and conditions of the Incentive Plan. This summary is qualified in its entirety by reference to the GigCapital3, Inc. 2021 Equity Incentive Plan, which is attached as *Annex H* to this prospectus/proxy statement. You are encouraged to read the entirety of the Incentive Plan.

**Summary of the Equity Incentive Plan**

The purpose of the Incentive Plan is to advance the interests of the Company and its stockholders by providing an incentive to attract, retain and reward persons for performing services and by motivating such persons to contribute to the growth and profitability of the Company and its subsidiaries following the closing of the Business Combination.

Approval of the Incentive Plan by the Company's stockholders is required, among other things, in order to: (i) comply with stock exchange listing rules requiring stockholder approval of equity compensation plans; and (ii) allow the grant of incentive stock options to employees under the Incentive Plan.

If this Incentive Plan Proposal is approved by the Company's stockholders, the Incentive Plan will become effective immediately as of the closing of the Business Combination. In the event that the Company's stockholders do not approve this Proposal, the Incentive Plan will not become effective. Approval of the Incentive Plan by the Company's stockholders will allow the post-combination company to grant restricted stock unit awards, stock options, stock appreciation rights or "SARs", restricted stock purchase rights, restricted stock bonuses, performance shares, performance units, cash-based awards and other stock-based awards at levels determined appropriate by the post-combination company's Board or the Board's compensation committee following the Closing of the Business Combination. The Incentive Plan will allow the post-combination company to utilize the foregoing types of equity and cash incentives in order to attract, retain and motivate employees, officers, directors, and consultants following the Closing of the Business Combination.

The post-combination company's employee equity compensation program, as implemented under the Incentive Plan, will allow the post-combination company to remain competitive with comparable companies in its industry by giving it resources to attract and retain talented individuals. Approval of the Incentive Plan will provide the post-combination company with flexibility to use equity compensation and other incentive awards to attract, retain and motivate talented employees, officers, directors, and consultants.

**Best Practices Integrated into the Post-Combination Company's Equity Compensation Program and the Incentive Plan**

The Incentive Plan includes provisions that are designed to protect the interests of the stockholders of the post-combination company following its effectiveness and to reflect corporate governance best practices including:

- Awards granted under the Incentive Plan will be subject to reduction, cancellation, forfeiture, or recoupment in accordance with any "clawback" policy or similar provisions required by applicable law, stock exchange listing standards, or policies adopted by the post-combination company, or as specified in a particular award agreement.

- No discounted stock options or stock appreciation rights. All stock options and stock appreciation rights granted under the Incentive Plan must have an exercise price not less than the fair market value

201

Table of Contents

of a share of Common Stock on the effective date the stock option or stock appreciation right is granted.

- Certain material amendments to the Incentive Plan require stockholder approval. The Incentive Plan requires stockholder approval of the following material revisions to the Incentive Plan: (a) an increase in the maximum aggregate number of shares of Common Stock that may be issued under the Incentive Plan (except by operation of the provisions of the Incentive Plan relating to changes in the post-combination company's capital structure), (b) a change in the class of persons eligible to receive incentive stock options, or (c) any other amendment that requires the approval of the post-combination company's stockholders under any applicable law, regulation, or rule, including any applicable stock exchange listing standards.

- Limit on non-employee director awards and other awards. The annual compensation awarded to any non-employee directors of the post-combination company during each calendar year, including both shares subject to stock awards granted under the Incentive Plan or otherwise and any cash fees paid to such non-employee director during any calendar year may not exceed $1 million in total value, or $2 million for the calendar year in which a non-employee director is first elected to the Board (calculating the value of any such stock awards based on the grant date fair market value of such stock awards for financial reporting purposes). Such limitation on non-employee director stock awards does not apply to any cash retainer fees, including cash retainer fees converted into equity awards at the election of the non-employee director, expense reimbursements, or distributions from any deferred compensation program applicable to the non-employee director.

**Information Regarding the Post-Combination Company's Equity Incentive Program**

It is critical to the post-combination company's long-term success that the interests of its employees, directors, officers, and consultants are tied to its success as "owners" of the business. Approval of the Incentive Plan will allow the post-combination company to grant restricted stock unit awards, stock options, stock appreciation rights, restricted stock purchase rights, restricted stock bonuses, performance shares, performance units, cash-based awards and other stock-based awards at levels determined appropriate by its post-combination company's Board or the Board's compensation committee following the Closing of the Business Combination in order to attract new employees, directors, officers, and consultants, retain existing employees, directors, officers, and consultants, and to motivate such persons to exert maximum efforts for the post-combination company's success. The Incentive Plan will allow the post-combination company to utilize these foregoing types of equity and cash incentive awards with flexibility to offer competitive equity compensation packages in order to retain and motivate the talent necessary for the post-combination company.

If the Company's proposal to approve the Incentive Plan is approved by the Company's stockholders, the post-combination company will reserve 10% of its fully-diluted capitalization following the Closing of the Business Combination available for grant under the Incentive Plan as of the effective time of the Closing of the Business Combination. This pool size is necessary to provide sufficient reserved shares for a level of grants that will attract, retain, and motivate employees and other participants under the Incentive Plan. Furthermore, if the Incentive Plan is approved by the Company's stockholders, the number of shares available for grant (other than incentive stock options) pursuant to the Incentive Plan will be subject to annual increases effective as of the first day of the post-combination company's fiscal year beginning in 2022 and the first day of each subsequent fiscal year through and including the first day of the post-combination company's fiscal year commencing in 2032 in an amount equal to the lesser of (i) 5% of the number of shares of the Common Stock outstanding as of the post-combination company's immediately preceding fiscal year or (ii) such amount, if any, as the Board may determine.

202

Table of Contents

**Description of the Incentive Plan**

The material features of the Incentive Plan are described below. The following description of the Incentive Plan is a summary only and is qualified in its entirety by reference to the complete text of the Incentive Plan. Stockholders are urged to read the actual text of the Incentive Plan in its entirety.

*Purpose*

The purpose of the Incentive Plan is to advance the interests of the Company and its stockholders by providing an incentive to attract, retain and reward persons for performing services and by motivating such persons to contribute to the growth and profitability of the Company and its subsidiaries.

*Types of Awards*

The terms of the Incentive Plan provide for the grant of restricted stock unit awards, incentive stock options (within the meaning of Section 422 of the Code), nonstatutory stock options, SARs, restricted stock awards, restricted stock units awards, performance units, performance shares, cash-based awards, and other stock-based awards.

*Shares Available for Awards*

Subject to adjustment for specified changes in the post-combination company's capitalization as set forth in the Incentive Plan, the maximum aggregate number of shares of Common Stock that may be issued under the Incentive Plan will be equal to (1) 10% of the fully-diluted capitalization of the post-combination company following the Closing of the Business Combination, plus (2) except with respect to awards of incentive stock options, annual increases effective as of the first day of the post-combination company's fiscal year beginning in 2022 and the first day of each subsequent fiscal year through and including the first day of the post-combination company's fiscal year commencing in 2032 in an amount equal to the lesser of (i) 5% of the number of shares of the Common Stock outstanding as of the post-combination company's immediately preceding fiscal year or (ii) such amount, if any, as the Board may determine. Subject to compliance with the requirements of Section 409A of the Code and any other applicable provisions of the Code and regulations thereunder, and with other applicable law or requirements (including applicable stock exchange requirements), the post-combination company's Board or the Board's compensation committee may authorize the issuance or assumption of benefits under the Incentive Plan in connection with any merger, consolidation, acquisition of property or stock, or reorganization upon such terms and conditions as it may deem appropriate without affecting the number of shares of Common Stock reserved or available for awards under the Plan. In addition, subject to compliance with applicable laws, and stock exchange listing requirements, shares available for grant under a stockholder approved plan of an acquired company (as appropriately adjusted to reflect the transaction) may be used for awards under the Incentive Plan to individuals who were not employees or directors of the post-combination company or a parent or subsidiary of the post-combination company prior to the transaction and will not reduce the number of shares otherwise available for issuance under the Incentive Plan.

Shares issued under the Incentive Plan will consist of authorized but unissued or reacquired shares of Common Stock. No fractional shares of Common Stock will be delivered under the Incentive Plan.

The following shares of Common Stock will become available again for issuance under the Incentive Plan: (i) any shares subject to a stock award that are not issued because such stock award expired or was canceled or terminated without all of the shares covered by such stock award having been exercised or settled in full; (ii) any shares subject to any portion of a stock award that is settled in cash; (iii) any shares issued pursuant to a stock award that are forfeited back to or repurchased for an amount not greater than the award's purchase price by the post-combination company; (iv) any shares reacquired by the post-combination company or withheld in satisfaction of tax withholding obligations on a stock award; and (v) any shares reacquired by the post-combination company or withheld as consideration for the exercise price of a stock option.

203

Table of Contents

*Non-Employee Director Compensation Limit*

Under the Incentive Plan, the annual compensation awarded to any non-employee directors of the post-combination company during each calendar year, including both shares subject to stock awards granted under the Incentive Plan or otherwise and any cash fees paid to such non-employee director during any calendar year may not exceed $1 million in total value, or $2 million for the calendar year in which a non-employee director is first elected to the Board (calculating the value of any such stock awards based on the grant date fair market value of such stock awards for financial reporting purposes). Such limitation on non-employee director stock awards does not apply to any cash retainer fees, including cash retainer fees converted into equity awards at the election of the non-employee director, expense reimbursements, or distributions from any deferred compensation program applicable to the non-employee director.

*Administration*

The Incentive Plan will be concurrently administered by the Board or the Board's compensation committee. The Board and the Board's compensation committee may each be considered to be a "*Plan Administrator*" for purposes of this Equity Incentive Plan Proposal. Subject to the terms of the Incentive Plan, the Plan Administrator has full and final power and authority to make all determinations and take all actions with respect to the Incentive Plan or any award as Plan Administrator may deem advisable to the extent not inconsistent with the provisions of the Incentive Plan or applicable law, including: determine the recipients of awards, the types of awards to be granted, the number of shares of Common Stock subject to or the cash value of awards, the terms and conditions of awards granted, and the criteria to be satisfied by participants as a condition to receipt of performance awards under the Incentive Plan, including the period of their exercisability and vesting. The Plan Administrator also has the authority to provide for accelerated exercisability and vesting of awards. Subject to the limitations set forth below, the Plan Administrator also determines the fair market value applicable to a stock award and the exercise price of stock options and stock appreciation rights granted under the Incentive Plan.

*Amendment and Termination*

The Plan Administrator may at any time amend the Incentive Plan or any outstanding award and may at any time terminate or suspend the Incentive Plan as to future grants of awards, provided that the Plan Administrator may not, without the affected award recipient's consent, alter the terms of the Plan so as to materially adversely affect a participant's rights under an award without the consent of the Participant. Consistent with any applicable law, regulation or rule, including the rules of any stock exchange, the Incentive Plan requires stockholder approval of certain material revisions to the Incentive Plan, including: (a) an increase in the maximum aggregate number of shares of Common Stock that may be issued under the Incentive Plan (except by operation of the provisions of the Incentive Plan relating to changes in the post-combination company's capital structure), (b) a change in the class of persons eligible to receive incentive stock options, or (c) or as otherwise required by applicable law, regulation, or rule. No awards may be made under the Incentive Plan following the ten year anniversary of the earlier of the date that the board of directors or the stockholders approve the Incentive Plan, but previously granted awards may continue in accordance with their terms beyond that date unless earlier terminated by the Plan Administrator.

*Eligibility*

All of the post-combination company's (including its affiliates) employees, non-employee directors, officers, and consultants will be eligible to participate in the Incentive Plan following the Closing of the Business Combination and may receive all types of awards other than incentive stock options. Incentive stock options may be granted under the Incentive Plan only to the post-combination company's employees (including officers) and employees of its parent and subsidiary corporations (as determined in accordance with Section 422 and Section 424 of the Code).

Table of Contents

***Terms and Conditions of Awards***

***All Awards***

Generally, the Plan Administrator will determine the terms of all awards under the Plan, including the vesting and acceleration of vesting of awards, provisions for the withholding of taxes, and payment of amounts in lieu of cash dividends or other cash distributions with respect to the post-combination company's Common Stock subject to awards.

***Awards Requiring Exercise***

Incentive stock options and, except as provided in the award agreement, nonqualified stock options, may not be transferred other than by will or the laws of descent and distribution, and during an employee's lifetime may be exercised only by the employee or the employee's guardian or legal representative. Upon the cessation of a participant's employment with the post-combination company, an award requiring exercise will cease to be exercisable and will terminate and all other unvested awards will be forfeited, except that:

- All stock options and SARs held by the participant which were exercisable immediately prior to the participant's termination of service with the post-combination company other than for Cause (as defined in the Incentive Plan) will, except as otherwise set forth in the option award agreement, remain exercisable for the lesser of (i) three months or (ii) the period ending on the latest date such stock option or SAR could have been exercised;

- All stock options and SARs held by the participant which were exercisable immediately prior to the participant's termination of service with the post-combination company due to death will remain exercisable for the lesser of (i) the one year period ending with the first anniversary of the participant's termination or (ii) the period ending on the latest date on which such stock option or SAR could have been exercised (provided that a participant's service will be deemed to have terminated due to death if the participant dies within three (3) months (or such other period provided by the participant's award agreement) after the participant's termination of service); and

- All stock options and SARs held by a participant which were exercisable immediately prior to the participant's termination of service with the post-combination company due to Disability (as defined in the Incentive Plan) will remain exercisable for the lesser of (i) the one year period ending with the first anniversary of the participant's termination or (ii) the period ending on the latest date on which such stock option or SAR could have been exercised.

The exercise price (or base value from which appreciation is to be measured) of each award requiring exercise will be 100% of the fair market value of the Common Stock subject to such award, as determined on the effective date of the grant, or such higher amount as the Plan Administrator may determine; provided that incentive stock options granted to participants who own stock of the post-combination company possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the post-combination company or any parent corporation, subsidiary corporation or affiliate of the post-combination company (a "*Ten Percent Holder*") must have an exercise price per share not less than 110% of the fair market value of a share of Common Stock on the effective date the incentive stock option is granted. Fair market value will be determined by the Plan Administrator consistent with the applicable requirements of Section 409A of the Code.

Awards requiring exercise will have a maximum term not to exceed ten years from the date of grant. Incentive stock options granted to a Ten Percent Holder will have a maximum term not to exceed five years from the date of grant.

***Effect of a Change in Control***

In the event of a "Change in Control" as described in the Incentive Plan, the acquiring or successor entity may assume or continue all or any awards outstanding under the Incentive Plan or substitute substantially

205

equivalent awards. Any awards that are not assumed or continued in connection with a Change in Control or are not exercised or settled prior to the Change in Control will terminate effective as of the time of the Change in Control. The Plan Administrator may provide for the acceleration of vesting of any or all outstanding awards upon such terms and to such extent as it determines, except that the vesting of all awards held by members of the board of directors who are not employees will automatically be accelerated in full. The Incentive Plan also authorizes the Plan Administrator, in its discretion and without the consent of any participant, to cancel each or any outstanding award denominated in shares of Common Stock upon a Change in Control in exchange for a payment to the participant with respect to each share subject to the canceled award of an amount equal to the excess of the consideration to be paid per share of Common Stock of the post-combination company in the Change in Control transaction over the exercise price per share, if any, under the award.

The Incentive Plan defines a "Change in Control" to include (a) a "person" (other than certain persons specified by the Incentive Plan) becoming the direct or indirect "beneficial owner" of more than 50% of the total fair market value or combined voting power of the post-combination company's then outstanding securities entitled to vote in the election of directors; (b) stockholder approval of a plan of liquidation or dissolution of the post-combination company; or (c) the occurrence of any of the following events upon which the stockholders of the post-combination company immediately before the event do not retain immediately after the event direct or indirect beneficial ownership of more than 50% of the combined voting power of outstanding securities entitled to vote in the election of directors of the post-combination company, its successor or the entity to which the assets of the post-combination company were transferred: (i) a sale or exchange by the stockholders in a single or series of related transactions of more than 50% of the post-combination company's voting stock, (ii) a merger or consolidation to which the post-combination company is a party, or (iii) the sale, exchange or transfer of all or substantially all of the assets of the post-combination company (other than a sale, exchange or transfer to one or more subsidiaries of the post-combination company).

However, in certain instances, the term "Change in Control" may be given a more limited meaning. If an amount treated as nonqualified deferred compensation within the meaning of Section 409A of the Code would become payable under the Plan upon, or on a date specified in relation to, a change in control event, that event must qualify as a change in the ownership or effective control of the post-combination company or in the ownership of a substantial portion of the assets of the post-combination company within the meaning of Section 409A.

### Changes in and Distributions with Respect to Company Common Stock

In the event of a merger, consolidation, reorganization, reincorporation, recapitalization, reclassification, stock dividend, stock split, reverse stock split, split-up, split-off, spin-off, combination of shares, exchange of shares or similar change affecting the post-combination company's Common Stock, or in the event of payment of a dividend or distribution to the stockholders of the post-combination company in a form other than Common Stock (excepting regular, periodic cash dividends) that has a material effect on the fair market value of shares of our stock, the Plan Administrator will make appropriate adjustments to the maximum number of shares that may be delivered under the Incentive Plan, to the maximum number of shares that may be issued upon the exercise of incentive stock options, to the maximum number of shares that may be issued with respect to stock options that are not incentive stock options, and will also make appropriate adjustments to the number and kind of shares of stock or securities subject to awards then outstanding or subsequently granted, and to any exercise price or purchase price relating to awards in order to prevent dilution or enlargement of participants' rights under the Incentive Plan.

### Effect of Section 280G and Section 4999 of the Code in Connection with a Change in Control

If any acceleration of vesting pursuant to an award granted under the Incentive Plan and any other payment or benefit received or to be received by a participant in the Incentive Plan would subject the participant to any excise tax pursuant to Section 4999 of the Code due to the characterization of such acceleration of vesting,

206

Table of Contents

payment or benefit as an "excess parachute payment" under Section 280G of the Code, then, provided such election would not subject the Participant to taxation under Section 409A, the participant may elect to reduce the amount of any acceleration of vesting called for under the award in order to avoid such characterization.

### Clawback Policy

The Plan Administrator may specify in any award agreement that an award granted under the Incentive Plan and the participant's rights, payments, and benefits with respect to such award will be subject to reduction, cancellation, forfeiture, or recoupment upon the occurrence of specified events, in addition to any otherwise applicable vesting or performance conditions of the award. Such events may include, but are not limited to, termination of the participant's service for Cause (within the meaning of the Incentive Plan) or any act by the participant, whether before or after termination of service, that would constitute Cause for termination of service, or any accounting restatement due to material noncompliance of the post-combination company with any financial reporting requirements of securities laws as a result of which, and to the extent that, such reduction, cancellation, forfeiture, or recoupment is required by applicable securities laws. In addition, to the extent that clawback or similar provisions applicable to awards are required by applicable law, stock exchange listing standards, or policies adopted by the post-combination company, awards granted under the Incentive Plan will be subject to such provisions.

If the post-combination company is required to prepare an accounting restatement due to the material noncompliance of the post-combination company, as a result of misconduct, with any financial reporting requirement under the securities laws, any participant who knowingly or through gross negligence engaged in the misconduct, or who knowingly or through gross negligence failed to prevent the misconduct, and any participant who is one of the individuals subject to automatic forfeiture under Section 304 of the Sarbanes-Oxley Act of 2002, will reimburse the post-combination company for (i) the amount of any payment in settlement of an award received by such participant during the 12-month period following the first public issuance or filing with the United States Securities and Exchange Commission (whichever first occurred) of the financial document embodying such financial reporting requirement, and (ii) any profits realized by such participant from the sale of securities of the post-combination company during such 12-month period.

### U.S. Federal Income Tax Consequences

**The following is a general summary of the material U.S. federal income tax consequences of the grant, exercise and vesting of awards under the Incentive Plan and the disposition of shares acquired pursuant to the exercise or settlement of such awards and is intended to reflect the current provisions of the Code and the regulations thereunder. This summary is not intended to be a complete statement of applicable law, nor does it address foreign, state, local or payroll tax considerations. This summary further assumes that all awards described in the summary are exempt from, or comply with, the requirement of Section 409A of the Code. Moreover, the U.S. federal income tax consequences to any particular participant may differ from those described herein by reason of, among other things, the particular circumstances of such participant.**

*Stock Options.* Holders of incentive stock options will generally incur no federal income tax liability at the time of grant or upon vesting or exercise of those options. However, the spread at exercise may give rise to "alternative minimum tax" liability for the taxable year in which the exercise occurs. If the holder does not dispose of the shares before the later of two years following the date of grant and one year following the date of exercise, the difference between the exercise price and the amount realized upon disposition of the shares will constitute long-term capital gain or loss, as the case may be. Assuming the holding period is satisfied, no deduction will be allowed to us for federal income tax purposes in connection with the grant or exercise of the incentive stock option or the disposition of the shares acquired on exercise of the option. If, within two years following the date of grant or within one year following the date of exercise, the holder of shares acquired through the exercise of an incentive stock option disposes of those shares, the participant will generally realize

207

Table of Contents

taxable compensation at the time of such disposition equal to the difference between the exercise price and the lesser of the fair market value of the share on the date of exercise or the amount realized on the subsequent disposition of the shares, and that amount will generally be deductible by us for federal income tax purposes, subject to the possible limitations on deductibility under Sections 280G and 162(m) of the Code for compensation paid to individuals designated in those Sections. Finally, if incentive stock options (granted under all stock plans of the post-combination company and its parent and subsidiary corporations, including the Incentive Plan) first become exercisable by a participant in any one year for shares having an aggregate value in excess of $100,000 (based on the grant date value), the portion of the incentive stock options in respect of those excess shares will be treated as non-qualified stock options for federal income tax purposes.

No income will be realized by a participant upon grant or vesting of an option that does not qualify as an incentive stock option (a "*non-qualified stock option*"). Upon the exercise of a non-qualified stock option, the participant will recognize ordinary compensation income in an amount equal to the excess, if any, of the fair market value of the underlying exercised shares over the option exercise price paid at the time of exercise, and the participant's tax basis will equal the sum of the compensation income recognized and the exercise price. We will be able to deduct this same excess amount for U.S. federal income tax purposes, but such deduction may be limited under Sections 280G and 162(m) of the Code for compensation paid to certain individuals designated in those Sections. In the event of a sale of shares received upon the exercise of a non-qualified stock option, any appreciation or depreciation after the exercise date generally will be taxed as capital gain or loss and will be long-term gain or loss if the holding period for such shares is more than one year.

*SARs.* No income will be realized by a participant upon grant or vesting of a SAR. Upon the exercise of a SAR, the participant will recognize ordinary compensation income in an amount equal to the fair market value of the payment received in respect of the SAR. We will be able to deduct this same amount for U.S. federal income tax purposes, but such deduction may be limited under Sections 280G and 162(m) of the Code for compensation paid to certain individuals designated in those Sections.

*Restricted Stock.* A participant will not be subject to tax upon the grant of an award of restricted stock unless the participant otherwise elects to be taxed at the time of grant pursuant to Section 83(b) of the Code. On the date an award of restricted stock becomes transferable or is no longer subject to a substantial risk of forfeiture (*i.e.*, the vesting date), the participant will have taxable compensation equal to the difference between the fair market value of the shares on that date over the amount the participant paid for such shares, if any, unless the participant made an election under Section 83(b) of the Code to be taxed at the time of grant. If the participant made an election under Section 83(b), the participant will have taxable compensation at the time of grant equal to the difference between the fair market value of the shares on the date of grant over the amount the participant paid for such shares, if any. If the election is made, the participant will not be allowed a deduction for restricted stock forfeited subsequently required to be returned to us. (Special rules apply to the receipt and disposition of restricted shares received by officers and directors who are subject to Section 16(b) of the Exchange Act.) We will be able to deduct, at the same time as it is recognized by the participant, the amount of taxable compensation to the participant for U.S. federal income tax purposes, but such deduction may be limited under Sections 280G and 162(m) of the Code for compensation paid to certain individuals designated in those Sections.

*Restricted Stock Units.* A participant will not be subject to tax upon the grant or vesting of a restricted stock unit award. Rather, upon the delivery of shares or cash pursuant to a restricted stock unit award, the participant will have taxable compensation equal to the fair market value of the number of shares (or the amount of cash) the participant actually receives with respect to the award. We will be able to deduct the amount of taxable compensation to the participant for U.S. federal income tax purposes, but the deduction may be limited under Sections 280G and 162(m) of the Code for compensation paid to certain individuals designated in those Sections.

**New Incentive Plan Benefits**

Grants under the Incentive Plan will be made at the discretion of the compensation committee of the post-combination company. Any grants under the Incentive Plan are not yet determinable, however, it is expected that

208

Table of Contents

grants will be made, including to individuals who will be directors and executive officers of the post-combination company. Any such grants would be made in accordance with the executive compensation program discussed in the section entitled "*Management After the Business Combination—Post-Combination Company Executive Compensation—Compensation Philosophy and Objectives Following the Business Combination*", including the recommendations of management relating thereto. The value of the awards granted under the Incentive Plan will depend on a number of factors, including the fair market value of the Common Stock on future dates, the exercise decisions made by the participants and the extent to which any applicable performance goals necessary for vesting or payment are achieved.

**Effective Date; Term**

If this Incentive Plan Proposal is approved by the Company's stockholders, the Incentive Plan will be effective immediately upon the closing of the Business Combination. No award will be granted under the Incentive Plan on or after the tenth anniversary of the earlier of the Incentive Plan being approved by the board of directors or the stockholders. Any award outstanding under the Incentive Plan at the time of termination will remain in effect until such award is exercised or has expired in accordance with its terms.

**Vote Required for Approval**

Approval of this proposal requires the affirmative vote of a majority of the votes cast by the stockholders present in person or represented by proxy and entitled to vote at the Special Meeting. Accordingly, under Delaware law, a Company stockholder's failure to vote, as well as an abstention and broker non-vote, will have no effect on the Incentive Plan Proposal. For purposes of NYSE rules, however, abstentions are treated as "votes cast" and will be counted as votes **"AGAINST"** this proposal. Abstentions will be counted in connection with the determination of whether a valid quorum is established.

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" PROPOSAL NO. 5.**

The existence of financial and personal interests of one or more of the Company's directors or officers may result in a conflict of interest on the part of such director(s) or officer(s) between what he or they may believe is in the best interests of the Company and its stockholders and what he or they may believe is best for himself or themselves in determining to recommend that stockholders vote for the proposals. See the section above entitled "*Proposal No. 1 - Approval of the Business Combination - Interests of Certain Persons in the Transactions*" for a further discussion.

209

Table of Contents

**PROPOSAL NO. 6 — THE ELECTION OF DIRECTORS PROPOSAL**

**Overview**

Pursuant to the Company's current amended and restated certificate of incorporation, the GigCapital3 Board is currently divided into three classes, Class I, Class II and Class III with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. The proposed Second Amended and Restated Certificate of Incorporation provides that the authorized number of directors will be fixed in the manner as provided in the bylaws of GigCapital3, which bylaws are to provide for a classified board with three terms pursuant to the Business Combination Agreement.

Pursuant to the Business Combination Agreement, at the Closing Date, our board of directors will consist of Robert Fenwick-Smith, Dr. Avi Katz, Timothy Reeser, Dr. Raluca Dinu, Thaddeus Senko, Neil Miotto, Meghan Sharp and two other individuals to be nominated in writing unanimously by the above-named individuals. Thaddeus Senko, Neil Miotto and Bruce Coventry are being nominated to serve as Class I directors; Timothy Reeser, Dr. Raluca Dinu and Meghan Sharp are being nominated to serve as Class II directors and Robert Fenwick-Smith, Dr. Avi Katz and Diana Tremblay are being nominated to serve as Class III directors.

Information regarding each nominee is set forth in the section entitled "*Management After the Business Combination.*"

**Vote Required for Approval**

The Election of Directors Proposal is conditioned on the approval of the Business Combination Proposal and the NYSE Stock Issuance Proposal at the special meeting.

If a quorum is present, directors are elected by a plurality of the votes cast, in person online or by proxy. This means that the nine nominees will be elected if they receive more affirmative votes than any other nominee for the same position. Votes marked "**FOR**" a nominee will be counted in favor of that nominee. Proxies will have full discretion to cast votes for other persons in the event any nominee is unable to serve. Failure to vote by proxy or to vote in person online at the special meeting and broker non-votes will have no effect on the vote since a plurality of the votes cast is required for the election of each nominee.

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" PROPOSAL NO. 6.**

210

Table of Contents

**PROPOSAL NO. 7—THE ADJOURNMENT PROPOSAL**

**Overview**

The Adjournment Proposal, if adopted, will allow our Board to adjourn the Special Meeting to a later date or dates to permit further solicitation of proxies. The Adjournment Proposal will only be presented to our stockholders in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal, but no other proposal if the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal are approved.

**Consequences if the Adjournment Proposal is Not Approved**

If the Adjournment Proposal is not approved by our stockholders, our Board may not be able to adjourn the Special Meeting to a later date in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal, the Election of Directors Proposal or any other proposal.

**Vote Required for Approval**

The approval of the Adjournment Proposal requires the affirmative vote of a majority of the votes cast by the stockholders present in person or represented by proxy and entitled to vote at the Special Meeting. Accordingly, a Company stockholder's failure to vote, as well as an abstention from voting and a broker non-vote, will have no effect on the Adjournment Proposal. Abstentions will be counted in connection with the determination of whether a valid quorum is established but will have no effect on the Adjournment Proposal.

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE ADJOURNMENT PROPOSAL.**

The existence of financial and personal interests of one or more of the Company's directors or officers may result in a conflict of interest on the part of such director(s) or officer(s) between what he or they may believe is in the best interests of the Company and its stockholders and what he or they may believe is best for himself or themselves in determining to recommend that stockholders vote for the proposals. See the section above entitled "*Proposal No. 1 - Approval of the Business Combination - Interests of Certain Persons in the Transactions*" for a further discussion.

211

**Table of Contents**

**INFORMATION ABOUT THE COMPANY PRIOR TO THE BUSINESS COMBINATION**

**Overview**

The Company is a Private-to-Public Equity (PPE) company, also known as a blank check company or a special purpose acquisition company, incorporated as a Delaware corporation on February 3, 2020 and formed for the purpose of acquiring, through a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, recapitalization, exchangeable share transaction or other similar business transaction with one or more operating businesses or assets.

"Private-to-Public Equity (PPE)" is a trademark of an affiliate of the Company, GigFounders, LLC, used pursuant to agreement.

**Significant Activities Since Inception**

The registration statement for the Company's IPO was declared effective on May 13, 2020. On May 18, 2020, the Company consummated its IPO of 20,000,000 units at a price of $10.00 per unit, generating gross proceeds of $200,000,000. Each unit consists of one share of Common Stock and three-fourths of one warrant to purchase one share of Common Stock upon the completion of an initial Business Combination, which would be triggered by the Business Combination. Each public warrant is exercisable for one share of Common Stock at a price of $11.50 per full share.

Prior to the sale of the public units in the IPO, the Company consummated a private placement of 893,479 private placement units at a price of $10.00 per unit in a private placement that occurred simultaneously with the completion of the initial closing of our IPO. Each private placement unit consists of one share of Common Stock and three-fourths of one warrant to purchase one share of Common Stock upon the completion of an initial Business Combination. Warrants will be exercisable for $11.50 per full share, and the exercise price of the warrants may be adjusted in certain circumstances as described our financial statements. Unlike the warrants included in the units sold in our IPO, if held by the original holder or its permitted transferees, the warrants included in the private placement units are not redeemable by us and subject to certain limited exceptions, will be subject to transfer restrictions until one year following the consummation of the initial business combination. If the warrants included in the private placement units are held by holders other than the initial holders or their permitted transferees, the warrants included in the private placement units will be redeemable by us and exercisable by holders on the same basis as the warrants included in our IPO.

In connection with the Company's IPO, the underwriters were granted an option to purchase up to an additional 3,000,000 additional public units ("*Over-Allotment Units*") solely to cover over-allotments, if any, at an offering price of $10.00 per Over-Allotment Unit. On June 27, 2020, the underwriters' over-allotment option expired.

On December 10, 2020, the Company entered into the Business Combination Agreement, by and among the Company, Merger Sub and Lightning Systems. Pursuant to the Business Combination Agreement, Lightning Systems will become a wholly-owned subsidiary of the Company as a result of the Company's wholly owned subsidiary, Merger Sub merger with and into Lightning Systems, with Lightning Systems surviving the merger, please see the section entitled "*Proposal No. 1—Approval of the Business Combination*." A copy of the Business Combination Agreement is attached to this proxy statement/prospectus as *Annex A*.

The Company's public units began trading on the NYSE under the symbol "GIK.U" on May 14, 2020. On June 29, 2020, the Company announced that the holders of the Company's units may elect to separately trade the securities underlying such units as of July 2, 2020. On July 2, 2020, the Company's shares of Common Stock and public warrants began trading on the NYSE under the symbols "GIX" and "GIX.WS," respectively. No fractional warrants were issued upon separation of the units and only whole warrants trade. Each warrant entitles

212

Table of Contents

the holder to purchase one common share at a price of $11.50. Warrants may only be exercised for whole shares and will become exercisable on the later of 30 days after the completion of the Company's initial business combination or May 18, 2020. The Company's warrants expire five years after the completion of the Business Combination or earlier upon redemption or liquidation the Company's prospectus.

**Initial Business Combination**

Under NYSE rules, an initial business combination must occur with one or more target businesses that together have a fair market value of at least 80% of the Company's assets held in the Trust Account (excluding taxes payable on the income earned on the Trust Account) at the time of the agreement to enter into the initial business combination. The fair market value of the target or targets must be determined by the Company's Board based upon one or more standards generally accepted by the financial community, such as discounted cash flow valuation or value of comparable businesses. Subject to this requirement, the Company's management has had virtually unrestricted flexibility in identifying and selecting one or more prospective target businesses, although the Company was not permitted to effectuate an initial business combination with another blank check company or a similar company with nominal operations. In any case, the Company determined that it would only complete an initial business combination in which it acquired 50% or more of the outstanding voting securities of the target or were otherwise not required to register as an investment company under the Investment Company Act.

**Redemption Rights for Holders of Public Shares**

As of December 31, 2020, the amount in the Trust Account is approximately $10.10 per public share. The Initial Stockholders have agreed to waive their Redemption Rights with respect to any Common Stock they may hold (other than any public shares, in the case of Cowen Investments) in connection with the consummation of the Business Combination. The Initial Stockholder Shares will be excluded from the pro rata calculation used to determine the per-share redemption price.

Holders of outstanding units must separate the underlying public shares and public warrants prior to exercising Redemption Rights with respect to the public shares. For more information about how to separate the underlying public shares from units, see the section titled "*Special Meeting of Company Stockholders—Redemption Rights*."

**Limitations on Redemption Rights**

Notwithstanding the foregoing the Company's current amended and restated certificate of incorporation provides that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13d-3 of the Exchange Act), will be restricted from seeking redemptions with respect to more than an aggregate of 15% of the public shares.

**Submission of Our Initial Business Combination to a Stockholder Vote**

The Special Meeting of our stockholders to which this proxy statement/prospectus relates is to solicit your approval of the Business Combination. Unlike many other blank check companies, our public stockholders are not required to vote against the Business Combination in order to exercise their redemption rights. If the Business Combination is not completed, then public stockholders electing to exercise their redemption rights will not be entitled to receive such payments. Our Initial Stockholders, including our Sponsor, have agreed to vote any shares of common stock owned by them in favor of the Business Combination.

**Employees**

The Company has two executive officers. These individuals are not obligated to devote any specific number of hours to the Company's matters but they intend to devote as much of their time as they deem

213

Table of Contents

necessary to the Company's affairs until the Company has completed its initial business combination. The amount of time the Company's officers devote in any time period varies based on the stage the Company is in with respect to the business combination. The Company does not intend to have any full time employees prior to the consummation of an initial business combination, which would be the Business Combination is completed.

**Managements**

*Directors and Officers*

The directors and officers of the Company are as follow as of December 31, 2020:

| Name | Age | Position |
| --- | --- | --- |
| Dr. Avi S. Katz | 62 | Executive Chairman of the Board of Directors, Secretary, President and Chief Executive Officer |
| Brad Weightman | 66 | Chief Financial Officer |
| Neil Miotto | 74 | Director |
| John Mikulsky | 75 | Director |
| Dr. Raluca Dinu | 47 | Director |
| Andrea Betti-Berutto | 56 | Director |
| Peter Wang | 64 | Director |

**Dr. Avi S. Katz** has served as our Executive Chairman of our Board of Directors, Chief Executive Officer, President and Secretary since February 2020. Dr. Katz has spent approximately 33 years in international executive positions within the TMT industry working for privately held start-ups, middle-cap companies and large enterprises. In these roles, Dr. Katz has been instrumental in launching and accelerating entities, building teams, large scale fund-raising, developing key alliances and technology partnerships, M&A activities, business development, financial management, global operations and sales and marketing. In October 2017, Dr. Katz founded GIG1, a Private-to-Public Equity (PPE) company formed for the purpose of acquiring a company in the technology industry. GIG1 completed its initial public offering in December 2017, in which it sold 14,375,000 units at price of $10.00 per unit, with each unit consisting of one share of GIG1 common stock, three-fourths of one warrant to purchase one share of GIG1 common stock and one right to receive one-tenth of one share of GIG1 common stock, generating aggregate proceeds of $143,750,000, and, at that time, was listed on the NYSE under the symbol "GIG." On February 22, 2019, after intensive screening of more than 400 companies worldwide, GIG1 entered into a stock purchase agreement to acquire Kaleyra at a transaction enterprise value of $187 million with combined cash and/or promissory note consideration of $15 million. Kaleyra is a global company specialized in providing mobile messaging services for financial institutions and companies of all sizes. The transaction closed on November 25, 2019, and GIG1 was renamed Kaleyra, Inc. and listed on the NYSE American stock exchange under the symbol "KLR" at that time. Dr. Katz has served as the Executive Chairman and Secretary of Kaleyra, Inc. since the consummation of the transaction in November 2019. Prior to that time, in addition to being the Executive Chairman and Secretary, he was also the Chief Executive Officer of GIG1. In March 2019, Dr. Katz founded GIG2. GIG2 completed its initial public offering in Junes 2019, in which it sold 17,250,000 units at a per unit price of $10.00, with each unit consisting of one share of GIG2 common stock, one warrant to purchase one share of GIG2 common stock, and one right to receive one-twentieth of one share of GIG2 common stock, generating aggregate proceeds of $172,500,000. GIG2 is listed on the NYSE under the symbol "GIX." GIG2 is engaged in intensive efforts of searching and screening companies worldwide, and has not yet completed its initial business combination. Dr. Katz serves as the Executive Chairman and Secretary of GIG2. Dr. Katz is also the sole managing member of GigFounders, LLC and a managing member of GigManagement, LLC. He is also the co-founder of Cognizer, a software company specializing in deep-learning powered natural language artificial intelligence, and was the Executive Chairman of Cognizer's board of directors from its inception in December 2018 until August 2020. Prior to GIG1 and GIG2, Dr. Katz dedicated 10 years to bootstrap, develop and manage GigPeak (NYSE American: formerly GIG), originally known as GigOptix, Inc. He served as Chairman of the Board, Chief Executive Officer and President of GigPeak. From its

214

Table of Contents

inception in 2007, which occurred through the acquisition of assets valued at less than $1 million, until its sale in April 2017 to IDT for $250 million in cash, GigPeak provided semiconductor integrated circuits (ICs) and software solutions for high-speed connectivity and video compression. While Dr. Katz was at GigPeak's helm, the company completed 10 M&A deals. From 2003 to 2005, Dr. Katz was the chief executive officer, president, and member of the board of directors of Intransa, Inc., which at the time provided full-featured, enterprise-class IP-based Storage Area Networks (SAN). From 2000 to 2003, Dr. Katz was the Chief Executive Officer and a member of the board of directors of Equator Technologies, which at the time sought to commercialize leading edge programmable media processing platform technology for the rapid design and deployment of digital media and imaging products. Equator Technologies was sold to Pixelworks, Inc. for $110 million in 2005. Dr. Katz has held several leadership positions over the span of his career within the technology industry since serving as Member of Technical Staff at AT&T Bell Laboratories in the 1980s, and has made numerous angel investments in high-tech companies around the world. Dr. Katz is a graduate of the Israeli Naval Academy and holds a B.Sc. and Ph.D. in Semiconductors Materials from the Technion (Israel Institute of Technology). He is a serial entrepreneur, holds many U.S. and international patents, has published many technical papers and is the editor of a number of technical books. Dr. Katz is married to Dr. Dinu, one of our directors.

