**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-02774-RMR-KLM (consolidated with 1:21-cv-03215-KLM)

JOHNNY R. SHAFER and JUSTIN COHEN,
Individually and On Behalf of All Others
Similarly Situated,

                    Plaintiffs,

        v.

LIGHTNING EMOTORS, INC., TIMOTHY
R. REESER, TERESA P. COVINGTON,
GIGACQUISITIONS3 LLC, GIGCAPITAL
GLOBAL, AVI S. KATZ, RALUCA DINU,
NEIL MIOTTO, GIGFOUNDERS LLC,
BRAD WEIGHTMAN, ANDREA BETTI-
BERUTTO, PETER WANG, JOHN J.
MIKULSKY, and ROBERT FENWICK-
SMITH,

Defendants.

---

**GIGACQUISITIONS3, LLC, GIGFOUNDERS, LLC, GIGCAPITAL GLOBAL, AVI S.
KATZ, RALUCA DINU, NEIL MIOTTO, BRAD WEIGHTMAN, JOHN MIKULSKY,
ANDREA BETTI-BERUTTO, AND PETER WANG'S MOTION TO DISMISS
CONSOLIDATED COMPLAINT WITH INCORPORATED MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................................... 3

    A.     The Parties ................................................................................................................ 3

    B.     Gig3's Initial Public Offering ................................................................................... 4

    C.     The Merger Negotiations and Announcement of the Deal .......................................... 5

    D.     The Proxy and Stockholder Vote ............................................................................... 6

    E.     Lightning's Post-Merger Performance ....................................................................... 7

ARGUMENT .................................................................................................................................... 8

    I.     Count I Fails to State a Claim Under Section 11 of the 1933 Act ............................... 8

        A.     The Statements Are Not Actionable Under the "Bespeaks Caution" Doctrine ...... 9

        B.     Plaintiffs Do Not Plausibly Allege the Statements Were False ........................... 11

    II.    Count II Fails to State a Claim Under Section 15 of the 1933 Act ............................. 12

    III.   Count III Fails to State a Claim Under Section 14(a) of the 1934 Act ....................... 13

        A.     Plaintiffs Do Not Allege Negligence by Each Gig3 Defendant as to Lightning Systems' Projections or Supply Chain or Production Capacity Statements ......... 14

        B.     Plaintiffs Do Not State Viable Claims as to Mentor-Investor Statements ............ 15

        C.     Count III Should Be Dismissed as to Defendant Weightman .............................. 16

    IV.   Count IV Fails to State a Claim Under Section 20(a) of the 1934 Act ....................... 17

    V.    Count V Fails to State a Claim Under Section 10(b) of the 1934 Act ....................... 17

        A.     Plaintiffs Fail to State a Claim Based on the Registration Statement .................. 18

        B.     Plaintiffs Fail to State a Claim Based on the December 10, 2020 Statements ..... 19

        C.     Plaintiffs Fail to State a Claim Based on the January 4, 2021 Slide Deck ........... 21

        D.     Plaintiffs Fail to State a Claim Based on the January 12, 2021 Slide Deck ......... 22

        E.     Plaintiffs Fail to State a Claim Based on the March 2021 Proxy ......................... 22

        F.     Plaintiffs Fail to State a Claim Based on the March 26, 2021 Press Release ....... 23

        G.     Plaintiffs Fail to State a Claim Based on Gig3's 2020 Form 10-K ...................... 23

        H.     Plaintiffs Fail to State a Claim Based on the Post-Merger Statements ................. 24

    VI.   Count VI Fails to State a Claim Under Section 20(a) of the 1934 Act ....................... 25

CONCLUSION ............................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ..........................................................................3, 25

*Anderson v. Spirit Aerosys. Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ...................................................................17, 18, 19

*Beck v. Dobrowski*,
559 F.3d 680 (7th Cir. 2009) ...................................................................................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................9

*Britton v. Parker*,
2007 WL 2871003 (D. Colo. Sept. 26, 2007)...........................................................13

*Britton v. Parker*,
2009 WL 3158133 (D. Colo. Sept. 23, 2009).....................................................15, 17

*City of Philadelphia v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ...................................................................... *passim*

*Croker v. Carrier Access Corp.*,
2006 WL 2035366 (D. Colo. July 18, 2006) ...........................................................24

*Exkae Ltd. v. Domo, Inc.*,
2020 WL 7352735 (D. Utah Dec. 15, 2020)..............................................................9

*Fan v. StoneMor Partners LP*,
927 F.3d 710 (3d Cir. 2019).....................................................................................20

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ..................................................................10, 11, 16

*Hampton v. root9B Techs., Inc.*,
897 F.3d 1291 (10th Cir. 2018) .............................................................................3, 12

*Janus Capital Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)..............................................................................................21, 24

*Jedrzejczyk v. Skillz Inc.*,
2022 WL 2441563 (N.D. Cal. July 5, 2022)............................................................21

*Khalik v. United Air Lines*,
   671 F.3d 1188 (10th Cir. 2012) ...............................................................................................9

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005) ...........................................................................................13

*Kuebler v. Vectren Corp.*,
   13 F.4th 631 (7th Cir. 2021) ..................................................................................................13

*Lane v. Page*,
   581 F. Supp. 2d 1094 (D.N.M. 2008) .....................................................................................16

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
   667 F.3d 1331 (10th Cir. 2012) .............................................................................................16

*Maher v. Durango Metals, Inc.*,
   144 F.3d 1302 (10th Cir. 1998) .............................................................................12, 13, 17, 25

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) .....................23

*Medina v. Clovis Oncology, Inc.*,
   215 F. Supp. 3d 1094 (D. Colo. 2017)...............................................................................12, 13

*Nakkhumpun v. Taylor*,
   782 F.3d 1142 (10th Cir. 2015) .............................................................................................12

*In re Ocera Therapeutics, Inc. Sec. Litig.*,
   2018 WL 7019481 (N.D. Cal. Oct. 16, 2018).........................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015).........................................................................................................12, 16

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) .................................................................................................19

*Pirraglia v. Novell, Inc.*,
   339 F.3d 1182 (10th Cir. 2003) .............................................................................................18

*In re Restoration Robotics, Inc. Sec. Litig.*,
   417 F. Supp. 3d 1242 (N.D. Cal. 2019) .................................................................................10

*Rubinstein v. Credit Suisse Grp. AG*,
   457 F. Supp. 3d 289 (S.D.N.Y. 2020)....................................................................................12

*Scritchfield v. Paolo*,
   274 F. Supp. 2d 163 (D.R.I. 2003)........................................................................................10

*iii*

*Slater v. A.G. Edwards & Sons, Inc.*,
     719 F.3d 1190 (10th Cir. 2013) ...............................................................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
     551 U.S. 308 (2007).............................................................................................17, 18

*Weinstein v. McClendon*,
     757 F.3d 1110 (10th Cir. 2014) ...............................................................................18

*In re ZAGG Inc. S'holder Derivative Action*,
     826 F.3d 1222 (10th Cir. 2016) ...............................................................................15

*Zhang v. Lifevantage Corp.*,
     2017 WL 2599883 (D. Utah June 15, 2017)...........................................................19

**Statutes**

Section 2 of the Securities Act of 1933, 15 U.S.C. § 77b.............................................................13

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k..................................................... *passim*

Section 15 of the Securities Act of 1933, 15 U.S.C. § 77*o*.................................................... *passim*

Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j.................................... *passim*

Section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n................................... *passim*

Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t.................................... *passim*

Section 21D of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4..........................2, 13, 18

**Other Authorities**

Fed. R. Civ. P. 8..........................................................................................................9, 12, 14

Fed. R. Civ. P. 9.......................................................................................................................9

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 .....................................................................................17

SEC Rule 14a-9, 17 C.F.R. § 240.14a-9......................................................................................13

*iv*

Defendants GigAcquisitions3, LLC, GigFounders, LLC, GigCapital Global, Avi S. Katz, Raluca Dinu, Neil Miotto, Brad Weightman, John Mikulsky, Andrea Betti-Berutto, and Peter Wang (collectively, the "Gig3 Defendants") hereby move to dismiss Plaintiffs' Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint" or "Compl.").

