# EXHIBIT 1

424B4 1 d870995d424b4.htm 424B4

**Table of Contents**

**Filed pursuant to Rule 424(b)(4)**
**Registration No. 333-236626**

**Prospectus**

# $200,000,000



# GigCapital3, Inc.

## 20,000,000 Units

GigCapital3, Inc., a Delaware corporation (the "Company"), is a newly organized Private-to-Public Equity (PPE)$^{TM}$ company, also known as a blank check company or special purpose acquisition company, formed for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or similar business combination with one or more businesses, which we refer to throughout this prospectus as our "initial business combination." We have not identified any potential business combination target and we have not, nor has anyone on our behalf, initiated any substantive business discussions, directly or indirectly, with any potential business combination target. Our efforts to identify a prospective target business will not be limited to a particular industry or geographic region, although we intend to focus on companies in the technology, media, and telecommunications industry.

This is an initial public offering of our securities. We are offering 20,000,000 units at an offering price of $10.00 each. Each unit consists of one share of our common stock, par value $0.0001 per share ("Common Stock"), and three-fourths (3/4) of one redeemable warrant. We refer herein to the units sold in this offering as our "public units," and the components thereof as our "public shares" and "public warrants," respectively. Each whole warrant entitles the holder to purchase one share of Common Stock at a price of $11.50 per share. Each warrant will become exercisable on the later of 30 days after the completion of our initial business combination, or 12 months from the closing of this offering and will expire on the fifth anniversary of the completion of our initial business combination, or earlier upon redemption or liquidation as described in this prospectus. Warrants will only be exercisable for whole shares. As a result, you must purchase at least four units in order to validly exercise your warrants. We have also granted the underwriters, Nomura Securities International, Inc. ("Nomura"), Oppenheimer & Co. Inc. ("Oppenheimer") and Odeon Capital Group LLC ("Odeon"), a 45-day option to purchase up to an additional 3,000,000 units solely to cover over-allotments, if any.

We will provide the purchasers of our public units, or our "public stockholders," with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account described below as of 2 business days prior to consummation of the initial business combination, including interest (which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares, subject to the limitations described herein. If we are unable to complete our initial business combination within 18 months from the closing of this offering, we will redeem 100% of the public shares at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including the interest (which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares, subject to applicable law and as further described herein.

Our sponsor, GigAcquisitions3, LLC, a Delaware limited liability company ("Sponsor"), and the underwriters have committed, pursuant to written agreements, to purchase an aggregate of 893,479 units, at $10.00 per unit in a private placement that will close simultaneously with this offering. Each such unit consists of one share of our Common Stock and three-fourths (3/4) of one redeemable warrant. We refer to these units throughout this prospectus as the "private units" and the shares of Common Stock included therein as the "private shares," and

Table of Contents

with ninety-four percent (94%) of the data center traffic coming from the cloud, and the global datasphere is projected to grow to 175 Zettabytes by 2025.[2] We believe that data has become a valuable asset and managing, and deriving insights from, data can transform customer experience, operational processes and business models. We believe that embracing today's digital transformation and experience enables both organic and inorganic fast pace growth, creating new strategic, operational and business opportunities fueled by emerging cloud, analytics, big data, and cognitive technologies. Being conscientious corporate citizens, we will focus on sustainable technology companies that can shape a better society and healthier environment. We intend to evaluate both private and public companies as potential initial business combination targets, focusing on opportunities that we believe would provide appropriate risk adjusted returns to stockholders. Following our initial business combination, our objective will be to implement or support the acquired company's operating strategies in order to generate additional value for stockholders. General goals may include additional acquisitions and operational improvements.

Our management team has significant hands-on experience helping TMT companies optimize their existing and new growth initiatives by exploiting insights from rich data assets that already exist within most TMT companies. We intend to apply a unique "Mentor-Investor" philosophy to partner with our targets where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company. Further, we intend to share best practices and key learnings, gathered from our management team's operating and investing experience, as well as strong relationships in the TMT industry, to help shape corporate strategies. Additionally, our management team has operated and invested in leading global TMT companies across their corporate life cycles and has developed deep relationships with key large multi-national organizations and investors. We believe that these relationships and our management team's know-how present a significant opportunity to help drive strategic dialogue, access new customer relationships and achieve global ambitions following the completion of our initial business combination.

Over the last several years, there has been an increase in private equity and venture backed capital invested in TMT companies. PricewaterhouseCoopers LLP ("PwC") estimates that global venture capital investment in 2019 resulted in a total of approximately $213 billion invested in 15,564 deals worldwide, with companies in the technology sectors receiving most of the investment.[3] This was an increase over the approximately $207 billion that PwC estimated was invested in 14,247 deals worldwide in 2018.[4] The total number of U.S. initial public offerings ("IPOs") in 2019 was approximately 165, which was a decrease of 20% from 2018.[5] Median deal size of IPOs was approximately $100 million for the third year in a row, and slightly up from 2018.[6] However, 9 IPOs raised over $1 billion, and the 10 largest IPOs raised $22 billion, or nearly half of total proceeds, as 2019 saw a number of mega unicorns (companies valued at $1 billion or more) conduct their IPOs.[7] Furthermore, 2019 was

---

[2] Statista, Global data center IP traffic 2012-2021, by data center type, (March 2020); IDC White Paper, The Digitization of the World - From Edge to Core, (Nov. 2018).

[3] PwC / CBInsights MoneyTree™ Report Q4 2019.

[4] PwC / CBInsights MoneyTree™ Report Q4 2018.

[5] EY, Global IPO Trends: Q4 2019. Compare to Renaissance Capital which estimates that there were 159 U.S. IPOs in 2019. Renaissance Capital, US IPO Market 2019 Annual Review.

[6] Renaissance Capital, US IPO Market 2019 Annual Review.

[7] Renaissance Capital, US IPO Market 2019 Annual Review.

**Table of Contents**

the largest year ever for both the numbers of blank check companies conducting IPOs and the amount of proceeds raised by such companies, with 59 IPOs of blank check companies that raised $13.6 billion.[8] As a result of the increased number of blank check company IPOs, blank check company IPOs represented a larger percentage of the IPOs in 2019 than in the prior ten years.[9] In addition, the number of blank check IPOs (59) exceeded the number of technology IPOs (52) in the U.S. in 2019.[10] Of the 59 IPOs that were conducted by blank check companies in 2019, approximately 20.2% were focused on TMT, and those companies raised approximately $2.7 billion in their IPOs.[11] In light of these market conditions, we intend to primarily focus our target sourcing efforts on private companies that we believe would benefit from a public listing and that are not otherwise gaining access to public capital in this current market environment. Furthermore, we believe that we are providing an interesting alternative investment opportunity that capitalizes on key trends impacting the capital markets for TMT companies.

