# EXHIBIT 15

424B3 1 d70436d424b3.htm 424B3

**Table of Contents**

**Filed Pursuant to Rule 424(b)(3)**
**Registration No. 333-251862**

**PROSPECTUS**

**PROXY STATEMENT FOR**
**SPECIAL MEETING OF**
**GIGCAPITAL3, INC.**

**PROSPECTUS FOR 70,385,096 SHARES OF COMMON STOCK**
**OF**
**GIGCAPITAL3, INC.**
**WHICH WILL BE RENAMED "LIGHTNING EMOTORS, INC." IN CONNECTION WITH THE BUSINESS COMBINATION DESCRIBED HEREIN**

The board of directors of GigCapital3, Inc., a Delaware corporation ("*GigCapital3*"), has unanimously approved (i) the merger of Project Power Merger Sub, Inc. ("*Merger Sub*"), a Delaware corporation, and Lightning Systems, Inc. ("*Lightning Systems*"), a Delaware corporation (the "*Business Combination*"), with Lightning Systems surviving the Business Combination as a wholly-owned subsidiary of GigCapital3, pursuant to the terms of the Business Combination Agreement, dated as of December 10, 2020, by and among GigCapital3, Merger Sub and Lightning Systems, attached to this proxy statement/prospectus as Annex A (the "*Business Combination Agreement*"), as more fully described elsewhere in this proxy statement/prospectus; and (ii) the other transactions contemplated by the Business Agreement and documents related thereto. In connection with the Business Combination, GigCapital3 will change its name to "Lightning eMotors, Inc."

At the effective time of the Business Combination, among other things, each share of Lightning Systems capital stock, par value $0.00001 per share (collectively, "*Lightning Systems Capital Stock*") issued and outstanding immediately prior to the effective time of the Business Combination (including shares of Lightning Systems Capital Stock resulting from the conversion or exercise of warrants, stock options and convertible notes prior to the effective time of the Business Combination) will be cancelled and converted into (i) the right to receive shares of common stock, par value $0.0001 per share, of the Company ("*Common Stock*") equal to the Exchange Ratio (as defined below) (such amount, the "*Per Share Merger Consideration*") and (ii) the contingent right to receive a portion of the Stockholder Earnout Shares (as defined in the accompanying proxy statement/prospectus), calculated on a Pro Rata Basis as defined in the accompanying proxy statement/prospectus) together with all other shares of Lightning Systems Capital Stock held by the holder of such shares as of immediately prior to the effective time of the Business Combination, if, as and when payable in accordance with the provisions of the Business Combination Agreement. The "*Exchange Ratio*" means the quotient of (a) the Aggregate Closing Merger Consideration (as defined below) divided by (b) the Company Fully Diluted Capital Stock (as defined below). The "*Aggregate Closing Merger Consideration*" means a number of shares of Common Stock equal to the quotient of (a) the Aggregate Closing Merger Consideration Value (as defined below) divided by (b) $10.00. The "*Aggregate Closing Merger Consideration Value*" means (a) $539,220,000, plus (b) the sum of the exercise prices of all Lightning Systems Options (as defined below) outstanding immediately prior to the effective time of the Business Combination, minus (c) the amount by which the net debt of Lightning Systems at the Closing (as defined below) exceeds $15,000,000, minus (d) the amount by which the cash and cash equivalents of Lightning Systems at the Closing is less than $500,000. The "*Company Fully Diluted Capital Stock*" means the sum of (a) the aggregate number of shares of Lightning Systems Capital Stock that are issued and outstanding as of immediately prior to the effective time of the Business Combination (including shares issued upon the exercise or conversion of Lightning Systems Options (as defined below), and warrants and convertible notes of Lightning Systems, in each case prior to the effective time of the Business Combination, but excluding any shares to be cancelled pursuant to the terms of the Business Combination Agreement, and (b) the maximum number of shares of Lightning Systems Common Stock (as defined below) issuable upon full exercise, exchange or conversion of all Lightning Systems stock options outstanding as of the effective time of the Business Combination. In addition, at the effective time of the Business Combination, each outstanding option to purchase shares of Lightning Systems common stock, par value $0.00001 per share ("*Lightning Systems Common Stock*," and each such option, a "*Lightning Systems Option*"), whether vested or unvested, will be assumed by GigCapital3 and converted into an option to purchase a number of shares of Common Stock (such option, an "*Exchanged Option*") equal to the product (rounded down to the nearest whole number) of (x) the number of shares of Lightning Systems Common Stock subject to such Lightning Systems Option immediately prior to the effective time of the Business Combination and (y) the Exchange Ratio, at an exercise price per share (rounded up to the nearest whole cent) equal to the quotient of (A) the exercise price per share of such Lightning Systems Option immediately prior to the effective time of the Business Combination divided by (B) the Exchange Ratio. Except as specifically provided above or as agreed to in writing with any holder of a Lightning Systems Option, following the effective time of the Business Combination, each Exchanged Option will continue to be governed by the same vesting and exercisability terms and otherwise substantially similar terms and conditions as were applicable to the corresponding former Lightning Systems Option immediately prior to the effective time of the Business Combination. The "*Closing*" means the closing of the transactions contemplated by the Business Combination Agreement.

The GigCapital3 Common Stock, units and warrants are currently listed on the New York Stock Exchange ("*NYSE")* under the symbols "GIK", "GIK.U" and "GIK.WS," respectively. Upon Closing, we intend to apply to list the shares as consideration in the Business Combination on the NYSE under the symbol "ZEV". Thereafter, our units (each comprised of one share of Common Stock, one right to receive one-tenth of one share of Common Stock and three-fourths of one warrant to purchase one share of Common Stock), will cease to trade as an individual security and, instead, will be separated into their constituent securities, and the Common Stock and warrants will trade under the symbols "ZEV" and "ZEV.WS," respectively. It is a condition of the consummation of the Business Combination described above that GigCapital3 receives confirmation from the NYSE that the securities have been conditionally approved for listing on the NYSE, but there can be no assurance such listing conditions will be met or that GigCapital3 will obtain such confirmation from the NYSE. If such listing conditions are not met or if such confirmation is not obtained, the Business Combination described above will not be consummated unless the NYSE condition set forth in the Business Combination Agreement is waived by the applicable parties.

