IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02774-RMR-KAS
        Consolidated with No. 21-cv-03215-RMR-KAS

JOHNNY R. SHAFER,
DAVID P. SARRO,
KEVIN L. TYE,
JESS Q. WILLIAMS,
JUSTIN COHEN,
        individually and on behalf of all others similarly situated,

        Plaintiffs,[1]

v.

LIGHTNING EMOTORS, INC.,
TIMOTHY R. REESER, and
TERESA P. COVINGTON,
GIGACQUISITIONS3 LLC,
GIGCAPITAL GLOBAL,
AVI S. KATZ,
RALUCA DINU,
NEIL MIOTTO,
GIGFOUNDERS LLC,
BRAD WEIGHTMAN,
ANDREA BETTI-BERUTTO,
PETER WANG,
JOHN J. MIKULSKY, and
ROBERT FENWICK-SMITH,

        Defendants.

---

[1] On December 17, 2021, the District Judge consolidated 21-cv-02774-RMR-KLM with 21-cv-03215-STV. *Order* [#36]. On April 22, 2022, the District Judge appointed David P. Sarro, Kevin L. Tye, and Jess Q. Williams as Lead Plaintiffs. *Order* [#48]. At the parties' subsequent request, the Court allowed the filing of a Consolidated Complaint [#52] for the consolidated actions. *Minute Order* [#51]. The heading on the Consolidated Complaint [#52] includes only Johnny R. Shafer and Justin Cohen (individually and on behalf of all others similarly situated) as Plaintiffs. However, in the body of the Consolidated Complaint, only the three Lead Plaintiffs, David P. Sarro, Kevin L. Tye, and Jess Q. Williams, are identified by name as parties. *See* [#52] ¶¶ 18-20. The Court notes that the heading on the electronic docket lists all five of these Plaintiffs, and the record contains no indication that Plaintiffs Shafer and Cohen are no longer associated with this lawsuit. Thus, the Court has included all five named Plaintiffs in the heading for this lawsuit. Regardless, the identities of the specific plaintiffs in this action have no impact on the Court's analysis of the Motions [#99, #101] addressed in this Recommendation.

_____

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

This matter is before the Court on the **Motion to Dismiss Plaintiffs'
Consolidated Complaint** [#99], filed by Defendants Lightning eMotors, Inc. ("Lightning"),
Timothy R. Reeser ("Reeser"), Teresa P. Covington ("Covington"), and Robert Fenwick-
Smith ("Fenwick-Smith") (collectively, the "Lightning Defendants"), and on the **Motion to
Dismiss Consolidated Complaint with Incorporated Memorandum of Law** [#101],
filed by Defendants GigAcquisitions3, LLC ("GigAcquisitions3"), GigFounders, LLC
("GigFounders"), GigCapital Global ("GigCapital"), Avi S. Katz ("Katz"), Raluca Dinu
("Dinu"), Neil Miotto ("Miotto"), Brad Weightman ("Weightman"), John Mikulsky
("Mikulsky"), Andrea Betti-Berutto ("Betti-Berutto"), and Peter Wang ("Wang")
(collectively, the "Gig3 Defendants"). Plaintiffs filed a single Response [#104] in
opposition to both Motions [#99, #101], and Defendants filed Replies [#105, #107]. The
Motions [#99, #101] have been referred for a Recommendation regarding disposition.
*See* [#103]. The Court has reviewed the briefs, the case file, and the applicable law. For
the reasons stated below, the Court **RECOMMENDS** that the Motions [#99, #101] be
**GRANTED**.

### I. Background

"This is a securities class action brought on behalf of investors in Lightning eMotors
securities during the period of May 18, 2020 through August 16, 2021, inclusive (the
"Class Period"), against [Defendant Lightning], certain of its officers and directors, and

the officers, directors, and certain affiliates of the Company's predecessor entity, GigCapital3, Inc. ("GigCapital3")," seeking remedies under Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act") and Sections 14(a), 20(a), and 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"). *Consol Compl.* [#52] at 5, ¶ 1. In short, Plaintiffs assert that Defendants intentionally misled investors. *See, e.g.*, *id.* ¶ 10. The Motions [#99, #101] seek to have this case dismissed in its entirety.

According to the Consolidated Complaint [#52],[2] the events giving rise to Plaintiffs' claims began when GigCapital3, a special purpose acquisition vehicle ("SPAC"), held its initial public offering ("IPO") on May 18, 2020. *Consol. Compl.* [#52] ¶ 1. GigCapital3 was a shell corporation formed by Defendant GigAcquisition3, at the direction of Defendant GigCapital and Defendant GigFounders (and through such entities, managing partners Defendant Katz and Defendant Dinu), with the sole purpose of pooling funds through an IPO to acquire or otherwise combine with a late-stage private company. *Id.*

Plaintiffs assert: "To say that using SPACs, rather than traditional IPOs, to take companies public was in vogue in 2020 would be an understatement." *Id.* ¶ 3. In 2019, there were 59 SPAC IPOs, raising $13.6 billion and accounting for 28% of companies brought public. *Id.* In 2020, there were 248 SPAC IPOs, collectively accounting for 55% of companies brought public and raising $83.4 billion in gross proceeds—a more than 500% increase in proceeds from 2019 to 2020. *Id.* Plaintiffs state that "[t]his proliferation

---

[2] The following recitation of allegations is primarily taken from Plaintiffs' overview of the case in the Consolidated Complaint [#52]. The Court discusses more detailed allegations, as necessary, in the Analysis section of this Recommendation. The Court further notes that all briefs and exhibits cited in this Recommendation are cited to the docket page number rather than to any page numbering on the documents themselves.

meant that investors looking to participate in a SPAC had a wealth of options to choose from." *Id.* Because at the time of its IPO a SPAC has not identified a target to acquire, investors are left to make their investment decision based on the information available about the SPAC itself—namely, the members of the SPAC's management team and their business experience, investment thesis, and track record in bringing other companies public. *Id.*

The directors and officers of GigCapital3 allegedly attempted to set their SPAC apart by selling investors on what they referred to as their "unique" approach to private equity in the SPAC's registration statement and prospectus filed with the Securities and Exchange Commission ("SEC"). *Id.* ¶ 4. Rather than completing a business transaction and cashing out their lucrative "initial stockholder shares,"[3]—the GigCapital3 team would employ a "Mentor-Investor" approach, with a plan to remain engaged with the target company over a three-to-five year period in order to ensure its success. *Id.* The GigCapital3 team would place members of its management on the board of the newly public target company, and its members would use their experience running public companies to help the target company's management develop appropriate strategies and, if necessary, acquire additional funding. *Id.*

Plaintiffs state that this strategy worked, as GigCapital3 successfully raised $200 million through the sale of securities to investors in its IPO. *Id.* ¶ 5. Prior to the IPO, SPAC sponsor Defendant GigAcquisitions3 (owned by the GigCapital3 management team)

---

[3] "Initial stockholder shares" are the private shares purchased, for what Plaintiffs describe as "a pittance," by the SPAC sponsors in the SPAC before the IPO. *Id.*

4

purchased more than 5.7 million "founders' shares" of GigCapital3 (approximately 20% of the SPAC) for just $25,000. *Id.*

On December 10, 2020, GigCapital3 announced that it had reached an agreement, subject to GigCapital3 investor approval, to acquire Lightning Systems (then doing business as Lightning eMotors), an electric vehicle and powertrain manufacturer based in Loveland, Colorado. *Id.* ¶ 6. Once the business combination was completed, Lightning Systems would become a wholly owned subsidiary of GigCapital3, GigCapital3 would rename itself Lightning eMotors, and GigCapital3 units, warrants, and common stock—then trading on the New York Stock Exchange ("NYSE") under the symbols "GIK.U," "GIK.WS," and "GIK"—would be relisted as "ZEV.WS" and "ZEV," with the units ("GIK.U") first being broken into their underlying securities. *Id.* Thus, Lightning Systems would become a publicly traded company without ever having to conduct a traditional IPO. *Id.*

Defendants allegedly sold the deal with Lightning Systems to investors as an ideal match: not only was Lightning Systems' management a good candidate for the "Mentor-Investor" approach supposedly employed by the GigCapital team, but the company itself was on the cusp of massive growth. *Id.* ¶ 7. With the funding provided by the SPAC acquisition, Lightning Systems was allegedly poised to grow its revenues exponentially, from $9 million in 2020 to $63 million in 2021 (a 600% increase from 2020 to 2021) to $354 million in 2022 (a 460% increase from 2021 to 2022). *Id.* Additionally, the company's gross margin would supposedly increase more than five-fold, from 3% in 2020 to 19% in 2022. *Id.* Defendants assured investors that they had "strong visibility" into these numbers

5

because Lightning Systems' backlog of contracted orders already covered revenues into 2022. *Id.*

Defendants continued to sell investors on Lightning Systems' growth story through press releases, investor presentations, and SEC filings until March 26, 2021, when GigCapital3 issued and disseminated the definitive proxy requesting that eligible shareholders vote to approve the business combination with Lightning Systems and, among other proposals, to elect Defendants Katz, Dinu, and Miotto to the new Lightning eMotors board of directors (the "Board") for initial terms of three years, two years, and one year, respectively. *Id.* Plaintiffs assert that, unbeknownst to investors, Defendants' statements touting Lightning Systems' positioning for rapid growth, robust supply chain, and operational stability were false and misleading, as were representations that the GigCapital3 team would remain engaged in the post-combination company. *Id.*

Plaintiffs state that, in truth, Lightning Systems was not well-positioned to rapidly scale its operations and that its projected financials were unachievable, as Defendants knew or were reckless in not knowing. *Id.* ¶ 9. The company had only been designing and manufacturing electric vehicles for two years and allegedly did not have the mature supply chain necessary to scale its production at the rate promised. *Id.* As a small, cash-constrained company, Lightning Systems was forced to rely on small, lower-tier suppliers for many of its key parts, including the batteries that powered its vehicles. *Id.* These suppliers did not have the capacity to move from production of small batches of parts to the hundreds needed for Lightning Systems to achieve the vehicle production quotas or revenue promised to investors. *Id.* Incomplete vehicles sitting on Lightning's production

floor for weeks or months while waiting for additional parts was already common. *Id.* Plaintiffs further allege that components shortages that had long afflicted the company became progressively worse through 2020 and into 2021, so that by the time the March 26, 2021 proxy was issued, Lightning Systems was already far off track for its 2021 revenue projections. *Id.*

Plaintiffs assert that, based on the false and misleading information contained in the proxy and earlier solicitation materials, GigCapital3 investors voted to approve the deal. *Id.* ¶ 10. The business combination with Lightning Systems closed on May 6, 2021, and Lightning eMotors securities began trading on the NYSE on May 7, 2021. *Id.* On May 11, 2021, five days after the deal closed, the new Lightning eMotors Board met and elected to reclassify the directorships of Defendant Katz (now co-Chairman of the Board) and Defendant Dinu, so that, like Defendant Miotto, they would only serve initial terms of one year on the Board. *Id.* This meant that they would need to run for re-election on October 7, 2021, at the first annual shareholder meeting. *Id.*

