# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-02774-RMR-KLM (consolidated with 1:21-cv-3215-RMR-KAS)

JOHNNY R. SHAFER,
JUSTIN COHEN, Individually and On Behalf of All Others Similarly Situated,

      Plaintiff,

v.

LIGHTNING EMOTORS, INC.,
TIMOTHY R. REESER,
TERESA P. COVINGTON,
GIGACQUISITIONS3 LLC,
GIGCAPITAL GLOBAL,
AVI S. KATZ,
RALUCA DINU,
NEIL MIOTTO
GIGFOUNDERS LLC
BRAD WEIGHTMAN,
ANDREA BETTI-BERUTTO,
PETER WANG,
JOHN J. MIKULSKY, and
ROBERT FENWICK-SMITH,

      Defendants.

---

## PLAINTIFFS' OBJECTION TO THE RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

---

4869-7140-7530.v1

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .............................................................................................................1

II.    ARGUMENT....................................................................................................................2

    A.    Statements About Lightning's Resilient Supply Chain, Revenue Visibility, and Ability to Scale Were Materially False and Misleading When Made............................2

        1.    The R&R Incorrectly Analyzes Defendants' Alleged Misstatements Concerning Lightning's Supply Chain...............................................................4

        2.    The Complaint Adequately Pleads Actionable Misstatements Concerning Defendants' Revenue Visibility and Ability to Scale ...................8

        3.    The Court Wrongly Considered Materials Outside of the Complaint for the Truth of the Matters Asserted Therein.......................................................10

    B.    The Complaint Sufficiently Pleads that Defendants Falsely Represented that Amazon Was a "Key" Lightning Customer ...............................................................12

    C.    The Gig Defendants' Statements Concerning Their "Mentor-Investor™" Strategy Were Materially False and Misleading ........................................................14

    D.    Plaintiffs Sufficiently Plead Scheme Liability Claims.................................................16

III.    CONCLUSION..............................................................................................................17

4869-7140-7530.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Abady v. Lipocine Inc.*,
　2023 WL 2933080 (D. Utah Apr. 13, 2023) ................................................................11

*Correa v. Liberty Oilfield Servs., Inc.*,
　548 F. Supp. 3d 1069 (D. Colo. 2021) ....................................................................9, 16

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
　2022 WL 716653 (D. Utah Mar. 9, 2022) ................................................................4, 6

*Grossman v. Novell, Inc.*,
　120 F.3d 1112 (10th Cir. 1997) ................................................................................16

*Hogan v. Pilgrim's Pride Corp.*,
　2021 WL 5565805 (D. Colo. Nov. 29, 2021) ............................................................17

*In re Alstom SA*,
　406 F. Supp. 2d 433 (S.D.N.Y. 2005) ......................................................................17

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
　667 F.3d 1331 (10th Cir. 2012) ............................................................................1, 15

*In re Lululemon Sec. Litig.*,
　14 F. Supp. 3d 553 (S.D.N.Y. 2014) ........................................................................13

*In re Molycorp, Inc. Sec. Litig.*,
　157 F. Supp. 3d 987 (D. Colo. 2016) ..........................................................................6

*In re Qudian Inc. Sec. Litig.*,
　2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) ..........................................................16

*In re Williams Sec. Litig.*,
　339 F. Supp. 2d 1206 (N.D. Okla. 2003) ..................................................................10

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
　45 F.4th 1236 (10th Cir. 2022) ........................................................................1, 5, 14

*Khoja v. Orexigen Therapeutics, Inc.*,
　899 F.3d 988 (9th Cir. 2018) ....................................................................................11

*Lorenzo v. SEC*,
　587 U.S. __, 139 S. Ct. 1094 (2019) ....................................................................16, 17

4869-7140-7530.v1

**Page**

*Lydon v. Local 103, Int'l Bhd. of Elec. Workers*,
770 F.3d 48 (1st Cir. 2014)................................................................................................12

*Malouf v. SEC*,
933 F.3d 1248 (10th Cir. 2019) .......................................................................................17

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..............................................................................................................6

*Nakkhumpun v. Taylor*,
782 F.3d 1142 (10th Cir. 2015) .......................................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).............................................................................................................9

*Peace Officers' Ann. & Ben. Fund of Ga. v. DaVita Inc.*,
372 F. Supp. 3d 1139 (D. Colo. 2019).................................................................................1

*Ret. Sys. of R.I. v. Williams Cos., Inc.*,
889 F.3d 1153 (10th Cir. 2018) .......................................................................................11

*SEC v. GenAudio Inc.*,
32 F.4th 902 (10th Cir. 2022) .......................................................................................7, 9

*SEC v. Mahabub*,
343 F. Supp. 3d 1022 (D. Colo. 2018)..............................................................................17

*SEC v. Scoville*,
913 F.3d 1204 (10th Cir. 2019) .......................................................................................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd*,
551 U.S. 308 (2007)........................................................................................................1, 6

*Yannes v. SCWorx Corp.*,
2021 WL 2555437 (S.D.N.Y. June 21, 2021) ...................................................................8

**STATUTES, RULES, AND REGULATIONS**

Federal Rule of Civil Procedure
Rule 12(b)(6)...............................................................................................................11
Rule 72(b) .....................................................................................................................1