**Brad Weightman** has served as our Chief Financial Officer since February 2020. Mr. Weightman has more than 30 years of global finance and accounting experience with a combination of large, mid-sized, and small public and private companies in the semiconductor, internet of things, hardware and software industries. Mr. Weightman has been the Chief Financial Officer of GIG2 since August 2019, and was also the Chief Financial Officer of GIG1 from that time until the closing of its business combination with Kaleyra, Inc. on November 25, 2019. Before then, beginning in April 2017, Mr. Weightman was Senior Business Controller at IDT, providing strategic and financial support for the General Manager and the division, prior to IDTI being acquired by Renesas Electronics Corp (TSE 6723:JP) in April 2019. Prior to GigPeak being acquired by IDT in April 2017, Mr. Weightman was Corporate Controller at GigPeak from September 2015 to April 2017. Before joining GigPeak, Mr. Weightman was self-employed as a financial consultant in 2015. Additionally, Mr. Weightman has held various finance and accounting positions at Echelon Corporation, an early developer of the internet of things market, supporting company growth from early stages to a mid-sized public company, as well as large corporations such as Advanced Micro Devices, Inc. and Xerox Holdings Corporation. Mr. Weightman received a Bachelor of Science degree in Accounting from San Jose State University, and is a Certified Public Accountant in California (inactive).

**Neil Miotto** joined the Board of Directors in February 2020. Mr. Miotto is a financial consultant and a retired assurance partner of KPMG LLP ("KPMG"), where he was a partner for 27 years until his retirement in September 2006. Since his retirement from KPMG, Mr. Miotto has provided high-level financial consulting services to companies in need of timely accounting assistance and has served on public company boards. He is deemed to be a "audit committee financial expert" under SEC rules. While at KPMG, Mr. Miotto focused on serving large public companies. Mr. Miotto also served as an SEC reviewing partner while at KPMG. Mr. Miotto became a member of the board of directors of GIG1 in October 2017 and has continued in that role after that company became Kaleyra, Inc. Mr. Miotto has also served on the board of directors of GIG2 since March 2019. In addition, Mr. Miotto served on the board of directors of Micrel, Inc. prior to its sale to Microchip Technology Inc. in May 2015, and on the board of directors of GigPeak from 2008 until its sale to IDT in April 2017. He also previously served on the board of directors of Cognizer from March 2019 to August 2020. He is a member of the American Institute of Certified Public Accountants and holds a Bachelor of Business Administration degree from Baruch College of The City University of New York.

**John J. Mikulsky** joined our Board of Directors in February 2020. Mr. Mikulsky became a member of the board of directors of GIG1 since December 2017 and has continued in that role after the company became Kaleyra, Inc. He joined the board of directors of GIG2 and the board of directors of Cognizer, in March 2019, serving on that company's board until August 2020. Mr. Mikulsky served as the Chief Executive Officer of Traycer Diagnostic Systems, Inc. from August 2016 to December 2017, and as a director, from October 2014 to December 2017. He previously served as President and Chief Executive Officer of Endwave Corporation (Nasdaq: ENWV) from

215

Table of Contents

December 2009 until June 2011, when Endwave Corporation was acquired by GigPeak; subsequent to such acquisition, he served on the board of directors of GigPeak from June 2011 until its sale IDT in April 2017. From May 1996 until November 2009, Mr. Mikulsky served Endwave Corporation in a multitude of capacities including Vice President of Product Development, Vice President of Marketing and Business Development and Chief Operating Officer. Prior to Endwave Corporation, Mr. Mikulsky worked as a Technology Manager for Balazs Analytical Laboratory, a provider of analytical services to the semiconductor and disk drive industries, from 1993 until 1996. Prior to 1993, Mr. Mikulsky worked at Raychem Corporation, most recently as a Division Manager for its Electronic Systems Division. Mr. Mikulsky holds a B.S. in electrical engineering from Marquette University, an M.S. in electrical engineering from Stanford University and an S.M. in Management from the Sloan School at the Massachusetts Institute of Technology.

**Dr. Raluca Dinu** joined our Board of Directors in February 2020. She has served as the Chief Executive Officer of GIG2 since August 2019 and as a member of its board of directors since March 2019. From April 2017 to May 2019, Dr. Dinu was the Vice President and General Manager of IDT's Optical Interconnects Division. Prior to that, she held several executive-level positions at GigPeak, including Executive Vice President and Chief Operation Officer from April 2016 until it was acquired by IDT in April 2017, and before that, as its Executive Vice President of Global Sales and Marketing from August 2015 to April 2016, and as its Senior Vice President of Global Sales and Marketing from December 2014 to August 2015. From February 2014 to September 2017, Dr. Dinu was a member of the board of directors of Brazil-Photonics, in Campinas, Brazil, a joint venture that GigPeak established with the Centro de Pesquisa e Desenvolvimento em Telecomunicações (CPqD). From 2001 to 2008, Dr. Dinu was VP of Engineering at Lumera Corporation ("Lumera") (Nasdaq: LMRA). Lumera was acquired by GigPeak in 2008, and Dr. Dinu joined GigPeak at that time. Dr. Dinu holds a B.Sc. in Physics and Ph.D. in Solid State Condensed Matter Physics from the University of Bucharest, and an Executive-M.B.A. from Stanford University. Dr. Dinu is married to Dr. Katz, our Executive Chairman of our Board of Directors, Chief Executive Officer, President and Secretary.

**Andrea Betti-Berutto** joined the Board of Directors as a director in February 2020. Mr. Betti-Berutto is a senior technologist and entrepreneur with more than 25 years of experience in Radio-Frequency and Optical Interconnect Systems and Components and Radio-Frequency Integrated Circuit Semiconductor technologies. He has served as the Hardware Chief Technical Officer of GIG2 since August 2019 and as the Hardware Chief Technical Officer of the Company since February 2020. Mr. Betti-Berutto is not an officer or employee of GIG2 or the Company, and in each instance the title of Hardware Chief Technical Officer reflects Mr. Betti-Berutto's core competency and expertise and is primarily for marketing purposes as he assists GIG2 and the Company, respectively, to identify suitable business combination candidates. From April 2017 through June 2019, Mr. Betti-Berutto was the Fellow of Optical Interconnect Business Units at IDT, which was acquired by Renesas Electronics Corp (TSE 6723:JP) in 2019. Mr. Betti-Berutto joined IDT through the acquisition of GigPeak in April 2017, and he led the integration of the of GigPeak technical team into IDT. At GigPeak, he served as the Chief Technology Officer since April 2007 through the April 2017 acquisition by IDT. Previously, Mr. Betti-Berutto was Co-Founder of iTerra Communication, a pioneer in semiconductors for new generation 40G optical networks, where he served as VP of Engineering for RF and Optical Communication Product Development and as a member of the board of directors. After a reorganization of iTerra, he co-founded GigOptix (which was renamed GigPeak in April 2016) and, as Chief Technology Officer (CTO), led the growth of the company's technologies and product lines into the 100/200G optical market, mmWave transceivers for future 5G network deployment and transceivers for sensing application. Together with Dr. Katz and the rest of the GigPeak executive leadership team, Mr. Betti-Berutto drove the acquisition and integration of 10 companies and technologies. Before starting iTerra Communication, he worked for various companies in microwave system and devices for Basestation and Space Communication such as Fujitsu (USA), European Space Agency (Netherlands) and Space Engineering SpA (Italy). Mr. Betti-Berutto is a very hands-on executive with large experience in product/technology and business roadmap definition, strategic initiatives, company re-organization, product development and NPI processes. He has published multiple papers in IEEE journals and conferences and owns U.S. patents in the area of high-speed RF and Optical Integrated circuits. Mr. Betti-Berutto holds the degree of

216

Table of Contents

Electronic Engineer (MS) from University of Rome "La Sapienza" (Italy) with specialization in Electromagnetism.

**Peter Wang** joined the Board of Directors as a director in February 2020. Mr. Wang served as a member of the board of directors of GIG1 from December 2017 until its business combination with Kaleyra, Inc. in November 2019. He has served as the Software Chief Technical Officer of GIG2 since August 2019 and as the Software Chief Technical Officer of the Company since February 2020. Mr. Wang is not an officer or employee of GIG2 or the Company, and in each instance the title of Software Chief Technical Officer reflects Mr. Wang's core competency and expertise and is primarily for marketing purposes as he assists GIG2 and the Company, respectively, to identify suitable business combination candidates. He is a managing partner of Tekhill Catalyst LLC, a cross-border business strategy and technology transfer advisory service, since January 2018. He was a Managing Partner of Optino Network LLC from September 2016 through December 2017. He also serves on the Technology Advisory Council for Benhamou Global Ventures since April 2014. Mr. Wang previously served as the founding President of CoolCloudz, an Infrastructure-as-a-Service company, and the Sr. Vice President and General Manager of the Cloud Storage Products Business Unit of UIT, in China between 2010 and 2012. Mr. Wang co-founded Retrevo Inc., a venture funded Web 2.0 vertical search company employing machine learning technology, and served as the Vice President of Engineering and Operations and Board director between late 2005 and 2009. Mr. Wang led the founding of Intransa Inc. and served as the founding President and Chairman of the Board in late 2000. Intransa Inc. was a pioneer IP SAN company in the storage industry, backed by prominent Silicon Valley venture capital firms. Through his tenure at Intransa Inc. through mid-2005, Mr. Wang not only served as the CTO and a Board director, but also as Vice President of Engineering and Marketing, driving global strategic partnerships, at different stages. Prior to Intransa Inc., Mr. Wang led the corporate Technology Development Center at 3Com Corp. and served in various leadership positions from 1995-2000. While at 3Com, Mr. Wang spear-headed wide ranging technology investigations, prototyping, cross-division technology strategies, and strategic and university research partnership efforts, on VoIP, high-speed networks, broadband and wireless access, intelligent infrastructure, and network appliances. Prior to 1995, Mr. Wang led advanced development of distributed computing technologies at TRW Space & Defense and received TRW Chairman's Award for Innovation. Mr. Wang was instrumental in a number of IEEE 802, IETF and ANSI standards. He has been awarded over 20 U.S. patents and has published a number of IEEE conferences and other journal papers. He holds MS in Management Sciences from Stanford University, M.S. in EECS from U.C. Berkeley, and B.S. in Electrical Engineering from the University of Michigan.

*Board Composition*

Following the Closing of the Business Combination, New Lightning eMotors' business and affairs will be organized under the direction of the New Lightning eMotors Board. We anticipate that the New Lightning eMotors Board will consist of nine members upon the consummation of the Business Combination. Robert Fenwick-Smith and Dr. Avi Katz will serve as Co-Chairman of the New Lightning eMotors Board. The primary responsibilities of the New Lightning eMotors Board will be to provide oversight, strategic guidance, counseling and direction to New Lightning eMotors' management. The New Lightning eMotors Board will meet on a regular basis and additionally as required.

In accordance with the terms of the proposed Second Amended and Restated Certificate of Incorporation, which will be effective upon the consummation of the Business Combination, the New Lightning eMotors Board will be divided into three classes, Class I, Class II and Class III, with only one class of directors being elected in each year and each class serving a three-year term, except with respect to the election of directors at the special meeting pursuant to Proposal No. 6 — The Election of Directors Proposal, the Class I directors will be elected to an initial one-year term (and three-year terms subsequently), the Class II directors will be elected to an initial two-year term (and three-year terms subsequently) and the Class III directors will be elected to an initial three-year term (and three-year terms subsequently). There is no cumulative voting with respect to the election of directors, with the result that the holders of more than 50% of the shares voted for the election of directors can elect all of the directors.

217

Table of Contents

The New Lightning eMotors Board will be divided into the following classes:

- Class I, which Lightning Systems and GigCapital3 anticipates will consist of Thaddeus Senko, Neil Miotto and Bruce Coventry, whose terms will expire at New Lightning eMotors' first annual meeting of stockholders to be held after the completion of this offering;

- Class II, which New Lightning eMotors and GigCapital3 anticipates will consist of Timothy Reeser, Dr. Raluca Dinu and Meghan Sharp, whose terms will expire at New Lightning eMotors' second annual meeting of stockholders to be held after the completion of this offering; and

- Class III, which New Lightning eMotors and GigCapital3 anticipates will consist of RobertFenwick-Smith, Dr. Avi Katz and Diana Tremblay, whose terms will expire at New Lightning eMotors' third annual meeting of stockholders to be held after the completion of this offering.

At each annual meeting of stockholders to be held after the initial classification, the successors to directors whose terms then expire will be elected to serve from the time of election and qualification until the third annual meeting following their election and until their successors are duly elected and qualified. This classification of the New Lightning eMotors Board may have the effect of delaying or preventing changes in New Lightning eMotors' control or management. New Lightning eMotors' directors may be removed for cause by the affirmative vote of the holders of at least a majority of New Lightning eMotors' voting stock.

### Stockholder Communications

The Company's Board has established a process for stockholders to send communications to the Company Board. Stockholders may communicate with the Company's Board generally or a specific director at any time by writing to the Company's Secretary, c/o GigCapital3, Inc., 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303. The Company will review all messages received, and forward any message that reasonably appears to be a communication from a stockholder about a matter of stockholder interest that is intended for communication to the Company's Board. Communications are sent as soon as practicable to the director to whom they are addressed, or if addressed to the Company's Board generally, to the Executive Chairman of the Company's Board. Because other appropriate avenues of communication exist for matters that are not of stockholder interest, communications that do not relate to matters of stockholder interest are not forwarded to the Company's Board.

### Director Independence

NYSE requires that a majority of the Company's Board must be composed of "independent directors," which is defined generally as a person other than an executive officer or employee of the Company or any other individual having a relationship, which, in the opinion of the Board would interfere with the director's exercise of independent judgment in carrying out the responsibilities of a director.

Messrs. Miotto, Mikulsky, Wang and Betti-Berutto are the Company's independent directors. The Company's independent directors have regularly scheduled meetings at which only independent directors are present. Any affiliated transactions will be on terms no less favorable to the Company than could be obtained from independent parties. Any affiliated transactions must be approved by a majority of the Company's independent and disinterested directors.

### Board Leadership Structure and Role in Risk Oversight

The Company's governance framework provides the Board with flexibility to select the appropriate Board leadership structure for the Company. In making leadership structure determinations, the Company's Board considers many factors, including the specific needs of the Company and what is in the best interests of the Company's stockholders. While the Board does not currently have a formal policy on whether the role of the

218

Table of Contents

Chief Executive Officer and Executive Chairman of the Board should be separate, since our formation in 2020, Dr. Katz has served as the Company's Chief Executive Officer, President, Executive Chairman of the Board and Secretary. The Company believes this structure is appropriate for the Company at this time, as the combined roles help provide strong and consistent leadership for the Company's management team and Board. When the Board convenes for a meeting, the non-management directors meet in executive session if the circumstances warrant. Given the composition of the Board with a majority of independent directors, the Board does not believe that it is necessary to formally designate a lead independent director at this time, although it may consider appointing a lead independent director if the circumstances change.

The Board's oversight of risk is administered directly through the Board, as a whole, or through its audit committee. Various reports and presentations regarding risk management are presented to the Board to identify and manage risk. The audit committee addresses risks that fall within the committee's area of responsibility. For example, the audit committee is responsible for overseeing the quality and objectivity of the Company's financial statements and the independent audit thereof. Management furnishes information regarding risk to the Board from time to time as requested.

### Compensation Committee Interlocks and Insider Participation

None of the Company's executive officers currently serves and in the past year has not served as a member of the compensation committee of any entity that has one or more executive officers serving on the Company's Board.

### Number and Terms of Office of Officers and Directors

The members of the Board were elected to the Board in connection with the IPO. The members will stand for re-election at the Company's annual meeting of stockholders, which will only be held if the Business Combination is not consummated prior to the date of the annual meeting of stockholders. In the event the Business Combination is consummated prior to the date of the annual meeting, at the special meeting of stockholders that will be held to seek approval of the Business Combination stockholders will be asked to vote on the directors who will comprise the Board after the closing of the Business Combination.

The Company's executive officers are elected by the Board and serve at the discretion of the Board, rather than for specific terms of office. The Company's Board is authorized to appoint persons to the offices set forth in the Company's Bylaws as it deems appropriate. The Company's Bylaws provide that the Company's executive officers may consist of a Chief Executive Officer, a President, a Chief Financial Officer, Vice Presidents, a Secretary, Assistant Secretaries, a Treasurer and such other offices as may be determined by the Board.

### Committees of the Company's Board

The Company's Board has three standing committees: an audit committee; a compensation committee; and a nominating and corporation governance committee. Each of the Company's audit committee, compensation committee and nominating and corporate governance committee are composed solely of independent directors. Each committee operates under a certificate of incorporation that is approved by the Company's Board and has the composition and responsibilities described below.

#### Audit Committee

Messrs. Miotto, Mikulsky and Wang currently serve as members of the Company's audit committee. Mr. Miotto serves as chairman of the audit committee. Under the NYSE listing standards and applicable SEC rules, the Company is required to have three members of the audit committee all of whom must be independent. Messrs. Miotto, Mikulsky and Wang are independent.

219

Table of Contents

Each member of the audit committee is financially literate and the Company's Board has determined that Mr. Miotto qualifies as an "audit committee financial expert" as defined in applicable SEC rules.

The Company has adopted an audit committee charter, which details the purpose and principal functions of the audit committee, including:

- assisting the Board in the oversight of (i) the accounting and financial reporting processes of the Company and the audits of the financial statements of Company, (ii) the preparation and integrity of the financial statements of the Company, (iii) the compliance by the Company with financial statement and regulatory requirements, (iv) the performance of the Company's internal finance and accounting personnel and its independent registered public accounting firms, and (v) the qualifications and independence of the Company's independent registered public accounting firms;

- reviewing with each of the internal and independent registered public accounting firms the overall scope and plans for audits, including authority and organizational reporting lines and adequacy of staffing and compensation;

- reviewing and discussing with management and internal auditors the Company's system of internal control and discuss with the independent registered public accounting firm any significant matters regarding internal controls over financial reporting that have come to its attention during the conduct of its audit;

- reviewing and discussing with management, internal auditors and independent registered public accounting firm the Company's financial and critical accounting practices, and policies relating to risk assessment and management;

- receiving and reviewing reports of the independent registered public accounting firm discussing (i) all critical accounting policies and practices to be used in the firm's audit of the Company's financial statements, (ii) all alternative treatments of financial information within U.S. GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm, and (iii) other material written communications between the independent registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

- reviewing and discussing with management and the independent registered public accounting firm the annual and quarterly financial statements and section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" of the Company prior to the filing of the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q;

- reviewing, or establishing, standards for the type of information and the type of presentation of such information to be included in, earnings press releases and earnings guidance provided to analysts and rating agencies;

- discussing with management and the independent registered public accounting firm any changes in Company's critical accounting principles and the effects of alternative U.S. GAAP methods, off-balance sheet structures and regulatory and accounting initiatives;

- reviewing material pending legal proceedings involving the Company and other contingent liabilities;

- meeting periodically with the Chief Executive Officer, Chief Financial Officer, the senior internal auditing executive and the independent registered public accounting firm in separate executive sessions to discuss results of examinations;

- reviewing and approving all transactions between the Company and related parties or affiliates of the officers of the Company requiring disclosure under Item 404 of Regulation S-K prior to the Company entering into such transactions;

220

Table of Contents

- establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submissions by employees or contractors of concerns regarding questionable accounting or accounting matters;

- reviewing periodically with the Company's management, the independent registered public accounting firm and outside legal counsel (i) legal and regulatory matters which may have a material effect on the financial statements, and (ii) corporate compliance policies or codes of conduct, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities; and

- establishing policies for the hiring of employees and former employees of the independent registered public accounting firm.

A copy of the Company's audit committee charter is available, free of charge, from the Company by writing to the Company's Secretary, c/o GigCapital3, Inc., 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303, or may be accessed on the Company's website at https://www.gigcapitalglobal.com/investors.

*Compensation Committee*

The Company has established a compensation committee of the Board consisting of Messrs. Mikulsky, Miotto and Betti-Berutto. Mr. Mikulsky serves as chairman of the compensation committee. The Company has adopted a compensation committee charter that details the purpose and responsibility of the compensation committee, including:

- reviewing the performance of the Chief Executive Officer and executive management;

- assisting the Board in developing and evaluating potential candidates for executive positions (including Chief Executive Officer);

- reviewing and approving goals and objectives relevant to the Chief Executive Officer and other executive officer compensation, evaluating the Chief Executive Officer's and other executive officers' performance in light of these corporate goals and objectives, and setting Chief Executive Officer and other executive officer compensation levels consistent with its evaluation and the Company's philosophy;

- approving the salaries, bonus and other compensation for all executive officers;

- reviewing and approving compensation packages for new corporate officers and termination packages for corporate officers as requested by management;

- reviewing and discussing with the Board and senior officers plans for officer development and corporate succession plans for the Chief Executive Officer and other senior officers;

- reviewing and making recommendations concerning executive compensation policies and plans;

- reviewing and recommending to the Board the adoption of or changes to the compensation of the Company's directors;

- reviewing and approving the awards made under any executive officer bonus plan, and providing an appropriate report to the Board;

- reviewing and making recommendations concerning long-term incentive compensation plans, including the use of stock options and other equity-based plans, and, except as otherwise delegated by the Board, acting as the "Plan Administrator" for equity-based and employee benefit plans;

221

Table of Contents

- approving all special perquisites, special cash payments and other special compensation and benefit arrangements for the Company's executive officers and employees;

- reviewing periodic reports from management on matters relating to the Company's personnel appointments and practices;

- assisting management in complying with the Company's proxy statement and annual report disclosure requirements;

- issuing an annual Report of the Compensation Committee on Executive Compensation for the Company's annual proxy statement in compliance with applicable SEC rules and regulations;

- annually evaluating the Committee's performance and the committee's charter and recommending to the Board any proposed changes to the charter or the committee; and

- undertaking all further actions and discharging all further responsibilities imposed upon the committee from time to time by the Board, the federal securities laws or the rules and regulations of the SEC.

The charter also provides that the compensation committee may, in its sole discretion, retain or obtain the advice of a compensation consultant, independent legal counsel or other adviser and will be directly responsible for the appointment, compensation and oversight of the work of any such adviser. However, before engaging or receiving advice from a compensation consultant, external legal counsel or any other adviser, the compensation committee will consider the independence of each such adviser, including the factors required by the NYSE and the SEC.

A copy of the Company's compensation committee charter is available, free of charge, from the Company by writing to the Company's Secretary, c/o GigCapital3, Inc., 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303, or may be accessed on the Company's website at https://www.gigcapitalglobal.com/investors.

*Nominating and Corporate Governance Committee*

The Company has established a nominating and corporate governance committee of the Board. The members of the Company's nominating and corporate governance committee are Messrs. Mikulsky, Miotto and Wang. Mr. Mikulsky serves as chair of the nominating and corporate governance committee. The Company has adopted a nominating and corporate governance committee charter, which details the purpose and responsibilities of the nominating and corporate governance committee, including:

- developing and recommending to the Board the criteria for appointment as a director;

- identifying, considering, recruiting and recommending candidates to fill new positions on the Board;

- reviewing candidates recommended by stockholders;

- conducting the appropriate and necessary inquiries into the backgrounds and qualifications of possible candidates; and

- recommending director nominees for approval by the Board and election by the stockholders at the next annual meeting.

The charter provides that the nominating and corporate governance committee may, in its sole discretion, retain or obtain the advice of, and terminate, any search firm to be used to identify director candidates, and will be directly responsible for approving the search firm's fees and other retention terms.

The Company has not formally established any specific, minimum qualifications that must be met or skills that are necessary for directors to possess. In general, in identifying and evaluating nominees for director,

Table of Contents

the Board considers educational background, diversity of professional experience, knowledge of the Company's business, integrity, professional reputation, independence, wisdom, and the ability to represent the best interests of the Company's stockholders. Prior to the Business Combination, holders of the Company's public shares will not have the right to recommend director candidates for nomination to the Board.

A copy of the Company's nominating and corporate governance committee charter is available, free of charge, from the Company by writing to the Company's Secretary, c/o GigCapital3, Inc., 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303, or may be accessed on the Company's website at https://www.gigcapitalglobal.com/investors.

### Meetings and Attendance

During the fiscal year ending December 31, 2020:

- the Company's Board held five meetings;

- the Company's audit committee held three meetings; and

- the Company's nominating and corporate governance committee held one meeting.

Each of the Company's incumbent directors attended or participated in at least 75% of the meetings of the Company's Board and the respective committees of which she or he is a member held during the period such incumbent director was a director during the fiscal year ended December 31, 2020.

The Company encourages all of its directors to attend the Company's annual meetings of stockholders. This special meeting will be in lieu of the Company's first annual meeting of stockholders.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires the Company's officers, directors and persons who beneficially own more than ten percent of the Company's Common Stock to file reports of ownership and changes in ownership with the SEC. These reporting persons are also required to furnish the Company with copies of all Section 16(a) forms they file. Based solely upon a review of the copies of such forms furnished to the Company, and on written representations from the reporting persons, the Company believes that all Section 16(a) filing requirements applicable to its officers, directors and ten percent stockholders were met on a timely basis during the fiscal year ended December 31, 2020.

### Code of Ethics

The Company has adopted a Code of Ethics applicable to the Company's management team and employees in accordance with applicable federal securities laws. You can review the Code of Ethics, as well as the Company's other publicly filed documents, by accessing the Company's public filings at the SEC's web site at www.sec.gov. In addition, a copy of the Code of Ethics will be provided without charge upon request from the Company, or may be accessed on the Company's website at https://www.gigcapitalglobal.com/investors. The Company intends to disclose any amendments to or waivers of certain provisions of the Company's Code of Ethics in a Current Report on Form 8-K. See "*Where You Can Find Additional Information*."

### Conflicts of Interest

The Founder and certain members of our Board and officers of the Company have interests in the Business Combination that are different from or in addition to (and which may conflict with) your interest. These interests include but are not limited to:

- the fact that our Initial Stockholders cannot redeem any of the shares of Common Stock that they hold in connection with a stockholder vote to approve a proposed initial business combination and such Initial Stockholders will lose their entire investment in us if an initial business combination is not consummated by November 18, 2021;

223

Table of Contents

- the fact that our Founder paid an aggregate of $6,525,000 for its portion of the Initial Stockholder Shares and such securities will have a significantly higher value at the time of the Business Combination, which if unrestricted and freely tradable would be valued at $56,350,000 (based upon a $10.00 per share price for our Common Stock);

- the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their shares of Common Stock that they hold if we fail to complete an initial business combination by November 18, 2021;

- the fact that our Founder paid an aggregate of $6,500,000 for their 650,000 private placement units, including the warrants that are a constituent part of the private placement units, and that such private placement units will be worthless if a business combination is not consummated by November 18, 2021;

- the continued right of our Founder to hold our Common Stock and the shares of Common Stock to be issued to our Founder upon exercise of its private placement warrants following the Business Combination, subject to certain vesting restrictions and lock-up periods;

- that fact that our Founder has agreed that it will be liable to us, if and to the extent any claims by a vendor for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below: (i) $10.00 per public share; or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case, net of the interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of the IPO against certain liabilities, including liabilities under the Securities Act;

- the anticipated continuation of certain members of our Board as directors of the post-combination company; and

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination.

After the completion of the Business Combination, Neil Miotto and Drs. Avi Katz and Raluca Dinu, will serve on the Board of the post-combination company.

In general, executive officers and directors of a corporation incorporated under the laws of the State of Delaware are required to present business opportunities to a corporation if:

- the corporation could financially undertake the opportunity;

- the opportunity is within the corporation's line of business; and

- it would not be fair to the corporation and its stockholders for the opportunity not to be brought to the attention of the corporation.

Accordingly, as a result of multiple business affiliations, the Company's officers and directors may have similar legal obligations relating to presenting business opportunities meeting the above-listed criteria to multiple entities. In addition, conflicts of interest may arise when the Company's Board evaluates a particular business opportunity with respect to the above-listed criteria. The Company cannot assure you that any of the above-mentioned conflicts will be resolved in the Company's favor.

In order to minimize potential conflicts of interest which may arise from multiple corporate affiliations, each of the Company's officers and directors has contractually agreed, pursuant to a written agreement with the Company, until the earliest of December 10, 2020 (the date of the execution of a definitive agreement for the

224

Table of Contents

Business Combination), the Company's liquidation or such time as he or she ceases to be an officer or director, to present to the Company for the Company's consideration, prior to presentation to any other entity, any suitable business opportunity which may reasonably be required to be presented to the Company, subject to any fiduciary or contractual obligations he or she might have. Accordingly, the Company's Charter provides that the doctrine of corporate opportunity will not apply with respect to any of the Company's executive officers or directors in circumstances where the application of the doctrine would conflict with any fiduciary duties or contractual obligations they may have.

Below is a table summarizing the entities to which the Company's executive officers and directors currently have fiduciary duties or contractual obligations:

| Individual | Entity | Entity's Business | Affiliation |
|---|---|---|---|
| Dr. Avi S. Katz | Kaleyra, Inc. | Mobile Messaging Services | Executive Chairman |
| | GigNext, LLC | Consulting and Investment | Founder and managing member |
| | GigFounders, LLC | Consulting and Investment | Founder and managing member |
| | GigManagement, LLC | Management Company | Founder and managing member |
| | GigAcquisitions, LLC | PPE (SPAC) sponsorship | Founder and manager |
| | GigAcquisitions2, LLC | PPE (SPAC) sponsorship | Founder and manager |
| | GigCapital2, Inc. | PPE (SPAC) | Founder and Executive Chairman |
| | GigAcquisitions3, LLC | PPE (SPAC) sponsorship | Founder and manager |
| | GigCapital4, Inc. | PPE (SPAC) | Founder and Executive Chairman |
| | GigAcquisitions4, LLC | PPE (SPAC) sponsorship | Founder and manager |
| | | | |
| Brad Weightman | GigCapital2, Inc. | PPE (SPAC) | Chief Financial Officer |
| | GigCapital4, Inc. | PPE (SPAC) | Chief Financial Officer |
| | | | |
| Neil Miotto | Kaleyra, Inc. | Mobile Messaging Services | Director |
| | GigFounders, LLC | Consulting and Investment | Minority member |
| | GigManagement, LLC | Management Company | Minority member |
| | GigCapital2, Inc. | PPE (SPAC) | Director |
| | GigCapital4, Inc. | AI Technology | Director |
| | | PPE (SPAC) | Director |
| | | | |
| John Mikulsky | Kaleyra, Inc. | Mobile Messaging Services | Director |
| | GigCapital2, Inc. | PPE (SPAC) | Director |
| | | AI Technology | Director |
| | | | |
| Dr. Raluca Dinu | GigCapital2, Inc. | PPE (SPAC) | Chief Executive Officer and Director |
| | Kaleyra, Inc. | Mobile Messaging Services | Strategic Advisory Board, Chair Founder |
| | GigManagement, LLC | Management Company | and managing member |
| | GigCapital4, Inc. | PPE (SPAC) | President and Chief Executive Officer |
| | | | |
| Peter Wang | GigCapital2, Inc. | PPE (SPAC) | Software Chief Technical Officer (title |
| | Kaleyra, Inc. | Mobile Messaging Services | held for marketing purposes only) |
| | | | Strategic Advisory Board, Member |
| | | | |
| Andrea Betti-Berutto | GigCapital2, Inc. | PPE (SPAC) | Hardware Chief Technical Officer (title |
| | GigCapital4, Inc. | PPE (SPAC) | held for marketing purposes only) |
| | | | Director |

225

Table of Contents

When the Company submits the Business Combination to its public stockholders for a vote, the Initial Stockholders have agreed to vote any shares held by them in favor of the Business Combination. In addition, they have agreed to waive their respective rights to participate in any liquidation distribution with respect to their Initial Stockholder Shares. If they purchased shares of Common Stock as part of the IPO or in the open market, however, they would be entitled to participate in any liquidation distribution in respect of such shares but have agreed not to convert or sell such shares to the Company in connection with the consummation of the Business Combination.

All ongoing and future transactions between the Company and any of its Initial Stockholders or their respective affiliates will be on terms believed by the Company to be no less favorable to the Company than are available from unaffiliated third parties. Such transactions will require prior approval by a majority of the Company's uninterested "independent" directors or the members of the Company's Board of who do not have an interest in the transaction, in either case who had access, at the Company's expense, to the Company's attorneys or independent legal counsel. The Company will not enter into any such transaction unless the Company's disinterested "independent" directors determine that the terms of such transaction are no less favorable to the Company than those that would be available to the Company with respect to such a transaction from unaffiliated third parties.

**Limitation on Liability and Indemnification of Officers and Directors**

The current amended and restated certificate of incorporation provides that the Company's directors and officers will be indemnified by the Company to the fullest extent authorized by the DGCL as it now exists or may in the future be amended, unless a director violated his or her duty of loyalty to the Company or its stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived improper personal benefit from its actions as a director. In addition, the current amended and restated certificate of incorporation provides that the Company's directors will not be personally liable for monetary damages to the Company for breaches of their fiduciary duty as directors, unless they violated their duty of loyalty to the Company or its stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived an improper personal benefit from their actions as directors.

The Company's Bylaws also permit the Company to secure and maintain insurance, at the Company's expense, on behalf of any director, officer, employee or agent of the Company or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the DGCL. The Company has purchased a policy of directors' and officers' liability insurance that insures its directors and officers against the cost of defense, settlement or payment of a judgment in some circumstances and insures the Company against its obligations to indemnify its directors and officers.

These provisions may discourage stockholders from bringing a lawsuit against the Company's directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit the Company and its stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent the Company pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions. The Company believes that these provisions, the insurance and the indemnity agreements are necessary to attract and retain talented and experienced directors and officers.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to the Company's directors, officers and controlling persons pursuant to the foregoing provisions, or otherwise, the Company has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable.

226

Table of Contents

**Principal Accounting Fees and Services**

The firm of BPM LLP ("BPM") acts as our independent registered public accounting firm. The following is a summary of fees paid to BPM for services rendered.

*Audit Fees.* Audit fees consist of fees for professional services rendered for the review of our quarterly financial statements and services that are normally provided by BPM in connection with regulatory filings. The aggregate fees of BPM for professional services rendered for the audit of our annual financial statements and reviews of the financial information included in our Forms 10-Q for the respective periods and other required filings with the SEC totaled $81,264. The aggregate fees of BPM related to audit services in connection with statutory and regulatory filings totaled $168,813. The above amounts include interim procedures and audit fees, as well as attendance at audit committee meetings. Total audit fees were $250,437.

*Audit-Related Fees.* Audit-related fees consist of fees billed for assurance and related services that are reasonably related to performance of the audit or review of our financial statements and are not reported under " - *Audit Fees*." These services include attest services that are not required by statute or regulation and consultations concerning financial accounting and reporting standards and due diligence related to mergers and acquisitions. During the period from February 3, 2020 (date of inception) to November 30, 2020, the aggregate fees of BPM related to due diligence in connection with mergers and acquisitions totaled $17,367.

*Tax Fees.* We did not pay BPM any fees for tax return services, planning and tax advice for the period from February 3, 2020 (date of inception) to November 30, 2020.

*All Other Fees.* We did not pay BPM for any other services for the period from February 3, 2020 (date of inception) to November 30, 2020.

**Legal Proceedings**

From time to time, we may become involved in actions, claims, suits, and other legal proceedings arising in the ordinary course of our business, including assertions by third parties relating to intellectual property infringement, breaches of contract or warranties or employment-related matters.

***Litigation Related to the Business Combination***

On January 7, 2021, a purported stockholder of the Company. filed a putative class action complaint in the Supreme Court of the State of New York, captioned *Shingote v. GigCapital3, Inc.*, *et al.* (Case No. 650109-2021) on behalf of a purported class of stockholders. The lawsuit names the Company and each of its current directors, Dr. Avi Katz, Neil Miotto, John Mikulsky, Dr. Raluca Dinu, Andrea Betti-Berutto, and Peter Wang, as defendants. The lawsuit alleges that the individual defendants breached their fiduciary duties by, among other things, failing to take appropriate steps to maximize the value of the Company and failing to disclose all material information necessary for the stockholders to make an informed decision on whether to vote their shares in favor of the Business Combination. The lawsuit also alleges that the Company aided and abetted the individual defendants' breaches of fiduciary duty. The lawsuit seeks, among other relief, injunctive relief enjoining the Business Combination or recission of the Business Combination and an order directing the defendants to amend this Registration Statement on Form S-4. The lawsuit also purports to seek a declaration that the defendants violated their fiduciary duties, damages, and recovery of the costs of the action, including reasonable attorneys' and experts' fees. The lawsuit is in a preliminary stage.

On January 12, 2021, another purported stockholder of the Company filed a separate complaint in the Supreme Court of the State of New York, captioned *Ezel v. GigCapital3, Inc.*, *et al.* (Case No. 650245-2021).

Table of Contents

The lawsuit also names Dr. Katz, Dr. Dinu, and Messrs. Miotto, Mikulsky, Betti-Berutto and Wang, and the Company, its wholly-owned subsidiary, Project Power Merger Sub, Inc., and Lightning Systems as defendants. The lawsuit alleges that the individual defendants breached their fiduciary duties by causing this Registration Statement on Form S-4, which purportedly contains materially misleading and incomplete information, to be disseminated to stockholders. The lawsuit also alleges that the Company, Project Power Merger Sub, Inc. and Lightning Systems aided and abetted the individual defendants' breaches of fiduciary duty. The lawsuit seeks, among other relief, injunctive relief enjoining the Business Combination or recission of the Business Combination and an order directing the defendants to amend this Registration Statement on Form S-4. The lawsuit also purports to seek a declaration that defendants violated their fiduciary duties and recovery of the costs of the action, including reasonable attorneys' and experts' fees. The lawsuit is in a preliminary stage.

On January 18, 2021, another purported stockholder of the Company filed a complaint in the Supreme Court of the State of New York, captioned *Michael v. GigCapital3, Inc*., *et al.* (Case No. 650349-2021). The lawsuit names the Company and each of Dr. Katz, Dr. Dinu, and Messrs. Miotto, Mikulsky, Betti-Berutto and Wang, as defendants. The lawsuit alleges that the individual defendants breached their fiduciary duties by causing the Registration Statement, which purportedly contained materially misleading and incomplete information, to be disseminated to stockholders. The lawsuit also alleges that the Company aided and abetted the individual defendants' breaches of fiduciary duty. The lawsuit seeks, among other relief, injunctive relief enjoining the Business Combination or recission of the Business Combination and an order directing the defendants to amend this Registration Statement on Form S-4. The lawsuit also purports to seek a declaration that defendants violated their fiduciary duties and recovery of the costs of the action, including reasonable attorneys' and experts' fees. The lawsuit is in a preliminary stage.