## INTRODUCTION

Plaintiffs are investors in GigCapital3, Inc. ("Gig3"), a special purpose acquisition company ("SPAC"). As a SPAC, Gig3's purpose was to raise investor capital, identify potential targets, and acquire a private company, which would become publicly traded as a result of the transaction. On May 6, 2021, Gig3 closed its business combination with Lightning Systems, Inc., an electric-vehicle and powertrain manufacturer, emerging as Lightning eMotors, Inc. ("Lightning"). The Complaint is little more than a thinly veiled attack on SPAC transactions generally. (*See, e.g.*, Compl. ¶¶48-49.) But the securities laws concern *disclosure*. They are not a mechanism for Plaintiffs to debate the policy merits of SPACs. Nor are generalized allegations about the financial incentives inherent in SPACs a substitute for allegations of *fact* showing the statements Plaintiffs now challenge were materially false or misleading when made and (where applicable) made negligently or fraudulently.

The statements Plaintiffs challenge fall largely within three categories. First, Plaintiffs challenge statements regarding Gig3's *intent* to employ a "Mentor-Investor" approach with its eventual target post-merger. (*E.g.*, *id.* ¶32.) These forward-looking statements were accompanied by cautionary language that Gig3 could not ensure the involvement of its management post-merger. Under the Tenth Circuit's "bespeaks caution" doctrine, they accordingly are not actionable. Additionally, there are no allegations of fact showing the Gig3 Defendants did not hold this intent at the time the statements were made. All Plaintiffs allege is that post-merger, Lightning's board (which the Gig3 Defendants did not control) voted to shorten the terms of the

1

Gig3-affiliated persons and not to renominate them to the board. In contrast, and as Plaintiffs acknowledge, the Gig3 Defendants remained involved in other companies post-de-SPAC merger.

Second, Plaintiffs challenge statements regarding Lightning Systems' projections. As to the projections in the proxy soliciting stockholder votes on the merger, Plaintiffs must allege facts showing not only falsity, but also facts showing that each of the Gig3 Defendants acted negligently. The Complaint misses this mark. The March 2021 proxy disclosed that the projections were provided to Gig3 in *November 2020* during merger negotiations; were revised *downward* based on feedback from Gig3; did not account for post-November events; and should not be relied on in voting on the merger. Plaintiffs do not allege that any of the *Gig3 Defendants*, who were outsiders to Lightning Systems, knew or should have known facts showing the projections were false.

As for Lightning's statements reaffirming the projections, to the extent the Gig3 Defendants can be liable for these statements at all, Plaintiffs must plead not just negligence, but particularized facts giving rise to a "strong inference" of scienter. *See* Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). Yet the Complaint does not identify a single piece of information in the Gig3 Defendants' possession that contradicted the projections or any other facts giving rise to a strong inference of intent to defraud.

Third, Plaintiffs challenge statements regarding Lightning's supply chain and production capacity. But again, Plaintiffs do not allege facts, much less particularized facts, showing that any of the Gig3 Defendants made these statements negligently or fraudulently. Plaintiffs rely on "Confidential Witnesses," but most left Lightning Systems months before Gig3 began negotiating a potential merger, and none is alleged to have provided any information to the Gig3 Defendants.

The Complaint suffers from numerous other defects, as detailed below and in the Lightning Defendants' motion to dismiss. All the claims against the Gig3 Defendants should be dismissed.

## **FACTUAL BACKGROUND**[1]

### A.   The Parties

Gig3 Entity Defendants. Gig3 was a Delaware corporation formed as a SPAC on February 3, 2020. (Compl. ¶¶2, 43, 50; Ex. 1 at F-7.)[2] On May 6, 2021, the business combination between Gig3 and Lightning Systems (the "Merger") closed, and the combined business became known as Lightning eMotors, Inc. (Compl. ¶¶59, 85.) GigAcquisitions3, LLC served as Gig3's sponsor (the "Sponsor"). As is customary with SPACs, before Gig3 went public, the Sponsor purchased 5,735,000 "founder shares" for an aggregate price of $25,000. (*Id.* ¶¶5, 50; Ex. 1 at 13.) GigFounders, LLC is an affiliate of the Sponsor, (Ex. 1 at 73), and entered into an agreement with Gig3 pursuant to which Gig3 paid $20,000 per month for office space and general and administrative services (Compl. ¶35). Aside from this services agreement, the Complaint does not allege that GigFounders played any role in Gig3. The Complaint also names as a defendant "GigCapital Global." (*Id.* ¶32.) No such entity exists. The only references to that name are in a website address for companies operating under the GigCapital trademark and in an investor presentation on a slide describing GigCapital, Inc. ("Gig1"), GigCapital2, Inc. ("Gig2"), and Gig3. (*See id.* ¶32 & n.2 (citing https://www.gigcapitalglobal.com); *id.* ¶33 (citing Ex. 2).)

Individual Gig3 Defendants. Katz founded the Sponsor and was the Executive Chairman and CEO of Gig3. (*Id.* ¶24.) At the closing of the Merger, Katz became co-chairman of Lightning's board of directors, a role he held until October 7, 2021. (*Id.*) Previously, Katz founded Gig1, which went public in December 2017 and completed a merger (or "de-SPAC") with Kaleyra in October

---

[1] For purposes of this motion to dismiss, the Court must accept well-pleaded factual allegations, but not conclusory allegations, as true. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1088 (10th Cir. 2003). The Court also may consider documents referred to in the complaint if the documents are central to plaintiffs' claims and the parties do not dispute the documents' authenticity. *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1297 (10th Cir. 2018).

[2] "Ex. _" citations are to the exhibits attached to the accompanying Declaration of Melanie E. Walker.

2019. (Ex. 1 at 3.) Katz has served as Kaleyra's board chairman since that time. (*See* Compl. ¶24; Ex. 3 at 74.) In March 2019, Katz founded Gig2, which went public in June 2019 and completed a de-SPAC merger in June 2021, emerging as UpHealth, Inc. (Ex. 1 at 3; Compl. ¶¶181-182.) Katz remains UpHealth's Chairman. (Ex. 3 at 74-75.)

Dinu served as a member of Gig3's board before the Merger and remained on Lightning's board from the closing until October 7, 2021. (Compl. ¶25.) She was chair of Kaleyra's strategic advisory board and has served on the board of UpHealth since its de-SPAC. (*See id.*; Ex. 3 at 75.)