We believe that our management team is well positioned to identify attractive businesses within the TMT industry that would benefit from access to the public markets and the skills of our management team. Our objective is to consummate our initial business combination with such a business and enhance stockholder value by improving its operational performance. We believe we can achieve this objective by utilizing our management team's extensive experience in both TMT industry transactions and operating TMT companies in combination with our management team's network of contacts in the TMT industry. We believe many companies in the TMT industry could benefit from access to the public markets but have been unable to do so due to a number of factors, including the time it takes to conduct a traditional IPO, market volatility and pricing uncertainty. We intend to focus on evaluating more established companies with leading competitive positions, strong management teams and strong long-term potential for revenue growth and margin expansion.

Our Sponsor, GigAcquisitions3, LLC, was founded and is managed by and affiliated with Dr. Avi S. Katz, who is also the Executive Chairman of our board of directors ("Board of Directors"), and our Chief Executive Officer, President and Secretary. Dr. Katz has spent approximately 33 years in international executive positions within the TMT industry, working for privately held start-ups, middle-cap companies and large enterprises. In these roles, Dr. Katz has been instrumental in launching and accelerating entities, building teams, large scale fund-raising, developing key alliances and technology partnerships, M&A activities, business development, financial management, global operations and sales and marketing. In October 2017, Dr. Katz founded GigCapital, Inc. ("GIG1"), a Private-to-Public Equity (PPE) company formed for the purpose of acquiring a company in the technology industry. GIG1 completed its initial public offering in December 2017, in which it sold 14,375,000 units at price of $10.00 per unit, with each unit consisting of one share of GIG1 common stock, three-fourths (3/4) of one warrant to purchase one share of GIG1 common stock and one right to receive one-tenth (1/10) of one share of GIG1 common stock, generating aggregate proceeds of $143,750,000, and, at that time, was listed on the NYSE under the symbol "GIG." On February 22, 2019, after intensive screening of more than 400 companies worldwide, GIG1 entered into a stock purchase agreement to acquire Kaleyra S.p.A., a company with shares formed under the laws of Italy ("Kaleyra"), at a transaction enterprise value of $187 million with combined cash and/or promissory note consideration of $15 million. Kaleyra is a global company specialized in providing mobile messaging services for financial institutions and companies of all sizes. The transaction closed on November 25, 2019, and GIG1 was renamed Kaleyra, Inc. and listed on the NYSE American stock exchange under the symbol "KLR" at that time. Dr. Katz has served as the Executive Chairman of Kaleyra, Inc. since the consummation of the transaction in November 2019. In March 2019, Dr. Katz founded GigCapital2, Inc. ("GIG2"), a Private-to-Public Equity (PPE) company formed for the purpose of acquiring a company in the TMT industry. GIG2 completed its initial public offering in June 2019, in which it sold 17,250,000 units at a per unit

---

[8]  Barrons, *2019 Was a Record Year for 'Blank-Check' Companies. Here Are the Biggest Trends.*, (Feb. 6, 2020).
[9]  Renaissance Capital, US IPO Market 2019 Annual Review.
[10] EY, Global IPO Trends: Q4 2018. CBInsights, The 2019 Tech IPO Pipeline.
[11] SPAC Research, SPACs: By The Numbers, (Feb. 2020).

**Table of Contents**

|  |  |
|---|---|
|  | If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In making such determination, our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of warrant shares issuable upon exercise of outstanding warrants. In such event, the holder would pay the exercise price by surrendering the warrants for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of warrant shares underlying the warrants to be so exercised, and the difference between the exercise price of the warrants and the fair market value by (y) the fair market value. |
|  | No fractional shares of Common Stock will be issued upon redemption. If, upon redemption, a holder would be entitled to receive a fractional interest in a share, we will round down to the nearest whole number of the number of shares of Common Stock to be issued to the holder. |
| **Indication of interest** | The Anchor Investors have indicated to us an interest to purchase up to 1,739,130 (or 2,000,000 if the over-allotment option is exercised in full) public units at $10.00 per unit in this offering and we have agreed to direct the underwriters to sell to the Anchor Investors such number of public units. There can be no assurance that the Anchor Investors will acquire any public units in this offering. |
|  | The Anchor Investors will not have any rights to the funds held in the trust account beyond the rights afforded to our public stockholders, as described herein. |
| **Founder Shares and Insider Shares** | In February 2020, our Sponsor purchased 5,735,000 founder shares for an aggregate purchase price of $25,000, or $0.0044 per share. Up to 750,000 founder shares are subject to forfeiture depending on the extent to which the underwriters' over-allotment option is exercised during this offering. |
|  | The number of founder shares, and the forfeiture mechanism underlying the founder shares, has been determined in order to ensure that the founder shares and insider shares will collectively represent 20% of the outstanding shares of Common Stock (excluding the private shares) upon completion of this offering and the exercise of the underwriters' over-allotment option, if any. If we increase or decrease the size of this offering pursuant to Rule 462(b) under the Securities Act, we will effect a share dividend or a share contribution back to capital, as applicable, immediately prior to the consummation of the offering, in such amount as to maintain the collective ownership of the initial stockholders, prior to this offering at approximately 20% of our issued and outstanding shares of Common Stock (excluding the private shares) upon the consummation of this |

13

**Table of Contents**

|  |  |
|---|---|
|  | offering. Prior to the investment in the Company of an aggregate of $25,000 by our Founder, we had no assets, tangible or intangible. |
|  | Prior to the consummation of this offering, we will issue 5,000 insider shares, solely in consideration of future services, to each of Mr. Weightman, our Vice President and Chief Financial Officer, Mr. Wang, our Software Chief Technical Officer, and Mr. Betti-Berutto, our Hardware Chief Technical Officer. |
| **Private units** | Our Sponsor and the underwriters have committed, pursuant to written agreements, to purchase an aggregate of 893,479 private units (or 969,000 private units if the underwriters' over-allotment is exercised in full) at $10.00 per unit in a private placement that will close simultaneously with this offering. |
|  | A portion of the purchase price of the private units will be added to the proceeds of this offering to be held in the trust account described below. If we do not complete our initial business combination within 18 months from the closing of this offering, the proceeds from the sale of the private units held in the trust account will be used to fund the redemption of our public shares (subject to the requirements of applicable law) and the warrants included in the private units will expire worthless. The private units are identical to the public units, except that the underlying warrants: (i) will not be redeemable by us and (ii) may be exercised for cash or on a cashless basis, as described in this prospectus, so long as they are held by our Sponsor, the underwriters or any of their respective permitted transferees. If the warrants included in the private units are held by holders other than our Sponsor, the underwriters or any of their respective permitted transferees, then the warrants included in the private units will be redeemable by us and exercisable by the holders on the same basis as the public warrants. In the event of a liquidation prior to our initial business combination, the warrants included in the private units will expire worthless. |
|  | The private units purchased by the underwriters are deemed underwriter's compensation by FINRA pursuant to Rule 5110 of the FINRA Manual. |
| **Transfer restrictions applicable to founder shares, insider shares and private units** | Except with respect to Permitted Transferees as described herein under "*Principal Stockholders*," our initial stockholders and the underwriters have agreed not to transfer, assign or sell any of their respective founder shares, insider shares, private units or any securities underlying the private units that they may hold until the date that is (i) in the case of the founder shares and insider shares, the earlier of (A) 12 months after the date of the consummation of our initial business combination or (B) subsequent to our initial business combination, (x) the date on which the last sale price of our Common |