**This proxy statement/prospectus provides shareholders of GigCapital3 with detailed information about the proposed business combination and other matters to be considered at the special meeting of GigCapital3. We encourage you to read this entire document, including the Annexes and other documents referred to herein, carefully and in their entirety. You should also carefully consider the risk factors described in the section entitled "*Risk Factors*" beginning on page 53 of this proxy statement/prospectus.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN THIS PROXY STATEMENT/PROSPECTUS, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR RELATED TRANSACTIONS OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THIS PROXY STATEMENT/PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.**

**This proxy statement/prospectus is dated March 26, 2021, and is first being mailed to GigCapital3's shareholders on or about March 26, 2021.**

**Table of Contents**

# GigCapital3, Inc.

**1731 Embarcadero Rd., Suite 200**
**Palo Alto, CA 94303**

Dear GigCapital3, Inc. Stockholder:

We cordially invite you to attend a special meeting (the "*Special Meeting*") of the stockholders of GigCapital3, Inc., a Delaware corporation ("*we*," "*us*," "*our*" or the "*Company*"), which will be held on April 21, 2021 at 10:00 a.m., PDT, via live webcast at www.virtualshareholdermeeting.com/GIK2021SM. In light of ongoing developments related to coronavirus (COVID-19), after careful consideration, the Company has determined that the Special Meeting will be a virtual meeting conducted exclusively via live webcast in order to facilitate stockholder attendance and participation while safeguarding the health and safety of our stockholders, directors and management team. You or your proxyholder will be able to attend and vote at the Special Meeting online by visiting www.virtualshareholdermeeting.com/GIK2021SM and using a control number assigned by Broadridge Financial Solutions. To register and receive access to the virtual meeting, registered stockholders and beneficial stockholders (those holding shares through a stock brokerage account or by a bank or other holder of record) will need to follow the instructions applicable to them provided in the proxy statement. Please note that you will only be able to access the Special Meeting by means of remote communication.

On December 10, 2020, the Company, Project Power Merger Sub, Inc. ("*Merger Sub*"), and Lightning Systems, Inc., a Delaware corporation ("*Lightning Systems*"), entered into a business combination agreement (and as it may be further amended from time to time, the "*Business Combination Agreement*"). If the Business Combination Agreement is adopted by Lightning Systems stockholders, and the Business Combination Agreement is approved by Company stockholders at the Special Meeting, Merger Sub will merge with and into Lightning Systems, with Lightning Systems surviving the merger. Upon the consummation of the transactions contemplated by the Business Combination Agreement (the "*Business Combination*"), the Company will change its name to Lightning eMotors, Inc. **As described in this proxy statement/prospectus, the Company's stockholders are being asked to consider and vote upon, among other things, the Business Combination and the other proposals set forth herein**.

Subject to the terms and conditions of the Business Combination Agreement, at the effective time of the Business Combination, each share of Lightning Systems capital stock, par value $0.00001 per share (collectively, "*Lightning Systems Capital Stock*") issued and outstanding immediately prior to the effective time of the Business Combination (including shares of Lightning Systems Capital Stock resulting from the conversion or exercise of warrants, stock options and convertible notes prior to the effective time of the Business Combination) will be cancelled and converted into (i) the right to receive shares of common stock, par value $0.0001 per share, of the Company ("*Common Stock*") equal to the Exchange Ratio (as defined below) (such amount, the "*Per Share Merger Consideration*") and (ii) the contingent right to receive a portion of the Stockholder Earnout Shares (as defined below), calculated on a Pro Rata Basis (as defined below) together with all other shares of Lightning Systems Capital Stock held by the holder of such shares as of immediately prior to the effective time of the Business Combination, if, as and when payable in accordance with the provisions of the Business Combination Agreement. The "*Exchange Ratio*" means the quotient of (a) the Aggregate Closing Merger Consideration (as defined below) divided by (b) the Company Fully Diluted Capital Stock (as defined below). The "*Aggregate Closing Merger Consideration*" means a number of shares of Common Stock equal to the quotient of (a) the Aggregate Closing Merger Consideration Value (as defined below) divided by (b) $10.00. The "*Aggregate Closing Merger Consideration Value*" means (a) $539,220,000, plus (b) the sum of the exercise prices of all Lightning Systems Options (as defined below) outstanding immediately prior to the effective time of the Business Combination, minus (c) the amount by which the net debt of Lightning Systems at the Closing (as defined below) exceeds $15,000,000, minus (d) the amount by which the cash and cash equivalents of Lightning Systems at the Closing is less than $500,000. The "*Company Fully Diluted Capital Stock*" means the sum of the aggregate number of shares of Lightning Systems Capital Stock that are issued and outstanding as of immediately prior to the effective time of the Business Combination (including shares issued upon the exercise or conversion of Lightning Systems Options (as defined below), and warrants and convertible notes of Lightning

Table of Contents

Systems, in each case prior to the effective time of the Business Combination, but excluding any shares to be cancelled pursuant to the terms of the Business Combination Agreement, and (b) the maximum number of shares of Lightning Systems Common Stock (as defined below) issuable upon full exercise, exchange or conversion of all Lightning Systems stock options outstanding as of the effective time of the Business Combination. In addition, at the effective time of the Business Combination, each outstanding option to purchase shares of Lightning Systems common stock, par value $0.00001 per share ("*Lightning Systems Common Stock*," and each such option, a "*Lightning Systems Option*"), whether vested or unvested, will be assumed by GigCapital3 and converted into an option to purchase a number of shares of Common Stock (such option, an "*Exchanged Option*") equal to the product (rounded down to the nearest whole number) of (x) the number of shares of Lightning Systems Common Stock subject to such Lightning Systems Option immediately prior to the effective time of the Business Combination and (y) the Exchange Ratio, at an exercise price per share (rounded up to the nearest whole cent) equal to the quotient of (A) the exercise price per share of such Lightning Systems Option immediately prior to the effective time of the Business Combination divided by (B) the Exchange Ratio. Except as specifically provided above or as agreed to in writing with any holder of a Lightning Systems Option, following the effective time of the Business Combination, each Exchanged Option will continue to be governed by the same vesting and exercisability terms and otherwise substantially similar terms and conditions as were applicable to the corresponding former Lightning Systems Option immediately prior to the effective time of the Business Combination. The "*Closing*" means the closing of the transactions contemplated by the Business Combination Agreement.