Less than a week later, on May 17, 2021, Lightning eMotors announced disappointing financial results for the first quarter of 2021, producing only thirty-one vehicles and one powertrain kit of its projected 500 annual quota and a net loss for the quarter of $27.4 million. *Id.* ¶ 11. It also revised its financial guidance downward, guiding $50 to $60 million in revenue for 2021 rather than the $63 million reported in the proxy, an approximate 5-20% revenue reduction. *Id.* The company's management attributed the miss to supply chain "headwinds" in the first quarter and noted that supply chain shortages would "have a significant impact on short-term margin and operating costs," but still

7

insisted that "Lightning eMotors [was] well-positioned to achieve its 2021 forecast of over 500 purpose-built zero emission commercial vehicles," and well-equipped to handle any further "supply chain unpredictability." *Id.* The company's management reiterated these sentiments at an "analyst day" on June 17, 2021, once again stating that the company's "established network" of suppliers and manufacturing partners were "making it easier to scale" and that they felt confident in the latest financial projections. *Id.*

Plaintiffs allege that the truth was revealed on August 16, 2021, when, following market close, the company announced dismal second quarter results. *Id.* ¶ 12. It announced that, because of "supply chain challenges," it had produced only thirty-seven vehicles and powertrain systems in the second quarter, and earned only $10.5 million during the first half of 2021, with a net loss over the same period of $73.5 million and net loss per share for the quarter of $0.79 (compared to $0.10 in the second quarter of 2020). *Id.* The company's gross margin had also worsened from -16% in the first quarter of 2021 to -19% in the second quarter. *Id.* Additionally, the company announced that it was withdrawing its prior financial guidance for 2021, as it no longer expected to meet the numbers provided, and announced that none of the GigCapital3 team members elected to the Board—Defendants Miotto, Dinu, and Katz—would be standing for re-election. *Id.* In other words, Plaintiffs state, "within just three months of the closing and amidst significant operational and financial challenges for Lightning, the GigCapital3 team was officially jumping ship and abandoning any pretense of actually employing the 'Mentor-Investor' model and three-to-five year engagement they had sold to investors." *Id.*

Following these disclosures, Plaintiffs allege that the artificial inflation caused by Defendants' purportedly materially false and misleading statements and omissions disappeared from Lightning's securities. *Id.* ¶ 13. Its stock price dropped from a closing price of $9.63 per share on August 16, 2021 to close at $8 per share on August 17, 2021—a single-day drop of 17% on unusually high trading volume. *Id.* Its warrant price dropped from a close of $1.82 on August 16, 2021, to close at $1.44 per warrant on August 17, 2021, a single-day drop of nearly 21%. *Id.*

Plaintiffs assert that, in short, Defendants, through the creation of the SPAC and affiliated entities and the issuance of numerous false and misleading misrepresentations and omissions of material fact, were able to persuade investors to invest in their SPAC and approve a business combination that was not nearly as promising or valuable as represented. *Id.* ¶ 14. While investors suffered significant damage from the business combination and resultant revelation of the purportedly true facts surrounding the transaction, Defendants allegedly reaped enormous profit. *Id.* Defendant Lightning obtained approximately $268 million in gross proceeds from the business combination; Defendants Reeser and Fenwick-Smith, who had owned significant Lightning Systems equity, subsequently owned millions of shares of a publicly traded company with the possibility of earning additional shares pursuant to an "earnout" clause in the merger agreement; Defendant Reeser received a six-figure "bonus" to celebrate the closing of the combination, while Defendant Fenwick-Smith and Defendant Covington each received a significant five-figure "bonus"; within a few weeks of closing, Defendant Reeser had his annual salary more than doubled and received large grants of Defendant

Lightning's restricted stock, with the added benefit of a massive annual bonus structure in the future; and Defendant GigAcquisitions3's founder shares, purchased for only $25,000, have made the GigCapital3 management team millions. *Id.* As of market close on May 16, 2022, Lightning's stock was worth $3.94 per share, approximately 43% of GigCapital3's $9.05 closing price on April 21, 2021, the day that shareholders approved the merger with Lightning. *Id.*

As a result of these allegations, Plaintiffs bring the following claims. Count I asserts violation of Section 11 of the 1933 Act by Lightning eMotors and the Gig Defendants (Katz, Dinu, Miotto, Weightman, Mikulsky, Betti-Berutto, and Wang). *Id.* ¶¶ 202-12. Count II asserts violation of Section 15 of the 1933 Act by the seven Gig Defendants and the Control Entity Defendants (GigCapital, GigFounders, and GigAcquisitions3). *Id.* ¶¶ 213-18. Count III asserts violation of Section 14(a) of the 1934 Act by Lightning eMotors and the seven Gig Defendants. *Id.* ¶¶ 219-31. Count IV asserts violation of Section 20(a) of the 1934 Act by the three Control Entity Defendants, the seven Gig Defendants, and the Lightning Defendants (Reeser, Fenwick-Smith, and Covington). *Id.* ¶¶ 232-38. Count V asserts violation of Section 10(b) of the 1934 Act by Lightning eMotors, the seven Gig Defendants, and the three Lightning Defendants. *Id.* ¶¶ 239-48. Count VI asserts violation of Section 20(a) of the 1934 Act by the seven Gig Defendants, the three Control Entity Defendants, and the three Lightning Defendants. *Id.* ¶¶ 249-57.

## II. Standard of Review

**A.      Fed. R. Civ. P. 12(b)(6)**

Rule 12(b)(6) tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[P]lausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (internal quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). However, "[a] pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do. Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). As the Tenth Circuit has explained, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is

insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (citation omitted).

## B.   Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA")

Securities fraud claims are subject to heightened pleading requirements. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095-96 (10th Cir. 2003). Fed. R. Civ. P. 9(b) states, "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." The Tenth Circuit has held that "Rule 9(b) does not require that a complaint set forth detailed evidentiary matter as to why particular defendants are responsible for particular statements, or that the allegations be factually or legally valid. Instead, Rule 9(b) requires that the pleadings give notice to the defendants of the fraudulent statements for which they are alleged to be responsible." *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1253 (10th Cir. 1997). Thus, "a complaint must identify the time, place, and content of each allegedly fraudulent representation or omission, identify the person responsible for it, and identify the consequences thereof[,]" i.e., "'the what, when, where and how.'" *Caprin v. Simon Transp. Servs., Inc.*, 99 F. App'x 150, 158 (10th Cir. 2004).

Prior to 1995, Rule 9(b) "set the standard for the level of particularity required when pleading the elements of a securities fraud claim." *Adams*, 340 F.3d at 1095. "In 1995,

Congress heightened the pleading standard for federal securities fraud with the passage of the PSLRA." *Id.* The PSLRA requires the complaint in a securities fraud action to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). According to the Tenth Circuit, "the PSLRA increased the burden on a plaintiff's pleading of the first element of a securities fraud action: the allegation that the defendant made a false statement, or failed to state a material fact necessary to make statements made not misleading." *Adams*, 340 F.3d at 1095.

Additionally, the Tenth Circuit has noted the heightened standard for pleading the scienter element of a securities fraud claim. *Id.* at 1095-96. While Rule 9(b) permits malice, intent, knowledge, and other conditions of mind to be averred generally, the PSLRA imposes a "more stringent rule" with respect to state of mind. *Id.* at 1096. It requires that, "[i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *see also Ellis v. Spectranetics Corp.*, No. 15-cv-01857-KLM, 2018 WL 1583837, at **7-13 (D. Colo. Apr. 2, 2018) (dismissing securities fraud complaint that failed to allege sufficient facts to create an inference of scienter that was at least as strong as any opposing inference).

13

## III. Analysis

At the outset, the Court notes a dispute regarding what documents may be considered in connection with adjudication of the Motions [#99, #101]. In a footnote, Plaintiffs object to Defendants' introduction of materials outside of the Amended Complaint [#52] to establish the truth of matters therein. *Response* [#104] at 25 n.8. Although Plaintiffs cite to certain pages in Defendants' Motions [#99, #101], they do not state which specific exhibits they contest and on what specific grounds they are asserting the Court should decline to consider each specific exhibit. This is particularly unhelpful given that a wide range of documents may be considered on motions to dismiss in securities fraud cases (although that range is certainly not unlimited). The Court finds that Plaintiffs have essentially waived their argument by failing to provide specific enough argument here. *See Cribari v. Allstate Fire & Cas. Ins. Co.*, 861 F. App'x 693, 708 (10th Cir. 2021) ("These arguments, raised before the district court in a perfunctory and undeveloped manner, parallel the kind of arguments we have refused consistently to take up in the past.") (citing *Folks v. State Farm Mut. Auto. Ins. Co.*, 784 F.3d 730, 741 (10th Cir. 2015) (noting that "minimal development of an issue in the district court could well result in forfeiture")).

Nevertheless, the Court has attempted to sift through the many documents provided by the parties and, in short, finds that it may consider those that it has cited in its analysis below. In general, documents that may be considered on a Rule 12(b)(6) motion without converting the motion to a summary judgment motion include: (1) "documents that the complaint incorporates by reference"; (2) "documents referred to in

14

the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the document's authenticity"; and (3) "matters of which a court may take judicial notice." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (citation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (applying this rule in a securities fraud case). The documents and materials the Court considers in this Recommendation, including filings with the SEC, fall within the rule outlined above. Courts have regularly taken judicial notice of such documents on motions to dismiss securities fraud claims. *See, e.g.*, *United Food & Com. Workers Int'l Union Loc. 464A v. Pilgrim's Pride Corp.*, No. 20-cv-01966-RM-MEH, 2022 WL 684169, at *1 (D. Colo. Mar. 8, 2022); *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, No. 04-cv-01030-RPM, 2005 WL 4161977, at *2 (D. Colo. Oct. 20, 2005). Nevertheless, the Court notes that when the documents "to be noticed contain disputed facts, a court should notice the documents for their existence, not for the truth of the disputed facts." *Sciortino v. Pepsico, Inc.*, 108 F. Supp. 3d 780, 791 n.2 (N.D. Cal. 2015) (citing cases).

The Court now turns to whether Plaintiffs have satisfied the elements of their securities frauds claims and met the heightened pleading requirements of both Rule 9(b) and the PSLRA, where required.

## A.    Count V: Section 10(b) of the 1934 Act

Count V asserts violation of § 10(b) of the 1934 Act and SEC Rule 10b-5 by Lightning eMotors, the Gig Defendants (Katz, Dinu, Miotto, Weightman, Mikulsky, Betti-Berutto, and Wang), and the Lightning Defendants (Reeser, Fenwick-Smith, and Covington). *Consol Compl.* [#52] ¶¶ 239-48. Rule 10b-5 implements § 10(b) of the 1934

15

Act, making it unlawful "(a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person, in connection with the purchase or sale of a security." 17 C.F.R. § 240.10b-5. The first section below, Section III.A.1., concerns only Rule 10b-5(b). The Court addresses Plaintiffs' argument regarding Rules 10b-5(a) and 10b-5(c) in Section III.A.2. below.

## 1.    Rule 10b-5(b)

"A plaintiff suing under Section 10(b) . . . bears a heavy burden at the pleading stage." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). To state a claim under Rule 10b-5, a plaintiff must plead: (1) a misrepresentation or omission of material fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; and (5) loss causation and economic loss. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997). Only the first two elements, i.e., whether Plaintiffs have plausibly pled a misrepresentation or omission of material fact and scienter, are at issue in the Motions [#99, #101], and therefore the Court need not address the last three elements in this Recommendation.