4869-7140-7530.v1

**Page**

17 C.F.R.
    §240.10b-5 ..................................................................................................................16
    §240.10b-5(a)..............................................................................................................16
    §240.10b-5(c)..............................................................................................................16

4869-7140-7530.v1

Pursuant to Federal Rule of Civil Procedure 72(b) and this Court's Civil Practice Standard 72.3, Plaintiffs object to the report and recommendation of Magistrate Judge Kathryn A. Starnella dated February 20, 2024 (ECF 111) (the "R&R") as follows.[1]

## I.    INTRODUCTION

It is axiomatic that, on a motion to dismiss, the Court must take Plaintiffs' allegations as true and give Plaintiffs the benefit of all reasonable inferences. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1339 (10th Cir. 2012). That principle is not altered where the allegations are subject to the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"). *Id.* Indeed, "'[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Peace Officers' Ann. & Ben. Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1149 (D. Colo. 2019). With respect to whether Plaintiffs have pleaded an actionable misstatement, the Court's job is to "determine whether the well-pleaded factual allegations, accepted as true and construed in favor of Plaintiffs, 'support a reasonable belief that the defendants['] statements identified by the plaintiff were false or misleading'" – it is not required to consider, and should not consider, Defendants' alternate hypotheticals or explanations. *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1250-51 (10th Cir. 2022); *see Tellabs, Inc. v. Makor Issues & Rts., Ltd*, 551 U.S. 308, 322-23 (2007).

In recommending that Plaintiffs' claims be dismissed on falsity grounds,[2] the Magistrate strayed

---

[1] All "¶ _" and "¶¶__" references are to Plaintiffs' Consolidated Complaint for Violation of the Federal Securities Laws (ECF 52) (the "Complaint"). Emphasis is added unless otherwise noted, and all internal citations omitted. Defined terms from the R&R are used herein.

[2] Specifically, the R&R recommends that Plaintiffs' 1934 Act §§10(b) and 14(a) claims and 1933 Act §11 claims be dismissed without prejudice for failure to plead falsity and/or deceitful conduct or a scheme. ECF 111 at 23, 26, 32, 34, 38, 46, 50-51, 53. The R&R also recommends that Plaintiffs' claims under

- 1 -

from these fundamental principles. In several instances, rather than draw reasonable inferences in Plaintiffs' favor and accepting well-pled allegations as true, inferences were drawn ***against*** Plaintiffs and key factual allegations were overlooked or improperly discounted. In others, extrinsic materials inappropriate for consideration on a motion to dismiss were relied upon for their truth and used to form counter-narratives favorable to Defendants with no basis in the Complaint's allegations. Accordingly, the Court should reject the R&R and, upon *de novo* review, deny Defendants' motions to dismiss.

## II.    ARGUMENT

### A.    Statements About Lightning's Resilient Supply Chain, Revenue Visibility, and Ability to Scale Were Materially False and Misleading When Made

The Complaint pleads that beginning on December 10, 2020, Defendants made a series of statements promoting a merger between GigCapital3 and Lightning Systems that highlighted Lightning's "strong" revenue "visibility," "relationships with suppliers" and asserting that it currently had "in place the pillars of success to drive solid financials" and would be able to "quickly scale revenues." ¶¶134-138. On January 4, 2021, for example, GigCapital3 filed a slide deck with the SEC containing information about Lightning representing that Lightning Systems' ability to work with multiple supply chain partners "has prevented major disruptions in production" despite the disruptions COVID-19 had inflicted on the global supply chain, and that Lightning Systems "has added and built additional redundancies into the supply chain . . . to mitigate supply-chain risk." ¶141. In the March 26, 2021 Proxy seeking shareholder approval for the merger, the Gig Defendants represented that Lightning had "built an extensive ecosystem of supply-chain partners," resulting in a supply chain "optimized for quality, reliability and cost" and that because Lightning had "relationships with multiple suppliers for each core component of our vehicles, we are able

---

§20(a) of the 1934 Act and §15 of the 1933 Act be dismissed for failure to plead primary violations of the securities laws. *Id.* at 54-55, 59.

- 2 -

to build and maintain a high degree of resilience in our supply chain." ¶72; *see also* ¶¶146, 148. After the merger closed, Lightning continued to tout its supply chain's strength. ¶¶156, 159, 161, 163-164. For example, in its July 8, 2021 prospectus, Lightning claimed one of its competitive advantages was its "[e]stablished strategic partnerships to optimize procurement and go-to-market strategy" and "extensive ecosystem of supply-chain partners" who were "instrumental to the performance and reliability of our vehicles and enable us to scale in a relatively asset light and cost-effective manner." ¶¶163-164.

These statements were materially false and misleading when made. In truth, Lightning did not have a robust supply network in place, and was instead experiencing worsening shortages of core components, primarily batteries. ¶¶79-82, 89, 108. Lightning's four battery suppliers, including, *e.g.*, eMatrix and Octillion, were each small companies that collectively could not supply Lightning with even enough working batteries to sustain the Company's current EV production (two to three completed EVs per week). ¶¶80, 110-111, 117. There was simply no way Lightning's small-scale battery suppliers could provide sufficient batteries for Lightning to complete 500 EVs in 2021 (an average of at least nine to ten EVs per week). ¶¶111, 124, 126, 131. And, since Lightning's supply chain was inadequate to allow it to scale to promised levels at the time it made such statements, Defendants did ***not*** actually have "strong visibility" into Lightning's 2021 and 2022 revenues, which could only be earned on vehicles that were completed and shipped. ¶¶79-82, 110-111, 117, 124-126, 131.