On January 22, 2021 another purported stockholder of the Company filed a complaint in the United States District Court for the Southern District of New York, captioned *Nassee v. GigCapital3, Inc*., *et al.* (Case No. 1:21-cv-00587). The lawsuit names the Company and Dr. Katz, Dr. Dinu, and Messrs. Miotto, Mikulsky, Betti-Berutto and Wang, as defendants. The lawsuit alleges that the defendants violated Section 14(a) of the Exchange Act by approving the dissemination of this Registration Statement on Form S-4 relating to the Business Combination, which the complaint contends, among other things, failed to provide critical information regarding the financial projections of the Company. The lawsuit also alleges that the individual defendants violated Section 20(a) of the Exchange Act by influencing and controlling the decisions giving rise to the Exchange Act violations alleged in the complaint and by negotiating, reviewing, and approving the Business Combination Agreement. The lawsuit seeks, among other relief, injunctive relief enjoining the Business Combination and directing the defendants to amend this Registration Statement on Form S-4. The lawsuit also purports to seek damages and recovery of the costs of the action, including reasonable attorneys' and experts' fees. The lawsuit is in a preliminary stage.

On January 25, 2021, another purported stockholder of the Company filed a complaint in the United States District Court for the Southern District of New York, captioned *Jensen v. GigCapital3, Inc.*, *et al.* (Case No. 1:21-cv-00649). The lawsuit names the Company and Dr. Katz, Dr. Dinu, and Messrs. Betti-Berutto, Mikulsky, Miotto and Wang, as defendants. The lawsuit alleges that the defendants violated Section 14(a) of the Exchange Act by approving the dissemination of the proxy statement contained in this Registration Statement on Form S-4 relating to the Business Combination, which the complaint contends failed to provide critical information regarding (i) the background of the Business Combination; (ii) purported conflicts involving the financial advisors; and (iii) Lightning Systems' financial projections and valuation. The lawsuit also alleges that the defendants violated Section 20(a) of the Exchange Act by influencing and controlling the decision making of the Company, including the content and dissemination of the material statements that the complaint contends are incomplete and misleading. The lawsuit also alleges that the individual defendants violated their fiduciary duties of candor and disclosure by approving or causing the purportedly materially deficient proxy statement to be disseminated. The lawsuit seeks, among other relief, injunctive relief enjoining the special meeting of the Company's stockholders to vote on the Business Combination until the Company discloses the material

228

Table of Contents

information that the complaint alleges was omitted from the proxy statement. The lawsuit also purports to seek damages and recovery of the costs of the action, including reasonable attorneys' and experts' fees. The lawsuit is in a preliminary stage.

Finally, on February 8, 2021, a purported stockholder of the Company filed a putative class action complaint in the United States District Court of the Northern District of California, captioned Ryan v. GigCapital3, Inc., et al. (Case No. 5:21-cv-00969) on behalf of a purported class of stockholders. The lawsuit names the Company and Dr. Katz, Dr. Dinu, and Messrs. Betti-Berutto, Mikulsky, Miotto and Wang, as defendants. The lawsuit alleges that the defendants violated Section 14(a) of the Exchange Act by approving the dissemination of this Registration Statement on Form S-4 relating to the Business Combination, which the complaint contends, among other things, failed to provide critical information regarding the financial projections of the Company. The lawsuit also alleges that the individual defendants violated Section 20(a) of the Exchange Act because they had the power to influence and control, and did influence and control the decision-making of the Company including the dissemination of this Registration Statement. The lawsuit seeks, among other relief, injunctive relief enjoining the Business Combination or recission of the Business Combination. The lawsuit also purports to seek a declaration that defendants Sections 14(a) and 20(a) of the Exchange Act and recovery of the costs of the action, including reasonable attorneys' and experts' fees. The lawsuit is in a preliminary stage.

The Company and each of the individual defendants intend to vigorously defend against each of the above lawsuits.

229

Table of Contents

**THE COMPANY'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion of the Company's financial condition and results of operations should be read in conjunction with the Company's consolidated financial statements and notes to those statements included in this proxy statement/prospectus. This discussion contains forward-looking statements that involve risks and uncertainties. Please see "Cautionary Note Regarding Forward-Looking Statements" and "Risk Factors" in this proxy statement/prospectus. Unless otherwise indicated or the context otherwise requires, references in this section to "we," "our," "us" and other similar terms refer to the Company and its consolidated subsidiaries before the Business Combination."*

**Overview**

We are a newly organized Private-to-Public Equity (PPE) company, also known as a blank check company or special purpose acquisition vehicle, incorporated in the State of Delaware and formed for the purpose of acquiring, engaging in a share exchange, share reconstruction and amalgamation with, purchasing all or substantially all of the assets of, or engaging in any other similar business combination with one or more businesses or entities. We intend to effectuate our initial Business Combination using cash from the proceeds from the sale of units (the "Units") in our initial public offering (the "Offering"), the sale of the units (the "private placement units") to our Founder and Underwriters, the sale of Common Stock to our Founder, our common equity or any preferred equity that we may create in accordance with the terms of our charter documents, debt, or a combination of cash, common or preferred equity and debt. The units sold in the Offering each consisted of one share of Common Stock, and three-fourth (3/4) of one redeemable warrant to purchase our common stock (no fractional shares will be issued upon exercise of the warrants). The private placement units were substantially similar to the units sold in the Offering, but for certain differences in the warrants included in each of them. For clarity, the warrants included in the units are referred to herein as the "public warrants", and the warrants included in the private placement units are referred to herein as the "private warrants".

The issuance of additional shares of Common Stock or the creation of one or more classes of preferred stock during our initial Business Combination:

- may significantly dilute the equity interest of investors in this Offering who would not have pre-emption rights in respect of any such issue;

- may subordinate the rights of holders of Common Stock if the rights, preferences, designations and limitations attaching to the preferred shares are senior to those afforded our shares of Common Stock;

- could cause a change in control if a substantial number of shares of Common Stock are issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors;

- may have the effect of delaying or preventing a change of control of us by diluting the share ownership or voting rights of a person seeking to obtain control of us; and

- may adversely affect prevailing market prices for our shares of Common Stock.

Similarly, if we issue debt securities or otherwise incur significant indebtedness, it could result in:

- default and foreclosure on our assets if our operating revenues after our initial Business Combination are insufficient to repay our debt obligations;

- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;

- our immediate payment of all principal and accrued interest, if any, if the debt is payable on demand;

230

Table of Contents

- our inability to obtain necessary additional financing if any document governing such debt contains covenants restricting our ability to obtain such financing while the debt security is outstanding;

- our inability to pay dividends on our shares of Common Stock;

- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our Common Stock if declared, expenses, capital expenditures, acquisitions and other general corporate purposes;

- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;

- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation; and

- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, execution of our strategy and other purposes and other disadvantages compared to our competitors who have less debt.

We expect to incur significant costs in the pursuit of our acquisition plans. We cannot assure you that our plans to raise capital or to complete our initial Business Combination will be successful.

**Results of Operations**

We have neither engaged in any operations nor generated any revenues to date. For the period from February 3, 2020 (date of inception) through December 31, 2020, our only activities have been organizational activities, those necessary to prepare for the Offering and to identify a target business for the Business Combination. We do not expect to generate any operating revenues until after completion of our initial Business Combination. We expect to generate non-operating income in the form of interest income on cash and marketable securities held in the Trust Account at Oppenheimer & Co., Inc. in New York, New York with Continental Stock Transfer & Trust Company acting as Trustee, which was funded after the Offering to hold an amount of cash and marketable securities equal to that raised in the Offering. We expect to incur increased expenses as a result of being a public company (for legal, financial reporting, accounting and auditing compliance), as well as for due diligence expenses.

For the period from February 3, 2020 (date of inception) through December 31, 2020, we had a net loss of $2,728,854, which consisted of operating expenses of $2,759,621 and a provision for income taxes of $13,086, which was partially offset by interest income on marketable securities held in the Trust Account of $43,853.

**Liquidity and Capital Resources**

On May 18, 2020, we consummated the closing of the Offering with the delivery of 20,000,000 units at a price of $10.00 per unit, generating gross proceeds of $200,000,000. Simultaneously with the closing of the Offering, we consummated the closing of the private placement with the sale of 650,000 private placement units at a price of $10.00 per unit to our Founder and sale of 243,479 private placement units at a price of $10.00 per unit to the Underwriters, generating aggregated gross proceeds of $8,934,790.

Following the closing of the Offering and the private placement, a total of $202,000,000 was placed in the Trust Account. We incurred $12,785,179 in offering related costs, including $4,000,000 of underwriting fees, $8,000,000 of deferred underwriting fees, and $785,179 of other costs. Subsequently to the closing of the Offering, offering costs of $785,179 accrued for at the closing of the Offering were reduced to $732,907. Therefore, total transaction costs amounted to $12,732,907.

231

Table of Contents

As of December 31, 2020, we held cash and marketable securities in the amount of $202,029,414 (including $42,137 of interest earned) in the Trust Account. In addition, there was interest receivable to the Trust Account of $1,716. The marketable securities consisted of money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act of 1940 which invest only in direct U.S. government obligations. Interest income earned from the funds held in the Trust Account may be used by us to pay taxes. For the period from February 3, 2020 (date of inception) through December 31, 2020, we did not withdraw any funds from the interest earned on the Trust Account.

For the period February 3, 2020 (date of inception) through December 31, 2020, cash used in operating activities was $1,104,305, consisting of a net loss of $2,728,854, interest earned on marketable securities held in the Trust Account of $43,853, including interest receivable of $1,716, and an increase in net operating assets of $192,808, including an increase in prepaid expenses of $149,725 and other non-current assets of $43,085, that were partially offset by increase in net operating liabilities of $1,861,210, including accrued liabilities of $1,770,980, accounts payable of $84,089, other current liabilities of $363, and payable to related parties of $5,778.

We intend to use substantially all of the funds held in the Trust Account, including any amounts representing interest earned on the Trust Account (which interest shall be net of taxes payable by us), to acquire a target business or businesses to complete our initial Business Combination and to pay our expenses relating thereto. We may withdraw interest to pay taxes. We estimate our annual franchise tax obligations to be approximately $200,000. Our annual income tax obligations will depend on the amount of interest and other income earned on the amounts held in the Trust Account. To the extent that our capital stock is used in whole or in part as consideration to affect our initial Business Combination, the remaining proceeds held in the Trust Account as well as any other net proceeds not expended will be used as working capital to finance the operations of the target business or businesses. Such working capital funds could be used in a variety of ways including continuing or expanding the target business' operations, for strategic acquisitions and for marketing, research and development of existing or new products. Such funds could also be used to repay any operating expenses or finders' fees which we had incurred prior to the completion of our initial Business Combination if the funds available to us outside of the Trust Account were insufficient to cover such expenses.

As of December 31, 2020, we had cash of $1,170,301 held outside the Trust Account. We believe that the proceeds not held in the Trust Account will be sufficient to allow us to operate for at least 18 months from the closing date of the Offering, assuming that a Business Combination is not consummated during that time. Over this time period, we intend to use these funds primarily for identifying and evaluating prospective acquisition candidates, performing business due diligence on prospective target businesses, traveling to and from the offices, plants or similar locations of prospective target businesses, reviewing corporate documents and material agreements of prospective target businesses, selecting the target business to acquire and structuring, negotiating and consummating the Business Combination.

If our estimates of the costs of undertaking in-depth due diligence and negotiating our initial Business Combination are less than the actual amount necessary to do so, we may have insufficient funds available to operate our business prior to our initial Business Combination. Moreover, we may need to obtain additional financing either to consummate our initial Business Combination or because we become obligated to redeem a significant number of our public shares upon consummation of our initial Business Combination, in which case we may issue additional securities or incur debt in connection with such Business Combination. In order to finance operating and/or transaction costs in connection with a Business Combination, our Founder, executive officers, directors, or their affiliates may, but are not obligated to, loan us funds. In the event that our initial Business Combination does not close, we may use a portion of the working capital held outside the Trust Account to repay such loaned amounts but no proceeds from our Trust Account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into units of the post-Business Combination entity at a price of $10.00 per unit at the option of the lender. The units would be identical to the private placement units.

232

Table of Contents

Following our initial Business Combination, if cash on hand is insufficient, we may need to obtain additional financing in order to meet our obligations.

### Off-Balance Sheet Arrangements

As of December 31, 2020, we have not entered into any off-balance sheet financing arrangements. We do not participate in transactions that create relationships with unconsolidated entities or financial partnerships, often referred to as variable interest entities, which would have been established for the purpose of facilitating off-balance sheet arrangements. We have not entered into any off-balance sheet financing arrangements, established any special purpose entities, guaranteed any debt or commitments of other entities, or purchased any non-financial assets.

### Contractual Obligations

As of December 31, 2020, we do not have any long-term debt, capital lease obligations, operating lease obligations or long-term liabilities, other than an agreement to pay our Sponsor a monthly fee of $20,000 for office space, administrative services and secretarial support. We began incurring these fees on June 6, 2019 and will continue to incur these fees monthly until the earlier of the completion of the Business Combination or our liquidation.

### Critical Accounting Policies

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and income and expenses during the periods reported. Actual results could materially differ from those estimates. We have identified the following critical accounting policies:

*Emerging Growth Company*

Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. We have elected not to opt out of such extended transition period which means that when an accounting standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, will adopt the new or revised accounting standard at the time private companies adopt the new or revised standard.

*Net Loss Per Common Share*

Net loss per share of Common Stock is computed by dividing net loss by the weighted-average number of shares of Common Stock outstanding for the period. We apply the two-class method in calculating the net loss per common share. Shares of Common Stock subject to possible redemption as of December 31, 2020 have been excluded from the calculation of the basic net loss per share since such shares, if redeemed, only participate in their pro rata share of the Trust Account earnings. When calculating our diluted net loss per share, we have not considered the effect of (i) the incremental number of shares of Common Stock to settle warrants sold in the Offering and private placement, as calculated using the treasury stock method; (ii) the contingently issuable shares associated with the rights sold in the Offering and Private Placement to receive one-twentieth of one share of common stock upon the consummation of our initial business combination, and (iii) the shares issued to the Insiders representing 15,000 shares of Common Stock underlying restricted stock awards for the periods they were outstanding. Since we were in a net loss position during the period after deducting net income attributable to Common Stock subject to redemption, diluted net loss per common share is the same as basic net loss per common share for the period.

233

Table of Contents

In accordance with the two-class method, our net loss is adjusted for net income that is attributable to Common Stock subject to redemption, as these shares only participate in the income of the Trust Account and not our losses. Accordingly, net loss per common share, basic and diluted, is calculated as follows:

|  | Period from February 3, 2020 (Inception) through December 31, 2020 |
| --- | --- |
| Net loss | $ (2,728,854) |
| Less: net income attributable to Common Stock subject to redemption | (22,176) |
| Net loss attributable to common stockholders | $ (2,751,030) |
| Weighted-average common shares outstanding, basic and diluted | 6,247,527 |
| Net loss per share Common share, basic and diluted | $ (0.44) |

*Common Stock subject to possible redemption*

We account for our common stock subject to possible redemption in accordance with the guidance in Accounting Standards Codification ("ASC") Topic 480 "Distinguishing Liabilities from Equity." Common Stock subject to mandatory redemption (if any) is classified as a liability instrument and is measured at fair value. Conditionally redeemable Common Stock (including common stock that features redemption rights that are either within the control of the holder or subject to redemption upon the occurrence of uncertain events not solely within our control) is classified as temporary equity. At all other times, Common Stock is classified as stockholders' equity. Our Common Stock features certain redemption rights that are considered to be outside of our control and subject to occurrence of uncertain future events. Accordingly, as of December 31, 2020, Common Stock subject to possible redemption is presented as temporary equity, outside of the stockholders' equity section of our balance sheet.

*Recent Accounting Pronouncements*

We do not believe that any recently issued, but not yet effective, accounting pronouncements, if currently adopted, would have a material effect on our financial statements.

**Quantitative and Qualitative Disclosures About Market Risk.**

To date, our efforts have been limited to organizational activities and activities relating to the Offering and the identification and evaluation of a potential initial business combination. We have neither engaged in any operations nor generated any revenues. As of December 31, 2020, the net proceeds from our Offering held in the Trust Account were comprised entirely of money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act, which invest solely in United States treasuries. Due to the short-term nature of the money market fund's investments, we do not believe that there will be an associated material exposure to interest rate risk.

As of December 31, 2020, $202,029,414 was held in the Trust Account for the purposes of consummating an initial business combination.

234

Table of Contents

**EXECUTIVE COMPENSATION**

**The Company**

*The following disclosure concerns the compensation of the Company's officers and directors for the period from February 3, 2020 (the date of the Company's inception) through December 31, 2020.*

Commencing on the date that the Company's securities were first listed on the NYSE through the earlier of consummation of the Company's initial business combination or our liquidation, the Company has and will continue to pay GigFounders, LLC, an affiliate of the Sponsor, a total of $20,000 per month, which funds are used to pay for office space and general and administrative services. This arrangement was agreed to by an affiliate of the Company's Executive Chairman and Chief Executive Officer for the Company's benefit and is not intended to provide such affiliate of the Company's Executive Chairman and Chief Executive Officer compensation in lieu of a salary. The Company believes that such fees are at least as favorable as it could have obtained from an unaffiliated third party for such services. Effective February 1, 2021, GigFounders, LLC assigned all of its rights, title and interest under the Administrative Services Agreements with the Company to GigManagement, LLC, another affiliate of the Sponsor, including the monthly payment of $20,000. Pursuant to this assignment agreement, GigFounders, LLC delegated to GigManagement, LLC all of its obligations, duties, responsibilities and right to receive payment under the Administrative Services Agreement.

In addition, Mr. Weightman, the Company's Chief Financial Officer is party to a Strategic Services Agreement pursuant to which Mr. Weightman is paid $5,000 per month for his services, and such amount could increase to up to $15,000 per month dependent upon the scope of services provided. Prior to the consummation of the IPO, the Company also issued an aggregate of 5,000 Insider Shares to Mr. Weightman in consideration of future services to the Company. Furthermore, prior to the consummation of the IPO, the Company issued an aggregate of 5,000 Insider Shares to each of Messrs. Betti-Berutto and Wang in consideration for future services to the Company as the Hardware Chief Technical Officer and Software Chief Technical Officer, respectively. Messrs. Wang and Betti-Berutto are not officers or employees of our company; their respective titles of Software Chief Technical Officer and Hardware Chief Technical Officer reflect their core competencies and expertise and are primarily for marketing purposes as they have assisted the Company to identify suitable business combination candidates. As a result, Messrs. Betti-Berutto and Wang each received 5,000 shares of Common Stock.

In accordance with what was provided for in the IPO prospectus, on May 21, 2020, the Board approved the payment by the Company of advisory fees to directors in connection with certain activities on the Company's behalf, such as identifying and investigating possible business targets and business combinations as well as pertaining to Board committee service and administrative and analytical services. These advisory fees will be paid quarterly, and include payments to Dr. Avi Katz, the Chief Executive Officer and Executive Chairman of the Board. The quarterly amounts approved are as follows, of which 2.5 quarterly payments have been made:

| | |
|---|---|
| Dr. Avi Katz | $ 30,000 |
| Dr. Raluca Dinu | $ 30,000 |
| Neil Miotto | $ 15,000 |
| John Mikulsky | $ 6,000 |
| Andrea Betti-Berutto | $ 15,000 |
| Peter Wang | $ 6,000 |

Except as set forth above, no compensation will be paid to the Company's Sponsor, executive officers and directors, or any of their respective affiliates, prior to or in connection with the consummation of our initial business combination, which would be the Business Combination, if completed. Additionally, these individuals are reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. The

235

Table of Contents

Company's independent directors review on a quarterly basis all payments that were made to the Sponsor, executive officers, directors or their affiliates. The Company is not party to any agreements with its officers and directors that provide for benefits upon termination of employment.

After the completion of the Business Combination, Neil Miotto and Drs. Avi Katz and Raluca Dinu, will serve on the New Lightning eMotors Board. The amount of any director compensation that may be paid is not known at this time, as it will be up to the directors of New Lightning eMotors following completion of the Business Combination to determine executive and director compensation, as further discussed below.

**Lightning Systems**

This section provides an overview of Lightning Systems' executive compensation programs, including a narrative description of the material factors necessary to understand the information disclosed regarding Lightning Systems' named executive officers, or NEOs, in the summary compensation table below. For 2020, Lightning Systems' NEOs were:

| Name | Position |
|---|---|
| Tim Reeser | Founder and Chief Executive Officer |
| Robert Fenwick-Smith | Interim Chief Financial Officer |
| Bill Kelley | Chief Technology Officer and Chief Operating Officer |

To achieve Lightning Systems' goals of eradicating commercial fleet emissions and maintaining its position as the market leader in the urban commercial zero emissions vehicle industry, Lightning Systems has designed, and intends to modify as necessary, its compensation and benefits program to attract, retain, incentivize and reward deeply talented and qualified executives who share its philosophy and desire to work towards achieving these goals.

Lightning Systems believes its compensation program should promote the success of the company and align executive incentives with the long-term interests of its stockholders. Lightning Systems' current compensation programs reflect its startup origins in that they consist primarily of salary and stock option awards. As Lightning Systems' needs evolve, Lightning Systems intends to continue to evaluate its philosophy and compensation programs as circumstances require. Lightning Systems' board of directors, with input from its Chief Executive Officer, has historically determined the compensation for Lightning Systems' NEOs.

Compensation of Lightning Systems' NEOs is comprised of three key components: base salary, short-term cash incentive and long-term equity incentive.

Table of Contents

| | Core Component | Objective/Features |
|---|---|---|
| **Salary** | Base Salary | Base salaries are intended to provide compensation consistent with each NEO's responsibilities, experience and performance in relation to the marketplace. |
| **Long-Term Equity Incentive** | Stock Options and Conversion from Profits Interests | Stock options are used to provide a strong incentive for creation of long-term stockholder value, as stock options may be exercised to provide value to executives to the extent Lightning Systems' stock price appreciates after the grant date to enhance retention and long-term thinking. Stock options granted as part of Lightning Systems' long-term incentive plan generally vest in equal installments on each of the quarterly anniversaries of the grant date over a period of four years, which may include a one-year cliff vesting date, to enhance retention and long-term thinking. Certain stock options granted under the long-term incentive plan will accelerate as to vesting upon Lightning Systems undergoing a merger, acquisition, or initial public offering.<br>Historically, Lightning Systems had offered profits interests to its executives. On December 31, 2019, in connection with Lightning Systems' conversion from a limited liability company into a C-corporation, Lightning Systems converted all of its then-outstanding profits interests into stock options, on a one-to-one basis with each stock option bearing the right to purchase one share of common stock at an exercise price of $0.05. As of December 31, 2020, Lightning Systems had granted outstanding stock options to employees and board members totaling 4,138,710, of which 1,692,073 were vested and exercisable. |
| **Perquisites** | Health and Welfare Benefits | Lightning Systems provides benefits to its named executive officers on the same basis as provided to all of its employees, including group health, dental and vision insurance; life insurance; accidental death and dismemberment insurance; short-and long-term disability insurance; and a tax-qualified Section 401(k) plan, including a safe harbor matching contribution by Lightning Systems of 100% on the first 3% of eligible compensation contributed and 50% of the following 2% eligible compensation contributed annually. Lightning Systems does not maintain any ongoing executive-specific benefit or perquisite programs. |

237

Table of Contents

### Summary Compensation Table

The following table sets forth information concerning the compensation of the Lightning Systems' named executive officers for the year ended December 31, 2020.

| Name and principal position | Year | Salary ($) | Bonus ($) | Stock Options ($)(1) | Non-equity Incentive Plan compensation ($) | All other compensation ($) (2) | Total ($) |
|---|---|---|---|---|---|---|---|
| Tim Reeser | 2020 | $207,692 | — | $120,000 | — | $  8,308 | $336,000 |
| *Founder and Chief Executive Officer* | 2019 | $199,160 | — | $ 40,000 | — | $  7,966 | $247,126 |
| Robert Fenwick-Smith | 2020 | $105,785 | — | $120,000 | — | $      0 | $225,785 |
| *Interim Chief Financial Officer* | 2019 | $ 51,139 | — | — | — | $      0 | $ 51,139 |
| Bill Kelley | 2020 | $207,692 | — | $ 72,000 | — | $  8,308 | $288,000 |
| *Chief Technology Officer and Chief Operating Officer* | 2019 | 195,854 | — | 22,500 | — | 7,709 | 226,063 |

(1)     The amounts in this column represent the aggregate grant-date fair value of stock options granted to each named executive officer, computed in accordance with the FASB's ASC Topic 718. See Note 11- Stock Options and Stock Based Compensation to Lightning Systems' audited financial statements included elsewhere in this proxy statement/prospectus for a discussion of the assumptions made by Lightning Systems in determining the grant-date fair value of Lightning Systems' stock options. Amounts reported with respect to the year ended December 31, 2019, include the conversion of outstanding profits interests to stock options on December 31, 2019, in connection with Lightning Systems' conversion from a limited liability company into a C-corporation. Such profits interests were converted into stock options on a one-to-one basis, with each stock option bearing the right to purchase one share of common stock at an exercise price of $0.05. The grant date fair value for the years ended December 31, 2020 and 2019 were $0.48 and $0.05, respectively.

(2)     Amounts in this column for all periods consist of matching contributions under Lightning Systems' 401(k) plan.

### Narrative Disclosure to Summary Compensation Table

For 2020, the compensation program for Lightning Systems' named executive officers consisted of base salary and incentive compensation delivered in the form of profits interests and stock option awards.

#### Base Salary

Base salary is set at a level that is commensurate with the executive's duties and authorities, contributions, prior experience and sustained performance.

#### No Annual Bonus

Lightning Systems does not have any formal arrangements specific to its named executive officers providing for annual cash bonus awards. Lightning Systems executive officers may participate in the MBO Bonus Program according to the terms of their offer letters or employment agreements, which provides for bonus compensation payments based on the achievement of overall Lightning Systems performance targets. Lightning Systems did not achieve the performance targets and did not award any payments under the MBO Bonus Program in 2020, nor did Lightning Systems pay any other discretionary bonus compensation in 2020.

Table of Contents

***Lightning Systems 2019 Equity Incentive Plan and Stock Option Awards***

In connection with its conversion to a C-corporation, on December 31, 2019, Lightning Systems' board of directors adopted, and Lightning Systems' stockholders approved, the Lightning Systems, Inc. 2019 Equity Incentive Plan, or the 2019 Plan. The 2019 Plan permits the grant of incentive stock options, nonqualified stock options, restricted stock awards and other stock-based awards. Incentive stock options may be granted only to employees of Lightning Systems and its parent and subsidiary corporations. All other awards may be granted to Lightning Systems' directors and employees and consultants of Lightning Systems and Lightning Systems' affiliates with respect to services provided to Lightning Systems.

A total of 6,500,000 shares are reserved for grant under the 2019 Plan. As of December 31, 2020, stock options to purchase 4,138,710 shares of Lightning Systems' common stock with a weighted-average exercise price of $0.23 per share were outstanding. There are no outstanding awards other than stock options pursuant to the 2019 Plan as of December 31, 2020.

*Administration*. Lightning Systems' board of directors or a committee delegated by the board of directors administers the 2019 Plan. Subject to the terms of the 2019 Plan, the administrator has the power to, among other things, select participants from among eligible employees, consultants and non-employee directors, determine the awards to be made pursuant to the 2019 plan, fix the option price, option period and manner in which an option becomes exercisable, establish the terms and conditions applicable to, and establish such other terms and requirements of the various compensation incentives under the 2019 Plan, and correct any defect, supply any omission or reconcile any inconsistency in the 2019 Plan or in any agreement under the 2019 Plan.

*Options*. Lightning Systems' employees and service providers have historically received incentive stock options ("ISOs") pursuant to the 2019 Plan. The exercise price per share of incentive stock options granted under the 2019 Plan must be at least 100% of the fair market value per share of Lightning Systems' common stock on the grant date; provided that the exercise price for an incentive stock option granted to a 10% or more holder of Lightning Systems' common stock will be no less than 110% of the fair market value per share of Lightning Systems' common stock on the grant date. Nonqualified stock options may be granted with a per share exercise price that is less than 100% of the per share fair market value of Lightning Systems' common stock. The aggregate fair market value of the shares with respect to which incentive stock options may be exercisable for the first time by an option holder in any calendar year, under the 2019 Plan or otherwise, may not exceed $100,000 (or such higher amount as permitted under Section 422 of the Internal Revenue Code of 1986, as amended, or the Code). Subject to the provisions of the 2019 Plan, the administrator determines the other terms of options, including any vesting and exercisability requirements, the method of payment of the option exercise price, the option expiration date (which may be no more than 10 years from the date of grant, or 5 years for an incentive stock option granted to a 10% or more holder of Lightning Systems' common stock), and the period following termination of service during which options may remain exercisable.

*Capital Adjustments*. In the event that Lightning Systems at any time increases or decreases the number of its outstanding shares or changes in any way the rights and privileges of such shares by means of the payment of a stock dividend or any other distribution payable in stock, or through a stock split, subdivision, consolidation, combination, reclassification or recapitalization involving the common stock, then in relation to the common stock that is affected by one or more of the above events, the numbers, exercise price, rights and privileges of the following shall be increased, decreased or changed in like manner as if they had been issued and outstanding, fully paid and nonassessable at the time of such occurrence: (i) the shares as to which awards may be granted under the 2019 Plan, (ii) the shares then included in each outstanding award granted under the 2019 Plan, and (iii) the maximum number of shares available for grant pursuant to incentive stock options.

In the event that (i) Lightning Systems at any time distributes with respect to the common stock, assets or securities of persons other than Lightning Systems (excluding cash or any distribution referred to in the foregoing paragraph), or (ii) if Lightning Systems at any time grants to the holders of its common stock rights to subscribe

239

Table of Contents

pro rata for additional shares thereof or for any other securities of Lightning Systems, or (iii) if there shall be any other change (excluding as described in the foregoing paragraph) in the number or kind of outstanding common shares or of any stock or other securities into which the common stock shall be changed or for which it shall have been exchanged, then the administrator may, in its discretion, determine that such event equitably requires an adjustment in the number or kind of shares subject to an option or other award, an adjustment in the option price or the taking of any other action by the administrator, including without limitation, the setting aside of any property for delivery to the participant upon the exercise of an option or the full vesting of an award. If the administrator makes such a determination, then such adjustments shall be made, or other action shall be taken, by the administrator and shall be effective for all purposes of the 2019 Plan and on each outstanding option or award that involves the particular type of stock for which a change was effected.

*Effect of Combination with the Company.* Each Lightning Systems Option that is outstanding immediately prior to the Effective Time of the Business Combination, whether vested or unvested, shall be assumed by the Company and converted into an Exchanged Option to purchase a number of shares of New Lightning eMotors Common Stock equal to the product (rounded down to the nearest whole number) of (x) the number of shares of Lightning Systems Common Stock subject to such Lightning Systems Option immediately prior to the Effective Time of the Business Combination and (y) the Exchange Ratio, at an exercise price per share (rounded up to the nearest whole cent) equal to the quotient of (A) the exercise price per share of such Lightning Systems Option immediately prior to the Effective Time of the Business Combination divided by (B) the Exchange Ratio; provided, however, that the exercise price and the number of shares of New Lightning eMotors Common Stock purchasable pursuant to the Exchanged Options will be determined in a manner consistent with the requirements of Section 409A of the Code and, in the case of incentive stock options, Section 422 of the Code. Except as specifically provided above or as agreed to in writing with any holder of a Lightning Systems Option, following the Effective Time of the Business Combination, each Exchanged Option will continue to be governed by the same vesting and exercisability terms and otherwise substantially similar terms and conditions as were applicable to the corresponding former Lightning Systems Option immediately prior to the Effective Time of the Business Combination.

*Plan Amendment or Termination.* Lightning Systems' board of directors may amend, modify, or terminate the 2019 Plan at any time. No amendment, modification or termination of the 2019 Plan or an award agreement shall in any manner adversely affect any options, restricted stock awards, or other award theretofore granted under the 2019 Plan, without the consent of the participant holding such options, restricted stock awards, or other awards; provided that Lightning Systems' board of directors may amend or modify the terms of the 2019 Plan or an award agreement, retroactively or prospectively, as permitted under the 2019 Plan to comply with changes in accounting or tax rules or to comply with Section 409A with or without the consent of the participant.

### Benefits, Perquisites and Retirement Benefits

Lightning Systems provides benefits to its named executive officers on the same basis as provided to all of its employees, including health, dental and vision insurance; life insurance; accidental death and dismemberment insurance; short-and long-term disability insurance. Lightning Systems does not maintain any ongoing executive-specific benefit or perquisite programs.

Lightning Systems provides a tax-qualified Section 401(k) plan for all employees, including its named executive officers. Lightning Systems provides a safe harbor match of 100% on the first 3% of eligible compensation contributed and 50% of the following 2% eligible compensation contributed of participants' elective contributions annually to the 401(k) plan. Lightning Systems does not provide to employees, including its named executive officers, any other retirement benefits, including but not limited to tax-qualified defined benefit plans, supplemental executive retirement plans and nonqualified defined contribution plans.

Table of Contents

*Agreements with Lightning Systems' Named Executive Officers and Potential Payments Upon Termination or Change of Control*

Lightning Systems evidences initial employment terms in offer letters to new employees providing for employment at will. None of Lightning Systems' named executive officers are party to an employment agreement with Lightning Systems.

Effective January 4, 2021, Lightning Systems appointed Ms. Teresa Covington Chief Financial Officer. In connection with Ms. Covington's appointment, Lightning Systems has agreed to pay Ms. Covington an annual base salary of $350,000 and to afford her a target bonus opportunity equal to 40% of base salary, subject to achievement of performance criteria determined by Lightning Systems.

On February 24, 2021, Lightning Systems granted Ms. Covington ISOs to purchase 124,450 shares of Lightning common stock at a price of $6.18 per share (which represented the per share fair market value of Lightning common stock on the date of grant) under the 2019 Plan. Such ISOs will vest in ratable installments on February 24, 2022, 2023 and 2024, subject to continued employment.

### Outstanding Equity Awards at Fiscal 2019 Year End

The following table provides information about the outstanding equity awards held by Lightning Systems' named executive officers as of December 31, 2020.

| Name | Grant Date | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date |
|---|---|---|---|---|---|
| Tim Reeser | 8/24/2020 | 15,625 | 234,375(2) | $ 0.55 | 8/24/2030 |
| | 12/31/2019(1) | 800,000 | 600,000(3) | $ 0.05 | 12/31/2029 |
| Robert Fenwick-Smith | 8/24/2020 | 15,625 | 234,375(2) | $ 0.55 | 8/24/2030 |
| Bill Kelley | 8/24/2020 | 9,375 | 140,625(2) | $ 0.55 | 8/24/2030 |
| | 12/31/2019(1) | 37,500 | 312,500(4) | $ 0.05 | 12/31/2029 |

(1) On December 31, 2019, in connection with Lightning's conversion from a limited liability company into a C-corporation, Lightning converted its all of its outstanding profits interest into stock options, on a one-to-one basis with each stock option bearing the right to purchase one share of common stock at an exercise price of $0.05.

(2) Such awards will vest in quarterly ratable installments over the four years following the date of grant; provided that in the case of Messrs. Reeser and Fenwick-Smith, 100,000 options will vest immediately prior to the consummation of the Business Combination.

(3) Such awards will vest in three ratable installments on October 1, 2021, 2022, and 2023.

(4) Such awards will vest as to 100,000 options on each of January 7, 2021 and 2022, and as to 37,500 options on each of October 1, 2021, 2022, and 2023.

### Director Compensation

In August 2020, Lightning Systems awarded each director, other than Mr. Morrison, stock options to purchase 50,000 shares of Lightning Systems common stock, plus options to purchase an additional 5,000 shares of Lightning Systems common stock, plus options to purchase an additional 5,000 shares of Lightning Systems common stock for each year of service per director. Such stock options have an exercise price equal to the fair market value on the date of grant of $0.55 per share.

241

Table of Contents

In February 2021, Lightning Systems awarded Mr. Morrison stock options to purchase 55,000 shares of Lightning Systems common stock at a price of $6.18 per share (which represented the per share fair market value on the date of grant). All such options will vest ratably over the first four anniversaries of the date of grant or upon a change in control, which would include the consummation of the Business Combination. Lightning Systems currently has no other formal arrangements under which directors receive compensation for their service on Lightning Systems' board of directors or its committees. Lightning Systems' policy is to reimburse directors for reasonable and necessary out-of-pocket expenses incurred in connection with attending board and committee meetings or performing other services in their capacities as directors.

Lightning Systems' board of directors expects to review director compensation periodically to ensure that director compensation remains competitive such that Lightning Systems is able to recruit and retain qualified directors. Following the consummation of the Business Combination, New Lightning eMotors intends to develop a board of directors' compensation program that is designed to align compensation with New Lightning eMotors' business objectives and the creation of stockholder value, while enabling New Lightning eMotors to attract, retain, incentivize and reward directors who contribute to the long-term success of New Lightning eMotors.

**New Lightning eMotors Executive Officer and Director Compensation Following the Business Combination**

Following the consummation of the Business Combination, Lightning Systems intends to develop an executive compensation program that is designed to align compensation with New Lightning eMotors' business objectives and the creation of stockholder value, while enabling New Lightning eMotors to attract, retain, incentivize and reward individuals who contribute to the long-term success of New Lightning eMotors. Decisions on the executive compensation program will be made by the Company's Board or a committee appointed by the Board.

### *Executive Compensation*

The policies of New Lightning eMotors with respect to the compensation of its executive officers following the Business Combination will be administered by the New Lightning eMotors Board in consultation with its compensation committee. The compensation policies followed by New Lightning will be intended to provide for compensation that is sufficient to attract, motivate and retain executives of Lightning Systems and potential other individuals and to establish an appropriate relationship between executive compensation and the creation of stockholder value.

In addition to the guidance provided by its compensation committee, New Lightning eMotors may utilize the services of third parties from time to time in connection with the hiring and compensation awarded to executive employees. This could include subscriptions to executive compensation surveys and other databases or the engagement of independent compensation consultants. At this time New Lightning eMotors is currently negotiating the terms of new employment agreements with the individuals that are expected to become the senior executive officers of New Lightning eMotors upon completion of the Business Combination.

As a part of the Business Combination, Lightning Systems expects to enter into new executive employee agreements that will be effective upon the completion of the Business Combination.

### *Equity Compensation*

It is anticipated that equity-based compensation will be an important foundation in executive compensation packages as New Lightning eMotors believes it is important to maintain a strong link between executive incentives and the creation of stockholder value. New Lightning eMotors believes that performance and equity-based compensation can be an important component of the total executive compensation package for maximizing stockholder value while, at the same time, attracting, motivating and retaining high-quality executives. Formal

242

Table of Contents

guidelines for the allocations of cash and equity-based compensation have not yet been determined, but it is expected that the Incentive Plan described in Proposal No. 5 will be an important element of the New Lightning eMotors compensation arrangements for both executive officers and directors.

### Director Compensation

It is anticipated that the compensation committee of the New Lightning eMotors Board will determine the compensation to be paid to the members of the New Lightning eMotors Board upon completion of the Business Combination.