Miotto was on Gig3's board and on Lightning's board until October 7, 2021. (Compl. ¶26.) He also is a director of Gig1 (now Kaleyra) and Gig2 (now UpHealth). (*Id.*; Ex. 3 at 76.)

Weightman was the CFO of Gig3 until the close of the Merger. (Compl. ¶¶27, 85.)

Mikulsky, Betti-Berutto, and Wang all were members of Gig3's board until the Merger. (*Id.* ¶¶28-30, 85.) Betti-Berutto also was Gig3's Hardware Chief Technical Officer, and Wang was its Software Chief Technical Officer. (*Id.* ¶¶30, 50; Ex. 1 at 99.) Weightman, Wang, and Betti-Berutto each were issued 5,000 insider shares in connection with Gig3's IPO. (*Id.* ¶¶27, 29, 50; Ex. 1 at 14.) Mikulsky remained a Kaleyra director after its de-SPAC, (Ex. 1 at 98), and Wang was a member of Kaleyra's strategic advisory board, (Compl. ¶30).

Individual Lightning Defendants. Timothy Reeser was CEO of Lightning Systems (and later Lightning) during the relevant period and joined Lightning's board upon the Merger. (*Id.* ¶38.) Robert Fenwick-Smith was Lightning Systems' executive director before the Merger and served as its interim CFO from February to December 2020. (*Id.* ¶39.) Post-Merger, Fenwick-Smith was co-chairman of Lightning's board. (*Id.)* Teresa Covington became senior vice president and CFO of Lightning Systems on January 4, 2021 and remained CFO after the Merger. (*Id.* ¶40.)

### B.    Gig3's Initial Public Offering

On May 18, 2020, the start of the putative Class Period, Gig3 completed its IPO of 20

4

million units at a price of $10 per unit. (Compl. ¶5.) Each unit consisted of one share of common stock and three-fourths of a warrant. (*Id.* ¶52; Ex. 1 at 116.) The founder shares and insider shares issued to Weightman, Betti-Berutto, and Wang were subject to "lock-up agreements," which restricted their sale until (i) 12 months after an initial business combination closed, or (ii) after an initial business combination, the date on which the last sale price of the stock equaled or exceeded $12.50 per share. (Compl. ¶50.) Due to the lock-up, the founder shares and insider shares could not be sold at any time during the putative Class Period and remained restricted until May 6, 2022.

The public units were offered pursuant to a May 13, 2020 Registration Statement and Prospectus. (*Id.* ¶51.) Gig3 explained that it was a SPAC formed for the purpose of effecting a business combination and that it would have 18 months from the closing of the IPO to complete its initial business combination. (Ex. 1 at 26.) If Gig3 could not complete a business combination in that time, it would return all IPO proceeds plus interest. (Compl. ¶54.) Public stockholders had the right to redeem their shares at the IPO price plus interest instead of holding them in the post-Merger entity, even if they voted in favor of the Merger. (*Id.*) In contrast, as the Registration Statement made clear, the Sponsor and other holders of private placement shares waived their redemption right, and "[a]ll of the founder shares and insider shares [would] be worthless [if Gig3 did] not consummate [its] initial business combination." (Ex. 1 at 46.)

Gig3 also outlined its intentions with respect to potential merger targets. Plaintiffs focus on Gig3's statements that it "intend[ed] to apply a unique 'Mentor-Investor' philosophy" and to partner with a target "over a 3 to 5 year horizon." (Compl. ¶¶132, 206; *see* Ex. 1 at 2, 79-80.) But Gig3 warned it could not guarantee that any of its officers or directors would play a role in the post-transaction company. (*See* Ex. 1 at 43, 85.)

### C. The Merger Negotiations and Announcement of the Deal

After its IPO, Gig3 actively searched for prospective businesses or assets to acquire.

5

(Compl. ¶55.) In August 2020, BofA Securities, Inc., Lightning Systems' financial advisor, approached Katz and Dinu about a potential acquisition. (*Id.*) Over the next several weeks, the parties discussed high-level deal terms, and Gig3 engaged in due diligence. (*Id.*)

On December 10, 2020, Lightning Systems and Gig3 issued a joint press release announcing that they had entered into a definitive agreement for a business combination. (*Id.* ¶58; Ex. 4.) In addition to outlining the terms of the deal, the press release included Lightning Systems' 2021 and 2022 revenue projections, stating, among other things, that Lightning Systems had "[h]igh revenue visibility with 100% of projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million under firm purchase orders as of today." (Compl. ¶134.) That same day, Dinu (on behalf of Gig3) and Reeser, Fenwick-Smith, and Lightning Systems' Chief Operations Officer, Bill Kelley, also hosted an investor call. (*Id.*; Ex. 5.)

In January 2021, Gig3 filed with the SEC two investor presentations. The first, which concerned Lightning Systems' business, reiterated that the company had "100% of 2021 revenue forecast contracted as of Q3 2020" and addressed how Lightning Systems was handling the supply-chain issues caused by COVID-19. (Compl. ¶¶140-141; Ex. 6 at 8.) The second, which concerned GigCapital's SPAC strategy, stated that GigCapital contemplated "[p]articipating actively at the company's [board of directors] and [strategic advisory board]" and providing "Financing and M&A advisory for growth and consolidation." (Compl. ¶144; Ex. 2 at 17.)

### D.    The Proxy and Stockholder Vote

On December 31, 2020, Gig3 filed a preliminary proxy statement, inviting stockholders to vote on the Merger. At that time, Gig3 still had 11 months to complete a business combination. (Ex. 7 at 18.) On March 26, 2021, Gig3's Proxy was declared effective by the SEC. (Compl. ¶66.)

As relevant here, the Proxy disclosed a summary of financial projections Lightning Systems had provided Gig3 during due diligence. Lightning Systems provided initial projections

6

in September 2020, which the parties revised downward in the course of their discussions, arriving at the projections included in the Proxy in late November 2020. (Ex. 8 at 155.) The Proxy contained extensive cautionary language relating to the projections, including that stockholders should not rely on them in voting on the Merger and that they were being provided because they had been made available to Gig3 and its board. (*See id.* at 162-63.)

The Proxy also included statements regarding Lightning Systems' supply chain. Lightning Systems stated it "optimize[d] [its] supply chain for quality, reliability, and cost"; had "multiple suppliers for each core component of our vehicles"; and "built an extensive ecosystem of supply-chain partners and specialty vehicle partners which are instrumental to our growth." (Compl. ¶148; Ex. 8 at 244-45, 259.) But it warned that "supply-chain disruptions from the COVID-19 pandemic" "may negatively impact revenue for 2021 as previously projected to GigCapital3." (Ex. 8 at 261.)

In addition, Gig3 expressed its belief that Lightning Systems could benefit from its Mentor-Investor approach, a sentiment repeated in a March 26, 2021 press release and its Form 10-K filed on March 31, 2021. (Compl. ¶¶150, 152, 154.) The Proxy also disclosed that during the negotiations, Gig3 had informed Lightning Systems that it "would require that Neil Miotto join the New Lightning Board as the co-chairman of the audit committee." (Ex. 8 at 155.)

### E.    Lightning's Post-Merger Performance

The Merger was approved by Gig3's stockholders on April 21, 2021, and the transaction closed on May 6, 2021. (Compl. ¶85.)