14

Table of Contents

| | |
|---|---|
| | of the deferred underwriting commission so as to ensure that our obligation to pay the deferred underwriting commission shall not impede the closing of the initial business combination. |
| **Redemption of public shares and distribution and liquidation if no initial business combination** | We will have only 18 months from the closing of this offering to complete our initial business combination. If we are unable to complete our initial business combination within such period, we will: (1) cease all operations except for the purpose of winding up; (2) as promptly as reasonably possible but not more than ten business days thereafter, redeem the outstanding public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (less up to $100,000 of interest to pay dissolution expenses and which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law; and (3) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board of Directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants, which will expire worthless if we fail to complete our initial business combination within the 18-month time period. |
| | Our initial stockholders and the underwriters have entered into letter agreements with us, pursuant to which they have waived their rights to liquidating distributions from the trust account with respect to their founder shares, insider shares and private shares if we fail to complete our initial business combination within 18 months from the closing of this offering. However, if our Founder, executive officers or directors acquire public shares after this offering they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the 18-month time frame. The underwriters have agreed to waive their rights to their deferred underwriting commissions held in the trust account in the event we do not complete our initial business combination within 18 months from the closing of this offering and, in such event, such amounts will be included with the funds held in the trust account that will be available to fund the redemption of our public shares. |
| **Conflicts of Interest** | If any of our officers or directors becomes aware of a business combination opportunity that falls within the line of business of any entity to which he or she has fiduciary or contractual obligations, he or she may be required to present such business combination opportunity to such entity prior to presenting such business |

26

**Table of Contents**

If our stockholders want us to hold an annual meeting prior to our consummation of a business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

**We may reincorporate in another jurisdiction in connection with our initial business combination and such reincorporation may result in taxes imposed on stockholders.**

We may, in connection with our initial business combination, reincorporate in the jurisdiction in which the target company or business is located or in another jurisdiction. The transaction may require a stockholder to recognize taxable income in the jurisdiction in which the stockholder is a tax resident or in which its members are resident if it is a tax transparent entity. We do not intend to make any cash distributions to stockholders to pay such taxes. Stockholders may be subject to withholding taxes or other taxes with respect to their ownership of us after the reincorporation.

**Our ability to successfully effect our initial business combination and to be successful thereafter will be largely dependent upon the efforts of our executive officers and directors, some of whom may join the post-transaction company following our initial business combination. The loss of our executive officers or directors could negatively impact the operations and profitability of our business.**

Our operations are dependent upon a relatively small group of individuals and, in particular, our executive officers and directors. We believe that our success depends on the continued service of our executive officers and directors, at least until we have consummated our initial business combination. In addition, our executive officers and directors are not required to commit any specified amount of time to our affairs and, accordingly, will have conflicts of interest in allocating management time among various business activities, including identifying potential business combinations and monitoring the related due diligence. We do not have an employment agreement with, or key-man insurance on the life of, any of our directors or executive officers. The unexpected loss of the services of one or more of our directors or executive officers could have a detrimental effect on us. Additionally, we do not intend to have any full-time employees prior to the consummation of our initial business combination.

The role of such persons in the target business following the initial business combination, however, cannot presently be ascertained. Although some of such persons may remain with the post-transaction company in senior management or advisory positions following our initial business combination, it is likely that some or all of the management of the target business will remain in place. While we intend to closely scrutinize any individuals we engage after our initial business combination, our assessment of these individuals may not prove to be correct. These individuals may be unfamiliar with the requirements of operating a company regulated by the SEC, which could cause us to have to expend time and resources helping them become familiar with such requirements.

Our officers and directors also hold roles in other companies. For example, there is significant overlap among the directors and officers of GIG2 and our company. Dr. Katz, our Chief Executive Officer and Executive Chairman, serves as Executive Chairman of GIG2. Certain of our directors, Dr. Dinu and Messrs. Miotto and Mikulsky, are members of the board of directors of GIG2. Dr. Dinu also serves as the Chief Executive Officer of GIG2. Our directors Messrs. Wang and Betti-Berutto serve as the Software Chief Technical Officer and Hardware Chief Technical Officer, respectively, of GIG2 and have similar roles with us. Messrs. Wang and Betti-Berutto are not officers or employees of our company; their respective titles of Software Chief Technical Officer and Hardware Chief Technical Officer reflect their core competencies and expertise and are primarily for marketing purposes as they assist our company to identify suitable business combination candidates. Mr. Weightman, our Chief Financial Officer, serves as the Chief Financial Officer of GIG2. In addition, there is overlap among our directors and the directors of Kaleyra, Inc. as Dr. Katz and Messrs. Miotto and Mikulsky are also directors of Kaleyra, Inc. Furthermore, Dr. Dinu chairs, and Mr. Wang is a member of, the Strategic Advisory Board of Kaleyra, Inc.

43

**Table of Contents**

affiliates. Our directors also serve as executive officers and board members for other entities. Our Founder, executive officers and directors are not currently aware of any specific opportunities for us to consummate our initial business combination with any entities with which they are affiliated, and there have been no discussions concerning a business combination with any such entity or entities. Although we will not be specifically focusing on, or targeting, any transaction with any affiliated entities, we would pursue such a transaction if we determined that such affiliated entity met our criteria for our initial business combination as set forth in "*Proposed Business—Initial Business Combination—Selection of a Target Business and Structuring of a Business Combination*" and such transaction was approved by a majority of our disinterested directors. Despite our agreement to obtain an opinion from an independent investment banking firm or another independent entity regarding the fairness to our stockholders from a financial point of view of a business combination with one or more domestic or international businesses affiliated with our executive officers, directors or existing holders, potential conflicts of interest still may exist and, as a result, the terms of the business combination may not be as advantageous to our public stockholders as they would be absent any conflicts of interest. Our directors have a fiduciary duty to act in the best interests of our stockholders, whether or not a conflict of interest may exist.