The "*Stockholder Earnout Shares*" are up to an additional 16,463,096 shares of Common Stock that shall be issued to equity holders of Lightning Systems who have received, or are entitled to receive, any Per Share Merger Consideration (such holders, the "*Stockholder Earnout Group*"), in three equal tranches if, during the period from the date of the Closing through and including the fifth anniversary of the date of the Closing, the dollar volume-weighted average price of Common Stock (as determined in accordance with the Business Combination Agreement) equals or exceeds $12.00, $14.00 and $16.00 per share for twenty (20) of any thirty (30) consecutive trading days commencing after the Closing on the NYSE, Nasdaq or any other national securities exchange, as applicable for each of such three tranches, respectively. "*Pro Rata Basis*" shall mean, with respect to any member of the Stockholder Earnout Group, in accordance with the ratio calculated by dividing (x) the sum of the aggregate Per Share Merger Consideration issued or issuable to such holder *by* (y) the sum of the aggregate Per Share Merger Consideration issued or issuable to the Stockholder Earnout Group, in each case, as of immediately following the Closing as determined in accordance with the Business Combination Agreement.

In connection with the execution of the Business Combination Agreement, the Company entered into a subscription agreement, dated as of December 10, 2020 (the "*PIPE Subscription Agreement*"), with BP Technology Ventures, Inc. (the "*PIPE Investor*"), pursuant to which, among other things, the Company agreed to issue and sell to the PIPE Investor, in a private placement to close immediately prior to the Closing, an aggregate of 2,500,000 shares of Common Stock at $10.00 per share, for an aggregate purchase price of $25,000,000.

Also in connection with execution of the Business Combination Agreement, the Company entered into subscription agreements, each dated as of December 10, 2020 (the "*Convertible Note Subscription Agreements*"), with certain investors (collectively, the "*Convertible Note Investors*"), pursuant to which, among other things, the Company agreed to issue and sell to the Convertible Note Investors, in private placements to close immediately prior to Closing, (a) convertible notes due in 2024 ("*Convertible Notes*") for an aggregate purchase price of $100,000,000 and (b) warrants to purchase up to 8,695,652 shares of Common Stock for a per share exercise price of $11.50 ("*Convertible Note Warrants*"). The Convertible Notes are convertible into 8,695,652 shares of Common Stock at a conversion price of $11.50.

The Company and Lightning Systems cannot complete the Business Combination unless the Company's stockholders approve the Business Combination, including the issuance of Common Stock to Lightning Systems equity holders as merger consideration and the issuance of shares of Common Stock to the PIPE Investors and the Convertible Notes and Convertible Note Warrants to the Convertible Note Investors, and certain of the other proposals contained herein. The Company is sending you this proxy statement/prospectus to ask you to vote in

Table of Contents

favor of the Business Combination Proposal, as described below, and the other matters described in this proxy statement/prospectus.

At the Special Meeting, Company stockholders will be asked to consider and vote upon a proposal (the "*Business Combination Proposal*" or "*Proposal No. 1*") to adopt the Business Combination Agreement, a copy of which is attached to the accompanying proxy statement as *Annex A*, and approve the transactions contemplated thereby, including the Business Combination. In addition, you are being asked to consider and vote upon a proposal to approve, for purposes of complying with applicable New York Stock Exchange (the "*NYSE*") listing rules, the issuance of more than 20% of the Company's outstanding Common Stock in connection with the Business Combination, the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, including up to 70,385,096 shares of Common Stock to the Lightning Systems equity holders, 2,500,000 shares of Common Stock to the PIPE Investor, 8,695,652 shares of our Common Stock upon conversion of the Convertible Notes and 8,695,652 shares of our Common Stock upon exercise of the Convertible Note Warrants (the "*NYSE Stock Issuance Proposal*" or "*Proposal No. 2*"); a proposal to adopt (i) two separate proposals to approve and adopt amendments to the Company's current amended and restated certificate of incorporation, as amended, to: (A) provide for the classification of our board of directors (our "*Board*") into three classes of directors with staggered terms of office and to make certain related changes ("*Proposal No. 3*"); and (B) (x) provide for certain additional changes, including but not limited to changing the post-combination company's corporate name from "GigCapital3, Inc." to "Lightning eMotors, Inc." and eliminating certain provisions specific to our status as a blank check company, which our Board believes are necessary to adequately address the needs of the post-combination company ("Proposal 4A") and (y) to authorize the adoption of Delaware as the exclusive forum for certain stockholder litigation ("*Proposal 4B*", which together with Proposal No. 3 and Proposal 4A are collectively referred to as the "*Charter Amendment Proposals*"); a proposal to approve the GigCapital3, Inc. 2021 Equity Incentive Plan (the "*Incentive Plan*") (the "*Incentive Plan Proposal*" or "*Proposal No. 5*"); a proposal to consider and vote upon a proposal to elect, effective at Closing Date, nine directors to serve staggered terms on our board of directors until the 2021, 2022 and 2023 annual meetings of stockholders, respectively, and until their respective successors are duly elected and qualified (the "*Election of Directors Proposal*" or "*Proposal No. 6*"); and a proposal to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal or the Election of Directors Proposal (the "*Adjournment Proposal*" or "*Proposal No. 7*").

Each of these proposals is more fully described in the accompanying proxy statement, which each stockholder is encouraged to read carefully.

Our Common Stock, units and warrants are currently listed on the New York Stock Exchange ("*NYSE*") under the symbols "GIK", "GIK.U" and "GIK.WS," respectively. Upon Closing, we intend to apply to list the shares as consideration in the Business Combination on the NYSE under the symbol "ZEV". Thereafter, our units (each comprised of one share of Common Stock, one right to receive one-tenth of one share of Common Stock and three-fourths of one warrant to purchase one share of Common Stock), will cease to trade as an individual security and, instead, will be separated into their constituent securities, and the Common Stock and warrants will trade under the symbols "ZEV" and "ZEV.WS," respectively.