Plaintiffs assert that various public statements made by Defendants between May 2020 and July 2021 were materially false or misleading. The statements can generally be sorted into three categories: (1) statements regarding Gig3's intent to form a "mentor-

16

investor" relationship with Lightning; (2) statements regarding Lightning's customers, supply chain, and revenue visibility; and (3) statements regarding Lightning's projections.

"In order to overcome a motion to dismiss, a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1333 (quoting 15 U.S.C. § 78u-4(b)(1)). Defendants argue that Plaintiffs do not meet this standard for any of the challenged statements because the allegations all fail to show that "the statements were actually false when made." *See, e.g.*, *Motion* [#99] at 13 (citing *Grossman*, 120 F.3d at 1119); *Motion* [#101] at 16-17. In other words, they argue that Plaintiffs have failed to adequately allege contemporaneous falsity, because "securities claims will not be based on 'fraud by hindsight.'" *Grossman*, 120 F.3d at 1124. Additionally, Defendants assert several other arguments only applicable to certain sets of statements, which are discussed to the extent necessary below.

### a.    Intent to Form Mentor-Investor Relationship

Here, Plaintiffs challenge statements regarding the Gig Defendants' plan to form a "mentor-investor" relationship and long-term partnership with Lightning. *See Consol. Compl.* [#52] ¶¶ 132 (regarding the May 13, 2020 Registration Statement and Prospectus), 135 (regarding the December 10, 2020 press release and investor call), 144 (regarding the January 12, 2021 ICR Conference slide deck), 150 (regarding the March 26, 2021 Proxy), 152 (regarding the March 26, 2021 press release), 154 (regarding the

March 31, 2021 Form 10-K). Plaintiffs assert that Defendants' statements about GigCapital's plan to partner with Lightning by applying its "unique" mentor-investor approach over the long term were materially misleading when made. *Response* [#104] at 33-37.

On March 26, 2021, Defendant Dinu affirmed statements made in the Proxy that "[t]he GigCapital team stays true to our Mentor Investor mission partnering with the exceptional management team of Lightning eMotors through the IPO and beyond, as we continue to build together a solid company to last." *Consol. Compl.* [#52] ¶¶ 150, 152 (emphases omitted). A few days later, on March 31, 2021, three weeks before the shareholder vote, the Gig Defendants again stated: "We intend to apply a unique 'Mentor-Investor' philosophy to partner with Lightning where we will offer financial, operational and executive mentoring in order to accelerate their growth and development from a privately held entity to a publicly traded company." *Id.* ¶ 154 (emphasis omitted). Plaintiffs assert that no statements controverting the March 2021 statements were made before April 21, 2021, when shareholders voted to approve the business combination and elect the slate of directors proposed in the Proxy, or before May 6, 2021, when the deal closed. *See id.* ¶ 85; *Response* [#104] at 33-34. On May 11, 2021, three business days after the deal closed, the Lightning Board held its first meeting and, without explanation, reclassified Defendants Katz's and Dinu's respective two-year and three-year terms such that they would face reelection with Defendant Miotto in only five months, in October 2021. *Consol. Compl.* [#52] ¶ 88. Then, three months later, in August 2021, the Board

announced that Defendants Katz, Dinu, and Miotto would not be running for re-election. *Id*. ¶ 103; *Ex. 5, Aug. 16, 2021 Form 10-Q* [#100-5] at 83.

Plaintiffs assert that "[t]his is not just a situation where a director resigns under questionable circumstances," but, "[r]ather, the hasty departures of Katz, Dinu, and Miotto represented a fundamental change in the business plan for Lightning going forward as a public company." *Response* [#104] at 34. Plaintiffs state that "[t]he entire premise of investors' investment in GigCapital3 was its management and their unique Mentor-Investors™ program," but that "[t]his much-hyped strategy was then abruptly thrown to the curb after the successful close of the Business Combination, without explanation." *Id.* (relying on *Chen v. X Fin.*, No. 19-CV-6908-KAM-SJB, 2021 WL 7449851, at *9 n.65 (E.D.N.Y. Dec. 9, 2021) ("The Registration Statement plainly touts the preferred loan business as a core part of [X Financial]'s business, and a few short weeks after its issuance, the company announced that it had already begun phasing out the program. The timing alone creates an inference of falsity."); *Voulgaris v. Array Biopharma, Inc.*, No. 17-cv-02789-KLM, 2020 WL 8367829, at *16 (D. Colo. Nov. 24, 2020) ("[T]he Court agrees with Plaintiffs that they do not have to 'identify the precise moment when Squarer . . . first decided to seek approval for [the cancer drug at issue] on the basis of a modified indication[,]' . . . What matters is that Plaintiffs plead facts from which it can be inferred that the change in indication occurred during the putative Class Period[.]")); *see also Consol. Compl.* [#52] ¶¶ 10, 12, 32, 53, 132, 144, 150, 154, 171.

In support of their argument, Plaintiffs rely heavily on *In re Qudian Inc. Securities Litigation*, No. 17-CV-9741 (JMF), 2019 WL 4735376, at *3, 9 (S.D.N.Y. Sept. 27, 2019),

19

wherein the plaintiffs, relying on a fundamental change (consisting of launching a new business with IPO funds) in Qudian's current business occurring shortly after its IPO, argued that the timing of the change, which began a month after the IPO and was announced two months after that, supported an inference that the decision to launch the new business had occurred before the IPO. *See Response* [#104] at 35. The company had provided a pre-IPO warning that it retained discretion on how to employ IPO funds and that it could expand into auto loans in the future, but the court still agreed that the plaintiffs had plausibly pleaded falsity. *Qudian*, 2019 WL 4735376, at **2, 9. The court stated:

> Defendants argue that Plaintiffs' allegations are "deficient as a matter of law" because they rely "solely on post-IPO developments." . . . But the cases cited by Defendants . . . do not support such a categorical rule. Surely if Qudian had announced the opening of Dabai Auto (and its investment) the day after the IPO, a factfinder could conclude that the company misled investors by not disclosing those plans in its offering materials. . . . [K]nowledge on "day-2" arguably would support an inference of knowledge on "day-1." The allegations here fall somewhere in the middle of the spectrum. But drawing all reasonable inferences in [p]laintiffs' favor, the Court concludes, from the timing and scale of the opening of Dabai Auto, that [p]laintiffs' allegations of knowledge on "day-1" here are plausible enough to survive [d]efendants' motion to dismiss.

*Id.* at *9 n.6. Plaintiffs conclude that, "[h]ere too, based upon the unusual and suspicious timing of the directors' reclassification and departures, along with the glaring lack of explanation for immediately jettisoning GigCapital3's central business philosophy upon the closing of the combination, a reasonable person would conclude that the Gig Defendants had abandoned their 'Mentor-Investors™' approach prior to the March 26, 2021 Proxy and press release, and likely before the May 13, 2020 Registration Statement." *Response* [#104] at 36-37.

Having reviewed the parties' arguments and legal authority, the Court finds that Plaintiffs have failed to meet the heightened pleading standard to adequately allege that the statements at issue were false or misleading when made. First, Plaintiffs have not directed the Court's attention to contemporaneous facts to plausibly show that Gig3's representatives did not intend to have a lasting partnership with the company. Plaintiffs' basis for claiming that these statements were false is premised primarily on the fact that none of Gig3's representatives on Lightning's Board, i.e., Defendants Katz, Dinu, and Miotto, remained directors beyond October 2021. *See Consol. Compl.* [#52] ¶ 133. Although Plaintiffs assert that, as early as May 2020, i.e, a year before the May 2021 business combination, Gig3's representatives had no intention of remaining on Lightning's Board, they have provided no factual support for this statement. *See Grossman*, 120 F.3d at 1124; *In re PolarityTE, Inc., Sec. Litig.*, ___ F. Supp. 3d ___, ___, No. 2:18-cv-00510, 2020 WL 6873798, at *7 (D. Utah Nov. 22, 2020) (dismissing complaint where there were no factual allegations statements that were not "true when made")).

Relatedly, Plaintiffs have not provided adequate allegations demonstrating that Defendants Katz, Dinu, and Miotto did not intend to remain on Lightning's Board at the times the various mentor-investor statements were made. Statements regarding the mentor-investor relationship are alleged to have been made several times prior to the shareholder vote, including May 13, 2020, December 10, 2020, January 12, 2021, March 26, 2021, and March 31, 2021. *See Consol. Compl.* [#52] ¶¶ 132, 135, 144, 150, 152, 154. The shareholders voted to approve the Business Combination and elect the slate of directors proposed in the Proxy on April 21, 2021, and the deal closed on May 6, 2021.

*Id.* ¶ 85. On May 11, 2021, the newly-formed Board of Lightning eMotors voted to change the multi-year terms of Defendants Katz and Dinu's directorships to be one year, like Defendant Miotto. *Id.* ¶ 10; *Ex. 4, May 17, 2021 Form 8-K/A* [#100-4] at 19. It was not until a few months later, in August 2021, that Lightning's Board decided not to renominate Defendants Katz, Dinu, or Miotto. *Ex. 5, Aug. 16, 2021 Form 10-Q* [#100-5] at 83. Thus, more than four months passed between the last challenged statement at the end of March 2021, and this August 2021 decision.

The Court finds that there is simply no indication here that, at the time the statements were made, Defendants Katz, Dinu, and Miotto did not intend to all stand for re-election when the Board held its first annual shareholder meeting on October 7, 2021, and there are no facts alleged to show that, prior to the August 10, 2021 Board meeting, that Defendants Katz, Dinu, and Miotto even had any knowledge that the Board would not re-nominate them. *See Ex. 5, Aug. 16, 2021 Form 10-Q* [#101-5] at 83. Although the Court may permissibly infer that they might have had some knowledge leading up to the meeting, the allegations are inadequate to show that there were any plans for them to leave the Board as soon as they did at the time any of the mentor-investor statements were made, the latest of which was March 31, 2021. *See Terenzini v. Goodrx Holdings*, No. LA CV 20-11444-DOC-MAR, 2022 WL 122944, at *5 (C.D. Cal. Jan. 6, 2022) (dismissing the complaint based on subsequent business decision made by a third party); *Hampton v. root9B Techs. Inc.*, 897 F.3d 1291, 1302-03 (10th Cir. 2018) (noting that the Court is "not oblig[ated] to infer" misrepresentations).

In short, Plaintiffs have not adequately alleged that it was the decision of Defendants Katz, Dinu, and Miotto to leave Lightning's Board; instead, based on Lightning's disclosures, the decision was made by Lightning's full Board, not Gig3's representatives, i.e., Defendants Katz, Dinu, and Miotto. *Ex. 5, Aug. 16, 2021 Form 10-Q* [#100-5] at 83. Further, there is no indication that, at the times the mentor-investor statements were made, that these Defendants did not intend to remain on the Board for the long term. Thus, the Court finds that Plaintiffs have simply not alleged enough to show under the heightened pleading standard that Defendants' statements regarding the mentor-investor relationship were false or misleading when made, and, therefore, these statements are inactionable.

### b.      Amazon as a Key Customer

Plaintiffs argue that Defendants' statements about Amazon being a key Lightning customer were false and/or materially misleading when made. *Response* [#104] at 22. On January 4, 2021, the Lightning filed a slide deck with the SEC discussing the business combination and, as is important here, highlighting Amazon as one of the company's key customers. *Consol. Compl.* [#52] ¶ 142. Plaintiffs argue that Amazon could not have been considered a "key customer" at the time this claim was made. *Response* [#104] at 28. In support, they rely on statements made by three of their confidential witnesses ("CW"), i.e., CW2, CW3, and CW5. *Id.*

In general, statements made by CWs may be "entitled to significant weight" when "the complaint describes the bases of [their] knowledge, the positions they held, their exposure to the relevant conduct, and the relevant time frame." *Mishkin v. Zynex Inc.*, No.