The R&R's findings that Plaintiffs failed to plead actionable misstatements or omissions with respect to Lightning's purportedly "resilient" supply chain, strong revenue visibility, and ability to scale EV production result from several errors. *See, e.g.*, R&R at 28, 35, 37-38, 46. If, instead, all well-pled allegations are accepted as true and reasonable inferences drawn in Plaintiffs' favor – as the Court must do in evaluating a motion to dismiss – the sufficiency of these allegations is evident.

- 3 -

4869-7140-7530.v1

### 1.    The R&R Incorrectly Analyzes Defendants' Alleged Misstatements Concerning Lightning's Supply Chain

The Magistrate's findings that Plaintiffs do not adequately allege that Lightning's battery supply chain issues rendered Defendants' statements about Lightning's supply chain materially false or misleading.  The Magistrate's contrary findings are incorrect for several reasons.  R&R at 30, 32, 43, 45.

***First***, the Magistrate erroneously limited her analysis of the alleged supply chain statements to just those statements made on May 17, 2021, and June 17, 2021, which explicitly reference either supply of batteries or chassis.  *See* R&R at 30-32.[3]  But, as detailed in the Complaint, numerous of Defendants' earlier material misstatements concerning Lightning's ability to scale, supply chain resilience generally, and revenue visibility were false and/or misleading because they ignored or misrepresented the critical shortages in battery supply and the inability of Lightning's four existing battery suppliers to provide sufficient batteries for Lightning to scale production as promised.  *See, e.g.*, ¶¶139(b)-(c), 143(b), 151(b)-(c).  To the extent the Magistrate discounted these misstatements because they did not expressly address batteries, and so were not ***literally*** false, such reasoning is contrary to law.  A statement is actionably false if a reasonable investor would find the statement, in context, misleading, regardless of its literal truth.  *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2022 WL 716653, at *5 (D. Utah Mar. 9, 2022) ("[s]tatements of literal truth 'can become, through their context and manner of presentation, devices which mislead investors'").  And in reasoning that *"even though Plaintiffs challenge statements that the company had 'built relationships with the suppliers,' Plaintiffs have not alleged facts that the company did not have*

---

[3] The Magistrate simply misconstrued Plaintiffs' allegations by evaluating whether a lack of chassis (or semiconductors therein) caused the failure to scale.  R&R at 28, 32-33.  As Defendants implicitly recognized by not briefing the issue, the Complaint does not include such allegations.  *See also, e.g.*, ¶162.  During the Class Period, battery supply, not chassis supply, was the limiting factor.  And, as discussed in §II.A.3, *infra*, the Magistrate's evaluation relied heavily upon extrinsic materials whose truth was inappropriately considered on a motion to dismiss.

- 4 -

relationships with suppliers," the Magistrate overlooked the actual reasons Plaintiffs allege that statement was misleading. *See* R&R at 27 (quoting ¶138). Plaintiffs allege that, in context, Lightning was asserting that it had a competitive advantage because it had already built the relationships with suppliers it needed to scale – which it had not done with respect to batteries. ¶¶138, 139(b).

*Second*, while multiple former Lightning employees confirm that the Company suffered from a crippling shortage of batteries throughout the entire Class Period, the Magistrate erred in discounting CW-4's highly relevant account on the ground that CW-4 left Lightning before Reeser's May and June 2021 statements expressly discussing battery supply. *Compare* R&R at 30, *with* ¶¶111-112, 117, 123-127, 156, 161; ECF 104 at 16-17. The Magistrate would not have reached such a conclusion had she also properly considered the alleged materially misleading statements about Lightning's resilient supply chain made from December 2020 through spring 2021 (*i.e.*, while CW-4 was employed at Lightning) as well. ¶123. Regardless, CW-4 reported that the battery-related production chokepoint existed in 2020 and that it continued into 2021. R&R at 30. CW-4, who was employed between spring 2020 and spring (*i.e.*, late Q1 or early Q2) 2021, recounted that the battery supply chain issues "had always been a problem" during CW-4's employment and "***got progressively worse***." ¶¶123-125. Moreover, CW4 confirmed that Lightning's battery suppliers were quite small producers, a fact corroborated by CW-2 and Reeser's own post-Class Period admission. ¶¶107, 117, 124.[4] Considered along with CW-1's and CW-2's allegations, Reeser's admission, and CW-4's observation that things got "progressively worse," these allegations demonstrate that battery shortages crippled Lightning through ***at least*** Q1 2021 (ending March 31, 2021), when CW-4 left. *See Pluralsight*, 45 F.4th at 1248 (in assessing falsity the court should consider, among other things,

---

[4] CW-2 said that Lightning was forced to work with small, "lower tier" battery suppliers because its orders were too small for large battery suppliers. ¶117. This adds to the overall coherence and plausibility of Plaintiffs' allegations, which must be "considered together." *Pluralsight*, 45 F.4th at 1248.

- 5 -

4869-7140-7530.v1

the number, detail, coherence, and plausibility of the facts "considered together").[5]

***Third***, though the Magistrate properly credited CW-1's account of Lightning's battery-related production bottleneck during Q1 and Q2 2021,[6] *see* R&R at 30 (finding "Plaintiffs' allegations demonstrate that battery supply issues arose . . . ."), she erred in reasoning that the alleged supply chain misstatements were not materially misleading because of purportedly exculpatory public disclosures. *Id.* at 31-32.