243

**Table of Contents**

**INFORMATION ABOUT LIGHTNING SYSTEMS**

*References in this section to "Lightning Systems" refers to Lightning Systems, Inc.*

**Company Overview**

Lightning Systems, doing business as "*Lightning eMotors*", is an electric vehicle designer and manufacturer, providing complete electrification solutions for commercial fleets – from Class 3 cargo and passenger vans to Class 6 work trucks, Class 7 city buses, which we believe represents a significant total addressable market of approximately $67 billion and Class A motor coaches. Lightning eMotors is committed to eradicating commercial fleet emissions, a primary cause of urban air pollution, by providing zero emission Class 3 to 7 Battery Electric Vehicles, Fuel Cell Electric Vehicles and charging infrastructure solutions to commercial fleet customers. As of the date of this proxy statement/prospectus, Lightning eMotors is the market leader in the Class 3 to Class 6 EV segment, with 72 units sold in 2020 representing approximately 36% of the total market in 2020. Lightning Systems delivered 41 Class 3 vehicles in 2020, constituting approximately 75% market share among Class 3 EVs. We believe that Lightning Systems is the only company in the United States that has delivered fully functional Class 3 to 7 EVs to end customers that are in use today, with 97 units delivered by us in 2019 and 2020 (in addition to 12 demonstration and test vehicles).

We started in 2008 as a manufacturer of hybrid systems for commercial vehicles, but have since realized that hybrid solutions did not adequately address the growing issue of urban air pollution from commercial vehicle fleets. We understood the importance of zero emission and the attractive market opportunity to offer full-range ZEVs, and in 2017 we redirected our efforts to focus exclusively on ZEVs, leveraging nearly 10 years of unparalleled knowledge developing and selling hybrid commercial vehicles to successfully adapt to zero emission vehicles. As of the date of this proxy statement/prospectus, all of Lightning eMotors' platforms have been fully certified by the California Air Resource Board ("*CARB*"), the clean air agency that defines vehicle emissions standards. We currently maintain 6 Executive Orders, which is a requirement to sell ZEV vehicles in California as well as various other states.

We are the only full-range manufacturer of Class 3 to 7 BEV and FCEV in the United States and provide end-to-end electrification solutions including advanced analytics software, charging solutions (which we refer to as "*Energy-as-a-Service*") and financing (which we refer to as "*EV-as-a-Service*"). We combine optimized modular software with a customized hardware design that allows us to address the diversified opportunities in the markets in which we operate in a cost-effective manner with a significant time-to-market advantage. We have also built an extensive ecosystem of supply-chain partners and specialty vehicle partners which are instrumental to our growth.

We believe the commercial ZEV space is at an inflection point with strong secular trends of regulation, corporate mandates and grants to accelerate the transition to zero emission vehicles globally. In addition, ZEVs already provide a lower TCO than ICE vehicles with state and federal grants made available to offset the higher upfront cost of commercial ZEVs. We believe that the TCO of ZEVs will continue to decrease as we drive down costs through our R&D efforts, supply chain maturity and scale. We believe that the TCO of Lightning eMotors' solutions will be lower than that of ICE vehicles, even without state and federal grants starting in the first half of 2022.

**Our Customers**

We sell primarily to large-scale enterprises, making our sales process Business-to-Big-Business focused and our products bespoke to our customers' needs. Because we sell directly to customers, we are able to assess and meet their needs in a cost-effective manner. Our customers choose to partner with us because we are the only one-stop shop for ZEVs, across classes 3 to 7 in the United States. We aim to take the complexity out of the EV purchasing process by helping customers to specify the vehicles that suit their individual needs based on our in-depth telematics\analytics while also providing them with complete charging solutions for their fleets and access to custom financing solutions.

244

Table of Contents

Our two-year, industry-leading head start in the commercial ZEV space led to significant progress in customer validation with 121 vehicles on the road as of February 22, 2021 (including 12 demonstration and test vehicles) and 1,569 electric commercial vehicles and electric powertrains on order as of December 31, 2020. Our vehicles currently on the road benefit from extensive validation with customers and end-users, ranging between 3 and 24 months, and are deployed in real working conditions, gathering real-world data.

Our customers represent some of the largest global fleet operators and logistics providers in the world, as well as a variety of other large enterprises and governments across a variety of commercial vehicle categories. We expect to generate significant repeat orders from these customers. In the third quarter of 2020, we secured $120 million of purchase orders from both new and existing customers, demonstrating a significant inflection point in ZEV adoption. As of December 31, 2020, we had $169 million of backlog, as compared to a backlog of $27 million as of December 31, 2019, and a pipeline of $800 million of sales. We have already received purchase orders to completely cover our estimated 2021 revenue and over 25% of 2022 revenue. As we continue to scale our manufacturing capabilities to meet increased demand – from both new and existing customers – we anticipate that our pipeline will continue to scale.

**Our Partners**

We optimize our supply chain for quality, reliability, and cost. We believe our long-term relationships with supply chain partners will be a key driver in our ability to scale without unduly sacrificing quality or delivery times and serve as a foundation for our growth. Because we have relationships with multiple suppliers for each core component of our vehicles, we are able to build and maintain a high degree of resilience in our supply chain, which will assist us with mitigating delays. We also partner with battery pack manufacturers allowing us to keep the latest battery technology in our vehicles at the time of manufacturing. To this end, we have recently entered into a three-year contract with our primary battery supplier, Romeo Power Technology, that will secure battery inventory without significant fluctuations in cost. We believe, that through careful supply chain management and the cultivation of long-term relationships with our suppliers, we can reduce our cost-of-goods-sold by up to 50% over the next 18 months. Continuous communication and partnerships with all of our suppliers has enabled us to maintain cutting-edge technology in our vehicles at the lowest possible cost.

**Industry Background**

According to Bloomberg New Energy Finance ("*Bloomberg NEF*"), global commercial EV sales are expected to increase from 96,000 vehicles in 2020 to 473,000 vehicles in 2040, representing a nearly 500% increase over the next 20 years. Even with this strong expected growth through 2040, such sales would represent only an estimated 7.7% of the commercial EV market providing Lightning eMotors a large, compelling market and opportunities for growth.

The TCO for commercial ZEVs has become highly competitive to ICE commercial vehicles. Today, grants and credits are driving TCO parity for ZEV versus their ICE counterparts. We expect that by the first half of 2022, the TCO of our vehicles will be lower than ICE without relying on grants and credits, as Lightning eMotors continues to reduce vehicle costs through economies of scale and contract-based cost reductions across the supply chain.

In addition to the TCO progress, strong global secular trends are accelerating the pace of commercial ZEV adoption. These trends can be broadly categorized as follows:

- *Regulatory Tailwinds*

  - Zero-Emission Zones: Led by London, England and Santa Monica, California, over 30 cities worldwide have enacted legislation creating zero-emission zones. These zones are intended to improve air quality and reduce noise. The cities are driving the conversion to ZEV's through tax revenues

245

Table of Contents

received from ICE vehicles. In London, non-compliant vans pay fees in excess of $130 per day, while coaches are charged double that rate.

- ○ Mandated Transition Timelines: California, which is currently our largest market, has enacted legislation setting a timeline for transition to ZEV across classes.

  - By 2023: 100% zero emissions for new airport shuttle buses (Zero Emission Airport Shuttle Regulation)

  - By 2029 (staged): 100% zero emission for public transit authorities buses (ICT Regulation)

  - By 2045: Advanced Clean Truck Law – 100% (ACT Regulation)

- *Corporate Mandates*

  - ○ Zero-Emission Goals: Major corporations, across many industries, have elected to proactively transition their vehicles towards being 100% ZEV. A selection of these companies and their self-imposed goals:

    - Amazon: 100% Renewable Energy by 2025 and Net Zero Carbon by 2040

    - UPS: 25% of vehicle purchases in 2020 run on alternative fuels

    - DHL: Targeting to operate 70% of first- and last-mile delivery services with clean transport modes by 2025 as part of its longer-term corporate commitment to reduce its logistics-related emissions to zero by 2050.

- *Grants*

  - ○ State and Federal Grants: In the United States, federal and state governments allocate grants totaling approximatively $1 billion per year to those operating ZEVs. Tax incentives and grants have accelerated the pace of adoption for ZEV by providing additional cost-based motivations for operators of medium-duty vehicles to accelerate the transition in the near-term.

**Our Market Opportunity**

Our large and growing Total Addressable Market ("*TAM*") is comprised of Class 3 to 7 medium-duty commercial vehicles, including shuttle buses, ambulances, delivery vans & trucks, bucket trucks, food trucks and coaches, among others. Regulatory tailwinds and a rapidly improving cost structure have accelerated the pace of adoption for electric vehicles, allowing operators to transition fleets to zero-emission standards in accelerated timelines. Our modular software and hardware solution enables us to serve a variety of attractive niche markets in a cost-effective and efficient manner. While other manufacturers and OEMs have focused on one or two classes of vehicles, we are currently the only company in the United States that is focused on delivering reliable, zero-emission vehicles – in both battery electric and fuel-cell electric designs – across Classes 3 to 7. By leveraging, and in some cases modifying, existing components, we have built a complete modular software and hardware solution that can be installed in medium-duty vehicles across classes and types, thus broadening and strengthening our TAM.

We estimate our TAM across Class 3 to 7 vehicles is roughly $67 billion annually worldwide based on 2018 data from the U.S. Department of Energy. The US market is approximately $22 billion, while the global offshore market is approximately $45 billion, resulting in a total addressable market of approximately $67 billion. In the United States, we estimate that a total of 539,000 vehicles are sold annually in the U.S. across these 5 classes, with Class 3 accounting for the greatest portion of the total, at 301,000 vehicles. Globally, we estimate that an additional 993,000 vehicles across these classes are sold annually.

246

Table of Contents

Because the medium-duty commercial vehicle category is very low volume in comparison to light-duty and heavy-duty commercial vehicles, established OEMs are reluctant to invest in production of medium-duty vehicles (Class 3 to 7 vehicles). While OEMs sell chassis and other parts that are utilized in our vehicles, the cost of creating a complete vehicle would be higher than their anticipated return on investment given the niche markets we serve.



Similarly, new entrants that build ZEVs from the ground up are limited by the lack of modularity in their solutions. A total vehicle that is designed and built to suit the requirements of one class is difficult and costly to modify. EV companies, including Rivian, Lordstown, Tesla, Nikola, Hyliion, Arrival and Proterra, have focused on higher-volume light-duty, Classes 1 to 2, and heavy-duty, Class 8, categories, but thus far, the narrow scope of their products and designs has left our TAM of Class 3 to 7 vehicles largely unchallenged. The large historic OEMs like Ford, GM, Mercedes, Volvo and Toyota are also predominantly focusing on light-duty and heavy-duty where the volumes are much higher than in the medium-duty.



We have manufactured and sold vehicles on the road for over two years, providing an important first-mover advantage in the commercial ZEV space across Class 3 to 7 vehicles. While other companies are still in the prototyping phase, we have a broad range of customers who have validated our vehicles and have been actively gathering telematics data off each vehicle every day and utilizing our analytics capabilities to optimize vehicle performance, which enhances customer attachment and we expect will result in low churn. As a result, we have been able to quantifiably demonstrate reliability and TCO validation for our customers, while continuing to improve our manufacturing and design practices. This has led to continued growth in market share: we currently have the highest or second-highest market share in each ZEV market in which we operate. In 2020, we had over

247

Table of Contents

36% market share across Classes 3 to 6 medium-duty vehicles. Having over 10 years' worth of research and development (R&D) and 121 vehicles on the road as of February 22, 2021 (including 12 demonstration and test vehicles) has allowed us to build out a solution that remains ahead of the competition in terms of technology, reliability, and versatility.

The sales cycle can take up to two years, as many customers wish to test and purchase vehicles in small numbers before scaling. Because we have already completed this process with many customers, we are seeing strong repeat purchase behavior from many of our early purchasers. In the third quarter of 2020, we received $120 million in repeat purchase orders. As of December 31, 2020, we had $169 million of backlog, as compared to an order backlog of $27 million as of December 31, 2019, and a pipeline of $800 million of sales. We have already received purchase orders to completely cover our estimated 2021 and over 25% of 2022 revenue. As we continue to scale our manufacturing capabilities to meet increased demand – from both new and existing customers – we anticipate that our pipeline will continue to scale.

In addition to our direct selling efforts, we leverage specialty vehicle and OEM partnerships with companies including Winnebago, Rev Group, Brown Industries, Shyft Group and ABC Companies, to deepen our TAM penetration. These partners purchase our powertrains and license our technology for use in their facilities, which allows us to electrify additional vehicles outside of our manufacturing facility. Our relationship with Plug Power allows us to offer fuel cell electric vehicles in addition to our battery powered models, which allows our customers to drive longer distances with larger payloads.

Incremental to this vehicle-based $67 billion TAM, we are currently pursuing additional market opportunities inEnergy-as-a-Service and the sale of electric powertrains to our OEM partners. We also offer EV-as-a-Service, which allows customers to lease vehicles with maintenance, insurance, and support included in the lease price, and Energy-as-a-Service, an all-in-one charging installation, maintenance, and support solution that we expect to provide a recurring revenue stream with 10-year contracts, to our customers. These solutions make it possible for our customers to fulfill all of their ZEV needs with Lightning eMotors, minimizing the friction that might otherwise arise from a transition from ICE vehicles to ZEV.

**Our Competitive Advantages**

We believe the following strengths will allow us to maintain and extend our leadership position.

- **Ability to offer cost effective solutions to highly segmented and customized markets in the Class3 to 7 ZEV markets.** Because the medium-duty commercial vehicle category is low volume in comparison to light-duty and heavy-duty commercial vehicle categories, established OEMs are reluctant to invest in production of Class 3 to 7 ZEV vehicles. Our long-term relationships with supply chain partners have prepared us to scale in a cost effective manner. Continuous communication with all of our suppliers has enabled us to maintain cutting-edge technology in our vehicles at a significantly lower cost.

- **Modular software and hardware design.** We have developed proprietary optimized modular software and hardware solutions andknow-how that allow us to address the diversified opportunities in the markets we serve in a cost-effective manner. We serve a highly segmented Class 3 to 7 ZEVs market where even within each class there are numerous specialty vehicles with significant mechanical and electrical complexities. Therefore, a one-size-fit-all design would likely fail in the face of the high degree of customization required. We have innovated in this space to create a vehicle class and application agnostic design enabled by modular software and hardware design. With a software-enabled platform and integration capabilities, we can bring vehicles across the class and application types to market faster and at a lower cost than our peers.

- **End-to-end commercial ZEV solutions.** We provide end-to-end electrification solutions for urban commercial fleets. Our solutions are centered around Class 3 to 7 commercial ZEVs and we also provide analytics, charging and financing services to make sure we can support our customers along every step of their way in their electrification journey. We manufacture Class 3 to 7 trucks and buses of every variety and

248

Table of Contents

also provide powertrains to strategic partners. We provide actionable fleet intelligence to our customers in real-time around driver behavior optimization, preventative diagnostics and fleet management, which provides us with a distinct opportunity for recurring revenue, a unique profit margin profile and compelling return on equity. In addition, we also provide Energy-as-a-Service to our customers, leasing our patented mobile chargers and regular chargers to customers to equip them with the necessary infrastructure to get their fleet electrified. To help our customers overcome the higher upfront costs associated with owning ZEVs, we work with financing partners including Generate Capital to provide EV-as-a-Service to lease our vehicles. Both the Energy-as-a-Service and EV-as-a-Service businesses provide recurring revenue streams to our business. Our highly integrated services make us the one-stop commercial vehicle electrification solution provider of choice for customers.

- **First-mover advantage in the rapidly growing commercial ZEV space.** We believe that we are ahead of our peers in customer validation with $169 million of backlog as of December 31, 2020 and a 36% market share across Class 3 to 6 ZEVs in 2020. Our two-year head start in the commercial ZEV space led to significant progress in customer validation. Commercial fleet customers require high reliability and a full-service network. In addition, they must factor TCO to validate the economic viability of the solution. The total sales cycle therefore typically ranges from 3 to 24 months and requires significant time and effort as well as deep engagement with customers throughout the process. Benefiting from our head start in the market, we already have 121 vehicles on the road as of February 22, 2021 (including 12 demonstration and test vehicles) and 30 fleets who have placed purchase orders, 10 of which have placed repeat orders. Through years of effort and cumulative customer validation, we have now reached the tipping point of an accelerated sales cycles which is expected to fuel our next phase of growth.

- **Highly scalable analytics solution differentiates our products and drives customer retention.** With our proprietary 1 Hertz analytics solution, every vehicle we put on the road becomes a data generator for us to provide real-time actionable intelligence to customers. Our solution leverages big data and analytics to provide intelligence around driver behavior optimization, preventative diagnostics and fleet management. In CARB testing of Class 3 ZEVs, our analytics software drives 25% greater efficiency compared to our competitors. Internally, we also leverage the massive amount of analytical data collected to optimize our products without compromising customer privacy, which further strengthens our technology leadership in the market. In addition to differentiating our products, our analytics solution also provides additional sources of revenues and drives customer retention. The solution currently has a 100% attachment rate with less than 1% expected churn rate in the future.

- **Growing intellectual property portfolio ensuring differentiated product offering.** We have over 10 years R&D experience in the clean transportation space. Our R&D efforts have led to a rich and growing patent portfolio that covers our entire solution including both hardware and software and across vehicles and chargers, which we believe are fundamental to our business and has created a deep competitive moat for us in the markets that we serve. These patents represent learnings from very significant challenges that we've experienced in the process of electrifying commercial vehicles. Compared with passenger electric vehicles, commercial electric vehicles require larger payload and more commitment to batteries, therefore driver behavior optimization, effective charging management and solid battery infrastructure are all critical aspects of the business and lead to the development of our rich patent portfolio.

- **Bespoke sales process selling directly into large fleet customers.** We are also innovating the go-to-market strategy in the commercial vehicle space. The commercial vehicle market is highly segmented and requires significant level of customization that increases with electrification. Therefore, unlike the traditional OEM space, we provide our fleet customers with a high-touch sales experience both directly and with channel support. We have an education-focused technically-sophisticated sales force and a comprehensive national demonstration vehicle pool that allows us to understand critical customer needs including battery capacity, vehicle types and financing needs, among others. Based on analyzing a fleet's specific drive cycles with our advanced analytics, we then customize vehicles and leverage our modular software and hardware to build a cost-effective solution. We have 10 years of regular engagement with over 250 fleets nationally, which has translated into significant purchase orders and sales pipeline and the potential for future growth.

249

Table of Contents

- **Established strategic partnerships to optimize procurement and go-to-market strategy**. Since 2008, we have built an extensive ecosystem of supply-chain partners and specialty vehicle partners. Our suppliers are instrumental to the performance and reliability of our vehicles and enable us to scale in a relatively asset light and cost-effective manner. Our key suppliers include Ford, BorgWarner, Romeo Power, Hino and Delta Electronics, among others, all of which are industry leading manufacturers of critical components like chassis, bodies, batteries and chargers. Plug Power, a leading hydrogen solution manufacturer, is one of our key supply chain partners with which we have established a multidimensional strategic partnership. We work with Plug Power to manufacture fuel cell-powered vehicles. We also leverage their extensive hydrogen fueling infrastructure and collaborate in the go-to-market strategy to sell class 3 through class 7 FCEVs.

  Our specialty vehicle partners are also critical to our rapid growth strategy and enable us to apply our modular technology to an expanding range of markets including recreational vehicles, ambulances, coaches etc. We work closely with OEMs including Winnebago, Rev Group and ABC Companies to electrify vehicles in their target markets that they manufacture. For example, we are the exclusive motor-coach RePower electrification solution provider to the leading motor-coach company, ABC Companies. Our electric RePower solution (replacing ICE with EV in older buses) has a 18-month shorter delivery time and is economically competitive (approximately half the price) compared to many new electric buses and coaches manufactured by other OEMs. Given our demonstrated capabilities, we received a $48 million purchase order from ABC Companies in September 2020.

- **Highly experienced management team.** We are led by a visionary senior management team with extensive experience and proven track record in building and managing businesses in the technology space at scale. Our senior management team drives our vision and corporate strategy and is committed to maintaining our technology leadership in the urban commercial ZEV space.

## Our Products and Technologies

Our complementary suite of IP-protected products, software and services are designed to deliver highly reliable and cost-effective solutions to our customers operating vehicles in a wide range of applications. The know-how gathered over the course of our 12-year operating history, combined with the 1 Hertz data transmission rate we have aggregated from every vehicle we have on the road for the last two years, have enabled us to customize our offering to maximize reliability and minimize total cost of ownership, driving repeat purchase behavior across our customer base.

- *Commercial ZEVs:* Our technology is optimized for vehicles in Classes 3 to 7, ranging from medium-duty vans up to motor-coaches. Because our software and hardware is modular, we are able to select from our code and hardware libraries to create configurations that suit customers' needs across a broad category of use applications. Our modular customization strategy allows us to adapt quickly to fulfill large orders with multiple configurations, including both battery electric and hydrogen fuel cell electric vehicles. We have developed a suite of proprietary intellectual property covering our modular solutions, including two pending non-provisional filings and one pending provisional filing, with nine additional invention disclosures in process for our commercial ZEV technologies.

- *Analytics*: Our proprietary analytics platform, installed in each vehicle, allows us to collect drive cycle and vehicle performance data at 1 Hertz. Leveraging AI-based optimization, we are able to provide drivers and fleet operators with real-time recommendations about how to improve vehicle performance, routes, and charging strategies. Our analytics offering is offered on a subscription basis, with high uptake rates and very limited churn.

- *Systems for OEMs:* In addition to building complete electric vehicles, we also design and sell electric powertrains to our OEM partners. We license our technology to these OEMs and train their technicians to install the powertrains within the OEMs' manufacturing facilities.

250

Table of Contents

- *Energy-as-a-Service:* Many of our customers want additional support in customizing their vehicle charging strategies. Beginning in June 2020, we offer a full turn-key Energy-as-a-Service solution in which Lightning eMotors owns and leases chargers to customers, facilitating Low Carbon Fuel Standard ("*LCFS*") monetization, and deep customer integration and attachment. Through our Energy-as-a-Service offering, we plan, build, and install charging infrastructure at a client's depot, then lease the infrastructure to the client on a recurring basis. Having a complete vehicle and charging solution from one partner is a value-add for our customers.

- *EV-as-a-Service:* For customers that are just entering the ZEV space, transitioning to ZEVs and building out a charging strategy can be quite complex. EV-as-a-Service is a packaged offering that includes the vehicle, charging, maintenance, insurance, and ongoing support, which makes it possible for customers to be early adopters of ZEVs and validate vehicle operating and TCO performance with less financial commitment than a traditional purchase model.



**Our Growth Strategy**

- **Capitalize on increasing regulatory and customer demands for commercial emission free vehicles.** We believe the commercial ZEV space is at a significant inflection point driven by multiple tailwinds including regulations, corporate mandates and state as well as federal grants. The growing supply chain maturity is also significantly increasing the economic attractiveness of ZEVs when compared with ICE vehicles. We have already capitalized on these trends and will continue to aggressively pursue demand for increased ZEV adoption.

- **Acquire new customers.** By leveraging our strategic partners including Plug Power and ABC Companies, we will continue to win new customers and expand into new markets. In addition, despite a relatively small sales staff, we have been able to generate strong revenue growth and a large pipeline of customers. We also intend to bolster our sales staff as we grow to help improve our pipeline and acquire new customers for our business.

- **Continue executing land-and-expand.** Once customers sign initial contract and purchase orders, we can significantly shorten the sales cycle to win repeat orders from them as we don't have to repeat the technical and TCO validation periods. We have $169 million of backlog as of December 31, 2020, and we believe that we have a clear path to $1 billion of revenue by 2025 based on the pipeline from existing customers.

- **Continue expanding our vehicle portfolio across Class 3 to 7 categories.** We intend to build upon our modular software and hardware design and end-to-end commercial ZEV solutions to expand our reach within the various segments in the Class 3 to 7 categories. We have been primarily delivering BEV to our

251

Table of Contents

customers to date, but our recent partnership with Plug Power will allow us to add FCEV vehicles to our product portfolio. In addition, we look to maintain the high attachment rate of our proprietary analytics solution and increase the penetration of our Energy-as-a-Service and EV-as-a-Service offerings.

- **International expansion.** As of the date of this proxy statement/prospectus, we have sold our ZEVs only in the United States other than one customer purchase order in Canada. By growing our commercial reach into international markets, we believe that we can build significant share and revenue opportunities within an untapped community of customers. In addition, Lightning eMotors currently works with many fleets in the U.S. that operate vehicles globally, providing an opportunity to quickly expand worldwide within those fleets.

- **Expand our global channel relationships.** We intend to continue building partnerships to accelerate the development and production of our solutions. Lightning eMotors' strategic, engineering, production and technology partners augment our internal resources and we intend to leverage their capabilities and infrastructure to bring our solutions to market more quickly and to meet industry standards, without requiring us to invest substantial amounts of capital.

- **Opportunistic strategic acquisitions.** We may pursue acquisitions as a means to accelerate our growth plans or augment our internal product and service development if they represent a strategic fit, drive value and are consistent with our overall strategy. Such acquisitions may allow us to accelerate the pace of our innovation, enable us to access new markets and customers, and scale our production facilities faster. While there is significant and growing demand for our products today, we believe these acquisitions may create more expansive use cases for our products. We believe that because of our unique strengths in vehicle electrification and electric vehicle production, we will be able to integrate, enhance and deploy new technologies.

## Sales and Marketing

Our education-focused, technically-sophisticated sales force markets and sells a complete range of end-to-end electrification solutions directly to urban commercial fleets, which include commercial ZEVs, powertrains, charging and financing services. Across our product portfolio, we are commissioning studies, conducting focus groups and gaining insight intended to focus sales and marketing efforts in a customer and partner-centric way, grounded on a foundation of zero-emissions.

## Research and Development

We have over 10 years of R&D focused on fleets that helps keep us ahead of our competitors. During the two years ended December 31, 2020, we had spent $2.3 million on R&D activities. Our primary areas of focus for R&D include, but are not limited to (i) ZEV development and system integration; (ii) software and algorithms for our electrification solutions; (iii) data analytics; (iv) accelerated lifetime testing processes to improve reliability, maintainability and system-level robustness; (v) sub-systems enhancement; and (vi) mobile charging solutions.

We expect to remain focused on R&D for the foreseeable future as we continue to invest in R&D activities to expand our commercial reach into international markets.

## Intellectual Property

Our success depends in part upon our ability to protect our core technology and intellectual property. We protect our growing intellectual property portfolio through a combination of patent, trademark, copyright and trade secret protection, as well as confidentiality and invention assignment agreements with our employees and consultants. We seek to control access to, and distribution of our proprietary information through non-disclosure agreements with our vendors and business partners. Unpatented research, development, know-how, and engineering skills make a vital contribution to our business, and we pursue patent protection when we believe it is possible and consistent with our overall strategy for safeguarding intellectual property. As of December 31,

252

Table of Contents

2020, we had two pending non-provisional filings and one pending provisional filing, with nine additional invention disclosures in process for our commercial ZEV technologies. We regularly review our development efforts to assess the existence and patentability of new intellectual property. To that end, we are prepared to file additional patent applications as we consider appropriate under the circumstances relating to the new technologies that we develop.

**Manufacturing and Production; Headquarters and Facilities**

Our 124,000 square foot headquarters is located in Loveland, Colorado. At this facility we are capable of designing, manufacturing, assembling and testing our ZEVs, powertrains and charging solutions. We manufacture our powertrains at our headquarters but also train our OEM partners' technicians to install them at their own manufacturing facilities. We currently operate a single labor shift with a capacity to manufacture and assemble 500 ZEV vehicles and/or powertrain units per year in a facility with approximately 70,000 square feet of manufacturing space. In November of 2020, Lightning Systems built out 20,000 square feet in our current building and executed a lease for an additional 107,000 square feet of manufacturing space in the adjacent building. The campus has a total of nearly 1 million square feet, of which over 500,000 is still available. Lightning Systems also has a first right of refusal to lease the remaining 500,000 square feet in the campus over the next 4 years. With the additional space added this year, along with additional labor, automation, and larger batch manufacturing, we have capacity to manufacture and assemble 3,000 ZEV vehicles and/or powertrain units per year, on a single labor shift.

**Employees**

As of December 31, 2020, we had 93 employees and 43 contractors. Our targeted hires typically have significant experience working for industry-leading original equipment manufacturers, automotive engineering firms and software companies. To date, we have not experienced any work stoppages and consider our relationship with our employees to be in good standing. None of our employees are either represented by a labor union or subject to a collective bargaining agreement.

**Government Regulations and Incentives**

We operate in an industry that is subject to extensive environmental and safety regulation, which has both become more stringent over time and is expected to become more stringent in the future. The laws and regulations to which we are subject govern, among others, water use; air emissions; use of recycled materials; energy sources; the storage, handling, treatment, transportation and disposal of hazardous materials; the protection of the environment, natural resources and endangered species; and the remediation of environmental contamination. We are required to obtain and comply with the terms and conditions of multiple environmental permits, certificates, or registrations, many of which are difficult and costly to obtain and could be subject to legal challenges. Compliance with such laws and regulations at a provincial, location, national, and international level is an important function of the company and is vital to our ability to continue our operations.

Environmental standards applicable to us are established by the laws and regulations of the jurisdictions in which we operate. These laws and regulations are subject to periodic modifications and increasingly stringent requirements. Violations of these laws and regulations, as well as permits and licenses, may result in substantial civil and criminal fines, penalties, and possibly orders to cease the violating operations or to conduct or pay for corrective works. In some instances, violations may also result in the suspension or revocation of permits and licenses.

A brief summary of material government and environmental regulations and incentives is set forth below.

*Motor Vehicle Safety*

Lightning eMotors vehicles are subject to compliance with the Federal Motor Vehicle Safety Standards ("FMVSS") and other regulatory obligations established by the National Highway Transportation Safety

253

Table of Contents

Administration ("NHTSA"). Lightning is a registered USDOT Intermediate Stage Manufacturer and Vehicle Alterer. Any chassis or body modifications performed by us must be designed, manufactured, and tested to ensure that the final ZEV remains certified to meet all FMVSS, bumper standards and theft prevention standards affected by the alterations when deployed to the customer. Failure to comply with safety regulations could result in substantial adverse impact to the company. These could include recalls, loss of USDOT registration, judicial enforcement, civil liability and reputational harm.

Lightning also maintains a commercial certification as a registered Ford Quality Vehicle Modifier or eQVM. This adds an additional level of third-party oversight to our safety design, and leverages mature "Big 3" safety practices. Currently only four companies are able to meet the stringent eQVM requirements established by Ford. Lightning is currently in discussion with General Motors to become the first modifier to be certified in a parallel program that is currently under development. We believe that these OEM certification programs represent significant barriers to entry for our competitors.

### EPA and CARB Emissions Compliance and Certification

Under the U.S. Clean Air Act, medium and heavy-duty vehicles and powertrains are required to obtain a Certificate of Conformity issued by the EPA, and a California Executive Order issued by the CARB. This regulatory process is designed to ensure that all vehicles comply with applicable emission standards for both criteria pollutants, such as nitrogen oxides (NOx) and particulate matter (PM), and GHGs, such as $CO_2$ and nitrous oxide ($N_2O$). A Certificate of Conformity is required for vehicles sold in all states, and an Executive Order is required for vehicles sold in California and states that have adopted the California standards. CARB sets more stringent standards for emissions control for certain regulated pollutants for new vehicles and engines sold in California and must obtain a waiver of preemption from the EPA before implementing and enforcing such standards. California's waiver of preemption with regard to GHG emission standards is currently the subject of legal challenges, and the authority of California to implement and enforce GHG emission standards for vehicles and engines in the future is uncertain. Currently, states that have adopted the California standards, as approved by the EPA, also require a CARB Executive Order for sales of vehicles in those states. There are currently fourteen additional states (in addition to the District of Columbia) that have adopted the California emissions standard for light, medium and heavy-duty vehicles. In these states, an EPA Certificate of Conformity and CARB Executive Order must be obtained for each model year for each class of vehicle. Failure to obtain or comply with the terms of a Certificate of Conformity or Executive Order is subject to civil penalty and administrative or judicial enforcement. Lightning eMotors currently utilizes EPA-certified chassis from major OEM's (meaning that Lightning does not require an alternative fuel vehicle certification from EPA for our ZEV's), and maintains 6 active CARB EOs for model year 2020, with more anticipated in model year 2021. The certification process is well known to Lightning and has been successfully exercised across the product line for both new and repowered vehicles.

Pursuant to its authority under the Clean Air Act, the EPA adopted Phase 1 fuel efficiency and GHG standards for medium-duty vehicles and engines on September 15, 2011. The EPA adopted more stringent fuel efficiency and GHG standards for medium-duty vehicles and engines on October 25, 2016. Manufacturers of vehicles and engines may comply with the GHG standards by selling increasing percentages of ZEVs. CARB also has adopted GHG and fuel efficiency standards for medium and heavy-duty vehicles and engines. The Advanced Clean Trucks (ACT) Regulation approved by CARB in June 2020 requires medium-duty and heavy-duty vehicle manufacturers to produce and offer for sale in California increasing numbers of ZEVs. These regulatory standards increase annually beginning in 2024, and will require that 30-50% of new truck sales in California (depending on Class) be ZEVs by 2030, and 55-75% (depending on Class) be ZEVs by 2035. CARB projects that the ACT regulation will result in sales of approximately 30,000 ZEVs by 2027, approximately 100,000 by 2030, and more than 250,000 by 2035.

Offset credits for early production of heavy-duty ZEVs can be generated beginning in model year 2021. Lightning eMotors' ZEV products will be eligible for these credits which can be banked and sold to truck OEMs that are not in compliance with the ACT regulation for a period of 5 years.

254

**Table of Contents**

Additional CARB regulations mandating ZEV deployment in specific vocations are in various stages of development or implementation. These include the Zero Emission Fleet Rule, Innovative Clean Transit Regulation, and the Zero Emission Airport Shuttle Regulation. We expect these or similar programs to be put in place over the next decade.

Receipt of an EPA Certificate of Conformity and CARB Executive Order obligates the holder to ensure that the covered engine or vehicle is capable of complying with applicable standards throughout the full useful life of the product, which for medium medium-duty vehicles may be ten years or from 120,000 to 185,000 miles, whichever comes first and depending on the engine and vehicle size. Emissions control system warranty coverage must be provided for a period of five years or 50,000 to 100,000 miles (CARB warranty obligations increasing to up to 110,000, 150,000 and 350,000 miles in 2022), whichever comes first and depending on the engine and vehicle size. During this time, manufacturers must repair emission-related defects at no cost to the customer. Throughout the full useful life of the engine or vehicle, manufacturers are required to remedy in-use problems that cause engines or vehicles to exceed emission standards for criteria pollutants or GHGs.

Manufacturers may have to conduct recalls, service campaigns or other field actions, or provide extended warranties to address any suchin-use issues that may arise. The EPA is considering extending the warranty period, including by adopting the CARB warranty obligations of 110,000, 150,000, or 350,000 miles, depending on the engine size. Manufacturers of medium-duty engines and vehicles also must ensure that their products comply with On Board Diagnostics ("*OBD*") requirements. The OBD system is intended to identify and diagnose malfunctions within the engine, aftertreatment and emission control systems and alert the driver to the underlying issue so the vehicle can be brought in for service. CARB issues approval of the OBD system as part of its issuance of an Executive Order; the EPA deems demonstration of compliance with CARB OBD requirements to satisfy the EPA's requirements. As with emissions compliance, manufacturers are required to ensure that the OBD system functions as designed and is able to identify component malfunctions throughout the full useful life of the vehicle or engine.

Many customers of EVs utilize state and Federal incentive programs to offset the higher initial costs of electric vehicles. Lightning Systems' customers have historically leveraged the California Hybrid and Zero-Emission Truck and Bus Voucher Incentive Project ("*HVIP*") as well as Volkswagen Emissions Mitigation Trust Fund ("*VW EMTF*") funding that is allocated to each state to purchase Lightning Systems' vehicles and charging systems. The HVIP program represents the most commonly utilized of the subsidy programs to Lightning customers due to its ease of access and amount of funding per vehicle (approximately 35% of the cost of a Lightning Systems electric vehicle). For the year ended December 31, 2019, Lightning Systems derived approximately 29% of its revenue from HVIP funding. For the year ending December 31, 2020, Lightning Systems derived approximately 30% of its revenue from HVIP funding. Of the order backlog as of December 31, 2020, approximately 70% of the orders include contingencies for 2021 HVIP funding that have not yet been secured, representing approximately 45% of the 2021 revenue. In December 2020, California announced that it planned to allocate approximately $150M to the 2021 HVIP program. As of December 31, 2020, there were seven other active companies that, like Lightning, have certified vehicles that can be funded under the program. Although Lightning has successfully participated in the program for the last five years, and expects to have HVIP funding secured for its 2021 orders in Q1 2021, any material problem with the HVIP program for 2021 could have a material adverse impact on Lightning's business, financial condition and results of operations.

*Battery Safety and Testing Regulation*

Our ZEVs and powertrains are intended to meet the International Organization for Standardization's standards for electrically propelled vehicles in vehicle operational safety specifications and connecting to an external power supply. Additionally, we may incorporate other battery system standards of the International Organization for Standardization in our ZEVs and powertrains.

Some of these standards include:

- *Conductive Charging* — for on board charge electromagnetic requirements;

255

Table of Contents

- *Battery Pack Enclosure Protection* — degrees of protection of the electrical equipment within an enclosure from the effects due to the ingress of water; and

- *Testing LTO Traction Battery Packs and Systems* — safety performance requirements during a variety of testing, like vibration, thermal cycling, overcharge and loss of thermal control.

Our battery packs are manufactured by third-party battery pack manufacturers, who ship them to Lightning eMotors. They must meet the applicable regulations governing the transport of "dangerous goods," which includes lithium-ion batteries that may present a risk in transportation. The governing regulations in the U.S., which are issued by the Pipeline and Hazardous Materials Safety Administration, are based on the UN Recommendations on the Safe Transport of Dangerous Goods Model Regulations, and related UN Manual Tests and Criteria. The regulations vary by mode of transportation when these items are shipped by ocean vessel, rail, truck or by air.

Our battery pack manufacturing partners are committed to meeting the applicable compliance requirements of the UN Manual of Tests and Criteria demonstrating their ability to ship battery packs by any method.

Certain of the tests performed include:

- *Altitude simulation* — simulating air transport;

- *Thermal cycling* — assessing cell and battery seal integrity;

- *Vibration* — simulating vibration during transport;

- *Shock* — simulating possible impacts during transport;

- *External short circuit* — simulating an external short circuit; and

- *Overcharge* — evaluating the ability of a rechargeable battery to withstand overcharging.

In addition, our battery packs include packaging for the lithium-ion battery cells. This packaging includes trace amounts of various hazardous chemicals whose use, storage and disposal is regulated under state and federal law.

### Low Carbon Fuel Standard Credits

California adopted the Low Carbon Fuel Standard in 2009 and began implementation in 2011. A comparable agency in Oregon adopted the similar Clean Fuels Program. Other states have proposed similar clean fuels programs, or are conducting initial studies at present. In 2018, the LCFS program introduced significant new LCFS credit mechanisms in connection with deployment of ZEV infrastructure, such as our Charging-as-as-service platform.

LCFS credits for charging infrastructure are specifically tied to the owner/operator of the electric vehicle supply equipment (*EVSE*"), which gives Lightning eMotors the incentive to grow the charging rental business model. There is no regulatory limit to the number of credits which can be accumulated and banked. Credit deficits under the LCFS have frequently exceeded credit generation since 2017, and there continues to be significant (and growing) requirements for producers of fossil fuels to offset the carbon intensity of their fuels. LCFS credit demand is expected to continue to grow as regulatory carbon intensity benchmark requirements already in place mandate increases from 7.5% reduction in CY2020 to 20% reduction by CY2030.