Upon the closing, nine individuals were elected to Lightning's board of directors, including Reeser, Fenwick-Smith, Katz, Dinu, and Miotto, with Katz and Dinu elected as Class III and Class II directors, respectively. (Ex. 9, Item 5.02.) Shortly after the closing, the Company announced that the board had voted to reclassify Katz and Dinu as Class I directors, requiring their re-election at the annual shareholder meeting in October, rather than the respective three- and two-year initial

7

terms they would have served as Class III and Class II directors. (Compl. ¶88.)

On May 17, 2021, Lightning reported its first quarter 2021 results and provided an outlook for full year 2021. (*Id.* ¶89.) The company reported revenues of $4.6 million, an increase of 561% over the same period the prior year, and "[d]espite supply chain headwinds," sales of 31 zero-emission commercial vehicles. (Ex. 10.) Lightning stated that it expected full year 2021 revenues to be in the range of $50 million to $60 million—down from the $63 million forecast in the Proxy. (*Id.* at 3.) It also disclosed that supply-chain delays had worsened and that it "expect[ed] supply chain delays will have a significant impact on 2021 revenue and possibly thereafter." (Ex. 11 at 6 of 22.) Lightning reiterated these views at an "Analyst Day" presentation on June 17, 2021. (Compl. ¶¶159-161.) A prospectus filed on July 8, 2021 provided an overview of Lightning's business, including a discussion of its supply-chain partners. (*Id.* ¶163; *see also* Ex. 3 at 14 (identifying dependency on suppliers as a "Risk Factor").)

Plaintiffs allege the "truth" was revealed on August 16, 2021, when Lightning announced its second-quarter results. (Compl. ¶101.) The company reported revenues of $5.9 million and a loss from operations of $17.9 million. (*Id.*; Ex. 12 at 2.) It also withdrew its prior guidance for 2021, "[p]rimarily because of unexpected chassis production disruptions and Delta-variant surges." (Compl. ¶102; Ex. 12 at 3.) Lightning's Form 10-Q, filed the same day, disclosed that Katz, Dinu, and Miotto each had terms that would expire at the conclusion of the October 7, 2021 annual meeting of shareholders and would "not be re-nominated to the Board." (Ex. 13 at 82.)

## ARGUMENT

### I.    Count I Fails to State a Claim Under Section 11 of the 1933 Act

Count I is based on allegedly false statements in Gig3's May 13, 2020 IPO Registration Statement. To state a claim under Section 11, 15 U.S.C. § 77k(a), Plaintiffs "must identify (1) a misrepresentation or an omission, that is (2) material." *Slater v. A.G. Edwards & Sons, Inc.*, 719

F.3d 1190, 1196 (10th Cir. 2013). "Section 11 claims are governed by Rule 8's notice pleading standard," although the heightened pleading requirements of Rule 9(b) may apply to "claims premised on fraud." *Exkae Ltd. v. Domo, Inc.*, 2020 WL 7352735, at *5 (D. Utah Dec. 15, 2020) (citing *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1251-52 (10th Cir. 1997)). Even under Rule 8, a complaint must be dismissed if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). Here, Plaintiffs attempt to disavow that their Section 11 claim is based on fraud, (*see* Compl. ¶205), but their other allegations belie this assertion, (*e.g., id.* ¶¶4, 133, 172). Whether viewed under Rule 8 or Rule 9, however, the Complaint does not adequately allege a materially false statement in the Registration Statement.

### A.      The Statements Are Not Actionable Under the "Bespeaks Caution" Doctrine

Plaintiffs contend that the following statements in the Registration Statement were false:

- "*We intend to apply a unique 'Mentor-Investor' philosophy* to partner with our targets where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company."

- "*We believe* that these relationships and our management team's know-how present a significant opportunity to help drive strategic dialogue, access new customer relationships and achieve global ambitions *following the completion of our initial business combination*."

- "We are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion."

- "*We will prioritize* entities with well-established, proven and talented management teams that wish to continue to drive their companies to growth and are eager to *succeed with support from an interactive and hands-on board of directors*."

(Compl. ¶¶132, 206; Ex. 1 at 2, 79-80 (emphases added).)

Each of these statements pertains to Gig3's future intentions with respect to its merger target. The Tenth Circuit has adopted the "bespeaks caution" doctrine, under which forward-

9

looking statements such as this are "considered immaterial" when accompanied by "sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect." *Grossman v. Novell, Inc*., 120 F.3d 1112, 1120 (10th Cir. 1997). The doctrine "provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Id*. (quoting *In re Worlds of Wonder Sec. Litig*., 35 F.3d 1407, 1413 (9th Cir. 1994)).

Here, the challenged statements plainly were forward-looking: as the Complaint itself alleges, these statements "emphasized the Gig Defendants' *intent* to stay significantly involved with whatever target company was chosen *following the closing of an initial business combination*." (Compl. ¶132 (emphases added).) *See In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1256 (N.D. Cal. 2019) (recognizing that "[a]n 'intention' to do something is forward-looking"); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 178 (D.R.I. 2003) (verb "intend" serves as a disclaimer to investors not to rely on the statement as an assertion of present fact).

Further, these statements were accompanied by specific risk disclosures and cautionary language. (Ex. 1 at 60, 85.) The Gig3 Defendants would not control the target post-Merger and could not guarantee that its management or board would support the Gig3 Defendants' continued involvement. The Registration Statement previewed this possibility, warning that "[t]he future role of members of our management team, if any, in a post-transaction company cannot presently be stated with any certainty"; "members of our management team may not become a part of the post-transaction company's management team or serve it in advisory positions"; and "it is also not certain whether one or more of our directors will remain associated with the post-transaction company in some capacity following our initial business combination." (*Id.* at 85.) Given these

10

cautionary statements on the subject at issue, the statements are not actionable. *See Grossman*, 120 F.3d at 1122 (affirming dismissal under "bespeaks caution" doctrine where registration statement contained risk disclosures on subject matter of forward-looking statements).[3]

### B.    Plaintiffs Do Not Plausibly Allege the Statements Were False

Even if the statements were not subject to the "bespeaks caution" doctrine (they are), they still would not be actionable because the Complaint does not plead facts showing they were false when made—that is, that as of May 2020, the Gig3 Defendants did not actually intend to continue to be involved in the target post-Merger. According to Plaintiffs, what the Gig3 Defendants really intended was "to close an initial business combination, reap their profits," and then move on to "their next SPAC venture." (Compl. ¶133.) But the Complaint does not allege any facts supporting this bald assertion. Plaintiffs note that, shortly after the Merger closed, Katz's and Dinu's directorships were shortened to last only until October 7, 2021. (*See id.*) Yet that decision was made by Lightning's full board, which Katz and Dinu did not control. There are no factual allegations that over a year earlier (when Lightning Systems was still unknown to them), they did not intend to stay involved with the eventual merger target for a longer period.