**Since our Sponsor will lose its entire investment in us if our initial business combination is not consummated, and our executive officers and directors have significant financial interests in our Sponsor, a conflict of interest may arise in determining whether a particular acquisition target is appropriate for our initial business combination.**

In February 2020, our Sponsor purchased 5,735,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share. Drs. Katz and Dinu, who are husband and wife, and Mr. Miotto, have a financial interest in an affiliate of our Sponsor, GigFounders, LLC. Dr. Katz is also the manager of our Sponsor. Certain of our other directors, Messrs. Mikulsky, Wang and Betti-Berutto, and Mr. Weightman, our Chief Financial Officer, also have a financial interest in our Sponsor. See "—*Certain Relationships and Related Party Transactions*." In addition, prior to consummation of this offering, we will issue 5,000 insider shares to each of Messrs. Weightman, Wang and Betti-Berutto solely in consideration of future services. All of the founder shares and insider shares will be worthless if we do not consummate our initial business combination. In addition, our Sponsor has committed to purchase 689,000 (assuming exercise of the over-allotment option by the underwriters) private units, for an aggregate purchase price of $6,890,000 which will be worthless if we do not consummate our initial business combination. The personal and financial interests of our Sponsor, as well as our executive officers and directors with a significant financial interest in our Sponsor, may influence their motivation in identifying and selecting a target business combination, completing an initial business combination and influencing the operation of the business following the initial business combination.

**We may issue notes or other debt securities, or otherwise incur substantial debt, to complete our initial business combination, which may adversely affect our financial condition and thus negatively impact the value of our stockholders' investment in us.**

On February 13, 2020, we issued a promissory note to our Sponsor with a principal amount of $100,000, all of which remained outstanding as of February 24, 2020.

46

**Table of Contents**

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements contained in this prospectus, which reflect our current views with respect to future events and financial performance, and any other statements of a future or forward-looking nature, constitute "forward-looking statements" for the purpose of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our or our management's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this prospectus may include, for example, statements about:

- our ability to complete our initial business combination;

- our success in retaining or recruiting, or changes required in, our officers, key employees or directors following our initial business combination;

- our executive officers and directors allocating their time to other businesses and potentially having conflicts of interest with our business or in approving our initial business combination, as a result of which they would then receive expense reimbursements;

- our potential ability to obtain additional financing to complete our initial business combination;

- our pool of prospective target businesses, including their industry and geographic location;

- the ability of our executive officers and directors to generate a number of potential investment opportunities;

- failure to list or delisting of our securities from the NYSE or an inability to have our securities listed on the NYSE following a business combination;

- our public securities' potential liquidity and trading;

- the lack of a market for our securities; or

- our financial performance following this offering.

The forward-looking statements contained in this prospectus are based on our current expectations and beliefs concerning future developments and their potential effects on us. Future developments affecting us may not be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described under the heading "*Risk Factors.*" Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

60

**Table of Contents**

completed an assessment of internal controls. We expect to assess the internal controls of our target business or businesses prior to the completion of our initial business combination and, if necessary, to implement and test additional controls as we may determine are necessary in order to state that we maintain an effective system of internal controls. A target business may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding the adequacy of internal controls. Many small and mid-sized target businesses we may consider for our initial business combination may have internal controls that need improvement in areas such as:

- staffing for financial, accounting and external reporting areas, including segregation of duties;

- reconciliation of accounts;

- proper recording of expenses and liabilities in the period to which they relate;

- evidence of internal review and approval of accounting transactions;

- documentation of processes, assumptions and conclusions underlying significant estimates; and

- documentation of accounting policies and procedures.

Because it will take time, management involvement and perhaps outside resources to determine what internal control improvements are necessary for us to meet regulatory requirements and market expectations for our operation of a target business, we may incur significant expense in meeting our public reporting responsibilities, particularly in the areas of designing, enhancing, or remediating internal and disclosure controls. Doing so effectively also may take longer than we expect, thus increasing our exposure to financial fraud or erroneous financing reporting.

### Related Party Transactions

In February 2020, our Sponsor purchased 5,735,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.0044 per share. The purchase price per founder share was determined by dividing the amount of cash contributed to the Company by the number of founder shares issued. Prior to the initial investment of $25,000 by our Founder, the Company had no assets, tangible or intangible.

The number of founder shares initially issued was determined with the intention that the founder shares, together with the insider shares owned by Messrs. Weightman, Wang and Betti-Berutto, would represent 20% of the outstanding shares of Common Stock upon completion of this offering (excluding the private units). Up to 750,000 of the founder shares are subject to forfeiture depending on whether and to what extent the underwriters' over-allotment option is exercised.

Dr. Katz, the manager of our Sponsor, and Mr. Miotto, one of our independent directors, have formed an LLC named GigFounders, LLC, of which 90% is owned by Drs. Katz and Dinu, who are husband and wife, and 10% is owned by Mr. Miotto; that partnership, which is also managed by Dr. Katz, has a financial and voting interest in our Sponsor that entitles it to participate in any economic return that the Sponsor receives for its investment in the Company in accordance with terms negotiated with the other holders of financial and voting interests in our Sponsor. Mr. Miotto's minority interest in GigFounders, LLC is passive as he does not participate in the governance of GigFounders, LLC. In addition, certain of our directors, Messrs. Mikulsky, Wang and Betti-Berutto, and Mr. Weightman, our Chief Financial Officer, each have a financial and voting interest in our Sponsor that entitles each of them to participate in any economic return that the Sponsor receives for its investment in the Company in accordance with terms negotiated with the other holders of financial and voting interests in our Sponsor.

We are obligated, commencing on the date of this prospectus, to pay GigFounders, LLC a monthly fee of an aggregate of $20,000 for office space and general and administrative services. In conjunction with our services agreement with GigFounders, LLC and in connection with GigFounders, LLC's affiliation with our Sponsor, we have a licensing arrangement with GigFounders, LLC whereby we are permitted to use its "Private-to-Public

73

**Table of Contents**

- developing and growing companies, both organically and inorganically, and expanding the product ranges and geographic footprints of a number of businesses;

- sourcing, structuring, acquiring and selling businesses and achieving synergies to create stockholder value;

- establishing a wide deal flow and efficient methodology of screening superior M&A targets worldwide;

- partnering with industry-leading companies to increase sales and improve the competitive position of those companies;

- addressing business and technological changes in an evolving global TMT landscape;

- evaluating the viability of emerging TMT business models;

- fostering relationships with sellers, capital providers and target management teams; and

- accessing the capital markets across various business cycles, including financing businesses and assisting companies with the transition to public ownership.