Pursuant to our certificate of incorporation, we are providing our stockholders that hold shares of Common Stock that were included in the units issued in our initial public offering ("*IPO*") ("*public stockholders*" and such shares, "*public shares*"), with the opportunity to redeem, upon the Closing, public shares then held by them for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing) in our trust account (the "*Trust Account*") that holds the proceeds (including interest, which shall be net of taxes paid and taxes payable and amounts previously redeemed) of our IPO and such additional amounts as we may deposit into such trust account in connection with extensions of time for us to consummate the Business Combination. The per-share amount we will distribute to public stockholders that properly redeem their shares will not be reduced by transaction expenses incurred by the Company and Lightning Systems in connection with the Business Combination. For illustrative purposes, based on the fair value of marketable securities held in our

Table of Contents

Trust Account of approximately $202.0 million as of December 31, 2020, the estimated per share redemption price would have been approximately $10.10 on such date. **<u>Public stockholders may elect to redeem their shares even if they vote for the Business Combination</u>**. A public stockholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13d-3 of the Securities Exchange Act of 1934, as amended), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 15% of the public shares. We have no specified maximum redemption threshold under our certificate of incorporation, other than the aforementioned 15% threshold. Each redemption of shares of Common Stock by our public stockholders will reduce the amount in our Trust Account, which held marketable securities with a fair value of approximately $202.0 million as of December 31, 2020.

The Business Combination Agreement provides that Lightning Systems' obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the PIPE Subscription Agreement and the Convertible Note Subscription Agreements, being no less than an aggregate amount of $150.0 million. This condition to closing in the Business Combination Agreement is for the sole benefit of the parties thereto and may be waived by either of us or Lightning Systems. If, as a result of redemptions of Common Stock by our public stockholders, this condition is not met (or waived), then either we or Lightning Systems may elect not to consummate the Business Combination. Furthermore, under the terms of the Convertible Note Subscription Agreements, a condition to the closing of the transactions contemplated by those agreements is that at least $50.0 million of the $150.0 million is from the Trust Account. In addition, in no event will we redeem shares of our Common Stock in an amount that would result in the Company's failure to have net tangible assets equaling or exceeding $5,000,001 (so that we are not subject to the SEC's "penny stock" rules). Holders of our outstanding public warrants do not have redemption rights in connection with the Business Combination. Unless otherwise specified, the information in the accompanying proxy statement assumes that none of our public stockholders exercise their redemption rights with respect to their shares of common stock.

Our initial stockholders prior to the IPO, GigAcquisitions3, LLC (sometimes referred to as the "*Founder*"), and those of our directors and officers who hold shares of Common Stock, together with Nomura Securities International, Inc. ("*Nomura*"), Oppenheimer & Co. Inc. ("*Oppenheimer*") and Odeon Capital Group LLC ("*Odeon*" and, together with Oppenheimer and Nomura, the "*Underwriters*")(such directors, officers, the Founder and the Underwriters, our "*Initial Stockholders*") have agreed to vote their shares of Common Stock in favor of the Business Combination. **Currently, our Initial Stockholders, officers and directors own approximately 22.8% of our issued and outstanding shares of Common Stock, including all of the Initial Stockholder Shares** (as defined below). The Initial Stockholder Shares are subject to transfer restrictions. The 5,893,479 shares of Common Stock (the "*Initial Stockholder Shares*") that are currently owned by our Initial Stockholders, of which 15,000 shares are held by our directors and officers, will be excluded from the pro rata calculation used to determine the per-share redemption price. Our Initial Stockholders have agreed to vote any shares of Common Stock owned by them in favor of the Business Combination.

We are providing you with the accompanying proxy statement and accompanying proxy card in connection with the solicitation of proxies to be voted at the Special Meeting and at any adjournments or postponements of the Special Meeting. Information about the Special Meeting, the Business Combination and other related business to be considered by the Company's stockholders at the Special Meeting is included in this proxy statement/prospectus. **Whether or not you plan to attend the Special Meeting, we urge you to read this proxy statement/prospectus, including the Annexes and the accompanying financials statements of the Company and of Lightning Systems, carefully and in their entirety. In particular, we urge you to read carefully the section entitled "*Risk Factors*" beginning on page 53 of the accompanying proxy statement.**

After careful consideration, our Board has approved the Business Combination Agreement and the transactions contemplated therein, and recommends that our stockholders vote "**FOR**" adoption of the Business Combination Agreement and approval of the transactions contemplated thereby, including the Business Combination, and "**FOR**" all other proposals presented to our stockholders in the accompanying proxy statement. When you consider the Board's recommendation of these proposals, you should keep in mind that our

**Table of Contents**

directors and officers have interests in the Business Combination that may conflict with your interests as a stockholder. Please see the section entitled "*Proposal No. 1 - Approval of the Business Combination - Interests of Certain Persons in the Business Combination*" for additional information.

Approval of each of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Incentive Plan Proposal, the Election of Directors Proposal and the Adjournment Proposal require the affirmative vote of a majority of the votes cast at the Special Meeting. Approval of the Charter Amendment Proposals require the affirmative vote of a majority of the outstanding shares of our Common Stock.

**Your vote is very important. Whether or not you plan to attend the Special Meeting, please vote as soon as possible by following the instructions in this proxy statement/prospectus to make sure that your shares are represented at the Special Meeting. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the Special Meeting. Even if you have voted by proxy, you may still vote during the Special Meeting by visiting www.virtualshareholdermeeting.com/GIK2021SM with your 16-digit control number assigned by Broadridge Financial Solutions included on your proxy card or obtained from them via email. The transactions contemplated by the Business Combination Agreement will be consummated only if the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals, the Incentive Plan Proposal and the Election of Directors Proposal are approved at the Special Meeting. The proposals in this proxy statement/prospectus (other than the Adjournment Proposal) are conditioned on the approval of the Business Combination Proposal.**

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted "**FOR**" each of the proposals presented at the Special Meeting. If you fail to return your proxy card or fail to instruct your bank, broker or other nominee how to vote, and do not attend the Special Meeting in person, the effect will be that your shares will not be counted for purposes of determining whether a quorum is present at the Special Meeting. If you are a stockholder of record and you attend the Special Meeting and wish to vote in person, you may withdraw your proxy and vote in person.

TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST DEMAND THAT THE COMPANY REDEEM YOUR SHARES FOR A PRO RATA PORTION OF THE FUNDS HELD IN THE TRUST ACCOUNT AND TENDER YOUR SHARES TO THE COMPANY'S TRANSFER AGENT AT LEAST TWO BUSINESS DAYS PRIOR TO THE VOTE AT SUCH MEETING. YOU MAY TENDER YOUR SHARES BY EITHER DELIVERING YOUR SHARE CERTIFICATE TO THE TRANSFER AGENT OR BY DELIVERING YOUR SHARES ELECTRONICALLY USING DEPOSITORY TRUST COMPANY'S DWAC (DEPOSIT WITHDRAWAL AT CUSTODIAN) SYSTEM. IF THE BUSINESS COMBINATION IS NOT COMPLETED, THEN THESE SHARES WILL NOT BE REDEEMED FOR CASH. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS.

On behalf of our Board, I would like to thank you for your support of GigCapital3, Inc. and look forward to a successful completion of the Business Combination.

Sincerely,

Dr. Avi S. Katz
Executive Chairman, Secretary, President and Chief Executive Officer
March 26, 2021

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN

**Table of Contents**

THIS PROXY STATEMENT/PROSPECTUS, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR RELATED TRANSACTIONS OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THIS PROXY STATEMENT/PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.

This proxy/prospectus statement is dated March 26, 2021, and is expected to be first mailed to Company stockholders on or about March 26, 2021.

**Table of Contents**

The following table illustrates varying ownership levels in the Company, assuming no redemptions by the Company's public stockholders and the maximum redemptions by the Company's stockholders:

| | No Redemptions | 15,050,267 shares of Common Stock redeemed |
|---|---|---|
| The Company's public stockholders | 24.3% | 7.36% |
| PIPE Investor | 3.0% | 3.72% |
| Initial Stockholders | 7.2% | 8.76% |
| The former Lightning Systems equity holders | 65.5% | 80.16% |
| | **100.0%** | **100.00%** |

Please see "*Unaudited Pro Forma Condensed Combined Financial Information - Description of the Business Combination*" on page 105.

**The Charter Amendment Proposals**

Upon the Closing, our amended and restated certificate of incorporation will be amended promptly to reflect the Charter Amendment Proposals to:

- provide for the classification of our Board into three classes of directors with staggered terms of office and to make certain related changes (Proposal No. 3);

- provide for certain additional changes, including but not limited to changing the post-combination company's corporate name from "GigCapital3, Inc." to "Lightning eMotors, Inc." and eliminating certain provisions specific to our status as a blank check company, which our Board believes are necessary to adequately address the needs of the post-combination company (Proposal No. 4A); and

- provide for the adoption of Delaware as the exclusive forum for certain stockholder litigation.

Please see the sections entitled *"Proposal No. 3 - Classification of the Board of Directors Proposal,"* *"Proposal No. 4A - Approval of Additional Amendments to Current Amended and Restated Certificate of Incorporation in Connection with the Business Combination Proposal"* and *"Proposal 4B - Authorization of Exclusive Form Provision"* for more information.

**Other Proposals**

In addition, the stockholders of the Company will be asked to vote on:

- a proposal to approve, for purposes of complying with applicable NYSE Listing Rules, the issuance of more than 20% of the Company's issued and outstanding Common Stock pursuant to the Business Combination, the PIPE Investment and the Convertible Note Investment (Proposal No. 2);

- a proposal to approve and adopt the Incentive Plan, a copy of which is attached to this proxy statement/prospectus as *Annex H*, including the authorization of the initial share reserve under the Incentive Plan (Proposal No. 5);

- a proposal to elect the directors comprising the board of directors of New Lightning eMotors following the closing of the Business Combination (Proposal No. 6); and

- a proposal to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Amendment Proposals or the Incentive Plan Proposal (Proposal No.7).

**Table of Contents**

Please see the sections entitled "*Proposal No. 2 - The NYSE Stock Issuance Proposal*," "*Proposal No. 5 - Approval of the Incentive Plan*," "*Proposal No. 6 – The Election of Directors Proposal*" and "*Proposal No. 7 - The Adjournment Proposal*" for more information.

**Date, Time and Place of Special Meeting**

The Special Meeting will be held on April 21, 2021 at 10:00 a.m., PDT, via live webcast at www.virtualshareholdermeeting.com/GIK2021SM. In light of ongoing developments related to coronavirus (COVID-19), after careful consideration, the Company has determined that the Special Meeting will be a virtual meeting conducted exclusively via live webcast in order to facilitate stockholder attendance and participation while safeguarding the health and safety of our stockholders, directors and management team. The Special Meeting will be conducted exclusively via live webcast and so stockholders will not be able to attend the meeting in person. Stockholders may attend the special meeting online and vote at the Special Meeting by visiting www.virtualshareholdermeeting.com/GIK2021SM and entering your 12-digit control number, which is either included on the proxy card you received or obtained through Broadridge Financial Solutions.

**Registering for the Special Meeting**

Any stockholder wishing to attend the virtual meeting should register in advance at www.virtualshareholdermeeting.com/GIK2021SM. To vote at the Special Meeting, please follow these instructions as applicable to the nature of your ownership of our Common Stock:

- To vote using the proxy card, simply complete, sign, date and return the proxy card pursuant to the instructions on the card. If you return your signed proxy card before the Annual Meeting, we will vote your shares as directed.

- To vote over the telephone, dial toll-free 1-800-690-6903 using a touch-tone phone and follow the recorded instructions. You will be asked to provide the company number and control number from the Notice. Your telephone vote must be received by 11:59 p.m. Eastern Time on April 20, 2021 to be counted.

- To vote through the Internet before the meeting, go to www.proxyvote.com and follow the onscreen instructions. Your Internet vote must be received by 11:59 p.m., Eastern Time on April 20, 2021 to be counted.

- To vote through the Internet during the meeting, please visit www.virtualshareholdermeeting.com/GIK2021SM and have available the 16-digit control number included in your Notice, on your proxy card or on the instructions that accompanied your proxy materials.

**Voting Power and Record Date**

Only Company stockholders of record at the close of business on March 15, 2021, the record date for the Special Meeting, will be entitled to vote at the Special Meeting. You are entitled to one vote for each share of Common Stock that you owned as of the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker, bank or other nominee to ensure that votes related to the shares you beneficially own are properly counted. On the record date, there were 25,893,479 shares of Common Stock outstanding and entitled to vote, of which 20,000,000 are public shares and 5,893,479 are Initial Stockholder Shares and Insider Shares held by our Initial Stockholders.

**Tax Consequences of the Business Combination**

For a description of the material U.S. federal income tax consequences of the Business Combination, please see the information set forth in the section entitled "*Proposal No. 1 – Approval of the Business Combination—Certain U.S. Federal Income Tax Considerations*".