23

09-cv-00780-REB-KLM, 2011 WL 1158715, at *7 (D. Colo. Mar. 30, 2011). In other words, the complaint must support the probability that the CWs possessed the information alleged by disclosing their positions within the company. *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1089 (D. Colo. 2004); *see also In re Lehman Bros. Sec. & Erisa Litig.*, Nos. 10 Civ. 6637(LAK), 09 MD 2017(LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (rejecting allegations from low-level CWs who were not managers or corporate officers who could speak to the company's broader practices). Further, CWs must have *contemporaneous* knowledge about the issue to demonstrate falsity. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580-81 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *see also Gregory v. Pronai Therapeutics Inc.*, 297 F. Supp. 3d 372, 408-09 (S.D.N.Y. 2018) (rejecting allegations by a confidential witness that were "unmoored in time" to challenged statements), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)). Finally, the CWs' statements must support a finding that the statements at issue are false or misleading, not merely that the company could have made better choices to meet the challenges it was facing. *See, e.g.*, *Lululemon*, 14 F. Supp. 3d at 580 (rejecting statements by CWs that the company "could have done more in terms of quality control"); *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 252 (S.D.N.Y. 2020) (stating that "subjective views of how the Company should have managed such challenges[ ] are not sufficient to demonstrate that any of the statements were inaccurate"); *EXKAE, Ltd. v. Domo, Inc.*, No. 2:19-CV-781-DAK-DAO, 2020 WL 7352735, at *6 (D. Utah Dec. 15, 2020) (rejecting allegations by confidential witnesses, stating: "Every business will have

employees that disagree on the correct strategy for growth, especially in businesses involved in emerging technologies with uncertain markets.").

In support of its argument that Defendants falsely stated that Amazon was a key customer in January 2021, Plaintiffs point to the following allegations made by the three CWs. *Response* [#104] at 28. CW2 asserted that Amazon's fifteen van pilot plan, which could have led to a 100-van order, was postponed in spring 2020 due to performance issues. *Consol. Compl.* [#52] ¶ 119. CW3, who worked primarily on the Amazon project, stated that the vans provided were unverified, untested, and potentially unsafe, and required a significant number of repairs, leading to Amazon threatening to "pull the contract." *Id.* ¶ 120. CW5 alleged that the vans provided to Amazon performed well below customer expectations. *Id.* ¶ 128. Plaintiffs assert that these statements collectively suggest that the 2020 pilot program with Amazon was an "abject failure," and therefore that Amazon was a "'key' customer shortly thereafter" is implausible. *Response* [#104] at 28.

The Court finds that Plaintiffs have not provided adequate allegations to show that Defendants' January 4, 2021 statement about Amazon was false or misleading. First, none of the identified CWs had been employed at the company for quite a period by the time that the statement was made. CW2 was employed from summer 2019 through spring 2020. *Consol. Compl.* [#52] ¶ 114. CW3 was employed from late 2019 through spring 2020. *Id.* ¶ 120. CW5 was employed from spring 2019 through spring 2020. *Id.* ¶ 128. Thus, these CWs had not been employed at the company for approximately 7-9 months before the January 2021 statement was made. Although pre-class period allegations may

be relevant under certain circumstances to demonstrate what the defendants knew during the class period, *see, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), the Court finds that the statements made here are too remote and do not demonstrate contemporaneous knowledge of the truth or falsity of the January 4, 2021 statement. *See Lululemon Sec. Litig.*, 14 F. Supp. 3d at 580-81. This finding is further supported by the fact that Plaintiffs have not alleged that Amazon's order had been cancelled, but rather merely that it was postponed, *see Consol. Compl.* [352] ¶ 119, and they have not alleged that Amazon was not a customer at the time of the statement.

Accordingly, the Court finds that Plaintiffs have failed to adequately allege that Defendants' January 4, 2021 statement about Amazon being a key customer was false and/or materially misleading when made.

### c.    Supply Chain

Plaintiffs argue that Defendants' statements about the company's robust supply chain were false and/or materially misleading when made, because Defendants did not have the robust supply chain that they said they did. *Response* [#104] at 22.

The company's supply chain purportedly involved multiple partners for each core component, which is known as "supply chain diversification," a concept which, when properly instituted, creates redundancies to help prevent "major disruptions in production" even when there are global supply chain troubles. *See Consol. Compl.* [#52] ¶¶ 72, 90, 138, 141, 146, 148, 156, 161, 163, 164. Because of this supply chain diversification, securities analysts noted that the company was "relatively insulated" from worldwide supply chain disruptions, compared to its peers. *Id.* [#52] ¶¶ 75-76. This meant that the

company's "optimized" supply chain was expected to ensure that it would meet its production goals and allow the company to "reduce [its] cost-of-goods-sold by up to 50%" over the 18 months following the March 26, 2021 Proxy statement. *Id.* ¶¶ 72, 148, 163.

On May 17, 2023, Defendant Reeser stated, "[e]ven with our battery supply, we have . . . a safety net against any single supplier constraint." *Id.* ¶ 90. On June 17, 2021, Defendant Reeser assured analysts and investors that, because Lightning's supply chain continued to be sound, it expected to meet production projections, stating: "So, we can have – we have inventory on the side of chassis, we have inventory of batteries" and "based on what we have on site today and what we have today, and what our suppliers have told us they will continue delivering, we do feel confident in [Lightning eMotors' projections]." *Id.* ¶¶ 96, 161. Plaintiffs assert that Defendant Reeser's statements were false or misleading. *Response* [#104] at 24.

The Court notes that, while Plaintiffs provide generalized argument about Defendants' alleged supply chain issues as a whole, they only provide sufficiently specific argument with respect to battery and chassis issues. In other words, the Court finds that Plaintiffs have not adequately alleged what specific supply chain issues, if any, there may have been beyond batteries and chassis. For example, even though Plaintiffs challenge statements that the company had "built relationships with the suppliers," Plaintiffs have not alleged facts that the company did not have relationships with suppliers, and they have not specified which suppliers may be at issue. *See Consol. Compl.* [#52] ¶ 138; *see Okla. Police Pension & Ret. Sys. v. Boulder Brands, Inc.*, No. 15-cv-00679-MSK-KMT, 2017 WL 1148689, at *6 (D. Colo. Mar. 28, 2017) (dismissing claim where the plaintiff did

"not argue that the quoted statements are themselves false"). As another example, on July 28, 2021, Lightning's major chassis supplier Ford Motor Company issued its Form 10-Q for the quarterly period ending June 30, 2021, stating in part: "The automotive industry continues to face a significant shortage of semiconductors, which has presented challenges and production disruptions globally, including at our assembly plants. . . . Based on the overall recovery rate we are seeing for the industry, we continue to believe the automotive semiconductor shortage may not be fully resolved until 2022." *Ex. 6, Ford's July 28, 2021 Form 10-Q* [#100-6] at 3. Defendants assert that Ford's pessimistic forecast "drastically impacted Lightning's production capabilities." *Motion* [#99] at 17. However, Plaintiffs do not provide specific enough argument as to a semiconductor shortage sufficient to demonstrate that any statements made by Defendants with respect to this issue were false or materially misleading when made.

For the reasons stated below, the Court finds that Plaintiffs' arguments about the company's supply chain with respect to batteries and chassis are "not supported by the required particularized factual allegations." *See Rumbaugh v. USANA Health Scis., Inc.*, No. 2:17-CV-106, 2018 WL 5044240, at *6 (D. Utah Oct. 17, 2018)); *see also In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1140 (D. Colo. 2011) (stating that "[g]eneralized or conclusory allegations of fraud will not be sufficient"), *aff'd*, *Sanchez v. Crocs, Inc.*, 667 F. App'x 710 (10th Cir. 2016).

i.       **Batteries**

Plaintiffs primarily rely on statements by CW1 and CW4 to support their assertion that Defendants' supply chain was not robust with respect to batteries.[4]

CW1, who worked as a service technician as well as in a production role from early 2021 to mid-2021, stated that the company's biggest supply problem was a shortage of batteries, because the company's existing battery suppliers could not keep up with the demand. *Consol. Compl.* [#52] ¶¶ 110-11. CW1 further stated that, in mid-2021, it was common to set aside partially completed EVs to wait for necessary parts and, on at least one occasion, employees were instructed to remove batteries from completed vehicles and reinstall them in other vehicles to double count completed vehicles. *Id.* ¶¶ 111-12. Further, one of Lightning's key battery suppliers, eMatrix, purportedly supplied unreliable batteries, which required technicians to constantly swap batteries in customers' vehicles. *Id.* ¶ 112.

CW4, a manufacturing supervisor from about spring 2020 to spring 2021, stated that significant supply issues existed, particularly with batteries, and that these issues progressively worsened. *Consol. Compl.* [#52] ¶ 124; *Notice of Errata* [#82] at 2. CW4 stated that, due to the constant shortage of batteries, Lightning prioritized vehicles which

---

[4] Plaintiffs also rely on CW2, who worked as an engineer from summer 2019 through spring 2020, who stated that the company had been forced to work with "lower tier" battery suppliers like eMatrix and Octillion because large battery suppliers did not want to work with the company. *Consol. Compl.* [#52] ¶ 117. As noted in the previous section, CW2 had not been employed at the company for quite a period by the time that the statements at issue were made in 2021, and therefore, CW2's statement is too remote and does not demonstrate contemporaneous knowledge of the truth or falsity of the 2021 statements. Even if the statements were contemporary, however, the Court notes that it does not go to the truth or falsity of any identified statements regarding the battery supply chain.

only required one battery so it could complete more vehicles. *Consol. Compl.* [#52] ¶ 125; *Notice of Errata* [#82] at 2. CW4 reported that his/her team could not meet its build quotas because of insufficient battery supplies. *Consol. Compl.* [#52] ¶ 126.

The primary statements at issue occurred on May 17, 2021, and June 17, 2021. *Consol. Compl.* [#52] ¶¶ 90, 96, 156, 159, 161. Regarding CW4, whose employment ended before these statements were made, Plaintiffs allege no facts to anchor CW4's statements in time, so it is impossible to know whether the described events occurred in spring 2020 or just prior to when CW4 left the company. In other words, there is no connection made between the events described by CW4 and the statements made by Defendant Reeser in the months following the end of CW4's employment. *See Gregory*, 297 F. Supp. 3d at 408-09.