Reeser's statement that "[e]ven with our battery supply, we have multiple pack suppliers supporting multiple platforms and applications, providing a safety net against any single supplier constraint," was not made less misleading because Reeser also "warned" that "current supply chain disruptions will have significant consequences on short term margin[s] and operating profits." *Id.* at 31. Indeed, Reeser's "warning" of future decreases to profitability does not at all speak to the issue of battery supply-related production constraints, which is the subject of Plaintiffs' allegations. Whether Lightning's short-term

---

[5] While the Magistrate said she was not addressing scienter (R&R at 46 n.8), a footnote in the R&R suggests that Plaintiffs may not have pleaded Reeser's scienter because the CWs were lower-level employees. R&R at 30 n.5. But the Court is required to consider Plaintiffs' scienter allegations collectively. *Tellabs*, 551 U.S. at 322-23; ECF 104 at 29-42. Further, Lightning was a small company, essentially producing only one product at a rate of only two EVs per week, making it implausible that Reeser did not know the reasons for the Company's production shortfalls. *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1011 (D. Colo. 2016) (with respect to company's only business, "it would be absurd to suggest that [d]efendants . . . were without knowledge that Mountain Pass did not contain any HREEs"). In any event, having publicly addressed Lightning's production outlook and supply chain, Reeser had a duty to know the true facts. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 49, 49 n.15 (2011) (defendant's statement that drug did not cause specific medical condition, despite not knowing whether this was true, supported strong inference of scienter).

[6] CW-1 recounted that during the first half of 2021, there were up to 30 otherwise-complete EVs on the production floor awaiting batteries for weeks or even months. ¶¶82, 110-111 (CW-1 explaining "Lightning's battery suppliers could not keep up with demand"). CW-1 also witnessed "another shortage of eMatrix batteries" during the summer of 2021 that resulted in employees being instructed to take batteries from at least six completed vehicles and install them in EVs awaiting batteries so that Lightning could count the additional vehicles in end-of-quarter production totals. ¶112. The quarter ending in "summer 2021" was, and could only be, Q2 2021, which ended on June 30, 2021. This account alone supports the inference that Defendants' statements regarding supply chain, ability to scale production, and revenue visibility were false and misleading.

- 6 -

4869-7140-7530.v1

margin and profit might be impacted by supply disruptions (*i.e.*, because Lightning might need to pay higher prices for batteries to ensure supply in a tighter market) says ***nothing*** about whether Lightning could get sufficient batteries from its suppliers to meet production targets in the first place, and so does not immunize Reeser's prior statement. *See SEC v. GenAudio Inc.*, 32 F.4th 902, 929 (10th Cir. 2022) (to counter false statement, "'cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . the plaintiffs challenge'").

The Magistrate also erred in finding inactionable Reeser's June 17, 2021 statement that, "based on what we have on site today and what we have today, and what our suppliers have told us they will continue delivering, we do feel confident in [Lightning eMotors' projections]" because Plaintiffs had not adequately alleged that "on-site battery supplies and promised batteries from suppliers" were not adequate to meet those projections. R&R at 31. To the contrary – June 17, 2021 was only 13 days before the end of Q2 2021, and CW-1 describes Lightning's critical shortage of batteries at precisely that time. ¶¶111-112. CW-1 explained that because of the ongoing shortage, employees removed batteries from six completed vehicles and installed them in other EVs awaiting batteries so Lightning could count the unfinished vehicles in Q2 2021 end-of-quarter production totals. ¶112. Absent this deceitful double-counting, Lightning would have reported a ***decrease*** in EV production between Q1 and Q2 2021. ¶¶89, 101. And, with merely two weeks left in Q2 2021, Reeser knew when he made his statements that Q2 production was essentially the same as Q1 2021 production, remaining flat at two or three vehicles per week. ¶¶94-97, 101. That is, Lightning had produced at most 67 of its promised 500 vehicles during the first half of the year, requiring it to average ***17 EVs per week – every week*** – during the second half of the year to meet its projection, with the same battery suppliers. ¶¶89, 101. The Magistrate also found significant that investors were also warned battery supply constraints were impacting revenue timing during the June 17, 2021

- 7 -

Analyst Day (R&R at 31), but this overlooks that, at that same event, Lightning reaffirmed its annual financial guidance and, when specifically asked about those supply constraints, Reeser falsely reassured investors that Lightning had sufficient batteries. ¶¶159-161.

Similarly, Reeser's disclosure on August 16, 2021 that Lightning was in "'the final stages of negotiations'" with a large, worldwide battery supplier was not, and could not be, exculpatory. R&R at 32. This disclosure occurred *after* market-close on the last day of the Class Period; the admission is part of the alleged corrective disclosure that caused Lightning's stock to drop. ¶¶184-185. Prior to this time, Reeser repeatedly (falsely) assured investors that Lightning had adequate batteries for its production activities (*e.g.*, ¶161) and that its multiple, diversified battery suppliers sufficed to allow Lightning to avoid the supply constraints experienced by other manufacturers and produce 500 EVs in 2021. ¶¶72, 90, 141, 148, 156, 161, 163. It was in the very statement the Magistrate identified that Reeser *finally* acknowledged what had been true from the beginning: Lightning's supply chain was not uniquely "diverse[]" or "redundant," such that it provided "a safety net against any single supplier constraint." ¶¶12, 141, 156, 161. Lightning required a large new battery supplier to scale beyond three EVs per week.