### GHG Credits — U.S. EPA

The EPA's Greenhouse Gas Rule requires all manufacturers of medium-duty engines and vehicles to comply with fleet average GHG standards. Manufacturers may comply with the standards by producing engines

256

Table of Contents

or vehicles, all of which comply with the standards, or by averaging, banking and trading GHG credits within vehicle or engine categories. Manufacturers may also comply with GHG standards by purchasing credits from manufacturers with a surplus of credits. The failure to comply with GHG standards can lead to civil penalties or the voiding of a manufacturer's EPA Certificate of Conformity. In connection with the delivery and placement into service of zero-emission and low-emission vehicles, we may earn tradable GHG credits that can be sold to other manufacturers. Under the EPA's Greenhouse Gas Rule, plug-in hybrid, all-electric and fuel cell vehicles earn a credit multiplier of 3.5, 4.5, and 5.5, respectively, for use in the calculation of GHG emission credits.

Commercial engine and vehicle manufacturers are required to meet the NOx emission standard for each type of engine or vehicle produced. Typical diesel engine emission control technology limits the fuel economy and GHG improvements that can be made while maintaining compliance with the NOx standard. As the fleet average GHG standards continue to decrease over time, compliance with the NOx standard may increase the difficulty for conventional diesel vehicles to meet the applicable GHG standards. Accordingly, manufacturers of diesel trucks may need to purchase GHG credits to cover their emission deficit. The EPA's Greenhouse Gas Rule provides the opportunity for the sale of excess credits to other manufacturers who require such credits to comply with these regulatory requirements. Furthermore, the regulation does not limit the number of GHG credits sold within the same commercial vehicle categories.

### GHG Credits — California Air Resources Board

California also has a GHG emissions regulatory program that is similar to the EPA requirements. Like the EPA's Greenhouse Gas Rule, the CARB rule allows for averaging, banking and trading of credits to comply with the fleet-average GHG standard and the failure to comply with the California GHG standard may lead to the imposition of civil penalties. The delivery and placement into service of our zero-emission vehicles in California may earn us tradable credits that can be sold. Under CARB GHG regulations, advanced technology vehicles also earn a credit multiplier of for use in the calculation of emission credits in the same amounts as under the EPA's Greenhouse Gas Rule.

Examples of other existing or potential future incentives and grant programs that either we or our customers can apply for include:

- *LCFS.* California was the first jurisdiction to develop an LCFS and similar LCFS programs may be adopted by other jurisdictions in the U.S. and around the world. The goal of an LCFS is to reduce the well-to-wheel carbon intensity of fuels by providing both mandated reduction targets as well as bankable and tradable credits.

- *Purchase Incentives.* Both California and New York have active programs that provide "cash on the hood" incentives to customers that purchase zero-emission vehicles. Other states are considering developing similar programs.

- *Grant Programs.* Government entities at all levels from federal, including the U.S. Department of Energy, state (for example, CARB) and local (for example, North Texas Council of Governments), have grant programs designed to increase and accelerate the development and deployment of ZEVs and charging or fueling infrastructure technologies. There is currently several billion dollars of VW Emissions Mitigation Trust Fund Money available to states for eligible mitigation actions, including incentives to purchase or retrofit low-or-zero emissions vehicles.

- *EPA Smartway.* The EPA Smartway program provides grants and funding for the retrofit of medium-duty vehicles with components and technologies that reduce emissions. Drivers and fleet owners who repower vehicles with advanced technology powertrains may be able to access funding to offset a portion of the cost.

### Competition

We currently have several limited competitors in the medium-duty electric vocational truck and shuttle bus space, including GreenPower Motor Company, XOS Trucks, Sea Electric, Workhorse and Motiv. We expect competition to

Table of Contents

increase in the near future, particularly as the commercial transportation sector increasingly shifts towards low-emission, zero-emission or carbon neutral solutions.

**Legal Proceedings**

From time to time, we may become involved in legal proceedings or be subject to claims arising in the ordinary course of our business. We are not currently a party to any material legal proceedings. Regardless of outcome, such proceedings or claims can have an adverse impact on us because of defense and settlement costs, diversion of resources and other factors, and there can be no assurances that favorable outcomes will be obtained.

258

**Table of Contents**

**LIGHTNING SYSTEMS' MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis provide information that Lightning Systems' management believes is relevant to an assessment and understanding of Lightning Systems' results of operations and financial condition. The discussion and analysis should be read together with "Selected Historical Financial Information of Lightning Systems" and the financial statements and related notes that are included elsewhere in this proxy statement/prospectus. The discussion and analysis should also be read together with our pro forma financial information as of December 31, 2020 and for the year ended December 31, 2020. See "Unaudited Pro Forma Condensed Combined Financial Information." This discussion may contain forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" or in other parts of this proxy statement/prospectus. Unless the context otherwise requires, references in this "Lightning Systems Management's Discussion and Analysis of Financial Condition and Results of Operations" to "we", "us", "our", and "the Company" are intended to mean the business and operations of Lightning Systems.*

## Overview

Lightning Systems, which also does business as Lightning eMotors, is a leading electric vehicle designer and manufacturer, providing complete electrification solutions for commercial fleets – from Class 3 cargo and passenger vans to Class 6 work trucks, Class 7 city buses, and Class A motor coaches which we believe represents a significant total addressable market of approximately $67 billion. Lightning Systems is committed to eradicating commercial fleet emissions, the main cause of urban air pollution, by providing zero emission Class 3 to 7 Battery Electric Vehicles, Fuel Cell Electric Vehicles and charging infrastructure solutions to commercial fleet customers. Our ongoing focus has been on reducing emissions and improving energy efficiency. As of the date of this proxy statement/prospectus, Lightning Systems is the market leader in the Class 3 to Class 6 EV segment, with 72 units sold in 2020 representing approximately 36% of the total market in 2020. Lightning Systems delivered 41 Class 3 vehicles in 2020, constituting approximately 75% market share among Class 3 EVs. We believe that Lightning Systems is the only company in the United States that has delivered fully functional Class 3 to 7 EVs to end customers that are in use today, with 97 units delivered by us in 2019 and 2020 (in addition to 12 demonstration and test vehicles).

We started in 2008 as a manufacturer of hybrid systems for commercial vehicles. In 2017 realizing that hybrid solutions did not adequately address the growing issue of urban air pollution from commercial vehicle fleets, we directed our efforts to focus exclusively on the attractive market opportunity in ZEVs. We leveraged nearly 10 years of unparalleled knowledge developing and implementing hybrid commercial vehicles to successfully adapt to zero emission vehicles. As of the date of this proxy statement/prospectus, all of Lightning Systems' platforms have been fully certified as zero emission vehicles by the California Air Resource Board, the clean air agency that defines vehicle emissions standards. We currently maintain 6 Executive Orders, which is a requirement to sell ZEV vehicles in California as well as various other states.

We are the only full-range manufacturer of Class 3 to 7 BEV and FCEV in the United States and provide end-to-end electrification solutions including advanced analytics software, mobile charging solutions, or Energy-as-a-Service, and financing which we refer to as EV-as-a-Service. We combine an internally developed optimized modular software with Lightning Systems hardware designs that allow us to address the diverse opportunities in the markets in which we operate in a cost-effective manner with a significant time-to-market advantage. We have also built an extensive ecosystem of supply-chain partners and specialty vehicle partners which are instrumental to our growth.

### Business Combination and Public Company Costs

Lightning Systems entered into the Business Combination Agreement with GigCapital3 on December 10, 2020. Pursuant to the Business Combination Agreement, and assuming a favorable vote of GigCapital3's stockholders,

259

Table of Contents

Merger Sub, a newly formed subsidiary of GigCapital3, will be merged with and into Lightning Systems in the Business Combination. Upon consummation of the Business Combination, the separate corporate existence of Merger Sub will cease, and Lightning Systems will continue as the Surviving Corporation of the Merger. Lightning Systems will be deemed the accounting predecessor and the combined entity will be the successor SEC registrant, meaning that Lightning Systems' financial statements for previous periods will be disclosed in the registrant's future periodic reports filed with the SEC.

The Business Combination is anticipated to be accounted for as a reverse recapitalization. Under this method of accounting, GigCapital3 will be treated as the acquired company for financial statement reporting purposes. The most significant change in the successor's future reported financial position and results are expected to be an estimated increase in cash (as compared to Lightning Systems' balance sheet at December 31, 2020) of between approximately $131.6 million, assuming maximum stockholder redemptions permitted under the Business Combination Agreement, and $283.7 million, assuming no stockholder redemptions. Total non-recurring transaction and other costs are estimated at approximately $40.0 million. See "*Unaudited Pro Forma Condensed Combined Financial Information.*"

As a result of the Business Combination, Lightning Systems will become the successor to a NYSE-listed company with common stock registered under the Exchange Act, which will require Lightning Systems to hire additional personnel and implement procedures and processes to address public company regulatory requirements and customary practices. Lightning Systems expects to incur additional annual expenses as a public company for, among other things, directors' and officers' liability insurance, director fees and additional internal and external accounting and legal and administrative resources, including increased audit and legal fees.

### *Recent Developments and the Covid-19 Pandemic*

On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a "Public Health Emergency of International Concern" and on March 11, 2020, declared it to be a pandemic. Actions taken around the world to help mitigate the spread of COVID-19 have included restrictions on travel, quarantines in certain areas, work-from-home orders and forced closures for certain types of public places and businesses. COVID-19 and actions taken to mitigate its spread have had and are expected to continue to have an adverse impact on the economies and financial markets of many countries, including the geographical area in which Lightning Systems operates. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was enacted to, among other provisions, provide emergency assistance for individuals, families and businesses affected by the COVID-19 pandemic.

As the COVID-19 pandemic continues to evolve, the extent of the impact to Lightning Systems' business operating results, cash flows, liquidity and financial condition will be primarily driven by the severity and duration of the COVID-19 pandemic, the pandemic's impact on the U.S. and global economies and the timing, scope and effectiveness of federal, state and local governmental responses to the pandemic. Those primary drivers are beyond Lightning Systems' knowledge and control and, as a result, at this time, Lightning Systems is unable to predict the cumulative impact, both in terms of severity and duration, that the COVID-19 pandemic will have on Lightning Systems' business, operating results, cash flows and financial condition, but such impact could be material if the current circumstances continue to exist for a prolonged period of time. Although Lightning Systems has made its best estimates based upon current information, actual results could materially differ from the estimates and assumptions developed by management. Accordingly, it is reasonably possible that the estimates made in the financial statements have been, or will be, materially and adversely impacted in the near term as a result of these conditions, and if so, Lightning Systems may be subject to future impairment losses related to long-lived assets as well as changes to valuations.

*Possible Impairments*. No impairments were recorded for years ended December 31, 2020 or 2019, as no triggering events or changes in circumstances had occurred as of such dates. However, due to significant uncertainty surrounding the continued effects of the COVID-19 pandemic, Lightning Systems' results

260

Table of Contents

of operations, cash flows, and financial condition could be impacted, and the extent of such impact cannot be reasonably estimated.

*Partial Shutdowns and Slow-Downs*. Lightning Systems is adhering to CDC guidelines that oblige us to shut down any department in which an employee tests positive for COVID-19 for 14 days. In November 2020, Lightning Systems closed our material handling department for two weeks after an employee tested positive. We have also regularly had employees absent from work or working from home on suspected COVID-19 infections. As COVID-19 spikes in Northern Colorado, there is a significant risk of department shutdowns impacting our first and second quarter 2021 revenue.

*Supply-Chain Delays*. Also, as a result of the COVID-19 pandemic, we have been experiencing significant delivery delays from our suppliers since April 2020. Within our capital constraints, we increased our raw material inventories to attempt to manage and mitigate this risk. However, several key suppliers have informed us of delivery delays ranging from four to sixteen weeks, that are expected to adversely impact production in the first and second quarter of 2021. Although we are working with our suppliers to minimize the impact, we expect supply chain delays will have a significant impact on our 2021 revenue and possibly thereafter.

The year ended December 31, 2020 revenue was consistent with its financial projections provided to GigCapital3 on November 29, 2020, but operating costs were higher than projected at that time. Lightning Systems incurred higher expenses for 2020 and expects higher expenses for 2021 related to its preparation to be a public company, supply-chain disruptions from the COVID-19 pandemic, and higher investments in its manufacturing operations as it lays the foundation for future revenue growth. Based on performance through January 2021, Lightning Systems has reaffirmed its revenue projections for 2021, but has indicated that it anticipates operating expenses will be higher than previously forecast to GigCapital3 in light of higher public company expenses, increased research and development costs and higher sales and marketing costs. In addition, Lighting Systems' management anticipates that we will continue to be negatively impacted by the COVID-19 pandemic through the first half of 2021, including supply-chain disruptions, which may negatively impact revenue for 2021 as previously projected to GigCapital3. Please see the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information*" for additional information.

## Comparability of Financial Information

Lightning Systems' results of operations and statements of assets and liabilities may not be comparable between periods as a result of Lightning Systems' ongoing evolution, refinement, and growth of its business operations within the electric commercial vehicle industry. While historically, the Company developed hybrid systems for commercial vehicles, during 2017, Lightning Systems refocused its business to producing the zero-emission EV power train upgrades and phased-out the production of hydraulic hybrid upfit systems. During 2019, Lightning Systems increased the physical and production capabilities of its Loveland, Colorado facility, in preparation of the installation and integration of EV power train upgrades into vehicles beginning in 2020. This change significantly reduced Lightning Systems' use and reliance on certified installer or dealers. In conjunction with the transition to using the Loveland plant for comprehensive production, Lightning Systems has continually improved its production technology, processes, and productivity and has invested in the supporting personnel and other infrastructure.

## Key Factors Affecting Operating Results

We believe that our performance and future success depend on several factors that present significant opportunities for us but also pose risks and challenges, including those discussed below and in the section of this proxy statement/prospectus titled "*Risk Factors.*"

### Commercial Launch of medium-duty trucks and other products

In 2020, Lightning Systems attained revenue commercialization of its ZEVs, with 72 customer-ordered Class 3 to Class 7 Commercial vehicles delivered during the year ended December 31, 2020. Prior to commercialization,

261

Table of Contents

we had to complete modification and construction of required manufacturing facilities, purchase and integrate related equipment and software, and achieve several research and development milestones. We will require substantial additional capital to develop our products and services, including those for orders in our revenue backlog, fund the growth and scaling of our manufacturing facilities, and fund operations for the foreseeable future. Until we can generate sufficient cash flow from operations, we expect to finance our operations through a combination of merger proceeds from the Business Combination, the PIPE Investment, the Convertible Note Investment, secondary public offerings, debt financings, collaborations, and licensing arrangements. The amount and timing of our future funding requirements depend on many factors, including the pace and results of our development efforts and our ability to scale our operations. Any delays in the successful completion of our manufacturing facility will impact our ability to generate revenue.

### Customer Demand

While still in early stages of commercialization, we have received significant interest from potential customers. As of December 31, 2020, and 2019, Lightning Systems' had a backlog of 1,569 and 276, respectively, of electric commercial vehicles and electric powertrains. Going forward, we expect the size of our committed backlog to be an important indicator of our future performance.

### Basis of Presentation

Currently, we conduct business through one operating segment, the zero-emission electric vehicle market. All long-lived assets are maintained in, and all losses are attributable to, the United States of America. See Note 2 in the accompanying audited financial statements for more information about our operating segment.

### Components of Results of Operations

### Revenues

Our revenue generation has evolved over time along with our business model. During the year ended December 31, 2020, revenue was derived from the installation and integration of all-electric powertrains within commercial vehicles, the sale of our all-electric powertrain kits, and the sales of chargers, an ancillary product. During the year ended December 31, 2019, our revenue was primarily derived from selling our all-electric powertrains kits along with the sales of chargers.

We anticipate deriving future revenue from the following business lines.

- *Direct Sales of Commercial ZEVs:* The sales of electric vehicles in Classes 3 to 7, and all-electric powertrain kits for vehicles in Classes 3 to 7.

- *Systems for OEMs:* The sales of electric powertrains to our OEM partners, including technology licenses, and training the OEM technicians how to install the powertrains within the OEMs' manufacturing facilities.

- *Analytics*: Our proprietary analytics platform, which is installed in each vehicle sold, allows us to collect and optimize drive cycle and vehicle performance data. This data provides drivers and fleet operators meaningful real-time recommendations about how to improve vehicle performance, routes, and charging strategies. In the future, our analytics offering will be offered on a subscription basis, with high uptake rates and very limited churn.

- *Energy-as-a-Service:* Lightning Systems, in the future, plans on owning and renting chargers to customers. The company will plan, build, and install charging infrastructure at a client's location and will charge the customer on a recurring basis. This service will facilitate LCFS monetization, reduce customers upfront capital investment for charging, and deepen our customer's relationship with both a vehicle and charging partnership.

262

Table of Contents

- *EV-as-a-Service*: For customers that are just entering the ZEV space, transitioning to ZEVs and building out a charging strategy can be quite complex. Lightning Systems, in the future, plans on offering EV-as-a-Service which will be a packaged offering that includes the vehicle, charging, maintenance, insurance, and ongoing support, for customers new to ZEV or those that desire a full-service solution. We believe this is an efficient way for customers to be early adopters of ZEVs and validate vehicle operating and total cost of ownership ("TCO") benefits of ZEV without large upfront investments and infrastructure.

### Cost of Revenues

Cost of revenues includes direct costs (parts, material, and labor), indirect manufacturing costs (manufacturing overhead, depreciation, plant operating lease expense, and rent), shipping, field services, and logistics costs, and provision for estimated warranty expenses.

### Research and Development Expense

Research and development expenses consist primarily of costs incurred for the discovery and development of Lightning Systems' electrified powertrain solutions and the production thereof, which principally include personnel-related expenses including salaries, benefits, travel and stock-based compensation, for personnel performing research and development activities and expenses related to materials and supplies.

Lightning Systems expects its research and development expense to increase for the foreseeable future as Lightning Systems continues to invest in research and development activities to achieve its operational and commercial goals.

### Selling, General, and Administrative Expense

Selling, general, and administrative expenses consist of personnel-related expenses for Lightning Systems' corporate, executive, engineering, finance, sales, marketing, program management support, and other administrative functions, expenses for outside professional services, including legal, audit and accounting services, as well as expenses for information technology, facilities, depreciation, amortization, travel, and sales and marketing costs. Personnel-related expenses consist of salaries, payroll taxes, benefits, and stock-based compensation.

Lightning Systems expects its selling, general, and administrative expenses to increase for the foreseeable future as Lightning Systems scales headcount and expenses with the growth of its business, buildout of the manufacturing facilities, refinement of its production processes, drive for productivity improvements, acquisition of new and retention of existing customers and the additional costs of a public company.

### Interest Expense

Interest expense consists of interest paid on our notes payable and the amortization of debt issue costs, debt discounts attributable to the bifurcation of warrants issued, and a beneficial conversion feature embedded in certain convertible notes. The notes payable included, over the periods presented, a term loan and working capital facility, a facilities agreement, and various convertible notes payable, as described in more detail below. For a description and terms of the notes payable, see the financial statements and the notes thereto for the years ended December 31, 2020 and 2019.

### Inducement Expense

From time to time, Lightning Systems has issued warrants to purchase Series C preferred shares to existing lenders in connection with the conversion of outstanding notes payable. During the year ended December 31, 2019, 1,405,621 Series C preferred warrants were issued to existing lenders to induce such lenders to convert $5.6 million of notes payable to Series C preferred shares. The preferred warrants are exercisable into Series C preferred shares at an exercise price of $1.66 per Series C preferred shares. On the date of grant, these warrants had a fair value of approximately $0.3 million. These warrant agreements were reissued on December 31, 2019 upon Lightning Systems' conversion to a C-corporation, on identical terms.

**Table of Contents**

**Results of Operations**

*Comparison of Fiscal Year Ended December 31, 2020 to Fiscal Year Ended December 31, 2019*

The following table sets forth our historical operating results for the periods indicated:

| | Years Ended December 31, | | $ Change | % Change |
|---|---|---|---|---|
| | 2020 | 2019 | | |
| | (dollar amounts in thousands) | | | |
| Revenues | $ 9,088 | $ 3,164 | $ 5,924 | 187.2% |
| Cost of revenues | 11,087 | 4,233 | 6,854 | 161.9% |
| Gross loss | (1,999) | (1,069) | (930) | 87.0% |
| Operating expenses | | | | |
| Research and development | 1,309 | 975 | 334 | 34.3% |
| Selling, general, and administrative | 10,451 | 7,121 | 3,330 | 46.8% |
| Total operating expenses | 11,760 | 8,096 | 3,664 | 45.3% |
| Loss from operations | (13,759) | (9,165) | (4,594) | 50.1% |
| Other expenses | | | | |
| Interest expense | 2,983 | 575 | 2,408 | 418.8% |
| Inducement expense | — | 309 | (309) | -100.0% |
| Loss (gain) from change in fair value of warrant liabilities | 20,835 | (119) | 20,954 | 17,608.4% |
| Other expense (income), net | 76 | (240) | 316 | -131.7% |
| Total other expenses | 23,894 | 525 | 23,369 | 4,451.2% |
| Net loss | $ (37,653) | $ (9,690) | $(27,963) | 288.6% |

*Revenues*

Our total revenue increased by $5.9 million, or 187%, from $3.2 million during the year ended December 31, 2019 to $9.1 million during the year ended December 31, 2020. The increase in the revenues was principally related to the installation and integration of our EV power trains in 72 ZEVs during the year ended December 31, 2020 as compared to the sale of 25 EV power train upgrade kits and 36 chargers during the year ended December 31, 2019. The increase in revenues was partially offset by a two week shutdown of our material handling department in November 2020, as well as supply chain delays through the second half of 2020 due to the impact of the COVID-19 pandemic.

*Cost of Revenues*

Cost of revenues increased by $6.9 million, or 162%, from $4.2 million during the year ended December 31, 2019 to $11.1 million during the year ended December 31, 2020. The increase in the cost of revenues was primarily related to an increase in revenue during the year ended December 31, 2020, as compared to the comparable period in 2019. This increase was partially offset by the change in our product mix from the direct sales of electric conversion (installation and integration) of electric vehicles and reductions in our direct cost of manufacturing through technology and process improvements. The increase in cost of revenues was partially offset by the impact of the COVID-19 pandemic, which had the net effect of deferring production from 2020 to 2021 as discussed above.

*Research and Development*

Research and development expenses increased by $0.3 million, or 34%, from $1.0 million during the year ended December 31, 2019 to $1.3 million during the year ended December 31, 2020. The increase was primarily due to an increase in our engineering headcount year-over-year, as we continue to advance the development and design of our vehicles, refine and improve our production process, and test our in-house engineering capabilities.

**Table of Contents**

### Selling, General, and Administrative

Selling, general, and administrative expenses increased by $3.3 million or 47%, from $7.1 million during the year ended December 31, 2019 to $10.5 million during the year ended December 31, 2020, primarily due to the increase in headcount in administration and sales to support the growing sales, backlog and production.

### Interest Expense

Interest expense increased by $2.4 million, or 419%, from $0.6 million during the year ended December 31, 2019 to $3.0 million during the year ended December 31, 2020. The increase was primarily due to the increase of $8.4 million in the average notes payable outstanding during each period from $2.2 million during the year ended December 31, 2019 to $10.6 million during the year ended December 31, 2020, and the amortization of debt discount of $1.8 million resulting from a beneficial conversion feature associated with the 2020 short term convertible debt loans.

### Inducement Expense

Inducement expense totaled $0.3 million during the year ended December 31, 2019 and reflected the fair market value of Series C Warrants issued in connection with the conversion of $5.6 million of notes payable to Series C preferred shares. The preferred warrants are exercisable into Series C preferred shares. There was no comparable expense during the year ended December 31, 2020.

### Change in Fair Value of Warrant Liabilities

The loss from change in fair value of warrant liabilities increased by $21.0 million, from a gain of $0.1 million in the year ended December 31, 2019 to a loss of $20.8 million in the year ended December 31, 2020. The change reflected the impact of the marking-to-market of the outstanding common and preferred warrants underlying the warrant liabilities. The significant increase reflects the increase in market value of Lightning Systems' common and preferred stock subsequent to the signing the Letter of Intent to the proposed Business Combination. For a description of the methodology used by Lightning Systems to determine the market value of the common and preferred stock, please see Fair Value significant accounting policy contained within this Management Discussion and Analysis or Note 2 to the Financial Statements of the years ended December 31, 2020 and 2019 contained elsewhere in this proxy statement / prospectus.

### Non-GAAP Financial Measures

In addition to our results determined in accordance with GAAP, we believe the following non-GAAP measure is useful in evaluating our operational performance. We use the following non-GAAP financial information among other operational metrics to evaluate our ongoing operations and for internal planning and forecasting purposes. We believe that non-GAAP financial information, when taken collectively, may be helpful to investors in assessing our operating performance.

### EBITDA and Adjusted EBITDA

"EBITDA" is defined as net loss before other non-operating expense or income, income tax expense or benefit, and depreciation and amortization. "Adjusted EBITDA" is defined as EBITDA adjusted for stock-based compensation, inducement expense and change in fair value of warrant liabilities. Adjusted EBITDA is intended as a supplemental measure of our performance that is neither required by, nor presented in accordance with, GAAP. We believe that the use of EBITDA and Adjusted EBITDA provides an additional tool for investors to use in evaluating ongoing operating results and trends and in comparing Lightning Systems' financial measures with those of comparable companies, which may present similar non-GAAP financial measures to investors. However, you should be aware that when evaluating EBITDA and Adjusted EBITDA we may incur future

265

Table of Contents

expenses similar to those excluded when calculating these measures. In addition, our presentation of these measures should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items. Our computation of Adjusted EBITDA may not be comparable to other similarly titled measures computed by other companies, because all companies may not calculate Adjusted EBITDA in the same fashion.

Because of these limitations, EBITDA and Adjusted EBITDA should not be considered in isolation or as a substitute for performance measures calculated in accordance with GAAP. We compensate for these limitations by relying primarily on our GAAP results and using EBITDA and Adjusted EBITDA on a supplemental basis. You should review the reconciliation of net loss to EBITDA and Adjusted EBITDA below and not rely on any single financial measure to evaluate our business.

The following table reconciles net loss to EBITDA and Adjusted EBITDA for the years ended December 31, 2020 and 2019:

| | Years Ended December 31, | |
| | 2020 | 2019 |
| | (dollar amounts in thousands) | |
| Net loss | $ (37,653) | $ (9,690) |
| Adjustments | | |
| Interest expense, net | 2,983 | 575 |
| Depreciation and amortization | 362 | 232 |
| EBITDA | (34,308) | (8,883) |
| Adjustments | | |
| Stock-based compensation | 275 | 172 |
| Inducement expense | — | 309 |
| Change in fair value of warrant liabilities | 20,835 | (119) |
| Adjusted EBITDA | $ (13,198) | $ (8,521) |

### Liquidity and Capital Resources

Since inception, Lightning Systems has financed its operations primarily from debt financing and the sales of common and convertible preferred shares. As of December 31, 2020, our principal sources of liquidity were our cash and cash equivalents in the amount of $0.5 million.

The following table provides a summary of cash flow data:

| | Years Ended December 31, | |
| | 2020 | 2019 |
| | (dollar amounts in thousands) | |
| Net cash used in operating activities | $ (16,226) | $ (13,226) |
| Net cash used in investing activities | (2,013) | (651) |
| Net cash from financing activities | 17,402 | 6,362 |
| Net (decrease) in cash | $ (837) | $ (7,515) |

### Cash Flows Used In Operating Activities

Net cash used in operating activities for the years ended December 31, 2020 and 2019 totaled $16.2 million and $13.2 million, respectively. Cash flows from operating activities are significantly affected by the revenue levels, mix of products and services, and investments in the business in research and development and selling, general, and administrative costs in order to develop products and services, improve manufacturing capacity and

Table of Contents

efficiency, and support revenue growth. The increase in net cash used in operating activities was driven by increases in cost of revenues, selling, general, and administrative expenses, and research and development expenses, as described in more detail above.

### Cash Flows Used In Investing Activities

Net cash used in investing activities for the years ended December 31, 2020 and 2019 totaled $2.0 million and $0.7 million, respectively. Cash flows from investing activities relate to capital expenditures to support revenue growth as we invest in and expand our business and infrastructure.

### Cash Flows from Financing Activities

Net cash from financing activities for the years ended December 31, 2020 and 2019 was $17.4 million and $6.4 million, respectively.

Lightning Systems has primarily financed its activities through a combination of debt and the issuance of Series C preferred convertible stock, net of the repayment of a certain note payable. In connection with these transactions, Lightning Systems issued common and preferred warrants. For a detail discussion of these activities, see the financial statements and the notes thereto for the years ended December 31, 2020 and 2019 contained elsewhere in this proxy / prospectus.

A summary of Lightning Systems' financing transactions for the periods presented are summarized below:

|  | Years Ended December 31, | |
|---|---|---|
|  | **2020** | **2019** |
|  | **(dollar amounts in thousands)** | |
| Notes payable activities |  |  |
| Proceeds from notes payable and Series C redeemable convertible preferred stock warrants | $ 1,000 | $ 7,000 |
| Proceeds from short-term convertible notes payable | 9,679 | — |
| Proceeds from 2020 convertible notes payable | 3,000 | — |
| Payments on notes payable | — | (2,000) |
| Redeemable convertible preferred stock activities |  |  |
| Proceeds from issuance of Series C redeemable convertible preferred stock and preferred stock warrants | 3,225 | 1,400 |
| Proceeds for the exercise of Series C redeemable convertible preferred warrants | 500 | — |
| Lease activities |  |  |
| Payments on finance lease obligations | (88) | (38) |
| Equity activities |  |  |
| Proceeds from exercise of stock options | 86 | — |
| Cash flows from financing activities | $ 17,402 | $ 6,362 |

Based on approximately $202.0 million in the Company's Trust Account as of December 31, 2020, and taking into account the anticipated gross proceeds of approximately $25.0 million from the PIPE Investment and approximately $100.0 million from the Convertible Note Investment, approximately 15,050,267 shares of Common Stock may be redeemed and still enable the Company to have sufficient cash to satisfy the cash closing conditions in the Business Combination Agreement and the Convertible Note Subscription Agreements. We refer to this as the "maximum redemption scenario" and the scenario where no additional shares of Common Stock are redeemed as the "no additional redemption scenario". On a pro forma basis as of December 31, 2020, the

Table of Contents

maximum redemption scenario would result in approximately $132.1 million of cash and cash equivalents and working capital of approximately $138.7 million (consisting of $144.2 million in current assets and $5.5 million in current liabilities) and the no additional redemption scenario would result in approximately $284.2 million of cash and cash equivalents and working capital of approximately $290.8 million (consisting of $296.3 million in current assets and $5.5 million in current liabilities). See "*Unaudited Pro Forma Condensed Combined Financial Information.*" We expect that following the Closing, we will have sufficient capital to fund our planned operations for the next 12 to 18 months under either the maximum redemption scenario or the no additional redemption scenario.

The design, manufacture, sale and servicing of Lightning Systems' ZEVs and electric powertrains is capital intensive. In the near term following the Closing, Lightning Systems' capital will be deployed for the projected operating expenses to execute on Lightning Systems' business plan, to provide necessary working capital for accounts receivable and inventory, to finance Lightning Systems' anticipated capital expenditures to expand the manufacturing capacity to meet revenue forecasts and to fund Lightning Systems' EV-as-a-Service and Energy-as-a-Service initiatives. Beyond 12 to 18 months, Lightning Systems will need to raise additional capital to scale its manufacturing. In addition, Lightning Systems may raise capital earlier on an opportunistic basis. These additional funds may be raised through the issuance of equity, equity related or debt securities, or through obtaining credit from government or financial institutions. Additional capital will be necessary in the future to fund ongoing operations, continue research, development and design efforts and improve infrastructure.

**Contractual Obligations and Commitments**

The following table summarizes our long-term contractual obligations associated with Lightning Systems' notes payable and operating and financing leases as of December 31, 2020, and the years in which these obligations are due:

| | Total | Less than 1 Year | 1 - 3 Years | 3 - 5 Years | More than 5 Years |
|---|---|---|---|---|---|
| | | (dollar amounts in thousands) | | | |
| Notes payable | | | | | |
| Term loan and revolving working capital facility | $ 6,000 | $ 3,000 | $ — | $ — | $ 3,000 |
| Short term convertible notes payable | 9,679 | 9,679 | — | — | — |
| Unsecured facility agreement | 1,500 | 1,500 | — | — | — |
| Lease | | | | | |
| Operating leases | 13,251 | 2,030 | 5,391 | 4,154 | 1,676 |
| Financing leases | 55 | 55 | — | — | — |
| | $30,485 | $ 16,264 | $5,391 | $4,154 | $ 4,676 |

**Backlog**

Backlog is comprised of non-binding agreements and purchase orders from customers. Although the backlog does not constitute a legal obligation, Lightning Systems believes the amounts included in backlog are firm, even though these non-binding orders may be cancelled or delayed by customers without penalty, and Lightning Systems may elect to permit cancellation of orders without penalty where management believes it is in Lightning Systems' best interest to do so. Lightning Systems, on a case-by-case basis and in our sole discretion, holds deposits for purchase orders from customers. Accordingly, revenue estimates and the amount and timing of work we expected to be performed at the time the estimate of backlog is developed is subject to change. It is possible that the methodology for determining bookings and backlog may not be comparable to methods used by other companies.

Backlog may not be indicative of future sales and can vary significantly from period to period.

Table of Contents

A summary of Lightning Systems' backlog as of each of the reporting periods is as follows:

|  | December 31, | |
|  | 2020 | 2019 |
|  | (dollar amounts in thousands) | |
| Units | 1,569 | 276 |
| Dollars (weighted value) | $ 169,421 | $ 27,081 |

## Off-Balance Sheet Arrangements

Lightning Systems has not engaged in any off-balance sheet arrangements, as defined in the rules and regulations of the SEC.

## Critical Accounting Policies and Estimates

Our financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and pursuant to the regulations of the U.S. Securities and Exchange Commission ("SEC"). The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements, as well as the reported expenses incurred during the reporting periods. Our estimates are based on our historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources.

Actual results may differ from these estimates under different assumptions or conditions. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates.

While our significant accounting policies are described in the notes to our financial statements, we believe that the following accounting policies are most critical to understanding our financial condition and historical and future results of operations:

- *Redeemable convertible preferred stock -* Due to the contingently redeemable nature of the preferred stock, Lightning Systems classifies the preferred stock as temporary equity in the mezzanine section of the balance sheet. In addition, Lightning Systems does not currently believe that the related contingent events and the redemption of the preferred stock is probable to occur. Therefore, Lightning Systems is not currently accreting the preferred stock to redemption value and will only do so if the preferred stock becomes probable of redemption in the future.

- *Revenue recognition* - The Company adopted Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers (Topic 606),* using the modified retrospective method effective January 1, 2019. The adoption considered all open contracts and determined there was no significant impact on the Company's balance sheets or Statements of Operations and Comprehensive Loss at January 1, 2019.

  The Company develops and produces Powertrain Kits for urban medium and heavy-duty vehicles, such as delivery trucks and buses. Powertrain Kits can either be sold direct to customers or installed and integrated by us into a vehicle. The Company transfers control and recognizes revenue for Powertrain Kits sold direct to customers when the product is shipped "FOB Shipping Point." When we are responsible for Vehicle Conversions, revenue is recognized upon completion of the conversion and the vehicle is made available to the customer. For Vehicle Conversions, the components are highly interdependent and interrelated, and conversion requires both the components and their installation and integration, which collectively represent the combined output to the customer. The Company also provides chargers as an ancillary supporting product to customers. Revenue for chargers is recognized when the product is drop shipped directly to the customer from the manufacturer. The Company, who controls the customer relationship and product pricing

269

Table of Contents

for chargers, is the principal in such transactions and revenue is recognized on a gross basis. From time to time we also sell services associated with the Powertrain Kits, revenue from which is recognized as the service is transferred to the customer. Service revenue for the years ended December 31, 2020 and 2019 represented less than 10% of total revenue.

The Company accounts for shipping and handling costs arranged on behalf of customers as fulfillment costs and records these costs within "Cost of revenues" in the accompanying Statements of Operations and Comprehensive Loss. Shipping and handling billed to customers is included in revenues and is not significant.

- *Fair Value -* U.S. GAAP for fair value establishes a hierarchy that prioritizes fair value measurements based on the types of inputs used for the various valuation techniques (market approach, income approach, and cost approach). Lightning Systems' financial assets and liabilities are measured using inputs from the three levels of the fair value hierarchy. The three levels of the hierarchy and the related inputs are as follows:

  ○ Level 1: Quoted prices (unadjusted) for identical assets or liabilities in active markets that Lightning Systems can access at the measurement date.

  ○ Level 2: Significant other observable inputs other than level 1 prices such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active or other inputs that are observable or can be corroborated by observable market data.

  ○ Level 3: Significant unobservable inputs that reflect Lightning Systems' own assumptions about the assumptions that market participants would use in pricing an asset or liability.

We categorize fair value measurements within the fair value hierarchy based upon the lowest level of the most significant inputs used to determine fair value.

An asset's or liability's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

Assets and liabilities measured at fair value are based on one or more of the following three valuation techniques noted in ASC 820, *Fair Value Measurement*:

  ○ *Market approach*: Prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities

  ○ *Cost approach*: Amount that would be required to replace the service capacity of an asset (replacement cost)

  ○ *Income approach*: Techniques to convert future amounts to a single present value amount based upon market expectations (including present value techniques, option pricing and excess earnings models)

Lightning Systems believes its valuation methods are appropriate and consistent with other market participants, however the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

Lightning Systems' financial instruments consist of cash and cash equivalents, accounts receivable, accounts payable, accrued liabilities, convertible notes payable, and warrant liabilities. The carrying value of cash and cash equivalents, accounts receivable, accounts payable, and accrued expenses approximates fair value because of the short-term nature of those instruments. Lightning Systems estimates that the current value of the notes approximates fair value based on prevailing market rates.

The common and preferred stock warrants issued in connection with the issuance of debt, the conversion of debt to preferred stock, and the issuance of preferred stock are recorded at their fair market value as of the date of each transaction. These common and preferred stock warrants are classified as warrant liabilities and are adjusted to their fair market value as of each reporting period.

270

Table of Contents

Lightning Systems estimated the value of Lightning Systems Common Stock, Lightning Systems Series C preferred stock, and Lightning Systems Series C preferred stock warrants, which value was used in the determination of the value of warrants issued in connection with certain debt and preferred stock transactions and when marking to market at the end of each reporting period. Lightning Systems considers such liability-classified warrants in Level 3 due to significant unobservable inputs in its valuation.

The key period end valuation milestones for Lightning Systems through December 31, 2020 were December 31, 2019, March 31, 2020, June 30, 2020, September 30, 2020, and December 31, 2020.

The 2019 valuations are based on Lightning Systems being a private company and a combination of the income and market approach allocated to stockholders using an Option Pricing Model and applying a Discount for Lack of Marketability judgement based on the Finnerty put-option model. The key inputs to the valuation models that were utilized to estimate the fair value of the warrant liabilities included volatility, risk free rate, probability of subsequent funding, and discounts for lack of marketability.