Plaintiffs also allege that Lightning disclosed on August 10, 2021 that "***none*** of the three GigCapital board members—Miotto, Dinu, or Katz—would stand for re-election," implying Miotto, Dinu, and Katz independently made that decision. (*Id.*) In fact, Lightning disclosed that "***the board of directors . . . voted***" to adopt a slate with different people, so Katz, Dinu, and Miotto would "***not be re-nominated*** to the Board." (Ex. 13 at 82 (emphases added).) The Complaint is silent as to why the board voted this way. In any event, these events say nothing about the Gig3

---

[3] The challenged statements—little more than "vague aspirations for the future"—also are nonactionable "puffery" because they are "too general to cause a reasonable investor to rely on [them] when making an investment decision." *See Grossman*, 120 F.3d at 1119, 1121 (statements about merger presenting a "compelling set of opportunities" and about "leveraging our combined knowledge" were "puffery").

11

Defendants' intent 14 months earlier. *See Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 295 (S.D.N.Y. 2020) ("A plaintiff may not plead a Section 11 claim 'with the benefit of 20/20 hindsight' or base the claim on a 'backward-looking assessment' of the registration statement.").

Plaintiffs' hypothesis is even more implausible given the Gig3 Defendants' track record. The GigCapital team tried to ensure its post-Merger involvement through the election of Katz, Dinu, and Miotto on Lightning's board. (Ex. 9, Item 5.02.) And as part of the deal, Gig3 negotiated that Lightning Systems accept Miotto as co-chairman of the audit committee after the Merger. (Ex. 8 at 155.) Further, the Gig3 Defendants have stayed involved with other targets post-de-SPAC for many years. (*See supra* p. 4.) These facts directly contradict Plaintiffs' premise that the Gig3 Defendants intended to exit at the earliest opportunity. Thus, under Rule 8, the Complaint's allegations do not support a plausible inference that these statements were false when made.[4]

## II.    Count II Fails to State a Claim Under Section 15 of the 1933 Act

Count II attempts to state a claim for "control person" liability under Section 15 of the 1933 Act.[5] To state a prima facie claim under Section 15, plaintiffs must plausibly allege (1) a primary violation of Section 11, and (2) "control over the primary violator by the alleged controlling person." *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1131 (D. Colo. 2017).

Because the Complaint does not allege a primary violation of Section 11, Count II should be dismissed. *See Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1303 (10th Cir. 2018).

---

[4] Additionally, Plaintiffs do not assert that the Gig3 Defendants did not actually believe the second statement above—"*[w]e believe* that these relationships and our management team's know-how present a significant opportunity")—and thus do not allege this statement of opinion was false. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-86 (2015); *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1159 (10th Cir. 2015).

[5] Under Section 15, a "controlling person" is jointly and severally liable with a "controlled person" who violates Section 11, "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77*o*(a); *see also Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304-05 (10th Cir. 1998).

Count II should be dismissed as to GigCapital Global for the additional reason that it is a brand name, not a "person" subject to liability under the securities laws. *See* 15 U.S.C. § 77b(a)(2). (*See supra* p. 3.) And Count II should be dismissed as to GigFounders for the additional reason that Plaintiffs do not allege facts showing that GigFounders controlled Gig3—that is, that it had the "power to direct or cause the direction of the management and policies" of Gig3. *See Medina*, 215 F. Supp. 3d at 1133-34. GigFounders did not own any Gig3 shares, (*see* Ex. 1 at 109), and while it had "an agreement for general administrative services and office space with GigCapital3," (Compl. ¶35), such an agreement does not suffice to establish "power to control." *See Maher*, 144 F.3d at 1305-06 (finding agreement insufficient for "control").

## III.    Count III Fails to State a Claim Under Section 14(a) of the 1934 Act

Count III purports to assert a claim under Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), and Rule 14a-9(a) thereunder, which prohibit false or misleading statements of material fact in a proxy statement. To state a Section 14(a) claim, a plaintiff must allege: "(1) that the proxy contained a material misrepresentation or omission; (2) that the defendant was at least negligent, and (3) that the proxy was the essential link in completing the transaction in question." *Britton v. Parker*, 2007 WL 2871003, at *8 (D. Colo. Sept. 26, 2007) (internal quotation marks omitted).

Section 14(a) claims are subject to the PSLRA, 15 U.S.C. §78u-4(b), which "was intended to eliminate some of the abuses experienced in private securities litigation," including by imposing heightened pleading standards on plaintiffs. *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258-59 (10th Cir. 2001). This means that Section 14 plaintiffs must identify "each statement alleged to have been misleading, the reason why each statement was misleading, and all relevant facts supporting that conclusion." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 638 (7th Cir. 2021). Further, courts have held that "a Section 14(a) plaintiff must plead with particularity facts that give rise to a strong inference of negligence." *See Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674,

13

683 (9th Cir. 2005).[6] And the PSLRA requires a complaint to "address negligence as to each Defendant (i.e., 'lumping together' of Defendants will not be accepted)." *In re Ocera Therapeutics, Inc. Sec. Litig*., 2018 WL 7019481, at *11 (N.D. Cal. Oct. 16, 2018).

Plaintiffs' Section 14(a) claims are based on the financial projections in the Proxy, statements about Lightning Systems' supply chain and production capacity, and statements about Gig3's belief that Lightning Systems would benefit from its "Mentor-Investor" approach. (Compl. ¶¶146-150, 223, 225.) For the reasons explained in the concurrently filed motion to dismiss of the Lightning Defendants, hereby incorporated by reference, the Complaint does not adequately allege that the financial projections or statements regarding Lightning Systems' supply chain or production capacity were actionably false. Further, as discussed below, the Complaint does not allege that the Gig3 Defendants acted negligently as to any of these statements, or that the statements about Gig3's Mentor-Investor approach were false or negligently made.

### A. Plaintiffs Do Not Allege Negligence by Each Gig3 Defendant as to Lightning Systems' Projections or Supply Chain or Production Capacity Statements

The Complaint is devoid of factual allegations that any of the *Gig3 Defendants* was negligent as to Lightning Systems' financial projections in the Proxy or the statements about its supply chain or production capacity. Relying on their CWs, Plaintiffs contend "Defendants" knew or should have known these statements were false. (Compl. ¶151(d).) But the Complaint does not allege that the CWs provided *any* information to any Gig3 Defendant. (*See id.* ¶¶110-131.)[7]

The mere fact that Gig3 had engaged in due diligence likewise does not provide a sufficient basis to infer knowledge of the details of Lightning Systems' business and establish negligence.

---

[6] *Compare Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009). This Court need not decide whether the "strong inference" pleading standard applies to allegations of negligence because, as explained below, the Complaint fails to allege negligence as to the Gig3 Defendants even under the Rule 8 plausibility standard.

[7] In fact, half of the CWs (CW-2, CW-3, and CW-5) left Lightning Systems in "spring 2020" and therefore had been gone from the company for several months before the parties even began negotiations.

14

*See, e.g.*, *In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1234 (10th Cir. 2016) (refusing to infer knowledge from membership on a committee responsible for underlying issue); *Britton v. Parker*, 2009 WL 3158133, at \*11 (D. Colo. Sept. 23, 2009) (dismissing Section 14(a) claim "in the absence of facts that would specifically demonstrate" why each defendant knew or should have known of alleged scheme). In fact, the Proxy disclosed that Lightning Systems "lowered" its projections "following the discussions with Drs. Dinu and Katz." (Ex. 8 at 155.) This suggests the opposite of negligence: to the extent Gig3 discovered facts during due diligence that it believed called Lightning Systems management's projections into question, it encouraged Lightning Systems management to revise its analysis.