Following the completion of this offering, we intend to begin the process of communicating with our management team and its affiliates' network of relationships worldwide to articulate the parameters for our search for a potential target initial business combination and begin the process of pursuing and reviewing potential opportunities.

**Business Combination Criteria**

Consistent with our strategy, we have identified general criteria and guidelines that we believe are important in evaluating prospective target businesses and, when evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews and inspection of facilities, as applicable, as well as a review of financial and other information that will be made available to us. We are seeking Mentor-Investor candidates to partner with over a 3 to 5 year horizon with a goal of reaching an enterprise value of over $1 billion. We intend to use the following and other criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet any or all of these criteria or guidelines.

- *Companies that embrace today's digital transformation and experience.* We will seek TMT companies and other companies anywhere in the world that are embracing today's digital transformation and experience as a competitive advantage. We believe that an embrace of today's digital transformation and experience enables both organic and inorganic growth, creating new strategic, operational and business opportunities fueled by the emerging cloud, analytics, big data and cognitive technologies. Being conscientious corporate citizens, we will focus on sustainable technology companies that can shape a better society and healthier environment.

- *Companies that will benefit from a public listing.* We will primarily seek companies that we believe will benefit from being publicly traded, and that will be able to effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.

- *Companies that will benefit from our industry expertise and relationships.* We will seek companies that will be best positioned to leverage our industry expertise, insights and relationships to create opportunities for value creation, whether acquisitions, capital investments in organic growth opportunities, generating greater operating efficiencies or significantly improving financial performance. We believe our strategy leverages our management team's distinctive background and vast network of industry leaders in the TMT industry. We will seek to identify such opportunities for value creation in evaluating potential business combinations.

- *Companies that are market-leading participants.* We will seek a target that has an established business and market position. While we will focus on TMT businesses, we will not seek a target that is pre-revenue or in early stages of development with unproven technologies.

Table of Contents

- *Companies that are SMB.* We believe targeting companies in the SMB market will provide the greatest number of opportunities for investment and will maximize the benefits of the collective network of our management team and its affiliates.

- *Companies with strong management.* We will prioritize entities with well-established, proven and talented management teams that wish to continue to drive their companies to growth and are eager to succeed with support from an interactive and hands-on board of directors. To the extent we believe it will enhance stockholder value, we would seek to selectively supplement the existing leadership of the business with proven leaders from our network, whether at the senior management level or at the board level.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management team may deem relevant.

### Competitive Strengths

We believe we have the following competitive strengths:

### Status as a Public Company

We believe our structure will make us an attractive business combination partner to target businesses. As an existing public company, we offer a target business an alternative to the traditional IPO through a merger or other business combination. In this situation, the owners of the target business would exchange their shares of stock in the target business for shares of stock or other securities or for a combination of shares of stock, other securities and cash, allowing us to tailor the consideration to the specific needs of the sellers. We believe target businesses might find this method a more certain and cost effective method to becoming a public company than the typical IPO. In a typical IPO, there are additional expenses incurred in marketing, roadshow and public reporting efforts that will likely not be present to the same extent in connection with a business combination with us. Furthermore, once the business combination is consummated, the target business will have effectively become public, whereas an IPO is always subject to the underwriters' ability to complete the offering, as well as general market conditions, which could prevent the offering from occurring. Once public, we believe the target business would then have greater access to capital and an additional means of providing management incentives consistent with stockholders' interests than it would have as a privately held company. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented employees. However there is currently no market for our securities and a market for our securities may not develop. As a result, this purported benefit may not be realized.

Although we believe that our status as a public company will make us an attractive business partner, some potential target businesses may view the inherent limitations in our status as a blank check company as a deterrent and may prefer to effect a business combination with a more established entity or with a private company. These inherent limitations include limitations on our available financial resources, which may be inferior to those of other entities pursuing the acquisition of similar target businesses; the requirement that we seek stockholder approval of a business combination or conduct a tender offer in relation thereto, which may delay the consummation of a transaction; and the existence of our outstanding warrants, which may represent a source of future dilution.

### Financial Position

With funds available for a business combination initially in the amount of $202,000,000 (or $232,300,000 if the over-allotment option is exercised), excluding deferred underwriting commissions of $8,000,000 (or $9,200,000 if the underwriters' over-allotment option is exercised in full) assuming no redemptions, we can offer a target

80

**Table of Contents**

business. By consummating our initial business combination with only a single entity, our lack of diversification may:

- subject us to negative economic, competitive and regulatory developments, any or all of which may have a substantial adverse impact on the particular industry in which we operate after our initial business combination, and

- cause us to depend on the marketing and sale of a single product or limited number of products or services.

### *Limited ability to evaluate the target's management team*

Although we intend to closely scrutinize the management of a prospective target business when evaluating the desirability of effecting our initial business combination with that business, our assessment of a target business' management may not prove to be correct. Moreover, members of our management team may not have significant experience or knowledge relating to the operations of the particular target business. The future role of members of our management team, if any, in a post-transaction company cannot presently be stated with any certainty. Consequently, members of our management team may not become a part of the post-transaction company's management team or serve it in advisory positions, and the future management may not have the necessary skills, qualifications or abilities to manage a public company. Further, it is also not certain whether one or more of our directors will remain associated with the post-transaction company in some capacity following our initial business combination. The determination as to whether any of our key personnel will remain with the post-transaction company will be made at the time of our initial business combination.

Following our initial business combination, we may seek to recruit additional managers to supplement the incumbent management of the target business. However, we may not have the ability to recruit additional managers, or to locate additional managers who will have the requisite skills, knowledge or experience necessary to enhance the incumbent management.

### *Stockholders May Not Have the Ability to Approve an Initial Business Combination*

In connection with any proposed business combination, we will either (1) seek stockholder approval of our initial business combination at a meeting called for such purpose at which stockholders may seek to convert their shares, regardless of whether they vote for or against the proposed business combination, into their pro rata share of the aggregate amount then on deposit in the trust account (net of taxes payable), or (2) provide our stockholders with the opportunity to sell their shares to us by means of a tender offer (and thereby avoid the need for a stockholder vote) for an amount equal to their pro rata share of the aggregate amount then on deposit in the trust account (net of taxes payable), in each case subject to the limitations described herein. We will seek stockholder approval if it is required by applicable law or stock exchange listing requirement, provided, that we may also decide to seek stockholder approval for business or other reasons.