37

Table of Contents

On October 2, 2020, the Company also entered into two separate letter agreements with BofA Securities pursuant to which, among other things, (1) the Company engaged BofA Securities to act as co-placement agent with Oppenheimer and Nomura on behalf of the Company in connection with the proposed PIPE financing and (2) acknowledged that BofA Securities would be permitted to provide such services as co-placement agent to the Company and concurrently provide transaction advisory services to Lightning Systems in connection with the proposed Business Combination.

On October 2, 2020, Oppenheimer, Nomura and BofA Securities began reaching out to prospective investors to schedule preliminary discussions regarding the proposed PIPE financing.

On October 4, 2020, Dr. Dinu introduced Mr. Selman to both Mr. Fenwick-Smith and Timothy Reeser, the Chief Executive Officer of Lightning Systems, over e-mail, and asked that Messrs. Fenwick-Smith and T. Reeser introduce Mr. Selman to Lightning Systems' legal counsel to begin discussions regarding the definitive Business Combination Agreement and a proxy statement. Dr. Dinu also requested that DLA review a draft of a confidential information memorandum that the Company and Lightning Systems intended to begin using the following day in meetings with prospective investors in the PIPE financing.

On October 4, 2020, Mr. Fenwick-Smith introduced Mr. Selman by e-mail to Keith Townsend of King & Spalding, outside legal counsel to Lightning Systems, and Jeff Reeser, who is acting as general counsel to Lightning Systems. Mr. Selman replied introducing his partner John Maselli of DLA, who Mr. Selman indicated would assist with preparing the definitive transaction documentation, and indicating that the lawyers should arrange a kick-off call to discuss documentation. Mr. Selman that same day e-mailed the same group with a proposed form of PIPE Subscription Agreement to be entered into by the Company and prospective investors in the PIPE financing, and requested that Messrs. J. Reeser and Townsend provide comments. Mr. J. Reeser replied indicating that he and Mr. Townsend would review the form of PIPE Subscription Agreement and let Mr. Selman know if they have any comments.

On October 5, 2020, and continuing for several weeks thereafter, the respective teams for Oppenheimer, Nomura, BofA Securities, the Company and Lightning Systems arranged and hosted virtual meetings with prospective investors in the PIPE financing, during which those teams made presentations to and answered questions from prospective PIPE financing investors regarding Lightning Systems' business, with the goal of raising at least $100 and up to $150 million in the PIPE financing based on a proposed pre-money valuation of Lightning Systems equity of $899 million. Between October 5, 2020 and November 16, 2020 the parties met approximately 46 potential investors in the PIPE financing in 58 meetings.

On October 5, 2020, Mr. Selman spoke by telephone with representatives of King & Spalding to provide an update on the investor meetings for the proposed PIPE financing that had occurred that day. During that call, the counsel discussed the preparation of the form of PIPE Subscription Agreement for the proposed PIPE financing, the definitive Business Combination Agreement for the proposed Business Combination, this proxy statement/prospectus and Lightning Systems' financial statements to be filed with the SEC in connection with the proposed Business Combination. They also discussed legal due diligence, which commenced after this conversation and continued until the Business Combination Agreement was finalized and signed on December 10, 2020.

On October 5, 2020, Dr. Dinu, Mr. Miotto, and Dr. Katz spoke with Mr. T. Reeser for 90 minutes about the current status of Lightning Systems sales, orders, and the sales pipeline, with specific questions around timing, risks, and cancellation clauses.

On October 7, 2020, Mr. Selman e-mailed the proposed form of PIPE Subscription Agreement for the proposed PIPE financing to a representative of Mayer Brown LLP ("*Mayer Brown*"), outside legal counsel to the joint placement agents, and asked that Mayer Brown provide comments to the form of PIPE Subscription Agreement. Later that day, Mr. Selman spoke by telephone with this same representative of Mayer Brown regarding the form of PIPE Subscription Agreement.

151

**Table of Contents**

into account (i) warrants to purchase Common Stock that will remain outstanding immediately following the Business Combination, (ii) the issuance of Stockholder Earnout Shares to the Stockholder Earnout Group should the earnout conditions in the Business Combination Agreement be satisfied, (iii) conversion of any of the Convertible Notes or (iv) the issuance of any shares upon completion of the Business Combination under the Incentive Plan, a copy of which is attached to this proxy statement/prospectus as *Annex H*. If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in New Lightning eMotors will be different. As a result of the Business Combination, the economic and voting interests of our public stockholders will decrease.

The public warrants and private placement warrants will become exercisable thirty (30) days after the completion of an initial business combination and will expire five (5) years after the completion of an initial business combination or earlier upon their redemption or liquidation.

Please read "*Unaudited Pro Forma Condensed Combined Financial Information*" for further information.

**Board of Directors of New Lightning eMotors Following the Business Combination**

Assuming the Election of Directors Proposal is approved by our stockholders at the special meeting, we expect the New Lightning eMotors Board to be comprised of the individuals set forth below following the completion of the Business Combination.

| Name | Age | Position |
| --- | --- | --- |
| Timothy Reeser | 49 | Chief Executive Officer and Class II Director |
| Dr. Avi Katz | 62 | Co-Chairman of the Board and Class III Director |
| Robert Fenwick-Smith | 58 | Co-Chairman of the Board and Class III Director |
| Dr. Raluca Dinu | 47 | Class II Director |
| Neil Miotto | 74 | Class I Director |
| Thaddeus Senko | 64 | Class I Director |
| Meghan Sharp | 49 | Class II Director |
| Diana Tremblay | 61 | Class III Director |
| Bruce Coventry | 68 | Class I Director |

Upon the Closing Date, we anticipate that the New Lightning eMotors Board will consist of nine members, reclassified into three separate classes, with each class serving a three-year term. Except with respect to the election of directors at the special meeting pursuant to *Proposal No. 6 — The Election of Directors Proposal*, the Class I directors will be elected to an initial one-year term (and three-year terms subsequently), the Class II directors will be elected to an initial two-year term (and three-year terms subsequently) and the Class III directors will be elected to an initial three-year term (and three-year terms subsequently).