As for CW1, the Complaint identifies only one statement anchored in time, though partially so. According to the Complaint, CW1 said that, in mid-2021, the production team commonly set aside partially completed EVs to wait for necessary parts and, on at least one occasion, employees were instructed to remove batteries from completed vehicles and reinstall them in other vehicles to double count completed vehicles. *Consol. Compl.* [#52] ¶¶ 111-12. While Plaintiffs' allegations demonstrate that battery supply issues arose, the Court cannot find, for the reasons that follow, that Plaintiffs have met the heightened pleading standard for showing that a statement was false or misleading under the PSLRA. *See* 15 U.S.C. § 78u-4(b)(1).[5]

---

[5] Even assuming that Plaintiffs have adequately demonstrated a false or misleading statement with respect to the battery supply chain, the Court notes that they have not provided allegations sufficient to meet the heightened standard for pleading the scienter element of a securities fraud

The supply chain issue regarding batteries was disclosed on multiple occasions. Plaintiffs point out that Defendant Reeser stated on May 17, 2021, that, "[e]ven with our battery supply, we have multiple pack suppliers supporting multiple platforms and applications, providing a safety net against any single supplier constraint." *Consol. Compl.* [#52] ¶¶ 90, 156; *Ex. 4, May 17, 2021 Form 8-K/A* [#100-4] at 25. Defendant Reeser's very next sentence, though, warned investors: "However, the current supply chain disruptions will have significant consequences on short term margin and operating profits." *Ex. 4, May 17, 2021 Form 8-K/A* [#100-4] at 25. At the June 17, 2021 Analyst Day event Defendant Reeser stated: "So, we can have – we have inventory on the side of chassis, we have inventory of batteries" and "based on what we have on site today and what we have today, and what our suppliers have told us they will continue delivering, we do feel confident in [Lightning eMotors' projections]." *Consol. Compl.* [#52] ¶¶ 96, 161. Plaintiffs have not adequately alleged that the difference between on-site battery supplies and promised batteries from suppliers rendered Defendant Reeser's statements false or materially misleading. Regardless, as part of that same presentation, investors were specifically warned, in writing, that "battery supply constraints [were] impacting revenue timing." *See* [#100-10] at 44.

Further, on the August 16 Q2 2021 Earnings Call, Defendant Reeser stated that the company was "working to remedy the supply chain disruptions through the technical

---

claim, which requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Here, they have not demonstrated that Defendant Reeser, who made the statements, acted with the required state of mind, given that Plaintiffs rely primarily on statements by lower-level employees at the company.

and commercial validation of additional suppliers," but that "further supply chain disruptions remain, including battery . . . shortages." *See Ex. 7, FQ2 2021 Earnings Call Transcripts* [#100-7] at 6. Defendant Reeser further stated that "[w]e are in the final stages of negotiations and technical integration and validation with one of the world's largest worldwide battery suppliers [and] [w]e believe that our work with our battery suppliers may mitigate our supply chain constraints in 2022 and beyond." *Id.* at 7. He concluded that, "[w]hile 2021 has been a challenging year, we . . . are taking action to help address the supply chain issues, which we believe will allow us to fulfill customer demand and drive . . . sales and revenue growth[.]" *Id.* Thus, although Defendants were optimistic about whether the battery supply chain issues were surmountable, they repeatedly tempered their predictions with warnings to investors.

Accordingly, the Court finds that Plaintiffs have failed to adequately allege that Defendants' statements about the battery supply chain were false and/or materially misleading when made.

### ii.   Chassis

Defendant Reeser's challenged statement regarding chassis occurred on June 17, 2021, when he said: "So, we can have – we have inventory on the side of chassis" and, "based on what we have on site today and what we have today, and what our suppliers have told us they will continue delivering, we do feel confident in [Lightning eMotors' projections]." *Consol. Compl.* [#52] ¶¶ 96, 161. Investors were told that the company bought chassis from four manufacturers: Ford, GM, Hino, and Isuzu. *Ex. 10, June 17, 2021 Form 8-K* [#100-10] at 32. As part of that same presentation, investors were

specifically warned, in writing, that "[c]hassis . . . supply constraints [were] impacting revenue timing." *See* [#100-10] at 44.

On the August 16 Q2 2021 Earnings Call, Defendant Reeser stated that the company was "working to remedy the supply chain disruptions through the technical and commercial validation of additional suppliers," but that "further supply chain disruptions remain, including . . . chassis shortages." *See Ex. 7, FQ2 2021 Earnings Call Transcripts* [#100-7] at 6. He noted that "[m]ajor chassis OEMs [i.e., "original equipment manufacturers"] have surprised the industry by shutting down in July for a week or more." *Id.* He further stated that "we are working on addressing the industry chassis shortage with our own Lightning-branded strip chassis and cab chassis products that are not chip limited." *Id.* On the same call, Defendant Covington explained that, "[p]rimarily because of unexpected chassis production disruptions and COVID-related delays, we are withdrawing our prior guidance for 2021." *Id.* at 8.

There are no allegations in the Consolidated Complaint [#52] that Defendant Reeser's June 17, 2021 statement was false or misleading when made, particularly given the written warning that investors were given during the same presentation and the fact that the temporary manufacturer shutdowns occurred in July, after the statement was made. *See* [#100-10] at 44. Again, as with the battery supply chain, although Defendants were optimistic that the chassis supply chain issues were surmountable, they repeatedly tempered their predictions with warnings to investors.

Accordingly, the Court finds that Plaintiffs have failed to adequately allege that the June 17, 2021 statement about chassis supply was false and/or materially misleading when made.

### d.   Revenue Visibility

Plaintiffs argue that Defendants' statements about the company's strong revenue visibility were false and/or materially misleading when made. *Response* [#104] at 22. With the funding provided by the SPAC acquisition, the company was allegedly poised to grow its revenues from $9 million in 2020 to $63 million in 2021 to $354 million in 2022. *Consol. Compl.* [#52] ¶¶ 7, 63. Defendants assured investors that they had strong visibility into these numbers, because the company's backlog of contracted orders already covered revenues into 2022. *Id.* ¶¶ 7, 134, 136. At the time these statements were made, i.e., December 10, 2020, Plaintiffs aver that "the backlog figures did not provide 'visibility'; they were a misleading mirage because Lightning lacked the parts needed to convert the orders to complete EVs at a rate anywhere near what was necessary to meet its targets." *Response* [#104] at 24.

Plaintiffs have not alleged facts contradicting the company's statements that, as of December 2020, it had received purchase orders for 100% of its projected 2021 revenue and 25% of its 2022 projected revenue. *See Consol. Compl.* [#52] ¶ 134. Further, the Court has already discussed the supply chain issues identified by Plaintiffs in the prior section, concluding that Plaintiffs have not adequately alleged false or misleading statements with regard to the supply chain. Plaintiffs are correct that, in some situations, additional disclosures may be required to make the "statements made, in the light of the

circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Plaintiffs are also correct that statements may be actionable where a defendant recklessly disregards problems underlying the statement. *See, e.g.*, *Yannes v. SCWorx Corp.*, No. 20-cv-03349 (JGK), 2021 WL 2555437, at **4, 7 (S.D.N.Y. June 21, 2021) (holding that statements touting an $840 million committed purchase order was actionable given problems with the supplier that were disregarded by the defendants).

Here, though, Plaintiffs have not adequately argued or alleged that Defendants recklessly disregarded problems with the supply chain which were in existence on December 10, 2020. "[I]n the absence of such detail, it is not possible to conclude that statements . . . were false or materially misleading at the time they were made." *Wolfe v. AspenBio Pharma, Inc.*, No. 11-cv-00165-REB-KMT, 2012 WL 4040344, at *8 (D. Colo. Sept. 13, 2012). Thus, Plaintiffs have not alleged enough to show under the heightened pleading standard that Defendants' statements regarding revenue visibility were false or misleading when made.

Accordingly, because the Court finds that Plaintiffs have failed to adequately allege that the statements about revenue visibility were false and/or materially misleading when made, the Court therefore finds that these statements are inactionable.

### e.     Lightning's Projections

Next, Defendants argue that no false statements were made in connection with Lightning's 2020-2025 financial projections and 2021 revenue guidance projections. *See, e.g.*, *Motion* [#99] at 16-20. There appears to be four primary statements at issue. *See*

*Response* [#104] at 32. First, a press release jointly issued by GigCapital3 and Lightning Systems on December 10, 2020, announced the business combination agreement and represented that Lightning Systems had "[h]igh revenue visibility with 100% of projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million under firm purchase orders as of today." *Consol. Compl.* [#52] ¶ 134. Second, the March 26, 2021 Proxy statement stated that the company was on track to achieve $63 million in revenue in 2021. *Id.* ¶¶ 66, 69. Third, in a May 17, 2021 press release and Form 10-Q of the same date, Defendants revised their guidance, stating that for 2021, the company expected "revenues to be in the range of $50 million to $60 million." *Id.* ¶ 156. Finally, at a presentation held on Analyst Day on June 17, 2021, Defendant Covington provided "[u]pdated fiscal 2021 guidance. We are reaffirming our revenue range of $50 million to $60 million." *Id.* ¶ 159. Plaintiffs note that their reasons for identifying these statements as false or misleading are "[e]ntwined with Defendants' [allegedly] materially misleading claims about Lightning's robust supply chain, its revenue visibility, and its ability to quickly scale production," allegations which the Court has addressed in the prior section and found inadequately alleged to be false or materially misleading.[6] *Response* [#104] at 29.

---

[6] The parties did not specifically and separately present argument regarding the company's ability to quickly scale production, but the issue appears to have been primarily tied to the supply chain issue, which the Court has already addressed. *See, e.g.*, *Response* [#104] at 12 ("This robust supply chain for core components would purportedly be a key driver in Lightning's ability to scale without unduly sacrificing quality or delivery times and serve as a foundation for its growth." (internal quotation and alteration marks omitted)), 13 ("Plaintiffs' allegations show that Lightning's battery supply constraints and other related production problems existed throughout the Class Period and that these longstanding issues, not a sudden shortage of chassis, were a major reason for the Company's inability to scale production and meet its financial projections.").

Defendants generally argue that Plaintiffs are incorrect regarding the company's projections for three reasons: (a) there can be no fraud by hindsight, (b) no particularized facts challenge the order backlog, and (c) the PSLRA's safe harbor for forward-looking statements. Motion [#99] at 16-20. The PSLRA provides "safe harbor" protection where:

> (A) the forward-looking statement is—(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial.

15 U.S.C.A. § 78u–5(c)(1). It does not apply to omissions of present fact, however. *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1231 (N.D. Okla. 2003); *see, e.g.*, *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-cv-01265-WDM-MEH, 2008 WL 879023, at *17 (D. Colo. Mar. 28, 2008) ("The alleged non-disclosure of the loss of the Microsoft contract, which allegedly represented 34.4% of the company's revenues, is not a forward looking event[.]"). Further, when a defendant makes a "mixed present/future statement," "the part of the statement that refers to the present" is not protected by the safe harbor. *In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1295 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015); *see, e.g.*, *Lorusso v. Boulder Brands, Inc.*, No. 15-cv-00679-MSK-KMT, 2017 WL 4365180, at *10 (D. Colo. Mar. 1, 2017) (listing a number of mixed present/future statements, each of which was premised on "representations that customer service and operations had reached satisfactory levels," including a statement that "looking at the April volumes we are seeing, we are confident that we're on track to deliver results in line with our plan and guidance").

Here, the Court addresses each of the company's projection statements separately to determine whether Plaintiffs have adequately alleged that they were false or misleading

37

at the time they were made. In short, based on the following, the Court finds that Plaintiffs have not alleged enough to show under the heightened pleading standard that Defendants' statements regarding Lightning's projections were false or misleading when made, and the Court therefore finds that these statements are inactionable.