Finally, to the extent any of the three disclosures the Magistrate found exculpatory could be considered relevant to the falsity of Defendants' Class Period misstatements (they are not), common sense dictates that none could immunize *prior* misstatements that investors had already reasonably relied upon.

### 2. The Complaint Adequately Pleads Actionable Misstatements Concerning Defendants' Revenue Visibility and Ability to Scale

As the R&R recognized, "statements may be actionable where a defendant recklessly disregards problems underlying the statement." R&R at 35 (citing *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *4, *7 (S.D.N.Y. June 21, 2021)). Because, as described above, Plaintiffs have adequately pleaded Lightning's severe battery supply constraints existed as of late 2020, they have also adequately pleaded that

- 8 -

4869-7140-7530.v1

statements regarding revenue visibility made at that time or later were misleading: Defendants had no reasonable basis to believe Lightning could convert its purported backlog of 1,500 orders into the 500 completed EVs needed to achieve that revenue in 2021. ¶¶63-64, 134 (December 10, 2021, touting "[h]igh revenue visibility"); ECF 104 at 6; ¶70 (March 26, 2021, projections "completely cover[ed]" and "backed by existing customer contracts"); *see also* R&R at 35 (overlooking March 26, 2021 allegations).

For this same reason, Defendants' projection that Lightning would be able to scale production and complete 500 vehicles in 2021, and earn the resulting revenue, first made on December 10, 2020 and repeated throughout the Class Period, is also actionable. R&R at 38-45. Each projection was misleading because, due to the ongoing battery supply constraints throughout 2020 and 2021 as described above, 500 completed vehicles in 2021 was an impossible target and one that did not "fairly align[] with the information in the [company's] possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).

To the extent the Magistrate found that Lightning's "risk warnings" insulated these statements from liability, this was error. R&R at 38. First, the purported warnings identified in the R&R are either boilerplate statements inherently applicable to virtually any estimate or were simultaneously contradicted by Defendants' own affirmative representations, rendering them meaningless. *Compare* R&R at 38, 40-44, *with* ¶156 (Lightning "well-positioned" to meet forecast despite "supply chain shortages"); ¶161 ("we have multiple partners," "we have inventory of batteries"). *See also GenAudio*, 32 F.4th at 929 (10th Cir. 2022) (cautionary language not substantive and tailored to particular future projections is inadequate); *Correa v. Liberty Oilfield Servs., Inc.*, 548 F. Supp. 3d 1069, 1083-84 (D. Colo. 2021) (warnings did not insulate otherwise actionable misleading statements because "[n]one of the statements in the risk section of the prospectus [came] close to explicitly stating what plaintiff alleges here" and were "vague and qualified").

- 9 -

More, the Complaint pleads Defendants were aware of the battery shortages preventing Lightning from producing more than two to three vehicles per week in the first half of 2021, rendering their warnings insufficient. *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1232 (N.D. Okla. 2003) (warnings "were simply not enough in light of what Defendants knew at the time they made their false statements").

Further, although the Magistrate correctly recognized that in a "'mixed present/future statement'" "'the part of the statement that refers to the present'" is not protected by the safe harbor, she failed to apply this standard. R&R at 37; *id.*, 38-45. The Complaint pleads numerous such statements. *See, e.g.*, ¶¶134, 136-138 (touting 2021 projected revenues of $63 million, based upon sales supported by fully "contracted orders . . . in place *today*" and an "annual production capacity of 1,000 vehicles *today*"); ¶152 ("Lightning eMotors has *maintained* remarkable momentum"); ¶156 (claiming Lightning *currently* was "*well-positioned* to achieve its 2021 forecast of over 500 purpose-built zero-emission commercial vehicles" and that "Q1 2021 *continued* the fast sales and delivery growth that started in 2020"); ¶¶159, 161 (projections reaffirmed based in part upon components "on site *today*").

### 3. The Court Wrongly Considered Materials Outside of the Complaint for the Truth of the Matters Asserted Therein

The Magistrate also erred in dismissing Plaintiffs' claims on the basis of Defendants' implausible counter-narrative, which ignored Plaintiffs' theory of the case and failed to accept Plaintiffs' well-pled allegations as true. R&R at 28. Defendants improperly attempted to rebut Plaintiffs' well-pled battery shortage allegations by suggesting that it was actually an unforeseeable scarcity of vehicle chassis, caused by unexpected shut down of production at GM and Ford in July 2021, that prevented Lightning from scaling production as promised. *See* ECF 99 at 1, 4-6, 11; ECF 107 at 1, 5, 13.