The 2020 valuations are based on Lightning Systems being a private company and determined using a Probability Weighted Expected Return Method ("PWERM") and a combination of several income and market approaches to determine the enterprise value of Lightning Systems. The enterprise value is adjusted for the probabilities of various scenarios/liquidity events occurring to create an overall weighted value of common stock as each valuation date. Each liquidity scenario has unique probabilities based on management's opinion, which is based on various management discussions with potential investors, advisors, and market participants, and unique facts and circumstances as of the valuation dates. The scenarios included early liquidation, a private merger and acquisition ("M&A") transaction, staying a privately held company, and a special purpose acquisition company ("SPAC") transaction/merger.

Each scenario was based on a different valuation methodology based on the unique risks, opportunities and a likely investor's or market participant's perspective. These included (a) Early liquidation: based on an Asset Approach using the existing equity value as of the valuation date; (b) Private M&A: based on a guideline transaction (market) approach using an assembled group of comparable transactions and trailing revenue metric/multiples; (c) Stay private: based on a discounted cash flow (income) approach using Lightning Systems' non-SPAC forecast and a market-based discount rate; and (d) SPAC transaction: based on a guideline public company (market) approach using an assembled peer group of comparable companies and forward revenue metrics/multiples. Value was allocated to all outstanding securities through the PWERM using capitalization tables unique to each liquidity scenario.

The preliminary valuation was then discounted by applying a Discount for Lack of Marketability ("DOLM") based on a Finnerty put-option model to determine a non-marketable, minority value of one share of common stock and one Series C preferred share.

The Board of Directors determined the value of the Lightning Systems' common stock as follows:

- At December 31, 2019, the Lightning Systems board of directors determined that the value of Lightning Systems' common stock was $32.2 million on an equity value basis or $0.05 per share and the Lightning Systems board of directors subsequently did not determine any change to the December 31, 2019 valuation as of March 31, 2020.

- At June 30, 2020, the Lightning Systems board of directors determined that the value of Lightning Systems' common stock had decreased to $20.3 million or $0.03 per share. The income and market approaches used to determine Lightning Systems' valuation at June 30, 2020 were influenced by the negative impacts of the COVID-19 pandemic on the business and the short-term effects of transitioning from electric powertrains to EVs, including a decrease in backlog.

- At September 30, 2020, the Lightning Systems board of directors determined that the value per share of Lightning Systems' common stock had increased to $2.06 per share, reflecting a weighted average of the enterprise value assuming several potential liquidity event scenarios. In particular, the September 30, 2020 valuation was impacted by the signing of a letter of intent with the

271

Table of Contents

GigCapital3 on September 23, 2020, as well as increased pipeline and backlog. At that point in time, the Lightning Systems board of directors, viewed the probability of success of the Business Combination transaction at approximately 25%, with all other remaining scenarios estimated at a combined probability of occurring of 75% (15% for a liquidation, 40% for a private merger transaction and 20% for Lightning Systems remaining a privately held independent company), for purpose of Lightning Systems' valuation.

- At December 31, 2020, the Lightning Systems Board of Directors determined that the value per share of Lightning Systems' common stock had increased to $3.51 per share, reflecting a weighted average of the enterprise value assuming several potential liquidity event scenarios. In particular, the December 31, 2020 valuation was impacted by increased pipeline and backlog. At that point in time, the Lightning Systems Board of Directors, viewed the probability of success of the Business Combination transaction at approximately 45%, with all other remaining scenarios estimated at a combined probability of occurring of 55% (15% for a liquidation, 30% for a private merger transaction and 10% for Lightning Systems remaining a privately held independent company), for purpose of Lightning Systems' valuation.

Based on the per share merger consideration to be paid by the Company pursuant to the Business Combination Agreement, the implied fully diluted share price for Lightning Systems' common stock immediately prior Closing would be $10.00 per share. The private company valuations of the Lightning Systems board of directors differ from the public company valuation of Lighting Systems by GigCapital3, the PIPE Investors and the Convertible Note Investors; principally due to the private company discount for the lack of marketability and probability of various scenarios/liquidity events at various points in time.

Lightning Systems' non-financial assets, which primarily consist of property and equipment, are not required to be carried at fair value on a recurring basis and are reported at carrying value. However, on a periodic basis or whenever events or changes in circumstances indicate that their carrying value may not be fully recoverable, these along with other non-financial instruments are assessed for impairment and, if applicable, written down to and recorded at fair value.

- *Beneficial Conversion Features* – Lightning Systems follows beneficial conversion feature guidance in ASC470-20, *Debt – Debt with Conversion and Other Options,* which applies to convertible stock and convertible debt. A beneficial conversion feature is defined as a nondetachable conversion feature that is in the money at the commitment date. The beneficial conversion feature guidance requires recognition of the conversion option's in-the-money portion, the intrinsic value of the option, in equity, with an offsetting reduction to the carrying amount of the instrument. The resulting discount is amortized as interest over the life of the instrument. When there is a subsequent change to the conversion ratio based on a future occurrence, the new conversion price may trigger the recognition of an additional beneficial conversion feature on occurrence.

- *Warrant liabilities* – Lightning Systems accounts for common and preferred warrants in accordance with the authoritative guidance which requires that free-standing financial instruments with certain cash settlement features and / or associated with preferred stock, which is classified as temporary equity, to be recorded at their fair value. All outstanding common and preferred warrants are recorded as "Warrant liabilities" based on their fair value on the date of the transaction. See the "Fair value" significant accounting policy for a description of the determination of fair value. Any changes in the fair value of these instruments are reported as "Loss (Gain) from change in fair value of warrant liabilities."

Warrants are separated from the host contract and reported at fair value when the warrant is a freestanding financial instrument that may ultimately require the issuer to settle the obligation by transferring assets. Under certain circumstances, most notably in the case of a deemed liquidation, the warrants issued in conjunction with Lightning Systems' debt and preferred stock transactions may be ultimately required to settle by a transfer of assets, and as a result the warrants are reported as liabilities at fair value each reporting period.

272

Table of Contents

Based on the terms of the common and preferred warrant agreements, Lightning Systems has determined that warrants issued in 2020 and 2019 are liabilities, as such, are included in "Warrant liabilities" on the Balance Sheets and recorded at fair value each reporting period.

**Recent Accounting Pronouncements**

From time to time, new accounting pronouncements are issued by standard setting bodies that are adopted by Lightning Systems as of the specified effective date. Unless otherwise discussed, Lightning Systems believes that the impact of recently issued standards that are not yet effective will not have a material impact on Lightning Systems' financial position or results of operations under adoption.

**Internal Control Over Financial Reporting**

In connection with the audit of Lightning Systems' financial statements for the years ended December 31, 2020 and 2019, Lightning Systems' management identified material weaknesses in Lightning Systems' internal controls. See the section titled *"Risk Factors — Lightning Systems and its independent registered public accounting firm have identified material weaknesses in its internal control over financial reporting. If Lightning Systems is unable to remedy these material weaknesses, or if Lightning Systems fails to establish and maintain effective internal controls, Lightning Systems may be unable to produce timely and accurate financial statements, and Lightning Systems may conclude that its internal control over financial reporting is not effective, which could adversely impact its investors' confidence and New Lightning eMotors' stock price."*

**Emerging Growth Company Status**

We are an emerging growth company ("*EGC*"), as defined in the Jumpstart Our Business Startups Act ("JOBS Act"). The JOBS Act permits companies with EGC status to take advantage of an extended transition period to comply with new or revised accounting standards, delaying the adoption of these accounting standards until they would apply to private companies. We have elected to use this extended transition period to enable us to comply with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date we (i) are no longer an emerging growth company or (ii) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, our financial statements may not be comparable to companies that comply with the new or revised accounting standards as of public company effective dates.

In addition, we intend to rely on the other exemptions and reduced reporting requirements provided by the JOBS Act. Subject to certain conditions set forth in the JOBS Act, if, as an EGC, we intend to rely on such exemptions, we are not required to, among other things: (i) provide an auditor's attestation report on our system of internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act; (ii) provide all of the compensation disclosure that may be required of non-emerging growth public companies under the Dodd-Frank Wall Street Reform and Consumer Protection Act; (iii) comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (auditor discussion and analysis); and (iv) disclose certain executive compensation-related items such as the correlation between executive compensation and performance and comparisons of the Chief Executive Officer's compensation to median employee compensation.

We will remain an EGC under the JOBS Act until the earliest of (i) December 31, 2025, which is the last day of our first fiscal year following the fifth anniversary of the initial public offering of GigCapital3, (ii) the last date of our fiscal year in which we have total annual gross revenue of at least $1.07 billion, (iii) the date on which we are deemed to be a "large accelerated filer" under the rules of the SEC with at least $700.0 million of outstanding securities held by non-affiliates, or (iv) the date on which we have issued more than $1.0 billion innon-convertible debt securities during the previous three-years.

Table of Contents

**Quantitative and Qualitative Disclosures About Market and other Risks**

We are exposed to a variety of market and other risks, including the effects of changes in interest rates, inflation, and foreign currency exchange rates.

*Interest Rate Risk*

Lightning Systems holds cash and cash equivalents for working capital purposes. Lightning Systems' cash and cash equivalents are placed with high-credit-quality financial institutions and issuers, and at times exceed federally insured limits. To date, Lightning Systems has not experienced any credit loss relating to its cash and cash equivalents. As of December 31, 2020, Lightning Systems had a cash balance of $0.5 million, consisting of operating and savings accounts, which are not affected by changes in the general level of U.S. interest rates.

*Commodity Price Risk*

Lightning Systems is a purchaser of certain commodities, including steel, aluminum, and composites. In addition, Lightning Systems is a purchaser of components and parts containing various commodities, including steel, aluminum, rubber and others which are integrated into Lightning Systems' end products. Lightning Systems generally buys these commodities and components based upon market prices that are established with the vendor as part of the purchase process. Lightning Systems does not use commodity financial instruments to hedge commodity prices.

Lightning Systems generally attempts to obtain firm pricing from most of its suppliers, consistent with backlog requirements and/or forecasted annual sales. To the extent that commodity prices increase and Lightning Systems does not have firm pricing from its suppliers, or its suppliers are not able to honor such prices, then Lightning Systems may experience margin declines to the extent it is not able to increase selling prices of its products.

*Foreign Currency Risk*

Lightning Systems does not believe that foreign currency risk and inflation risk currently pose a material threat to its business.

*Change in Certifying Accountant*

On October 13, 2020, the Lightning Systems Board of Directors engaged Grant Thornton LLP to serve as Lightning Systems' independent registered public accounting firm. At the same time, Lighting Systems' Board of Directors dismissed Plante & Moran, PLLC as Lighting Systems' independent auditors, effective for the audit of the fiscal year ended December 31, 2019. Plante & Moran, PLLC had previously audited Lighting Systems financial statements for the years ended December 31, 2019 and December 31, 2018 in accordance with auditing standards generally accepted in the United States of America. Following its engagement, Grant Thornton LLP reaudited in accordance with the standards of the PCAOB and Lightning Systems reissued its financial statements as of and for the years ended December 31, 2019, which are included in this proxy statement/prospectus, and December 31, 2018, which are not included herein.

Plante & Moran, PLLC did not audit Lightning Systems' financial statements for any period subsequent to the year ended December 31, 2019. For the years ended December 31, 2019 and 2018, and the subsequent interim period through October 13, 2020, no report by Plante & Moran, PLLC on Lightning Systems' financial statements contained an adverse opinion or a disclaimer of opinion, or was qualified or modified as to uncertainty, audit scope or accounting principles, except for the substantial doubt about Lightning Systems' ability to continue as a going concern.

During the two fiscal years ended December 31, 2019, and the subsequent interim period through October 13, 2020, there were (i) no disagreements with Plante & Moran, PLLC on any matter of accounting principles or

274

Table of Contents

practices, financial statement disclosure or auditing scope or procedures, which disagreements, if not resolved to the satisfaction of Plante & Moran, PLLC, would have caused them to make reference to the subject matter of the disagreements in their audit reports, and (ii) no "reportable events," as such term is defined in Item 304(a)(1)(v) of Regulation S-K, except for certain material weaknesses in internal control over financial reporting, which primarily relate to a lack of segregation of duties and the lack of technical resources to appropriately apply GAAP to complex equity transactions and except for the substantial doubt about Lightning Systems' ability to continue as a going concern.

We have provided Plante & Moran, PLLC with a copy of these disclosures and they have furnished a letter addressed to the SEC stating that it agrees with the statements made herein, a copy of which is included as Exhibit 16.1 to the registration statement of which this proxy statement/prospectus forms a part.

During Lightning Systems' fiscal year ended December 31, 2019, and through October 13, 2020, neither Lightning Systems nor anyone acting on its behalf consulted with Grant Thornton LLP regarding either: (i) the application of accounting principles to a specified transaction, either completed or proposed; or the type of audit opinion that might be rendered on its financial statements, and neither a written report nor oral advice was provided to Lightning Systems that Grant Thornton LLP concluded was an important factor considered by Lightning Systems in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a disagreement or a reportable event.

275

**Table of Contents**

**MANAGEMENT AFTER THE BUSINESS COMBINATION**

**Management and Board of Directors**

Upon the consummation of the Business Combination, the business and affairs of New Lightning eMotors will be managed by or under the direction of the New Lightning eMotors Board. The directors and executive officers of New Lightning eMotors upon consummation of the Business Combination will include the following.

| Name | Age | Position |
|---|---|---|
| Timothy Reeser | 49 | Chief Executive Officer and Director |
| Teresa Covington | 57 | Chief Financial Officer |
| William Kelley | 64 | Chief Technology Officer and Chief Operating Officer |
| Robert Fenwick-Smith | 58 | Co-Chairman of the Board of Directors |
| Dr. Avi Katz | 62 | Co-Chairman of the Board of Directors |
| Dr. Raluca Dinu | 47 | Director |
| Neil Miotto | 74 | Director |
| Thaddeus Senko | 64 | Director |
| Meghan Sharp | 49 | Director |
| Diana Tremblay | 61 | Director |
| Bruce Coventry | 68 | Director |

**Executive Officers**

*Timothy Reeser*. Mr. Reeser founded Lightning Systems in October 2008. Since October 2012, he has served as Lightning Systems' Chief Executive Officer. He will continue in this role at New Lightning eMotors and also serve as a member of the New Lightning eMotors Board. Mr. Reeser has served as Managing Partner of Aravaipa Ventures from August 2011 to present. From January 2010 through April 2013, Mr. Reeser served as Chief Executive Officer of OptiEnzi Sensors, Inc., a chemical analytics company. From January 2009 through October 2012, Mr. Reeser served as vice president of CSU Ventures, the clean-energy supercluster of Colorado State University. Mr. Reeser is a senior technology executive, entrepreneur, and venture investor in transportation technology, cleantech and software with over 25 years of experience building international executive management teams and growing companies organically and through mergers and acquisitions. Mr. Reeser received his Bachelors of Science in Mechanical Engineering in 1993 from Colorado State University.

Mr. Reeser is qualified to serve on the New Lightning eMotors Board based on his experience as the Chief Executive Officer of Lightning Systems, going-forward, New Lightning eMotors.

*Robert Fenwick-Smith*. Mr. Fenwick-Smith serves as Lightning Systems' Executive Chairman and has served as Lightning Systems' Chairman of the Board of Directors since 2010. From February 2020 through December 2020, Mr. Fenwick-Smith served as Lightning Systems' interim Chief Financial Officer. He will continue on the New Lightning eMotors Board as its Co-Chairman of the Board of Directors. Mr. Fenwick-Smith founded Aravaipa Ventures in January 2008 and has served as Senior Managing Director of Aravaipa Ventures since its inception. Mr. Fenwick-Smith has served as the Chairman of the Board of Directors of aWhere Inc., a weather data analytics company, from 2008 to present; Clear Comfort Water, Inc., an industrial water treatment technology company, from 2014 to present; Boulder Industries, Inc., sustainable rubber and plastic solutions company, from 2014 to present; and Silver Bullet Water Treatment, Inc., a water management company from 2011 to present. Prior to founding Aravaipa Ventures, Mr. Fenwick-Smith worked in private equity in Europe for 20 years, during which his primary activity was serving as a founder and Chief Executive Officer of the Romaco Group from 1999 through 2002. Mr. Fenwick-Smith received his Bachelors in Economics from Lausanne University (Switzerland) in 1984 and his MBA from Harvard Business School in 1988.

Mr. Fenwick-Smith is qualified to serve Co-Chairman of the New Lightning eMotors Board based on his experience as Chairman of the Board of Lightning Systems and his investing experience.

276

Table of Contents

*William Kelley, Jr.* Mr. Kelley has served as Lightning Systems' Chief Technology Officer and Chief Operating Officer since September 2017. Prior to his work at Lightning Systems, Mr. Kelley was self-employed and the principal of Developmeant IP, a technology development consultancy, since 2012. Mr. Kelley had previously served as the Corporate Vice President for Research & Technology for Borg Warner, Inc., a hybrid and electric vehicle company. Mr. Kelley received his Bachelor of Science in Nuclear Engineering from Lowell Technological Institute (now known as the University of Massachusetts at Lowell), and his Master of Science in Nuclear Engineering degree from Rensselaer Polytechnic Institute. He is a certified Reliability Engineer.

*Teresa Covington*. Ms. Covington will begin as Lightning Systems' Senior Vice President and Chief Financial Officer effective January 4, 2021. She previously served as the Senior Vice President and Chief Financial Officer of asTech, a cloud-based technology and diagnostic automotive services platform from October 2019 until the end of 2020. From March 2017 through October 2019, Ms. Covington served as the Senior Vice President and Chief Financial Officer of AeroVironment Inc., a technology leader in unmanned systems for defense and commercial markets. She previously served as AeroVironment's vice president of finance from July 2015 to March 2017 and as interim chief financial officer from February 2015 to July 2015. Prior to joining AeroVironment, from August 2000 to May 2011, Ms. Covington served as senior vice president and chief financial officer of Line 6, Inc., a global designer and manufacturer of musical instruments that is now part of Yamaha. Ms. Covington earned an M.B.A. from Stanford University Graduate School of Business, an M.S. in electrical engineering from the University of Southern California and a B.S. in electrical engineering from the University of Illinois at Urbana-Champaign.

**Non-Employee Directors**

*Dr. Avi S. Katz*. Upon consummation of the Business Combination, Dr. Katz will serve as theCo-Chairman of the Board of Directors of New Lightning eMotors. Dr. Katz has served as GigCapita3's Executive Chairman of our Board of Directors, Chief Executive Officer, President and Secretary since February 2020. Dr. Katz has spent approximately 33 years in international executive positions within the TMT industry working for privately held start-ups, middle-cap companies and large enterprises. In these roles, Dr. Katz has been instrumental in launching and accelerating entities, building teams, large scale fund-raising, developing key alliances and technology partnerships, M&A activities, business development, financial management, global operations and sales and marketing. In October 2017, Dr. Katz founded GIG1, a Private-to-Public Equity (PPE) company formed for the purpose of acquiring a company in the technology industry. GIG1 completed its initial public offering in December 2017, in which it sold 14,375,000 units at price of $10.00 per unit, with each unit consisting of one share of GIG1 common stock, three-fourths of one warrant to purchase one share of GIG1 common stock and one right to receive one-tenth of one share of GIG1 common stock, generating aggregate proceeds of $143,750,000, and, at that time, was listed on the NYSE under the symbol "GIG." On February 22, 2019, after intensive screening of more than 400 companies worldwide, GIG1 entered into a stock purchase agreement to acquire Kaleyra at a transaction enterprise value of $187 million with combined cash and/or promissory note consideration of $15 million. Kaleyra is a global company specialized in providing mobile messaging services for financial institutions and companies of all sizes. The transaction closed on November 25, 2019, and GIG1 was renamed Kaleyra, Inc. and listed on the NYSE American stock exchange under the symbol "KLR" at that time. Dr. Katz has served as the Executive Chairman and Secretary of Kaleyra, Inc. since the consummation of the transaction in November 2019. Prior to that time, in addition to being the Executive Chairman and Secretary, he was also the Chief Executive Officer of GIG1. In March 2019, Dr. Katz founded GIG2. GIG2 completed its initial public offering in Junes 2019, in which it sold 17,250,000 units at a per unit price of $10.00, with each unit consisting of one share of GIG2 common stock, one warrant to purchase one share of GIG2 common stock, and one right to receive one-twentieth of one share of GIG2 common stock, generating aggregate proceeds of $172,500,000. GIG2 is listed on the NYSE under the symbol "GIX." GIG2 is engaged in intensive efforts of searching and screening companies worldwide, and has not yet completed its initial business combination. Dr. Katz serves as the Executive Chairman and Secretary of GIG2. Dr. Katz is also the sole managing member of GigFounders, LLC and a managing member of GigManagement, LLC. He is also the co-founder of Cognizer, a software company specializing in deep-learning powered natural language artificial intelligence, and was the

**Table of Contents**

Executive Chairman of Cognizer's board of directors from its inception in December 2018 until August 2020. Prior to GIG1 and GIG2, Dr. Katz dedicated 10 years to bootstrap, develop and manage GigPeak (NYSE American: formerly GIG), originally known as GigOptix, Inc. He served as Chairman of the Board, Chief Executive Officer and President of GigPeak. From its inception in 2007, which occurred through the acquisition of assets valued at less than $1 million, until its sale in April 2017 to IDT for $250 million in cash, GigPeak provided semiconductor integrated circuits (ICs) and software solutions for high-speed connectivity and video compression. While Dr. Katz was at GigPeak's helm, the company completed 10 M&A deals. From 2003 to 2005, Dr. Katz was the chief executive officer, president, and member of the board of directors of Intransa, Inc., which at the time provided full-featured, enterprise-class IP-based Storage Area Networks (SAN). From 2000 to 2003, Dr. Katz was the Chief Executive Officer and a member of the board of directors of Equator Technologies, which at the time sought to commercialize leading edge programmable media processing platform technology for the rapid design and deployment of digital media and imaging products. Equator Technologies was sold to Pixelworks, Inc. for $110 million in 2005. Dr. Katz has held several leadership positions over the span of his career within the technology industry since serving as Member of Technical Staff at AT&T Bell Laboratories in the 1980s, and has made numerous angel investments in high-tech companies around the world. Dr. Katz is a graduate of the Israeli Naval Academy and holds a B.Sc. and Ph.D. in Semiconductors Materials from the Technion (Israel Institute of Technology). He is a serial entrepreneur, holds many U.S. and international patents, has published many technical papers and is the editor of a number of technical books. Dr. Katz is married to Dr. Dinu, one of our directors.

Dr. Katz is qualified to serve as Co-Chairman of the New Lightning eMotors Board based on his business experience as a founder, inventor, chief executive officer and director of a publicly-listed company and his investing experience.

*Dr. Raluca Dinu*. Upon the consummation of the Business Combination, Dr. Dinu will serve as a member of the New Lightning eMotors Board. Dr. Dinu has been a member of the Board of Directors of GigCapital3 since February 2020. She has served as the Chief Executive Officer of GIG2 since August 2019 and as a member of its board of directors since March 2019. From April 2017 to May 2019, Dr. Dinu was the Vice President and General Manager of IDT's Optical Interconnects Division. Prior to that, she held several executive-level positions at GigPeak, including Executive Vice President and Chief Operation Officer from April 2016 until it was acquired by IDT in April 2017, and before that, as its Executive Vice President of Global Sales and Marketing from August 2015 to April 2016, and as its Senior Vice President of Global Sales and Marketing from December 2014 to August 2015. From February 2014 to September 2017, Dr. Dinu was a member of the board of directors of Brazil-Photonics, in Campinas, Brazil, a joint venture that GigPeak established with the Centro de Pesquisa e Desenvolvimento em Telecomunicações (CPqD). From 2001 to 2008, Dr. Dinu was VP of Engineering at Lumera Corporation ("Lumera") (Nasdaq: LMRA). Lumera was acquired by GigPeak in 2008, and Dr. Dinu joined GigPeak at that time. Dr. Dinu holds a B.Sc. in Physics and Ph.D. in Solid State Condensed Matter Physics from the University of Bucharest, and an Executive-M.B.A. from Stanford University. Dr. Dinu is married to Dr. Katz, our Executive Chairman of our Board of Directors, Chief Executive Officer, President and Secretary.

Dr. Dinu is qualified to serve on the New Lightning eMotors Board based on her business experience as a board member of a publicly-listed company and her investing experience.

*Neil Miotto*. Upon the consummation of the Business Combination, Mr. Miotto will serve as a member of the New Lightning eMotors Board. Mr. Miotto has been a member of the Board of Directors of GigCaptial3 since February 2020. Mr. Miotto is a financial consultant and a retired assurance partner of KPMG LLP ("KPMG"), where he was a partner for 27 years until his retirement in September 2006. Since his retirement from KPMG, Mr. Miotto has provided high-level financial consulting services to companies in need of timely accounting assistance and has served on public company boards. He is deemed to be a "audit committee financial expert" under SEC rules. While at KPMG, Mr. Miotto focused on serving large public companies. Mr. Miotto also served as an SEC reviewing partner while at KPMG. Mr. Miotto became a member of the board of directors of

278

Table of Contents

GIG1 in October 2017 and has continued in that role after that company became Kaleyra, Inc. Mr. Miotto has also served on the board of directors of GIG2 since March 2019. In addition, Mr. Miotto served on the board of directors of Micrel, Inc. prior to its sale to Microchip Technology Inc. in May 2015, and on the board of directors of GigPeak from 2008 until its sale to IDT in April 2017. He also previously served on the board of directors of Cognizer from March 2019 to August 2020. He is a member of the American Institute of Certified Public Accountants and holds a Bachelor of Business Administration degree from Baruch College of The City University of New York.

Mr. Miotto is qualified to serve on the New Lightning eMotors Board based on his business experience as a board member of a publicly-listed company and his experience as an audit committee financial expert.

***Thaddeus Senko***. Upon the consummation of the Business Combination, Mr. Senko will serve as a member of the New Lightning eMotors Board. Since 2018, Mr. Senko has served as a member of Autoliv Inc.'s (NYSE:ALV), a supplier of automotive safety systems, board of directors, serving as chairman of the audit committee, as well as on the risk and compliance, nominating and governance committee. From 1978 to 2017, Mr. Senko served as a partner at KPMG LLP, providing enterprise risk management, compliance, and audit services to various public companies. At KPMG, he served as Audit Partner and SEC Reviewing Partner for eight years, Chief Audit Executive for four years, Global and National Partner in Charge of Internal Audit, Risk & Compliance Services for eight years, Global Engagement Partner and Client Services Partner for seven years and Global Leader of the ESG practice for two years. Mr. Senko's overall career at KPMG spanned 39 years. Previously, Mr. Senko served on the Board of Duquesne University, a private university with approximately 10,000 students, from 2007 to 2016, chairing the Audit and Finance Committee and serving on the Executive and University Advancement Committee. Mr. Senko continues to serve on the university's Business Advisory Council. He is deemed to be an "audit committee financial expert" under SEC rules. Mr. Senko received a bachelor's degree in business administration from Duquesne University.

Mr. Senko is qualified to serve on the New Lightning eMotors Board based on his experience as a director to private and public companies and his experience in the automotive industry.

***Meghan Sharp.*** Upon the consummation of the Business Combination, Ms. Sharp will serve as a member of the New Lightning eMotors Board. Since 2020, Ms. Sharp has served as the Global Head of BP Ventures, Inc. ("BP Ventures"), an affiliate of BP Technology Ventures, Inc., which is a venture capital firm that primarily invests in private and high-growth technology companies in the upstream, downstream and alternative energy. At BP Ventures, Ms. Sharp also serves as the Vice President of "innovation & engineering" teams, leading BP Ventures's initiatives in orienting businesses towards reducing carbon emissions to zero. From October 2019 to 2020, Ms. Sharp served as the Chief Operating Officer for Beyond Limits, an Artificial Intelligence (AI) and cognitive computing company that engineers advanced cognitive AI solutions for companies in industries such as energy, healthcare, finance and logistics. From August 2010 to October 2019, Ms. Sharp served as the Managing Director of BP Ventures's Americas division. Ms. Sharp holds a Ph.D. in Microbial Genetics from the University of California, San Francisco, has held postdoctoral positions in plant genetics at the University of Chicago and the Carnegie Institution of Washington at Stanford University, and an MBA with a focus on venture capital from Columbia University.

Ms. Sharp is qualified to serve on the New Lightning eMotors Board based on her experience in the clean energy industry.

***Diana Tremblay***. Upon the consummation of the Business Combination, Ms. Tremblay will serve as a member of the New Lightning eMotors Board. Ms. Tremblay currently serves on the Board of Directors of Itron, Inc. (NASDAQ:ITRI). Ms. Tremblay retired from General Motors Company, the motor vehicle manufacturer and distributor multinational corporation (NYSE:GM) in September 2017. She had been with that company since 1977, and during her tenure at GM, she held a variety of positions in engineering, manufacturing and labor relations, including direct operational responsibility for over 50,000 employees. From July 2013 until her retirement, Ms. Tremblay served as Vice President of Global Business Services, where she was charged with

279

Table of Contents

streamlining administrative processes around the world to improve service quality, reduce complexity, and achieve cost efficiencies in such areas as finance, human resources, real estate, purchasing, asset management, and master data. From December 2009 to July 2013, Ms. Tremblay held the position of Vice President of Manufacturing at GM. She has a Bachelor of Industrial Administration Degree form Kettering University (formerly General Motors Institute) and a Master of Science in Management Degree from Massachusetts Institute of Technology.

Ms. Tremblay is qualified to serve on the New Lightning eMotors Board based on her broad business experience that includes her previous roles at GM as an engineer, plant manager, head of manufacturing, and lead labor relations negotiator, which together with her knowledge of business services and global manufacturing processes, provide additional international, administrative and manufacturing perspectives to the Board.

*Bruce Coventry*. Upon the consummation of the Business Combination, Mr. Coventry will serve as a member of the New Lightning eMotors Board. Since the first quarter of 2020, Mr. Coventry has served as a senior advisor to GigCapital Global, a leading automotive technology and business advisory board. Mr. Coventry is currently the President of Coventry Consulting Group, an automotive consultancy focused on integrating technology-based start-ups into the complex processes of Global Automotive OEM's. Between March 2017 and December 2020, Mr. Coventry was Managing Partner of motormindz, an automotive consulting group. From November 2015 to December 2016, Mr. Coventry was Chief Operating Officer of Android Industries, a private equity owned and world's largest assembler of automotive complex sub-assemblies and modules. Mr. Coventry has been a member of the Board of Directors of Canada Carbon Inc. (TSX.V: CCB), a natural resources company focused on the acquisition and development of graphite properties throughout Canada, since August 2012. Mr. Coventry also served as Chairman of the Board of Directors of TowerSec Inc., an automotive cybersecurity software company that is a leading global solution vendor, specializes in delivering on-board cyber security software products to OEMs, suppliers and the aftermarket telematics manufacturers, beginning in August 2013 until the company's acquisition by HARMAN (NYSE:HAR) in March 2016. Mr. Coventry also currently serves on the Board of Trustees of Kettering University (formerly General Motors Institute), a position that he has held since 2001. Mr. Coventry has also ran a Global Engine Joint Venture initiative for Chrysler, Hyundai, and Mitsubishi, and previously served as President of Chrysler's Global Electric Motorcar. Mr. Coventry holds a Bachelor of Industrial Administration Degree from Kettering University and a Master of Business Administration from Michigan State University.

Mr. Coventry is qualified to serve on the New Lightning eMotors Board based on his broad business experience including his extensive experience in automotive product development, manufacturing, engineering, operations, and supply chain management.

**Classified Board of Directors**

In accordance with our certificate of incorporation, our Board is not classified as all directors are elected to one-year terms on an annual basis.

As discussed above, in connection with the Business Combination, the New Lightning eMotors Board will be reconstituted and initially be comprised of nine members who will be voted upon by the stockholders at the Special Meeting. Our Board believes it is in the best interests of the Company for the New Lightning eMotors Board to be classified into three classes, each comprising as nearly as possible one-third of the directors to serve three-year terms. If Proposal No. 3 is approved at the Special Meeting, each Class I director, consisting of Thaddeus Senko, Neil Miotto and Bruce Coventry, will have a term that expires at the post-combination company's annual meeting of stockholders in 2021, each Class II director, consisting of Timothy Reeser, Dr. Raluca Dinu and Meghan Sharp, will have a term that expires at the post-combination company's annual meeting of stockholders in 2022 and each Class III director, consisting of Robert Fenwick-Smith, Dr. Avi Katz and Diana Tremblay, will have a term that expires at the post-combination company's annual meeting of stockholders in 2023, or in each case until their respective successors are duly elected and qualified, or until their earlier resignation, removal or death.

Table of Contents

**Committees of the Board of Directors**

The standing committees of our Board currently consist of an audit committee, a compensation committee and a nominating and corporate governance committee. Each of the committees will report to the New Lightning eMotors Board as they deem appropriate and as the New Lightning eMotors Board may request. The composition, duties and responsibilities of these committees are set forth below. The New Lightning eMotors Board may also convene additional committees as necessary and in accordance with the organizational documents of the post-combination company.

*Audit Committee*

The audit committee is responsible for, among other matters:

- assisting the New Lightning eMotors Board in the oversight of (i) the accounting and financial reporting processes of the Company and the audits of the financial statements of Company, (ii) the preparation and integrity of the financial statements of the Company, (iii) the compliance by the Company with financial statement and regulatory requirements, (iv) the performance of the Company's internal finance and accounting personnel and its independent registered public accounting firms, and (v) the qualifications and independence of the Company's independent registered public accounting firms;

- reviewing with each of the internal and independent registered public accounting firms the overall scope and plans for audits, including authority and organizational reporting lines and adequacy of staffing and compensation;

- reviewing and discussing with management and internal auditors the Company's system of internal control and discuss with the independent registered public accounting firm any significant matters regarding internal controls over financial reporting that have come to its attention during the conduct of its audit;

- reviewing and discussing with management, internal auditors and independent registered public accounting firm the Company's financial and critical accounting practices, and policies relating to risk assessment and management;

- receiving and reviewing reports of the independent registered public accounting firm discussing (i) all critical accounting policies and practices to be used in the firm's audit of the Company's financial statements, (ii) all alternative treatments of financial information within U.S. GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm, and (iii) other material written communications between the independent registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

- reviewing and discussing with management and the independent registered public accounting firm the annual and quarterly financial statements and section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" of the Company prior to the filing of the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q;

- reviewing, or establishing, standards for the type of information and the type of presentation of such information to be included in, earnings press releases and earnings guidance provided to analysts and rating agencies;

- discussing with management and the independent registered public accounting firm any changes in Company's critical accounting principles and the effects of alternative U.S. GAAP methods, off-balance sheet structures and regulatory and accounting initiatives;

- reviewing material pending legal proceedings involving the Company and other contingent liabilities;

- meeting periodically with the Chief Executive Officer, Chief Financial Officer, the senior internal auditing executive and the independent registered public accounting firm in separate executive sessions to discuss results of examinations;

281

Table of Contents

- reviewing and approving all transactions between the Company and related parties or affiliates of the officers of the Company requiring disclosure under Item 404 of Regulation S-K prior to the Company entering into such

- establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submissions by employees or contractors of concerns regarding questionable accounting or accounting matters;

- reviewing periodically with the Company's management, the independent registered public accounting firm and outside legal counsel (i) legal and regulatory matters which may have a material effect on the financial statements, and (ii) corporate compliance policies or codes of conduct, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities; and

- establishing policies for the hiring of employees and former employees of the independent registered public accounting firm.

Upon consummation of the Business Combination, we anticipate our audit committee will consist of Messrs. Senko and Miotto and Ms. Tremblay, each of whom qualifies as an independent director according to the rules and regulations of the SEC and NYSE with respect to audit committee membership. We anticipate that Mr. Senko will serve as chairman of the audit committee. Each member of the audit committee is financially literate and our Board has determined that Messrs. Senko and Miotto qualifies as an "audit committee financial expert" as defined in applicable SEC rules. Our Board has adopted a written charter for the audit committee, which will be available on our corporate website at https://lightningemotors.com/investors/ upon the completion of the Business Combination. The information on our website is not part of this proxy statement/prospectus.

*Compensation Committee*

The compensation committee is responsible for, among other matters:

- reviewing the performance of the Chief Executive Officer and executive management;

- assisting the New Lightning eMotors Board in developing and evaluating potential candidates for executive positions (including Chief Executive Officer);

- reviewing and approving goals and objectives relevant to the Chief Executive Officer and other executive officer compensation, evaluating the Chief Executive Officer's and other executive officers' performance in light of these corporate goals and objectives, and setting Chief Executive Officer and other executive officer compensation levels consistent with its evaluation and the Company's philosophy;

- approving the salaries, bonus and other compensation for all executive officers;

- reviewing and approving compensation packages for new corporate officers and termination packages for corporate officers as requested by management;

- reviewing and discussing with the New Lightning eMotors Board and senior officers plans for officer development and corporate succession plans for the Chief Executive Officer and other senior officers;

- reviewing and making recommendations concerning executive compensation policies and plans;

- reviewing and recommending to the New Lightning eMotors Board the adoption of or changes to the compensation of the Company's directors;

- reviewing and approving the awards made under any executive officer bonus plan, and providing an appropriate report to the New Lightning eMotors Board;

282

Table of Contents

- reviewing and making recommendations concerning long-term incentive compensation plans, including the use of stock options and other equity-based plans, and, except as otherwise delegated by the Board, acting as the "Plan Administrator" for equity-based and employee benefit plans;

- approving all special perquisites, special cash payments and other special compensation and benefit arrangements for the Company's executive officers and employees;

- reviewing periodic reports from management on matters relating to the Company's personnel appointments and practices;

- assisting management in complying with the Company's proxy statement and annual report disclosure requirements;

- issuing an annual Report of the Compensation Committee on Executive Compensation for the Company's annual proxy statement in compliance with applicable SEC rules and regulations;

- annually evaluating the Committee's performance and the committee's charter and recommending to the New Lightning eMotors Board any proposed changes to the charter or the committee; and

- undertaking all further actions and discharging all further responsibilities imposed upon the committee from time to time by the Board, the federal securities laws or the rules and regulations of the SEC.

Upon consummation of the Business Combination, we anticipate our compensation committee will consist of Messrs. Coventry and Senko, Ms. Tremblay and Ms. Sharp each of whom qualifies as an independent director according to the rules and regulations of NYSE with respect to compensation committee membership. We anticipate that Ms. Tremblay will serve as chairman of the compensation committee. Our Board has adopted a written charter for the compensation committee, which will be available on our corporate website at https://lightningemotors.com/investors/ upon the completion of the Business Combination. The information on our website is not part of this proxy statement/prospectus.

### Nominating and Governance Committee

The compensation committee is responsible for, among other matters:

- developing and recommending to the New Lightning eMotors Board the criteria for appointment as a director;

- identifying, considering, recruiting and recommending candidates to fill new positions on the Board;

- reviewing candidates recommended by stockholders;

- conducting the appropriate and necessary inquiries into the backgrounds and qualifications of possible candidates; and

- recommending director nominees for approval by the New Lightning eMotors Board and election by the stockholders at the next annual meeting.

The nominating and governance committee has not established any specific, minimum qualifications that must be met or skills that are necessary for directors to possess. In general, in identifying and evaluating nominees for director, the Board considers educational background, diversity of professional experience, knowledge of our business, integrity, professional reputation, independence, wisdom, and the ability to represent the best interests of our stockholders.