Plaintiffs also note that the Proxy was issued "just days before the end of Lighting Systems' first financial quarter," (Compl. ¶151(e)), but the Complaint does not allege the Gig3 Defendants had real-time access to Lightning Systems' financial results. In any event, the projections were accompanied by a clear disclaimer that they were "provided to [Gig3] on November 29, 2020" and expressly disclaimed incorporating information obtained after that date. (Ex. 8 at 163-64.)

**B.      Plaintiffs Do Not State Viable Claims as to Mentor-Investor Statements**

Plaintiffs do not adequately allege falsity or negligence as to the statements in the Proxy about Gig3's Mentor-Investor approach. Gig3 noted that its Registration Statement had "stated that we are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion." (Compl. ¶150.) Gig3 then added:

- "[w]e believe that through our Mentor-Investment approach, we will be able to work with Lightning Systems to look for and successfully exploit opportunities for value creation";

- "Lightning Systems' intent stated to us in diligence . . . is well suited to the assistance that we provide"; and

- Lightning Systems has "substantial growth opportunity in front of it that we believe can benefit from our Mentor-Investment approach."

15

(*Id.*) As with the challenged statements in the Registration Statement, Plaintiffs contend these statements were false by pointing to Katz, Dinu, and Miotto's short tenures on Lightning's board post-Merger. (*Id.* ¶151.) These allegations do not suffice to establish material falsity.

For starters, these statements are nonactionable "puffery." (*See supra* p. 11, n.3.) *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1339 (10th Cir. 2012) (statement that "this year is really focused on integration and getting synergies from all those acquisitions" and "general, forward-looking expressions of confidence in future integration progress" nonactionable puffery); *Grossman*, 120 F.3d at 1119, 1121 (statements that merger presented a "compelling set of opportunities" and "we are leveraging our combined knowledge" nonactionable puffery).

Moreover, these statements merely expressed Gig3's opinion that Lightning could benefit from its mentorship. The Complaint nowhere alleges that the Gig3 Defendants did not actually hold that belief or did not intend to implement that approach post-Merger (subject, of course, to Lightning's willingness to accept its mentorship). *See Omnicare*, 575 U.S. at 184-86 (opinion is false or misleading only if speaker did not believe it or if it did not "fairly align[] with the information in the issuer's possession at the time").[8]

For similar reasons, the Complaint fails to adequately allege negligence. There are no allegations of fact that any of the Gig3 Defendants knew or should have known as of the Proxy that the Lightning board would vote to reclassify Katz's and Dinu's directorships shortly after the Merger and vote just a few months later not to renominate Katz, Dinu, and Miotto for the board.

## C.      Count III Should Be Dismissed as to Defendant Weightman

Count III should be dismissed as to Weightman for the additional reason that he did not

---

[8] As for the Gig3 board's opinion that, "based on a number of factors, . . . the terms of the Business Combination were fair to and in the best interests of the Company and its stockholders," (Compl. ¶226), Plaintiffs do not allege how or why this opinion was false. *See Omnicare*, 575 U.S. at 184-86; *Lane v. Page*, 581 F. Supp. 2d 1094, 1126 (D.N.M. 2008) (dismissing Section 14(a) claim based on identical statement).

"solicit or to permit the use of his name to solicit" the Proxy. 15 U.S.C. § 78n; *Britton*, 2009 WL 3158133, at *6 (dismissing Section 14(a) claim against CFO because he was "not alleged to have been responsible for either of the challenged Proxy Statements").

**IV.    Count IV Fails to State a Claim Under Section 20(a) of the 1934 Act**

Plaintiffs advance a Section 20(a) control person claim against Defendants based on the alleged Section 14(a) violation. (Compl. ¶¶232-235.)[9] Under Section 20(a), a "plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher*, 144 F.3d at 1305. Count IV should be dismissed because the Complaint fails to plead a primary violation of Section 14(a). Additionally, GigCapital Global and GigFounders are not controlling persons. (*See supra* pp. 12-13.)

**V.    Count V Fails to State a Claim Under Section 10(b) of the 1934 Act**

To state a claim under Section 10(b) of the 1934 Act and Rule 10b-5 thereunder, a plaintiff must allege that (i) the defendant made a false or misleading statement of material fact; (ii) with scienter; (iii) in connection with the purchase or sale of a security; (iv) upon which the plaintiff relied; (v) suffering an economic loss; and (vi) the material misrepresentation was the cause of the plaintiff's loss. *Anderson v. Spirit Aerosys. Holdings, Inc.*, 827 F.3d 1229, 1236-37 & n.4 (10th Cir. 2016). Further, a plaintiff must meet the PSLRA's stringent pleading standards for securities fraud actions in general and for scienter allegations in particular. *See City of Philadelphia*, 264 F.3d at 1258; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-22 (2007).

As noted, the PSLRA requires a complaint to "specify each statement alleged to have been misleading" and further specify "the reason or reasons why the statement is misleading." *Tellabs*,

---

[9] Section 20(a) of the 1934 Act makes a "controlling person" jointly and severally liable with a "controlled person" for primary violations of the 1934 Act, including Sections 10(b) and 14(a), "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a); *see also Maher*, 144 F.3d at 1304-05.

551 U.S. at 321 (quoting 15 U.S.C. § 78u-4(b)(1)); *see also Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1188 (10th Cir. 2003). Additionally, the PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference" of scienter—that is, a strong inference of "intent to deceive, manipulate, or defraud" investors. 15 U.S.C. § 78u-4(b)(2); *City of Philadelphia*, 264 F.3d at 1262. "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." *Weinstein v. McClendon*, 757 F.3d 1110, 1113 (10th Cir. 2014) (quoting *Tellabs*, 551 U.S. at 324). Moreover, not only must any inference of scienter be "strong," it also must be "at least as compelling as any opposing inference." *Anderson*, 827 F.3d at 1237 (quoting *Tellabs*, 551 U.S. at 314). This means courts must weigh competing inferences of scienter at the pleading stage and determine their relative strength. *Tellabs*, 551 U.S. at 324; *see also Anderson*, 827 F.3d at 1248 (courts "must 'compare the parties' dual explanations'" and "decide which is more cogent and compelling"). As Count V fails to meet these stringent requirements, it should be dismissed.

### A.    Plaintiffs Fail to State a Claim Based on the Registration Statement

As explained above, the Complaint fails to allege that any of the challenged statements in Gig3's IPO Registration Statement—all of which relate to Gig3's Mentor-Investor approach—was materially false or misleading at the time it was made. (*See supra* pp. 11-12.)

The Complaint also fails to allege any facts—much less particularized facts—giving rise to a strong inference of scienter. It simply recounts that, five days after the Merger, Lightning announced that Katz and Dinu had been reclassified as Class I directors and asserts that, on August 16, 2021, Lightning disclosed that Katz, Dinu, and Miotto "would not be running for re-election." (Compl. ¶171.) This allegation misstates the August 16 disclosure, which actually said that Katz, Dinu, and Miotto "*will not be re-nominated to the Board.*" (Ex. 13 at 82 (emphasis added).) These post-Merger decisions by Lightning's board—which the board could make irrespective of Katz,

Dinu, or Miotto's wishes or intentions—do not support a strong inference that the Gig3 Defendants intended to defraud investors by describing their Mentor-Investor approach months earlier, before Lightning Systems was even a target.