Under the rules of the NYSE, stockholder approval would be required for our initial business combination if, for example:

- we issue (other than in a public offering for cash) a number of shares of Common Stock that would either (a) be equal to or in excess of 20% of the number of shares of Common Stock then outstanding or (b) have voting power equal to or in excess of 20% of the voting power then outstanding;

- any of our directors, officers or substantial security holders (as defined by the rules of the NYSE) has a 5% or greater interest, directly or indirectly, in the target business or assets to be acquired and if the number of shares of Common Stock to be issued, or if the number of shares of Common Stock into which the securities may be convertible or exercisable, exceeds either (a) 1% of the number of shares of Common Stock or 1% of the voting power outstanding before the issuance in the case of any of our directors and officers or (b) 5% of the number of shares of Common Stock or 5% of the voting power outstanding before the issuance in the case of any substantial security holders; or

85

Table of Contents

the Israeli Naval Academy and holds a B.Sc. and Ph.D. in Semiconductors Materials from the Technion (Israel Institute of Technology). He is a serial entrepreneur, holds many U.S. and international patents, has published many technical papers and is the editor of a number of technical books. Dr. Katz is married to Dr. Dinu, one of our directors.

**Brad Weightman** has served as our Chief Financial Officer since February 2020. Mr. Weightman has more than 30 years of global finance and accounting experience with a combination of large, mid-sized, and small public and private companies in the semiconductor, internet of things, hardware and software industries. Mr. Weightman has been the Chief Financial Officer of GIG2 since August 2019, and was also the Chief Financial Officer of GIG1 from that time until the closing of its business combination with Kaleyra, Inc. on November 25, 2019. Before then, beginning in April 2017, Mr. Weightman was Senior Business Controller at IDT, providing strategic and financial support for the General Manager and the division, prior to IDTI being acquired by Renesas Electronics Corp (TSE 6723:JP) in April 2019. Prior to GigPeak being acquired by IDT in April 2017, Mr. Weightman was Corporate Controller at GigPeak from September 2015 to April 2017. Before joining GigPeak, Mr. Weightman was self-employed as a financial consultant in 2015. Additionally, Mr. Weightman has held various finance and accounting positions at Echelon Corporation, an early developer of the internet of things market, supporting company growth from early stages to a mid-sized public company, as well as large corporations such as Advanced Micro Devices, Inc. and Xerox Holdings Corporation. Mr. Weightman received a Bachelor of Science degree in Accounting from San Jose State University, and is a Certified Public Accountant in California (inactive).

**Neil Miotto** joined the Board of Directors in February 2020. Mr. Miotto is a financial consultant and a retired assurance partner of KPMG LLP ("KPMG"), where he was a partner for 27 years until his retirement in September 2006. Since his retirement from KPMG, Mr. Miotto has provided high-level financial consulting services to companies in need of timely accounting assistance and has served on public company boards. He is deemed to be a "audit committee financial expert" under SEC rules. While at KPMG, Mr. Miotto focused on serving large public companies. Mr. Miotto also served as an SEC reviewing partner while at KPMG. Mr. Miotto became a member of the board of directors of GIG1 in October 2017 and has continued in that role after that company became Kaleyra, Inc. Mr. Miotto has also served on the board of directors of GIG2 since March 2019. In addition, Mr. Miotto served on the board of directors of Micrel, Inc. prior to its sale to Microchip Technology Inc. in May 2015, and on the board of directors of GigPeak from 2008 until its sale to IDT in April 2017. He currently serves on the board of directors of Cognizer, a position he has held since March 2019. He is a member of the American Institute of Certified Public Accountants and holds a Bachelor of Business Administration degree from Baruch College of The City University of New York.

**John J. Mikulsky** joined our Board of Directors in February 2020. Mr. Mikulsky became a member of the board of directors of GIG1 since December 2017 and has continued in that role after the company became Kaleyra, Inc. He joined the board of directors of GIG2 and the board of directors of Cognizer, in March 2019. Mr. Mikulsky served as the Chief Executive Officer of Traycer Diagnostic Systems, Inc. from August 2016 to December 2017, and as a director, from October 2014 to December 2017. He previously served as President and Chief Executive Officer of Endwave Corporation (Nasdaq: ENWV) from December 2009 until June 2011, when Endwave Corporation was acquired by GigPeak; subsequent to such acquisition, he served on the board of directors of GigPeak from June 2011 until its sale IDT in April 2017. From May 1996 until November 2009, Mr. Mikulsky served Endwave Corporation in a multitude of capacities including Vice President of Product Development, Vice President of Marketing and Business Development and Chief Operating Officer. Prior to Endwave Corporation, Mr. Mikulsky worked as a Technology Manager for Balazs Analytical Laboratory, a provider of analytical services to the semiconductor and disk drive industries, from 1993 until 1996. Prior to 1993, Mr. Mikulsky worked at Raychem Corporation, most recently as a Division Manager for its Electronic Systems Division. Mr. Mikulsky holds a B.S. in electrical engineering from Marquette University, an M.S. in electrical engineering from Stanford University and an S.M. in Management from the Sloan School at the Massachusetts Institute of Technology.

**Dr. Raluca Dinu** joined our Board of Directors in February 2020. She has served as the Chief Executive Officer of GIG2 since August 2019 and as a member of its board of directors since March 2019. From April 2017 to

98

Table of Contents

May 2019, Dr. Dinu was the Vice President and General Manager of IDT's Optical Interconnects Division. Prior to that, she held several executive-level positions at GigPeak, including Executive Vice President and Chief Operation Officer from April 2016 until it was acquired by IDT in April 2017, and before that, as its Executive Vice President of Global Sales and Marketing from August 2015 to April 2016, and as its Senior Vice President of Global Sales and Marketing from December 2014 to August 2015. From February 2014 to September 2017, Dr. Dinu was a member of the board of directors of Brazil-Photonics, in Campinas, Brazil, a joint venture that GigPeak established with the Centro de Pesquisa e Desenvolvimento em Telecomunicações (CPqD). From 2001 to 2008, Dr. Dinu was VP of Engineering at Lumera Corporation ("Lumera") (Nasdaq: LMRA). Lumera was acquired by GigPeak in 2008, and Dr. Dinu joined GigPeak at that time. Dr. Dinu holds a B.Sc. in Physics and Ph.D. in Solid State Condensed Matter Physics from the University of Bucharest, and an Executive-M.B.A. from Stanford University. Dr. Dinu is married to Dr. Katz, our Executive Chairman of our Board of Directors, Chief Executive Officer, President and Secretary.