Our board of directors has nominated the following individuals for election at our special meeting pursuant to Proposal No. 6 — The Election of Directors Proposal:

- *Class I Directors*: Neil Miotto, Thaddeus Senko and Bruce Coventry;

- *Class II Directors*: Dr. Raluca Dinu, Timothy Reeser and Meghan Sharp; and

- *Class III Directors*: Dr. Avi Katz, Robert Fenwick-Smith and Diana Tremblay.

For additional details, see the sections of this proxy statement/prospectus entitled "*Proposal No. 6 — The Election of Directors Proposal*" and "*Management After the Business Combination.*"

170

**Table of Contents**

**PROPOSAL NO. 6 — THE ELECTION OF DIRECTORS PROPOSAL**

**Overview**

Pursuant to the Company's current amended and restated certificate of incorporation, the GigCapital3 Board is currently divided into three classes, Class I, Class II and Class III with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. The proposed Second Amended and Restated Certificate of Incorporation provides that the authorized number of directors will be fixed in the manner as provided in the bylaws of GigCapital3, which bylaws are to provide for a classified board with three terms pursuant to the Business Combination Agreement.

Pursuant to the Business Combination Agreement, at the Closing Date, our board of directors will consist of Robert Fenwick-Smith, Dr. Avi Katz, Timothy Reeser, Dr. Raluca Dinu, Thaddeus Senko, Neil Miotto, Meghan Sharp and two other individuals to be nominated in writing unanimously by the above-named individuals. Thaddeus Senko, Neil Miotto and Bruce Coventry are being nominated to serve as Class I directors; Timothy Reeser, Dr. Raluca Dinu and Meghan Sharp are being nominated to serve as Class II directors and Robert Fenwick-Smith, Dr. Avi Katz and Diana Tremblay are being nominated to serve as Class III directors.

Information regarding each nominee is set forth in the section entitled "*Management After the Business Combination.*"

**Vote Required for Approval**

The Election of Directors Proposal is conditioned on the approval of the Business Combination Proposal and the NYSE Stock Issuance Proposal at the special meeting.

If a quorum is present, directors are elected by a plurality of the votes cast, in person online or by proxy. This means that the nine nominees will be elected if they receive more affirmative votes than any other nominee for the same position. Votes marked "**FOR**" a nominee will be counted in favor of that nominee. Proxies will have full discretion to cast votes for other persons in the event any nominee is unable to serve. Failure to vote by proxy or to vote in person online at the special meeting and broker non-votes will have no effect on the vote since a plurality of the votes cast is required for the election of each nominee.

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" PROPOSAL NO. 6.**

210

**Table of Contents**

Each member of the audit committee is financially literate and the Company's Board has determined that Mr. Miotto qualifies as an "audit committee financial expert" as defined in applicable SEC rules.

The Company has adopted an audit committee charter, which details the purpose and principal functions of the audit committee, including:

- assisting the Board in the oversight of (i) the accounting and financial reporting processes of the Company and the audits of the financial statements of Company, (ii) the preparation and integrity of the financial statements of the Company, (iii) the compliance by the Company with financial statement and regulatory requirements, (iv) the performance of the Company's internal finance and accounting personnel and its independent registered public accounting firms, and (v) the qualifications and independence of the Company's independent registered public accounting firms;

- reviewing with each of the internal and independent registered public accounting firms the overall scope and plans for audits, including authority and organizational reporting lines and adequacy of staffing and compensation;

- reviewing and discussing with management and internal auditors the Company's system of internal control and discuss with the independent registered public accounting firm any significant matters regarding internal controls over financial reporting that have come to its attention during the conduct of its audit;

- reviewing and discussing with management, internal auditors and independent registered public accounting firm the Company's financial and critical accounting practices, and policies relating to risk assessment and management;

- receiving and reviewing reports of the independent registered public accounting firm discussing (i) all critical accounting policies and practices to be used in the firm's audit of the Company's financial statements, (ii) all alternative treatments of financial information within U.S. GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm, and (iii) other material written communications between the independent registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

- reviewing and discussing with management and the independent registered public accounting firm the annual and quarterly financial statements and section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" of the Company prior to the filing of the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q;

- reviewing, or establishing, standards for the type of information and the type of presentation of such information to be included in, earnings press releases and earnings guidance provided to analysts and rating agencies;

- discussing with management and the independent registered public accounting firm any changes in Company's critical accounting principles and the effects of alternative U.S. GAAP methods, off-balance sheet structures and regulatory and accounting initiatives;

- reviewing material pending legal proceedings involving the Company and other contingent liabilities;

- meeting periodically with the Chief Executive Officer, Chief Financial Officer, the senior internal auditing executive and the independent registered public accounting firm in separate executive sessions to discuss results of examinations;

- reviewing and approving all transactions between the Company and related parties or affiliates of the officers of the Company requiring disclosure under Item 404 of Regulation S-K prior to the Company entering into such transactions;

220

Table of Contents

GIG1 in October 2017 and has continued in that role after that company became Kaleyra, Inc. Mr. Miotto has also served on the board of directors of GIG2 since March 2019. In addition, Mr. Miotto served on the board of directors of Micrel, Inc. prior to its sale to Microchip Technology Inc. in May 2015, and on the board of directors of GigPeak from 2008 until its sale to IDT in April 2017. He also previously served on the board of directors of Cognizer from March 2019 to August 2020. He is a member of the American Institute of Certified Public Accountants and holds a Bachelor of Business Administration degree from Baruch College of The City University of New York.

Mr. Miotto is qualified to serve on the New Lightning eMotors Board based on his business experience as a board member of a publicly-listed company and his experience as an audit committee financial expert.

*Thaddeus Senko*. Upon the consummation of the Business Combination, Mr. Senko will serve as a member of the New Lightning eMotors Board. Since 2018, Mr. Senko has served as a member of Autoliv Inc.'s (NYSE:ALV), a supplier of automotive safety systems, board of directors, serving as chairman of the audit committee, as well as on the risk and compliance, nominating and governance committee. From 1978 to 2017, Mr. Senko served as a partner at KPMG LLP, providing enterprise risk management, compliance, and audit services to various public companies. At KPMG, he served as Audit Partner and SEC Reviewing Partner for eight years, Chief Audit Executive for four years, Global and National Partner in Charge of Internal Audit, Risk & Compliance Services for eight years, Global Engagement Partner and Client Services Partner for seven years and Global Leader of the ESG practice for two years. Mr. Senko's overall career at KPMG spanned 39 years. Previously, Mr. Senko served on the Board of Duquesne University, a private university with approximately 10,000 students, from 2007 to 2016, chairing the Audit and Finance Committee and serving on the Executive and University Advancement Committee. Mr. Senko continues to serve on the university's Business Advisory Council. He is deemed to be an "audit committee financial expert" under SEC rules. Mr. Senko received a bachelor's degree in business administration from Duquesne University.