### i.      December 10, 2020

First, a press release jointly issued by GigCapital3 and Lightning Systems on December 10, 2020, announcing the business combination agreement also represented that Lightning Systems had "[h]igh revenue visibility with 100% of projected 2021 revenue of $63 million and 25% of 2022 projected revenue of $354 million under firm purchase orders as of today." *Consol. Compl.* [#52] ¶ 134. Plaintiffs assert that this statement was false or misleading because it was based on sales supported by fully "contracted orders . . . in place today" and an "annual production capacity of 1,000 vehicles today." *Response* [#104] at 32 (quoting *Consol. Compl.* [#52] ¶¶ 134, 137).

However, Plaintiffs have not alleged facts contradicting the company's statements that as of December 2020, the company had received purchase orders for "100% of projected 2021 revenue . . . and 25% of 2022 projected revenue." *Consol. Compl.* [#52] ¶ 134. When the business combination was announced on December 10, 2020, the company warned investors that the projections "should not be relied upon as necessarily being indicative of future results." *Ex. 9, Dec. 10, 2020 Form 8-K* [#100-9] at 14. The same announcement stated that the "assumptions and estimates underlying such financial forecast information are inherently uncertain and subject to a wide variety of . . . risks and uncertainties." *Id.* Further, although some production issues existed in 2021 (leading to

the reduction in the company's projections), Plaintiffs have not adequately alleged that, on December 10, 2020, the company did not have a reasonable expectation of an annual production capacity of 1,000 vehicles.

Accordingly, the Court finds that Plaintiffs have failed to adequately allege that the December 10, 2020 statements about the company's projections were false and/or materially misleading when made.

### ii.    March 26, 2021

Second, the March 26, 2021 Proxy statement stated that the company was on track to achieve $63 million in revenue in 2021. *Consol. Compl.* [#52] ¶¶ 66, 69. Plaintiffs assert that this statement was false or misleading given Defendant Reeser's purportedly untrue statement that same day that "Lightning eMotors has maintained remarkable momentum since [it] announced the proposed business combination in December." *Response* [#104] at 32 (quoting *Consol. Compl.* [#52] ¶ 152); *see, e.g.*, *In re Eros Int'l PLC Sec. Litig.*, No. 19-14125, 2021 WL 1560728, at *7 (D.N.J. Apr. 20, 2021) (holding that the statement "[w]e have *maintained* a strong balance sheet *and built-in* working capital efficiencies" was not forward-looking) (emphases in original)).

Defendants aver that "[a] key input for Lightning's projections was its order backlog, which reflects customer orders that have been placed but not yet fulfilled." *Motion* [#99] at 17 (citing *Ex. 1, Mar. 26, 2021 Proxy Statement* [#100-1] at 276). As of the March 26, 2021 Proxy statement, the company had significant customer demand for its electric vehicles and powertrains. *Ex. 1, Mar. 26, 2021 Proxy Statement* [#100-1] at 173 (stating that the company had a backlog order of 1,569 electric and commercial

vehicles and electric powertrains as of December 31, 2020). This same Proxy statement warned investors that "these non-binding orders may be cancelled or delayed by customers without penalty" and "our backlog could be reduced due to cancellation of orders by customers." *Ex. 1, Mar. 26, 2021 Proxy Statement* [#100-1] at 80, 282. Investors were further warned that that "[t]he financial projections are forward-looking statements that are inherently subject to significant uncertainties and contingencies." *Ex. 1, Mar. 26, 2021 Proxy Statement* [#100-1] at 177. Regardless, Plaintiffs have not adequately explained what changed between December 10, 2020 and March 26, 2021 to make Defendant Reeser's statement untrue.  The Court has already discussed issues regarding the supply chain and revenue visibility, and those allegations are inadequate to demonstrate that the company was clearly no longer on track to achieve $63 million in revenue in 2021.

Accordingly, the Court finds that Plaintiffs have failed to adequately allege that the March 26, 2021 statements about the company's projections were false and/or materially misleading when made.

### iii.    May 17, 2021

Third, in a May 17, 2021 press release and Form 10-Q of the same date, Defendants revised their guidance, stating that for 2021, the company expected "revenues to be in the range of $50 million to $60 million." *Consol. Compl.* [#52] ¶ 156. Plaintiffs assert that this statement was false or misleading given Defendant Reeser's statements of that same day that the company was "well-positioned to achieve its 2021 forecast of over 500 purpose-built zero-emission commercial vehicles" and that "Q1 2021

continued the fast sales and delivery growth that started in 2020." *Response* [#104] at 32 (quoting *Consol. Compl.* [#52] ¶ 156); *see, e.g.*, *Gold Res. Corp.*, 957 F. Supp. 2d at 1296 (holding that the statement "as we *continue* on our trajectory for aggressive production growth" was not forward-looking) (emphasis in original).

Investors were warned that "actual results may vary in material respects from those projected," *Ex. 4, May 17, 2021 Form 8-K/A* [#100-4] at 27, and, in fact, the company's 2021 guidance was lowered in May 2021 because by that time the automotive industry was facing "[e]xtreme supply chain shortages." *Ex. 4, May 17, 2021 Form 8-K/A* [#100-4] at 26.  Investors were notified that "several key suppliers have informed us of delivery delays ranging from four to sixteen weeks, that have impacted production in the first quarter of 2021 and may affect the remainder of the year" and that, [a]lthough we are working with our suppliers to minimize the impact, we expect supply chain delays will have a significant impact on our 2021 revenue and possibly thereafter." *Id.* at 7. The company also disclosed key factors posing "significant opportunities" as well as "risks and challenges" which could affect results, including customer demand. *Id.* at 7-8 ("While still in early stages of commercialization, we have received significant interest from potential customers, and repeat orders from more than 10 commercial fleet customers. On March 31, 2021, and March 31, 2020, Lightning Systems had a backlog . . . of 1,590 and 284, respectively, of electric commercial vehicles and electric powertrains."). The company further provided an in-depth warning regarding the impact of the COVID-19 pandemic and the uncertainty underlying its future impact on "business operating results, cash

flows, liquidity and financial condition," noting that the company "may be subject to future impairment losses related to long-lived assets as well as changes to valuation." *Id.* at 7.

In addition, the company identified a notable increase in sales of completed vehicles "during the three months end[ing] March 31, 2021" as compared to "the three months end[ing] March 31, 2020." *Id.* at 9. The three months ending on March 31, 2020 produced total revenue of about $695,000 as compared to the three months ending on March 31, 2021, which produced total revenue of about $4,491,000, i.e., a 560.6% increase in revenue that was "primarily due to the sale" of additional vehicles. *Id.* In support of Defendant Reeser's statement that the company was well-positioned to achieve its 2021 forecast of over 500 vehicles, investors were told that, "[d]espite supply chain headwinds," the company reported the sale of 31 vehicles in the first quarter of 2021, meaning the company received revenue of $4.6 million, an increase from the first quarter of 2020 of $0.7 million. *Ex. 4, May 17, 2021 Form 8-K/A* [#100-4] at 24. Investors were also notified that there was a "[b]acklog at quarter end of $169 million and sales pipeline of $807 million, respectively." *Id.* These numbers indicated "an increase of +500% year-over-year" and reflected "continued robust demand" for the company's product. *Id.* at 25. Further, in a statement directly connected to the company's May 17, 2021 projection of $50-60 million, Defendants warned investors:

> Extreme supply chain shortages will have a significant impact on short-term margin and operating costs, resulting in a small, negative gross margin for the full year. However, margins are expected to progressively improve over the next three quarters from the -16% in Q1 as the Company ramps production and benefits from operating leverage. Operating losses will also be impacted and are expected to be higher each quarter than the first quarter loss of $5.3 million with public company costs as well as higher

42

investments in research and development and sales, general and administrative costs to scale the business.

*Ex. 4, May 17, 2021 Form 8-K/A* [#100-4] at 26.

The Court has previously determined that Plaintiffs have not adequately alleged that the supply chain issues were so severe as of May 17, 2021, as to make Defendants' statements about them false or materially misleading. Given this finding, in conjunction with various clarifying statements and cautions made to investors outlined above, the Court finds that Plaintiffs have not adequately shown that the company's projections of $50-60 million for 2021 were false or materially misleading as of the time they were made on May 17, 2021. Therefore, statements regarding the company's projections as of May 17, 2021 are inactionable.

### iv.    June 17, 2021

Finally, at a presentation held for Analyst Day on June 17, 2021, Defendant Covington provided "[u]pdated fiscal 2021 guidance. We are reaffirming our revenue range of $50 million to $60 million." *Consol. Compl.* [#52] ¶ 159. Plaintiffs assert that this statement was false or misleading given Defendant Reeser's statements of that same day that the company's confidence in the projections was based in part on components "on site today," and that the company's mature supply chain would help drive positive gross margin in Q4 2021. *Response* [#104] at 32-33 (quoting *Consol. Compl.* [#52] ¶ 161).

The Court finds that Plaintiffs have not adequately alleged that these statements were false or materially misleading at the time they were made. Plaintiffs have not alleged, for example, that as of June 17, 2021, the company has not "[a]lready received purchase orders to fulfill 100% of 2021E revenue." *Ex. 10, June 17, 2021 Form 8-K* [#100-10] at 17.

Plaintiffs have not alleged that the company's supply chain and technology partners did not include multiple partners, such as, for example, Romeo Power Technology, Proterra, Octillion Power Systems, and eMatrix for batteries; BorgWarner, DANA, and Danfoss for drivetrains; AMC Companies and Soderholm for repowers, and Plug Power for fuel cell EVs. *Ex. 10, June 17, 2021 Form 8-K* [#100-10] at 24.  Plaintiffs also have not alleged that the company was not receiving repeat orders from multiple companies, including U.S. Parking Services Company, Global eCommerce Player, U.S. Real Estate Service Firm, U.S. Cable Provider, European Logistics Operator, and U.S. Fleet Operator. *Ex. 10, June 17, 2021 Form 8-K* [#100-10] at 39. As noted previously, when discussing FY21 Q1 results, which were pre-merger, i.e., before the company went public, investors were warned that "[c]hassis and battery supply constraints [were] impacting revenue timing." *Ex. 10, June 17, 2021 Form 8-K* [#100-10] at 44. This helped to explain the previous reduction in 2020 guidance to $50-60 million. *Id.* The company projected a positive gross margin in Q4 2021 given, among many other factors, the maturation of its supply chain. *Ex. 10, June 17, 2021 Form 8-K* [#100-10] at 45. This expectation supported its projected increase of manufacturing capacity from 72 vehicles in 2020 to 500 in 2021 to 3,000 in 2022. *Ex. 10, June 17, 2021 Form 8-K* [#100-10] at 46. Investors were also given the general safe harbor warnings that "assumptions and estimates underlying such financial forecast information are inherently uncertain and are subject to a wide variety of . . . risks and uncertainties." *Ex. 10, June 17, 2021 Form 8-K* [#100-10] at 6.

As part of the presentation, the Chief Technology Officer Bill Kelley[7] stated in connection with the battery supply chain that "[t]he serendipitous value is, because we have numerous supplies that can be applied to the same platforms. [sic] When one supplier has a particular issue or a struggle, we're able to use multiple battery configurations on a particular chassis" and "that flexibility allows us some diversification of our supply chain, when times get rough for some of these guys." *Consol. Compl.* [#52] ¶ 161. Defendant Covington followed up, stating: "[A]s Bill talked about on his slide, we have multiple partners across many of the parts that we purchased, which is one of the ways that we have been[,] one[,] managing the cost, as well as managing some of the supply chain disruptions that we've had," which would help to drive that positive gross margin through the last quarter of 2021. *Id.*

The Court has previously determined that Plaintiffs have not adequately alleged that the supply chain issues were so severe as of June 17, 2021, as to make Defendants' statements about them false or materially misleading. Given this finding, in conjunction with the various statements and cautions to investors on Analyst Day, the Court finds that Plaintiffs have not adequately shown that the company's projections of $50-60 million for 2021 were false or materially misleading as of the time they were made on June 17, 2021. Therefore, statements regarding the company's projections as of June 17, 2021 are inactionable.