- 10 -

In addition to being impermissible at this stage of the case, and logically flawed in general,[7] Defendants' counter-narrative relied upon extensive material neither incorporated by reference to the Complaint or subject to judicial notice – something not allowed on a Rule 12(b)(6) motion to dismiss. *Id.* The Magistrate in turn relied on these outside sources in dismissing Plaintiffs' claims. *See, e.g.*, R&R at 28. But, on a motion to dismiss, even when documents outside the complaint are considered, they may be considered ***only*** for what they say (*e.g.*, to provide context to allegedly false statements), ***not*** for the truth of any disputed matters asserted therein. R&R at 15; *Emps.' Ret. Sys. of R.I. v. Williams Cos., Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018); *Abady v. Lipocine Inc.*, 2023 WL 2933080, at * 2 (D. Utah Apr. 13, 2023) (rejecting argument that outside materials may be used to rebut factual allegations). The Magistrate's (and Defendants') reliance on these materials for the truth of their content was improper. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (noting "a concerning pattern in securities cases like this one: exploiting [judicial notice and incorporation to] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage").

The Magistrate justified reliance on the materials by finding that Plaintiffs "essentially waived" any objection to consideration of documents outside the Complaint by failing to identify the specific grounds

---

[7] The July 2021 shutdowns (lasting only a few weeks) could not have affected Lightning's failure to scale during Q1 and Q2 2021 (ending June 30, 2021), which predated the shutdowns, nor did they impact the ongoing shortage of batteries during the Class Period that continually prevented completion of more than two to three EVs per week. The shutdowns also had no impact on the then-current state of Lightning's supply chain, its revenue visibility, or how well-positioned the Company was during the Class Period to produce 500 EVs, at the time the alleged misstatements were made. Still, a determination that the shutdowns had any effect on Lightning's ability to scale after Q2 2021 would require the Court to impermissibly decide disputed issues of fact, including that: (i) Ford and GM each closed plants making Lightning's chassis; (ii) Ford and GM collectively could not supply Lightning with more than two or three chassis per week; (iii) Lightning could not get chassis from its other suppliers, Isuzu and Hino (R&R at 32); and (iv) contrary to Plaintiffs' allegations, battery supply was not the limiting factor in Lightning's inability to scale.

- 11 -

for disregarding particular exhibits.  R&R at 14.  This was both factually and legally incorrect.  First, Plaintiffs did argue that the Court could not consider extrinsic materials purporting to suggest that Lightning could not get enough chassis since that is not "what Plaintiffs allege, and their well-pleaded allegations, which are supported by particularized witness accounts . . . must be taken as true on a motion to dismiss."  ECF 104 at 15-16.  Second, the Magistrate's holding on waiver is backwards.  Having sought to introduce extrinsic materials, it was ***Defendants***' burden to identify the particular documents/matters to be considered, the purpose for which they were being introduced, and the legal basis for the Court's ability to consider them (*i.e.*, their incorporation by reference in the Complaint or suitability for judicial notice).  *See Lydon v. Local 103, Int'l Bhd. of Elec. Workers*, 770 F.3d 48, 53 (1st Cir. 2014).  Yet, the entirety of Defendants' argument for consideration appeared in a footnote (ECF 99 at 2 n.1; ECF 101 at 3 n.1), and Defendants made ***no*** effort to justify consideration of various news-article hyperlinks referenced in their briefing.  *See* ECF 107 at 1.  Thus, if there was any waiver at all, it was by Defendants, not Plaintiffs.

**B.     The Complaint Sufficiently Pleads that Defendants Falsely Represented that Amazon Was a "Key" Lightning Customer**

On January 4, 2021, Lightning filed a slide-deck with the SEC touting Amazon as a "Key Customer[]."  ¶142; *see generally* ECFs 100-9 & 100-10 (promoting Amazon as a customer; peppering presentations with images of Amazon vans).  But at the time, Amazon was neither a "key customer" nor even a recurring customer, having suspended its 15-van "pilot program" or "proof of concept order" with Lightning in mid-2020 due to significant quality and performance issues.  ¶¶83, 119-122, 128, 143(c).  Amazon ultimately elected to purchase 100,000 vans from another manufacturer altogether. ¶83. Multiple CWs – including employees who worked directly on Lightning's Amazon pilot project – described the project's abject failure, the frustration of high-level Amazon personnel, and Amazon's decision not to order additional vans, which led to a round of Lightning layoffs in May 2020.  ¶¶119-122, 128, 168.  The CWs'

- 12 -

4869-7140-7530.v1

detailed first-hand accounts corroborating one another adequately support these allegations.

The Magistrate, however, refused to credit the relevant CW allegations because the three employees left Lightning in spring 2020 at the time the pilot project was suspended. R&R at 25-26; ¶¶114, 119-120, 128. This was error. Although the Magistrate said the allegations were unmoored in time, there is no question that the CWs worked on the pilot project, understood why Amazon was so dissatisfied with Lightning's EVs, and were employed at Lightning when Amazon finally shuttered the program. ¶¶119-122, 128.[8] What the Magistrate instead seems to suggest is that, by leaving when they did, the CWs could not know whether in the intervening seven months before the "key customer" statements were made Amazon changed its mind and reinstated the program – and that such information would be necessary for Plaintiffs' claims to be actionable. R&R at 25-26.