Upon consummation of the Business Combination, we anticipate our nominating and governance committee will consist of Messrs. Coventry and Miotto and Ms. Sharp each of whom qualifies as an independent director according to the rules and regulations of the SEC and NYSE with respect to nominating and governance committee membership. We anticipate that Mr. Miotto will serve as chairman of the nominating and governance

283

Table of Contents

committee. Our Board has adopted a written charter for the nominating and governance committee, which will be available on our corporate website at https://lightningemotors.com/investors/ upon the completion of the Business Combination. The information on our website is not part of this proxy statement/prospectus.

**Code of Ethics**

We have adopted a Code of Ethics applicable to our management team and employees in accordance with applicable federal securities laws. We have previously filed copies of our Code of Ethics and the charter for each of our committees. You can review those documents, as well as our other publicly filed documents, by accessing our public filings at the SEC's web site at www.sec.gov. In addition, a copy of the Code of Ethics will be provided without charge upon request from us. We intend to disclose any amendments to or waivers of certain provisions of our Code of Ethics in a Current Report on Form 8-K. See "Where You Can Find Additional Information."

**Communications with the Board of Directors**

Following the completion of the Business Combination, interested parties wishing to communicate with the New Lightning eMotors Board or with an individual member or members of the New Lightning eMotors Board may do so by writing to the New Lightning eMotors Board or to the particular member or members of the New Lightning eMotors Board, and mailing the correspondence to Lightning eMotors, Inc., 815 14th Street SW, Suite A100, Loveland, Colorado 80587. Each communication should set forth (i) the name and address of the stockholder as it appears in our register, and if the shares of our Common Stock are held by a nominee, the name and address of the beneficial owner of such shares, and (ii) the number of shares of our Common Stock that are owned of record by the record holder and beneficially by the beneficial owner.

**Post-Combination Company Executive Compensation**

*The following disclosure concerns the compensation of individuals who will serve as the Company's named executive officers and directors following the completion of the Business Combination.*

284

Table of Contents

*Summary Compensation Table*

The table below sets forth the annual compensation levels of the principal executive officer who will serve as Chief Executive of New Lightning eMotors and the individuals who are expected to be the next two most highly compensated officers. The compensation totals and individual amounts reflect the compensation of such officers by Lightning Systems as of the date of this proxy statement/prospectus, which amounts are expected to continue following consummation of the Business Combination for Messrs. T. Reeser and Kelley. Ms. Covington is beginning as Lightning Systems' Chief Financial Officer on January 4, 2021, and her base salary will be $350,000. In fiscal year 2021, the totals and amounts for any of these three executive officers may change based, on among other things, changes to the terms of the employment of such persons.

| Name and principal position | Year | Salary ($) | Bonus ($) | Stock Options ($)(1) | Non-equity Incentive Plan compensation ($) | All other compensation ($) (2) | Total ($) |
|---|---|---|---|---|---|---|---|
| Tim Reeser | 2020 | $207,692 | — | $120,000 | — | $ 8,308 | $336,000 |
| *Founder and Chief Executive Officer* | 2019 | 199,160 | — | 40,000 | — | 7,966 | 247,126 |
| Teresa Covington | 2020 | — | — | — | — | — | — |
| *Chief Financial Officer* | 2019 | — | — | — | — | — | — |
| Bill Kelley | 2020 | 207,692 | — | 72,000 | — | 8,308 | 288,000 |
| *Chief Technology Officer and Chief Operating Officer* | 2019 | 195,854 | — | 22,500 | — | 7,709 | 226,063 |

(1)   The amounts in this column represent the aggregate grant-date fair value of stock options granted to each named executive officer, computed in accordance with the FASB's ASC Topic 718. See Note 12- Stock Options and Stock Based Compensation to Lightning Systems' audited consolidated financial statements included elsewhere in this proxy statement/prospectus for a discussion of the assumptions made by Lightning Systems in determining the grant-date fair value of Lightning Systems' stock options. On December 31, 2019, in connection with Lightning Systems' conversion from a limited liability company into a C-corporation, Lightning Systems converted all of its outstanding profits interest into stock options, on a one-to-one basis with each stock option bearing the right to purchase one share of common stock at an exercise price of $0.05.

(2)   Amounts in this column for 2019 consist of matching contributions under Lightning Systems' 401(k) plan.

*Compensation Philosophy and Objectives Following the Business Combination*

Following the Closing of the Business Combination, New Lightning eMotors intends to develop an executive compensation program that is consistent with Lightning Systems' existing compensation policies and philosophies, which are designed to align compensation with the post-combination company's business objectives and the creation of stockholder value, while enabling the post-combination company to attract, motivate and retain individuals who contribute to the long-term success of the post-combination company.

Decisions on the executive compensation program will be made by the compensation committee of the New Lightning eMotors Board, which will be established at the Closing of the Business Combination. The following discussion is based on the present expectations as to the executive compensation program to be adopted by the compensation committee. The executive compensation program actually adopted will depend on the judgment of the members of the compensation committee and may differ from that set forth in the following discussion.

The Company anticipates that decisions regarding executive compensation will reflect a belief that the executive compensation program must be competitive in order to attract and retain our executive officers. The Company anticipates that the compensation committee of the New Lightning eMotors Board will seek to implement the compensation policies and philosophies by linking a significant portion of the post-combination

285

Table of Contents

company's executive officers' cash compensation to performance objectives and by providing a portion of their compensation as long-term incentive compensation in the form of equity awards.

The Company anticipates that compensation for New Lightning eMotors' executive officers will have three primary components: base salary, an annual cash incentive bonus and long-term equity-based incentive compensation.

*Employment Agreements*

It is expected that New Lightning eMotors will enter into new employment agreements with the named executive officers identified under the subsection above entitled "*Post-Combination Company Executive Compensation*," subject to the terms of any existing employment agreements or severance agreements with Lightning Systems, and that these employment agreements will be reviewed annually by the compensation committee of the New Lightning eMotors Board to the extent recommended upon advice and counsel of its advisors.

*Annual Bonuses*

New Lightning eMotors intends to use annual cash incentive bonuses for the named executive officers to tie a portion of their compensation to financial and operational objectives achievable within the applicable fiscal year. New Lightning eMotors expects that, near the beginning of each year, the compensation committee of the New Lightning eMotors Board will select the performance targets, target amounts, target award opportunities and other term and conditions of annual cash bonuses for the named executive officers. Following the end of each year, it is expected that the compensation committee will determine the extent to which the performance targets were achieved and the amount of the award that is payable to the named executive officers. For 2021, it is expected that New Lightning eMotors will establish an annual cash bonus plan that links the payment of cash bonus awards to the achievement of targeted financial performance goals.

*Equity-Based Awards*

If the Incentive Plan Proposal is approved, New Lightning eMotors intends to use equity-based awards to rewardlong-term performance of the named executive officers. New Lightning eMotors believes that providing a meaningful portion of the total compensation package in the form of equity-based awards will align the incentives of its named executive officers with the interests of its stockholders and serve to motivate and retain the individual named executive officers. Any awards would be made in accordance with the executive compensation program discussed in the section entitled "*Management After the Business Combination—Post-Combination Company Executive Compensation—Compensation Philosophy and Objectives Following the Business Combination*", including the recommendations of management relating thereto. See "*Proposal No. 5 - Approval of the Incentive Plan.*"

**Other Compensation**

New Lightning eMotors expects to continue to maintain various employee benefit plans, including medical, dental, life insurance and a 401(k) plan, in which the named executive officers will be eligible to participate. New Lightning eMotors also expects to provide certain perquisites to its named executive officers, subject to the compensation committee's ongoing review.

**Deductibility of Executive Compensation**

Section 162(m) of the Code denies a federal income tax deduction for certain compensation in excess of $1,000,000 per year paid to the chief executive officer, the chief financial officer, the three other most highly paid executive officers of a publicly traded corporation, and anyone previously subject to Section 162(m). The

286

Table of Contents

Company expects the policy of New Lightning eMotors will be to consider the tax impact of its compensation arrangements as one factor, among others, in evaluating and determining the structure, implementation, and amount of awards paid to its executive officers. However, to retain highly skilled executives and remain competitive with other employers, the compensation committee of the New Lightning eMotors Board may authorize compensation that would not be deductible under Section 162(m) or otherwise if it determines that such compensation is in the best interests of New Lightning eMotors and its stockholders, and maintaining tax deductibility will not be the sole consideration taken into account in determining what compensation arrangements are in our and our stockholders' best interests. The right to grant compensation that is not deductible is expressly reserved, and New Lightning eMotors may do so.

### *Director Compensation Following this Business Combination*

Following the completion of the Business Combination, New Lightning eMotors' compensation committee will make recommendations to the New Lightning eMotors Board of the compensation to be paid to the members of the New Lightning eMotors Board.

287

Table of Contents

**DESCRIPTION OF SECURITIES**

The following summary of the material terms of New Lightning eMotors' securities following the Business Combination is not intended to be a complete summary of the rights and preferences of such securities. The full text of the proposed Second Amended and Restated Certificate of Incorporation is attached as *Annex B* to this proxy statement/prospectus. We urge you to read our Second Amended and Restated Certificate of Incorporation in its entirety for a complete description of the rights and preferences of New Lightning eMotors' securities following the Business Combination.

**General**

The proposed Second Amended and Restated Certificate of Incorporation authorizes the issuance of 250,000,000 shares of Common Stock, $0.0001 par value per share and 1,000,000 shares of preferred stock, par value $0.0001 per share. The outstanding shares of our Common Stock are, and the shares of Common Stock issuable (i) both (a) in connection with the Business Combination pursuant to the Business Combination Agreement and (b) the PIPE Investment, (ii) upon conversion of the Convertible Notes and (iii) upon exercise of the Convertible Note Warrants, will be, duly authorized, validly issued, fully paid and non-assessable. As of the record date for the Special Meeting, there were 25,893,479 shares of Common Stock outstanding, held of record by approximately 7 holders of common stock and no shares of preferred stock outstanding. Such numbers do not include DTC participants or beneficial owners holding shares through nominee names.

**Common Stock**

Common stockholders of record are entitled to one vote for each share held on all matters to be voted on by stockholders. Unless specified in the proposed Second Amended and Restated Certificate of Incorporation, or as required by applicable provisions of the DGCL or applicable stock exchange rules, the affirmative vote of a majority of our shares of Common Stock that are voted is required to approve any such matter voted on by our stockholders. Our stockholders are entitled to receive ratable dividends when, as and if declared by the Board out of funds legally available therefor.

Our Board is currently elected each year at our annual meeting of stockholders. If our stockholders approve the Second Amended and Restated Certificate of Incorporation at the Special Meeting, our Board will be divided into three classes, each of which will generally serve for a term of three years with only one class of directors being elected in each year. There is no cumulative voting with respect to the election of directors, with the result that the holders of more than 50% of the shares eligible to vote for the election of directors can elect all of the directors.

In the event of a liquidation, dissolution or winding up of the Company after the Business Combination, our stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the Common Stock. Our stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the Common Stock, except that we will provide our public stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable by us) upon the completion of the Business Combination, subject to the limitations described in this proxy statement/prospectus.

Our stockholders have no conversion, preemptive or other subscription rights. Public stockholders who sell or convert their stock into their share of the Trust Account still have the right to exercise the warrants that they may hold.

288

Table of Contents

**Preferred Stock**

There are no shares of preferred stock outstanding. Our proposed Second Amended and Restated Certificate of Incorporation authorizes the issuance of 1,000,000 shares of preferred stock with such designation, rights and preferences as may be determined from time to time by our Board. No shares of preferred stock are being issued or registered in connection with the Business Combination. Accordingly, our Board is empowered, without stockholder approval, to issue preferred stock with dividend, liquidation, conversion, voting or other rights which could adversely affect the voting power or other rights of the holders of Common Stock. However, the underwriting agreement for the Company's IPO prohibits the Company, prior to the Business Combination, from issuing preferred stock which participates in any manner in the proceeds of the Trust Account, or which votes as a class with the Common Stock on the Business Combination. The Company is permitted under the terms of our current amended and restated certificate of incorporation to issue some or all of the preferred stock to effect the Business Combination, however, the Business Combination Agreement does not contemplate any such issuance of preferred stock. In addition, the preferred stock could be utilized as a method of discouraging, delaying or preventing a change in control of us. Although the Company does not currently intend to issue any shares of preferred stock, the Company cannot assure you that the Company will not do so in the future.

**Warrants**

There are 15,670,104 warrants outstanding, of which 14,999,996 are public warrants and 670,108 are private placement warrants. Each whole warrant entitles the registered holder to purchase one share of Common Stock at a price of $11.50 per share, subject to adjustment as discussed below, at any time after the completion of the Business Combination. Only whole warrants are exercisable. The public warrants will expire at 5:00 p.m., New York City time, on the fifth anniversary of our completion of the IPO, or earlier upon redemption.

No public warrants will be exercisable for cash unless the Company has an effective and current registration statement covering the shares of Common Stock issuable upon exercise of the warrants and a current prospectus relating to such shares of Common Stock. Notwithstanding the foregoing, if a registration statement covering the issuance of the shares of Common Stock issuable upon exercise of the public warrants is not effective within 90 days from the closing of the Business Combination, warrant holders may, until such time as there is an effective registration statement and during any period when the Company shall have failed to maintain an effective registration statement, exercise warrants on a cashless basis pursuant to an available exemption from registration under the Securities Act. If an exemption from registration is not available, holders will not be able to exercise their warrants on a cashless basis.

The private placement warrants are identical to the public warrants except that such private placement warrants will be exercisable for cash (even if a registration statement covering the issuance of the warrant shares issuable upon exercise of such warrants is not effective) or on a cashless basis, at the holder's option, and will not be redeemable by us, in each case so long as they are still held by the Founders or their affiliates.

Once the warrants become exercisable, the Company may redeem the outstanding warrants (excluding the private placement warrants):

- in whole and not in part;
- at a price of $0.01 per warrant;
- upon a minimum of 30 days' prior written notice of redemption, which the Company refers to as the 30-day redemption period; and
- if, and only if, the last reported sale price of the Common Stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading day period ending on the third trading day prior to the date on which the Company sends the notice of redemption to the warrant holders.

289

Table of Contents

The Company will not redeem the warrants unless a registration statement under the Securities Act covering the issuance of the warrant shares underlying the warrants to be so redeemed is then effective and a current prospectus relating to those warrant shares is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by the Company, it may exercise our redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws.

If the foregoing conditions are satisfied and the Company issues a notice of redemption, each warrant holder may exercise his, her or its warrants prior to the scheduled redemption date. However, the price of the shares of Common Stock may fall below the $18.00 trigger price (as adjusted) as well as the $11.50 exercise price (as adjusted) after the redemption notice is issued.

The redemption criteria for our warrants have been established at a price which is intended to provide warrant holders a reasonable premium to the initial exercise price and provide a sufficient differential between the then-prevailing share price and the exercise price so that if the share price declines as a result of our redemption call, the redemption will not cause the share price to drop below the exercise price of the warrants.

If the Company calls the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In making such determination, our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of warrant shares issuable upon exercise of outstanding warrants. In such event, the holder would pay the exercise price by surrendering the warrants for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the warrants to be so exercised, and the difference between the exercise price of the warrants and the fair market value by (y) the fair market value.

A holder of a warrant may notify the Company in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such warrant, to the extent that after giving effect to such exercise, such person (together with such person's affiliates), to the warrant agent's actual knowledge, would beneficially own in excess of 9.8% (or such other amount as a holder may specify) of the shares of Common Stock outstanding immediately after giving effect to such exercise.

If the number of outstanding shares of Common Stock is increased by a stock dividend payable in shares of Common Stock, or by a split-up of shares of Common Stock or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Common Stock issuable on exercise of each warrant will be increased in proportion to such increase in the outstanding shares of Common Stock. A rights offering to holders of Common Stock entitling holders to purchase shares of Common Stock at a price less than the fair market value will be deemed a stock dividend of a number of shares of Common Stock equal to the product of (i) the number of shares of Common Stock actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for Common Stock) multiplied by (ii) one (1) minus the quotient of (x) the price per share of Common Stock paid in such rights offering divided by (y) the fair market value. For these purposes (i) if the rights offering is for securities convertible into or exercisable for Common Stock, in determining the price payable for Common Stock, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (ii) fair market value means the volume weighted average price of Common Stock as reported during the 10 trading day period ending on the trading day prior to the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

In addition, if the Company, at any time while the warrants are outstanding and unexpired, pays a dividend or make a distribution in cash, securities or other assets to the holders of Common Stock on account of such

Table of Contents

shares of Common Stock (or other shares of our capital stock into which the warrants are convertible), other than (a) as described above, (b) certain ordinary cash dividends, (c) to satisfy the redemption rights of the holders of Common Stock in connection with a Business Combination, (d) as a result of the repurchase of shares of Company Stock if the Business Combination is presented to the stockholders of the Company for approval, or (e) in connection with the redemption of our public shares upon our failure to complete the Business Combination, then the warrant exercise price will be decreased, effective immediately after the effective date of such event, by the amount of cash and/or the fair market value of any securities or other assets paid on each share of common stock in respect of such event.

If the number of outstanding shares of Common Stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Common Stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Common Stock issuable on exercise of each warrant will be decreased in proportion to such decrease in outstanding shares of Common Stock.

Whenever the number of shares of Common Stock purchasable upon the exercise of the warrants is adjusted, as described above, the warrant exercise price will be adjusted by multiplying the warrant exercise price immediately prior to such adjustment by a fraction (x) the numerator of which will be the number of shares of Common Stock purchasable upon the exercise of the warrants immediately prior to such adjustment, and (y) the denominator of which will be the number of shares of Common Stock so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding shares of Common Stock (other than those described above or that solely affects the par value of such shares of Common Stock), or in the case of any merger or consolidation of us with or into another corporation (other than a consolidation or merger in which the Company is the continuing corporation and that does not result in any reclassification or reorganization of our outstanding shares of Common Stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of us as an entirety or substantially as an entirety in connection with which the Company is dissolved, the holders of the warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the warrants and in lieu of the shares of Common Stock immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the warrants would have received if such holder had exercised their warrants immediately prior to such event. However, if such holders were entitled to exercise a right of election as to the kind or amount of securities, cash or other assets receivable upon such consolidation or merger, then the kind and amount of securities, cash or other assets for which each warrant will become exercisable will be deemed to be the weighted average of the kind and amount received per share by such holders in such consolidation or merger that affirmatively make such election, and if a tender, exchange or redemption offer has been made to and accepted by such holders (other than a tender, exchange or redemption offer made by the Company in connection with redemption rights held by Company stockholders as provided for in the proposed Second Amended and Restated Certificate of Incorporation or as a result of the repurchase of shares of Common Stock by us if the Business Combination is presented to the stockholders of the Company for approval) under circumstances in which, upon completion of such tender or exchange offer, the maker thereof, together with members of any group (within the meaning of Rule 13d-5(b)(1) under the Exchange Act) of which such maker is a part, and together with any affiliate or associate of such maker (within the meaning of Rule 12b-2 under the Exchange Act) and any members of any such group of which any such affiliate or associate is a part, own beneficially (within the meaning of Rule 13d-3 under the Exchange Act) more than 50% of the outstanding shares of Common Stock, the holder of a warrant will be entitled to receive the highest amount of cash, securities or other property to which such holder would actually have been entitled as a stockholder if such warrant holder had exercised the warrant prior to the expiration of such tender or exchange offer, accepted such offer and all of the Common Stock held by such holder had been purchased pursuant to such tender or exchange offer, subject to adjustments (from and after the consummation of such tender or exchange offer) as nearly equivalent as possible

291

Table of Contents

to the adjustments provided for in the warrant agreement. Additionally, if less than 70% of the consideration receivable by the holders of Common Stock in such a transaction is payable in the form of Common Stock in the successor entity that is listed for trading on a national securities exchange or is quoted in an established over-the-counter market, or is to be so listed for trading or quoted immediately following such event, and if the registered holder of the warrant properly exercises the warrant within 30 days following public disclosure of such transaction, the warrant exercise price will be reduced as specified in the warrant agreement based on the per share consideration minus Black-Scholes Warrant Value (as defined in the warrant agreement) of the warrant in order to determine and realize the option value component of the warrant. This formula is to compensate the warrant holder for the loss of the option value portion of the warrant due to the requirement that the warrant holder exercise the warrant within 30 days of the event. The Black-Scholes model is an accepted pricing model for estimating fair market value where no quoted market price for an instrument is available.

The warrants were issued in registered form under the Warrant Agreement between the Warrant Agent and us. The Warrant Agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants.

**Dividends**

The Company has not paid any cash dividends on our Common Stock to date and does not intend to pay cash dividends prior to the completion of our Business Combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of our Business Combination. The payment of any cash dividends subsequent to our Business Combination will be within the discretion of our New Lightning eMotors Board at such time. In addition, our Board is not currently contemplating and does not anticipate declaring any stock dividends in the foreseeable future. Further, if the Company incurs any indebtedness, our ability to declare dividends may be limited by restrictive covenants the Company may agree to in connection therewith.

**Election of Directors**

The New Lightning eMotors Board will be divided into three classes, Class I, Class II and Class III, with only one class of directors being elected in each year and each class serving a three-year term, except with respect to the election of directors at the special meeting pursuant to Proposal No. 6 — The Election of Directors Proposal, Class I directors will be elected to an initial one-year term (and three-year terms subsequently), the Class II directors will be elected to an initial two-year term (and three-year terms subsequently) and the Class III directors will be elected to an initial three-year term (and three-year terms subsequently). There is no cumulative voting with respect to the election of directors, with the result that the holders of more than 50% of the shares voted for the election of directors can elect all of the directors.

**Our Transfer Agent and Warrant Agent**

The Transfer Agent for our Common Stock and Warrant Agent for our warrants is Continental Stock Transfer & Trust Company. The Company has agreed to indemnify Continental Stock Transfer & Trust Company in its roles as Transfer Agent and Warrant Agent, its agents and each of its stockholders, directors, officers and employees against all liabilities, including judgments, costs and reasonable counsel fees that may arise out of acts performed or omitted for its activities in that capacity, except for any liability due to any gross negligence, willful misconduct or bad faith of the indemnified person or entity.

**Certain Anti-Takeover Provisions of Delaware Law, the Company's Certificate of Incorporation and Bylaws**

Our current amended and restated certificate of incorporation contains certain requirements and restrictions that will apply to the Company until the completion of the Company's initial business combination, which would

292

Table of Contents

be the Business Combination if consummated. Prior to the consummation of the initial business combination, these provisions cannot be amended without the approval of the holders of at least 65% of the Common Stock then outstanding. The approval of the Charter Amendment Proposals only require the approval by the holders of a majority of the Common Stock as this amendment would occur concurrent with the completion of the initial business combination. Our Initial Stockholders, who collectively beneficially own 22.8% of the issued and outstanding Common Stock, will participate in any vote to amend our current amended and restated certificate of incorporation and will have the discretion to vote in any manner they choose. Specifically, our current amended and restated certificate of Incorporation provides, among other things, that:

- our public stockholders have the opportunity to redeem, if such holders elect to do so, all or a portion of their public shares upon the completion of our initial business combination, which would be the Business Combination if consummated, at a per-share price which is payable in cash and, in the event the public shares are redeemed are in connection with a stockholder vote on the proposed initial business combination, such as the Business Combination, is equal to the quotient obtained by dividing (a) the aggregate amount on deposit in the Trust Account as of two (2) business days prior to the consummation of the initial Business Combination, including interest not previously released to the Company to pay its taxes, by (b) the total number of then outstanding public shares.

- unlike many blank check companies that hold stockholder votes and conduct proxy solicitations in conjunction with their initial business combinations and provide for related redemptions of public shares for cash upon completion of such initial business combinations even when a vote is not required by law, if a stockholder vote is not required by law and the Company does not decide to hold a stockholder vote for business or other legal reasons, the Company will, pursuant to our current amended and restated certificate of incorporation and subject to lawfully available funds therefor, conduct the redemptions pursuant to the tender offer rules of the SEC, and file tender offer documents with the SEC prior to completing our initial business combination, which would be the Business Combination if consummated. Our current amended and restated certificate of incorporation requires these tender offer documents to contain substantially the same financial and other information about such initial business combination and the redemption rights as is required under the SEC's proxy rules. If, however, a stockholder approval of the transaction is required by law, or the Company decides to obtain stockholder approval for business or other legal reasons, it will, like many blank check companies, offer to redeem shares in conjunction with a proxy solicitation pursuant to the proxy rules and not pursuant to the tender offer rules.

- if the Company seeks stockholder approval, we will complete our initial business combination, which would be the Business Combination if consummated, only if a majority of the shares of Common Stock voting at a stockholder meeting are voted in favor of the business combination. However, the participation of our Founders, officers, directors, advisors or their affiliates in privately-negotiated transactions (as described in this proxy statement/prospectus), if any, could result in the approval of our business combination even if a majority of our public stockholders vote, or indicate their intention to vote, against such business combination.

- if the Company seeks stockholder approval of our initial business combination and it does not conduct redemptions in connection with the Business Combination pursuant to the tender offer rules, our current amended and restated certificate of incorporation provides that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 15% of the shares sold in the Company's IPO. However, the Company would not be restricting our stockholders' ability to vote all of their shares for or against the Business Combination.

If our stockholders approve the Charter Proposals, our proposed Second Amended and Restated Certificate of Incorporation will provide that the New Lightning eMotors Board is classified into three classes of directors of approximately equal size. As a result, in most circumstances, a person can gain control of the board only by

Table of Contents

successfully engaging in a proxy contest at three or more annual meetings. Furthermore, because the New Lightning eMotors Board will be classified, directors may be removed only with cause by a majority of our outstanding shares.

In addition, the proposed Second Amended and Restated Certificate of Incorporation does not provide for cumulative voting in the election of directors. Our authorized but unissued Common Stock and preferred stock are available for future issuances without stockholder approval and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved Common Stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

**Special Meeting of Stockholders**

The proposed Second Amended and Restated Certificate of Incorporation provide that special meetings of our stockholders may be called only by the Chairman of the Board, our Chief Executive Officer or the New Lightning eMotors Board pursuant to a resolution adopted by a majority of the New Lightning eMotors Board. Stockholders of New Lightning eMotors will not be eligible and will have no right to call a special meeting.

**Advance Notice Requirements for Stockholder Proposals and Director Nominations**

Our proposed Amended and Restated Bylaws, attached as *Annex C*, provide that stockholders seeking to bring business before our annual meeting of stockholders, or to nominate candidates for election as directors at our annual meeting of stockholders, must provide timely notice of their intent in writing. To be timely, a stockholder's notice will need to be received by the Company's Secretary at our principal executive offices not later than the close of business on the 90th day nor earlier than the open of business on the 120th day prior to the anniversary date of the immediately preceding annual meeting of stockholders. Pursuant to Rule 14a-8 of the Exchange Act, proposals seeking inclusion in our annual proxy statement must comply with the notice periods contained in the annual proxy statement. The proposed Second Amended and Restated Certificate of Incorporation specifies certain requirements as to the form and content of a stockholders' meeting. These provisions may preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders. Our proposed Amended and Restated Bylaws also specify certain requirements as to the form and content of a stockholder's notice for an annual meeting. Specifically, a stockholder's notice must include: (i) a brief description of the business desired to be brought before the annual meeting, the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event such business includes a proposal to amend the bylaws, the language of the proposed amendment) and the reasons for conducting such business at the annual meeting, (ii) the name and record address of such stockholder and the name and address of the beneficial owner, if any, on whose behalf the proposal is made, (iii) the class or series and number of shares of our capital stock that are owned beneficially and of record by such stockholder and by the beneficial owner, if any, on whose behalf the proposal is made, (iv) a description of all arrangements or understandings between such stockholder and the beneficial owner, if any, on whose behalf the proposal is made and any other person or persons (including their names) in connection with the proposal of such business by such stockholder, (v) any material interest of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made in such business and (vi) a representation that such stockholder (or a qualified representative of such stockholder) intends to appear in person or by proxy at the annual meeting to bring such business before the meeting. These notice requirements will be deemed satisfied by a stockholder as to any proposal (other than nominations) if the stockholder has notified the Company of such stockholder's intention to present such proposal at an annual meeting in compliance with Rule 14a-8 (or any successor thereof) of the Exchange Act, and such stockholder has complied with the requirements of such rule for inclusion of such proposal in a proxy statement prepared by us to solicit proxies for such annual meeting. The foregoing provisions may limit our stockholders' ability to bring matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders.

294

Table of Contents

**Securities Eligible for Future Sale**

The Company has 25,893,479 shares of Common Stock outstanding as of the date hereof. Of these shares, 20,000,000 public shares are freely tradable without restriction or further registration under the Securities Act, except for any shares purchased by one of our affiliates within the meaning of Rule 144. All of the remaining 5,893,479 outstanding shares (including all 893,479 private placement units and their component shares of Common Stock) are, and any shares of Common Stock issued to the PIPE Investor or upon either conversion of the Convertible Notes or exercise of the Convertible Note Warrants will be, restricted securities under Rule 144, in that they were issued in private transactions not involving a public offering.

### *Rule 144*

Pursuant to Rule 144, a person who has beneficially owned restricted shares of our Common Stock or warrants for at least six months would be entitled to sell their securities provided that (i) such person is not deemed to have been one of our affiliates at the time of, or at any time during the three months preceding, a sale and (ii) the Company is subject to the Exchange Act periodic reporting requirements for at least three months before the sale and have filed all required reports under Section 13 or 15(d) of the Exchange Act during the 12 months (or such shorter period as the Company was required to file reports) preceding the sale.

Persons who have beneficially owned restricted shares of our Common Stock or warrants for at least six months but who are our affiliates at the time of, or at any time during the three months preceding, a sale, would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period only a number of securities that does not exceed the greater of:

- 1% of the total number of shares of Common Stock then outstanding; or

- the average weekly reported trading volume of the common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

Sales by our affiliates under Rule 144 are also limited by manner of sale provisions and notice requirements and to the availability of current public information about us.

### *Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies*

Rule 144 is not available for the resale of securities initially issued by shell companies (other than business combination related shell companies) or issuers that have been at any time previously a shell company. However, Rule 144 also includes an important exception to this prohibition if the following conditions are met:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;

- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;

- the issuer of the securities has filed all Exchange Act reports and material required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Form 8-K reports; and

- at least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

As a result, our Initial Stockholders will be able to sell their Founder Shares and private placement shares and private placement warrants and the Sellers will be able to sell the Common Stock received as consideration in the Business Combination, as applicable, pursuant to Rule 144 without registration one year after the Company has completed the Business Combination.

295

Table of Contents

*Registration Rights Agreement*

On May 13, 2020, the Company entered into a Registration Rights Agreement with the Sponsor, the Underwriters and Insiders. These holders will be entitled to make up to three demands, excluding short form registration demands, that the Company register such securities for sale under the Securities Act. In addition, these holders will have "piggy-back" registration rights to include their securities in other registration statements filed by the Company. The Company will bear the expenses incurred in connection with the filing of any such registration statements. There will be no penalties associated with delays in registering the securities under the Registration Rights Agreement.

*PIPE Subscription Agreement*

Under the terms of the PIPE Subscription Agreement, the Company agreed to file the PIPE Resale Registration Statement registering for resale under the Securities Act all of the PIPE Shares acquired by the Subscribers by the PIPE Resale Registration Filing Deadline, and the Company shall use its commercially reasonable efforts to have the PIPE Resale Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the 60th calendar day (or 120th calendar day if the SEC notifies the Company that it will "review" the PIPE Resale Registration Statement) following the PIPE Resale Registration Filing Deadline. The Company will use its commercially reasonable efforts to maintain the continuous effectiveness of the PIPE Resale Registration Statement, and to be supplemented and amended to the extent necessary to ensure that such PIPE Resale Registration Statement is available or, if not available, that another registration statement is available for the resale of the Subscribed Shares, until the earliest of (i) the date on which the PIPE Shares may be resold without volume or manner of sale limitations pursuant to Rule , (ii) the date on which such PIPE Shares have actually been sold and (iii) the date which is two years after the Closing.

Notwithstanding anything to the contrary in the PIPE Subscription Agreement, the Company shall be entitled to delay or postpone the effectiveness of the PIPE Resale Registration Statement, and from time to time to require the PIPE Investor not to sell under the PIPE Resale Registration Statement or to suspend the effectiveness thereof, if the negotiation or consummation of a transaction by the Company or its subsidiaries is pending or an event has occurred, which negotiation, consummation or event, the New Lightning eMotors Board reasonably believes, upon the advice of legal counsel, would require additional disclosure by the Company in the PIPE Resale Registration Statement of material information that the Company has a bona fide business purpose for keeping confidential and the non-disclosure of which in the PIPE Resale Registration Statement would be expected, in the reasonable determination of the New Lightning eMotors Board, upon the advice of legal counsel, to cause the PIPE Resale Registration Statement to fail to comply with applicable disclosure requirements; provided, however, that the Company may not delay or suspend the PIPE Resale Registration Statement on more than two occasions or for more than sixty consecutive calendar days, or more than ninety total calendar days, in each case during any twelve-month period.

*Convertible Note Subscription Agreements*

The Company shall be obligated to register the shares issuable upon conversion of the Convertible Notes and the exercise of the Convertible Note Warrants, as well as the resale of the Convertible Note Warrants. The Company agreed that, by the Convertible Note Resale Registration Filing Deadline, the Company will file with the SEC the Convertible Note Resale Registration Statement registering the resale of the (I) shares of Common Stock issuable upon (x) conversion of the Convertible Notes and (y) exercise of the Convertible Note Warrants and (II) the Convertible Note Warrants, and the Company shall use its commercially reasonable efforts to have the Convertible Note Resale Registration Statement declared effective as soon as practicable after the filing thereof, but no later than the 60th calendar day (or 90th calendar day if the Commission notifies the Company that it will "review" the Convertible Note Resale Registration Statement) following the Convertible Note Resale Registration Filing Deadline. The Company will use its commercially reasonable efforts to maintain the continuous effectiveness of the Convertible Note Resale Registration Statement, and to be supplemented and

296

**Table of Contents**

amended to the extent necessary to ensure that such Convertible Note Resale Registration Statement is available or, if not available, that another registration statement is available for the resale of the Convertible Note Registrable Securities, until the earliest of (i) the date on which the Convertible Note Registrable Securities may be resold without volume or manner of sale limitations pursuant to Rule 144 promulgated under the Securities Act, (ii) the date on which such Convertible Note Registrable Securities have actually been sold and (iii) the date which is three years after the Closing.

Notwithstanding anything to the contrary in this Convertible Note Subscription Agreements, the Company shall be entitled to delay or postpone the effectiveness of the Convertible Note Resale Registration Statement, and from time to time to require any Note Investor not to sell under the Convertible Note Resale Registration Statement or to suspend the effectiveness thereof, if the negotiation or consummation of a transaction by the Company or its subsidiaries is pending or an event has occurred, which negotiation, consummation or event, the New Lightning eMotors Board reasonably believes, upon the advice of legal counsel, would require additional disclosure by the Company in the Convertible Note Resale Registration Statement of material information that the Company has a bona fide business purpose for keeping confidential and the non-disclosure of which in the Convertible Note Resale Registration Statement would be expected, in the reasonable determination of the New Lightning eMotors Board, upon the advice of legal counsel, to cause the Convertible Note Resale Registration Statement to fail to comply with applicable disclosure requirements.

### *Amended and Restated Warrant Agreement*

Pursuant to the terms of the Amended and Restated Warrant Agreement to be entered into by the Company, and consistent with what is provided for in the Warrant Agreement with regard to the public warrants, the Company will agree that as soon as practicable, but in no event later than fifteen business days after the Closing, it shall use its best efforts to file with the SEC the Warrant Shares Registration Statement for the registration, under the Securities Act, of the shares of Common Stock issuable upon exercise of the warrants. The Company shall use its best efforts to cause the same to become effective and to maintain the effectiveness of such Warrant Shares Registration Statement, and a current prospectus relating thereto, until the expiration of the warrants in accordance with the provisions of the Amended and Restated Warrant Agreement. If any such Warrant Shares Registration Statement has not been declared effective by the 90th day following the Closing of the Business Combination, holders of the warrants shall have the right, during the period beginning on the 91st day after the Closing of the Business Combination and ending upon such Warrant Shares Registration Statement being declared effective by the SEC, and during any other period when the Company shall fail to have maintained an effective registration statement covering the shares of Common Stock issuable upon exercise of the warrants, to exercise such warrants on a "cashless basis," by exchanging the warrants (in accordance with Section 3(a)(9) of the Securities Act (or any successor rule) or another exemption) for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the warrants, multiplied by the difference between the exercise price and the Fair Market Value (as defined below) by (y) the Fair Market Value. The date that notice of cashless exercise is received by the Warrant Agent shall be conclusively determined by the Warrant Agent. In connection with the "cashless exercise" of a public warrant or a Convertible Note Warrant, the Company shall, upon request, provide the Warrant Agent with an opinion of counsel for the Company (which shall be an outside law firm with securities law experience) stating that (i) the exercise of the warrants on a cashless basis is not required to be registered under the Securities Act and (ii) the shares of Common Stock issued upon such exercise shall be freely tradable under U.S. federal securities laws by anyone who is not an affiliate (as such term is defined in Rule 144 (or any successor rule)) of the Company and, accordingly, shall not be required to bear a restrictive legend.

297

Table of Contents

**Section 203 of the DGCL**

New Lightning eMotors will be subject to the provisions of Section 203 of the DGCL regulating corporate takeovers. This statute prevents certain Delaware corporations, under certain circumstances, from engaging in a "business combination" with:

- a stockholder who owns 15% or more of our outstanding voting stock (otherwise known as an "interested stockholder");

- an affiliate of an interested stockholder; or

- an associate of an interested stockholder, for three years following the date that the stockholder became an interested stockholder.

A "business combination" includes a merger or sale of more than 10% of our assets. However, the above provisions of Section 203 do not apply if:

- the New Lightning eMotors Board approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction;

- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of common stock; or

- on or subsequent to the date of the transaction, the business combination is approved by the New Lightning eMotors Board and authorized at a meeting of our stockholders, and not by written consent, by an affirmative vote of at least two-thirds of the outstanding voting stock not owned by the interested stockholder.

**Listing of Securities**

The Company intends to apply to continue the listing of our Common Stock and warrants on NYSE under the symbols "ZEV" and "ZEV.WS" respectively, upon the Closing. Our units, which currently are traded on NYSE under the symbol "GIK.U" will cease to be traded upon Closing and, instead, such units will be separated into the public shares and public warrants, which will trade as independent securities as described above.

298

Table of Contents

**BENEFICIAL OWNERSHIP OF SECURITIES**

The following table sets forth information known to the Company regarding (i) the actual beneficial ownership of our Common Stock as of the record date (pre-Business Combination) and (ii) expected beneficial ownership of our Common Stock immediately following consummation of the Business Combination (post-Business Combination), assuming that no additional public shares of the Company are redeemed, and alternatively the maximum number of shares of the Company are redeemed, by:

- each person who is, or is expected to be, the beneficial owner of more than 5% of the outstanding shares of our Common Stock;

- each of our current officers and directors;

- each person who will become a named officer or director of New Lightning eMotors; and

- all officers and directors of the Company, as a group, and of New Lightning eMotors, as a group.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days.

The beneficial ownership of our Common Stock pre-Business Combination is based on 25,893,479 shares of Common Stock (including Initial Stockholder Shares) issued and outstanding as of March 15, 2021.