This is particularly true given that Gig3's experience with Lightning stands in sharp contrast to the Gig3 Individual Defendants' long-term involvement in other companies after de-SPAC mergers. (*See supra* p. 4.) The only inference to be drawn from these facts—and certainly the more compelling inference—is the innocent one: the Gig3 Defendants intended to stay involved in the company, but Lightning decided to go in a different direction after the Merger. *See Anderson*, 827 F.3d at 1237 (affirming dismissal for failure to adequately allege scienter: "Our task is to determine whether the inference arising from the plaintiffs' scienter allegations is cogent and compelling when compared to the defendants' suggested inference.").

While this is true as to all the Gig3 Defendants, it is even more so as to GigCapital Global, GigFounders, Weightman, Betti-Berutto, Wang, and Mikulsky. Plaintiffs must allege a "strong inference" of scienter with respect to *each* defendant. *See Zhang v. Lifevantage Corp.*, 2017 WL 2599883, at *10 (D. Utah June 15, 2017); *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015). The Complaint does not even attempt to allege that each of these Defendants knew in May 2020 that Katz, Dinu, and Miotto supposedly did not intend to remain involved post-Merger.

### B.    Plaintiffs Fail to State a Claim Based on the December 10, 2020 Statements

Plaintiffs challenge statements in a December 10, 2020 press release and analyst call later that day. As to the press release, Plaintiffs challenge statements regarding Lightning's "high revenue visibility" underlying its revenue projections, its production capacity projections, and a statement attributed to Reeser that "[t]he capital raised in this transaction will enable Lightning to accelerate its growth plans and fulfill significant demand from our customers." (Compl. ¶¶134-136.) As set forth in the Lightning Defendants' motion to dismiss, hereby incorporated by

reference, the Complaint does not adequately allege these statements were false.

Further, the Complaint fails to allege particularized facts giving rise to a strong inference of scienter as to *each* of the Gig3 Defendants as to these statements about *Lightning Systems'* pre-Merger business. Plaintiffs rely primarily on their CWs. But even assuming that the CW accounts sufficed to show that *Lightning Systems'* management knew its revenue and production projections were not achievable (which they do not), none of the CWs is alleged to have had any interactions with, or provided any information whatsoever to, any of the Gig3 Defendants. (Compl. ¶¶110-131.) *See Ellis*, 2018 WL 1583837, at *12 (dismissing claims for failure to allege scienter where "none of the confidential witnesses is alleged to have had any contact or communicated with either Individual Defendant regarding anything alleged in the [complaint]").

Plaintiffs imply that the Gig3 Defendants should have known Lightning Systems' projections were not achievable because they performed due diligence. (Compl. ¶176.) But the Complaint does not allege a single piece of information obtained in due diligence that revealed the projections to be false. "[T]he Tenth Circuit has rejected the notion that knowledge may be imputed to a high-ranking corporate officer because of his or her position alone." *Ellis*, 2018 WL 1583837, at *5; *see also City of Philadelphia*, 264 F.3d at 1264. The requested inference is even more attenuated here, as the Gig3 Defendants were *outsiders* to Lightning Systems. Moreover, the fact that Gig3 caused Lightning Systems to revise its projections downward (Ex. 8 at 155) contradicts the notion that the Gig3 Defendants intended to defraud investors with inflated projections.[10]

As to the analyst call, Plaintiffs challenge certain statements made by Reeser, Fenwick-

---

[10] Plaintiffs point to the fact that Gig3 did not obtain more private-investment-in-public-equity ("PIPE") financing for the Merger as evidence of scienter. (Compl. ¶¶177-178.) But all the facts relating to Defendants' efforts to get PIPE financing were disclosed in detail in the Proxy. (*See, e.g.*, Ex. 8 at 143-44, 148-53, 168-69.) This shows the opposite of an intent to defraud. *Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019) (no intent to defraud where "investors were appraised of the relevant information").

Smith, and Dinu. (Compl. ¶¶135-138.) First, the Gig3 Defendants cannot be held liable for the statements made by Reeser and Fenwick-Smith, and only Dinu can be held liable for her own statements. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (only the *maker* of a statement—the person with "ultimate authority over the statement, including its content and whether and how to communicate it"—can be liable for that statement).

Second, Dinu's forward-looking statement about Gig3's intent to seek opportunities to partner with companies "for the long-term" is not actionable. *Jedrzejczyk v. Skillz Inc.*, 2022 WL 2441563, at *5 (N.D. Cal. July 5, 2022) (statements that were "merely alternative ways of declaring or reaffirming" future objective not actionable under PSLRA safe harbor for forward-looking statements) (quoting *Wochos v. Tesla Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021))).[11] As for Dinu's statement that Lightning Systems had "the best revenue visibility" and could "quickly scale revenues," (Compl. ¶136), again, there are no particularized facts showing that Dinu did not believe these things to be true based on information obtained from Lightning Systems during due diligence, and thus no allegations sufficient to plead falsity or scienter.[12]

### C.    Plaintiffs Fail to State a Claim Based on the January 4, 2021 Slide Deck

On January 4, 2021, Gig3 filed with the SEC a slide deck titled "Lightning: Opportunity Overview." (Ex. 6.) Plaintiffs challenge statements that: (i) Lightning Systems had "Robust Contracts with Financial Visibility," including "100% of 2021 revenue forecast contracted as of Q3 2020"; (ii) Lightning had "added and built additional redundancies into the supply chain . . . to mitigate supply-chain risk"; and (iii) listing "Amazon" on a slide titled "Select Key Customers."

---

[11] Nor do Plaintiffs adequately allege falsity or scienter as to this statement. (*See supra* pp. 11-12, 19.)

[12] Plaintiffs allege that Dinu stated Lightning Systems had capacity to build 1,000 vehicles per year, while the Proxy said that Lightning only had capacity to build 500 vehicles. (Compl. ¶¶136, 139(d).) Even if Dinu was mistaken, the Complaint does not allege a plausible inference, never mind a strong inference, of scienter. Dinu had nothing to gain by misleading investors about Lightning Systems' production capacity in December 2020 and then revealing the true facts in March 2021, before the Merger vote.

21

(Compl. ¶¶140-142 (emphases omitted).) In contending these statements were knowingly false, Plaintiffs rely on their CWs. (*Id.* ¶143.) But even if the CW allegations were sufficient to show falsity and scienter for the Lightning Defendants, they say nothing about what was known to the Gig3 Defendants and do not support any inference of scienter. *See Ellis*, 2018 WL 1583837, at \*5.

### D.       Plaintiffs Fail to State a Claim Based on the January 12, 2021 Slide Deck

Plaintiffs attack statements in a January 12, 2021 slide deck regarding GigCapital's Mentor-Investor strategy. (Compl. ¶¶144-145.) The Lightning board's decisions post-Merger shed no light on the Gig3 Defendants' intent, as part of their investment strategy, to "participat[e] actively" in target company boards, "[p]rovide continuous Financing and M&A advisory," or "provide continued support and guidance." (*See supra* pp. 11-12.) Their continued involvement in other companies dispels any inference of falsity or fraudulent intent. (*See supra* pp. 4, 12.)