**Andrea Betti-Berutto** joined the Board of Directors as a director in February 2020. Mr. Betti-Berutto is a senior technologist and entrepreneur with more than 25 years of experience in Radio-Frequency and Optical Interconnect Systems and Components and Radio-Frequency Integrated Circuit Semiconductor technologies. He has served as the Hardware Chief Technical Officer of GIG2 since August 2019 and as the Hardware Chief Technical Officer of the Company since February 2020. Mr. Betti-Berutto is not an officer or employee of GIG2 or the Company, and in each instance the title of Hardware Chief Technical Officer reflects Mr. Betti-Berutto's core competency and expertise and is primarily for marketing purposes as he assists GIG2 and the Company, respectively, to identify suitable business combination candidates. From April 2017 through June 2019, Mr. Betti-Berutto was the Fellow of Optical Interconnect Business Units at IDT, which was acquired by Renesas Electronics Corp (TSE 6723:JP) in 2019. Mr. Betti-Berutto joined IDT through the acquisition of GigPeak in April 2017, and he led the integration of the of GigPeak technical team into IDT. At GigPeak, he served as the Chief Technology Officer since April 2007 through the April 2017 acquisition by IDT. Previously, Mr. Betti-Berutto was Co-Founder of iTerra Communication, a pioneer in semiconductors for new generation 40G optical networks, where he served as VP of Engineering for RF and Optical Communication Product Development and as a member of the board of directors. After a reorganization of iTerra, he co-founded GigOptix (which was renamed GigPeak in April 2016) and, as Chief Technology Officer (CTO), led the growth of the company's technologies and product lines into the 100/200G optical market, mmWave transceivers for future 5G network deployment and transceivers for sensing application. Together with Dr. Katz and the rest of the GigPeak executive leadership team, Mr. Betti-Berutto drove the acquisition and integration of 10 companies and technologies. Before starting iTerra Communication, he worked for various companies in microwave system and devices for Basestation and Space Communication such as Fujitsu (USA), European Space Agency (Netherlands) and Space Engineering SpA (Italy). Mr. Betti-Berutto is a very hands-on executive with large experience in product/technology and business roadmap definition, strategic initiatives, company re-organization, product development and NPI processes. He has published multiple papers in IEEE journals and conferences and owns U.S. patents in the area of high-speed RF and Optical Integrated circuits. Mr. Betti-Berutto holds the degree of Electronic Engineer (MS) from University of Rome "La Sapienza" (Italy) with specialization in Electromagnetism.

**Peter Wang** joined the Board of Directors as a director in February 2020. Mr. Wang served as a member of the board of directors of GIG1 from December 2017 until its business combination with Kaleyra, Inc. in November 2019. He has served as the Software Chief Technical Officer of GIG2 since August 2019 and as the Software Chief Technical Officer of the Company since February 2020. Mr. Wang is not an officer or employee of GIG2 or the Company, and in each instance the title of Software Chief Technical Officer reflects Mr. Wang's core competency and expertise and is primarily for marketing purposes as he assists GIG2 and the Company, respectively, to identify suitable business combination candidates. He is a managing partner of Tekhill Catalyst LLC, a cross-border business strategy and technology transfer advisory service, since January 2018. He was a Managing Partner of Optino Network LLC from September 2016 through December 2017. He also serves on the Technology Advisory Council for Benhamou Global Ventures since April 2014. Mr. Wang previously served as the founding President of CoolCloudz, an Infrastructure-as-a-Service company, and the Sr. Vice President and

**Table of Contents**

**PRINCIPAL STOCKHOLDERS**

The following table sets forth information regarding the beneficial ownership of our shares of Common Stock as of the date of this prospectus, and as adjusted to reflect the sale of our shares of Common Stock included in the units offered by this prospectus and private units, and assuming no purchase of units in this offering, by:

- each person known by us to be the beneficial owner of more than 5% of the outstanding shares of Common Stock;

- each of our executive officers and directors that beneficially owns shares of Common Stock; and

- all our executive officers and directors as a group.

Unless otherwise indicated, we believe that all persons named in the table have sole voting and investment power with respect to all shares of Common Stock beneficially owned by them. The following table does not reflect record or beneficial ownership of any shares of Common Stock issuable upon exercise of warrants as these warrants are not exercisable within 60 days of the date of this prospectus. The post-offering numbers and percentages presented assume that the underwriters do not exercise their over-allotment option, that our Sponsor forfeits 750,000 founder shares, that the Anchor Investors do not buy any units in this offering and that there are 25,893,479 shares of our Common Stock issued and outstanding after this offering.

| | Prior to Offering | | After Offering(2) | |
| Name and Address of Beneficial Owner(1) | Amount and Nature of Beneficial Ownership | Approximate Percentage of Outstanding Common Stock(3) | Amount and Nature of Beneficial Ownership | Approximate Percentage of Outstanding Common Stock(4) |
|---|---|---|---|---|
| GigAcquisitions3, LLC(5) | 5,735,000 | 99.74% | 5,635,000(6) | 21.76% |
| Dr. Avi S. Katz(5) | 5,735,000 | 99.74% | 5,635,000(6) | 21.76% |
| Brad Weightman | 5,000 | * | 5,000 | * |
| Neil Miotto | — | — | — | — |
| John Mikulsky | — | — | — | — |
| Dr. Raluca Dinu | — | — | — | — |
| Andrea Betti-Berutto | 5,000 | * | 5,000 | * |
| Peter Wang | 5,000 | * | 5,000 | * |
| All directors and officers as a group (7 individuals) | 5,750,000 | 100.00% | 5,650,000 | 21.82% |

* Less than one percent
(1) Unless otherwise indicated, the business address of each of the individuals is 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303.
(2) Assumes (i) no exercise of the over-allotment option, (ii) an aggregate of 750,000 shares of Common Stock have been forfeited by our Founder, (iii) 650,000 private units have been purchased by our Sponsor simultaneously with the consummation of this offering, and (iv) 243,479 private units have been purchased by the underwriters simultaneously with the consummation of this offering.
(3) Based on 5,750,000 shares of Common Stock outstanding immediately prior to this offering.
(4) Based on 25,893,479 shares of Common Stock outstanding immediately after this offering.
(5) Represents shares held by our Sponsor. The shares held by our Sponsor are beneficially owned by Dr. Katz, our Executive Chairman of the Board of Directors, Chief Executive Officer, President and Secretary, and the manager of our Sponsor, who has sole voting and dispositive power over the shares held by our Sponsor. The Sponsor's business address is 1731 Embarcadero Rd., Suite 200, Palo Alto, CA 94303.
(6) Includes 4,985,000 founder shares and 650,000 private units.