Mr. Senko is qualified to serve on the New Lightning eMotors Board based on his experience as a director to private and public companies and his experience in the automotive industry.

*Meghan Sharp.* Upon the consummation of the Business Combination, Ms. Sharp will serve as a member of the New Lightning eMotors Board. Since 2020, Ms. Sharp has served as the Global Head of BP Ventures, Inc. ("BP Ventures"), an affiliate of BP Technology Ventures, Inc., which is a venture capital firm that primarily invests in private and high-growth technology companies in the upstream, downstream and alternative energy. At BP Ventures, Ms. Sharp also serves as the Vice President of "innovation & engineering" teams, leading BP Ventures's initiatives in orienting businesses towards reducing carbon emissions to zero. From October 2019 to 2020, Ms. Sharp served as the Chief Operating Officer for Beyond Limits, an Artificial Intelligence (AI) and cognitive computing company that engineers advanced cognitive AI solutions for companies in industries such as energy, healthcare, finance and logistics. From August 2010 to October 2019, Ms. Sharp served as the Managing Director of BP Ventures's Americas division. Ms. Sharp holds a Ph.D. in Microbial Genetics from the University of California, San Francisco, has held postdoctoral positions in plant genetics at the University of Chicago and the Carnegie Institution of Washington at Stanford University, and an MBA with a focus on venture capital from Columbia University.

Ms. Sharp is qualified to serve on the New Lightning eMotors Board based on her experience in the clean energy industry.

*Diana Tremblay*. Upon the consummation of the Business Combination, Ms. Tremblay will serve as a member of the New Lightning eMotors Board. Ms. Tremblay currently serves on the Board of Directors of Itron, Inc. (NASDAQ:ITRI). Ms. Tremblay retired from General Motors Company, the motor vehicle manufacturer and distributor multinational corporation (NYSE:GM) in September 2017. She had been with that company since 1977, and during her tenure at GM, she held a variety of positions in engineering, manufacturing and labor relations, including direct operational responsibility for over 50,000 employees. From July 2013 until her retirement, Ms. Tremblay served as Vice President of Global Business Services, where she was charged with

279

Table of Contents

streamlining administrative processes around the world to improve service quality, reduce complexity, and achieve cost efficiencies in such areas as finance, human resources, real estate, purchasing, asset management, and master data. From December 2009 to July 2013, Ms. Tremblay held the position of Vice President of Manufacturing at GM. She has a Bachelor of Industrial Administration Degree form Kettering University (formerly General Motors Institute) and a Master of Science in Management Degree from Massachusetts Institute of Technology.

Ms. Tremblay is qualified to serve on the New Lightning eMotors Board based on her broad business experience that includes her previous roles at GM as an engineer, plant manager, head of manufacturing, and lead labor relations negotiator, which together with her knowledge of business services and global manufacturing processes, provide additional international, administrative and manufacturing perspectives to the Board.

*Bruce Coventry*. Upon the consummation of the Business Combination, Mr. Coventry will serve as a member of the New Lightning eMotors Board. Since the first quarter of 2020, Mr. Coventry has served as a senior advisor to GigCapital Global, a leading automotive technology and business advisory board. Mr. Coventry is currently the President of Coventry Consulting Group, an automotive consultancy focused on integrating technology-based start-ups into the complex processes of Global Automotive OEM's. Between March 2017 and December 2020, Mr. Coventry was Managing Partner of motormindz, an automotive consulting group. From November 2015 to December 2016, Mr. Coventry was Chief Operating Officer of Android Industries, a private equity owned and world's largest assembler of automotive complex sub-assemblies and modules. Mr. Coventry has been a member of the Board of Directors of Canada Carbon Inc. (TSX.V: CCB), a natural resources company focused on the acquisition and development of graphite properties throughout Canada, since August 2012. Mr. Coventry also served as Chairman of the Board of Directors of TowerSec Inc., an automotive cybersecurity software company that is a leading global solution vendor, specializes in delivering on-board cyber security software products to OEMs, suppliers and the aftermarket telematics manufacturers, beginning in August 2013 until the company's acquisition by HARMAN (NYSE:HAR) in March 2016. Mr. Coventry also currently serves on the Board of Trustees of Kettering University (formerly General Motors Institute), a position that he has held since 2001. Mr. Coventry has also ran a Global Engine Joint Venture initiative for Chrysler, Hyundai, and Mitsubishi, and previously served as President of Chrysler's Global Electric Motorcar. Mr. Coventry holds a Bachelor of Industrial Administration Degree from Kettering University and a Master of Business Administration from Michigan State University.

Mr. Coventry is qualified to serve on the New Lightning eMotors Board based on his broad business experience including his extensive experience in automotive product development, manufacturing, engineering, operations, and supply chain management.

**Classified Board of Directors**

In accordance with our certificate of incorporation, our Board is not classified as all directors are elected to one-year terms on an annual basis.

As discussed above, in connection with the Business Combination, the New Lightning eMotors Board will be reconstituted and initially be comprised of nine members who will be voted upon by the stockholders at the Special Meeting. Our Board believes it is in the best interests of the Company for the New Lightning eMotors Board to be classified into three classes, each comprising as nearly as possible one-third of the directors to serve three-year terms. If Proposal No. 3 is approved at the Special Meeting, each Class I director, consisting of Thaddeus Senko, Neil Miotto and Bruce Coventry, will have a term that expires at the post-combination company's annual meeting of stockholders in 2021, each Class II director, consisting of Timothy Reeser, Dr. Raluca Dinu and Meghan Sharp, will have a term that expires at the post-combination company's annual meeting of stockholders in 2022 and each Class III director, consisting of Robert Fenwick-Smith, Dr. Avi Katz and Diana Tremblay, will have a term that expires at the post-combination company's annual meeting of stockholders in 2023, or in each case until their respective successors are duly elected and qualified, or until their earlier resignation, removal or death.

280