---

[7] Plaintiffs allege that Kelley was the "COO," i.e., Chief Operating Officer. In the June 17, 2021 presentation, his title is listed as the Chief Technology Officer. This apparent conflict has no impact on the Court's analysis.

### f.    Conclusion

For the foregoing reasons, the Court finds that Plaintiffs have inadequately alleged that Defendants made statements that were false or materially misleading at the time they were made.[8] Accordingly, the Court **recommends** that the Motions [#99, #101] be **granted in part** and that the portion of Plaintiffs' Count V asserted pursuant to Rule 10b-5(b) be **dismissed without prejudice**.[9]

### 2.    Rules 10b-5(a) and 10b-5(c)

Plaintiffs argue that Defendants' operation was a scheme to defraud or a fraudulent course of business which violates Rules 10(b)-5(a) and 10b-5(c), i.e., rules which implement parts of § 10(b) of the 1934 Act. *Response* [#104] at 37-39. As is relevant here,

---

[8] Because the Court finds that Plaintiffs have not adequately alleged the existence of false or misleading statements, the Court does not address the parties' arguments regarding scienter, i.e., whether Defendants *knew* that the statements were false or misleading at the time they were made.

[9] Plaintiffs state in their Response: "[I]f the Court is inclined to grant Defendants' motions, Plaintiffs request that the Court provide them an opportunity to bring an appropriate motion to amend the Complaint to cure any identified deficiencies." *Response* [#104] at 60. The Tenth Circuit Court of Appeals has held this type of statement to be "inadequate to preserve a request for leave to amend the complaint." *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1230 (10th Cir. 2023) (observing in a securities litigation case: "But the plaintiffs didn't seek leave to amend the complaint. They instead opposed dismissal, adding a request to amend if the court were to regard the complaint as inadequate."); *see also Gold Res. Corp.* 776 F.3d at 1118-19 (stating in a securities litigation case: "The district court did not abuse its discretion in dismissing the complaint with prejudice where plaintiff's memorandum contained only one sentence at the very end of his brief alternatively requesting leave to amend in the event the district court should decide to dismiss his complaint."). However, "[l]eave to amend is to be granted with extreme liberality in securities fraud cases, because the heightened pleading requirements imposed by the PSLRA are so difficult to meet." *Heiner v. Watford*, No. 20-cv-02652-NYW-STV, 2022 WL 18777077, at *21 (D. Colo. Nov. 21, 2022) (quoting *Osher v. JNI Corp.*, 183 F. App'x 604, 605 (9th Cir. 2006)), *aff'd and adopted by* 2023 WL 2824288 (D. Colo. Mar. 27, 2023) (dismissing with prejudice only those claims which were time-barred). Thus, the Court recommends dismissal without prejudice as to this claim and the claims subsequently addressed in this Recommendation.

Rule 10b-5 makes it unlawful "(a) to employ any device, scheme, or artifice to defraud, . . . or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person, in connection with the purchase or sale of a security." 17 C.F.R. § 240.10b-5.

The Tenth Circuit Court of Appeals has rarely addressed Rules 10b-5(a) and 10b-5(c) for any purpose. *See, e.g.*, *Malouf v. S.E.C.*, 933 F.3d 1248, 1259-62 (10th Cir. 2019); *S.E.C. v. Scoville*, 913 F.3d 1204, 1212, 1223 n.8 (10th Cir. 2019); *O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 898 (10th Cir. 1992); *Zobrist v. Coal-X-Inc.*, 708 F.2d 1511, 1517 n.7 (10th Cir. 1983). In general, these claims are distinct from the claims under Rule 10b-5(b) discussed above "because they are based on deceptive conduct rather than deceptive statements." *Hogan v. Pilgrim's Pride Corp.*, No. 16-cv-02611-RBJ, 2021 WL 5565805, at *3 (D. Colo. Nov. 29, 2021) (citation omitted). Under Rule 10b-5(a), "[a] device is simply that which is devised, or formed by design; a scheme is a project, plan, or program of something to be done; and an artifice is an artful stratagem or trick." *Lorenzo v. S.E.C.*, 587 U.S. __, __, 139 S. Ct. 1094, 1101 (2019) (internal quotation marks and alterations omitted). Both rules require a finding of scienter, i.e., "a mental state embracing intent to deceive, manipulate, or defraud" which may also include conduct equivalent to "extreme recklessness," which occurs "when the petitioner knows or must have known that the conduct created a danger of misleading investors." *Malouf*, 933 F.3d 1248, 1261 (10th Cir. 2019).

Specifically, Plaintiffs argue that Defendants' "misstatements and omissions were part of an overarching scheme to profit from a business combination/public offering

regardless of whether that business combination was fair, or even fairly represented, to shareholders." *Response* [#104] at 37. They state that Defendants' deceptive acts "that are independent of their misstatements and omissions" include the following eight occurrences. *Id.*

First, Plaintiffs cite the formation of GigCapital3 by Defendants Katz, Dinu, Miotto, GigAcquisitions3, GigFounders LLC, and GigCapital "and their awards of insider shares at negligible or no cost to themselves and the rest of the GigCapital3 management team (ensuring huge profit as long as any deal closed)." *Id.* (citing *Consol. Compl.* [#52] ¶¶ 5, 27, 167). Second, they cite the Gig Defendants' marketing of the SPAC as a unique investment vehicle with experienced management who would remain involved in the company for three-to-five years, "giving investors in the SPAC false comfort that the SPAC was not just a 'get rich quick' scheme for the Gig Defendants." *Id.* (citing *Consol. Compl.* [#52] ¶¶ 4, 32-33). Third, they cite the negotiation of the "purportedly 'fair' deal" by Defendants Katz, Dinu, Fenwick-Smith, and Reeser, "which would lead to rich rewards for all four individuals." *Id.* (citing *Consol. Compl.* [#52] ¶¶ 67, 167). Fourth, they cite the creation of the alternative funding method in the form of debt securities that was used to complete the deal "even though there was a demonstrated lack of interest among dozens of sophisticated investors with access to inside information about Lightning Systems in a PIPE [Private Investment in Public Equity] investment, and only Lightning's existing investor was willing to provide additional investment funds to make up the purchase price." *Id.* at 37-38 (citing *Consol. Compl.* [#52] ¶¶ 176-78). Fifth, they cite the solicitation of investor proxies by the Gig Defendants "through the creation and/or dissemination of

materially misleading information" about the company in press releases, presentations, and the Proxy. *Id.* at 38 (citing *Consol. Compl.* [#52] ¶¶ 67, 138, 146). Sixth, they cite the reclassification of Defendants Katz's and Dinu's directorships "just days after the deal closed, materially changing the slate of directors that investors had elected in reliance on the Proxy." *Id.* (citing *Consol. Compl.* [#52] ¶¶ 10, 88, 133, 171). Seventh, they cite Defendant's Katz, Miotto, and Dinu's failure to stand for reelection following the reclassification, "such that the Gig management team would have no involvement in Lightning just months after the deal closed (a fact that the Lightning Defendants, Katz, Dinu and Miotto then concealed for the next several months)." *Id.* (citing *Consol. Compl.* [#52] ¶¶ 12, 103, 171). Finally, they cite the "continued concealment" by Defendants Katz, Miotto, and Dinu and the Lightning Defendants "as to the true state of Lightning's operations and ability to meet its stated 2021 projections, including at an analyst day held at Lightning headquarters and in a registration statement to sell insider shares." *Id.* (citing *Consol. Compl.* [#52] ¶¶ 14, 93, 170).

In short, Plaintiffs assert that Defendants' scheme allowed them to profit from the business combination even though it "was not nearly as promising as represented to investors," it circumvented the investors' right to elect a board for the company by restructuring the board "as soon as the deal was closed," and it allowed Defendants to award themselves "large increases in compensation, new stock grants, and bonuses for completing the unfair transaction." *Id.*

Both Rule 10b-5(a) and (c) claims require that "the violator (1) directly or indirectly employed a device, scheme, or artifice to defraud (2) with scienter (3) in the offer or sale

of a security (4) using interstate commerce or the mails." *S.E.C. v. Mahabub*, 343 F. Supp. 3d 1022, 1047 (D. Colo. 2018). Importantly, "a plaintiff may not cast claims of misrepresentations as claims under Rule 10b–5(a) and (c) and thus evade the pleading requirements imposed in misrepresentation cases." *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005). In addition, "a plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made." *Id.* Rather, liability may arise under the same set of facts under all three of Rule 10b-5's subsections only "where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b–5(b), as well as that the defendants undertook a deceptive scheme or course of conduct *that went beyond the misrepresentations*." *Id.* (emphasis added).

There are several deficiencies in Plaintiffs' Rule 10b-5(a) and (c) claims. First, it is unclear what fraudulent or deceitful *conduct* occurred. The Court has already addressed many of the allegations mentioned by Plaintiffs here which were also asserted to support their Rule 10b-5(b) claim, including statements made in press releases, presentations, and the Proxy; the reclassification of Defendants Katz's and Dinu's directorships; the failure of Defendants Katz, Dinu, and Miotto to stand for reelection; and the company's operations and ability to meet projections. The Court found that Plaintiffs did not adequately allege those items to be false or misleading at the time they were made. Regardless, Rule 10b-5(a) and (c) claims may not be entirely based on the same statements or omissions underlying a Rule 10b-5(b) claim. *See Mahabub*, 343 F. Supp.

3d at 1047 ("The prevailing view among the district courts of this circuit is that liability under the foregoing provisions—often called 'scheme liability'—may not be based simply on the same misstatements or material omissions that support a . . . Rule 10b-5(b) claim.").

Second, the remainder of the alleged conduct does not enable the Court to discern how the alleged conduct is part of a fraudulent or deceitful scheme when that conduct was *disclosed* to investors. For example, the March 26, 2021 Proxy discusses: the insider shares awarded to various Defendants, *see* [#100-1] at 15, 249, 316, 318; the use of the SPAC as the investment vehicle for the company, *see id.* at 239, 285; how the deal was negotiated, including how the underlying due diligence was conducted, *see id.* at 28, 54, 96, 114, 163-66, 171-74; and the use of debt securities, *see id.* at 71-72, 282. Plaintiffs have not adequately alleged that the business combination/public offering was not fair or that it was not fairly represented to shareholders. Particularly given these disclosures to investors, this type of conduct does not appear to rise to the level of a Rule 10b-5(a) or (c) violation. Additionally, these disclosures sets this case apart from *Malouf*, where the Tenth Circuit Court of Appeals found that improper conduct under these rules could be based on a situation where the company at issue knew that a conflict of interest existed in the form of an *undisclosed* financial arrangement with the defendant employee but told clients that no conflict existed, and where the defendant did not correct those statements or disclose his own conflict. 933 F.3d at 1261.