But such a determination improperly draws numerous (illogical) inferences *against* Plaintiffs, in violation of the applicable pleading standards. The Complaint pleads that the Amazon pilot program was a limited test, after which – *if successful* – Amazon *might* order up to 100 more vans. ¶83. Lightning categorically failed. ¶¶119-122, 128. There are no facts in the record suggesting that Amazon, after such a fiasco, (i) suspended the pilot program only to quickly reinstate it despite Lightning's continued struggle with serious reliability and safety issues (¶¶110, 116, 120, 130), and then (ii) after Lightning laid off its Amazon project employees (¶¶119, 168), placed a large quantity of vehicle orders sufficient to make it a "key customer". Indeed, such an explanation is not only pure speculation, it is exceedingly implausible.[9]

---

[8] Plaintiffs' allegations are unlike those in *Lululemon*, where the question was whether the quality issues and lack of testing described by CWs continued after they left. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579-80 (S.D.N.Y. 2014); R&R at 26. Here, the question is not whether Amazon *continued* as a customer. It had already pulled the plug before the CWs left.

[9] Not surprisingly and consistent with Plaintiffs' allegations, when Lightning reported its Q1 2021 results on May 17, 2021, supposed "key" customer Amazon was notably absent from its list of customers to

- 13 -

4869-7140-7530.v1

As the Tenth Circuit recognized in *Pluralsight*, on a motion to dismiss the Court "need not evaluate [such] hypotheticals." *Pluralsight*, 45 F.4th at 1250. Instead, Plaintiffs' allegations are "accepted as true ***and construed in favor of Plaintiffs***" to support a reasonable inference that Defendants' statements were misleading. *Id.* at 1250-51. Plaintiffs are not required to counter the Magistrate's speculation.

In any event, notwithstanding the failed pilot program, that Amazon had ordered just 15 vans, and only on a "Proof-of-Concept" basis (which was not disclosed to investors), hardly qualifies it as a "key" customer. *See* ¶¶120, 128; *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1148 (10th Cir. 2015) (falsity alleged where a reasonable person would understand statement to be "'inconsistent with the facts on the ground'").

C.    **The Gig Defendants' Statements Concerning Their "Mentor-Investor™" Strategy Were Materially False and Misleading**

In GigCapital3's March 26, 2021 Proxy, its board of directors unanimously recommended that shareholders vote "for" the Lightning combination, which would allow the directors to reap a significant financial windfall. ¶¶146, 166-167. In support of this recommendation, the Gig3 Defendants touted their unique "Mentor-Investor" relationship with Lightning, promising investors they would assist the first-time public company and its executives (who had little to no public-company experience) for three to five years after the merger. ¶¶150-152; *see also* ¶154 (March 31, 2021 statement reiterating commitment to the Mentor-Investor philosophy). On April 21, 2021, shareholders voted to approve the deal, which closed on May 6, 2021. ¶85. Then, just ***three business days later*** on May 11, 2021, the new Lightning Board (including GigCapital3 directors Katz, Dinu, and Miotto) held its first meeting and, without explanation, reclassified Katz's and Dinu's respective three- and two-year Board terms such that they would face reelection with Miotto only months later, in October 2021. ¶88. Four months later, on August 16, 2021,

---

whom Lightning shipped EVs in Q1 2021. *See* ECF 100-4 at 24 of 29.

4869-7140-7530.v1

Lightning announced Katz, Dinu, and Miotto would not seek reelection at all. ¶103.

The Magistrate recommended dismissal of these claims largely because of a mistaken belief that Plaintiffs had pled only that "none of Gig3's representatives on Lightning's Board . . . remained directors beyond October 2021." R&R at 21. But that was only half the story. Certainly, the unexpected August 16, 2021 announcement that all three Gig3 directors would leave the Board within a few months despite the Gig Defendants' promised *years* of involvement, is an enormous red flag. But the critical fact supporting an inference that the decision was made much earlier is that it was only *three business days* after the deal closed that the Board reclassified Katz and Dinu such that all three Gig3 directors would come up for election in a matter of months. ¶¶88, 171-172. This was no coincidence.[10]

Given the Board's actions on May 11, 2021 and August 16, 2021, which are unquestionably connected, it is reasonable to infer that Katz, Dinu and Miotto decided to leave the Board prior to issuance of the March 26, 2021 Proxy.[11] *See Level 3*, 667 F.3d at 1342 (falsity shown where a reasonable person would believe a statement was misleading). Even if the decision was made between when the Proxy was issued and the April 21, 2021 shareholder vote, Defendants would still have had a duty to update so as not

---

[10] It is implausible that Katz, Dinu, and Miotto were not involved in the decision to reclassify their directorship terms or the decision not to renominate, but that, instead, the other Board members conspired to vote them off, as the Magistrate erroneously concluded. R&R at 23. This is particularly true since Defendants claim that the Lightning and GigCapital3 boards negotiated the business combination together, including the specific slate of directors to be proposed in the Proxy and the length of term each director would serve. *See* ECF 101-1 at 224 of 327. If anything, it is more plausible that in negotiations, (i) Lightning was willing to do a deal but didn't want outside interference in management, (ii) the Gig Defendants were more than willing to jettison the SPAC's promised Mentor-Investor business model during negotiations in order to push the deal forward, since they would get their money either way and it had never been an actual priority for them, ¶¶166-168, but (iii) they all deceptively concealed their intentions from GigCapital3 investors until after the deal closed so as not to endanger shareholder approval of the combination.

[11] This is akin to a salesperson taking the unusual step of downloading a customer sales list to a personal thumb drive. If that salesperson left to work for a competitor six weeks later, a reasonable person would infer that the salesperson had been planning to leave prior to the file transfer.

- 15 -

to mislead shareholders with respect to their earlier representations. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1125 (10th Cir. 1997). Thus, Plaintiffs are entitled to the reasonable inference that, based upon Defendant's *immediate* May 11, 2021 reclassification step, the decision for Katz, Dinu and Miotto to leave the Lightning Board as soon as possible had been made well before the March 26, 2021 Proxy, and certainly twenty days earlier, prior to the April 21, 2021 vote. *But see* R&R at 22 (assessing four-month gap ended August 16, 2021). The Gig3 directors' reclassification is sufficiently proximate in time to support a reasonable belief that Defendants' statements were misleading when made. *See In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *3, *9 n.6 (S.D.N.Y. Sept. 27, 2019) (allowing inference that business change beginning one month after IPO and announced two months after that, had been planned pre-IPO).

Finally, the Magistrate's finding that the Mentor-Investors™ strategy statements were inadequate to support Plaintiffs' Section 11 claims for the reasons "discussed above" in the Court's discussion of the 1934 Act claims, applied an incorrect legal standard. Unlike claims under Section 10(b), which are subject to heightened pleading standards, claims under §11 are governed by Rule 8's notice pleading standard, which only requires that a complaint plead "'enough facts to state a claim to relief that is plausible on its face.'" *See Correa*, 548 F. Supp. 3d at 1077 (citing *Iqbal* and *Twombly* standards). Plaintiffs' allegations met this standard, and by applying the 1934 Act standards to the §11 claims, the Magistrate erred in holding Plaintiffs to a higher pleading threshold.

### D. Plaintiffs Sufficiently Plead Scheme Liability Claims

The Magistrate also erred in dismissing Plaintiffs' scheme liability claims. R&R at 46-52. The Supreme Court has rejected the argument that Rules 10b-5(a) and (c) are "violated only when conduct other than misstatements [are] involved." *Lorenzo v. SEC*, 587 U.S. __, 139 S. Ct. 1094, 1101-02 (2019). Rather, there is "considerable overlap" between subsections of Rule 10b-5, and scheme liability under (a)

- 16 -

4869-7140-7530.v1

and (c) can be based on a scheme to take advantage of misleading statements – even when subsection (b) speaks to the actual *making* of such statements. *Id.* at 1102. Accordingly, scheme liability may rest upon Defendants' failure to disclose or correct the misrepresentations of others. *Malouf v. SEC*, 933 F.3d 1248, 1259 (10th Cir. 2019); ECF 104 at 27.[12] Plaintiffs' claims may also be based upon acts of a defendant which, though known at the time, were not yet known to be part of a deceptive scheme. R&R at 50-51; ECF 104 at 27-28; *see SEC v. Scoville*, 913 F.3d 1204, 1224 (10th Cir. 2019) (while purchasers knew the terms of their internet advertising investment, they were deceived as to the source of profits). Through Defendants' various deceptive acts alleged, including the Gig Defendants' issuance of misleading Proxy materials and projections provided by the Lightning Defendants designed to induce shareholder approval of the deal, Defendants concealed the extent to which Lightning was suffering from crippling supply chain constraints and falsely claimed Katz and Dinu's continued participation on Lightning's Board. This was all part of the Gig Defendants' scheme to complete a business transaction regardless of its unfairness to shareholders, take their money and run. Plaintiffs have therefore adequately alleged scheme liability not just for Defendants' acts in furtherance of their deceptive scheme, but for their misstatements, omissions, and failures to correct the misrepresentations of others.

## III.    CONCLUSION

For these reasons, the Court should reject the R&R and deny Defendants' Motions to Dismiss.

---

[12] *In re Alstom SA*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) and *SEC v. Mahabub*, 343 F. Supp. 3d 1022, 1047 (D. Colo. 2018) are pre-*Lorenzo* and pre-*Malouf*. R&R at 50-51. *Hogan v. Pilgrim's Pride Corp.*, 2021 WL 5565805 (D. Colo. Nov. 29, 2021) involved *dicta* concerning a motion to reconsider a dismissal where the parties had not previously briefed whether scheme liability was adequately pleaded. R&R at 47.

- 17 -

DATED:  March 5, 2024                          Respectfully submitted,

                                               **JOHNSON FISTEL, LLP**

                                               */s/ Jeffrey A. Berens*
                                               Jeffrey A. Berens
                                               2373 Central Park Boulevard, Suite 100
                                               Denver, CO  80238
                                               Telephone:  303/861-1764
                                               303/861-1764 (fax)
                                               jeffb@johnsonfistel.com

                                               **JOHNSON FISTEL, LLP**
                                               Michael I. Fistel, Jr.
                                               Mary Ellen Conner
                                               40 Powder Springs Street
                                               Marietta, GA 30064
                                               Telephone:  470/632-6000
                                               770/200-3101 (fax)
                                               michaelf@johnsonfistel.com
                                               maryellenc@johnsofistel.com

                                               **ROBBINS GELLER RUDMAN
                                               & DOWD LLP**
                                               Daniel S. Drosman
                                               Hillary B. Stakem
                                               Heather G. Geiger
                                               655 West Broadway, Suite 1900
                                               San Diego, CA  92101
                                               Telephone: 619/231-1058
                                               619/231-7423 (fax)
                                               dand@rgrdlaw.com
                                               hstakem@rgrdlaw.com
                                               hgeiger@rgrdlaw.com

                                               ***Lead Counsel for Plaintiffs***

- 18 -

4869-7140-7530.v1