The expected beneficial ownership of shares of Common Stock post-Business Combination assuming none of the public shares are redeemed has been determined based upon the following: (i) that no public stockholders exercise their redemption rights (no redemptions scenario), (ii) that none of the investors set forth in the table below has purchased or purchases shares of Common Stock (pre- or post-Business Combination), (iii) that 2,500,000 shares of Common Stock are issued to the PIPE Investor, (iv) that 53,922,000 shares of Common Stock are issued to the former Lightning Systems equity holders, (v) no issuance of any Stockholder Earnout Shares, (vi) cashless exercise of the pre-Merger Lightning Systems warrants prior to the consummation of the business combination, (vii) conversion of the pre-Merger Lightning Systems convertible notes prior to the consummation of the business combination, (viii) no exercise of the warrants, (ix) no conversion of the Convertible Notes, and (x) there will be an aggregate of 82,315,479 shares of New Lightning eMotors Common stock issued and outstanding at Closing.

The expected beneficial ownership of shares of Common Stock post-Business Combination assuming the maximum number of public shares have been redeemed has been determined based on the following: (i) that holders of 15,050,267 public shares exercise their redemption rights (maximum redemption scenario), (ii) that none of the investors set forth in the table below has purchased or purchases shares of Common Stock (pre- or post-Business Combination), (iii) that 2,500,000 shares of Common Stock are issued to the PIPE Investor, (iv) that 53,922,000 shares of Common Stock are issued to the former Lightning Systems equity holders, (v) no issuance of any Stockholder Earnout Shares, (vi) cashless exercise of the pre-Merger Lightning Systems warrants prior to the consummation of the business combination, (vii) conversion of the pre-Merger Lightning Systems convertible notes prior to the consummation of the business combination, (viii) no exercise of the warrants, (ix) no conversion of the Convertible Notes, and (x) there will be an aggregate of 67,265,975 shares of New Lightning eMotors Common stock issued and outstanding at Closing.

299

Table of Contents

Unless otherwise indicated, we believe that all persons named in the table below have sole voting and investment power with respect to all shares of Common Stock or warrants beneficially owned by them.

| | Before the Business Combination | | After the Business Combination | | | |
| | | | Assuming No Additional Redemption | | Assuming Maximum Redemption | |
| Name and Address of Beneficial Owner(1) | Number of Shares | Approximate %(2) | Number of Shares | Approximate % | Number of Shares | Approximate % |
|---|---|---|---|---|---|---|
| Dr. Avi Katz(3) | 5,635,000(4) | 21.8% | 6,122,500(5) | 7.6% | 6,122,500(5) | 9.2% |
| Dr. Raluca Dinu | — | — | — | * | — | * |
| John Mikulsky | — | — | — | * | — | * |
| Peter Wang | 5,000 | * | 5,000 | * | 5,000 | * |
| Neil Miotto | — | — | — | * | — | * |
| Andrea Betti-Berutto | 5,000 | * | 5,000 | * | 5,000 | * |
| Brad Weightman | 5,000 | * | 5,000 | * | 5,000 | * |
| GigAcquisitions3, LLC(3) | 5,635,000(4) | 21.8% | 6,122,500(5) | 7.6% | 6,122,500(5) | 9.2% |
| Robert Fenwick-Smith(6) | — | — | 4,973,701 | 6.0% | 4,973,701 | 7.4% |
| Timothy Reeser(7) | — | — | 1,380,352 | 1.7% | 1,380,352 | 2.0% |
| Teresa Covington | — | — | — | * | — | * |
| William Kelley(8) | — | — | 499,991 | * | 499,991 | * |
| Thaddeus Senko | — | — | — | * | — | * |
| Meghan Sharp | — | — | — | * | — | * |
| Diana Tremblay | — | — | — | * | — | * |
| Bruce Coventry | — | — | — | * | — | * |
| Aravaipa Venture Fund(9) | — | — | 4,627,345 | 5.6% | 4,627,345 | 6.9% |
| BP Technology Ventures Inc. / BP Lubricants USA Inc.(10) | — | — | 22,888,873 | 27.8% | 22,888,873 | 34.0 |
| Rosella Holdings Ltd.(11) | — | — | 11,088,350 | 13.5% | 11,088,350 | 16.5% |
| All directors and officers as a group prior to the business combination (6 individuals) | 5,650,000 | 21.8% | 6,137,500 | 7.6% | 6,137,500 | 9.3% |
| All directors and officers as a group following the business combination (11 individuals) | 5,650,000 | 21.8% | 50,389,205 | 62.0% | 50,389,205 | 76.1% |

\*   Less than one percent.

(1)   Unless otherwise indicated, the business address of each of the individuals is 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303. The address for the individuals affiliated with New Lightning eMotors who will become officers or directors of the post-combination company is 319 Foxtail Court Boulder, CO 80305 United States.

(2)   Based on 25,893,479 shares of Common Stock outstanding as of March 15, 2021.

(3)   Represents shares held by our Sponsor. The shares held by our Sponsor are beneficially owned by Dr. Avi S. Katz, our Executive Chairman, Secretary, President, and Chief Executive Officer, and the manager of our Sponsor, who has sole voting and dispositive power over the shares held by our Sponsor.

(4)   Does not include 487,500 shares of Common Stock underlying warrants.

(5)   Includes 487,500 shares of Common Stock underlying warrants.

(6)   Consists of (i) 245,568 shares of New Lightning eMotors Common Stock issued in exchange for outstanding pre-merger Lightning Systems Common Stock, and (ii) 100,789 shares of New Lightning eMotors Common Stock issuable upon the exercise of New Lightning eMotors options issued in exchange of pre-merger Lightning Systems options within 60 days of February 28, 2021. In addition, Mr. Fenwick-Smith is a co-founding partner and member of Aravaipa Venture Fund, LLC and the managing member of Aravaipa Ventures, LLC and may be deemed to beneficially own the shares held by Aravaipa Venture Fund, LLC. Mr. Fenwick-Smith disclaims beneficial ownership of such shares except to the extent of his

300

Table of Contents

pecuniary interest therein. The address of the business office of the reporting person is 319 Foxtail Court Boulder, CO 80305 United States.

(7)    Consists of (i) 440,567 shares of New Lightning eMotors Common Stock issued in exchange for outstanding pre-merger Lightning Systems Common Stock, (ii) 859,669 shares of New Lightning eMotors Common Stock issuable upon the exercise of New Lightning eMotors options issued in exchange of pre-merger Lightning Systems options within 60 days of March 15, 2021, (iii) 40,631 shares of New Lightning eMotors Common Stock issued in exchange for Lightning Systems Common Stock received upon the automatic conversion of pre-merger Lightning Systems preferred stock, and (iv) 39,486 shares of shares of New Lightning eMotors Common Stock issued in exchange for Lightning Systems Common Stock received upon the exercise of pre-merger warrants, assuming cashless exercise.

(8)    Consists of (i) 332,010 shares of New Lightning eMotors Common Stock issued in exchange for outstanding pre-merger Lightning Systems Common Stock, (ii) 167,981 shares of New Lightning eMotors Common Stock issuable upon the exercise of New Lightning eMotors options issued in exchange of pre-merger Lightning Systems options within 60 days of March 15, 2021.

(9)    Consists of (i) 487,935 shares of New Lightning eMotors Common Stock issued in exchange for outstanding pre-merger Lightning Systems Common Stock, (ii) 3,965,543 shares of New Lightning eMotors Common Stock issued in exchange for Lightning Systems Common Stock received upon the automatic conversion of pre-merger Lightning Systems preferred stock, and (iii) 173,867 shares of New Lightning eMotors Common Stock issued in exchange for Lightning Systems Common Stock received upon the exercise of pre-merger warrants, assuming cashless exercise each held by Aravaipa Venture Fund, LLC. The managing member of Aravaipa Venture Fund, LLC is Aravaipa Ventures, LLC. Robert Fenwick-Smith is a co-founding partner and member of Aravaipa Venture Fund, LLC and the managing member of Aravaipa Ventures, LLC and may be deemed to beneficially own the shares held by Aravaipa Venture Fund, LLC. Mr. Fenwick-Smith disclaims beneficial ownership of such shares except to the extent of his pecuniary interest therein. The address of the business office of the reporting person is 319 Foxtail Court Boulder, CO 80305 United States.

(10)    Consists of (i) 15,539,917 shares of New Lightning eMotors Common Stock issued in exchange for Lightning Systems Common Stock received upon the automatic conversion of pre-merger Lightning Systems preferred stock, (ii) 942,886 shares of New Lightning eMotors Common Stock issued in exchange for Lightning Systems Common Stock upon the automatic conversion of pre-merger Lightning eMotors convertible notes, (iii) 3,906,071 shares of shares of New Lightning eMotors Common Stock issuable upon exercise of pre-merger Lightning Systems warrants, assuming cashless exercise and (iv) 2,500,000 shares of New Lightning eMotors Common Stock purchased in connection with the PIPE Subscription Agreement, each held by BP Technology Ventures, Inc., an investment holding vehicle incorporated in Guernsey. BP Technology Ventures, Inc. is owned 100% by BP Corporation North America Inc., which is owned 100% by BP America Inc., which is owned 100% by BP America Ltd., which is owned 100% by BP Holdings North America Ltd., which is owned 100% by BP P.L.C. The address of the business office of the reporting person is 501 Westlake Park Blvd, Houston, TX 77079.

(11)    Consists of (i) 9,668,353 shares of New Lightning eMotors Common Stock issued in exchange for Lightning Systems Common Stock received upon the automatic conversion of pre-merger Lightning Systems preferred stock, (ii) 285,723 shares of New Lightning eMotors Common Stock issued in exchange for Lightning Systems Common Stock received upon the automatic conversion of pre-merger Lightning eMotors convertible notes and (iii) 1,134,273 shares of shares of New Lightning eMotors Common Stock issued in exchange for Lightning Systems Common Stock received upon the exercise of pre-merger warrants, assuming cashless exercise, each held by Rosella Holdings Limited, an investment holding vehicle incorporated in Guernsey. The shareholders and members of the Board of Directors of Rosella Holdings Limited are International Company Management Limited and Portman Welbeck Limited, both of which are wholly owned by the administrator Rawlinson and Hunter Limited and hold their interest in Rosella Holdings Limited as nominees for the Trustees of three Guernsey discretionary trusts each of which beneficially own one third of Rosella Holdings Limited. In addition, Rosella Holdings Limited owns an indirect and non-controlling interest in Aravaipa Ventures. The address of the business office of the reporting person is Trafalgar Court, 3rd Floor, West Wing, Les Banques, St. Peter Port, Guernset, GYI 2JA.

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**The Company's Related Party Transactions**

*Initial Stockholder Shares*

During the period from February 3, 2020 (date of inception) to February 14, 2020, the Sponsor purchased 5,735,000 Initial Stockholder Shares for an aggregate purchase price of $25,000, or $0.0044 per share. The Company also issued 5,000 shares of Common Stock, solely in consideration of future services, to two of our directors, Messrs. Wang and Betti-Berutto, and our Chief Financial Officer, Mr. Weightman, pursuant to Insider Shares Grant Agreements dated May 13, 2020 between the Company and each of these individuals, for an aggregate issuance of 15,000 Insider Shares of Common Stock. The Insider Shares are subject to forfeiture if an individual resigns or his services are terminated for cause prior to the completion of the Business Combination. The Initial Stockholder Shares acquired by the Sponsor on February 14, 2020 are identical to the common stock included in the units sold in the IPO except that the Initial Stockholder Shares are subject to certain transfer restrictions, as described in more detail below. The Sponsor has forfeited 750,000 Initial Stockholder Shares because the over-allotment option was not exercised by the Underwriters. Because the entire over-allotment option was not exercised, the forfeiture did not need to be adjusted.

*Private Placement*

The Sponsor and the Underwriters purchased from the Company an aggregate of 650,000 and 243,479 private placement units, respectively, at a price of $10.00 per unit in a private placement that occurred simultaneously with the completion of the closing of the IPO. Each private placement unit consists of one share of the Company's Common Stock, and three-fourths of a private placement warrant. Each whole private placement warrant will be exercisable for $11.50 per share, and the exercise price of the private placement warrants may be adjusted in certain circumstances.

No fractional shares will be issued upon exercise of the private placement warrants. If, upon exercise of the private placement warrants, a holder would be entitled to receive a fractional interest in a share, the Company will, upon exercise, round down to the nearest whole number the number of shares of Common Stock to be issued to the private placement warrant holder. Each private placement warrant will become exercisable on the later of 30 days after the Closing of the Business Combination or May 18, 2021 and will expire five years after the Closing of the Business Combination or earlier upon redemption or liquidation. However, if the Company does not complete a Business Combination on or prior to the 18-month period allotted to complete the Business Combination, the private placement warrants will expire at the end of such period. If the Company is unable to deliver registered shares of Common Stock to the holder upon exercise of the private placement warrants during the exercise period, there will be no net cash settlement of these private placement warrants and the private placement warrants will expire worthless, unless they may be exercised on a cashless basis in the circumstances described in the Amended and Restated Warrant Agreement.

Unlike the public warrants included in the units sold in the IPO, if held by the original holder or its permitted transferees, the warrants included in the private placement units are not redeemable by the Company. Thus, once the private placement warrants become exercisable, the Company may redeem the outstanding private placement warrants in whole and not in part at a price of $0.01 per private placement warrant upon a minimum of 30 days' prior written notice of redemption, only in the event that the private placement warrants are no longer held by the Sponsor or the Underwriters and/or their permitted transferees and the last sale price of the Company's shares of Common Stock equals or exceeds $18.00 per share for any 20 trading days within the 30-trading day period ending on the third trading day before the Company sends the notice of redemption to the private placement warrant holders.

Also, unlike the public warrants included in the units sold in the IPO, if held by the original holder or its permitted transferees, the warrants included in the private placement units, subject to certain limited exceptions,

302

Table of Contents

will be subject to transfer restrictions until one year following the Closing of the Business Combination. If the warrants included in the private placement units are held by holders other than the initial holders or their permitted transferees, the warrants included in the private placement units will be redeemable by the Company and exercisable by holders on the same basis as the warrants included in the IPO.

If the Company does not complete a Business Combination, then a portion of the proceeds from the sale of the private placement units will be part of the liquidating distribution to the public stockholders.

The Initial Stockholders collectively own approximately 22% of the Company's issued and outstanding shares after the IPO, the private placement, and forfeiture of 750,000 Initial Stockholder Shares by the Sponsor.

### Sponsor Promissory Note

The Company entered into a promissory note agreement with the Sponsor under which $100,000 was loaned to the Company for the payment of expenses related to the IPO. The promissory note was non-interest bearing, unsecured and was repaid in full on May 18, 2020.

### Lock-up Agreements

Subject to certain limited exceptions, the Insiders have agreed not to transfer, assign or sell any of their respective Insider Shares him or by his affiliates until the earlier of (A) 12 months after the Closing of the Business Combination or (B) the date on which, subsequent to the Business Combination, (x) the date on which the last sale price of the Common Stock equals or exceeds $12.50 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 90 days after the Business Combination, or (y) the date on which the Company completes a liquidation, merger, stock exchange or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of Common Stock for cash, securities or other property (the "*Lock-up Period*"). Also subject to certain limited exceptions, the Company's Sponsor and Underwriters have agreed not to transfer, assign or sell any of their respective private placement units or Initial Stockholder Shares (including shares or other securities underlying the private placement units) that they may hold until the date that is (i) in the case of the Initial Stockholder Shares acquired by the Sponsor on February 14, 2020, the end of the Lock-up Period, and (ii) in the case of the private placement units and Initial Stockholder Shares or other securities underlying such private placement units, until 30 days after the Closing of the Company's Business Combination. Notwithstanding the foregoing, during the their respective lock-up periods, the Initial Stockholders may transfer, assign or sell any of the aforenamed securities (1) amongst the Sponsor and its affiliates, to its executive officers or directors, or to any affiliate or family member of any of its executive officers or directors, (2) in the case of an entity, as a distribution to its partners, stockholders or members upon its liquidation, (3) in the case of an individual, (i) by bona fide gift to such person's immediate family or to a trust, the beneficiary of which is a member of such person's immediate family, an affiliate of such person or to a charitable organization, (ii) by virtue of the laws of descent and distribution upon death of such person, (iii) pursuant to a qualified domestic relations order, (4) by certain pledges to secure obligations incurred in connection with purchases of the Company's securities, (5) through private sales or transfers made in connection with the consummation of Business Combination at prices no greater than the price at which such securities were originally purchased, (6) in the case of an Underwriter, to such Underwriter's affiliates or any entity controlled by such Underwriter. or (7) to us for no value for cancellation in connection with the consummation of our initial business combination; *provided*, that, in each such case (except clause (7)), these permitted transferees shall enter into a written agreement with the Company agreeing to be bound by the transfer restrictions agreed to by the original holder in connection with the purchase of the securities being transferred.

### Working Capital Loans

In order to meet the Company's working capital needs, the Sponsor, executive officers and directors, or their affiliates may, but are not obligated to, loan the Company funds, from time to time or at any time, in whatever

Table of Contents

amount they deem reasonable in their sole discretion. Each loan would be evidenced by a promissory note. Up to $1,500,000 of such loans may be convertible into additional units of the post-business combination entity at a price of $10.00 per unit at the option of the lender. The units would be identical to the private placement units. No such working capital loans have been made.

### Registration Rights Agreement

On May 13, 2020, the Company entered into a Registration Rights Agreement with the Sponsor, the Underwriters and Insiders. These holders will be entitled to make up to three demands, excluding short form registration demands, that the Company register such securities for sale under the Securities Act. In addition, these holders will have "piggy-back" registration rights to include their securities in other registration statements filed by the Company. The Company will bear the expenses incurred in connection with the filing of any such registration statements. There will be no penalties associated with delays in registering the securities under the Registration Rights Agreement.

### Strategic Services Agreements

On February 14, 2020, the Company entered into a Strategic Services Agreement with Mr. Weightman, the Company's Chief Financial Officer. Mr. Weightman initially received $5,000 per month for his services and such amount could increase to up to $15,000 per month dependent upon the scope of services provided. Commencing with the first month after the consummation of the IPO, the Company has paid Mr. Weightman for services rendered since February 14, 2020 and on a monthly basis thereafter for all services rendered after the consummation of the IPO. In addition, prior to the consummation of IPO, the Company issued 5,000 Insider shares, in consideration of future services to it, to Mr. Weightman.

### Administrative Services Agreement

The Company agreed to pay $20,000 a month for office space, administrative services and secretarial support to an affiliate of the Sponsor, GigFounders, LLC. Services commenced on May 14, 2020, the date the securities were first listed on the New York Stock Exchange, and will terminate upon the earlier of the Closing of the Business Combination or the liquidation of the Company. Effective February 1, 2021, GigFounders, LLC assigned all of its rights, title and interest under the Administrative Services Agreements with the Company to GigManagement, LLC, including the monthly payment of $20,000. Pursuant to this assignment agreement, GigFounders, LLC delegated to GigManagement, LLC all of its obligations, duties, responsibilities and right to receive payment under the Administrative Services Agreement.

**The Company's Related Party Transactions Following the Business Combination**

### Agreements with Affiliates of Lightning Systems

Following the Business Combination, certain of the existing agreements described under "*Lightning Systems Related Party Transactions*" will continue in effect.

304

**Table of Contents**

**PRICE RANGE OF SECURITIES AND DIVIDENDS**

**The Company**

*Price Range of the Company's Securities*

Our units began trading on the NYSE under the symbol "GIK.U" on May 14, 2020. On June 29, 2020, the Company announced that the holders of the Company's units may elect to separately trade the securities underlying such units as of July 2, 2020. On July 2, 2020, our shares of common stock and warrants began trading on the NYSE under the symbols "GIK" and "GIK.WS," respectively. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Each warrant entitles the holder to purchase one share of Common Stock at a price of $11.50. Warrants may only be exercised for whole shares and will become exercisable on the later of 30 days after the completion of our initial business combination or May 18, 2020. Our warrants expire five years after the completion of our initial business combination or earlier upon redemption or liquidation.

The following table sets forth, for the calendar quarter indicated, the high and low sales prices per unit, Common Stock and warrant as reported on NYSE for the periods presented.

|  | Units (GIX.U) | | Common Stock (GIX) | | Warrants (GIX.WS) | |
|---|---|---|---|---|---|---|
|  | High | Low | High | Low | High | Low |
| Year ended December 31, 2020 |  |  |  |  |  |  |
| Quarter ended June 30, 2020 | $10.99 | $10.40 | $10.23 | $ 9.93 | $0.70 | $ 0.11 |
| Quarter ended September 30, 2020 | $12.11 | $10.73 | $10.60 | $10.06 | $1.19 | $ 0.47 |
| Quarter ended December 31, 2020 | $15.00 | $10.21 | $12.12 | $10.01 | $2.47 | $ 0.33 |

On December 9, 2020, the trading date immediately prior to the public announcement of the Business Combination, our Common Stock, public warrants and public units closed at $12.55, $2.68 and $14.60, respectively.

*Dividend Policy of the Company*

We have not paid any cash dividends on our shares of common stock to date and do not intend to pay cash dividends prior to the completion of a business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of a business combination. The payment of any dividends subsequent to a business combination will be within the discretion of our then Board of Directors. It is the present intention of our Board of Directors to retain all earnings, if any, for use in our business operations and, accordingly, our board does not anticipate declaring any dividends in the foreseeable future.

**Lightning Systems**

*Price Range of Lightning Systems Securitie*s

Historical market price information regarding Lightning Systems is not provided because there is no public market for the Lightning Systems Capital Stock. For information about distributions paid by Lightning Systems to the holders of the Lightning Systems Capital Stock, please see the sections entitled "*Lightning Systems' Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Sources and Uses of Cash.*"

305

Table of Contents

**CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS**

The following is a discussion of certain U.S. federal income tax consequences of the ownership and disposition of our Common Stock. This discussion is limited to holders that hold our Common Stock as a "capital asset" for U.S. federal income tax purposes (generally, property held for investment). This summary is based on the provisions of the Code, U.S. Treasury regulations, administrative rules and judicial decisions, all as in effect on the date hereof. These authorities may change or be subject to differing interpretations. Any such change or differing interpretation may be applied retroactively in a manner that could adversely affect holders to which this section applies. We have not sought and will not seek any rulings from the IRS with respect to the statements made and the conclusions reached in the following discussion, and there can be no assurance that the IRS or a court will agree with such statements and conclusions.

The following does not purport to be a complete analysis of all potential tax effects resulting from the ownership and disposition of our Common Stock, and this discussion does not address all aspects of U.S. federal income taxation that may be relevant to particular holders in light of their personal circumstances. In addition, this summary does not address the Medicare tax on certain investment income, U.S. federal estate or gift tax laws, any state, local or non-U.S. tax laws or any tax treaties. This summary also does not address tax considerations applicable to investors that may be subject to special treatment under the U.S. federal income tax laws, such as:

- banks, insurance companies or other financial institutions;

- tax-exempt or governmental organizations;

- qualified foreign pension funds (or any entities all of the interests of which are held by a qualified foreign pension fund);

- brokers or dealers in securities or foreign currencies;

- U.S. persons whose functional currency is not the U.S. dollar;

- "controlled foreign corporations," "passive foreign investment companies" and corporations that accumulate earnings to avoid U.S. federal income tax;

- traders in securities that use themark-to-market method of accounting for U.S. federal income tax purposes;

- persons subject to the alternative minimum tax;

- partnerships or other pass-through entities for U.S. federal income tax purposes or holders of interests therein;

- persons deemed to sell our Common Stock under the constructive sale provisions of the Code;

- persons that acquired our Common Stock through the exercise of employee stock options or otherwise as compensation or through a tax-qualified retirement plan;

- real estate investment trusts;

- regulated investment companies;

- certain former citizens or long-term residents of the United States; and

- persons that hold our Common Stock as part of a straddle, appreciated financial position, synthetic security, hedge, conversion transaction or other integrated investment or risk reduction transaction.

If a partnership (including an entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds our Common Stock, the tax treatment of a partner in the partnership generally will depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner level.

306

Table of Contents

Accordingly, we urge partners in partnerships (including entities or arrangements treated as partnerships for U.S. federal income tax purposes) holding our Common Stock to consult their tax advisors regarding the U.S. federal income tax consequences to them relating to the matters discussed below.

**THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. INVESTORS SHOULD CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATIONS, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER THE U.S. FEDERAL ESTATE OR GIFT TAX LAWS OR UNDER THE LAWS OF ANY STATE, LOCAL OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE INCOME TAX TREATY.**

**U.S. Holders**

This section is addressed to "U.S. holders" of our Common Stock. For purposes of this discussion, a "U.S. holder" is a beneficial owner of shares of our Common Stock that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust (i) the administration of which is subject to the primary supervision of a U.S. court and which has one or more United States persons (within the meaning of the Code) who have the authority to control all substantial decisions of the trust or (ii) which has made a valid election under applicable U.S. Treasury regulations to be treated as a United States person.

*Distributions on Our Common Stock*

If we pay cash distributions to U.S. holders of shares of our Common Stock, such distributions generally will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. holder's adjusted tax basis in our Common Stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the Common Stock and will be treated as described under "—Sale, Taxable Exchange or Other Taxable Disposition of Our Common Stock" below.

Dividends we pay to a U.S. holder that is a corporation generally will qualify for the dividends received deduction (at varying percentages based upon such U.S. holder's ownership percentage in the Company) if the requisite holding period is satisfied. With certain exceptions (including, but not limited to, dividends treated as investment income for purposes of investment interest deduction limitations) and provided certain holding period requirements are met, dividends we pay to a non-corporate U.S. holder generally will constitute "qualified dividends" that will be subject to tax at the maximum tax rate accorded to long-term capital gains.

*Sale, Taxable Exchange or Other Taxable Disposition of Our Common Stock*

Upon a sale, taxable exchange or other taxable disposition of our Common Stock, a U.S. holder generally will recognize capital gain or loss in an amount equal to the difference between the amount realized and the U.S. holder's adjusted tax basis in the shares of our Common Stock. Any such capital gain or loss generally will be long-term capital gain or loss if the U.S. holder's holding period for shares of our Common Stock so disposed of exceeds one year. Long-term capital gains recognized by non-corporate U.S. holders will be eligible to be taxed at reduced rates. The deductibility of capital losses is subject to limitations. Generally, the amount of gain or loss recognized by a U.S. holder is an amount equal to the difference between (i) the sum of the amount of cash and the fair market value of any property received in such disposition and (ii) the U.S. holder's adjusted tax basis in its Common Stock so disposed of.

307

Table of Contents

### Information Reporting and Backup Withholding

Payments received by a U.S. holder may be subject, under certain circumstances, to information reporting and backup withholding. Backup withholding will not apply, however, to a U.S. holder that (i) is a corporation or entity that is otherwise exempt from backup withholding (which, when required, certifies as to its exempt status) or (ii) furnishes a correct taxpayer identification number and makes any other required certification on IRS Form W-9.

Backup withholding is not an additional tax. Rather, the U.S. income tax liability (if any) of persons subject to backup withholding will be reduced by the amount of tax withheld. If backup withholding results in an overpayment of taxes, a refund may be obtained, provided that the required information is timely furnished to the IRS.

### Non-U.S. Holders

This section is addressed to "Non-U.S. holders" of our Common Stock. For purposes of this discussion, a "Non-U.S. holder" is any beneficial owner of our Common Stock that is neither a U.S. holder nor an entity treated as a partnership for U.S. federal income tax purposes.

### Distributions on Our Common Stock

In general, any distributions we make to a Non-U.S. holder of shares of our Common Stock, to the extent paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles), will constitute dividends for U.S. federal income tax purposes and, provided such dividends are not effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States, we will be required to withhold tax from the gross amount of the dividend at a rate of 30%, unless such Non-U.S. holder is eligible for a reduced rate of withholding tax under an applicable income tax treaty and provides proper certification of its eligibility for such reduced rate (usually on an applicable IRS Form W-8). Any distribution not constituting a dividend will be treated first as reducing (but not below zero) the Non-U.S. holder's adjusted tax basis in its shares of our Common Stock and, to the extent such distribution exceeds the Non-U.S. holder's adjusted tax basis, as gain realized from the sale or other disposition of the Common Stock, which will be treated as described under "—Sale, Taxable Exchange or Other Taxable Disposition of Our Common Stock" below.

This withholding tax does not apply to dividends paid to a Non-U.S. holder who provides a Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States. Instead, the effectively connected dividends will be subject to regular U.S. income tax as if the Non-U.S. holder were a U.S. resident, subject to an applicable income tax treaty providing otherwise. A Non-U.S. corporation receiving effectively connected dividends may also be subject to an additional "branch profits tax" imposed at a rate of 30% (or a lower treaty rate). In addition, if we determine that we are likely to be classified as a USRPHC (see "—Sale, Taxable Exchange or Other Taxable Disposition of Our Common Stock " below), we may withhold up to 15% of any distribution to a Non-U.S. holder to which Section 301 of the Code applies and which is not made out of our earnings and profits.

### Sale, Taxable Exchange or Other Taxable Disposition of Our Common Stock

Subject to the discussions below under "*Non-U.S. Holders—Information Reporting and Backup Withholding*" and "*Non-U.S. Holders—Foreign Account Tax Compliance Act,*" a Non-U.S. holder generally should not be subject to U.S. federal income or withholding tax in respect of any gain recognized on a sale, taxable exchange or other taxable disposition of our Common Stock, unless:

- the Non-U.S. holder is an individual who is present in the United States for a period or periods aggregating 183 days or more during the calendar year in which the sale or disposition occurs and certain other conditions are met;

308

Table of Contents

- the gain is effectively connected with a trade or business conducted by the Non-U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment maintained by the Non-U.S. holder in the United States); or

- we are or have been a USRPHC for U.S. federal income tax purposes at any time during the shorter of the five-year period ending on the date of disposition or the period that the Non-U.S. holder held our Common Stock, and, in the case where shares of our Common Stock are regularly traded on an established securities market, the Non-U.S. holder has owned, directly or constructively, more than 5% of our Common Stock at any time within the shorter of the five-year period preceding the disposition or such Non-U.S. holder's holding period for the shares of our Common Stock.

A Non-U.S. holder described in the first bullet point above will be subject to U.S. federal income tax at a rate of 30% (or such lower rate as specified by an applicable income tax treaty) on the amount of such gain, which generally may be offset by U.S. source capital losses.

A Non-U.S. holder whose gain is described in the second bullet point above generally will be taxed on a net income basis at the rates and in the manner generally applicable to United States persons (as defined in the Code) unless an applicable income tax treaty provides otherwise. If the Non-U.S. holder is a corporation for U.S. federal income tax purposes whose gain is described in the second bullet point above, then such gain would also be included in its effectively connected earnings and profits (as adjusted for certain items), which may be subject to a branch profits tax (at a rate of 30% or such lower rate as specified by an applicable income tax treaty).

If the third bullet point above applies to a Non-U.S. holder, gain recognized by such holder on the sale, exchange or other disposition of our Common Stock will be subject to tax at generally applicable U.S. federal income tax rates. In addition, a buyer of our Common Stock from such holder may be required to withhold U.S. federal income tax at a rate of 15% of the amount realized upon such disposition. We do not believe we currently are a USRPHC and we do not anticipate becoming one in the near future, although no assurances can be given in this regard.

### Information Reporting and Backup Withholding

Any dividends paid to a Non-U.S. holder must be reported annually to the IRS and to the Non-U.S. holder. Copies of these information returns may be made available to the tax authorities in the country in which the Non-U.S. holder resides or is established. Any dividends paid to a Non-U.S. holder generally will not be subject to backup withholding if the Non-U.S. holder establishes an exemption by properly certifying its non-U.S. status on an applicable IRS Form W-8 (or a successor form).

Payments of the proceeds of the sale or other disposition by a Non-U.S. holder of our Common Stock effected by or through a U.S. office of a broker generally will be subject to information reporting and backup withholding (at the applicable rate) unless the Non-U.S. holder establishes an exemption by properly certifying its non-U.S. status on an applicable IRS Form W-8 (or a successor form) and certain other conditions are met. Information reporting and backup withholding generally will not apply to any payment of the proceeds from a sale or other disposition of our Common Stock effected outside the United States by a non-U.S. office of a broker. However, unless such broker has documentary evidence in its records that the Non-U.S. holder is not a United States person and certain other conditions are met, or the Non-U.S. holder otherwise establishes an exemption, information reporting will apply to a payment of the proceeds of the disposition of our Common Stock effected outside the United States by such a broker if it has certain relationships within the United States.

Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability (if any) of persons subject to backup withholding will be reduced by the amount of tax withheld. If backup withholding results in an overpayment of taxes, a refund may be obtained, provided that the required information is timely furnished to the IRS.

Table of Contents

***Additional Withholding Requirements under FATCA***

Sections 1471 through 1474 of the Code, and the U.S. Treasury regulations and administrative guidance issued thereunder ("*FATCA*"), impose a 30% withholding tax on any dividends paid on our Common Stock, and subject to the discussion of certain proposed Treasury regulations below, on the gross proceeds from a disposition of our Common Stock, in each case if paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code) (including, in some cases, when such foreign financial institution or non-financial foreign entity is acting as an intermediary), unless (i) in the case of a foreign financial institution, such institution enters into an agreement with the U.S. government to withhold on certain payments, and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are non-U.S. entities with U.S. owners), (ii) in the case of a non-financial foreign entity, such entity certifies that it does not have any "substantial United States owners" (as defined in the Code) or provides the applicable withholding agent with a certification identifying the direct and indirect substantial United States owners of the entity, or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules and provides appropriate documentation. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these rules may be subject to different rules. Under certain circumstances, a holder might be eligible for refunds or credits of such taxes.

The U.S. Treasury released proposed Treasury regulations which, if finalized in their present form, would eliminate the federal withholding tax of 30% applicable to the gross proceeds of a sale or other disposition of our Common Stock. In its preamble to such proposed Treasury regulations, the U.S. Treasury stated that taxpayers may generally rely on the proposed regulations until final regulations are issued.

Non-U.S. holders are encouraged to consult their own tax advisors regarding the possible implications of FATCA to them.

310

Table of Contents

## ACCOUNTING TREATMENT

The Business Combination is intended to be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, the Company will be treated as the "acquired" company for financial reporting purposes. Accordingly, the Business Combination will be treated as the equivalent of Lightning Systems issuing stock for the net assets of the Company, accompanied by a recapitalization. The net assets of the Company will be stated at historical cost, with no goodwill or other intangible assets recorded. Operations prior to the Business Combination will be those of Lightning Systems.

## LEGAL MATTERS

The legality of shares of Common Stock offered by the proxy statement/prospectus will be passed upon for the Company by DLA Piper LLP (US).

## EXPERTS

The financial statements of GigCapital3, Inc. as of December 31, 2020 and for the period from February 3, 2020 (date of inception) through December 31, 2020 included in this prospectus have been so included in reliance on the report (which contains an explanatory paragraph relating to the Company's ability to continue as a going concern as described in Note 1 to the financial statements) of BPM LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting.

The Lightning Systems, Inc. balance sheets as of December 31, 2020 and 2019, and the related statements of operations and comprehensive loss, redeemable convertible preferred stock and stockholders' deficit and cash flows for each of the two years in the period ended December 31, 2020, included in this prospectus and elsewhere in the registration statement have been so included in reliance upon the report of Grant Thornton LLP, independent registered public accountants, upon the authority of said firm as experts in accounting and auditing.

## APPRAISAL RIGHTS

Appraisal rights are not available to holders of shares of our Common Stock or Lightning Systems Common Stock in connection with the Business Combination.

Pursuant to Section 262 of the DGCL, Lightning Systems stockholders who comply with the applicable requirements of Section 262 of the DGCL and do not otherwise fail to perfect, waive withdraw or lose the right to appraisal under Delaware law have the right to seek appraisal of the fair value of their shares of Lightning Systems Capital Stock, as determined by the Court of Chancery, if the Merger is completed. The "fair value" of such Dissenting Shares of Lightning Systems Capital Stock as determined by the Court of Chancery may be more or less than, or the same as, the value of the consideration that such stockholder would otherwise be entitled to receive under the Business Combination Agreement. Lightning Systems stockholders who do not vote in favor of the Merger nor consent in writing to it and who wish to preserve their appraisal rights must so advise Lightning Systems by submitting a demand for appraisal within the period prescribed by Section 262 of the DGCL after receiving a notice from Lightning Systems or the Company that appraisal rights are available to them, and must otherwise precisely follow the procedures prescribed by Section 262 of the DGCL. Failure to follow any of the statutory procedures set forth in Section 262 of the DGCL will result in the loss or waiver of appraisal rights under Delaware law. In view of the complexity of Section 262 of the DGCL, Lightning Systems stockholders who may wish to pursue appraisal rights should consult their legal and financial advisors.

Table of Contents

**HOUSEHOLDING INFORMATION**

Pursuant to the rules of the SEC, unless we have received contrary instructions, we are permitted to send a single copy of this proxy statement/prospectus to any household at which two or more stockholders reside if we believe the stockholders are members of the same family. This process, known as "householding," reduces the volume of duplicate information received at any one household and helps to reduce our expenses. However, if stockholders prefer to receive multiple sets of our disclosure documents at the same address this year or in future years, the stockholders should follow the instructions described below. Similarly, if an address is shared with another stockholder and together both of the stockholders would like to receive only a single set of our disclosure documents, the stockholders should follow these instructions:

- If the shares are registered in the name of the stockholder, the stockholder should contact us at our offices at c/o GigCapital3, Inc., 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303 Attention: Secretary or by telephone at (650) 276-7040, to inform us of his or her request; or

- If a bank, broker or other nominee holds the shares, the stockholder should contact the bank, broker or other nominee directly.

**TRANSFER AGENT AND REGISTRAR**

The Transfer Agent for our securities is Continental Stock Transfer & Trust Company.

**SUBMISSION OF STOCKHOLDER PROPOSALS**

Our Board is aware of no other matter that may be brought before the Special Meeting. Under Delaware law, only business that is specified in the notice of Special Meeting to stockholders may be transacted at the Special Meeting.

312

**Table of Contents**

## WHERE YOU CAN FIND MORE INFORMATION

We file reports, proxy statements and other information with the SEC as required by the Exchange Act. You can read the Company's SEC filings, including this proxy statement/prospectus, over the Internet at the SEC's website at http://www.sec.gov. You may also obtain copies of the materials described above at prescribed rates by writing to the SEC, Public Reference Section, 100 F Street, N.E., Washington, D.C. 20549.

If you would like additional copies of this proxy statement/prospectus or if you have questions about the Business Combination or the proposals to be presented at the Special Meeting, you should contact the Company at the following address and telephone number:

GigCapital3, Inc.
1731 Embarcadero Rd., Suite 200
Palo Alto, CA 94303
Tel: (650) 276-7040

You may also obtain these documents by requesting them in writing or by telephone from the Company's proxy solicitation agent at the following address and telephone number:

MacKenzie Partners, Inc.
1407 Broadway, 27th Floor
New York, NY 10018
Telephone: (212) 929-5500 (Call Collect)
or
Call Toll-Free: (800) 322-2885
E-mail: proxy@mackenziepartners.com

If you are a stockholder of the Company and would like to request documents, please do so by one week prior to the Special Meeting, in order to receive them before the Special Meeting. If you request any documents from us, we will mail them to you by first class mail, or another equally prompt means.

All information contained in this proxy statement/prospectus relating to the Company has been supplied by the Company, and all such information relating to Lightning Systems has been supplied by Lightning Systems. Information provided by either the Company or Lightning Systems does not constitute any representation, estimate or projection of any other party.

This document is a proxy statement of the Company for the Special Meeting. We have not authorized anyone to give any information or make any representation about the Business Combination, the Company or Lightning Systems that is different from, or in addition to, that contained in this proxy statement/prospectus. Therefore, if anyone does give you information of this sort, you should not rely on it. The information contained in this proxy statement/prospectus speaks only as of the date of this proxy statement/prospectus, unless the information specifically indicates that another date applies.