### E.       Plaintiffs Fail to State a Claim Based on the March 2021 Proxy

Plaintiffs do not adequately allege that the challenged statements in the Proxy were false. (*See supra* p. 14.) Nor do they adequately allege scienter. Besides the deficient allegations about board tenure, due diligence, and CWs, Plaintiffs allege the Gig3 Defendants had a financial motive to have the Merger approved. (*E.g.*, Compl. ¶¶47-48.) But as Plaintiffs concede, these motives are inherent in all SPAC transactions. (*Id.* ¶49.) "[G]eneralized motives shared by all companies" are insufficient for pleading scienter. *City of Philadelphia*, 264 F.3d at 1269. In the context of SPACs, "if scienter could be pleaded on that basis alone, virtually every [de-SPAC] company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Id.* (quotation omitted).

Further, the inference of scienter is implausible. When the proposed merger was announced on December 10, 2020, Gig3 still had 11 months to complete a business combination. (Compl. ¶54; Ex. 7 at 18.) Thus, it was not under time pressure to close and could continue to explore other

targets if it believed Lightning Systems would not be a good investment. Indeed, given the lock-up agreement, the Gig3 Defendants had a significant personal financial incentive to ensure that any merger would be successful in the long term. Courts have held in analogous circumstances that an executive's investment in the company's stock undermines any claimed inference of scienter. *See, e.g.*, *City of Philadelphia*, 264 F.3d at 1270; *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 153 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).

### F.       Plaintiffs Fail to State a Claim Based on the March 26, 2021 Press Release

As to the March 26, 2021 press release, Plaintiff challenge one statement by Reeser and one statement by Dinu: "The GigCapital team stays true to our Mentor Investor mission partnering with the exceptional management team of Lightning through the IPO and beyond, as we continue to build together a solid company to last." (Compl. ¶152; Ex. 14.)[13] As explained, the Complaint does not allege facts showing that Dinu's statement of puffery is actionable or false. Nor does the Complaint allege particularized facts giving rise to a strong inference of scienter. Indeed, Plaintiffs' scienter theory is nonsensical. By their account, the Gig3 Defendants intended to "use the additional credibility gained from having successfully completed another 'de-SPAC' transaction to attract more investors into their next SPAC venture." (Compl. ¶153(a).) But the fact that Katz, Dinu, and Miotto were on Lightning' board for only a few months was disclosed to the market. If the Mentor-Investor approach was important to potential investors in GigCapital SPACs, this would *undermine* their ability to attract future investors.

### G.       Plaintiffs Fail to State a Claim Based on Gig3's 2020 Form 10-K

Plaintiffs attack a similar statement in Gig3's Form 10-K filed on March 31, 2021 regarding the Gig3 Defendants' forward-looking intent to apply the Mentor-Investor approach. (Compl.

---

[13] As noted, the Gig3 Defendants cannot be held liable for statements made by Reeser, and only Dinu can be held liable for statements attributed to her. (*See supra* p. 21.)

¶154.) The Section 10(b) claim as to this statement fails for the reasons discussed.

### H. Plaintiffs Fail to State a Claim Based on the Post-Merger Statements

Plaintiffs also challenge several statements made post-Merger. GigCapital Global, GigFounders, Weightman, Betti-Berutto, Wang, and Mikulsky did not have any involvement with Lightning post-Merger; therefore, they cannot be liable for any of these statements.

Although Katz, Dinu, and Miotto served on Lightning' board, they too cannot be liable for statements made by (and specifically attributed to) Lightning management. *See Janus*, 564 U.S. at 142. With respect to the group-published statements at issue, which concern Lightning's ability to manage supply-chain issues (*see* Compl. ¶¶156, 163, 164), Plaintiffs fail to plead a strong inference of scienter as to Katz, Dinu, or Miotto. *See Croker v. Carrier Access Corp.*, 2006 WL 2035366, at *10 (D. Colo. July 18, 2006) (demonstration of scienter for group published statements requires proof that each individual defendant was aware of the purportedly contrary facts).[14]

Again, Plaintiffs rely on their CWs. (Compl. ¶¶155, 165.) But the CWs still at Lightning in May and July 2021—CW-6 and possibly CW-1 (the Complaint ambiguously alleges that CW-1 remained at the company until "mid-2021")—were, respectively, a "senior technician" and a "field service technician." (*Id.* ¶¶110, 130.) Neither is alleged to have reported directly to Lightning senior management, much less to have provided information to Lightning's outside directors. *See Ellis*, 2018 WL 1583837, at *9 (finding confidential witness allegations insufficient to allege a strong inference of scienter where they "require the reader to assume that this information somehow made its way to [the individual defendants]"). Further, the Complaint does not even attempt to allege any motive to defraud on the part of Katz, Dinu, or Miotto at this time post-Merger; nor could it, given the lock-up agreement. (Compl. ¶50.)

---

[14] For the reasons set forth in the Lightning Defendants' motion to dismiss, hereby incorporated by reference, Plaintiffs do not adequately allege the challenged post-Merger statements were false.

24

**VI.    Count VI Fails to State a Claim Under Section 20(a) of the 1934 Act**

Under Count VI, Plaintiffs assert that all Defendants (except Lightning) are secondarily liable as controlling persons for the alleged Section 10(b) violations. (Compl. ¶¶249-257.) The claim fails absent primary violations. Moreover, GigCapital and GigFounders are not liable under Section 20(a) for the reasons discussed. (*See supra* pp. 13, 17.)

Additionally, Plaintiffs fail to plead facts showing that the Gig3 Defendants controlled any of the statements about Lightning Systems. There are no factual allegations that, either before or after the Merger, the Gig3 Defendants "individually exerted control or influence over the day-to-day operations" of the company so as to control the accuracy of the information provided by Lightning about its business. *Adams*, 340 F.3d at 1108. After the Merger, Katz, Dinu, and Miotto (the only Gig3 Defendants involved at all with Lightning) were outside directors with no operational, financial, or managerial role. (*See* Compl. ¶¶27-30.) *See Adams*, 340 F.3d at 1108 ("The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act.").

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed as to the Gig3 Defendants.

25

Dated:  June 14, 2023                         Respectfully submitted,

                                              DLA PIPER LLP (US)

                                              *s/ Melanie E. Walker*
                                              Melanie E. Walker
                                              Gaspard Rappoport
                                              2000 Avenue of the Stars
                                              Suite 400 North Tower
                                              Los Angeles, CA 90067
                                              (310) 595-3000
                                              E-mail: melanie.walker@us.dlapiper.com
                                              gaspard.rappoport@us.dlapiper.com

                                              and

                                              David Freeburg
                                              701 Fifth Avenue Suite 6900
                                              Seattle, WA, 98104
                                              (206) 839-4811
                                              E-mail: david.freeburg@us.dlapiper.com

                                              *Attorneys for Defendants*
                                              *GigAcquisitions3, LLC, GigFounders, LLC,*
                                              *GigCapital Global, Avi S. Katz, Raluca Dinu,*
                                              *Neil Miotto, Brad Weightman, John Mikulsky,*
                                              *Andrea Betti-Berutto, and Peter Wang*

26

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 14, 2023, I electronically filed the foregoing Motion to Dismiss Plaintiffs' Consolidated Complaint with Incorporated Memorandum of Law with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Melanie E. Walker*
Melanie E. Walker