Immediately after this offering (without the exercise of the underwriters' over-allotment option), our initial stockholders and any of their permitted transferees will beneficially own approximately 21.8% of our issued and

109

**Table of Contents**

## DESCRIPTION OF SECURITIES

### General

As of the date of this prospectus, we are authorized to issue 100,000,000 shares of Common Stock, par value $0.0001 per share, and 1,000,000 shares of preferred stock, par value $0.0001 per share. As of the date of this prospectus, 5,735,000 shares of Common Stock are outstanding, and we expect to issue the 15,000 insider shares prior to the public offering. No shares of preferred stock are currently outstanding. The following description summarizes the material terms of our securities. Because it is only a summary, it may not contain all the information that is important to you. For a complete description, you should refer to our amended and restated certificate of incorporation and the form of warrant agreement, which are filed as exhibits to the registration statement of which this prospectus is a part, and to the applicable provisions of Delaware law.

### Units

Each unit consists of one share of our Common Stock and three-fourths (3/4) of one warrant to purchase one share of our Common Stock for an exercise price of $11.50 per share, subject to adjustment as described in this prospectus. Only whole warrants are exercisable. Accordingly, unless you purchase at least four units, you will not be able to receive or trade whole warrants. The warrants will become exercisable on the later of (a) 30 days after the completion of our initial business combination; and (b) 12 months from the closing of this offering. The warrants will expire at 5:00 p.m., New York City time, on the fifth anniversary of our completion of an initial business combination, or earlier upon redemption.

The shares of Common Stock and warrants will begin to trade separately on the 52nd day after the date of this prospectus unless the underwriters inform us of its decision to allow earlier separate trading, provided that in no event may the shares of Common Stock and warrants be traded separately until we have filed with the SEC a Current Report on Form 8-K which includes an audited balance sheet reflecting our receipt of the gross proceeds of this offering. Once the shares of Common Stock and warrants commence separate trading, holders will have the option to continue to hold units or separate their units into the component pieces.

We will file a Current Report on Form 8-K which includes an audited balance sheet promptly upon the consummation of this offering. The audited balance sheet will reflect proceeds we receive from the exercise of the over-allotment option, if the over-allotment option is exercised on the date of this prospectus. If the over-allotment option is exercised after the date of this prospectus, we will file an amendment to the Form 8-K to provide updated financial information to reflect the exercise of the over-allotment option. We will also include in this Form 8-K, an amendment thereto, or in a subsequent Form 8-K information indicating if the underwriters have allowed separate trading of the shares of Common Stock and warrants prior to the 52nd day after the date of this prospectus.

### Common Stock

Prior to the date of this prospectus, there were 5,735,000 shares of our Common Stock outstanding. Our Founder, together with Messrs. Weightman, Wang and Betti-Berutto, will own 20% of our issued and outstanding shares after this offering (excluding the private units and assuming they do not purchase any units in this offering). Upon the closing of this offering, 25,893,479 shares of our Common Stock will be outstanding (assuming no exercise of the underwriters' over-allotment option and the corresponding forfeiture of an aggregate of 750,000 founder shares). If we increase or decrease the size of the offering pursuant to Rule 462(b) under the Securities Act, we will effect a stock dividend or share contribution back to capital, as applicable, immediately prior to the consummation of the offering in such amount as to maintain the ownership of our Founder, together with Messrs. Weightman, Wang and Betti-Berutto, prior to this offering at 20% of our issued and outstanding shares of our Common Stock upon the consummation of this offering, as described above.

Common stockholders of record are entitled to one vote for each share held on all matters to be voted on by stockholders. Unless specified in our amended and restated certificate of incorporation, or as required by

116

**Table of Contents**

## 1. DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS

*Organization and General*

GigCapital3, Inc. (the "Company") was incorporated in Delaware on February 3, 2020. The Company was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (the "Business Combination"). The Company will be an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act") upon the closing of the initial public offering.

As of February 14, 2020 the Company had not commenced any operations. All activity for the period from February 3, 2020 (date of inception) through February 14, 2020 relates to the Company's formation and the proposed initial public offering ("Proposed Offering") described below. The Company will not generate any operating revenues until after completion of the Business Combination, at the earliest. The Company will generate non-operating income in the form of interest income on cash and cash equivalents from the proceeds derived from the Proposed Offering. The Company has selected December 31 as its fiscal year end.

*Sponsor, Founder and Proposed Financing*

The Company's sponsor is GigAcquisitions3, LLC, a Delaware limited liability company (the "Sponsor" and is sometimes referred to as the "Founder"). The Company intends to finance a Business Combination with proceeds from a $200,000,000 public offering (Note 3), a $6,500,000 private placement with the Sponsor (or $6,890,000 private placement if the over-allotment option is exercised in full) and a $2,434,790 private placement (or $2,800,000 private placement if the over-allotment option is exercised in full) with Nomura Securities International, Inc. ("Nomura"), Oppenheimer & Co. Inc. ("Oppenheimer") and Odeon Capital Group LLC ("Odeon") (collectively, the "Underwriters") (Note 4). Upon the closing of the Proposed Offering and the private placement, $202,000,000 (or $232,300,000 if the underwriters' over-allotment option is exercised in full—Note 3) will be held in the Trust Account (discussed below).

*The Trust Account*

The funds in the Trust Account will be invested only in U.S. government treasury bills with a maturity of one hundred and eighty-five (185) days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act of 1940 which invest only in direct U.S. government obligations. Funds will remain in the Trust Account until the earlier of (i) the consummation of the Business Combination or (ii) the distribution of the Trust Account as described below. The remaining proceeds from the Proposed Offering outside the Trust Account may be used to pay for business, legal and accounting due diligence expenses on acquisition targets and continuing general and administrative expenses.

The Company's amended and restated certificate of incorporation will provide that, other than the withdrawal of interest to pay taxes none of the funds held in the Trust Account will be released until the earlier of: (i) the completion of the Business Combination; (ii) the redemption of 100% of the shares of common stock included in the units being sold in the Proposed Offering if the Company is unable to complete a Business Combination within 18 months from the closing of the Proposed Offering; or (iii) the redemption of the public shares in connection with a stockholder vote to amend the Company's amended and restated certificate of incorporation to modify the substance or timing of the Company's obligation to redeem 100% of its public shares if it does not complete its initial Business Combination within 18 months from the closing of the Proposed Offering.

*Business Combination*

The Company's management has broad discretion with respect to the specific application of the net proceeds of the Proposed Offering, although substantially all of the net proceeds of the Proposed Offering are intended to be