Accordingly, the Court **recommends** that the Motions [#99, #101] be **granted in part** and that the portion of Plaintiffs' Count V asserted pursuant to Rule 10b-5(a) and (c) be **dismissed without prejudice**.

## B.    Count III: Section 14(a) of the 1934 Act

Count III asserts violation of Section 14(a) of the 1934 Act by Lightning eMotors and the seven Gig Defendants (Katz, Dinu, Miotto, Weightman, Mikulsky, Betti-Berutto, and Wang). *Consol. Compl.* [#52] ¶¶ 219-31.

Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), titled "Solicitation of proxies in violation of rules and regulations," provides:

> (1) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.
>
> (2) The rules and regulations prescribed by the Commission under paragraph (1) may include--(A) a requirement that a solicitation of proxy, consent, or authorization by (or on behalf of) an issuer include a nominee submitted by a shareholder to serve on the board of directors of the issuer; and (B) a requirement that an issuer follow a certain procedure in relation to a solicitation described in subparagraph (A).

Plaintiffs' § 14(a) claim is limited to statements made in the March 2021 proxy statement for the business combination. *Consol. Compl.* [#52] ¶¶ 223-28; *see also Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 689 (D. Colo. 2007) (stating that, "to prevail under Section 14(a), a plaintiff must show, among other things, that a proxy statement contained a material misrepresentation or omission"). Defendants

assert that Plaintiffs fail to adequately plead two elements of this claim: "(1) that the proxy contained a material misrepresentation or omission; [and] (2) that the defendant was at least negligent[.]" *Motion* [#99] at 29-30 (quoting *Britton v. Parker*, Nos. 06-cv-01797-MSK-KLM, 06-cv-01922-MSK-KLM, 06-cv-02017-MSK-KLM, 2007 WL 2871003, at *8 (D. Colo. Sept. 26, 2007)).

Regarding the first element, Defendants assert that the statements Plaintiffs challenge in the proxy statement, *see Consol. Compl.* [#52] ¶¶ 146-51, fall within the same three categories as their § 10(b) claim. *Motion* [#99] at 30. This is true, and Plaintiffs address their § 10(b)-related statements simultaneously with their § 14(a)-related statements. *See Response* [#104] at 21-22 (discussing the elements of these two claims), 22-37 (discussing false and misleading statements for these two claims). "The PSLRA's pleading requirements as to misleading statements and omissions apply to Section 14(a) claims[.]" *Furlong Fund LLC v. VBI Vaccines, Inc.*, No. 14-Cv-9435 (SHS), 2016 WL 1181710, at *3 (S.D.N.Y. Mar. 25, 2016). Thus, for the reasons discussed previously, Plaintiffs have failed to adequately plead that any statements or omissions by Defendants were false or materially misleading at the time they were made. *See, e.g.*, *Britton*, 2007 WL 2871003, at *8 (D. Colo. Sept. 26, 2007) ("For the same reasons that the allegations in the Amended Complaint are too conclusory and inspecific to support [a § 10(b) claim], the allegations are too conclusory and inspecific to support" § 14(a) claim).

Accordingly, the Court **recommends** that the Motions [#99, #101] be **granted in part** and that Plaintiffs' Count III be **dismissed without prejudice**.

**D.    Counts IV and VI: Section 20(a) of the 1934 Act**

Both Count IV and Count VI assert violation of § 20(a) of the 1934 Act by the three Control Entity Defendants (GigCapital, GigFounders, and GigAcquisitions3), the seven Gig Defendants (Katz, Dinu, Miotto, Weightman, Mikulsky, Betti-Berutto, and Wang), and the Lightning Defendants (Reeser, Fenwick-Smith, and Covington). *Consol. Compl.* [#52] ¶¶ 232-38, 249-57. However, Count IV is asserted by "all Plaintiffs on behalf of themselves and all Class members who were eligible to vote on the Business Combination and held their shares through the closing of the Business Combination," *id.* ¶ 233, while Count VI is asserted by "Plaintiff Tye on behalf of himself and the Class," *id.* ¶ 250.

"[T]o state a claim under § 20(a) of the Securities Exchange Act, plaintiffs must allege (1) a primary violation of the securities laws; and (2) control over the primary violator by the alleged controlling person." *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, Nos. 20-cv-00054-SPF-JFJ, 20-cv-00077-SPS-JFJ, 20-cv-00117-SPF-JFJ, 2022 WL 377415, at *27 (N.D. Okla. Jan. 7, 2022) (citing *Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1270 (10th Cir. 2001)).

Here, the Lightning Defendants argue that Plaintiffs' § 20(a) claims should be dismissed because they are predicated on their §§ 10(b) and 14(a) claims, and if those claims fail, then so do the § 20(a) claims. *Motion* [#99] at 30 n.11 (citing *Hampton v. root9B Techs. Inc.*, 897 F.3d 1291, 1303 (10th Cir. 2018) (holding that "a § 20(a) claim must be premised on a primary violation of the securities laws but no such violation has been established here") (internal quotation marks and modification omitted)). Because

Plaintiffs have failed to adequately allege the first element of this claim, i.e., a primary violation of the 1934 securities law, the Court finds that this claim fails as well.

Accordingly, the Court **recommends** that the Motions [#99, #101] be **granted in part** and that Plaintiffs' Count IV and Count VI be **dismissed without prejudice**.

E.      **Count I: Section 11 of the 1933 Act**

Count I asserts violation of § 11 of the 1933 Act by Lightning eMotors and the Gig Defendants (Katz, Dinu, Miotto, Weightman, Mikulsky, Betti-Berutto, and Wang). *Consol. Compl.* [#52] ¶¶ 202-12. Plaintiffs contend that these Defendants made material misrepresentations regarding GigCapital3's business model in its May 12, 2020 Registration Statement for the IPO. *See Consol. Compl.* [#52] ¶¶ 206-10.

Section 11 of the 1933 Act, 15 U.S.C. § 77k, "imposes strict liability for material misstatements or omissions in a stock offering's registration statement or prospectus." *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013). To state a claim here, Plaintiffs must allege "(1) a misrepresentation or an omission, that is (2) material." *Id.* If they adequately do so, then liability attaches to "every person who signed the registration statement" and to "every underwriter." 15 U.S.C. § 77k(a)(1), (a)(5).

"Because Section 11 is a strict liability provision, a plaintiff's burden for a prima facie showing is low." *Correa v. Liberty Oilfield Servs., Inc.*, 548 F. Supp. 3d 1069, 1078 (D. Colo. 2021). "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). The

55

plaintiff "need not allege scienter, reliance, or loss causation." *United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1233 (10th Cir. 2014) (internal quotation marks and citation omitted).

"As the statute's text indicates, a party may be liable under Section 11 for both affirmative statements and omissions." *Correa*, 548 F. Supp. 3d at 1079. "Liability for violating § 11 of the Securities Act arises when a registration statement is shown either to have (1) contained an untrue statement of material fact, (2) omitted a material fact required to be disclosed, or (3) omitted a material fact necessary to make other statements not misleading." *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1156 (D. Colo. 2012). "An omission without a duty to disclose is not a basis for liability, however." *Correa*, 548 F. Supp. 3d at 1079 (citing *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1125 (10th Cir. 1997)). "[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (quotations and citation omitted).

"The meaning of materiality in a § 11 Securities Act claim is identical to that in a § 10-b Exchange Act claim for securities fraud." *Slater*, 719 F.3d at 1197. This means that a statement is only material if "a reasonable investor would consider it important in determining whether to buy or sell stock." *Grossman*, 120 F.3d at 1119. "Materiality also depends on the information that already exists in the market[.]" *Correa*, 548 F. Supp. 3d at 1079. "[U]nless the statement significantly altered the total mix of information available, it will not be considered material." *Grossman*, 120 F.3d at 1119 (citation and internal

quotation marks omitted). "Materiality is a mixed question of law and fact that is typically reserved for the trier of fact." *Correa*, 548 F. Supp. 3d at 1079. However, a court will "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial." *McDonald*, 287 F.3d at 997 (quoting *Grossman*, 120 F.3d at 1118).

Plaintiffs contend that these Defendants made material misrepresentations regarding GigCapital3's business model in its May 12, 2020 Registration Statement for the IPO. *See Consol. Compl.* [#52] ¶¶ 206-10. Plaintiffs assert that the misrepresentations include the statements that Defendants would apply a "unique Mentor-Investor philosophy," "help drive strategic dialogue," "seek Mentor-Investor candidates to partner with over a 3 to 5 year horizon," and "prioritize entities with well-established, proven and talented management . . . that are eager to succeed with support from an interactive and hands-on board of directors." *Response* [#104] at 57 (citing *Consol. Compl.* [#52] ¶¶ 202-12). However, as the Court has already previously discussed, Plaintiffs have not adequately alleged material misrepresentations in connection with the "mentor-investor" approached espoused by the company. Plaintiffs do not plausibly allege that Defendants Katz, Dinu, or Miotto did not intend to be "mentor-investors" or form a lasting partnership with Lightning at the time these statements were made, and thus Plaintiffs failed to meet their pleading burden to demonstrate that the May 12, 2020 Registration Statement contained materially false or misleading statements or omissions. In other words, Plaintiffs appear to be trying to allege "fraud by hindsight," an approach which has been

squarely rejected in the context of securities litigation. *See, e.g.*, *Grossman*, 120 F.3d at 1124.

Accordingly, the Court **recommends** that the Motions [#99, #101] be **granted in part** and that Plaintiffs' Count I be **dismissed without prejudice**.

## F.      Count II: Section 15 of the 1933 Act

Count II asserts violation of Section 15 of the 1933 Act by the seven Gig Defendants (Katz, Dinu, Miotto, Weightman, Mikulsky, Betti-Berutto, and Wang) and the Control Entity Defendants (GigCapital, GigFounders, and GigAcquisitions3). *Id.* ¶¶ 213-18.

Section 15(a) of the 1933 Act, 15 U.S.C.A. § 77o, titled "Liability of controlling persons," provides: "Every person who . . . controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." To state a claim here, a plaintiff must adequately allege "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). To adequately allege that a defendant is a control person, the plaintiff must provide allegations indicating that the defendant had "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether

through ownership of voting securities, by contract, or otherwise." *Id.* (quoting 17 C.F.R. § 230.405).

Because the Court found that Plaintiffs failed to adequately allege a primary violation of the 1933 Act, i.e., their Count I premised on violation of Section 11 of the 1933 Act, Plaintiffs have failed to adequately allege the first element of this claim, i.e., "a primary violation of the securities laws." Thus, the Court finds that Plaintiffs have failed to state a claim as to Section 15 of the 1933 Act. *See, e.g.*, *In re Molycorp, Inc. Sec. Litig.*, No. 12-CV-00292-RM-KMT, 2015 WL 1540523, at *36 (D. Colo. Mar. 31, 2015) ("Here, because Plaintiffs have failed to establish a primary violation of the 1933 Act, Plaintiffs do not plead sufficiently a Section 15 claim.") (internal citation omitted).

Accordingly, the Court **recommends** that the Motions [#99, #101] be **granted in part** and that Plaintiffs' Count II be **dismissed without prejudice**.

### IV. Conclusion

Based on the foregoing,

IT IS HEREBY **RECOMMENDED** that the Motions [#99, #101] be **GRANTED** and that Plaintiffs' claims be **DISMISSED without prejudice**.

IT IS FURTHER **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and

legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996). A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: February 20, 2024                    BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge